No. _____

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

A.A.R.P. and W.M.M., on their own behalf and on behalf of all others similarly situated,

*Petitioners–Appellants*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, PAMELA BONDI, Attorney General of the United States, in her official capacity; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of the Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCO RUBIO, Secretary of State, in his official capacity; U.S. STATE DEPARTMENT; JOSH JOHNSON, in his official capacity as acting Dallas Field Office Director for U.S. Immigration and Customs Enforcement; MARCELLO VILLEGAS, in his official capacity as the Facility Administrator of the Bluebonnet Detention Center; PHILLIP VALDEZ, in his official capacity as Facility Administrator of the Eden Detention Center; JIMMY JOHNSON, in his/her official capacity as Facility Administrator of the Prairieland Detention Center; and JUDITH BENNETT, in her official capacity as Warden of the Rolling Plains Detention Center;

*Defendants–Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Texas
(Case No. 1:25-cv-59-H)

---

## PETITIONERS' OPPOSED EMERGENCY MOTION FOR A TEMPORARY ADMINISTRATIVE INJUNCTION AND AN INJUNCTION PENDING APPEAL OR A WRIT OF MANDAMUS

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies pursuant to Fifth Circuit Rule 27.4 and Rule 28.2.1 that the following listed persons and private entities have an interest in the outcome of this case, including all private practice lawyers and private law firms currently engaged in this litigation. Pursuant to the fourth sentence of Rule 28.2.1, government officials and entities are not included in this certificate. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Petitioners–Appellants (movants in the present motion):** A.A.R.P. and W.M.M., represented by American Civil Liberties Union Foundation attorneys Lee Gelernt, Daniel Galindo, Ashley Gorski, Patrick Toomey, Omar Jadwat, Hina Shamsi, Sidra Mahfooz, Oscar Sarabia Roman, My Khanh Ngo, Noelle Smith, and Cody Wofsy; and American Civil Liberties Union Foundation of Texas attorneys Brian Klosterboer, Thomas Buser-Clancy, Savannah Kumar, Charelle Lett, Ashley Harris, and Adriana Piñon.

**Defendants–Appellees** are government officials and entities.

## NATURE OF EMERGENCY AND RELIEF SOUGHT

Petitioners-Plaintiffs ("Petitioners") and the proposed class seek emergency relief in light of developing and alarming circumstances in the Northern District of Texas. **Starting yesterday evening, proposed class members have been given notices designating them as alien enemies under the Alien Enemies Act ("AEA"), and they are being told that they will be imminently removed under the AEA, as soon as this afternoon. DHS has now publicly announced that AEA removals are imminent**.[1] The notices are in English only and do not inform proposed class members of their right to contest the designation in a federal court. The government has refused to give any information to undersigned counsel for the proposed class, and as far as Plaintiffs know, the government is not giving notice to proposed class members' immigration attorneys.

Removal without sufficient notice and time to seek habeas relief is in clear violation of the Supreme Court's decision on the Alien Enemies Act from April 7, 2025 in *J.G.G. v. Trump*. The district court has not acted on Petitioners' emergency request for a TRO in light of yesterday evening's events. **Plaintiffs therefore respectfully request an immediate order from this Court barring any removals of proposed class members. Without this Court's intervention, dozens or**

---

[1] https://abcnews.go.com/US/attorneys-venezuelans-warn-clients-imminent-risk-deportation-aea/story?id=120950962.

4

**hundreds of proposed class members may be removed to a possible life sentence in El Salvador with no real opportunity to contest their designation or removal.**

Another district court in the Fifth Circuit has issued a district-wide TRO for the Southern District of Texas. In that case, Judge Rodriguez issued the TRO because there was a risk that individuals might not get sufficient notice given the government's refusal to provide specificity or rule out that it may give as little as 24 hours' notice, even though notices had not yet been issued. *J.A.V. v. Trump*, No. 25-cv-72 (S.D. Tex 2025).

This case stems from a Proclamation signed on March 14, 2025, in which the President invoked a war power, the Alien Enemies Act of 1798 ("AEA"), to summarily remove noncitizens from the U.S. and bypass the immigration laws Congress has enacted. *See* Invocation of the Alien Enemies Act (Mar. 15, 2025) ("Proclamation").[2] The AEA permits the President to invoke the AEA only where the United States is in a "declared war" with a "foreign government or nation" or a "foreign government or nation" is threatening to, or has engaged in, an "invasion or predatory incursion" against the "territory of the United States." The Proclamation targets Venezuelan noncitizens accused of being part of Tren de Aragua ("TdA"), a criminal gang, and claims that the gang is engaged in an "invasion and predatory incursion" within the meaning of the AEA.

---

[2] https://perma.cc/ZS8M-ZQHJ.

On the evening of March 15, a D.C. District Court issued an order temporarily pausing removals pursuant to the Proclamation for a provisionally certified nationwide class. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *2 (D.C. Cir. Mar. 26, 2025). The D.C. Circuit denied the government's motion to vacate that TRO.

On April 7, in a 5-4 decision, the Supreme Court granted the government's application to vacate the TRO order on the basis that Plaintiffs had to proceed through habeas, without reaching the merits of whether the Proclamation exceeds the President's power under the AEA. In doing so, however, the Court emphasized that individuals who are designated under the AEA Proclamation are "entitle[d] to due process" and notice "within a reasonable time and in such manner as will allow them to actually seek habeas relief" before removal. *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *3 (U.S. Apr. 7, 2025).

In accordance with the Supreme Court's ruling, Petitioners filed this habeas action in the Northern District of Texas on behalf of themselves and a proposed class on April 16. *A.A.R.P. v. Trump*, No. 1:25-cv-59-H, ECF No. 1. Petitioners simultaneously moved for a temporary restraining order and to certify a district-wide class. *Id.* at ECF Nos. 2, 3. Petitioners sought class-wide relief enjoining their imminent removal without adequate notice because the government had begun moving Venezuelan noncitizens around the country to Bluebonnet Detention Facility

in Anson, Texas, without meaningful explanation, and had not indicated the type of notice it intended to provide those designated under the AEA nor how much time it would give individuals before seeking to remove them to El Salvador or another country under the AEA. Moreover, in a hearing in the Southern District of Texas on Friday, April 11, the government said it had not ruled out the possibility that individuals would receive as little as 24 hours' notice before removal—which would deprive them of the "reasonable time" and "due process" required by the Supreme Court's order. *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *3 (U.S. Apr. 7, 2025).

On April 17, the district court in this case issued an order denying Petitioners' TRO. The court found no risk of summary removal because "the government does not presently expect to remove [the named Petitioners] pending resolution of their habeas petition." ECF No. 27 at 1. But the government provided no assurances with respect to other putative class members. The district court nonetheless stated: "the Supreme Court's opinion in *J.G.G.,* along with the government's general representations about the procedures necessary in these cases, strongly suggest that the putative class is also not facing such an imminent threat …." Order at 9 (ECF No. 27). Since the district court denied the TRO, Petitioners have learned that officers at Bluebonnet have distributed notices under the Alien Enemies Act, in English only, that designate Venezuelan men for removal under the AEA, and have

told the men that the *removals are imminent and will happen today*. *See* ECF No. 30-1 (Brown Decl.). These removals could therefore occur <u>at any moment</u>.[3]

Petitioners submitted a copy of the notice to the district court, ECF Nos. 34-1. 34-2, and attach it as a copy here. It states that the noncitizen has been designated an alien enemy under the AEA. It gives no timeframe for the removal. It does not inform the noncitizen how long they have to contest their designation or even how to do so. Nor does it provide notice of the opportunity for judicial review or permit the designee to indicate that they intend to contest their designation. It says only that "[i]f you desire to make a phone call, you will be permitted to do so." The notice is in English despite the fact that the overwhelming number of people designated under the AEA speak only Spanish.

---

[3] Counsel for Petitioners contacted counsel for the government by email at 4:49pm CT on April 17, 2025, even before hearing about the distribution of notices at Bluebonnet, to ask if the government would make the same representations as to the putative class members as it did for the two named Petitioners. Counsel for the government did not respond to that correspondence. After then hearing that notices were being distributed at the Bluebonnet facility, we again contacted the government, at 6:23 pm CT, to ask whether it was accurate that the government had begun distributing AEA notices to Venezuelan men at the facility. At 6:36pm CT, counsel for the government said they would inquire and circle back. At 8:11pm CT, the government responded that the two named Petitioners had not been given notices. We immediately responded that we were inquiring about putative class members. At 8:41pm CT, the government wrote: "We are not in a position at this time to share information about unknown detainees who are not currently parties to the pending litigation." The government has continued to decline to provide any information beyond the two named Petitioners and opposed even an emergency status hearing before the district court today.

Attorneys whose clients are detained at Bluebonnet have reported that their clients are receiving these notices and being told deportation is imminent. As detailed in the Brown Declaration, in the hours after the district court's order on the TRO, Attorney Brown's client, F.G.M., was approached by ICE officers, accused of being a member of Tren de Aragua, and told to sign papers in English. ECF No. 30-1 (Brown Decl.) ¶ 3. F.G.M. understands only Spanish, and he refused to sign. ICE told him the papers "were coming from the President, and that he will be deported even if he did not sign it." *Id.* Another Venezuelan man who is detained at Bluebonnet and speaks English then read the notice to Attorney Brown, and the notice tracks the language of the Alien Enemies Act: "In the notice, it classified F.G.M. as a TdA gang member" who "must be removed" from the United States. *Id.* F.G.M., like other men against whom the Alien Enemies Act has already been used, does not have a final order of removal and is therefore not removable under the immigration laws. *See id.* The notice was not provided to counsel by the government, not did the government inform Attorney Brown that her client was being designated under the AEA.

In addition to Brown's client, immigration lawyers and family members have reported that dozens if not hundreds of Venezuelan men were moved to the Bluebonnet facility. They are reporting that the forms are being passed out widely to the dozens of Venezuelan men who have been brought there over the past few days.

ECF No. 30-2 (Brane Declaration); *see also* ECF No. 30-3 (Collins Decl.); *see also* ECF No. 34-4 (Petty Decl.); ECF No. 34-3 (YSGC Decl.). Lawyers have not been provided with the form or told that their clients were being designated under the AEA.[4]

These circumstances appear strikingly similar to the government's initial efforts to avoid judicial review of its summary removals. There, the government issued the Proclamation publicly just hours before it "rushed to load people onto planes and get them airborne" in "an attempt to evade an injunction and deny those aboard the planes the change to avail themselves of judicial review." *J.G.G. v. Trump*, 1:25-cv-766 (D.D.C. Apr. 16, 2025), ECF No. 81 at 42; *see also id.* at 41 ("From the opening hours of Saturday, the Government's conduct betrayed a desire to outrun the equitable reach of the Judiciary."). Although the government has since acknowledged that notice is required, it has suggested that as little as 24 hours notice is sufficient to satisfy due process, *see J.A.V. v. Trump*, No. 1:25-cv-72, Apr. 11 Oral Arg 7:2-3, and is now preparing to remove individuals imminently, as soon as today, perhaps with less than 24 hours and with no meaningful notice to individuals how to

---

[4] On March 15, at least 137 Venezuelans were removed under the AEA to the CECOT prison in El Salvador. Those individuals were overwhelmingly, if not exclusively, detained at facilities in the S.D. Texas. On April 11, after a hearing, Judge Rodriguez entered a class wide TRO to preserve the status quo and prevent additional individuals from being removed under the AEA. He then ordered expedited preliminary injunction briefing and set a hearing on the P.I. for April 23, 2025. *J.A.V. v. Trump*, No. 25-cv-72 (S.D. Tex 2025).

contest their designation, much notice sufficient to actually contest their designation, as the Supreme Court held was necessary in *J.G.G.*

Given that individuals are now in imminent danger of removal, Petitioners respectfully request that the Court issue a temporary administrative injunction and injunction pending appeal prohibiting removal of any putative class members from the United States pursuant to the AEA Proclamation. The district court declined to act on Petitioners' renewed emergency application for a class-wide TRO, including their request that it provisionally certify a class to preserve the status quo and the ability of class members to seek habeas review consistent with the Supreme Court's ruling. *See In re Fort Worth Chamber of Commerce*, 100 F.4th 528, 535 (5th Cir. 2024) (where context and circumstances required urgent injunctive relief, district court "effectively denied" motion by not promptly ruling on it). If the individuals are removed before the district court can act and the putative class members are removed from the country, the district court would be permanently divested of jurisdiction under the government's position that it need not return individuals, even those mistakenly erroneously removed.[5] *See* All Writs Act, 28 U.S.C. 1651 (court

---

[5] *See, e.g.*, *Abrego Garcia v. Noem*, No. 251345, 2025 WL 1021113, at *4 (4th Cir. Apr. 7, 2025) (Thacker, J., concurring); *see also Abrego-Garcia v. Noem*, No. 8:25-cv-951-Px (D. Md. Apr. 15, 2025), ECF No. 77 ¶ 7 ("DHS does not have authority to forcibly extract an alien from the domestic custody of a foreign sovereign nation."); *id.* at ECF No. 77-1 ("That's up to El Salvador if they want to return him, that's not up to us." (quoting AG Bondi)).

can issue writs necessary to preserve its jurisdiction). And given the brutal nature of the Salvadoran prison where other Venezuelan men were sent under the AEA last month, the irreparable harm to them is manifest.

Accordingly, Petitioners respectfully request a class-wide injunction pending appeal and a class-wide temporary administrative injunction. Significantly, the injunction sought here does *not* seek to prohibit the government from prosecuting any individual who has committed a crime. Nor does it seek release from immigration detention or prohibit the government from removing any individual who may lawfully be removed under the immigration laws.

## LEGAL AND FACTUAL BACKGROUND

### I.     The Alien Enemies Act

The AEA is a wartime authority that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens. Passed in 1798, the AEA, as codified today at 50 U.S.C. § 21, provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

This Act has been used only three times in the country's history and each time in a period of war—the War of 1812, World War I, and World War II.

The Act also provides that individuals designated as enemy aliens will generally have time to "settle affairs" before removal and the option to voluntarily "depart."[6] *See, e.g.*, *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the [AG] can lawfully remove him against his will.").

## II.     The AEA Proclamation and the Unlawful Removals

On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Proclamation. Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15. As set forth more fully in Judge Boasberg's opinion, even prior to the Proclamation's publication the government sought to remove individuals. *J.G.G. v. Trump*, No. 1:25-cv-766-JEB

---

[6] 50 U.S.C. § 21 (providing for removal of only those "alien enemies" who "refuse or neglect to depart" from the U.S.); *id*. § 22 (granting time for departure in accordance with treaty stipulation or "where no such treaty exists, or is in force," a "reasonable time as may be consistent with the public safety, and according to the dictates of humanity and national hospitality").

(D.D.C. Mar. 18, 2025), ECF No. 28-1 (Cerna Decl.) ¶ 5; *J.G.G.*, 2025 WL 890401, at *3 (D.D.C. Mar. 24, 2025) (noting that prior to publication of Proclamation, and after a lawsuit was filed against the summary removals, it appeared that "the Government . . . was nonetheless moving forward with its summary-deportation plans.")

In addition to claiming that a *criminal gang* during *peacetime* satisfies the AEA's statutory predicates, the Proclamation does not provide any process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. The Proclamation also supplants the removal process under the congressionally enacted immigration laws, which, among other things, provide a right to seek protection from persecution and torture. *See, e.g.*, 8 U.S.C. §§ 1158, 1231(b)(3), 1231 note.

To date, at least 137 Venezuelan men have been removed under the Proclamation and are now in El Salvador in one of the most notorious prisons in the world, possibly for the rest of their lives. Whether most (or perhaps all) of the class lacks ties to TdA remains to be seen, because Respondents secretly rushed the men out of the country and have provided no information about them. But evidence since these individuals were sent to El Salvador flights on March 15 increasingly shows that many were not "members" of TdA. *See J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exhs. 4-20) (media reports

regarding evidence contradicting gang allegations). Such false accusations are particularly devastating given Petitioner's strong claims for relief under our immigration laws. Exh. A (Gian-Grosso Decl.) ¶ 6.

The government's errors are unsurprising, given the methods it is employing to identify members of TdA. The "Alien Enemy Validation Guide" that the government has used to ascertain alien enemy status, requires ICE officers to tally points for different categories of alleged TdA membership characteristics. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exh. 1). The guide relies on a number of dubious criteria, including physical attributes like "tattoos denoting membership/loyalty to TDA" and hand gestures, symbols, logos, graffiti, or manner of dress. But experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying gang members. *Id.* at 67-3 (Hanson Decl.) ¶¶ 22-24, 27; *id.* at 67-4 (Antillano Decl.) ¶ 14; *id.* at 67-12 (Dudley Decl.) ¶ 25.

Experts on El Salvador have also explained how those removed there face grave harm and torture at the Salvadoran Terrorism Confinement Center ("CECOT"), including electric shocks, beating, waterboarding, and use of implements of torture on detainees' fingers. *See J.G.G.*, 2025 WL 1024097, at *9 (U.S. Apr. 7, 2025) (Sotomayor, J., dissenting); *see also J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-4 (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41; *id.* at 44-3 (Goebertus

Decl.) ¶¶ 8, 10, 17. These abusive conditions are life threatening, as demonstrated by the hundreds of people who have died in Salvadoran prisons. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-3 (Goebertus Decl.) ¶ 5; *id.* at 44-4 (Bishop Decl.) ¶¶ 43–50. Worse, those removed and detained at CECOT face indefinite detention. *Id.* at 44-3 (Goebertus Decl.) ¶ 3 (quoting the Salvadoran government that people held in CECOT "will never leave"); Nayib Bukele, X.com post (Mar. 16, 2025, 5:13AM ET) (detainees "were immediately transferred to CECOT . . . for a period of one year (renewable)").[7]

### III. Petitioners

Petitioner A.A.R.P. is a Venezuelan national who is detained at Bluebonnet Detention Center in Anson, Texas. *See* ECF No. 2-2 (Blakeborough Decl.) ¶ 2. A.A.R.P. fled Venezuela because he and his family were persecuted there in the past for their political beliefs and for publicly protesting against the current Venezuelan government. *Id.* ¶ 8. He came to the United States in 2023 with his wife and their son. *Id.* ¶ 3. He is currently seeking asylum, withholding, and protection under the Convention Against Torture. *Id.* ¶ 8. His next hearing is scheduled for April 28, 2025, at the Fort Snelling Minnesota Immigration Court. *Id.* A.A.R.P. was detained while carpooling to work with his wife on March 26, 2025. *Id.* ¶ 5. ICE has accused A.A.R.P. of having "tattoos and associates that

---

[7] https://perma.cc/52PT-DWMR.

indicate membership in the Tren de Aragua gang" in an I-213. *Id*. ¶ 6. A.A.R.P. has a number of tattoos including a clock that shows the date and time of his son's birth, a cross, and the Virgin Mary. *Id*. ¶ 7. None of these tattoos are related to TdA and A.A.R.P. vehemently denies any connection to TdA. *Id*. ¶¶ 7-8. Early on April 14, A.A.R.P. was suddenly transferred from the Sherburne County Jail in Minnesota to the Bluebonnet Detention Center despite his upcoming April 28 hearing in immigration court in Minnesota. *Id*. ¶ 8. A.A.R.P. is at risk of being classified as an alien enemy under the Aliens Enemy Act and summarily deported under the Proclamation to El Salvador. *Id*. ¶¶ 8, 10.

Petitioner W.M.M. is a Venezuelan national who is also detained at Bluebonnet Detention Center in Anson, Texas. ECF No. 2-3 (D'Adamo Decl.) ¶ 3. W.M.M. fled Venezuela after the Venezuelan military harassed and assaulted him because they believed that he did not support the Maduro regime. *Id*. ¶ 4. W.M.M. arrived in the United States in 2023, was released on his own recognizance, and filed an asylum application. *Id*. ¶ 9. Several months later, federal authorities arrested W.M.M. on a misdemeanor warrant for alleged illegal entry into the United States. *Id*. ¶ 10. At his hearing on the warrant, the government alleged that W.M.M. is affiliated with TdA based on emojis used in W.M.M.'s social media feed, and a comment left by another individual on a social media post. *Id*. ¶ 11. The government also alleged that W.M.M. was arrested at a residence where an alleged

TdA associate was present. *Id*. W.M.M. denies any connection with TdA. *Id*. The magistrate judge ordered W.M.M. released from federal criminal custody because the government had not met its threshold burden to show a serious risk that W.M.M. would flee. *Id*. ¶ 12. The judge noted that the illegal entry case was W.M.M.'s only interaction with a court. *Id*. The U.S. Marshals released W.M.M. into ICE's custody on March 17 and subsequently detained for about a month at the Winn Correctional Center in Louisiana. *Id*. ¶¶ 13-14.

On April 14, W.M.M. was abruptly transferred along with several other Venezuelans to the Bluebonnet Detention Center, where he is now currently detained with Venezuelans transferred from other facilities. *Id*. ¶ 15. Even though W.M.M. has an individual hearing scheduled in immigration court for August 22, his phone access was abruptly cut off the afternoon of April 15 and he was told he would be imminently transferred again. *Id*. ¶ 18. W.M.M. is fearful that he will be classified as an alien enemy under the Aliens Enemy Act and summarily deported under the Proclamation to El Salvador. *Id*. ¶ 19.

Upon information and belief, the government has over the past 24-48 hours transferred Venezuelan men from detention centers around the country—including Louisiana, Minnesota, and California—to the Bluebonnet Detention Center in this District despite their pending removal proceedings in immigration court in other regions. Upon information and belief, people have been transferred in groups of

Venezuelan men, and been told that they appear to be on a list with other Venezuelans. Thus, many individuals in this District are at imminent risk of summary removal pursuant to the Proclamation.

## LEGAL STANDARD

Federal Rule of Appellate Procedure 8(a) permits an injunction pending appeal upon the movant showing: (1) a strong likelihood of success on the merits; (2) irreparable injury without an injunction; (3) that the balance of hardships supports an injunction; and (4) that the public interest favors such relief. *Whole Woman's Health v. Jackson*, 13 F.4th 434 (5th Cir. 2021).

## ARGUMENT

### I.     This Court Has Jurisdiction.

The district court's denial of Petitioners' motions for an emergency class-wide TRO are appealable because, as the Supreme Court held, the orders sought may be construed as "appealable injunctions." *See Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025). The Court has jurisdiction to review a denial of such an injunction under 28 U.S.C. § 1292(a)(1).

Petitioners seek an emergency class-wide TRO that enjoins Defendants from removing the named Petitioners and putative class members in the Northern District of Texas under the AEA Proclamation until they have a meaningful opportunity to seek judicial review and challenge Defendants' efforts to imminently remove them

from the United States to a Salvadoran prison or elsewhere without due process. The relief sought here parallels the TROs that AEA detainees sought and obtained in *J.G.G. See Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *1 ("On March 15, 2025, the District Court for the District of Columbia issued two temporary restraining orders (TROs) preventing any removal of the named plaintiffs and preventing removal under the AEA of a provisionally certified class consisting of '[a]ll noncitizens in U.S. custody who are subject to' the Proclamation."). Because of that, the district court's denial of Petitioners' motions for an emergency class-wide TRO are similarly appealable here. *Id.* at *2; *see also United States v. Wood*, 295 F.2d 772, 778 & n.6 (5th Cir. 1961), *cert. denied*, 369 U.S. 850 (construing denial of TRO as a final, appealable decision where "substantial rights of the parties" would be "irreparably lost if review is delayed," and observing as "significant" that "Courts of Appeals have considered the merits of denials of temporary restraining orders in deportation cases, evidently on the theory that unless review is had the entire controversy would be mooted by the deportation of the appellant"); *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 426 (5th Cir. 1981) ("The denial of a so-called temporary restraining order is properly appealable when entered after a hearing in which all interested parties had an opportunity to participate, thus allowing for full presentation of relevant facts.").

II.    **Petitioners Are Likely to Succeed on the Merits.**

   **A. The Supreme Court has held that due process entitles Petitioners to adequate notice and a reasonable opportunity to obtain judicial review before Defendants summarily remove them.**

Summary removals without adequate notice or a meaningful opportunity to challenge "alien enemy" designations violate the AEA and due process. As the Supreme Court has now made clear, the government must provide Petitioners and putative class members notice "within a reasonable time and in such a manner as will allow them to actually seek" relief from summary removals under the Proclamation. *J.G.G.*, 2025 WL 102409, at \*2 ("detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their removal."). Because the government seeks to imminently remove class members without adequate notice, reasonable time, or sufficient opportunity to "actually seek" court review as the Supreme Court commanded, an injunction pending appeal and emergency administrative injunction are warranted to ensure that class members receive due process. *See J.G.G.*, 2025 WL 102409, at \*2 ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings.").

The notice the government is providing does not remotely comply with the Supreme Court's order. At a minimum, the notice must be translated into a language that individuals can understand, for Venezuelans Spanish and English. Most

importantly, there must be sufficient time for individuals to seek review. As during World War II, that notice must be at least 30 days in advance of any attempted removal. *See* 10 Fed. Reg. 12,189 (Sept. 28, 1945). And it must be provided to undersigned counsel so that no individual is mistakenly removed. *See*, *e.g.*, *Noem v. Abrego Garcia*, No. 24A949, 2025 WL 1077101 (U.S. Apr. 10, 2025).

### B. Petitioners' Proposed Class Satisfies the Requirements of Rule 23.

In its April 17 order on Petitioners' motion for a TRO, the district court stated that it was reserving decision on Petitioners' motion for class certification. Order at 1, ECF No. 27. Its decision noted that "the Supreme Court's opinion in *J.G.G.*, along with the government's general representations about the procedures necessary in these cases, strongly suggest that the putative class is also not facing such an imminent threat as the petitioners allege." *Id.* at 9. However, early this morning, Petitioners apprised the district court that putative class members *are*, in fact, facing imminent removals. *See supra*. Under these circumstances, the district court has constructively denied Petitioners' motion for class certification, and Petitioners respectfully request class-wide relief.

Petitioners' motion for class certification is substantially likely to succeed on the merits. *See* Mot. for Class Certification (ECF No. 3); Brief of Amicus Curiae Class Action and Habeas Professors, *J.A.V. v. Trump*, No. 1:25-cv-00072 (S.D. Tex. Apr. 16, 2025) (ECF No. 41).

Petitioners sought to certify the following class under Federal Rules of Civil

Procedure 23(a) and 23(b)(2):

> All noncitizens in custody in the Northern District of Texas who were, are, or will be subject to the March 2025 Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua' and/or its implementation.

The proposed class readily satisfies the requirements of Rule 23.

### 1. The Proposed Class is So Numerous that Joinder Is Impracticable.

Numerosity is present, as demonstrated by the number of people in the United

States that the government has admitted having designated as subject to the AEA

Proclamation. *See* Cerna Decl. ¶ 6, *J.G.G. v. Trump*, No. 25-cv-766-JEB (D.D.C.

Mar. 18, 2025), ECF No. 28-1 (identifying a total of 258 people in the United States

who the government believes are TdA members). Additionally, people who were,

are, or will be designated as subject to the AEA Proclamation are detained and

confined in the Northern District of Texas. Upon information and belief, the

government has recently transferred Venezuelan men from detention centers all over

the country to the Bluebonnet Detention Center in the Northern District of Texas,

and they are at imminent risk of removal pursuant to the Proclamation. Declarations

submitted to the district court confirm that multiple Venezuelan men have received

AEA notices and are being told they will be deported as soon as today. Further,

because ICE continues to "track[] the TdA members who are amenable to removal

proceedings," *id.,* "the class includes unknown, unnamed future members." *Pederson*, 213 F.3d at 868 n.11; *see also Jack*, 498 F.2d at 124 (discussing impracticability of joinder of unknown persons); *Phillips v. Joint Legislative Comm. on Performance & Expenditure Review*, 637 F.2d 1014, 1022 (5th Cir. 1981) ("joinder of unknown individuals is 'certainly impracticable'").

### 2. Members of the Class Have Common Questions of Law and Fact.

All class members suffer the same injury: violation of their right to due process, unlawful removal under the AEA, and unlawful denial of their statutory rights to the removal and detention procedures contained in the INA. And the class raises common questions that will generate common answers, including whether the Proclamation and its implementation violate the AEA, the INA, and the statutory protections for asylum seekers. Any one of these common issues, standing alone, is enough to satisfy Rule 23(a)(2)'s permissive standard. *See Yates v. Collier*, 868 F.3d 354, 363 n.6 (5th Cir. 2017) ("we reaffirm that Rule 23(a)(2) requires only that a plaintiff demonstrate at least one common question of law or fact" (citing *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 359 (2011))). "To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014). The proposed class has done so here. Should the Court agree that Respondents likely cannot lawfully remove noncitizens

under the AEA because there has, for instance, been no "invasion or predatory incursion" by a "foreign government or nation," all class members will benefit from the requested relief. And while class members may eventually present individualized defenses to their designation as alien enemies, "this 'obvious fact does not destroy commonality'" for purposes of addressing these common questions. *Valentine*, 490 F. Supp. 3d at 1159 (citing *Yates*, 868 F.3d at 363).

The district court placed great weight on the government's statement that it "does not presently expect" to remove Petitioners under the AEA "until after the pending habeas petition is resolved," and that "[i]f that changes, [it] will update the Court." Order at 1 (ECF No. 27). Focusing on this representation, the court noted that "petitioners cannot seek relief that is necessary only to class members but not to them as named petitioners," suggesting that Petitioners may not be appropriate representatives of the class. *Id.* at 9. But that conclusion misapprehends the nature of Petitioners' and the proposed class's claims. Their claims involve numerous common questions of law and fact, their injuries all flow from the unlawful implementation of the AEA, and they seek relief beyond a government representation concerning its present expectation. The government's representation to the district court does not moot anyone's claims or alter those facts.

### 3. The Petitioners' Claims Are Typical of Class Members' Claims.

Typicality is satisfied here for largely the same reasons that commonality is satisfied. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011) ("The commonality and typicality requirements of Rule 23(a) tend to merge" (citation omitted). Each proposed class member, including the proposed class representatives, faces the same principal injury (unlawful removal), based on the same government policy (invocation of the AEA), which is unlawful as to the entire class because it violates the AEA itself, as well as the immigration laws and the Constitution.

### 4. Petitioners and Petitioners' Counsel Will Adequately Protect the Interests of the Proposed Class.

Here, there are no differences that create conflicts between the named Petitioners' interests and the class members' interests. Petitioners will fairly and adequately protect the interests of the proposed class. Petitioners are also represented by experienced counsel with significant experience litigating class actions and cases involving the rights of noncitizens.

### 5. The Proposed Class Also Satisfies Rule 23(b).

Petitioners here seek class certification under Rule 23(b)(2). Rule 23(b)(2) "was intended primarily to facilitate civil rights class actions, where the class representatives typically sought broad injunctive or declaratory relief against discriminatory practices." *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 993 (5th Cir. 1981) (citing Advisory Committee Notes, 39 F.R.D. 98, 102 (1966)). Thus,

courts in the Fifth Circuit have certified under Rule 23(b)(2) similar classes of individuals subject to restrictive immigration-related policies. *See, e.g.*, *Murillo v. Musegades*, 809 F. Supp. 487, 503 (W.D. Tex. 1992); *ODonnell v. Harris Cnty.*, No. CV H-16-1414, 2017 WL 1542457, at \*1 (S.D. Tex. Apr. 28, 2017). Rule 23(b)(2) is satisfied here because Respondents have acted on grounds that apply generally to the class by subjecting them all to the same Proclamation and attempting to summarily remove them without complying with the AEA, INA and due process. *See Yates*, 868 F.3d at 366.

### C. Alternatively, a Class Should Be Certified Under Habeas Equity Principles.

Every circuit that has addressed the issue has found that a class habeas action may be maintained. *See, e.g.*, *U.S. ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125–26 (2d Cir. 1974); *Bijeol v. Benson*, 513 F.2d 965, 967 (7th Cir. 1975); *Williams v. Richardson*, 481 F.2d 358, 361 (8th Cir. 1973); *Mead v. Parker*, 464 F.2d 1108, 1112–13 (9th Cir. 1972); *Napier v. Gertrude*, 542 F.2d 825, 827 & n.5 (10th Cir. 1976); *LoBue v. Christopher*, 82 F.3d 1081, 1085 (D.C. Cir. 1996).

For instance, in *Sero*, the Second Circuit relied on the Supreme Court's decision in *Harris v. Nelson*, 394 U.S. 286 (1969), to "confirm[] the power of the judiciary, under the All Writs Act . . . to fashion for habeas actions 'appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage,'" and held that "unusual circumstances" provided "compelling

justification for allowing a multi-party proceeding similar to the class action authorized by the Rules of Civil Procedure." 506 F.2d at 1125 (citing *Harris*, 394 U.S. at 299). Adopting a similar approach in *Bijeol*, the Seventh Circuit found a class habeas appropriate where all prisoners raised an "identical" issue of law and the number of prisoners was "too great for joinder of all to be practical." 513 F.2d at 968. Likewise, the Eighth and Ninth Circuits reversed district court decisions, holding that a habeas corpus petition may seek relief for an appropriate class. *See Mead*, 464 F.2d at 1113 ("where the relief sought can be of immediate benefit to a large and amorphous group . . . a class action may be appropriate"); *Williams*, 481 F.2d at 361 (agreeing with *Mead*); *see also Napier*, 542 F.2d at 827 & n.5 (Tenth Circuit noting "class treatment" could be available by the court "apply[ing] an analogous procedure by reference to Rule 23"); *LoBue*, 82 F.3d at 1085 (noting that "courts have in fact developed such equivalents" of "class actions in habeas").

Although it has not addressed the availability of class habeas, the Supreme Court has ruled on the merits in multiple class habeas cases, including several recent ones involving immigration detention. *See*, *e.g., Johnson v. Guzman Chavez*, 594 U.S. 523, 532 (2021) (class of noncitizens detained in Virginia); *Nielsen v. Preap*, 586 U.S. 392, 400 (2019) (two classes of noncitizens, one detained in California and the other in the Western District of Washington); *Jennings v. Rodriguez*, 583 U.S. 281, 290 (2018) (class of noncitizens in the Central District of California, with

subclasses for different detention authorities). Courts in the Fifth Circuit have also considered class habeas cases on the merits. *See, e.g.*, *Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 421 (5th Cir. 1992) (habeas class of noncitizen witnesses challenging government practice of detention over ten days, where government has opposed certification based on mootness and lack of typicality); *St. Jules v. Savage*, 512 F.2d 881, 882 (5th Cir. 1975) (reversing dismissal and remanding where district court held that each petitioner's challenge had to be "considering individually" because those inmates "present a single constitutional challenge"); *In re Class Action Application for Habeas Corpus on Behalf of All Material Witnesses in W. Dist. of Texas*, 612 F. Supp. 940, 948 (W.D. Tex. 1985) (granting summary judgment to class of individuals detained as material witnesses in the Western District of Texas).

The reasoning of these cases confirms why class treatment is not only appropriate but preferred here in light of the vulnerabilities of the class, which consists of detained noncitizens with limited resources and English proficiency, preventing them from bringing their own individual claims. *See Sero*, 506 F.2d at 1125-26; William B. Rubenstein, *Newberg on Class Actions* § 3.12 (5th ed. 2017).. Class-wide relief is also urgently necessary in light of the government's failure to comply with the Supreme Court's clear instruction that individuals must be given sufficient notice and opportunity to seek review. *Supra*.; *see also Mead*, 464 F.2d at 1112-13 ("there can be cases, and this is one of them, where the relief sought can be

of immediate benefit to a large and amorphous group. In such cases, it has been that a class action may be appropriate[.]'").

### III. An Emergency Injunction Preserving the Status Quo Will Prevent Irreparable Injury, Will Not Injure Defendants, and Will Serve the Public Interest.

In the absence of a TRO, Petitioners and the class are at imminent risk of summary removal to places, such as El Salvador, where they face life-threatening conditions, persecution, and torture, and may remain for the rest of their lives, incommunicado. *See supra*; *J.G.G.*, 2025 WL 1024097, at \*5 ("[I]nmates in Salvadoran prisons are 'highly likely to face immediate and intentional life-threatening harm at the hands of state actors.'"). That easily constitutes irreparable harm. *See Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005) (irreparable harm" where petitioners face "forced separation and likely persecution" "if deported"); *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *Patel v. Barr*, No. 20-3856, 2020 WL 4700636, at \* 8 (E.D. Pa. Aug. 13, 2020); *see also J.G.G.*, 2025 WL 890401, at \*16 ("[T]he risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm" if Venezuelans are removed under the AEA Proclamation to El Salvador). And Petitioners and the class may never get out of these prisons. *See J.G.G.*, 2025 WL 1024097, at \*5; *see also supra*.

Even if the government instead removes Petitioners or the class to Venezuela, they face serious harm there, too. Many fled Venezuela for the very purpose of escaping persecution there, and have pending asylum cases on that basis. For example, A.A.R.P. and his family were persecuted for their political beliefs and actions protesting against the current Venezuelan government, and he fears persecution if returned. ECF No. 2-2 (Blakeborough Decl.) ¶ 8. Likewise, W.M.M. fled Venezuela because he was harassed and assaulted by the Venezuelan military for his perceived opposition to the Maduro regime, and he is seeking asylum on that basis. ECF No. 2-3 (D'Adamo Decl.) ¶ 4. And returning to Venezuela labeled as a gang member by the U.S. government only increases the danger, as they will face heightened scrutiny from Venezuela's security agency, and possibly even violence from rivals of TdA. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶ 28.

Not only do Petitioners and the class face grave harm, thus far the government has tried to execute removals without any due process. *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"). Although the Supreme Court has now made clear that meaningful notice is required under the AEA, *J.G.G.*, 2025 WL 102409, at \*2,

Defendants face no comparable harm. Petitioners and the class do not contest

Respondents' ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under the immigration laws. *Cf. J.G.G.*, 2025 WL 914682, at *30 ("The Executive remains free to take TdA members off the streets and keep them in detention. The Executive can also deport alleged members of TdA under the INA[.]"). Thus, Respondents cannot show how the government's interests "overcome the irreparable injury to [petitioner] absent a stay, or justify denial of a short stay *pendente lite*." *Ragbir v. United States*, No. 2:17-CV-1256-KM, 2018 WL 1446407, at *18 (D.N.J. Mar. 23, 2018), *appeal dismissed*, No. 18-2142, 2018 WL 6133744 (3d Cir. Nov. 15, 2018); *see also Patel*, 2020 WL 4700636, at *9 (noting "any inconvenience to the Government from the brief delay is far outweighed by the threat of irreparable harm to [plaintiff]" and that "[t]he public interest is also better served by an orderly court process that assures that [the plaintiff's] invocation of federal court relief is considered before the removal process continues.").

The public interest also weighs in favor of Petitioners. The public has a critical interest in preventing wrongful removals, especially where it could mean a lifetime sentence in a notorious foreign prison. *See Nken*, 556 U.S. at 436; *see also Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex. 1982) (protecting people who face persecution abroad "goes to the very heart of the principles and moral precepts upon which this country and its Constitution were founded"). That is especially so given the government's position that it will not obtain the release of individuals mistakenly

sent to the notorious Salvadoran prison. *See Abrego Garcia*, 2025 WL 1021113, at

\*4. Moreover, "[t]here is generally no public interest in the perpetuation of unlawful

agency action." *See Wages & White Lion Inv., L.L.C. v. FDA*, 16 F.4th 1130, 1143

(5th Cir. 2021).

## IV.    The Court Should Alternatively Grant Mandamus Relief.

The extraordinary circumstances here warrant mandamus relief. In deciding

whether the writ should issue, courts must consider: "(1) whether the petitioner has

demonstrated that it has no other adequate means to attain the relief [he] desires; (2)

whether the petitioner's right to issuance of the writ is clear and indisputable; and

(3) whether we, in the exercise of our discretion, are satisfied that the writ is

appropriate under the circumstances." *In re Itron, Inc.*, 883 F.3d 553, 567 (5th Cir.

2018) (quoting *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380–81 (2004)

(cleaned up)). "These hurdles, however demanding, are not insuperable." *In re Gee*,

941 F.3d 153, 158 (5th Cir. 2019) (quoting *Cheney*, 542 U.S. at 381). In cases such

as this, mandamus provides a "useful 'safety valve[]' for promptly correcting serious

errors." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (citation

omitted).

Moreover, as noted, another district court in the Fifth Circuit has issued a

district-wide TRO for the Southern District of Texas. In that case, Judge Rodriguez

issued the TRO because there was a risk that individuals might not get sufficient

notice given the government's refusal to provide specificity or rule out that notice might be as little as 24 hours' notice – precisely what has now happened. *J.A.V. v. Trump*, No. 25-cv-72 (S.D. Tex 2025).

As discussed above, petitioners have no other means to halt the removals that may divest the courts of jurisdiction to address the enormously important legal questions presented by their claims. Their right to the issuance of the writ is clear and indisputable, as the district court's refusal to act on an emergency application for temporary restraining order or emergency request for a status conference, and constructive denial of a class-wide TRO, in light of the circumstances was a "clear abuse of discretion that produces patently erroneous results." *In re JPMorgan Chase & Co.*, 916 F.3d 494, 500 (5th Cir. 2019) (cleaned up). Because of the district court's constructive denial of Petitioners' motion for class certification, its denial of Petitioners' motion for a TRO, and its failure to act on Petitioners' emergency motion, putative class members are facing imminent removal—without adequate notice and without due process, contrary to the Supreme Court's command in *J.G.G.* This Court's intervention is immediately required to ensure that the courts retain jurisdiction and to prevent manifest irreparable harms.

## CONCLUSION

The Court should grant an injunction pending appeal, or immediately grant a temporary administrative injunction or issue a writ of mandamus.

Dated: April 18, 2025

Respectfully submitted,

/s/Lee Gelernt
Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org
E: dgalindo@aclu.org
E: agorski@aclu.org
E: ptoomey@aclu.org
E: smahfooz@aclu.org
E: ojadwat@aclu.org
E: hshamsi@aclu.org

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org
E: cwofsy@aclu.org

Brian Klosterboer
Tx Bar No. 24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
Adriana Piñon
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS, INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org

Attorneys for Appellants–
Petitioners

aharris@aclutx.org
apinon@aclutx.org

# CERTIFICATE OF COMPLIANCE WITH RULE 27.3

I certify the following in compliance with Fifth Circuit Rule 27.3:

• Before filing this Motion, counsel for Appellants contacted the Clerk's Office and opposing counsel to advise them of the intent to file this Motion. Counsel also phoned the offices of opposing counsel before filing.

• The facts stated herein supporting emergency consideration of this motion are true and complete.

• Because Appellants request an injunction pending appeal as soon as practicable and, or alternatively, an immediate temporary administrative injunction, the Court's review of this motion is requested by April 18, 2025.

• True and correct copies of relevant orders and other documents are attached as exhibits to this motion.

• This motion is being served at the same time it is being filed.

• The names of counsel representing the parties, including contact information of all counsel, are as follows:

- Lee Gelernt – lgelernt@aclu.org
- Daniel Galindo – dgalindo@aclu.org
- Brian Klosterboer – bklosterboer@aclu.org
- Drew C. Ensign - Drew.C.Ensign@usdoj.gov
- George M. Padis - george.padis@usdoj.gov
- Ann Cruce-Haag - ann.haag@usdoj.gov
- Nancy Naseem Safavi - nancy.safavi@usdoj.gov

<u>/s/ Lee Gelernt</u>
Lee Gelernt

**CERTIFICATE OF CONFERENCE**

On April 18, 2025, counsel for Appellants conferred with counsel for

Appellees, who stated that Appellees oppose the relief requested in this motion and

will file a response in opposition to the motion. The filing of this motion was also

preceded by telephone calls to the clerk's office and to the offices of opposing

counsel on April 18, 2025, advising of the intent to file the emergency motion.


/s/ Lee Gelernt
Lee Gelernt

## CERTIFICATE OF SERVICE

On April 18, 2025, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lee Gelernt
Lee Gelernt

## CERTIFICATE OF WORD COUNT

This motion contains 7,674 words. It complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point FONT) using Microsoft Word (the same program used to calculate the word count).

/s/ Lee Gelernt
Lee Gelernt