# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Docket No. 25-10534

W.M.M., F.G.M., and A.R.P., *et al.*,

*Petitioners – Appellants*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents – Appellees*

**On Appeal from**
United States District Court for the Northern District of Texas,
No. 1:25-cv-59-H

## BRIEF OF PETITIONERS-APPELLANTS

Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
samdur@aclu.org
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org

Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org

cwofsy@aclu.org

Brian Klosterboer
Tx Bar No.  24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
Adriana Piñon
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS,
INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org
apinon@aclutx.org

ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(212) 549-2500
khuddleston@aclu.org

*For Petitioners-Appellants*
*W.M.M., F.G.M., A.R.P., et al.*


**Barred in Texas and Arizona only;*
*supervised by a member of the D.C.*
*Bar*

# CERTIFICATE OF INTERESTED PERSONS

Appellants certify that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## Petitioners-Appellants

A.R.P., on their own behalf and on behalf of others similarly situated
F.G.M., on their own behalf and on behalf of others similarly situated
W.M.M., on their own behalf and on behalf of others similarly situated

## Counsel for Petitioners-Appellants

| | | |
|---|---|---|
| Lee Gelernt | Spencer Amdur | Brian Klosterboer |
| Daniel Galindo | Noelle Smith | Thomas Buser-Clancy |
| Ashley Gorski | Oscar Sarabia Roman | Savannah Kumar |
| Patrick Toomey | My Khanh Ngo | Charelle Lett |
| Sidra Mahfooz | Cody Wofsy | Ashley Harris |
| Omar Jadwat | Kathryn Huddleston | Adriana Piñon |
| Hina Shamsi | | |

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF TEXAS

**Respondents-Appellees** are government officials and entities.

## STATEMENT REGARDING ORAL ARGUMENT

This Court has scheduled oral argument for Monday, June 30, 2025, at 2:00 P.M. in New Orleans.  Petitioners-Appellants respectfully submit that oral argument will assist the Court's review of the numerous statutory and constitutional issues in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT .............................................. ii

TABLE OF AUTHORITIES ..................................................................................v

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUES............................................................................1

INTRODUCTION ..................................................................................................1

STATEMENT OF THE CASE...............................................................................3

    A.  THE INA AND THE AEA…………………………………………….3

    B.  THE PROCLAMATION AND ITS IMPLEMENTATION………………4

    C.  THE *J.G.G.* LITIGATION…………………………………………….....10

    D.  THIS LITIGATION…………………………………………………...11

SUMMARY OF ARGUMENT .............................................................................14

STANDARD ........................................................................................................19

ARGUMENT ........................................................................................................20

    I.  PETITIONERS' CLAIMS ARE JUSTICIABLE ………………………20

    II.  THE PROCLAMATION IS NOT AUTHORIZED BY THE AEA……..23

        A. The AEA Can Only Be Used During Military Hostilities....................23

        B.  The AEA Cannot Be Invoked Against a Non-State Actor...................30

    III. PROPER NOTICE REQUIRES ALL RELEVANT INFORMATION AND AT LEAST 30 DAYS TO FIND A LAWYER, PREPARE A CASE, AND SEEK RELIEF……………………………………………38

    IV. THE PROCLAMATION VIOLATES A NUMBER OF PROCEDURAL PROTECTIONS……………………………………………………………47

A. The Proclamation Is Subject to the INA's Removal Procedures. ........47

B. People Removed Under the Proclamation Cannot Be Sent to Places Where They Face Torture or Persecution. ..................................................49

C. The Proclamation Violates the AEA's Right to Voluntary Departure.52

V. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR THE PETITIONERS………………………………………………………………..54

CONCLUSION .................................................................................................55

CERTIFICATE OF SERVICE ...............................................................................58

CERTIFICATE OF COMPLIANCE .......................................................................59

# TABLE OF AUTHORITIES

**Cases**

*A.A.R.P. v. Trump*,
2025 WL 1417281 (U.S. May 16, 2025)...................................................... passim

*A.S.R. v. Trump*,
2025 WL 1378784 (W.D. Pa. May 13, 2025) ............................................. 21, 35

*Al-Alwi v. Trump*,
901 F.3d 294 (D.C. Cir. 2018)....................................................................34

*Alford v. United States*,
709 F.2d 418 (5th Cir. 1983) ............................................................... 44, 46

*Ardestani v. I.N.S.*,
502 U.S. 129 (1991) ....................................................................................40

*Biwot v. Gonzales*,
403 F.3d 1094 (9th Cir. 2005) ............................................................. 43, 44

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ....................................................................................23

*Boumediene v. Bush*,
553 U.S. 723 (2008) ............................................................................. 39, 42

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997) ....................................................................28

*Citizens Protective League v. Clark*,
155 F.2d 290 (D.C. Cir. 1946)............................................................. 22, 42

*City of W. Covina v. Perkins*,
525 U.S. 234 (1999) ....................................................................................42

*Cruz Rendon v. Holder*,
603 F.3d 1104 (9th Cir. 2010) ....................................................................46

*D.B.U. v. Trump*,
  No. 25-1164, 2025 WL 1233583 (10th Cir. Apr. 29, 2025) ...............................55

*D.B.U. v. Trump*,
  No. 1:25-CV-01163, 2025 WL 1304288 (D. Colo. May 6, 2025)............... 11, 21

*Demjanjuk v. Holder*,
  563 F.3d 565 (6th Cir. 2009) ...................................................................54

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) ................................................................................51

*Freza v. Att'y Gen.*,
  49 F.4th 293 (3d Cir. 2022) ........................................................... 43, 45

*G.F.F. v. Trump*,
  No. 25-cv-2886, 2025 WL 1301052 (S.D.N.Y. May 6, 2025) .................... 11, 21

*George v. McDonough*,
  596 U.S. 740 (2022) ................................................................................24

*Greene v. McElroy*,
  360 U.S. 474 (1959). ...............................................................................41

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ......................................................................... 28, 42

*Hernandez Lara v. Barr*,
  962 F.3d 45 (1st Cir. 2020) ............................................................ 43, 44, 46

*Holmes v. Jennison*,
  39 U.S. 540 (1840) .................................................................................32

*Huidekoper's Lessee v. Douglass*,
  7 U.S. (3 Cranch) 1 (1805) .....................................................................29

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022) .......................................................... 51, 54

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) ................................................................50

*J.A.V. v. Trump*,
No. 1:25-CV-072, 2025 WL 1257450 (S.D. Tex. May 1, 2025) ...... 11, 21, 24, 29

*J.G.G. v. Trump*,
145 S. Ct. 1003 (2025) ................................................. passim

*J.G.G. v. Trump*,
2025 WL 890401 (D.D.C. Mar. 24, 2025) ...........................................52

*J.G.G. v. Trump*,
2025 WL 1119481 (D.D.C. Apr. 16, 2025) .......................................10

*J.G.G. v. Trump*,
No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ........................ passim

*Johnson v. Eisentrager*,
339 U.S. 763 (1950) ............................................... 25, 27, 31

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................55

*Leiva Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) .................................................54

*Ludecke v. Watkins*,
335 U.S. 160 (1948) ....................................................... 11, 20, 21, 22

*M.A.P.S. v. Garite*,
No. 25-CV-00171-DB, 2025 WL 1379220 (W.D. Tex. May 13, 2025).............11

*Medellin v. Texas*,
552 U.S. 491 (2008) ..........................................................32

*Memphis Light, Gas & Water Div. v. Craft*,
436 U.S. 1 (1978) ....................................................... 39, 42

*Miles v. Apex Marine Corp.*,
498 U.S. 19 (1990) ....................................................................... 48, 51

*Miller-El v. Cockrell*,
537 U.S. 322 (2003) ...........................................................................33

*Morissette v. United States*,
342 U.S. 246 (1952) ...........................................................................24

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ....................................................................... 41, 43

*Nasrallah v. Barr*,
590 U.S. 573 (2020) ....................................................................... 50, 52

*New Jersey v. United States*,
91 F.3d 463 (3d Cir. 1996) .................................................................28

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................................................... 54, 55

*Nunez v. Boldin*,
537 F. Supp. 578 (S.D. Tex. 1982)................................... 43, 44, 46, 55

*Padavan v. United States*,
82 F.3d 23 (2d Cir. 1996) ...................................................................28

*Paulson Geophysical Serv., Inc. v. Sigmar*,
529 F.3d 303 (5th Cir. 2008) ..............................................................20

*Quintero v. Garland*,
998 F.3d 612 (4th Cir. 2021) ..............................................................44

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ...........................................................................51

*Sanchez Puentes v. Garite*,
2025 WL 1203179 (W.D. Tex. Apr. 25, 2025)......................................8

*Techt v. Hughes*,
128 N.E. 185 (N.Y. 1920) ...................................................................25

*The Benito Estenger*,
176 U.S. 568 (1900) .........................................................................26

*The Rapid*,
8 Cranch 155 (1814) .........................................................................25

*Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*,
602 U.S. 268 (2024) .........................................................................26

*U.S. ex rel. D'Esquiva v. Uhl*,
137 F.2d 903 (2d Cir. 1943) ....................................................... 22, 33

*U.S. ex rel. Gregoire v. Watkins*,
164 F.2d 137 (2d Cir. 1947) .............................................................22

*U.S. ex rel. Hoehn v. Shaughnessy*,
175 F.2d 116 (2d Cir. 1949) .............................................................22

*U.S. ex rel. Jaegeler v. Carusi*,
342 U.S. 347 (1952) .........................................................................21

*U.S. ex rel. Kessler v. Watkins*,
163 F.2d 140 (2d Cir. 1947) ....................................................... 22, 33

*U.S. ex rel. Ludwig v. Watkins*,
164 F.2d 456 (2d Cir. 1947) ............................................... 22, 52, 53

*U.S. ex rel. Von Heymann v. Watkins*,
159 F.2d 650 (2d Cir. 1947) ....................................................... 22, 52

*U.S. ex rel. Zdunic v. Uhl*,
137 F.2d 858 (2d Cir. 1943) ....................................................... 22, 33

*United States ex rel. Dorfler v. Watkins*,
171 F.2d 431 (2d Cir. 1948) .............................................................53

*United States v. Tinoso,*
  327 F.3d 864 (9th Cir. 2003) ................................................................48

*Usubakunov v. Garland,*
  16 F.4th 1299 (9th Cir. 2021) ........................................................ 43, 46

*Ware v. Hylton,*
  3 U.S. (3 Dall.) 199 (1796) ................................................................25

*White v. Burnley,*
  61 U.S. 235 (1857) ............................................................................26

*Wis. Cent. Ltd v. United States,*
  585 U.S. 274 (2018) ..........................................................................27

**Statutes**

8 U.S.C. Ch. 12 ...................................................................................3, 47

10 U.S.C. Ch. 47A ..................................................................................30

18 U.S.C. § 2332b ...................................................................................30

18 U.S.C. § 2339B ...................................................................................30

28 U.S.C. § 2255 .....................................................................................46

42 U.S.C. § 265 .......................................................................................51

50 U.S.C. § 21 ................................................................................ passim

50 U.S.C. § 22 ............................................................................ 24, 32, 53

50 U.S.C. § 23 .........................................................................................24

50 U.S.C. § 24 .........................................................................................24

8 U.S.C. § 1158 .......................................................................................49

8 U.S.C. § 1182 ............................................................................ 4, 36, 37

8 U.S.C. § 1189(a)(1) ........................................................................ 35, 36

8 U.S.C. § 1225 .......................................................................... 4, 37, 48

8 U.S.C. § 1226 ................................................................................4, 37

8 U.S.C. § 1227 ...................................................................... 4, 36, 37

8 U.S.C. § 1228 ................................................................................4, 48

8 U.S.C. § 1229 ...................................................................... 40, 41, 47

8 U.S.C. § 1229a .......................................................................... 3, 47, 48

8 U.S.C. § 1231 .............................................................. 4, 37, 49, 50, 51

8 U.S.C. § 1231 note .................................................................... 3, 50, 51

8 U.S.C. § 1531 *et seq* ............................................................ 4, 36, 48

Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No.
   105-277, Div. G. Title XXI, 112 Stat. 2681 (1998) ...............................50

An Act Concerning Aliens, 1 Stat. 571 (1798) ................................ 27, 30

## Rules & Regulations

8 C.F.R. § 1240.10 ...............................................................................52

8 C.F.R. § 1240.11 ...............................................................................52

8 C.F.R. § 1208.16-.18 ................................................................ 3, 49, 50

10 Fed. Reg. 12189 ..............................................................................53

Fed. R. Crim. P. 7(c)(1) .......................................................................41

**Constitutional Provisions**

U.S. Const. art. I, § 10, cl. 3 .................................................................28

U.S. Const. art. I, § 8, cl. 15 ...............................................................28

U.S. Const. art. I, § 9, cl. 2 .................................................................28

U.S. Const. art. IV, § 4 .......................................................................28

**Other Authorities**

Invocation of the Alien Enemies Act Regarding the Invasion of the United States
    by Tren de Aragua (Mar. 15, 2025)............................................ passim

Mica Rosenberg et al., *Trump Administration Knew Vast Majority of Venezuelans
    Sent to Salvadoran Prison Had Not Been Convicted of U.S. Crimes*, ProPublica
    (May 30, 2025) ................................................................................8

8 Annals of Cong. (1798)............................................................. 26, 27

Att'y Gen., Memorandum for Law Enforcement Officers, Guidance for
    Implementing the Alien Enemies Act (Mar. 14, 2025)...........................5

Brittany Gibson, *Migrant Detainees Should Be in El Salvador Prison "For the
    Rest of Their Lives," Noem Says*, Axios (Apr. 9, 2025) ........................9

Burns' Dictionary, *Denizen* (1792)........................................................31

C-SPAN, *National Security and Intelligence Officials Testify on Global Threats*,
    (Mar. 26, 2025)...............................................................................34

ICE, *Performance-Based National Detention Standards 2011* ...............................40

Jacob's Dictionary, *Denizen* (1811)........................................................31

Johnson's Dictionary, *Incursion* (1773) .................................................24

Johnson's Dictionary, *Invasion* (1773) ..................................................24

Letter from George Washington to Thomas Jefferson (Feb. 6, 1781) ...................29

Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798).................29

*Matter of C-B-*, 25 I. & N. Dec. 888 (BIA 2012) ...................................................43

S. Rep. No. 82-1137 (1952) .....................................................................................48

Webster's Dictionary, *Invasion* (1828).....................................................................24

Webster's Dictionary, *Predatory* (1828) ..................................................................24

William Blackstone, 1 Commentaries on the Laws of England 249 (1765) ...........25

Cong. Res. Serv., The Foreign Terrorist Organization List (May 13, 2025) ..........35

U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20
    (1988)..................................................................................................................50

Emmerich de Vattel, The Law of Nations; or, Principles of the Law of Nature
    (1758)............................................................................................... 25, 31

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 2241. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether Petitioners-Appellants satisfy the preliminary injunction factors for their claim that the Alien Enemies Act does not authorize their removal pursuant to the President's March 14, 2025 Proclamation.

2. What notice and procedural protections are required before an AEA detainee is removed under the Proclamation.

## INTRODUCTION

The Alien Enemies Act ("AEA") is a wartime authority that cannot be used during peacetime and can only be used against a nation or government. Presidents have abided those statutory limits for over two hundred years. But now, for the first time in history, the government claims it can use this war power against a private criminal organization, to address ordinary crime and unlawful immigration, even though Congress has enacted extensive laws to regulate those acts. Indeed, government officials have made clear that the whole point of the Proclamation is to evade the procedures and protections that Congress and the Constitution normally require for prosecution and deportation.

1

In the first 24 hours the Proclamation was in effect, the government removed over a hundred and thirty people, with no process at all, to a gulag-type prison in El Salvador known for torture and other horrific abuse, where the U.S. government is paying to have them held, and where they may spend the rest of their lives without any access to the outside world.  It has since emerged that many and likely most of these people have no criminal convictions or gang connections, and that the government designated them based on innocuous tattoos, clothing, hand gestures, and similar criteria.  The government now seeks to send countless others, without trial or due process, to a brutal foreign prison.

The Proclamation is void under the AEA.  It is predicated on migration and crimes committed by a gang.  But the AEA, by its terms, only applies during an *armed conflict* with a *sovereign nation*.  It requires a "declared war," "invasion," or "predatory incursion"—terms that Congress consistently used to refer to military hostilities.  It requires an attack by a "nation or government" that has "citizens" and "subjects," not a non-state actor.  And the Act governs "alien enemies"—a well-established term at the time of the AEA's enactment, which likewise required war between sovereigns.  Every piece of the statute's text reinforces those two requirements.  And the Proclamation fails them both.

Even if the Proclamation could be enforced, the Supreme Court has now twice made clear that the government may not summarily remove people without affording

2

them a real chance to contest their designation and removal.  Due process, habeas, and multiple statutes require specific protections.  At a minimum, the government must give detainees meaningful notice of the charges and how to contest them, along with sufficient time and access to attorneys to allow them to actually seek review. The government must also abide by the procedural protections in the Immigration and Nationality Act ("INA") and the AEA, including Congress's categorical bars against removing people to countries where they face torture or persecution.

The government has plenty of tools to address crime and migration.  The AEA is for something else: war between nations.  The Proclamation should be enjoined.

## STATEMENT OF THE CASE

### A.    THE INA AND THE AEA

The INA provides a comprehensive system governing the admission, presence, and removal of noncitizens in the United States.  *See* 8 U.S.C. Ch. 12.  The INA is the "sole and exclusive procedure for determining whether an alien may be . . . removed from the United States."  *Id.* § 1229a(a)(3).  The statute also includes specific safeguards that permit noncitizens to seek protection from persecution and torture.  *See, e.g.*, 8 U.S.C. § 1231(b)(3)(A) (withholding of removal); Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681, codified at 8 U.S.C. § 1231 note (implementing Convention Against Torture); 8 C.F.R. § 1208.16-.18 (same).

3

The INA provides an extensive set of mechanisms for the detention and removal of noncitizens who violate immigration law or commit crimes or terrorism. *See* 8 U.S.C. §§ 1182(a)(2), 1182(a)(3), 1225(b)(2)(A), 1226(a)-(c), 1227(a)(2)-(4), 1228, 1231(a). Congress also created an Alien Terrorist Removal Court specifically to adjudicate the removal of an "alien terrorist," including a member of a foreign terrorist organization ("FTO"). 8 U.S.C. § 1531 *et seq.*; *see id.* § 1226a (process to detain and remove FTO members and other "suspected terrorists").

In contrast, the AEA authorizes the detention and removal of citizens of a country that carries out or threatens armed conflict against the territory of the United States. Passed in 1798 in anticipation of a war with France, the AEA provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

50 U.S.C. § 21. The Act allows "for the removal of" noncitizens only if they "refuse or neglect to depart" after being designated alien enemies. *Id.*

## B.    THE PROCLAMATION AND ITS IMPLEMENTATION

On March 14, 2025, the President signed a Proclamation under the AEA declaring that Tren de Aragua ("TdA"), a Venezuelan criminal gang, is "perpetrating, attempting, and threatening an invasion or predatory incursion against

4

the territory of the United States."  Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025) ("Proclamation").[1]   The Proclamation, which was signed March 14 but not made public until March 15, provides that "all Venezuelan citizens 14 years of age or older who are members of TdA … are liable to be apprehended, restrained, secured, and removed as Alien Enemies."

The Proclamation does not lay out any process for accused TdA members to challenge their designation.  An implementing memorandum by the Department of Justice ("AG Memorandum") likewise describes an "immediate removal requirement" and states that detainees are not entitled "to judicial review of the removal order in any court of the United States."  Att'y Gen., Memorandum for Law Enforcement Officers, Guidance for Implementing the Alien Enemies Act (Mar. 14, 2025), § 5(a);[2] *see id.* § 2(A)(v)(g) (directing officers to inform noncitizens that they are "not entitled to a hearing, appeal, or judicial review").

The AG Memorandum further states that officers enforcing the Proclamation may "enter[] an Alien Enemy's residence to make an AEA apprehension" without a judicial or administrative warrant.  *Id.* §§ 2(B), 2(A)(iv); *see id.* ("To be clear, … it

---

[1] https://perma.cc/ZS8M-ZQHJ.

[2] https://lawprofessors.typepad.com/files/20250314_aea_memo.pdf.

is not necessary to complete [designation and warrant forms] prior to apprehending an Alien Enemy.").

The AG Memorandum includes a worksheet for officials to identify TdA members, called an "Alien Enemy Validation Guide." The Guide uses a system that assigns points based on alleged indicators of gang affiliation, with weight given to tattoos, hand gestures, and social media activity. Supp.ROA.872-76. The Guide assigns four points for a TdA tattoo or clothing, but does not explain which tattoos or clothing are associated with TdA. The Chicago HSI office lists a Chicago Bulls image as TdA-associated, worth four points. Supp.ROA.894. The Guide assigns six points for any text message with a "known member[]" of TdA, but does not define the term. A score of eight points generally results in an automatic designation as an "alien enemy," as does a score of six points with supervisor approval. Supp.ROA.872-76.

Experts who study Venezuela and TdA have explained that these criteria have little connection to TdA. For example, the group does not use consistent symbols or tattoos to identify members. Supp.ROA.742-43 (Hanson Decl.) ¶¶ 22, 24; Supp.ROA.752 (Antillano Decl.) ¶ 14; Supp.ROA.763 (Dudley Decl.) ¶ 25. The symbols and tattoos the government has relied on are common in Venezuelan culture and do not reliably indicate gang affiliation. Supp.ROA.742-43 (Hanson Decl.) ¶¶ 22-24; Supp.ROA.752 (Antillano Decl.) ¶ 14; Supp.ROA.984-88 (quoting TdA

expert).  Other indicia in the Guide betray similar misunderstanding of TdA.  For instance, the Guide assigns points for a TdA membership certificate, but even the government's own experts agree that TdA is a fragmented and decentralized group with no clear leadership structure and certainly no membership certificates. *Compare* Supp.ROA.738-44 (Hanson Decl.) ¶¶ 1, 16, 27; Supp.ROA.751-52 (Antillano Decl.) ¶¶ 10-11, 14; Supp.ROA.762 (Dudley Decl.) ¶ 22, *with* Supp.ROA.825-26 (Smith Decl.) ¶¶ 9-10; Supp.ROA.836 (Charles Decl.) ¶ 7.

On March 15, detainees were loaded onto planes without any prior warning. Some were given notice forms as they were transported, but those forms, written in English only, stated that the detainees were "not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal." Supp.ROA.890.  The government removed at least 137 people on March 15 under the Proclamation.  Supp.ROA.947-53, 1031 (261 total removals, but the government claimed some were not removed "solely" pursuant to the Proclamation).

Since then, it has emerged that a disturbing number of the people the government has designated under the Proclamation appear to have no connection at all to TdA.  Reporting indicates that approximately 75% of individuals on the March 15 flights had no criminal record in the United States or abroad, and that a substantial number entered the United States legally, including several who entered as highly vetted refugees.  Supp.ROA.914-20, 1040-44 (CBS investigation);

Supp.ROA.1046-50 (CATO report); *Agelviz-Sanguino v. Noem*, No. 4:25-cv-2116, Dkt. 1 ¶ 1 (S.D. Tex. May 9, 2025).[3]  When the government was forced to set forth evidence of TdA membership in a different habeas proceeding, the district court concluded that its accusations were "completely and wholly unsubstantiated by anything meaningful in the record." *Sanchez Puentes v. Garite*, 2025 WL 1203179, *15-16 (W.D. Tex. Apr. 25, 2025) (government had "no evidence" of TdA membership).

Scores of people deported on March 15 appear to have been designated based on tattoos that are unrelated to TdA.  Supp.ROA.899-1038 (news articles collecting stories).  For one detainee, a professional makeup artist, the only evidence the government ever adduced to establish his membership in TdA was two crown tattoos, which accompany the words "Mom" and "Dad," and celebrate his participation in an Epiphany festival in his hometown.  Supp.ROA.775-77 (Reyes Decl.) ¶¶ 4-7, 22, 24.  Another man had a tattoo of the autism awareness ribbon, along with the name of his brother, who is autistic.  Supp.ROA.964-72.

The government has sent all AEA deportees to the Centro de Confinamiento del Terrorismo ("CECOT"), a notoriously brutal prison in El Salvador.  Detainees at CECOT are typically held incommunicado, with no access to lawyers, their families,

---

[3] Mica Rosenberg et al., *Trump Administration Knew Vast Majority of Venezuelans Sent to Salvadoran Prison Had Not Been Convicted of U.S. Crimes*, ProPublica (May 30, 2025), https://shorturl.at/Ltboo.

or the outside world.  Supp.ROA.947-53.  Conditions in Salvadoran prisons include beatings, forced labor, multiple forms of torture, and indefinite detention without trial.  Supp.ROA.856-61 (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41; Supp.ROA.767-72 (Goebertus Decl.) ¶¶ 3, 8, 10, 17 (describing waterboarding, beatings severe enough to break bones and rupture organs, and being forced to share a cell with the body of an inmate recently beaten to death).  Salvadoran and American officials have stated that people detained at CECOT will spend the rest of their lives there. Supp.ROA.767-68 (Goebertus Decl.) ¶ 3; Brittany Gibson, *Migrant Detainees Should Be in El Salvador Prison "For the Rest of Their Lives," Noem Says*, Axios (Apr. 9, 2025).[4]  Indeed, human rights groups are "not aware of any detainees who have been released from that prison."  Supp.ROA.767-68 (Goebertus Decl.) ¶ 3.

Salvadoran and U.S. officials have acknowledged that the United States is paying El Salvador to detain these men at CECOT without trial "for a period of one year (renewable)."  Nayib Bukele (@nayibbukele), X (Apr. 4, 2025, 10:23 AM).[5] The U.S. government has nonetheless taken the position "that it is unable to provide for the return" of individuals the government has sent to CECOT.  *A.A.R.P. v. Trump*, 2025 WL 1417281, *2 (U.S. May 16, 2025).

---

[4] https://perma.cc/L34J-HBMX.

[5] https://x.com/nayibbukele/status/1901245427216978290.

C.    **THE *J.G.G.* LITIGATION.**

Just after midnight on March 14, before any removals had occurred, several detainees sued under the Administrative Procedure Act ("APA") to challenge their removal under the AEA and moved for a temporary restraining order on behalf of a putative nationwide class.  *See J.G.G. v. Trump*, No. 1:25-cv-766 (D.D.C.).  Before the district court could act, the government quickly sought to deport AEA detainees it had moved from around the country to South Texas.  The first planes took off *during* the TRO hearing later that day.  Minutes later, the district court ordered that "any plane containing class members that is going to take off or is in the air needs to be returned to the United States," whether by "turning around a plane or not disembarking anyone on the plane." *J.G.G. v. Trump*, 2025 WL 1119481, *1-5, *14 (D.D.C. Apr. 16, 2025) (cleaned up) (detailing the events of March 15).  The government continued the flights, and in total delivered 261 people to CECOT shortly after midnight on March 16.  *Id.*

The government appealed the TRO and sought a stay pending appeal.  The D.C. Circuit denied the stay; Judge Henderson concluded that the Proclamation was not authorized by the AEA, and Judge Millett concluded that summary removals violate due process.  *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) (per curiam).  The Supreme Court granted the stay, holding that the government was likely to succeed on its claim that the plaintiffs could not challenge

AEA removals through the APA, and that they should instead seek review through habeas petitions in their districts of confinement.  *Trump v. J.G.G.*, 145 S. Ct. 1003, 1005-06 (2025).  The Court emphasized, however, that AEA designees are "entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'"  *Id.* at 1006 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)).  And the Court held that, to facilitate such review, detainees must receive notice of their designation "within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs."  *Id.*

Petitioners around the country subsequently filed habeas petitions, and a number of courts enjoined the removal of districtwide classes of AEA detainees, barring their removal while their challenges were adjudicated.  *See, e.g.*, *J.A.V. v. Trump*, No. 1:25-cv-072, 2025 WL 1257450, *20 (S.D. Tex. May 1, 2025); *D.B.U. v. Trump*, No. 1:25-cv-01163, 2025 WL 1304288, *10 (D. Colo. May 6, 2025); *G.F.F. v. Trump*, No. 25-cv-2886, 2025 WL 1301052, *11 (S.D.N.Y. May 6, 2025); *M.A.P.S. v. Garite*, 25-cv-00171, 2025 WL 1379220, *1 (W.D. Tex. May 13, 2025).

## D.    THIS LITIGATION.

Appellants filed this habeas action in the Northern District of Texas on behalf of themselves and a proposed class on April 16, after learning that the government

11

was moving Venezuelan noncitizens from around the country to the Bluebonnet Detention Facility in Anson, Texas, rather than facilities in the Southern District of Texas, where the first AEA flights had originated, but where Judge Rodriguez had subsequently enjoined AEA removals. Appellants sought a classwide TRO to prevent their removal while their legal challenges proceeded.[6]

On April 17, the district court denied Appellants' TRO based on a lack of imminent harm, noting the government's statement that it did not "presently expect to remove [the named Petitioners] pending resolution of their habeas petition." ROA.250. The district court determined that the putative class did not face imminent removal given "the Supreme Court's opinion in *J.G.G.*, along with the government's general representations about the procedures necessary in these cases." ROA.258.

But mere "hours later, putative class members were served notices of AEA removal and told that they would be removed 'tonight or tomorrow.'" *A.A.R.P.*, 2025 WL 1417281, *1. In light of the Supreme Court's *J.G.G.* decision, the government had revised the notice form to delete the statement that AEA designees were not entitled to review. But its new form did not say detainees could contest removal, much less how to do so or on what timeline, and it was still written only in English. Supp.ROA.845 (Form AEA 21-B). It said only that "[i]f you desire to

---

[6] This case was originally captioned *A.A.R.P. v. Trump*, but was later re-captioned *W.M.M. v. Trump*. Dkt. 44.

make a phone call, you will be permitted to do so." *Id.* Within days, the government disclosed that its post-*J.G.G.* notice policy was to remove people 12 hours after providing this notice, or 24 hours after they stated an intention to file a "habeas petition." ROA.472 (Cisneros Decl.) ¶ 11.[7]

After learning of their imminent removal, the putative class moved for an emergency TRO just after midnight on April 18.[8] *A.A.R.P.*, 2025 WL 1417281, *1. Fourteen hours later, Appellants appealed the constructive denial of the emergency TRO to this Court and subsequently filed an application for an emergency injunction with the Supreme Court. *Id.* at *1-2. Late that afternoon, the government had transported putative class members from the detention facility to an airport. *Id.* at *1, *3. Because "the record before the district court . . . indicated that removals of putative class members were likely imminent," the Supreme Court issued an administrative stay just prior to midnight ordering the government "not to remove any member of the putative class of detainees." *Id.* at *3. Shortly after, this Court denied Appellants' motion.

---

[7] The government initially tried to keep its 12- and 24-hour notice protocols secret, by filing those procedures in a sealed declaration in the Southern District of Texas, without alerting any other court, including the Supreme Court. Judge Rodriguez unsealed the declaration. *J.A.V.* Minute Order (Apr. 24, 2025).

[8] All times referenced are Central Time.

After briefing, the Supreme Court construed the application as a petition for a writ of certiorari from this Court's decision, granted the petition and the application for an injunction pending further proceedings, vacated this Court's judgment, and remanded for further proceedings. *Id.* at *1. The Court held that "[i]n order to 'actually seek habeas relief,' a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." *Id.* at *2. The Court further stated that "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest the removal, surely does not pass muster." *Id.*

On remand, the Supreme Court instructed this Court to address "(1) all the normal preliminary injunction factors, including likelihood of success on the merits, as to the named plaintiffs' underlying habeas claims that the AEA does not authorize their removal pursuant to the President's March 14, 2025, Proclamation, and (2) the issue of what notice is due, as to the putative class's due process claims against summary removal." *Id.* at *4.

**SUMMARY OF ARGUMENT**

## I.    PETITIONERS' CLAIMS ARE JUSTICIABLE.

All of Petitioners' claims can be resolved by this Court. The Supreme Court has already ruled on the merits of their procedural claims and instructed this Court to address them further. The Supreme Court also reiterated that courts can decide

14

questions regarding the AEA's interpretation—as they consistently have for decades—to ensure the Executive stays within the bounds set by Congress.

## II.    THE PROCLAMATION IS NOT AUTHORIZED BY THE AEA.

The Proclamation does not satisfy the AEA's requirements of (1) a military conflict with (2) a sovereign state.

### A. The AEA Can Only Be Used During Military Hostilities.

By its terms, the Proclamation was issued in response to civil immigration violations and criminal activity by a gang.  That is not a valid basis to invoke the AEA, which can only be applied during wartime.

The terms "invasion" and "predatory incursion," like the neighboring phrase "declared war," refer to military hostilities, not crime or migration.  A mountain of sources from the time of the AEA's enactment in 1798 use "invasion" and "predatory incursion" to mean a military attack.  This includes contemporaneous dictionaries, statutes, constitutional provisions, writings of the Framers, and hundreds of Framing-era writings surveyed by Judge Rodriguez.

Likewise, the term "alien enemies" was an established law-of-nations concept that required not just military conflict, but all-out war between nations, such that every subject of each sovereign was considered the other's enemy.  That concept has no application to the civil and criminal violations asserted in the Proclamation.

## B. The AEA Cannot Be Invoked Against a Non-State Actor.

The AEA's text also requires that the military conflict be with a "nation or government," whose "natives, citizens, denizens, or subjects" become alien enemies during a time of war. The Proclamation does not satisfy those textual requirements. TdA is not a nation or a government, and as such, it is incapable of having natives, citizens, denizens, or subjects. The Proclamation claims that TdA is connected to government officials in Venezuela. But the vague connections it asserts, even if true, do not establish that TdA itself is a nation or government. That alone establishes that the AEA does not authorize the Proclamation. And in any event, the Proclamation's asserted governmental connections are devoid of detail or evidence, and contrary to the assessment of the government's own intelligence agencies and experts on Venezuela and TdA.

\*          \*          \*

The government cannot activate the AEA's extraordinary wartime powers just by designating TdA as an FTO. Unlike the AEA, FTO designation does not require an armed attack by a foreign nation. Any foreign private organization that commits any of a long list of crimes may be designated as an FTO. FTO designation does not trigger the AEA any more than a RICO indictment does.

Congress has created numerous other mechanisms to detain and deport noncitizens who violate immigration laws or commit crimes, and it has even created

a court specifically for the removal of FTO members and others engaged in terrorism. The AEA addresses something different: war among sovereign nations.

The government's position would have alarming consequences. If "invasion" includes crime and migration, it could mean that States can wage war unilaterally, and that Congress could suspend habeas corpus at any time. And if any connection to a foreign government were enough to trigger the AEA, it would massively expand the Executive's war powers—allowing it to apply the AEA to all manner of non-state organizations in the United States.

### III.  PROPER NOTICE REQUIRES ALL RELEVANT INFORMATION AND AT LEAST 30 DAYS TO FIND A LAWYER, PREPARE A CASE, AND SEEK RELIEF.

The Supreme Court has held that AEA detainees must be given information and time to actually find an attorney, prepare a case, and seek relief before they are removed. And it has recognized that detainees' due process interests are profound, because they potentially face indefinite detention in a brutal foreign prison. Under those circumstances, due process, the habeas statute, and the AEA itself require certain minimum procedures.

First, the government must provide notice of a person's designation and removal in plain terms, written in a language they understand. Second, the notice must clearly explain that a person can challenge their designation and removal by filing a lawsuit in federal court. Third, the government must provide notice to a

17

person's immigration counsel, if any, and to class counsel; it must provide a list of pro bono attorneys; and it must allow regular phone access.  Fourth, the government must provide the factual basis for its accusation of TdA membership

Finally, the government must give notice at least 30 days prior to removal. This is the same amount of time provided during World War II.  Given the dire stakes for detainees, the insurmountable hurdles to proceeding pro se, and the difficulty of finding counsel and preparing a case, any shorter amount of time would all but guarantee that many detainees are removed to CECOT without review.

## IV.    THE PROCLAMATION VIOLATES A NUMBER OF PROCEDURAL PROTECTIONS.

### A. The Proclamation Is Subject to the INA's Removal Procedures.

The INA provides that it is the "sole and exclusive" procedure for determining whether a noncitizen can be removed.  There is no basis to exclude AEA removals from this rule.  The INA's procedures apply across the board, regardless of the basis for removal.

### B. People Removed Under the Proclamation Cannot Be Sent to Places Where They Face Torture or Persecution.

Even if INA procedures were not required, the government cannot remove people to countries where they face torture or persecution.  Congress has enacted mandatory prohibitions against such removals, regardless of the basis for removal.

The government must therefore inform people of the place to which they will be removed, and give them an opportunity to raise these persecution and torture claims.

### C. The Proclamation Violates the AEA's Right to Voluntary Departure.

By the statute's terms, the government can only remove people under the AEA if they "refuse or neglect to depart" voluntarily.  But the Proclamation and its implementation do not give designated TdA members an opportunity to depart before removal to a foreign prison.

### V.    THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR THE PETITIONERS.

The Supreme Court has already recognized that Petitioners are facing profound irreparable harm.  The public also has a strong interest in preventing erroneous removals, especially to countries where noncitizens face persecution and torture.  The government, in contrast, faces no comparable injury here, as it would retain the tools for addressing migration and crime that Congress has provided.

### STANDARD

The Supreme Court instructed this Court to address "all the normal preliminary injunction factors."  *A.A.R.P.*, 2025 WL 1417281, *4.  "A court should issue a preliminary injunction if the movant shows (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any

harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Paulson Geophysical Serv., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008) (cleaned up).

## ARGUMENT

## I.   PETITIONERS' CLAIMS ARE JUSTICIABLE.

Petitioners advance two sets of claims: that the Proclamation does not satisfy the AEA's statutory requirements, and that the Proclamation violates a number of procedural protections.  As to the procedural claims, the Supreme Court has already twice ruled on the issue of what protections must be afforded to AEA detainees, and it instructed this Court to address the merits of those issues on remand.  *See A.A.R.P.*, 2025 WL 1417281, *2-4; *J.G.G.*, 2025 WL 1024097, *2.

This Court can similarly review Petitioners' claims that the Proclamation does not satisfy the AEA's statutory requirements of an ongoing or threatened "invasion or predatory incursion" perpetrated by a "nation or government."  The Supreme Court recently confirmed that courts can review not only whether an individual "is in fact an alien enemy" under the AEA, but also "'questions of interpretation and constitutionality' of the Act." *Id.* (quoting *Ludecke*, 335 U.S. at 163, 172 n.17).  That is precisely what Petitioners seek here: a construction of the terms of the statute.

In light of the Supreme Court's ruling, every district court to consider these statutory claims in a habeas proceeding has found them reviewable. *See, e.g.*, *J.A.V.*,

2025 WL 1257450, *13-18; *D.B.U.*, 2025 WL 1304288, *4; *G.F.F.*, 2025 WL 1301052, *8; *A.S.R. v. Trump*, 2025 WL 1378784, *11 (W.D. Pa. May 13, 2025); *see also J.G.G.*, 2025 WL 914682, *8-10 (Henderson, J., concurring); *id.* at *16 (Millett, J., concurring).

Indeed, *Ludecke* itself reached the merits of the statutory question presented there: whether a "declared war" existed within the meaning of the Act when "actual hostilities" had ceased and the "shooting war" had ended. 335 U.S. at 161, 166-70. The Supreme Court concluded, on the merits, that the statutory term "declared war" did not mean "actual hostilities," and that once Congress declares war, the war continues for purposes of the AEA until the political branches declare it over. *Id.* at 170 & n.15. *Ludecke* did not evaluate the "political judgment" of Congress and the President about when to rescind the formal declaration of war. *Id.* at 169-70. But it did interpret the meaning of the statute to determine whether its requirements were satisfied. And applying that interpretation, four years later, the Court *reversed* an AEA removal order because "[t]he statutory power of the Attorney General to remove petitioner as an enemy alien ended when Congress terminated the war." *U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952).

Consistent with *J.G.G.* and *Ludecke*'s recognition that questions about the "construction," "interpretation," and "validity" of the AEA are justiciable, 335 U.S. at 163, 171, courts during World War II reviewed a range of issues concerning the

meaning and application of the AEA's terms. *See, e.g.*, *U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir. 1947) (interpreting "foreign nation or government"); *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860-61 (2d Cir. 1943) ("[t]he meaning of [native, citizen, denizen, or subject] as used in the statute . . . presents a question of law"); *U.S. ex rel. Gregoire v. Watkins*, 164 F.2d 137, 138 (2d Cir. 1947) (interpreting "native"); *U.S. ex rel. D'Esquiva v. Uhl*, 137 F.2d 903, 905-07 (2d Cir. 1943) (same and reviewing legal status of Austria); *Citizens Protective League v. Clark*, 155 F.2d 290, 292, 295 (D.C. Cir. 1946) (reviewing whether Proclamation fell within "the precise terms" of the AEA); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (interpreting "within the United States"); *U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947) (interpreting "refuse or neglect to depart"); *U.S. ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116, 117-18 (2d Cir. 1949) (interpreting "reasonable time" to depart under Section 22).

Nor does the political question doctrine pose any barrier to reviewing Petitioners' claims. The Supreme Court foreclosed that possibility in *J.G.G.* and *Ludecke*, by instructing courts to resolve questions of the AEA's "construction and validity" and "interpretation and constitutionality." 335 U.S. at 163, 171; *J.G.G.*, 2025 WL 1024097, *2; *see also A.A.R.P.*, 2025 WL 1417281, *4 (instructing this Court to address named plaintiffs' statutory claims); *J.G.G.*, 2025 WL 914682, *6-8 (Henderson, J., concurring) (rejecting government's political-question arguments).

## II.    THE PROCLAMATION IS NOT AUTHORIZED BY THE AEA.

The AEA is a wartime authority that requires (1) a "declared war," or an ongoing or threatened "invasion or predatory incursion" (2) by a "foreign government or nation." 50 U.S.C. § 21.  The Proclamation fails both of those requirements, even assuming its factual assertions are true.

The text and context of the AEA make clear that it applies to one specific situation: armed conflict between nation states.  When military conflict breaks out, the AEA provides an extraordinary authority to detain and remove every national of the enemy foreign nation, even those lawfully present in the United States.  By contrast, Congress has enacted a wide range of *other* tools for the Executive to address migration, crime, and non-state terrorism.  The President cannot expand his wartime authorities simply by asserting that crime and migration are metaphorically akin to warfare, or that a non-state organization has some loose and unspecified relation to a foreign government.

### A. The AEA Can Only Be Used During Military Hostilities.

To interpret the AEA, the Court must examine "the ordinary public meaning of its terms at the time of its enactment" in 1798.  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020).  Every tool of interpretation confirms that the AEA requires armed conflict between states, not the "crimes" or "mass migration" asserted by the

Proclamation.  *See J.G.G.*, 2025 WL 914682, *8-10 (Henderson, J., concurring) (holding the Proclamation invalid on this basis); *J.A.V.*, 2025 WL 1257450 (same).

To start, the AEA's text requires a "declared war," "invasion," or "predatory incursion."  50 U.S.C. § 21.  Contemporaneous dictionaries defined these terms to mean armed hostilities between military rivals.  *See* Webster's Dictionary, *Invasion* (1828) ("invasion" is "particularly the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force"); Johnson's Dictionary, *Invasion* (1773) ("[h]ostile entrance" such as when "William the Conqueror invaded England" or when "nations" experience "arm'd *invasion*, and embrace the war"); Webster's, *Predatory* (1828) ("plundering" or "pillaging"); Johnson's, *Incursion* (1773) ("[a]ttack" or "[i]nvasion without conquest").

The text also refers to "alien enemies"—the title and subject of the Act.  50 U.S.C. §§ 21-24.  And in 1798, "alien enemy" was a well-established term of art in the law of nations, which referred to the citizens and subjects of a foreign nation with whom the United States was at war.  In this situation, when "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it."  *George v. McDonough*, 596 U.S. 740, 746 (2022) (cleaned up).  The AEA thus imported "the cluster of ideas that were attached" to the concept of "alien enemies" in the 18th century. *Morissette v. United States*, 342 U.S. 246, 263 (1952). And that concept plainly required armed hostilities between warring sovereigns.

Under the law of nations, "an alien enemy [was] the subject of a foreign state at war with the United States." *Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (quoting *Techt v. Hughes*, 128 N.E. 185, 186 (N.Y. 1920) (Cardozo, J.) and collecting treatises and historical sources). The idea was that "in war 'every individual of the one nation must acknowledge every individual of the other nation as his own enemy.'" *Eisentrager*, 339 U.S. at 772 (quoting *The Rapid*, 8 Cranch 155, 161 (1814)).

Critically, this law-of-nations concept of alien enemies required an actual armed conflict. *See id.* at 775 (AEA requires "the existence of a state of war"); *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 228 (1796) (holding that people could not be "alien enemies" during peacetime); Vattel bk. III, ch. V, §§ 69, 70 (alien enemy status arose when "a nation is at open war" against "another nation"). By contrast, domestic crimes "committed by private citizens" such as "robbers" were handled "according to that rule of the civil law," and did not trigger the law of war or the status of alien enemies. William Blackstone, 1 Commentaries on the Laws of England 249 (1765). This remains true today, as crime and migration are governed by ordinary domestic law, whereas warfare is governed by its own set of rules. Thus, by tying the AEA to this concept of "alien enemies," Congress used an established law-of-nations term which plainly excluded the kinds of TdA activities alleged in the Proclamation.

25

Other parts of the AEA's text perfectly match the law-of-nations concept of an "alien enemy."  The Act authorizes detention and removal of "all natives, citizens, denizens, or subjects of the hostile nation or government," 50 U.S.C. § 21—exactly those whom the law of nations deemed enemies.  *See The Benito Estenger*, 176 U.S. 568, 571 (1900) ("citizens or subjects" of an enemy nation are alien enemies based on their "political status").  And the Act requires an attack "against the territory of the United States," 50 U.S.C. § 21, in line with the law of nations' requirement of armed hostilities sufficient to mobilize "all the subjects or citizens of the one" against all the "subjects or citizens of the other."  *White v. Burnley*, 61 U.S. 235, 249 (1857).

The Act's historical context further confirms that Congress intended to incorporate the law-of-nations meaning, and therefore to require military conflict. *Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 279 (2024) (looking to "historical context").  The AEA was enacted in the lead-up to war with France, with the universal understanding that it would apply to French citizens if a full war broke out.  *See, e.g.*, 8 Annals of Cong. 1790 (1798) ("In the event of a war with France, all her citizens here will become alien enemies . . .").  Legislators consistently stated their intention to follow the law of nations in enacting the AEA.  *See* 8 Annals of Cong. 1577 (1798); *id*. at 1790; *id*. at 1979-80.  And in discussing the Act's scope, its drafters were clear that, outside of war, "foreigners guilty of crimes against the

United States" would be "apprehended and punished according to the existing laws: the present regulation was not pointed at them." *Id.* at 1575.

Congress reinforced this same distinction—between war and crime—when it passed the Alien Friends Act weeks before the AEA. The Alien Friends Act was the peacetime counterpart to the AEA; it provided a different process for the removal of noncitizens, outside the context of war, who were deemed "dangerous to the peace and safety of the United States." An Act Concerning Aliens § 1, 1 Stat. 571 (1798). Unlike the AEA, which was passed pursuant to Congress's "power to declare war," the Alien Friends Act targeted noncitizens who merely committed "dangerous" acts within the United States, but whose nations were not at war with the United States. *Eisentrager*, 339 U.S. at 774 n.6 (distinguishing the debates over the two Acts). By using a *different* statute from the AEA to govern the peacetime removal of noncitizens a President deemed dangerous, Congress made clear that the President could not undertake the identical action under the AEA. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) (courts "presume differences in language like this convey differences in meaning," especially when enacted by "the same Congress") (cleaned up).

Contemporaneous enactments further underscore that the AEA's language refers to military conflict. For instance, in the Constitution—written and ratified just a decade before the AEA—the word "invasion" is exclusively "used in a military

sense." *J.G.G.*, 2025 WL 914682, *9 (Henderson, J., concurring).  States can "engage in War" if they are "actually invaded."  U.S. Const. art. I, § 10, cl. 3.  Congress can "provide for calling forth the Militia to . . . repel Invasions."  *Id.* art. I, § 8, cl. 15.  And Congress can suspend habeas corpus in certain "Cases of Rebellion or Invasion."  *Id.* art. I, § 9, cl. 2; *see Hamdi v. Rumsfeld*, 542 U.S. 507, 554, 558 (2004) (Scalia, J., dissenting) (suspension available in "the exigencies of war").  In addition to confirming the military meaning of the words in the AEA, these provisions show the open-ended dangers that might follow—suspending habeas corpus, States claiming authority to wage war on their own—if courts, for the first time in U.S. history, were to interpret Framing-era references to "invasion" to encompass crime and migration.

Indeed, courts and the government itself have long understood that, when the AEA was enacted, these words referred to military hostilities.  The Second Circuit has explained that the Invasion Clause, *see* U.S. Const. art. IV, § 4, refers to "armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government"—not "illegal immigration" or crimes committed by immigrants.  *Padavan v. United States*, 82 F.3d 23, 25, 28 (2d Cir. 1996); *see California v. United States*, 104 F.3d 1086, 1090-91 (9th Cir. 1997) (same); *New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996) (same).  And the Department of Justice recently explained that "common usage of the term

in the late Eighteenth Century predominantly referred to 'invasion' as a hostile and organized military force"—not "irregular migration or criminal cartels' smuggling activities."  Br. for the United States at 38, *United States v. Oklahoma*, No. 24-6144 (10th Cir. Nov. 20, 2024).

The same pattern holds across all manner of sources at the time of the AEA, which used the terms "invasion" and "incursion" to refer to military attacks.  *See, e.g.*, *Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1, 11 (1805) ("predatory incursions" by Native American nation led to "an Indian war"); Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798) (describing "predatory incursions of the French" that were met by the militia); Letter from George Washington to Thomas Jefferson (Feb. 6, 1781) (describing British military raid as a "predatory incursion"); *J.A.V.*, 2025 WL 1257450, *15 (concluding, after "review[ing] numerous historical records using 'invasion,' 'predatory incursion,' and 'incursion' for the period from 1780 through 1820," that "the significant majority of the records . . . referred to an attack by military forces"); *see* Supp.ROA.847-49 (appendix listing 133 records).

Congress thus used terms whose ordinary public meaning in 1798 referred to armed hostility between sovereigns.  The Proclamation, however, does not and obviously could not assert that the United States is in an armed conflict with TdA, much less Venezuela.  While the Proclamation uses the label "irregular warfare," the

actual activities it asserts are simply TdA's participation in "illegal migration" and "crimes," especially selling "drug[s]." Those activities do not describe any kind of military conflict with the United States and therefore do not constitute an invasion or predatory incursion within the meaning of the AEA. The Proclamation thus comes nowhere near meeting the AEA's statutory prerequisites.

**B. The AEA Cannot Be Invoked Against a Non-State Actor.**

In addition to requiring military hostilities, the AEA can only be used against a foreign state. This presents an additional reason why the Proclamation is not authorized by the AEA. Even if there were an armed conflict with a non-state actor, the AEA would not apply. From the Founding to the present, Congress has created numerous *other* tools for the Executive to detain and deport members of non-state organizations, both during an armed conflict and in peacetime. *See, e.g.*, An Act Concerning Aliens § 1, 1 Stat. 571 (1798); 10 U.S.C. ch. 47A (Military Commissions Act); 18 U.S.C. §§ 2332b, 2339B; *supra* at 4, 36, 48 (listing statutory schemes for detaining and removing members of FTOs). The AEA, however, is not one of those tools.

The text makes this clear in several ways. It requires an attack by a "nation or government," not a non-state actor. 50 U.S.C. § 21. And it identifies as alien enemies "all natives, citizens, denizens, or subjects of the hostile nation or government." *Id.* Those terms describe a specific legal relationship between an

30

individual and a sovereign state, which does not apply to a non-state organization. *See Eisentrager*, 339 U.S. at 773 (alien enemy status stems from a subject's "allegiance" and "duty to his sovereign"—his "political and legal relations to the enemy government").  There is no such thing as a "native" or "citizen" or "subject" of a gang.[9]  And the Proclamation does not claim otherwise, referring only to "members" of TdA.  That alone makes the Proclamation incompatible with the AEA's text, because the Proclamation on its face does not apply to the "natives, citizens, denizens, or subjects of [a] hostile nation or government."

The text also refers to "alien enemies," which, as discussed, was a law-of-nations concept that only applied to the subjects of a foreign sovereign.  Alien enemy status under the law of nations arose on the understanding that a "sovereign represents the nation, and acts in the name of the whole society," and that because of that unique role, "[w]hen the sovereign or ruler of the state declares war against another sovereign," "all the subjects of one are enemies to all the subjects of the other."  Vattel bk. III, ch. V, § 70 (1758).  That concept has no application to non-state actors.

---

[9] In the late 18th Century, a "denizen" was "[a]n alien infranchised by the king's letters patent," who existed "in a kind of middle state, between an alien and a natural born subject."  Burns' Dictionary, *Denizen* (1792); Jacob's Dictionary, *Denizen* (1811) (same).  This, too, requires a sovereign.

The statutory text goes even further to exclude groups like TdA, because it describes the requisite "hostile nation or government" as one capable of entering a "treaty" with the United States.  50 U.S.C. § 22.  But a treaty is an "agreement among sovereign powers."  *Medellin v. Texas*, 552 U.S. 491, 505, 507 (2008); *see Holmes v. Jennison*, 39 U.S. 540, 570-72 (1840) (similar).  Because TdA is not a sovereign state and does not conduct foreign policy or sign treaties, it cannot be the "hostile nation or government" that the AEA requires.

Faced with these clear requirements of war with a foreign sovereign, the Proclamation's vague assertions of a connection between TdA and the government of Venezuela, even if true, *but see infra*, would not satisfy the AEA.  The Proclamation notably does not claim that TdA itself is a "nation or government" for AEA purposes.  Rather, it mentions a series of hazy and unexplained contacts between TdA and the Venezuelan government: It claims TdA "coordinates" with a different organization (Cartel de los Soles), which in turn is "sponsored" by the government.  It says TdA "maintains close ties" with government agencies and is "closely aligned" with the government.  And using hedged language, the Proclamation states, with no further explanation, that TdA is acting "both directly and at the direction, clandestine or otherwise, of the Maduro regime."  But none of these cryptic assertions fit the textual requirements of the AEA.  The Act applies only to a "nation or government" and its "subjects" and "citizens."  The Act does

not apply to an entity that is *not* a nation or government, that does *not* have citizens or subjects, and that merely "maintains close ties" to government officials. To establish "alien enemies" under the law of war and the text of the AEA, the United States would need to be engaged in an actual war with Venezuela. But the Proclamation does not and could not claim that TdA's undefined "ties" mean that the United States and Venezuela are at war.

That is enough to render the Proclamation incompatible with the AEA. Even taking its statements as true, the Proclamation does not assert an attack by a "nation or government" as the AEA requires. Consequently, the Court need not look beyond the face of the Proclamation to hold that it fails to satisfy the AEA's statutory requirements.

If, however, the Court were look beyond the face of the Proclamation, the governmental connections the Proclamation claims—already vague and devoid of detail—are directly contrary to the conclusions of U.S. intelligence agencies and experts who study Venezuela and TdA. Even if some degree of deference applies to the Proclamation's factual assertions, "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see Kessler*, 163 F.2d at 143 (reviewing facts to determine whether AEA requirement was met); *D'Esquiva*, 137 F.2d at 905-07 (same); *Zdunic*, 137 F.2d at 860-61 (ordering fact-finding on AEA predicate); *cf. Al-Alwi v. Trump*, 901 F.3d 294, 298-

300 (D.C. Cir. 2018) (reviewing whether "[t]he record" showed the existence of "active hostilities" under the AUMF).    Accepting the Proclamation's dubious conclusory statements without review would permit the government to evade the AEA's limits at will.

Contrary to the Proclamation, the overwhelming view among the U.S. intelligence agencies is that TdA is "not controlled by the Venezuelan government," and is "not acting at the direction of the Maduro administration." Supp.ROA.1052-55. The CIA Director confirmed this to Congress after the Proclamation was issued. When asked whether the intelligence community believes that, through TdA, the United States is "being invaded by the nation of Venezuela," he stated, "we have no assessment that says that." *National Security and Intelligence Officials Testify on Global Threats* at 57:59-58:10, C-SPAN (Mar. 26, 2025).[10]  Experts who have spent years studying TdA and the Venezuelan government have testified the same, explaining that there is "no evidence that the Maduro regime has directed Tren de Aragua to migrate to the United States or to commit any crimes within the United States."   Supp.ROA.738-42 (Hanson Decl.) ¶¶ 1, 14, 17, 19-20; Supp.ROA.752 (Antillano Decl.) ¶¶ 12-13; Supp.ROA.756-63 (Dudley Decl.) ¶¶ 2, 5, 17-18, 21, 23-24; *see* Supp.ROA.741 (Hanson Decl.) ¶ 17 (claims of such direction are "absolutely

---

[10] https://www.cspan.org/program/house-committee/national-security-and-intelligence-officials-testify-on-globalthreats/657380

implausible").  To the contrary, the intelligence community has determined that TdA and the Maduro regime are "hostile to each other," that there is no evidence of communication or funding by which the government has directed TdA's activities, and that TdA is not a centralized organization capable of carrying out such a concerted activity.  Supp.ROA.1052-55.

*          *          *

The Proclamation thus exceeds the authority granted by the AEA, because it does not respond to a "declared war," "invasion," or "predatory incursion"—all of which require armed conflict—and it does not target the "citizens" and "subjects" of a "nation or government."

Neither of those defects is cured by the fact that the administration has designated TdA as a foreign terrorist organization.  *See A.S.R.*, 2025 WL 1208275, *14-18 (concluding that FTO status validated the use of the AEA).  Over a hundred organizations have been designated as FTOs; 79 are currently.[11]  To be designated, an organization does not need to engage in anything close to military hostilities or be a sovereign nation or government.  Instead, a "foreign organization" can be designated as an FTO if it commits any of a long list of crimes, like kidnapping or "[t]he use of any . . . firearm, or other weapon or dangerous device."  8 U.S.C.

---

[11] *See* Cong. Res. Serv., The Foreign Terrorist Organization (FTO) List, Tbl. 1 (May 13, 2025).  The Secretary of State is empowered to designate FTOs whenever he "finds" the criteria satisfied.  8 U.S.C. § 1189(a)(1).

§ 1189(a)(1)(A), (B) (referencing 8 U.S.C. § 1182(a)(3)(B)).  Multiple criminal gangs have recently been designated.  But like a RICO indictment against a criminal organization, the simple fact of an FTO designation does not mean that an entity is engaged in military hostilities.  And the FTO criteria do not require any element of statehood, like sovereignty or engagement in foreign relations.

The FTO designation is further irrelevant to the AEA because Congress has provided a *different* set of tools for detaining and removing actual FTO members.  The immigration laws provide a range of authorities to detain and remove a "member" or "representative" of an FTO.  Notably, Congress created a specialized court for the removal non-citizen "terrorists."  8 U.S.C. §§ 1531 *et seq.*  (Alien Terrorist Removal Court for FTO members among others); *see id.* §§ 1536-1537 (detention authority); *see also* 8 U.S.C. § 1182(a)(3)(B)(i)(V), (vi) ("member of a terrorist organization" including FTO is removable); *id.* § 1227(a)(4)(B) (same); *id.* § 1226a (additional detention and removal scheme for FTO members and other "suspected terrorists").  Members of course can also be prosecuted and detained for any crime they commit.  And if they engage in armed conflict against the United States, they can be subject to a range of detention and removal schemes designed for non-state actors.  The AEA, by contrast, is designed for something else, which does not apply to TdA or other gangs: war between sovereign states.

Congress has similarly provided detention and removal authorities for the specific activities the Proclamation identifies: "illegal migration," "drug trafficking," and other "crimes." The INA provides a host of detention and removal options for people who enter the country unlawfully and who commit crimes. *See, e.g.*, 8 U.S.C. §§ 1182(a)(2), (a)(3), 1225, 1227(a)(2), (a)(4), 1226(c), 1231(a)(6). And all the crimes identified in the Proclamation are of course subject to serious criminal penalties. These authorities belie the notion that the government needs to misappropriate a wartime power to address issues for which Congress has already provided extensive and specific tools.

Allowing the government to stretch the AEA here would open the door to a range of abuses. The government has already claimed extraordinary powers under the AEA—including to strip people of their legal status in this country; to send people to be held indefinitely without trial, incommunicado, in a horrific foreign prison; and to enter American homes without a warrant. *See supra* at 5-9. There are many troubling indications that the government is applying the Proclamation to scores of people with no TdA affiliation, using criteria that have almost nothing to do with TdA membership, even assuming TdA has formal "members." *See supra* at 6-8. So far, these efforts have primarily targeted Venezuelan men. But these efforts are likely to expand dramatically if courts rule that the government can use the AEA against non-state organizations that are not engaged in armed hostilities. Many

nations have criminal gangs that have some presence in the United States.  And if the Proclamation's thin assertions are enough, the President could easily claim that any gang or other non-state actor "coordinates" with a foreign government and aims to "destabiliz[e]" the United States.

### III.    PROPER NOTICE REQUIRES ALL RELEVANT INFORMATION AND AT LEAST 30 DAYS TO FIND A LAWYER, PREPARE A CASE, AND SEEK RELIEF.

The Supreme Court has prescribed that "AEA detainees must receive notice . . . that they are subject to removal under the Act . . . afforded within a reasonable time and in such a manner as will allow them to *actually* seek habeas relief in the proper venue before such removal occurs."  *J.G.G.*, 145 S. Ct. at 1006 (emphasis added).  The Court has further explained that "[i]n order to 'actually seek habeas relief,' a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief."  *A.A.R.P.*, 2025 WL 1417281, *2.  And it "surely does not pass muster" for the government to provide "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal."  *Id.*  The Supreme Court remanded to this Court to address "the precise process necessary to satisfy the Constitution."  *Id.*

In the unique circumstances facing detainees under the Proclamation, due process, habeas corpus, and the AEA require three critical things: (1) information

about how to challenge a person's AEA designation and removal; (2) the factual basis for the government's accusation of TdA membership; and (3) a 30-day period to attempt to find counsel and to prepare and file a habeas petition in federal court.[12]

1.  Consistent with the Supreme Court's rulings, the government must inform a detainee about their designation, removal, country of removal, and how to challenge them.  That requires notice in a language the individual understands, written in plain language.  Additionally, the notice must state clearly that the person can challenge their removal by filing a lawsuit in federal court, and that they can contact lawyers.  And the notice must state the earliest date by which the person may be removed if they do not challenge removal.  *See J.G.G.*, 145 S. Ct. at 1006 (notice must inform detainees "that they are subject to removal under the Act"); *A.A.R.P.*, 2025 WL 1417281, *2 (notice must explain "how to exercise due process rights to contest that removal"); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 & n.15 (1978) (notice of electricity cutoff violated due process where it "did not

---

[12] The Supreme Court held that due process requires reasonable notice and a meaningful opportunity to seek habeas relief.  Habeas review likewise requires "a meaningful opportunity to demonstrate that [one] is being held pursuant to 'the erroneous application or interpretation of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (cleaned up); *see Hamdi*, 542 U.S. at 525-26 (similar under habeas statutes).  The AEA itself has also been understood to allow individuals to challenge their designation.  *See Ludecke*, 335 U.S. at 163, 172 n.17.  These all require the same basic protections discussed here.

advise [recipients] of a procedure for challenging" disputed bills, including "where, during which hours of the day, and before whom" to raise the dispute).

Further, for a person "to actually seek habeas relief" they "must have sufficient . . . information to reasonably be able to contact counsel." *A.A.R.P.*, 2025 WL 1417281 *2; *see* Supp.ROA.1067 (explaining that counsel is not aware of any AEA detainee who has managed to file a habeas petition pro se); Supp.ROA.1058-59 (Babaie Supp. Decl.) ¶¶ 9, 12; *Ardestani v. I.N.S.*, 502 U.S. 129, 138 (1991) (acknowledging that "the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important"). The government must therefore provide several pieces of information to facilitate legal representation. First, it must provide the same notice described above to the detainee's immigration counsel, if any, as well as class counsel in this case. Second, the government must provide the list of free legal service providers that immigration detention facilities are already required to share. *See* 8 U.S.C. § 1229(b)(2); ICE, *Performance-Based National Detention Standards 2011*, at 386 ("PBNDS") (requiring "a list of telephone numbers for current free legal service providers").[13] And third, the government must provide regular telephone access, not merely a single phone call, *supra* at 12-13, and inform the individual that they can call and/or meet in person with attorneys. *See* PBNDS at

---

[13] https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

388 (requiring "[f]ull telephone access" and "easily accessible" calls to "legal representatives").

These steps would be taken by anyone who was "desirous of actually informing" a person of their rights. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).

2.  To allow a person to meaningfully contest the government's accusation of TdA membership, the notice must further include the factual basis for the individual's alien enemy designation. This is one of the most basic procedural entitlements any time the government seeks to impose a deprivation based on a factual allegation. *See, e.g.*, 8 U.S.C. § 1229(a)(1) (notice charging a person with removability must disclose "[t]he acts or conduct alleged to be in violation of law"); Fed. R. Crim. P. 7(c)(1) (criminal indictment must inform defendant of "the essential facts constituting the offense"); *Mullane*, 339 U.S. at 314 (notice must be "reasonably calculated" to provide "opportunity to present . . . objections").

The Supreme Court has long treated this principle as "immutable": "Where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959). Even during a "period of ongoing combat," a person classified as an enemy combatant "must receive notice

of the factual basis for his classification, and a fair opportunity to rebut the Government's assertions before a neutral decisionmaker." *Hamdi*, 542 U.S. at 532-33 (plurality op.) (explaining notice and opportunity must be "meaningful"). Absent this information, AEA detainees will be unable to *meaningfully* challenge their designation. *See Memphis Light*, 436 U.S. at 14 (purpose of notice is to "permit adequate preparation for" challenging the deprivation); *City of W. Covina v. Perkins*, 525 U.S. 234, 240 (1999) (similar); *Boumediene*, 553 U.S. at 779 (same in habeas corpus proceeding).

3. AEA detainees must have at least 30 days' notice before the government may remove them—particularly in light of the significant complexity in obtaining counsel and filing a federal habeas petition (or attempting to prepare and file a pro se petition), and the grave consequences if a detainee does not manage to do so in time.

This is the same amount of notice the government gave alleged alien enemies during World War II. At that time, the United States had come under direct military attack by Japan and had declared war against multiple foreign powers—yet the government still believed it reasonable and necessary to provide alleged alien enemies with at least 30 days' notice prior to any forced removal. *See Citizens Protective League*, 155 F.2d at 295. Significantly, that notice period applied even

to those the government deemed "dangerous to the public peace and safety of the United States" during a world war.  *Id.*

The practical barriers faced by AEA detainees underscore why a minimum of 30 days is necessary.  As the Supreme Court emphasized, to actually seek habeas relief, detainees need "sufficient time . . . to contact counsel, file a petition, and pursue appropriate relief."  *A.A.R.P.*, 2025 WL 1417281, *2.  And under the circumstances here, several practical barriers mean that each of those steps could take a significant amount of time.  *See id.* (courts must consider "all the circumstances") (quoting *Mullane*, 339 U.S. at 314); *Biwot v. Gonzales*, 403 F.3d 1094, 1099 (9th Cir. 2005) (due process must account for "any barriers" faced by a noncitizen); *Matter of C-B-*, 25 I. & N. Dec. 888, 889 (BIA 2012) (same).

First, detention hinders AEA detainees' ability to quickly locate and communicate with counsel.  "[D]ata shows that detention significantly decreases the ability of respondents in immigration proceedings to obtain counsel."  *Hernandez Lara v. Barr*, 962 F.3d 45, 55-56 (1st Cir. 2020); *Nunez v. Boldin*, 537 F. Supp. 578, 582-83, 586 (S.D. Tex. 1982) (cataloguing hurdles); *Freza v. Att'y Gen.*, 49 F.4th 293, 300 (3d Cir. 2022) (courts cannot "ignore the realities of obtaining legal counsel while detained"); *Usubakunov v. Garland*, 16 F.4th 1299, 1307 (9th Cir. 2021) (describing "very difficult barriers faced by a detained applicant who does not speak English" in obtaining counsel); *see also Alford v. United States*, 709 F.2d 418, 424

(5th Cir. 1983) (incarceration "considerably constrained" "ability to find, retain, and confer with counsel"). Among other things, "[d]etainees' access to phone calls and visits is generally limited, which hampers their ability to contact and meet with prospective lawyers." *Hernandez Lara*, 962 F.3d at 55. AEA detainees' access to in-person meetings with attorneys is likewise limited by detention facility rules: lawyers generally cannot meet with detainees whose names and DHS-assigned numbers they do not know in advance, and the government has refused to provide this information. ROA.643-44 (Sarabia Roman Decl.) ¶ 3. And detained immigrants "may have limited access to relevant documents." *Quintero v. Garland*, 998 F.3d 612, 629 (4th Cir. 2021).

Second, many AEA detainees do not speak or read English. Some cannot read at all and must rely on other detainees or guards to read forms to them. *See* ROA.270 (Brown Decl.) ¶ 4 (describing English-speaking detainee interpreting AEA notice); ROA.273-74 (Collins Decl.) ¶ 10 (same). These pose obvious barriers to learning about the legal process, learning about attorneys, and making contact with them. *Nunez*, 537 F. Supp. at 586 (notice and opportunity to develop claim must account for not speaking English or understanding legal system); *Hernandez Lara*, 962 F.3d at 55; *Biwot*, 403 F.3d at 1099.

Third, there is a limited pool of pro bono attorneys who can litigate federal habeas petitions. Many immigration practitioners are not familiar with the

procedures or legal issues involved in federal habeas litigation. *See* Supp.ROA.1058-59 (Babaie Supp. Decl.) ¶¶ 10-11. It will therefore take time for a detainee to successfully find an attorney who is available to quickly interview them for potential representation, research their factual situation and legal claims, gather evidence, draft pleadings, and file in federal court—all while communicating with a detained client. Lawyers frequently have months for all of this before filing federal lawsuits. Thirty days—or the time left when a detainee manages to secure counsel—is lightning-fast by contrast.

This problem would be hugely magnified in a scenario where the Proclamation is upheld. So far, most of the habeas cases have focused on the same threshold legal arguments regarding the Proclamation's validity. But if the Proclamation is upheld, subsequent habeas petitions will focus on the fact-specific question of whether each individual is a TdA member. That will require attorneys to investigate and develop facts for every separate detainee. The scale of that undertaking will be immense. In just the first hours the Proclamation was in effect, the government deported hundreds of people. If the Proclamation is upheld, the government will likely attempt to use it to deport hundreds or thousands more.

Based on similar barriers, courts have found that days or weeks are insufficient for detained immigrants to press their claims. *See Freza*, 49 F.4th at 300, 302 (denial of 30-day continuance violated due process); *Hernandez Lara*, 962

F.3d at 55-56 (five weeks insufficient for Spanish-speaking detainee to find counsel and have counsel prepare the case); *Cruz Rendon v. Holder*, 603 F.3d 1104, 1110 (9th Cir. 2010) (two months insufficient to find lawyer and "marshal significant documentary evidence" from detention); *Usubakunov*, 16 F.4th at 1306-07 (seven weeks insufficient for attorney to meet with detained client and prepare case); *see also Alford*, 709 F.2d at 424 (denial of two weeks for preparation after just three weeks to find lawyer denied fair trial, in proceeding under 28 U.S.C. § 2255); *Nunez*, 537 F. Supp. at 580 n.1, 586-87 (requiring reasonable notice, attorney access, and "time that allows those aliens wishing to apply for asylum to do so meaningfully").

If anything, AEA detainees need significantly *more* time than many immigration detainees.  The pool of available attorneys is much more limited. Federal habeas litigation is significantly different from immigration proceedings. And if they do not find counsel in time, the consequences are dire and, the government has argued, irreversible.  AEA detainees face indefinite detention, possibly for the remainder of their lives, in a notoriously brutal prison abroad.  Those grave consequences should not be left to the random luck of whether a detainee can obtain timely telephone access at the detention center, or leaves an unclear message on a lawyer's voicemail, or needs to try multiple lawyers, or needs a few days or weeks to gather evidence, or the many other contingencies that could result in

erroneous removals to CECOT, without judicial review, under a shorter notice period.[14]

## IV.  THE PROCLAMATION VIOLATES A NUMBER OF PROCEDURAL PROTECTIONS.

Even if the Proclamation was authorized by the AEA, and individuals were given due process to contest their designation and removal, it would still have to comply with the procedures Congress has mandated.  Congress has provided that the INA's removal process is the "sole and exclusive procedure" for adjudicating removal.  It has barred the Executive from removing a person to a country where they face persecution or torture.  And it provided a right to voluntary departure in the AEA.  The Proclamation cannot be enforced without following these statutory commands.

### A. The Proclamation Is Subject to the INA's Removal Procedures.

Since the last invocation of the AEA more than eighty years ago, Congress has carefully specified the procedures by which noncitizens may be removed from the United States.  *See* 8 U.S.C. ch. 12; *id.* §§ 1229, 1229a.  And Congress made clear, when it enacted the INA in 1952, that it intended its new comprehensive framework to govern *all* removals unless it said otherwise: "Unless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and

---

[14] Detainees must also have the ability to seek an extension for good cause.

exclusive procedure for determining whether an alien may be . . . removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). This language makes clear that Congress intended for the INA to "supersede all previous laws with regard to deportability." S. Rep. No. 82-1137, at 30 (1952). Congress enacted this provision with full knowledge of the AEA, which had been used only a few years earlier. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law).

Congress has explicitly exempted several removal procedures from the INA's "sole and exclusive" application. *See, e.g.*, 8 U.S.C. §§ 1225(b), 1228, 1229a(a)(3) (exempting expedited removal); 8 U.S.C. § 1531 *et seq.* (special removal procedures for FTO members and other terror suspects); 8 U.S.C. § 1226a (same). But it has never exempted the AEA. Thus, before anyone can be removed under the Proclamation, the government must obtain a final removal order using the procedures spelled out in the INA. The AEA still allows the Executive to detain and deport immigrants during a war who would otherwise be lawfully present. But

Congress's clear textual commands do not allow the government to jettison the INA's "sole and exclusive" removal procedures.[15]

### B. People Removed Under the Proclamation Cannot Be Sent to Places Where They Face Torture or Persecution.

Even if AEA removals did not have to follow the INA's removal procedures, they would still have to comply with Congress's two mandatory bars on removal to a country where a person faces torture or persecution. The government cannot carry out removals under the Proclamation without applying Congress's protections against persecution and torture in the country of removal.[16]

First, the withholding-of-removal statute provides that the government "may not remove an alien" to any country where their "life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16 (withholding of removal procedures). The Supreme Court has made clear that this protection is mandatory. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 444

---

[15] If Petitioners succeed in this claim, some of the protections discussed in the previous section might be superseded, because instead of requiring Petitioners to initiate their own habeas proceeding to contest removal, the INA would require the government to initiate a removal proceeding.

[16] Congress has also provided all non-citizens a right to seek asylum if they fear persecution in their home country. *See* 8 U.S.C. § 1158.

(1987) (noncitizens "who can show a clear probability of persecution are *entitled* to mandatory suspension of deportation" under withholding of removal).

Second, the Convention Against Torture ("CAT") and its implementing statute categorically prohibit the government from removing a noncitizen to any country where "there are substantial grounds for believing the person would be in danger of being subjected to torture." 8 U.S.C. § 1231 note; *see* U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988); Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-277, Div. G. Title XXI, 112 Stat. 2681 (1998) (implementing CAT); 8 C.F.R. §§ 208.16-208.18 (CAT procedures). These protections are likewise mandatory. *See Nasrallah v. Barr*, 590 U.S. 573, 575 (2020) ("If the noncitizen demonstrates that he likely would be tortured if removed to the designated country of removal, then he is *entitled* to CAT relief.") (emphasis added).

These protections apply here by their plain terms. Both rules apply to removals generally, with no limitation that would exclude the AEA. *See* 8 U.S.C. § 1231(b)(3)(A) (applying withholding to any effort to "remove" a person); 8 U.S.C. § 1231 note (applying CAT to any effort to "expel, extradite, or otherwise effect the involuntary return of any person"). The AEA, which itself speaks of "removal," falls squarely within the terms of both statutes. 50 U.S.C. § 21. Congress enacted

50

the withholding and CAT bars with full knowledge of the AEA's removal process. *See Miles*, 498 U.S. at 32. And while Congress included specific exceptions to both withholding and CAT, *see* 8 U.S.C. § 1231(b)(3)(B); *id.* § 1231 note (same exceptions for both withholding and CAT), it made no exception for AEA removals.

Judge Walker's opinion in *Huisha-Huisha v. Mayorkas* underscores why CAT and withholding apply here. 27 F.4th 718 (D.C. Cir. 2022). There, the D.C. Circuit addressed whether the government could expel noncitizens under 42 U.S.C. § 265—a public-health statute that, like the AEA, lies outside the INA and authorizes removal. The Court explained that because § 265 "says nothing about where the Executive may expel," it therefore does not displace Congress's specific commands about where people cannot be removed. *Id.* at 731-32. The exact same is true here. *See id.* at 732 (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018)) ("When . . . 'confronted with two Acts of Congress allegedly touching on the same topic,' [a] court 'must strive to give effect to both.'") (cleaned up)). Congress's "specific prohibition[s]" against removal to persecution and torture are an "exception" to the AEA's "general permission" for removal. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("the specific governs the general").

The government therefore may not remove anyone under the Proclamation without screening people for persecution and torture in the country of removal. This requires notifying individuals of the country of removal, providing a meaningful

opportunity to express fear, and if fear is expressed, affording a fair and serious adjudication of the claim.  *See Nasrallah*, 590 U.S. at 575; 8 C.F.R. §§ 1240.10(f), 1240.11(c)(1).  So far, the government has ignored these congressional mandates, with devastating consequences.  Without any of the required screenings, it has removed hundreds of people under the AEA to a prison in El Salvador where they face "indefinite detention" without trial, *A.A.R.P.*, 2025 WL 1417281, *2, where they are held incommunicado and might "never leave," and where they face an alarming "risk of torture, beatings, and even death," *J.G.G. v. Trump*, 2025 WL 890401, *16 (D.D.C. Mar. 24, 2025).  Congress enacted withholding and CAT precisely to bar removals to such places.

### C. The Proclamation Violates the AEA's Right to Voluntary Departure.

In enforcing the Proclamation, the government has been summarily removing people without giving them the opportunity to depart voluntarily.  But the AEA explicitly provides a right to voluntary departure.  The Act pointedly states that the President may "provide for the removal of those who, not being permitted to reside within the United States, *refuse or neglect to depart therefrom*."  50 U.S.C. § 21 (emphasis added); *see J.G.G.*, 2025 WL 890401, *14 (recognizing this right).

Even during World War II, courts consistently recognized that "alien enemies" had the right to voluntary departure. *See Ludwig*, 164 F.2d at 457 (Section 21 establishes a "right of voluntary departure"); *Von Heymann*, 159 F.2d at 653

(similar); *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the Attorney General can lawfully remove him against his will."). The right of voluntary departure provided by Section 21 is a "statutory condition precedent" to removal. *Ludwig*, 164 F.2d at 457.

Section 22 provides a separate right to take time "for the recovery, disposal, and removal of [one's] goods and effects" prior to departure. 50 U.S.C. § 22. Section 22's provision of time to settle affairs applies to individuals who are "not chargeable with actual hostility, or other crime against the public safety." *Id.* The Proclamation asserts that *all* people subject to the Proclamation are "chargeable with actual hostility," and thus "ineligible for the benefits of 50 U.S.C. 22." But contrary to the government's position in the district courts, even assuming that a categorical determination were valid, it has no impact on the right to voluntary departure, which is provided by Section 21, and is not subject to the condition in Section 22. Indeed, in World War II, even those "deemed to be dangerous to the public peace and safety of the United States" received 30 days to voluntarily depart. 10 Fed. Reg. 12189.

Moreover, the Proclamation's categorical invocation of Section 22's exception is improper. That provision requires an individualized assessment of whether "an alien" is engaged in "actual hostility." 50 U.S.C. § 22. When a statute provides a right that is conditioned on a person's conduct, the government cannot

nullify that right with a blanket assertion, devoid of any evidence, that the condition is never satisfied.

## V.     THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR THE PETITIONERS.

The Supreme Court has already held that Petitioners face "a high risk" of "severe, irreparable harm." *A.A.R.P.*, 2025 WL 1417281, *2. Petitioners' interest is "particularly weighty" because the government has represented "that it is unable to provide for the return of an individual deported in error to a prison in El Salvador." *Id.* If removed, class members may never get out of these prisons. *See id.*; *supra* at 8-9 (explaining that Petitioners face indefinite and possibly permanent detention). That alone renders the harm here irreparable.

But, even worse, the conditions they face at CECOT are "harsh and life threatening." Supp.ROA.854-56 (Bishop Decl.) ¶¶ 14, 21; *see also* Supp.ROA.768 (Goebertus Decl.) ¶ 4; *supra* at 8-9 (describing conditions at CECOT, including waterboarding, electric shocks, and other forms of torture); *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *Leiva Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (same); *Demjanjuk v. Holder*, 563 F.3d 565, 565 (6th Cir. 2009) (same).

The balance of equities and the public interest factors merge in cases against the government, *Nken v. Holder*, 556 U.S. 418, 435 (2009), and here, they overwhelmingly favor Petitioners. The public has a critical interest in "preventing

aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Id.* at 436; *see also Nunez*, 537 F. Supp. at 587 (protecting people who face persecution abroad "goes to the very heart of the principles and moral precepts upon which this country and its Constitution were founded"). And there is a "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

The government can make no comparable claim to harm. *See A.A.R.P.*, 2025 WL 1417281, *2 (granting injunction pending appeal); *D.B.U. v. Trump*, 2025 WL 1233583, *1 (10th Cir. Apr. 29, 2025) (finding no irreparable harm to government from order restraining AEA removals); *J.G.G.*, 2025 WL 914682, *11 (Henderson, J., concurring) (same). Petitioners are not challenging the government's ability to prosecute criminal offenses, or to detain and remove noncitizens under the immigration laws. *See id.* (no irreparable harm to government on this basis); *supra* at 4, 36, 48 (listing authorities the government retains).[17]

## CONCLUSION

The Court should grant a preliminary injunction.

---

[17] The Court should not require a security bond, or at most a minimal one of $1.

Dated: June 5, 2025

Respectfully submitted,

Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
samdur@aclu.org
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org

Brian Klosterboer
Tx Bar No. 24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
Adriana Piñon
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS,
INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org

*/s/Lee Gelernt*
Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(212) 549-2500
khuddleston@aclu.org

*For Petitioners-Appellants*
*W.M.M., F.G.M., A.R.P., et al.*

*\*Barred in Texas and Arizona only;*
*supervised by a member of the D.C.*
*Bar*

aharris@aclutx.org
apinon@aclutx.org

## CERTIFICATE OF SERVICE

I certify that, on June 5, 2025, a true and correct copy of this document
was transmitted to the Clerk of the United States Court of Appeals for the Fifth
Circuit via the Court's CM/ECF document filing system, and on all counsel of
record.

*/s/ Lee Gelernt*
Lee Gelernt

## CERTIFICATE OF COMPLIANCE

This brief complies with (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b) because it contains 12,988 words, excluding the parts of the brief exempt by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Lee Gelernt*
Lee Gelernt