# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Docket No. 25-10534

W.M.M., F.G.M., and A.R.P., *et al.*,

*Petitioners – Appellants*

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents – Appellees*

**On Appeal from**
United States District Court for the Northern District of Texas,
No. 1:25-cv-59-H

**SUPPLEMENTAL RECORD FOR PETITIONERS-APPELLANTS**

*Counsel Listed on Inside Cover*

Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
F: (332) 220-1702
E: samdur@aclu.org
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org
E: cwofsy@aclu.org

Brian Klosterboer
Tx Bar No.  24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
Adriana Piñon
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS,
    INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org
apinon@aclutx.org

Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (332) 220-1702
E: lgelernt@aclu.org
E: dgalindo@aclu.org
E: agorski@aclu.org
E: ptoomey@aclu.org
E: smahfooz@aclu.org
E: ojadwat@aclu.org
E: hshamsi@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
T: (212) 549-2500
F: (332) 220-1702
E: khuddleston@aclu.org

*For Petitioners-Appellants*
*W.M.M., F.G.M., A.R.P., et al.*

*\*Barred in Texas and Arizona only;*
*supervised by a member of the D.C. Bar*

# TABLE OF CONTENTS

Tab A.    Declaration of Rebecca Hanson,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) ...........................1

Tab B.    Declaration of Andres Antillano,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) .........................9

Tab C.    Declaration of Steven Dudley,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) ........................17

Tab D.    Declaration of Juanita Goebertus,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) ........................27

Tab E.    Declaration of Paulina Reyes,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) ........................34

Tab F.    Declaration of Linette Tobin,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) ........................77

Tab G.    Declaration of Assistant Director Selwyn Smith,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) ........................80

Tab H.    Declaration of Acting Assistant Director Marcos D. Charles,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) ........................90

Tab I.    Declaration of Assistant Field Office Director Carlos D. Cisneros,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) ........................96

Tab J.    Notice and Warrant of Apprehension and Removal under the
         Alien Enemies Act, Form AEA-21B,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) .......................100

Tab K.    Appendix A,
         *J.A.V. et al. v. Trump et al.*, No. 1:25-cv-72 (S.D. Tex.) .......................101

Tab L.    Declaration of Sarah C. Bishop,
         *M.A.P.S. v. Garite et al.*, No. 3:25-cv-171 (W.D. Tex.) .......................104

Tab M.    Declaration of Oscar Sarabia Roman,
         *M.A.P.S. v. Garite et al.*, No. 3:25-cv-171 (W.D. Tex.) .......................120

Tab N.   Declaration of Jennifer Babaie,
         *M.A.P.S. v. Garite et al.*, No. 3:25-cv-171 (W.D. Tex.) ........................308

Tab O.   Petitioner-Plaintiff's Reply in Support of Preliminary Injunction,
         *M.A.P.S. v. Garite et al.*, No. 3:25-cv-171 (W.D. Tex.) ........................311

# Tab A

# Exhibit A

# DECLARATION OF REBECCA HANSON,

## ASSSISTANT PROFESSOR OF SOCIOLOGY AND CRIMINOLOGY AT THE UNIVERSITY OF FLORIDA

I, Rebecca Hanson, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

**Summary**

1.      The Venezuelan gang Tren de Aragua ("TdA") is a loose, disorganized group. There is no evidence that the Maduro regime controls TdA or that the Maduro government and TdA are intertwined. Nor is there evidence that the Maduro regime has directed the TdA to enter the United States or directed any TdA activities within the country. Moreover, it has no structured presence in the United States, and its members cannot be identified using indicia like tattoos or hand gestures.

**Qualifications**

2.      I received my Ph.D in Sociology from the University of Georgia in 2017. My doctoral dissertation was entitled "Civilian Policing, Sociality Revolution, and Violent Pluralism in Venezuela."

3.      Currently, I am an Assistant Professor at the University of Florida. I have a joint appointment in the Departments of Sociology & Criminology and Law, and the Center for Latin American Studies. I am also the Director of the University of Florida's International Ethnography Lab. I am currently a visiting fellow at Harvard's David Rockefeller Center for Latin American Studies and Notre Dame's Kellogg Institute for International Studies.

Docusign Envelope ID: AB18E15B-D7A4-4152-9ED5-B4F5DB3B8A0D
Case 1:23-cv-00634 Document 125-2 Filed 04/16/25 Page 8 of 8
Case 1:23-cv-00634 Document 125-2 Filed 05/30/2025 Page 3 of 8

4.      I have received various grants and other funding related to my work on Venezuela, including from the Fulbright Association and Development Bank of Latin America. Through these grants, I have studied topics such as policing, gangs, politics, and incarceration in Venezuela.

5.      I have published numerous peer reviewed articles covering topics from militarized policing, gangs and other armed actors in Venezuela, and the security policies of the governments of Hugo Chávez and Nicolás Maduro.  My work has been published in the *Journal of Latin American Studies*; *Crime, Law, and Social Change*; and *Latin American Research Review*, among others. My newest book, Policing the Revolution: The Transformation of Coercive Power and Venezuela's Security Landscape During Chavismo, was published by the Oxford University Press in 2025.

6.      I teach courses on Criminological Theory, Crime and Violence in Latin America, Gangs and Society, and Law and Order in Latin America.

7.      My opinions derive from over a decade of studies that I have carried out specific to the topics of policing, violence, and gangs in Venezuela. Since 2010, I have conducted extensive, long-term ethnographic research and interviews with over 200 Venezuelan police officers as well as dozens of interviews with gang members and residents of communities where these gangs operate. I regularly collaborate with Venezuelan scholars who develop rigorous and reliable empirical research in that country.

8.      Based on my experience, I have been asked to assess the government's description of the TdA and how it is identifying potential TdA members. My conclusions are set out below.

Docusign Envelope ID: AB18E153-D7A1-4452-9ED5-B4f5DB3B8A0D

Case 1:25-cv-00664 Document 42-2 Filed 04/16/25 Page 4 of 8
Case 1:25-cv-00664 Document 42-2 Filed 05/30/2025 Page 4 of 8

9.      I have read the Proclamation and the Cerna Declaration (ECF No. 26) submitted in this case.

10.      I provide this declaration based on my personal and professional knowledge.

**Findings and Opinions**

11.      I have been closely following reporting and politicians' statements regarding recent deportations of Venezuelan migrants and claims about deportees being members of TdA. Most of the claims about Tren de Aragua, its relationship to the Maduro government, and its supposed presence within the United States lack credible evidence to substantiate them or completely contradict what empirical research has demonstrated.

12.      The TdA is a relatively new gang that emerged in Tocorón prison around 2014. While there are no reliable estimates of current TdA membership, between 2014 and 2017 the gang most likely had at most 200 to 300 members. Given a current lack of rigorous research and verifiable data I am skeptical of the U.S. government's ability to correctly estimate current membership.

13.      TdA does not act as the de facto government in any region of Venezuela.

14.      TdA does not have political objectives, and is not an arm of the Maduro government.

15.      The gang's established and existing revenue streams and criminal work is largely outside the United States. There is no evidence to suggest that drug or arms trafficking or transnational extortion are core sources of income for the group. The TdA is a relatively new gang with limited resources and therefore relatively limited capacity as compared to peer gangs.

16.     The gang has become increasingly fragmented and decentralized since 2023, further limiting its capacity. That year the Venezuelan government began cracking down on TdA, including when they sent 11,000 soldiers to raid the Tocorón prison that had been a hub of TdA activity. Ultimately, the TdA is of modest prominence and is nowhere near as established as other gangs in Central and South America.

17.     It is absolutely implausible that the Maduro regime controls TdA or that the Maduro government and TdA are intertwined. The relationship between the Maduro government and TdA is largely antagonistic. The relationship is best characterized as conflictive and competitive, with brief moments of coordination when the government and TDA benefit economically and politically from this coordination. For example, the government has, in the past, sometimes turned a blind eye to illicit activities in exchange for a reduction in visible criminal activity. But there are no clear, direct, and stable links between TdA and the Maduro government.

18.     The government's proclamation mentions Tareck El Aissami. Mr. El Aissami has not been an important figure in the Maduro regime for the past several years. Maduro's government arrested Mr. El Aissami in April 2024 on charges that he was part of a scheme through which hundreds of millions of dollars in state oil proceeds seemingly disappeared.  He remains incarcerated. At present, the relationship between Mr. El Aissami and the Maduro regime is conflictual and antagonistic.

19.     There is no credible evidence that TdA has a foothold as a criminal organization within the United States. TdA activities are neither widespread nor coordinated within the United States. The profile of suspected TdA crimes in the United States do not indicate a systemic

criminal enterprise. Rather, the vast majority of arrests of suspected TdA members in the United

States have been for crimes like shoplifting and cell phone robbery—crimes commonly handled

by police departments.

20.     Nor is there any credible evidence to establish that the Maduro regime has

directed the TdA to enter the United States or directed any TdA activities within the country.

Maduro simply does not control the gangs in Venezuela, TdA included. Moreover, there is no

credible evidence that the migration of young Venezuelan men, with or without criminal records,

to the United States has been directed by the Maduro government. Instead, research has found

that this migration is the result of the horrific economic and humanitarian crisis that began in

2014 and left many families in the country without access to food, healthcare, water, and

electricity. Human rights organizations have also found that police abuse and repression and

human rights violations have played a role in some Venezuelans' decisions to migrate.

21.     There is currently no credible way to link Venezuelan migrants in the United

States to TdA. The methods identified by the government are not reliable.

22.     Tattoos are not a reliable way to identify members of the group. The TdA, and

gangs more generally in Venezuela, do not have a history of using tattoos to indicate

membership. Indeed, no credible scholarship or studies of gangs in Venezuela indicate tattooing

as a shared common practice among gang members. TdA members may, of course, have tattoos,

but this is not part of a collective identity. In fact, many young Venezuelans who have no

association with the TdA individually opt for personal tattoos based on personally meaningful

symbols or popular culture iconography. The government's reliance on tattoos appears to result

from an incorrect conflation of gang practices in Central America and Venezuela. In countries

Docusign Envelope ID: AB19E152-D7A1-4AE2-9ED5-B465DB3B8A0D

Case 25-00584   Document 156-2   Page 12 of 16   Date Filed 05/30/2025
Case 25-00584   Document 156-2   Page 12 of 16   Date Filed 05/30/2025

like El Salvador and Honduras, gangs have long used tattoos to indicate membership and identity.

23.     Hand gestures are also not a credible way to identify the TdA. There are no formal hand gestures associated with the group.  Overall, I am aware of no iconography or unifying cultural motifs, such as symbols, insignias, logos, notations, graffiti tags, music, or drawings associated with it. Nor does the gang have a typical manner of dress. Other gangs in Central and South America might have certain hand gestures, symbols, or dress associated with them, but not the TdA.

24.     I have reviewed law enforcement bulletins provided to me through a Freedom of Information Act request by the nonprofit Property of the People. These documents indicate various tattoos that law enforcement agencies believe to be associated with TdA. Far from being indicative of TdA members, the tattoos identified were merely representative of the cultural milieu of poor and working-class neighborhoods in Venezuela. For example, the government highlighted tattoos with the phrase "Real Hasta la Muerte." That is an album by a Puerto Rican rapper that is popular in Venezuela. The bulletin from the Chicago Homeland Security Investigations Office also said that wearing a Chicago Bulls basketball jersey, especially a Michael Jordan jersey, was an identifier of TdA. But NBA basketball—and Michael Jordan in particular—are very popular in Venezuelan culture. Venezuelans also take great pride when their fellow Venezuelans are on U.S. professional sports teams, especially baseball and basketball teams. Using sports attire from U.S. professional sports teams with Venezuelan nationals on them to identify TdA membership is simply not credible.

Docusign Envelope ID: AB19E452-D7A1-44F2-9ED5-B465DB3B8A0D

Case 3:25-cv-00524   Document 36-2   Filed 03/16/25   Page 13 of 342
Case 1:25-cv-00766   Document 115   Date Filed 05/30/2025   Page 13 of 8

25.     The government has also stated it uses previous criminal records to identify TdA members in the United States. However, the U.S. government has no reliable access to criminal records within Venezuela. Given the current contentious relationship between the U.S. and Venezuelan governments, it is implausible that Venezuelan security institutions would share these records with ICE or other police departments in the United States.

26.     Indeed, statements made by ICE demonstrate an alarming unfamiliarity with the TdA. For example, on March 21, 2025, ICE agents announced they had arrested two TdA gang members from Venezuela that had been hiding in the U.S. since 2003.[1] However, the assertion that TdA gang members have been in hiding in the U.S. since 2003 is illogical given that TdA did not exist until 2014.

27.     At bottom, the TdA is a loose, disorganized group that has weakened significantly since 2023. It is not acting at the direction of the Maduro regime, it has no structured presence in the United States, and its members cannot be identified using indicia like tattoos or hand gestures.

28.     Finally, individuals who are erroneously labeled as TdA members face enormous risk if they are returned to Venezuela. Being labeled as a TdA associate puts that person in grave danger because they may be targeted by police and other gang members.

Executed on 27th of March, 2025, in Notre Dame, Indiana.

Rebecca Hanson

---

[1] *See* ICE, X.com (Mar. 21, 2025), *available at*
https://x.com/ICEgov/status/1903250363332903128.

# Tab B

# Exhibit B

Docusign Envelope ID: B7E21D46-8640-4530-9FB1-E95E3FEBBDE1

### DECLARACION DE ANDRES ANTILLANO,

### PROFESOR ASISTENTE Y JEFE DE CATEDRA DE CRIMINOLOGIA,
### UNIVERSIDAD CENTRAL DE VENEZUELA

Yo, Andrés Antillano, declaro lo siguiente de conformidad con 28 U.S.C. § 1746, and declaro bajo pena de perjurio que lo siguiente es verdadero y correcto según mi leal saber y entender:

**Calificaciones:**

1. Soy psicólogo social con posgrado en Criminología de la Universidad de Barcelona. Nací y vivo en Caracas, Venezuela.

2. Actualmente, soy profesor asistente de la Universidad Central de Venezuela en la Facultad de Derecho y Ciencias Políticas. También soy Jefe de Cátedra de Criminología en la Escuela de Derecho de la UCV. He trabajado como profesor desde 2002.

3. Enseño diversos cursos que tienen que ver con temas de pandillas, encarcelamiento y criminología en Venezuela. También he impartido un seminario destinado a gerentes y oficiales superiores del Consejo General de Policía, Policía Nacional Bolivariana y Universidad Nacional de la Seguridad.

4. Al mismo tiempo, también trabajo como investigador del Instituto de Ciencias Penales y Jefe de la Sección de Criminología, y soy coordinador del Grupo de Trabajo de Fuerzas de Seguridad, Agencias de Control y Mercados Ilegales del Consejo Latinoamericano de Ciencias Sociales.

5. He recibido financiación de numerosas fuentes, entre ellas Colectivo de Estudios Drogas y Derecho del Washington Office on Latin America, Corporación Andina de Fomento, Fundación Rosa de Luxemburgo-Región Andina, Fundación Paz y Reconciliación Proyecto.

**10**

6.     He publicado más de 50 artículos y capítulos de libros sobre sobre pandillas, crimen organizado, migración y prisiones, incluso en la *Revista Venezolana de Economía y Ciencias Sociales* y *Political Geography*. Mi libro más reciente, titulado *Carceral Communities in Latin America*, recoge investigaciones sobre pandillas carcelarias y gobiernos criminales en distintos países de América Latina.

7.     La mayor parte de mi trabajo ha sido en Venezuela. Pero también me desempeñé como investigador invitado en Rice University, profesor invitado o presentador para seminarios y conferencias en Harvard University, New York University, Pomona College, and Tulane University.

8.     He leído la Proclamación y la Declaración de Cerna (ECF No. 26) presentadas en este caso. Proporciono esta declaración basada en mis conocimientos personales y profesionales, y mi revisión de estos documentos.

9.     Mis opiniones de derivan de más de una década de estudios que he realizado sobre pandillas, crimen organizado, migración y prisiones. He realizado más de 100 entrevistas con miembros de pandillas en Venezuela, con informantes claves sobre dinámicas de pandillas y con miembros con el régimen de Maduro, así como trabajo etnográfico en prisiones y en zonas bajo control de pandillas tanto en Venezuela como en países vecinos. Con base en mi experiencia, se me ha pedido que evalúe la descripción que el gobierno hace del Tren de Aragua y cómo identifica a sus posibles miembros. Mis conclusiones se exponen a continuación.

**Opiniones**

10.     El Tren de Aragua no es una organización altamente estructurada, centralizada, con líneas de mando y membresía claramente definidas. Los niveles mayores de estructuración se dieron durante la última década en el estado Aragua, donde las bandas que operaban en distintas localidades se coordinaban con la prison gang que controlaba el penal de Tocorón.

**11**

11.     Sin embargo, en septiembre de 2023 este penal es intervenido por fuerzas militares venezolanas. Desde ese momento, el papel de coordinación de este grupo parece haberse debilitado, en la medida en que deben preocuparse por su sobrevivencia frente a la persecución y golpes de los cuerpos de seguridad de toda la región y han perdido uno de sus instrumentos principales para coordinar e imponer acciones, la prisión, por lo que los grupos locales actúan con aún mayor autonomía e independencia.

12.     No hay evidencia de que el Tren tenga una gran presencia en los EEUU.

13.     Como mencioné, actualmente el Tren es un grupo descentralizado y descoordinado. No hay evidencia de que el Tren mantenga conexiones estables con el estado venezolano ni de que el régimen de Maduro dirija sus acciones hacia los EEUU.

14.     Por las mismas razones señaladas al inicio, el Tren de Aragua nunca ha tenido una membresía definida, ni ritos de iniciación o marcas de identidad como tatuaje que identifiquen a sus miembros, a diferencia de otras organizaciones como las maras centroamericanas o algunas gangs étnicas en EEUU. Los tatuajes son populares entre jóvenes venezolanos y no tienen ninguna relación con la pertenencia a alguna organización criminal ni subcultura específica. No hay ningún símbolo gráfico que identifique al Tren de Aragua ni a sus miembros. Tampoco hay evidencia que el grupo tiene ciertas reglas fijas, una constitución o certificados de membresía.

Ejecutado el 27 de marzo, 2025, en Caracas, Venezuela.

DocuSigned by:

*Andres Antillano*

A55F67EE25A6441...

Andrés Antillano

3

**12**

**DECLARATION OF ANDRES ANTILLANO,**
**ASSISTANT PROFESSOR AND HEAD OF THE CRIMINOLOGY DEPARTMENT,**
**CENTRAL UNIVERSITY OF VENEZUELA**

I, Andrés Antillano, declare the following pursuant to 28 U.S.C. § 1746, and declare

under the penalty of perjury that the following is true and correct to the best of my knowledge

and belief:

**Qualifications:**

1.      I am a social psychologist with a postgraduate degree in Criminology from the

University of Barcelona. I was born and live in Caracas, Venezuela

2.      I am currently an assistant professor at the Central University of Venezuela in

the Department of Law and Political Science. I am also the Head of the Criminology

Department at the UCV School of Law. I have worked as a professor since 2002.

3.      I teach various courses related to gangs, incarceration, and criminology in

Venezuela. I have also taught a seminar for managers and senior officers of the General

Police Council, the Bolivarian National Police, and the National University of Security.

4.      At the same time, I also work as an investigator at the Institute of Criminal

Sciences and Head of the Criminology Section, and I am the coordinator of the Working

Group on Security Forces, Control Agencies, and Illegal Markets of the Latin American

Council of Social Sciences.

5.      I have received funding from numerous sources, including the Washington

Office on Latin America Drug and Law Studies Collective, the Development Bank of Latin

America, the Rosa Luxemburg Foundation-Andean Region, and the Peace and Reconciliation

Project Foundation.

6.      I have published more than 50 articles and book chapters on gangs, organized

crime, migration, and prisons, including in the *Venezuelan Journal of Economics and Social*

*Sciences* and *Political Geography*. My most recent book, titled *Carceral Communities in*

13

*Latin America*, compiles research on prison gangs and criminal governments in various Latin American countries.

7.     Most of my work has been in Venezuela. However, I have also served as a visiting researcher at Rice University, and as a visiting professor and presenter for seminars and conferences at Harvard University, New York University, Pomona College, and Tulane University.

8.     I have read the Proclamation and the Cerna Declaration (ECF No. 26) presented in this case. I provide this statement based on my personal and professional knowledge and my review of these documents.

9.     My opinions derive from more than a decade of research I have conducted on gangs, organized crime, migration, and prisons. I have conducted over 100 interviews with gang members in Venezuela, with key informants on gang dynamics, and with members within the Maduro regime, as well as ethnographic work in prisons and gang-controlled areas both in Venezuela and neighboring countries. Based on my experience, I have been asked to evaluate the government's description of Tren de Aragua and how it identifies potential members. My findings are presented below.

**Opinions**

10.     Tren de Aragua is not a highly structured, centralized organization with clearly defined lines of command and membership. The greatest levels of structuring have arisen during the last decade in the state of Aragua, where gangs operating in different locations coordinated with the prison gang that controlled the Tocorón prison.

11.     However, in September 2023, this prison was taken over by Venezuelan military forces. Since then, the group's coordinating role appears to have weakened, as they must worry about their survival in the face of persecution and attacks from security forces throughout the region and they have lost one of their main instruments for coordinating and

enforcing actions, the prison, for this reason the local groups operate with even greater autonomy and independence.

12.     There is no evidence that Tren [de Aragua] has a significant presence in the US.

13.     As I mentioned, Tren [de Aragua] is currently a decentralized and uncoordinated group. There is no evidence that the Tren maintains stable connections with the Venezuelan state or that the Maduro regime directs its actions toward the United States.

14.     For the same reasons noted at the beginning, Tren de Aragua has never had a defined membership, nor initiation rites or identity marks such as tattoos that identify its members, unlike other organizations such as Central American gangs or some ethnic gangs in the United States. Tattoos are popular among young Venezuelans and have no connection to belonging to a specific criminal organization or subculture. There is no graphic symbol that identifies Tren de Aragua or its members. There is also no evidence that the group has certain fixed rules, a constitution, or membership certificates.

**CERTIFICATE OF TRANSLATION**

I, Talia Roma, certify that I am fluent in both English and Spanish and that I have translated the foregoing declaration from Andres Antillano, faithfully and accurately, from Spanish into English. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: March 27, 2025

_____
Talia Roma
Paralegal
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94609
(412) 626-1379
troma@aclu.org

# Tab C

# Exhibit C

## DECLARATION OF STEVEN DUDLEY,
## CO-DIRECTOR OF INSIGHT CRIME

1.  I, Steven Dudley, am the Co-Director of InSight Crime. If called to testify, I could and would do so as follows:

**Summary**

2.  The Venezuelan gang Tren de Aragua is a dangerous transnational gang but has little substantial U.S. presence. In fact, the U.S. government has yet to share any evidence to show that the gang has a structured or operational presence inside the United States, or that it is operating in any coherent or collective fashion across the U.S. Nor have we seen evidence that the Maduro regime is communicating with or directing any Tren de Aragua leaders or any Tren de Aragua activity in the United States, much less that the regime is directing young Venezuelan men to migrate to the United States. Although the Venezuelan government operates as a criminal hybrid state (a term of art I explain below) with ties to many criminal organizations present there, Tren de Aragua, as currently constituted, does not have substantial connections with the Venezuelan state anywhere it operates.

**Qualifications**

3.  I have been asked to provide an expert opinion on aspects of Tren de Aragua in the United States. I have read the Proclamation and the Cerna Declaration (ECF No. 26) submitted in this case. I make this declaration based on my personal and professional knowledge, my skill, experience, training, and education, and facts and data regularly relied upon in my field that are currently available to me. The opinions in this declaration are my own.

4.  Appendix A is a true and correct copy of my curriculum vitae.

5.      InSight Crime is a think tank with offices at American University in Washington, D.C., and Medellín, Colombia. We specialize in investigating and analyzing organized crime in the Americas and assessing State efforts to combat these organizations, offering a diverse set of perspective on these topics.[1] InSight Crime is the leading source for investigation, reporting, analysis, and training targeted to meet the needs of academics, researchers, policymakers and analysts, journalists, NGOs, and law enforcement and government officials tackling the problems posed by organized crime and drug trafficking throughout the region. InSight Crime has done numerous projects for the U.S. government, including several concerning Venezuela and its multiple non-state criminal groups such as Tren de Aragua. Our open-source reporting reaches between 300,000 and 400,000 readers every month, and our material is routinely cited, quoted, and reprinted in major media outlets. We have been doing this for 15 years. Our coverage has been recognized through awards including, most recently, a special citation by the Columbia Journalism School for coverage of Latin America, the Ortega & Gasset award for best investigative story, and two Simón Bolívar awards for investigative stories.

6.      I hold a master's degree in Latin American Studies from the University of Texas at Austin. I have a bachelor's degree in history from Cornell University in Ithaca, New York. I am a Senior Fellow at American University's Center for Latin American and Latino Studies and a former fellow at the Woodrow Wilson International Center for Scholars in Washington, D.C.

7.      I lived in Guatemala from 1991 to 1992, in Brazil in 1993 and in 1998, and in Colombia off-and-on for nearly ten years beginning in 1995 and ending in late 2007. I have

---

[1] For more information, *see* insightcrime.org.

traveled to many parts of Latin America during my 30 years as a journalist and investigator in the region, including to Venezuela on dozens of occasions. During that time period, I worked for media organizations like the *Miami Herald,* the *Washington Post*, National Public Radio, the *Economist*, and the British Broadcasting Corporation (BBC), among others. I am a member of the International Consortium of Investigative Journalists and was a Knight Fellow at Stanford University.

8.      In addition to my work for media and InSight Crime, I wrote a book concerning the Revolutionary Armed Forces of Colombia (FARC) guerrillas that was published in English (*Walking Ghosts* - Routledge 2004) and Spanish (*Armas y urnas* - Grupo Planeta 2008), and a book on the MS-13 gang (*MS-13: The Making of America's Most Notorious Gang* – HarperCollins 2020), which won the Lucas Prize for book in progress. I have also published reports on drug trafficking and organized criminal networks in Central America and Mexico for policy groups such as the Woodrow Wilson International Center for Scholars, the International Crisis Group, and the Migration Policy Institute.

9.      As part of my work at InSight Crime, I do regular trips to the region and am in nearly constant contact with government authorities, media partners, correspondents, academics, and other investigators throughout the region, including with our team of correspondents in Venezuela. In all, I have made more than 100 trips to the region since I became co-founded InSight Crime in 2010.

10.     I focus a lot of this work on trying to understand how international criminal organizations operate, including prison gangs. In 2012-2013, for example, I went to Ciudad

3

20

Juárez, Mexico, to investigate and write about the prison gang known as Barrio Azteca.[2] The

gang had operations inside and outside the prison system and had expanded across the US-

Mexico border. They also worked with corrupt police.

11.     In 2016, I directed a year-long investigative project on prisons in the region

financed by the National Endowment for Democracy (NED).[3] For that project, we studied the

way prison gangs operated in five countries.[4] We entered prisons in the countries I studied and

spoke to those on the inside, including the heads of the gangs. Each of the prison gangs in

question had operations inside and outside the prisons, including criminal enterprises that

involved prison guards and police.

12.     In 2014, I became the co-principal of a two-year project funded by the U.S.

Department of Justice's National Institute for Justice on the MS-13.[5] Our goal was to study the

gang through various academic instruments and field research in three different geographic

areas: Washington, D.C., Los Angeles, and El Salvador. For this project, I traveled to El

Salvador several times and met with active members of the MS-13 inside jails.

13.     In 2018, I was the co-principal of a U.S. State Department-funded project that is

focused on criminal dynamics in Brazil, Argentina, and Paraguay. As part of this project, I

---

[2] *See* Steven Dudley, "Barrio Azteca Gang Poised for Leap into International Drug Trade," InSight Crime (Feb. 13, 2013), https://insightcrime.org/investigations/barrio-azteca-gang-poised-leap/

[3] NED is a private foundation, funded mostly by the U.S. Congress, that finances projects worldwide that support democracy. See https://www.ned.org/about/.

[4] *See* "The Prison Dilemma," a special project financed by the National Endowment for Democracy, https://insightcrime.org/investigations/the-prison-dilemma-in-the-americas/.

[5] *See* description of project: https://www.american.edu/centers/latin-american-latino-studies/transnational-criminal-capacity-of-ms-13.cfm.

worked with experts and investigators in Brazil. I also traveled to Brazil, where I went inside several prisons. Our focus of the Brazil research is the Primeiro Comando da Capital (PCC), or First Capital Command, which is the region's largest prison gang.

14.     Since 2018, I have assisted with InSight Crime's work on Venezuela, which is also funded by the U.S. State Department. The project has mapped the criminal ecosystem of that country. InSight Crime has worked with dozens of its correspondents, as well as independent investigators and civil society organizations, to provide the world's most comprehensive database and repository of organized crime groups in Venezuela.

15.     I have been asked to provide an expert opinion on the threat of Tren de Aragua in the United States. I make this declaration based on my personal and professional knowledge, my skill, experience, training, and education, and facts and data regularly relied upon in my field that are currently available to me in large part because of the ongoing work we have in Venezuela.

**TREN DE ARAGUA**

16.     I have studied organized crime in Venezuela for the last 25 years. I am very familiar with the origins of Tren de Aragua in Venezuela and its activities both there and in other parts of South America. I am also familiar with what is now the limited reach of Tren de Aragua in the United States, in part because we at InSight Crime have also reported on this extensively over the last year.

17.     I have reviewed the March 15, 2025-Proclamation entitled Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua. In it, the President uses the term "hybrid criminal state" to describe the relationship between Venezuela and Tren de Aragua. The Proclamation indicates that the Venezuelan state has weaponized Tren

de Aragua to "invade, attempt to invade, and threaten to invade the [United States]," to "perpetrate[] irregular warfare within the [United States]," and to "use[] drug trafficking as a weapon against our citizens."

18.     That characterization of the relationship between the Venezuelan state and Tren de Aragua as it relates to its activities in the United States is simply incorrect.

19.     While InSight Crime has characterized the Venezuelan government as a "hybrid criminal state," we use that term to refer to how the Venezuelan government has, at times, worked with militia groups, Colombian guerrilla organizations, and organized crime groups inside Venezuela to further its own economic, political, and social agenda. In practice, for example, state security forces may permit a group to operate in a particular area; in exchange, the group maintains social and political control in a way that favors the government. In some instances, these arrangements may also include monetary or other economic exchanges between the sides. In other instances, it may just be a promise to control violence in return for free reign over the criminal economies in these areas. These arrangements are made most notably with more overtly political groups or guerrilla groups that have often veered into criminal activities, but sometimes they are made with criminal organizations or prison gangs.

20.     Because the Maduro regime's power is fragmented and these criminal groups are broken into semi-independent factions, these arrangements are not uniform nor established for any set time periods. For example, they can take place with one bloc of the state even while another bloc actively opposes a criminal group. The agreements are also volatile and often contingent on personal and political affinities. When one side is no longer served by an agreement, for instance, it can devolve into open fighting between the group and Venezuelan

security forces. We have even identified instances in which one part of a criminal group is fighting with the government while another part of the same criminal group is working alongside it.

21.     Currently, Tren de Aragua does not appear to be actively connected to the Venezuelan government in any sustained fashion. In fact, most of the Maduro regime's interaction and coordination occurs with militias, guerrilla groups, and criminal organizations aside from Tren de Aragua. A good comparative example of those other groups are the *colectivos* (collectives), which are a disparate network of grassroots, left-wing political militias that are trained, financed, and armed by the state and act as political shock troops. Unlike the colectivos, Tren de Aragua is not trained, financed, or armed by the state. And the state's interaction with Tren de Aragua is quite minimal as compared to those same colectivos.

22.     Much of this can be traced back to 2023, when it emerged that the Venezuelan government had begun a corruption investigation into then-Oil Minister Tareck El Aissami. As noted in the Proclamation, El Aissami was the highest-level government patron of Tren de Aragua. The impact of the corruption investigation, however, was substantial. In March 2023, El Aissami resigned his ministry post. In September 2023, the Venezuelan government raided the Tocorón prison, during which Venezuelan military forces dismantled what was then Tren de Aragua's headquarters. Its leader fled the prison, most likely prior to the raid, and since 2023, the group has become more dispersed and holds less sway in the areas where it is present in Venezuela. And in April 2024, the government announced it had arrested El Aissami.

23.     In our investigations over the period in which the prison gang has operated, we have never seen Tren de Aragua deployed by the Venezuelan government in a concerted or

military fashion. Tren de Aragua is not a militia or paramilitary group like the colectivos, nor is it a mercenary group associated with the Venezuelan government in the style of the once-vaunted Wagner group from Russia. In other words, it is not an arm of the Venezuelan government. And we have seen no evidence that the Maduro regime has directed Tren de Aragua to migrate to the United States or to commit any crimes within the United States. To be sure, in recent months the Venezuelan government has assisted in capturing members of Tren de Aragua in other countries, most notably in Colombia.

24.     That is not to diminish the threat Tren de Aragua poses as a criminal gang operational in Venezuela and other parts of South America, which we have documented in numerous in-depth reports from Colombia, Peru, and Chile. However, although Tren de Aragua is undoubtedly a powerful criminal organization in Venezuela and some other parts of South America, there is no evidence of a structured or operational presence in the United States and no evidence of the Maduro regime communicating with it or any purported leaders, or directing it or any purported leaders to commit crimes in the U.S.

25.     Finally, a word about identification of Tren de Aragua members. As noted, I have extensive experience studying street and prison gangs. Some of them do have tattoos that indicate gang affiliation. As of this writing, Tren de Aragua does not have any such tattoos. What's more, even gangs that once used tattoos to identify themselves have moved away from them precisely because they help law enforcement identify them. Therefore, using tattoos as a means of identifying Tren de Aragua members does not seem to me to be a reliable means of identifying them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Steven Dudley
Co-director, InSight Crime
March 28, 2025

# Tab D

# Exhibit E

## DECLARATION OF JUANITA GOEBERTUS,
## DIRECTOR, AMERICAS DIVISION, HUMAN RIGHTS WATCH

I, Juanita Goebertus, declare the following under 28 U.S.C. § 1746, and state that
under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am the Director of the Americas Division of Human Rights Watch and have worked
   with the organization since 2022. I hold BAs in Law and Political Science from the
   Universidad de los Andes (Colombia) and an LLM from Harvard Law School. I oversee
   Human Rights Watch's work on El Salvador and have traveled to the country several
   times, most recently in 2024. I provide this declaration based on my personal knowledge
   and experience.

2. Individuals deported pursuant to the 1789 Alien Enemies Act have been sent to the Center
   for Terrorism Confinement, the Centro de Confinamiento del Terrorismo (CECOT) in
   Tecoluca, El Salvador. The prison was first announced for a capacity of 20,000 detainees.
   The Salvadoran government later doubled its reported capacity, to 40,000.  As Human
   Rights Watch explained to the UN Human Rights Committee in July 2024, the population
   size raises concerns that prison authorities will not be able to provide individualized
   treatment to detainees, thereby contravening the UN Standard Minimum Rules for the
   Treatment of Prisoners.

3. People held in CECOT, as well as in other prisons in El Salvador, are denied
   communication with their relatives and lawyers, and only appear before courts in online
   hearings, often in groups of several hundred detainees at the same time. The Salvadoran
   government has described people held in CECOT as "terrorists," and has said that they
   "will never leave." Human Rights Watch is not aware of any detainees who have been
   released from that prison. The government of El Salvador denies human rights groups

access to its prisons and has only allowed journalists and social media influencers to visit CECOT under highly controlled circumstances. In videos produced during these visits, Salvadoran authorities are seen saying that prisoners only "leave the cell for 30 minutes a day" and that some are held in solitary confinement cells, which are completely dark.

4. While CECOT is likely to have more modern technology and infrastructure than other prisons in El Salvador, I understand the mistreatment of detainees there to be in large part similar to what Human Rights Watch has documented in other prisons in El Salvador, including Izalco, La Esperanza (Mariona) and Santa Ana prisons. This includes cases of torture, ill-treatment, incommunicado detention, severe violations of due process and inhumane conditions, such as lack of access to adequate healthcare and food.

5. Prison conditions in El Salvador should be understood within the context of the country's three-year-long state of emergency, which has suspended constitutional due process rights. Since the state of emergency was instituted in March 2022, security forces report detaining 85,000 people (the equivalent of 1.4% of the country's population). Although the government has denied Human Rights Watch information on the number of detainees it holds and its prison capacity, Human Rights Watch estimates based on official data that there are 109,000 people held in prisons with an official capacity for 70,000. Since the state of emergency was instituted, over 350 people have died in El Salvador's prisons according to Salvadoran human rights groups, including the organization Cristosal, which jointly authored our December 7, 2022 report on El Salvador's prisons titled, "We Can Arrest Anyone We Want" (hereinafter "We Can Arrest Anyone").[1]

---

[1] Human Rights Watch, *"We Can Arrest Anyone We Want": Widespread Human Rights Violations Under El Salvador's "State of Emergency"*, WWW.HRW.ORG, Dec. 7, 2022, https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el#3683 (last visited Mar. 19, 2025).

6. In July 2024, Human Rights Watch published a report on abuses committed against children during the state of emergency, titled "Your Child Does Not Exist Here." Over 3,300 children have been detained, many without any ties to gang activity or criminal organizations. Human Rights Watch documented 66 cases of children subjected to torture, ill-treatment and appalling conditions, including at times extreme overcrowding, unhygienic conditions, and inadequate access to food and medical care while in custody. In February, the Legislative Assembly approved a law ordering the transfer of children detained for organized crime offenses to the country's adult prison system, exposing them to a heightened risk of abuse and violating international juvenile justice standards.

7. For "We Can Arrest Anyone," and in "Your Child Does Not Exist Here," Human Rights Watch has interviewed more than 30 people released from El Salvador's prisons, including children, and dozens of people who have relatives in jail.[2] These interviews were conducted in person in several states in El Salvador or by telephone and corroborated by additional research and media reports.

8. One of the people we spoke with was an 18-year-old construction worker who said that police beat prison newcomers with batons for an hour. He said that when he denied being a gang member, they sent him to a dark basement cell with 320 detainees, where prison guards and other detainees beat him every day. On one occasion, one guard beat him so severely that it broke a rib.

---

[2] Human Rights Watch, *"Your Child Does Not Exist Here": Human Rights Abuses Against Children Under El Salvador's "State of Emergency"*, WWW.HRW.ORG, Jul. 16, 2024, https://www.hrw.org/report/2024/07/16/your-child-does-not-exist-here/human-rights-abuses-against-children-under-el (last visited Mar. 19, 2025).

9. The construction worker said the cell he was imprisoned in was so crowded that detainees had to sleep on the floor or standing, a description often repeated by people who have been imprisoned in El Salvador.

10. Another detainee we interviewed was held for two days in a police lock-up with capacity for 25 people, but he said that when he arrived, there were over 75 prisoners. He slept on the floor next to "the bathroom," a hole in the ground that smelled "terrible." He was sent in a group of other prisoners to Izalco prison on the third day, where they were ordered the group to take off their clothes. They were forced to kneel on the ground naked looking downwards for four hours in front of the prison's gate. Guards took the group to a room with five barrels full of water with ice, he said. Fifteen guards forced him and others to go into the barrels for around two hours in total, as they questioned them. The detainee was forced into a barrel "around 30 times," and was kept there for about a minute each time. Guards forced his head under water so he could not breathe. "I felt I was drowning," he said. Guards repeatedly insulted them, calling them "dogs" and "scum" and saying they would "pay for what [they] had done."

11. A third detainee held in prison in June 2022 described being sent to what he described as a "punishment cell." He said officers moved him and others there to "make room for other detainees." The new cell was constantly dark, detainees had to sleep standing due to overcrowding, and there was no regular access to drinking water.

12. For "We Can Arrest Anyone," Human Rights Watch and Cristosal gathered evidence of over 240 cases of people detained in prisons in El Salvador with underlying health conditions, including diabetes, recent history of stroke, and meningitis. Former detainees often describe filthy and disease-ridden prisons. Doctors who visited detention sites told

31

Docusign Envelope ID: DD47694C-7A56-4BB9-9B9C-993DA7493DB6

us that tuberculosis, fungal infections, scabies, severe malnutrition and chronic digestive issues were common.

13. Out of the estimated 350 detainees who have died in El Salvador's prisons, we documented 11 of these cases in detail in "We Can Arrest Anyone", based on interviews with victims' relatives, medical records, analysis by forensic experts, and other evidence.

14. In one case, a person who died in custody was buried in a mass grave, without the family's knowledge. This practice could amount to an enforced disappearance if authorities intentionally concealed the fate or whereabouts of the detainee.

15. In at least two other cases, officials appear to have failed to provide detainees the daily medication they required to manage underlying health conditions such as diabetes.

16. In at least four of the eleven cases, photographs of the bodies show bruises. Members of the Independent Forensic Expert Group (IFEG) of the International Rehabilitation Council for Torture Victims (IRCT), who reviewed the photos and other evidence in two of the cases, told Human Rights Watch and Cristosal that the deaths were "suspicious" given that the bodies "present multiple lesions that show trauma that could have been caused by torture or ill-treatment that might have contributed to their deaths while in custody."

17. In a separate Human Rights Watch report from February 2020, titled "Deported to Danger," Human Rights Watch investigated and reported on the conditions in Salvadoran prisons experienced by Salvadoran nationals deported by the United States.[3] In interviews with deportees and their relatives or friends, we collected accounts of three

---

[3] Human Rights Watch, *Deported to Danger: United States Deportation Policies Expose Salvadorans to Death and Abuse*, WWW.HRW.ORG, Feb. 5, 2020, https://www.hrw.org/report/2020/02/05/deported-danger-united-states-deportation-policies-expose-salvadorans-death-and (last visited Mar. 19, 2025).

male deportees from the United States who said they were beaten by police or soldiers during arrest, followed by beatings during their time in custody, which lasted between three days to over a year. During their time in prison, two of these individuals reported being kicked in the face and testicles. A third man described being kicked by guards in his neck and abdomen, after which he sustained injuries requiring an operation for a ruptured pancreas and spleen, month-long hospitalization, and 60 days of post-release treatment.

Executed on this 19th day of March, 2025 in Villa de Leyva, Colombia.

Signed by:

*Juanita Goebertus*

F2D78A8897CF4A6...

JUANITA GOEBERTUS

# Tab E

# Exhibit F

# DECLARATION OF PAULINA REYES

I, Paulina Reyes, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. My name is Paulina Reyes. I am a managing attorney at Immigrant Defenders Law Center ("ImmDef"), licensed to practice law in California.  I represent detained and non-detained immigrants in removal proceedings.

3. I represent Andry Jose Hernandez Romero in his removal proceedings. I submit this declaration because I am deeply concerned for my client.  Andry was pursuing asylum when he was abruptly moved to Texas and removed under the Alien Enemies Act, without any notice that the government was alleging him to be an alien enemy, and without any notice that he would be removed.

4. Andry is a Venezuelan national. He worked for a government sponsored news channel as a professional makeup artist and identifies as gay. He faced constant discrimination because of his sexual orientation. He and other station employees were forced to promote pro-Maduro content in their social media and to vote in favor of issues supported by that government. He refused and the producers at his government-sponsored station attacked him and threatened to further harm him if he did not comply.  Around this same time, he began to be followed by "colectivos," armed groups operating at the behest of the government, and was threatened by them to support the Maduro government.

5. In response, Andry quit the television station and went into hiding, leaving Venezuela in May 2024.

6. On August 29, 2024, Andry presented at the San Ysidro Port of Entry after making an appointment with the CBP One app. He was questioned about his tattoos, transferred to ICE custody, and sent to Otay Mesa Detention Center ("OMDC").

7. Andry was put into expedited removal proceedings and received a positive credible fear determination. He was then placed in removal proceedings.

8. At OMDC, he was flagged as a security risk for the sole reason of his tattoos and an allegation that they showed he was associated with Tren de Aragua. During questioning, Andry maintained that he was not part of Tren de Aragua nor affiliated with them in any way.

9. I was retained as *pro bono* counsel on or about December 6, 2024. While in detention, I maintained constant communication with him, including in-person visits and phone calls. I filed an asylum application on his behalf and evidence to corroborate his asylum claim.

10. Andry was abruptly moved on March 6 or 7 from OMDC to Webb County Detention Center ("WCDC") in Laredo, Texas, despite still having ongoing immigration proceedings in California. Although I am his attorney, the Office of Enforcement and Removal Operations ("ERO") did not notify me of the transfer. I found out because my client called me from WCDC.

11. He had a hearing on March 13 at Otay Mesa Immigration Court. ERO in WCDC did not make him available to video conference into that hearing. The hearing was rescheduled to March 17.

12. I have never been able to schedule a call with Andry since he arrived at WCDC. I have only been able to speak to him when he is able to place an outgoing call. He spoke to me on March 7 and reported that about 20 other Venezuelans had also recently been transferred to WCDC, including at least one other person in ongoing proceedings at the Otay Mesa Immigration Court and one individual granted withholding of removal.

13. On the evening of March 13 and again on the morning of March 14, I asked WCDC and ERO for an opportunity to schedule a call with my client.

14. On March 14, I received an email response from ERO that Andry was no longer in WCDC but was not provided information about his location. I called the facility and was again told that he was no longer in WCDC; the person I spoke to did not provide me any further information about where he had been taken and for what reason.

15. That evening, I emailed the duty attorney for the Office of Principal Legal Advisory ("OPLA") in Otay Mesa to inquire about his custody and confirm whether he would appear at the upcoming hearing on March 17. I did not receive a response.

16. On March 17, Andry was not present at the Master Calendar Hearing. When asked for his location, the OPLA attorney responded that he is "no longer in ICE custody." The OPLA attorney later confirmed that he had been removed to El Salvador.

17. This was the first time that his forced removal was mentioned by any government official. The OPLA attorney did not provide any further information as to the reason he was removed, and did not respond to the Immigration Judge's question about how he was removed if there was no removal order.

18. The hearing was continued to April 2, 2025.

19. On March 19, I emailed the duty attorney at OPLA to ask whether Andry was removed subject to the Alien Enemies Act to ask whether there is a process to contact my client while his removal proceedings are ongoing, and whether he would be made available for his next hearing on April 2.

20. ICE Deputy Chief Counsel told me in response to my e-mail: "I can confirm that [Andry] was removed on March 15," that "[t]here is no process through DHS to facilitate communication with a removed individual," nor to "facilitate appearance" at the next hearing date, and that "I do not have further information related to your client's removal."

I have seen Andry's name on publicly reported lists of people removed to El Salvador under the Alien Enemies Act and know of no other basis that would explain his removal.

21. Andry has no involvement whatsoever with Tren de Aragua.

22. Andry has a few tattoos, including "Mom" next to a crown on one wrist, and "Dad" next to a crown on the other wrist. From a young age, he has been involved with the nationally and culturally famous "Three Kings" (or, "Three Wise Men") festival and performance in his hometown. Additionally, he is a makeup artist for beauty pageants; on his social media he appears promoting those beauty pageants alongside a crown, a common prop that contestants in a pageant would wear.

23. I have attached a true and complete copy of OPLA's evidence against my client (Exhibit A) and photos from his social media (Exhibit B).

24. These crown tattoos are the only basis of the government's assertion, in its filing, that he is connected to Tren de Aragua. An officer says "[t]he crown has been found to be an identifier for a Tren de Aragua gang member" without offering further explanation. On a points-based rubric in the filing used by detention officers to evaluate if someone is a gang member, only the tattoo is mentioned. There are other categories for contact with other gang members, "intelligence information" from other agencies, being identified as a gang member in other documents or by another agency --- none of those categories are indicated for Andry.

25. Andry did not have the opportunity to contest the evidence submitted against him before he was forcibly removed. There is no evidence to believe that he is affiliated in any way with Tren de Aragua and Andry has consistently refuted those claims. He fled Venezuela due to persecution for his political opinion and his sexual orientation and his tattoos have an obvious explanation that has nothing to do with a gang.

26. Everything in this declaration is true and correct to the best of my knowledge and recollection.

Executed on the 27th day of March at San Diego, California.


*/s/ Paulina Reyes*

Paulina Reyes, Esq.
Counsel for Andry Jose Hernandez Romero

# EXHIBIT A

**DETAINED**

JASON B. AGUILAR
Chief Counsel
SYDNEY L. POMYKATA
Deputy Chief Counsel
MATTHEW S. WARREN
Assistant Chief Counsel
Office of the Principal Legal Advisor, San Diego (Otay Mesa)
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
PO Box 438150
San Diego, California 92143

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## OTAY MESA, CALIFORNIA

In the Matter of:

HERNANDEZ ROMERO, Andry

**In Removal Proceedings**

File No.   A█████894

Immigration Judge: ███

Next Hearing: 3/7/2025

## DHS SUBMISSION OF EVIDENCE

The Department of Homeland Security (DHS or the Department) hereby submits

evidence for the record.

## TABLE OF CONTENTS

TAB A: STG Report– Page 3
        These Are the Tattoos... - Page 19
        I-213 - Page 23
        Record of Sworn Statement -Page 26

Date:

*Matthew Warren*

3/6/2025

Matthew Warren
Assistant Chief Counsel

EOIR — 3 of 33



# STG QUESTIONNAIRE

| Facility: | Otay Mesa Detention Center | | |
|---|---|---|---|
| Inmate/Resident Name: | HERNANDEZ ROMERO, ANDRY JOSE | ID Number: | ▮▮▮▮▮ |
| Date of Birth: | ▮▮▮▮▮ | | |
| Nickname / AKA / Moniker (s): | UNKNOWN | | |

## I. INMATE/RESIDENT ADVISEMENT

Inmate/Resident ___HERNANDEZ ROMERO, ANDRY JOSE___ was advised on ___09/02/2024___ , that failure to respond to the questions in a truthful manner could result in disciplinary action being taken. In addition, information obtained can be released to the contracting agency and/or law enforcement.

## II. RACE (Note: Check applicable race(s) as expressed by the inmate/resident):

○ White   ○ Black or African American   ● Hispanic or Latino   ○ American Indian or Alaska Native   ○ Asian or Pacific Islander

## III. QUESTIONS

| 1. Where is your Hometown? | VENEZUELA | | |
|---|---|---|---|
| 2. Are you related to or do you know any employees of this facility? | Unknown | | |
| 3. Do you have any tattoos? | Yes | | |
| | If yes, | T-LEFT ARM=ROSES, SNAKE T-LEFT WRIST=CROWN DAD T-RIGHT WRIST=MOM T-LEFT LEG=ROSE, BUTTERFLY T-LEFT BUTTOCK=FLOWER | |
| | If yes, When: | 30 YEARS OLD | |
| | If yes, Where: | STREETS | |
| 4. Have you ever been involved in a gang, disruptive group? | No | | (*see note below) |
| 5. Have you ever been associated with a terrorist organization or involved in terrorist activities? | No | | (*see note below) |

** IF THE ANSWER TO #4 OR #5 IS "YES," COMPLETE QUESTIONS 6-23 BELOW. **IF THE ANSWER TO #5 IS "YES," COMPLETE A 9-12C IN ADDITION TO 9-12A.

* IF THE ANSWER TO #4 AND/OR #5 IS "NO", PROCEED TO SECTION IV; UNLESS THERE ARE SPECIFIC CHARACTERISTICS ABOUT THE SUSPECT WHICH ARE BELIEVED TO BE TRUE, BASED UPON CREDIBLE EVIDENCE TO SUPPORT ASSIGNMENT AND APPROVAL; THEN PROCEED WITH COMPLETING QUESTIONS 6-23 BELOW

| 6. What is the name of the group? | TREN DE ARAGUA | |
|---|---|---|
| 7. Are you a member or an associate? | Associate | |
| 8. At what age did you become a member? | DETAINEE HERNANDEZ STATED THAT HE IS NOT A MEMBER OF ANY GANG | |
| 9. Did you become a member or associate before or after incarceration? | Before | |
| How long involved? | DETAINEE HERNANDEZ STATED THAT HE IS NOT A MEMBER OF ANY GANG | |
| 10. Describe how you became a member? | | |
| DETAINEE HERNANDEZ STATED THAT HE IS NOT A MEMBER OF ANY GANG. | | |
| 11. Do you hold a position of rank in the group? | No | |
| 12. Are there other members of the group at this facility? | Unknown | |
| 13. Who are enemies of the group? | | |
| NONE | | |
| 14. Do you associate with any other groups? | No | |

Page 1 of 2

Uploaded on 02/06/2025 2:56:12 PM [Pacific Standard Time]

# STG QUESTIONNAIRE

| | |
|---|---|
| 15. Does the group have contact with other groups outside of the facility? | No |
| 16. Does the group receive financial support from outside the facility? | No |
| 17. Have you ever been ordered to assault or "hit" anyone? | No |
| 18. How do members of the group communicate? | |
| UNKNOWN | |
| 19. Who is/are the leaders(s) of the group at the facility? | |
| UNKNOWN | |
| 20. Who is/are the leader(s) of the group in your housing unit? | |
| UNKNOWN | |
| 21. How does the leadership structure of the group function? | |
| UNKNOWN | |
| 22. Do you want out of the group? | No |
| 23. Do you fear for your safety as a result of your membership/affiliation with the group? | No |

**Interviewer Printed Name:**     Arturo Torres     **Date:**   12/03/2024

STG OFFICER

**Confirmed by:**     Charles Cross Jr     **Date:**   12/10/2024

INVESTIGATOR

**NOTE**   This form can be completed and filed electronically via the CoreCivic/STG designated intranet site; therefore, this copy form is required only where a hard copy file is being maintained.

## To Be Completed By Interviewer

### IV. INTERVIEWER

| Inmate/resident's demeanor during interview: | Uncooperative |
|---|---|

| **Interviewer's Comments:** |
|---|
| ON INITIAL INTERVIEW DETAINEE HERNANDEZ STATED THAT HE WAS NOT A MEMBER OF ANY GANG. UPON CONDUCTING A REVIEW OF DETAINEE HERNANDEZ'S TATTOOS IT WAS FOUND THAT DETAINEE HERNANDEZ HAS A CROWN ON EACH ONE OF HIS WRIST. THE CROWN HAS BEEN FOUND TO BE AN IDENTIFIER FOR A TREN DE ARAGUA GANG MEMBER. |

| **List and describe location of scars, brands, tattoos or other identifying marks of body:** **S=Scars   B=Brands   T=Tattoos   O=Other(explain)** |
|---|
| T-LEFT ARM=ROSES, SNAKE T-LEFT WRIST=CROWN DAD T-RIGHT WRIST=MOM T-LEFT LEG=ROSE, BUTTERFLY T-LEFT BUTTOCK=FLOWER |

| **Determining factors to conclude reasonable suspicion:** |
|---|
| DETAINEE HERNANDEZ PORTS TATTOOS "CROWNS" THAT ARE CONSISTENT WITH THOSE OF A TREN DE ARAGUA MEMBER. |

Proprietary Information - Not For Distribution - Copyrighted     Property of Corrections CoreCivic

File Name: 9-12A_Questionnaire.pdf

Uploaded on 03/06/2025 PM Position 42-56-2 in Package 6016/Date Filed 05/30/2025
Case 2:25-cv-00025 Document 42-56-2 Page 6316/Date Filed 05/30/2025 of 43
9-12B

# STG MEMBER VALIDATION / CONFIRMATION

| Inmate/Resident Name: | HERNANDEZ ROMERO, ANDRY JOSE | | Number: | ▉▉▉▉ |
|---|---|---|---|---|
| Facility: | Otay Mesa Detention Center | Jurisdiction: | IMMIGRATION AND CUSTOMS ENFORCEMENT | |

Score each applicable criteria item and total the points for validation level. All items scored shall have supporting documentation placed in the intelligence file.

| CATEGORY / SCORE | | POINTS |
|---|---|---|
| **Admission - Inmate/resident admits to association/membership with STG or gang.** | (5) | 0 |
| **Possession of STG Paraphernalia/Contraband: - Includes, but not limited to: drawings, letters, graffiti, bylaws, rosters, publications, documents, photos, audio tapes, clothes, symbols, logos, and any other personal property.** | (5) | 0 |
| **STG Tattoos/Brands/Identifying Marks** | (5) | 5 |
| **Observed and known contact with STG/Gang members/suspects** | (4) | 0 |
| **Intelligence information received from other agencies** | (5) | 0 |
| **Correspondence/communication with known STG/Gang members/suspects** | (4) | 0 |
| **Group photos with known STG/Gang members/suspects** | (4) | 0 |
| **Identified as an STG member/suspect in any document - Includes official records, media reports, and correspondence** | (5) | 0 |
| **Validation/confirmation of STG membership by law enforcement, Corrections, or sending jurisdiction** | (10 | 0 |
| | **TOTAL SCORE** | 5 |

| **STG/Gang membership status. (9 or lower is SUSPECT) (10 or higher is MEMBER CONFIRMED):** | SUSPECT |
|---|---|

| **STG/Gang Affiliation:** |
|---|
| TREN DE ARAGUA |

| **Leadership (position or rank):** |
|---|
| UNKNOWN |

| **Comments:** |
|---|
| ON INITIAL INTERVIEW DETAINEE HERNANDEZ STATED THAT HE WAS NOT A MEMBER OF ANY GANG. UPON CONDUCTING A REVIEW OF DETAINEE HERNANDEZ'S TATTOOS IT WAS FOUND THAT DETAINEE HERNANDEZ HAS A CROWN ON EACH ONE OF HIS WRIST. THE CROWN HAS BEEN FOUND TO BE AN IDENTIFIER FOR A TREN DE ARAGUA GANG MEMBER. |

| **Completed by:** | Arturo Torres | **Date:** | 12/03/2024 |
|---|---|---|---|
| | STG OFFICER | | |

| **Confirmed by:** | Charles Cross Jr | **Date:** | 12/10/2024 |
|---|---|---|---|
| | INVESTIGATOR | | |

**NOTE:** This form can be completed and filed electronically via the CoreCivic/STG designated intranet site; therefore, this copy form is required only where a hard copy file is being maintained.

JUNE 1, 2009
Proprietary Information - Not For Distribution - Copyrighted
005
Property of CoreCivic
File Name: 9-12B_Validation.pdf

## STG CHRONOLOGICAL SUMMARY

| Inmate/Resident | HERNANDEZ ROMERO, ANDRY JOSE | | |
|---|---|---|---|
| **CoreCivic Inmate #:** | ▮▮▮▮▮ | **Agency Inmate #:** | ▮▮▮▮▮ |
| **STG Affiliation:** | OTHER - HISPANIC | | |

| Association - 09/06/2024 10:54 | | Comment | 09/06/2024 10:54 |
|---|---|---|---|

ON INITIAL INTERVIEW DETAINEE HERNANDEZ STATED THAT HE WAS NOT A MEMBER OF ANY GANG. UPON CONDUCTING A REVIEW OF DETAINEE HERNANDEZ'S TATTOOS IT WAS FOUND THAT DETAINEE HERNANDEZ HAS A CROWN ON EACH ONE OF HIS WRIST. THE CROWN HAS BEEN FOUND TO BE AN IDENTIFIER FOR A TREN DE ARAGUA GANG MEMBER.

**Comment**   Arturo Torres          **Title**  STG OFFICER

Proprietary Information - Not For Distribution - Copyrighted          006          Property of CoreCivic

9/6/24 1:36 PM

File Name: Association_202409061054.pdf



File Name: HERNANDEZ ROMERO ANDRY JOSE 221128894 (1).JPG



File Name: HERNANDEZ ROMERO ANDRY JOSE 221128894 (2).JPG



File Name: HERNANDEZ ROMERO ANDRY JOSE 221128894 (3).JPG




File Name: HERNANDEZ ROMERO ANDRY JOSE 221128894 (4).JPG



File Name: HERNANDEZ ROMERO ANDRY JOSE 221128894 (5).JPG



File Name: HERNANDEZ ROMERO ANDRY JOSE 221128894 (6).JPG

Uploaded on 03/06/2025 2:00:54 PM (Pacific Standard Time) Received 04/16/2025 Date Filed 05/30/2025

# STG CHRONOLOGICAL SUMMARY

| Inmate/Resident | HERNANDEZ ROMERO, ANDRY JOSE | |
|---|---|---|
| CoreCivic Inmate #: | ███████ | Agency Inmate #: ███████ |
| STG Affiliation: | OTHER - HISPANIC | |

| Association - 09/06/2024 10:54 | | Comment | 09/06/2024 10:54 |
|---|---|---|---|

ON INITIAL INTERVIEW DETAINEE HERNANDEZ STATED THAT HE WAS NOT A MEMBER OF ANY GANG. UPON CONDUCTING A REVIEW OF DETAINEE HERNANDEZ'S TATTOOS IT WAS FOUND THAT DETAINEE HERNANDEZ HAS A CROWN ON EACH ONE OF HIS WRIST. THE CROWN HAS BEEN FOUND TO BE AN IDENTIFIER FOR A TREN DE ARAGUA GANG MEMBER.

**Comment**  Arturo Torres            **Title**  STG OFFICER

Proprietary Information - Not For Distribution - Copyrighted
9/6/24 1:36 PM
Property of CoreCivic
52
File Name: Notes_20240906.pdf

# STG QUESTIONNAIRE

| Facility: | Otay Mesa Detention Center | | |
|---|---|---|---|
| Inmate/Resident Name: | HERNANDEZ ROMERO, ANDRY JOSE | ID Number: | ▮▮▮▮ |
| Date of Birth: | ▮▮▮▮ | | |
| Nickname / AKA / Moniker (s): | UNKNOWN | | |

## I. INMATE/RESIDENT ADVISEMENT

Inmate/Resident _____HERNANDEZ ROMERO, ANDRY JOSE_____ was advised on _____09/02/2024_____, that failure to respond to the questions in a truthful manner could result in disciplinary action being taken. In addition, information obtained can be released to the contracting agency and/or law enforcement.

## II. RACE (Note: Check applicable race(s) as expressed by the inmate/resident):

○ White    ○ Black or African American    ● Hispanic or Latino    ○ American Indian or Alaska Native    ○ Asian or Pacific Islander

## III. QUESTIONS

| 1. Where is your Hometown? | VENEZUELA | | |
|---|---|---|---|
| 2. Are you related to or do you know any employees of this facility? | Unknown | | |
| 3. Do you have any tattoos? | Yes | | |
| | If yes, | T-LEFT ARM=ROSES, SNAKE T-LEFT WRIST=CROWN DAD T-RIGHT WRIST=MOM T-LEFT LEG=ROSE, BUTTERFLY T-LEFT BUTTOCK=FLOWER | |
| | If yes, When: | 30 YEARS OLD | |
| | If yes, Where: | STREETS | |
| 4. Have you ever been involved in a gang, disruptive group? | No | (*see note below) | |
| 5. Have you ever been associated with a terrorist organization or involved in terrorist activities? | No | (*see note below) | |

** IF THE ANSWER TO #4 OR #5 IS "YES," COMPLETE QUESTIONS 6-23 BELOW. **IF THE ANSWER TO #5 IS "YES," COMPLETE A 9-12C IN ADDITION TO 9-12A.

* IF THE ANSWER TO #4 AND/OR #5 IS "NO", PROCEED TO SECTION IV; UNLESS THERE ARE SPECIFIC CHARACTERISTICS ABOUT THE SUSPECT WHICH ARE BELIEVED TO BE TRUE, BASED UPON CREDIBLE EVIDENCE TO SUPPORT ASSIGNMENT AND APPROVAL; THEN PROCEED WITH COMPLETING QUESTIONS 6-23 BELOW

| 6. What is the name of the group? | TREN DE ARAGUA | |
|---|---|---|
| 7. Are you a member or an associate? | Associate | |
| 8. At what age did you become a member? | DETAINEE HERNANDEZ STATED THAT HE IS NOT A MEMBER OF ANY GANG | |
| 9. Did you become a member or associate before or after incarceration? | Before | |
| How long involved? | DETAINEE HERNANDEZ STATED THAT HE IS NOT A MEMBER OF ANY GANG | |
| 10. Describe how you became a member? | | |
| DETAINEE HERNANDEZ STATED THAT HE IS NOT A MEMBER OF ANY GANG. | | |
| 11. Do you hold a position of rank in the group? | No | |
| 12. Are there other members of the group at this facility? | Unknown | |
| 13. Who are enemies of the group? | | |
| NONE | | |
| 14. Do you associate with any other groups? | No | |

Proprietary Information - Not For Distribution - Copyrighted

Property of Corrections CoreCivic

55

File Name: 9-12A doc 20240906.pdf

# STG QUESTIONNAIRE

| 15. Does the group have contact with other groups outside of the facility? | No |
|---|---|
| 16. Does the group receive financial support from outside the facility? | No |
| 17. Have you ever been ordered to assault or "hit" anyone? | No |
| 18. How do members of the group communicate? | |
| UNKNOWN | |
| 19. Who is/are the leaders(s) of the group at the facility? | |
| UNKNOWN | |
| 20. Who is/are the leader(s) of the group in your housing unit? | |
| UNKNOWN | |
| 21. How does the leadership structure of the group function? | |
| UNKNOWN | |
| 22. Do you want out of the group? | No |
| 23. Do you fear for your safety as a result of your membership/affiliation with the group? | No |

**Interviewer Printed Name:**      Arturo Torres      **Date:**   12/03/2024

STG OFFICER

**Confirmed by:**      Charles Cross Jr      **Date:**   12/10/2024

INVESTIGATOR

**NOTE**   This form can be completed and filed electronically via the CoreCivic/STG designated intranet site; therefore, this copy form is required only where a hard copy file is being maintained.

# To Be Completed By Interviewer

## IV. INTERVIEWER

| Inmate/resident's demeanor during interview: | Uncooperative |
|---|---|

**Interviewer's Comments:**

ON INITIAL INTERVIEW DETAINEE HERNANDEZ STATED THAT HE WAS NOT A MEMBER OF ANY GANG. UPON CONDUCTING A REVIEW OF DETAINEE HERNANDEZ'S TATTOOS IT WAS FOUND THAT DETAINEE HERNANDEZ HAS A CROWN ON EACH ONE OF HIS WRIST. THE CROWN HAS BEEN FOUND TO BE AN IDENTIFIER FOR A TREN DE ARAGUA GANG MEMBER.

**List and describe location of scars, brands, tattoos or other identifying marks of body:**
**S=Scars   B=Brands   T=Tattoos   O=Other(explain)**

T-LEFT ARM=ROSES, SNAKE T-LEFT WRIST=CROWN DAD T-RIGHT WRIST=MOM T-LEFT LEG=ROSE, BUTTERFLY T-LEFT BUTTOCK=FLOWER

**Determining factors to conclude reasonable suspicion:**

DETAINEE HERNANDEZ PORTS TATTOOS "CROWNS" THAT ARE CONSISTENT WITH THOSE OF A TREN DE ARAGUA MEMBER.

Proprietary Information - Not For Distribution - Copyrighted      015      Property of Corrections CoreCivic

54

AUGUST 1, 2009

File Name: 9-12A Doc 20240906.pdf

Uploaded on 03/06/2025 Case 6:23-cv-00007 Document 142-56-2 Filed on 06/16/25 in TXSD 05/30/2025 of 43

# STG MEMBER VALIDATION / CONFIRMATION

| Inmate/Resident Name: | HERNANDEZ ROMERO, ANDRY JOSE | | Number: | 6336080 |
|---|---|---|---|---|
| Facility: | Otay Mesa Detention Center | Jurisdiction: | IMMIGRATION AND CUSTOMS ENFORCEMENT | |

Score each applicable criteria item and total the points for validation level. All items scored shall have supporting documentation placed in the intelligence file.

| CATEGORY / SCORE | | POINTS |
|---|---|---|
| **Admission - Inmate/resident admits to association/membership with STG or gang.** | (5) | 0 |
| **Possession of STG Paraphernalia/Contraband: - Includes, but not limited to: drawings, letters, graffiti, bylaws, rosters, publications, documents, photos, audio tapes, clothes, symbols, logos, and any other personal property.** | (5) | 0 |
| **STG Tattoos/Brands/Identifying Marks** | (5) | 5 |
| **Observed and known contact with STG/Gang members/suspects** | (4) | 0 |
| **Intelligence information received from other agencies** | (5) | 0 |
| **Correspondence/communication with known STG/Gang members/suspects** | (4) | 0 |
| **Group photos with known STG/Gang members/suspects** | (4) | 0 |
| **Identified as an STG member/suspect in any document - Includes official records, media reports, and correspondence** | (5) | 0 |
| **Validation/confirmation of STG membership by law enforcement, Corrections, or sending jurisdiction** | (10 | 0 |
| | **TOTAL SCORE** | 5 |

| STG/Gang membership status. (9 or lower is SUSPECT) (10 or higher is MEMBER CONFIRMED): | SUSPECT |
|---|---|

| STG/Gang Affiliation: |
|---|
| TREN DE ARAGUA |

| Leadership (position or rank): |
|---|
| UNKNOWN |

| Comments: |
|---|
| ON INITIAL INTERVIEW DETAINEE HERNANDEZ STATED THAT HE WAS NOT A MEMBER OF ANY GANG. UPON CONDUCTING A REVIEW OF DETAINEE HERNANDEZ'S TATTOOS IT WAS FOUND THAT DETAINEE HERNANDEZ HAS A CROWN ON EACH ONE OF HIS WRIST. THE CROWN HAS BEEN FOUND TO BE AN IDENTIFIER FOR A TREN DE ARAGUA GANG MEMBER. |

| Completed by: | Arturo Torres | Date: | 12/03/2024 |
|---|---|---|---|
| | STG OFFICER | | |

| Confirmed by: | Charles Cross Jr | Date: | 12/10/2024 |
|---|---|---|---|
| | INVESTIGATOR | | |

**NOTE:** This form can be completed and filed electronically via the CoreCivic/STG designated intranet site; therefore, this copy form is required only where a hard copy file is being maintained.

JUNE 1, 2009
Proprietary Information - Not For Distribution - Copyrighted 016 Property of CoreCivic
EOIR – 17 of 33

## Workflow History

| Owner | Start Date/Time | Workflow Step | Comments |
|---|---|---|---|
| Cross Jr, Charles W | 12/03/2024 | Confirm | |
| Torres, Arturo M | 09/06/2024 | Administer | TREN DE ARAGUA SUSPECT |

Proprietary Information - Not For Distribution - Copyrighted - v2

Property of CoreCivic   12/10/24 1:17 PM

File Name: Packet_20240906.pdf

**Newsweek**  SUBSCRIBE FOR $1  **Login**

**U.S.** | Immigration   Tren De Aragua   Gangs   Illegal Immigration   U.S.-Mexico Border

# These Are the Tattoos the Government Says Can Identify Tren de Aragua

**Published** Dec 31, 2024 at 1:17 PM EST

**Updated** Dec 31, 2024 at 4:08 PM EST



Uploaded on 03/06/2025, 5:52 PM Case Case 2:25-00052-4 Document 67-1 Filed 05/30/2025 Page 67 of 342

**Newsweek** SUBSCRIBE FOR $1



By **Dan Gooding**
Politics Reporter

Newsweek Is A Trust Project Member

FOLLOW

---

**News Article** | 17

**B**order patrol officers announced the capture of another suspected member of <ins>the Venezuelan gang Tren de Aragua</ins> in California, who was sporting signature tattoos linked to the notoriously violent group.

The unnamed suspect was found by U.S. Customs and Border Protection in Imperial, with star tattoos similar to those seen on other members of the gang that <ins>has slowly spread across the U.S.</ins> in recent years.

## Why It Matters

<ins>Tren de Aragua (TdA)</ins> members have been linked to several high-profile crimes in 2024, including <ins>the murders of Laken Riley in Georgia</ins> and <ins>Jocelyn Nungaray in Texas</ins>. Law enforcement officials recently put out a bulletin noting that the alleged gang members' distinctive tattoos in the hopes they could lead the public to identifying other suspects.

EOIR — 20 of 33

https://www.newsweek.com/tren-de-aragua-venezuela-gang-tattoos-border-patrol-2007684

**Newsweek**    SUBSCRIBE FOR $1



Tattoos linked to the Venezuelan gang Tren de Aragua, which has a growing presence in the United States. Inset: a suspected member of the group, captured by Border Patrol officers in California    **TEXAS DEPARTMENT OF PUBLIC SAFETY/US BORDER PATROL**

## What To Know

U.S. Border Patrol Chief Patrol Agent Gregory K. Bovino posted on X, formerly Twitter, about the capture of the Venezuelan who had an outstanding warrant for attempted homicide in Redwood City and was previously arrested for grand larceny in New York.

The man had stars on either shoulder, similar to others seen on TdA members, which indicate rank, according to the Texas Department of Public Safety.

Other common tattoos are crowns, which the Texas DPS said was similar to iconography used by the Latin Kings, as well as firearms, grenades, trains, dice, roses, and predatory felines. Text reading "Real Hasta la Muerte", meaning "'Till death", and "Hijos de Dios", or "Sons of God", is also sometimes tattooed across the chest or on arms.

Border patrol agents elsewhere have posted similar images across 2024, showing AK-47s on suspects' arms, along with footprints and playing cards.

**Newsweek**    SUBSCRIBE FOR $1

**4/** 3: USBP agents in Ysleta, TX arrested a Venezuelan w/ no prior criminal history but w/ tattoos associated to the Tren de Aragua Gang.

Watch out for this gang. It is the most powerful in Venezuela, known for murder, drug trafficking, sex crimes, extortion, & other violent acts. pic.twitter.com/x1Mg3FpoOq

— Chief Jason Owens (@USBPChief) April 6, 2024

---

READ MORE    **Immigration**



**What is the 1798 Alien Enemies Act? How Law Could Help Trump Deportations**

**El Salvador Agrees to 'Unprecedented' Migrant Deal, Marco Rubio Says**

**MS-13 Gang Member Sentenced to Life for Dismembering Associate**

**Trump to Use 'Alien Enemies Act' to Rapidly Remove Immigrants—What We Know**

---

A report from Telemundo in October said members often conceal their tattoos in order to make it across the U.S.-Mexico border. The gang has now been reported officially in at least 15 states, including Texas, Florida, Georgia, California and Colorado, and is known for its violent tactics, drug trafficking and money laundering.

CBP said it detained 41 TdA members in Fiscal Year 2023 – running October 1, 2022, through September 30, 2023 – along with 27 the following year, and 5 since October 1, 2024. In total, 523 known gang members were detained by the border patrol.

*Newsweek* reached out to CBP and Immigration and Customs Enforcement (ICE) for further comment Monday afternoon via email.

## What People Are Saying

Uploaded on 03/06/2025 12:52 PM Case Case 1:25-cv-01534 Document 6 Document 53-1 Filed 03/05/2025 Page 70 of 342 Date Filed 03/30/2025 Page 23 of 43
2/23, 5:52 PM


consequences in the Premier Sector.

**House Homeland Security Subcommittee on Emergency Management and Technology Chairman, New York Republican Anthony D'Esposito, at a hearing on December 10:** "The Venezuelan criminal organization has been deemed "MS-13 on steroids," establishing drug trafficking, migrant smuggling, human trafficking, and extortion networks throughout the Nation."

## What's Next

President-elect Donald Trump has promised to crack down on transnational gangs like TdA once he returns to the White House on January 20. In Texas, Governor Greg Abbott has been offering $5,000 rewards for information leading to the capture of the gang's members.





**Newsweek Is Committed To Journalism That's Factual And Fair.**

**Hold Us Accountable And Submit Your Rating Of This Article On The Meter.**

---

Request Reprint & Licensing

Submit Correction

View Editorial & AI Guidelines

## Recommended For You

EOIR — 23 of 33

SIGMA Event: 64752256
Subject ID : 212694867

**U.S. Department of Homeland Security**

**Record of Deportable/Inadmissible Alien**

| Family Name (CAPS) | First | Middle | | Sex | Hair | Eyes | Cmplxn |
|---|---|---|---|---|---|---|---|
| HERNANDEZ ROMERO, ANDRY JOSE | | | | M | GRY | BRO | FAR |

| Country of Citizenship | Passport Number and Country of Issue | File Number | Height | Weight | Occupation |
|---|---|---|---|---|---|
| VENEZUELA | | Case No | 69 | 138 | |

| U.S. Address | | Scars and Marks |
|---|---|---|
| See Narrative | | NONE INDICATED |

| Date, Place, Time, and Manner of Last Entry | Passenger Boarded at | F.B.I. Number | ☒ Single |
|---|---|---|---|
| 08/29/2024, 2504 - SYS, 06:00, Afoot, Pedestrian West | N/A | | ☐ Divorced  ☐ Married  ☐ Widower  ☐ Separated |

| Number, Street, City, Province (State) and Country of Permanent Residence | Method of Location/Apprehension |
|---|---|
| | ISP |

| Date of Birth | Age: | Date of Action | Location Code | At/Near | Date/Hour |
|---|---|---|---|---|---|
| | | 08/29/2024 | 2504 - SYS | SAN YSIDRO, CA | 08/29/2024 0651 |

| City, Province (State) and Country of Birth | AR ☐ | Form : (Type and No.) Lifted ☐ Not Lifted ☐ | By |
|---|---|---|---|
| , VENEZUELA | | NONE | TRUONG, CAR35983 |

| NIV Issuing Post and NIV Number | Social Security Account Name | Status at Entry | Status When Found |
|---|---|---|---|
| None | None | See Narrative | TRAVEL/SEEKING |

| Date Visa Issued | Social Security Number | Length of Time Illegally in U.S. |
|---|---|---|
| None | None | At Entry |

| Immigration Record | Criminal Record |
|---|---|
| POSITIVE - See Narrative | None Known |

| Name , Address, and Nationality of Spouse (Maiden Name, if Appropriate) | Number and Nationality of Minor Children |
|---|---|
| NONE | None |

| Father's Name, Nationality, and Address, if Known | Mother's Present and Maiden Names, Nationality, and Address, if Known |
|---|---|
| | |

| Monies Due/Property in U.S. Not in Immediate Possession | Fingerprinted? ☒ Yes ☐ No | Systems Checks | Charge Code Words(s) |
|---|---|---|---|
| See Narrative | | See Narrative | See Narrative |

| Name and Address of (Last)(Current) U.S. Employer | Type of Employment | Salary | Employed from/to |
|---|---|---|---|
| NONE | NONE | 0.0 USD  Hr | 0/0/00 - 0/0/00 |

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

FINS

Left Index Finger                    Right Index Finger

STATUS AT ENTRY
----------------------------------------
Other Applicant for Admission

US ADDRESS
----------
... (CONTINUED ON I-831)

AKIMOVA, CAR30212
CBP OFFICER

| Alien has been advised of communication privileges | 08/29/2024 | | |
|---|---|---|---|
| | (Date/Initials) | (Signature and Title of Immigration Officer) |

| Distribution: | Received: (Subject and Documents)  (Report of Interview) |
|---|---|
| A-FILE | AKIMOVA, CAR30212 - CBP OFFICER |
| | Officer: |
| | on: August 29, 2024                    (time) |
| | Disposition: EXPEDITED REMOVAL-CREDIBLE FEAR (ERCF) |
| | Examining Officer: |
| | PINEDA, CAO05796 - SUPERVISORY CBP OFFICER |

Form I-213 (Rev. 08/01/07)

**U.S. Department of Homeland Security**

**Continuation Page for Form** _I213_

| Alien's Name | File Number A- | Date |
|---|---|---|
| HERNANDEZ ROMERO, ANDRY JOSE | SIGMA Event:<br>Event No: | August 30, 2024 |

CLAIMED DOCUMENTS
----------------
Passport -

RECORDS CHECKED
---------------
ATS-P Neg
TECS Pos
NCIC Neg
CIS Pos
CLAIM Neg
CCD Neg
IAFIS Pos
EARM Pos

SECTION CODES
-------------
Sec212(a)(7)(A)(i)(I)
8 USC 1182-ALIEN INADMISSIBILITY UNDER SEC 212(a)

CLAIMED PROPERTY
-------------------
Personal Property BAGGAGE CHECK 15240560

Narrative:
-------------
On 08/29/2024, at approximately 0600 hours, Andry Jose HERNANDEZ ROMERO (DOB: )
applied for admission applied for admission into the United States from Mexico via the San
Ysidro Port of Entry Pedestrian West Facility. HERNANDEZ ROMERO arrived for his CBP One
Appointment. HERNANDEZ ROMERO and a native and citizen of Venezuela.
HERNANDEZ ROMERO presented a Venezuelan Passport bearing their name and likeness. HERNANDEZ
ROMERO is enroute to
System checks were done through super query, yielding negative results.
On 08/30/2024, at approximately 1000 hours, HERNANDEZ ROMERO was interviewed by U.S.
Customs and Border Protection (CBP) Officer AKIMOVA in the Spanish language, witnessed by
CBP Officer CASTRO, C. During an oral interview and sworn statement, HERNANDEZ ROMERO
freely and voluntarily made the following statements:
HERNANDEZ ROMERO admitted to being a native and citizen of Venezuela by virtue of birth in
. HERNANDEZ ROMERO stated that his mother,                        was
born in Venezuela. HERNANDEZ ROMERO stated that his father,              , was born in
Venezuela. HERNANDEZ ROMERO stated that he only claims citizenship from Venezuela.
HERNANDEZ ROMERO stated that he is not married, and that he HERNANDEZ ROMEROs not have any
children.
HERNANDEZ ROMERO stated that he was enroute to                        to live and work.
HERNANDEZ ROMERO stated that he has never lived in the United States.
HERNANDEZ ROMERO admitted to not possessing legal documents to enter into, pass through, or
remain in the United States.
HERNANDEZ ROMERO stated that he has never applied for a United States Visa. HERNANDEZ
ROMERO stated that he does not have any applications pending with United States Citizenship
and Immigration Services.
...(CONTINUED ON NEXT PAGE)

| Signature | Title |
|---|---|
| AKIMOVA, CAR30212 | CBP OFFICER |

2 of 3 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

**63**

**U.S. Department of Homeland Security**

**Continuation Page for Form** I213

| Alien's Name | File Number A | Date |
|---|---|---|
| HERNANDEZ ROMERO, ANDRY JOSE | SIGMA Event: | August 30, 2024 |
| | Event No: | |

HERNANDEZ ROMERO stated that he left his home country because he was being threatened by his coworkers and bosses for being gay and for his political views.
HERNANDEZ ROMERO stated he worked as a makeup artist at the state-run TV channel and did make up for guests and anchors of the channel.
HERNANDEZ ROMERO stated that he was being threatened from march till November of 2023 until he quit his job. HERNANDEZ ROMERO stated he was slapped by his boss in front of his coworkers.
HERNANDEZ ROMERO stated he was previously removed from the US by border patrol when he tried to enter illegally. HERNANDEZ ROMERO was returned to Tabasco, Mexico.
HERNANDEZ ROMERO stated his friend helped him fill out a CBP1 application and he came to Tijuana at the time of his appointment to claim asylum.
HERNANDEZ ROMERO stated that he has fear of returning to Venezuela. HERNANDEZ ROMERO claimed that he believed he would be harmed if returned to Venezuela.
HERNANDEZ ROMERO was offered a phone call and given the opportunity to speak with a friend. HERNANDEZ ROMERO contacted his friend in
HERNANDEZ ROMERO declined notification of his detention to his consulate.
HERNANDEZ ROMERO submitted a DNA sample on DNA Sample Collector number
Disposition: HERNANDEZ ROMERO, Andry Jose was presumed inadmissible to the United States pursuant to section 212(a)(6)(C)(ii) and 212(a)(7)(A)(i)(I) of the INA as amended.
HERNANDEZ ROMERO was provided a list of free legal services and served with form M-444 Information About Credible Fear Interview and taken into Department of Homeland Security custody pending credible fear interview before an asylum officer.

| Signature | Title |
|---|---|
| AKIMOVA, CAR30212 | CBP OFFICER |

3 of 3 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

**64**

U.S. Department of Homeland Security

## Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act

Office: **SAN YSIDRO, CA, USA**

SIGMA Event:
File No: **A-**
Event Number :

Statement by: **HERNANDEZ ROMERO, ANDRY JOSE**

In the case of: **HERNANDEZ ROMERO, ANDRY JOSE**

Date of Birth:

Gender (circle one): Male Female

At: **SAN YSIDRO (SYS)**

Date: **08/29/2024**

Before: **AKIMOVA, CAR30212 - CBP OFFICER**

(Name and Title)

In the **SPANISH**     language. Interpreter **CASTRO, CA**     Employed by **CBP/DHS**

I am an officer of the United States Department of Homeland Security. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Except as I will explain to you, you are not entitled to a hearing or review.

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.

Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

Q: Do you understand what I've said to you?
A: Yes.

Q: Do you have any questions?
A: No.

Q: What language are you comfortable speaking with me?
A: Spanish.

Q: Are you willing to answer my questions at this time?
A: Yes.

Q: Do you swear or affirm that all the statements you are about to make are true and complete?
A: Yes.

Q: Are you under the effects of any medication, drugs or alcohol at this time?
A: No.
...(CONTINUED ON I-831)

Page 1 of **6**

H?AJ

I-867A (08/01/07)

Uploaded on: 03/06/2025 at 03:04:52 PM Pacific Standard Time    Case 2:25-cv-00534    Document 56-2    Filed 04/16/25    Date Filed 05/30/2025    75 of 43

U.S. Department of Homeland Security

Continuation Page for Form I-867A

| Alien's Name | File Number A- | Date |
|---|---|---|
| HERNANDEZ ROMERO, ANDRY JOSE | SIGMA Event: | August 30, 2024 |
| | Event No: | |

Q: Do you understand that you are under oath and are obliged to tell the truth, under penalty of perjury?
A: Yes.

Q: What is your true and correct name?
A: HERNANDEZ ROMERO, Andry Jose

Q: What is your true date of birth?
A:

Q: Do you have, or have you ever used any other names?
A: No

Q: In what City, State and Country where you born?
A:                    , Venezuela.

Q: Of what country are you a citizen?
A: Venezuela.

Q: Do you have citizenship in any other country?
A: No.

Q: Of what country is your father a citizen?
A: Venezuela.

Q: Of what country is your mother a citizen?
A: Venezuela.

Q: What is your biological father's true and correct name?
A:

Q: What is your biological mother's true and correct name?
A:

Q: Where were your biological parents born?
A: In Venezuela.

Q: Where did you grow up as a child/teenager?
A: In Venezuela.

Q: Have you ever resided in any other country besides Venezuela?
A: Bogota, Colombia.

Q: Have you ever applied for any documents to travel to the U.S.?
A: No.

Q: Where were you currently living?
A: In Venezuela

Q: Do you have any children?
A: No
... (CONTINUED ON NEXT PAGE)

HR AJ

| Signature | Title |
|---|---|
| AKIMOVA, CAR30212 | CBP OFFICER |

2 of 6 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

U.S. Department of Homeland Security

Continuation Page for Form I-867A

| Alien's Name HERNANDEZ ROMERO, ANDRY JOSE | File Number A- | Date August 30, 2024 |

Q: Have you ever been legally married?
A: No

Q: When did you leave  Venezuela to travel to the U.S.?
A: May 23rd 2024.

Q: Where were you before?
A: I travelled in Colombia, Panama, Nicaragua, Honduras. I came by bus walking and taxis.

Q: When did you arrive in Tijuana?
A: 27 August 2024.

Q: Did you travel in group or with someone else?
A: By myself.

Q: Why did you specifically travel to Tijuana?
A: Because I filled out the CBP1 application and this location was the earliest appointment.

Q: Who fille dout a CBP One application?
A:  My friend

Q: Before coming here did you speak with or were advised by any lawyers, or legal representatives?
A: Yes

Q:  On what day did you attempt to enter the United States?
A:  08/27/2024

Q: How did you attempt to enter the United States?
A:  I came walking.

Q: What documents did you present to the primary officer when you applied for admission?
A: My Venezuelan passport

Q: What is the reason you are seeking asylum?
A:  I am discriminated against because im gay and being humiliated at work.

Q: What's your job?
A:  Makeup artist for the state run tv channel.

Q: Who threatened you?
A: The people form the channel. The producers threatened me because of my political views against the gov

Q: When did this occur?
A: from march through November of last year.

Q: Did they threaten you physically?
A:  Yes, they slapped me in front of my coworkers.

Q: Did you report this to the police?
... (CONTINUED ON NEXT PAGE)

HRAJ

| Signature AKIMOVA, CAR30212 | Title CBP OFFICER |

3 of 6 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

**U.S. Department of Homeland Security**

**Continuation Page for Form** I-867A

| Alien's Name | File Number | Date |
|---|---|---|
| HERNANDEZ ROMERO, ANDRY JOSE | | August 30, 2024 |

A:   No

Q: Did you claim asylum while in Mexico?
A: No.

Q: Why not?
A: Because I didn't know I could do that.

Q: Where are you destined in the U.S.?
A:

Q: Did you apply for a visa or any type of legal immigration status before coming here?
A: No.

Q: Where you ever deported or removed from any country?
A: Yes

Q: When were you removed?
A:   A month ago

Q: What happened?
A: I was returned to Tabasco Mexico, from Texas by border patrol. For illegal entry

Q: Are you part of a political party?
A: Yes, but I don't know the name

Q: Are you aware one needs legal documents or status to enter the U.S.?
A: Yes.

Q: Have you ever held any legal status or documents allowing to lawfully enter the U.S.?
A: No.

Q: Do any of your immediate family members possess proper documentation to enter the United States?
A:   No

Q: Do you have any family or friends or know people associated with organized crime?
A: No.

Q:   Do you have any applications or petitions pending with the Bureau of Citizenship and Immigration Services?
A:   No.

Q: Do you have any criminal history in the U.S. or anywhere in the world?
A: No

Q: Have you or your immediate family been a victim of kidnapping, attempted kidnapping, extortion, or murder during your travel here?
A: No.

Q: Have you ever been persecuted or threatened due to your political views or status, religious...(CONTINUED ON NEXT PAGE)

HRAJ

| Signature | Title |
|---|---|
| AKIMOVA, CAR30212 | CBP OFFICER |

4  of  6  Pages

Form I-831 Continuation Page (Rev. 08/01/07)

U.S. Department of Homeland Security

Continuation Page for Form I-867A

| Alien's Name | File Number | Date |
|---|---|---|
| HERNANDEZ ROMERO, ANDRY JOSE | | August 30, 2024 |

beliefs, sexual preference or identification, race, or gender?
A: Yes.

Q: Do you know of anyone making any promises to you in exchange for your declaration?
A: No.

Q: Is the declaration you gave the honest truth and all voluntary?
A: Yes.

Q: Do you have any questions or anything to add?
A: No.

HRAJ

| Signature | Title |
|---|---|
| AKIMOVA, CAR30212 | CBP OFFICER |

5 of 6 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

U.S. Department of Homeland Security

**Jurat for Record of Sworn Statement in
Proceedings under Section 235(b)(1) of the Act**

SIGMA Event: 64752256

Q: Why did you leave your home country or country of last residence?

A. **People were threatening me because i am Gay and because of my political beliefs.**

Q. Do you have any fear or concern about being returned to your home country or being removed from the United States?

A. **Yes**

Q. Would you be harmed if you are returned to your home country or country of last residence?

A. **Yes**

Q. Do you have any questions or is there anything else you would like to add?

A. **No**

I have read (or have had read to me) this statement, consisting of __6__ pages (including this page). I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above named officer of the Department of Homeland Security. I have initialed each page of this statement (and the corrections noted on page(s)_____ ).

Signat

Sworn and subscribed to before me at **SAN YSIDRO (SYS)**
on **August 30, 2024** .

Signature of Immigration Officer | **AKIMOVA, CAR30212
CBP OFFICER**

Witnessed by:

**CASTRO, Carlos**

CERTIFICATE OF SERVICE

On 3/6/2025, I, Matthew Warren, Assistant Chief Counsel, served a copy of this DHS
SUBMISSION OF EVIDENCE and any attached pages through the EOIR Courts and Appeals
System (ECAS), which will automatically send service notifications to both parties that a new
document has been filed. If unrepresented, the document will also be served on the respondent
at the Otay Mesa Detention Center, 7488 Calzada de la Fuente, San Diego, CA 92113.


*Matthew Warren*
_____
Matthew Warren
Assistant Chief Counsel

# EXHIBIT B





Screenshot of Andry Jose Hernandez
Romero's Instagram page














# Tab F

# Exhibit G

## Declaration of Linette Tobin

I, Linette Tobin, do hereby declare the following under penalty of perjury:

1.    I am the immigration attorney for Jerce Reyes Barrios, born in January 16, 1989 in Venezuela.

2.    In February and March 2024, Mr. Reyes Barrios marched in two demonstrations in Venezuela protesting the authoritarian rule of Maduro.  At the second demonstration, he was detained and taken to a clandestine building where he was tortured (electric shocks and suffocation) along with other demonstrators.

3.    Shortly after his release, he fled Venezuela for the United States.  He registered with CBP One in Mexico, then presented himself to CBP officials on the day of his appointment.  He was taken into custody and detained at Otay Mesa Detention Facility in September 2024.

4.    We applied for asylum, withholding of removal, and CAT protection in December 2024.  His final individual hearing is set for April 17, 2025 before Judge Robinson at the Otay Mesa Immigration Court.

5.    On March 15, 2025, Mr. Reyes Barrios was deported to El Salvador with no notice to counsel or family.  It was not until March 18, 2025 that counsel was able to reach an ICE official and learn that he had in fact been deported.

6.    Mr. Reyes Barrios was/is a professional soccer player in Venezuela.  He has never been arrested or charged with a crime.  He has a steady employment record as a soccer player, as well as a soccer coach for children and youth.

7.    Initially, Mr. Reyes Barrios was placed in maximum security at Otay Mesa and accused of being a Tren de Aragua gang member.  The accusation is based on two things.  First, he has a tattoo on his arm of a crown sitting atop a soccer ball with a rosary and the word "Dios."  DHS alleges that this tattoo is proof of gang membership.  In reality, he chose this tattoo, because it is similar to the logo for his favorite soccer team Real Madrid.  See logo below.

 Real Madrid logo     Mr. Reyes Barrios tattoo

8.    Second, DHS reviewed his social media posts and found a photo of Mr. Reyes Barrios making a hand gesture that they allege is proof of gang membership.  In fact, the gesture is a common one that means I Love You in sign language and is commonly used as a Rock&Roll symbol.

 Mr. Reyes Barrios' social media post

9.      After submitting a police clearance from Venezuela indicating no criminal record, multiple employment letters, a declaration from the tattoo artist who rendered the tattoo, and various online images showing similar soccer ball/crown tattoos and explaining the meaning of the hand gesture, Mr. Reyes Barrios was transferred out of maximum security.

10.     Nevertheless on March 10th or 11th, he was transferred from Otay Mesa to Texas without notice.  Then, on March 15, 2025, he was deported to El Salvador.  Counsel and family have lost all contact with him and have no information regaring his whereabouts or condition.

Sworn this 18th day of March 2025.

Linette Tobin, Esq.
Counsel for Jerce Reyes Barrios

# Tab G

# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| J.G.G., *et al.*,<br><br>Petitioner,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Respondents. | No. 1:25-cv-766 (JEB)<br><br><u>Declaration Of Deputy Assistant Director<br>Selwyn Smith</u> |

## DECLARATION OF SELWYN SMITH

I, Selwyn Smith, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am a Deputy Assistant Director ("DAD") for Homeland Security Investigations ("HSI") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      As the DAD of Countering Transnational Organized Crime, Public Safety and Border Security division ("PSBS"), I oversee a wide variety of investigative and special operations programs targeting Transnational Criminal Organizations involved in human smuggling, narcotics trafficking, racketeering and violent gang activity as well as other crimes enforced by HSI. These programmatic areas support the targeting of cross border criminal organizations that exploit America's legitimate trade, travel, and financial systems for illicit purposes.

3.      I am aware that the instant lawsuit has been filed regarding the removal of

Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4.      I provide this declaration based on my personal knowledge, reasonable inquiry,

and information obtained from various records, systems, databases, other DHS employees, and

information portals maintained and relied upon by DHS in the regular course of business.

5.      On March 15, 2025, President Trump announced the Proclamation *Invocation of

the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating

that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to

invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare

within the country; and used drug trafficking as a weapon against our citizens" (the

Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-

alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same

Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan

citizens 14 years of age or older who are members of TdA, are within the United States, and are

not actually naturalized or lawful permanent residents of the United States are liable to be

apprehended, restrained, secured, and removed as Alien Enemies."

6.      Members of TdA pose an extraordinary threat to the American public. TdA

members are involved in illicit activity to invoke fear and supremacy in neighborhoods and with

the general population. This has been evident from investigations throughout the nation where

TdA members coalesce to conduct their criminal acts. For example, TdA's takeover of Denver

apartment buildings stoked fear in the tenants when TdA committed burglaries, narcotics, and

weapons violations. Other inquiries into the actions of member of TdA have resulted in criminal

investigations and prosecution of cases of human trafficking, to include trafficking of women

from Venezuela; bank fraud; federal narcotics violations; extortion of human smuggling victims; and homicide, to name a few. This, along with the myriad state violations and investigations of groups of TdA members committing crimes throughout the nation are evidence of their criminal enterprise.

7.      TdA is a violent transnational criminal organization (TCO) which originated in the mid-to-late 2000's as a prison gang founded by inmates of the Tocorón prison in the Venezuelan state of Aragua. TdA has since evolved from Venezuela's most powerful homegrown prison gang into a TCO which by 2018, had expanded throughout South America and grew to have an estimated 3,000 to 5,000 members. As TdA continues its expansion throughout South America it is currently proliferating into North America.

8.      Much like MS-13, as TdA's influence and power expanded to other prisons throughout Venezuela and then across the southern hemisphere, the global leadership of the organization exploited the prison system to develop a base of operations for the gang to coordinate logistics, revenue streams, and recruitment. TdA was also able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. The founding members, senior leaders, and a vast number of TdA members escaped the Tocorón prison in September 2023. The subsequent destruction of the prison resulted in the displacement of the senior leaders and the decentralization of the global command-and-control structure for the organization.

9.      Over the course of the past three years, TdA has expanded throughout North America and are now known to be present and committing criminal activity in at least 40 states in the continental United States and Canada. TdA has proven to leverage many of the same expansion tactics and strategies in the United States that they previously employed throughout

South America. Due to the migration patterns of the Venezuelan diaspora and the vast expansion of the organization throughout the United States, TdA has become a loosely affiliated collection of independent cells committing disorganized and opportunistic crimes of violence against the Venezuelan population and rival gangs, terrorizing local communities. Detention of TdA leaders and members would potentially result in the unintended consequence of consolidating and centralizing their command-and-control structure and thereby providing an opportunity for TdA to organize and prolong the violent activities of their criminal enterprise within the United States.

10.     Historically, TdA has been found to be either, or both, strategic and opportunistic in their evolution and expansion. Within the Venezuelan penitentiary system, TdA methodically pursued geographic expansion by taking control of selected prisons in Aragua and surrounding states. Throughout the gang's expansion across international borders, the establishment and disbursement became more random and responsive to the environment and driven by profitability. As TdA continues its geographical expansion it has shown to operate as a loosely organized criminal syndicate serving as an umbrella organization for franchise networks under the TdA banner.

11.     TdA establishes their presence in a three-phase expansion methodology through force and dominance in an urban population within a geographical region. This pattern of behavior has been documented in TdA's expansion throughout South America, including into Colombia, Perú, and Chile. The three known phases of expansion are the Exploration, Penetration, and Consolidation phase.

12.     <u>Exploration</u> - In this step, TdA has been known to infiltrate and control groups of Venezuelan refugees traveling along migratory routes. By mixing with these migrants TdA

**84**

members can keep a low profile and pass into new regions. They have been known to exploit

these migrants for the gang's profit through extortion and sexual exploitation.

13.    Penetration - In this step, TdA members begin to establish themselves within their

new territory. This is often accompanied by a corresponding increase in crime and violence as

they begin to set up their criminal activities and confront existing gangs previously established in

the area. In general, TdA has historically targeted opportunistic areas with a relatively low

volume of rival organizations present and with elevated profitability. During this phase TdA will

typically engage in extortion, low-level drug distribution, human trafficking and sexual

exploitation, kidnapping, and other violent crimes of intimidation.

14.    Consolidation - Once TdA members have firmly established themselves within an

area and overcome and/or absorbed competing gangs through domination they move to

consolidate their power and position within the territory into an enterprise.

15.    Reporting reveals TdA is attempting to expand its presence and criminal activity

throughout the Western Hemisphere by exploiting the record mass migration resulting from

Venezuela's recent political, economic, and humanitarian crises. According to key assessments, if

left unchecked, TdA is likely to establish increasingly sophisticated human smuggling and sex

trafficking networks into the United States leading to an increase in criminal activity and likely

adding further strain to law enforcement resources as seen in Chicago, New York, Denver, and

along our southern border.

16.    As of September 2024, ICE HSI reporting indicates that TdA members have been

identified in at least 40 states across the United States. ICE HSI has opened approximately 472

investigations targeting members and/or TdA criminal networks across domestic and

international offices. The violations in these investigations include, but are not limited to,

murder, robbery, human smuggling, human trafficking, sex trafficking, hostage taking, narcotics trafficking, and firearms violations.

17.    In January 2024, the New York Police Department ("NYPD") recorded a surge in moped robberies that are attributed by police as likely orchestrated by TdA recruits. NYPD CompStat reporting indicates that moped-based armed robbery patterns during this period were 158% higher than the same period the previous year. NYPD attributes this surge to be a result of TdA recruitment of Venezuelans in New York City migrant centers. Accused leaders have admitted to a complex network connected to Florida and Texas with profits shipped back to South America. Associated crews of this TdA network are allegedly involved in extortion and ransom schemes connected to human smuggling and human trafficking networks.

18.    In June 2024, multiple suspected TdA members participated in a nationally publicized series of robberies including the armed robbery of $2 million in merchandise from a high-end jewelry store in Denver, Colorado. In total, 13 subjects were apprehended by ICE HSI in a multi-agency, coordinated enforcement operation as the group attempted to flee to Venezuela.

19.    In January 2025, as a result of a joint ICE HSI investigation, nine TdA members were criminally charged in Colorado state court for their participation in the December 17, 2024, armed home invasion, kidnapping, and torture of two Venezuelan nationals at the Edge of Lowry Apartments in Aurora, Colorado. In total, 12 subjects were charged, with three Venezuelan nationals remaining at large. The court granted the City of Aurora an emergency order to temporarily close the Edge of Lowery Complex due to "an imminent threat to public safety and welfare."

20.     In February 2025, a joint multi-jurisdictional ICE HSI investigation with the Federal Bureau of Investigation and Tennessee Bureau of Investigation, dismantled a transnational commercial sex trafficking enterprise charging eight subjects with ties to TdA. The defendants operated an illegal commercial sex and sex trafficking enterprise out of Nashville motels from July 2022 through March 2024. The defendants facilitated the victims' arrival into the United States and used online commercial sex websites to post advertisements and internet or cellular communications to conduct illicit criminal activities.

21.     It is critical to use all available law enforcement tools to disrupt TdA activities quickly. These individuals are designated as foreign terrorists. Within Venezuela, TdA was able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. Keeping them in ICE custody where they could potentially continue to recruit new TdA members poses a grave risk to ICE personnel; other, nonviolent detainees; and the United States as a whole.

22.     Though many TdA members subject to the AEA do not have criminal records in the United States, due to their origin as a prison gang, it is safe to assume these subjects have criminal histories in their home countries, which U.S, law enforcement cannot verify due to the lack of diplomatic relations that currently exist with the country of Venezuela. The lack of a criminal record in the United States does not indicate they pose a limited threat. In fact, based upon their association with TdA, the lack of specific information about each individual actually highlights the risk they pose. It demonstrates that they are potential terrorists for whom we lack a complete profile.

23.     However, even though many of these TdA members have been in the United States only a short time, some have still managed to commit extremely serious crimes. A review

of ICE databases reveals that numerous individuals subject to the AEA have arrests and

convictions in the United States for dangerous offenses.

24. Additionally, a review of ICE databases reveals that numerous individuals

removed have arrests, pending charges, and convictions outside of the United States, including

an individual who is under investigation by Venezuelan authorities for the crimes of aggravated

homicide, qualified kidnapping, and illegal carrying of weapons of war and short arms with

ammunition for organized gang in concealment and trafficking; an individual who is the subject

of an active INTERPOL Blue Notice issued on or about January 2, 2025, and a Red Notice

issued February 5, 2025, for the crime of kidnapping and rape in Chile; an individual who is the

subject of an INTERPOL Red Notice issued by Chile for kidnapping for ransom and criminal

conspiracy involving TdA; an individual who admitted he sold marijuana and crystal

methamphetamine for the Colombian gang Las Paisas, assaulted someone with a knife for a

cellphone while living in Venezuela, and has twice robbed people for money while living in

Colombia; an individual who is the subject of an INTERPOL Red Notice for child abduction; an

individual identified as a "high-ranking" member of the TdA by the Mobile Tactical Interdiction

Unit in Guatemala City, Guatemala; an individual who is the subject of an INTERPOL Red

Notice based on obstruction of justice, criminal conspiracy, and aggravated corruption based on

the individual's role as a police officer in modifying evidence to cover up a murder; an individual

who, according to Peruvian Newspapers, is associated with high-ranking TdA members and who

fled Peru while under investigation for illegal possession of firearm and distributing narcotics;

and an individual who is the subject of an INTERPOL Blue Notice stating that he is under

investigation in Venezuela for murder with aggravating circumstances against a victim whose

corpse was found inside a suitcase on a dirt road.

25.     According to a review of ICE databases, numerous individuals removed were arrested together as part of federal gang operations, including two individuals who were in a vehicle during a Federal Bureau of Investigations gun bust with known TdA members; four individuals who were arrested during the execution of an HSI New York City operation; and four individuals who were encountered during the execution of an arrest warrant targeting a TdA gang member, all of whom were in a residence with a firearm and attempted to flee out the back of the residence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April 2025.

SELWYN J SMITH

Digitally signed by SELWYN J SMITH
Date: 2025.04.01 21:51:03 -04'00'

Selwyn Smith
Deputy Assistant Director
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

89

# Tab H

Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

J.G.G., *et al*.,

Petitioner,

v.

DONALD J. TRUMP, *et al*.,

Respondents.

No. 1:25-cv-766 (JEB)

<u>Declaration Of Acting Assistant Director</u>
<u>Marcos D. Charles</u>

**DECLARATION OF MARCOS D. CHARLES**

I, Marcos D. Charles, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an Acting Assistant Director for Field Operations at Enforcement and
Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the
U.S. Department of Homeland Security ("DHS").

2.      As the (A) Assistant Director, I am responsible for providing guidance and
counsel to the twenty-five ERO Field Office Directors, ensuring all field operations are working
to efficiently execute the agency mission.  I began my career with the U.S. Government as a
border patrol agent for the former Immigration and Naturalization Service in Hebbronville, TX.
Over time I was promoted to Senior Border Patrol Agent, Supervisory Border Patrol Agent, and
Field Operations Supervisor. I joined ICE in 2008 as the Assistant Officer in Charge. Overtime I
was promoted to Supervisory Detention and Deportation Officer, Assistant Field Office Director,

Chief of Staff, Deputy Field Office Director, and Field Office Director before becoming the

Acting Assistant Director.

3.      I am aware that the instant lawsuit has been filed regarding the removal of

Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4.      I provide this declaration based on my personal knowledge, reasonable inquiry,

and information obtained from various records, systems, databases, other DHS employees, and

information portals maintained and relied upon by DHS in the regular course of business.

5.      On March 15, 2025, President Trump announced the Proclamation *Invocation of

the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating

that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to

invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare

within the country; and used drug trafficking as a weapon against our citizens" (the

Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-

alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same

Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan

citizens 14 years of age or older who are members of TdA, are within the United States, and are

not actually naturalized or lawful permanent residents of the United States are liable to be

apprehended, restrained, secured, and removed as Alien Enemies."

6.      Gangs remain one of the more formidable issues that corrections officials face in

the management of prisons and civil detention facilities. Gangs are responsible for a

disproportionate amount of prison misconduct and violence. Their continued presence challenges

ongoing efforts to maintain control, order, and safety in the facilities. While all gangs disrupt the

orderly administration of detention facilities, TdA represents a heightened challenge beyond

what prisons in the United States face, given TdA's formation and history in penal institutions.

      7.     TdA is not just a normal gang. Open-source information documents the gang's

history and growth over the last decade. As reported in National Public Radio's article titled,

*Tren de Aragua, a criminal organization with roots in Venezuela, has roots in Venezuela, has*

*rapidly expanded across Latin America*, TdA was founded in 2014 in the Tocorón prison, in the

central Venezuelan state of Aragua, led by Héctor Rusthenford Guerrero Flores, alias "Niño

Guerrero." The gang largely controlled the Tocorón prison and eventually branched out overseas.

The gang's leaders fled the prison in 2023 when it was taken over by security forces. While

leadership splintered after fleeing the prison, TdA recruited new gang members from among the

eight million Venezuelans who had fled the country's economic crisis. Initially, it established

criminal cells in neighboring Colombia, Peru, and Chile, where it smuggled drugs and people

and operated extortion rackets and prostitution rings. TdA's most notorious alleged crime was the

2024 killing of Ronald Ojeda, a former Venezuelan army officer who conspired against Nicolás

Maduro, the country's authoritarian leader, then fled to Chile. Suspected gang members dressed

as Chilean police officers abducted Ojeda from his apartment. Days later, his body was found

stuffed in a suitcase and buried in cement. The history reflects over a decade of savage criminal

activity, vicious disregard for authority, and violent crimes which threaten the stability of order.

TdA poses the same terrorizations in the United States as the origin countries from which they

started – Venezuela, and now also to include Colombia, Peru and Chile.

      8.     While in confinement in Venezuela, TdA was able to grow its numbers

exponentially. Multiple examples of their savagery can be found in open-source news articles

highlighting the numerous abhorrent activities they have conducted while in the United States

**93**

including but not limited to murder, rape, kidnapping, sex trafficking, drug trafficking, robbery, and assault. Further, TdA has been designated a Foreign Terrorist Organization. Their continued presence in ICE custody poses significant risks such as the ability to recruit new TdA members. Detention of hundreds of members of a designated Foreign Terrorist Organization, among other populations of aliens is an unnecessary danger to other detainees and facility staff.

9.    The designation of TdA as a terrorist organization has introduced new budgetary challenges for ICE/ERO. This classification necessitates a shift in resource allocation, directing limited funds and human capital towards the identification, arrest, detention, and removal of individuals within this newly prioritized organization. ICE is bound by statutory requirements to not release certain aliens from immigration detention based on criminal or threat designations. This shift in priorities hampers ICE's ability to properly detain those aliens who are not statutorily eligible for release or for whom an ICE officer determines is a public safety or flight risk during the custody determination process. Detaining this dangerous population of aliens detracts from our already limited bedspace capacities and diminishes our resources and obstructs ICE's ability to detain other criminal aliens, and make difficult decisions on which aliens are the most egregious, dangerous and/or removable all while also being bound by statutory requirements in the Immigration and Nationality Act (INA), which imposes limitations on release, such as aliens subject to expedited removal, or for whom there is a prohibition of release under the mandatory detention provision of INA § 236(c). ICE currently has roughly 41,500 beds available for detention. These beds cost the American public roughly $152 a bed daily. Because members of TdA pose a significant threat of danger at ICE detention facilities, their swift removal from the United States after entering ICE custody ensures the preservation of security and order for both detainees and facility personnel.

Case 1:25-cv-01634   Document 45-2   Filed 04/23/25   Page 107 of 342   Case 1:25-cv-00766-JEB   Document 72-2   Filed 04/01/25   Page 5 of 6

Case 1:25-cv-00766-JEB   Document 72-2   Filed 04/01/25   Page 5 of 5

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April, 2025.

MARCOS D CHARLES
Digitally signed by
MARCOS D CHARLES
Date: 2025.04.01
22:48:40 -04'00'

Marcos D. Charles
Acting Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# Tab I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| J.A.V., et al.,<br><br>*Petitioner.*<br><br><br>v.<br><br><br>DONALD J. TRUMP, et al.,<br><br>*Respondents.* | Civil Action No. 1:25-cv-072 |

## DECLARATION OF ASSISTANT FIELD OFFICE DIRECTOR

Pursuant to the authority of 28 U.S.C. § 1746, I, Carlos D. Cisneros, an Assistant Field Office Director for U.S. Department of Homeland Security (DHS), United States Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), Harlingen, Texas (TX) declare as follows:

1.      I am an Assistant Field Office Director ("AFOD") for U.S. Department of Homeland Security, United States Immigration and Customs Enforcement, Enforcement and Removal Operations ("ICE ERO Harlingen"). I began my employment with ICE (Legacy Immigration and Naturalization Service) on January 18, 2000, and I have been serving as the AFOD for ICE ERO Harlingen since August 28, 2022.

2.      In my role as AFOD, I oversee ERO enforcement operations for the Harlingen Office. As an AFOD, I am responsible for the supervision of deportation officers managing detained cases in Harlingen, Texas. I am also responsible for overseeing the safety, security and care of individuals in my custody.

3.      While preparing this declaration, I have examined the official records available to me regarding the Alien Enemies Act (AEA) notice procedure. I submit this declaration to outline

<span style="color:red">**96**</span>

the notice procedure and to inform the court about why a description of the procedure should be kept under seal.

**A.      The Notice**

4.      Attached as an exhibit to this declaration is a copy of Form AEA-21B, which ICE officers serve on aliens whom the Agency intends to detain or remove pursuant to the AEA. Each alien is served individually, and the Form AEA-21B is read and explained to each alien in a language that alien understands.

5.      Consistent with a Notice to Appear in Title 8 proceedings, the Form AEA-21B is written in the English language. However, it is read and explained to each alien in a language that alien understands.  ICE officers are accustomed to working with aliens who do not understand English.

6.      Through an ICE-wide contract with a language assistance vendor (i.e. language lines), ICE uses professional oral interpretation and translation services that cover more than 200 languages, including rare and Indigenous languages. Enforcement and Removal Operations (ERO) serves as the Contracting Officer Representative for this ICE-wide language services contract. Centralizing oversight over the contract allows better coordination with the vendor and the establishment of processes for obtaining regular reports. Additionally, many ERO staff have sufficient proficiency in one or more languages other than English and communicate with limited English proficiency (LEP) persons in their primary language when appropriate.

7.      Pursuant to ICE detention standards, oral interpretation or assistance is provided to any detained alien who is illiterate or who speaks another language in which written material has not been translated.

8.      The various ICE Detention Standards under which detention facilities operate require that information be provided to LEP persons in a language or manner they can understand throughout the detention process to provide them with meaningful access to programs and services. This may be accomplished through use of bilingual staff or professional interpretation and translation services. Depending on the type of facility and contract specifications, the contractor may have and use their own dedicated language line.

**B.      Habeas Components to the Process**

9.      The alien is served individually with a copy of the Notice, Form AEA 21-B, the notice is read to the alien in a language that he or she understands.

**97**

10.     As part of the notice procedure, the alien is informed that he or she can make a telephone call to whomever he or she desires, including legal representatives. ICE ensures that telephones are made available for the aliens and that the aliens have access to the telephone lines.

11.     Although there may be fact-specific exceptional cases, in a general case, after an alien is served with Form AEA 21-B, the alien is given a reasonable amount of time, and no less than 12 hours, including the ability to make a telephone call, to indicate or express an intent to file a habeas petition. If the alien does not express any such intention, then ICE may proceed with the removal, though such removal may not actually occur for many more hours or days, giving the alien additional time to express an intent. If the alien does express an intent to file a habeas petition, the alien is given a reasonable amount of time, and no less than 24 hours, to actually file that petition. If the alien does not file such a petition within 24 hours, then ICE may proceed with the removal, though such removal may not actually occur for many more hours or days, giving the alien additional time to file the petition. Further, because aliens subject to the AEA are often detained for several days before removal, they frequently have much more time to express an intent to file a habeas petition or to actually file such a petition. Moreover, these timeframes are consistent with, if not more generous than, the timeframes used for expedited removal procedures under Title 8.

12.     In nearly every case in which an alien files a habeas petition based on detention related to the AEA, the alien also seeks a Temporary Restraining Order (TRO).  The TRO request is typically adjudicated quickly, sometimes within hours of being filed. Although there may be fact-specific exceptional cases, in a general case, ICE will not remove under the AEA an alien who has filed a habeas petition while that petition is pending. However, ICE may reconsider that position in cases where a TRO has been denied and the habeas proceedings have not concluded within a reasonable time.

**C.     Justification for Sealing the Description of the Notice Procedure**

13.     The internal notice procedure outlined in this declaration should be filed and remain under seal because this process is law enforcement sensitive. In this circumstance, revealing our notice procedure would disclose to the public guidelines that are integral to conducting law enforcement investigations and could risk circumvention of the law.

Signed this _____ day of April 2025.



Carlos D. Cisneros
Assistant Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

# Tab J

## NOTICE AND WARRANT OF APPREHENSION AND REMOVAL
## UNDER THE ALIEN ENEMIES ACT

A-File No:_____ Date:_____

In the Matter of: _____

Date of Birth: _____ Sex: Male Female

### Warrant of Apprehension and Removal

**To any authorized law enforcement officer:**

The President has found that Tren de Aragua is perpetrating, attempting, or threatening an invasion or predatory incursion against the territory of the United States, and that Tren de Aragua members are thus Alien Enemies removable under Title 50, United States Code, Section 21.

_____ has been determined to be: (1) at least fourteen years of
      (Full Name of Alien Enemy)
age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua. Accordingly, he or she has been determined to be an Alien Enemy and, under Title 50, United States Code, Section 21, he or she shall be apprehended, restrained, and removed from the United States pursuant to this Warrant of Apprehension and Removal.

    **Signature of Supervisory Officer:** _____

    **Title of Officer:** _____ **Date:** _____

### Notice to Alien Enemy

I am a law enforcement officer authorized to apprehend, restrain, and remove Alien Enemies. You have been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua. Accordingly, under the Alien Enemies Act, you have been determined to be an Alien Enemy subject to apprehension, restraint, and removal from the United States. Until you are removed from the United States, you will be detained under Title 50, United States Code, Section 21. Any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding. This is not a removal under the Immigration and Nationality Act. If you desire to make a phone call, you will be permitted to do so.

After being removed from the United States, you must request and obtain permission from the Secretary of Homeland Security to enter or attempt to enter the United States at any time. Should you enter or attempt to enter the United States without receiving such permission, you will be subject to immediate removal and may be subject to criminal prosecution and imprisonment.

Signature of alien: _____ Date: _____

---

### CERTIFICATE OF SERVICE

I personally served a copy of this Notice and Warrant upon the above-named person on `_____
and ensured it was read to this person in a language he or she understands.     (Date)

_____      _____
Name of officer/agent        Signature of officer/agent

---

Form AEA-21B

**100**

# Tab K

**APPENDIX A**

| Searched Term | Historical Record With Hyperlink |
|---|---|
| Invasion | To James Madison from Edmund Pendleton, 23 October 1780 |
| Invasion | From Thomas Jefferson to George Weedon, 6 November 1780 |
| Invasion | To James Madison from David Jameson, 18–19 November 1780 |
| Invasion | [To Thomas Jefferson from Edward? Archer, 3 January 1781] |
| Invasion | To Thomas Jefferson from Steuben, 12 January 1781 |
| Invasion | From Thomas Jefferson to Benjamin Harrison, 29 January 1781 |
| Invasion | To Thomas Jefferson from George Muter, 20 March 1781 |
| Invasion | To George Washington from George Weedon, 11 April 1781 |
| Invasion | Petition of Robert Poage and Others, May 1781 |
| Invasion | To George Washington from Lewis Nicola, 2 December 1782 |
| Invasion | Report on Simon Metcalfe, [10 December] 1782 |
| Invasion | Thomas Barclay to the American Commissioners, 10 September 1786 |
| Invasion | Thomas Barclay to the American Commissioners, with Enclosure, 10 September 1786 |
| Invasion | Robert Yates's Version, [18 June 1787] |
| Invasion | To John Adams from Antoine Marie Cerisier, 3 November 1787 |
| Invasion | To John Jay from John Adams, 16 December 1787 |
| Invasion | To James Madison from George Nicholas, 16 September 1791 |
| Invasion | From Benjamin Lincoln to John Adams, 11 September 1793 |
| Invasion | Charles Adams to John Adams, 6 December 1793 |
| Invasion | To George Washington from Henry Knox, 4 August 1794 |
| Invasion | To George Washington from Richmond, Va., Citizens, 30 July 1795 |
| Invasion | To George Washington from William Sheed, 20 January 1796 |
| Invasion | To Thomas Jefferson from Nathaniel Cutting, 19 February 1798 |
| Invasion | From Thomas Jefferson to James Monroe, 8 March 1798 |
| Invasion | John Quincy Adams to Abigail Adams, 11 June 1798 |
| Invasion | From George Washington to James McHenry, 4 July 1798 |
| Invasion | To Thomas Jefferson from Henry Tazewell, 12 July 1798 |
| Invasion | The Report of 1800, [7 January] 1800 |
| Invasion | I. Draft Bill, [before 7 December 1801] |
| Invasion | The Examination Number V, [29 December 1801] |
| Invasion | To James Madison from William Jarvis, 26 October 1803 (Abstract) |
| Invasion | To James Madison from John Robertson, 11 November 1803 (Abstract) |
| Invasion | From Thomas Jefferson to Rufus King, 17 February 1804 |
| Invasion | To Thomas Jefferson from John Broom, 28 December 1805 |
| Invasion | To James Madison from Levett Harris, 29 April 1806 (Abstract) |
| Invasion | From James Madison to William Pinkney, 21 October 1807 |
| Invasion | To James Madison from William Pinkney, 23 November 1807 |
| Invasion | Annual Message to Congress Draft, 8 November 1808 |
| Invasion | Thomas Jefferson to Skelton Jones, 28 July 1809 |
| Invasion | From John Adams to Boston Patriot, 25 August 1809 |
| Invasion | From John Adams to Boston Patriot, 22 September 1809 |
| Invasion | Lafayette to Thomas Jefferson, 20 February 1810 |
| Invasion | Charles Hall to Thomas Jefferson, 25 June 1812 |
| Invasion | Memorandum from an Unidentified Correspondent, [post 1 July] 1812 |
| Invasion | From John Adams to Benjamin Rush, 27 December 1812 |
| Invasion | Robert Wright to John Armstrong, 14 July 1814 |
| Invasion | To James Madison from William Jones, 26 October 1814 |
| Invasion | Lafayette to Thomas Jefferson, 10 October 1815 |
| Invasion | Isaac Briggs to Thomas Jefferson, 16 February 1816 |
| Invasion | To James Madison from Edmond Kelly, [ca. 29] January 1820 |
| Predatory Incursion | From George Washington to Thomas Jefferson, 6 February 1781 |
| Predatory Incursion | From George Washington to Philip John Schuyler, 14 May 1781 |
| Predatory Incursion | From A. Hamilton to Vicomte de Noailles, [4 April 18 May 24 May 1782] |

**APPENDIX A**

| | |
|---|---|
| Predatory Incursion | From George Washington to Nathanael Greene, 29 January 1783 |
| Predatory Incursion | Walter Lowrie et al., eds. American State Papers. Documents, Legislative and Executive, of the Congress of the United States. 38 vols. Washington, D.C., Gales and Seaton, 1832–61. |
| Predatory Incursion | To George Washington from Thomas Jefferson, 29 August 1790 |
| Predatory Incursion | From George Washington to the U.S. Senate and House of Representatives, 7 December 1796 |
| Predatory Incursion | From John Adams to United States Congress, 16 May 1797 |
| Predatory Incursion | To Alexander Hamilton from Timothy Pickering, 9 June 1798 |
| Predatory Incursion | To John Adams from Wilson Miles Cary, 14 June 1798 |
| Predatory Incursion | Enclosure: Charles Cotesworth Pinckney to Thomas Butler, 23 March 1800 |
| Predatory Incursion | To James Madison from Thomas Farmar, 11 March 1806 (Abstract) |
| Predatory Incursion | To Thomas Jefferson from Albert Gallatin, 25 July 1807 |
| Predatory Incursion | To James Madison from Harry Toulmin, 28 July 1810 |
| Predatory Incursion | American State Papers: Documents, Legislative and Executive, of the Congress of the United States … (38 vols.; Washington, 1832–61). |
| Predatory Incursion | To James Madison from Thomas Griffin and Others, 2 July 1812 (Abstract) |
| Predatory Incursion | To James Madison from William Eustis, 2 September 1812 |
| Predatory Incursion | To James Madison from Ninian Edwards, 16 January 1813 (Abstract) |
| Predatory Incursion | To James Madison from the North Carolina Legislature, 29 November 1813 (Abstract) |
| Predatory Incursion | Annual Message to Congress, 7 December 1813 |
| Predatory Incursion | To James Madison from William Jones, 29 June 1814 |
| Predatory Incursion | To James Madison from the Baltimore Committee of Vigilance and Safety, 26 January 1815 |
| Incursion | To George Washington from La Luzerne, 4 February 1780 |
| Incursion | From George Washington to Major General Johann Kalb, 21 March 1780 |
| Incursion | From George Washington to George Clinton, 12 April 1780 |
| Incursion | From George Washington to the Board of War, 23 April 1780 |
| Incursion | To George Washington from Brigadier General Henry Knox, 23 May 1780 |
| Incursion | From George Washington to Major General Robert Howe, 4 June 1780 |
| Incursion | To George Washington from Major General Robert Howe, 16 June 1780 |
| Incursion | From George Washington to Jeremiah Powell, 28 June 1780 |
| Incursion | From George Washington to Thomas Jefferson, 18 July 1780 |
| Incursion | From George Washington to Samuel Huntington, 21 October 1780 |
| Incursion | To George Washington from Brigadier General Jedediah Huntington, 1 November 1780 |
| Incursion | To George Washington from George Clinton, 3 November 1780 |
| Incursion | To George Washington from Colonel William Malcom, 7 November 1780 |
| Incursion | From George Washington to Captain Alexander Mitchell, 30 December 1780 |
| Incursion | Diary of Arnold's Invasion and Notes on Subsequent Events in 1781: Versions of 1796?, 1805, and 1816 |
| Incursion | To George Washington from Thomas Jefferson, 10 January 1781 |
| Incursion | From Thomas Jefferson to Jacob Wray, 15 January 1781 |
| Incursion | To George Washington from Major General Nathanael Greene, 24 January 1781 |
| Incursion | From Alexander Hamilton to Lieutenant Colonel John Laurens, [4 February 1781] |
| Incursion | To Thomas Jefferson from Steuben, 23 February 1781 |
| Incursion | From George Washington to Captain Destouches, 27 February 1781 |
| Incursion | To Thomas Jefferson from John Walker, 8 March 1781 |
| Incursion | Petition of Robert Poage and Others, May 1781 |
| Incursion | From George Washington to Philip John Schuyler, 14 May 1781 |
| Incursion | June 1781 |
| Incursion | From George Washington to George Clinton, 21 June 1781 |
| Incursion | To John Jay from Robert Morris, 4 July 1781 |

**APPENDIX A**

| Incursion | From George Washington to Jean-Baptiste Donatien de Vimeur, comte de Rochambeau, 11 July 1781 |
|-----------|-----------|
| Incursion | To James Madison from David Jameson, 10 August 1781 |
| Incursion | From James Madison to Edmund Randolph, 16 July 1782 |
| Incursion | To George Washington from Benjamin Harrison, Sr., 25 October 1782 |
| Incursion | To George Washington from Gilbert Simpson, 27 April 1784 |
| Incursion | To Thomas Jefferson from Ezra Stiles, 8 December 1786 |
| Incursion | Enclosure, 15 June 1789 |
| Incursion | To George Washington from the Kentucky Convention, 25 July 1789 |
| Incursion | To George Washington from Michael Lacassagne, 26 October 1789 |
| Incursion | [Diary entry: 15 March 1790] |
| Incursion | Address of the President to Congress, 8 December 1790 |
| Incursion | To George Washington from Henry Knox, 5 January 1791 |
| Incursion | To George Washington from Henry Knox, 15 January 1791 |
| Incursion | To Thomas Jefferson from William Short, 22 April 1792 |
| Incursion | For Dunlap's American Daily Advertiser, [20 October] 1792 |
| Incursion | To George Washington from Arthur Young, 17 January 1793 |
| Incursion | Memorandum from Henry Knox, 16 May 1793 |
| Incursion | To Thomas Jefferson from James Monroe, 26 May 1794 |
| Incursion | To George Washington from Count de La Belinaye, 30 September 1794 |
| Incursion | To George Washington from James McHenry, 3 August 1796 |
| Incursion | To George Washington from Rufus King, 12 November 1796 |
| Incursion | From Thomas Jefferson to Henry Dearborn, 15 February 1803 |
| Incursion | To John Adams from François Adriaan Van der Kemp, 15 February 1804 |
| Incursion | To Thomas Jefferson from Pierre Samuel Du Pont de Nemours, 10 March 1806 |
| Incursion | From James Madison to James Monroe and William Pinkney, 17 May 1806 |
| Incursion | To James Madison from John Murray Forbes, 6 April 1807 |
| Incursion | James Chamberlain to Thomas Jefferson, [received 28 June 1811] |
| Incursion | To James Madison from Joseph Haslet, 14 April 1813 |
| Incursion | From James Madison to William Jones, 18 October 1813 |
| Incursion | To James Madison from Nathaniel Searle Jr., 6 July 1814 |
| Incursion | Thomas Jefferson to Louis H. Girardin, 27 March 1815 |
| Incursion | Enclosure: Thomas Humphreys's Plan for Emancipating and Colonizing American Slaves, 1 January 1817, with his Note to Thomas Jefferson, 23 January 1817 |
| Incursion | From James Madison to James Monroe, 13 February 1819 |

**103**

# Tab L

# Exhibit D

## Declaration of Dr. Sarah C. Bishop
## Risks for Non-Salvadoran Actors Facing Third Country Removal to El Salvador

### Introduction

1. I am writing this expert witness report to address human rights abuses in Salvadoran prisons. I am a full professor with tenure at Baruch College, the City University of New York. I was the 2020-2021 Fulbright Scholar to El Salvador during which time I lived and conducted fieldwork in the country; I have since returned to El Salvador each year for fieldwork related to both published and in-process projects about the State of Exception, human rights abuses by state actors, gang activity, and prison conditions.

2. Deportees who are imprisoned in El Salvador are highly likely to face immediate and intentional life-threatening harm at the hands of state actors and a secondary threat of violence from incarcerated gang members.

### Expert Qualifications

3. I was the 2020/2021 Fulbright scholar to El Salvador, during which time I lived and worked in the Department of La Libertad consulting with local academics and non-profit personnel to develop a project that chronicles the experiences of individuals affected by gang-, government-, and domestic-based violence, as well as the professional and psychological outcomes for deportees. I have interviewed multiple people who have been deported back to El Salvador after failed asylum claims and have also interviewed personnel from non-profit organizations working to support individuals who had been deported by the United States or by another government.

4. I have published three books on the experiences of refugees and undocumented immigrants in the United States. In 2022, Columbia University Press published my book *A Story to Save Your Life: Communication and Culture in Migrants' Search for Asylum*. The book won the Abraham Brilloff Prize in Ethics and the Oral History Association's Best Book Award in 2023. My book *Undocumented Storytellers: Narrating the Immigrant Rights Movement* was published by Oxford University Press in 2019 and was the winner of the Best Book Award from the American Studies Division of the National Communication Association. *U.S. Media and Migration: Refugee Oral Histories* was published by Routledge in 2016 and won the Sue DeWine Distinguished Scholarly Book Award.

5. I am a migration scholar with a Ph.D. in Intercultural Communication from the University of Pittsburgh (2014). My dissertation was an oral history project analyzing the push factors and migration experiences of 74 refugees living in the United States. I received an M.A. from New York University in 2009 in Media, Culture, and Communication during which I took classes such as "Refugees and IDPs: Protection and Practice." I received a B.A. from the University of Akron in 2008.

6. I have published numerous articles in peer-reviewed academic journals on the experiences of forced migrants from Central America, including most recently "Hidden in Plain Sight: The In/Visibility of Human Rights in El Salvador's Prisons Under the State of Exception" coauthored with Salvadoran expert Dr. Mneesha Gellmen and forthcoming in *Latin American Research*

*Review* in 2025; "Beyond the Glowing Headlines: Social Science Analysis of the State of Exception in El Salvador," *Columbia Regional Expert Series,* coauthored with Salvadoran experts Dr. Tom Boerman and Dr. Tommie Sue Montgomery in 2023; "An Illusion of Control: How El Salvador's President Rhetorically Inflates His Ability to Quell Violence," published in *Journalism and Media* in 2023; "'What Does a Torture Survivor Look Like?': Nonverbal Communication in Asylum Interviews and Hearings," published in the *Journal of International & Intercultural Communication* in 2021; "Intercultural Communication, the Influence of Trauma, and the Pursuit of Asylum in the United States," published in the *Journal of Ethnic and Cultural Studies* in 2021; "An International Analysis of Governmental Media Campaigns to Deter Asylum Seekers," published in the *International Journal of Communication* in 2020. All of my books and the articles I have published in academic journals have been subject to peer review by other experts.

7.  I regularly give talks about country conditions in El Salvador and the root causes of forced migration, including "Violence for Peace: Authoritarian Justifications of Human Rights Abuses in Central America," to be presented at the Anthropology of Peace, Conflict, and Security Conference in June 2025; "Intergovernmental Criminal History Information Sharing: Justice on Paper, Violence in Practice for Forced Migrants," presented at the Marxe School for International Affairs in March 2025; "Populism, Rhetorical Strategy, and the Regression of Democracy in Central America," presented at Cristosal in San Salvador in February 2023; "Addressing Misinformation and Distortion of Statistics in Country Conditions Research," presented at the International Studies Association in November 2024; "An Illusion of Control: How El Salvador's President Rhetorically Inflates His Ability to Quell Violence," presented at the annual meeting of the American Sociological Association in August 2022; "Health and Safety in El Salvador," presented at the Fulbright Pre-departure Orientations in June 2022, June 2023, and June 2024; and "The Returned: Communication and Culture in the Post-Deportation Lives of Former Asylum Seekers from El Salvador," presented at the annual meeting of the International Association for the Study of Forced Migration in July 2021.

8.  I have received several competitive grants for my research on El Salvador, including a 2025 grant from the American Council of Learned Societies (ACLS) and a 2024 grant from the Waterhouse Family Institute to study post-deportation experiences in El Salvador through a family communication approach; a 2022-2023 PSC CUNY Grant for research that documents post-deportation harm in El Salvador; a 2022 grant from the Robert Bosch Stiftung Foundation to travel to El Salvador and meet with investigative journalists and human rights activists for a project about President Nayib Bukele's recent actions against independent media; and a 2018 fellowship from the Institute for the Study of Human Rights at Columbia University to study obstacles to human rights and efforts to promote peace in post-conflict societies including El Salvador.

9.  I remain current on events in El Salvador through regularly reading local, national, and international sources including academic and government studies and investigative journalism studies, through frequent conversations with colleagues in the U.S. and El Salvador, and by presenting my research on El Salvador at national and international academic conferences.

10. At Baruch College, I teach classes on migration to the United States and global communication in the Department of Communication Studies, the Macaulay Honors College, and the Masters in International Affairs. I am affiliate faculty in the Department of Black and Latino Studies.

11.   My migration research has been recognized for being ethical and applied to real-world contexts: I won the Abraham J. Briloff Prize in Ethics in 2017 and 2023, and the Stanley L. Saxton Applied Research Award in 2018. Moreover, in keeping with the New York State Ethics Commission Reform Act of 2022, I undergo annual ethics training at CUNY.

12.   Methodologically, I rely on oral history, ethnography, critical-cultural analysis of governmental communication, and qualitative comparative analysis to conduct my research about country conditions in El Salvador. These are standard and widely used social science methodologies. At Baruch, I am responsible for teaching a graduate level required course on qualitative methods in which I train master's level students in these methods.

13.   In 2025 I received $75,000 from the Russell Sage Foundation to continue the project "Recovering the Visibility of Post-Deportation Experiences in El Salvador: A Family Communication Approach" for the years 2025-2027 to involve additional participants who have family members who have been deported under the State of Exception.

### Democratic Erosion and Governmental Corruption in El Salvador

14.   El Salvador is experiencing a severe democratic decline that threatens the human rights and general safety of the whole population. The 2023 U.S. State Department's Human Rights Reports on El Salvador cites "credible reports of: unlawful or arbitrary killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; extensive gender-based violence, including domestic and sexual violence, and femicide; substantial barriers to sexual and reproductive health services access; trafficking in persons, including forced labor; and crimes involving violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons."[1]

15.   President Bukele was discovered through meticulously documented reporting by investigative journalists working for *El Faro* in 2020 to have been negotiating with imprisoned gang leaders who reportedly agreed to a reduction in homicides and electoral support in exchange for additional prison privileges and other benefits for incarcerated gang members.[2] During the weekend of March 25, 2022 there was a record-setting string of around eighty-seven gang-committed homicides across El Salvador that resulted from the unraveling of that secret pact between Bukele and the gangs in what MS-13 called a "betrayal" of Bukele's loyalty. The Monday following the homicides, Bukele successfully called on the Salvadoran Legislative Assembly to pass a State of Exception, which suspends many constitutional protections including due process, drastically increases police and military powers to arrest and imprison suspected gang members, and curtails the right to legal defense.

---

[1] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 1.
[2] Carlos Martínez, Oscar Martínez, Sergio Arauz, and Efren Lemus. "Bukele has been negotiating with MS-13 for a reduction in homicides and electoral support." *El Faro.* 6 September 2020. https://elfaro net/en/202009/el_salvador/24785/Bukele-Has-Been-Negotiating-with-MS-13-for-a-Reduction-in-Homicides-and-Electoral-Support.htm

16.     As a result of the government's actions under the current State of Exception, El Salvador currently has the highest incarceration rate in the world.[3]

17.     Salvadoran Vice President Félix Ullóa revealed plainly to the *New York Times*, "To these people who say democracy is being dismantled, my answer is yes — we are not dismantling it, we are eliminating it, we are replacing it with something new."[4] The politicized use of all three branches of government to enact and extend the power of the State of Exception disallows any guarantee of justice for Salvadorans against whom the State has acted.

18.     The government of El Salvador claims that it has been effective at establishing peace in the country. Americas director at Amnesty International Ana Piquer explained in December 2024, "What the government calls 'peace' is actually an illusion intended to hide a repressive system, a structure of control and oppression that abuses its power and disregards the rights of those who were already invisible—people living in poverty, under state stigma, and marginalization—all in the name of a supposed security defined in a very narrow way."[5]

19.     Bukele's director of prisons, Osiris Luna Meza, was indicted by the United States Federal Government for arranging meetings in prison for negotiations with MS-13.[6] As the U.S. Treasury Department reveals, "Osiris Luna Meza (Luna) and Carlos Amilcar Marroquin Chica (Marroquin) [chairman of Bukele's Social Fabric Reconstruction Unit] led, facilitated, and organized a number of secret meetings involving incarcerated gang leaders, in which known gang members were allowed to enter the prison facilities and meet with senior gang leadership. These meetings were part of the Government of El Salvador's efforts to negotiate a secret truce with gang leadership."[7] Luna has also been deemed corrupt by the U.S. Department of Treasury for developing a scheme with another senior Bukele official to embezzle millions of dollars from the prison commissary system.[8]

---

[3] "El Salvador Opens 40,000-Person Prison as Arrests Soar in Gang Crackdown." *Reuters*. 1 February 2023. https://www.reuters.com/world/americas/el-salvador-opens-40000-person-prison-arrests-soar-gang-crackdown-2023-02-01/#:~:text=SAN%20SALVADOR%2C%20Feb%201%20(Reuters,the%20prison%20population%20to%20soar.

[4] Natalie Kitroeff. "He Cracked Down on Gangs and Rights. Now He's Set to Win a Landslide." New York Times. 2 February 2024. https://www.nytimes.com/2024/02/02/world/americas/el-salvador-bukele-election html

[5] "El Salvador: A thousand days into the state of emergency. 'Security' at the expense of human rights." Amnesty International. 20 December 2024. https://www.amnesty.org/en/latest/news/2024/12/el-salvador-mil-dias-regimen-excepcion-modelo-seguridad-a-costa-derechos-humanos/

[6] United States District Court. Eastern District of New York. Paragraph 35. chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.justice.gov/usao-edny/press-release/file/1569726/download

[7] "Treasury Targets Corruption Networks Linked to Transnational Organized Crime." U.S. Treasury Department. 8 December 2021. https://home.treasury.gov/news/press-releases/jy0519

[8] "Treasury Targets Corruption Networks Linked to Transnational Organized Crime." U.S. Department of the Treasury. 8 December 2021. https://home.treasury.gov/news/press-releases/jy0519

20. In multiple recent documented cases, the Salvadoran government has falsified records, ignored international human rights laws, and detained and prosecuted individuals without evidence to support the ongoing expansion of the State of Exception and indiscriminately punish those who resist or oppose it. As described by Human Rights Watch, "In many cases, detentions appear to be based on the appearance and social background of the detainees, or on questionable evidence, such as anonymous calls and uncorroborated allegations on social media. In these cases, police and soldiers did not show people a search or arrest warrant, and rarely informed them or their families of the reasons for their arrest. A mother who witnessed the detention of her son said that police officers told her, 'We can arrest anyone we want.'"[9]

## General Living Conditions in Prison

21. The 2023 U.S. State Department Human Rights Report on El Salvador emphasizes that "Prison conditions *before* the state of exception were harsh and life threatening …The addition of 72,000 detainees under the state of exception exacerbated the problem."[10] Rather than merely being a result of overcrowding, the same U.S. State Department report cites testimonies from released prisoners that show that the life threatening nature of the prison is a result of "systemic abuse in the prison system, including beatings by guards and the use of electric shocks."[11]

22. Salvadoran government officials have directly stated that the dangerous and unsanitary conditions for prisoners taken into custody during the State of Exception are being created intentionally: for example, the U.S. State Department notes that "From the start of the state of exception, the government frequently advertised on social media the overcrowded conditions and lack of adequate food in the prisons as appropriate treatment for gang members."[12] The Directorate General of Penal Centers advertised: "All the suffering these bastards have inflicted on the population, we will make happen to them in the prisons, and we will be very forceful with this. They live without the light of the sun, the food is rationed… they sleep on the floor because that is what they deserve."[13] Paradoxically, this was the same director who was indicted by the United States Federal Government for arranging meetings in prison for negotiations with MS-13,[14] and who has been deemed corrupt by the U.S. Department of Treasury for developing a scheme with another senior Bukele official to embezzle millions of dollars from the prison commissary system, emphasizing the scope of corruption common in prison leadership.[15]

23. In response to international human rights organizations that have raised the alarm about current conditions in El Salvador, President Bukele tweeted "Let all the 'human rights' NGOs know that we are going to destroy these damn murderers and their collaborators, we will throw them in

---

[9] Human Rights Watch and Cristosal. "We Can Arrest Anyone We Want": Widespread Human Rights Violations Under El Salvador's "State of Emergency." 7 December 2022, https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el

[10] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 7, emphasis added

[11] Ibid., p 5.

[12] "El Salvador 2022 Human Rights Report." https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 6.

[13] Cited in Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 34.

[14] United States District Court. Eastern District of New York. Paragraph 35. chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.justice.gov/usao-edny/press-release/file/1569726/download

[15] "Treasury Targets Corruption Networks Linked to Transnational Organized Crime." U.S. Department of the Treasury. 8 December 2021. https://home.treasury.gov/news/press-releases/jy0519

prison and they will never get out. We don't care about their pitying reports, their prepaid journalists, their puppet politicians, nor their famous 'international community' that never cared about our people."[16]

24.    El Salvador's Public Security Minister has confirmed the plan not to release prisoners and claimed that there are 40,000 serial killers in El Salvador. He stated in an interview with CNN in 2024: "Someone who every day killed people, every day raped our girls, how can you change their minds? We are not stupid…In the US, imagine a serial killer in your state, in your community being released by a judge … how would you feel as a citizen? We don't have facts that someone can change a mind from a serial killer … and we have more than 40,000 serial killers in El Salvador."[17]

25.    In October 2021 the Salvadoran government declared that information relating to all detained persons would be considered confidential; over 325 complains to the Interamerican Commission on Human Rights show that when family members have requested information about their detained loved ones, "authorities either refused or provided false information about their whereabouts."[18] In a sample of 131 cases, Cristosal found that 115 family members of detainees have not received any information about the whereabouts or wellbeing of their detained family members since the day of their capture.[19]

26.    During my January 2024 visit to El Salvador, I visited Mariona prison where many informal vendors were set up outside the prison gates selling packets of food, medicine, soap, and clothing to individuals with detained family members. Family members can seek to protect their detained relatives from illness or starvation in prison if their family is able to purchase these expensive packets, which cost $100-$300 per month although the national minimum monthly wage is only $365.[20] However, even families who can afford these packets have no assurance that the resources they try to send will ever reach their loved ones inside the prison; there are reports of prison officials deliberately withholding medicine and food even when it is available,[21] and reports of guards forcing women to do sexual acts in exchange for food and medicine.[22]

---

[16] Nayib Bukele. 16 May 2023. https://x.com/nayibbukele/status/1658608915683201030?s=20

[17] David Culver, Abel Alvarado, and Evelio Contreras. "Exclusive: Locking eyes with mass murderers in El Salvador." 13 November 2024 https://www.cnn.com/2024/11/06/americas/el-salvador-inside-cecot-prison/index html

[18] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 29.

[19] Noah Bullock. "The State of Exception in El Salvador: Taking Stock." Testimony before the United States Congress, Tom Lantos Human Rights Commission. 10 December 2024. https://www.youtube.com/watch?v=ChTW-gm-5SI

[20] Mneesha Gellman. "El Salvador voters set to trade democracy for promise of security in presidential election." *The Conversation.* 29 January 2024. https://theconversation.com/el-salvador-voters-set-to-trade-democracy-for-promise-of-security-in-presidential-election-221092

[21] "Testimonios: Sobrevivientes de las Cárceles del Régimen." A weekly series from *El Faro.* https://especiales.elfaro net/es/testimonios/

[22] "El Silencio no es opción: Investigación sobre las practices de tortura, muerte, y justicia fallida el el regimen de excepción." 10 July 2024. Cristosal Foundation. https://cristosal.org/ES/presentacion-informe-el-silencio-no-es-opcion/

27.    A 2024 Report on the Violation of the Right to Health in the Country's Penal Centers from the Human and Community Rights Defense Unit (UNIDEHC) found that upon arrival in prison, detainees under the State of Exception "were received by guards, where many of them were beaten to pressure them to declare which 'gang they belonged to,' and if they refused to say so, they were beaten and tortured more, some convulsed from the beatings they received and others died in these practices, on the first day of transfer."[23] In February 2025, the spokesperson for the organization who produced this report was arbitrarily detained during a raid on the organization's headquarters; Amnesty International concluded his detention was "particularly concerning, as he has been both a witness to and a denouncer of torture in penitentiary centers."[24]

28.    The Human and Community Rights Defense Unit (UNIDEHC) also reported in 2024 after a round of interviews with a health professional who worked in a clinic that served some inmates from Mariona prison that inmates were "not provided with medication to treat their diseases that they already suffered from; for example: people with hypertension, diabetes, kidney failure, respiratory problems, among others. They did not receive medication, which caused decompensation and death in some cases. Guards were repeatedly asked for help when someone convulsed or felt ill, but they did not arrive until the following day, or the person's health became more complicated or they died, waiting for help from the prison authorities."[25]

29.    Both the 2022 and 2023 U.S. State Department's Human Rights Report on El Salvador state that prison officials repeatedly denied access to the Salvadoran Human Rights Ombudsman's Office, the entity responsible for investigating accusations of human rights abuses in prison.[26]

30.    In 2023, Bukele announced the opening of the new "mega-prison" called the *Centro de Confinamiento del Terrorismo* or CECOT. An analysis of the CECOT's design using satellite footage found that if the prison were to reach full supposed capacity of forty thousand, each prisoner would have less than two feet of space in shared cells—an amount the authors point out is less than half the space required for transporting midsized cattle under EU law.[27]

31.    The U.S. State Department confirms that prisoners have been held in grossly overcrowded prisons with as many as 80 prisoners held in cells designed for just 12 so that they must sleep standing up.[28]

### Systemic Torture as State Policy in Salvadoran Prisons

32.    Although El Salvador is a signatory to both the Convention Against Torture and the International Covenant on Civil and Political Rights, Amnesty International has concluded that there is a

---

[23] Human and Community Rights Defense Unit (UNIDEHC). Violation of the Right to Health in the Country's Penal Centers. 2024. https://heyzine.com/flip-book/9849749093.html#page/1 p 17.

[24] "El Salvador: Repression against human rights defenders and community leaders." Amnesty International 5 March 2025. https://www.amnesty.org/en/documents/amr29/9100/2025/en/

[25] Human and Community Rights Defense Unit (UNIDEHC). Violation of the Right to Health in the Country's Penal Centers. 2024. https://heyzine.com/flip-book/9849749093.html#page/1

[26] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 4.

[27] Christine Murray, and Alan Smith.. "Inside El Salvador's mega-prison: the jail giving inmates less space than livestock." Financial Times, 6 March 2023. https://www.ft.com/content/d05a1b0a-f444-4337-99d2-84d9f0b59f95.

[28] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 6.

"systemic use of torture in Salvadoran prisons."[29] The organization notes with concern the three primary characteristics of the crisis: "1) the massive number of human rights violations being committed; 2) the high degree of state coordination in the design and implementation of this measure; and 3) a state response that tends to conceal and minimize these actions, refusing to recognize and diligently investigate the abuses."[30] They confirm that "torture and cruel, inhuman, and degrading treatment have become habitual practice rather than isolated incidents in the prisons."[31]

33.    The range of violence occurring inside prisons in El Salvador at the hands of gangs and prison guards is acknowledged in the 2022 and 2023 U.S. State Department's Human Rights Reports on El Salvador; detainees are subject to beatings, waterboarding, and use implements of torture on detainees' fingers to try to force confessions of gang affiliation.[32] Likewise, family members of the detained have been threatened with arrest by security forces to "stop asking questions."[33]

34.    A July 2024 report from Cristosal—compiled from 3,643 reports of abuses or rights violations, 110 interviews, case-by-case analyses of 7,742 detainees' experiences—concluded that "Torture has become a state policy, with cruel and inhuman treatment regularly practices in prisons and places of detention."[34]

35.    Human Rights Watch conducted 90 interviews about human rights abuses under the State of Exception and published in July 2023 evidence of torture including suffocation, burning, and mock executions against children.[35] The report also found that authorities use abusive language and death threats when making arrests of children who are subjected to human rights violations before, during, and even after their release, and that "In many cases, authorities coerced children into making false confessions to crimes through a combination of abusive plea deals and sometimes mistreatment or torture."[36]

36.    An extensive December 2022 investigative report by Human Rights Watch and Cristosal about the State of Exception found that "human rights violations were not isolated incidents by rogue agents. Rather, similar violations were carried out repeatedly and across the country, throughout a period of several months, by both the military and the police."[37]

---

[29] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/

[30] Ibid.

[31] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 33.

[32] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 5; "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 2, 15.

[33] Ibid.

[34] "El Silencio no es opción: Investigación sobre las practices de tortura, muerte, y justicia fallida el el regimen de excepción." 10 July 2024. Cristosal Foundation. https://cristosal.org/ES/presentacion-informe-el-silencio-no-es-opcion/

[35] Human Rights Watch. "Your Child Does Not Exist Here: Human Rights Abuses Against Children Under El Salvador's 'State of Emergency.'" 16 July 2024. https://www.hrw.org/report/2024/07/16/your-child-does-not-exist-here-human-rights-abuses-against-children-under-el

[36] Ibid. p 2.

[37] Human Rights Watch and Cristosal. "We Can Arrest Anyone We Want": Widespread Human Rights Violations Under El Salvador's "State of Emergency." 7 December 2022, https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el; The Minister of Security is determined to see the number of arrests rise. See: Mario Gonzalez. "Security Minister wants to imprison 80,000 gang members." *El Diario de Hoy.* 17 June 2022. https://www.elsalvador.com/noticias/nacional/regimen-de-excepcion-ministro-gustavo-villatoro/968181/2022/

37.    In some cases, many inmates are punished if one does not obey the guards' orders. UNIDEHC found in an interview with a health professional who had worked at Mariona prison, "In some cells, when an order of the guards or person was not obeyed, they were punished, some examples are: wetting all the people in the cell including their belongings with high-pressure hoses with ice cold water, invading the cell with tear gas; electric shocks, beatings with objects, confinement in the 'punishment cell,' where there were insects and animals (cockroaches, scorpions and mice)…[and] to deprive the right to food, use of the bathroom, and going out in the sunlight, for many days."[38]

38.    Amnesty International confirms that "the grave human rights violations being committed under the state of emergency are systematic in nature due to the widespread and sustained manner in which they are occurring; the level of state organization and planning involving the convergence of the three branches of the state; the impunity and lack of accountability; the lack of transparency and access to information; and the widespread criminalization of poverty, as an aspect of discrimination."[39] This is not a matter of isolated acts of violence and torture but rather a coordinated dismantling of the rule of law and widespread practice of grave violations of human rights as the current norm.

39.    A team of investigative journalists working to produce a report of human rights abuses under the State of Exception for an *Al Jazeera* documentary shared with me during my visit to El Salvador in early 2023 their preliminary findings, including an interview with an adolescent who had been released from Izalco prison who reported that there were daily beatings in prison, that "the guards would ignore people's requests for medical attention," that "guards would beat someone [un]til they were dead and then bring the body back into the cells and leave it there until the body started stinking," that food rations were so meager that they sometimes had to split one hard-boiled egg between two people for a meal, and that "usually the gang members in the cells would bully weaker people for their food." Former inmates revealed that tear gassing in the overcrowded prisons were so frequent that detainees would reserve one of the three small cups of water they usually received each day to flush their eyes after being gassed.[40]

40.    Because the Salvadoran government has been actively attempting to conceal the human rights abuses occurring in prison, a team of investigative journalists at *El Faro* has been recording and publish weekly testimonies of individuals who survived incarceration under the State of Exception. These testimonies corroborate the reports cited above by confirming widespread torture including public beatings to death in front of other inmates, the deliberate withholding of medicine from sick inmates that has resulted in the need for appendages to be amputated, officials throwing prisoners' food on the ground so that inmates must lick the floor to survive, and guards knowing about but failing to take action to prevent some inmates from raping other inmates.[41]

41.    Further testimonies gathered and published by the newspaper *El Pais* reveal practices such as prison officials in Izalco prison hosing down the floor of an overcrowded cell with water then

---

[38] Human and Community Rights Defense Unit (UNIDEHC). Violation of the Right to Health in the Country's Penal Centers. 2024. https://heyzine.com/flip-book/9849749093.html#page/1 p 18.

[39] "El Salvador: One year into state of emergency, authorities are systematically committing human rights violations." Amnesty International. 3 April 2023. https://www.amnesty.org/en/latest/news/2023/04/el-salvador-state-emergency-systematic-human-rights-violations/

[40] Mark Scialla, Salvadoran-based investigative journalist and director of documentary on human rights abuses under the State of Exception for *Al Jazeera* "Fault Lines." 28 February 2023, via message to Sarah Bishop.

[41] "Testimonios: Sobrevivientes de las Cárceles del Régimen." A weekly series from *El Faro*. https://especiales.elfaro.net/es/testimonios/

*Expert Declaration of Sarah C. Bishop, Ph.D.*                                    *Page 9 of 15*

<span style="color:red">113</span>

sending an electric current through the water to shock everyone inside, guards responding to inmates' pleas for medicine or food with beatings (sometimes to the point of death), and state officials' explicit threats to murder inmates and fabricate justifications, such as "I can shoot you right now and say you wanted to escape."[42]

42. El Salvador's government has repeatedly been accused of committing crimes against humanity. Zaria Navas, former Inspector General for the Salvadoran National Police and now head of Cristosal's Law and Security program, declared in June 2023 that due to the systemic and widespread human rights abuses committed during the State of Exception: "There is enough evidence for El Salvador to be tried for crimes against humanity."[43]   Likewise, in July 2023, former Salvadoran Human Rights Ombudsman David Morales equated the abuses occurring in the prisons under the State of Exception with the 1932 genocide against the country's indigenous population and the atrocities committed during El Salvador's 1980-1992 civil war; like Navas, he described the government's actions as crimes against humanity.[44] More recently, in December 2024, Leonor Arteaga from the Due Process of Law Foundation concluded, "it is also likely that some of the torture enforced disappearances and extrajudicial executions that have been documented may constitute crimes against humanity which implies the existence of a plan or a policy to commit them involving a chain of command of government actors in El Salvador."[45]

## Deaths in Prison

43. The deaths of around 375 incarcerated individuals since the start of the State of Exception have been recorded so far, but the human rights nongovernmental organization (NGO) Socorro Jurídico Humanitario that the actual number of deaths may exceed 1000 because of an estimated minimum of fifteen deaths per month that are not reported.[46]

44. In a sample of 100 cases of prison deaths that occurred during the first year of the State of Exception and for which a cause of death could be determined, Cristosal found through photographic, forensic, and testimonial evidence that 75% of the deaths were violent, probably violent, or with suspicions of criminality on account of a common pattern of hematomas caused by beatings, sharp object wounds, and signs of strangulation on the cadavers examined.[47] Others have died due to being denied medical care.[48]

---

[42] David Marcial Pérez. "The rampant abuse in El Salvador's prisons: 'They beat him to death in the cell and dragged him out like an animal'." *El Pais.* 26 March 2023. https://english.elpais.com/international/2023-03-26/the-rampant-abuse-in-el-salvadors-prisons-they-beat-him-to-death-in-the-cell-and-dragged-him-out-like-an-animal html

[43] Julia Gavarrete. "There is Enough Evidence for El Salvador to be Tried for Crimes Against Humanity." *El Faro.* 7 June 2023. https://elfaro net/en/202306/el_salvador/26881/there-is-enough-evidence-for-el-salvador-to-be-tried-for-crimes-against-humanity#

[44] Lissette Lemus. "David Morales: Los Crímenes que está Cometiendo el Gobierno Actual son de Lesa Humanidad." *El Salvador.com.* 16 July 2023.  https://www.elsalvador.com/noticias/nacional/capturados-cristosal-regimen-de-excepcion-breaking-news/1076092/2023/

[45] Leonor Arteaga. "The State of Exception in El Salvador: Taking Stock." Testimony before the United States Congress, Tom Lantos Human Rights Commission. 10 December 2024. https://www.youtube.com/watch?v=ChTW-gm-5SI

[46] Socorro Jurídico Humanitario (Humanitarian Legal Aid). 16 March 2025. https://x.com/SJHumanitario/status/1901454047162372257

[47] Cristosal (2023). One Year Under State of Exception: A Permanent Measure of Repression and Human Rights Violations. https://cristosal.org/EN/wp-content/uploads/2023/08/One-year-under-the-state-of-exception-1.pdf. Page 29.

[48] David Bernal. "Socorro Jurídico ya contabiliza 235 reos muertos bajo régimen de excepción en El Salvador." 24 February 2024. *La Prensa Grafica.* https://www.laprensagrafica.com/elsalvador/Socorro-Juridico-ya-contabiliza-235-reos-muertos-en-regimen-20240223-0089.html

45. The actual number of deaths is impossible to confirm because of the government's opacity on the matter.[49] Noah Bullock, the director of Cristosal, explains, "Our investigations demonstrate a clear pattern of torture within the prisons and so we don't discount that the number of people who have died in the State of Emergency could be much higher."[50] The Salvadoran state maintains that all prison deaths have been the result of natural causes despite forensic evidence to the contrary.[51]

46. The known death rate in Salvadoran prisons is around 70 times greater than the international violent death according to the United Nations' 2024 Global Prison Population report.[52]

47. The organization MOVIR (Movimiento de Victimas del Régimen de Excepción, or Movement of Victims of the Regimen of Exception) has corroborated that a considerable number of the deaths evaluated so far have been a result of physical attacks of various kinds carried out by state agents, in addition to "beatings inflicted by other prisoners with acquiescence of the prison authorities."[53]

48. The testimony of Professor Mario Alberto Martínez, who was arrested and detained after making a public statement denouncing the arbitrary detention of his daughter, includes the account of his being in a highly overcrowded cell where inmates were not allowed to speak or even to pray. When three boys were caught talking, the guards removed them from the cell and beat them until they appeared to be dead. Martinez reports that "people died every day" while he was in prison.[54]

49. Even the deaths described by medical legal obituaries as nonviolent have in some cases involved cadavers that show forensic evidence of torture. One 45-year-old man with an intellectual disability died in prison and was buried by the state in a mass grave with a legal obituary that showed he died from a "pulmonary edema." However, photographic evidence of the cadaver showed edemas of his face, and interviews with individuals detained in the same prison reveal that he was beaten so severely that he lost mobility including the ability to eat.[55] Others have been released from prison in such severe physical states that they have died within days of release because of injuries they sustained in prison; they are not counted among the numbers of deaths in prison.[56]

---

[49] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/. p 33.

[50] "El Salvador's Prison State." *Fault Lines, Al Jazeera English*. May 24, 2023. https://www.aljazeera.com/program/fault-lines/2023/5/24/el-salvadors-prison-state

[51] Bryan Avelar. "Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons." *El Pais*. 29 May 2023. https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html

[52] United Nations Office on Drugs and Crime (UNODC). "Global prison population and trends. A focus on rehabilitation." 15 August 2024. https://www.cdeunodc.inegi.org mx/index.php/2024/08/15/global-prison-population-and-trends-a-focus-on-rehabilitation/; The figure of 366 deaths among an inmate population of 83,000 translates to a ratio of 404.82 deaths per 100,000, a rate 69.8 times greater than the international violent death rate of 5.8 per 100,000.

[53] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/. P 33.

[54] Williams Sandoval. ""Vi cuando llevaban gente tiesa; todos los días moría gente": así narra un profesor su paso por las cárceles del régimen de excepción." *La Prensa Grafica*. 14 June 2024. https://www.laprensagrafica.com/elsalvador/Vi-cuando-llevaban-gente-tiesa-todos-los-dias-moria-gente-asi-narra-un-profesor-su-paso-por-las-carceles-del-regimen-de-excepcion-20240614-0056.html

[55] Bryan Avelar. "Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons." *El Pais*. 29 May 2023. https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html

[56] Cristosal. "One Year Under the State of Exception." May 2023. https://cristosal.org/EN/2023/08/17/report-one-year-under-the-state-of-exception/ p 53.

50.   It sometimes takes several months for family members to learn of the death of a loved one in prison, as was the case for a 76-year-old woman who was arrested in April 2022, died while in custody the following November, and was buried in a mass grave. Her children were not advised of her death and continued to send care packages to the prison until February 2023 when a lawyer told them their mother would be released on bail if they paid $3,000. When they arrived at the prison to deliver one last care package before their mother's release, guards told them she had been dead for months.[57]

## Governmental Attempts to Obscure the Visibility of Human Rights Violations

51.   Public access to national data is a central tenet of democracy that has been severely curtailed under Bukele as a means of maintaining popularity while allowing widespread human rights abuses to be committed out of public view. The government of El Salvador is intentionally restricting access to previously publicly available information especially as related to the police and military, prisoners, and the judiciary. As a result, it is becoming increasingly difficult for academics, NGOs, and other governments to access the information and statistics that would reveal the full scope of the disregard for human rights taking place in El Salvador. To produce evidence that is statistically significant instead of just anecdotal in this repressive context requires a coordinated approach to identify patterns and fidelity among pockets of available data in the rapidly unfolding human rights crisis.

52.   As I and my coauthors in a 2023 report in Columbia University's *Regional Expert Series* explain, President Bukele's government has attempted to prevent public knowledge of continuing and widespread human rights abuses through strategies that include (1) denying outsiders access to the prisons, including the Salvadoran Human Rights Ombudsman's Office; (2) criminalizing the media and threatening journalists; (3) subjecting family members of the detained to threats of arrest if they speak publicly of their loved ones' experiences; and (4) routinely charging that individuals and groups who expose the abuses associated with the State of Exception are supporters of gang members and terrorists, in some cases leading to their imprisonment.[58]

53.   Though international NGOs have been working for all three years of the State of Exception to document and corroborate widespread claims of human rights abuses taking place in El Salvador, this work is made highly difficult and sometimes impossible by the government's resistance. As described by Amnesty International in December 2023, "It is not possible to obtain official statistics such as the number of prisoners, overcrowding rate at detention centres, deaths of prisoners, number of crimes, [and] whether abuses of force by public security agents are being recorded and disciplined, among other citizen security variables used to monitor and assess the security situation and state of emergency."[59] Likewise, clandestine graves discovered in El Salvador are deemed by Bukele's government as matters of national security and the identities of their contents classified.

---

[57] "Relato: Las mentiras de un abogado y el deterioro en el penal le costaron la vida a Rosa." La Prensa Grafica. 11 February 2023. https://www.laprensagrafica.com/elsalvador/Relato-Las-mentiras-de-un-abogado-y-el-deterioro-en-el-penal-le-costaron-la-vida-a-rosa-20230210-0095.html
[58] Sarah Bishop, Tommie Sue Montgomery, and Tom Boermann. "Behind the Glowing Headlines: Social Science Analysis of the State of Exception in El Salvador" CeMeCA's Regional Expert Series No. 9, 2023.
[59] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 64.

54. The State Department's 2023 Human Rights Report on El Salvador explicitly remarks on the invisibility of and lack of access to national data: "Human rights groups observed that the government increasingly declined to make public data for monitoring and analysis purposes. *Gato Encerrado,* an investigative newspaper, noted the government continued to expand the types of information it classified as confidential and not subject to public disclosure requirements."[60] Without reliable access to national data, neither the State Department nor any other concerned party can provide a more exhaustive view of country conditions that would be possible in more democratic contexts.

55. There are increasing instances of the government blatantly obscuring evidence of state violence. For example, the Attorney General of El Salvador claims to have investigated 143 deaths in prison during the State of Exception and found that every one of the 143 was due to pre-existing conditions or natural causes. However, the U.S. State Department Human Rights report released in 2024 offers evidence from sources including Socorro Jurídico Humanitario, Cristosal, and *El Pais* determining through forensic evidence dozens of violent deaths in prison including those where prison guards beat inmates to death.[61] What the U.S. State Department calls "systemic abuse in the prison system" is effectively denied by the Salvadoran State.

56. The government's clampdown on information related to human rights appears to be devolving. Whereas the 2022 U.S. State Department Human Rights report on El Salvador revealed that "The government reported varying numbers of disappearances and sporadically declined to provide media with numbers and additional data on disappearances, often claiming the statistics were classified,"[62] the report from the following year explains that the Minister of Justice and Public Security had announced the total suspension of investigations into disappearances.[63] These kinds of data would be more readily available in more democratic contexts and offer evidence of El Salvador's sharp democratic decline.

57. To create an illusion of improving country conditions with respect to gang violence, Bukele relies on rhetorical strategies that include selectively revealing and concealing national data.[64] The Inter-American Commission on Human Rights (IACHR) has criticized the Salvadoran State for "a lack of access to statistical data and official records on violence and crime from the Attorney General's Office and the Institute of Forensic Medicine, as well as other data from the PNC [National Civil Police], making it difficult to verify, contrast, and analyze information on citizen security."[65] IACHR notes the "absence of updated official data on incidents of injured or dead persons related to police or Armed Force officers that could be construed as human rights violations."[66] In other

---

[60] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 27.
[61] Ibid, p 2.
[62] "El Salvador 2022 Human Rights Report." US Department of State https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 3.
[63] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 4.
[64] Parker Assmann. "El Salvador to Omit Key Data from Official Homicide Tally." *Insight Crime.* 18 July 2019. https://insightcrime.org/news/brief/el-salvador-omit-key-data-homicides/;  Sarah C. Bishop. "An Illusion of Control: How El Salvador's President Rhetorically Inflates His Ability to Quell Violence." *Journalism and Media, 4,* no. 1 (2023): 16-29.
[65]Inter-American Commission on Human Rights. "Follow-up of Recommendations Issued by the IACHR in its Country or Thematic Reports: El Salvador." 2022. https://www.oas.org/en/iachr/docs/annual/2022/Chapters/12-IA2022_Cap_5_El_Salvador_EN.pdf. p 874.
[66] Ibid., p 876.

words, the state has repeatedly refused to provide the information that would be necessary to know the full scope of and prosecute instances of police and military violence.

58. Americas Director for Amnesty International Ana Piquer reported in March 2024 that "the denial, minimization and concealment of reported serious human rights violations reflect the government's unwillingness to fulfil its duty to respect and promote human rights in the country."[67] By strategically concealing both the nature and scope of human rights abuses taking place, the government of El Salvador has managed to mitigate international awareness.

### Gang Activity During the State of Exception

59. Publicly visible gang activity outside the prisons has quieted during the State of Exception, though gang violence inside the prisons subsists.[68] Since 2004, a practice had been in place to hold members of the two most powerful gangs in El Salvador, MS-13 and Barrio 18, in separate prisons in a measure designed to prevent both rival inter-gang violence and violence between gang members and civilians. Former Salvadoran Security Minister Bertrand Galindo explained, "The point was that if we left them in the same facilities, with the level of violence that was occurring and the weakness of the infrastructure, the state was not going to be able to prevent them from killing each other."[69] Bukele changed this policy in 2020 and reaffirmed on Twitter during the opening of his new 2023 mega-prison that gang members would be mixed together and held for decades[70]—a change certain to result in violence between the gangs and indicative of the Salvadoran state's determination not to protect its detained citizens from harm at the hands of the gangs.

60. The high probability of violent gang activity in prisons during the State of Exception in El Salvador since the policy changed has been confirmed by a range of instances such as a January 2025 riot in Izalco prison in which active gang members mixed together in a cell with retired gang members reportedly attacked each other using iron bars they had removed from their beds, resulting in at least three deaths.[71] Two weeks after the riot, three inmates from Izalco prison died in hospitals; the families of the deceased were informed that the cause of their deaths was "illness." [72]

---

[67] Amnesty International. "El Salvador: The institutionalization of human rights violations after two years of emergency rule." 27 March 2024. https://www.amnesty.org/en/latest/news/2024/03/el-salvador-two-years-emergency-rule/
[68] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 5.
[69] Roberto Valencia. "How El Salvador Handed its Prisons to the Mara Street Gangs." *InsightCrime* 3 September 2014. https://insightcrime.org/news/analysis/how-el-salvador-handed-its-prisons-to-the-gangs/#:~:text=On%20September%202%2C%202004%20the,active%20gang%20members%20call%20pesetas.
[70] Bukele, Nayib (@NayibBukele). 2023. Twitter, February 24, 2023. Translated from Spanish by Sarah C. Bishop. https://twitter.com/nayibbukele/status/1629165213600849920.
[71] David Bernal, Cindy Castillo y Claudia Espinoza. "Pedirán una investigación por motín en penal de Izalco." *La Presna Grafica.* 10 January 2025. https://www.laprensagrafica.com/elsalvador/Pediran-una-investigacion-por-motin-en-penal-de-Izalco-20250110-0063.html
[72] Oscar Reyes. "Reos de penal de Izalco mueren en hospitals." 28 January 2025. *La Prensa Grafica.* https://www.laprensagrafica.com/elsalvador/Reos-de-penal-de-Izalco-mueren-en-hospitales-20250128-0083 html

61.    Bukele's failure to protect detainees from gang violence has been widely criticized by human rights organizations. Director for the Americas at Human Rights Watch José Miguel Vivanco stated that not separating gang-affiliated detainees from each other or from other detainees showed the government's "wickedness and cruelty;"[73] the Human Rights Commission of El Salvador stated that the practice "carries a total risk of mutinies or selective or collective murders."[74] Still, much of the news reporting on Bukele's change in procedure referenced the country's general prison overcrowding, as though the move was an inevitable reality in a national context where the prison population was already double its stated capacity. The fact that Bukele reiterated his intention to mix gang members together in the announcement of the opening of the new mega-prison that was promised to solve the issue of overcrowding reveals this practice as a deliberate strategy in knowing acquiescence to the violence likely to result rather than an unfortunate necessity.

62.    In practice, this means that Salvadoran citizens, many of whom have been arrested arbitrarily, continue to be victim to gang control and authority even while detained. In some prisons, MS-13 and Barrio 18 are designating leaders of crowded cells to set cell rules and determine who receives food and water. Breaking the gang's rules may result in physical beatings.[75]

## Conclusion

63.    Deportees who are imprisoned in El Salvador are highly likely to face immediate and intentional life-threatening harm at the hands of state actors and a secondary threat of violence from incarcerated gang members.

---

## Signature

I declare under penalty of perjury that the foregoing is true and correct to best of my knowledge.

_____                    March 19, 2025_____

Signature                                        Date

---

[74] Marcos González Díaz. "Bukele contra las maras: las impactantes imágenes con las que El Salvador anunció que juntó a presos de diferentes pandillas en las celdas para combatir la violencia." *BBC News Mundo.* 28 April 2020. https://www.bbc.com/mundo/noticias-america-latina-52450557

[75] Stephen Dudley et al. "El Salvador's (Perpetual) State of Emergency: How Bukele's Government Overpowered Gangs." December 2023. https://insightcrime.org/investigations/el-salvador-perpetual-state-emergency-how-bukele-government-overpowered-gangs/#:~:text=In%20March%202022%2C%20the%20government,suspected%20gang%20members%20and%20collaborators p 6.

# Tab M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

---

M.A.P.S., on her own behalf and on behalf of others
similarly situated,

*Petitioner–Plaintiff,*

v.

ANGEL GARITE, in his official capacity as Assistant
El Paso Field Office Director for U.S. Immigration
and Customs Enforcement and Warden of the El Paso
Processing Center, *et al.*,

*Respondents–Defendants.*

Case No: 3:25-cv-0171-DB

---

## DECLARATION OF OSCAR SARABIA ROMAN

I, Oscar Sarabia Roman, declare as follows:

1. I am over eighteen years of age and am competent to make this declaration.

2. I am a lawyer at the American Civil Liberties Union Immigrants' Rights Project. I
   represent the Petitioners in this case.

3. Attached hereto as exhibits are true and correct copies of the following:

**Exhibit Documents**

1.  "Alien Enemy Validation Guide," "Verification of Removal," and "Notice and Warrant
    of Apprehension and Removal Under the Alien Enemies Act" Transcription.

2.  Second "Notice and Warrant of Apprehension and Removal under the Alien Enemies
    Act" (Form AEA-21B).

3.  Attorney General, Memorandum for Law Enforcement Officers re: Guidance for
    Implementing the Alien Enemies Act (Mar. 14, 2025).

4.  Dep't of Homeland Sec., Homeland Sec. Investigations, Assessment Report of Analysis
    (HSI-CHI-24-455).

1

**120**

5.   Dep't of Homeland Sec., U.S. Border Patrol, Situational Awareness: TDA Gang Recognition Indicators (Oct. 2, 2023).

6.   Syra Ortiz Blanes, Veronica Egui Brito & Claire Healy, *Trump Sent These Venezuelans to El Salvador Mega Prison. Their Families Deny Gang Ties*, Miami Herald (Mar. 18, 2025), *available at* https://www.miamiherald.com/news/local/immigration/article302251339.html.

7.   Veronica Egui Brito, *Despite Refugee Status in the U.S., Young Venezuelan Was Deported to Salvadoran Prison*, Miami Herald (Mar. 21, 2025), *available at* https://www.miamiherald.com/news/local/immigration/article302464134.html.

8.   Patrick J. McDonnell et al., *They Were Called Gang Members and Deported. Families Say Their Only Crime Was Having Tattoos*, L.A. Times (Mar. 23, 2025), *available at* https://www.latimes.com/world-nation/story/2025-03-23/deportation-trump-venezuelans-el-salvador.

9.   Carla Gloria Colome & Florantonia Singer, *Arturo and Frizgeralth, Convicted for Being Venezuelans: Trump Takes Another Step in His Racist Drift*, El Pais (Mar. 24, 2025), *available at* https://english.elpais.com/international/2025-03-24/arturo-and-frizgeralth-convicted-for-being-venezuelans-trump-takes-another-step-in-his-racist-drift.html.

10.   Arelis R. Hernandez & Maria Luisa Paul, *They Were Arrested During Routine ICE Check-Ins. Then They Were Disappeared*, Wash. Post (Mar. 22, 2025), *available at* https://www.washingtonpost.com/immigration/2025/03/22/trump-venezuela-migrants-el-salvador/.

11.   Syra Ortiz Blanes & Veronica Egui Brito, *U.S. Sent Venezuelan Man with Pending Political Asylum Case to El Salvador Mega Prison*, Miami Herald (Mar. 27, 2025), *available at* https://www.miamiherald.com/news/local/immigration/article302671624.html.

12.   Noah Lanard & Isabela Dias, *You're Here Because of Your Tattoos*, Mother Jones (Mar. 26, 2025), *available at* https://www.motherjones.com/politics/2025/03/trump-el-salvador-venezulea-deportation-prison-cecot-bukele/.

13.   Tom Phillips & Clavel Rangel, *Deported Because of His Tattoos: Has the US Targeted Venezuelans for Their Body Art?*, Guardian (Mar. 20, 2025), *available at* https://www.theguardian.com/us-news/2025/mar/20/deported-because-of-his-tattoos-has-the-us-targeted-venezuelans-for-their-body-art.

14.   Nicole Acevedo, Deon J. Hampton & David Noriega, *Tattoos of Deported Venezuelans Don't Necessarily Signal Gang Affiliation, Experts Say*, NBC News (Mar. 21, 2025), *available at* https://www.nbcnews.com/news/latino/tattoos-deported-venezuelans-not-necessarily-gang-members-rcna197089.

121

15. Julie Turjewitz, Jazmine Ulloa, Isayen Herrera, Hamed Aleaziz & Zolan Kanno-Youngs, *'Alien Enemies' or Innocent Men? Inside Trump's Rushed Effort to Deport 238 Migrants*, N.Y. Times (Apr. 15, 2025), *available at* https://www.nytimes.com/2025/04/15/world/americas/trump-migrants-deportations.html.

16. Jonathan Blitzer, *The Makeup Artist Donald Trump Deported under the Alien Enemies Act*, New Yorker (Mar. 31, 2025), *available at* https://www.newyorker.com/news/annals-of-immigration/the-makeup-artist-donald-trump-deported-under-the-alien-enemies-act.

17. *About 90% of migrants sent to El Salvador lacked U.S. criminal record*, L.A. Times (Apr. 10, 2025), *available at* https://www.latimes.com/world-nation/story/2025-04-10/about-90-of-migrants-sent-to-el-salvador-lacked-u-s-criminal-record.

18. David J. Bier, *50+ Venezuelans Imprisoned in El Salvador Came to US Legally, Never Violated Immigration Law*, CATO Inst. (May 19, 2025), *available at* https://www.cato.org/blog/50-venezuelans-imprisoned-el-salvador-came-us-legally-never-violated-immigration-law.

19. John Hudson & Warren P. Strobel, *U.S. Intelligence Contradicts Trump's Justification for Mass Deportations*, Wash. Post (Apr. 17, 2025), *available at* https://www.washingtonpost.com/national-security/2025/04/17/us-intelligence-tren-de-aragua-deportations-trump/.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on 20th of May, 2025, in San Francisco, California.

*/s/ Oscar Sarabia Roman*
Oscar Sarabia Roman

122

# EXHIBIT 1

**ALIEN ENEMIES ACT:**
**ALIEN ENEMY VALIDATION GUIDE**

In the case of: _____ A-File No:_____

1. The person named above is fourteen years or older: ☐
2. The person named above is not a citizen or lawful permanent resident of the United States: ☐
3. The person named above is a citizen of Venezuela: ☐

   *If any of these three requirements are not satisfied, the person named above shall not be ordered removed under the Alien Enemies Act (AEA). In such a case, you should consult your supervisor and the Office of the Principal Legal Advisor (OPLA), U.S. Immigration and Customs Enforcement, and, where applicable, initiate removal proceedings under the Immigration and Nationality Act (INA).*

4. The person named above is validated as a member of Tren de Aragua (TDA), as determined by reference to the following evaluation form:

   **Instructions:** *Complete the following validation evaluation form for each suspected alien targeted for removal under the AEA, or, following apprehension, for each alien potentially subject to an AEA removal.*

   *After accounting for the two comments below, aliens scoring 8 points and higher are validated as members of TDA; you should proceed with issuing Form AEA-21B, titled, "Notice and Warrant of Apprehension and Removal under the Alien Enemies Act." Aliens scoring 6 or 7 points may be validated as members of TDA; you should consult with a supervisor and OPLA, reviewing the totality of the facts, before making that determination; if you determine an alien should not be validated at this time as a member of TDA, when available, you should initiate removal proceedings under the INA. Alien scoring 5 points or less should not be validated at this time as member of TDA; when available, you should initiate removal proceedings under the INA.*[1]

   *Comment 1: Even if 8 points or higher, if all tallied points for an alien are from the Symbolism and/or Association categories (with __no points__ scoring in any other category), consult your supervisor and OPLA before determining whether to validate the alien as a member of TDA (and proceed with an AEA removal) or initiate INA removal proceedings.*

---

[1] A tally of 5 points or less, or any decision to initiate INA removal proceedings, is not a finding that an alien is *not* an Alien Enemy. Relatedly, at any time, additional information may come to light that gives reason to revisit a prior decision to forego an AEA removal.

*Comment 2*: *For purposes of validating an alien as a member of TDA, at least one scoring category must involve conduct occurring, or information received, within the past five years.*

| Valuation Explanation | | | |
|---|---|---|---|
| **Category** | **Definition Explanation** | **Points** | |
| **Judicial Outcomes and Official Documents** | a. Subject has been convicted of violating Title 18, United States Code, Section 521 or any other federal or state law criminalizing or imposing civil penalties for activity related to TDA | **10** | |
| | b. Court records (e.g., indictments, criminal complaints, sentencing memorandums) identifying the subject as a member of TDA, describing specific activity of TDA | **5** | |
| **Self-Admission** | a. Subject self-identifies as a member or associate of TDA verbally or in writing to law enforcement officer, even if that self identification to a law enforcement officer is unwitting, e.g., through lawful interception of communications. | **10** | |
| **Criminal Conduct and Information** | a. Subject participates in criminal activity (e.g., narcotics trafficking, human smuggling, etc.) with other members of TDA, including preparatory meetings and significant incidents directly attributed to TDA | **6** | |
| | b. Law enforcement or intelligence reporting identifying subject as a member of TDA, to include Bureau of Prisons validations and reliable foreign partner information. | **4** | |
| | c. Credible testimonies/statements from victims, community members, or informants that affirm the subject's membership in or allegiance to TDA. | **3** | |
| | d. Detailed open-source media (e.g., newspapers, investigative journalism reports) that describe arrest, prosecution, or operations of a subject as a member of TDA | **2** | |
| | e. Subject conducts and/or facilitates business with TDA (e.g., money laundering, mule, service provider) | **2** | |
| **Documents and Communications** | a. Written or electronic communications (e.g., e-mails, letters, texts, secure messages) that discuss business with, and/or are communicating with, known members of TDA; cell phone data contains multiple group, organizational, or organization leaders' or members' information. | **6** | |
| | b. Subject conducts phone calls about the business of TDA with known members of TDA | **10** | |
| | c. Financial transactions indicating criminal activity for TDA or with known members of TDA | **3** | |
| | d. Subject possesses written rules, constitution, membership certificates, bylaws, etc., indicating, together with other conduct, membership of or allegiance to TDA | **6** | |
| **Symbolism** | a. Subject has tattoos denoting membership/loyalty to TDA | **4** | |
| | b. Social media posts by the subject displaying symbols of TDA or depicting activity with other known members of TDA | **2** | |
| | c. Subject observed tagging or graffitiing to mark the territory of, and the subject's allegiance to, TDA | **2** | |
| | d. Subject observed displaying hand signs used by TDA | **2** | |
| | e. Subject displays insignia, logos, notations, drawings, or dress known to indicate allegiance to TDA, as observed by law enforcement in person or via virtual mediums | **4** | |

| Association | a. | Surveillance documentation that a subject is frequently observed closely associating with known leaders and members of TDA | 2 | |
| | b. | Subject part of group photos with two or more known members of TDA | 2 | |
| | c. | Subject presently resides with known members of TDA | 2 | |
| | | | **Total Points** | |
| | | | | |

## VALIDATION DETERMINATION

*Note: If any of the four requirements are <u>not</u> satisfied, do not complete this validation determination.*

Based on the validation guide and instructions above, including Comments 1 and 2, I find

that the person named above, _____:

1. Is fourteen years or older;
2. Is not a citizen or lawful permanent resident of the United States;
3. Is a citizen of Venezuela; and
4. Is a member of Tren de Aragua.

Accordingly, the above-named person is validated as an Alien Enemy.

_____    _____    _____
*Name of Agent/officer*      *Signature of agent/officer*           *Date*
*completing the form*        *completing the form*

_____    _____    _____
*Name of Supervisor*         *Signature of Supervisor*            *Date*

**126**

# VERIFICATION OF REMOVAL

A-number_____ Date: _____

Alien Enemy's name: _____

| Departure Date | Port of Departure | Manner of Departure |
|---|---|---|
| Signature of Verifying Officer | | Title of Officer |

**Photograph of alien removed**

**Right index fingerprint of alien removed**

_____
(Signature of alien whose fingerprint and
Photograph appear above)

_____
(Signature of official taking fingerprint)

## NOTICE AND WARRANT OF APPREHENSION AND REMOVAL
## UNDER THE ALIEN ENEMIES ACT

A-File No._____     Date: _____

In the Matter of: _____

Date of Birth: _____          Sex:     Male          Female

**Warrant of Apprehension and Removal**

To any authorized law enforcement officer:

The President has found that Tren de Aragua is perpetrating, attempting, or threatening an invasion or predatory incursion against the territory of the United States, and that Tren de Aragua members are thus Alien Enemies removable under Title 50, United States Code, Section 21.

_____has been determined to be: (1) at least fourteen years of
                    (Full Name of Alien Enemy)
age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua. Accordingly, he or she has been determined to be an Alien Enemy and, under Title 50, United States Code, Section 21, he or she shall immediately be apprehended, restrained, and removed from the United States pursuant to this Warrant of Apprehension and Removal.

**Signature of Supervisory Officer:** _____

**Title of Officer:** _____     **Date:** _____

**Notice to Alien Enemy**

I am a law enforcement officer authorized to apprehend, restrain, and remove Alien Enemies. You have been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua. Accordingly, you have been determined to be an Alien Enemy subject to apprehension, restraint, and removal from the United States. You are not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal. Until you are removed from the United States, you will remain detained under Title 40, Unite States Code, Section 21. Any statements you make now or while you are in custody may be used against you in any administrative or criminal proceeding. This is not a removal under the Immigration and Nationality Act.

After being removed from the United States, you must request and obtain permission from the Secretary of Homeland Security to enter or attempt to enter the United States at any time. Should you enter or attempt to enter the United States without receiving such permission, you will be subject to immediate removal and may be subject to criminal prosecution and imprisonment.

Signature of alien: _____     Date:_____

| **CERTIFICATE OF SERVICE** |
| --- |
|  |

128

# EXHIBIT 2

## NOTICE AND WARRANT OF APPREHENSION AND REMOVAL
## UNDER THE ALIEN ENEMIES ACT

A-File No:_____     Date:_____

In the Matter of: _____

Date of Birth: _____     Sex:     Male     Female

### Warrant of Apprehension and Removal

**To any authorized law enforcement officer:**

The President has found that Tren de Aragua is perpetrating, attempting, or threatening an invasion or predatory incursion against the territory of the United States, and that Tren de Aragua members are thus Alien Enemies removable under Title 50, United States Code, Section 21.

_____ has been determined to be: (1) at least fourteen years of
      (Full Name of Alien Enemy)
age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua. Accordingly, he or she has been determined to be an Alien Enemy and, under Title 50, United States Code, Section 21, he or she shall be apprehended, restrained, and removed from the United States pursuant to this Warrant of Apprehension and Removal.

**Signature of Supervisory Officer:** _____

**Title of Officer:** _____     **Date:** _____

### Notice to Alien Enemy

I am a law enforcement officer authorized to apprehend, restrain, and remove Alien Enemies. You have been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua. Accordingly, under the Alien Enemies Act, you have been determined to be an Alien Enemy subject to apprehension, restraint, and removal from the United States. Until you are removed from the United States, you will be detained under Title 50, United States Code, Section 21. Any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding. This is not a removal under the Immigration and Nationality Act. If you desire to make a phone call, you will be permitted to do so.

After being removed from the United States, you must request and obtain permission from the Secretary of Homeland Security to enter or attempt to enter the United States at any time. Should you enter or attempt to enter the United States without receiving such permission, you will be subject to immediate removal and may be subject to criminal prosecution and imprisonment.

Signature of alien: _____     Date: _____

---

**CERTIFICATE OF SERVICE**

I personally served a copy of this Notice and Warrant upon the above-named person on _____
and ensured it was read to this person in a language he or she understands.     (Date)

_____     _____
Name of officer/agent     Signature of officer/agent

---

Form AEA-21B

**130**

# EXHIBIT 3



# Office of the Attorney General
## Washington, D. C. 20530

March 14, 2025

**MEMORANDUM FOR LAW ENFORCEMENT OFFICERS**

FROM:                    THE ATTORNEY GENERAL

SUBJECT:             GUIDANCE FOR IMPLEMENTING THE ALIEN ENEMIES ACT

The President's Proclamation under 50 U.S.C. § 21 et seq., titled, "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua" ("the Proclamation"), directs the Attorney General and Secretary of Homeland Security to apprehend, restrain, secure, and remove every Alien Enemy subject to the Proclamation. The Proclamation further grants authority to the Attorney General to issue any guidance necessary to effectuate the prompt apprehension, detention, and removal of Alien Enemies. This memorandum provides guidance on implementing the President's invocation of the Alien Enemies Act ("AEA"). This guidance shall take effect when the Proclamation is made public by the President.

\*\*\*

## (1) Definitions

For purposes of this guidance memorandum, an "Alien Enemy" under the Proclamation and 50 U.S.C. § 21 is a person who is: (1) fourteen years of age or older; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of the hostile enemy Tren de Aragua, as determined by reference to Form AEA-21A, titled, "Alien Enemies Act: Alien Enemy Validation Guide," attached to this memorandum.

## (2) Removal of Alien Enemies

All aliens who are determined to be Alien Enemies under the Proclamation and 50 U.S.C. § 21 shall be issued a Notice and Warrant of Apprehension and Removal under the AEA and removed from the United States, except as provided in section (8) of this memorandum. In effectuating the removal of Alien Enemies, law enforcement officers and agents ("officers") must follow the procedures below.

### A. Apprehension and Removal Procedures in Proactive Matters

#### i.    Step 1: Validation of Alien Enemy Status and Execution of Form AEA-21A

At Step 1 of the proactive AEA apprehension and removal procedures, a line officer, or any other available officer ("line officer"), is responsible for determining whether an individual qualifies as an Alien Enemy. As outlined above, that requires determining that an individual is: (1) at least fourteen years of age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua.

**LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE**

**132**

Form AEA-21A guides the analysis of these four requirements. Accordingly, at Step 1, a line officer must complete Form AEA-21A for each suspected Alien Enemy. As outlined in that form, there may be instances where removal proceedings under the Immigration and Nationality Act ("INA") would be more appropriate based upon a review of the facts of the case than removal under the AEA. Line officers should adhere to the instructions in Form AEA-21A, including consulting with their supervisor(s) and the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement, in making such a determination.

At the conclusion of Step 1, if all four requirements stated above are satisfied, the line officer must validate the subject individual as an Alien Enemy by signing the Validation Determination section of Form AEA-21A. Thereafter, a supervisor must review the line officer's determination and approve the reviewing officer's determination by signing in the space allotted in Form AEA-21A. In this supervisory review, the supervisor may consider all relevant facts, including but not limited to, supporting documentation, identity verification documentation, and statements made by the alien regarding his or her alienage and connection to Tren de Aragua. The supervisor may request additional information from any source and may require an interview of the alien.

### ii.    Step 2: Issuance of Warrant of Apprehension and Removal

If, at the conclusion of Step 1, a supervisor approves the line officer's validation determination, a supervisor must then issue a Warrant of Apprehension and Removal for the subject Alien Enemy by signing the top portion of Form AEA-21B, titled "Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act."

### iii.    Step 3: Deconfliction

To the extent possible, before apprehending an Alien Enemy, officers should conduct standard conflict checks (e.g., DICE, DARTS) to ensure apprehending and removing the Alien Enemy is consistent with the interests of justice.

### iv.    Step 4: Apprehension of Alien Enemies in Proactive Matters

After a supervisor issues a Warrant of Apprehension and Removal and deconfliction is complete, officers shall use all available tools to immediately apprehend validated Alien Enemies wherever they are found in the United States, including, but not limited to, inside Alien Enemies' residences and workplaces. Prior to entering an Alien Enemy's residence to apprehend an Alien Enemy, officers must have reason to believe the validated Alien Enemy is present inside the residence.

To be clear, as outlined below in the section titled, "Apprehension and Removal Procedures in Reactive Matters," it is not necessary to complete Forms AEA-21A and AEA-21B prior to apprehending an Alien Enemy, where an officer has a reasonable belief that all four requirements to be validated as an Alien Enemy are met. In such circumstances, officers are authorized to apprehend the Alien Enemy and thereafter complete Forms AEA-21A and AEA-21B.

While a judicial or administrative arrest warrant is not necessary to apprehend a validated Alien Enemy, to perfect apprehension operation plans, officers should consider consulting federal prosecutors in the relevant district to obtain criminal search warrants and/or criminal arrest warrants based on violations of, for example, 8 U.S.C. § 1304(e) (failure to carry immigration documents), 8 U.S.C. § 1306 (failure to register and failure to comply with address obligations), 8 U.S.C. § 1324 (smuggling and harboring aliens), 8 U.S.C. §§ 1325–1326 (illegal entry and re-entry); and 18 U.S.C. § 922(g)(5) (possession of firearm by alien). Beyond these common crimes, because Tren de Aragua has been designated as a Foreign Terrorist Organization and a Specially Designated Global Terrorist, crimes including 18 U.S.C. § 2339B (providing material support or resources to designated Foreign Terrorist Organizations) and 50 U.S.C. § 1705 (violating orders issued under the International Emergency Economic Powers Act) may also be relevant to address in any consultation. While the ultimate goal is immediate identification and removal of Alien Enemies, coordination with federal prosecutors—who are required to support these operations at every step—may enhance officers' ability to conduct apprehensions safely and efficiently, and may assist in the collection of evidence identifying additional Tren de Aragua members in the vicinity of the Alien Enemy to be apprehended.

### v.   Step 5: Service of Notice and Warrant of Apprehension and Removal

Upon apprehension, an officer must serve the Alien Enemy with Form AEA-21B. This Notice and Warrant of Apprehension and Removal must include a statement by the officer that notifies the Alien Enemy that:

a) The officer has been authorized to apprehend, restrain, and remove Alien Enemies;
b) The alien has been determined to be an Alien Enemy;
c) The alien has been determined to be at least fourteen years of age;
d) The alien has been determined to not be a citizen or lawful permanent resident of the United States;
e) The alien has been determined to be a citizen of Venezuela;
f) The alien has been determined to be a member of Tren de Aragua;
g) The alien is not entitled to a hearing, appeal, or judicial review of the apprehension and removal warrant;
h) The Alien Enemy shall be detained pending removal from the United States; and
i) After being removed from the United States, the Alien Enemy may not enter or attempt to enter the United States without the permission of the Secretary of Homeland Security.

After serving Form AEA-21B upon the validated Alien Enemy, the serving officer must obtain the signature of the Alien Enemy and execute the certificate of service on Form AEA-21B. If the Alien Enemy refuses to sign, the officer should so indicate on the signature line.

**LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE**

### vi.    Step 6: Detention

All apprehended Alien Enemies must be detained under 50 U.S.C. § 21 until removal is effectuated because all Alien Enemies subject to the Proclamation are chargeable with actual hostility or other crime against the public safety. Such detention may occur in any location deemed suitable by officers in the Department of Justice or the Department of Homeland Security, and may include facilities maintained by the federal government, state or local governments, or contracted private entities.

### vii.    Step 7: Removal

Immediately upon apprehension, officers should commence arrangements to promptly remove the Alien Enemy out of the territory of the United States. At the time of removal, officers must verify removal of the Alien Enemy on Form AEA-21C, titled, "Verification of Removal," and fully execute such form.

### B. Apprehension and Removal Procedures in Reactive Matters

As much as practicable, officers should follow the proactive procedures above—and have an executed Warrant of Apprehension and Removal—before contacting an Alien Enemy. However, that will not always be realistic or effective in swiftly identifying and removing Alien Enemies. For example, consistent with the law, officers may need to contact a suspected Alien Enemy to develop further facts or otherwise confirm any of the four requirements for validation as an Alien Enemy. Or an officer may encounter a suspected Alien Enemy in the natural course of the officer's enforcement activity, such as when apprehending other validated members of Tren de Aragua. Given the dynamic nature of enforcement operations, officers in the field are authorized to apprehend aliens upon a reasonable belief that the alien meets all four requirements to be validated as an Alien Enemy. This authority includes entering an Alien Enemy's residence to make an AEA apprehension where circumstances render it impracticable to first obtain a signed Notice and Warrant of Apprehension and Removal (Form AEA-21B).

Whenever officers make a reactive apprehension under the AEA, officers must thereafter complete each relevant step of the Proactive Removal Procedures outlined above. And prior to removal of an Alien Enemy, officers must complete all forms described above, namely, Forms AEA-21A, AEA-21B, and AEA-21C.

### (3) Independent Arrest Authority

Many Alien Enemies and suspected Alien Enemies are already subject to immediate arrest under traditional criminal and immigration arrest authority. Those arrests should already be occurring. And in such cases, adhering to traditional arrest requirements, there is no reason to wait for validation of Alien Enemy status before making an arrest. Following such arrests officers have discretion to initiate an AEA removal if all requirements set forth herein are satisfied.

### (4) Recordkeeping

All records associated with the apprehension and removal of an Alien Enemy, including all forms identified above and all supporting documentation, must be maintained by the Department of Homeland Security.

### (5) Limitations on Relief From Removal

#### a. No entitlement to hearings, appeals, or judicial review of removal order

An alien determined to be an Alien Enemy and ordered removed under the Proclamation and 50 U.S.C. § 21 is not entitled to a hearing before an immigration judge, to an appeal of the removal order to the Board of Immigration Appeals, or to judicial review of the removal order in any court of the United States.

#### b. Ineligibility for relief or protection from removal

An alien determined to be an Alien Enemy under the Proclamation and 50 U.S.C. § 21 shall be ineligible for any relief or protection from removal.

### (6) Reporting of Apprehension and Removal Warrants

All issued Forms AEA-21B under this guidance memorandum must be reported to the Secretary of Homeland Security.

### (7) Apprehension and Removal Authority

All Department of Justice and Department of Homeland Security officers and agents are hereby authorized to perform the actions described herein, including but not limited to, determining Alien Enemy status, issuing notices and warrants of apprehension and removal, and effectuating removals of Alien Enemies from the United States. At the direction of the Attorney General or the Secretary of Homeland Security, subject to applicable law, any other law enforcement officer or agent may also perform the actions described herein.

### (8) Exemptions from Removal

An alien determined to be an Alien Enemy under the Proclamation and 50 U.S.C. § 21 may be exempted from the immediate removal requirement of section (2) of this memorandum in the following circumstances:

    **a.** First, immediate removal is not mandated when an Assistant United States Attorney or other Department of Justice attorney determines that the Alien Enemy may have engaged in criminal misconduct in violation of federal laws and investigation and/or prosecution of that criminal misconduct would best serve the interests of justice. In such a case, the Alien Enemy shall be detained under 50 U.S.C. § 21

**LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE**

(irrespective of any conditions of release set under 18 U.S.C. § 3142),[1] until the conclusion of any investigation, prosecution, and custodial sentence, or until an Assistant United States Attorney or other Department of Justice attorney determines that continued investigation or criminal prosecution no longer best serves the interests of justice. At such time, the Alien Enemy shall be removed from the United States under the AEA.

**b.**  Second, immediate apprehension and removal of an Alien Enemy is not mandated when the investigating agency determines that such actions would substantially compromise a significant law enforcement investigation or prosecution, and the participating U.S. Attorney's Office concurs in writing with the agency's determination.[2]   These determinations should be made with all relevant circumstances in mind, including the safety of the public and the desire to swiftly remove Alien Enemies from the United States. Delay in apprehension and removal of an Alien Enemy under this subsection is permitted only for such time as is reasonably necessary to complete the investigation or prosecution. Further, in the event it would not impair an investigation or prosecution to hold an Alien Enemy in custody during the pendency of the investigation or prosecution, the Alien Enemy shall be detained under 50 U.S.C. § 21.

All exemptions under this section shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130; such reports shall specify the anticipated charges, the anticipated timeframe for bringing charges, and, where applicable, the significance of an Alien Enemy's role in an ongoing investigation or prosecution.

**(9) Prosecution Referrals**

Consistent with the exemptions outlined in section (8), throughout the removal process described herein, officers should be alert to cases where a referral to the U.S. Attorney's Office for criminal prosecution, rather than immediate removal as an Alien Enemy, may better serve the interests of justice.

**(10)**      **Attachments**

a.  Form AEA-21A ("Alien Enemies Act: Validation Guide")

---

[1] In the event a court orders an Alien Enemy detained pending trial under 18 U.S.C. § 3142, officers should be prepared to resume custody of the Alien Enemy under 50 U.S.C. § 21 when the Alien Enemy's custodial status changes (e.g., when conditions of release are later set by the court or the criminal case terminates).

[2] There may be instances where a federal agency is partnered with a state or local prosecutor on an active investigation or prosecution. The presumption in such cases is that any associated Alien Enemy will be subject to immediate apprehension and removal under the AEA. This presumption may be overcome only upon approval from the Office of the Deputy Attorney General following a written request from the subject agency and prosecutor's office.

**LAW ENFORCEMENT SENSITIVE/LIMITED OFFICIAL USE**

      b.  Form AEA-21B ("Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act")

      c.  Form AEA-21C ("Verification of Removal")

# ALIEN ENEMIES ACT:
## ALIEN ENEMY VALIDATION GUIDE

In the case of: _____    A-File No.: _____

1. The person named above is fourteen years or older: ☐
2. The person named above is not a citizen or lawful permanent resident of the United States: ☐
3. The person named above is a citizen of Venezuela: ☐

    *If any of these three requirements are not satisfied, the person named above shall not be ordered removed under the Alien Enemies Act (AEA). In such a case, you should consult your supervisor and the Office of the Principal Legal Advisor (OPLA), U.S. Immigration and Customs Enforcement, and, where applicable, initiate removal proceedings under the Immigration and Nationality Act (INA).*

4. The person named above is validated as a member of Tren de Aragua (TDA), as determined by reference to the following evaluation form:

    **Instructions**: *Complete the following validation evaluation form for each suspected alien targeted for removal under the AEA, or, following apprehension, for each alien potentially subject to an AEA removal.*

    *After accounting for the two comments below, aliens scoring 8 points and higher are validated as members of TDA; you should proceed with issuing Form AEA-21B, titled, "Notice and Warrant of Apprehension and Removal under the Alien Enemies Act." Aliens scoring 6 or 7 points may be validated as members of TDA; you should consult with a supervisor and OPLA, reviewing the totality of the facts, before making that determination; if you determine an alien should not be validated at this time as a member of TDA, when available, you should initiate removal proceedings under the INA. Aliens scoring 5 points or less should not be validated at this time as members of TDA; when available, you should initiate removal proceedings under the INA.*[1]

    *Comment 1: Even if 8 points or higher, if all tallied points for an alien are from the Symbolism and/or Association categories (with no points scoring in any other category), consult your supervisor and OPLA before determining whether to validate the alien as a member of TDA (and proceed with an AEA removal) or initiate INA removal proceedings.*

---

[1] A tally of 5 points or less, or any decision to initiate INA removal proceedings, is not a finding that an alien is *not* an Alien Enemy. Relatedly, at any time, additional information may come to light that gives reason to revisit a prior decision to forego an AEA removal.

1

Form AEA-21A

139

*Comment 2: For purposes of validating an alien as a member of TDA, at least one scoring category must involve conduct occurring, or information received, within the past five years.*

| Validation Evaluation | | | |
|---|---|---|---|
| **Category** | **Definition/Explanation** | **Points** | **✓** |
| **Judicial Outcomes and Official Documents** | a. Subject has been convicted of violating Title 18, United States Code, Section 521 or any other federal or state law criminalizing or imposing civil penalties for activity related to TDA | **10** | |
| | b. Court records (e.g., indictments, criminal complaints, sentencing memorandums) identifying the subject as a member of TDA, describing specific activity of TDA | **5** | |
| **Self-Admission** | a. Subject self-identifies as a member or associate of TDA verbally or in writing to law enforcement officer, even if that self-identification to a law enforcement officer is unwitting, e.g., through lawful interception of communications | **10** | |
| **Criminal Conduct and Information** | a. Subject participates in criminal activity (e.g., narcotics trafficking, human smuggling, etc.) with other members of TDA, including preparatory meetings and significant incidents directly attributed to TDA | **6** | |
| | b. Law enforcement or intelligence reporting identifying subject as a member of TDA, to include Bureau of Prisons validations and reliable foreign partner information | **4** | |
| | c. Credible testimonies/statements from victims, community members, or informants that affirm the subject's membership in or allegiance to TDA | **3** | |
| | d. Detailed open-source media (e.g., newspapers, investigative journalism reports) that describe arrest, prosecution, or operations of a subject as a member of TDA | **2** | |
| | e. Subject conducts and/or facilitates business with TDA (e.g., money laundering, mule, service provider) | **2** | |
| **Documents and Communications** | a. Written or electronic communications (e.g., e-mails, letters, texts, secure messages) that discuss business with, and/or are communicating with, known members of TDA; cell phone data contains multiple group, organizational, or organization leaders' or members' information | **6** | |
| | b. Subject conducts phone calls about the business of TDA with known members of TDA | **10** | |
| | c. Financial transactions indicating criminal activity for TDA or with known members of TDA | **3** | |
| | d. Subject possesses written rules, constitution, membership certificates, bylaws, etc., indicating, together with other conduct, membership of or allegiance to TDA | **6** | |
| **Symbolism** | a. Subject has tattoos denoting membership/loyalty to TDA | **4** | |
| | b. Social media posts by the subject displaying symbols of TDA or depicting activity with other known members of TDA | **2** | |
| | c. Subject observed tagging or graffitiing to mark the territory of, and the subject's allegiance to, TDA | **2** | |
| | d. Subject observed displaying hand signs used by TDA | **2** | |
| | e. Subject displays insignia, logos, notations, drawings, or dress known to indicate allegiance to TDA, as observed by law enforcement in person or via virtual mediums | **4** | |

Form AEA-21A

**140**

| Association | a. | Surveillance documentation that a subject is frequently observed closely associating with known leaders and members of TDA | 2 | |
| | b. | Subject part of group photos with two or more known members of TDA | 2 | |
| | c. | Subject presently resides with known members of TDA | 2 | |
| | | | **Total Points** | |
| | | | | |

## VALIDATION DETERMINATION

*Note: If any of the four requirements are <u>not</u> satisfied, do not complete this validation determination.*

Based on the validation guide and instructions above, including Comments 1 and 2, I find

that the person named above, _____:

1. Is fourteen years or older;
2. Is not a citizen or lawful permanent resident of the United States;
3. Is a citizen of Venezuela; and
4. Is a member of Tren de Aragua.

Accordingly, the above-named person is validated as an Alien Enemy.

_____          _____          _____
*Name of agent/officer*          *Signature of agent/officer*          *Date*
*completing the form*            *completing the form*

_____          _____          _____
*Name of supervisor*             *Signature of supervisor*             *Date*

3

Form AEA-21A

**141**

## NOTICE AND WARRANT OF APPREHENSION AND REMOVAL
## UNDER THE ALIEN ENEMIES ACT

A-File No:_____     Date:_____

In the Matter of: _____

Date of Birth: _____     Sex:     Male          Female

**Warrant of Apprehension and Removal**

**To any authorized law enforcement officer:**

The President has found that Tren de Aragua is perpetrating, attempting, or threatening an invasion or predatory incursion against the territory of the United States, and that Tren de Aragua members are thus Alien Enemies removable under Title 50, United States Code, Section 21.

_____ has been determined to be: (1) at least fourteen years of
      (Full Name of Alien Enemy)
age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua. Accordingly, he or she has been determined to be an Alien Enemy and, under Title 50, United States Code, Section 21, he or she shall immediately be apprehended, restrained, and removed from the United States pursuant to this Warrant of Apprehension and Removal.

**Signature of Supervisory Officer:** _____

**Title of Officer:** _____     **Date:** _____

**Notice to Alien Enemy**

I am a law enforcement officer authorized to apprehend, restrain, and remove Alien Enemies. You have been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua. Accordingly, you have been determined to be an Alien Enemy subject to apprehension, restraint, and removal from the United States. You are not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal. Until you are removed from the United States, you will remain detained under Title 50, United States Code, Section 21. Any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding. This is not a removal under the Immigration and Nationality Act.

After being removed from the United States, you must request and obtain permission from the Secretary of Homeland Security to enter or attempt to enter the United States at any time. Should you enter or attempt to enter the United States without receiving such permission, you will be subject to immediate removal and may be subject to criminal prosecution and imprisonment.

Signature of alien: _____     Date: _____

| CERTIFICATE OF SERVICE |
| --- |

I personally served the original of this Notice and Warrant upon the above-named person on _____.
                                                             (Date)

_____     _____
Name of officer/agent          Signature of officer/agent

Form AEA-21B

142

## VERIFICATION OF REMOVAL

A-File No:_____   Date:_____

Alien Enemy's name:_____

| Departure Date | Port of Departure | Manner of Departure |
|---|---|---|
| Signature of Verifying Officer | | Title of Officer |

**Photograph of alien removed**

**Right index fingerprint of alien removed**

_____
(Signature of alien whose fingerprint and
photograph appear above)

_____
(Signature of official taking fingerprint)

Form AEA-21C

# EXHIBIT 4

# Homeland Security Investigations

HSI-CHI-24-455

**ASSESSMENT REPORT OF ANALYSIS**

## WHAT IS TREN DE ARAGUA?

Tren de Aragua (TdA) is a transnational criminal organization that began as a labor union working in Venezuelan rail yards in the mid-to-late 2000s. TdA rapidly evolved into a gang that specializes in human trafficking, extreme violence, and extortion in the Aragua State of Venezuela. The foundation of the gang and its leadership is based in Venezuelan prisons but has expanded into Mexico, Brazil, Ecuador, Peru, Chile, Costa Rica, Panama, Colombia, Guatemala, and Bolivia. The gang is swiftly growing and ramping up recruiting measures to strengthen its presence in the United States. TdA is headed by Héctor Rusthenford Guerrero Flores aka "Nino Guerrero"—his current whereabouts are unknown.

## EXPANSION AND CRIMINAL INVOLVEMENT

TdA has continuously made efforts to expand its criminal enterprise into other countries. There are three major steps that are part of its expansion process:

1. **Exploration Phase:** TdA members arrive to a new area via border crossings, migration routes, hotspots, or urban areas with notable Venezuelan populations. TdA members exploit migrants and maintain a low profile while conducting illicit activities.

2. **Penetration Phase:** TdA members enter local criminal economies with low barriers to entry.

3. **Consolidation Phase:** TdA establishes roots in criminal economies, sets up a financial base, and builds criminal structures needed to maintain their illicit activities. This phase usually involves money laundering.

As depicted by a July 2023 InSight crime report (see map to the right), TdA has been involved in a variety of crimes while operating in South America.

More recently, the organization has shifted its focus to establish a presence in the United States. Open source information indicates that TdA members are present in California, Illinois, Florida, New York, Nevada, and Texas and that suspected TdA members may be involved in a variety of crimes to include kidnapping, human trafficking, sex trafficking, organized retail crime, robberies, and document fraud.



Tren de Aragua's Regional Presence and Criminal Economies (2023)

PRESENCE
- Exploration phase
- Penetration phase
- Consolidation phase

CRIMINAL ECONOMIES
- Extortion
- Kidnapping
- Migrant Smuggling
- Human Trafficking
- Contraband
- Micro-trafficking
- Cybercrime
- Black Markets
- Robberies
- Illegal Mining
- Loan Sharking
- Small-scale Drug Trafficking



**145**



# Homeland Security Investigations

HSI-CHI-24-455

## DETECTING AND IDENTIFYING

Open source material has depicted TdA members with a combination of the below tattoos:

**ASSESSMENT REPORT OF ANALYSIS**

**"Jump Man" Symbol**



**AK-47s**



**Trains**



**Crowns**



**"Hijos de Dios" Quote**



"HJ" or "Hijos de Dios" translation: "Sons of God"

**"Real Hasta La Muerte" Quote**



"Real Hasta La Muerte" translation: "Till Death"

**Stars**



**Clocks**



**Skull with Gas Mask**



## ADDITIONAL IDENTIFIERS

Homeland Security Investigations, Chicago Field Office, has obtained additional information to help identify TdA members:

- Typically males in the age range of 18-25 years old;

- Dressed in high-end urban street wear;

- Favor the Chicago Bulls<sup>USPER</sup> basketball jersey, specifically Michael Jordan<sup>USPER</sup> jerseys with the number "23", and Jordan "Jump Man" footwear/sneakers; and / or

- Often wear sports attire from U.S. professional sports teams with Venezuelan nationals on them.

*This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label USPER and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.*

*This is a Homeland Security Investigations (HSI), Chicago Field Division document. For any questions related to this report or to provide additional information, please contact HSI Chicago at (630) 458-7400 or HSIChicagoIntake@hsi.dhs.gov.*

**146**

# EXHIBIT 5

UNCLASSIFIED//FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

U.S. DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION

# U.S. BORDER PATROL          EL PASO SECTOR

THIS INFORMATION WAS PROVIDED BY CBP AND MAY CONTAIN INFORMATION FROM ANOTHER AGENCY. ANY DISCLOSURE OF THIS INFORMATION OUTSIDE OF CBP MAY CONSTITUTE A VIOLATION OF THE THIRD AGENCY RULE. RELEASING ANY INFORMATION TO ANY ENTITY OUTSIDE OF CBP IS STRICTLY PROHIBITED.

**Situational Awareness**                                    **DATE: 10/02/2023**
**TDA Gang Recognition Indicators**

**(U//FOUO/LES)** The El Paso Sector (EPT) Intelligence Unit (SIU) HUMINT-Gang Unit continues to see migrants from Venezuela with confirmed and suspected links to the Tren de Aragua (TDA) gang.

**(U//FOUO/LES)** Intelligence collections have identified the below tattoos on subjects; indicative of possibly being a member or associate of the TDA.

### AK-47

  

**Gas Mask/Real Hasta la Muerte**

 

UNCLASSIFIED//FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

**148**

**Stars on the Shoulders:**



**Trains:**



**Ismalito:**



**(U//FOUO/LES)** EPT HUMINT-Gang Unit collections determined that the Chicago Bulls attire, clocks, and rose tattoos are typically related to the Venezuelan culture and not a definite indictor of being a member or associate of the TDA.

**(U//FOUO/LES)** Agents are reminded to remain cognizant of their surroundings at all times and maintain a high level of situational awareness when dealing with subjects with TDA indicators.

This product was prepared by the El Paso Sector Intelligence and Operations Center.
Comments and/or questions may be directed to the El Paso Sector Intelligence HUMINT-GANG Unit EPT_SIU_HUMINT@cbp.dhs.gov.

EXHIBIT 6

# Trump sent these Venezuelans to El Salvador mega prison. Their families deny gang ties.

miamiherald.com/news/local/immigration/article302251339.html

Syra Ortiz Blanes, Verónica Egui Brito, Claire Healy                    March 18, 2025

<u>Immigration</u>
By <u>Syra Ortiz Blanes</u>,
<u>Verónica Egui Brito</u> and
<u>Claire Healy</u>
| 💬 22



AdChoices ▷

Watch the latest video shared today on President Nayib Bukele's X account, showing over 200 Venezuelan migrants—that the federal government is linking to Tren de Aragua —arriving in El Salvador and being transferred to the country's mega prison. The footage documents their arrival and transfer to the country's notorious prison. U.S. Secretary of State Marco Rubio and President Bukele have both confirmed the deportation flights. By El Salvador Presidential Press Office

The day after he was arrested while working at a restaurant in Texas, Mervin Jose Yamarte Fernandez climbed out of a plane in shackles in El Salvador, bound for the largest mega-prison in Latin America.

His sister, Jare, recognized him in a video shared on social media. As masked guards shaved detainees' heads and led them into cells at the maximum-security complex, Yamarte Fernandez turned his gaze slowly to the camera.

TOP VIDEOS

"He was asking for help. And that help didn't come from the lips. It came from the soul," said Jare, who asked to be identified by her nickname because she fears for her family's safety and who added her brother has no previous criminal record. "You know when someone has their soul broken."

<u>READ MORE: Trump deports hundreds of alleged Venezuelan gang members. Did he defy a court order?</u>

Yamarte Fernandez, 29, is among 238 Venezuelans the Trump administration accused of being gang members without providing public evidence and sent over the weekend to El Salvador's Terrorist Confinement Center, a prison about 45 miles from the capital designed to hold up to 40,000 people as part of a crackdown on gangs. They will be jailed for at least one year, El Salvador's President Nayib Bukele said in a <u>statement</u> on X, following a deal brokered between the two countries in February.

**151**



Mervin Jose Yamarte Fernandez, 29, is one of Venezuelans accused by the Trump administration of gang affiliation and sent over the weekend to El Salvador's Terrorist Confinement Center. His sister identified him in a video shared on social media by the Salvadoran government. "He shouldn't be imprisoned in El Salvador, let alone in a dangerous prison like the one where the Mara Salvatruchas are held," his sister told the Miami Herald. El Salvador Presidential Press Office

"These heinous monsters were extracted and removed to El Salvador where they will no longer be able to pose any threat to the American people," White House Press Secretary Karoline Leavitt said.

But families of three men who appear to have been deported and imprisoned in El Salvador told the Miami Herald that their relatives have no gang affiliation – and two said their relatives had never been charged with a crime in the U.S. or elsewhere. One has been previously accused by the U.S. government of ties to the feared Tren de Aragua gang, but his family denies any connection.

Neither the Department of Homeland Security nor Immigration and Customs Enforcement responded to Miami Herald questions about what criteria was used to select detainees sent to El Salvador, what the plan is for detainees incarcerated abroad, and whether the government had defied a federal judge's orders to send them there.

Legal experts have taken the Trump administration to court over the deportations, arguing that the government illegally invoked an 18th century wartime law. On Saturday, a federal judge ordered the government to hold off on the deportations. The Justice Department has said in court filings that the judge's oral order to turn around the planes, after they had already departed, was not enforceable and suggested that the ruling was not applicable outside U.S. territory.

<u>READ MORE: White House says it didn't defy court order on deportations as judge calls hearing</u>

Hannah Flamm, an attorney and acting senior policy director at the International Refugee Assistance Project, a New York-based legal aid and advocacy group, said the Trump administration's use of wartime authorities to conduct deportations is "shocking." She described the weekend's deportations as part of a "campaign of mass deportations and evisceration of the rule of law."

"The Trump administration is pushing the limits to find out what it can get away with, both in the courts and in public opinion," she said.

Families of some of the men sent to El Salvador told the Herald that they feel powerless in the wake of the U.S. government's decision to ship their loved ones off to a prison in a foreign country without due process. For years, the prison has been the subject of investigations by reporters and advocates who have found thousands of innocent people have been jailed there without due process.

"He shouldn't be imprisoned in El Salvador, let alone in a dangerous prison like the one where the Mara Salvatruchas are held," said Jare, referring to the international criminal organization with roots in El Salvador. "There are many innocent people behind bars. And today, my brother is one of them."

Originally Yamarte Fernandez was hesitant to move to the United States, Jare said, but she convinced him to join her in Dallas County to provide a better life for his partner and daughter, who stayed back in their home state of Zulia. Jare said her brother did not have any tattoos because of their Christian upbringing. Tattoos have been used by the U.S. government in the past as an indication of gang affiliation, though experts say that Tren de Aragua members don't have any particular signs that identify their membership.

"I'm in so much pain," said Jare, who lives in Texas. "I never imagined this country would cause so much harm to my family."

### 'Irregular warfare'

On Saturday, President Donald Trump <u>invoked the centuries old wartime law</u> to allow his administration to arrest, relocate, and deport any Venezuelan citizens over the age of 14 who are Tren de Aragua members.

Best known for its role in interning Japanese immigrants during World War II, the Alien Enemies Act is a 1798 law that has been used only three times before – all during times of war. In his announcement of the order, Trump said that Tren de Aragua is invading the country.

**153**

"Evidence irrefutably demonstrates that TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens," a statement from Trump said.

Anyone accused of being a member of the gang has no right to challenge the accusation under the Alien Enemies law, which grants the government the power to deport a person without due process or the opportunity to contest the claim. Before the proclamation, the American Civil Liberties Union filed a lawsuit against the U.S. government on behalf of five Venezuelans facing deportation.

The rights organization claimed the law cannot be used against nationals of Venezuela because the United States is not at war with Venezuela nor has Venezuela launched a predatory incursion into the United States. Attorneys said the five men, who were not among those deported on Saturday, had been wrongly identified as gang members and were seeking asylum. At least two of them fled Venezuela in part because Tren de Aragua was persecuting them, according to the lawsuit.

"J.A.V. is not and has never been a member of Tren de Aragua," attorneys wrote about one of the plaintiffs. "He was in fact victimized by that group and the group is the reason he cannot return to Venezuela."

Lee Gelernt, the ACLU's lead counsel on the case, called the use of the Alien Enemies Act "flatly unlawful" in a statement to the Herald. But he said that even if it could be used, the individuals were entitled to due process to show they were not gang members.

"If these individuals are afforded due process it will then be determined whether they are members of the gang but we would caution hesitation before anybody takes at face value the Trump administration's characterization given the administration's frequent overstatement about immigrant detainees, including with respect to the individuals sent to Guantanamo over the past month," said Gelernt.

**READ MORE:'Give us back our sons': A look at the Venezuelan migrants Trump sent to Guantanamo**

A federal judge issued a ruling blocking the president from deporting the men on Saturday. He also broadened the order to apply to anyone who could be at risk of deportation under the executive order.

At the hearing, he ordered the Trump administration to return any flights that were in mid-air. Flight-tracking data shows that three flights landed after the judge blocked the executive order, according to the Washington Post.

<span style="color:red">**154**</span>  4/15

"Oopsie… Too late," Bukele underline(wrote on X,) a post that Secretary of State Marco Rubio later re-shared.

In Monday's press briefing at the White House, Leavitt said the U.S. is paying $6 million to El Salvador "for the detention of these foreign terrorists." That same day during a court hearing, the federal judge questioned the Trump administration to determine whether it had violated Saturday's injunction.

In an interview with Fox News, Rubio was asked about concerns regarding the underline(lack of concrete evidence) confirming that all the individuals deported to the Salvadoran prisons are indeed members of Tren de Aragua. He responded, "If one of them turns out not to be, then they're just illegally in our country, and the Salvadorans can then deport them from — to Venezuela, but they weren't supposed to be in our country to begin with."

Flamm, the International Refugee Project lawyer, said the Trump administration was undermining its own ability to crack down on gangs by deporting the people it is in the midst of prosecuting. The federal government sent MS-13 members to El Salvador over the weekend too, underline(including a top leader of the group) who is a defendant in a prominent criminal case in New York

"The U.S. government has gone out of its way to prosecute on terrorism charges precisely in an effort to hold gang leaders to account. But the Trump administration clearly does not actually care about public safety or accountability," she said.

## 'Decision to leave'

Yamarte Fernandez had bought a house in a poor neighborhood in Maracaibo to live with his wife and 4-year-old daughter. But the house needed to be remodeled, the kitchen refurbished, the roof replaced.

He decided to travel to the U.S. to support his family at home and send back his earnings to fix up the house. He made the journey from Zulia to the U.S through the Darien Gap, the dangerous jungle between Panama and Colombia, with 13 other Venezuelans, including three other men from his neighborhood who were detained by ICE the same day he was. He arrived at the border in September 2023.

**155**



Mervin Jose Yamarte Fernandez, 29, is one of 238 Venezuelans accused by the Trump administration of gang affiliation and sent over the weekend to El Salvador's Terrorist Confinement Center. His sister

recognized him in a video shared on social media, where masked guards shaved the detainees' heads and escorted them into cells at the maximum-security facility. As the camera panned across the scene, Yamarte slowly turned his gaze toward it. Yamarte's family

But as the Trump Administration started its crackdown on illegal immigration – specifically targeting Venezuelans – Yamarte Fernandez and his family had already decided to self deport later this year.

"We had made the decision to leave the U.S. voluntarily to return to Venezuela," Jare said. "I wanted to stay until December, but he was determined to leave in September."

Jare said his brother was a hard worker determined to not burden the U.S. In videos where she recognized her brother in El Salvador, she identified two other men who had traveled with him from their neighborhood in Venezuela.

"We came to this country to work and do things right," she said. "It's painful that they blame my brother, and they portray him as a member of the Tren de Aragua. I don't accept the bad reputation created around my brother."

Yamarte Fernandez is one of seven siblings from a Christian family in Maracaibo, the capital of oil-rich state Zulia, bordering Colombia, according to his sister. Jare described him as a lifelong athlete who loved soccer and baseball and found ways to be active despite his challenging asthma.

"It's a lie when they said that he was from the TdA. My brother doesn't even have a tattoo," his sister said, explaining that his family doesn't believe in tattoos because of religious reasons.

## 'Speaking to the devil'

On Monday, Venezuelan National Assembly President Jorge Rodríguez called on the legislature, controlled by Nicolás Maduro's regime, to issue a formal request banning all Venezuelans from traveling to the U.S.

"In the United States, there is no rule of law when it comes to the rights of our migrants," Rodríguez said during a press conference in Caracas. He also spoke about Venezuelans who were sent to the prison in El Salvador.

"We will go to great lengths, even if it means speaking to the devil, to ensure that Venezuelans are returned to their homeland," he said.

Venezuelan opposition leader Edmundo Gonzalez, who is recognized by the U.S. and other democratic nations as the real winner of the presidential election held in Venezuela on July 28th, and Maria Corina Machado issued a statement Monday saying that the Tren de Aragua poses a significant "threat to the entire region."

**157**

Machado and Gonzalez expressed support for the measures the U.S. is taking to identify, arrest and prosecute those involved with or supporting the gang. However, they stressed the need for authorities to exercise "extreme caution in administering justice." They said it is crucial to distinguish between high-level criminals like Maduro and the vast majority of innocent Venezuelans, to prevent the unjust criminalization of Venezuelan migrants.

## 'Wait for me'

Another family fears that their relative was also sent to prison in El Salvador, after he had spent several weeks awaiting deportation in Texas.

Gustavo Adolfo Aguilera Agüero, 27, is from the Venezuelan Andes in Táchira, an area bordering Colombia, and had been living in Dallas since December 2023 with his wife. The couple entered the United States using a now-defunct mobile application to schedule appointments with southwest border authorities. Aguilera Agüero's wife soon found out she was five months pregnant with their first child. Her husband was working installing water pipes on rooftops and his wife found work taking care of children.

"It hasn't been easy, but we came together to move ahead in life together," said his wife, Susej, who asked to only use her first name because she fears for her safety.

In early February, authorities detained Aguilera Agüero while he was taking trash out of his home, his wife said. Authorities had been looking for someone else, she said, but he was taken to Bluebonnet Detention Facility in Anson, Texas.

Aguilera Agüero spent several weeks in detention waiting for a deportation to Venezuela, but his mother, Miriam Aguilera, now fears her son could be among the Venezuelans deported on Saturday to El Salvador instead. The family last heard from Aguilera Agüero on Friday night, when he told his mother he was being deported to Venezuela. A plane from Conviasa, Venezuelan airlines, was going to take him back to his country.

"Mom, we're going to be deported to Venezuela. Wait for me," Miriam Aguilera remembered her son telling her.

**158**





Gustavo Adolfo Aguilera Agüero, 27, from the Venezuelan Andes in Táchira, had been living in Dallas, Texas, with his wife since December 2023. In early February, Aguilera Agüero was detained by authorities while taking out the trash, according to his wife. Authorities were actually searching for someone else, but Aguilera Agüero spent several weeks in detention, awaiting deportation to Venezuela. Now, his mother, Miriam Aguilera, fears her son may be among the Venezuelans deported to El Salvador on Saturday instead. Aguilera's family

But by Sunday, no plane had arrived in Venezuela, and she saw the deportations to El Salvador on the news. She still doesn't know where he is – and has been scanning videos of the Terrorism Confinement Center in El Salvador looking for him.

Aguilera Agüero has an American-citizen son, Jacob, who is nine months old, and an older Venezuelan son, Santiago. His family denies that he has any connection with Tren de Aragua. According to his mother, her son's tattoos tell a story of love and loyalty: A crown, inked with the name of his first son, Santiago. A star intertwined with his name and his mother's name. Across one arm, the phrase "*Real hasta la muerte*" – "Real until death" – which was made famous by Puerto Rican reggaeton artist Anuel AA.

Public safety authorities in Texas have linked these tattoos to Tren de Aragua and officials are using them to identify suspected members.

"We were told he was arrested because of the tattoos on his neck and arms, but my son doesn't have a criminal record," Miriam Aguilera told the Herald.

One man whose relatives spoke with the Herald has previously faced accusations of gang ties from the Drug Enforcement Administration. His family insists he was wrongfully accused of gang involvement.

### 'Let us leave'

Henry Javier Vargas Lugo, 32, originally from La Guaira state on Venezuela's coast, had been living in Aurora, Colorado, for nearly a year when he was detained on Jan. 29, and he was later transported to Texas.

**160**

Before Vargas Lugo migrated to the U.S., he lived in Colombia for seven years, working as a mechanic in Bogotá. Seeking a fresh start, he decided to leave Colombia and try his luck in the United States.

Vargas Lugo entered the U.S. through El Paso, bringing his daughter and her mother with him. When U.S. Customs and Border Protection encountered him, they asked him to remove his shirt to document his tattoos. Officials inquired whether he was affiliated with a gang, including Tren de Aragua, and he denied any association, according to his sister, Nayrobis Vargas, who spoke with the Miami Herald. He has several tattoos, including crowns with his niece and mother's name, a clock on his arm and a rosary.



Henry Javier Vargas, 32, originally from Vargas state on Venezuela's coast, had been living in Aurora, Colorado, for nearly a year when he was detained on January 29. Prior to migrating to the U.S., Vargas spent seven years in Colombia, working as a mechanic in Bogotá. Vargas's family was able to identify him in a video posted by Salvadoran President Nayib Bukele, showing the detainees arriving in El Salvador. In the footage, his hands are shackled, and his head is bowed in a moment of despair Vargas's family

In Colorado he worked odd jobs, delivering food and shoveling snow, doing whatever it took to provide for his family, his family said.

He was arrested in Aurora on extortion charges connected to an incident that occurred on the light rail, officials confirmed. He was later released from jail pending an investigation, and his family says that he was the victim of a scam.

The Drug Enforcement Administration – which participated in the arrest – released a photo of Vargas Lugo, identifying him as a member of Tren de Aragua, but hasn't disclosed any evidence. He has yet to be sentenced with a crime.

Vargas Lugo's family was able to identify him in a video posted by Bukele of the detainees arriving in El Salvador. His hands are shackled and his head bowed.



Henry Javier Vargas, 32, originally from La Guaira state on Venezuela's coast, had been living in Colorado for nearly a year when a family member identified him in a video posted by Salvadoran President Nayib Bukele. The footage showed Vargas among the Venezuelans deported to El Salvador's largest mega-prison, the largest in Latin America. In the video, his hands are shackled, and his head is bowed in a moment of despair. El Salvador Presidential Press Office

"The families are devastated and terrified of what might happen to them," said one of his cousins in Venezuela. "I haven't eaten all day just thinking about what they're going through."

Yamarte Fernandez's family is still planning to self deport back to Venezuela. His sister said she does not "blame Trump" because she was "taught not to judge others." But she said that the president's decisions are "reaching extremes that are impacting innocent people."

**163**

13/15

"Let us leave, but let us leave in a good way," said Jare, Yamarte Fernandez's sister. "Not leaving from here and ending up in a prison."

## Afternoon Newsletter

Latest news, plus the afternoon business & national news.

By submitting, I agree to the Privacy Policy and Terms of Service.

**Thank you for signing up!**
You'll receive the next newsletter in your inbox.

Explore more of our newsletters and subscribe to your favorites.

Verónica Egui Brito ha profundizado en temas sociales apremiantes y de derechos humanos. Cubre noticias dentro de la vibrante ciudad de Hialeah y sus alrededores para el Nuevo Herald y el Miami Herald. Nacida y criada en Caracas, Venezuela. Se unió al Herald en 2022. Verónica Egui Brito has delved into pressing social, and human rights issues. She covers news within the vibrant city of Hialeah, and its surrounding areas for el Nuevo Herald, and the Miami Herald. Born and raised in Caracas, Venezuela. Joined the Herald in 2022.

SB

Syra Ortiz Blanes covers immigration for the Miami Herald and El Nuevo Herald. Previously, she was the Puerto Rico and Spanish Caribbean reporter for the Heralds through Report for America.

## Join the Conversation

Anyone can read the comments, but you must be a subscriber or logged in with a registered account to contribute. If you do not have a registered account, you can sign up for one below (it's free).

Conversations are opinions of our readers and are subject to the Community Guidelines.

## All Comments

# EXHIBIT 7

IMMIGRATION

# Despite refugee status in the U.S., young Venezuelan was deported to Salvadoran prison

By **Verónica Egui Brito**

Updated March 21, 2025 5:34 PM

☰🔍        𝕸𝖎𝖆𝖒𝖎 𝕳𝖊𝖗𝖆𝖑𝖉        Log In  |  **Subscribe**



**166**

A screengrab from a video obtained from the El Salvador Presidential Press Office shows alleged members of the Venezuelan gang Tren de Aragua, deported by the U.S. government, detained at the Terrorism Confinement Center in Tecoluca, El Salvador, on March 16, 2025. *El Salvador Presidential Press Office*

E.M. and his girlfriend fled persecution in their native Venezuela in 2021 and dreamed of making a new life in the United States.

The young couple spend two years in Colombia before applying for refugee status in 2023 to come to the U.S. Struggling to survive in Colombia, they worked tirelessly in informal jobs, selling food on the streets and making deliveries to make ends meet.

On Jan. 8, after they were finally granted the coveted refugee status, E.M., 29, and his girlfriend, Daniela Palma, 30, finally arrived in the United States, flying into Houston.

Upon arrival, an immigration officer asked the young man the question that changed his life in moments.

"Do you have any tattoos?"

He had already been asked that by U.S. authorities in Colombia as part of an extensive background check, and he now gave the same answer. He lifted his shirt and pants and showed the immigration officer tattoos on his chest, legs and arms — a crown, a soccer ball and a palm tree.

At that point, it no longer mattered that he had no criminal record, and that he had been granted refugee status, with the full legal right to enter the United States. Immigration officials decided the tattoos were evidence enough to suspect he might be a member of Tren de Aragua, a prison-born Venezuelan gang whose members have earned a reputation in Latin America as fearless and ruthless.

**167**

E.M., whom the Miami Herald is not identifying by his full name for his safety in case he is forced to return to Venezuela, was detained. His girlfriend, threatened with detention for months herself, agreed to be deported back to Colombia.

E.M. spent the next couple of months in three different immigration detention centers in Texas, his girlfriend said.

On March 15, the Trump administration deported him, along with over 200 other Venezuelans, to El Salvador, where they were promptly imprisoned in a maximum-security facility with a troubling history of violating human rights and where men sleep hundreds to a cell on steel beds with no mattresses or pillows.



A screengrab from a video obtained from the El Salvador Presidential Press Office shows alleged members of the Venezuelan criminal organization Tren de Aragua, deported by the U.S. government, detained at the Terrorism Confinement Center in Tecoluca, El Salvador, on March 16, 2025. *El Salvador Presidential Press Office*

His girlfriend and his family suspected he had been sent to the fearsome prison, the *Centro de Confinamiento del Terrorismo* — Terrorism Confinement Center, known by its Spanish initials, CECOT. On Thursday, CBS News got its hands on the entire list of all Venezuelans sent to El Salvador. E.M.'s name was on it.

**168**

E.M. is not the only Venezuelan granted refugee status in the U.S. who was deported to El Salvador, the Herald has learned; another man, who was detained longer than E.M., shared the same fate. However, his family has chosen to remain anonymous to avoid jeopardizing his safety.

## Rebuilding their lives

E.M. fled his country in 2021 with his girlfriend to escape persecution they endured from the government. They had been targeted by authorities and *colectivos* — Venezuelan armed paramilitary groups — in their hometown, his girlfriend said, for exposing government shortcomings and for their efforts to help their local community.

The couple fled to Colombia, which shares a large — and porous — land border with Venezuela.

For the next three years, E.M. and Palma worked to rebuild their lives. E.M. mainly worked in deliveries, navigating the busy streets of Bogota to earn enough to support themselves while awaiting the results of their refugee status application.

They applied for refugee status – a protection granted to individuals who are unable or unwilling to return to their home country due to past persecution or a well-founded fear of future persecution –to enter the United States. They kept out of trouble — neither had a criminal record in Colombia or Venezuela, according to the Colombian National Police and the Venezuelan Ministry of the Interior and Justice.

The next 17 months were filled with background and criminal checks and countless interviews — by the United Nations High Commissioner for Refugees, the International Organization for Migration, and finally U.S. Citizenship and Immigration Services.

During their interview with the U.S. agency in September, an officer asked E.M. and his girlfriend if they had any tattoos. E.M. said he did, his girlfriend said. The

officer didn't raise any alarms, and the tattoos didn't appear to be an issue. After the thorough background checks, the couple was granted refugee status, their future seemingly secured. The dream of starting fresh in the U.S. appeared within reach.

## The tattoo question

At George Bush Intercontinental Airport in Houston, they were screened — and that's when an immigration officer again asked E.M. if he had any tattoos. The immigration officials in Houston said E.M.'s tattoos were similar to those seen on members of Tren de Aragua. That moment marked the beginning of the couple's troubles and separated them from each other, Palma said.

"It's unfair to criminalize every Venezuelan. Having a tattoo or being born in Aragua doesn't make you a member of a criminal gang," Palma told the Herald. She described her boyfriend as a passionate about sports, especially soccer, a gentle man and an entrepreneur.

They had been together for five years, though they had known each other as kids growing up neighbors in a poor town in Aragua state, in central-west Venezuela.

Aragua state is where the infamous Tren de Aragua gang originated. The gang's roots trace back to the infamous Tocoron prison, where its leaders, many of whom were hardened criminals, began organizing and establishing their power.

E.M.'s tattoos were inked more than a decade ago when he was just a boy, E.M.'s uncle, Noel Guape, said.

**170**



Alleged members of the Venezuelan criminal organization Tren de Aragua, deported by the U.S. government, detained at the Terrorism Confinement Center in Tecoluca, El Salvador, on March 16, 2025. *El Salvador Presidential Press Office*

Law enforcement authorities in Texas have linked tattoos to the Tren de Aragua gang, using them as a way to identify suspected members. However, experts have said that, unlike many other criminal gangs, TdA members don't have specific, identifiable tattoos.

E.M.'s family is now left in anguish, wondering if he's safe.

"He is the kind of person who illuminated a room just when he walked in," his uncle told the Herald. "He is the life of the party, always bringing laughter and warmth wherever he goes."

Catholic Charities of Dallas had been expecting to help E.M. and his girlfriend transition into life in the U.S. when they learned he had been detained and Palma had been deported.

"The refugee services that our organization provides do not have the power to influence arrival decisions or deportation processes," said Nadia Ahmad Daniali, the case manager in charge of reception and placement of the Venezuelan refugee couple.

**171**

During his last call from E.M. a week ago, he told his uncle he knew he was going to be deported. He didn't specify the destination, but the family assumed it would be Venezuela. But as the days passed without word from E.M., and his alien registration number disappeared from the online immigration system, his family panicked. They worried he had been sent to El Salvador, where he had no connections and where his life might be in danger.

Since last Friday E.M.'s family desperately had tried to contact the ICE detention centers where he had been last held in Texas, but no one had been willing to provide any information about his whereabouts. It wasn't until Thursday afternoon they found out he was on the list of the hundreds of Venezuelans sent to El Salvador.

## 'He is not a criminal'

Several Venezuelans families have told the Herald their family members were deported to El Salvador despite not having any criminal record in the U.S or elsewhere.

Jerce Reyes Barrios, a professional soccer player from Venezuela, took part in peaceful demonstrations against the Nicolas Maduro regime in 2024. He was detained, tortured with electric shock shock and suffocation. When he was released he fled to the U.S. seeking protection.

Reyes' story was detailed in a court document filed by his attorney, Linette Tobin, in a federal court case in Washington, D.C., where the ACLU is challenging the deportations of the Venezuelans to El Salvador.

Reyes registered with CBP One, a mobile application developed by U.S. Customs and Border Protection that allowed migrants to schedule appointments at ports of entry along the U.S.-Mexico border.

Reyes used the app to secure an appointment and, on the day of his scheduled entry, he presented himself to CBP officials, but his tattoos raised alarms. He was detained and sent to the Otay Mesa Detention Center near San Diego. Despite

having no criminal record in Venezuela, no links to gangs and no history of violence, Reyes was treated as a criminal, his lawyer said.

After applying for asylum in December 2024, he was deported to El Salvador last week without any notice to his lawyer or family, his attorney said. His loved ones were left in the dark, wondering what had become of him.

Reyes and E.M. were deported with another 236 Venezuelans the same day the Trump administration invoked the Alien Enemies Act, an 18th Century law that had been used only three times in history — all during times of war or invasion. Under the law, Trump asserted the power to arrest, relocate or deport any Venezuelan over 14 from what the U.S. considers an "an invasion."

The law strips individuals accused of gang membership, like Reyes and E.M., of their right to challenge the accusation. The government maintains it can deport them without due process.

"My boyfriend is not defined by a tattoo or his birthplace. We want justice for him," Palma said. "We are going to prove he is not a criminal."

This story was originally published March 21, 2025 at 5:00 PM.

## Related Stories from Miami Herald

**IMMIGRATION**

**Administration: 'Many' Venezuelans sent to El Salvador prison had no U.S. criminal record**

March 18, 2025 7:52 PM

**IMMIGRATION**

**Trump sent these Venezuelans to El Salvador mega prison. Their families deny gang ties.**

March 18, 2025 5:30 AM

---



**Verónica Egui Brito**

el Nuevo Herald

🐦 ✉ 📞 305-376-2664

Verónica Egui Brito ha profundizado en temas sociales apremiantes y de derechos humanos. Cubre noticias dentro de la vibrante ciudad de Hialeah y sus alrededores para el Nuevo Herald y el Miami Herald. Nacida y criada en Caracas, Venezuela. Se unió al Herald en 2022. Verónica Egui Brito has delved into pressing social,

**173**

# EXHIBIT 8



WORLD & NATION

# They were called gang members and deported. Families say their only crime was having tattoos



Venezuelan Vice President Delcy Rodriguez, center, attends a rally Tuesday in Caracas to protest the imprisonment of Venezuelans in a Salvadorean jail. Hundreds of people marched through the capital to demand the release and repatriation of 238 Venezuelans sent by President Trump to a prison in El Salvador, accused of links to the El Tren de Aragua criminal gang. (Juan Barreto / Getty Images)

**By Patrick J. McDonnell, Kate Linthicum, Mery Mogollon and Nelson Rauda**

March 23, 2025 3 AM PT

- Relatives of a Venezuelan deported to El Salvador say his tattoo isn't a sign of gang membership. It supports his favorite soccer team.
- "The United States now has a tropical gulag," says one expert of the Trump administration's agreement with El Salvador to imprison deportees.

SAN SALVADOR — One is a former professional soccer player who, according to his lawyer, fled Venezuela after being tortured by the country's authoritarian government.

The other, also from Venezuela, is a onetime shoe salesman and social media influencer who documented his journey from South America on TikTok.

Both were apparently among thousands of political asylum aspirants who entered the United States from Mexico legally via an immigration process scrapped by the Trump administration.

Both were detained, one in California, and deported. Now they are imprisoned in El Salvador, according to their families, who have been left in the dark about their fates in a penal system widely condemned for human rights abuses.

"This has been a torture for us, an injustice," said Antonia Cristina Barrios de Reyes, mother of Jerce Egbunik Reyes Barrios, 36, the former professional goalkeeper. "My son is not a criminal."



Jerce Egbunik Reyes Barrios, a former professional soccer player from Venezuela, was among the alleged gang members deported from the United States to El Salvador. "My son is not a criminal," his mother said. (Family of Jerce Reyes)

The social media influencer is Nolberto Rafael Aguilar Rodríguez, 32. He initially fled to Colombia, Venezuela's western neighbor, out of desperation, said his sister, Jennifer Aguilar.

"We're *campesinos*, we come from the fields," she said. "We left Venezuela because we were starving."



WORLD & NATION

**Stranded in Mexico City, these migrants hoping to reach the United States have no good options**

Jan. 26, 2025

Reyes Barrios and Aguilar were among 261 people — the vast majority Venezuelans — expelled to El Salvador last week after the Trump administration alleged that most were affiliated with the Venezuela-based Tren de Aragua gang, which President Trump has declared a terrorist group.

The evidence of gang membership cited by the government is typically flimsy to nonexistent, defense lawyers allege, and largely based on tattoos and social media postings.

Experts say the administration's outsourcing of detained migrants to a nation with an infamously repressive prison system has no precedent.

In El Salvador, "the United States now has a tropical gulag," said Regina Bateson, a political scientist at the University of Colorado Boulder. "The notion that the U.S. government is paying millions of dollars to another government to violate these people's rights is horrifying."

**178**



### This French film about Mexico has 13 Oscar nominations. Why 'Emilia Pérez' is tanking in Mexico

Feb. 1, 2025

The El Salvador operation is part of a deal between the Trump administration and [Salvadoran President Nayib Bukele](#). Advocates have filed a federal lawsuit challenging Trump's use of the Alien Enemies Act — a statute from 1798 previously only invoked during wartime — to expel most of the alleged Venezuelan gang members.

ADVERTISEMENT

On Friday, a federal judge in Washington, D.C., vowed to "get to the bottom" of whether the Trump administration [defied his order](#) to hold off on the deportations while lawsuits challenging the expulsions played out in court.

Many relatives of the deportees deny their kin have gang ties or a criminal record, saying they were simply searching for better lives or escaping persecution in their turbulent homeland, part of the exodus that has seen millions flee Venezuela.

"We have no idea what's going to happen to Jerce," said Jair Barrios, uncle of the soccer player. "We understand and respect the laws of each country; but at the same time, we ask that, please, let justice be done and truly innocent people be released."

Reyes Barrios was detained at the Otay Mesa border post in California in September, according to a statement from his attorney, Linette Tobin, when he appeared for his appointment under the Biden administration program known as CBP One, which facilitated U.S. entry for prospective asylum applicants and others.

According to Tobin, he was mistakenly accused of Tren de Aragua affiliation based on an arm tattoo and a social media post in which he made a hand gesture that U.S. authorities called a gang sign.

The tattoo — a crown atop a soccer ball, with a rosary and the word "Díos" — is actually an homage to his favorite team, Real Madrid, Tobin wrote. The hand gesture is a popular sign language rendering of "I Love You," the lawyer added.

Reyes Barrios participated in antigovernment demonstrations in Venezuela in February and March 2024, Tobin wrote, and was subsequently arrested and tortured, enduring electric shocks and suffocation. After his release, he fled for the United States and registered for CBP One while in Mexico.

Tobin portrayed Reyes Barrios as a law-abiding person who had never been charged with a crime and wrote that he had "a steady employment record as a soccer player, as well as a soccer coach for children and youth."

Once in custody in California, Tobin wrote, Reyes Barrios applied for political asylum and other relief. A hearing had been set for April 17 at immigration court in Otay Mesa.

Reyes Barrios was deported to El Salvador on March 15.

Tricia McLaughlin, assistant secretary for the Department of Homeland Security, defended the government action.

**180**

Reyes Barrios was "not only in the United States illegally," McLaughlin wrote on X, "but he has tattoos that are consistent with those indicating TdA [Tren de Aragua] membership. His own social media indicates he is a member of the vicious TdA gang."

She added that "DHS intelligence assessments go beyond a single tattoo and we are confident in our findings."

Reyes Barrios is a "respected person" in Venezuela, said his wife, Mariyen Araujo Sandoval, who has remained in Mexico with two of the couple's four children.

"It's unjust to criminalize someone because of a tattoo," said Araujo, 32. She said she recognized her husband in the online videos of Venezuelans expelled to El Salvador.

Now dashed, she said, is her family's dream of a reunion in the United States. She now hopes for a reunion in Venezuela — if her husband can ever get out of El Salvador.

"I'm too scared to even try to go to the United States," said Araujo, who noted that she also has a tattoo, of a rose. "I'd be afraid that they would separate me from my daughters and put me in jail."

The Venezuelans dispatched to El Salvador have no legal recourse for appeal or release, attorneys say, and may face indefinite detention.

"There is, of course, no law, rule or judicial standard in El Salvador to outsource the prisons," said José Marinero, a Salvadoran lawyer. "These people have ... no conviction, no debt to the Salvadoran justice system."

Their predicament, activists say, highlights the erosion of democracy across the region, as well as the dramatic crackdown on migration pushed by Washington.

**181**

"There's no real safe haven left," said Michael Ahn Paarlberg, a political scientist who studies Latin America at Virginia Commonwealth University.



An image provided by El Salvador's presidential press office shows prison guards overseeing deportees at a facility in Tecoluca on March 16. (Associated Press)

The Trump administration has acknowledged that many of those deported under the Alien Enemies Act have no criminal records in the United States. But the government says they may still pose a threat.

"We sent over 250 alien enemy members of Tren de Aragua, which El Salvador has agreed to hold in their very good jails at a fair price that will also save our taxpayer dollars," Secretary of State Marco Rubio, who brokered the deal with Bukele, declared on X.

Critics say that Trump, like Bukele, invokes crime as an excuse for suspending civil liberties.

"They're using these particularly vulnerable people as test cases," said Paarlberg, who added that the message appears to be: "If we can deport people who don't have criminal records, people who are fleeing a regime that pretty much everyone and the U.S. government agrees is authoritarian, then we can deport anyone."

Bukele, a former advertising executive who labels himself "the world's coolest dictator," dispatched video crews to record the arrival of the Venezuelans, who were led off deportation planes in shackles and had their hair shorn.

"This is a performative act of cruelty ... to scare people into not coming, to scare people who are here without papers, to scare people away from protesting," Paarlberg said.

News of the deportations has sent relatives of the expelled Venezuelans poring over videos and social media posts in an effort to determine if their loved ones were among those flown to El Salvador.



A photo provided by El Salvador's presidential press office shows prison guards transfering deportees from the U.S. to the Terrorism Confinement Center in Tecoluca on March 16.  (Associated Press)

The names of the deported Venezuelans appeared on a list leaked to the media. Included was Aguilar, who garnered more than 40,000 followers as he documented his northbound trek from South America on TikTok. His feed included images from the treacherous Darien Gap, the dense jungle separating Colombia and Panama.

Jennifer Aguilar described her brother as a hard-working family man who fled Venezuela for Colombia in 2013. He has three children: an 11-year-old girl in Venezuela and a 4-year-old girl and boy, 2, in Colombia. Aguilar's sister says he got his tattoo, of playing cards and dice, to cover up a scar on his forearm from an accident he had at age 16.



Nolberto Rafael Aguilar Rodríguez, 32, is one of hundreds of Venezuelan migrants detained in the U.S. and sent to El Salvador.   (Jennifer Aguilar)

According to his sister, Aguilar made his way to Mexico and secured an appointment for U.S. entry via CBP One. On June 24, he posted a video of himself boarding a plane, apparently en route to the U.S.-Mexican border.

"Have faith in God," he wrote in a caption. "Never put your head down. And trust yourself."

Jennifer Aguilar said he got a job in a travel agency in the California border city of Calexico. For reasons that remain unclear, he was detained by U.S. immigration authorities late last year.

From Colombia, where she lives with her three daughters, Jennifer Aguilar has written about her brother's plight on social media and sent messages to Venezuelan President Nicolás Maduro and to Bukele, the Salvadoran leader.

Aguilar "has never been to prison in Venezuela or in Colombia," she wrote to Bukele. "Believe me, if he was guilty I'd say: 'Leave him there.' Because we were taught to be honest and do good."



187



Nolberto Rafael Aguilar Rodríguez chronicled his journey from South America to the United States on social media. He was deported and is now being held in El Salvador.  (Jennifer Aguilar)

"I've tried by all means … to be Rafael's voice," said the sister, adding that she doesn't know anyone in El Salvador. "If I could be there, I would. I'm deeply sorry that I can't."

El Salvador has rounded up and imprisoned some 85,000 people — the equivalent of 1.5% of the nation's population — since March 2022, when Bukele declared a state of emergency that effectively suspended constitutional due process rights. The Venezuelans were dispatched to the infamous Center for Terrorism Confinement, the centerpiece of Bukele's mass incarceration agenda.

*Times staff writers McDonnell and Linthicum reported from Mexico City while special correspondents Mery Mogollón and Nelson Rauda contributed, respectively, from Caracas, Venezuela, and San Salvador. Special correspondent Cecilia Sánchez Vidal contributed from Mexico City.*

## More to Read

### The Tren de Aragua gang started in a Venezuelan prison. It's now deep in U.S. politics

March 18, 2025



# EXHIBIT 9



SUBSCRIBE 

# International

MEXICO · CHINA · LATEST NEWS



VENEZUELA >

# Arturo and Frizgeralth, convicted for being Venezuelans: Trump takes another step in his racist drift

Families recognize their loved ones in videos from the Salvadoran prison where the US deported nearly 300 people with alleged ties to the Tren de Aragua gang. Some have clean criminal records. No one knows if they'll be able to return home

**190**



SuarezVzla is the stage name of the reggaeton artist Arturo Suárez-Trejo from Venezuela.
**CORTESÍA**

**CARLA GLORIA COLOMÉ** | **FLORANTONIA SINGER**

New York / Caracas - MAR 24, 2025 - 10:26CET

Dart Martins, a Peruvian reggaeton artist in a hurry to record his song TXTEO, can't believe he has to delay it because SuarezVzla isn't there. They've been making music together for a long time. Last time they were on a stage was at the Urban Fresh Festival in Santiago, Chile, in front of a young, loud audience. A video captures the memory of that April night: Dart Martins at the front of the stage, singing; SuarezVzla in the back, the audience in front, doing *perreo*. Earlier this year, when SuarezVzla had already left Chile to settle in the United States, they exchanged a few messages. Donald Trump had not yet returned to the White House.

**191**

"How's it going in the United States?" Martins, 30, asked in one of his messages. "I heard Trump is deporting all the illegal immigrants."

SuarezVzla — the stage name of Arturo Suárez-Trejo, 33 — told him it was true, that they were going to deport many illegal migrants, but that everything was fine with him. He had left his native Venezuela in 2018 and had settled in Chile. There he made music, friends and fans. On September 2, 2024, around 1 p.m., he entered the United States after presenting himself at the San Ysidro border crossing in California. He had benefited from the CBP One program, the application created by the Joe Biden administration and dismantled by the Republican administration on its first day in office, which has allowed legal entry into the country to some 900,000 immigrants.

SuarezVzla left Venezuela in 2018 and settled in Chile. On September 2, 2024, he entered the United States after presenting himself at the San Ysidro border crossing in California.
**CORTESÍA**

192

Suárez wanted to improve his musical technique and return to Chile with his wife. He had the protection of a parole program and a hearing scheduled for April 2 of this year. He won't be able to go: he now finds himself in El Salvador. He met the same fate as the 238 Venezuelans who were taken there last week in a dystopian story: expelled from the United States under a two-century-old law in violation of a court order and taken to a maximum-security prison for terrorists built by Salvadoran President Nayib Bukele.

On February 8, Suárez was recording a video clip at a home in Raleigh, North Carolina, where he lived. Immigration and Customs Enforcement (ICE) agents arrived and arrested the entire group of people. They first held him at the Stewart Detention Center in Georgia. They then transferred him to the Valle Detention Center in Texas. At one point, he told his family he was being deported to Venezuela.

"We thought this was going to happen, they were going to deport him to Caracas," says his brother, Nelson Suárez-Trejo, 35, who describes Suárez as a noble man, a lover of music and poetry, who has never thrown a punch beyond his kickboxing practices.

Days after Suárez's last call, the nightmare began. The images of the inmates, shaved, handcuffed, and sent on three flights to El Salvador as alleged members of the Venezuelan criminal gang Tren de Aragua, were shocking. They zoomed in on one and there was no doubt: it was Suárez.

"We knew it because of the tattoos he has and his physical features," his brother says.

No one has provided any information or warning to the family. Confirmation didn't come until Thursday, when CBS News published an internal U.S. government list of the names of the 238 Venezuelans who were sent to the Central American country, despite a judge's order preventing the deportation. The name Arturo Suárez-Trejo appears on the list. To this day, the family remains unaware of what will happen to him.

"We haven't received any response from the Salvadoran government. We don't even know what charges he faces. He had no criminal record," his brother says.

Suárez's family, friends, and fans have been circulating documents on social media confirming that he has no criminal record in any of the countries where he has lived. Dozens of people have shared his photos, his videos perched on a stage, and his love songs. They have united to demand justice for someone they describe as "a fundamental pillar of Santiago's emerging cultural scene." Suárez "is an artist, not a criminal," they assert.

"He doesn't deserve to have his life ended, to have his name tarnished," his brother insists. "I don't understand how they can cut short the dreams of someone who came to this country to dream big and who didn't enter illegally. We're affected; we're not Tren de Aragua, we're not even from Aragua."

Nelson would also like to know "how he is, how they are treating him" in prison. It's the same question being asked by Nathali, Sánchez's wife, who has been struggling with so much concern for almost a week. "In the Texas prison, he was coughing blood and had a fever. I'm afraid it could get worse," says the 27-year-old, who cares for their daughter, a baby born just three months ago. "I won't rest until I see him free, until I see him with his daughter."

Following a wave of condemnation over the deportation of dozens of men considered criminals to El Salvador, U.S. authorities have acknowledged that not all of them are members of the aforementioned gang and that some do not even have a criminal record in the United States. Several officials told CBS News that 137 of the Venezuelan men sent to the Salvadoran mega-prison were treated as "enemy aliens," but that 101 were deported "under ordinary immigration procedures." Organizations such as the United Nations have focused on the way these migrants are being treated. Its Secretary-General, António Guterres, called for respect for "due process, their fundamental rights, and their most basic dignity."

Now, Suárez's brother, Nelson, is the one who will have to take care of the baby and his wife, who remain in Chile. "She doesn't have the means to work three months after giving birth. She's alone, and now I, as his brother, have to take care of them." But the thing is, Nelson is also afraid to go out on the streets. He's an Amazon delivery driver; he has to work. His papers are in order, but nothing guarantees that the same thing that happened to Suárez won't happen to him. "I'm also terrified of being stopped. I have my TPS, my court date, and my

**194**

license, all in order, but who knows. I walk the streets in fear because I also have tattoos, but I don't belong to any gang; all I've done my whole life is work."



Guards look after deportees from the United States at the Anti-Terrorist Detention Center in Tecoluca, El Salvador, on March 16, 2025.
**AP**

## The party that wasn't in Venezuela

At the Cornejo Pulgar home, high in the Antímano neighborhood in western Caracas, blue and yellow balloons were placed a week ago. This was how they were planning to welcome Frizgeralth De Jesús, 25, the youngest of the children who would be returning to the country, the only one who still has a huge baby portrait hanging in the living room. The deportation was the best news for his family, after the young man had spent eight months in a detention center in Texas. At home, they were happy, his older brother Carlos says from Caracas.

They were planning to go greet him at the airport that Saturday, after he told them he was happy and about to board the plane home.

Last year, Frizgeralth had made a long journey through the Darien Gap. He waited for his appointment to apply for temporary residence through the now-defunct CBP One application, a benefit that Venezuelans had until last year. His deadline was June 19, 2024. Meanwhile, he was making plans to open a store in the United States to sell the streetwear brand he started in Venezuela. "He was going to look for something better," says Carlos. That something ended up being a prison as soon as he crossed into the United States. He was with three friends, another one of his brothers, and his brother's girlfriend. They were headed to Tennessee, where another of his sisters has lived for seven years. Venezuelans have been migrating en masse for a decade now. Now, almost all of them have a place to call home.

Frizgeralth was the only one of his group who wasn't allowed to enter. The tattoos on his neck, chest, abdomen, arms, and legs became the unwritten reason that led to his being declared a suspect when he tried to enter the country in June 2024. He had been in custody ever since. Now he's also gone missing. His family hasn't seen him in the videos Salvadoran President Nayib Bukele released celebrating the agreement with the United States to provide jailer services. But they deduced he's in that group. Now, his name on the published list confirms it.

During his eight months in prison, Frizgeralth spoke mostly with his sister, who lives a 12-hour drive from where he was detained. In a message she still has, the young man told her: "I never imagined being in prison just for getting tattoos." Tattoos are part of the style he identifies with, that urban, very hip-hop, very American fashion that led him to start his own clothing brand and for which he was ultimately arrested. "This is mental torture every day," he wrote in another message.

His sister has considered buying a ticket from Tennessee to El Salvador, not knowing if she'll be able to see him. Carlos also tried to find information at the march that Nicolás Maduro's government organized this week in solidarity with their families. The head of the National Assembly, Jorge Rodríguez, compared U.S. immigration policy to the Nazi persecution of Jews sent to concentration camps during World War II, and promised to do whatever was necessary to

**196**

bring them to Venezuela. But Carlos found no answers about his brother. "The truth is, I spent the entire march crying."

*Sign up for [our weekly newsletter](#) to get more English-language news coverage from EL PAÍS USA Edition*

---

Sign up to EL PAÍS US Edition bulletin

---

 

---

**MORE INFORMATION**


**A tattoo of Real Madrid: The Trump administration's 'proof' for deporting a Venezuelan to El Salvador**
MACARENA VIDAL LIY | WASHINGTON

---


**A tattoo, an ear, a neck: Venezuelan mothers recognize their sons in images of alleged gang members sent to El Salvador**
CARLA GLORIA COLOMÉ | NEW YORK

---

**ARCHIVED IN**

Venezuela · Donald Trump · El Salvador · Nayib Bukele · Tennessee · Chile ⌄

---

Adheres to                                           
More information ›

---

If you are interested in licensing this content, click **here**

# EXHIBIT 10

**Immigration**

# They were arrested during routine ICE check-ins. Then they disappeared.

Deportation proceedings are often shrouded in secrecy. But lawyers say the lack of information about the Venezuelan migrants deported under the Alien Enemies Act is nearly unprecedented.

Updated March 22, 2025

Nays Ñaupari Rosila shows a photo of herself and her husband, Henrry Albornoz Quintero, who was detained by ICE. (Desiree Rios/For The Washington Post)

By Arelis R. Hernández and María Luisa Paúl

SAN ANTONIO — Henrry Albornoz Quintero's family had been tracking his whereabouts through an online detainee locator ever since he was arrested and put in deportation proceedings after a routine check-in with immigration officials in late January.

But on Friday — less than a week before the expected birth of his son — the Venezuelan man disappeared from the database.

"Your search has returned zero (0) matching records," the government website states.

The families and lawyers of dozens of other Venezuelan and Salvadoran men who had been detained by U.S. Immigration and Customs Enforcement say their relatives and clients have similarly disappeared over the past week, with no explanation provided by the government over where they may be.

Deportation proceedings in the United States are often shrouded in secrecy. Arrest records are not public, and detainees can be transferred to far-flung jails anywhere in the United States. But family members, lawyers and the public can get information on an inmate's whereabouts through an online database, contact with an official or direct phone communication with a detainee.

**199**

Yet in the week since the Trump administration invoked the Alien Enemies Act to deport 137 Venezuelan migrants accused of being Tren de Aragua gang members to a mega-prison in El Salvador, detainees can no longer be found in the database. The Trump administration cast them as violent threats against Americans, though a top ICE official admitted in a court filing that "many" of those deported under the act do not have criminal records in the U.S. A lawyer advocating for those sent to El Salvador said in court Friday that his team would soon file documents that show some of the migrants deported there were rejected by the prison because they were women or from countries other than Venezuela or El Salvador.

Government prosecutors have offered little or no information about the migrants who were left there. Lawyers have gone to court dates for bond and asylum hearings, only to find that their clients are missing. Relatives have been left to scrutinize images released by the Salvadoran government showing men being frog-marched off a plane in shackles into the prison, to find out if they are there.

"This looks like the kinds of things we thought only happened in other countries, and it's happening to people who come from those places and came here to get away from it," said Michelle Brané, a former Biden appointee who is among a group of lawyers working to identify detainees who may have been sent to El Salvador. "You're not supposed to have people disappear in the United States."

The White House and the U.S. Department of Homeland Security have not released the names of the men sent to El Salvador and did not respond to questions regarding when family members or lawyers will be notified. Press secretary Karoline Leavitt said at a briefing Monday that the names were not being released "because of privacy concerns at this point in time — that doesn't mean we won't."

---

## Do you know someone who was sent to El Salvador?

The Washington Post is trying to learn more about those being detained in El Salvador. If you know — or think — that your loved one is one of those involved, we would like to hear from you. You can send us information at this link.

The Washington Post está intentando obtener más información sobre las personas detenidas en El Salvador. Si sabe o cree que su ser querido está entre las personas afectadas, nos gustaría saberlo. Puede enviarnos información a través de este enlace.

---

Lawyers of those likely to have been sent to El Salvador say the lack of information around these men is nearly unprecedented. They described a scrambled quest to find out where their clients are that has thus far yielded few answers. Some called ICE detention centers and were told that the detainees about whom they were inquiring were no longer there, but officials weren't able to say where they are now.

"It's like being completely stonewalled," said Lucia Curiel, who is representing a Salvadoran man who she said has no criminal convictions and disappeared from ICE's detainee database after the Alien Enemies Act was invoked.

Communicating with the migrants sent to El Salvador and offering them legal representation is likely to be extremely difficult. Inmates at the prison where they were sent are routinely denied access to lawyers or relatives.

**200**

The families of 19-year-old Anyelo Sarabia González and 24-year-old Francisco Javier García Casique shared similar stories. Their relatives had been in regular contact with them before they disappeared last weekend. Their family members believe they have spotted them in photos taken of prisoners at El Salvador's Terrorism Confinement Center, but they have no official information on where they are or why they were taken there.

For Albornoz Quintero's family, the search for information has been anguishing. His wife, Nays Ñaupari Rosila, is nine months pregnant. She said she has repeatedly called Salvadoran authorities but has not been able to get through to anyone. When she went to the Dallas ICE office looking for answers, she said she was told to leave or risk arrest.

"I'm so scared for my baby," Ñaupari Rosila, 22, said, sobbing. "Unfortunately, we came to a country where basically we don't have a right to anything."

# 'This isn't Venezuela'

The three men whose families spoke with The Washington Post are all young Venezuelans who settled in north Texas. All had been in the United States for about a year after illegally crossing the Rio Grande and surrendering to U.S. Border Patrol. They were released into the country while they pursued asylum claims and were required to attend regular check-ins with ICE.

Anyelo Sarabia González was "the baby of the house," said Solanyer Michell Sarabia González, 25, his older sister. The siblings, along with another sister, crossed into the U.S. in November 2023. They were told to check in with ICE once a year — and it was during one of those check-ins in January that an officer began asking questions.

Solanyer said an ICE official took interest in a tattoo on her brother's hand showing a rose with petals made of $100 bills. He'd only recently gotten the tattoo, she said. Their mother had forbade him from getting one in Venezuela. Because her brother was now helping her pay the bills, "I felt like I couldn't say no when he asked. God, I even helped him pick it. We thought it was just a cool design."

The official asked where Anyelo was from, said his sister, who also had an appointment that day and witnessed what transpired. When he said he was from La Victoria, in the Venezuelan state of Aragua, that "was the nail in the coffin," she said. He was taken to another room and told to strip naked. His sisters got on their knees and begged the official to deport them instead.

For more than a month, Solanyer and her brother stayed in contact regularly by phone. She tried reassuring him that everything would be fine. She reminded him that he had an asylum hearing coming up in May.

"Don't cry. This isn't Venezuela," she told him. "They have a justice system here."

Francisco Javier García Casique had also been detained while trying to comply with a routine ICE check-in during February of last year. His brother, Sebastián García Casique, said one of the officers looked at his arms — sprawled with tattoos of a compass, a crown, a single rose, and his mother's, grandmother's and sisters' names — and began asking questions.

"They saw that and they decided he was Tren de Aragua," Sebastián said. "They didn't care that he had never been arrested before — neither in Peru, Venezuela or the United States — and told him that they needed to investigate him more."

Sebastián said his brother was detained for several months last year. Though Sebastián said authorities could not link Francisco to any criminal activity, he was nonetheless ordered deported. But that didn't happen. A judge released him with an ankle monitor because, at the time, the U.S. did not have a deportation agreement with Venezuela and the court decided he didn't pose a security threat, his brother said.

"Francisco just kept telling us: 'I have nothing to fear because I'm not a criminal,'" his brother recalled. Then in February, officials showed up at Francisco's home and sent him to a detention center. "It was bittersweet for him, but he kept saying that his only wish was to be sent back to Venezuela."

Albornoz Quintero and his wife had just celebrated their first year in the U.S. when he went to the ICE check-in where he was detained. He is a mechanic by training and had managed to find repair jobs while waiting for a work permit. The couple initially made ends meet by sleeping in a car but eventually earned enough money to put a deposit down on an apartment in Dallas.

Both were elated when they learned she was pregnant, Ñaupari Rosila said.

She had no issues at the check-in, but an officer detained her husband without providing any explanation. The expectant mom — then seven months pregnant — got in touch with an attorney and began raising money for him to be released on bond. A hearing was scheduled for the same week that she was due.

But a few days before, Albornoz Quintero told his wife he was going to be deported back to Venezuela. The other men whose families spoke with The Post say their loved ones also said they were going to be sent home.

In Texas and Venezuela, relatives anxiously searched for information on their flights. They were disappointed, but the men were also eager to be out of jail and back with their families, even if it was in the place they'd risked everything to leave. Francisco's relatives cooked his favorite foods and prepared a homecoming celebration.

Then they disappeared.

# Pushing legal boundaries

On the same day the men last called their families, President Donald Trump had invoked a wartime provision designating members of the Tren de Aragua gang as alien enemies eligible for immediate deportation.

The next day, March 15, they were boarded onto planes as a court battle began brewing over whether the president had the right to deport the men under the act. Five men named as plaintiffs in the case were removed from the planes, but the others departed and were in the air when a federal judge ordered that they be turned around. The planes landed in El Salvador several hours later anyway.

Greg Chen, senior director of government relations for the American Immigration Lawyers Association, said there appears to have been an information breakdown between immigration officials in Washington and local ICE officials, who do not appear to have received adequate instruction about what is happening and what to do next.

"There's operational chaos," he said.

The situation echoes ICE's early days after its founding in 2003, when entering immigration detention was like "entering a black hole," said Ohio State University law professor César Cuauhtémoc García Hernández. "People would die in detention, and ICE wouldn't inform anyone."

But several immigration lawyers said the agency had become more transparent in recent years, after several embarrassing investigative reports and lawsuits. ICE regularly made detainees available for court, granted some legal access, facilitated phone calls and in 2020 created the locator system in response to pressure from advocacy groups. Anyone with a detainee's basic details could learn where that person was being held.

That wasn't the case, however, when the Trump administration began sending migrants to the Guantánamo Bay naval station in Cuba. When families of those migrants searched the ICE locator for information on their loved ones, they were told to call a Florida field office. The agency only updated the locator with a specific "NSGB" label after the advocates brought a lawsuit earlier this year, ACLU attorney Eunice Cho said.

If the system does not offer a location, the likely scenario is that the detainee is no longer in ICE custody. That person could be dead, or in the case of the alleged Venezuelan gang members, out of the country.

"We are in a situation where ICE is pushing the boundaries of what it is legally permitted to do," García Hernández said. "ICE is trying to act aggressively in making headway on President Trump's promise of overseeing a mass deportation campaign and making use of every legal tool available with little regard to norms or practices or the effect removal has on the people who care about that individual."

The Trump administration has wavered in justifying its decision to land two planes carrying Venezuelan migrants deported under the Alien Enemies Act. High-ranking Trump administration officials have argued the president's executive authority supersedes the judge's order, while in court his lawyers have argued that because the planes were over international waters, the ruling did not apply.

**203**

# 'Freedom and rights?'

Dallas attorney John Dutton logged on to Albornoz Quintero's bond hearing this week through the virtual Webex platform. His client did not. The lawyer asked a government prosecutor where the expectant father was.

The Trump administration attorney said he did not know, Dutton said.

"The judge suggested that I contact the Salvadoran Consulate," in the event that he was indeed in El Salvador, Dutton recalled. If that was the case, the judged noted, he wasn't sure if he had any jurisdiction over the case anymore.

"Can you imagine just being taken ahead of what is supposed to be one of the most exciting days of your life, the birth of a child, and being put in a foreign prison designed for terrorists?" Dutton said. "This kid is screwed."

With no information from lawyers, families are resorting to amateur sleuthing — zooming in on blurry photos, studying every image, and freezing frames of videos shared by the White House and Salvadoran government — to confirm whether their brother, father, son or spouse are among those spirited away to a foreign prison.

Sebastián García Casique found his brother in a photograph. The blurry image featured dozens of men in formation, with their heads shaved and wrists bound behind them. Sebastián zoomed in on every bald head. Then he saw them: the tattoos, the ears, the broad frame he had known his whole life.

Still, hoping to be wrong, Sebastián checked the ICE locator website. Until March 15, it showed his brother was still in Texas. By Sunday night, that had changed. Now it indicated that his search yielded no results.

"The worst part is that they don't even have the courtesy of calling the families," Sebastián said. "It's inhumane how they're literally disappearing people. What happened to being the country of freedom and rights?"

Solanyer Sarabia González was also bewildered when she spotted her little brother among the prisoners in El Salvador.

"I kept thinking to myself: 'How in the world will I ever recognize him now among all these bald guys?'" she said. Then she recognized him. "Those are the knees, shoulders, forehead I've known and loved forever."

For Albornoz Quintero's wife, finding him in a photograph was an official confirmation that he will not be at his child's birth. Ñaupari Rosila has tried to keep her mind focused on the baby, arranging and rearranging the baby's corner of their one-bedroom apartment. Most of the walls in their unit are bare, except for where the baby's crib is, which she has decorated with a dinosaur sticker.

The closet is full of baby clothes that her husband had excitedly picked out.

"I just want to know where my husband is," she said. "How can they just do this?"

*Graphics by Álvaro Valiño. Silvia Foster-Frau contributed to this report.*

**What readers are saying**

The comments express strong opposition to the use of the Alien Enemies Act for deporting individuals without criminal records, drawing parallels to authoritarian regimes and historical instances of "disappearing" people. Many commenters fear this sets a dangerous precedent for... <u>Show more</u>

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT 11

**IMMIGRATION**

## U.S. sent Venezuelan man with pending political asylum case to El Salvador mega prison

By **Syra Ortiz Blanes** and **Verónica Egui Brito**
Updated March 27, 2025 10:00 AM | 💬 11



Frengel Reyes Mota and his 9-year-old stepson, whose face has been blurred to protect his identity.



▶ Only have a minute? Listen instead
Powered by **Trinity Audio**
00:00                                    08:32

Frengel Reyes Mota was supposed to be dealing with his ongoing asylum case as he fought for his chance to stay in the United States. Suddenly, he instead found himself locked up in a mega prison thousands of miles away.

"He's in the torture prison in El Salvador," Mark Prada, Reyes Mota's lawyer, told Immigration Judge Jorge Pereira

during a hearing on Monday at the Krome Detention Center in western Miami-Dade

County. The hearing had been scheduled before Reyes Mota was sent out of the country.

TOP VIDEOS



AD

Reyes Mota is among the hundreds of Venezuelans that the Trump administration deported earlier this month through the use of extraordinary wartime powers based on a 1798 law. The administration sent them to the Terrorism Confinement Center in El Salvador, claiming they are members of the notorious Venezuelan gang Tren de Aragua.

But the 24-year-old father does not have a criminal record in Venezuela. His U.S. immigration detention records are riddled with mistakes, raising questions about how reliable they are. He does not have tattoos and his family members deny he has any gang ties.

"He's not a gang member, judge," Prada said.

Had Reyes Mota still been in the United States, the hearing related to his asylum request would have been a commonplace matter. But his absence showcases the remarkable nature of the Venezuelans' deportation to El Salvador. As lawyers argue the deportation flights were unlawful and violated a federal judge's order, the immigration court system is navigating the case of an asylum seeker with pending immigration proceedings whom the Trump administration flew to another country without due process.

"We are facing a novel and extremely concerning situation where people's immigration court proceedings are still pending but they are being disappeared from the United States without any lawful removal order," said Prada. "This is an affront to the rule of law."

Other lawyers have said in court documents challenging the deportations that their clients were also in pending asylum or other immigration proceedings.

### 'Doesn't deserve this injustice'

Reyes Mota and his wife decided to come to the United States because they saw no future for their child in Venezuela. In 2023, they became part of the seven million Venezuelans who have fled economic turbulence, political repression and widespread poverty in their native country.

Liyanara Sánchez, Reyes Mota's wife, described him as a reserved man, a loving husband, a dedicated father and pet lover. In the United States he painted houses for a living. He carefully budgeted to buy treats and clothes to spoil his adopted dog, Sacha.

"He's the most beautiful person. If you need something, he'll be there for you," said Sánchez. "He's a hard worker. He's never left us without food or housing."

At a young age, he chose to build a life with Sánchez, who was already a mother. To the boy, Reyes Mota was more than a stepfather — he was a true father, someone

who stepped into the role with love and commitment, embracing the boy as his own, his family said.

"I need help for my father," his 9-year-old son, who has learned English in the United States, told the Herald over audio messages. "My father is very nice with me.... My father is not bad people. My father is very, very good people."



Frengel Reyes Mota, a 24-year-old Venezuelan asylum seeker, enjoyed playing with his dog, Sacha. He was deported to El Salvador's mega prison despite having no criminal record in Venezuela or the U.S. *Frengel Reyes Mota family*

On Feb. 4, Reyes Mota, who was living in Tampa, went to the Immigration and Customs Enforcement office in the city for a required check-in. There, agents informed him that he was being placed in custody under suspicion of being associated with the Tren de Aragua gang, according to his family.

From detention, Reyes Mota asked his loved ones about whether Sacha was eating enough and how his son was doing in school. But they lost contact with him on the day before the deportation flights to El Salvador, on March 15. A week later, his name popped up on a list of Venezuelans who were being held at the Central American mega prison.

"He doesn't deserve this injustice," said a family member who requested to remain anonymous out of fear for their safety.

## Back in the courtroom

At attorney Prada's request the judge froze Reyes Mota's asylum case for the time being. That way, he could eventually take it up again. That is, if he is ever able to return to the United States.

"We can agree that there was no removal order from this court or another court," the judge said, noting that there was very little he could do.

The U.S. government claims on Reyes Mota's I-213 form, a document the Department of Homeland Security uses to support that someone is deportable, that he "may be a Tren de Aragua associate." But in those same documents, the government says he has no criminal records or immigration history in the United States. The government also uses someone else's last name in several parts of the document, identifies him with female pronouns, and uses two different unique identification numbers that immigration authorities use to keep track of individuals, raising questions about the reliability of Trump officials' accusations against him.

After Prada pointed out the mistakes and argued there is no evidence Reyes Mota was a Tren de Aragua member, the judge asked whether the government had made a mistake. Lawyers for the Department of Homeland Security said this was not a hearing to analyze evidence but that they would look into it. However, there are no more hearings for the foreseeable future.

Reyes Mota's family also provided to the Miami Herald government documents showing that Reyes Mota did not have any criminal record in Venezuela, and photos that show he does not have any tattoos. Immigration authorities have used the presence of tattoos to hold migrants on suspicions of being gang members.

On Wednesday afternoon, Homeland Security Kristi Noem was on her way to visit the Terrorism Confinement Center in El Salvador.She and other officials have touted the deportations as a feat of President Donald Trump's agenda to keep Americans safe from violent criminals. Before her arrival she said on her X account she was going to see firsthand "where the worst-of-the-worst criminals are housed."

But the Trump administration has admitted in federal court documents that "many" Venezuelans it accused of being dangerous gang members and deported through presidential wartime powers have no criminal records in the United States, although they argued it was only because they had only been in the U.S. briefly. On Wednesday, a federal appeals court in Washington upheld the block a lower court had imposed on the use of the war time powers to deport immigrants.

212



Frengel Reyes Mota, a 24-year-old father and asylum seeker, was deported to El Salvador's mega prison despite having no criminal record, according to Department of Homeland Security records. In his free time, Reyes Mota enjoyed playing with his dog, Sacha. *Frengel Reyes Mota family*

Several family members of Venezuelan men sent to El Salvador have also told the Herald their loved ones at the Terrorism Confinement Center are not part of Tren de

Aragua. The Trump administration has also sent Venezuelans who had been granted refugee status to El Salvador. To receive refugee status, people must undergo extensive background checks.

READ MORE: Despite refugee status in the U.S., young Venezuelan was deported to Salvadoran prison

Venezuelan nonprofit organizations have raised alarms about the "arbitrary detentions of Venezuelan migrants" in the United States, emphasizing that they had left their country fleeing a difficult situation where their lives could be in danger if they are returned.

"The mass and indiscriminate deportation of Venezuelans, without properly assessing their individual circumstances" makes them vulnerable, Foro por la Vida, a coalition of human-rights groups in Venezuela, said in a statement.

Reyes Mota, a young man from a poverty-stricken city in a region rich in oil, wanted stability and peace for his family, his loved ones said. When he came to the United States, he was not expecting he would end up held indefinitely in a Central American prison that has been accused of human rights violations, or that the U.S. government would accuse him of belonging to a gang designated as a terrorist organization.

His loved ones insist that he is a man of integrity with no criminal record.

"Please, Trump, there are many innocent people in that jail," his wife said, "and they are paying the price."

This story was originally published March 26, 2025 at 6:56 PM.

## 📰 Afternoon Newsletter

Latest news, plus the afternoon business & national news.

[                                              ]  **SIGN UP**

By submitting, I agree to the Privacy Policy and Terms of Service.

**SB**     **Syra Ortiz Blanes**
           el Nuevo Herald
           🐦 ✉

<span style="color:red">**214**</span>

# EXHIBIT 12

**IMMIGRATION**

# "You're Here Because of Your Tattoos"

*The Trump administration sent Venezuelans to El Salvador's most infamous prison. Their families are looking for answers.*

**NOAH LANARD AND ISABELA DIAS**   **MARCH 26, 2025**



**Mother Jones illustration; Mark Boster/Los Angeles Times/Getty; Photos courtesy Génesis Lozada, Joseph Giardina, Arturo Suárez, and María Alvarado**



Mother Jones illustration; Mark Boster/Los Angeles Times/Getty; Photos courtesy Génesis Lozada, Joseph Giardina, Arturo Suárez, and María Alvarado

*Fight disinformation: Sign up for the free* Mother Jones Daily *newsletter and follow the news that matters.*

**On Friday,** March 14, Arturo Suárez Trejo called his wife, Nathali Sánchez, from an immigration detention center in Texas. Suárez, a 33-year-old native of Caracas, Venezuela, explained that his deportation flight had been delayed. He told his wife he would be home soon. Suárez did not want to go back to Venezuela. Still, there was at least a silver lining: In December, Sánchez had given birth to their daughter, Nahiara. Suárez would finally have a chance to meet the three-month-old baby girl he had only ever seen on screens.

But, Sánchez told *Mother Jones*, she has not heard from Suárez since. Instead, last weekend, she found herself zooming in on a photo the government of El Salvador published of Venezuelan men the Trump administration had sent to President Nayib Bukele's infamous Terrorism Confinement Center, or CECOT. "I realized that one of them was my husband," she said. "I recognized him by the tattoo [on his neck], by his ear, and by his chin. Even though I couldn't see his face, I knew it was him." The photo Sánchez examined—and a highly produced propaganda video promoted by Secretary of State Marco Rubio and the White House—showed Venezuelans shackled in prison uniforms as they were pushed around by guards and had their heads shaved.

The tattoo on Suárez's neck is of a *colibrí*, a hummingbird. His wife said it is meant to symbolize "harmony and good energy." She said his other tattoos, like a palm tree on his hand—an homage to Suárez's late mother's use of a Venezuelan expression about God being greater than a coconut tree—were similarly innocuous. Nevertheless, they may be why Suárez has been effectively disappeared by the US government into a Salvadoran mega-prison.

*Mother Jones* has spoken with friends, family members, and lawyers of ten men sent to El Salvador by the Trump administration based on allegations that they are members of the Venezuelan organized crime group Tren de Aragua. All of them say their relatives have tattoos and believe that is why their loved ones were targeted. But they vigorously reject the idea that their sons, brothers, and husbands have anything to do with Tren de Aragua, which the Trump

administration recently labeled a foreign terrorist organization. The families have substantiated those assertions to *Mother Jones*, including—in many cases—by providing official documents attesting to their relatives' lack of criminal histories in Venezuela. Such evidence might have persuaded US judges that the men were not part of any criminal organization had the Trump administration not deliberately deprived them of due process.

On March 14, President Donald Trump quietly signed a proclamation invoking the Alien Enemies Act—a 1798 law last used during World War II. The order declared that the United States is under invasion by Tren de Aragua. It is the first time in US history that the 18th-century statute, which gives the president extraordinary powers to detain and deport noncitizens, has been used absent a Congressional declaration of war. The administration then employed the wartime authority unlocked by the Alien Enemies Act to quickly load Venezuelans onto deportation flights from Texas to El Salvador.

In response to a class action lawsuit brought by the ACLU and Democracy Forward, federal judge James Boasberg almost immediately blocked the Trump White House from using the Alien Enemies Act to summarily deport Venezuelans, and directed any planes already in the air to turn around. But in defiance of that order, the administration kept jets flying to El Salvador. Now Suárez and others like him are trapped in the Central American nation with no clear way to contact their relatives or lawyers.

Suárez, whose story has also been reported on by the Venezuelan outlet *El Estímulo*, is an aspiring pop musician who records under the name SuarezVzla. His older brother, Nelson Suárez, said his sibling's tattoos were intended to help him "stand out" from the crowd. "As Venezuelans, we can't be in our own country so we came to a country where there is supposedly freedom of expression, where there are human rights, where there's the strongest and most robust democracy," Nelson said. "Yet the government is treating us like criminals based only on our tattoos, or because we're Venezuelan, without a proper investigation or a prosecutor offering any evidence." (All interviews with family members for this story were conducted in Spanish.)

---

*"Well, you're here because of your tattoos," the ICE agent reportedly said. "We're finding and questioning everyone who has tattoos."*

The Justice Department's website states that Suárez's immigration case is still pending and that he is due to appear before a judge next Wednesday. Records provided by Nelson Suárez show that Arturo has no criminal record in Venezuela. Nor, according to his family, does Suárez have one in Colombia and Chile, where he lived after leaving Venezuela in 2016. They say he is one of millions of Venezuelans who sought a better life elsewhere after fleeing one of the worst economic collapses in modern history. (Just a few years ago, Secretary Rubio, then a senator from Florida, stressed that failure to protect Venezuelans from deportation "would result in a very real death sentence for countless" people who had "fled their country.")

The stories shared with *Mother Jones* suggest that Trump's immigration officials actively sought out Venezuelan men with tattoos before the Alien Enemies Act was invoked and then removed them to El Salvador within hours of the presidential proclamation taking effect.

"This doesn't just happen overnight," said immigration lawyer Joseph Giardina, who represents one of the men now in El Salvador, Frizgeralth de Jesus Cornejo Pulgar. "They don't get a staged reception in El Salvador and a whole wing for them in a maximum-security prison…It was a planned operation, that was carried out quickly and in violation of the judge's order. They knew what they were doing."



Arturo Suárez performing and speaking with his baby daughter from detention. **Courtesy Arturo Suárez**

**The White House** has yet to provide evidence that the hundreds of Venezuelans flown to El Salvador—without an opportunity to challenge their labeling as Tren de Aragua members and "terrorists"—had actual ties to the gang. When pressed on the criteria used for their identification, Press Secretary Karoline Leavitt pointed to unspecified "intelligence" deployed to arrest the Venezuelans she has referred to as "heinous monsters." Trump's border czar Tom Homan has insisted—without providing specific details—that the public should trust ICE to have correctly targeted the Venezuelans based on "criminal investigations," social media posts, and surveillance.

Robert Cerna, an acting field office director for ICE's removal operations branch, said the agency "did not simply rely on social media posts, photographs of the alien displaying gang-related hand gestures, or tattoos alone." But Cerna also acknowledged that many of the Venezuelans deported under the Alien Enemies Act had no criminal history in the United States, a fact he twisted into an argument to seemingly justify the summary deportations without due process. "The lack of a criminal record does not indicate they pose a limited threat," Cerna wrote. "In fact, based upon their association with TdA, the lack of specific information about each individual actually highlights the risk they pose. It demonstrates that they are terrorists with regard to whom we lack a complete profile."

The relatives who talked to *Mother Jones* painted a vastly different picture from the US government's description of the men as terrorists or hardened criminals. Many said their loved ones were tricked into thinking they were being sent back to Venezuela, not to a third country. (The Department of Homeland Security and ICE did not respond to a detailed request for comment asking for any evidence that the Venezuelans named in this article have ties to Tren de Aragua.)

Before leaving for the United States in late 2023, Neri Alvarado Borges lived in Yaritagua, a small city in north central Venezuela. His father is a farmer and his mother supports his 15-year-old brother, Nelyerson, who has autism.



Neri Alvarado with his brother Nelyerson in 2023. **Courtesy María Alvarado**

Alvarado's older sister, María, stressed in a call from Venezuela that her brother has no connection to Tren de Aragua. She said her brother was deeply devoted to helping Nelyerson—explaining that one of his three tattoos is an autism awareness ribbon with his brother's name on it and that he used to teach swimming classes for children with developmental disabilities. "Anyone who's talked to Neri for even an hour can tell you what a great person he is. Truly, as a family, we are completely devastated to see him going through something so unjust—especially knowing that he's never done anything wrong," María said. "He's someone who, as they say, wouldn't even hurt a fly."

Still, Alvarado was detained by ICE outside his apartment in early February and brought in for questioning, Juan Enrique Hernández, the owner of two Venezuelan bakeries in the Dallas area and Alvarado's boss, told *Mother Jones.* One day later, Hernández went to see him in detention and asked him to explain what had happened. Alvarado told Hernández that an ICE agent had asked him if he knew why he had been picked up; Alvarado said that he did not. "Well, you're here because of your tattoos," the ICE agent replied, according to Hernández. "We're finding and questioning everyone who has tattoos."

The agent then asked Alvarado to explain his tattoos and for permission to review his phone for any evidence of gang activity. "You're clean," the ICE officer told Alvarado after he complied, according to both Hernández and María Alvarado. "I'm going to put down here that you have nothing to do with Tren de Aragua."

<span style="color:red">**220**</span>

For reasons that remain unclear, Hernández said that another official in ICE's Dallas field office decided to keep Alvarado detained. María Alvarado said her brother told her the same story at the time.

Hernández spoke to Alvarado shortly before he was sent to El Salvador. "There are 90 of us here. We all have tattoos. We were all detained for the same reasons," he recalled Alvarado telling him. "From what they told me, we are going to be deported." Both assumed that meant being sent back to Venezuela.

Hernández, a US citizen who moved to the United States from Venezuela nearly three decades ago, searched desperately for Alvarado when he didn't show up in his home country that weekend. He was nearly certain that Alvarado was in El Salvador when he first spoke to *Mother Jones* on Thursday. "I have very few friends," he said. "Very few friends and I have been in this country for 27 years. I let Neri into my house because he is a stand-up guy...Because you can tell when someone is good or bad." Later that day, on Alvarado's 25th birthday, Hernández got confirmation that his friend was in El Salvador when CBS News published a list of the 238 people now at CECOT.

A centerpiece of Bukele's brutal anti-gang crackdown, CECOT is known for due process violations and extreme confinement conditions. Last year, CNN obtained rare access to the remote prison, which can hold up to 40,000 people. The network found prisoners living in crowded cells with metal beds that had no mattresses or sheets, an open toilet, and a cement basin. Visitation and time outdoors are not allowed. A photographer who was allowed into the prison as the Venezuelans arrived earlier this month wrote for *Time* magazine that he witnessed them being beaten, humiliated, and stripped naked.

The Trump administration has indicated in court records that the El Salvador operation was weeks, if not months, in the making. In a declaration, a State Department official said arrangements with the Salvadoran and Venezuelan governments for the countries to take back US deportees allegedly associated with Tren de Aragua had been made after weeks of talks "at the highest levels"—including ones involving Secretary of State Rubio—and "were the result of intensive and delicate negotiations."

As part of the deal, the US government will pay El Salvador $6 million to hold the Venezuelan men for at least one year. Calling the agreements a "foreign policy matter," Rubio has claimed the outsourcing of deportees' detention to Bukele's "excellent prison system" is saving money for US taxpayers.

It is unclear if, or when, anyone sent to CECOT will be able to return to Venezuela. A Human Rights Watch program director noted in a declaration that the organization "is not aware of any detainees who have been released from that prison." During an appeals court hearing on March 24, the ACLU's lead counsel Lee Gelernt said, "We're looking at people now who may be in a Salvadoran prison the rest of their lives."



Neri Alvarado working at the bakery and the autism awareness tattoo with his brother's name. **Courtesy María Alvarado**

**Joseph Giardina's** client Frizgeralth de Jesus Cornejo Pulgar thought he was set to return to Venezuela on a deportation flight. Carlos, Frizgeralth's older sibling, said his 26-year-old brother called their sister, who lives in Tennessee, from the El Valle detention center in Texas. He said Frizgeralth told her he was going to be deported to Venezuela later that day. "He was happy that he was going to be here with us," Carlos said from Caracas in a video call with *Mother Jones*.

But Frizgeralth never arrived. Eventually, the family heard from the girlfriend of another Venezuelan set to be deported on the same flight as Carlos. She had identified him in videos shared on social media of the men who had been sent to the prison in El Salvador. On March 19, Carlos started scouring the internet and spotted his brother in a TikTok video. In it, Frizgeralth has his freshly shaved head pressed down, a rose tattoo on his neck peeking out from under a white t-shirt.

"We felt very powerless and in a lot of pain," Carlos said. "To see how they mistreat a person who doesn't deserve any of that. It's not fair."

*"I never imagined being imprisoned just for getting a tattoo."*

Frizgeralth arrived in the United States in June 2024 after crossing the Darién Gap and waiting several months in Mexico for a CBP One appointment. The Biden-era program, which the Trump administration has since terminated,

allowed migrants to schedule a date to present lawfully at a US port of entry. Carlos said Border patrol agents let Frizgeralth's girlfriend and their other brother, as well as two friends, through but they held Frizgeralth back. He ended up detained at Winn Correctional Center, an ICE facility in Louisiana.

In messages to his family from detention, Frizgeralth expressed concern he was being investigated because of his tattoos. He explained that none of the 20 or so images—including one on his chest of an angel holding a gun—he has tattooed on his body have any connection to gang activity. He also described feeling discouraged from hearing stories in detention of Venezuelans who had recently been redetained and said ICE agents picked them up over suspicions about their tattoos.

Frizgeralth even had a declaration from his tattoo artist confirming the harmless nature of the artwork. "I never imagined being imprisoned just for getting a tattoo," Frizgeralth, who owns a streetwear clothing brand with Carlos, wrote. "I never imagined being separated from my family. I wouldn't wish this on anyone, not even my worst enemy if I had one. It's horrible, it's mental torture every day."

Like Suárez and Alvarado, Frizgeralth had no criminal record in Venezuela, documents show. Giardina said his client also had no known criminal history in the United States. Nor did he have a final deportation order. During his preliminary court hearings, the US government never claimed or presented evidence that Frizgeralth had ties to Tren de Aragua. "He was doing everything he was supposed to do," Giardina said. "He got vetted and checked when he came into the country. He was in detention the entire time. It's insanity." If anything, Giardina said, his client had a strong claim for asylum based on political persecution. He said Frizgeralth was being targeted by the *colectivos*, paramilitary groups linked to the Maduro regime.

About a week prior to his deportation, they moved Frizgeralth to Texas. His next hearing, which is scheduled for April 10, still appears on the immigration court's online system. "To detain them in this maximum security prison with no access to lawyers, no charges, just because you're saying they're terrorists…," Giardina said. "I mean, what the hell?"

Génesis Lozada Sánchez said she and her younger brother Wuilliam are from a rural Venezuelan "cattle town" called Coloncito near Colombia. Following Venezuela's economic collapse, both she and Wuilliam lived in Bogota, where her brother saved up for the journey to the United States by making pants at a clothing factory. After he reached the border last January, Wuilliam was detained for more than a year, Génesis said.

On Friday, March 14, he called a cousin in the United States to say that he was about to be deported to Venezuela. "But to everyone's surprise, that's not what happened. They were kidnapped," Génesis said. "Why do I say kidnapped? These people have no ties to El Salvador. They haven't committed any crimes there. And they're not even Salvadoran. They don't even cross into El Salvador after going through the Darién Gap on their way to the United States. So, it's a kidnapping. They tricked these guys into signing papers by telling them they were being sent to Venezuela."

Like other men sent to El Salvador, Wuilliam has tattoos. But Génesis said that they have nothing to do with Tren de Aragua and that her brother has no criminal record. His goal had been to make enough money in the United States to help support their parents and to save up enough to hopefully open a clothing factory back home.

Other reporting and court briefs further support the families' suspicions that their loved ones were primarily targeted for deportation because of their tattoos. In one instance, a professional soccer player, whose attorney said had fled Venezuela after protesting against the Maduro regime and being tortured, was accused of gang membership based on a tattoo similar to the logo of his favorite team, Real Madrid.

John Dutton, a Houston-based immigration attorney, said that he started noticing ICE officers detaining Venezuelans during check-ins due to their tattoos earlier this year. "If they notice they have a tattoo, they're just taking them into custody," he explained. "No more questions to ask." Dutton estimated he now has about a dozen clients who have been arrested because of tattoos.

**223**

One of his clients, Henrry Albornoz Quintero, was due in court for a bond hearing last Wednesday after being taken into detention at a routine ICE check-in. "I show up. The judge asked me where my client is," the Houston lawyer said. "I asked the same question to the DHS attorney. She looked at her notes, shuffled papers around as if she's gonna find the answer in there, looks up, and said, 'Judge, I don't know.'"

Dutton told the judge that his client might be in El Salvador; his relatives had recognized him in one of the images of people at CECOT. The judge then decided not to hear the case on the grounds that he no longer had jurisdiction. "You could tell he wanted to help me," Dutton added. "He just couldn't. There's nothing he could do."

The next day, Albornoz's name appeared on the list of people imprisoned in El Salvador. So far, Albornoz is the only one of Dutton's clients to be sent there. His wife is nine months pregnant with their first child.

"They didn't just deport these people and then set them free," says Ilya Somin, a law professor at George Mason University. "They sent them to El Salvador, where that country, at the behest of the United States, is incarcerating them for at least a year in their prison system. This is not just deportation without due process. This is imprisonment without due process in a foreign prison system that has terrible conditions. That's a pretty blatant violation of the Fifth Amendment's due process clause, which says that you can't take away people's life, liberty or property without due process of law."

**Until Thursday,** March 20, Barbara Alexandra Manzo still wasn't sure if her brother Lainerke Daniel Manzo Lovera was among those sent to El Salvador and transferred to CECOT. The family hadn't heard from him since that Saturday, when he called from El Paso, Texas, to say they were deporting him to Venezuela or Mexico. Her confirmation also came when she saw his name on the CBS News list.

Barbara Alexandra told *Mother Jones* that Lainerke didn't even have a tattoo before he left Venezuela in December 2023. He got one—a clock on his arm—while living and working in Mexico, waiting for a CBP One appointment. It was a gift from a roommate who had been given a date before he did. Last October, Lainerke showed up at the border and was sent to ICE detention; first in San Diego, then briefly in Arizona. He had a court hearing scheduled for March 26.

"My son went to look for a better future, the American Dream," his mother Eglee Xiomara said in a video. "And it didn't come true. That was the worst trip he has ever made in his life."

Lainerke has yet to meet his six-month-old daughter, who was born in the United States. "He's never been in prison," Barbara Alexandra said. "[We're wondering] if he's ok or if something is happening to him. And we'll never know because we have no recourse."

Nelson Suárez fears that he, too, could meet the same fate as his brother Arturo, the Venezuelan musician. Even during the first Trump administration, the fact that Nelson has Temporary Protected Status and a pending asylum case would have been enough to protect him from deportation. But there are no guarantees that it will be now. If Judge Boasberg's temporary restraining order is lifted or overturned, he could be immediately deported to Venezuela, or sent to El Salvador, without due process. He doesn't know if he will walk out of a scheduled check-in with ICE in May free or in chains.

"I'm really scared," he said last week. "My three daughters are here with me. My wife is here. My kids are in school. I don't know what could happen. Since this happened to my brother, I really haven't been able to sleep. I have no peace, no sense of calm. I'm afraid to go out on the street. But at the same time, we have to go out to work and get things done."

EXHIBIT 13

Support the Guardian
Fund independent journalism with $5 per month

Support us →

Sign in

US

News   Opinion   Sport   Culture   Lifestyle   ≡



# 'Deported because of his tattoos': has the US targeted Venezuelans for their body art?

US claims tattoos prove membership of Tren de Aragua gang but relatives describe tributes to God, family and Real Madrid

By **Tom Phillips** and **Clavel Rangel**

Venezuela migrants who have been caught up in Trump's crackdown, seemingly in part because of their tattoos.
Composite: Supplied

Thu 20 Mar 2025 19.42 EDT

Like many Venezuelans of his generation, Franco José Caraballo Tiapa is a man of many tattoos.

There is one of a rose, one of a lion, and another – on the left side of the 26-year-old's neck – of a razor blade that represents his work as a barber.

Two other tattoos pay tribute to Caraballo's eldest daughter, Shalome: a pocket watch featuring the time of her birth and some black lettering on his chest that spells out the four-year-old's name.

"He's just a normal kid … he likes tattoos – that's it," said Martin Rosenow, a Florida-based attorney who represents the Venezuelan asylum seeker – one of <span style="color:red">scores shipped to El Salvador by the Trump administration last weekend</span> as part of his hard-line immigration crackdown.



Tattoos on the body of Franco José Caraballo Tiapa.

Caraballo's fondness for body art may have been his undoing. For when the father of two was detained by US immigration officials in Dallas last month, they appear to have taken those tattoos as proof that he was a member of <span style="color:red">Venezuela's most notorious gang, Tren de Aragua.</span>

An official Department of Homeland Security document issued in early February and reviewed by the Guardian states: "[The] subject [Caraballo] has been identified as a Member/Active of Tren de Aragua" although it does not explain how agents reached that conclusion. The same document notes that Caraballo – who it calls a "Deportable/Excludable Alien" - has several tattoos and no known criminal history "at this time".

Rosenow rejected the idea that the images inked on to his client's skin indicated gang membership. "It's specious – there's no basis [for this conclusion]," he said. "Experts in Venezuela who study the gang have all stated that there are no tattoos that associate gang members. It's not like the Central American MS-13 gang where tattoos are relevant in their organization."

"Tren de Agua has no [specific] tattoos," Rosenow continued. "If you see pictures [of actual Tren de Aragua members arrested in the US], they're shirtless and many of them don't even have tattoos.

"I'm nauseated by it all. I'm distressed for these individuals. I'm sad for what this means. As an American, for me it's disgraceful that we would violate human rights so flagrantly on an international level."

Caraballo, who hails from the Venezuelan state of Bolívar and entered the US over its southern border in October 2023, is one of several Venezuelans

227

whom immigration officials appear to have identified as gang members based on little more than their nationality and their tattoos.

### Daniel Alberto Lozano Camargo

Daniel Alberto Lozano Camargo, a 20-year-old asylum seeker from Maracaibo in western Venezuela, lived in Houston, Texas where he washed cars for a living, advertising his services on Facebook.

His partner, a US citizen called Leslie Aranda, said he was arrested last November after being contacted by a supposed client. She has not heard from him since last Friday, when Donald Trump invoked sweeping wartime powers called the Alien Enemies Act to deport people considered a threat, such as members of Tren de Aragua, which was last month designated a foreign terrorist organization.

 

Daniel Alberto Lozano Camargo.

Like other Venezuelans who were deported, Lozano has several tattoos, said Aranda, 25. He has the name of his partner's daughter, Danessy, on one arm. A rose. The name of his niece, Eurimar, with a crown over the letter E. Praying hands on his neck. His father's name, Adalberto, and his initials. Lozano also has the date of his anniversary with Aranda: 19 January 2023. Another tattoo reads "King of Myself."

"I know his father's name is significant to him because he died when Daniel was young. And I also know he didn't really like the rose tattoo because a friend who was practising did it. Daniel loves art and tattoos - that's why he has them," Aranda said.

Lozano's mother, Daniela, who is also in the US, said: "They violated his human rights - it's an injustice. He doesn't belong to any gang."

### Neri José Alvarado Borges

The sister of Neri José Alvarado Borges, another Venezuelan deported to El Salvador, said the 24-year-old also had tattoos that relatives suspect may have led to him being wrongly identified as a criminal.

One says "Family", another says "Brothers" and a third, on his left thigh, features the name of his younger brother, Neryelson, who is autistic, and the rainbow-colored ribbon of the autism acceptance movement.



Neri José Alvarado Borges.

"None of these tattoos has anything at all to do with the Tren de Aragua," said his sister, Lisbengerth Montilla, 20. "But for them [immigration authorities] anyone with a tattoo is connected to Tren de Aragua."

Montilla said her brother was no gangster. In fact, he was a psychology student who had been forced to abandon his studies and migrate to the US nine months ago because of Venezuela's economic collapse.

After trekking through the perilous Darién Gap jungle and entering the US, Alvarado, who has no criminal history, built a life in Dallas where he worked in a bakery.

"Many of us have come here because of the situation back in our country," said Montilla, who also lives in the US. "There were times when we didn't even have food to eat or have the money to buy anything. Many people fled because of the dictatorship in Venezuela, seeking a better future.

"Not all of those people [deported to El Salvador] are criminals – and not all Venezuelans are bad people. We are from a decent, hard-working and upstanding family. We've never had problems with anybody."

**Luis Carlos José Marcano Silva**

Case 2:25-cv-00574-DBB Document 56-34 Page 247 of 342 PageID.3488



Luis Carlos José Marcano Silva.

Luis Carlos José Marcano Silva, a 26-year-old barber from the Venezuelan island of Margarita, was detained at an immigration hearing in Miami last month. His tattoos also seemingly played a role in his detention and deportation to El Salvador.

One, on Marcano's belly, shows the face of Jesus of Nazareth. Another, on his arm, shows an infinity symbol while a third features the name of his daughter, Adelys. His chest is emblazoned with the image of a crown.

"[At the hearing] all they kept telling him was that he belonged to the Tren de Aragua gang. When his wife contacted the lawyer, they said it was probably because of his tattoos," said Marcano's mother, Adelys del Valle Silva Ortega, denying that her son has any links to the crime group or even a criminal record.

"I feel frustrated, desperate. I imagine they are not treating him well. I've already seen videos of that prison," Silva said of the notorious Salvadoran "anti-terrorism" jail where her son is now thought to be incarcerated. "I think of him every moment, praying to the Virgin of the Valley [a Venezuelan patron saint] to protect him."

### Jerce Reyes Barrios

The lawyer for a fifth Venezuelan man deported to El Salvador, a former professional footballer called Jerce Reyes Barrios, 36, has also claimed his tattoos played a role in sealing his fate.

Reyes's tattoos include one of a crown sitting atop a soccer ball with a rosary and the word "Dios" (God). In a sworn declaration, his California-based attorney, Linette Tobin, said the Department of Homeland Security had alleged this tattoo was proof of gang membership.

"In reality, he chose this tattoo because it is similar to the logo for his favourite soccer team, Real Madrid," Tobin said in her statement on Wednesday.

**230**

Tobin rejected the idea that her client was a gang member and said he had fled Venezuela in early 2024 after being detained at an anti-government demonstration by security forces. Reyes was subsequently "taken to a clandestine building where he was tortured" with electric shocks and suffocation.

Tobin said US immigration officials had reviewed her client's social media posts and found one in which he made "a hand gesture that they allege is proof of gang membership".

"In fact, the gesture is a common one that means I Love You in sign language and is commonly used as a rock'n'roll symbol," Tobin said.

**Francisco Javier García Casique**

Sebastián García Casique, the brother of a sixth Venezuelan deported to El Salvador, said his sibling, Francisco Javier García Casique, also had tattoos, including of a rose, a compass and a phrase reading: "God chooses his toughest battles for his best warriors."



Francisco Javier García Casique.

A fourth tattoo says: "Vivir el momento" (Live in the Moment). A fifth says in English: "Family".

In September 2021 García posted an Instagram video of a tattoo of a timepiece being inked on to his right arm by an artist in Peru, where he then lived. "My tattoo in tribute to my two grandmas who I love and miss a lot," García wrote.

**Anyelo Sarabia González**

In a sworn declaration, the sister of Anyelo Sarabia González, Solanyer Michell Sarabia González, said her 19-year-old brother had been detained by immigration agents at the start of this year in Dallas and that those agents had asked "about a tattoo that is visible on his hand" showing a rose with money as its petals.

"He had that tattoo done … because he thought it looked cool," González's sister said, adding that she believed her brother had been sent to El Salvador "under the false pretence that he was a member of Tren de Aragua".

"The tattoo has no meaning or connection to any gang," said González, 25. Two other tattoos on her brother's body – of the phrases "strength and courage" and "I can do all things through Christ who strengthens me" – were also not gang-related, she said.

**231**

**Franco José Caraballo Tiapa**

Rosenow also saw no indication that his client – who he said had sought asylum on the basis of political persecution after taking part in opposition protests – was involved in the Venezuelan gang. He said Caraballo's "cheesy" and romantic Instagram posts indicated he was not "a vicious gang member".



Franco José Caraballo Tiapa

A Venezuelan criminal background check issued earlier this month indicates Caraballo has no criminal record there. Francisco Javier García Casique's family has also published evidence that he had no criminal record back home.

The White House has described the Venezuelans deported to El Salvador as "heinous monsters" and terrorists but has yet to release detailed information about their identities, let alone their alleged crimes.

On Thursday afternoon CBS News published an internal government list of the 238 Venezuelan deportees, which included the names of all of the men in this story.

On Monday, a senior official from immigration and customs enforcement, Robert Cerna, admitted that "many" of those removed from the US under the Alien Enemy Act did not have criminal records in the US, but he nevertheless said they were Tren de Aragua members.

The fact that those people did not have a criminal record "is because they have only been in the country for a short period of time", Cerna said.

# EXHIBIT 14

IMMIGRATION

# Tattoos of deported Venezuelans don't necessarily signal gang affiliation, experts say

Relatives of some Venezuelan deportees believe the men were targeted as Tren de Aragua members based on their tattoos, but a gang expert said this isn't a reliable identifier.



—— The Trump administration on March 16 deported to El Salvador 238 people it claimed were members of Venezuela's Tren de Aragua gang and 23 people it said belonged to MS-13.

El Salvador Presidency handout / Getty Images

March 21, 2025, 12:22 PM PDT

**By Nicole Acevedo, Deon J. Hampton and David Noriega**

**234**

Nike's Jumpman, roses and a popular phrase from a Donald Trump-supporting Puerto Rican rapper: These are some of the tattoos defense lawyers and relatives say helped authorities accuse several Venezuelan men of belonging to Tren de Aragua gang.

The men were not deported to their homeland last weekend but were instead sent to El Salvador, where they were jailed in a notorious megaprison, raising questions about whether they were given due process.

Lawyers for at least five men have said in court filings this week that the U.S. government apprehended their clients in part because of tattoos that immigration authorities believed signaled ties to the gang.

Law enforcement and immigration officials have said in the past they've had a challenging time identifying legitimate members of the Venezuelan criminal organization. Often the only information they do have to identify individuals is alleged gang tattoos.

In the case of the recent deportation flights, Robert Cerna, the acting field office director of enforcement and removal operations at Immigration and Customs Enforcement, said in a sworn declaration on Monday that officials did not solely rely on tattoos to identify the deportees as alleged gang members.

But family members and attorneys are contesting that assertion, saying the inkings in question merely indicate the men are sports fans or family men, not gang members. They believe their clients and deported relatives were falsely accused and targeted because of their tattoos, and denied the men are connected to Tren de Aragua at all.

What is 'Tren De Aragua'? Explaining the gang at center of Trump's immigration crackdown

04:40



Other Latin American gangs, such as the Salvadoran group MS-13, are known to use certain tattoos to identify their membership.

But that's not the case with the Venezuelan gang Tren de Aragua, according to Ronna **Risq**uez, an expert on the group who authored the Spanish-language book "The Tren de Aragua: The Gang That Revolutionized Organized Crime in Latin America."

**Risq**uez said tattoos are not closely connected with affiliation to Tren de Aragua. When asked if there's a specific tattoo that identifies Tren de Aragua members, **Risq**uez told Noticias Telemundo, "Venezuelan gangs are not identified by tattoos."

"To be a member of one of these Venezuelan organizations, you don't need a tattoo," she said in Spanish. "You can have no tattoos and still be part of Tren de Aragua. You can also have a tattoo that matches other members of the organization."

Law enforcement and immigration officials across the nation have linked several tattoos to Tren de Aragua: stars on shoulders, crowns, firearms, grenades, trains, dice, predatory felines, gas masks, clocks, the Illuminati sign and the jersey number 23 – which basketball players including Michael Jordan and LeBron James made famous – in addition to tattoos of roses and the Jumpman logo.



**Families of deported Venezuelans are distraught their loved ones were sent to El Salvador**

Other tattooed phrases law enforcement says are associated with the gang include "Hijos de Dios" (Sons of God), or its abbreviation "HJ," and "Real Hasta la Muerte" (Real Until Death).

The government of El Salvador stated this week that hundreds of men deported from the U.S. last weekend were members of Tren de Aragua. In a propaganda-style video, the detainees were shown handcuffed in a crouched position as their heads were being shaved ahead of their transfer to the CECOT megaprison, according to El Salvador's Press Secretariat.

The video shows some prisoners who have tattoos: One man sports ink of a rose, an Illuminati symbol and the Jumpman logo, inspired by Michael Jordan – all tattoos previously cited by police and immigration authorities as evidence of ties to Tren de Aragua.

But Risquez said that gang members also sport tattoos considered culturally popular at the moment and popular among the general public – such as "Real Hasta la Muerte" tattoos, a phrase popularized by Anuel AA, the reggaeton singer.

"This guy is loved by many Venezuelans and by many Latin Americans who have adopted this tattoo, and they've gotten that tattoo," Risquez said. "So that tattoo can't be associated with Tren de Aragua because there are many people who aren't from the Tren de Aragua, including Anuel, who have that tattoo."

**237**



—— A photo from U.S. Border Patrol of what it said are Tren de Aragua tattoos. U.S. Border Patrol

The Trump administration views Tren de Aragua as a national security threat, saying dangerous members have entered the country illegally. In the U.S., law enforcement has accused dozens of people of belonging to the gang in at least 14 states, according to an NBC News analysis.

The administration has repeatedly cited Tren de Aragua as the embodiment of the criminal immigrant as part of the president's aggressive immigration enforcement agenda, which has included sending hundreds of Venezuelan immigrants to the U.S. naval base in Guantanamo Bay,

Cuba, and to the Salvadoran megaprison, as well as stripping hundreds of thousands more of temporary legal status in the U.S.

Targeting Venezuelans because of their tattoos is "wrong and outrageous," said Bill Hing, a law professor at the University of San Francisco and co-director of the school's immigration and deportation defense clinic.

"It's very evident that just having a Michael Jordan tattoo does not necessarily mean that a person is a gang member," said Hing, who has represented hundreds of asylum-seekers from Central America, Colombia and Venezuela.

A neck tattoo of the Jumpman logo was allegedly among the reasons one man was detained at Guantanamo along with 176 other Venezuelans, according to documents filed in a lawsuit by the American Civil Liberties Union and other groups.

"Jordan is popular around the world, and for many Venezuelans he's part of their fashion," Hing said. He echoed Risquez in saying that most people get tattoos based on pop culture references as well as their geographical or ancestral roots, racial pride and religion.



**Why the men who were sent to El Salvador's mega-prison may never make it out**

Families and lawyers fear for the deportees who may face indefinite detention in a prison known for

The idea that a Jordan tattoo or jersey would be used to link someone with Tren de Aragua is close to laughable, said Risquez.

The Department of Homeland Security did not respond to a request for comment. But on Tuesday, the White House said in a statement in response to the deportation flights to El Salvador that it was "confident in DHS intelligence assessments on these gang affiliations and criminality." It added that the Venezuelan immigrants who were removed from the U.S. had final orders of deportation, though some attorneys and family members of the deportees are contesting that.

"This administration is not going to ignore the rule of law," the statement said.

Hundreds of Venezuelans have since been removed from the U.S. under the Alien Enemies Act, which allows the president to expeditiously deport noncitizens during wartime.

Trump invoked this law after he claimed the gang was invading the United States. That justification is now the heart of dispute between Department of Justice lawyers and a federal judge.

But in assessing the use of tattoos as a main identifier of gang affiliation, Risquez pointed out that as in all parts of the world, the only way to determine that a person is a delinquent or criminal is "to conduct a police investigation" and "grant them due process."



**Nicole Acevedo**

Nicole Acevedo is a reporter for NBC Latino.

**Deon J. Hampton**

Deon J. Hampton is a national reporter for NBC News.

**David Noriega**

David Noriega is an NBC News correspondent based in Los Angeles.

Sarah Ford, Damià Bonmatí, Daniella Silva, Gary Grumbach and Carmen Sesin contributed.

# EXHIBIT 15

The Trump administration sent them to a prison in El Salvador under a wartime act, calling them members of a Venezuelan gang. But a New York Times investigation found little evidence of criminal backgrounds or links to the gang.

**By Julie Turkewitz, Jazmine Ulloa, Isayen Herrera, Hamed Aleaziz and Zolan Kanno-Youngs**
Published April 15, 2025   Updated April 16, 2025, 11:12 a.m. ET

*Follow live updates on the Trump administration here.*

Nathali Sánchez last heard from her husband on March 14, when he called from a Texas detention center to say he was being deported back to Venezuela. Later that night, he texted her through a government messaging app for detainees.

"I love you," he wrote, "soon we will be together forever."

Her husband, Arturo Suárez Trejo, 33, a musician, had been in American custody for a month, calling every few days to assure his family that he was OK, his relatives said. Now, the couple believed they would reunite and he would finally meet his daughter, Nahiara, who had been born during his brief stint as a migrant in the United States.

But less than a day later, Mr. Suárez was shackled, loaded onto a plane and sent to a maximum-security prison in El Salvador, according to an internal government list of detainees obtained by The New York Times. Around the time Mr. Suárez was texting his wife, the Trump administration was quietly invoking the Alien Enemies Act, a sweeping wartime power that allows the government to swiftly deport citizens of an invading nation.

Mr. Suárez and 237 others, the Trump administration argued after the order became public, were all members of a Venezuelan gang called Tren de Aragua, which was "aligned with" the Venezuelan government and was "perpetrating" an invasion of the United States.

<span style="color:red">**242**</span>



Ms. Sánchez with a photo of her husband, Mr. Suárez.  Cristobal Olivares for The New York Times



Ms. Sánchez showing the last messages Mr. Suárez sent before she lost contact with him. "I love you with my life," he wrote.   Cristobal Olivares for The New York Times

It was an extraordinary move: The act has only been invoked three times in American history, experts say — most recently in World War II, when it was used to detain German, Italian and Japanese people.

And in this case, the Venezuelan men were declared "alien enemies" and shipped to a prison with little or no opportunity to contest the allegations against them, according to migrants, their lawyers, court testimony, judges and interviews with dozens of prisoners' families conducted by The New York Times.

The government's public declaration of the act was made on March 15 at 3:53 p.m., according to court records. The migrants were all on flights to El Salvador by 7:36 p.m.

Yet most of the men do not have criminal records in the United States or elsewhere in the region, beyond immigration offenses, a New York Times investigation has found. And very few of them appear to have any clear, documented links to the Venezuelan gang.

As they were being expelled, the detainees repeatedly begged officials to explain why they were being deported, and where they were being taken, one of their lawyers told the courts. At no point, the lawyer said, did officers indicate that the men were being sent to El Salvador or that they were removed under the Alien Enemies Act.

The Alien Enemies Act gives the U.S. government broad powers to detain people during times of war, but Supreme Court rulings make clear that detainees have a right to challenge the government, and are entitled to a hearing, before their removal.

Last month, an appeals court judge criticized the lack of due process under the Trump administration. "Nazis got better treatment under the Alien Enemy Act," said Judge Patricia Millett.

Then, last week, all nine Supreme Court justices said that targeted individuals must be given time to contest their removal before they're expelled — and demanded that the Trump administration provide that opportunity going forward.

In court, the administration has argued that the men can still challenge their incarceration — but that will be difficult, if not impossible, because they are already in El Salvador, out of reach of the American justice system, with little access to lawyers or even their family members.

"They should stay there for the rest of their lives," Kristi Noem, the homeland security secretary, said last week.

Then on Monday, President Nayib Bukele of El Salvador forcefully backed the administration during a visit to the White House. He flatly rejected the idea of returning a Maryland man who had been wrongfully deported to El Salvador,

despite the Supreme Court's instructions that the United States take steps to bring back the migrant.



Kristi Noem, the homeland security secretary, during a tour last month of the prison in El Salvador where deported migrants accused of being gang members are being held.  Pool photo by Alex Brandon

Family members of Venezuelans deported to El Salvador protested in Caracas last month, demanding the release of their loved ones. "Migration is not a crime!" some shouted.  Adriana Loureiro Fernandez for The New York Times

The Trump administration claims that all of the 238 Venezuelan men now imprisoned in El Salvador are members of Tren de Aragua, a transnational gang born in Venezuela. Their expulsion, the administration argues, is part of its plan to deport the worst migrant offenders.

Officials say they used criminal records, social media, surveillance data, interviews with migrants and other information, like tattoos, to make their accusations.

But a Times investigation found little evidence of any criminal background — or any association with the gang — for most of the men. In fact, the prosecutors, law enforcement officials, court documents and media reports that The Times uncovered or spoke to in multiple countries suggested that only a few of the detainees might have had any connection to Tren de Aragua.

Seeking to provide a fuller picture of who was imprisoned, a team of Times reporters and researchers ran the 238 names through three U.S. public records databases, checked backgrounds in Venezuela, Colombia, Peru, Ecuador and Chile, scoured court documents and news articles, spoke to dozens of family members and interviewed experts on Tren de Aragua.

The findings are not comprehensive — there is no global public database to search for every accusation, and the U.S. government did not share its evidence against the detainees. But The Times's investigation provides a snapshot of who the United States sent to El Salvador.

Some of the prisoners do appear to have committed grave crimes. At least 32 of the men sent to El Salvador have faced serious criminal accusations or convictions in the United States or abroad, including a man accused of participating in an assault in Chicago, another convicted of trying to smuggle arms out of the United States and others accused of theft, strangulation, domestic battery or harboring undocumented immigrants.

One has a homicide conviction in Venezuela, according to court documents. Another man was accused in Chile of kidnapping, drugging and raping a woman during a four-day rage.

Chilean prosecutors also believe the man is a member of Tren de Aragua, according to court documents. Investigators say they found his name and messages in the phones of other gang members.

Beyond that, The Times found that another two dozen of the men locked up in El Salvador had been accused or found guilty of lower-level offenses in the United States or elsewhere, including trespassing, speeding in a school zone and driving an improperly registered vehicle.

But for the others, including Mr. Suárez, the musician, The Times found no evidence of a criminal background, beyond offenses related to being unauthorized migrants. Mr. Suárez's family presented official certificates from Venezuela,

**248**

Colombia and Chile — where he lived in the past — saying he had no convictions in those nations.

All 238 men will spend at least a year in El Salvador's Terrorism Confinement Center, a sprawling complex of concrete and barbed wire built by President Nayib Bukele, who has called himself "a dictator" and promoted the prison as a holding pen for his country's worst criminals.

The Terrorism Confinement Center in Tecoluca, El Salvador.  Salvador Melendez/Associated Press

Guards outside the prison where the migrants are being held.  Pool photo by Alex Brandon

The United States is paying the government of El Salvador to incarcerate the Venezuelan prisoners. On X, the Salvadoran leader called the yearlong sentence "renewable."

The U.S. government's use of the alien act is now the subject of an intense court battle between the administration and civil rights groups, including the American Civil Liberties Union, whose lawyers say the government has not met the standard to invoke the measure: a war with or invasion by Venezuela.

The groups also argue the government has violated the migrants' rights to contest the accusation that they are members of Tren de Aragua and therefore "alien enemies."

In court, the government has said that it has broad powers to determine what constitutes a war or invasion, as well as to decide who is a member of the gang, which the administration recently designated a foreign terrorist organization.

This week, the Supreme Court said the Trump administration could continue deporting people using the Alien Enemies Act while the legal fight plays out in the courts — as long as detainees have a chance to challenge their expulsions.

In a related case, the Supreme Court this month also ordered the Trump administration to take steps to return the Maryland man, Kilmar Abrego García, whom the government conceded it had sent to El Salvador in error.

In that case, a judge found that the government had decided Mr. García was a member of another notorious gang, MS-13, on the basis of flimsy evidence.

As for the prisoners accused of belonging to Tren de Aragua, a spokeswoman for the Department of Homeland Security, Tricia McLaughlin, said that all the men sent to El Salvador are "actually terrorists, human rights abusers, gangsters and more; they just don't have a rap sheet in the U.S."

"We are confident in our law enforcement's intelligence," she added. "We have a stringent law enforcement assessment in place that abides by due process."

The raids targeting Venezuelan migrants began just after Mr. Trump took office.

Officials from Immigration and Customs Enforcement seized Neri Alvarado, 25, a former psychology student, in a parking lot as he headed to work at a Dallas bakery, said his sister and his boss. Authorities picked up Francisco García Casique, 24, a barber, at his home in Austin, Texas, his family said. They grabbed Gustavo Aguilera Agüero, 27, an Uber driver, while he was working on his car in a driveway outside Dallas, according to his mother.

Izaida Alvarado in the room she used to share with her brother, Neri Alvarado, in Yaritagua, Venezuela.

Adriana Loureiro Fernandez for The New York Times

Case 2:25-cv-05341-DB Document 58-4 Page 270 of 342 Date Filed 05/30/2025

Neri Alvarado's mother, Yelitza Borges, at home in Yaritagua, Venezuela. Adriana Loureiro Fernandez for The New York Times

Mr. Suárez, the musician, came from a once middle-class family in Venezuela, the second oldest of seven siblings. His mother was an educator, his father a bricklayer. In 2014, he joined mass protests against the country's authoritarian government, said his older brother, Nelson Suárez, 35, who now lives in the United States.

But when the country's autocratic leader, Nicolás Maduro, tightened his grip and the Venezuelan economy spiraled into crisis, leaving millions hungry, the younger Mr. Suárez left for Colombia, then Chile.

"Many times we had to run for our lives," said the older Mr. Suárez, "until we decided to leave."

Case 2:25-cv-05371-D Document 58-34 Page F271 05 Date Filed 05/30/2025 88

In Chile, the younger Mr. Suárez installed refrigerators and began building a following as a singer, mixing rap, hip-hop and reggaeton.

"There's no sin here; there's no sentence," he sang in one song, about a woman who works the streets to escape poverty.

He met his wife, Ms. Sánchez, at a music event.

In the United States, Mr. Suárez believed he could advance his music career, said his brother, and make money to send back to his growing family.

He entered the United States on Sept. 3 using a Biden-era application that allowed people to present themselves at the border and ask for entry, according to documents reviewed by The Times. Officials allowed him in with an order to appear in court on March 6, where he would have the opportunity to fight removal.

In North Carolina, he worked in landscaping, said his brother Nelson.

On Dec. 2, his daughter was born in Chile.

On Jan. 20, Mr. Trump became president.

On Feb. 8, Mr. Suárez arrived at a house in Raleigh to record a music video. But U.S. immigration agents showed up and hauled him away, according to the brother.

Soon, Mr. Suárez was in detention in Georgia, where he told his brother that an official had done a background check and reviewed his YouTube channel. Mr. Suárez told his brother that officials didn't seem to believe he was guilty of anything more than being a migrant.

Case 2:25-cv-05341-DB Document 58-24 Page 272 of 342 Date Filed 05/30/2025

Relatives of Mr. Suárez protesting his deportation to El Salvador in Caracas, Venezuela. Adriana Loureiro
Fernandez for The New York Times

Paola Paiva-Trejo in front of a mural honoring some of the Venezuelans deported to El Salvador, including her brother, Arturo Suárez. Adriana Loureiro Fernandez for The New York Times

"If this had been another moment, they would have let him go," the brother said Mr. Suárez told him. "But since we are in this madness he was going to stay in the hands of ICE"

In dozens of interviews, family members said that once the men were detained, U.S. officials focused on their tattoos.

Mr. García, the barber, had the word "peace" written on his neck, accompanied by a crown, and had the names of his mother, grandmother and sisters on his body, said his family.

Mr. Aguilera, the Uber driver, had the name of his oldest son, Santiago, also accompanied by a crown, a star, a skull with flowers and the infinity symbol, according to his mother.

Case 2:25-cv-05371-DB Document 56-24 Page 274 of 342 Date Filed 05/30/2025

Mr. Alvarado, the former psychology student, had come to the United States to earn money to help his younger brother, who has autism, other disabilities and health problems, his family said.

Before leaving, Mr. Alvarado had inked on his leg a rainbow ribbon associated with autism awareness. His sister said it went with Mr. Alvarado's other tattoos, which read: "brothers," "family" and "self love."

Mr. Alvarado arrived in the United States with an autism awareness tattoo, which his family believes was used to tag him as a member of Tren de Aragua.

Case 2:25-cv-05141-DB Document 58-4 Page F1 25-05 Date Filed 05/30/2025 88

Mr. Alvarado's little brother, Neryelson, in Venezuela. Adriana Loureiro Fernandez for The New York Times

In an interview, Mr. Trump's border czar, Tom Homan, said tattoos were just one factor used to determine if an individual was a member of Tren de Aragua.

"I don't say it's a major factor," he said, "it's one of many."

But an internal government document made public in court filings indicates how much weight is given to tattoos.

The document, called the "Alien Enemy Validation Guide," instructs immigration officials to use a point system to identify members of Tren de Aragua. Eight points makes someone a "validated" member of the group. Having tattoos associated with the gang is worth four points.

Wearing clothing associated with the gang is worth another four.

**258**

A second government document indicates that the administration considers a crown tattoo — much like the one worn by soccer star Lionel Messi — and the "Jump Man" symbol, popularized by Michael Jordan, to be Tren de Aragua symbols.

Clothing associated with the gang includes "high-end urban street wear."

In interviews, five Venezuelan experts on Tren de Aragua — two police officials, two scholars and a journalist — told The Times that while some transnational gangs use tattoos as indicators of membership, the Venezuelan group did not.

"In the case of the Tren de Aragua," said Luis Izquiel, a professor of criminology at Venezuela's Central University, "there is no common pattern of similar tattoos among its members."

While many Tren de Aragua members have tattoos, experts said, so do many young Venezuelan men.

Of the 30 men whose family members or lawyers spoke to the Times, at least 27 have tattoos.

Mr. Suárez has 33, said his family, reflecting his urban music aesthetic. They include one of his signature phrases, they said: "The future is bright."

The Trump administration began to move dozens of detained Venezuelan men to facilities in Texas roughly two weeks before invoking the Alien Enemies Act.

On March 14 and 15, the men called their families to say that Americans officials had told them they were being deported back to Venezuela, according to dozens of interviews.

In Aragua state, in Venezuela, Mirelis Casique, the mother of Mr. García, the barber, rushed to fix up his room, applying new paint and hanging new curtains.

Mirelis Casique, the mother of Mr. García, in the room that was to be his upon his return to Venezuela. "I would put my hands in fire for my son, I know he's not a criminal," she said.  Adriana Loureiro Fernandez for The New York Times

Case 2:25-cv-05341-DBcase 25-34 Document 58-34 Filed 05/30/2025 Page 278 of 342 PageID #: 188

Ms. Casique with a photo of Mr. García.   Adriana Loureiro Fernandez for The New York Times

But by March 16, the wife of Mr. Suárez, the musician, had still not heard from him.

Her anxiety rising, she turned to Google.

"Deportation to Venezuela," she typed into the search box.

By now, three flights carrying the 238 men had arrived in El Salvador, despite a judge's order that the Trump administration turn them around.

That morning, Mr. Bukele had posted a video showing the new prisoners shackled and gripped by guards in riot gear being led into the prison.

"We removed terrorists," Mr. Homan, the U.S. border czar, said from Washington. "That should be a celebration in this country."

**261**

Case 2:25-cv-05341-DBH Document 56-34 Page 279 of 342 Date Filed 05/30/2025

Online, Mr. Suárez's wife pulled up an image of a sea of shaved, cuffed men in Salvadoran prison. She recognized one: It was her husband.

Holding her newborn, she sat down and cried.

Later, she logged in to an online ICE search page that had allowed her to track her husband's whereabouts in the United States.

Mr. Suárez had suddenly disappeared from the system.

Never before, legal analysts say, has the Alien Enemies Act been used with such little due process.

During World War II, the Department of Justice established civilian hearing boards in which "registered aliens" of German, Italian and Japanese descent arrested by the government could argue they were not a danger to the nation, legal scholars said.

Many scholars have criticized that process as deeply flawed; detainees were not afforded lawyers and could still be held based on hearsay and bias or racial discrimination.

But Eric L. Muller, a professor at the University of North Carolina School of Law, said they nevertheless provided "a check" on the government, adding that the majority of people who obtained a hearing under the civilian boards were released.

Ms. Sánchez with her daughter, Nahiara, in Santiago. "This is no longer a dream," Mr. Sánchez's brother, Nelson, said of the musician's incarceration. "I feel that am living the American nightmare." Cristobal Olivares for The New York Times

**263**

Case 2:25-cv-05371-DB Document 58-4 Page 281 of 342 Date Filed 05/30/2025

Yuransi Gonzalez during a protest against the deportation of Venezuelans to El Salvador. Her son Anyelo Sarabia, 19, is among those imprisoned in the terrorism center.   Adriana Loureiro Fernandez for The New York Times

In Venezuela, families have gathered for marches calling for the release of loved ones. Many have tried contacting American and Salvadoran officials, but say their messages have gone unanswered.

The governments of Mr. Trump and Mr. Bukele have refused to release a list of the men confined in the terrorism center or to confirm to families who is there.

For this article, The Times obtained an internal government list of names. CBS News previously reported the names.

The White House has said that 137 of the men were deported under the Alien Enemies Act, while 101 others were expelled under normal immigration proceedings. All are accused of being gang members, and all are in prison in El Salvador.

**264**

Case 2:25-v-05341-DB Document 58-34 Page 282 of 342 Date Filed 05/30/2025

In recent weeks, Venezuela's autocratic leader has accused the Trump administration of engaging in a violation with a long grim history in Latin America: a large-scale "forced disappearance."

The United Nations defines the practice as the deprivation of liberty "followed by a refusal to disclose the fate or whereabouts of the persons concerned."

In a rare moment of agreement, Human Rights Watch has come to the same conclusion as the Venezuelan leader.

Mr. Suárez's brother says his biggest fear is that "tomorrow I get my brother back — in a wooden box."

An uncle of Mr. Suárez's, Edgar Trejo, said the family had been struggling not only to understand how the musician ended up in a faraway prison, but also the turn of events in "a country as organized and as just" as the United States.

Once upon a time, said Mr. Trejo, a pastor in Caracas, he believed that the United States was "God's policeman on earth."

In Caracas, the family had become accustomed to people being carted away with no trial.

Now, he said, "what we have seen here," in Venezuela "we are also seeing there."

In Caracas, women protest the deportations to El Salvador. On sign reads: "Freedom for our kidnapped sons." Adriana Loureiro Fernandez for The New York Times

Research was contributed by Alain Delaquérière, Susan C. Beachy, Kirsten Noyes and Sheelagh McNeill. Reporting was contributed by Pascale Bonnefoy, Sheyla Urdaneta, Mitra Taj, Alan Feuer, Steven Rich, José María León Cabrera, Annie Correal, Miriam Jordan,Luis Ferré-Sadurní, Ana Ley, Genevieve Glatsky and Simón Posada.

**Read by Julie Turkewitz**
Audio produced by Jack D'Isidoro.

**Julie Turkewitz** is the Andes Bureau Chief for The Times, based in Bogotá, Colombia, covering Colombia, Venezuela, Bolivia, Ecuador and Peru.

**Jazmine Ulloa** is a national politics reporter for The Times, covering the 2024 presidential campaign. She is based in Washington.

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy.

**Zolan Kanno-Youngs** is a White House correspondent for The Times, covering President Trump and his administration.

**266**

# EXHIBIT 16

ANNALS OF IMMIGRATION

# THE MAKEUP ARTIST DONALD TRUMP DEPORTED UNDER THE ALIEN ENEMIES ACT

*The President has invoked the law to send Venezuelans to prison in El Salvador without due process— and, in many cases, under false pretenses.*

**By Jonathan Blitzer**

March 31, 2025



Illustration by Anuj Shrestha



Throughout the fall and winter, Alexis Romero de Hernández struggled to accept a grim new routine. She lived in a small town in central Venezuela called Capacho, with her husband and the younger of her two sons. Her eldest, a thirty-one-year-old makeup artist named Andry José Hernández Romero, was being held in an immigration jail in San Diego. He called her every few days, usually late in the afternoon, to reassure her that he was safe. The calls would last about a minute. Alexis had to put money on his calling card to keep them coming. "Mama, relax," Andry would tell her. "I'm fine. They're treating us well. What's bad is that we're stuck here."

In Capacho, Andry was a member of a local theatre troupe, and he acted in an annual church procession during the Epiphany, which, in the Spanish-speaking world, is known as El Día de los Reyes Magos, or Three Kings Day. He loved to draw, and had a penchant for bringing aesthetic flourishes to every corner of his life. When he worked as a hotel receptionist for a time, he created balloon decorations in the lobby; at home, he designed costumes and clothes. He made friends easily but, Alexis said, didn't drink or stay out late. Andry is "very, very humble and very, very open," she told me, by phone. "He's comfortable being alone. He cooks for me and helps clean. He's a homebody."

In 2023, Andry took a job at a state-run television station in Caracas, the country's capital. It was an ideal job—he was responsible for prepping the show's

anchors and guests for the screen, and his family, who have a shop that sells glass for mirrors and tables, needed the money. But he was gay and skeptical of the country's authoritarian regime, which made him a target for abuse. The year he spent in Caracas, Alexis told me, was one of "persecution and discrimination. People in high places always discriminate against those who are lower down. They humiliated him." At night, after work, he was often followed home and harassed by armed vigilantes aligned with the government; on one occasion, his boss at the station slapped him in front of his co-workers.

---

## Get the News & Politics newsletter

The latest from Washington and beyond, covering current events, the economy, and more, from our columnists and correspondents.

| ••• |
| --- |

Sign up

By signing up, you agree to our user agreement (including class action waiver and arbitration provisions), and acknowledge our privacy policy.

When Andry told his parents that he'd decided to leave Venezuela, in late May of 2024, they begged him to stay. "At least see how things go with the elections," Alexis told him, referring to the country's Presidential race that August. "His father talked to him, too. But there was no way to convince him not to go." Andry's decision initially seemed prescient: the current President, Nicolás Maduro, who appeared to have lost the vote by an overwhelming margin, declared himself the winner. Andry was one of roughly seven hundred and sixty thousand Venezuelans who travelled to the United States during the Biden Administration, traversing an infamously dangerous jungle known as the Darién Gap, between Colombia and Panama. "He made the journey," Alexis said. "He wanted to change his life, to reach his potential, and to help us here."

The first time Andry tried to enter the U.S., he was arrested and sent to Tabasco, Mexico, where a friend helped him download a government app that allowed migrants to make appointments at ports of entry. The system, known as CBP One, was the Biden Administration's attempt to create a more orderly process for people to enter the country. Part of the premise was to incentivize migrants to come "the right way," though it often took months for slots to open up. On the morning of August 29th, a U.S. official interviewed Andry at the U.S.-Mexico border in San Diego. Andry had no criminal record, and the exchange seemed straightforward.

"Did you claim asylum while in Mexico?" the official asked.

"I didn't know I could do that," he replied.

Andry eventually passed his preliminary asylum screening. Officials determined that he demonstrated a "credible fear" of persecution in his home country. But during a physical exam, they had fixated on his tattoos. A snake extending from a bouquet of flowers covers his left forearm and biceps. On each of his wrists is a crown, with the words "Mom" and "Dad" inked next to them in English. The photographs in his file show a thin man, slight of build, with a youthful face and dark hair; there are rings under his eyes, and he is standing before the government photographer without a shirt.





Andry José Hernández Romero.  Photograph courtesy Lindsay Toczylowski

Andry denied belonging to any gang. The agent, who asked him about the tattoos, described his "demeanor during interview" as "uncooperative." A note was added to his file: "Upon conducting a review of detainee Hernandez's tattoos it was found that detainee Hernandez has a crown on each one of his wrist. The crown has been found to be an identifier for a Tren de Aragua gang member." These crowns, according to the government, were "determining factors to conclude reasonable suspicion."

Often, asylum seekers who pass their initial screening are released with a future court date, but Andry remained in custody, apparently because of the government's suspicions about his tattoos. In December, three months into his detention, he met Paulina Reyes, a lawyer from the Immigrant Defenders Law Center, a legal-advocacy organization, who agreed to represent him on a pro-bono basis. Reyes filed an asylum application on Andry's behalf. They spoke regularly, both in person and on the phone, while waiting for a court appearance scheduled for March 13th.

About a week before the hearing, Andry and a number of other Venezuelans in San Diego were transferred to a facility in South Texas. Reyes, whom Immigration and Customs Enforcement (ICE) had neglected to inform, found this out when Andry called her from Texas. That was the last time the two of them spoke. During his March 13th hearing, in San Diego, Reyes thought he might appear on video. When he did not, the proceedings were postponed until March 17th. Reyes wasn't able to speak with him, so she didn't realize that, on Friday, March 14th, he'd managed to make one last phone call to his mother. He told her he was fine, but that the government was about to transfer him again. He had no information about his destination.

**273**

When Andry failed to appear at his second hearing, the immigration judge wanted to know why the government wasn't making him available. "He was removed to El Salvador," the ICE lawyer replied. "We just found out today." This surprised the judge, who was there to determine whether or not Andry should be deported. "How can he be removed to El Salvador," the judge asked, "if there's no removal order?"

On March 14th, Donald Trump had signed a proclamation declaring that his Administration would begin using vastly expanded Presidential powers under the Alien Enemies Act—a law from 1798 that had previously been invoked just three times, supplying the rationale for the U.S. government to target British nationals during the War of 1812, to intern Germans during the First World War, and to intern Japanese, German, and Italian immigrants during the Second. The law allows the President to detain and deport immigrants living lawfully in the U.S. if they are from countries considered "enemies" of the government. In this case, Trump claimed that the Venezuelan gang Tren de Aragua, operating "in conjunction" with elements of the Maduro government, had "infiltrated the United States" and was "conducting irregular warfare."

The White House didn't make the proclamation public for another day. In the meantime, the government was secretly putting Venezuelans who were in federal custody on planes, readying them for deportation. Andry was one of them; there were two hundred and thirty-seven others who, like him, were accused of belonging to the gang. The vast majority were involved in pending immigration cases but were not given an opportunity to contest the alleged evidence against them. A high-ranking ICE official later acknowledged that many of these men had no criminal records in the U.S. but insisted that the absence of such a history "actually highlights the risk they pose."

El Salvador is a conspicuously punitive destination. The country's President, Nayib Bukele, has suspended parts of the country's constitution and, during the

past three years, jailed more than eighty thousand alleged gang members without clear charges. In February, after a meeting in San Salvador with Marco Rubio, the U.S. Secretary of State, Bukele offered to house immigrants who'd been arrested on American soil in his newly built prison, which is called the Terrorism Confinement Center. "We have offered the United States of America the opportunity to outsource part of its prison system," Bukele wrote on X. "The fee would be relatively low for the U.S. but significant for us, making our entire prison system sustainable."

On the day that Trump signed the order, Lee Gelernt, a veteran litigator with the American Civil Liberties Union who specializes in immigrants' rights, was in a courtroom in Washington, D.C., arguing a case about another controversial decision recently made by the Administration. In February, the President had sent a hundred and seventy-eight Venezuelan men from U.S. detention to the military compound at Guantánamo Bay, Cuba. After the A.C.L.U. brought a legal challenge, the Department of Homeland Security deported the men to Venezuela, evidently to avoid a court fight over their access to legal representation. But the government said that it planned to send more migrants to Guantánamo. Gelernt was trying to insure that they'd have access to lawyers. In the hours before the hearing, he'd also been monitoring early news reports that the President was preparing to invoke the Alien Enemies Act to deport more Venezuelan migrants.

As soon as the hearing ended, Gelernt rushed back to his hotel, where he worked through the night with his A.C.L.U. colleagues to prepare an emergency lawsuit. The idea was to prevent the government from deporting anyone under the Alien Enemies Act while the case could be argued in court. "If people already had final orders of removal, the government doesn't need the Alien Enemies Act," Gelernt told me. "Using the Alien Enemies Act is all about short-circuiting the immigration process, not only to eliminate hearings in immigration court but to be able to send them wherever the government wants."

Through a national network of immigration attorneys, the team identified five plaintiffs who fit the profile of those at the greatest risk of being summarily deported to El Salvador: they were Venezuelan men in federal custody who had open immigration cases and had recently been transferred to a detention facility in Texas. The lawyers took down affidavits from the plaintiffs' immigration attorneys —the men themselves were unreachable—and crafted an argument to protect a wider class of migrants in custody. The A.C.L.U. filed its brief sometime after two in the morning on March 15th—a Saturday. Within hours, a federal judge in Washington, D.C., had issued a temporary restraining order to block the deportation of the five plaintiffs, who, it turned out, had already been taken to the airport. Four of them had to be pulled off the planes on the tarmac. The other passengers were left to wait on the aircraft for several hours more.

The judge, James Boasberg, a former prosecutor who'd been appointed to his current position by Barack Obama and to a prior judgeship by George W. Bush, scheduled a hearing on Zoom for five o'clock that afternoon. About an hour before it was set to begin, the White House announced its invocation of the Alien Enemies Act. At the hearing, Boasberg asked the government lawyer, "Are imminent deportations and removals under this proclamation planned?" According to a transcript of the proceedings, the lawyer responded, "Your Honor, I don't know the answer to that question." Boasberg turned to Gelernt, who said, "I recognize it's Saturday, but, on the other hand, the government appears to be moving planes very rapidly to El Salvador with hundreds of people. So we hope that, in the next five minutes, counsel for the government can get an answer to that." Boasberg gave the government forty minutes.

During that time, according to an analysis by the Washington *Post*, two planes full of migrants left Texas for Honduras. Either the government lawyer was unaware of these departures or he feigned ignorance, because when Boasberg reconvened the hearing at six o'clock the attorney still couldn't provide any information. "I am still trying to get additional details," he said.

276

At a quarter to seven, Boasberg issued a ruling to extend his temporary restraining order to anyone in federal custody, which meant that, until further notice, the Trump Administration could deport people under federal immigration laws but not under the Alien Enemies Act. "Particularly given the plaintiff's information unrebutted by the government that flights are actively departing and plan to depart, I do not believe that I am able to wait any longer," Boasberg said. He instructed the government's lawyer "that any plane containing these folks that is going to take off or is in the air needs to be returned to the United States." He added, "However that's accomplished . . . I leave to you. But this is something that you need to make sure is complied with immediately."

The judge's verbal order was entered into the written record at 7:26 P.M. Shortly after that, the two planes that had left Texas during the adjournment arrived in Honduras, and a third took off from Texas. Within a few hours, each of those planes departed Honduras for El Salvador: one at 11:39 P.M., another at 11:43 P.M., and the last at 12:39 A.M. Just before eight o'clock on the morning of March 16th, Bukele posted a New York *Post* article about Boasberg's order, adding in a comment, "Oopsie . . . Too late." Rubio retweeted Bukele's sarcastic post. Bukele soon began releasing footage of Salvadoran soldiers swarming the migrants as they got off the planes. Videos showed the men looking stunned, as their heads were shaved and they were frog-marched into prison.

Several hours later, Nelson, a thirty-five-year-old from Venezuela, who works as a truck driver in North Carolina, spotted his younger brother, Arturo, in a photograph of the detained men dressed in prison whites and crouching in rows with their heads bowed. (Nelson's last name has been withheld for his protection.) He couldn't see Arturo's face, but he didn't have to: Nelson spotted a hummingbird tattoo on his neck. Beyond that, he told me, "We don't have any signs that my brother's even still alive." Arturo's case was first reported by *Mother Jones*, but Nelson and I met through another Venezuelan in the U.S., whose cousin had been deported. She was too scared to talk to a journalist. "We can't give an

interview because his life is at risk in Venezuela, and we're in danger here," she texted. "*Este señor*"—Trump—"is even threatening the lawyers who defend immigrants."

Arturo is a singer who worked landscaping jobs in the U.S. He left Venezuela in 2016, living in Colombia and then Chile with his wife, who, three months ago, gave birth to their daughter. As part of his application for temporary protected status in the U.S., which would have theoretically shielded him from deportation and granted him work authorization, he was supposed to have an appointment with D.H.S. on February 12th to get fingerprinted. But, on February 8th, he was arrested at a house where he was shooting a music video. In Nelson's telling, ICE officers turned up looking for someone else but took Arturo into custody as a "collateral arrest."

The family didn't have the money to retain a lawyer, and Nelson was told he couldn't raise bond. Still, Nelson managed to secure documentation from each of the countries where his brother had lived, demonstrating that he didn't have a criminal history. When I asked Nelson whether he thought Arturo's tattoos were the reason for his deportation to El Salvador, he told me, "I imagine it has to be. He hasn't even gotten a speeding ticket in the U.S., which is how they normally get Latinos. I just don't even understand how there's evidence to categorize him as a criminal."

Other family members learned of their relatives' deportations the same way that Nelson had—from the footage released by Bukele. As the Washington *Post* reported, Mervin Yamarte, a twenty-nine-year-old father from Maracaibo, who had worked as a roofer in Venezuela, had called his mother in mid-March saying he would see her soon: after being arrested, he and three of his friends from home, who were living together in Dallas, had agreed to sign deportation orders, expecting to be returned to Venezuela. When his mother recognized him in a video posted by Bukele, she told the *Post*, "I couldn't speak." The father of Carlos

**278**

Daniel Terán, an eighteen-year-old Venezuelan who was first arrested in January, underline(shared with NPR) a series of text messages he had exchanged with his son on the eve of Carlos's deportation. "With God's help, we are leaving today," Carlos had said, assuming that he was being deported home. "God bless you, son," his father replied. A few days later, someone sent him a photo of his son in the Salvadoran prison. Other relatives panicked when they hadn't heard from the men but could not find them in the U.S. government's searchable database of people in immigration detention. The wife of Franco Caraballo, a twenty-six-year-old, underline(told Reuters), "I've never seen him without hair, so I haven't recognized him in the photos," adding, "I just suspect he's there because of the tattoos that he has and right now any Venezuelan man with tattoos is assumed to be a gang member."

The Trump Administration has denied the Venezuelans a chance to respond to the government's allegations of gang membership, but the most obvious through line, in each case, appears to be their tattoos. As part of the White House's effort to invoke the Alien Enemies Act, ICE officers received a document called the "Alien Enemy Validation Guide," which provided a point system based on different categories of incriminating behavior or associations. If an immigrant in custody scored six points or higher, according to the rubric, he "may be validated" as a gang member. Tattoos, which fall under the "Symbolism" category, constitute four points; social-media posts "displaying" gang symbols are two points. Using "open source material," agents at the investigative arm of ICE compiled photos of tattoos considered suspicious: crowns, stars, the Michael Jordan Jumpman logo. Jerce Reyes Barrios, a thirty-six-year-old soccer player and youth coach, fled Venezuela last year after marching in anti-government protests. His immigration file cites two grounds for suspicion: a gesture he made while posing for a photo that was posted to social media and a tattoo of a crown on top of a soccer ball with a rosary and the word "*Dios*." His lawyer, Linette Tobin, worked with his family to secure documents from the police in Venezuela to show that he hadn't committed any crimes. They also tracked down Barrios's tattoo artist. "He wanted a tattoo related to soccer," the artist said in a legal declaration. "We searched on

the internet and the ball with a crown caught our attention to represent the king of soccer, and he liked the idea."

In the aftermath of the deportations, someone took photographs of Tobin's court filing and posted them on social media, where they soon went viral. Critics of Trump shared them as evidence that innocent people were being sent to "rot in prison" in El Salvador, while the President's defenders shared photos of Tobin, deriding the affidavit she gave as as a "hoax." "I looked at my phone, and I saw the calls and the emails. I was seriously horrified," she told me. Right-wing groups were singling her out for harassment, but she was more upset about her client, whose personal information was now being widely circulated.

Andrés Antillano, a criminology professor at the Central University of Venezuela, has spent much of his career studying Tren de Aragua. "This is the first time I've ever encountered any reference to the significance of tattoos," he told me. He called the thinking "absurd" and "naïve." Tattoos were typically associated with Central American gangs that built their identities around holding specific territory, he said, but "it's been a long time since that sort of thing would apply to Tren de Aragua." In fact, the guidance ICE provided to its officers for identifying members of Tren de Aragua seems to be based on the operations of the Salvadoran gang MS-13. It flags graffiti, hand signs, and tattoos—all hallmarks of MS-13, but "irrelevant" to how Tren de Aragua functions, Antillano said.

Ronna Rísquez, a Venezuelan journalist who's reported extensively on criminal groups in Venezuela, published the definitive book on Tren de Aragua. "The truth is that a tattoo identifying Tren de Aragua does not exist," she told me. "Tren de Aragua does not use any tattoos as a form of gang identification; no Venezuelan gang does." In Rísquez's view, tattoos are a completely unreliable indicator of someone's criminal proclivities; rather, they reflect contemporary fashions and socioeconomic class. "Most young people in Latin America these days have tattoos," she said. Often, they imitate those of celebrities: a watch in reference to the Argentinean soccer legend Lionel Messi, the phrase "real hasta la muerte," in

**280**

homage to the Puerto Rican singer Anuel AA. (Both of these symbols appear in the ICE documents.) Rísquez went on, "People get a tattoo because it means something particular to them."

Andry's tattoos have an immediate significance to the people in Capacho. For a hundred and eight years, the town has held a special festival for the celebration of Three Kings Day, replete with elaborate theatrical acts, sets, costumes, and casts of dozens. The holiday is observed widely across Venezuela (and indeed throughout much of the Christian world), but the production in Capacho is legendary in the country and has been awarded distinguished status as a national *patrimonio*, or heritage. "This work represents for the community of Capacho the greatest cultural expression of street theatre," Jorge Cárdenas, a leader of the Foundation of Reyes Magos of Capacho, told me earlier this week. "To speak of Capacho is to speak of the Reyes Magos."

Cárdenas has known Andry since he was a boy, when Andry participated in the festival's program for children. When we spoke, Cárdenas described Andry's contributions to local theatre, including all of his roles in the festival itself, before leaving me a series of messages brimming with literary and religious detail. Andry was one of the thirteen main actors in the show, a makeup stylist for the others, and the costume designer for nearly two dozen dancers. One of the principal symbols of Three Kings Day is a crown. "Andry is a great lover of the festival, and the two crowns on his wrists are a tribute to his passion for it," Cárdenas said.

During the past week, several of Andry's friends—some in the U.S., others in Venezuela—urged me to watch footage of Andry at the festival, which is on YouTube. There was something painfully desperate in their insistence, as if seeing images of Andry for myself would help correct an otherwise stunning cultural misunderstanding.

One morning, a childhood friend of Andry's named Alejandro, who currently lives in the state of Georgia, where he works as a food deliveryman, spoke to me during his shift. Alejandro came to the U.S. at the end of 2023, shortly after the death of his father, who owned a bus company. He had spent a few years in Venezuela as a taxi driver but eventually abandoned the job because he had to pay too much of his meagre wages to local criminal groups as protection money, a tax known as a *vacuna,* or vaccine. The irony wasn't lost on him that he was now living in a country where he could be accused of gangsterism. "They're taking everyone now," he told me. "It doesn't matter if you have papers or not." He lives in an apartment with his brother-in-law and two others from Capacho. One of them, in a nod to their home town, also has a tattoo of a crown.

Judge Boasberg called a hearing on March 17th to determine whether the Trump Administration had deliberately flouted his earlier order. If so, it meant that the White House was choosing to ignore the Constitution's foundational system of checks and balances—and challenging the judiciary to do something about it. By then, the Justice Department had unsuccessfully asked a higher court to remove Boasberg from the case. In the courtroom, Boasberg explained to the Administration's lawyers that he wanted to "perform fact finding." When did the planes leave for El Salvador? How many people were on each one? When were the migrants transferred into the custody of the Salvadoran authorities? "I'm not at liberty to disclose anything about any flights," one of the Administration's lawyers said. Trump's legal team then struggled to explain why they couldn't say more. "If you tell me it's classified, then we will go down to a classified facility in this building, and you can give me that information then," Boasberg said. "If what you are saying is that it's classified and you can't tell me, then you are going to need to make a good showing as to why that is."

The government lawyer said that he could "consult with the clients on that, but we don't believe it's necessary." Gelernt told the judge, "There's been a lot of talk

over the last seven weeks about constitutional crisis. People are throwing that term around. I think we are getting very close to it."

Within a day, Trump began attacking Boasberg on Truth Social. "This Radical Left Lunatic of a Judge, a troublemaker and agitator who was sadly appointed by Barack Hussein Obama, was not elected President," he wrote. "I'm just doing what the VOTERS wanted me to do. This judge, like many of the Crooked Judges' I am forced to appear before, should be IMPEACHED!!!" In response to the President, Chief Justice John Roberts issued a rare rebuke, saying, "For more than two centuries, it has been established that impeachment is not an appropriate response to disagreement concerning a judicial decision."

Soon, Attorney General Pam Bondi's name began to appear on an increasingly aggressive series of filings. One of them called the judge's requests for information "a picayune dispute over the micromanagement of immaterial factfinding." The Administration claims that it did not violate the judge's order, because two of the three deportation flights had already left the United States when Boasberg made his ruling. According to federal officials, the Venezuelans on the third plane weren't removed solely on the basis of the Alien Enemies Act. But that assertion raises another question: if they were deported under regular immigration procedures, why would they be sent to El Salvador without prior warning? Early last week, the Justice Department invoked the "state-secrets privilege," claiming that sharing even minimal details about the deportation flights "would pose reasonable danger to national security and foreign affairs."

Gelernt was the lead litigator in some of the highest-profile lawsuits of Trump's first term, including successful challenges to the initial Muslim ban and the Administration's family-separation policy. He pointed out that the last time Roberts rebuked the President was in 2018, when, in another case brought by Gelernt and the A.C.L.U., a federal judge blocked a Trump proclamation ending asylum at the border. Trump lambasted him as an "Obama judge." The echoes were unmistakable, yet they also reinforced the fact that the Administration has

only become more combative since Trump's first term. "They're much more intent on picking a fight with the federal judiciary," Gelernt told me. "It appears to me that they think that's a winning political issue for them." He continued, "The stridency of their positions is what's catching me, the unwillingness to give at all. What also seems clear is that the D.O.J. lawyers do not have authorization to make any concessions in court."

On March 26th, a federal appeals court upheld Boasberg's temporary restraining order. One of the judges, Patricia Millett, had expressed disbelief that Venezuelans were being sent to El Salvador without any notice or opportunity to mount a legal defense. "Nazis got better treatment under the Alien Enemies Act," she said. The Justice Department filed an emergency petition before the Supreme Court. In the meantime, Trump's Secretary of Homeland Security, Kristi Noem, who has publicly called undocumented immigrants "dirtbags," visited the Salvadoran facility. Standing in front of a cell crammed with prisoners who appeared to be Salvadorans, covered in MS-13 tattoos, she said, "This facility is one of the tools in our tool kit that we will use if you commit crimes against the American people."

Andry's American lawyers are caught in something of a paradox. They're vocal about sharing the details of his disappearance, because, if he fades from the news, his situation may grow even more dire. Yet Andry is also an asylum seeker. Disclosing the full identity of someone fleeing persecution is inherently risky. One evening, while I was talking with one of his attorneys, Lindsay Toczylowski, the president of the Immigrant Defenders Law Center, CBS News published the full list of the two hundred and thirty-eight Venezuelans deported to El Salvador. "I had spent nights looking at his Instagram pictures, thinking, *How can something like this happen to him?*" she told me. "But at the same time I felt like we couldn't share that information. When the list was published, it was inevitable that those pictures would be out there."

284

Toczylowski and her colleagues had debated whether disclosing that Andry was gay would make him a target inside the Salvadoran prison. They decided it was pointless to try to hide it, and that maybe it would make the public more sympathetic to his case. Ordinarily, this would be a conversation they could have had with Andry. Under the circumstances, all they could do was discuss it with his mother. She told them, "Do absolutely everything you can to get him out of there."

On March 21st, _Time_ published a report, by Philip Holsinger, an American photojournalist, who gained access to the Salvadoran prison when the Venezuelans first arrived. In the story, he described someone roughly resembling Andry. "One young man sobbed when a guard pushed him to the floor," Holsinger wrote. "He said, 'I'm not a gang member. I'm gay. I'm a barber.' "The description went on: he "began to whimper, folding his hands in prayer. . . . He was slapped. The man asked for his mother, then buried his face in his chained hands and cried as he was slapped again."

On social media, people connected this account with the photos that Toczylowski had shared of Andry. Toczylowski told me that it seemed unlikely Andry would have described himself as a barber. But was it possible that, in addition to a gay makeup artist, the Trump Administration had just deported a gay hairdresser? One user on X posted a photo of Andry alongside a photo taken by Holsinger of a Venezuelan prisoner getting his head shaved. "The first photo is of a young Venezuelan named Andrys—a twenty-three-year-old gay makeup artist," the person wrote. (Andry is thirty-one.) A spokesperson for the Department of Homeland Security quoted the post and responded, "No. DHS intelligence assessments go well beyond just gang affiliate tattoos. This man's own social media indicates he is a member of Tren de Aragua."

The residents of Capacho have been holding regular vigils for Andry, and they've recorded videos of spirited pleas to release him. Cárdenas, the head of the Three Kings festival, begged Bukele directly, calling Andry a "great talent of our town."

At the gatherings, many people turned out wearing costumes from the festival. Andry's full name is ubiquitous in the Spanish-language coverage. Online, there are already dozens of photos, not just of him but of his old neighbors and friends filling the streets before the local church. In one of them, Andry's mother and father are standing next to three men in festival garb, holding signs for Conscience, Justice, and Liberty. On each of their heads is a crown. ♦

## New Yorker Favorites

- They thought that they'd found the perfect apartment. They weren't alone.

- The world's oldest temple and the dawn of civilization.

- What happened to the whale from "Free Willy."

- It was one of the oldest buildings left downtown. Why not try to save it?

- The religious right's leading ghostwriter.

- After high-school football stars were accused of rape, online vigilantes demanded that justice be served.

- A comic strip by Alison Bechdel: the seven-minute semi-sadistic workout.

Sign up for our daily newsletter to receive the best stories from *The New Yorker*.



*Jonathan Blitzer* is a staff writer at The New Yorker. His first book, "*Everyone Who Is Gone Is Here*," was published in January, 2024.

**More:** Immigrants    Donald Trump    Deportations    Asylum Seekers

# Get the News & Politics newsletter

The latest from Washington and beyond, covering current events, the economy, and more, from our columnists and correspondents.

Sign up

## READ MORE

THE LEDE

### The Mystery of ICE's Unidentifiable Arrests

In early March, the agency announced that it had arrested forty-eight people in New Mexico—a month later, their identities and whereabouts remain unknown.

**By Jonathan Blitzer**

LETTER FROM BRAZIL

### The Brazilian Judge Taking On the Digital Far Right

Alexandre de Moraes's efforts to fight extremism online have pitted him against Jair Bolsonaro, Elon Musk, and Donald Trump.

**By Jon Lee Anderson**

DEEP STATE DIARIES

### "I Am Seeing My Community of Researchers Decimated"

**287**

Across the country, the Trump Administration's assault on public institutions and its cuts to government funding are forcing scientists to abandon their work and the patients who benefit from it.

**By E. Tammy Kim**

ANNALS OF HIGHER EDUCATION

## What Comes After D.E.I.?

Colleges around the country, in the face of legal and political backlash to their diversity programs, are pivoting to an alternative framework known as pluralism.

**By Emma Green**

A REPORTER AT LARGE

## Starved in Jail

Why are incarcerated people dying from lack of food or water, even as private companies are paid millions for their care?

**By Sarah Stillman**

DEEP STATE DIARIES

## Killing the Military's Consumer Watchdog

A unit inside the C.F.P.B. protects servicemembers and veterans from financial scams. The Trump Administration has tried to stop it.

**By E. Tammy Kim**

THE POLITICAL SCENE

## The Senate's Age of Irrelevance

Elon Musk's DOGE and Trump's executive orders are pushing Congress's upper chamber from ineffectiveness to obsolescence. Will John Thune, the new Majority Leader, let them?

**By David D. Kirkpatrick**

DEEP STATE DIARIES

## The Plight of the Taxman

As I.R.S. employees toil through tax season, their agency is being dismantled by the government it powers.

**By E. Tammy Kim**

THE LEDE

## Why Benjamin Netanyahu Is Going Back to War

The public's fears for the fate of the ceasefire and the hostages have become a struggle over the rule of law.

**By Bernard Avishai**

THE LEDE

## Why Harvard Decided to Challenge Donald Trump

Universities are accustomed to acquiescing to the government, but Trump made Harvard an offer it couldn't *not* refuse.

**By Jeannie Suk Gersen**

A REPORTER AT LARGE

## How Police Let One of America's Most Prolific Predators Get Away

When a prosecutor began chasing an accused serial rapist, she lost her job but unravelled a scandal. Why were the police refusing to investigate Sean Williams?

**By Ronan Farrow**

THE LEDE

## The Last Time Pro-Palestinian Activists Faced Deportation

Mahmoud Khalil's case is eerily similar to that of the L.A. Eight, in which a group of students were targeted, not because of any criminal activity but because of their speech.

**By David Cole**



Your Privacy Choices

# EXHIBIT 17

Case 2:25-cv-05374-DB Document 56-34 Page 309 of 342 Date Filed 05/30/2025

## Los Angeles Times

WORLD & NATION

# About 90% of migrants sent to El Salvador lacked U.S. criminal record



Guards transfer deportees from the U.S., alleged to be Venezuelan gang members, to the Terrorism Confinement Center in Tecoluca, El Salvador, on March 16. ( El Salvador presidential press office via Associated Press)

**By Bloomberg News**

April 10, 2025 7:05 AM PT

Trump administration officials have described the men deported to El Salvador prisons last month as "the worst of the worst," suggesting they were gang members involved in

**292**

murder, rape and kidnapping.

The reality is that of 238 migrants — mostly Venezuelan — that officials accused of belonging to the Tren de Aragua gang and [expelled to the Central American country](#) in mid-March, just a small fraction had ever been charged with serious crimes in the U.S.

Hundreds of pages of U.S. legal records and American government statements reviewed by Bloomberg News found five men charged with or convicted of felony assault or firearms violations. Three men were charged with misdemeanors including harassment and petty theft. Two others were charged with human smuggling.

For the rest of the men, there was no available information showing they committed any crime other than traffic or immigration violations in the U.S.



**POLITICS**

**Supreme Court immigration ruling: Due process in theory, deportation in practice**

April 9, 2025

The findings raise questions about how the Trump administration determined that the migrants sent to El Salvador were violent criminals. The U.S. maintains that all of the Venezuelans on the flights had committed a crime because they were in the country illegally, a senior official with the Department of Homeland Security said in an email. The official said many of the men who lacked U.S. records were nonetheless terrorists, human-rights abusers or gangsters.

Many of the men allegedly associated with Tren de Aragua were deported under the rarely used Alien Enemies Act of 1798 without court review.

A U.S. judge ordered the administration to stop, but on Monday, the Supreme Court said the administration can seek to resume deportations under the act if migrants are given notice and a chance to make their case to a judge.

**293**

Media reports in the Washington Post and elsewhere have cast doubt on the White House's portrayals of the men as criminals, and lawyers have said that some individuals were identified as gang members based on the types of clothing they were wearing or tattoos they had.



POLITICS

**Supreme Court upholds Trump's war power to deport Venezuelan gang members**

April 7, 2025

A CBS News investigation found that three-fourths of the men sent to El Salvador couldn't be connected with a U.S. or international criminal record. Now, Bloomberg's review of U.S. court cases and government statements show there's very little publicly available documentation to support the notion that only violent offenders were sent away.

ADVERTISEMENT

The administration has acknowledged in court that not all the men have criminal records, but say it's only further evidence of the threat they pose.

"It demonstrates that they are terrorists with regard to whom we lack a complete profile," Robert Cerna, the acting field office director of enforcement and removal

operations for Immigration and Customs Enforcement, said in a legal filing in the battle over the deportations.

Bloomberg obtained a list of the passengers and examined their criminal histories by reviewing U.S. federal court records, media reports and public statements by government officials. The search also included state court dockets, though not all local courts make records available online. There were 13 court cases involving people with names that were similar to a deportee, though not an exact match; those weren't included in the final tally because the connection couldn't be confirmed.



**WORLD & NATION**

**A closer look at Trump's move to send Venezuelan migrants to a prison in El Salvador**

April 6, 2025

The deportations are at the center of a high-stakes legal showdown that is testing the ability of federal judges to enforce limits on the president's power. In its Monday opinion, the Supreme Court didn't rule on whether the administration's interpretation of the law was correct, but said it can resume using the law to try to deport alleged Venezuelan gang members. The court said detainees must have notice and a chance to make their case to a judge before they are deported.

U.S. deportations to El Salvador have received outsize attention in part because of Kilmar Abrego Garcia, a Maryland man who immigration officials conceded was wrongly expelled. He was part of a separate group of Salvadoran deportees who were accused of being part of a different gang, MS-13.

Andrés Antillano, a professor at the Central University of Venezuela in Caracas who studies organized crime, says it is possible that some individuals affiliated with Tren de Aragua are in the U.S., but panic about an organized crime wave is overblown. He compared it with previous concerns about immigrants bringing in crime, likening it to

**295**

anti-Italian bias in the 1940s and 1950s focused on alleged ties to the mafia, anti-Cuban sentiment amid Miami's drug wars of the 1980s and more recently stereotypes about Central Americans being involved with MS-13.

"Waves of migration have generated a lot of anxiety, and myths have emerged," Antillano said in an interview. The Trump administration is "criminalizing young Venezuelans, mostly from working-class groups."

## More to Read

**U.S. judge temporarily stops west Texas immigrant deportations under Alien Enemies Act**

April 26, 2025



**Trump's deportations may face challenge as prison punishment without a trial**

April 25, 2025



**Alito's dissent in deportation case says Supreme Court rushed to block Trump with middle-of-night order**

April 20, 2025



Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# EXHIBIT 18

# 50+ Venezuelans Imprisoned in El Salvador Came to US Legally, Never Violated Immigration Law

cato.org/blog/50-venezuelans-imprisoned-el-salvador-came-us-legally-never-violated-immigration-law

By David J. Bier                                                                                              May 19, 2025



Shortly after the US government illegally and unconstitutionally transported about 240 Venezuelans to be imprisoned in El Salvador's horrific "terrorism" prison on March 15, CBS News **published** their names. A subsequent CBS News investigation **found** that 75 percent of the men on that list had no criminal record in the United States or abroad. Less attention has been paid to the fact that dozens of these men never violated immigration laws either.

**Why This Review Was Needed**

The US government not only denied these men due process; it has also generally failed to provide their families, their attorneys, or the public *any* information about what it alleges these men did to deserve incarceration in El Salvador. In fact, it has never even published a comprehensive list of individuals that it has sent to El Salvador, and it has refused to verify the CBS News list. Journalists **have already discovered** that the list obtained by CBS News was incomplete.

**298**

Moreover, in most cases, the men never knew the "evidence" against them or that they were being removed to El Salvador. Finally, the US and Salvadoran governments won't allow the men to talk to anyone, so there is no way to interview them directly.

Given the total lack of transparency by the federal government, we have compiled what the families of the men themselves are reporting about their entries and what likely triggered their incarceration in El Salvador. Their stories are often corroborated by government entry documents, witness testimony, and the administration's statements about them.

**How the Imprisoned Venezuelans Came to America**

Sadly, no information regarding one in three of the men could be found online. Maybe no one in their families knows they are missing, or maybe they are too afraid to speak up. For 48 percent of the 174 about whom we have some information, we have no information about their method of crossing into the United States. For many, the only information is Facebook or Instagram posts from their mothers pleading for information about their children. About 100 relatives also signed **a letter** to Salvadoran President Nayib Bukele, but it contains no case-specific information.

The government calls them all "**illegal aliens**." But of the 90 cases where the method of crossing is known, 50 men report that they came legally to the United States, with advanced US government permission, at an official border crossing point. A **Reuters survey** of 50 men also placed the proportion of those who entered legally at about half. This isn't surprising because about half of all the Venezuelans who have immigrated over the past two years came legally as well—either as **refugees**, **parolees**, or **visa holders**. The proportion isn't what matters the most: the astounding absolute numbers are. Dozens of *legal* immigrants were stripped of their status and imprisoned in El Salvador.

These legal immigrants include a temporary visa holder and four men who were authorized to travel through the US refugee program. The government vetted these refugees abroad and concluded that they would face persecution, letting them resettle in the United States. The other 45 legal immigrants scheduled appointments using the CBP One app, through which they were permitted to seek entry. Among those with appointments, 24 were paroled into the United States, where they could live and work legally for up to two years, while the other 21 were detained at the port of entry.

These people came to the United States with advanced US government permission, were vetted and screened before arrival, violated no US immigration law, and the US government turned around and "disappeared" them without due process to a foreign prison. It **is paying** the Salvadoran government to continue to keep them incarcerated.

**Who Is the US Government Paying to Be Imprisoned?**

**299**

The men were workers—construction laborers, pipe installers, cooks, delivery drivers, a soccer coach, a makeup artist, a mechanic, a veterinarian, a musician, and an entrepreneur. Most of those who were released quickly found jobs in the United States.

A majority of the men are fathers. Altogether, the men were trying to support 44 children. The US government did not inform their families, lawyers, or anyone else of their impending imprisonment at US government expense in a Salvadoran prison **known for torture and other abuses** that would be illegal inside the United States. Agents simply disappeared them without charge or trial or even acknowledgment, which is rightly considered **a crime against humanity**.

CBS News obtained **a list** of the flight manifests from March 15, but there was never any official recognition of that list, so no one could confirm the whereabouts of their loved ones. It turned out that the CBS list was incomplete, and two of these legal immigrants vanished without a trace. It took **mediainvestigations** to reveal their whereabouts in the Salvadoran prison. In one case, ICE lied to the family before **admitting** that their relative was sent to the prison.

**What's the Evidence Against Them?**

The US government asserts that they are "criminal terrorists" who are "confirmed" members of a criminal organization known as Tren de Aragua (TdA). Investigations by the _New York Times_, Bloomberg, and CBS News have all found that few of the imprisoned men have any criminal record. All these legal immigrants denied gang membership, and only two appear to have had a US criminal conviction of any kind, both for minor drug offenses. About two dozen of the legal immigrants were detained immediately at the port of entry where they were authorized to seek entry, so there is no possibility that they demonstrated any gang ties or committed any crimes inside the United States.

Most, at least 42, were labeled as gang members primarily based on their tattoos, which Venezuelan gangs do not use to identify members and are not reliable indicators of gang membership. According to court documents, DHS **created** a checklist to determine that heavily weights "dressing" like a gang member, using "gang signs," and, most critically, tattoos. No criminal conviction, arrest, or even witness testimony is required.

DHS's images of "TdA tattoos" include the Jordan logo, an AK-47, a train, a crown, "hijos," "HJ," a star, a clock, and a gas mask. But as the American Immigration Council's Aaron Reichlin Melnick has shown, **all of these supposed TdA tattoos** were not taken from Venezuelan gang members but rather stolen by DHS from social media accounts that have nothing to do with TdA or Venezuela. For instance, DHS obtained its TdA "Jordan" from a Michael Jordan fan account in the United States. It pulled its AK-47 tattoo from a Turkish tattoo artist.

**300**

Because these men were denied due process, the public had no opportunity to obtain a real accounting of any evidence against them. DHS **says**, "We aren't going to share intelligence reports and undermine national security every time a gang member denies he is one." Of course, they **do share** **details** every time that those details support their negative portrayal of this group.

Therefore, DHS's failure to give any information on anyone else corroborates these men's assertions that they are innocent. In one case, DHS **has even tried** to say that one imprisoned man "entered illegally … via CBP One," which is incoherent and only further highlights how DHS views anyone it wants to expel as "illegal" regardless of how they entered.

Since DHS refuses to be transparent, we must often rely on media reporting and family accounts. However, these accounts often include official government documents, showing no criminal records and legal entries.

Among the supposedly damning tattoos from the legal immigrants were several roses, multiple clocks, crowns over the names of family members, playing cards used to cover up an ugly scar from a childhood accident, a song lyric from a reggaeton artist from *Puerto Rico*, the Real Madrid logo on a professional soccer player, and a reference to the video game Call of Duty on a teenager.

**Here are gay makeup artist Andry Hernandez Romero's tattoos. He entered legally:**

**301**



As Cato's Ilya Somin **points out,** all people are entitled to due process under the US Constitution before the US government imprisons them. This is true whether they entered legally or illegally. But the fact that the US government now has the reputation of sending legal immigrants to foreign prisons without due process may deter many people from wanting to come legally and build their lives in a country where the rule of law is so absent.

**Read the reports for each individual below:**

## Profiles of 50 Legal Immigrants Imprisoned in El Salvador

The tables below summarize the information for each person.

Constitutional Law, Immigration

# EXHIBIT 19

303

*Democracy Dies in Darkness*

# U.S. intelligence contradicts Trump's justification for mass deportations

The determination is the most comprehensive assessment to date undercutting the president's rationale for deporting suspected gang members without due process.

April 17, 2025

By John Hudson and Warren P. Strobel

The National Intelligence Council, drawing on the acumen of the United States' 18 intelligence agencies, determined in a secret assessment early this month that the Venezuelan government is not directing an invasion of the United States by the prison gang Tren de Aragua, a judgment that contradicts President Donald Trump's public statements, according to people familiar with the matter.

The determination is the U.S. government's most comprehensive assessment to date undercutting Trump's rationale for deporting suspected gang members without due process under the Alien Enemies Act, the 1798 law last used during World War II that laid the foundation for the incarceration of more than 110,000 Japanese Americans.

Trump invoked the act in mid-March, proclaiming without evidence that Tren de Aragua is perpetrating an "invasion" of the United States "at the direction" of the regime of Venezuelan President Nicolás Maduro. Under the Alien Enemies Act, the government sent planeloads of alleged gang members to El Salvador's notorious megaprison despite a judge's order to turn the planes around and afford the detainees an opportunity to challenge their removal through standard legal processes.

---

## Trump presidency

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises and legal challenges to his executive orders and actions.

---

The intelligence product found that although there are some low-level contacts between the Maduro government and Tren de Aragua, or TdA, the gang does not operate at the direction of Venezuela's leader. The product builds on U.S. intelligence findings in February, first reported by the New York Times, that the gang is not controlled by Venezuela.

The National Intelligence Council is the analytic hub of the U.S. intelligence community that reports to Director of National Intelligence Tulsi Gabbard. It is composed of veteran specialists in particular regions or topics, known as national intelligence officers, and produces classified assessments meant to represent the assessment of all U.S. spy agencies.

The people familiar with this assessment spoke on the condition of anonymity to discuss confidential intelligence matters.

When asked about the findings, the Office of the Director of National Intelligence dismissed it as the work of "deep state actors" working in conjunction with the media.

"President Trump took necessary and historic action to safeguard our nation when he deported these violent Tren de Aragua terrorists," the statement said. "Now that America is safer without these terrorists in our cities, deep state actors have resorted to using their propaganda arm to attack the President's successful policies."

The finding was nearly unanimous among the U.S. intelligence agencies with the exception of the FBI, which assessed a moderate level of cooperation between the gang and the Venezuelan government, two people familiar with the matter said.

The dispute over the group's ties to Venezuela come amid a larger standoff between the Trump administration and the courts that has alarmed constitutional scholars, the president's political opponents and some fellow Republicans as the administration challenges judges' orders arising from this case and others.

The Alien Enemies Act empowers the executive branch to summarily remove foreigners whose home country is at war with the United States or waging a "predatory incursion" into U.S. territory. Legal experts believe the law requires that the invasion or incursion be linked to the actions of a foreign government.

Trump's invocation of the act claims such a link: "TdA is undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela."

Two Democrats on the House Intelligence Committee, Rep. Jim Himes (Connecticut), the panel's top member from his party, and Rep. Joaquin Castro (Texas), wrote to Gabbard on April 10 imploring her to declassify information on TdA's alleged ties to the Venezuelan government, a committee spokesperson said. The pair asked her to do so "in keeping with her public commitment to greater transparency" from U.S. spy agencies. They have yet to receive a reply, the spokesperson said.

Castro asked Gabbard at an Intelligence Committee hearing in late March whether U.S. spy agencies assessed that the Maduro government is directing "any hostile actions against the United States."

**305**

"There are varied assessments that came from different intelligence community elements," Gabbard replied. She did not disclose that almost all U.S. intelligence agencies, with the exception of the FBI, did not see evidence of such links.

At the hearing, Castro also asked CIA Director John Ratcliffe whether U.S. spy agencies had an assessment that the United States is at war with, or being invaded by, Venezuela. "We have no assessment that says that," Ratcliffe replied.

A former U.S. intelligence officer who served in South America, speaking on the condition of anonymity because of the issue's sensitivity, said he knew of no evidence that TdA was directed by Maduro and his allies. That view is shared widely by regional analysts.

"The idea that Maduro is directing Tren de Aragua members and sending criminals to infiltrate the United States is ludicrous," said Geoff Ramsey, a Venezuela expert at the Atlantic Council, a Washington-based think tank.

The group, which started as a prison gang in the Venezuelan state of Aragua in 2014, has expanded into a transnational gang that has carried out brazen crimes from Santiago, Chile, to New York City. But it does not operate with a clearly defined hierarchical structure, Ramsey said.

"Tren de Aragua has become more like a brand that any group of carjackers from Miami down to Argentina can invoke to further their criminal activity, but there's really no clear sense of hierarchy," he said. "And the reality is that Tren de Aragua has not always gotten along with the Maduro government: We saw just a few years ago, the military in 2023, stormed a prison that Tren de Aragua controlled and allegedly carried out extrajudicial executions."

Trump's standoff with the courts over his deportation orders has grown increasingly rancorous.

For weeks, Chief U.S. District Judge James E. Boasberg of D.C. has pressed the Justice Department on why the administration deposited more than 130 Venezuelan deportees in the Salvadoran megaprison without due process, hours after he ordered the administration not to do so and said any planes that had already taken off should be turned around and returned to the United States.

On Wednesday, he said he would launch proceedings to determine whether any Trump administration officials defied his order not to deport the migrants and should face criminal contempt charges.

"The Constitution does not tolerate willful disobedience of judicial orders — especially by officials of a coordinate branch who have sworn an oath to uphold it," the judge said.

Allowing political leaders to defy court judgments would make "a solemn mockery" of "the constitution itself," he said.

Administration officials have broadly maintained that they've complied with all court orders, even as they've repeatedly walked right up to the line of open defiance and publicly attacked Boasberg and other judges for seeking to restrain the president's agenda.

Steven Cheung, White House communications director, said in an emailed statement, "The President is 100% committed to ensuring that terrorists and criminal illegal migrants are no longer a threat to Americans and their communities across the country."

**306**

**What readers are saying**

The comments overwhelmingly criticize President Trump, focusing on his alleged dishonesty and the contradiction between his claims and the U.S. intelligence community's assessment regarding Tren de Aragua's ties to the Venezuelan government. Many commenters express disbelief in...   Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# Tab N

## SUPPLEMENTAL DECLARATION OF JENNIFER BABAIE

I, Jennifer Babaie, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge:

1. My name is Jennifer Babaie. I am the Director of Advocacy and Legal Services of Las Americas Immigrant Advocacy Center. Las Americas is one of the few legal service providers offering pro bono representation to detained immigrants in Texas and New Mexico. We work with clients detained in the U.S. Immigration and Customs Enforcement ("ICE") El Paso Field Office jurisdiction, including El Paso Processing Center ("EPPC").

2. Besides the named Petitioner in this case, M.A.P.S., Las Americas directly represents or has assisted multiple individuals in immigration detention who have been accused by the government of being associated with or members of Tren de Aragua ("TdA").

3. For instance, Las Americas represents Anyelo Jose Sarabia Gonzalez, a 19-year-old Venezuelan national who was wrongfully deported to the CECOT prison in El Salvador on or about March 15, 2025. He, along with his older sister, applied for asylum within one year after entering the United States in November 2023. In January 2025, Mr. Sarabia Gonzalez was suddenly arrested when he went to his ICE check-in in Dallas, Texas, based on his tattoos, even though they have no connection to any gang. Despite being in removal proceedings—in fact, his next immigration court date was scheduled for today, May 20, 2025—Mr. Sarabia Gonzalez was deported to El Salvador based on false allegations that he is a TdA member. *See J.G.G. v. Trump*, No. 1:25-cv-766-JEB (D.D.C. Mar. 19, 2025), ECF No. 44-13 (declaration of Mr. Sarabia Gonzalez's sister).

4. As of May 20, 2025, my staff and I are aware of three other Venezuelan individuals currently detained at EPPC who have been accused of TdA membership by either ICE or Customs and Border Protection.

5. On any given day, thousands of people are detained in the Western District of Texas. ICE regularly reports its detention data on its website. Based on the data reported in May 2025, there was an average daily population of 3,673. *See* U.S. Immigr. & Customs Enf't, FY 2025 ICE Statistics: Detention FY 2025 YTD (data source May 13, 2025), https://www.ice.gov/detain/detention-management (download spreadsheet, select "Facilities FY25" tab, and add numbers for all male and female average daily population (FY ADP) for the following facilities: EPPC (743); Karnes County ICE Processing Center (816); Limestone County Detention Center (27); T. Don Hutto Detention Center (428); and South Texas ICE Processing Center (1659)).

6. A new report reflects that one of the detention centers in this District, South Texas ICE Processing Center, is among the 12 detention centers with the highest average daily populations in the country. *See* Austin Kocher & Adam Sawyer, New Method Uncovers Hidden Population Spikes at Some ICE Detention Centers (May 12, 2025), https://austinkocher.substack.com/p/new-method-uncovers-hidden-population.

7. Despite these high populations and the attendant need for immediate legal representation, there are not enough attorneys willing to work with detained immigrants. The number of nonprofit immigrants' rights lawyers and immigration attorneys willing to take cases *pro bono* or *low bono* is a drop in the bucket, and so most people in detention are unrepresented. There are many factors contributing to the lack of attorneys, including: there is no law school in the region; funding for this kind of representation has been cut back; and immigration law and representation of detained clients is complicated and requires extensive training and keeping abreast of new policies and laws. Previously, there was a Legal Orientation Program in EPPC; that program would provide Know Your Rights presentations to detainees, and in appropriate cases it would refer detainees for possible legal representation. Because this program no longer exists at EPPC, it is far harder to do any outreach to people detained at EPPC.

8. People in detention also face many barriers in reaching out to even try to find an attorney willing to help them. As mentioned, as a result of federal stop-work orders and contract terminations, there is no longer public funding for a Legal Orientation Program, so at EPPC and many if not all other detention centers there are now no groups regularly visiting detention centers to provide legal information and orientation. Each detention center has its own rules and systems in place for setting up confidential attorney calls, and those are generally initiated *by the attorney* outside the facility. So if a person or their family has not already retained an attorney for them to initiate such calls, those in detention must have money in their account to be able to afford outgoing calls to seek consultation and representation. Moreover, ICE regularly transfers people between detention centers without any notice to attorneys and even refuses to release dates of deportation to attorneys of record. Thus, if an attorney has a pre-representation call set up with a potential client but that person is moved to a different facility, that can lead to at least several days' delay, as the attorney must locate the individual and then navigate the new detention center's process for legal calls and wait to set up another legal call at the new facility.

9. Unrepresented detained people face multiple barriers to preparing and filing a habeas petition. First, the majority of individuals in ICE detention have limited English proficiency. Las Americas works with hundreds of detained individuals per year: the vast majority do not speak, read, or write any English, and many of them are illiterate in their native language. While there is supposed to be a law library in every detention center, the one at EPPC has limited resources, including old computers that struggle to maintain internet connection and load websites, and there are no interpretation or translation services available. There is also no program or means of providing impacted persons with an overview of what habeas corpus is, why it is relevant to them, and how they can apply for it. In other words, the vast majority of people in detention—and especially those likely to be subject to the Alien Enemies Act ("AEA")—would somehow, on their own, need to learn (1) there is a form of relief known as a writ of habeas corpus, (2) they should file a habeas petition in federal court if they wish to challenge their AEA designation, (3) the steps they would need to properly file a habeas petition, i.e., how to go online and locate and download necessary forms and how to file those forms in federal court, and (4) how to draft a habeas petition with the necessary information to obtain relief from a federal court, all in English. Even if they somehow became aware of all that,

they would still need to rapidly complete all of these steps and would require assistance of facility staff as well as individual financial resources to mail the documents to the federal courthouse and serve respondents in a timely manner.

10. Even when Las Americas represents a detained noncitizen in a habeas case, the process takes a lengthy time to gather the necessary facts and prepare the habeas petition. Typically, we learn of a new case via our general telephone hotline, which allows persons detained at EPPC to leave us a voicemail describing their situation and the help they need. Depending on capacity at the time and the needs presented in a case, our team will review phone messages several times a week and add the person to an intake wait list. Our intake wait list can range anywhere from 1 week to 4 weeks, depending on volume. We also receive referrals from family members and organizations based locally and across the U.S., and from consulates serving constituents in the area. During the screening process, we evaluate a case based on a multitude of factors, including eligibility for immigration relief, what opportunities for relief are available, and capacity to intervene in their case in a timely manner. Prior to the President's Proclamation under the AEA, Las Americas only handled habeas cases in a very limited way, with a co-counsel arrangement with at least one other organization or lawyer, and as a means of seeking relief for persons facing indefinite detention, rather than to prevent impending removal.

11. The decision as to whether we can adequately represent someone for a writ of habeas corpus also turns on whether we have an attorney that can assist us with a pro hac vice appearance in federal court. This has proven more difficult in Texas than in New Mexico, and we have recently invested in applying for admission for one staff attorney to the Western District of Texas. Each habeas filing also turns on whether we have the financial resources to support the case, including mailing fees to comply with federal service of process rules, filing fees, and pro hac vice fees. Finally, as habeas is not a traditional part of our practice, or that of many immigration legal service providers, we often do not have attorney capacity to file and litigate these cases because of challenges juggling briefing and hearing rules and timelines in two different federal circuits, while still maintaining a full immigration court docket.

12. In short, it is exceedingly difficult for a person in detention who does not currently have representation to find an attorney to help them file a habeas petition, even if they have several weeks' notice. It is practically impossible for an unrepresented detained person to file a habeas petition on their own in a matter of days.

I, Jennifer Babaie, affirm under penalty of perjury, that the foregoing is true and correct.

Date: May 20, 2025                    */s/ Jennifer Babaie*
                                       Jennifer Babaie

# Tab O

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

M.A.P.S., on her own behalf and on behalf of others
similarly situated,

*Petitioner–Plaintiff*,

v.

ANGEL GARITE, in his official capacity as Assistant
El Paso Field Office Director for U.S. Immigration
and Customs Enforcement and Warden of the El Paso
Processing Center, *et al.*,

*Respondents–Defendants*.

Case No: 3:25-cv-0171-DB

## PETITIONER-PLAINTIFF'S REPLY
## IN SUPPORT OF PRELIMINARY INJUNCTION

i

## INTRODUCTION

A preliminary injunction (or summary judgement) is warranted. And absent intervention by this Court, Petitioner and the class face irreparable harm, ECF No. 16, a conclusion strongly bolstered by the Supreme Court's recent ruling in *A.A.R.P. v. Trump*, No. 24A1007, 2025 WL 1417281 (U.S. May 16, 2025) (per curiam) (issuing a district-wide injunction pending appeal).

## ARGUMENT

### I.     THE COURT CAN REVIEW PETITIONER'S CLAIMS.

The government claims that Petitioner lacks standing, even though she has been formally designated under the Proclamation, because she might not be removed. Opp. 7. No court has accepted that argument, even in cases where the petitioners had not yet been formally designated under the Proclamation. *See, e.g.*, *D.B.U. v. Trump*, 2025 WL 1304288, at *2–3 (D. Colo. May 6, 2025); *A.S.R. v. Trump*, 2025 WL 1378784, at *9–10 (W.D. Pa. May 13, 2025); *W.M.M. v. Trump*, 2025 WL 1358476, at *8 (N.D. Tex. May 9, 2025). Indeed, the Supreme Court "reject[ed]" the proposition that assurances to forego removal while a habeas petition is pending could defeat class treatment or moot a claim. *A.A.R.P.*, 2025 WL 1417281, at *4 (citation omitted).

Respondents also contest standing because some class members may have Title 8 immigration orders. Opp. 8. But Petitioner does not have such an order. And nothing in this litigation prevents the government from lawfully executing a Title 8 final removal order. Rather, Petitioner challenges the government's assertion of extraordinary powers under the AEA to circumvent Title 8, eliminate humanitarian relief, and send Venezuelans to a notorious Salvadoran prison. Respondents also contend that they lack responsibility for any harm that befalls class members at the hands of third parties after removal, but not surprisingly, no court has accepted that remarkable contention. *See A.A.R.P.*, 2025 WL 1417281, at *2; *G.F.F. v. Trump*, 2025 WL

312

1301052, at *10 (S.D.N.Y. May 6, 2025); *D.B.U.*, 2025 WL 1304288, at *9; *A.S.R.*, 2025 WL 1378784, at *22; *see also Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005) ("irreparable harm" from "likely persecution" "if deported").

Respondents argue that even if there is standing, the court may not review whether the Proclamation satisfies the statutory criteria for invoking the AEA. But the Supreme Court has already foreclosed that argument. *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) ("questions of interpretation and constitutionality" of the AEA are reviewable) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)). Thus, in accordance with *J.G.G.*, Judge Rodriguez of the Southern District of Texas explained in *J.A.V. v. Trump*, that whether the Proclamation satisfies the AEA's statutory preconditions is reviewable and then proceeded to find the Proclamation was invalid on the merits. 2025 WL 1257450, at *13–18 (S.D. Tex. May 1, 2025). Every other district court has likewise rejected this argument, as has Judge Henderson in the D.C. Circuit. *See e.g.*, *G.F.F.*, 2025 WL 1301052, at *8; *D.B.U.*, 2025 WL 1304288, at *3–4; *A.S.R.*, 2025 WL 1378784, at *11; *J.G.G. v. Trump*, 2025 WL 914682, *5–7 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (addressing *Citizens Protective League*, *California*, and dismissing political question arguments).[1]

Lastly, Respondents wrongly assert that the Court lacks jurisdiction over Petitioner's CAT claim. Opp. 14. Petitioner does not ask *this* Court to decide whether she is ultimately entitled to CAT protection, but only to decide that she has a right to present her claim in some forum. And the jurisdictional provision on which the government relies, § 1252(a)(4), has no bearing here because it provides only that the individual merits of a CAT claim should be raised in immigration proceedings. Here, the whole point is that the government is seeking to circumvent immigration

---

[1] Respondents' other cases are irrelevant because they pre-date *Ludecke* or do not address AEA (*United States v. Abbott*, 1110 F.4th 700 (5th Cir. 2024), addresses "invasion" in the Constitution; *Martin v. Mott*, 25 U.S. 18 (1827), use of militia in a separate statute). Opp. 10–11.

proceedings and refusing to allow class members to raise their CAT claims in those proceedings, followed by a petition for review. Where, as here, a noncitizen has "no opportunity to raise these issues before an [Immigration Judge] . . . there can be no judicial review as contemplated in the channeling provisions of section 1252(a)(4)." *D.V.D. v. U.S. DHS*, 2025 WL 1142968, at *9 (D. Mass. Apr. 18, 2025). That is why "section 1252(a)(4) does not bar review [w]hen a detained [noncitizen] seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal." *Id.* (internal quotations and citation omitted); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 732 (D.C. Cir. 2022) (reviewing claim that the government could not bypass CAT by using public health laws).[2]

## II.    PETITIONER IS LIKELY TO SUCCEED ON THE MERITS.

### A.    The Proclamation Fails to Satisfy the AEA.

Respondents do not seriously contest that every tool of interpretation—including copious historical evidence—confirms that the AEA requires armed conflict between nation states, not the "crimes" or "mass migration" asserted by the Proclamation. Mot. 14–23. Respondents simply do not engage with that evidence, instead, arguing that the Court should revise the statute, departing from its original meaning. Opp. 15–18. But that contradicts the Supreme Court's repeated directive to interpret statutes based on "the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). While there may be technological advances

---

[2] Respondents' cases are inapposite. *Kapoor v. DeMarco* challenged the Secretary of State's decision to *extradite* a fugitive and the court explicitly relied on the "rule of non-inquiry" specific to that context. 132 F.4th 595, 608–11 (2d Cir. 2025); *see also Mironescu v. Costner*, 480 F.3d 664, 674 (4th Cir. 2007) (CAT unavailable because "Mironescu presents his claim as part of his challenge to extradition, rather than removal"). *Omar v. McHugh* concerned the rights of individuals held in *military* custody *abroad*. 646 F.3d 13, 18 (D.C. Cir. 2011). And the petitioner in *Garay v. DHS* had his CAT claim fully adjudicated in removal proceedings, so he already had a forum to pursue his rights under FARRA. 2019 WL 542035, at *1 (W.D. Tex. Feb. 8, 2019).

314

in warfare, the terms of the AEA still require an "invasion" or "predatory incursion" as understood when it was passed in 1798—one arising in a military context "against the territory" of the United States. Here, Respondents' proposed interpretation is far afield from what Congress intended, no longer involving a state actor, armed conflict, or territorial incursion.[3] As both Judge Rodriguez and Judge Henderson explained at length, the AEA is a wartime authority that is simply not applicable to migration or criminal activity. *See J.G.G.*, 2025 WL 914682, *8–10 (Henderson, J., concurring) (examining text, context and history, and noting "[m]igration alone did not suffice"); *J.A.V.*, 2025 WL 1257450, at *17–18 (Proclamation's description of TdA's activities do not constitute and "invasion" or "predatory incursion" within meaning of AEA).

Second, any purported invasion is not perpetrated by a "foreign nation or government." Respondents contend that TdA is intertwined with the Venezuelan government, but the statute requires a "nation or government." Mot. 18–23. There would be no need for TdA to undertake hostile actions at the direction of the Maduro regime if TdA was itself a nation or government. *See D.B.U.*, 2025 WL 1304288, at *7. Respondents argue that TdA exercises de facto territorial control, but the Proclamation itself stops far short of saying that TdA operates as a genuine government with sovereign control over any territory. And Respondents' claim is further belied by the fact that the Proclamation names Venezuela, not TdA, as the relevant "foreign government."

If Congress intended to vest the President with broader authority, it would have said so. After all, as explained in a source Respondents cite, Congress has long been aware of the

---

[3] Respondents attempt to introduce several news articles claiming that TdA is attempting to control territory in the U.S. Opp. 19. But the Proclamation itself must declare "the event" that the President is responding to, and it does not allege that TdA is attempting to control U.S. territory. In any event, experts explain that there is "no evidence" that TdA has "a significant presence in the US." ECF No. 34-4 ¶ 12; ECF No. 34-5 ¶ 2 (TdA "has little substantial U.S. presence"); ECF No. 34-3 ¶¶ 19, 27 (no "foothold" in the US nor any "systemic" or "structured" activity).

distinction between executive branch authority to use "military force against non-traditional actors" and "more traditional conflicts" waged against formally recognized states. Opp. 20 (citing Bradley & Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005)). Congress knows how to confer authority against non-state actors, *see, e.g.*, 22 U.S.C. § 6442a; 18 U.S.C. § 2339A, but it has never amended the AEA to broaden its scope beyond actions taken by "foreign nation[s]" and "government[s]," 50 U.S.C. § 21.

Respondents cannot cure these defects by gesturing to TdA's designation as a foreign terrorist organization (FTO). Opp. 19–20. That designation does not require anything close to military hostilities. Instead, a "foreign organization" can be designated as an FTO for engaging in—or intending to engage in—a long list of criminal activities, like kidnapping or "[t]he use of any . . . firearm, or other weapon or dangerous device." 8 U.S.C. § 1189(a)(1)(A), (B) (referencing 8 U.S.C. § 1182(a)(3)(B)). Nor does the FTO criteria require any element of statehood, territorial control or diplomatic engagement. The AEA, by contrast, was designed for war between sovereign states. That framework simply does not apply to TdA or other gangs.[4]

In sum, the Court need look no further than the Proclamation's face: Even accepting the findings, they do not assert that TdA is a nation or government that has citizens or exercises treaty powers or other formal governmental powers. Nor do the findings claim that TdA has engaged in a *military* invasion or incursion against U.S. territory.[5]

### B. The Notice Violates the AEA and the Due Process Clause.

---

[4] Indeed, Congress has provided a different set of tools for detaining and removing FTO members specifically. *See, e.g.*, 8 U.S.C. § 1182(a)(3)(B); 8 U.S.C. § 1227(a)(4)(B); 8 U.S.C. § 1534.

[5] Respondents submitted the FBI's report, which concluded that it was "more or less equally plausible" that TdA was supported or was not supported by the Venezuelan government. Exh. C, FBI Report 6. But it failed to submit reports from the *seventeen* other agencies that concluded that the Venezuelan government is not directing an invasion by TdA. ECF No. 34-10 at Exh. 19.

The Supreme Court has already twice made clear that AEA designees are entitled to "due process" and "notice and opportunity to be heard," which includes notice "afforded within a reasonable time and in such a manner as will allow them to *actually* seek habeas relief." *J.G.G.*, 145 S. Ct. at 1006 (emphasis added); *A.A.R.P.*, 2025 WL 1417281, at \*2. While Respondents state that they are "working on a new notice process" since the Court's *A.A.R.P.* decision rejecting their protocols, they oppose the relief that Petitioner specifically requests, Opp. 23, but present no reason why the Court should revisit its conclusion that 30 days' notice is necessary, ECF No. 16.

The fact that Petitioner herself received notice does not undermine this claim, especially for the class. *See A.A.R.P.*, 2025 WL 1417281, at \*4 ("[W]e are skeptical of the self-defeating notion that the right to the *notice . . .* must *itself* be vindicated through individual habeas petitions, somehow by plaintiffs who have not received notice."). Respondents cite a tiny handful of cases—all brought by individuals who had prior representation—but that only underscores that the vast majority have not been able to seek judicial review. Petitioner's counsel is not aware of any case where an unrepresented individual was able to file their own habeas petition. That is unsurprising given the inadequate form Respondents use, *see* ECF No. 3-2 at 5, and the immense barriers for detained people seeking representation or proceeding pro se, *see* ECF No. 34-11 ¶¶ 7–12.

Finally, Respondents fail to contend with the plain language of § 21 requiring an opportunity for voluntary departure. *See* 50 U.S.C. § 21 (permitting removal of only those alien enemies who "refuse or neglect to depart"); *U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947) (opportunity to voluntarily depart is a "statutory condition precedent" to removal); *see also J.G.G. v. Trump*, 2025 WL 890401, at \*14 (D.D.C. Mar. 24, 2025). There is no exception to this right under § 21. *See U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947). Respondents invoke § 22's exception for those "chargeable with actual hostility, or other crime

against public safety," Opp. 24, but the § 22 exception applies to an entirely separate issue— whether designees receive an additional period to settle their affairs in accordance with bilateral treaties or "national hospitality." In any event, § 22's exception requires a specific, individualized finding of being "chargeable" with actual hostility or a crime against public safety. *See U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 141 (2d Cir. 1947). Respondents have made no such showing here, let alone afforded any process to contest one's initial AEA designation.

### C.    The Proclamation Violates the Specific Protections that Congress Established for Seeking Humanitarian Protection, and INA's Procedural Requirements.

Respondents argue that there is no direct conflict between CAT and removals under the AEA because the U.S. avoids removals to countries where noncitizens will likely be tortured. Opp. 26 (citing *Munaf v. Geren*, 553 U.S. 674 (2008)). But the government cannot merely assert that; moreover, it ignores the extensive evidence about Salvadoran prisons. *See* ECF No. 34-6 (Bishop Decl.); ECF No. 34-7 (Goebertus Decl.). More fundamentally, it ignores the Proclamation's central defect: it categorically forecloses any opportunity even to *invoke* CAT protections. *See Huisha-Huisha*, 27 F.4th at 731–32. *Munaf* offers Respondents no support because there the Court expressly stated that CAT "speaks to situations where a detainee is being 'returned' [from the United States] to 'a country,'" and declined to decide its applicability to the facts before it, where petitioners were already outside the United States. 533 U.S. at 703 n.6 (cleaned up). That caution reinforces Petitioner's point: courts must adjudicate whether the government can effect removals under the AEA without first allowing one even to seek CAT relief, which is a binding obligation. Respondents further try to evade CAT protections by arguing that it is only used for removal under the INA. Opp. 25. But they fail to address *Huisha-Huisha*, which is on all fours with this case. CAT protections are not contradicted by anything in the AEA and therefore must be given full effect. 27 F.4th at 731–32 (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When . . .

confronted with two Acts of Congress allegedly touching on the same topic," a court "must strive to give effect to both.") (cleaned up)). Because no genuine conflict exists between the AEA and CAT, this Court can harmonize these statutes by concluding that CAT's protections apply to removals under the AEA. The government's reliance on *Citizens Protective League v. Clark*, 155 F.2d 290 (D.C. Cir. 1946), fares no better. Opp. 26–27. That case predates CAT by more than fifty years—Congress has since enacted obligations that impose an explicit statutory bar on removing individuals to countries where they are more likely than not to face torture. 8 U.S.C. § 1231 note.

The same is true of other humanitarian protections, such as withholding. While the AG and DHS administer such protections, their availability is governed by Congress and cannot be categorically displaced by Executive discretion. A blanket bar based solely on AEA designation is flatly incompatible with the INA's requirement of case-by-case adjudication, including under 8 U.S.C. § 1231(b)(3)(B)(iv). *See Las Americas Immigr. Advoc. Ctr. v. DHS*, 2025 WL 1403811, at *15 (D.D.C. May 9, 2025) (rejecting "arguments about the government's discretion in ultimately granting asylum" in light of INA's plain language). Respondents also incorrectly contend that the INA's procedural mechanisms are irrelevant. Opp. 25. Respondents mischaracterize 8 U.S.C. § 1229a(a)(3) as pertaining only to the determination of "admissibility" or "deportability" under Title 8. Opp. 25. But nothing in that statute so limits its terms. To the contrary, § 1229a(a)(3) renders the INA the "sole and exclusive procedure" to determine whether *any* noncitizen "may be . . . removed from the United States." And while Congress knew of the AEA when it enacted the INA, it deliberately declined to exclude AEA-based removals from this statutory scheme— even as it carved out express exceptions elsewhere. *See, e.g.*, 8 U.S.C. §§ 1225(b), 1531.

## III.    THE COURT MAY ENJOIN TRANSFERS OUT OF THE DISTRICT.

Respondents are wrong that the INA's jurisdictional provisions bar this Court from

319

prohibiting transfers within the United States. *See D.B.U.*, 2025 WL 1304288, at *5 (rejecting same jurisdictional arguments). Section 1252(a)(2)(B)(ii) applies only to those decisions where Congress has "set out the Attorney General's discretionary authority in the statute." *Kucana v. Holder*, 558 U.S. 233, 247 (2010). While the government points to § 1231(g), that provision never even mentions "transfer," let alone commits transfer decisions to the agency's unreviewable discretion. *See Ozturk v. Hyde*, 2025 WL 1318154, at *8 (2d Cir. May 7, 2025); *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 209–10 (4th Cir. 2019) (relying on *Kucana* to hold § 1252(a)(2)(B)(ii) does not bar review of transfer decisions); *Aguilar v. U.S. ICE*, 510 F.3d 1, 20 (1st Cir. 2007) (rejecting *Van Dinh v. Reno* as the "minority view"). Transfer is not a discretionary action that § 1252(a)(2)(b)(ii) is meant to shield from review. *See Zadvydas v. Davis*, 533 U.S. 678, 688 (2001); *Gayle v. Meade*, 614 F. Supp. 3d 175, 1203–04 (S.D. Fla. 2020).[6] And because § 1231(g) does not address transfers, they are not encompassed within the actions that cannot be enjoined under § 1252(f)(1). *See, e.g., J.A.V.*, 2025 WL 1257450, at *18 (enjoining transfers). Respondents' reliance on § 1252(g) is likewise incorrect because that provision "applies only to three discrete actions . . . to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders,'" *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 482 (1999), and applies only to the AG's discretionary authority, *id.* at 485. Like § 1252(a)(2)(B)(ii), it does not bar review of statutory and constitutional claims. *See D.B.U. v. Trump*, No. 25-cv-1163 (D. Colo. May 2, 2025), ECF No. 49 at 8–9.[7]

---

[6] *Dominguez-Estrella v. INS*, 71 F. Supp. 2d 578 (W.D. La. 1999), is inapposite because it predates *Kucana*'s holding on § 1252(a)(2)(B)(ii), and concerns a discretionary decision to deny release.

[7] *Glushchenko v. U.S. DHS*, 566 F. Supp. 3d 693 (W.D. Tex. 2021), supports Petitioner because the court there maintained jurisdiction over statutory and constitutional claims. *Liu v. INS*, 293 F.3d 36 (2d Cir. 2002) involved a challenge to removal orders or commencement of removal proceedings under the INA, not the AEA. Finally, *Tercero v. Holder*, 510 F. App'x 761, 766 (10th Cir. 2013), cited § 1231(g) without any meaningful analysis, and disregarded *AADC*'s holding that § 1252(g) only applies to the three specifically enumerated decisions, 525 U.S. at 482.

If there were any doubt, the All Writs Act permits a court to "enjoin almost any conduct 'which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion.'" *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1102 (11th Cir. 2004); *see also ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978). As a practical matter, if the government were permitted to transfer Petitioner or class members outside the District to a distant detention center, counsel would face obstacles in gathering evidence and presenting facts relevant to the claims in this case, including whether they are properly designated under the Proclamation. S*ee A.A.R.P.*, 2025 WL 1417281, at *3 ("We had the power to issue injunctive relief to prevent irreparable harm" (citing 28 U.S.C. § 1651(a))); *G.F.F.*, 2025 WL 1301052, at *12 (enjoining transfers pursuant to All Writs Act).

## III.    EQUITABLE FACTORS WEIGH IN PETITIONER'S FAVOR.

Respondents dismiss Petitioner as complaining of the general "burden of removal." Opp. 28 (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2019)). But the Supreme Court has already explained that individuals in Petitioner's position have "a high risk" of "severe, irreparable harm." *A.A.R.P.*, 2025 WL 1417281, at *2. Conversely, the government can make no comparable claim to harm. *See id.* (granting stay pending appeal); *D.B.U. v. Trump*, 2025 WL 1233583, at *1 (10th Cir. Apr. 29, 2025) (no irreparable harm from order restraining AEA removals). Indeed, the government retains the ability to prosecute crimes, detain noncitizens, and remove noncitizens under existing immigration laws. *See, e.g.*, *J.G.G.*, 2025 WL 914682, at *11 (Henderson, J., concurring) (explaining speculative nature of government's purported foreign policy harms).

## CONCLUSION

The Court should grant a preliminary injunction or summary judgment, and require no security or set a nominal bond.

Dated: May 27, 2025

Noelle Smith*
Oscar Sarabia Roman*
My Khanh Ngo**
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org

Adriana Piñon
TX Bar No. 24089768
Brian Klosterboer
Tx Bar No.  24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar*
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
ACLU FOUNDATION OF TEXAS, INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
apinon@aclutx.org
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org

Jennifer Babaie*±
Las Americas Immigrant Advocacy Center
1500 E Yandell Dr. El Paso, TX 79902
Tel: (915) 544-5126
jenniferbabaie@las-americas.org

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt**
Daniel Galindo**
Ashley Gorski*
Patrick Toomey*
Sidra Mahfooz*
Omar Jadwat*
Hina Shamsi*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Yulie Landan**±
Matthew S. Vogel*†±
Sirine Shebaya**±
National Immigration Project of the
National Lawyers Guild
1763 Columbia Road NW
Suite 175 # 896645
Washington, DC 20009
Tel: (213) 430-5521
yulie@nipnlg.org
sirine@nipnlg.org
matt@nipnlg.org
†Not admitted in DC; working remotely
from and admitted in Louisiana only.

±*Counsel for individual Petitioner only*

Attorneys for Petitioner-Plaintiff
**Pro hac vice applications forthcoming*
***Application for admission forthcoming*

**322**

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2025, a true and correct copy of the foregoing document was electronically filed through the Court's CM/ECF system which will send a notice of electronic filing to all counsel of record.

Respectfully submitted,

/s/ *Adriana Pinon*
Adriana Pinon
ACLU FOUNDATION OF TEXAS, INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146