No. 25-10534

# In the United States Court of Appeals for the Fifth Circuit

W.M.M., on their own behalf and on behalf of others similarly situated; F.G.M., on their own behalf and on behalf of others similarly situated; A.R.P., on their own behalf and on behalf of others similarly situated,

*Petitioners-Appellants*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, Attorney General of the United States, in her official capacity; KRISTI NOEM, Secretary of the United States Department of Homeland Security, in her official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of United States Immigration and Customs Enforcement, in his official capacity; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCO RUBIO, Secretary of State, in his official capacity; UNITED STATES STATE DEPARTMENT; JOSH JOHNSON, in his official capacity as acting Dallas Field Office Director for United States Immigration and Customs Enforcement; MARCELLO VILLEGAS, in his official capacity as the Facility Administrator of the Bluebonnet Detention Center; PHILLIP VALDEZ, in his official capacity as Facility Administrator of the Eden Detention Center; JIMMY JOHNSON, in his/her official capacity as Facility Administrator of the Prairieland Detention Center; JUDITH BENNETT, in her official capacity as Warden of the Rolling Plains Detention Center,

*Respondents-Appellees.*

On Appeal from the United States District Court
for the Southern District of Texas

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS-APPELLANTS

Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
Ana M. Builes
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation.  In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: June 2, 2025              */s/ Brianne J. Gorod*
                                 Brianne J. Gorod

                                 *Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .................. i

CORPORATE DISCLOSURE STATEMENT .................................................. ii

TABLE OF CONTENTS .......................................................................................... iii

TABLE OF AUTHORITIES ................................................................................. iv

INTEREST OF *AMICUS CURIAE* ..................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ............................................................................................................. 5

I.  As Used in the AEA, a "Nation or Government" Is a Sovereign Entity that Claims to Exercise Control over the People in a Defined Territory and Is Recognized by Other Sovereigns as Having that Authority ................................................................................. 5

II.  The AEA Has Only Been Invoked in Conflicts with Entities that Constituted "Nation[s] or Government[s]" Within the Meaning of the Law of Nations at the Time the AEA Was Passed ........................ 15

    A.  War of 1812 .......................................................................... 15

    B.  World War I ........................................................................... 16

    C.  World War II .......................................................................... 17

III.  Tren de Aragua Is Not a "Nation or Government" Within the Meaning of the AEA ......................................................................... 18

CONCLUSION ........................................................................................................... 26

CERTIFICATE OF SERVICE ............................................................................ 1A

CERTIFICATE OF COMPLIANCE ................................................................. 2A

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Korematsu v. United States*,
    323 U.S. 214 (1944) ............................................................ 18

*Ludecke v. Watkins*,
    335 U.S. 160 (1948) ........................................................ 12, 13, 25

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ............................................................ 12

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ............................................................ 18

*U.S. ex rel. Zdunic v. Uhl*,
    137 F.2d 858 (2d Cir. 1943) ................................................ 25

*Ware v. Hylton*,
    3 Dall. 199 (1796) ............................................................... 5

<u>CONSTITUTIONAL PROVISIONS, STATUTES, & LEGISLATIVE</u>
<u>MATERIALS</u>

Act of June 25, 1798, ch. 58, 1 Stat. 570 ................................. 12

Act of July 6, 1798, ch. 66, 1 Stat. 577 ................................... 12

Act of June 18, 1812, ch. 102, 2 Stat. 755 .............................. 15

7 Annals of Cong. (1797) ....................................................... 11, 12

8 Annals of Cong. (1798) ........................................................ 5, 6

24 Annals of Cong. (1812) ...................................................... 15

The Declaration of Independence (U.S. 1776) ......................... 8

Joint Resolution Declaring War Against Imperial Government of Japan,
    Pub. L. No. 77-328, 55 Stat. 795 (1941) ............................ 18

Joint Resolution Declaring War Against Germany, Pub. L. No. 77-331, 55
    Stat. 796 (1941) ................................................................. 18

iv

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Joint Resolution Declaring War Against Italy, Pub. L. No. 77-332, 55 Stat. 797 (1941) ........................................................................... 18

Pub. Res. No. 1, 40 Stat. 1 (1917)............................................................ 16

Pub. Res. No. 17, 40 Stat. 429 (1917)...................................................... 16

50 U.S.C. § 21 .............................................................. 1, 12, 19, 20

50 U.S.C. § 22 ...................................................................... 12, 24

50 U.S.C. § 23 ............................................................................ 12

50 U.S.C. § 24 ............................................................................ 12

U.S. Const. art. I, § 8, cl. 11 ............................................................ 3, 13

## OTHER AUTHORITIES

Gregory Ablavsky, *Species of Sovereignty: Native Nationhood, the United States, and International Law, 1783-1795*, 106 J. Am. Hist. 591 (2019) ................................................................................. 6, 7, 23

William Blackstone, *Commentaries on the Laws of England* (1791)..... 5, 22

Thomas Dyche & William Pardon, *A New General English Dictionary* (1754) ............................................................................... 24

Exec. Order No. 14,157, 90 Fed. Reg. 8439 (Jan. 29, 2025)................. 19

Julius Goebel Jr., *The Recognition Policy of the United States* (1915).. 9, 10, 23

David M. Golove & Daniel J. Hulsebosch, *The Law of Nations and the Constitution: An Early Modern Perspective*, 106 Geo. L.J. 1593 (2018) ............................................................................... 5, 6

Wilhelm G. Grewe, *The Epochs of International Law* (Michael Byers, ed. 2000)................................................................................. 7-9

Hugo Grotius, *The Rights of War and Peace* (Liberty Fund 2005 ed.) .. 21

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Daniel J. Hulsebosch, *The Revolutionary Portfolio: Constitution-Making and the Wider World in the American Revolution*, 47 Suffolk U. L. Rev. 759 (2014) ......................................................................................... 8, 23

Charles Cheney Hyde, *International Law Chiefly as Interpreted and Applied by the United States* (1922)...................................................... 24

Letter from James Monroe to the Secretary of the Mississippi Territory (July 11, 1812), *in* Mississippi Department of Archives & History, https://da.mdah.ms.gov/series/territorial/s499/detail/10761#dtop...... 15

Letter from John Quincy Adams to Don Joaquin de Anduaga, (Apr. 6, 1822)................................................................................................. 10

Letter from Robert Lansing to Attorney General (Oct. 5, 1918), *in* 1 *Papers Relating to the Foreign Relations of the United States*, https://history.state.gov/historicaldocuments/frus1918Supp02/d206. 17

Letter from Thomas Jefferson to Gouverneur Morris (Mar. 12, 1793), https://founders.archives.gov/documents/Jefferson/01-25-02-0330... 10

James Madison, *Report on Virginia Resolutions* (Jan. 7, 1800), https://founders.archives.gov/documents/Madison/01-17-02-0202 ... 3, 6, 13

Nat'l Intelligence Council, *Venezuela: Examining Regime Ties to Tren De Aragua* 2 (Apr. 7, 2025), https://static01.nyt.com/newsgraphics/documenttools/32f71f10c36cc482/d90251d5-full.pdf............................................................................... 22

Proclamation No. 1364, 40 Stat. 1659 (Apr. 6, 1917) ............................ 16

Proclamation No. 1417, 40 Stat. 1716 (Dec. 11, 1917).......................... 16

Proclamation No. 2525, 55 Stat. 1700 (Dec. 7, 1941)............................ 17

Proclamation No. 2526, 55 Stat. 1705 (Dec. 8, 1941)............................ 17

Proclamation No. 2527, 55 Stat. Pt. 2 1707 (Dec. 8, 1941).................... 17

Proclamation No. 10903, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13033 (Mar. 14, 2025)...................................................................................... 2

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Resp. to Mot. for TRO, *AARP v. Trump*, No. 1:25-cv-00059 (N.D. Tex. Apr. 16, 2025)...................................................................................... 4

J. Gregory Sidak, *War, Liberty, and Enemy Aliens*, 67 N.Y.U. L. Rev. 1402 (2001) .................................................................................................. 21

Joseph Story, *Commentaries on the Constitution of the United States* (1833) .................................................................................................. 12

U.S. Dep't of State, *Designation of the Islamic Revolutionary Guard Corps* (2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.................................................................. 19

U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ ........................... 19

Emer de Vattel, *The Law of Nations* (Liberty Fund 2008).... 6, 7, 9, 13, 14, 21, 22

Woodrow Wilson, *Address to a Joint Session of Congress Requesting a Declaration of War Against Germany* (1917), https://www.archives.gov/milestone-documents/address-to-congress-declaration-of-war-against-germany ................................................... 16

*Works of Jefferson* (Paul Leicester Ford ed., 1904)................................ 10

*The Writings of Thomas Jefferson* (H.A. Washington, ed. 1854)................................................................................................... 10

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC seeks to uphold constitutional protections for noncitizens as well as for citizens and to ensure that federal laws are interpreted in a manner consistent with their text and history. Accordingly, CAC has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 1798, Congress passed the Alien Enemies Act (AEA), which provides that during a state of "declared war," or when "any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government," the President can restrain and remove "all natives, citizens, denizens, or subjects of the hostile nation or government" as "alien enemies." 50 U.S.C. § 21. As the text of the AEA makes explicit, the President can only invoke the AEA's sweeping authorities under certain circumstances and against certain people.

On March 14, 2025, President Trump issued a proclamation invoking the AEA in response to "hostile actions" perpetrated against the United States by Tren de Aragua (TdA), a "Foreign Terrorist Organization" with alleged ties to the

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

government of Venezuela. *See* Proclamation No. 10903, Invocation of the Alien

Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90

Fed. Reg. 13033 (Mar. 14, 2025). The Proclamation states that "all Venezuelan

citizens . . . who are members of [TdA], are within the United States, and are not

actually naturalized or lawful permanent residents of the United States are liable to

be apprehended, restrained, secured, and removed as Alien Enemies." *Id.* § 1, 90

Fed. Reg. at 13034.

The President's invocation of the AEA is unlawful on multiple grounds,

including that TdA is not a "foreign nation or government" within the meaning of

the AEA. The lawmakers who passed the AEA in 1798 understood the terms

"nation" and "government" with reference to the law of nations. And under the

law of nations, there were at least two essential attributes of any "nation" or

"government." First, a "nation" or "government" had to hold itself out as

controlling a defined territory and acting on behalf of the people who lived in that

territory. Second, and relatedly, other sovereigns had to recognize the "nation" or

"government" as acting on behalf of the people in that territory such that it could

engage in foreign affairs with other sovereigns.

The history of the AEA's passage explains why the Act's drafters used

language that limited its applicability to "natives, citizens, denizens, or subjects of"

the sorts of formal sovereigns that qualified as "nation[s] or government[s]" under

2

the law of nations.  When the AEA was passed in response to the United States's ongoing conflict with the French Republic, it was understood to be an exercise of Congress's power "[t]o declare [w]ar," U.S. Const. art. I, § 8, cl. 11.  As the AEA's drafters understood it, during a state of war or when the nation was under attack, Congress had the power "under the law of nations" to hold noncitizens accountable for the "offences committed by the nations of which they make part."  James Madison, *Report on Virginia Resolutions* (Jan. 7, 1800), https://founders.archives.gov/documents/Madison/01-17-02-0202 [hereinafter *Report on Virginia Resolutions*].  Significantly, though, only the "natives, citizens, denizens, or subjects" of formal "nation[s] or government[s]"—those sovereign entities that held themselves out as acting on behalf of the people within a defined territory and that had been recognized by other sovereigns as having the authority to do so—could be held accountable under the law of nations for the actions of their nations of origin.

This is why the AEA's drafters made a belligerent act against the United States by a "foreign nation or government" a prerequisite to invoking the AEA's sweeping powers, and only permitted the President to invoke those powers against the "natives, citizens, denizens, or subjects" of those "foreign nation[s] or government[s]."  Indeed, during the over two hundred years that the AEA has been federal law, it has been invoked only three times—each time against the subjects or

citizens of "foreign nation[s] or government[s]" as those terms were understood at the time of the AEA's drafting.

Relying on assertions not actually in the Proclamation itself, Appellees argued below that TdA qualifies as a "foreign government" within the meaning of the AEA for two reasons.  First, Appellees claim that it has "infiltrat[ed] key elements of the Venezuelan state, mak[ing] it indistinguishable from Venezuela." Resp. to Mot. for TRO at 21, *AARP v. Trump*, No. 1:25-cv-00059 (N.D. Tex. Apr. 16, 2025) ("TRO Resp.").  Second, they say that it acts as a "governing authority in the areas where it operates." *Id.* at 22.  But even if these factual assertions were true, they simply do not make TdA a "government" within the meaning of the AEA.  Indeed, Appellees make no effort at all to show that TdA is a "government," as that term was understood at the time the AEA was drafted.

In sum, President Trump's Proclamation attempts to utilize sweeping authorities that can only be invoked under the highly restricted circumstances set out in the text of the statute.  Routine judicial interpretation of that text can elucidate the contours of the AEA's requirements, and it makes clear that those requirements have not been satisfied here.

# ARGUMENT

**I.    As Used in the AEA, a "Nation or Government" Is a Sovereign Entity that Claims to Exercise Control over the People in a Defined Territory and Is Recognized by Other Sovereigns as Having that Authority.**

**A.**  The AEA does not define the terms "nation or government" because at the time of the AEA's passage, both terms were understood to be defined by the law of nations, the international norms that governed the "mutual intercourse" between nations in the eighteenth century and profoundly influenced the Founding generation.  1 William Blackstone, *Commentaries on the Laws of England*, bk. 1, § 2, at *43 (1791); *see also* David M. Golove & Daniel J. Hulsebosch, *The Law of Nations and the Constitution: An Early Modern Perspective*, 106 Geo. L.J. 1593, 1597 (2018) (noting the "broad consensus in the Founding period" that the law of nations informed and bound the federal government); *cf. Ware v. Hylton*, 3 Dall. 199, 281 (1796) (Wilson, J.) ("When the United States declared their independence, they were bound to receive the law of nations, in its modern state of purity and refinement.").  Indeed, the phrase "alien enemy" stems from the law of nations, *see, e.g., id*. at 227 (Chase, J.), and the debates concerning the AEA were littered with references to that body of law, 8 Annals of Cong. 1577 (1798) (Rep. Sitgreaves) ("All understand the rights to which aliens are entitled by the laws of

nations."); 8 *id*. at 1790 (Rep. Sewall); 8 *id*. at 1979-80 (Rep. Gallatin); *cf. Report on Virginia Resolutions.*

While the terms "nation" and "government" had slightly different meanings under the law of nations, *see* Emer de Vattel, *The Law of Nations*, bk. 1, ch. I, § 1 (Liberty Fund 2008); *id*. bk. 1, ch. III, §§ 26-31 (a "nation" was a "societ[y] of men united together," while a "government" was the "public authority" that could establish laws "to be observed" by the nation), the AEA's drafters understood the law of nations to establish two interrelated qualifications for any entity seeking to become either a nation or government: self-definition and foreign recognition.  *Cf.* Golove & Hulsebosch, *supra*, at 1630 n.164 (noting that the recognition of governments and nations was "governed by similar principles, at least according to the American interpretation of the law of nations in the Founding era").

First, both nations and governments were sovereigns that held themselves out as ruling a defined territory and exercising control over the people in that territory.  For example, one leading source defined a "nation" as a "body politic," with the "peculiar and exclusive right" to act on behalf of its territory, Vattel, *supra*, bk. I, ch. 1, § 1, & ch. 18, § 203, and a "government" as an entity with the "right to command" the nation, *id.* bk. 1, ch. 1, § 3; *cf.* Gregory Ablavsky, *Species of Sovereignty: Native Nationhood, the United States, and International Law, 1783-1795*, 106 J. Am. Hist. 591, 596 (2019) (describing the influence of Vattel's

"canonical" treatise in the early United States).  Under these definitions, both "nations" and "governments" held themselves out as exercising control over a defined territory: "The whole space over which a nation extends its government, becomes the seat of its jurisdiction, and is called its *territory*."  Vattel, *supra*, bk. I, ch. 18, § 205; *see generally* Wilhelm G. Grewe, *The Epochs of International Law* 343 (Michael Byers, ed. 2000) (during the late 1700s, recognition of new states "was satisfied with the actual existence of a sufficiently organised political body with effective authority and an approximately definable territory").

Second, and relatedly, nations and governments were entities recognized by other sovereigns as having the authority to act on behalf of the people in their territory, such that they could speak for those people on the international stage.  Nations and governments could engage in foreign affairs by, for example, "contract[ing] in the name of the state" through the negotiation of "[p]ublic treaties" which were "binding on the whole nation," participating in diplomacy through "public ministers," and declaring war "in the name of the society at large."  *See Vattel, supra,* bk. II, ch. 12, § 154; *id.* bk. III, ch. 1, §§ 2-4; *id.* bk. IV, ch. 5, §§ 55-57; *see also* Ablavsky, *supra*, at 607 ("The definitive measure of sovereignty was external, turning on recognition by other sovereigns.  Nationhood, in short, was a performative act directed toward an audience of other nations."); *see generally* Grewe, *supra*, at 361 (describing the eighteenth-century understanding of

7

treaties as commitments on behalf of the state instead of "personal obligations of the sovereign").

**B.** These international norms described the attributes of European nations whose legitimacy was long established, and they also informed the Founding generation's understanding of what would be required for the American Revolution to turn thirteen colonies into a new nation.

Start with self-definition.  In the Declaration of Independence, the colonies declared that they "ought to be Free and Independent States," and they claimed the "full Power to levy War, conclude Peace, contract Alliances, [and] establish Commerce."  The Declaration of Independence para. 34 (U.S. 1776).  In other words, they claimed the power to do all "which Independent States may of right do."  *Id.*  The Declaration of Independence thus "announced" to other nations that the new United States had determined it had a "claim to international recognition" under the law of nations.  Daniel J. Hulsebosch, *The Revolutionary Portfolio: Constitution-Making and the Wider World in the American Revolution*, 47 Suffolk U. L. Rev. 759, 764 (2014).

While the Declaration of Independence announced that the colonies understood themselves to be an independent sovereign, the Framers appreciated that it was critical for other countries to also recognize the United States as a new nation.  That is why the Continental Congress sent Benjamin Franklin as its first

Minister to France to secure "a recognition of our independency and sovereignty" after declaring independence. Julius Goebel Jr., *The Recognition Policy of the United States* 82 (1915). Indeed, it was only after the United States announced its independence, and France accepted its foreign minister, that it could negotiate its first treaty with the French monarchy in 1778. *Id*.; Grewe, *supra*, at 348 (describing France's assessment "that the colonies which, through their population and the extension of their territory, had formed a respectable nation, [and] had established their independence not only through a solemn declaration, but also factually").

After independence, the United States had to develop its own policy for when to recognize new nations and governments, and that policy again underscored that self-definition and formal recognition were key attributes of any such entity. For example, when deciding whether to recognize new governments or nations, eighteenth-century diplomats reiterated the law of nations requirement that a nation or government must hold itself out as a sovereign that controlled and represented the people in its territory. Vattel, *supra*, bk. I, ch. 18, § 203; *id.* bk. 1, ch. 1, § 3. Consistent with that approach, during the French Revolution in 1792, Thomas Jefferson urged his compatriots to recognize France's new republican government and receive its minister because it was clear that the government had been "established as the lawful representatives of the Nation and authorized to act

9

for them." Goebel, *supra,* at 105 (quoting 4 *Works of Jefferson* 149 (Paul Leicester

Ford ed., 1904)); Charles Cheney Hyde, *International Law Chiefly as Interpreted*

*and Applied by the United States* 67-68 (1922) (noting that, for Jefferson, the

American policy of recognition was to "acknowledge any government to be

rightful which is formed by the will of the nation, substantially declared" (quoting

3 *The Writings of Thomas Jefferson* 488-89 (H.A. Washington, ed. 1854)); *see*

Letter from Thomas Jefferson to Gouverneur Morris (Mar. 12, 1793),

https://founders.archives.gov/documents/Jefferson/01-25-02-0330 ("every [nation]

may govern itself according to whatever form it pleases, and change these forms at

it's own will: and that it may transact it's business with foreign nations through

whatever organ it thinks proper").

   In inquiries like these, an entity's self-definition was essential. Diplomats

considered whether new foreign nations or governments "deliberately assert[ed]

their right to that character, [and] had maintained and established it," Hyde, *supra*,

at 60 n.3 (quoting Letter from John Quincy Adams to Don Joaquin de Anduaga

(Apr. 6, 1822)), and whether a newly declared nation or government was "in a

position to fulfill all the international obligations and responsibilities incumbent

upon a sovereign state," *id.* at 70 n.2 (quoting Acting Secretary of State Hill's

September 8, 1900, description of a recognition policy that had been "practiced

upon occasion for more than a century"). In that way, self-definition and

recognition went hand in hand—the "former exclusively depending upon the determination of the Nation itself" and the "latter resulting from the successful execution of that determination." *Id*. at 60 n.3 (quoting Letter from John Quincy Adams (1822)).

**C.** The history of the AEA's passage underscores that the Act extends only to entities that qualified as foreign nations or governments under the law of nations— that is, sovereign entities that held themselves out as acting on behalf of people in a defined territory and were recognized by other nations as having that authority.

The AEA was the federal government's response to an ongoing conflict with one "foreign nation or government" in particular—the French Republic. *See* 7 Annals of Cong. 56 (1797) (President Adams referring to France as "nation" and "Government"). In 1798, the United States was embroiled in hostilities with its erstwhile ally. Known as the Quasi-War, the conflict started when the French Directory, outraged that the United States had ratified a treaty with Great Britain, retaliated by attacking U.S. merchants in the Caribbean. Hundreds of U.S. ships were seized. President Adams, in a 1797 address, urged Congress to take action to "enable our seafaring citizens to defend themselves against violations of the law of nations." 7 *id.* at 57 (1797) (Speech to Joint Session of Congress). Although Adams never asked Congress to declare war, he "[n]evertheless" urged Congress to

"guard against sudden and predatory incursions" by "foreign nations" like the French Republic. *Id*.

That same year, still hoping to normalize relations, Adams sent envoys to meet with the French foreign minister. The foreign minister, through three intermediaries, responded by demanding a bribe. Public outrage over what became known as the XYZ affair led Congress to pass two interrelated acts: the Alien Friends Act and the AEA. *See* Act of June 25, 1798, ch. 58, 1 Stat. 570 (expired); Act of July 6, 1798, ch. 66, 1 Stat. 577 (codified at 50 U.S.C. §§ 21-24). The Alien Friends Act granted the President sweeping power to detain and expel any noncitizen deemed "dangerous to the peace and safety of the United States." *See* 1 Stat. at 571, § 1. That Act was "vigorously and contemporaneously attacked as unconstitutional." *Ludecke v. Watkins*, 335 U.S. 160, 171 n.18 (1948); *cf. Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) (describing the Alien Friends Act as "one of the most notorious laws in our country's history" that was "widely condemned as unconstitutional by Madison and many others"); 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1288 (1833) (noting that the Alien Friends Act "left no permanent traces in the constitutional jurisprudence of the country"). By contrast, the AEA, passed just eleven days later, was met with consensus about

its fundamental constitutionality by members of both political parties. *Ludecke*, 335 U.S. at 171 n.18.

The reason for this disparity was simple: the AEA was understood to be an extension of Congress's power "[t]o declare [w]ar," U.S. Const. art. I, § 8, cl. 11, while the Alien Friends Act was not. During a state of war, as James Madison explained, Congress had the power "under the law of nations" to hold foreign citizens and subjects accountable for the "offences committed by the nation of which they make part." *Report on Virginia Resolutions*; *accord* Vattel, *supra*, bk. III, ch. V, § 70 ("[w]hen the sovereign or ruler of the state declares war against another sovereign, it is understood that the whole nation declares war against another nation: for the sovereign represents the nation, and acts in the name of the whole society" and thus "all the subjects of one are enemies to all the subjects of the other"). Put differently, even though a noncitizen might not have himself committed a belligerent act, his "removal" was "conformable to the law of nations" and "justified by the constitution" if he was the subject of a nation waging war, purportedly on his behalf. *Report on Virgina Resolutions*.

This is why the AEA's drafters required a "declared war" between a "foreign nation or government" and the United States, or an "invasion or predatory incursion" against the United States by a "foreign nation or government," before the AEA's sweeping powers could be invoked. Only a nation or government could

demand the sort of allegiance from its people that would justify holding them personally accountable for their sovereign's actions during war. To put it in law of nations terms, only a sovereign entity that claimed the authority to act on its peoples' behalf and was recognized as having that authority was capable of waging the type of war the AEA requires—a "public" one, "in the name of the public power[] and by its order." Vattel, *supra*, bk. III, ch. 1, § 2.

"Alien friends," by contrast, could be held accountable only for their own actions. As James Madison explained, while an "alien friend[]" resided in the United States, he owed it "temporary allegiance," by which he was bound to its "municipal law" and in turn "entitled" to its "protection and advantage." *Report on Virgina Resolutions*. Because of this, alien friends could only be "tried and punished" according to municipal law, and the law of nations did not authorize their "expulsion." *Id*. That was why, to Madison, the Alien Friends Act was "unjustifiable." *Id.*

Thus, the AEA's history underscores what its text makes clear: the AEA can only be invoked against a "nation or government" that both holds itself out as acting on behalf of the people in its territory and is recognized by other nations as having the authority to do so.

**II.     The AEA Has Only Been Invoked in Conflicts with Entities that Constituted "Nation[s] or Government[s]" Within the Meaning of the Law of Nations at the Time the AEA Was Passed.**

The AEA has been invoked just three times.  Each time, the United States was in a state of war against an entity that held itself out as a sovereign nation able to act on behalf of the people in its territory and that was formally recognized as such by other sovereigns.

**A. War of 1812.**  On June 18, 1812, Congress declared war—against the United Kingdom of Great Britain—for the first time in the United States's history.  Act of June 18, 1812, ch. 102, 2 Stat. 755.  Claiming that its subjects owed it perpetual allegiance, Great Britain had indiscriminately stopped American merchant vessels and pressed both their British and American sailors into service in the British Navy.  *See* 24 Annals of Cong. 1623-24 (1812) (Pres. Madison).  A month after Congress declared war to respond to this attack on American commerce, Secretary of State James Monroe noted that "all the subjects of his Britannic Majesty, residing within the United States, have become alien enemies," and directed them to "report themselves" to the U.S. Marshals for further procedures under the AEA.  Letter from James Monroe to the Secretary of the Mississippi Territory (July 11, 1812), *in* Mississippi Department of Archives & History, https://da.mdah.ms.gov/series/territorial/s499/detail/10761#dtop.

15

**B. World War I.**  On April 2, 1917, President Woodrow Wilson posed to Congress an extraordinary dilemma "which it was neither right nor constitutionally permissible that I should assume the responsibility of making."  Woodrow Wilson, *Address to a Joint Session of Congress Requesting a Declaration of War Against Germany* (1917), https://www.archives.gov/milestone-documents/address-to-congress-declaration-of-war-against-germany.  The Imperial German Government had declared an all-out submarine war that culminated in the torpedoing of the *Lusitania*, killing all 128 Americans on board.  *Id.*  Citing the Zimmerman telegram—an "intercepted note" in which Germany laid out a plot to turn Mexico against the United States—Wilson also warned of German and Prussian spies in "unsuspecting communities and even our offices of government."  *Id.*  Shortly after, Congress declared war against the Imperial German Government and its ally the Imperial and Royal Austro-Hungarian Government.  *See* Pub. Res. No. 1, 40 Stat. 1 (1917); Pub. Res. No. 17, 40 Stat. 429 (1917).  Wilson then issued a proclamation that termed all subjects of both governments "alien enemies."  *See* Proclamation No. 1364, 40 Stat. 1659 (Apr. 6, 1917); Proclamation No. 1417, 40 Stat. 1716 (Dec. 11, 1917).

The government implemented these proclamations in a manner designed to guard against the possibility of exercising the AEA's authorities against natives, citizens, denizens, or subjects of nations or governments with which the United

States was not at war.  Initially, Wilson's proclamation applied to subjects of the German and Austrian governments who actively opposed those governments, including the members of the Czecho-Slovak National Council.  Later in the war, after the Czecho-Slovaks proclaimed their intent to form an independent state with a separate government, the United States "formally recognize[d] the Czecho-Slovak National Council as a '*de facto* belligerent government clothed with proper authority to direct the military and political affairs of the Czecho-Slovaks.'"  Letter from Robert Lansing to Attorney General (Oct. 5, 1918), *in Papers Relating to the Foreign Relations of the United States*, https://history.state.gov/historicaldocuments/frus1918Supp02/d206.  And after the United States formally recognized the Czecho-Slovak Republic as a sovereign state, the government stopped considering its people to be "alien enemies" subject to the AEA.  *Id.*

C. **World War II.**  Hours after the bombing of Pearl Harbor by Japanese warplanes, President Franklin D. Roosevelt proclaimed that "an invasion has been perpetrated upon the territory of the United States by the Empire of Japan."  Proclamation No. 2525, 55 Stat. 1700, 1701 (Dec. 7, 1941).  Because of this, Roosevelt labeled the citizens of the Axis Powers—Japan, Germany, and Italy— "alien enemies."  *See id.*; Proclamation No. 2526, 55 Stat. 1705 (Dec. 8, 1941); Proclamation No. 2527, 55 Stat. Pt. 2 1707 (Dec. 8, 1941).  Days later, Congress

declared war against those three governments. *See* Joint Resolution Declaring War Against Imperial Government of Japan, Pub. L. No. 77-328, 55 Stat. 795 (1941); Joint Resolution Declaring War Against Germany, Pub. L. No. 77-331, 55 Stat. 796 (1941); Joint Resolution Declaring War Against Italy, Pub. L. No. 77-332, 55 Stat. 797 (1941).[2]

\* \* \*

In short, since its enactment, Presidents have used the AEA only when provoked by the belligerency of "foreign nation[s] or government[s]"—that is, sovereign entities that held themselves out as having the authority to act on behalf of the people in their territory and that had been recognized as having that authority by other sovereigns. The Act has never been invoked as Appellees attempt here—to restrain and remove alleged members of a criminal gang who are citizens of a foreign nation with which the United States is not at war.

## III. Tren de Aragua Is Not a "Nation or Government" Within the Meaning of the AEA.

By its plain text, the AEA can only be invoked against the "natives, citizens,

---

[2] Later, by Executive Order, Roosevelt interned thousands of Japanese American citizens, a decision notoriously upheld by the Supreme Court at the time. *See Korematsu v. United States*, 323 U.S. 214, 223-24 (1944). *But cf. Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (internal citation and quotation marks omitted) (observing that "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—has no place in law under the Constitution").

denizens, or subjects" of a "foreign nation or government."  50 U.S.C. § 21.  And as discussed earlier, an entity qualifies as a "foreign nation or government" under the AEA only if it is a sovereign entity that holds itself out as having the authority to act on behalf of the people in a defined territory and is recognized by other nations as having that authority.

TdA meets neither of these criteria.  It does not purport to act on behalf of the inhabitants of a defined territory, and neither the United States nor any other nation has recognized it as a nation or government capable of engaging in international relations.  Quite the opposite—on his first day in office, President Trump designated TdA a "Foreign Terrorist Organization" (FTO) and said that it has "engaged in a campaign of violence and terror throughout the Western Hemisphere" and "flooded the United States with deadly drugs, violent criminals, and vicious gangs."  Exec. Order No. 14,157, 90 Fed. Reg. 8439 (Jan. 29, 2025).[3]

---

[3] When it designated TdA as an FTO, the government did not describe TdA as a "government" or an entity that acts with governmental support.  *Compare* Exec. Order No. 14,157, *supra*, at 90 Fed. Reg. at 8439 (describing TdA as a "transnational organization[]"), *with* U.S. Dep't of State, *Designation of the Islamic Revolutionary Guard Corps* (2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/ (recognizing the Islamic Revolutionary Guard Corps as engaging in terrorist activity for forty years "with the support of the Iranian government").  It also has not recognized Venezuela as a state sponsor of terrorism.  *See* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/.

Significantly, Appellees concede that TdA is not a "nation," TRO Resp. 23, but they argue that it is a "government" within the meaning of the AEA for two reasons. First, although the government did not make this precise claim in the Proclamation itself, Appellees have argued in this litigation that "TdA's infiltration of key elements of the Venezuelan state[] make it indistinguishable from Venezuela." *Id.* at 21; *id.* ("Given how significantly TdA is intertwined in the fabric of Venezuela's structures, it functions as a governing entity."). But the President's Proclamation was not addressed to Venezuela—it was addressed to TdA specifically. *Cf.* 50 U.S.C. § 21 (authorizing apprehension of "all natives, citizens, denizens, or subjects of *the* hostile nation or government" (emphasis added)). The AEA makes clear that any invasions or predatory incursions in which TdA might be directly engaged can only form the basis for a proclamation under 50 U.S. § 21 if TdA is a "foreign nation or government." And Appellees do not and cannot show that it is, because TdA has neither held itself out as a sovereign acting on behalf of people in a defined territory nor has any other sovereign recognized it as such.

Appellees argue that this use of the AEA is not "novel" because "the United States has a long history of using war powers against formally nonstate actors." TRO Resp. 21. But that history is not relevant here. The question is not whether the President can use military force against a nonstate actor, but instead whether he

can invoke the AEA.  And the President's authority to do so is explicitly limited to citizens of "foreign nation[s] or government[s]."  Though Appellees note that Congress authorized the use of military force against "formally nonstate actors" during the Mexican-American and Spanish-American Wars, *see* TRO Resp. 21-22, they do not assert that either President James Polk or President William McKinley invoked the AEA during those conflicts, *see* J. Gregory Sidak, *War, Liberty, and Enemy Aliens*, 67 N.Y.U. L. Rev. 1402, 1412 (2001) (noting that those Presidents "appear not to have claimed" any power under the AEA).

Significantly, at the time the AEA was passed, the law of nations distinguished between wars waged by "nation[s] or government[s]"—entities holding themselves out as sovereigns and recognized as such by other sovereigns—and acts of aggression from nonstate actors.  Only natives, citizens, subjects, and denizens of the former could be considered "alien enemies."  For example, because pirates were considered nonstate actors, even though "perhaps they may [have] observe[d] some kind of Equity among themselves," Hugo Grotius, *The Rights of War and Peace*, bk. 3, ch. 3, § 2 (Liberty Fund 2005 ed.), their "predatory expeditions" were "carefully distinguished" from "[l]egitimate and formal warfare" between two sovereigns, Vattel, *supra*, bk. III, ch. 4, § 67.  "Enemies," by virtue of their "Right of commanding the People" could declare, or "publickly denounce," war.  Pirates, by contrast, could not.  Grotius, *supra*, bk. 3,

ch. 3, §§ 1-2.  Put differently, when a group of pirates or marauders committed a "predatory excursion," Vattel, *supra*, bk. III, ch. 4, § 67, as Appellees argue that TdA has done here, they became an enemy to all mankind, not a sovereign government whose subjects or citizens were "alien enemies" under the law of nations.  *See generally* 4 Blackstone, *supra*, at *68-*71 (a pirate was a "*hostis humani generis* [enemy to mankind]" who committed "offence[s] against the law of nations").

The pursuit of Pancho Villa, which Appellees reference, *see* TRO Resp. 22, underscores this point.  When Villa's bandits, all Mexican citizens, kept crossing the Southern border to attack American towns, President Wilson thought the "law of nations" justified sending United States troops into Mexican territory to pursue these robbers, but he did not invoke the AEA to detain Villa's bandits in the United States.  Hyde, *supra*, at 112 n.5.  In other words, the United States neither found the Mexican government responsible for those attacks nor held its citizens liable as "alien enemies" under the AEA.  Instead, Wilson viewed "those marauders" as "the common enemies of the two countries," *id.* at 113 n.4, much as intelligence findings today view TdA to be a threat to both the security of Venezuela and the United States, Nat'l Intelligence Council, *Venezuela: Examining Regime Ties to Tren De Aragua* 2 (Apr. 7, 2025), https://static01.nyt.com/newsgraphics/documenttools/32f71f10c36cc482/d90251d5

-full.pdf (noting that "Venezuelan law enforcement actions demonstrat[e] the regime treats [TdA] as a threat").

Second, again making claims that are not in the Proclamation itself, Appellees have argued that TdA is a "government" because it acts as a "governing authority in the areas where it operates."  TRO Resp. 22; *see id.* (noting "TdA's governance and organizational structure, as well as its *de facto* control over parts of Venezuela where it operates with impunity").  But, again, Appellees barely attempt to reconcile that view with the understanding of the term "government" at the time the AEA was drafted.  Demonstrating that TdA has become the government of Venezuela under the law of nations, would require, for example, evidence that TdA has been "established as the lawful representative[]," Goebel, *supra*, at 105, of any territories over which it allegedly exercises "de facto" authority—whatever territories those are.  And it would require evidence that TdA not only controls, but *holds itself out as* controlling, those territories—that it has "deliberately assert[ed]" its rights as a governing authority, Hyde, *supra,* at 60 n.3 (quotation omitted), by sending ministers, engaging in diplomacy, or otherwise making a "claim to international recognition" as a government, Hulsebosch, *supra*, at 764.  Given that the TdA has made no such "performative act" of sovereignty, Ablavsky, *supra*, at 607, it is no surprise that neither the United States nor any other country has recognized TdA as the government of any part of Venezuela's territory.

Appellees cite a single dictionary definition to show that "the control and authority TdA exercises in Venezuela is consistent with founding-era definitions of 'government.'"  TRO Resp. 23 (citing Thomas Dyche & William Pardon, *A New General English Dictionary* (1754) ("the power or authority that one person exercises over another")).  But Appellees ignore entirely the other definition of "government" in that dictionary—"the publick authority or manner of administering justice in every nation or commonwealth," Dyche & Pardon, *supra*, at 352—and they barely engage at all with the law of nations—the body of law that informed the AEA's drafters' understanding of the meaning of those terms.

Indeed, the closest Appellees come to engaging with the law of nations is to argue that "although the AEA references the possibility that a covered entity *may* be able to enter a treaty governing certain aspects of relations between it and the United States, the statute does not in any way establish treaty-making authority as a prerequisite to inclusion."  TRO Resp. 23 (citing 50 U.S.C. § 22 and noting that it contemplates circumstances "where no such treaty exists").  But 50 U.S.C. § 22 simply recognizes that the AEA may apply to citizens or subjects of foreign nations or governments with which there is no relevant treaty in force.  It does nothing to suggest that the AEA is applicable to entities that were not "foreign nation[s] or government[s]" within the meaning of the law of nations and thus were not capable of entering into treaties at all.  If anything, it supports the view that the AEA

applies only to entities that held themselves out as having the authority to act on behalf of the people in a defined territory and are recognized by other nations as such—qualities that, of course, do not apply to TdA.

Finally, Appellees have argued that this Court does not have the authority "to second-guess [the President's] determinations" regarding the relationship between the TdA and Venezuela.  TRO Resp. 23-24.  But that is not what this Court is being asked to do.  This Court is simply being asked to interpret the AEA's text—a task that is emphatically the judicial role, *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 861 (2d Cir. 1943) (interpreting the word "denizen," as understood by "Congress in 1798"); *Ludecke*, 335 U.S. at 163 (noting that courts can review "questions of interpretation" of the AEA)—and then decide whether TdA qualifies as a "nation or government" within the meaning of the AEA.  It clearly does not.  At the time the AEA was drafted, a "nation or government" was an entity that held itself out as acting on behalf of people in a defined territory and was recognized by other sovereigns as having the authority to do so.  Appellees have not even attempted to show that TdA satisfies these criteria.  Whatever the proper standard for reviewing the Proclamation's findings, and regardless of whether this Court accepts them, it should hold that the President's invocation of the AEA is unlawful.

## CONCLUSION

For the foregoing reasons, this Court should hold that the President's

invocation of the AEA is unlawful.

Respectfully submitted,

Dated: June 2, 2025

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
Ana M. Builes
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on June 2, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 2nd day of June, 2025.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5,971 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Executed this 2nd day of June, 2025.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

2A