No. 25-10534

# United States Court of Appeals for the Fifth Circuit

---

W.M.M., F.G.M., and A.R.P. et al.,

*Petitioners-Appellants,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States,* et al.,

*Respondents-Appellees*

---

On Appeal from the United States District Court
for the Northern District of Texas
No. 1:25-CV-59

---

**BRIEF OF THE BRENNAN CENTER FOR JUSTICE, THE CATO INSTITUTE, AND PROFESSORS OF LAW ILYA SOMIN AND JOHN DEHN AS AMICI CURIAE IN SUPPORT OF PETITIONERS-APPELLANTS**

---

Gregory L. Diskant
Aron Fischer
Emma Ellman-Golan
Isaac Weingram
Anna Blum
PATTERSON BELKNAP WEBB & TYLER
1133 Avenue of the Americas
New York, New York 10036
Phone: (212) 336-2000
gldiskant@pbwt.com

Leah J. Tulin
Katherine Yon Ebright
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW,
Suite 1150
Washington, DC 20036
Phone: (202) 650-6397
tulinl@brennan.law.nyu.edu

Ilya Somin
Professor of Law
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
Phone: (703) 993-8069
isomin@gmu.edu

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for amici curiae certifies that, in addition to those listed in Appellants' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Amici:*

(1)  The Brennan Center for Justice at NYU School of Law;

(2)  The Cato Institute;

(3)  Ilya Somin;

(4)  John Dehn.

None of amici have any parent corporations and no publicly held company owns 10% or greater ownership in any of amici.

***Counsel for Amici***: Leah J. Tulin and Katherine Yon Ebright of the Brennan Center for Justice; Professor Ilya Somin of the Antonin Scalia Law School; and Gregory L. Diskant, Aron Fischer, Emma Ellman-Golan, Isaac Weingram, and Anna Blum of Patterson Belknap Webb & Tyler LLP.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ....................................................................ii

INTEREST OF AMICI CURIAE ............................................................1

SUMMARY OF ARGUMENT..............................................................1

ARGUMENT ........................................................................................3

I.  The Proclamation Is Manifestly Unlawful. ...................................3

    A.  The AEA's text, context, and history establish that it is a wartime authority only.........................................................3

    B.  The Proclamation seeks to apply the AEA unlawfully in peacetime. ........................................................................12

II.  The Political Question Doctrine Does Not Bar Judicial Review. ........................................................................................18

    A.  Courts may review the Proclamation — and the factual assertions on which it relies — as an "obvious mistake" or "manifestly unauthorized exercise of power." .................19

    B.  The judiciary's power to review the Proclamation is at its height because individual liberties are implicated. ........22

    C.  Judicially manageable standards allow courts to identify manifestly unauthorized exercises of wartime powers...................................................................................25

III.  Adopting the government's interpretation of the AEA would have dire consequences. ...............................................................29

    A.  The government's arguments could allow the AEA to be used against any group of immigrants. ...............................29

    B.  The government's interpretation of "invasion" would subvert the federal-state balance of war powers and threaten habeas corpus protections.....................................30

CONCLUSION......................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.R.P. v. Trump*,
  2025 WL 1417281 (U.S. May 16, 2025) ............................................. 23

*A.S.R. v. Trump*,
  No. 3:25-cv-00113, 2025 WL 1378784 (W.D. Pa. May 13,
  2025) ..................................................................................... 5–6, 8, 16

*Al-Warafi v. Obama*,
  No. 09-2368, 2015 WL 4600420 (D.D.C. Jul. 30, 2015),
  *vacated and appeal dismissed as moot*, No. 15-5266 (D.C.
  Cir. Mar. 4, 2016) ................................................................... 27–28

*Baker v. Carr*,
  369 U.S. 186 (1962) ................................................................ *passim*

*Bas v. Tingy*,
  4 U.S. 37 (1800) ........................................................................ 10, 12

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ........................................................................ 4

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ................................................................... 22, 32

*California v. United States*,
  104 F.3d 1086 (9th Cir. 1997) ................................................... 28, 29

*Chastleton Corp. v. Sinclair*,
  264 U.S. 543 (1924) ........................................................................ 21

*Clarke v. Morey*,
  10 Johns. 69 (N.Y. Sup. Ct. 1813) ................................................... 9

*D.B.U. v. Trump*,
  No. 25-cv-01163, 2025 WL 1304288 (D. Colo. May 6, 2025) ............... 5

*Duncan v. Kahanamoku,*
  327 U.S. 304 (1946) ........................................................................ 16

*G.F.F. v. Trump,*
  No. 25-cv-2886, 2025 WL 1301052 (S.D.N.Y. May 6, 2025) ................ 5

*Hamdan v. Rumsfeld,*
  548 U.S. 557 (2006) ........................................................................ 16

*Hamdi v. Rumsfeld,*
  542 U.S. 507 (2004) ................................................................... 19, 22

*Harjo v. Kleppe,*
  420 F. Supp. 1110 (D.D.C. 1976), *aff'd,* 581 F.2d 949 (D.C.
  Cir. 1978) ................................................................................ 21–22

*J.A.V. v. Trump,*
  No. 1:25-cv-072, 2025 WL 1257450 (S.D. Tex. May 1,
  2025) ................................................................................... 5, 8

*J.G.G. v. Trump,*
  No. 1:25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025),
  *vacated on other grounds,* 145 S. Ct. 1003 (2025) ....................... 5, 8, 29

*J.O.P. v. Dept. of Homeland Sec.,*
  No. 25-1519, 2025 WL 1431263 (4th Cir. May 19, 2025) ................ 5, 8

*Johnson v. Eisentrager,*
  339 U.S. 763 (1950) ................................................................... 12, 18

*Koohi v. United States,*
  976 F.2d 1328 (9th Cir. 1992) ........................................................ 26

*Little v. Barreme,*
  6 U.S. 170 (1804) ...................................................................... 20–21

*Ludecke v. Watkins,*
  335 U.S. 160 (1948) ........................................................................ 18

*McAllister v. Att'y Gen.,*
  444 F.3d 178 (3d Cir. 2006) ............................................................ 16

*Ex parte Milligan,*
    71 U.S. 2 (1866) ............................................................. 21

*Mitchell v. Laird,*
    488 F.2d 611 (D.C. Cir. 1973) ..................................... 27

*Mochizuki v. United States,*
    43 Fed. Cl. 97 (1999) .................................................... 24

*Padavan v. United States,*
    82 F.3d 23 (2d Cir. 1996) ............................................. 28

*Pan American World Airways v. Aetna Casualty & Surety,*
    505 F.2d 989 (2d Cir. 1974) .................................... 26–27

*Prize Cases,* 67 U.S. (2 Black) 635 (1862) ......................... 27

*Rucho v. Common Cause,*
    588 U.S. 684 (2019) ...................................................... 22

*In re September 11 Litigation,*
    751 F.3d 86 (2d Cir. 2014) ..................................... 16, 26

*Sterling v. Constantin,*
    287 U.S. 378 (1932) ................................................ 19, 20

*United States v. Abbott,*
    110 F.4th 700 (5th Cir. 2024) ................................... 6, 19

*United States v. Sandoval,*
    231 U.S. 28 (1913) ........................................................ 19

*United States v. Shell Oil Co.,*
    294 F.3d 1045 (9th Cir. 2002) ..................................... 27

*United States v. Texas,*
    719 F. Supp. 3d 640 (W.D. Tex. 2024) ........................ 31

*United States v. Texas,*
    97 F. 4th 268 (5th Cir. 2024) ....................................... 29

iv

*United States v. Zubaydah,*
  595 U.S. 195 (2022) .................................................................. 20, 24

*Ware v. Hylton,*
  3 U.S. 199 (1796) .......................................................................... 10

*Yates v. United States,*
  574 U.S. 528 (2015) ........................................................................ 8

## Constitutional Provisions

U.S. Const. art. I, § 9, cl. 2 ................................................................ 31

U.S. Const. art. I, § 10 ................................................................... 4, 31

## Statutes

8 U.S.C. §1227(a)(4)(B) ..................................................................... 15

8 U.S.C. § 1231(b)(3)(A) ................................................................... 24

8 U.S.C. §§ 1531–37 ........................................................................ 15

50 U.S.C. § 21 ........................................................................... 3, 9, 29

50 U.S.C. § 22 ................................................................................... 9

Act of Feb. 20, 1800, ch. 9 (2 Stat. 7) ................................................ 4

Act of Jan. 2, 1812, ch. 11 (2 Stat. 670) ............................................ 4

Act of Sept. 29, 1789 § 5, 1 Stat. 95 .................................................. 8

Alien Friends Act, 1 Stat. 570 (1798) .................................................. 9

Anti-Terrorism Act, 18 U.S.C. § 2336(a) ........................................... 25

Civil Liberties Act of 1988, Pub. L. 100-383, 102 Stat. 903 ................... 24

Comprehensive Environmental Response, Compensation,
  and Liability Act, 42 U.S.C. § 9607(b)(2) ......................................... 25

Federal Torts Claims Act, 28 U.S.C. § 2680(j) .................................... 25

Foreign Affairs Reform and Restructuring Act, 112 Stat.
2681 (1998)..................................................................... 23–24

Wartime Violation of Italian American Civil Liberties Act,
Pub. L. 106-451, 114 Stat. 1947 (2000) ............................... 24

**Legislative Materials**

8 Annals of Cong. 1573–82 (1798).......................................... 7

8 Annals of Cong. 1575 (1798) ................................................ 7

8 Annals of Cong. 1980 (1798) ................................................ 9

16 Annals of Cong. 452–54 (1807)......................................... 6–7

126 Cong. Rec. S28188 (1980) ................................................ 15

American Sovereignty Protection Act, H.R. 6941, 96th Cong.
(1980)................................................................................ 15

*Annual Worldwide Threats Assessment Hearing Before H.
Permanent Select Comm. on Intelligence*, 119th Cong.
(2025)................................................................................ 17

J. Res. 8, 13th Cong. (1815)...................................................... 4

*Reclaiming Congress's Article I Powers: Counterterrorism
AUMF Reform – Hearing Before H. Comm. on Foreign
Affairs*, 118th Cong. 30 (2023) (testimony of Rich Visek)
118th Cong. 30 (2023) ................................................... 13–14

**Other Authorities**

*Invocation of the Alien Enemies Act Regarding the Invasion
of the United States by Tren de Aragua*, 90 Fed. Reg.
13033 (Mar. 14, 2025) ............................................... *passim*

Presidential Proclamation 1364, 40 Stat. 1650 (Apr. 6, 1917).............. 11

Presidential Proclamation 2525, 6 Fed. Reg. 6321, 55 Stat.
1700 (Dec. 7, 1941)....................................................... 11, 30

Presidential Proclamation 2526, 6 Fed. Reg. 6323, 55 Stat. 1705 (Dec. 8, 1941) ........................................................ 11, 30

Presidential Proclamation 2527, 6 Fed. Reg. 6324, 55 Stat. 1705 (Dec. 8, 1941) ........................................................ 11, 30

Treaty of Paris, Sept. 3, 1783, 8 Stat. 80 .................................. 9

Treaty with the Apaches, July 1, 1852, 10 Stat. 979 ............................ 7

**Secondary Sources**

Amanda L. Tyler, *Habeas Corpus and the American Revolution*, 103 Cal. L. Rev. 645 (2015) .............................. 31

Amanda L. Tyler, *Suspension as an Emergency Power*, 118 Yale L.J. 600, 639–62 (2009) ............................................. 32

Circular from James Monroe to the Secretary of the Mississippi Territory (July 11, 1812), *in* Mississippi Dep't of Archives & History, *available at* https://perma.cc/RY6D-BETN ........................................... 11

David J. Bier, *U.S. Citizens Were 89% of Convicted Fentanyl Traffickers in 2022,* Cato at Liberty (Aug. 23, 2023), https://perma.cc/H8MF-NCDE .......................................... 32

Emmerich de Vattel, The Law of Nations (1758) ............................... 9–10

Exec. Comm., Int'l Law Ass'n, *Final Report on the Meaning of Armed Conflict in International Law* (2010), https://perma.cc/4G5G-6837 ............................................. 14

Harvey Strum, *Jewish Internees in the American South, 1942-1945*, 42 Am. Jewish Archives 27 (1990)................................... 30

Ilya Somin, *En Banc Fifth Circuit Rules for Texas in Water Buoy Case, but Doesn't Resolve Issue of Whether Illegal Migration Qualifies as "Invasion,"* Reason, July 31, 2024, https://perma.cc/8Q7E-UXT4................................................ 6

Ilya Somin, *Immigration is Not Invasion*, Lawfare (Mar. 25, 2024), https://perma.cc/TS87-3Y55 .......................................... 5

Ilya Somin, *Trump (Partially) Wins an Alien Enemies Act Case*, Reason (May 14, 2025), https://perma.cc/88DS-PREU ................................................................................. 8

James Kent, Commentaries on American Law (1826) ........................... 12

James Madison, *The Report of 1800,* Founders Online (Jan. 7, 1800), https://perma.cc/E73C-5TN8 ............................. 4, 9

James Morton Smith, *The Enforcement of the Alien Friends Act of 1798*, 41 Miss. Valley Hist. Rev. 85 (1954) .............................. 11

John Adams, Address Before United States Congress (May 16, 1797), *in* Founders Online, https://perma.cc/GJJ8-2RB7 ....................................................................................... 6

John Yoo, *Why Texas Cannot Treat Illegal Immigration as an 'Invasion'*, Nat'l Rev. (Nov. 18, 2022), https://archive.is/BzABV ....................................................... 31

Joshua Treviño, *The Meaning of Invasion Under the Compact Clause of the Constitution*, Texas Public Policy Foundation (Nov. 2022), https://perma.cc/F4XC-AVRP ..................... 5

Kaitlan Collins et al., *Trump involved in discussions over suspending habeas corpus, sources say,* CNN (May 9, 2025), https://perma.cc/42B2-MUZF ................................... 31

Letter from Alan Parker, Assistant Attorney General, to Senator Edward Kennedy (Aug. 2, 1980) .......................................... 15

Letter from General Henry Knox to Governor Arthur St. Clair (Aug. 23, 1790), *in* The St. Clair Papers, Vol. II (1882) .................................................................................... 7

Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798), *in* Founders Online, https://perma.cc/9ZLS-MGZP ....................................................................................... 6

Nat'l Intelligence Council, Venezuela: Examining Regime
Ties to Tren de Aragua (Apr. 7, 2025),
https://perma.cc/KGL6-QNC8.......................................................17, 18

Office of the Attorney General, *Guidance for Implementing
the Alien Enemies Act* (Mar. 14, 2025),
https://perma.cc/28MW-9MCB .........................................................23

Rebecca Ingber, *Judicial Deference and Presidential Power
Under the Alien Enemies Act*, Just Security (May 20,
2025), https://perma.cc/V9ZC-329R.............................................15, 20

U.S. Dep't of State, Bureau of Counterterrorism, *Foreign
Terrorist Organizations*, https://perma.cc/E72C-PJQX ...............15–16

William H. Taft, IV, *Self-Defense and the Oil Platforms
Decision*, 29 Yale J. Int'l L. 295 (2004)................................................13

## INTEREST OF AMICI CURIAE[1]

The Brennan Center is a nonpartisan think tank and public interest law institute that seeks to improve systems of democracy and justice. The Center has conducted extensive research on presidential emergency powers, including the Alien Enemies Act.

The Cato Institute is a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. The Institute has long had a focus on both immigration policy and issues related to civil liberties.

Ilya Somin and John Dehn are law professors with significant expertise and interest in constitutional law, the law of war, and immigration law and policy. Additional information about amici Law Professors is included as an appendix to this brief.

## SUMMARY OF ARGUMENT

The Alien Enemies Act of 1798 (AEA) is a wartime authority. Congress enacted the AEA under its constitutional war powers as an

---

[1] No counsel for a party authored this brief in whole or in part, and no party or its counsel made a monetary contribution intended to fund its preparation or submission. No person, other than amici curiae, their members, or their counsel, contributed money intended to fund preparing or submitting the brief. This brief does not purport to convey the position of New York University School of Law.

implementation of the law of war, which in 1798 allowed the government to detain or expel supposed "alien enemies." The AEA may be invoked only in the event of a declared war or an act of war undertaken by a foreign nation or government against U.S. territory. It has no peacetime applicability and has never been used outside of a major conflict. Before now, the only time the AEA was invoked absent a declared war was after Japan's attack on Pearl Harbor, just days before Congress declared war.

The current invocation of the AEA, *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13033 (Mar. 14, 2025) ("Proclamation"), falls well outside the law's scope. By its text, the Proclamation addresses unlawful migration, narcotics trafficking, and gang violence, none of which constitute an "invasion" or "predatory incursion." Under no interpretation of the law of war could these civil and criminal matters trigger the AEA's exceptional powers. The designation of Tren de Aragua (TdA) as a foreign terrorist organization (FTO) does not transform its activities into acts of war.

This case does not present a political question. But even if it did, established exceptions to that doctrine would apply. Courts may always check obvious mistakes and manifestly unauthorized exercises of power.

And the judiciary's ability to act is at its apex when civil liberties are at stake. Courts have the power to correct the president's misappropriation of the AEA in peacetime — and can rely on the judicially manageable standards historically used to identify acts of war.

Should courts adopt the government's unfounded interpretation of the AEA or hold that the executive's pronouncements are unreviewable, there would be dire consequences. The president could leverage the law's power against any group of immigrants. The federal government could suspend the writ of habeas corpus and states could "engage in War" at any time.

## ARGUMENT

### I.    The Proclamation Is Manifestly Unlawful.

####    A.    The AEA's text, context, and history establish that it is a wartime authority only.

Congress authorized the use of the AEA only in limited circumstances: in times of declared war or an ongoing or threatened "invasion or predatory incursion" by a foreign nation or government against U.S. territory. 50 U.S.C. § 21. Although neither "invasion" nor "predatory incursion" is explicitly defined, these terms were both readily understood in 1798 to refer to armed attacks by military forces. *See*

*Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020) (interpreting statute according to ordinary public meaning of its terms). Indeed, the law's text, context, and history clarify that these terms refer to acts of war — military activity — under the law of nations; they do not refer to civil or criminal activity.

Contemporaneous sources — the Constitution, ratified less than a decade before the AEA's enactment; acts of Congress; and Founding-era writings — consistently use "invasion" to refer to large-scale acts of war. *See, e.g.*, U.S. Const. art. I, § 10 (permitting states to "engage in War" if actually invaded); J. Res. 8, 13th Cong. (1815) (adopted) (lauding Louisiana for implementing State War Clause to repel British "invading army" at Battle of New Orleans); Act of Feb. 20, 1800, ch. 9 (2 Stat. 7) (authorizing enlistments if "war shall break out" or "imminent danger of invasion of their territory" is "discovered to exist"); Act of Jan. 2, 1812, ch. 11 (2 Stat. 670) (authorizing enlistments in times of "actual or threatened invasion" and subjecting enlistees to "the rules and articles of war"); James Madison, *The Report of 1800,* Founders Online (Jan. 7, 1800), https://perma.cc/E73C-5TN8 (explaining, in report addressing the Invasion Clause of Article IV, as well as the AEA and Alien Friends Act,

that "[i]nvasion is an operation of war"); *see generally* Ilya Somin, *Immigration is Not Invasion*, Lawfare (Mar. 25, 2024), https://perma.cc/TS87-3Y55 (discussing "invasion" provisions of Constitution); Joshua Treviño, *The Meaning of Invasion Under the Compact Clause of the Constitution*, Texas Public Policy Foundation (Nov. 2022), https://perma.cc/F4XC-AVRP (surveying meaning of "invasion" during Founding era).

Recognizing this original understanding, courts addressing the Proclamation have rightly concluded that "invasion" refers to a sizeable armed attack involving military force. *See J.G.G. v. Trump*, No. 1:25-5067, 2025 WL 914682, at *16–21 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring), *vacated on other grounds,* 145 S. Ct. 1003 (2025); *J.O.P. v. Dept. of Homeland Sec.*, No. 25-1519, 2025 WL 1431263, at *9–10 (4th Cir. May 19, 2025) (Gregory, J., concurring); *G.F.F. v. Trump*, No. 25-cv-2886, 2025 WL 1301052, at *9 (S.D.N.Y. May 6, 2025); *D.B.U. v. Trump*, No. 25-cv-01163, 2025 WL 1304288, at *6 (D. Colo. May 6, 2025); *J.A.V. v. Trump*, No. 1:25-cv-072, 2025 WL 1257450, at *15–16 (S.D. Tex. May 1, 2025); *cf. A.S.R. v. Trump*, No. 3:25-cv-00113, 2025 WL 1378784, at

*12 n.8 (W.D. Pa. May 13, 2025) (declining to reach what "invasion" means).[2]

The Founding generation used "predatory incursion" to refer to smaller-scale acts of war — particularly military raids that could be repelled by militias. *See, e.g.*, Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798), *in* Founders Online, https://perma.cc/9ZLS-MGZP ("Small, predatory incursions of the French . . . might occasion great destruction of property [but] the militia might be sufficient to repel them . . . ."). On the eve of the Quasi-War with France, President Adams requested war preparations, cautioning Congress that while the Atlantic insulated the nation against "invasions in time of War," its "principal Sea Ports" could be subject to "predatory incursions" by French forces. John Adams, Address Before United States Congress (May 16, 1797), *in* Founders Online, https://perma.cc/GJJ8-2RB7; *see also* 16 Annals of

---

[2] A member of this Court has suggested that unlawful migration and private violence might qualify as an "invasion" under the Constitution. *United States v. Abbott*, 110 F.4th 700, 735–38 (5th Cir. 2024) (en banc) (Ho, J., concurring in the judgment in part, dissenting in part). But this opinion cites no textual or original-meaning evidence, and it misinterprets evidence from the 1870s. *See* Ilya Somin, *En Banc Fifth Circuit Rules for Texas in Water Buoy Case, but Doesn't Resolve Issue of Whether Illegal Migration Qualifies as "Invasion,"* Reason, July 31, 2024, https://perma.cc/8Q7E-UXT4 (critiquing opinion).

Cong. 452–54 (1807) (discussing need to fortify seaport — New York City
— "against national hostility and predatory incursions"). In ensuing
debates over the AEA, a legislator proposed an amendment to make the
law available the moment an adversary authorized hostilities, believing
"it would not be proper to wait until predatory incursions were made . . .
or until what shall be considered as threatening or actual invasion
appeared." 8 Annals of Cong. 1573–82 (1798). The amendment failed,
with other lawmakers criticizing this lower threshold because "it would
be improper to give the President this power" before an actual war. *Id.* at
1575.

Similarly, "predatory incursion" and related phrases arose in
discussions, treaties, and statutes regarding Native American wars. *See,
e.g.*, Letter from General Henry Knox to Governor Arthur St. Clair (Aug.
23, 1790), *in* The St. Clair Papers, Vol. II, 162 (1882) (discussing
"predatory incursions of the Wabash Indians" during Northwest Indian
War); Treaty with the Apaches, Arts. 2, 5, July 1, 1852, 10 Stat. 979
(agreeing that "hostilities between the . . . parties shall forever cease" and
binding the Apaches "to desist and refrain from making any incursions
. . . of a hostile or predatory character" (quotation marks omitted)); *see*

*also* Act of Sept. 29, 1789 § 5, 1 Stat. 95 (authorizing president to call forth militia to repel "hostile incursions of the Indians"). As with "invasion," the term "predatory incursion" referred specifically to acts of war. *See J.G.G.*, 2025 WL 914682, at *10 (Henderson, J., concurring) (listing additional uses of "predatory incursion" indicating term referred to military "attack" amounting to "a lesser form of invasion"); *J.O.P.,* 2025 WL 1431263, at *9–10 (Gregory, J. concurring); *J.A.V.*, 2025 WL 1257450, at *15–16. Contrary to the government's argument and the court's decision in *A.S.R.*, it did not encompass every form of "significant disruption to the public safety" by a "cohesive group." 2025 WL 1378784, at *17; *see* Ilya Somin, *Trump (Partially) Wins an Alien Enemies Act Case*, Reason (May 14, 2025), https://perma.cc/88DS-PREU (critiquing overbroad *A.S.R.* definition of "predatory incursion" as ahistorical and violating canons against redundancy and absurdity).

This understanding of "invasion" and "predatory incursion" is reinforced by the rule of *noscitur a sociis* — a "word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citation and quotation marks omitted). The terms "invasion" and "predatory incursion" should be understood by reference to the proximate

and unambiguous term "declared war" and the nearby mentions of "hostile nation" and acts of "actual hostility." 50 U.S.C. §§ 21–22. This is the language of armed conflict between nations, not illicit activity by gang members. *See, e.g.*, Treaty of Paris, Art. 7, Sept. 3, 1783, 8 Stat. 80 ("There shall be a firm and perpetual peace . . . wherefore all hostilities . . . shall from henceforth cease . . . .").

The context of the AEA's enactment further confirms that these terms refer to acts of war. The law was enacted alongside the Alien Friends Act, 1 Stat. 570 (1798), a complementary — and controversial — authority intended for peacetime. Congress and the many critics of the Alien Friends Act justified the more potent powers of the AEA as implementing the rules of war under the law of nations. *See, e.g.*, 8 Annals of Cong. 1980 (1798) (noting that "alien enemies" can be "treated as prisoners of war" consistent with law of nations); Madison, *supra*; *see also Clarke v. Morey*, 10 Johns. 69, 74 (N.Y. Sup. Ct. 1813) (describing AEA as "a true exposition and declaration of the modern law of nations" governing "alien enemies resident at the opening of [a] war"). Indeed, the entire concept of "alien enemies" is drawn from the law of war (as of 1798) and has no apparent significance in peacetime. *See* Emmerich de Vattel,

The Law of Nations, bk. III, ch. IV, § 63 (1758); *Ware v. Hylton*, 3 U.S. 199, 228 (1796) (opinion of Chase, J.) (explaining that "alien enemies" do not exist in peacetime).

Consistent with its enactment as an implementation of the law of war, the AEA was designed for what the Founding generation understood as "perfect" or "general" war between nations, not periods of "restrained, or limited, hostility." *See Bas v. Tingy*, 4 U.S. 37, 43–44 (1800) (opinion of Chase, J.) (explaining that perfect wars between nations are regulated by the rules of war under the law of nations, whereas undeclared, imperfect wars are governed by municipal law). As noted above, Congress declined a proposal to make the AEA applicable in times of "authorize[d] hostilities," with lawmakers concerned about the prudence and legality of imposing "alien enemy" status on immigrants in lower-intensity, less formal engagements. *See supra* at p. 7; *see also* Vattel, *supra*, bk. III, ch. IV, § 63 (expounding "[c]onduct to be observed towards the subjects of an enemy, who are in the country at the time of *the declaration of war*" (emphasis added)). Consequently, President Adams relied on the peacetime Alien Friends Act throughout the Quasi-War, which involved naval engagements with France that never escalated through a war

declaration or ground assault. *See generally* James Morton Smith, *The Enforcement of the Alien Friends Act of 1798*, 41 Miss. Valley Hist. Rev. 85 (1954).

The AEA has been invoked only three times, always in a major armed conflict with foreign sovereigns. In the War of 1812 and World War I, Presidents Madison and Wilson invoked the law after Congress declared war. Circular from James Monroe to the Secretary of the Mississippi Territory (July 11, 1812), *in* Mississippi Dep't of Archives & History, Doc. No. 5, *available at* https://perma.cc/RY6D-BETN; Presidential Proclamation 1364, 40 Stat. 1650 (Apr. 6, 1917). In World War II, President Roosevelt invoked the law upon Japan's attack on Pearl Harbor, an "invasion" involving hundreds of warplanes. Presidential Proclamation 2525, 6 Fed. Reg. 6321, 55 Stat. 1700 (Dec. 7, 1941). The next day, Roosevelt proclaimed that Germany and Italy, Japan's allies, threatened an "invasion or predatory incursion." Presidential Proclamation 2526, 6 Fed. Reg. 6323, 55 Stat. 1705 (Dec. 8, 1941); Presidential Proclamation 2527, 6 Fed. Reg. 6324, 55 Stat. 1707 (Dec. 8, 1941). Within the week, Congress declared war on all three countries.

**B.    The Proclamation seeks to apply the AEA unlawfully in peacetime.**

The Proclamation is an unlawful invocation of the AEA. While it purports to acknowledge that the law is meant for wartime, asserting that TdA is "conducting irregular warfare and undertaking hostile actions" against the United States, the activities it describes are in no way equivalent to an armed attack by a foreign sovereign. Unlawful migration, narcotics trafficking, and gang violence are not acts of war that justify invoking the AEA.

To start, there is no analogy between the civil and criminal activities discussed in the Proclamation and a "perfect war," which Justice Washington described as a conflict in which "one whole nation is at war with another whole nation" and "all members of the nation . . . are authorised to commit hostilities against all the members of the other, in every place, and under every circumstance." *Bas*, 4 U.S. at 40 (opinion of Washington, J.); *accord Johnson v. Eisentrager*, 339 U.S. 763, 772–73 (1950) (grounding AEA in perfect war principles); *see also* James Kent, Commentaries on American Law, vol. I, 53–54 (1826) ("When war is duly declared, it is . . . between all the individuals of the one, and all the individuals of which the other nation is composed . . . [Law of nations

authorities say] a state has a right to deal as an enemy with persons and property so found within its power.").

Nor would any plausible interpretation of the modern law of war — which evolved in tandem with modern war-fighting — conclude that unlawful migration, narcotics trafficking, or gang violence constitute an act of war. Today, the law of war has two components: *jus ad bellum*, which primarily governs whether an armed attack triggering a nation's right of self-defense has occurred, and *jus in bello*, which governs the means and methods of war, including the treatment of civilians during armed conflict. Both regimes are relevant to an AEA invocation, *i.e.*, the application of special wartime rules to civilians, based on an invasion or predatory incursion. Yet neither applies to the civil and criminal activity described in the Proclamation. Under *jus ad bellum*, an armed attack, particularly one by irregular forces, must involve a use of force of a certain "gravity," with substantial "scale and effects," to trigger a state's right to self-defense. William H. Taft, IV, *Self-Defense and the Oil Platforms Decision*, 29 Yale J. Int'l L. 295, 300–01 (2004); *see infra* Section II.C (describing similar threshold for identifying "act of war" in U.S. statutory and contract cases); *see also Reclaiming Congress's Article*

*I Powers: Counterterrorism AUMF Reform – Hearing Before H. Comm. on Foreign Affairs*, 118th Cong. 30 (2023) (testimony of Rich Visek) (Acting Legal Adviser at State Department is "not aware of any statement by anyone" that narcotics trafficking constitutes armed attack under law of war).

Likewise, an armed conflict under *jus in bello* requires militaries or paramilitaries engaged in "fighting of some intensity." Exec. Comm., Int'l Law Ass'n, *Final Report on the Meaning of Armed Conflict in International Law*, 2 (2010), https://perma.cc/4G5G-6837. It is not enough to show "lower level or chaotic violence" of the type that criminal gangs perpetrate. *Id.* at 2–3, 28. The activities cited in the Proclamation are typical of criminal gangs; indeed, the Proclamation refers to these activities as "crimes." This conduct does not remotely entail an armed attack or armed conflict under the law of war.

Neither the rise of international terrorism nor the designation of TdA as an FTO changes matters. All efforts to amend the AEA to apply to terrorism have failed.[3] And although FTO designation has legal and

---

[3] Most notably, during the Iran hostage crisis, Congress debated defining "predatory incursion" to include "seizing and holding the premises of a

practical repercussions, it is "inapposite to the question of whether we are at war." Rebecca Ingber, *Judicial Deference and Presidential Power Under the Alien Enemies Act*, Just Security (May 20, 2025), https://perma.cc/V9ZC-329R. Immigration law — not the law of war — explicitly governs the deportation of FTO members. *See* 8 U.S.C. § 1227(a)(4)(B). And when the Attorney General certifies that using regular immigration procedures would pose a national security risk, immigration law establishes special procedures for terrorist deportations. *See* 8 U.S.C. §§ 1531–37. Interpreting FTO designation to trigger the AEA would effectively nullify this carefully legislated regime.

Furthermore, overstating the consequences of FTO designation would have absurd consequences: Nearly a hundred organizations scattered across the globe are designated FTOs. U.S. Dep't of State,

---

diplomatic mission." American Sovereignty Protection Act, H.R. 6941, 96th Cong. (1980). Asked to assess the amendment's constitutionality, the Department of Justice advised that "predatory incursion" was "clearly intended to apply to situations where war is imminent but has not yet been declared" and expressed doubts about the legality of extending the AEA to contexts "when no war was anticipated." Letter from Alan Parker, Assistant Attorney General, to Senator Edward Kennedy (Aug. 2, 1980). In response, the amendment's proponents argued that certain acts of "international terrorism," such as storming an embassy, would "de facto amount to the conduct of war." 126 Cong. Rec. S28188 (1980). The amendment failed.

Bureau of Counterterrorism, *Foreign Terrorist Organizations*, https://perma.cc/E72C-PJQX; *see also McAllister v. Att'y Gen.*, 444 F.3d 178, 187 (3d Cir. 2006) (noting that standard for FTO designation "encompasses more conduct than our society, and perhaps even Congress, has come to associate with traditional acts of terrorism"). Although a large-scale, concerted attack by an FTO can constitute an act of war,[4] it cannot be the case that any assault, theft, or murder committed by members of these groups creates a state of war. *See In re September 11 Litigation*, 751 F.3d 86, 92 (2d Cir. 2014) (holding that although terrorist attacks are not generally "acts of war," the September 11 attacks "were different in means, scale, and loss from any other terrorist attack"); *Hamdan v. Rumsfeld*, 548 U.S. 557, 599 n.31 (2006) (holding that U.S. war with al-Qaeda started on September 11, well after the group's FTO designation). To hold otherwise, as the government urges and the court in *A.S.R.* ruled, 2025 WL 1378784, at *17, would untenably expand the reach of constitutional war powers beyond *but also within* U.S. borders. *Cf. Duncan v. Kahanamoku*, 327 U.S. 304, 322 (1946) ("[T]he founders of

---

[4] Under the AEA, an act of war must also be perpetrated by a "foreign nation or government" – not a nonstate FTO.

this country are not likely to have contemplated complete military dominance within the limits of a Territory made part of this country . . . . They were opposed to governments that placed in the hands of one man the power to make, interpret, and enforce the laws.").

Government officials, moreover, have disclaimed any ongoing war with Venezuela and called into question TdA's capacity to conduct substantial operations on U.S. territory. On March 26, 2025, CIA Director John Ratcliffe testified before Congress that no intelligence assessment suggests the nation is at war with or being invaded by Venezuela, notwithstanding the Proclamation's assertion that Venezuela is a "hybrid criminal state" directing TdA's "irregular warfare." *Annual Worldwide Threats Assessment Hearing Before H. Permanent Select Comm. on Intelligence*, 119th Cong. (2025). A now-declassified intelligence assessment from April similarly concluded that TdA is not operating at Venezuela's behest and that its presence stateside is "small," "decentralized," and "focus[ed] on low-skill criminal activities." Nat'l Intelligence Council, Venezuela: Examining Regime Ties to Tren de Aragua, at 1, (Apr. 7, 2025), https://perma.cc/KGL6-QNC8. Far from having the capacity to wage war, TdA, per the intelligence assessment,

likely lacks the capacity to "coordinate[] large volumes of human trafficking or migrant smuggling." *Id*. These conclusions underscore that the Proclamation wrongly identified an "invasion" or "predatory incursion" by a foreign nation or government.

## II.    The Political Question Doctrine Does Not Bar Judicial Review.

Throughout this litigation, the government has argued that the president's foreign relations power renders the Proclamation an unreviewable exercise of political judgment. Not so. As the Supreme Court has said, "resort to the courts may be had . . . to challenge the construction and validity of the [AEA],'" *Ludecke v. Watkins*, 335 U.S. 160, 171 (1948), or "to ascertain the existence of a state of war," *Eisentrager*, 339 U.S. at 775; *see also Baker v. Carr*, 369 U.S. 186, 211 (1962) (noting that a case does not "lie beyond judicial cognizance" simply because it "touches foreign relations").

Amici write to emphasize that, in addition to the courts' duty to interpret statutory terms, well-established exceptions to the political question doctrine permit robust judicial review of the Proclamation, including its factual assertions. Determining whether the political question doctrine precludes review demands "discriminating inquiry into

the precise facts and posture of the particular case." *Id.* at 217. When that inquiry reveals an "obvious mistake" or "manifestly unauthorized exercise of power," the doctrine does not bar judicial intervention. *Id.* at 214, 217; *accord Sterling v. Constantin*, 287 U.S. 378, 399 (1932) ("[T]here is a permitted range of honest judgment as to the measures to be taken in meeting force with force, in suppressing violence and restoring order."). Additionally, courts "most assuredly" may review the executive's actions when individual liberties are at stake, even in sensitive wartime contexts. *Hamdi v. Rumsfeld*, 542 U.S. 507, 535–36 (2004).

### A.    Courts may review the Proclamation — and the factual assertions on which it relies — as an "obvious mistake" or "manifestly unauthorized exercise of power."

The political branches have broad discretion in matters of war. But the president cannot transform civil and criminal matters into acts of war by "arbitrarily calling" them an invasion or predatory incursion by a foreign nation or government. *See Baker*, 369 U.S. at 216 (rejecting political branches' ability to unlock powers through factually baseless designations (quoting *United States v. Sandoval*, 231 U.S. 28, 46 (1913)); *Abbott*, 110 F.4th at 736 (Ho, J., concurring in the judgment in part, dissenting in part) (acknowledging that "a state of invasion . . . does not

19

exist just because [the executive] has uttered a certain magic word" and noting that a declaration of invasion "must be done in good faith"); *cf.* *Sterling*, 287 U.S. at 399, 401 (explaining that although Texas governor had "discretion in calling out its military forces to suppress insurrection and disorder," it did not follow that "that every sort of action the Governor may take, no matter how unjustified by the exigency . . . is conclusively supported by mere executive fiat"). Words have meaning. And it is within the power of the courts to correct "obvious mistake[s]," even when those words arise in a wartime statute. *Baker*, 369 U.S. at 214 (citation omitted); *see also United States v. Zubaydah*, 595 U.S. 195, 237–38 (2022) (Gorsuch, J., dissenting) ("There comes a point where we should not be ignorant as judges of what we know to be true as citizens."); Ingber, *supra* (noting that "[t]he president's attempt to invoke the language of war does not change" the "basic judicial task[s]" of "interpret[ing] a statute, weigh[ing] the facts, and apply[ing] them to the law").

Over centuries and across conflicts, courts have intervened when the political branches exceeded their wartime authorities. From the Quasi-War onward, courts have assessed whether the political branches' wartime measures exceed what the law "obviously contemplates." *Little*

*v. Barreme*, 6 U.S. 170, 177 (1804). They have rejected exercises of presidential discretion when patently unsound, *see Ex parte Milligan*, 71 U.S. 2, 121 (1866) (disallowing Civil War-era use of military commissions based on "judicial knowledge that in Indiana the Federal authority was always unopposed, and its courts always open"), and they have challenged baseless congressional determinations regarding war-related exigencies, *see Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924) (scrutinizing Congress's assessment that World War I-related emergencies existed after 1922).

Thus, in formalizing the political question doctrine, the Supreme Court acknowledged that the judiciary is "not at liberty to shut its eyes to an obvious mistake" even in matters relating to war. *Baker*, 369 U.S. at 214 (citation omitted). As discussed, no plausible interpretation of TdA's conduct qualifies as an "invasion" or "predatory incursion" for purposes of the AEA — *i.e.*, as an act of war. The Proclamation is precisely the kind of "obvious mistake" and "manifestly unauthorized exercise of power" that courts have historically reviewed notwithstanding the president's latitude in matters of war. *Id.* at 214, 217; *accord Harjo v. Kleppe*, 420 F. Supp. 1110, 1117 (D.D.C. 1976), *aff'd*, 581 F.2d 949 (D.C.

Cir. 1978) (reaffirming courts' power to review issues "usually considered a matter for political departments" when political branch "acts arbitrarily").

### B.   The judiciary's power to review the Proclamation is at its height because individual liberties are implicated.

Throughout its political question caselaw, the Supreme Court has emphasized that the judiciary's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Rucho v. Common Cause*, 588 U.S. 684, 709 (2019) (quotation marks and citation omitted); *Baker*, 369 U.S. at 261, 262 (Clark, J., concurring) ("[A] chief function of the Court is to secure the national rights. . . . National respect for the courts is more enhanced through the forthright enforcement of those rights rather than by rendering them nugatory through the interposition of subterfuges."). This constitutional role does not vanish when the political branches assert national security interests. Instead, as the Court explained in *Hamdi v. Rumsfeld*, "[w]hatever power the United States Constitution envisions for the Executive . . . in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." 542 U.S. at 536; *see also Boumediene v. Bush*, 553 U.S. 723, 765 (2008) ("To hold the political branches have the

power to switch the Constitution on or off at will . . . would permit a striking anomaly in our tripartite system of government. . . .").

The Supreme Court has recognized that the Proclamation has a direct impact on immigrants' rights. The Court addressed one of those impacts in *A.A.R.P. v. Trump*, 2025 WL 1417281, at *2 (U.S. May 16, 2025), holding that due process requires immigrants subject to AEA deportation to be provided with notice and an opportunity to be heard. But the AEA implicates a host of additional constitutional and statutory rights not addressed in *A.A.R.P.*

AEA invocations unlock sweeping regulatory, detention, and deportation powers over immigrants. *See infra* at 30 (discussing past AEA regulations). The administration has apparently concluded that the Proclamation authorizes warrantless searches and arrests, notwithstanding the Fourth Amendment. *See* Office of the Attorney General, *Guidance for Implementing the Alien Enemies Act* (Mar. 14, 2025), https://perma.cc/28MW-9MCB. It has also determined that the Proclamation allows it to bypass "any relief or protection from removal," *id.*, despite laws safeguarding immigrants' right not to be deported to countries where they will face torture or persecution, *see* Foreign Affairs

23

Reform and Restructuring Act, 112 Stat. 2681 (1998); 8 U.S.C. § 1231(b)(3)(A). The Proclamation, if upheld, would enable the government to run roughshod over established constitutional and statutory rights.

These rights deprivations are no surprise, given the AEA's shameful history. The law was last used to intern 31,000 noncitizens of Japanese, German, and Italian descent without due process and based principally on their ancestry — actions that the federal government subsequently recognized as a "fundamental injustice." *See, e.g.*, Civil Liberties Act of 1988, Pub. L. 100-383, 102 Stat. 903 (1988) (providing reparations to lawful residents of Japanese descent interned under AEA); Wartime Violation of Italian American Civil Liberties Act, Pub. L. 106-451, 114 Stat. 1947 (2000) (apologizing to internees of Italian descent); *Mochizuki v. United States*, 43 Fed. Cl. 97, 97–98 (1999) (approving settlement providing reparations to additional noncitizens of Japanese descent interned under AEA).

When the president endeavors to revive a law with this record, the courts' power to serve as a guardian of civil liberties is at its height. *See Zubaydah*, 595 U.S. at 250, 252 (Gorsuch, J., dissenting) ("[H]istory

24

reveals that executive officials can sometimes be tempted to misuse claims of national security to shroud major abuses . . . . This Court hardly needs to add fuel to that fire by abdicating any pretense of an independent judicial inquiry . . . .").

### C.   Judicially manageable standards allow courts to identify manifestly unauthorized exercises of wartime powers.

The government suggests that courts cannot review the Proclamation because no judicially manageable standards exist for determining what constitutes an "invasion" or "predatory incursion." That concern rings hollow when extensive caselaw — including every case addressing the Proclamation — demonstrates that courts are perfectly capable of adjudicating what constitutes an act of war.

Parts of the Anti-Terrorism Act, 18 U.S.C. § 2336(a), Federal Torts Claims Act (FTCA), 28 U.S.C. § 2680(j), and Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607(b)(2), preclude these laws' application to harms arising from acts of war. Similarly, insurance contracts commonly exclude wartime harms from their coverage. When confronted with disputes over

these "war exclusion" provisions, judges regularly decide what constitutes an act of war.

Across this jurisprudence, courts have evaluated several factors: the (1) scale of an attack; (2) means used for an attack; (3) objectives targeted; (4) nature and motives of the adversary; and (5) responses of the U.S. and foreign governments. *Koohi v. United States*, for instance, identified the congressionally unauthorized Tanker War of the 1980s as a "time of war" by reference to U.S. naval combat against Iranian gunboats. 976 F.2d 1328, 1334–35 (9th Cir. 1992) (exempting U.S. Navy's downing of Iranian aircraft from FTCA). *Koohi* described war as a state of "overwhelming and pervasive violence" in which U.S. forces might make "life or death decisions in the midst of combat" and civilians might be harmed. *Id.* at 1335. In a similar vein, *In re September 11 Litigation* deemed the September 11 attacks an act of war based on their "purpose" and devastating "scale, means, and effect," which mirrored that of a military attack. 751 F.3d at 89 (exempting World Trade Center dust remediation from CERCLA). By contrast, *Pan American World Airways v. Aetna Casualty & Surety* reasoned that a plane hijacking was not an act of war because it had "criminal rather than military overtones," did

not target military objectives, and was perpetrated by a "relatively minute entity . . . rather than a sovereign government." 505 F.2d 989, 1014–15, 1017 (2d Cir. 1974). In these cases and others, the courts used the law of war as a guidepost. *See, e.g.*, *id.* at 1012, n.12 (describing law of war as the "starting place" for judicial inquiry); *United States v. Shell Oil Co.*, 294 F.3d 1045, 1061 (9th Cir. 2002) ("[T]he term 'act of war' appears to have been borrowed from international law. . . .").

Courts have used similar standards to review challenges to clear presidential exercises of war powers. Before upholding President Lincoln's unilateral imposition of a blockade in the Civil War, the *Prize Cases* independently reviewed relevant facts to establish the presence of a war under the law of war. 67 U.S. (2 Black) 635, 667–69 (1862) (discussing attack on Fort Sumter and ensuing scale of military conflict, attempted secession of Confederate States as separate sovereign and belligerent, and foreign nations' responses). A century later, *Mitchell v. Laird* assessed the duration, magnitude, and casualties of the Vietnam War to determine that a state of war existed and the president "was without power to continue the war without Congressional approval." 488 F.2d 611, 614 (D.C. Cir. 1973). More recently, *Al-Warafi v. Obama*

reviewed the scope of U.S. deployments and combat operations to determine that the War in Afghanistan persisted and supported continuing law-of-war detentions, notwithstanding President Obama's announcement of the war's conclusion. No. 09-2368, 2015 WL 4600420, at *5–7 (D.D.C. Jul. 30, 2015), *vacated and appeal dismissed as moot*, No. 15-5266 (D.C. Cir. Mar. 4, 2016) (dismissing case based on petitioner's transfer out of Guantanamo Bay).

The Invasion Clause cases are not to the contrary. Those 1990s cases invoked the political question doctrine to dismiss claims that the government was permitting a migrant "invasion" in violation of Article IV of the Constitution. *See, e.g.*, *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). But those cases are materially different: The plaintiffs were not challenging presidential action but instead supposed presidential *inaction*. The courts therefore had no cause to consider whether there had been a "manifestly unauthorized exercise of power." *Baker*, 369 U.S. at 217. Notably, those courts also made clear that, if necessary, they would interpret the term "invasion" to require armed hostilities by foreign powers. *Padavan*, 82 F.3d at 28 ("Assuming, arguendo, that the plaintiffs'

Invasion Clause claim is justiciable . . . . for a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity . . . ."); *California*, 104 F.3d at 1091 (same); *see also J.G.G.*, 2025 WL 914682, at *6 (Henderson, J., concurring) (noting *California* would weigh against the government's argument). Courts can use well-developed bodies of law to enjoin the Proclamation's obvious misappropriation of a wartime authority for peacetime immigration enforcement. *Cf. United States v. Texas*, 97 F. 4th 268, 294–95 (5th Cir. 2024) (rejecting argument that State War Clause gives Texas power to conduct immigration enforcement otherwise preempted by federal law).

## III.  Adopting the government's interpretation of the AEA would have dire consequences.

### A.  The government's arguments could allow the AEA to be used against any group of immigrants.

Without a judicial check on AEA invocations, the president could use it to target any immigrant group at any time. By its text, the AEA applies to "all natives, citizens, denizens, or subjects" of an enemy nation or government. 50 U.S.C. § 21. The law does not exclude long-term residents, asylum-seekers, or other lawfully present noncitizens. In

World War II, even German Jews fleeing the Third Reich were interned under the AEA. *See generally* Harvey Strum, *Jewish Internees in the American South, 1942–1945*, 42 Am. Jewish Archives 27 (1990).

The law's power extends beyond simply detaining and deporting "alien enemies." Past presidents have used it to issue draconian regulations. During World War II, President Roosevelt prohibited *all* Japanese, German, and Italian noncitizens — hundreds of thousands of individuals — from owning flashlights, radios, and cameras; joining disfavored associations; and traveling by plane. *See* Proclamation 2525; Proclamation 2526; Proclamation 2527. These powers simply cannot be available to respond to commonplace civil and criminal activity. Nor can their invocation be immune to judicial review. Otherwise, the AEA would empower the president to bypass Congress and establish *de facto* criminal and immigration law.

**B.    The government's interpretation of "invasion" would subvert the federal-state balance of war powers and threaten habeas corpus protections.**

If unlawful migration, narcotics trafficking, and gang violence constituted an "invasion," states could claim the right to "engage in War" unilaterally even though the State War Clause generally forbids state

war-making. U.S. Const. art. I, § 10. Because these civil and criminal acts occur routinely, border states could attack neighboring countries and drag the United States into war at any time. This would be a drastic usurpation of the federal government's authority over war and peace and would defeat the "very purpose" of the State War Clause's general prohibition. John Yoo, *Why Texas Cannot Treat Illegal Immigration as an 'Invasion'*, Nat'l Rev. (Nov. 18, 2022), https://archive.is/BzABV.

The government's overbroad definition of "invasion" could also permit the abuse of other war powers, including the Suspension Clause, which guarantees the right of habeas corpus "unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. "The suspension of habeas corpus is a stunning exercise of power," *United States v. Texas*, 719 F. Supp. 3d 640, 684 (W.D. Tex. 2024), that this administration is reportedly considering, *see* Kaitlan Collins et al., *Trump involved in discussions over suspending habeas corpus, sources say*, CNN (May 9, 2025), https://perma.cc/42B2-MUZF. British violations of the writ were major grievances before and during the American Revolution. *See generally* Amanda L. Tyler, *Habeas Corpus and the American Revolution*, 103 Cal. L. Rev. 645 (2015). The Founders

wisely took care to prevent such abuses. *See Boumediene*, 553 U.S. at 739–44. Labeling peacetime activity as an "invasion" would undo their efforts, granting virtually unconstrained power to suspend the writ.

Moreover, the suspension power is not limited to immigrants or border states. Suspension may be broadly applied to U.S. citizens, as was the case during the Civil War and Reconstruction. *See* Amanda L. Tyler, *Suspension as an Emergency Power*, 118 Yale L.J. 600, 639–62 (2009). Today, U.S. citizens regularly facilitate unlawful migration and engage in narcotics trafficking and gang violence. *See, e.g.*, David J. Bier, *U.S. Citizens Were 89% of Convicted Fentanyl Traffickers in 2022*, Cato at Liberty (Aug. 23, 2023), https://perma.cc/H8MF-NCDE. Undocumented migrants, narcotics traffickers, and gang members live in both border and interior states.

Courts should refuse the government's invitation to degrade constitutional safeguards and create dangerous state and federal powers — whether by redefining "invasion" or holding that proclaimed "invasions" are judicially unreviewable. Our system of checks and balances exists to prevent this kind of abuse.

## CONCLUSION

This Court should conclude that the president lacked the authority to invoke the AEA.

Respectfully submitted,

*/s/ Leah J. Tulin*

Gregory L. Diskant
Aron Fischer
Emma Ellman-Golan
Isaac Weingram
Anna Blum
PATTERSON BELKNAP WEBB &
TYLER
1133 Avenue of the Americas
New York, New York 10036
Phone: (212) 336-2000
gldiskant@pbwt.com

Leah J. Tulin
Katherine Yon Ebright
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW,
Suite 1150
Washington, DC 20036
Phone: (202) 650-6397
tulinl@brennan.law.nyu.edu

Ilya Somin
Professor of Law
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
Phone: (703) 993-8069
isomin@gmu.edu

*Counsel for Amici Curiae*

June 2, 2025

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 6,493 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

*/s/ Leah J. Tulin*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

*/s/ Leah J. Tulin*

# APPENDIX

Ilya Somin is Professor of Law at the Antonin Scalia Law School, George Mason University and B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute. He writes extensively on constitutional law and immigration law and policy. His writings and briefs have been cited by the U.S. Supreme Court, lower federal courts, state supreme courts, and the Supreme Court of Israel. He is the author of multiple books on constitutional law and migration rights, including *Free to Move: Foot Voting, Migration, and Political Freedom* (rev. ed. 2022), *Democracy and Political Ignorance: Why Smaller Government is Smarter* (2d ed. 2016), and *The Grasping Hand:* Kelo v. City of New London *and the Limits of Eminent Domain* (2015).

John Dehn is Associate Professor of Law and Faculty Director of the National Security and Civil Rights Program at Loyola University Chicago School of Law. A retired U.S. Army judge advocate, he writes in his personal capacity on constitutional and international law in areas related to foreign affairs, armed conflict, U.S. military law, and national self-defense. His work has been cited by the Office of Legal Counsel, by the Second Circuit, and in briefs related to military commissions.