# United States Court of Appeals

*for the*

# Fifth Circuit

---

### Case No. 25-10534

W.M.M., on their own behalf and on behalf of others similarly situated; F.G.M.,
on their own behalf and on behalf of others similarly situated; A.R.P., on their
own behalf and on behalf of others similarly situated,

*Petitioners-Appellants,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States;
PAMELA BONDI, Attorney General of the United States, in her official capacity;
KRISTI NOEM, Secretary of the United States Department of Homeland
Security, in her official capacity; UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, Acting Director of the United States
Immigration and Customs Enforcement, in his official capacity; UNITED
STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCO
RUBIO, Secretary of State, in his official capacity; UNITED STATES STATE
DEPARTMENT; JOSH JOHNSON, in his official capacity as acting Dallas Field
Office Director for United States Immigration and Customs Enforcement;
MARCELLO VILLEGAS, in his official capacity as the Facility Administrator of
the Bluebonnet Detention Center; PHILLIP VALDEZ, in his official capacity as
Facility Administrator of the Eden Detention Center; JIMMY JOHNSON, in
his/her official capacity as Facility Administrator of the Prairieland Detention
Center; JUDITH BENNETT, in her official capacity as Warden of the Rolling
Plains Detention Center,

*Respondents-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS, ABILENE, NO. 1:25-CV-59

---

## BRIEF OF *AMICUS CURIAE* LEGAL HISTORIAN ERIC L.
## MULLER IN SUPPORT OF PETITIONERS-APPELLANTS

AMY E. DAVIS
  *Counsel of Record*
LAW CENTER OF AMY E. DAVIS
151 CALLE DE SAN FRANCISCO
SUITE 200, PMB 1263
SAN JUAN, PR 00901
(214) 838-3501
adavis@cdfirm.com

ERIC L. MULLER
UNIVERSITY OF NORTH CAROLINA
SCHOOL OF LAW
CB #3380
CHAPEL HILL, NC 27599
(919) 962-7067
emuller@email.unc.edu

*Counsel for Amicus Curiae*



CP  COUNSEL PRESS    (800) 4-APPEAL • (812796)

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**
*A.A.R.P. v. Trump*
*Case No. 25-10534*

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed in the parties' briefs, have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

*Amicus curiae*: Eric L. Muller is a professor of law at the University of North Carolina School of Law in Chapel Hill, North Carolina.

*Counsel:* Amy E. Davis, of Law Center of Amy E. Davis PR, LLC.

/s/ Amy E. Davis
Amy E. Davis
*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

I.     STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE ....1

II.    SUMMARY OF ARGUMENT ...................................................................2

III.   ARGUMENT

      A.    False Allegations of a Threatened Coastal Invasion Were Central to the Government's Defense of Its Curfew and Mass Exclusion Orders in *Hirabayashi* as well as to the Supreme Court's Approval of the Curfew. ...................................................................................................3

      B.    Contemporaneous Military Assessments Refuted the Claim of a Threatened Invasion. ...........................................................................6

           1.    Army Intelligence (G-2) Reports ....................................7

           2.    Views of Military Leadership .........................................9

      C.    The Court Should Heed the Lesson of *Hirabayashi* ..........................11

CERTIFICATE OF SERVICE ...............................................................................14

CERTIFICATE OF COMPLIANCE .....................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hirabayashi v. United States*, 320 U.S. 81 (1943) ........................2, 3, 4, 5, 6, 11, 12

*Korematsu v. United States*, 323 U.S. 214 (1944) ................................................... 5

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .............................................................12

**Statutes**

Alien Enemies Act, ch. 66, 1 Stat. 577 (1798) (codified as amended at 50 U.S.C. §§ 21-24 (2018)) ........................................................................................................1

Civil Liberties Act of 1988 § 4202(a), Pub. L. No. 100-383, 102 Stat. 903, 904 (codified at 50 U.S.C. § 4212(a) (2018)) ...............................................................11

**Briefs and Court Documents**

*Brief for the United States in Hirabayashi v. United States*, May 8, 1943, 1943 WL 71885........................................................................................................... 4, 5

*Respondent's Opposition to Petitioners' Motions for a Preliminary Injunction and for Class Certification, J.A.V. v. Trump*, No. 1:25-cv-00072 (S.D. Tex. Apr. 22, 2025) ....................................................................................................................2

**Books and Secondary Sources**

Stetson Conn et al., *Guarding the United States and its Outposts* (2000) .............10

Eric L. Muller, *American Inquisition: The Hunt for Japanese American Disloyalty in World War II* (2008) ...........................................................................................1

Eric L. Muller, *Free to Die for Their Country: The Story of the Japanese American Draft Resisters in World War II* (2001) ...................................................................1

Eric L. Muller, *Hirabayashi and the Invasion Evasion*, 88 N.C. L. Rev. 1333 (2010) ...............................................................................................................1, 7

Eric L. Muller, *Lawyer, Jailer, Ally, Foe: Complicity and Conscience in America's World War II Concentration Camps* (2023) ...........................................................1

## Archival Materials

*G-2 Estimate No. 17*, *4:00 PM Dec. 22 to 10:00 PM Dec. 23*, Records of the U.S. Army Ground Forces, RG 499, Entry 128, National Archives at College Park, Md. ......................................................................................................7

*G-2 Periodic Report*, Records of the U.S. Army Ground Forces, RG 499, Entry 125, National Archives at College Park, Md. .......................................8

*G-2 Periodic Report, 12:00 Noon Feb. 14, 1942,* Records of the U.S. Army Ground Forces, RG 499, Entry 125, National Archives at College Park, Md .........8

*G-2 Periodic Report, 12:00 Noon Feb. 7, 1942,* Records of the U.S. Army Ground Forces, RG 499, Entry 125, National Archives at College Park, Md ......................8

*G-2 Periodic Report, 12:00 Noon Jan. 31, 1942 ,* Records of the U.S. Army Ground Forces, RG 499, Entry 125, National Archives at College Park, Md .........8

*Letter from Col. Ralph G. Smith, Exec. Officer, Assistant Chief of Staff, G-2, to Assistant Chief of Staff, War Plans Div.* (Jan. 30, 1942), RG 165, WPD Gen. Correspondence, Box 254, No. 4544-43, National Archives at College Park, Md. .8

*Letter from Field Marshal J.G. Dill, British Army, to Gen. George C. Marshall, Chief of Staff, War Dep't* (Feb. 20, 1942), microformed on Reel 27, Item 1157 (Marshall Center Microfilm) ....................................................................9

*Letter from Lt. Gen. L.J. McNair, U.S. Army, to Commanding Gen., Field Forces* (Dec. 23, 1941), microformed in RG 165, Item 4612-5, Box 259, National Archives at College Park, Md. .............................................................10

*Letter from Sen. Rufus C. Holman to Sen. Hiram W. Johnson* (Feb. 9, 1942), microformed on Records of the Japanese Evacuation and Resettlement Study, Reel 4, Frames 283b-284a (Bancroft Library) .................................................11

*Memorandum from Gen. Dwight D. Eisenhower, Assistant Chief of Staff, War Dep't, to Field Marshal J.G. Dill, British Army* (Feb. 20, 1942), microformed on Reel 27, Item 1157 (Marshall Center Microfilm) ....................................9

*Memorandum from Sen. Homer T. Bone* (Feb. 4, 1942), microformed on Records of the Japanese Evacuation and Resettlement Study, Reel 4, Frame 277b (Bancroft Library) .............................................................................11

*Telegram from Gen. George C. Marshall, Chief of Staff, U.S. Army, to Commanding Officer, Barksdale Field* (Jan. 18, 1942), microformed on Reel 17, Item 706 (Marshall Center Microfilm) ...................................................................10

*Western Sea Frontier Gen. Order No. 1-43* (Dec. 24, 1942), RG 499, Entry 118, National Archives at College Park, Md. ..............................................................10

## I.    STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus curiae Eric L. Muller is the Dan K. Moore Distinguished Professor of Jurisprudence and Ethics at the University of North Carolina School of Law and a leading scholar of the wartime treatment of Japanese Americans during World War II. He is the author of several books on the subject, including *Free to Die for Their Country: The Story of the Japanese American Draft Resisters in World War II* (2001), *American Inquisition: The Hunt for Japanese American Disloyalty in World War II* (2008), and *Lawyer, Jailer, Ally, Foe: Complicity and Conscience in America's World War II Concentration Camps* (2023), as well as numerous scholarly articles, including *Hirabayashi and the Invasion Evasion* (2010). That article forms the foundation of this submission, which presents archival evidence that the U.S. government's justification for the 1942 racial curfew and mass exclusion of Japanese Americans—the threat of a Japanese invasion of the West Coast—was refuted by contemporaneous but classified military intelligence and planning. Professor Muller offers this brief to provide the Court with historical perspective on the dangers of uncritically accepting executive claims of "invasion" in the application of the Alien Enemies Act.[1] He has an interest in ensuring the sound development of the law in this field and in avoiding decisions that repeat the tragedy of rights violations

---

[1] Alien Enemies Act, ch. 66, 1 Stat. 577 (1798) (codified as amended at 50 U.S.C. §§ 21–24 (2018)).

1

enabled by unexamined and unjustified executive assertions of invasions of U.S. territory.[2]

## II.    SUMMARY OF ARGUMENT

The government invokes the Alien Enemies Act in this and other current cases on the strength of what it depicts as an "invasion or predatory incursion" of the United States by Venezuela in the guise of a criminal gang, Tren de Aragua. It offers little in the way of evidence to support this claim. Instead, it argues "there is no basis for second-guessing the Executive's policy judgment that … an 'invasion' or 'predatory incursion' is occurring."[3]

This is not the first time the government has come to the courts with a thinly sourced story about invasion. In the litigation leading to the Supreme Court's discredited decision in *Hirabayashi v. United States*,[4] the government defended the dusk-to-dawn curfew imposed on the West Coast's Japanese Americans and their subsequent mass removal in the spring of 1942 as key elements of a plan to defend the coast against a serious threat of an invasion by Japanese military forces.

In reality, curfew and removal were not part of any plan to meet a threatened invasion. There was no such threat. Military records, classified at the time but now

---

[2] This brief was not authored in whole or in part by counsel for any party, and no person or entity other than amicus curiae or its counsel has made a monetary contribution toward the brief's preparation or submission.

[3] *Respondent's Opposition to Petitioners' Motions for a Preliminary Injunction and for Class Certification* at 12, *J.A.V. v. Trump*, No. 1:25-cv-00072 (S.D. Tex. Apr. 22, 2025).

[4] 320 US. 81 (1943)

available, reveal that the War Department and the Army's top intelligence branch repeatedly and consistently assessed that no invasion threat existed at the time curfew and removal were ordered. Nevertheless, the Supreme Court credited the government's narrative about such a threat and upheld those racially discriminatory measures. The result was a grave constitutional error and enduring harm to well over one hundred thousand Japanese American citizens and Japanese resident aliens.

The government's consequential misrepresentations about the threat of a Japanese invasion in the *Hirabayashi* litigation provide a cautionary lesson about the present claim of enemy invasion. Courts facing extraordinary, unscrutinized "invasion" claims should heed this historical warning.

## III.  **ARGUMENT**

### A.  **False Allegations of a Threatened Coastal Invasion Were Central to the Government's Defense of Its Curfew and Mass Exclusion Orders in *Hirabayashi* as well as to the Supreme Court's Approval of the Curfew.**

The concept of "invasion" played a central rhetorical and legal role in the government's defense of the curfew and mass removal orders in *Hirabayashi*. The term appeared not as a passing reference but as the linchpin of the argument that these measures were necessary to protect the United States from a foreign military threat. Crucially, the government advanced this argument without opening its

3

rationale to scrutiny, relying on the doctrine of judicial notice to encourage the Court to accept its characterizations.[5]

The references to "invasion" in the government's Supreme Court brief in *Hirabayashi* are too numerous to quote here in their entirety, but the following passages capture their centrality and urgency:

- "The principal danger to be apprehended was *a Japanese invasion*, and the possible assistance to attacking Japanese forces would be most likely to come from the Japanese residing on the West Coast."[6]

- "At the time of the initiation of the evacuation program here in issue, it was the utmost military importance to prepare against *an invasion* of the Pacific Coast."[7]

- "Faced with the responsibility of repelling *a possible Japanese invasion* which might have threatened the very integrity of our nation... it was the duty of the commanding general to take into account the plain fact that over 100,000 Japanese were grouped along the coast."[8]

---

[5] See *Brief for the United States in Hirabayashi v. United States*, May 8, 1943, at 11, 1943 WL 71885
[6] Id. at 65 (emphasis added).
[7] Id. at 15 (emphasis added).
[8] Id. at 61 (emphasis added).

- "What was needed was a method of removing at once the unknown number of Japanese persons who might assist *a Japanese invasion*."[9]

- "[A] disloyal minority, if only a few hundreds or thousands, strategically placed, might spell the difference between the success or failure of *any attempted invasion*."[10]

At oral argument on May 10, 1943, U.S. Solicitor General Charles Fahy amplified this theme, insisting on a "threat of invasion."[11] "[I]t was not unreasonable," he argued, "for those charged with the defense of the West Coast to fear that in case of an invasion there would be among this group of people a number of persons who might assist the enemy."[12] He continued: "The challenged orders were defense measures for the avowed purpose of safeguarding the military area in question, at a time of threatened air raids and invasion by the Japanese forces, from the danger of sabotage and espionage."[13]

The Supreme Court embraced the government's representations about an invasion in upholding the curfew.[14] Writing for the Court, Chief Justice Stone proclaimed that it "c[ould] not be doubted" that the "men charged with the

---

[9] Id. at 62 (emphasis added).
[10] Id. at 61 (emphasis added).
[11] Id. at 3347.
[12] Id.
[13] Id.
[14] The Supreme Court in *Hirabayashi* addressed only the curfew, deferring the question of mass exclusion for resolution in *Korematsu v. United States*, 323 U.S. 214 (1944).

responsibility of our national defense had ample grounds for concluding that they must face the danger of invasion [and] take measures against it."[15] Justice Douglas, concurring in the Court's opinion, put the matter bluntly. "After the disastrous bombing of Pearl Harbor," he wrote, "[t]he threat of Japanese invasion of the west coast was not fanciful, but real."[16]

Belief in threat of invasion was not incidental to the Court's analysis—it was the linchpin. The Court acknowledged that "a discrimination based on race alone" would ordinarily be "odious," "irrelevant," and "prohibited,"[17] but a different rule was appropriate in "a time of war and threatened invasion."[18] The Court "could not close [its] eyes" to what it saw as "the fact … that, in time of war, residents having ethnic affiliations with an invading enemy may be a greater source of danger than those of a different ancestry."[19] Without that claimed threat, the constitutional justification for the racial curfew would have collapsed.

## B.   Contemporaneous Military Assessments Refuted the Claim of a Threatened Invasion.

The military assessments available to the highest levels of government in early 1942 left no doubt: a Japanese invasion of the continental United States was neither expected nor regarded as a serious possibility. This conclusion is not a matter of

---

[15] *Hirabayashi*, 320 US at 94.
[16] Id. at 105 (Douglas, J., concurring).
[17] Id. at 100.
[18] Id.
[19] Id. at 101.

historical hindsight. It was the judgment of the War Department and its intelligence divisions at the time the curfew and exclusion policies were being developed and implemented.[20]

### 1. Army Intelligence (G-2) Reports

The Army's G-2 intelligence division issued regular evaluations of Japanese capabilities in the weeks following Pearl Harbor. These confidential reports, dated between December 1941 and March 1942, consistently concluded that Japan had neither the intention nor the capacity to launch an invasion of the West Coast. At most, G-2 envisioned isolated submarine attacks or possible air raids by carrier-based planes—limited acts of harassment that posed no genuine threat to territorial control.

For example, a December 23, 1941, G-2 report noted sporadic submarine activity off the Pacific coast but found no evidence of plans for invasion, predicting only harassment of shipping in the western half of the Pacific Ocean and intensified attacks on Malaya, Borneo, and the Philippines.[21] Subsequent bulletins in January and February of 1942 noted minor shifts in Japanese capabilities but did not budge

---

[20] What follows is a synopsis of certain key archival findings. They are supplemented and contextualized more fully in Eric L. Muller, *Hirabayashi and the Invasion Evasion*, 88 N.C. L. Rev 1333, 1357 (2010).

[21] *G-2 Estimate No. 17, 4:00 PM Dec. 22 to 10:00 PM Dec. 23*, at 2, Records of the U.S. Army Ground Forces, RG 499, Entry 128, National Archives at College Park, Md.

from the overall assessment that significant Japanese military activity would remain confined to the western Pacific.[22]

Between late January of 1942 and February 19, 1942, the day President Roosevelt signed the executive order empowering the Army to uproot Japanese Americans, G-2 repeatedly noted that "no hostile ground forces [we]re believed to be nearer than … about 2,000 miles west by south of the Hawaiian Islands."[23] The only predicted enemy activity in the Pacific during this time period was intensified attacks along its western rim; G-2 did not anticipate "surprise attacks" along the West Coast of the United States by air or sea, harassment of shipping, or attacks on Siberia.[24] G-2 saw no realistic prospect of a Japanese invasion of the west coast— and not even of Oahu. In its six-month projection dated January 30, 1942, G-2 anticipated only air and naval raids, along with the potential capture of an undefended island to use as a staging ground for a future assault on Oahu.[25] The assessment was clear and emphatic: Japan's military was not believed to have the

---

[22] See Muller, *Hirabayashi and the Invasion Evasion*, 88 N.C. L. Rev. at 1357.

[23] See *G-2 Periodic Report, 12:00 Noon Jan. 31, 1942*, at 1, Records of the U.S. Army Ground Forces, RG 499, Entry 125, National Archives at College Park, Md; *G-2 Periodic Report, 12:00 Noon Feb. 7, 1942*, at 1, Records of the U.S. Army Ground Forces, RG 499, Entry 125, National Archives at College Park, Md; *G-2 Periodic Report, 12:00 Noon Feb. 14, 1942*, at 1, Records of the U.S. Army Ground Forces, RG 499, Entry 125, National Archives at College Park, Md.

[24] See *G-2 Periodic Report, 12:00 Noon Jan. 31, 1942*, at 1; *G-2 Periodic Report, 12:00 Noon Feb. 7, 1942*, at 1; *G-2 Periodic Report*, 12:00 Noon Feb. 14, 1942, at 1.

[25] See *Letter from Col. Ralph G. Smith, Exec. Officer, Assistant Chief of Staff, G-2, to Assistant Chief of Staff, War Plans Div.* (Jan. 30, 1942), RG 165, WPD Gen. Correspondence, Box 254, No. 4544-43, National Archives at College Park, Md.

capacity to invade Hawaii, much less mount an attack on California, more than 2,500 miles farther east.

## 2. Views of Military Leadership

Senior military officials shared the view that no invasion of the coast was expected. On February 20, 1942, British Field Marshal John Dill relayed to U.S. military leadership the opinion of the British Chiefs of Staff that "[s]o long as the United States maintain a battle fleet in the Pacific, large scale seaborne expeditions against the western seaboard of North America … are considered impracticable."[26] "In view of the great distances over which … operations would have to be undertaken," argued the British, "it is probably not necessary to provide a strong scale of defence [sic] except at selected points of great importance."

Brigadier General Dwight D. Eisenhower responded to the British on behalf of his superior, Army Chief of Staff George C. Marshall: "I am in concurrence with the conclusions of the British Chiefs of Staff with reference to the Japanese threat to the West Coast."[27] Thus, when the Western Defense Command's nervous senior officer, Lieutenant General John DeWitt, requested a large influx of troops to support coastal defense as 1942 began, Army command denied the request, with a member

---

[26] *Letter from Field Marshal J.G. Dill, British Army, to Gen. George C. Marshall, Chief of Staff, War Dep't* (Feb. 20, 1942), microformed on Reel 27, Item 1157 (Marshall Center Microfilm).

[27] *Memorandum from Gen. Dwight D. Eisenhower, Assistant Chief of Staff, War Dep't, to Field Marshal J.G. Dill, British Army* (Feb. 20, 1942), microformed on Reel 27, Item 1157 (Marshall Center Microfilm).

of the general staff commenting that there would "very little or nothing" for such troops to defend against.[28]

In January of 1942, Army Chief of Staff Marshall ordered Brigadier General Mark W. Clark to undertake an inspection tour of conditions in the Western Defense Command. Clark returned with the recommendation that the region should lose its designation as a "theater of operations" due to the lack of an appreciable threat to the coast.[29] Three months later, the Army and Navy assessed West Coast conditions as part of an inquiry into unity of command in the event of enemy action there. They concluded on April 18, 1942, that the entire Pacific Coast should be deemed in "a state of non-invasion," which meant "a condition where operations of the enemy are not projected …, except by raids, submarine operations, or sporadic attacks."[30] This non-invasion status remained in place along the coast for the duration of the war.[31]

These views of the situation on the coast were not confined to internal Army communications. On February 3, 1942, General Clark and Admiral Harold Stark appeared before an informal House-Senate Committee on Defense of the West Coast convened to consider plans for coastal defense. Their testimony was unequivocal:

---

[28] See *Letter from Lt. Gen. L.J. McNair, U.S. Army, to Commanding Gen., Field Forces* (Dec. 23, 1941), microformed in RG 165, Item 4612-5, Box 259, National Archives at College Park, Md.

[29] *Telegram from Gen. George C. Marshall, Chief of Staff, U.S. Army, to Commanding Officer, Barksdale Field* (Jan. 18, 1942), microformed on Reel 17, Item 706 (Marshall Center Microfilm).).

[30] Western Sea Frontier Gen. Order No. 1-43, at 3 (Dec. 24, 1942), RG 499, Entry 118, National Archives at College Park, Md.

[31] See Stetson Conn et al., *Guarding the United States and its Outposts* 43 (2000).

"an invasion effort was out of the question" and "was not expected by the military or naval administration."[32] "[I]t would be impossible," Admiral Stark testified, "for the enemy to engage in a sustained attack on the Pacific Coast at the present time."[33]

The picture that emerges from this array of military, intelligence, and legislative sources is clear: there was no actual threat of Japanese invasion in early 1942, and the responsible military officials knew it. They told Congress so. They documented it in their internal communications. They formalized it through strategic reclassifications. Yet the public narrative advanced by the government before the Supreme Court—and ultimately adopted by the Court itself—suggested precisely the opposite. It would take more than forty years for the government to acknowledge that the actions against Japanese Americans in World War II "were carried out without adequate security reasons … and were motivated by racial prejudice, wartime hysteria, and a failure of political leadership."[34]

## C.    The Court Should Heed the Lesson of *Hirabayashi*

The tragic lesson of *Hirabayashi* is not only that courts can be misled by the executive in times of perceived crisis, but that when they are, the consequences for

---

[32] *Memorandum from Sen. Homer T. Bone* (Feb. 4, 1942), microformed on Records of the Japanese Evacuation and Resettlement Study, Reel 4, Frame 277b (Bancroft Library).

[33] *Letter from Sen. Rufus C. Holman to Sen. Hiram W. Johnson* (Feb. 9, 1942), microformed on Records of the Japanese Evacuation and Resettlement Study, Reel 4, Frames 283b–284a (Bancroft Library).

[34] Civil Liberties Act of 1988 § 4202(a), Pub. L. No. 100-383, 102 Stat. 903, 904 (codified at 50 U.S.C. § 4212(a) (2018)).

individual liberty and constitutional principle can be profound and enduring. The government then, as now, urged the judiciary to accept at face value its assertion that the nation was confronting an "invasion." Then, as now, that assertion came untethered from any serious evidentiary foundation. In *Hirabayashi*, the Court deferred. In doing so, it lent its authority to a policy of racial discrimination, imprisonment without trial, and the suppression of rights in the name of national defense.

This Court faces a moment of similar import. The government once again invokes the language of invasion to justify sweeping deprivations of liberty. It again urges deference. But history advises scrutiny, and the Constitution demands it.[35] Amicus respectfully urges the Court not to repeat the error of *Hirabayashi*—an error that time has laid bare, but that only judicial vigilance could have prevented.

Respectfully submitted,

**LAW CENTER OF AMY E. DAVIS PR, LLC**

  */s/ Amy E. Davis*
Amy E. Davis
Texas Bar No. 24007083
151 Calle de San Francisco
Ste. 200, PMB 1263
San Juan, PR 00901
**Telephone:** (214) 838-3501
**Email:** adavis@cdfirm.com

---

[35] Cf. *Miller–El v. Cockrell*, 537 U. S. 322, 340 (2003) (deference in reviewing discrimination claims "does not imply abandonment or abdication of judicial review").

*Counsel of Record for Amicus Curiae*

On the Brief:

*/s/ Eric L. Muller*
Eric L. Muller
Dan K. Moore Distinguished Professor
UNC School of Law
Author and Amicus Curiae
Not admitted to the U.S. Fifth Circuit Court of Appeals

CERTIFICATE OF SERVICE

I hereby certify that on June 3rd, 2025, I electronically filed the foregoing

with the Clerk of the Court using the ECF system, which will send notification of

such filing to all ECF participants.


/s/ Amy E. Davis
Amy E. Davis

CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 2931 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ Amy E. Davis
Amy E. Davis