No. 25-10534

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

W.M.M, *et al.*,

*Plaintiffs Appellees*, v.

DONALD J. TRUMP,

PRESIDENT OF THE United States, *et al.*,

*Defendants-Appellants*.

## BRIEF AMICUS CURIAE OF DEMOCRACY DEFENDERS FUND AND FORMER GOVERNMENT OFFICIALS

June 4, 2025

Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Steve@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

Stuart M. Gerson
1227 25th Street NW, Suite 700
Washington, DC 20037
Tel: (202) 861-4180
SGerson@ix.netcom.com

*Counsel for* Amicus Curiae

# CERTIFICATE OF INTERESTED PERSONS

No. 25-10534

W.M.M., *et al.*,
*Plaintiffs Appellees*,

v.

DONALD J. TRUMP, PRESIDENT OF THE United States, *et al.*,
*Defendants-Appellants*.

The undersigned counsel for *amicus curiae* certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of the case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees and Counsel:**

Alan Charles Raul, Associate Counsel to the President in the Reagan Administration from 1986 to 1988.

Barbara Comstock, Representative of the 10th Congressional District of Virginia from 2015 to 2019 (R).

Christine Todd Whitman, Governor of New Jersey from 1994 to 2001 (R); Administrator of the Environmental Protection Agency in the George W. Bush Administration from 2001 to 2003.

Christopher Shays, Representative for the 4th Congressional District of Connecticut from 1987 to 2009 (R).

Donald B. Ayer, Deputy Attorney General in the George H.W. Bush Administration from 1989 to 1990; Principal Deputy Solicitor General in the Reagan Administration

from 1986 to 1988; United States Attorney for the Eastern District of California from 1981 to 1986 in the Reagan Administration.

Mickey Edwards, Representative of the 5th Congressional District of Oklahoma from 1977 to 1993 (R).

Fern M. Smith, Judge of the U.S. District Court for the Northern District of California appointed by President Reagan from 1988 to 2005.

John J. Farmer Jr., New Jersey Attorney General from 1999 to 2002 (R); Assistant U.S. Attorney for the District of New Jersey from 1990 to 1994.

John McKay, U.S. Attorney for the Western District of Washington appointed by George W. Bush from 2001 to 2007.

Paul Rosenzweig, Deputy Assistant Secretary for Policy, Department of Homeland Security in the George W. Bush Administration from 2005 to 2009.

Peter Keisler, Acting Attorney General in the George W. Bush Administration in 2007; Assistant Attorney General for the Civil Division in the Bush Administration from 2003 to 2007; Principal Deputy Associate Attorney General and Acting Associate Attorney General in the Bush Administration from 2002 to 2003; Assistant and Associate Counsel to the President in the Reagan Administration from 1986 to 1988.

Philip Lacovara, Counsel to the Special Prosecutor, Watergate Special Prosecutor's Office in the Nixon Administration from 1973 to 1974.

Robert Shanks, Deputy Assistant Attorney General, Office of Legal Counsel in the Reagan Administration from 1981 to 1984.

Stanley A. Twardy, Jr., United States Attorney for the District of Connecticut from 1985 to 1991 and Chief of Staff to Connecticut Governor Lowell P. Weicker, Jr from 1991 to 1993.

Susan Molinari, Representative of the 14th Congressional District of New

York from 1990 to 1993 and the 13th Congressional District of New York from 1993 to 1997 (R).

Tom Coleman, Assistant Attorney General of Missouri from 1969 to 1972; Missouri State Representative from 1973 to 76; Representative of the 6th Congressional District of Missouri from 1976 to 1993 (R).

Trevor Potter, Chairman of the Federal Election Commission and Commissioner of the Federal Election Commission from 1991 to 1995; General Counsel to John McCain's Presidential Campaign from 2000 to 2008.

Ty Cobb, Special Counsel to the President in the Trump Administration from 2017 to 2018 and Assistant U.S. Attorney for the District of Maryland from 1980 to 1986.

William F. Weld, Governor of Massachusetts from 1991 to 1997 (R) and United States Assistant Attorney General for the Criminal Division from 1986 to 1988.

William Joseph Walsh, Representative of the 8th Congressional District of Illinois from 2011 to 2013 (R).

## STATEMENT REGARDING PARTIES' CONSENT

Pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure, on May 28, 2024, counsel for *Amici* conferred with counsel for Appellants and counsel for Appellees, and all parties consented to the filing of this brief.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ II

TABLE OF AUTHORITIES ................................................................................ VI

STATEMENT OF INTEREST AND INTRODUCTION ........................................ 7

ARGUMENT ........................................................................................................ 10

   I.   THE AEA WAS NOT DESIGNED FOR THE PRESENT CONTEXT. ............................ 10

   II.   IMMIGRATION AND CRIMINAL LAW PROVIDE THE STATUTORY AUTHORITY NEEDED TO PROTECT PUBLIC SAFETY AND NATIONAL SECURITY ............................ 11

      A.  *Immigration Law*.................................................................................. 12

      B.  *Criminal Law* ...................................................................................... 15

CONCLUSION ..................................................................................................... 17

CERTIFICATE OF SERVICE .............................................................................. 19

CERTIFICATE OF COMPLIANCE ..................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Bonilla v. Decker* .................................................................................................... 14

*D.B.U. v. Trump* ..................................................................................................... 11

*G.F.F. v. Trump* ...................................................................................................... 11

*J.A.V. v. Trump* ...................................................................................................... 11

*J.G.G. v. Trump* ................................................................................................... 8, 9

*Lockington v. Smith* ............................................................................................... 11

**Statutes**

18 U.S.C. § 1381 ...................................................................................................... 16

18 U.S.C. § 1389 ...................................................................................................... 16

18 U.S.C. § 2339 ...................................................................................................... 15

18 U.S.C. § 951 ........................................................................................................ 16

50 U.S.C. § 21 ............................................................................................................ 9

8 U.S.C. § 1182 ........................................................................................................ 12

8 U.S.C. § 1227 ............................................................................................ 12, 13, 14

8 U.S.C. § 1531 ........................................................................................................ 14

**Other Authorities**

Alien and Enemies Acts of 1798 .............................................................................. 10

Alien Friends Act of 1978 ........................................................................................ 10

Proclamation, 40 Stat. 1651 ..................................................................................... 11

Proclamation: Alien Enemies—Japanese of 1941 ................................................... 11

## STATEMENT OF INTEREST AND INTRODUCTION

*Amicus Curiae* Democracy Defenders Fund ("DDF") is a bipartisan, nonprofit organization committed to upholding the rule of law and defending the Constitution. The other *amici curiae* on this brief (collectively with DDF, "*Amici*") are conservative or independent former government and national security officials, including those who were elected as Republicans or served in Republican administrations.[1] These *amici* have collectively spent decades in public service in the federal government and state governments. They share a commitment to limited government, the rule of law, and protecting American public safety and national security, consistent with the Constitution and the nation's laws.[2]

*Amici* write to express their deep concern over the use of the Alien Enemies Act ("AEA," or "Act"), 50 U.S.C. § 21, which grants the Executive Branch extraordinary powers during wartime, at a moment when the United States is not at war. The Trump Administration improperly invoked the AEA to enforce its immigration and public safety policy objectives. Altogether apart from one's views concerning those objectives, the Administration's use of the AEA is unlawful and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* affirm that no counsel for a party authored this brief in whole or in part, no party or counsel for a party contributed money that was intended to fund preparing or submitting this brief, and no person other than Amici or their counsel contributed money that was intended to fund the preparation or submission of this brief.

[2] In its order remanding this case to the 5th Circuit, the Supreme Court "recognize[d] the significance of the Government's national security interests as well as the necessity that such interests be pursued in a manner consistent with the Constitution." *A.A.R.P. v. Trump*, 605 U.S. _, _ (2025).

7

unnecessary. The Executive Branch has at its disposal a panoply of immigration and criminal statutes to remove dangerous noncitizen gang members and other public safety and national security threats from the country. The AEA is not one of them.

Enacted in 1798 when the United States faced potential war with France, the AEA grants the President "near-blanket authority" to immediately detain and remove so-called "alien enemies." *J.G.G. v. Trump,* 25-5068, (D.C. Cir. Mar. 26, 2025), ECF No. 1208724047, at 3 (Henderson, J., concurring).[3] The AEA conditions those powers on the existence of wartime conflicts with foreign nations. *Id.* at 2. If the United States is not facing a "declared war" with, or "invasion or predatory incursion" "perpetrated, attempted, or threatened against, the territory of the United States" by, a "foreign nation or government," 50 U.S.C. § 21, the President cannot invoke the AEA.

The United States is not presently at war. Nor is it under threat of foreign invasion or incursion. Nevertheless, President Trump issued a proclamation invoking the AEA and declaring that Tren de Aragua ("TdA"), a Venezuelan gang, is a "hybrid criminal state" "threatening an invasion or predatory incursion" against the United States. Tren De Aragua , *Invocation of the Alien Enemies Act Regarding the Invasion of The United States*, The White House (Mar. 15, 2025),

---

[3] On March 26, 2025, the D.C. Circuit of Appeals denied an emergency motion by the United States to stay two temporary restraining orders preventing the deportation of noncitizens under the AEA.

https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/. But that proclamation failed to meet the AEA's required statutory criteria. *See J.G.G.*, 25-5068, at 23 (Henderson, J., concurring).[4]

As set forth below, even without the AEA, the United States maintains an array of tools to protect public safety against gang, terrorist, and other criminal activity. An order stopping the improper use of the AEA would not limit the government's ability to ensure our safety in any way, including through removals. For years after 9/11, terrorist organizations and their members or affiliates in the United States posed a primary threat to this nation. The AEA was never invoked throughout this period. Yet the United States successfully protected the homeland, removing members of terrorist organizations or those otherwise engaged in terrorist activities, and prosecuting hundreds of these individuals.

The Administration's invocation of the AEA is patently unlawful. It is also the wrong tool to accomplish the aims that the Administration has advanced. The United States has many legal and effective ways to apprehend or remove individuals who threaten the nation's security.

---

[4] While the proclamation attempts to skirt the issue by suggesting links between TdA and the Venezuelan government, alleged links between a gang and a foreign nation are not sufficient to satisfy the AEA. The AEA requires an invasion or incursion by a "foreign nation or government." 50 U.S.C. § 21.

## ARGUMENT

**I.     The AEA was not designed for the present context.**

The United States enacted the AEA a decade after adopting the Constitution, at a time when the young nation had no standing army or navy, and virtually no criminal, immigration, or national security law. The AEA was one in a series of statutes intended to prepare for a war with a hostile foreign nation, France. *See*, collectively, the Alien and Enemies Acts of 1798 (the Naturalization Act of June 18, 1798, 1 Stat. 566; the Alien Friends Act of June 25, 1978, ch. 58., 1 Stat. 570; the Sedition Act of July 14, 1798, ch. 74, 1 Stat. 596; and the AEA).[5] This effort went beyond these four Acts—and included, for example, laws creating the Department of the Navy, (Act Establishing the Navy Department, April 30, 1798, ch. 52, 1 Stat. 553-554), and authorizing the President to raise a standing army of 10,000 men to combat a French invasion or declaration of war (Act of May 28, 1798, ch. 46, § 1, 1 Stat. 551).

The AEA has previously been invoked only three times: the War of 1812, World War I, and World War II. *See Lockington v. Smith*, 15 F. Cas. 758, 758-759 (C.C.D. Pa. 1817) (discussing the War of 1812 proclamation); Proclamation, 40 Stat. 1651 (1917) (World War I); Proclamation: Alien Enemies—Japanese, 6 Fed. Reg. 6,321 (Dec. 10, 1941) (World War II). The alleged presence of TdA gang members

---

[5] The other three acts are no longer operative; the Naturalization Act of 1798 was repealed in 1802, and the Alien Friends Act and Sedition Act both expired in 1801.

in the United States bears no resemblance to those wars—and does not meet the AEA's statutory requirements. The text, surrounding statutory context, and history described above, all show that the AEA is limited to times when the U.S. faces "invasion" or "predatory incursion," during "hostilities," from a "foreign nation or government." *J.G.G.*, 25-5068, at 16-17 (Henderson, J., concurring); *see also J.A.V. v. Trump*, 1:25-cv-00072 (S.D. Tex. May 1, 2025), ECF No. 58; *G.F.F. v. Trump*, 1:25-cv-02886 (S.D.N.Y. May 6, 2025), ECF No. 84; *D.B.U. v. Trump*, 1:25-cv-01163 (D. Colo. May 6, 2025), ECF No. 52. The United States currently faces no wartime threat from a foreign nation justifying removals under the AEA.

## II. Immigration and criminal law provide the statutory authority needed to protect public safety and national security

An order forbidding the improper invocation of the AEA will not hamper the government's ability to protect public safety and national security. Congress has provided the Executive with many tools, through both immigration and criminal law, to ensure public safety and national security. There is no need for the Executive to twist the meaning of the AEA beyond recognition to accomplish these aims. In fact, both immigration and criminal law are often better suited to the task of addressing risks to national security and public safety threats because their application is not limited by a noncitizen's place of birth or nationality—as opposed to the overbroad yet underinclusive AEA.

### A. Immigration Law

Immigration law provides the Executive Branch power to remove foreign terrorists and other national security threats. Under 8 U.S.C. § 1227(a)(4)(B), the government is empowered to remove noncitizen members of foreign terrorist organizations and other noncitizens who may engage in terrorist activities in the United States. The United States may also remove any noncitizen who would otherwise be inadmissible to receive visas or enter the United States because of their terrorist activities or association with a terrorist organization, under 8 U.S.C. § 1182(A)(3)(B) and (F).

The Executive has the statutory authority to remove a noncitizen who has "engaged" or "incited terrorist activity," is a representative or a member of a terrorist organization, has "endorse[d] or espouse[d] terrorist activity" or persuaded others to do so, or "has received military-type training…from or on behalf of any organization that, at the time the training was received, was a terrorist organization." 8 U.S.C. § 1182(A)(3)(B), (F). Since the United States has deemed TdA to be a terrorist organization, United States Department of State, *Designation of International Cartels*, (Feb. 20, 2025), https://www.state.gov/designation-of-international-cartels/, the government can pursue removing TdA members from the country under this authority.

The Administration's removal authorities are not limited to terrorism. Immigration law also grants the Executive the capacity to detain and remove noncitizens who threaten national security or public safety in other ways. Under 8 U.S.C. § 1227(a)(4)(A), the government may deport noncitizens who commit espionage, sabotage, national security offenses, or other activities to overthrow the government of the United States through force or unlawful means, as well as "any other criminal activity which endangers public safety or national security."

The Executive Branch is permitted by the Immigration and Nationality Act ("INA") to detain certain noncitizens at their discretion. Moreover, noncitizens who are statutorily inadmissible or deportable under terrorism-related grounds are subject to mandatory detention. That category has historically included known gang members. See, e.g., Memorandum from John Morton, Director, Immigration & Customs Enforcement, to All Field Office Dirs., All Special Agents in Charge, and All Chief Counsel Regarding *Civil Immigration Enforcement: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems*, (Dec. 21, 2012), https://www.ice.gov/doclib/detention-reform/pdf/detainer-policy.pdf (listing "known gang member" as an example of a removable noncitizen who "poses a significant risk to national security, border security, or public safety"). The United States moved to detain and remove members of the MS-13 gang under this authority. *See Bonilla v. Decker*, No. 22-CV-4501 (ER), 2024 WL 182315 (S.D.N.Y. Jan. 17,

2024). Similarly, the INA explicitly provides that noncitizens who commit criminal offenses are deportable, and this has previously been reflected in Department of Homeland Security guidance. 8 U.S.C. § 1227(a)(2) ("Any alien who…is convicted of a crime for which a sentence of one year or longer may be imposed, is deportable."); *see also* memorandum from Tae D. Johnson, Acting Director of U.S. Immigration and Customs Enforcement on *Guidelines for the Enforcement of Civil Immigration Law*, Sept. 30, 2021, https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf ("A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal.").

To the extent the Executive Branch wishes to deport noncitizens outside the bounds of standard immigration procedures, Congress has enacted exceptional measures for deporting "alien terrorists." Title 8 U.S.C. § 1531 *et seq.* establishes the Alien Terrorist Removal Court and related procedures. The Attorney General may proceed through this channel when she has "classified information that an alien is an alien terrorist." 8 U.S.C. § 1533(a)(1). This statute, unlike the AEA, could provide the government recourse for instances in which it is concerned that the typical legal processes imperil national security.

### B. Criminal Law

The criminal law is also an important and effective tool for the United States to address terrorist and other security threats. Unlike the AEA, criminal law can be used against any individual, whether they are a citizen or not, thereby allowing the government to apprehend and prosecute anyone who threatens public safety. Terrorism is not limited to noncitizens, nor are the broad array of violent threats that imperil our security.

Across administrations, there have been hundreds of terrorism prosecutions and convictions that have successfully protected the homeland against potential threats. *See* Terrorism Prosecution Database, CENTER ON NATIONAL SECURITY AT FORDHAM LAW, https://www.centeronnationalsecurity.org/terrorism-database. These laws—including, for example, broad material-support statutes 18 U.S.C. § 2339A and 18 U.S.C. § 2339B—enable the government to prosecute those who provide resources or other assistance in support of the commission of terrorist crimes. They also allow the government to prosecute those who provide resources or other material support to designated foreign terrorist organizations—a category that now includes TdA.

Even in wartime, criminal law provides alternatives preferable to the AEA. Chapters 37 and 105 of the criminal code cover all manner of espionage and sabotage. Other parts of the criminal code authorize the imprisonment of

unregistered agents of a foreign government, trespassers on military property, and conspirators who plot attacks on United States service members. *See* 18 U.S.C. § 951, 18 U.S.C. § 1381, and 18 U.S.C. § 1389. The United States has fought a number of wars since World War II and repelled numerous threats from hostile foreign governments. Not once has the nation been compelled to invoke the AEA.

Unlike the AEA, criminal law applies against both noncitizens and citizens. That flexibility is useful in combating modern threats, and the United States has availed itself of criminal laws to do so many times. Through 2019, the United States brought hundreds of terrorism prosecutions against alleged ISIS-affiliated defendants. The majority of the ISIS prosecutions—at the time, pursuing the most significant terrorist threat the United States faced—were against United States citizens. See Terrorism Prosecution Database, CENTER ON NATIONAL SECURITY AT FORDHAM LAW, https://www.centeronnationalsecurity.org/terrorism-database. President Trump has repeatedly touted his success at "defeating ISIS" during his first term in office; his administration's use of the criminal law—and not the AEA—was a critical component of that victory securing the home-front.

Employing the AEA to tackle modern threats against the U.S. is neither efficient nor effective. The AEA is a blunt instrument with a narrow aperture—contributing to the government sweeping up nonviolent Venezuelans in its dragnet, while missing all criminal activity by anyone who is not a Venezuelan noncitizen.

Crime and terrorism are perpetrated by people of all backgrounds. But the United States' invocation of the AEA only targets immigrants from a specific country, Venezuela, leaving a vast swath of potential perpetrators untouched. The threats represented by those dangerous noncitizens identified in the President's Proclamation can be contained by the wide range of immigration and criminal laws at the United States' disposal.

## CONCLUSION

Not only would it be unlawful and set a dangerous precedent, there is simply no need to apply the AEA to circumstances beyond its clear language and intent. The Executive Branch is imbued with sufficient powers, both derived from the Constitution and granted statutorily by Congress, to accomplish the Administration's public safety and national security objectives. It is the Executive's duty to exercise those powers responsibly and lawfully and not to circumvent them through invocation of an act designed for wartime.

Respectfully submitted,

/s/ *Norman L. Eisen*
Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003

Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Steve@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

Stuart M. Gerson
1227 25th Street NW, Suite 700
Washington, DC 20037
Tel: (202) 861-4180
SGerson@ix.netcom.com

*Counsel for* Amicus Curiae

June 4, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, an electronic copy of the foregoing brief *amicus curiae* was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF filing system and that service upon counsel for the parties will be accomplished using the CM/ECF system.

*/s/ Norman L. Eisen*
Norman L. Eisen

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it has 2,460 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Norman L. Eisen*
Norman L. Eisen