**COVINGTON**

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T  +1 415 591 6000

<u>**Via ECF**</u>

June 3, 2025

Lyle W. Cayce
Clerk of Court
United States Court of Appeals
  for the Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130-3408

> Re:  **W.M.M. v. Trump, Case No. 25-10534**
> **Brief of Japanese American Citizens League and Other**
> **Asian American and Pacific Islander Organizations as**
> ***Amici Curiae* In Support of Petitioners-Appellants**

Dear Clerk of Court:

Yesterday, June 3, 2025, the undersigned filed the amicus brief in the above-titled case. As part of the brief, we attached **Exhibit A**, listing all the amici organizations on the amicus brief. We have identified an error on the list that we would like to correct. In view of this error, we would like to re-submit the amicus brief of the Japanese American Citizens League and other Asian American and Pacific Islander organizations reflecting the corrected Exhibit A, a copy of which is enclosed. We have also made this necessary correction in the paper copy of the amicus brief required to be submitted by the Court.

Thank you for your attention to this matter.  Please call me if you have any questions.

Sincerely,

s/ Darren Teshima
Darren Teshima

Enclosure

No. 25-10534

# United States Court of Appeals for the Fifth Circuit

W.M.M., F.G.M., and A.R.P., *et al.*,

*Petitioners—Appellants,*

– v. –

Donald J. Trump, *in his official capacity as President of the United States*, et al.,

*Respondents—Appellees.*

On Appeal From the United States District Court
for the Northern District of Texas
USDC NO. 1:25-CV-59

## BRIEF OF JAPANESE AMERICAN CITIZENS LEAGUE AND OTHER ASIAN AMERICAN AND PACIFIC ISLANDER ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS-APPELLANTS

Noah Baron
Asian Americans Advancing Justice | AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036
Telephone: (202) 868-0396
nbaron@advancingjustice-aajc.org

Robert S. Chang
Fred T. Korematsu Center for Law and Equality
UC Irvine School of Law
401 E. Peltason Dr.
Irvine, CA 92697
Telephone: (949) 824-3034
rchang@law.uci.edu

Darren Seiji Teshima
Robert D. Fram
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
dteshima@cov.com
rfram@cov.com

Benedict M. Lenhart
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5114
blenhart@cov.com

Carl Takei
Asian Law Caucus
55 Columbus Ave.
San Francisco, CA 94111
Telephone: (415) 212-8588
carlt@asianlawcaucus.org

*Attorneys for Amicus Curiae*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that–in addition to the persons and entities listed in the appellees Certificate of Interested Persons– the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## *Petitioners—Appellants*

W.M.M.
F.G.M.
A.R.P.

## *Attorneys for Petitioners—Appellants*

Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi
Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy

## *Respondents—Appellees*

Donald J. Trump, in his official capacity as President of the United States
Pamela Bondi, Attorney General of the United States, in her official capacity

Kristi Noem, Secretary of the United States Department of Homeland
Security, in her official capacity
United States Department of Homeland Security
Todd Lyons, Acting Director of the Director of United States Immigration and
Customs Enforcement, in his official capacity
United States Immigration and Customs Enforcement
Marco Rubio, Secretary of State, in his official capacity
United States State Department
Josh Johnson, in his official capacity as acting Dallas Field Office Director for
United States Immigration and Customs Enforcement
Marcello Villegas, in his official capacity as the Facility Administrator of the
Bluebonnet Detention Center
Phillip Valdez, in his official capacity as Facility Administrator of the Eden
Detention Center
Jimmy Johnson, in his/her official capacity as Facility Administrator of the
Prairieland Detention Center
Judith Bennett, in her official capacity as Warden of the Rolling Plains
Detention Center

### *Attorneys for Respondents—Appellees*

Nancy Naseem Safavi
George M. Padis

### *Amici Curiae*

*See* attached **Exhibit A**

### *Attorneys for Amici Curiae*

Darren Seiji Teshima
Robert D. Fram
Benedict M. Lenhart
Robert S. Chang
Carl Takei
Noah Baron

## CORPORATE DISCLOSURE STATEMENT

None of the amici have a direct financial interest in the outcome of the case. Amici are nonprofit organizations, or fiscally sponsored projects of nonprofit organizations, that operate under Sections 501(c)(3) and 501(c)(6) of the Internal Revenue Code and do not issue stock. Accordingly, no publicly held corporation owns more than 10% of any stock in amici.

Respectfully submitted,
COVINGTON & BURLING LLP

*s/Darren Seiji Teshima*
Darren Seiji Teshima
Robert D. Fram
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
dteshima@cov.com
rfram@cov.com

Benedict M. Lenhart
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5114
blenhart@cov.com

Robert S. Chang
Fred T. Korematsu Center for Law and
Equality
UC Irvine School of Law
401 E. Peltason Dr.
Irvine, CA 92697
Telephone: (949) 824-3034
rchang@law.uci.edu

Carl Takei
Asian Law Caucus
55 Columbus Ave.
San Francisco, CA 94111
Telephone: (415) 212-8588
carlt@asianlawcaucus.org

Noah Baron
Asian Americans Advancing Justice

iv

| AACJ
1620 L Street NW, Suite 1050
Washington, DC 20036
Telephone: (202) 868-0396
nbaron@advancingjustice-aajc.org

*Counsel for Amici Curiae Japanese
American Citizens League and other
Asian American and Pacific Islander
("AAPI") organizations*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................ iii

I.  INTEREST OF AMICI CURIAE ..................................................... 1

II. INTRODUCTION AND SUMMARY OF ARGUMENT ................. 1

III. ARGUMENT ................................................................................ 4

    A.    The Civil Liberties Disaster Inflicted on Japanese
            Americans During WWII Offers Critical Lessons for
            the Nation and for the Court. .................................................. 4

            1.    Civil Liberties Lose Their Meaning If the
                     Executive Is Permitted to Exert Its Putative
                     Authority Free From Meaningful Judicial
                     Review. ........................................................................ 7

            2.    In WWII, the Courts Allowed the Government to
                     Perpetrate a Fraud by Turning a Blind Eye to the
                     Government's Unsupported National Security
                     Rationale and Ignoring Clear Evidence of Racial
                     and National Origin Animus. ...................................... 12

            3.    The Alien Enemy Act Detentions Opened the
                     Door to the Imposition of Discriminatory Curfews
                     as Well as the Wholesale Incarceration of
                     Japanese Americans. .................................................. 17

    B.    Unlawful Detentions—Especially When Legitimized by
            Our Courts—Stain Our Nation's History and
            Constitution and Inflict an Immeasurable Harm on
            Individuals, Families, Communities, and the Nation
            Itself. ...................................................................................... 18

    C.    As in WWII, the Government's Current Invocation of
            the Act Is Tainted by False Justifications and
            Suppression of Truthful Information. ................................. 24

    D.    As in WWII, the Current Implementation of the Act
            Raises Serious Due Process and Equal Protection
            Concerns. .............................................................................. 29

IV.    CONCLUSION ...................................................................31

CERTIFICATE OF SERVICE .................................................35

CERTIFICATE OF COMPLIANCE .......................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.R.P. v. Trump,*
2025 WL 1417281 (U.S. May 16, 2025) ................................................ 6

*A.S.R. v. Trump,*
2025 WL 1378784 (W.D. Pa. May 13, 2025) .................................... 28

*Abrego Garcia v. Noem,*
2025 WL 1135112 (4th Cir. Apr. 17, 2025) ..................................... 28

*Ex parte Endo,*
323 U.S. 283 (1944) ............................................................................ 10

*Hirabayashi v. United States,*
320 U.S. 81, 99 (1943) ............................................................ *passim*

*Hirabayashi v. United States,*
828 F.2d 591 (9th Cir. 1987) ......................................................... 12, 18

*Hohri v. United States,*
586 F. Supp. 769 (D.D.C. 1984) .................................................. 13, 14

*Hohri v. United States*
782 F.2d, 227, 234 (D.C. Cir. 1986) ................................................. 14

*J.A.V. v. Trump,*
2025 WL 1257450 (S.D. Tex. May 1, 2025) ..................................... 28

*J.G.G. v. Trump,*
No. 1:25-cv-00766-JEB (Mar. 17, 2025), ECF No. 26 .................. 27, 28

*Korematsu v. United States,*
323 U.S. 214 (1944) ................................................................ *passim*

*Korematsu v. United States,*
584 F. Supp. 1406 (N.D. Cal. 1984) ........................................... *passim*

*Marbury v. Madison,*
   5 U.S. 137 (1803) ............................................................... 1

*Mochizuki v. United States,*
   43 Fed. Cl. 97 (1999) ...................................................... 18

*Ozawa v. United States,*
   260 U.S. 178 (1922) .......................................................... 7

*Sanchez Puentes v. Garite,*
   2025 WL 1203179 (W.D. Tex. Apr. 25, 2025) ..................... 30

*Trump v. Hawaii,*
   585 U.S. 667 (2018) .......................................................... 3

*Trump v. J.G.G.,*
   145 S. Ct. 1003 (2025) ................................................. 6, 29

*United States v. Mayer,*
   235 U.S. 55 (1914) .......................................................... 12

*United States v. Morgan,*
   346 U.S. 502 (1954) ........................................................ 12

*Yasui v. United States,*
   320 U.S. 115 (1943) ........................................................ 10

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ................................................... 11, 12

**Statutes**

Alien Enemies Act ................................................... 1, 5, 17, 18

Chinese Exclusion Act of 1882 ............................................... 7

Executive Order 9066 (February 19, 1942) .................................. *passim*

**Federal Regulations**

Proclamation No. 2525, 6 Fed. Reg. 6321 (Dec. 7, 1941) ..................... 8

## Other Authorities

Am. Hist., *Righting a Wrong: Japanese Americans and
    World War II* (archived Sept. 29, 2023),
    https://wayback.archive-
    it.org/3340/20230929154444/https://americanhistory.si.ed
    u/righting-wrong-japanese-americans-and-world-war-ii/ .................... 3

Charlie Savage, Julian E. Barnes, and Maggie Haberman,
    *Official Push to Rewrite Intelligence So It Could Not Be
    'Used Against' Trump*, N.Y. Times (May 20, 2025) ........................... 25

Erika Lee, *The Making of Asian America: A History* 139-41
    (2015) ...................................................................................................... 7

*Greg Robinson,
    By Order of the President* 208 (2001) ........................................... 16, 17

John Hudson & Warren P. Strobel, *U.S. Intelligence
    Contradicts Trump's Justification for Mass Deportations*,
    Wash. Post (Apr. 17, 2025) ................................................................. 25

Mae Ngai, *Impossible Subjects* 176 (2004) ............................................... 8

Nat'l Intelligence Council, *Venezuela: Examining Regime
    Ties to Tren de Aragua* ....................................................................... 26

Report No. 26/20, Case 12.545, Merits Report, *Isamu Carlos
    Shibayama et al. United States* (Apr. 22, 2020),
    https://www.oas.org/en/iachr/decisions/2020/US_12.545_E
    N.PDF ................................................................................................... 18

Kenneth D. Ringle, *Report on Japanese Question*,
    Densho.org (Jan. 26, 1942),
    https://ddr.densho.org/media/ddr-densho-67/ddr-densho-
    67-9-mezzanine-7753af4600.htm ....................................................... 14

Ronald Reagan, *Remarks on Signing the Bill Providing Restitution for the Wartime Internment of Japanese-American Civilians,* Ronald Reagan Presidential Library & Museum (Aug. 10, 1988), https://www.reaganlibrary.gov/archives/speech/remarks-signing-bill-providing-restitution-wartime-internment-japanese-american ............................................................... 5

Tetsuden Kashima, *Judgment Without Trial* 124 ( 2003 ) ..................... 2

## I.    INTEREST OF AMICI CURIAE[1]

The Japanese American Citizens League and over 60 other Asian American Pacific Islander ("AAPI") organizations are committed to preserving Japanese American history, serving AAPI communities, and advancing civil rights. Many were involved in redress efforts for World War II ("WWII") incarcerations, the *coram nobis* lawsuits, and ongoing advocacy for Japanese Latin Americans.

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

Courts must act as a check on the Executive when it asserts power beyond those granted by the Constitution; otherwise, terrible wrongs inevitably result. The instant case, and other similar habeas petitions challenging the use of the Alien Enemies Act ("AEA" or the "Act"), offer an opportunity for the Court to fulfill its role and duty as a co-equal branch in our constitutional democracy, and to ensure that we remain "a government of laws, and not of men." *See Marbury v. Madison*, 5 U.S. 137, 163 (1803). Amici write to urge the Court to exercise its authority consistent with the powers of Article III, because they are keenly aware

---

[1]    The parties have consented to the filing of this amicus brief. No counsel for a party authored any part of the brief. No person other than amici or their counsel paid for the preparation or submission of the brief.

1

of the devastating consequences that can result when the Executive sweeps too broadly and when courts respond by failing to safeguard the rights of individuals.

In WWII, the government's violation of Japanese Americans' civil liberties occurred in two distinct steps. The first—on December 7, 1941, shortly after the attack on Pearl Harbor—was President Franklin D. Roosevelt's invocation of the Act in Proclamation 2525, which led the government to detain more than 17,000 Japanese immigrants. Tetsuden Kashima, *Judgment Without Trial* 124 (2003).  These individuals were labeled "enemy aliens" not because they had done anything wrong, but because they were leaders in an ethnic community that government officials deemed suspicious based on national origin. Despite their strong connections to the U.S., they spent months, and in some cases years, detained in internment camps administered by the U.S. Army and Department of Justice.

The Executive again relied on group-based logic to justify the second step: Issued on February 19, 1942, Executive Order 9066 resulted in the wholesale "evacuation" and incarceration of more than 120,000 individuals of Japanese ancestry—75,000 American citizens, and 45,000

noncitizen immigrants—in prison camps scattered throughout remote locations in the interior of the United States, administered by the newly-created War Relocation Authority ("WRA"). Smithsonian Nat'l Museum of Am. Hist., *Righting a Wrong: Japanese Americans and World War II* (archived Sept. 29, 2023), https://wayback.archive-it.org/3340/20230929154444/https://americanhistory.si.edu/righting-wrong-japanese-americans-and-world-war-ii/. Though the second step was given the Court's blessing in *Korematsu v. United States*, 323 U.S. 214 (1944) ("*Korematsu*"), abrogated by *Trump v. Hawaii,* 585 U.S. 667, 710 (2018), the constitutionality of the first step was never squarely tested.

We know today that the *Korematsu* decision was not only a judicial abdication that was "gravely wrong the day it was decided," *Trump v. Hawaii*, 585 U.S. at 710, but that it was founded on a government effort to defraud the Court—one that the Court enabled by choosing to defer excessively to the Executive. *Korematsu v. United States*, 584 F. Supp. 1406, 1417-19 (N.D. Cal. 1984) ("*Korematsu (coram nobis)*")  (describing government decisions to knowingly withhold material evidence from the Court). This judicial history "stands as a constant caution that in times

of war or declared military necessity our institutions must be vigilant in protecting constitutional guarantees. It stands as a caution that in times of distress the shield of military necessity and national security must not be used to protect governmental actions from close scrutiny and accountability." *Id.* at 1420.

The lessons from this history are clear: courts must fulfill their role in our constitutional democracy to check executive overreach. By blindly deferring to unsubstantiated government claims of necessity, courts abdicate their role as arbiters of constitutional law. When courts relinquish this duty, the consequences can be devastating—not only for the individuals directly affected, but for the legitimacy and integrity of our constitutional system. For these reasons, the Court should require the government to present credible evidence to support its invocation of the AEA and allow for a process that permits robust judicial review when individuals are designated as "Alien Enemies."

## III.  ARGUMENT

### A.  The Civil Liberties Disaster Inflicted on Japanese Americans During WWII Offers Critical Lessons for the Nation and for the Court.

Larry Oda—now the president of *amicus curiae* Japanese American Citizens League—was born behind barbed wire in Crystal City, Texas, at

4

what was officially known as a "U.S. Family Internment Camp," because his Japanese immigrant father, Junichi Oda, was arrested on July 8, 1942 after wrongfully being identified as a "potentially dangerous" alien enemy. Such experiences—of multigenerational incarceration triggered by Alien Enemies Act arrests—are common in the collective memory of the Japanese American community and are modernly regarded as a profound injustice that left lasting scars on families. *See* Ronald Reagan, *Remarks on Signing the Bill Providing Restitution for the Wartime Internment of Japanese-American Civilians*, Ronald Reagan Presidential Library & Museum (Aug. 10, 1988), https://www.reaganlibrary.gov/archives/speech/remarks-signing-bill-providing-restitution-wartime-internment-japanese-american ("For here we admit a wrong; here we reaffirm our commitment as a nation to equal justice under the law.").

Today, the Trump administration's invocation of the Act against Venezuelan nationals alleged to be members of the Tren de Aragua ("TdA") gang bears disturbing parallels to that dark chapter. Once again, the government seeks to justify indiscriminate detention and deportation by claiming necessity while resisting meaningful judicial review. Once

again, it targets individuals based on group characteristics rather than individualized determinations and—like Korematsu—draws distinctions based on ethnic lines. And once again, it asks courts to accept its claims without substantiation, even as it seeks to suppress its own intelligence assessments that contradict its public justifications.

Any person threatened with deportation under the Act is entitled to judicial review. *Trump v. J.G.G.*, 604 U.S. ----, 145 S. Ct. 1003, 1006 (2025) (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review is available."); *A.A.R.P. v. Trump*, 605 U.S. ---- , No. 24-1177, 2025 WL 1417281, at *2 (U.S. May 16, 2025) (for those challenging deportation under the Act to a foreign prison, "[t]he detainees' interests at stake are . . . particularly weighty"). Yet the mere existence of judicial review is insufficient if that review is only cursory. The WWII experiences of Japanese Americans subjected to the Act and subsequent mass incarceration offer two essential lessons: first, that individualized due process is vital to preventing sweeping civil liberties violations ; and second, that courts must fulfill their duty as a separate and co-equal branch by carefully scrutinizing executive claims of necessity rather than blindly deferring to unsubstantiated assertions.

1.    **Civil Liberties Lose Their Meaning If the Executive Is Permitted to Exert Its Putative Authority Free From Meaningful Judicial Review.**

After the Chinese Exclusion Act of 1882 stemmed the flow of laborers from China, immigrants from Japan were recruited to come to the United States as cheap labor. Though many intended to return to Japan, "they settled down, called for their families to join them, and built strong ethnic communities."[2] Japanese immigrants like Junichi Oda sought to integrate into their new homes—Oda became the head of the abalone processing cooperative on Fisherman's Wharf in Monterey, California—but were deemed racially ineligible to become naturalized citizens. *See Ozawa v. United States*, 260 U.S. 178, 198 (1922). Their efforts to put down roots were chopped away in the aftermath of the bombing of Pearl Harbor.

President Franklin D. Roosevelt invoked the Act and declared that "all natives, citizens, denizens or subjects of the Empire of Japan being of the age of fourteen years and upwards who shall be within the United States or within any territories in any way subject to the jurisdiction of the United States  and not actually naturalized . . . are termed alien

---

[2]    Erika Lee, *The Making of Asian America: A History* 139-41 (2015).

enemies[.]" Proclamation No. 2525, 6 Fed. Reg. 6321 (Dec. 7, 1941). Those deemed potentially dangerous were "Buddhist priests, martial arts instructors, Japanese language teachers, members of theater companies, chamber-of-commerce leaders, employees of Japanese companies, and editors of the Japanese language press, as well as leaders of the Japanese Association of America and patriotic [to U.S.] organizations."[3] Only a week later, FBI Director J. Edgar Hoover "reported that 'practically all'" such persons had been "taken into custody"—a total of about 1,291 Japanese immigrants. *Personal Justice Denied*, *supra*, at 55. Even so, arrests continued: by February 1942, that number had risen to about 2,192. *Id.*

Following similar logic, President Roosevelt's February 19, 1942, Executive Order 9066 subsequently authorized the mass roundup and incarceration of approximately 120,000 Japanese Americans, about two-thirds of whom were U.S. citizens. *Personal Justice Denied*, *supra*, at 117-18.

When faced with such mass deprivations of rights, it is essential

---

[3]     Mae Ngai, *Impossible Subjects* 176 (2004); *see also* Comm'n on Wartime Relocation & Internment of Civilians, *Personal Justice Denied* 54 (1982).

that courts require the government to adhere to the law and due process. Courts must demand meaningful evidence from the government substantiating its claim of necessity, and examine that evidence with a critical eye. History illustrates the importance of doing so: In the WWII Japanese American cases, the Supreme Court failed to do so. When Fred Korematsu, Gordon Hirabayashi, Minoru Yasui, and Mitsuye Endo challenged the constitutionality of the military orders, the Supreme Court largely deferred to government claims without demanding evidence. The result was disastrous to over a hundred thousand people and a blight upon the American judiciary.

In *Hirabayashi v. United States*, the Court upheld a curfew imposed on Japanese Americans, accepting at face value the government's assertions that targeting the entire Japanese American community was justified because "there were disloyal members of that population, whose number and strength could not be precisely and quickly ascertained." 320 U.S. 81, 99 (1943) ("*Hirabayashi*"). The Court's reasoning rested heavily on its deference to the government's claims about the conditions that may well have "encouraged the continued attachment of members of this group to Japan and Japanese institutions." *Id.* at 98. Rather than

examining the basis for these claims—which would have revealed their falsity—the Court considered only whether the government "could reasonably have" arrived at them. *Id.; see also id.* at 103-104 (noting that certain "facts, and the inferences which could be rationally drawn from them," supported the government's position).

Wielding *Hirabayashi*, the Court in *Korematsu* proceeded even further, approving the exclusion orders that forced Japanese Americans from their homes. 323 U.S. at 223-24.[4] Though claiming to apply "the most rigid scrutiny", *id.* at 216, in reality, the Court again uncritically deferred to the government's claims without demanding evidence.

In *Ex parte Endo*, while the Court held that the government could not continue to detain a citizen whose loyalty was not in question, the Court assumed "that the original evacuation was justified" and that individualized determinations were not required prior to incarceration. 323 U.S. 283, 302 (1944).

As Justice Murphy noted in his *Korematsu* dissent, the exclusion order "[fell] into the ugly abyss of racism," and the Court decisions

---

[4]    Decided with *Korematsu* was its companion case, *Yasui v. United States*, 320 U.S. 115, 117 (1943), which upheld, on the same grounds set forth in *Korematsu*, the conviction of a Japanese American citizen for violating the curfew established under the statute ratifying Executive Order 9066.

ratifying it were justified by "a plea of military necessity that [had] neither substance nor support." 323 U.S. at 233-34 (Murphy, J., dissenting). His dissent proved prescient. By failing to hold the government to its burden of proof and deferring instead to unsupported claims of military necessity, the Court enabled one of the most sweeping civil liberties violations in American history. The damage was not limited to those directly affected; it created a precedent that could justify further incursions on constitutional rights.

Less than a decade later, in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) the Court demonstrated the right way to confront claims of government necessity. President Truman argued that national security justified government seizure of steel mills to support the Korean War effort. *See id.* at 582. The Court carefully examined Truman's arguments and found them wanting. *See id.* at 585-86. Concurring in the judgment and opinion of the Court, Justice Jackson rejected the government's appeal for emergency powers to meet national security needs:

> The appeal, however, that we declare the existence of inherent powers *ex necessitate* to meet an emergency asks us to do what many think would be wise, although **it is something the forefathers omitted. They knew what emergencies were,**

***knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation. We may also suspect that they suspected that emergency powers would tend to kindle emergencies.***

*Id.* at 650  (Jackson, J., concurring) (emphases added).

> **2.    In WWII, the Courts Allowed the Government to Perpetrate a Fraud by Turning a Blind Eye to the Government's Unsupported National Security Rationale and Ignoring Clear Evidence of Racial and National Origin Animus.**

The full extent of the harm caused by the judiciary's dereliction of its duty in the WWII Japanese American cases did not come to light until the 1980s, when the coram nobis[5] cases revealed that during the litigation of those WWII cases, the government deliberately suppressed, altered, and destroyed evidence that contradicted its claims about Japanese Americans posing a security threat. *See Korematsu (coram nobis)*, 584 F. Supp. at 1417-18; *Hirabayashi v. United States*, 828 F.2d 591, 598-604 (9th Cir. 1987) ("*Hirabayashi (coram nobis)*").

The Supreme Court's decisions in the WWII Cases rested heavily on a report authored by General John L. DeWitt, an anti-Japanese racist

---

[5]    *Coram nobis* relief is appropriate in criminal cases when "the errors [are] of the most fundamental character; that is, such as rendered the proceeding itself irregular and invalid." *United States v. Mayer*, 235 U.S. 55, 69 (1914); *see also United States v. Morgan*, 346 U.S. 502, 512-13 (1954).

who had publicly stated: "[a] Jap's a Jap" and "[t]here is no way to determine their loyalty" in April 1943, while he was preparing the report. *Personal Justice Denied*, *supra*, at 221-22. When the *Korematsu's* majority wrote that "we could not reject the finding of the military authorities that it was impossible to bring about an immediate segregation of the disloyal from the loyal," 323 U.S. at 219, it was referring to General DeWitt's report concluding that the mass removal of Japanese Americans was justified. But the government deliberately concealed from the Supreme Court the multiple intelligence reports that undercut DeWitt's conclusions: intelligence reports from the FBI, the Office of Naval Intelligence ("ONI"), and the Federal Communications Commission all contradicted General DeWitt's claims about Japanese American disloyalty and the threat of espionage and sabotage. *Hohri v. United States*, 586 F. Supp. 769, 778-79 (D.D.C. 1984), *reh'g en banc denied*, 793 F.2d 304, *vacated on other grounds*, 482 U.S. 64 (1987). In particular, the government concealed what was perhaps the most thorough pre-war assessment of the Japanese American community, authored by Lieutenant Commander Kenneth Ringle of the ONI. Ringle explicitly recommended against mass removal and internment of

13

Japanese Americans, calling it both "unwarranted" and "very unwise." Lt. Cmdr. Kenneth D. Ringle, *Report on Japanese Question*, Densho.org (Jan. 26, 1942), https://ddr.densho.org/media/ddr-densho-67/ddr-densho-67-9-mezzanine-7753af4600.htm. Moreover, Ringle expressly concluded that individualized determinations *could be* made expeditiously. As recounted by the D.C. Circuit in *Hohri v. United States*: "[T]he entire 'Japanese Problem' has been magnified out of its true proportion, largely because of the physical characteristics of the [Japanese] people * * *. [I]t should be handled on the basis of the *individual,* regardless of citizenship, and *not* on a racial basis." 782 F.2d at 234 (quoting Ringle Report at 3) (alterations and emphasis in original). As the D.C. Circuit further observed: "Ennis knew that Ringle's views could not be dismissed as those of a solitary dissident, for Ennis had been informed that Ringle's views were shared by his superiors at Naval Intelligence." *Id.* (citing E. Ennis, *Memorandum for the Solicitor General*, at 2 (April 30, 1943)).

When some Justice Department attorneys learned of this exculpatory evidence, they attempted to alert the Supreme Court through a footnote in the government's *Korematsu* brief. *See Korematsu (coram nobis)*, 584 F. Supp. at 1417-18. This footnote explicitly

repudiated DeWitt's espionage claims and advised the Court of the existence of evidence in conflict with those claims. *See id.* However, War Department officials intervened with the Solicitor General. *See id.* at 1420-23. As a result, the Solicitor General halted printing of the brief and directed that the footnote be revised in ways that misled the Supreme Court, by failing to alert the Court that DeWitt's factual allegations were unreliable and lacked evidentiary support. *Id.* at 1419.

Just as egregiously, the War Department secretly rewrote General DeWitt's Final Report to make it consistent with the government's litigation position and then—without the knowledge of the Justice Department—ordered the destruction of the original report. Lorraine K. Bannai, *Enduring Conviction: Fred Korematsu and his Quest for Justice* 147–48 (2015); Irons, *supra*, at 208–11. The original version candidly acknowledged that the decision to remove Japanese Americans was not based on a time-sensitive need to determine individual loyalty, with DeWitt stating: "It was not that there was insufficient time in which to make such a determination; it was simply a matter of facing the realities that a positive determination could not be made, that an exact separation of the 'sheep from the goats' was unfeasible." Irons, *supra*, at 208 (quoting

original version of DeWitt's report). This admission directly contradicted the government's legal argument that it was time pressure, rather than DeWitt's suspicions of the "tightly-knit racial group" status of Japanese Americans, that made individual loyalty determinations impossible. Once DeWitt agreed to rewrite the troublesome language, the War Department sent the sanitized report to attorneys at the Justice Department, who submitted it to the Supreme Court. Bannai, *supra*, at 147–48; Irons, *supra*, at 211–12.

Beyond that, the Justice Department never acknowledged a plethora of other available evidence undermining justification for the mass incarceration. Even as the *Korematsu* case made its way through the courts, the director of the War Relocation Authority—responsible for running the incarceration camps—authored a memorandum, provided to the Secretary of the Interior, arguing that there was no conceivable military justification for incarceration. Greg Robinson, *By Order of the President* 208 (2001). Simultaneously, the military was growing skeptical of the "security" rationale for incarceration, as evidenced by its decision to "reimpose[] selective service on Japanese Americans." *Id.* at 209. And Assistant Secretary of War John McCloy—who "supervised preparation

16

of the Supreme Court brief" in *Korematsu*—was "receptive to proposals for closing the camps, since he did not consider security a problem" but delayed acting on them so as to "maintain[] the government's legal position" in *Korematsu*. *Id*. at 208-10.

### 3. The Alien Enemy Act Detentions Opened the Door to the Imposition of Discriminatory Curfews as Well as the Wholesale Incarceration of Japanese Americans.

As Justice Jackson noted in dissent in *Korematsu*, a judicial opinion approving a violation of the Constitution has a "generative power" of its own, legitimating further violations, for it "lies about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need." *Korematsu*, 323 U.S. at 246 (Jackson, J., dissenting). Certainly, the judicial failure to protect Japanese Americans against infringements of their rights under the Act, the preemptive detention of Japanese immigrants and warrantless searches—contributed to the Supreme Court upholding a race-based curfew (*Hirabayashi*) which in turn provided the precedential basis for *Korematsu* itself. *Id*. at 247 ("The Court is now saying that in *Hirabayashi* we did decide the very things we there said we were not deciding. Because we said that these citizens could be made to stay in

their homes during the hours of dark, it is said we must require them to leave home entirely[.]"); *see also Hirabayashi (coram nobis)*, 828 F.2d at 593 (describing the progression from initial selective detentions to mass incarceration). Invocation of the Alien Enemies Act also opened the door to other abuses with extraterritorial impact.[6]

The transition from targeted AEA detentions to mass exclusion orders demonstrates how extraordinary powers, once invoked, can expand beyond their initial scope. The AEA detentions normalized the concept that an entire ethnic group could be treated as presumptively disloyal, and they established a process by which constitutional rights could be subordinated to vague claims of military necessity.

**B.    Unlawful Detentions—Especially When Legitimized by Our Courts—Stain Our Nation's History and Constitution and Inflict an Immeasurable Harm on Individuals, Families, Communities, and the Nation Itself.**

---

[6]    During World War II, the U.S. government colluded with thirteen Latin American governments to abduct thousands of their own citizens of Japanese ancestry and then transport them to the United States, where the U.S. government detained them as Alien Enemies to be traded in potential hostage exchanges with Japan. *See Mochizuki v. United States*, 43 Fed. Cl. 97 (1999) (settling claims against the United States for these abductions); Inter-American Comm'n on Human Rights, Report No. 26/20, Case 12.545, Merits Report, *Isamu Carlos Shibayama et al. United States* (Apr. 22, 2020), https://www.oas.org/en/iachr/decisions/2020/US_12.545_EN.PDF (describing abductions and detentions).

In WWII, detentions under the Act took a severe personal toll. The detentions harmed individuals who were not enemies but who had been forced to remain non-citizens because they were deemed racially ineligible to naturalize, and those harms cascaded down to their U.S.-born citizen children. Immigrants who had built lives in America, contributed to their communities and raised families, were suddenly branded as enemies based on their national origin and on flimsy evidence never tested in a courtroom. And for those with U.S. citizen children, detention under the Act often intersected with the broader roundups authorized by Executive Order 9066.

One example is Natsu Saito. On December 9, 1941, Mrs. Saito was a 43-year-old widow with four children and had been a legal resident of the United States for 25 years. On that day, she was arrested in Aberdeen, Washington by FBI and local police officers, without prior notice, warrant, or the opportunity to contact her children. Her two youngest children, aged 15 and 16, returned home from school to discover their mother missing and FBI agents ransacking their home and the small gift shop that Mrs. Saito owned.

Mrs. Saito's FBI files include numerous letters of support from

friends and acquaintances in the community, but nothing substantiated her designation as an "Alien Enemy." The only suspicious activity noted by the Justice Department's Hearing Board (a summary process in which the alleged enemies were not allowed to have an attorney present) was her "emphatic" refusal of a request by a Japanese national to obtain maps and news articles "that might be of interest to the Japanese government."

On January 13, 1942, the Board recommended that Natsu Saito be paroled without bond, but she was not actually released to her family until months later, on April 6, 1942. And much of Mrs. Saito's "parole" ended up being in a different kind of prison. Shortly after arriving home, Mrs. Saito and her children were ordered to leave their home under the authority of Executive Order 9066. They had just days to pack what they could carry and arrange to sell or store everything else the family owned. Under armed guard, the family boarded a train with blacked-out windows, headed to the Tule Lake War Relocation Center.

Mrs. Saito was released from Tule Lake on September 25, 1943, to move to Chicago. However, her enemy alien parole was not terminated until November 15, 1945. In the meantime, beginning in early 1945, she

taught Japanese language classes to U.S. Army personnel at the University of Chicago. Natsu Saito became a U.S. citizen after the racial restriction on citizenship was removed in 1952, but the trauma induced by the process has remained with the family to this day.

Another example is Kunitomo Mayeda. Mr. Mayeda came to the United States in 1907, a 16-year-old boy with dreams of studying English and serving as a diplomat to bridge Japanese and American cultures. By the 1930s, Mr. Mayeda had five children, all born in the United States. After his wife passed away in the mid-1930s, he returned to Japan to remarry. He returned to the United States in 1937 for better economic opportunities and to care for his older sons, while his new wife raised the youngest children in Japan. Mr. Mayeda's two oldest sons attended high school in the San Diego area and thrived there: his eldest son Al became a football star at Coronado High School, and his son Ray served as student body treasurer and ran track.

Shortly after Pearl Harbor, Al enlisted in the U.S. Army, and Mr. Mayeda signed a patriotic oath along with other immigrants to "pledge our resources, our children and our lives toward a victorious conclusion of the war upon the Axis nations." Nevertheless, the FBI arrested Mr.

Mayeda on March 19, 1942, while his younger son Ray was at school. He was transferred through a series of detention centers, including Tuna Canyon, and ultimately confined in Santa Fe, New Mexico. Mr. Mayeda was never charged with espionage or sabotage, yet he remained imprisoned for the entire duration of WWII, over three years, from March 19, 1942 until sometime in 1945.

It appears that Mr. Mayeda—like many community leaders—was swept up by the FBI simply for being a first-generation immigrant and having a role in the local Japanese Association. He had no criminal record, no weapons, and no secret affiliations. Yet because he had advocated for cultural unity and had family living in Japan, he became a target. The only "evidence" against Mr. Mayeda included an unsubstantiated report that "someone turned a powerful spotlight onto a high-water tank" during recent blackouts, and that he had once given thirty dollars to Japanese relief ministries in Tokyo. Despite thoroughly searching Mr. Mayeda's home, and translating letters written in Japanese, the FBI turned up nothing incriminating. An FBI report admitted that "the light was not a powerful spotlight but was apparently from an ordinary flashlight." The Government also ignored exculpatory

evidence such as the statement from a retired Brigadier General that Mr. Mayeda "is a much better American than most American citizens."

The long-term consequences for his family were profound. The Mayedas lost their home, livelihood, and precious years they would never recover. Additionally, while Mr. Mayeda was detained in DOJ custody as an "Alien Enemy" and his oldest son Al served in the U.S. Army, his 19-year-old son Ray was incarcerated by the WRA. Separated from his family, Ray was first held inside horse stables in what was dubbed the "Santa Anita Assembly Center," and then with other unmarried men at the Poston War Relocation Center. Mr. Mayeda eventually asked to be repatriated to Japan where he could be with his second wife and three youngest children. He knew that this meant separation and possible estrangement from his two eldest sons but felt he had little choice since he had been imprisoned by the government for years without charge, due solely to his national origin.

These stories illustrate the disregard for individual rights, due process, and the profound human cost of the government's sweeping use of the Act and, subsequently, Executive Order 9066. The hearings afforded to these individuals did not provide a fair opportunity to be

heard before a neutral bench officer. Even when hearings recommended release, as in Mrs. Saito's case, delays of months could follow before actual release occurred—only to be followed by incarceration under Executive Order 9066.

The parallels to the current situation are stark. Then, as now, individuals were targeted based on group characteristics rather than individualized determinations of threat to public safety . Then, as now, the government presumed guilt rather than innocence. And then, as now, the human consequences extended far beyond the period of detention itself, affecting families, livelihoods, and communities for generations.

### C.   As in WWII, the Government's Current Invocation of the Act Is Tainted by False Justifications and Suppression of Truthful Information.

The Trump administration has invoked the Act based on allegations that TdA constitutes a "foreign nation or government" that has engaged in a "predatory incursion" or "invasion" of the United States within the meaning of the Act. However, as in the WWII Japanese American cases, intelligence assessments contradict the government's public justifications—even after administration officials tried to rewrite those assessments because they knew they undercut the government's

position. The government has not shared these assessments with the courts, and the reporting about them led the administration to seek to punish leakers.

In mid-April, the *Washington Post* reported that the National Intelligence Council, drawing on assessments from 18 intelligence agencies, determined in a secret assessment that the Venezuelan government is not directing an invasion of the United States by TdA, directly contradicting the administration's claims. John Hudson & Warren P. Strobel, *U.S. Intelligence Contradicts Trump's Justification for Mass Deportations*, Wash. Post (Apr. 17, 2025), https://www.washingtonpost.com/national-security/2025/04/17/us-intelligence-tren-de-aragua-deportations-trump/. It now has been reported that the chief of staff to the Director of National Intelligence directed analysts to "rewrit[e]" the assessment "so this document is not used against" the administration. Charlie Savage, Julian E. Barnes, and Maggie Haberman, *Official Push to Rewrite Intelligence So It Could Not Be 'Used Against' Trump*, N.Y. Times (May 20, 2025), https://www.nytimes.com/2025/05/20/us/politics/gabbard-intelligence-venezuelans-tren-de-aragua-trump.html.   Even with those changes,

however, the declassified sections of this intelligence assessment contradict the administration's position, stating: "[T]he Maduro regime probably does not have a policy of cooperating with TdA and is not directing TdA movement to and operations in the United States. . . . Furthermore, most of the IC [Intelligence Community] judges that intelligence indicating that regime leaders are directing or enabling TdA migration to the United States is not credible." Nat'l Intelligence Council, *Venezuela: Examining Regime Ties to Tren de Aragua*, SOCM 2025-11374 (Apr. 7, 2025). Moreover, when questioned at an Intelligence Committee hearing, CIA Director John Ratcliffe reportedly stated that U.S. spy agencies had "no assessment" indicating that the United States is at war with or being invaded by Venezuela. Hudson & Strobel, *supra*.

Shortly after public reporting of these intelligence assessments, the government rescinded protections for journalists in leak investigations, specifically citing news coverage of these assessments as a justification. Memorandum from the Attorney General to All Department Employees (Apr. 25, 2025) (regarding updated policy on obtaining information from members of the news media). This specific reference, combined with the timing of the memorandum coming just eight days after publication of

the *Washington Post* article, raises further concerns that the government is seeking to limit disclosure of information that might undercut the government's representations to the courts. This context further underscores the importance of meaningful judicial review of the administration's invocation of the Act.

The government also has offered circular explanations for the absence of incriminating evidence against AEA detainees today that echo those given by General DeWitt in WWII. In his report, General DeWitt wrote: "The very fact that no sabotage [by Japanese Americans] has taken place to date is a disturbing and confirming indication that such action will be taken." *Korematsu*, 323 U.S. at 241 n.15 (Murphy, J., dissenting). In support of the government's arguments in another AEA habeas class action that "[a]gency personnel carefully vet each individual alien to ensure they are in fact TdA," Def. Mot. to Vacate TRO, *J.G.G. v. Trump*, No. 1:25-cv-00766-JEB (Mar. 17, 2025), ECF No. 26, an ICE official declared: "The lack of a criminal record does not indicate they pose a limited threat. In fact, based upon their association with TdA, the lack of specific information about each individual actually highlights the risk

they pose." Decl. Robert Cerna ¶ 9, *J.G.G. v. Trump*, No. 1:25-cv-00766-JEB (Mar. 17, 2025), ECF No. 26-1.

The Court risks creating another grave injustice if it declines to "delve into whether the Executive Branch possesses sufficient support for its conclusion" that a foreign nation or government has effected an "invasion" or "predatory incursion," *J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1257450, at *10 (S.D. Tex. May 1, 2025), or holds that it "may not (and therefore will not) assess the truthfulness of the statements in the Proclamation." *A.S.R. v. Trump*, No. 3:25-CV-00113, 2025 WL 1378784, at *11 (W.D. Pa. May 13, 2025).  Indeed, if the Court chooses to turn a blind eye to these false justifications and attempted coverups, it will leave the door open to even greater abuses of power in the future. Just as the initial WWII AEA detentions opened the door to the mass incarceration of Japanese Americans and Japanese Latin Americans, today's actions could pave the way for erosion of the rights of many more beyond the Venezuelans who are currently being targeted. *See Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025) (Wilkinson, J., concurring) ("If today the Executive claims the right to deport without due process and in disregard of court orders, what

28

assurance will there be tomorrow that it will not deport American citizens and then disclaim responsibility to bring them home?").

Unless the judiciary imposes meaningful constraints, the extraordinary powers claimed under the Act could be applied to an ever-widening circle of groups deemed undesirable. *See Trump v. J.G.G.*, 604 U.S. ----, 145 S. Ct. 1003, 1014-16 (2025) (Sotomayor, J., dissenting) (warning about the danger of expanding executive power without proper constraints).

### D. As in WWII, the Current Implementation of the Act Raises Serious Due Process and Equal Protection Concerns.

As in WWII, the government's current implementation of the Act raises serious due process and equal protection concerns. The administration's procedures for identifying, detaining, and removing individuals under the Act permit the government to engage in these serious invasions of rights with virtually no procedural protections, let alone a hearing before a neutral bench officer. This truncated process creates a very high risk that people will be deported based on false allegations. Indeed, in the only case so far to have tested the individual allegations against an alleged Alien Enemy, the Western District of

Texas excoriated the government for its "shoddy affidavits and contradictory testimony," found that the government was "going off of nearly nothing, to substantiate their mammoth claims," and held that "[t]he Court would not accept this evidence even in a case where only nominal damages were at stake, let alone what is at stake here." *Sanchez Puentes v. Garite*, No. EP-25-CV-00127-DB, 2025 WL 1203179, at *13-*14 (W.D. Tex. Apr. 25, 2025).

This pattern of targeting individuals without adequate evidence, resisting judicial review, and making public assertions that contradict internal assessments echoes the government's conduct during the Japanese American incarceration. It underscores the need for meaningful judicial scrutiny of the government's invocation and implementation of the Act.

Amici note that, similar to WWII, when the government began with a more targeted, though still problematic, program directed at so-called "alien enemies," the government has moved, through vacatur and termination of Temporary Protected Status, to pave the way for the deportation of over 600,000 Venezuelans who had previously been granted TPS. The purported justification for the administration's

invocation of the AEA has been, in some ways, extended to this broader group, including the use of deeply troubling characterizations of Venezuelans.

## IV. CONCLUSION

The Japanese American experience offers a powerful reminder of the dangers that arise when courts defer too readily to government claims of necessity without demanding evidence. The mass incarceration of Japanese Americans during WWII represents one of the most profound civil liberties failures in our nation's history—a failure that resulted not only from executive overreach but also from judicial abdication of responsibility.

The *coram nobis* cases revealed that this failure was compounded by government misconduct, including the suppression and alteration of evidence that contradicted claims of military necessity. This history demonstrates the vital importance of meaningful judicial review when the government seeks to exercise extraordinary powers that curtail individual liberty.

Today, as the Court considers the administration's invocation of the Act, it should heed these lessons. It should require the government to

provide specific, credible evidence supporting its claims about TdA's alleged status as a "foreign nation or government" and its alleged "invasion" of the United States, and claims about specifical individuals' alleged involvement with TdA. It should consider that evidence—if it exists—with a critical eye. It should ensure that individuals targeted by the Act have a genuine opportunity to contest the allegations against them before a neutral bench officer. And it should view with skepticism government arguments for limited judicial review or extreme deference to executive determinations.

By closely scrutinizing the government's assertions and evidence, this Court can fulfill its constitutional role as a check on Executive overreach, avoid repeating the grave errors of the past, and avert the institutional and intergenerational harms inflicted upon Japanese Americans during WWII.

Dated: June 2, 2025

Respectfully submitted,
COVINGTON & BURLING LLP

*s/Darren Seiji Teshima*
Darren Seiji Teshima
Robert D. Fram
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
dteshima@cov.com
rfram@cov.com

Benedict M. Lenhart
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5114
blenhart@cov.com

Robert S. Chang
Fred T. Korematsu Center for Law
and Equality
Uc Irvine School of Law
401 E. Peltason Dr.
Irvine, CA 92697
Telephone: (949) 824-3034
rchang@law.uci.edu

Carl Takei
Asian Law Caucus
55 Columbus Ave.
San Francisco, CA 94111
Telephone: (415) 212-8588
carlt@asianlawcaucus.org

Noah Baron
Asian Americans Advancing Justice

|AACJ
1620 L Street NW, Suite 1050
Washington, DC 20036
Telephone: (202) 868-0396
nbaron@advancingjustice-aajc.org

*Counsel for Amici Curiae Japanese
American Citizens League and other
Asian American and Pacific Islander
("AAPI") organizations*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/Darren Seiji Teshima*
Darren Seiji Teshima

*Counsel for Amici Curiae*
*Japanese American Citizens*
*League and other Asian*
*American and Pacific Islander*
*("AAPI") organizations*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,192 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font size 14.


*s/Darren Seiji Teshima*
Darren Seiji Teshima

*Counsel for Amici Curiae*
*Japanese American Citizens*
*League and other Asian*
*American and Pacific Islander*
*("AAPI") organizations*

# [CORRECTED] EXHIBIT A

Japanese American Citizens League (JACL)
18 Million Rising
AAPI Equity Alliance
AAPI NJ
AAPI Youth Rising
APIA Vote-MI
Asian American Association of New Mexico
Asian American Bar Association of Greater Chicago
Asian American Bar Association of New York
Asian American Bar Association of the Greater Bay Area
Asian American Coalition of Ohio
Asian American Lawyers Association of Massachusetts
Asian American Organizing Project
Asian Americans Advancing Justice | Chicago
Asian Americans United
Asian Counseling and Referral Service
Asian Law Alliance
Asian Pacific American Bar Association of Silicon Valley
Asian Pacific American Women Lawyers Alliance
Asian Refugees United
Asian Texans for Justice
Asian/Pacific Bar Association of Sacramento
AZ AANHPI Advocates
Bainbridge Island Japanese American Exclusion Memorial Association
Chinese American Citizens Alliance
Chinese American Citizens Alliance Portland Lodge
Chinese American Legal Defense Alliance (CALDA)
Chinese for Affirmative Action
Crystal City Pilgrimage Committee

Densho

Filipino American Lawyers Association of New York

Filipino American Lawyers of San Diego

Filipino Bar Association of Northern California (FBANC)

Freedom Action Now, Inc.

Freedom, Inc.

Friends of Minidoka

Friends of the Historical Museum at Fort Missoula

Japanese American Bar Association

Japanese American Memorial Pilgrimages

Japanese American Museum of Oregon

Japanese American National Museum

Japanese Community Youth Council

Japanese Peruvian Oral History Project

Korean American Bar Association of Washington DC

Little Tokyo Service Center

Minidoka Pilgrimage Planning Committee

Minoru Yasui Legacy Project

Missouri Asian American Bar Association

National Asian Pacific American Bar Association (NAPABA)

National Filipino American Lawyers Association

New Mexico Asian Family Center

Nikkei for Civil Rights & Redress

Nikkei Heritage Association of Washington

Nikkei Progressives

OCA-Asian Pacific American Advocates

Pacific Asian Counseling Services

Pan Asian Lawyers of San Diego

Stop AAPI Hate

TeachAAPI

Topaz Museum

Tule Lake Committee

Vietnamese American Bar Association of Northern California (VABANC)

Vietnamese American Community Center of the East Bay