No. 25-10534

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

W.M.M., et al.,

Petitioners-Appellants,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Respondents-Appellees.

ON APPEAL FROM UNITED STATES DISTRICT COURT OF THE
NORTHERN DISTRICT OF TEXAS
Case No. 1:25-cv-00059-H
Agency Case Numbers: 244-147-155, 249-153-992, 240-730-011
(Detained)

SUPPLEMENTAL RECORD EXCERPTS
FOR RESPONDENTS-APPELLEES

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to Assistant Attorney General

JOHN W. BLAKELEY
Senior Counsel

NANCY N. SAFAVI
Senior Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Sta.
Washington, D.C. 20044
(202) 514-9875
Nancy.Safavi@usdoj.gov

Attorneys for Respondents-
Appellees

# TABLE OF CONTENTS

Tab A    Declaration of acting Assistant Director Marco D. Charles
*J.G.G., et al., v. Trump et al*., No. 1:25-cv-00766 (D.D.C.) .........1

Tab B    Declaration of Deputy Assistant Director Selwyn Smith
*J.G.G., et al., v. Trump et al,* No. 1:25-cv-00766 (D.D.C.) .........7

Tab C    Certification of Kellie M. Hardman
*M.A.P.S. v. Garite, et al.*, No. 3:25-cv-171 (W.D. Tex.) .............17

Tab D    Declaration of Deputy Assistant Director Selwyn Smith
*J.G.G., et al., v. Trump, et al*., No. 1:25-cv-00766 (D.D.C.) .......32

Tab E    Declaration of Joshua D, Johnson
*A.A.R.P., et al., v. Trump, et al.*, No. 24A1007 ..........................37

Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G.*, et al.*,

Petitioner,

v.

DONALD J. TRUMP, *et al.*,

Respondents.

No. 1:25-cv-766 (JEB)

Declaration Of Acting Assistant Director
Marcos D. Charles

## DECLARATION OF MARCOS D. CHARLES

I, Marcos D. Charles, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an Acting Assistant Director for Field Operations at Enforcement and Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      As the (A) Assistant Director, I am responsible for providing guidance and counsel to the twenty-five ERO Field Office Directors, ensuring all field operations are working to efficiently execute the agency mission.  I began my career with the U.S. Government as a border patrol agent for the former Immigration and Naturalization Service in Hebbronville, TX. Over time I was promoted to Senior Border Patrol Agent, Supervisory Border Patrol Agent, and Field Operations Supervisor. I joined ICE in 2008 as the Assistant Officer in Charge. Overtime I was promoted to Supervisory Detention and Deportation Officer, Assistant Field Office Director,

Chief of Staff, Deputy Field Office Director, and Field Office Director before becoming the Acting Assistant Director.

3.    I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4.    I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.    On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens" (the Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."

6.    Gangs remain one of the more formidable issues that corrections officials face in the management of prisons and civil detention facilities. Gangs are responsible for a disproportionate amount of prison misconduct and violence. Their continued presence challenges ongoing efforts to maintain control, order, and safety in the facilities. While all gangs disrupt the

orderly administration of detention facilities, TdA represents a heightened challenge beyond

what prisons in the United States face, given TdA's formation and history in penal institutions.

7.      TdA is not just a normal gang. Open-source information documents the gang's

history and growth over the last decade. As reported in National Public Radio's article titled,

*Tren de Aragua, a criminal organization with roots in Venezuela, has roots in Venezuela, has*

*rapidly expanded across Latin America*, TdA was founded in 2014 in the Tocorón prison, in the

central Venezuelan state of Aragua, led by Héctor Rusthenford Guerrero Flores, alias "Niño

Guerrero." The gang largely controlled the Tocorón prison and eventually branched out overseas.

The gang's leaders fled the prison in 2023 when it was taken over by security forces. While

leadership splintered after fleeing the prison, TdA recruited new gang members from among the

eight million Venezuelans who had fled the country's economic crisis. Initially, it established

criminal cells in neighboring Colombia, Peru, and Chile, where it smuggled drugs and people

and operated extortion rackets and prostitution rings. TdA's most notorious alleged crime was the

2024 killing of Ronald Ojeda, a former Venezuelan army officer who conspired against Nicolás

Maduro, the country's authoritarian leader, then fled to Chile. Suspected gang members dressed

as Chilean police officers abducted Ojeda from his apartment. Days later, his body was found

stuffed in a suitcase and buried in cement. The history reflects over a decade of savage criminal

activity, vicious disregard for authority, and violent crimes which threaten the stability of order.

TdA poses the same terrorizations in the United States as the origin countries from which they

started – Venezuela, and now also to include Colombia, Peru and Chile.

8.      While in confinement in Venezuela, TdA was able to grow its numbers

exponentially. Multiple examples of their savagery can be found in open-source news articles

highlighting the numerous abhorrent activities they have conducted while in the United States

4

including but not limited to murder, rape, kidnapping, sex trafficking, drug trafficking, robbery, and assault. Further, TdA has been designated a Foreign Terrorist Organization. Their continued presence in ICE custody poses significant risks such as the ability to recruit new TdA members. Detention of hundreds of members of a designated Foreign Terrorist Organization, among other populations of aliens is an unnecessary danger to other detainees and facility staff.

9.      The designation of TdA as a terrorist organization has introduced new budgetary challenges for ICE/ERO. This classification necessitates a shift in resource allocation, directing limited funds and human capital towards the identification, arrest, detention, and removal of individuals within this newly prioritized organization. ICE is bound by statutory requirements to not release certain aliens from immigration detention based on criminal or threat designations. This shift in priorities hampers ICE's ability to properly detain those aliens who are not statutorily eligible for release or for whom an ICE officer determines is a public safety or flight risk during the custody determination process. Detaining this dangerous population of aliens detracts from our already limited bedspace capacities and diminishes our resources and obstructs ICE's ability to detain other criminal aliens, and make difficult decisions on which aliens are the most egregious, dangerous and/or removable all while also being bound by statutory requirements in the Immigration and Nationality Act (INA), which imposes limitations on release, such as aliens subject to expedited removal, or for whom there is a prohibition of release under the mandatory detention provision of INA § 236(c). ICE currently has roughly 41,500 beds available for detention. These beds cost the American public roughly $152 a bed daily. Because members of TdA pose a significant threat of danger at ICE detention facilities, their swift removal from the United States after entering ICE custody ensures the preservation of security and order for both detainees and facility personnel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April, 2025.

MARCOS D CHARLES

Digitally signed by
MARCOS D CHARLES
Date: 2025.04.01
22:48:40 -04'00'

Marcos D. Charles
Acting Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

6

Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G.*, et al.*,

Petitioner,

v.

DONALD J. TRUMP, *et al.*,

Respondents.

No. 1:25-cv-766 (JEB)

Declaration Of Deputy Assistant Director
Selwyn Smith

DECLARATION OF SELWYN SMITH

I, Selwyn Smith, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am a Deputy Assistant Director ("DAD") for Homeland Security Investigations

("HSI") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of

Homeland Security ("DHS").

2.      As the DAD of Countering Transnational Organized Crime, Public Safety and

Border Security division ("PSBS"), I oversee a wide variety of investigative and special

operations programs targeting Transnational Criminal Organizations involved in human

smuggling, narcotics trafficking, racketeering and violent gang activity as well as other crimes

enforced by HSI. These programmatic areas support the targeting of cross border criminal

organizations that exploit America's legitimate trade, travel, and financial systems for illicit

purposes.

3.      I am aware that the instant lawsuit has been filed regarding the removal of

Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4.      I provide this declaration based on my personal knowledge, reasonable inquiry,

and information obtained from various records, systems, databases, other DHS employees, and

information portals maintained and relied upon by DHS in the regular course of business.

5.      On March 15, 2025, President Trump announced the Proclamation *Invocation of

the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating

that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to

invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare

within the country; and used drug trafficking as a weapon against our citizens" (the

Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-

alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same

Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan

citizens 14 years of age or older who are members of TdA, are within the United States, and are

not actually naturalized or lawful permanent residents of the United States are liable to be

apprehended, restrained, secured, and removed as Alien Enemies."

6.      Members of TdA pose an extraordinary threat to the American public. TdA

members are involved in illicit activity to invoke fear and supremacy in neighborhoods and with

the general population. This has been evident from investigations throughout the nation where

TdA members coalesce to conduct their criminal acts. For example, TdA's takeover of Denver

apartment buildings stoked fear in the tenants when TdA committed burglaries, narcotics, and

weapons violations. Other inquiries into the actions of member of TdA have resulted in criminal

investigations and prosecution of cases of human trafficking, to include trafficking of women

9

from Venezuela; bank fraud; federal narcotics violations; extortion of human smuggling victims; and homicide, to name a few. This, along with the myriad state violations and investigations of groups of TdA members committing crimes throughout the nation are evidence of their criminal enterprise.

7.      TdA is a violent transnational criminal organization (TCO) which originated in the mid-to-late 2000's as a prison gang founded by inmates of the Tocorón prison in the Venezuelan state of Aragua. TdA has since evolved from Venezuela's most powerful homegrown prison gang into a TCO which by 2018, had expanded throughout South America and grew to have an estimated 3,000 to 5,000 members. As TdA continues its expansion throughout South America it is currently proliferating into North America.

8.      Much like MS-13, as TdA's influence and power expanded to other prisons throughout Venezuela and then across the southern hemisphere, the global leadership of the organization exploited the prison system to develop a base of operations for the gang to coordinate logistics, revenue streams, and recruitment. TdA was also able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. The founding members, senior leaders, and a vast number of TdA members escaped the Tocorón prison in September 2023. The subsequent destruction of the prison resulted in the displacement of the senior leaders and the decentralization of the global command-and-control structure for the organization.

9.      Over the course of the past three years, TdA has expanded throughout North America and are now known to be present and committing criminal activity in at least 40 states in the continental United States and Canada. TdA has proven to leverage many of the same expansion tactics and strategies in the United States that they previously employed throughout

10

South America. Due to the migration patterns of the Venezuelan diaspora and the vast expansion of the organization throughout the United States, TdA has become a loosely affiliated collection of independent cells committing disorganized and opportunistic crimes of violence against the Venezuelan population and rival gangs, terrorizing local communities. Detention of TdA leaders and members would potentially result in the unintended consequence of consolidating and centralizing their command-and-control structure and thereby providing an opportunity for TdA to organize and prolong the violent activities of their criminal enterprise within the United States.

10.    Historically, TdA has been found to be either, or both, strategic and opportunistic in their evolution and expansion. Within the Venezuelan penitentiary system, TdA methodically pursued geographic expansion by taking control of selected prisons in Aragua and surrounding states. Throughout the gang's expansion across international borders, the establishment and disbursement became more random and responsive to the environment and driven by profitability. As TdA continues its geographical expansion it has shown to operate as a loosely organized criminal syndicate serving as an umbrella organization for franchise networks under the TdA banner.

11.    TdA establishes their presence in a three-phase expansion methodology through force and dominance in an urban population within a geographical region. This pattern of behavior has been documented in TdA's expansion throughout South America, including into Colombia, Perú, and Chile. The three known phases of expansion are the Exploration, Penetration, and Consolidation phase.

12.    Exploration - In this step, TdA has been known to infiltrate and control groups of Venezuelan refugees traveling along migratory routes. By mixing with these migrants TdA

11

members can keep a low profile and pass into new regions. They have been known to exploit

these migrants for the gang's profit through extortion and sexual exploitation.

13.    <u>Penetration</u> - In this step, TdA members begin to establish themselves within their

new territory. This is often accompanied by a corresponding increase in crime and violence as

they begin to set up their criminal activities and confront existing gangs previously established in

the area. In general, TdA has historically targeted opportunistic areas with a relatively low

volume of rival organizations present and with elevated profitability. During this phase TdA will

typically engage in extortion, low-level drug distribution, human trafficking and sexual

exploitation, kidnapping, and other violent crimes of intimidation.

14.    <u>Consolidation</u> - Once TdA members have firmly established themselves within an

area and overcome and/or absorbed competing gangs through domination they move to

consolidate their power and position within the territory into an enterprise.

15.    Reporting reveals TdA is attempting to expand its presence and criminal activity

throughout the Western Hemisphere by exploiting the record mass migration resulting from

Venezuela's recent political, economic, and humanitarian crises. According to key assessments, if

left unchecked, TdA is likely to establish increasingly sophisticated human smuggling and sex

trafficking networks into the United States leading to an increase in criminal activity and likely

adding further strain to law enforcement resources as seen in Chicago, New York, Denver, and

along our southern border.

16.    As of September 2024, ICE HSI reporting indicates that TdA members have been

identified in at least 40 states across the United States. ICE HSI has opened approximately 472

investigations targeting members and/or TdA criminal networks across domestic and

international offices. The violations in these investigations include, but are not limited to,

murder, robbery, human smuggling, human trafficking, sex trafficking, hostage taking, narcotics

trafficking, and firearms violations.

17.     In January 2024, the New York Police Department ("NYPD") recorded a surge in

moped robberies that are attributed by police as likely orchestrated by TdA recruits. NYPD

CompStat reporting indicates that moped-based armed robbery patterns during this period were

158% higher than the same period the previous year. NYPD attributes this surge to be a result of

TdA recruitment of Venezuelans in New York City migrant centers. Accused leaders have

admitted to a complex network connected to Florida and Texas with profits shipped back to

South America. Associated crews of this TdA network are allegedly involved in extortion and

ransom schemes connected to human smuggling and human trafficking networks.

18.     In June 2024, multiple suspected TdA members participated in a nationally

publicized series of robberies including the armed robbery of $2 million in merchandise from a

high-end jewelry store in Denver, Colorado. In total, 13 subjects were apprehended by ICE HSI

in a multi-agency, coordinated enforcement operation as the group attempted to flee to

Venezuela.

19.     In January 2025, as a result of a joint ICE HSI investigation, nine TdA members

were criminally charged in Colorado state court for their participation in the December 17, 2024,

armed home invasion, kidnapping, and torture of two Venezuelan nationals at the Edge of Lowry

Apartments in Aurora, Colorado. In total, 12 subjects were charged, with three Venezuelan

nationals remaining at large. The court granted the City of Aurora an emergency order to

temporarily close the Edge of Lowery Complex due to "an imminent threat to public safety and

welfare."

13

20.    In February 2025, a joint multi-jurisdictional ICE HSI investigation with the Federal Bureau of Investigation and Tennessee Bureau of Investigation, dismantled a transnational commercial sex trafficking enterprise charging eight subjects with ties to TdA. The defendants operated an illegal commercial sex and sex trafficking enterprise out of Nashville motels from July 2022 through March 2024. The defendants facilitated the victims' arrival into the United States and used online commercial sex websites to post advertisements and internet or cellular communications to conduct illicit criminal activities.

21.    It is critical to use all available law enforcement tools to disrupt TdA activities quickly. These individuals are designated as foreign terrorists. Within Venezuela, TdA was able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. Keeping them in ICE custody where they could potentially continue to recruit new TdA members poses a grave risk to ICE personnel; other, nonviolent detainees; and the United States as a whole.

22.    Though many TdA members subject to the AEA do not have criminal records in the United States, due to their origin as a prison gang, it is safe to assume these subjects have criminal histories in their home countries, which U.S, law enforcement cannot verify due to the lack of diplomatic relations that currently exist with the country of Venezuela. The lack of a criminal record in the United States does not indicate they pose a limited threat. In fact, based upon their association with TdA, the lack of specific information about each individual actually highlights the risk they pose. It demonstrates that they are potential terrorists for whom we lack a complete profile.

23.    However, even though many of these TdA members have been in the United States only a short time, some have still managed to commit extremely serious crimes. A review

of ICE databases reveals that numerous individuals subject to the AEA have arrests and convictions in the United States for dangerous offenses.

24.    Additionally, a review of ICE databases reveals that numerous individuals removed have arrests, pending charges, and convictions outside of the United States, including an individual who is under investigation by Venezuelan authorities for the crimes of aggravated homicide, qualified kidnapping, and illegal carrying of weapons of war and short arms with ammunition for organized gang in concealment and trafficking; an individual who is the subject of an active INTERPOL Blue Notice issued on or about January 2, 2025, and a Red Notice issued February 5, 2025, for the crime of kidnapping and rape in Chile; an individual who is the subject of an INTERPOL Red Notice issued by Chile for kidnapping for ransom and criminal conspiracy involving TdA; an individual who admitted he sold marijuana and crystal methamphetamine for the Colombian gang Las Paisas, assaulted someone with a knife for a cellphone while living in Venezuela, and has twice robbed people for money while living in Colombia; an individual who is the subject of an INTERPOL Red Notice for child abduction; an individual identified as a "high-ranking" member of the TdA by the Mobile Tactical Interdiction Unit in Guatemala City, Guatemala; an individual who is the subject of an INTERPOL Red Notice based on obstruction of justice, criminal conspiracy, and aggravated corruption based on the individual's role as a police officer in modifying evidence to cover up a murder; an individual who, according to Peruvian Newspapers, is associated with high-ranking TdA members and who fled Peru while under investigation for illegal possession of firearm and distributing narcotics; and an individual who is the subject of an INTERPOL Blue Notice stating that he is under investigation in Venezuela for murder with aggravating circumstances against a victim whose corpse was found inside a suitcase on a dirt road.

15

25.    According to a review of ICE databases, numerous individuals removed were arrested together as part of federal gang operations, including two individuals who were in a vehicle during a Federal Bureau of Investigations gun bust with known TdA members; four individuals who were arrested during the execution of an HSI New York City operation; and four individuals who were encountered during the execution of an arrest warrant targeting a TdA gang member, all of whom were in a residence with a firearm and attempted to flee out the back of the residence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April 2025.

SELWYN J SMITH

Digitally signed by SELWYN J SMITH
Date: 2025.04.01 21:51:03 -04'00'

Selwyn Smith
Deputy Assistant Director
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Exhibit C

## CERTIFCATION OF KELLIE M. HARDIMAN

I, Kellie M. Hardiman, state:

1. I am the Deputy Assistant Director responsible for the Criminal Intelligence Branch within the Criminal Investigative Division of the Federal Bureau of Investigation (FBI). I have served in my position since December 2024, and I have been employed by the FBI as an intelligence analyst since September 2003. I am responsible for, among other things, oversight of the production of intelligence analysis related to criminal threats.

2. Attached to this certification is a true and correct copy of an FBI Intelligence Assessment titled "Venezuelan Government Officials Use Tren de Aragua to Undermine Public Safety," dated January 28, 2025.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.

May 16 , 2025

Kellie M. Hardiman
Deputy Assistant Director
Criminal Intelligence Branch
Criminal Investigative Division
Federal Bureau of Investigation
Washington, D.C.

1

18



**FBI** FEDERAL BUREAU OF INVESTIGATION

*FBI Intelligence Assessment*

*Published by: Federal Bureau of Investigation*                    *23 January 2025*

This document is unclassified.

# Venezuelan Government Officials Use Tren de Aragua to Undermine Public Safety

## Key Takeaways

The FBI assesses some Venezuelan Government officials likely facilitate the migration of Tren de Aragua (TdA) members from Venezuela to the United States to advance the Maduro regime's objective of undermining public safety in the United States, demanding additional law enforcement (LE) resources and focus.

The FBI assesses some Venezuelan Government officials likely use TdA members as proxies for the Maduro regime in an effort to destabilize Chile, Ecuador, Peru, Colombia, and the United States, demonstrating Maduro's willingness to violate the territorial sovereignty of Venezuela's neighbors to advance the regime's policies.

## Looking Forward

The FBI assesses, in the next 6 to 18 months, Venezuelan Government officials likely will attempt to leverage TdA members in the United States as proxy actors to threaten, abduct, and kill members of the Venezuelan diaspora in the United States who are vocal Maduro critics and expand similar activities throughout South America. The implications would be a loss of confidence by the fleeing dissidents in the United States and foreign LE providing safety to them.

## Opportunities

Opportunities to counteract TdA presence and expansion in the United States include increasing awareness of and educating state and local LE on known activities and methods of the criminal organization. Intelligence and LE agencies could collaborate on developing and focusing intelligence collection requirements. FBI Legats in North, Central, and South America, and the Caribbean have built robust LE partnerships in the region, which provide the opportunity to gain a holistic understanding of the TdA threat and identify changes or trends in how the group operates.

## Venezuelan Government Officials Amplify the Expansion of TdA Criminal Actors into the United States

The FBI assesses some Venezuelan Government officials likely facilitate the migration of TdA[a] members from Venezuela to the United States to advance the Maduro regime's objective of undermining public safety in the United States. This assessment is based on reported efforts by the Maduro regime to manage and finance TdA to create social problems in the United States and its release of violent TdA members from Venezuelan prisons.

- As of November 2023, the Venezuelan Government had strategically managed and financed TdA as part of Venezuela's larger foreign policy goal of creating internal security and social problems for the United States. Venezuelan President Nicolas Maduro viewed the border chaos and widespread problems in New York City, New York, and Chicago, Illinois, among other places, as his successful use of TdA to create political, social, and security issues for the USG, which he used as leverage in sanctions negotiations with the United States.[b] High-ranking Venezuelan officials were not involved in TdA's daily activities. Strategic decision-making regarding Venezuelan Government use of TdA went through Maduro, who used confidants as go-betweens to insulate himself from public affiliation with TdA, according to a human source with indirect access.[1]

- As of late February 2024, Maria Iris Varela Rangel, who oversaw the correctional and penal institutions in Venezuela, was deliberately releasing members of TdA from the prison systems. The newly released TdA members were encouraged to flee Venezuela, travel to the United States, and often received transportation assistance, according to a human source, much of whose reporting has been corroborated over the last three years.[2]

## Venezuelan Government Officials Use TdA as Proxy Actors in South America and the United States

The FBI assesses some Venezuelan Government officials likely use TdA members as proxies for the Maduro regime in an effort to destabilize Chile, Ecuador, Peru, Colombia, and the United States. This assessment is based on efforts by senior Venezuelan Government officials to plan lethal operations using TdA actors in neighboring regional countries and increase the number of violent TdA actors for use as potential proxies in the United States.

- As of February 2023, two Cuban men in military uniforms of an unspecified country and an unidentified number of Syrian men were in Caracas, Venezuela, working for Venezuelan Vice President Delcy Rodriguez, according to a contact who claimed

---

[a] As of July 2024, TdA was Venezuela's most powerful homegrown criminal organization and the only Venezuelan gang that had successfully operated outside Venezuela. TdA grew from a prison gang isolated in the Venezuelan state of Aragua to a transnational threat with a diverse and violent criminal portfolio. *Source*: Website | InSight Crime | "Tren de Aragua" | 3 July 2024 | www.insightcrime.org/venezuela-organized-crime-news/tren-de-aragua/ | accessed on 11 July 2024 | InSight Crime is a non-profit think tank and media organization with offices in Washington, DC, and Medellín, Colombia, specializing in investigating organized crime in Latin America and the Caribbean.

[b] See Appendix A: Diplomatic Efforts of the Maduro Regime Tied to Migration and Sanctions Relief.

direct access and who spoke in confidence. The Syrian men possessed plans describing the use of TdA as a proxy force to disable the Governments of Chile, Peru, and the United States. According to the Syrians, as recounted by the contact, the first phase of the plan had been in action for two years as of February 2023; it called for the release of TdA leaders from prison and the relocation of their family members to the United States.[3]

- As of August 2023, Venezuelan National Assembly member Diosdado Cabello was working with members of TdA and Mexico-based Cartel Jalisco Nueva Generacion (CJNG) to plan, train, direct, and conduct violent attacks in South America, specifically in Chile and Ecuador. The plan targeting Ecuador included attacks on two unnamed Ecuadorian congressional members. The intended targets in Chile were unknown, but the operatives who were to conduct the attacks were of Colombian and Venezuelan ethnicity, according to a contact who spoke in confidence.[4]

## Perspective

Since 2001, with the inception of Bolivarian Circles[c] under former President Hugo Chavez, Venezuela has experienced a rise in government-supported state and local level criminal groups, such as *colectivos*[d]; *megabandas*,[e] such as TdA; ideologically aligned paramilitary organizations[f]; and Peace Defender Squads.[g] The Maduro regime has embraced and expanded the use of these groups to achieve internal and external objectives under the banner of protecting the Bolivarian Revolution. As of September 2023, Venezuelan national and local government authorities have ceded ever-greater control over their AORs, allowing criminal groups to act as de facto public safety authorities.[5] As a result, a Venezuelan hybrid criminal state has emerged, blurring the lines between government and criminal actors. The Venezuelan Government uses these alliances to consolidate power from the top down, targeting and intimidating political opponents and dissidents in Venezuela while abdicating responsibility for the resulting violence and chaos.[6, 7]

---

[c] Bolivarian Circles were created by Chavez in 2001 as a new generation of political groups to provide grass-roots political support. *Source:* Investigative Report | Insight Crime | "The Devolution of State Power: The 'Colectivos'" | 18 May 2018 | https://insightcrime.org/investigations/devolution-state-power-colectivos/ | accessed on 7 May 2024.

[d] *Colectivos* emerged in the 2000s as a disparate network of grassroots political groups that were trained, financed, and armed by the state. *Source:* Investigative report | Insight Crime | "Maduro's Peace Defender Squads Are Anything But Peaceful" | 12 July 2023 | https://insightcrime.org/investigations/maduro-peace-defender-squads-anything-peaceful/ | accessed on 8 May 2024.

[e] Megabandas, aka trenes, are criminal structures dedicated to criminal activities like killings, drug trafficking, and extortion. TdA falls under the *megabandas* banner. *Source:* Report | European Union Agency for Asylum (EUAA) | "Venezuela – Country Focus" | November 2023 | | https://euaa.europa.eu/publications/venezuela-country-focus | accessed on 24 April 2024 | EUAA is an agency created by European Union regulation 439/210 to increase cooperation among member states on asylum.

[f] *Analyst Note:* "Ideologically aligned paramilitary organizations" refers to groups like the ELN.

[g] Cuadrillas Defensoras de la Paz (CUPAZ), or Peace Defender Squads, were created in March 2019 by Maduro as volunteer civilian groups meant to bring peace to Venezuelan neighborhoods. The CUPAZ, however, have been used to target political opposition and are involved in criminal activities exploiting local communities. *Source:* Report | Insight Crime | "Maduro's Peace Defender Squads Are Anything But Peaceful" | 12 July 2023 | https://insightcrime.org/investigations/maduro-peace-defender-squads-anything-peaceful/ | accessed on 8 May 2024.

The Venezuelan Government faced accusations it uses groups, like the National Liberation Army (ELN) and TdA, to intimidate, kidnap, and kill dissidents and political opponents sheltering in neighboring countries, such as Colombia and Chile, after they have fled social, political, and economic dysfunction in Venezuela.[h] The Venezuelan Government has publicly countered these accusations by accusing dissidents, including an unknown number of former Venezuelan military members, of plotting to overthrow the Maduro regime. For example, in February 2024, a group, which included at least four TdA members, abducted and killed a former Venezuelan Army lieutenant and outspoken Maduro critic, who was living in asylum in Chile. In January 2024, the Venezuelan Government publicly accused the victim of participating in a conspiracy to overthrow the regime and kill Maduro. In May 2024, the Chilean prosecutor leading the investigation indicated that investigators had ruled out the victim's involvement in criminal activities and that Chile suspected the killing had been directed from Venezuela. In response, the Venezuelan Government called the victim's killing a false-flag operation carried out by Chilean and foreign intelligence agents to blame Venezuela.[8, 9, 10, 11]

## Outlook

The FBI assesses, in the next 6 to 18 months, some Venezuelan Government officials likely will attempt to leverage TdA members in the United States as proxy actors to threaten, abduct, and kill members of the US-based Venezuelan diaspora who are vocal Maduro critics.[i] Indicators that this is occurring mirror Venezuela's alleged transnational repression efforts in South America, with tactics that include harassment, abductions, cross-border renditions, and targeted killings. The FBI also assesses Venezuelan Government officials likely will increase actions to target Maduro regime critics and pro-Venezuela democracy advocates throughout South American countries, leveraging TdA members when convenient, thereby leading to further destabilization in the region. Indicators this is occurring include open source or foreign partner reporting of violent incidences involving high-profile dissidents or intelligence reporting of planned attacks on regime critics using TdA members.

## Implications

As TdA expands its presence in the United States, the Venezuelan diaspora may become targets of opportunity to further silence critics of the Maduro regime, increasing violence and resulting in a loss of confidence in the USG's ability to protect free speech and those granted asylum or temporary residency, posing a challenge to US LE. Venezuela's use of violent proxy actors inside the United States to repress pro-democracy, anti-Maduro activists would increase violence in US communities where migrants have settled and present challenges for US LE to detect and counter the activity. As TdA further expands activities throughout South America, its expansion would undermine the confidence of dissidents fleeing to perceived safe haven countries.

---

[h] See Appendix B: Venezuelan Migration Trends.

[i] See Appendix B: Venezuelan Migration Trends.

## Analytic Tradecraft Summary

### Confidence Level

(U) The FBI has medium confidence in the assessments within this intelligence assessment. The intelligence cited to support these assessments, although sourced with seven sources with direct and indirect access, did not carry sufficient quality, variety, or corroboration to warrant a higher level of confidence. The FBI considered lowering its confidence in the assessments due to the primary sources, who were one-time contacts with indirect access and who may have been motivated by the perceived possibility of a favorable immigration decision. Ultimately, the core evidence, combined with the additional contextual information, supported the FBI's medium confidence in the assessments. As noted below, additional information collected on this threat could prompt the FBI to refine or change its assessments and would improve the confidence in those judgments.

### Key Assumption

(U) The assessments in this intelligence assessment rely on the key assumption TdA and its members accommodate willingly the regime's directives when the action either furthers, or at least does not impair, TdA's own interests. If this assumption were incorrect, the regime might threaten Venezuela-based family of TdA members to coerce compliance. If this were happening, the FBI would expect to see new source reporting, subject interviews, and information from LE in both the United States and South America indicating TdA members were seeking LE assistance to protect their families from Venezuelan Government retribution.

### Changes or Consistency in Analytic Line

The assessments in this intelligence assessment are consistent with the assessments in three products published since March 2024 but present a detailed analysis of how Venezuelan Government officials likely use TdA in South America and, more recently, the United States to advance the Maduro regime's policy objectives.

Finally, these assessments are also consistent with the assessment conveyed in an 8 March 2024 FBI Situational Awareness Bulletin, but focuses on the Venezuelan Government's role in facilitating the migration of TdA members from Venezuela to the United States to advance Maduro regime objectives.

## Analysis of Alternatives

The FBI considered the alternative hypothesis TdA's expansion into the United States and other countries in South and Central America likely is not actively planned or centrally supported by the Venezuelan Government but rather is resulting solely from TdA's organic exploitation of the massive migration of Venezuelans for financial gains. If this alternative proves to be correct, violence and criminal activities, including kidnapping, homicide, sex trafficking, extortion, and drug and weapons trafficking, in North, Central, and South America, the Caribbean, and the United States may increase and strain LE resources to counter TdA in US communities and prisons. Regionally, financially motivated criminal activities and associated violence may cause instability with allied countries in South and Central America, negatively impacting US interests in the region. Supporting this alternate hypothesis, TdA takes advantage of the massive migration of Venezuelan citizens throughout the Western Hemisphere to assume control of these routes and exploit those migrants by engaging in human trafficking, smuggling, extortion, and robbery.[12] This is a major source of income for TdA. Furthermore, TdA members use the migrant groups to reach cities in other countries with a Venezuelan diaspora, which provides cover for them to continue their criminal activity and avoid LE detection.

The FBI considered this alternative hypothesis to be more or less equally plausible with this product's analytic line. Based on the body of the credible open source reporting, some of which cite foreign police officials and prosecutors describing the involvement of TdA members carrying out apparent transnational repression activities allegedly at the behest of the Venezuelan Government, combined with the added contextual information, the FBI deemed the primary assessment to be more likely.

Indicators that would increase the likelihood of this alternative include reporting regarding Venezuelan Government plans and intentions and TdA interests and alignment.

## Appendix A: Diplomatic Efforts of the Maduro Regime Tied to Migration and Sanctions Relief

Below is a timeline of diplomatic events beginning with the signing of the Barbados Accords.[j] The war in Ukraine has caused increased volatility in the global oil and gas market, driving up oil and gas prices, with mixed implications for Venezuela. While higher prices offered potential revenue gains for oil producing nations, Venezuela's ability to capitalize on these increases has been constrained by ongoing US economic sanctions.

The timeline is drawn from press releases issued by the US Department of State (DOS), sanctions implementation guidance issued by the US Department of the Treasury, and open source media reports. This timeline is not intended to represent a full and nuanced analysis of US-Venezuelan diplomatic exchanges on this topic or a fulsome analysis of Venezuela's foreign and energy policies but is provided to contextualize and partially corroborate, albeit circumstantially, the November 2023 reporting as described above.

### Timeline of Diplomatic Events

— **17 October 2023** – Venezuela signed the Barbados Accords as a political roadmap agreement with key electoral guarantees in the run-up to Venezuela's 2024 presidential election.[k]

— **18 October 2023** – The Department of the Treasury's Office of Foreign Assets Control (OFAC) temporarily suspended sanctions targeting Venezuela's oil, gas, and gold mining sectors.[l]

  o OFAC issued General License 43, which temporarily authorized all transactions involving CVG Compania General de Mineria de Venezuela CA (MINERVEN). MINERVEN was the only entity designated by OFAC for operating in the gold sector of the Venezuelan economy.

  o OFAC issued General License 44, which temporarily authorized all transactions related to oil and gas sector operations in Venezuela.

---

[j] The Barbados Accords, formally known as the Partial Agreement on the Promotion of Political Rights and Electoral Guarantees for All, was signed in October 2023 between the Venezuelan Government and the opposition coalition, the Unitary Platform. The agreement aimed to lay the groundwork for free and fair elections in Venezuela, with Norway acting as the main mediator. *Source*: News article | Associated Press| "Venezuela and opposition reach deal on electoral conditions. They plan to sign Tuesday in Barbados" | 16 October 2023 | https://apnews.com/article/venezuela-opposition-norway-talks-c7591a133328d66512854a6869b13703 | accessed on 22 October 2024.

[k] News article | Reuters | "Venezuela, opposition sign election deal; US weighs sanctions relief | 17 October 2023 | https://www.reuters.com/world/americas/venezuela-opposition-sign-election-deal-paving-way-us-sanctions-relief-2023-10-17/ | accessed on 12 May 2025.

[l] USG website | US Department of the Treasury, Office of Foreign Assets Control | "Frequently Asked Questions Regarding the Suspension of Certain U.S. Sanctions with Respect to Venezuela on October 18, 2023" | 18 October 2023 | https://ofac.treasury.gov/sanctions-programs-and-country-information/venezuela-related-sanctions | accessed on 21 June 2024.

— **18 October 2023** – Venezuela resumed accepting repatriation flights from the United States immediately after signing the Barbados Accords.[m]

— **30 January 2024 –** The Biden Administration announced its intention to re-impose previously suspended oil, gas, and gold mining sanctions targeting Venezuela on 17 April 2024, in response to the Maduro regime's arrest of members of Venezuela's democratic opposition in contravention of the Barbados Accords.[n]

— **30 January 2024 –**Rodriguez warned Venezuela would cancel repatriation flights as of 13 February 2024 if the United States were to intensify its "economic aggression against Venezuela," referring to the Biden Administration's decision to re-impose oil and gas sanctions.[o]

— **7 February 2024** – Venezuelan officials disrupt repatriation flights by stopping their validation of the citizenship status of potential returnees.[p]

— **23 February 2024** – Venezuela stopped accepting repatriation flights. The move was not a formal end to the October 2023 agreement; rather, Venezuelan officials blocked the flights by refusing to validate the citizenship of returnees.[q]

— **17 April 2024** – The United States re-imposes oil and gas sanctions on Venezuela.[r]

---

[m] Website | International Crisis Group | Barbados Deal Sets Venezuela on a Rocky Path to Competitive Polls | 30 January 2024 | https://www.crisisgroup.org/latin-america-caribbean/venezuela-the-perilous-path-to-a-key-election | accessed on 12 May 2025. The International Crisis Group is a global non-profit, non-governmental organization used by policymakers and academics, conducting research and analysis on global crises.

[n] Press release | DOS | "Venezuela: Sanctions Actions and Supporting Democracy" | 30 January 2024 | https://www.state.gov/venezuela-sanctions-actions-and-supporting-democracy/ | accessed on 24 June 2024.

[o] News article | Al-Jazeera | "Venezuela accuses US of 'blackmail' over sanctions" | 30 January 2024 | https://www.aljazeera.com/news/2024/1/30/venezuela-accuses-us-of-blackmail-over-sanctions | accessed on 24 June 2024 | Al Jazeera operates under Al Jazeera Media Network, which is partially funded by the government of Qatar.

[p] News article | *The New York Times* | "Deportation Flights From the U.S. to Venezuela in Limbo" | 7 February 2024 | https://www.nytimes.com/2024/02/07/world/americas/migrant-crisis-deport-venezuela-flights.html | accessed on 21 June 2024.

[q] News article | *The New York Post* | "Venezuela stops accepting flights of migrants deported from US, Mexico" | 23 February 2024 | https://nypost.com/2024/02/23/world-news/venezuela-stops-taking-flights-of-migrants-deported-from-us/ | accessed on 21 June 2024.

[r] USG website | US Department of the Treasury, Office of Foreign Assets Control | "Frequently Asked Questions Regarding the Suspension of Certain U.S. Sanctions with Respect to Venezuela on October 18, 2023, Updated 17 April 2024" | 17 April 2024 | https://ofac.treasury.gov/sanctions-programs-and-country-information/venezuela-related-sanctions | accessed on 21 June 2024.

## Appendix B: Venezuelan Migration Trends

The following charts highlight the total number of Venezuelan nationals who, as of December 2022, have left the country since 2015 and the anticipated total through 2025. Chart A was obtained from an open source report focused on Venezuelan migrants and is intended to provide additional context regarding the exodus of Venezuelans under the Maduro regime, as compared to other countries.



**Chart A: Historic Venezuelan Migrant Exodus from Venezuela**

(millions of migrants)



(years following start of migration episode)

More than 7 million Venezuelans have left the country since 2015, with 1.4 million more expected to migrate by 2025.

*Source*: Report | International Monetary Fund | "Venezuela's Migrants Bring Economic Opportunity to Latin America" | 7 December 2022 | https://www.imf.org/en/News/Articles/2022/12/06/cf-venezuelas-migrants-bring-economic-opportunity-to-latin-america | accessed on 6 September 2024.

Chart B highlights the increase in Venezuelan citizens who have been encountered by the CBP at and between US ports of entry between October 2019 and July 2024.

**Chart B: Citizens of Venezuela: CBP Encounters at and Between Ports of Entry**



At the Ports of Entry (CBP Office of Field Operations)
Between the Ports of Entry (Border Patrol)

*Source:* Report | Advocacy for Human Rights in the Americas | "Citizens of Venezuela: CBP Encounters At and Between Ports of Entry" | 26 August 2024 | https://borderoversight.org/2024/08/26/cbp-encounters-with-citizens-of-venezuela/ | accessed on 6 September 2024 | The Washington Office on Latin America (WOLA) is a US non-governmental organization (NGO) whose stated goal is to promote human rights, democracy, and social and economic justice in Latin America and the Caribbean.

# Estimative Language

Analytic products must indicate and explain the basis for the uncertainties associated with major analytic judgments, accomplished through the use of estimative language. Estimative language consists of two elements: (1) A likelihood statement assessing the development of a threat (2) Level of confidence in the sources and the analytic reasoning supporting the judgment.

Assessments/Judgments are not intended to imply statements of fact. They are based on collected information, which is often incomplete or fragmentary, as well as logic, argumentation, and precedents.

## Expressions of Likelihood

IC Directive 203, issued on 2 January 2015, states products meeting ODNI analytic standards must express and explain uncertainties associated with analytic judgments. This standard is met in part by expressing likelihood in an analytic judgment.

Phrases such as "the FBI judges" and "the FBI assesses," and terms such as "likely" and "probably" convey analytical judgments and assessments. The chart below approximates how expressions of likelihood and probability correlate with percentages of chance. Only terms of likelihood should appear in FBI products; the chart includes terms of probability strictly for comparison, as they sometimes appear in reporting from other government agencies. Furthermore, the FBI does not arrive at judgments through statistical analysis and will not use terms of probability to convey uncertainty in FBI external intelligence products.

| Terms of Likelihood | Almost No Chance | Very Unlikely | Unlikely | Roughly Even Chance | Likely | Very Likely | Almost Certain(ly) |
|---|---|---|---|---|---|---|---|
| Terms of Probability | Remote | Highly Improbable | Improbable (Improbably) | Roughly Even Odds | Probable (Probably) | Highly Probable | Nearly Certain |
| Percentages of Chance | 1-5% | 5-20% | 20-45% | 45-55% | 55-80% | 80-95% | 95-99% |

Table showing terms of likelihood aligned with terms of probability and percentages of chance.

## Confidence Level Definitions

(U) Confidence levels reflect the quality and quantity of the source information supporting a judgment. Consequently, the FBI ascribes high, medium, or low levels of confidence to assessments, as follows:

**High confidence** generally indicates the FBI's judgments are based on high-quality information from multiple sources. High confidence in a judgment does not imply the assessment is a fact or a certainty; such judgments might be wrong. While additional reporting and information sources may change analytical judgments, such changes are most likely to be refinements and not substantial in nature.

**Medium confidence** generally means the information is credibly sourced and plausible but not of sufficient quality or corroborated sufficiently to warrant a higher level of confidence. Additional reporting or information sources have the potential to increase the FBI's confidence levels or substantively change analytical judgments.

**Low confidence** generally means the information's credibility or plausibility is uncertain, the information is too fragmented or poorly corroborated to make solid analytic inferences, or the reliability of the sources is questionable. Absent additional reporting or information sources, analytical judgments should be considered preliminary in nature.

## Endnotes

[1] (U) FBI INFORMATION | 24 January 2024 | November 2023 | "[TITLE REDACTED]."

[2] (U) FBI INFORMATION | 24 April 2024 | February 2024 | "[TITLE REDACTED]."

[3] (U) FBI INFORMATION | 24 May 2024 | February 2023 | "[TITLE REDACTED]."

[4] (U) FBI INFORMATION | 23 August 2023 | 16 August 2023 | "[TITLE REDACTED]."

[5] (U) Report | European Union Agency for Asylum | "Venezuela – Country Focus" | November 2023 | https://euaa.europa.eu/publications/venezuela-country-focus | accessed on 24 April 2024 | EUAA is an agency created by European Union regulation 439/210 to increase cooperation among member states on asylum.

[6] (U) News article | Al Jazeera | "Venezuela: Who are the colectivos?" | 9 May 2019 | https://www.aljazeera.com/features/2019/5/9/venezuela-who-are-the-colectivos | accessed on 24 April 2024.

[7] (U) News article | *The Washington Post* | "Maduro's muscle: Politically backed motorcycle gangs known as 'colectivos' aree the enforcers for Venezuela's authoritarian leader" | 14 March 2019 | https://www.washingtonpost.com/world/the_americas/maduros-muscle-politically-backed-motorcyle-gangs-known-as-colectivos-are-the-enforcers-for-venezuelas-authoritarian-leader/2019/03/13/2242068c-4452-11e9-94ab-d2dda3c0df52_story.html | accessed on 1 July 2024.

[8] (U) News article | Al Jazeera | "Chile calls for the extradition of Venezuelans after dissident's murder" | 12 April 2024 | https://www.aljazeera.com/news/2024/2/12/chile-calls-for-the-extradition-of-venezuelans-after-dissidents-murder | accessed on 24 April 2024.

[9] (U) News Broadcast | Bogota Caracol Television in Spanish | "Venezuelan 'Spies,' Transnational 'Criminal Gang' Members Attack Exiled Maduro Opponents Living in Colombia, Chile" | 31 March 2024 | [URL unavailable] | accessed on 3 May 2024 | Caracol Television is a member of the Latin American Information Alliance, the Ibero-American Telecommunications Organization (OTI), the Consortium of National Private Channels and Asomedios.

[10] (U) News article | *El Pais* | "Fear, Sadness, and Suspicion: the funeral of Ronald Ojeda, the former Venezuelan military officer killed in Chile by Tren de Aragua" | 8 March 2024 | http://elpais.com/chile/2024-03-09/miedo-trizteza-y-sospechas-el-funeral-de-ronald-ojeda--el-exmilitar-venezolano-asesinado-en-chile-por-el-tren-de-aragua.html | accessed on 11 July 2024 | El Pais is a widely distributed Spanish newspaper.

[11] (U) News article | *Wall Street Journal* | "Maduro Allies Hunt Dissidents Abroad Ahead of Venezuela's Election" | 24 July 2024 | https://www.wsj.com/world/americas/venezuela-maduro-elections-f6baa913 | accessed on 12 November 2024.

[12] (U) Website | InSight Crime | "Tren de Aragua" | 12 July 2024 | https://insightcrime.org/venezuela-organized-crime-news/tren-de-aragua/ | accessed on 5 October 2024.

Exhibit D

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| *J.G.G., et al.,* | |
| *Petitioners-Plaintiffs,* | |
| v. | No. 1:25-cv-766 (JEB) |
| *DONALD J. TRUMP, et al.,* | Declaration Of Deputy Assistant Director |
| *Respondents-Defendants.* | Selwyn Smith |

**SUPPLEMENTAL DECLARATION OF SELWYN SMITH**

I, Selwyn Smith, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am a Deputy Assistant Director ("DAD") for Homeland Security Investigations ("HSI") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      As the DAD of Countering Transnational Organized Crime, Public Safety and Border Security division ("PSBS"), I oversee a wide variety of investigative and special operations programs targeting Transnational Criminal Organizations involved in human smuggling, narcotics trafficking, racketeering and violent gang activity as well as other crimes enforced by HSI. These programmatic areas support the targeting of cross border criminal organizations that exploit America's legitimate trade, travel, and financial systems for illicit purposes.

1

33

3.      I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act (AEA).

4.      I provide this supplemental declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business. I incorporate by reference my previously filed declaration in this matter and add the following.

5.      HSI is aware that members of TdA have previously exploited the irregular migration of Venezuelan nationals coming to the United States. As such, these subjects were able to infiltrate cities across America and engage in opportunistic criminal activities.

6.      Since January 20, 2025, HSI has conducted 1,238 arrests involving TdA members or affiliates. Of that number, 384 were criminal arrests and 854 were administrative arrests.

7.      Members of TdA pose an extraordinary threat to the American public. Such a serious threat must be carefully vetted. HSI uses a variety of tools to identify individuals as members of TdA. ICE utilizes specific gang criteria which is applied to each subject to assess gang affiliation. Specifically, HSI identifies members based on the results of investigative techniques and information such as previous criminal convictions for TdA-related activities, surveillance, law enforcement encounters, interviews, computer indices checks, association with other known gang members, and self-identification.  HSI's process for identifying gang members has been in effect since 2005 and has proven to support legal sufficiency in administrative and criminal arrests. This criteria is considered law enforcement privileged as the disclosure of which could significantly impact ongoing and future investigations. For instance, TdA members are

proactive in concealing tattoos or no longer getting tattoos that could reveal their association with TdA.

8.      We have seen atrocious violent acts across the country from TdA members. For instance, HSI arrested five (5) TdA members who threatened to cut off an elderly woman's fingers during a home invasion and robbery at gunpoint. This elderly woman was tied up in her own home and pistol-whipped. In a separate home invasion in Utah, three TdA members forced their way into a residence and assaulted an occupant, who had previously fled from the TdA members after being forced into commercial sex work. In New York, six (6) TdA members were recently indicted on racketeering activity that included murder, robbery, extortion, and drug trafficking. In another case in New York, twenty-one (21) TdA members and associates were indicted for, among other things, human smuggling, sex trafficking and rape of young women, firearm trafficking, and murder. In New Mexico, HSI identified a TdA cell involved in commercial sex trafficking where victims were threatened at gunpoint to perform sex acts with 4 to 8 clients per day. After a large-scale long-term law enforcement operation, HSI arrested 15 members of TdA for sex trafficking and murder.

9.      TdA members continue to be involved in heinous illicit activity to invoke fear and supremacy in neighborhoods and with the general population. This has been evident from a significant number of investigations and arrests throughout most of the nation where TdA members coalesce to conduct their atrocious criminal acts.

10.     Continuing to hold hundreds of members of a designated Foreign Terrorist Organization, where there is an immediate mechanism to remove them, would be irresponsible. Within Venezuela, TdA was able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. Keeping them in ICE custody

where they could potentially continue to recruit new TdA members poses a grave risk to ICE personnel; other, nonviolent detainees; and the United States as a whole.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of May 2025.

SELWYN J SMITH
Digitally signed by SELWYN J SMITH
Date: 2025.05.09 10:50:20 -04'00'

_____
Selwyn Smith
Deputy Assistant Director
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Exhibit E

## IN THE SUPREME COURT OF THE UNITED STATES

A.A.R.P., ET AL.,

    *Applicants*,

v.

DONALD J. TRUMP, PRESIDENT OF
THE UNITED STATES, ET AL.

No. 24A1007

## <u>DECLARATION OF JOSHUA D. JOHNSON</u>

I, Joshua D. Johnson, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am employed by U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). I currently serve as the Acting Field Office Director for the Dallas Field Office. In this role, I supervise ERO personnel and activity within the Dallas area of responsibility (AOR). I have held this position since February 9, 2025.

2.      I began my law enforcement career in 2008 as an Immigration Enforcement Agent in the ERO Dallas Field Office and have previously served as a Deportation Officer, Supervisory Detention and Deportation Officer, Assistant Field Office Director, and Deputy Field Office Director.

3.      I provide this declaration based on my personal knowledge, belief, reasonable inquiry, and information obtained from various records, systems, databases, other DHS

employees, employees of DHS contract facilities, and information portals maintained and relied upon by DHS in the regular course of business.

4.      I am aware of the above-captioned litigation.

5.      I submit this declaration to describe the size of the putative class and illustrate the challenges the Court's orders pose for ICE.

6.      ICE estimates it currently detains approximately 176 putative class members at several facilities within the Dallas AOR that house immigration detainees.

7.      Of the 176 putative class members within the Dallas AOR, approximately 27 are subject to final orders of removal and amenable to removal pursuant to Title 8 authorities.

8.      Of the 176 putative class members within the Dallas AOR, 121 are amenable to expedited removal pursuant to section 235(b) of the Immigration and Nationality Act.

9.      Venezuelan members of Tren de Aragua ("TdA") have proven difficult to manage in immigration detention facilities. For example, on April 26, 2025, 23 detainees, all TdA members, refused their breakfast trays and barricaded both the front and rear entrance doors of their housing unit using bed cots. The detainees covered the surveillance cameras and blocked the housing unit windows. The detainees threatened to take hostages and injure facility contract staff and ICE officers. The detainees also attempted to flood the housing unit by clogging toilets. The detainees failed to comply with orders to dismantle the barricades and were barricaded in the housing unit for several hours.

10.      On May 4, 2025, those 23 detainees were relocated from the Bluebonnet Detention Facility (Bluebonnet) located in Anson, Texas to the Prairieland Detention Center (Prairieland) located in Alvarado, Texas.

11.     Relocating the detainees to Prairieland was necessary because the organized and coordinated nature of the detainee misconduct threatened the security, safety, and order of the Bluebonnet facility and posed a risk to other detainees, staff, contractors, and any visitors within the facility.

12.     According to open-source intelligence on the gang's operations within Venezuela, TdA was able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. Keeping them in ICE custody where they could potentially continue to recruit new TdA members poses a grave risk to ICE personnel; other, nonviolent detainees; and the United States as a whole.

Signed this 12th day of May 2025,

JOSHUA D JOHNSON

Digitally signed by JOSHUA D JOHNSON
Date: 2025.05.12 14:14:46 -05'00'

_____

Joshua D. Johnson
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security