No. 25-10534

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

W.M.M., F.G.M., A.R.P., et al.,

Petitioners-Appellants,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Respondents-Appellees.

_____

ON APPEAL FROM UNITED STATES DISTRICT COURT OF THE
NORTHERN DISTRICT OF TEXAS
Case No. 1:25-cv-00059-H
Agency Case Numbers:  244-147-155; 249-153-992; 240-730-011
(Detained)

_____

**BRIEF FOR RESPONDENTS-APPELLEES**

_____

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to Assistant Attorney General

NANCY N. SAFAVI
Senior Trial Attorney
Office of Immigration Litigation

JOHN W. BLAKELEY
Senior Counsel

Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Sta.
Washington, D.C. 20044
(202) 514-9875
Nancy.Safavi@usdoj.gov


Attorneys for Respondents-
Appellees

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel certifies that the following listed non-government persons may have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- W.M.M,
- A.R.P.,
- F.G.M,
  Petitioners on their own behalf and on behalf of others similarly situated

- Lee Gelernt
- Daniel Galindo
- Ashley Gorski
- Patrick Toomey
- Sidra Mahfooz
- Omar Jadwat
- Hina Shamsi
- AMERICAN CIVIL LIBERTIES UNION FOUNDATION
- 125 Broad Street, 18th Floor
- New York, NY 10004
  Counsel for Petitioners

- Spencer Amdur
- Noelle Smith
- Oscar Sarabia Roman
- My Khanh Ngo
- Cody Wofsy
- AMERICAN CIVIL LIBERTIES UNION FOUNDATION
- 425 California Street, Suite 700
- San Francisco, CA 94104

- T: (415) 343-0770
  Counsel for Petitioners

- Brian Klosterboer
- Thomas Buser-Clancy
- Savannah Kumar
- Charelle Lett
- Ashley Harris
- Adriana Piñon
- ACLU FOUNDATION OF TEXAS, INC.
- 1018 Preston St.
- Houston, TX 77002
- (713) 942-8146
  Counsel for Petitioners
-
- Kathryn Huddleston*
- AMERICAN CIVIL LIBERTIES UNION FOUNDATION
- 915 15th Street, NW, 7th Floor
- Washington, DC 20005
- T: (212) 549-2500
  Counsel for Petitioners

- Respondents-Appellees are government officials and entities.


s/ Nancy Safavi
NANCY N. SAFAVI
Senior Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 514-9875
Nancy.Safavi@usdoj.gov

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This Court scheduled oral argument in this case for Monday, June 30, 2025, at 2:00 p.m. CDT, in the En Banc Courtroom of the Wisdom Courthouse in New Orleans.  Respondents-Appellees' counsel will attend and present Respondents-Appellees' position.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF JURISDICTION ............................................................. 1

STATEMENT OF THE ISSUES ................................................................ 2

INTRODUCTION .................................................................................... 3

STATEMENT OF THE CASE ................................................................. 7

    I.    The President's Proclamation And The Alien Enemies
        Act ............................................................................................ 7

        A.  The President's March 14 AEA Proclamation ................. 9

    II.   Procedural Background ......................................................... 14

    III.  DHS's Revised Notice Procedures ....................................... 17

SUMMARY OF ARGUMENT ................................................................ 18

STANDARD OF REVIEW ..................................................................... 22

ARGUMENT .......................................................................................... 23

    I.    THE PROCLAMATION IS A LAWFUL EXERCISE OF
        THE PRESIDENT'S BROAD POWERS UNDER THE
        AEA ....................................................................................... 23

        A.   Judicial Review Under the AEA is Extremely
            Limited and Deferential ............................................... 24

        B.   The Proclamation Properly Identifies A
            "Predatory Incursion" And An "Invasion" Under
            The AEA ....................................................................... 28

            1.   TdA has perpetrated, attempted, or
                threatened a "predatory incursion." ................... 29

   2. TdA has perpetrated, attempted, or
    threatened an "invasion." .................................. 41

  C. The Proclamation Properly Identifies A "Foreign
   Nation or Government" Under The AEA ..................... 45

II. THE GOVERNMENT'S REVISED AEA NOTICE
 PROCEDURES SATISFY DUE PROCESS ......................... 50

  A. The Government's AEA Procedures Provide
   Sufficient Opportunity To Seek Habeas Relief ........... 50

  B. Petitioners' Monthlong Notice Regime Is Not
   Legally Required ........................................... 55

  C. Petitioners' Other Procedural Objections Fail ........... 62

IV. PETITIONERS FAIL TO ESTABLISH THE
 REMAINING PRELIMINARY-INJUNCTION
 FACTORS .................................................... 66

  A. Petitioners Have Not Established Irreparable
   Harm ....................................................... 66

  B. The Balance of Equities And Public Interest
   Favor The Government ...................................... 67

CONCLUSION ..................................................... 69

BRIEF FORMAT CERTIFICATION

CERTIFICATE OF SERVICE

## **TABLE OF AUTHORITIES**

## **CASES**

*A.A.R.P. v. Trump,*
    145 S. Ct. 1364 (2025) ............................................................... 2, passim

*A.S.R. v. Trump,*
    2025 WL 1378784 (May 13, 2025) ....................................33, 35, 46, 62

*Adams v. Vance,*
    570 F.2d 950 (D.C. Cir. 1978) ...........................................................66, 67

*American Ins. Ass'n v. Garamendi,*
    539 U.S. 396, 414, S. Ct. 2374 (2003) ..................................................27

*Arevalo v. Trump,*
    2025 WL 1554183 (C.D. Cal. June 2, 2025) ........................... 23, passim

*Boumediene v. Bush,*
    553 U.S. 723, 128 S. Ct. 2229 (2008) ...................................................46

*California v. United States,*
    104 F.3d 1086 (9th Cir. 1997) ...............................................................26

*Carson v. Am. Brands, Inc.,*
    450 U.S. 79, 101 S. Ct. 993 (1981) .........................................................2

*Chiles v. United States,*
    69 F.3d 1094 (11th Cir. 1995) ...............................................................26

*Citizens Protective League v. Clark,*
    155 F.2d 290 (D.C. Cir. 1946) ...................................................9, 23, 55

*D.B.U. v. Trump,*
    No. 25-cv-1163 (D. Colo. Apr. 12, 2025) .................................18, 54, 61

*DHS v. Thuraissigiam,*
    591 U.S. 103, 140 S. Ct. 1959 (2020)................................51, 53, 56, 59

*Ex parte Gilroy,*
    257 F. 110 (S.D.N.Y. 1919) ...................................................................58

*Ex parte Graber*,
    247 F. 882 (N.D. Ala. 1918) .................................................. 9

*Ex parte Risse*,
    257 F. 102 (S.D.N.Y. 1919) .............................................. 57

*G.F.F. & J.G.O.* v. *Trump*,
    No. 25-cv-2886 (S.D.N.Y. Apr. 8, 2025) .............................. 18

*G.F.F. v. Trump*,
    No. 25 CIV. 2886 (AKH), 2025 WL 1301052 (S.D.N.Y. May 6, 2025)
    ........................................................................ 54, 55, 61

*Gutierrez-Contreras v. Warden*,
    No. 5:25-CV-00965-SSS-KES, 2025 WL 1202547 (C.D. Cal. Apr. 25,
    2025) ................................................................... 61

*Hamama v. Adduci*,
    912 F.3d 869 (6th Cir. 2018) ............................................ 64

*Holder v. Humanitarian Law Project*,
    561 U.S. 1, 130 S. Ct. 2705 (2010) ................................ 27, 45

*Huidekoper's Lessee v. Douglas*,
    7 U.S. 1 (1805) ........................................................ 36

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) .......................................... 64

*J.A.V. v. Trump*,
    2025 WL 1257450 (S.D. Tex. May 1, 2025) ...................... 36, 38, 46, 62

*J.G.G. v. Trump*,
    No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) .............. 7, 36

*Kiyemba v. Obama*,
    561 F.3d 509 (D.C. Cir. 2009) .......................................... 64

*Lindsey v. Normet*,
    405 U.S. 56, 92 S. Ct. 862 (1972) ...................................... 52

*Little v. Llano County,*
  __ F.4th __, 2025 WL 1478599 (2025) ................................................ 22

*Lockington v. Smith,*
  15 F. Cas. 758 (C.C.D. Pa. 1817) ...................................................... 8, 9

*Ludecke v. Watkins,*
  335 U.S. 160, 69 S. Ct. 85 (1948) ............................................ 4, passim

*Mathews v. Eldridge,*
  424 U.S. 319, 96 S. Ct. 893 (1976) ..................................................... 52

*Morrissey v. Brewer,*
  408 U.S. 471, 92 S. Ct. 2593 (1972) .................................................... 52

*Morton v. Mancari,*
  417 U.S. 535, 94 S. Ct. 2474 (1974) .................................................... 63

*Munaf v. Geren,*
  553 U.S. 674, 128 S. Ct. 2207 (2008) ...................................... 62, 64, 65

*New Jersey v. United States,*
  91 F.3d 463 (3d Cir. 1996) ................................................................ 26

*Nishimura Ekiu v. United States,*
  142 U.S. 651, 12 S. Ct. 336 (1892) ..................................................... 59

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................... 65, 66

*Padavan v. United States,*
  82 F.3d 23 (2d Cir. 1996) ................................................................. 26

*Ramirez-Osorio v. INS,*
  745 F.2d 937 (5th Cir. 1984) ............................................................. 57

*The Japanese Immigrant Case,*
  189 U.S. 86, 23 S. Ct. 611 (1903) ................................................. 52, 60

*Trump v. J.G.G.,*
  145 S. Ct. 1003 (2025) ............................................................ 4, passim

*TVA v. Hill,*
  437 U.S. 153, 98 S. Ct. 2279 (1978) .................................................. 63

*United States ex rel. Kessler v. Watkins,*
  163 F.2d 140 (2d Cir. 1947) ........................................................... 25

*United States ex rel. Schlueter v. Watkins,*
  67 F. Supp. 556 (S.D.N.Y. 1946) .................................................... 58

*United States ex rel. Von Heymann v. Watkins,*
  159 F.2d 650 (2d Cir. 1947) ........................................................... 62

*Wong Yang Sung v. McGrath,*
  339 U.S. 33, S. Ct. 445 (1950) ....................................................... 59

*Worcester v. Georgia,*
  31 U.S. 515 (1832) .......................................................................... 32

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
  576 U.S. 1, 135 S. Ct. 2076 (2015) ................................................ 27

## STATUTES

### Immigration and Nationality Act of 1952, as amended:

Section 219(a)(1),
  8 U.S.C. § 1189(a)(1) ............................................................... 11, 34

Section 219(d)(4),
  8 U.S.C. § 1189(d)(4) ............................................................... 11, 34

Section 212 (b)(3)(B),
  8 U.S.C. § 1182(b)(3)(B) ............................................................... 13

Section 237(a)(4)(B),
  8 U.S.C. § 1227(a)(4)(B) .......................................................... 13, 65

Section 241(b)(2),
  8 U.S.C. § 1231(b)(2) ..................................................................... 65

Section 235(b),
   8 U.S.C. § 1225(b) .................................................................... 51

Section 235(b)(1)(A)(i),
   8 U.S.C. § 1225(b)(1)(A)(i) ....................................................... 51

Section 235(B)(iii)(III)
   8 U.S.C. §1225(B)(iii)(III) ......................................................... 51

Section 240(a)(3),
   8 U.S.C. § 1229a(a)(3) ................................................................ 63

## Other Statues:

28 U.S.C. § 1292(a)(1) ....................................................................... 2

50 U.S.C. § 21 ................................................................... 3, passim

50 U.S.C. § 22 ........................................................... 8, 48, 62

50 U.S.C. § 23 ................................................................................ 8

50 U.S.C. § 24 ................................................................................ 8

50 U.S.C. § 4302(a) ....................................................................... 38

## REGULATIONS

6 Fed. Reg. 6321 ............................................................................. 9

10 Fed. Reg. 12189 ........................................................................ 55

27 Fed. Reg. 12617 ........................................................................ 55

27 Fed. Reg. 12619 ........................................................................ 55

90 Fed. Reg. 10,030 ....................................................................... 12

90 Fed. Reg. 13,033 (Mar. 20, 2025) ................................. 3, passim

90 Fed. Reg. 13,034 ................................................................. 12, 47

Exec. Order No. 14,157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8439 (Jan. 29, 2025) ................................ 35, 67

## OTHER AUTHORITIES

Christian Bahnareanu, *The Evolution of Warfare from Classic to Hybrid Actions*, 55 Strategic Impact 55 (2015) ......................................... 33, 37

Frederick Barlow, The Complete English Dictionary or, General Repository of the English Language (1772-1773) ......................... 39, 40

Gregory E. Fehlings, *America's First Limited War*, 53 Naval War College Rev. 101, 108 (2000) ............................................. 31,39

J. Gregory Sidak, *War, Liberty and Enemy Aliens*, 67 N.Y.U. L. Rev. 1402, 1406 (1992) ........................................................ 31,38

James Morton Smith, *Freedom's Fetters: The Alien and Sedition Laws and American Civil Liberties* 49 (1956) ................................ 40

John Ash, *The New and Complete Dictionary of the English Language* (1775) ...................................................................... 41

*Johnson's Dictionary*, "Invader" (1773) .................................... 41

Jonathan Limehouse, *Colorado Apartment to Close After Multiple Arrests, Claims of Venezuelan Gang Takeover*, USA Today (Jan. 14, 2025), https://www.usatoday.com/story/news/nation/2025/01/14/the-edge-at-lowry-apartments-aurora-colorado/77694475007 ................. 43

Nathan Bailey, A Universal Etymological English Dictionary (25th ed. 1783) ...................................................................... 40

Nicole C. Brambila, *Venezuelan TdA Gang Uses Similar Aurora Tactics to Take Over Building in San Antonio, Texas*, Denver Gazette (Dec. 21, 2024), https://denvergazette.com/news/immigration/venezuelan-gang-aurora-san-antonio-apartments-takeover/article_fc65e418-8d5e-11ef-bb8b-7fc830f6fa36.html ................................................. 44

Noah Webster, *An American Dictionary of the English Language* (1828) ...................................................................29

Office of the Historian, *Barbary Wars, 1801–1805 and 1815–1816,* https://history.state.gov/milestones/1801-1829/barbary-wars ............32

Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Power of States*, 13 Brit. J. Am. Legal Stud. 21 (2024) ......................................................................41, 42

Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773) 29

David Currie, *The Constitution in Congress:  The Federalist Period, 1789-1801*, at 254 (1997)...............................................31, 39

Stephen I. Vladeck, *Enemy Aliens, Enemy Property, and Access to the Courts*, 11 Lewis & Clark L. Rev. 963, 968 (2007) .............................31

Thomas Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789)..........................................................................40

*Tren de Aragua: From Prison Gang to Transnational Criminal Enterprise*, InSight Crime (Oct. 2023), https://insightcrime.org/wp-content/uploads/2023/08/Tren-de-Aragua-From-Prison-Gang-to-Transnational-Criminal-Enterprise-InSight-Crime-Oct-2023-1.pdf..43

No. 25-10534

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

W.M.M., F.G.M., A.R.P., et al.,

Petitioners-Appellants,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Respondents-Appellees.

_____

ON APPEAL FROM UNITED STATES DISTRICT COURT OF THE
NORTHERN DISTRICT OF TEXAS
Case No. 1:25-cv-00059-H
Agency Case Numbers:  244-147-155; 249-153-992; 240-730-011
(Detained)

_____

**BRIEF FOR RESPONDENTS-APPELLEES**

_____

## STATEMENT OF JURISDICTION

The district court entered its order for the first motion for a
temporary restraining order on April 17, 2025, and on the following day,
Petitioners sought emergency relief, including a second motion for a
temporary restraining order.  This is an appeal from the district court's

inaction on that motion. This Court has jurisdiction under 28 U.S.C. §1292(a)(1) to "review interlocutory orders that have 'the practical effect of refusing an injunction.'" *A.A.R.P. v. Trump*, 605 U.S. \_, \_ (2025) (citing *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84, 101 S. Ct. 993 (1981)).[1]

## STATEMENT OF THE ISSUES

I.     Whether the Government is likely to succeed on the merits because, under the highly deferential and limited judicial review available under the Alien Enemies Act, the President acted within his authority in finding that (A) TdA has perpetrated, attempted, or threatened a "predatory incursion" or "invasion," (B) carried out by a "foreign nation or government."

II.     Whether the Government's revised AEA notice procedures comport with the Due Process Clause and statutory procedural requirements.

III.     Whether the balance of equities favor the Government.

---

[1]  Citations to "ROA." refer to the Record of Appeal filed with the Court on Monday, June 2, 2025.  The ROA was updated and fully complete on June 27, 2025.

2

## **INTRODUCTION**

The President has determined that thousands of members of a foreign terrorist organization—Tren De Aragua (TdA)—have illegally "infiltrated" this Nation at the behest of a hostile foreign power, Venezuela. Proclamation No. 10.903, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. at 13,033 Mar, 20, 2025). TdA members are working to "destabiliz[e] … the United States" by "undertaking hostile actions and conducting irregular warfare" at the direction of the Maduro Regime in Venezuela. *Id.* Like many Presidents faced with hostile foreign incursions into the United States, President Trump has decided to address that threat by exercising his powers under the Alien Enemies Act (AEA), 50 U.S.C. §21 et seq., which authorizes the summary removal of certain enemy aliens where a foreign nation or government is engaged in "invasions or predatory incursions" of U.S. territory.

The Supreme Court recently held that aliens subject to removal under the AEA "must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief" before removal. *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367, 1370 (2025).

In response, the Executive Branch has revised its procedures for facilitating the expedient but responsible removal of enemy aliens. Before any such alien is removed, he will be given notice in a language he understands, information about how to challenge his removal, the option to request a list of available attorneys, and seven days to file a habeas petition. That process—and the Proclamation it implements— are plainly lawful. This Court should accordingly direct the district court to dismiss Petitioners' habeas petitions.

To start, Petitioners' challenges to the Proclamation itself fail because the AEA grants the President a near "unlimited" authority to identify and countermand foreign invasions or predatory incursions. *Ludecke v. Watkins*, 335 U.S. 335 160, 170, 69 S. Ct. 85 (1948). By the same token, the AEA gives the courts an exceedingly limited role, consistent with their institutional "competence" and constitutional "responsibility." *Id.* Petitioners seek to invert that allocation of authority. They ask this Court to set aside the President's judgment and decide for itself whether thousands of members of a designated foreign terrorist organization, who have poured across the border at the direction of a hostile foreign nation and appear poised to conduct targeted killings

4

and sow terror, really constitute a "predatory incursion" or "invasion." That kind of second-guessing is not the role of the Judiciary and in all events misreads the AEA. Not only does the Proclamation fall comfortably within the AEA's text and history; it clearly satisfies the deferential inquiry that must guide any judicial review here.

Petitioners' challenge to the current AEA removal procedures fares no better. Again, enemy aliens now receive notice of their designation, information about how to challenge any such removal, and ample time to do so. That is more than sufficient for any enemy alien to "actually seek habeas relief in the proper venue before such removal occurs." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025). Petitioners nonetheless insist that the Constitution compels enemy aliens receive at least one month to even file a habeas petition. That arbitrary figure lacks any legal mooring and would outpace what aliens receive in analogous immigration contexts like expedited removal. Petitioners also demand that all enemy aliens should receive the factual basis for their detention before they decide whether to pursue habeas. But that is neither necessary nor prudent. Once an alien is detained under the AEA, and so informed, he knows everything he needs to file a habeas petition contesting his detention—

i.e., saying he is not in fact a TdA member.  Further, to the extent it is appropriate for the Government to disclose its evidence at any point, it should be during habeas proceedings, where the Government can adequately protect any national-security sensitivities.

The equities and public interest similarly cut against a preliminary injunction.  Petitioners ask this Court to pretermit a national-security decision issued by the President of the United States, pursuant to his statutory authority and unique constitutional perspective.  On the other side of the ledger, Petitioners offer nothing more than generic concerns about improper removal.  But the procedures here exceed what is offered in analogous contexts like expedited removal and give enemy aliens more than ample opportunity to demonstrate they are not members of TdA.  In short, nothing in the AEA, Constitution, or public interest supports Petitioners' arguments.

## STATEMENT OF THE CASE

### I.    The President's Proclamation And The Alien Enemies Act

Enacted in 1798, the AEA grants the Executive broad power to designate, detain, and remove enemy aliens from the United States not only during a "declared war," but also in response to a "threatened"

"invasion or predatory incursion."  Indeed, the Act was enacted at the start of the Quasi-War, when French privateers (privately owned ships licensed by the government) were seizing American ships but there was no declared war with France.  *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8 (D.C. Cir. Mar. 26, 2025) (Henderson, J. concurring).

The first sentence of Section 21—the Act's most significant source of authority—provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

50 U.S.C. §21.  Section 21's second sentence elaborates on related powers:

> The President is authorized in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety.

*Id*.    The Act's remaining provisions outline procedures for implementing the President's broad authority.  Section 22 provides that "an alien who becomes liable as an enemy" but who "is not chargeable with actual hostility, or other crime against the public safety," may be afforded some time to settle his affairs before departing from the United States.  50 U.S.C. §22.  Section 23 provides an optional process by which an alien enemy can be ordered removed by a federal court following a complaint.  50 U.S.C. §23; *see Lockington v. Smith*, 15 F. Cas. 758, 761 (C.C.D. Pa. 1817) (Washington, J.) (endorsing AEA removals outside the Section 23 process).  And Section 24 prescribes the marshal of the district's role in implementing AEA removal orders.  50 U.S.C. §24.

Presidents have repeatedly relied on the AEA to detain and remove alien enemies.  During the War of 1812, President Madison "require[d] the subjects of the enemy" to report to the local marshal, be removed from residing "within forty miles of tide water," or else be "taken into custody by the marshal." *Lockington*, 15 F. Cas. at 759.  Upon entering World War I, President Wilson issued several proclamations regarding enemy aliens, including that citizens of Austria-Hungary "who may be at large to the danger of the public peace or safety" "will be subject to summary

arrest by the United States marshal." *Ex parte Graber*, <u>247 F. 882, 883,</u> <u>887</u> (N.D. Ala. 1918).   In World War II, President Roosevelt issued proclamations for citizens of each Axis power, heavily restricting their movements and providing that those "deemed dangerous to the public peace or safety of the United States by the Attorney General or the Secretary of War, as the case may be, are subject to summary apprehension." <u>6 Fed. Reg. 6321</u>.  Those proclamations, and the resulting regulations, were "less, rather than greater, in scope than the Act." *Citizens Protective League v. Clark*, <u>155 F.2d 290, 295</u> (D.C. Ci<u>r. 1946</u>).

## A.  The President's March 14 AEA Proclamation

Tren de Aragua (TdA) is a transnational criminal organization that is supported and directed by members of the Maduro regime in its endeavors.   <u>ROA.1201-04</u>, *FBI Intelligence Assessment: Venezuelan Government Officials Use Tren de Aragua to Undermine Public Safety*, 23 January 2025; <u>ROA.1188</u>, Charles Declaration, at ¶ 7.  The group originated in Venezuelan prisons, growing rapidly by extorting inmates and ultimately seizing control of the prison in Tocoron where it began. <u>ROA.1188</u>, at ¶7.   TdA has since expanded—first to neighboring countries, and, by leveraging Venezuelan nationals' migration flow, into

North America.  ROA.1191-94, Smith Declaration, at ¶¶9, 12, 15-16.  TdA has "conducted kidnappings, extorted businesses, bribed public officials, authorized its members to attack and kill U.S. law enforcement, and assassinated a Venezuelan opposition figure."    Office of the Spokesperson, Dep't of State, Designation of International Cartels (Feb. 20, 2025).

Now, TdA has infiltrated the United States.  Over the past three years, TdA had established a strong presence in "at least 40 states" and Canada.  *Id.*  Further, TdA's proliferation in the United States has fostered crime and endangered communities, as TdA members have committed murder, robbery, human smuggling, human trafficking, sex trafficking, hostage taking, kidnapping, narcotics trafficking, and firearms violations.  ROA.1192-93 at ¶6, ROA.1194-95 at ¶12, ROA.1195-96 at ¶ 16, ROA.1197-99 at ¶¶ 23-25.  TdA has been involved in complex robbery, extortion, and sex trafficking rings from New York to Nashville to Denver.  ROA.1196-97 at  ¶¶17-18, 20.  TdA has even taken over territory—including several apartment complexes across the country, including one in Aurora, Colorado where TdA members kidnapped and abused Venezuelan migrants.  ROA.1192-96 at ¶¶6, 19.

Behind TdA stands Venezuela, which has used groups like TdA to intimidate, kidnap, and kill dissidents abroad. ROA.1204,. The FBI has assessed it is "likely" that Venezuela will similarly "leverage TdA members in the United States as proxy actors to threaten, abduct, and kill members of the US-based Venezuelan diaspora who are vocal Maduro critics," *id.*, as part of Venezuela's long-term strategy to "destabilize" democratic countries, including the United States, by releasing TdA members from prison and directing and financing them to create "political, social, and security issues" for the United States. ROA.1201-03. The FBI has determined that Maduro himself oversees decisions to use TdA strategically. *Id.*

Shortly after President Trump took office, the Secretary of State designated TdA as a "foreign terrorist organization." 90 Fed. Reg. 10,030. That designation reflects the Secretary's finding that TdA engages in "terrorist activity" or "terrorism" or "retains the capability and intent" to do so, and thereby "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. §1189(a)(1), (d)(4).

On March 14, 2025, the President signed a proclamation invoking his authorities under the AEA, 50 U.S.C. §21 et seq., against TdA

members, citing TdA's entwinement with Venezuela and its hostile designs on the United States. *See* 90 Fed. Reg. 13,033. That Proclamation outlines the President's findings that TdA members meet the AEA's statutory criteria for removal. The President found that TdA is entwined with Venezuela so as to effectively function as a "hybrid criminal state." *Id.* TdA is "closely aligned with" Maduro's regime in Venezuela, and it has "infiltrated" the regime's "military and law enforcement apparatus." *Id.* Further, through TdA, Venezuela is "conducting irregular warfare and undertaking hostile actions against the United States," *id.*, and "is perpetrating an invasion of and predatory incursion into the United States," posing "a substantial danger" to the Nation. *Id.*

Based on these determinations, the President proclaimed that, pursuant to the AEA, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." 90 Fed. Reg. at 13,034. Further, "all such members of TdA

are" "chargeable with actual hostility against the United States" and "are a danger to the public peace or safety of the United States." *Id.*

The Proclamation also deemed all such TdA members "subject to immediate apprehension, detention, and removal." *Id.* The President directed the "issu[ance of] any guidance necessary to effectuate the prompt apprehension, detention, and removal of all Alien Enemies described" above. *Id.* Aliens apprehended under the Proclamation may be detained until their removal, then may be removed to "any such location as may be directed" by enforcing officers. *Id.*

TdA members remain deportable under other authorities, including under Title 8 as members of a foreign terrorist organization or otherwise. 8 U.S.C. §§1182(b)(3)(B), 1227(a)(4)(B); *see also A.A.R.P.*, 145 S. Ct. at 1370. But the Proclamation authorizes the President to use the AEA's particularly expeditious statutory removal method for particularly dangerous individuals.

Since January 20, 2025, ICE Homeland Security Investigations has "conducted 1,238 arrests involving TdA members or affiliates," 384 of which were criminal. ROA.1215, Smith Supplemental Declaration, at ¶6. ICE has been identifying members of TdA based on "investigative

techniques and information such as previous criminal convictions for TdA-related activities, surveillance, law enforcement encounters, interviews, computer indices checks, association with other known gang members, and self-identification," along with other sensitive law enforcement criteria. ROA.1216-16 ¶7.

## II.     Procedural Background

On April 16, 2025, Petitioners A.R.P. and W.M.M. jointly petitioned for a writ of habeas corpus, ROA.1-22, challenging, *inter alia*, the legality of their detention under the AEA. ROA.17–22. Simultaneously, they moved for a temporary restraining order (TRO), ROA.26-28, and certification of a provisional class of aliens detained pursuant to the AEA, ROA.33-34. The next day, the district court denied the TRO. ROA.234-43.

On April 18, 2025, Petitioners again moved for a TRO. ROA.248-50. The district court ordered the government to respond within 24 hours, but before that TRO was fully briefed, Petitioners filed a notice of appeal, divesting the court of jurisdiction. *See* ROA.556-57. The same afternoon, Petitioners filed an emergency application for an injunction or writ of mandamus with the Supreme Court. *See A.A.R.P.*, 145 S. Ct. at

1034. Early on April 19, 2025, the Fifth Circuit denied the appeal as premature. ROA.557. Almost simultaneously, the Supreme Court issued emergency relief ordering "the government . . . not to remove any member of the putative class . . . until further order of" the Court. *See A.A.R.P*, 145 S. Ct. at 1034.

On May 16, 2025, the Supreme Court vacated this Court's judgment and enjoined the Government from removing class members under the AEA until this Court issues a further decision and the Supreme Court disposes "of the petition for a writ of certiorari." *A.A.R.P.*, 145 S. Ct. at 1367, 1370. The Court held that aliens subject to removal under the AEA "must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief" before removal. *Id.* at 1368. The Court did not specify what process is due, but deemed insufficient "notice roughly 24 hours before removal" that did not contain information on the way to contest removal. *Id.* The Supreme Court remanded the case to this Court to "address (1) all the normal preliminary injunction factors, including likelihood of success on the merits, as to the named plaintiffs' underlying habeas claims that the AEA does not authorize their removal . . . and (2) the issue of what notice is

due, as to the putative class's due process claims against summary removal." *Id.* at 1368, 1370. The Court clarified that the injunction barred removals only "under the AEA," so the government may continue removing class members under Title 8 or other authorities. *Id.* at 1368, 1370.

TdA members have proven difficult and dangerous to keep in detention. There are at least 176 TdA putative class members currently detained in the Dallas area, many of whom have been there since April. ROA.1219, Johnson Declaration, at ¶¶ 7-9. Because TdA members pose a danger to the public, they must be detained, which also limits ICE's ability to detain other criminal aliens by straining bedspace and other resources. ROA.1189 at ¶ 9. And because TdA was founded and grew in prisons, TdA members are adept at recruiting and organizing within prisons through extortion. ROA.1220 at ¶12; ROA.1194 at ¶10, 21. Keeping so many TdA members in detention thus "poses a grave risk to ICE personnel; other, nonviolent detainees; and the United States as a whole." *Id.* For example, on April 26, 23 putative class members "barricaded in the housing unit," covered the surveillance cameras and blocked the housing unit windows, "threatened to take hostages and

16

injure facility contract staff and ICE officers," "attempted to flood the housing unit by clogging toilets," and refused to comply with orders for several hours. ROA.1219 at ¶9. Due to the danger those detainees pose, they had to be moved to another facility. ROA.1220 at ¶ 11.

## III.  DHS's Revised Notice Procedures

In light of *A.A.R.P.*, the Government revised its notice policy for aliens designated for removal under the AEA. *Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act*, ROA.1124-27). The new notice form tells aliens, in a language they can understand, that they can contest their removal under the AEA by filing a habeas petition in the district where they are detained. *Id.* The notice further informs aliens that they may retain counsel, make calls for that purpose, and will be given a list of potential counsel upon request. *Id.*

Alien enemies will be given seven days from receipt of that notice to file habeas petitions, during which time the aliens will not be removed under the AEA. *Id.* Aliens who petition for habeas will not be removed until that petition is resolved. *Id.* Even under the previous notice policy,

numerous aliens have been able to file habeas petitions, including Petitioners.[2]

## SUMMARY OF ARGUMENT

Petitioners ask this Court to enjoin sensitive policy judgments made by the President and the Executive Branch. Petitioners cannot make any of the showings necessary to secure the extraordinary injunction that they request. None of their arguments are likely to succeed on the merits. And the balance of equities cuts strongly against them.

I.     Petitioners are unlikely to succeed in their challenge to the lawfulness of the Proclamation. The AEA allows the President to direct the removal of alien enemies if (1) there is "a declared war," an "invasion," or a "predatory incursion" that is "perpetrated, attempted, or threatened" "against the territory of the United States," 50 U.S.C. §21, and (2) such action is taken by a "foreign nation" or "government," *id.* The President

---

[2] *See, e.g., G.F.F. & J.G.O.* v. *Trump*, No. 25-cv-2886 (S.D.N.Y. Apr. 8, 2025); *J.A.V. v. Trump*, No. 25-cv-72 (S.D. Tex. Apr. 8, 2025); *D.B.U. v. Trump*, No. 25-cv-1163 (D. Colo. Apr. 12, 2025) ; *A.S.R.* v. *Trump*, No. 25-cv-133 (W.D. Pa. Apr. 15, 2025); *A.A.R.P.* v. *Trump*, No. 25-cv-59 (N.D. Tex. Apr. 16, 2025); *Gutierrez-Contreras v. Trump*, No. 25-cv-911 (C.D. Cal. Apr. 14, 2025); *Arevalo Millan v. Trump*, --- F. Supp. 3d ---, 2025 WL 1554183, at *9 (C.D. Cal. June 2, 2025).

properly found both requirements to be satisfied by TdA's actions in the United States, and this Court should not second-guess that judgment.

A.    Judicial review of the AEA is highly limited and extremely deferential to the President's sensitive foreign policy judgments. While courts can interpret statutory language like "incursion," "invasion," and "foreign nation," those terms should be interpreted capaciously given the AEA's breadth, the range of sensitive national-security situations that may arise, and the President's underlying constitutional authority over national security and foreign affairs.

B.    Applying the appropriately deferential form of review, the President properly determined that TdA has "perpetrated, attempted, or threatened" a "predatory incursion" and an "invasion" against U.S. territory. At the time the AEA was enacted, a "predatory incursion" referred broadly to a hostile entry or attack, not necessarily committed by a military force. The President properly found that TdA had made such an incursion into the United States—using illegal mass migration, weapons, and drug trafficking—to destabilize our national security. Petitioners contend that the statute applied only in times of "war" or other military hostilities, but that argument ignores historical context

and fails to give effect to the statute's distinction between "declared war," "predatory incursions," and "invasions." Although the Court need not reach the question, the President also properly found an "invasion"— another term that did not connote military hostilities at the time of the AEA and which covers TdA's dangerous encroachment on U.S. territory.

C. The Proclamation also appropriately identifies a "foreign nation" or "government" under the AEA. Petitioners contend that the President cannot remove TdA members under the AEA because TdA is a "non-state actor." But the President found that TdA is so entwined with the state of Venezuela as to form a "hybrid criminal state." 90 Fed. Reg. at 13,033. That foreign-affairs judgment is owed extreme deference.

II. Petitioners' due-process challenge to the Government's revised notice policy. Under the revised policy, the Government now gives AEA detainees notice of their detention in a language they understand, information about how to challenge it including how to contact counsel, and seven days in which to file a habeas petition before being removed. Notice, ROA.1124-27. Those procedures readily afford aliens a "sufficient" opportunity to "actually seek habeas relief," particularly in light of the Government's countervailing interests in

removing dangerous TdA members swiftly.  *See A.A.R.P.*, 145 S. Ct. at 1368.

Petitioners' other procedural arguments similarly lack merit.  The AEA does not require a period for voluntary departure, as Petitioners contend.  And Petitioners cannot invoke the protections of the INA or the Convention Against Torture, as habeas is the exclusive remedy for judicial review under the AEA.

III.  Petitioners cannot satisfy the remaining preliminary injunction factors.  Although Petitioners contend that they may be removed to a prison in El Salvador with supposedly harsh conditions, they do not explain why enjoining the Proclamation or the Government's notice procedures would prevent those harms, given that they are removable under the INA in any event, including possibly to El Salvador. And on the other side of the balance of harms, the Supreme Court has already "recognize[d] the significance of the Government's national security interests" in this case.  *A.A.R.P.*, 145 S. Ct. at 1368.  The President has determined that TdA and its members pose significant danger to the national security of the United States.  And the record

establishes that their imminent removal is necessary in light of the dangers they have posed and continue to pose while in detention.

## STANDARD OF REVIEW

The Supreme Court instructed this Court to address "all the normal preliminary injunction factors" on remand. *A.A.R.P.*, 145 S. Ct. at 1370. "To obtain the 'extraordinary remedy' of a preliminary injunction," petitioners must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Little v. Llano County*, __ F.4th __, __, 2025 WL 1478599 (2025).

## ARGUMENT

### I.    THE PROCLAMATION IS A LAWFUL EXERCISE OF THE PRESIDENT'S BROAD POWERS UNDER THE AEA

Petitioners are unlikely to succeed on their claim that the Proclamation violates the AEA's statutory requirements.  The AEA authorizes the President to direct the removal of alien enemies if (1) there is an "invasion," or a "predatory incursion" that is "perpetrated, attempted, or threatened" "against the territory of the United States," 50

U.S.C. §21, and (2) such action is taken by a "foreign nation" or "government." *Id.* Especially given the exceedingly limited scope of judicial review under the AEA and the significant deference courts extend to the President's determinations, the Proclamation readily satisfies both conditions.

## A. Judicial Review Under the AEA is Extremely Limited and Deferential

Petitioners' claims under the AEA implicate national security and foreign-policy issues "for which judges have neither technical competence nor official responsibility." *Ludecke v. Watkins*, 335 U.S. 160, 170, 68 S. Ct. 1429 (1948). The AEA grants the President alone discretion to proclaim when an "invasion" or "predatory incursion" by a hostile nation has occurred. 50 U.S.C. §21; *Arevalo v. Trump*, 2025 WL 1554183, at *9 (C.D. Cal. June 2, 2025). And that grant of authority is about "as unlimited as the legislature could make it." *Ludecke*, 335 U.S. at 164 (citation omitted). Courts have thus long recognized that "[u]nreviewable power in the President . . . is the essence of the" AEA. *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946). As the Supreme Court recently put it, the AEA "largely preclude[s] judicial review."

*Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (quoting *Ludecke*, 335 U.S. at 163).

Thus, courts exercising jurisdiction may engage in "limited" judicial review to decide "'questions of interpretation and constitutionality' of the Act.'" *J.G.G.*, 145 S. Ct. at 1006 (quoting *Ludecke*, 335 U.S. at 163 n.17). But in doing so, courts cannot second-guess the President's underlying determinations; the "very nature" of the President's AEA powers "rejects the notion that courts may pass judgment upon the exercise of his discretion." *Ludecke*, 335 U.S. at 164; *accord Arevalo*, 2025 WL 1554183, at *9 ("[A] court cannot decide whether an invasion or a predatory incursion exists without supplanting, to some degree, the President's discretion.").

The Supreme Court's analysis in *Ludecke* underscores just how limited that review is. There, the Supreme Court considered whether the President had lawfully applied the AEA to direct the removal of alien enemies even after Germany had unconditionally surrendered. 335 U.S. at 170. The Court upheld the President's determination that enemy aliens justifiably detained "during active hostilities" retained "their potency for mischief" after hostilities ended. *Id.* In doing so, the Court

engaged in statutory interpretation—it agreed that the statutory term "declared war" does not mean only "actual hostilities." *Id.* at 171. But *Ludecke* "construed the AEA only to the extent necessary to reject the argument that the President had exceeded the scope of his authority under the AEA." *Arevalo*, 2025 WL 1554183, at *8; *see United States ex rel. Kessler v. Watkins*, 163 F.2d 140, 142 (2d Cir. 1947) (construing the AEA terms "invasion" and "predatory incursion" only to reject the argument that the President's authority under the AEA was "limited to times of active hostilities").

Those principles dictate a similarly deferential inquiry here. While courts can parse the terms "incursion," "invasion," and "foreign nation," those terms should be given wide berth given the AEA's breadth, the range of sensitive national-security situations that may arise, and the President's underlying constitutional authority over national security and foreign affairs. Unduly narrow interpretations of terms like "predatory incursion" and "invasion" could preclude "the President from deciding that an 'invasion' occurs if a foreign nation launches an unmanned drone or cyber-attack on the United States or if a foreign military aggressively enters the United States for some purpose other

than assuming control over U.S. territory." *Arevalo*, 2025 WL 1554183, at *9. Courts should not interpret the AEA to hamstring the President in responding to evolving forms of warfare and conflict. *See Ludecke*, 335 U.S. at 164.

Underscoring the point, many determinations that the AEA vests in the President are ones that courts have deemed nonjusticiable political questions in other contexts. Take the question whether the President validly determined that TdA is engaged in a "predatory incursion" or "invasion" under the AEA. Until recently, courts uniformly held that similar challenges under the Constitution's Invasions Clause provided "no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion." *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996) (same). Those courts saw that question as "largely a matter of opinion," rendering it "impossible . . . to reach a conclusion." *Padavan v. United States*, 82 F.3d 23, 27 (2d Cir. 1996) ("Invasion Clause claim is nonjusticiable"); *accord Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995).

Similarly, Petitioners seek to second-guess the President's determination that TdA constitutes a "foreign nation or government." But the President—not the courts—bears the "vast share of responsibility for our foreign relations." *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414, S. Ct. 2374 (2003) (citations omitted). Thus, in matters involving "sensitive and weighty interests of national security and foreign affairs," courts must defer to the "evaluation of facts by the Executive." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34, 130 S. Ct. 2705 (2010); *cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28, 135 S. Ct. 2076 (2015) (observing that the "power to recognize foreign states resides in the President alone"). The determination whether a particular group's incursion or invasion against the United States can be attributed to a foreign nation or government, like the recognition power and other foreign-affairs powers of the President, involves "acute foreign policy concerns" that courts are ill-equipped to second-guess. *Holder*, 561 U.S. at 34.

## B. The Proclamation Properly Identifies A "Predatory Incursion" And An "Invasion" Under The AEA

When the AEA was enacted, a "predatory incursion" meant a coordinated entry into the United States with a common, destructive

purpose. That definition fits TdA's activities to a "T." TdA is a designated foreign terrorist organization that the President determined, based on intelligence sources, is bent upon surreptitiously entering the United States to destabilize our institutions. *See* 90 Fed. Reg. at 13,033 (finding that TdA is using "mass illegal migration" and weapons trafficking to "further its objectives of harming United States citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing … the United States."); *see* FBI Assessment ROA.1204 (discussing threat of TdA "increasing violence" in the United States, "resulting in a loss of confidence in the [Government's] ability to protect free speech and those granted asylum or temporary residency"). Further, although this Court does not need to reach the question, the TdA's hostile actions in U.S. territory also qualify as an "invasion" within the meaning of the AEA. Petitioners instead argue that the terms "predatory incursion" and "invasion" in the AEA require "armed hostilities between military rivals," Br.24, and dismiss TdA as a mere gang engaged in ordinary criminal activity. But Petitioners' cramped reading of the AEA lacks support in the statute's text or history. And Petitioners' attempts to downplay the

28

types of threatening activities that TdA engages in cannot be squared with the deference owed to the President's determinations here.

### 1. TdA has perpetrated, attempted, or threatened a "predatory incursion."

a. The statutory text, structure, and history all demonstrate that the term "predatory incursion" covers a broad range of hostile entries into particular territory—not, as Petitioners would have it, just military aggressions.

i. Starting with the text, contemporary dictionaries defined both "predatory" and "incursion" in broad terms, without reference to formal military warfare. Eighteenth- and nineteenth-century dictionaries defined "incursion" as an "[a]ttack; mischievous occurrence," or an "[i]nvasion without conquest; inroad; ravage." Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773); *see* Noah Webster, *An American Dictionary of the English Language* (1828) ("Literally, a running into; hence entering into a territory with hostile intention; an inroad."). And those dictionaries defined "predatory" to mean "plundering," "pillaging," and "rapine." Johnson, *supra*; Webster, *supra*. Putting those terms together, the contemporaneous meaning of the phrase "predatory incursion" was an entry or attack for a hostile and

29

destructive purpose. The terms did not inherently imply the involvement of an army.

Neighboring statutory text reinforces the plain meaning of "predatory incursion." The AEA applies in times of "declared war" "*or*" "invasion or predatory incursion." 50 U.S.C. §21 (emphasis added). Congress's use of different terms—and the disjunctive—indicates that they should be given different meanings. "Predatory incursion" thus must mean something different from "declared war." Under Petitioners' reading, it does not; both terms cover armed conflicts perpetrated by foreign armies. The Government's reading, by contrast, gives independent effect to the term "predatory incursion."[3]

Neighboring language reinforces that predatory incursions extend beyond armed conflict. The AEA authorizes removal of alien enemies when a predatory incursion (or invasion) has been "perpetrated, *attempted, or threatened* against the territory of the United States." 50

---

[3]    The Supreme Court in *Ludecke* held that the term "declared war" can apply even after "actual hostilities" have ceased. 335 U.S. 160 at 171. But the term requires armed conflict to have occurred at some point. And in any event, the Supreme Court's broad reading of the term "declared war" in *Ludecke* only underscores that the AEA can be invoked without ongoing hostilities.

U.S.C. §21 (emphasis added). That the AEA covers nationals of hostile powers that have merely "attempted" or "threatened" incursions shows that "an actual armed conflict" is not required. *Contra* Br. 25.

Historical context and usage reinforce the statutory text. The impetus for the passage of the AEA was the Quasi-War, an undeclared conflict between the United States and France. *See* David Currie, *The Constitution in Congress: The Federalist Period, 1789-1801*, at 254 (1997); J. Gregory Sidak, *War, Liberty and Enemy Aliens*, 67 N.Y.U. L. Rev. 1402, 1406 (1992). That conflict was largely perpetrated by "French privateers" attacking U.S. merchant vessels. Gregory E. Fehlings, *America's First Limited War*, 53 Naval War College Rev. 101, 108 (2000). Although U.S. ships were being attacked, "[n]o war had yet been declared, but it might break out at any time." David Currie, *The Constitution in Congress: The Federalist Period, 1789-1801*, at 254 (1997). Against that backdrop, the AEA "was meant to give the President broad authority over potential spies and saboteurs at home." Stephen I. Vladeck, *Enemy Aliens, Enemy Property, and Access to the Courts*, 11 Lewis & Clark L. Rev. 963, 968 (2007). Similarly, not long after, the Barbary Wars involved vassal "states" of the Ottoman Empire using

pirates to raid American ships in the Mediterranean. *See* Office of the Historian, *Barbary Wars, 1801–1805 and 1815–1816,* https://history.state.gov/milestones/1801-1829/barbary-wars. The use of pirates or privateers by nations to conduct hostile acts on other nations was common at the time and often seen as akin to an act of war. *Id.* Given the nature of the Quasi-War, it makes sense that Congress would have wanted to ensure that the AEA covered coordinated aggressions broader than "declared war" or other formal, military conflicts— including those committed by mercenaries and proxies. Consistent with that history, the use of the term "incursion" in the eighteenth and nineteenth centuries was not limited to aggressions by organized military forces. For example, in his 1796 address to Congress, President Washington discussed measures to protect American settlements "from the predatory incursions of those unruly individuals who can not be restrained by their tribes." President George Washington, Eighth Annual Address to Congress (Dec. 7, 1796). The "predatory incursion" was not conducted by a tribe's army, but rather by "unruly individuals" who were not necessarily aligned with their tribe. Likewise, in *Worcester v. Georgia*, 31 U.S. 515 (1832), the Supreme Court discussed state

charters that referred to "incursions" by Indians and by "other enemies, pirates, and robbers." *Id.* at 545. Those examples illustrate that an "incursion" did not need to be perpetrated by an army, or other state actors, *contra* Br.29.

Myriad modern examples confirm that the word "incursions" extends beyond formal military operations. *See A.S.R. v. Trump*, 2025 WL 1378784, at *16 (May 13, 2025) (citing examples). One district court canvased modern usage and found many instances in which "incursions" described aggressions committed by "organizations" following "foreign directives," or even "individual[]" terrorists. *Id.* That does not reflect that the words' meanings have changed—the district court noted that they have not, *see id.*—but rather that today's conflicts often involve proxies, guerrillas, and terrorists rather than traditional armies. *See generally* Christian Bahnareanu, *The Evolution of Warfare from Classic to Hybrid Actions*, 55 Strategic Impact 55 (2015).

ii. The Proclamation plainly describes a "predatory incursion" by TdA that is being "perpetrated, attempted, or threatened against the territory of the United States." 50 U.S.C. §21. The Secretary of State has designated TdA a "foreign terrorist organization," *i.e.*, a cohesive

"organization" that "engages in terrorist activity" which "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. §1189(a)(1). In the Proclamation, the President further found that TdA shares with the Maduro regime a common "goal of destabilizing democratic nations in the Americas, including the United States." 90 Fed. Reg. at 13,033–34.

TdA has entered the United States with the hostile purpose of fulfilling that destructive goal. The President has found that TdA operates "both within and outside the United States." *See* Exec. Order No. 14,157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8439 (Jan. 29, 2025). TdA uses "illegal narcotics as a weapon to 'flood' the United States" and destabilize our security. 90 Fed. Reg. at 13,033. TdA engages in "mass illegal migration" and "used drug trafficking as a weapon against our citizens." *Id.* By flooding weapons, drugs, and illegal migrants into the United States, TdA is plainly committing that incursion "against the territory of the United States." 50 U.S.C. §21; *see* Smith Suppl. Decl., ROA.1215-16 at ¶¶5, 8 (describing TdA's infiltration of American cities and violent acts against Americans).

34

Indeed, the FBI believes Venezuela may direct TdA to carry out targeted attacks on Venezuelan dissidents on American soil. *See* FBI Assessment, ROA. 1202. At the very least, that amounts to a "*threatened*" "predatory incursion" against U.S. territory. 50 U.S.C. §21 (emphasis added).

In short, TdA is "certainly united by the common goal of causing significant disruption to the public safety—whether that be the safety of persons, property, or pecuniary interests—of those within the United States." *A.S.R.*, 2025 WL 1378784, at *18. The Proclamation thus properly identifies a "predatory incursion" that is being "perpetrated, attempted, or threatened" by TdA. 50 U.S.C. §21. And critically, the President's findings that TdA's activities rise to the level of a predatory incursion is a sensitive foreign-affairs judgment owed great deference. *See Arevalo*, 2025 WL 1554183, at *9.

b.    Petitioners instead erroneously contend that the AEA applies only in times of "war" or "actual armed conflict" by warring militaries. Br.24-27. Yet they identify no eighteenth-century dictionary that defined "incursion" in expressly military terms. Rather, their sole exemplar includes the definition "attack" or "invasion without conquest." Br.24

35

(quoting Johnson's, *Incursion* (1773)).   But an "attack" frequently describes aggressions by individuals, not just militaries.

Petitioners contend that *Huidekoper's Lessee v. Douglas*, 7 U.S. 1 (1805), used the phrase "predatory incursion" to refer to a military attack—a point echoed by some courts.  *See, e.g.*, *J.G.G. v. Trump*, 2025 WL 914682, at *10 (Mar. 26, 2025) (Henderson, J., concurring); *J.A.V.*, 2025 WL 1257450, at *15-16.   *Huidekoper's Lessee* described Pennsylvania's efforts to secure its borders against "predatory incursions of the Indians" while an "Indian war existed on her frontiers." *Id.* at 11. If anything, that usage illustrates that "predatory incursions" included lesser skirmishes that might be precursors to war, and that guarding against such "predatory incursions" helped prevent full-blown armed conflict.

In any event, Petitioners' examples at most show that the term "predatory incursion" can *also* cover attacks perpetrated by armies or during wartime—not that the term *exclusively* covers those scenarios. And it is hardly surprising that many late 18th century uses of "predatory incursions" referred to military aggressions, given that large-scale

36

conventional battles between armies and militias were then the predominant form of conflict. Bahnareanu, *supra*, at 57-66.

Petitioners claim that other language in the AEA—namely, the phrase "alien enemies"—imposes a military-context limitation that "predatory incursion" might otherwise not. They portray the phrase "alien enemies" as a law-of-nations "term of art" that meant "citizens and subjects of a foreign nation with whom the United States was at war." *Id.* at 24. And they argue that Congress used that term in the AEA to import the concept of "armed hostilities between warring sovereigns." *Id.* But again, the AEA's text refutes that theory: it is not limited to times of "declared war." Congress authorized the President to remove aliens as "alien enemies" whenever there is "a declared war … *or* any invasion or predatory incursion." 50 U.S.C. §21 (emphasis added).

Petitioners' reading of "alien enemy" also ignores the AEA's application to "attempted" or "threatened" predatory incursions. Under Petitioners' theory, the term "alien enemy" encompasses only citizens of nations with which the United States is already at war. But the AEA expressly extends to situations when a foreign nation or government has merely "threatened" an attack on U.S. territory; citizens of such countries

37

qualify as "alien enemies" at that juncture, regardless of whether Congress ultimately declares war or a wider conflict breaks out. <u>50 U.S.C. §21</u>. The President surely could have invoked the AEA against Cuban nationals during the Cuban Missile Crisis based on its threatened incursion, even though no armed conflict came to pass. *See* Sidak, *supra*, 1410. And the President could surely invoke the AEA to order the removal of potential spies from a particular hostile nation if he knew that its government had threatened to launch an attack on U.S. soil. Yet under Petitioners' theory, the President would be hamstrung from responding to such crises under the AEA.

Other statutes demonstrate that when Congress wants to define terms like "alien enemy" in the narrow way that petitioners suggest, Congress does so expressly. The Trading with the Enemy Act of 1917, for example, defines the word "enemy" to mean (among other things), a resident of "any nation with which the United States is at war." <u>50 U.S.C. §4302(a)</u>. The AEA, by contrast, does not apply such a limiting definition to the term "alien enemies."

History likewise refutes Petitioners' theory. The AEA was enacted in response to concern about "what to do about French citizens in the

United States" when "[n]o war had yet been declared."  Currie, *supra*, at 254.  Given Congress's familiarity with conflicts perpetrated in large part by privateers, it would be passing strange if Congress had intended to exclude predatory incursions committed by proxies and mercenaries from the AEA's reach.  To be sure, the French used "warships" in addition to "privateers" to plunder U.S. shipping vessels during the Quasi-War. Fehlings, *supra*, 125.  But Congress did not plausibly enact the AEA at the height of the Quasi-War just to implicitly block the President from addressing incursions committed by privateers alone.

Petitioners are also incorrect that the since-expired Alien Friends Act—enacted by the same Congress—supports their reading of the AEA. Br. 27.  The Alien Friends Act authorized the removal of aliens "dangerous to the peace and safety of the United States" without requiring a finding of declared war, invasion, or predatory incursion.  An Act Concerning Aliens 1, 1 Stat. 571 (1798).  Petitioners contend that the Alien Friends Act, not the AEA, would have governed the "peacetime removal of noncitizens a President deemed dangerous."  Br. 27.  But, far from covering mutually exclusive situations, "there was an overlapping of the legislation affecting aliens."  James Morton Smith, *Freedom's*

*Fetters:  The Alien and Sedition Laws and American Civil Liberties* 49 (1956).  At bottom, the AEA's text is simply not confined to declared wars.

### 2.    TdA has perpetrated, attempted, or threatened an "invasion."

As discussed, the AEA can be invoked when there is an "invasion *or* predatory incursion," 50 U.S.C. §21 (emphasis added), as well as a "declared war."   While the incursion prong alone justifies the Proclamation, TdA's hostilities against the United States also constitute an "invasion" under the AEA.

a.    When the AEA was enacted in 1798, an "invasion" broadly referred to a "hostile entrance," *see, e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or "hostile encroachment" on another's territory, *see* Thomas Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789).  Other dictionaries defined "invasion" as a "descent upon a country," an "usurpation," or "the entrance or attack of an enemy on the dominions of another."  *See* Frederick Barlow, The Complete English Dictionary or, General Repository of the English Language (1772-1773); Nathan Bailey, A Universal Etymological English Dictionary (25th ed. 1783).  Although some contemporaneous dictionaries "included formal military

40

operations," dictionaries also covered "many other kinds of encroachments or intrusions." Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Power of States*, 13 Brit. J. Am. Legal Stud. 21 (2024) (canvassing eighteenth-century dictionary definitions).

Relatedly, contemporary dictionaries defined an "invader" as "[o]ne who enters with hostility into the possessions of another." *Johnson's Dictionary*, "Invader" (1773). But the definition does not require the "invader" to be armed or part of a military force. *Id.* In sum, "[e]ighteenth-century dictionaries inform us that when 'invasion' and its variants applied to physical intrusions, the scope was not limited to incursions by a foreign army." Natelson & Hyman, *supra*, 20.

Contemporaneous usage of the word "invasion" in the Federalist Papers and in early acts of Congress reinforces that broad understanding. That is, "[e]ighteenth century American political discourse confirms what the dictionaries suggest: the scope of 'invasion' and its variants was quite broad" and extended beyond military hostilities. Natelson & Hyman, *supra*, 23. For example, when debating the Constitution, the Founders referred to "hostile *invasions* of lawless

41

and ambitious men" seeking to "introduce anarchy, confusion, and every disorder." *Id.* (emphasis added) (quoting 4 The Documentary History of the Ratification of the Constitution 116, 117 (John P. Kaminski et al. eds., 1976–2023) (41 vols)). Madison warned of "the predatory spirit of licentious adventurers" and "daring and sudden *invaders*" along the Atlantic Coast. *The Federalist* No. 41 (Madison) (emphasis added).

Indeed, the term "invasion" sometimes even described hostile acts of mass migration. For example, in 1783, the Pennsylvania legislature passed a resolution that peaceful, yet unauthorized immigration from Connecticut had become an invasion, referring to "invaders of the State." Natelson & Hyman, *supra*, 23–24. In short, "invasion" was a term used far more broadly than just military aggressions by foreign nations.

b. Applying the appropriate historical definition, the Proclamation properly identifies an "invasion" by TdA "against the territory of the United States." As explained above, TdA is a designated foreign terrorist organization that is "flooding" the United States with weapons and mass migration to destabilize the nation's security. There is also substantial evidence that TdA is physically "encroaching" on U.S. territory. For example, several recent reports explain that TdA is

42

present in over 40 states and has taken control over particular apartment complexes in U.S. cities.[4]  Moreover, TdA has demonstrated a pattern of "setting down roots" in multiple South American countries—indicating that its *modus operandi* is encroaching on foreign territory with the hostile purpose of taking control.[5]  That pattern of TdA "violat[ing] the territorial sovereignty of Venezuela's neighbors" was documented in U.S. intelligence reports preceding the Proclamation.  *See* FBI Intelligence Assessment, ROA.1202.  Those actions plainly satisfy the historical meaning of an "invasion" as a hostile attack or encroachment.  At the very least, TdA has "attempted" or "threatened" an "invasion"—which would suffice to satisfy the AEA.  50 U.S.C. §21.

---

[4] *See* Jonathan Limehouse, *Colorado Apartment to Close After Multiple Arrests, Claims of Venezuelan Gang Takeover*, USA Today (Jan. 14, 2025), https://www.usatoday.com/story/news/nation/2025/01/14/the-edge-at-lowry-apartments-aurora-colorado/77694475007; Nicole C. Brambila, *Venezuelan TdA Gang Uses Similar Aurora Tactics to Take Over Building in San Antonio, Texas*, Denver Gazette (Dec. 21, 2024), https://denvergazette.com/news/immigration/venezuelan-gang-aurora-san-antonio-apartments-takeover/article_fc65e418-8d5e-11ef-bb8b-7fc830f6fa36.html; *see also* Smith Decl, ROA.1214.

[5] *Tren de Aragua: From Prison Gang to Transnational Criminal Enterprise*, InSight Crime (Oct. 2023), https://insightcrime.org/wp-content/uploads/2023/08/Tren-de-Aragua-From-Prison-Gang-to-Transnational-Criminal-Enterprise-InSight-Crime-Oct-2023-1.pdf.

### C. The Proclamation Properly Identifies A "Foreign Nation or Government" Under The AEA

The AEA further requires the President to find that the relevant incursion or invasion was perpetrated by a "foreign nation or government." 50 U.S.C. §21. Here, the Proclamation reflects the President's finding that TdA is operating at the direction of Venezuela's Maduro regime. 90 Fed. Reg. at 13,033. Petitioners instead contend that the AEA cannot be invoked against TdA because TdA is a "non-state actor." Br.30. But the President found otherwise in deeming TdA entwined with the Maduro regime—a sensitive national-security judgment that warrants particular deference.

a. In the Proclamation, the President found that TdA infiltrated the Maduro regime of Venezuela, "including its military and law enforcement apparatus," and thus constitutes an arm of Venezuela's "hybrid criminal state." 90 Fed. Reg. at 13,033. The President explained that Maduro coordinates with TdA via the regime-sponsored narco-terrorism enterprise Cártel de los Soles. *Id.* The Cártel de los Soles, in turn, "coordinates with and relies on TdA . . . to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id.*

Thus, the President found that Maduro controls and ceded territory to TdA, such that Venezuela operates as a hybrid-criminal state with TdA and other criminal organizations. 90 Fed. Reg. at 13,033 ("Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA."). FBI intelligence also reveals that as of November 2023, the Maduro regime "had strategically managed and financed TdA as part of Venezuela's larger foreign policy goal of creating internal security and social problems for the United States." FBI Intelligence Assessment, ROA.1202. The FBI further found that Maduro regime officials "likely use TdA members as proxies," and even "deliberately releas[ed] members of TdA" from Venezuelan prisons and encouraged their "travel to the United States." *Id.*

Courts owe those determinations extraordinary deference. In cases involving "sensitive and weighty interests of national security and foreign affairs," the "evaluation of the facts by the Executive" is "entitled to deference." *Holder*, 561 U.S. at 33-34. After all, unlike the President, "most federal judges" do not "begin the day with briefings that may describe new and serious threats to our Nation and its people."

45

*Boumediene v. Bush*, 553 U.S. 723, 797, 128 S. Ct. 2229 (2008).  And in the AEA context, the Supreme Court has already recognized that the President's factual judgments should not be disturbed.  *See Ludecke*, 335 U.S. at 171-172.  The AEA context is thus the last place for accepting Petitioners' invitation for courts to decide for themselves the relationship between TdA and the Maduro regime, based on the conclusions of "experts who study Venezuela and TdA."  *Contra* Br.33; *see A.S.R.*, 2025 WL 1378784, at *19; *J.A.V.*, 2025 WL 1257450, at *17.

b.     Petitioners attack a strawman in contending that the President cannot invoke the AEA against TdA because it is a "non-state actor."  Br.30.  The Government has never suggested that the AEA applies to rogue criminals unconnected to any foreign nation or government.  But when, as here, an organization is so closely bound up with a foreign nation as to create a "hybrid criminal state," an incursion or invasion by the organization *is* an incursion or invasion by a "foreign nation or government."   That interpretation tracks conflicts that precipitated the enactment of the AEA, like the Quasi-War, in which France used privateers as proxies to attack American vessels.  *See* p.11, *supra*.  This includes the use of pirates in the Barbary Wars as well.  That

46

interpretation also comports with modern conflicts, in which nations are often entwined with proxies that commit terrorism and cyberattacks. Congress did not plausibly exclude those actors from the AEA's breadth.

To be sure, the AEA authorizes the President to go further, and to designate as alien enemies "*all* natives, citizens, denizens, or subjects of the hostile nation or government"—here, the Maduro regime. 50 U.S.C. §21 (emphasis added). Instead, the President chose to the Proclamation to designate only TdA members, *see* 90 Fed. Reg. at 13,034, consistent with the President's authority under the AEA to prescribe "in what cases" enemy aliens shall be restrained and removed, 50 U.S.C. §21. As the Supreme Court recognized in *Ludecke*, the President's decisions under the AEA should not be second-guessed by courts simply "because the President chooses to have that power exercised within narrower limits than Congress authorized." 335 U.S. at 166.

c.     Petitioners' other arguments for a narrow reading of the AEA limited to nation-states lack merit. *See* Pet. Br.30-31.

*First*, Petitioners argue that the AEA identifies as alien enemies "all natives, citizens, denizens, or subjects of the hostile nation or government"—terms supposedly describing a "legal relationship between

47

an individual and a sovereign state," but not between an individual and "gang." *Id.* That again misses the point. The Proclamation does not apply to private gangs lacking any affiliation to a foreign nation or government. The Proclamation applies to TdA, a designated foreign terrorist organization that the President has determined has aligned with the Maduro regime to undermine American national security. When an organization becomes so entwined with the foreign nation or government as to form a "hybrid criminal state," the organization itself is part of the hostile foreign government for AEA purposes.

Petitioners further contend that another AEA provision, 50 U.S.C. §22, indicates that the "foreign nation or government" must be an entity capable of entering into a "treaty" with the United States. Br.32. But again, the Government does not argue that the AEA applies to entities with no connection to a treaty-making nation-state. Venezuela is a sovereign state with which the United States can enter into treaties, and the President properly found that TdA is part of Venezuela's hybrid criminal state. That determination should resolve the matter.

## II.   THE GOVERNMENT'S REVISED AEA NOTICE PROCEDURES SATISFY DUE PROCESS

Petitioners are also unlikely to prevail on their due-process challenge to the government's procedures for notice of removal under the AEA.  The Government's revised procedures exceed whatever procedural protections are required.  Petitioners claim an entitlement to a 30-day notice period after aliens are informed of the factual basis for their AEA removal, essentially demanding judicial policymaking that would perversely afford enemy aliens far greater process than many ordinary illegal entrants—such as those subject to expedited removal—receive.

### A. The Government's AEA Procedures Provide Sufficient Opportunity To Seek Habeas Relief

In *J.G.G.*, the Supreme Court held that the AEA and the habeas corpus statute require that detainees "receive notice… that they are subject to removal under the Act," and that such notice "must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." 145 S. Ct. at 1006.  In *A.A.R.P.*, the Court further clarified that "to 'actually seek habeas relief,' a detainee must have sufficient time and

information to reasonably be able to contact counsel, file a petition and pursue appropriate relief." *A.A.R.P.*, 145 S. Ct. at 1368.

The Government's new procedures readily satisfy, and indeed exceed, what the Supreme Court has held is required: AEA detainees receive notice of their detention in a language they understand, information about how to challenge it, and the time to do so. Notice, ROA.1124-27. Nothing more is required.

To start, the Government now provides an alien with notice that tells him that he can challenge his AEA designation by filing a habeas petition in his district of confinement. Notice, ROA.1124-27. That notice adds that a list of available attorneys will be provided upon request (and aliens can call those attorneys, or call family members or others who can assist). Notice, ROA.1124-27. The Government will ensure that all of this information is conveyed to the alien in a language he understands. Notice, ROA.1124-27. Thereafter, the alien then has at least seven days to choose to file a habeas petition. Notice, ROA.1124-27. If the alien does so, he will not be removed under the AEA until that petition is adjudicated. Notice, ROA.1124-27.

Those procedures readily afford aliens a "sufficient" opportunity to "actually seek habeas relief." *See A.A.R.P.*, 145 S. Ct. at 1368. The new notice tells an alien exactly "how to … contest [his] removal." *A.A.R.P.*, 145 S. Ct. at 1368. And the new procedures afford more than adequate time to do so. Indeed, seven days to merely *file* a habeas petition is far greater process than what the federal immigration laws offer in analogous contexts. Most relevant, the expedited-removal process under 8 U.S.C. §1225(b) subjects certain illegal aliens to immediate removal "without further hearing or review," 8 U.S.C. §1225(b)(1)(A)(i), subject to only a limited window to establish a "credible fear of persecution," *DHS v. Thuraissigiam*, 591 U.S. 103, 109, 140 S. Ct. 1959 (2020). Within that window, credible fear determinations are often made within a matter of hours, and any review of an adverse determination must be completed within a week—and "to the maximum extent practicable within 24 hours." 8 U.S.C. §1225(B)(iii)(III).

The Supreme Court has held that these procedures satisfy due process. *Thuraissigiam*, 591 U.S. at 140. Rightly so. "[I]n general," the English common law only required "several days" between the "time of summons and a hearing." *See, e.g.*, 2 Chitty's General Practice 176

51

(1834); *see also Lindsey v. Normet*, 405 U.S. 56, 63, 92 S. Ct. 862 (1972) (eviction statute required trial 6 days after notice).   The procedures here—which afford seven days plus additional protections—readily pass muster, not least because due process is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593 (1972); *see also Mathews v. Eldridge*, 424 U.S. 319, 334-35, 96 S. Ct. 893 (1976).   And where the Government has a strong interest in "prompt, vigorous" action—especially in matters of national security—due process does not forbid the Government from requiring illegal aliens to move with "appropriate" expedition.   *The Japanese Immigrant Case*, 189 U.S. 86, 101, 23 S. Ct. 611 (1903).

That is this case.   The Government has a tremendous interest in swiftly removing alien enemies from the United States—especially where the class of aliens is defined by membership in a terrorist organization (versus simply being a national of a hostile foreign power).   Here, the President, operating from his unique constitutional perch as Commander-in-Chief, has determined that the presence of TdA members in this country endangers the nation and requires immediate action.   90

Fed. Reg. 13033.  And as the Government has explained elsewhere, that threat is not alleviated by the fact some TdA members happen to be presently detained.

This April, for instance, TdA aliens barricaded themselves within their housing unit, and "threatened to take hostages and injure facility contract staff and ICE officers."  Johnson Decl. ROA.1219 at ¶ 9.  More generally, TdA has long been able to "grow its numbers" from others in detention, creating the risk that current AEA aliens will be able to "recruit new TdA members" while being held here.  *Id.* at ROA.1220 at ¶ 9.  So long as the Government is forced to keep TdA members in this country, they present a "grave risk to ICE personnel; other, nonviolent detainees; and the United States as a whole."  *Id.*  Those risks compel an efficient process.  Nothing in the AEA or anything else requires this country to endure those risks beyond what is necessary for those aliens to raise a claim.

## B. Petitioners' Monthlong Notice Regime Is Not Legally Required

Petitioners counter that the Constitution requires that the Government (1) give enemy aliens a month to merely file a habeas petition and (2) provide each alien a factual basis for his detention within

his original detention notice, before habeas proceedings even commence. *See* Pet. Br. at 38, 41. Neither policy proposal is required.

1.    Start with Petitioners' demand for a 30-day notice period. Petitioners claim that a host of "practical barriers"—*e.g.*, aliens' poor grasp of English, inability to contact counsel, and time needed to prepare a case—constitutionally compel that these supposed agents of a hostile foreign nation be given a month to simply to get a habeas petition on file. Br.40-45.

That is wrong. For one, as explained above, the Government's new notice ensures that aliens receive all relevant information in a language they understand—including a list of available counsel. There is no reason why an alien needs weeks to avail himself of those options, especially where the Constitution does not give an illegal alien a right to counsel in this context in the first place.

Moreover, Petitioners' practical concerns flounder on the facts. Petitioners themselves were able to seek relief here within hours of learning about potential removal. ROA.17-22. And petitioners across the country have filed petitions in fewer than seven days, with the help of counsel. *See, e.g., D.B.U.*, 2025 WL 116350; *G.F.F. v. Trump*, No. 25 CIV.

54

2886 (AKH), 2025 WL 1301052, *6 (S.D.N.Y. May 6, 2025). Nothing suggests that aliens facing removal under the AEA could not file habeas petitions within a week, least of all when the inquiry at issue—whether the alien is in fact a member of a designated foreign terrorist organization—is rather straightforward.

Petitioners note that during World War II, enemy aliens were given 30 days, not seven. *See* Br.42-43. But the Government's choice of 30 days in World War II reflects a policy decision, not a constitutional floor that is somehow required for all time, across all modes of enemies. Indeed, the 1940s proclamation on which Petitioners rely reflected a policy of "restraint" by the Attorney General, not some constitutional dictate. *Citizens Protective League*, 155 F.2d at 295. To that end, those procedures were never binding and have since been repealed. 10 Fed. Reg. 12189; 27 Fed. Reg. 12617, 12619.

World War II also proves a poor analog, because the context of detention today is very different from the 1940s. Before the internet and modern communications, more time was needed to provide notice, reach counsel, file claims, and hold hearings. Nowadays, technology and greater access to legal services make filings much quicker and easier.

What was required to effectuate a level of process during the 1940s is far greater than what is needed today.

And again, nowhere do Petitioners explain why enemy aliens are somehow entitled to more process than other aliens removed via summary proceedings like expedited removal. Nor could they. All of the same "practical" considerations that Petitioners allege are equally present there: Aliens stopped at the border—or unable to adequately show that they have been continuously present in the United States for two years—often do not speak English, will not have immediate access to counsel, and need time to develop a case. Even so, certain expedited-removal proceedings must statutorily conclude in the same time that enemy aliens are now given to merely *start* theirs via habeas. *See Thuraissigiam*, 591 U.S. at 109-13 (describing scheme and citing relevant provisions).

2. Petitioners also argue (at 41-42) that the Constitution requires the Government to provide the factual basis for an alien's designation as an alien enemy within his original detention notice—and before any habeas proceedings even begin. This too is wrong.

56

When the President issues a proclamation under the AEA, he establishes a class of aliens who are subject to summary removal. And when the Executive Branch detains an alien pursuant to that proclamation, it necessarily determines that the alien is a member of that class. That conclusion—*i.e.*, the individual is an alien of a certain age, nationality, and affiliation—is sufficient to justify the alien's detention, and is everything that an alien needs to "actually seek habeas relief in the proper venue before such removal occurs"—*i.e.*, to assert he is not one of those things. *J.G.G.*, 145 S. Ct. at 1006.

Petitioners (at 41) insist more is required, analogizing to indictments. But it is well-settled that what is required in *criminal* proceedings is different in kind from what is needed in *civil* immigration enforcement. *See, e.g.*, *Ramirez-Osorio v. INS*, 745 F.2d 937, 944 (5th Cir. 1984). And that distinction is particularly applicable here. Given the nature of the AEA—the exigencies involved, and the presidential responsibilities it bestows—courts have held that it "must be presumed that the President has acted lawfully" in detaining an enemy alien. *Ex parte Risse*, 257 F. 102, 104 (S.D.N.Y. 1919). In turn, the "burden" is on the alien to show he is "not" part of that "hostile" invasion or incursion.

57

*Id.* It is "not upon the United States to show that he is." *Ex parte Gilroy*, 257 F. 110, 114 (S.D.N.Y. 1919); *see also United States ex rel. Schlueter v. Watkins*, 67 F. Supp. 556, 565 (S.D.N.Y. 1946), *aff'd*, 158 F.2d 853 (2d Cir. 1946) (describing procedures during World War II).

Petitioners' proposal would improperly invert this burden: It would require that the government disclose to an enemy alien the basis for its conclusion before that alien even decides whether to contest his removal—without any concrete basis for doing so. Moreover, to the extent the Government must justify its classification before an alien's removal, the proper time is during habeas proceedings, not as a precursor. Indeed, the evidence showing membership in an enemy class—particularly when that class is a foreign terrorist organization— is often highly sensitive and may need to be sealed or otherwise protected. That could be possible during habeas proceedings, but not if the Government's case must be affirmatively disclosed with the original notice.

3.    Petitioners' due-process challenges are especially misguided because, for at least the bulk of the putative class, the Due Process Clause requires no more process than what the political branches provide. The

58

Supreme Court has long held that "the due process rights of an alien seeking initial entry" are no greater than "[w]hatever procedure[s] [are] authorized by Congress." *Thuraissigiam*, 591 U.S. at 139. For aliens who have never been lawfully admitted—a group which undoubtedly includes many (if not nearly all) of the class members here—"the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660, 12 S. Ct. 336 (1892) (emphasis added); accord *Thuraissigiam*, 591 U.S. at 138-40.

On that score, the Supreme Court's cases have long indicated that illegal aliens who evade detection in crossing the border should be treated no differently than those who are stopped at the border. *Thuraissigiam*, 591 U.S. at 138-40. Aliens who have been admitted may claim due-process protections beyond what Congress has provided, even where their legal status changes (*e.g.*, an alien who overstays a visa, or is later determined to have been wrongly admitted). *See Wong Yang Sung v. McGrath*, 339 U.S. 33, 49-50 S. Ct. 445 (1950). But the Supreme Court has never held that aliens who have "entered the country clandestinely"

are entitled to such additional rights. *Japanese Immigrant*, 189 U.S. at 100.

That is fatal to much of Petitioners' due-process challenge. To be sure, the Supreme Court has interpreted the AEA and habeas corpus statute to provide for tailored review of AEA decisions. *See Ludecke*, 335 U.S. at 163-64, 171 n.17. But Congress, not the Constitution, chose that process. At least for much of the putative class, the Due Process Clause does not license federal courts to augment those procedures. While the AEA guarantees enemy aliens "a reasonable time . . . to actually *seek* habeas relief," *J.G.G.*, 145 S. Ct. at 1006 (emphasis added)—the Due Process Clause does not layer yet more process on top. What matters, in sum, is what the AEA requires—and in conducting that inquiry, the federal courts should be loath to displace what the Executive Branch has decided. The "full responsibility for the just exercise of this great power may validly be left where the Congress has constitutionally placed it—on the President of the United States." *Ludecke*, 335 U.S. at 173.

In short, the current process for AEA removals comports with the AEA and due process alike. This Court should resist the jagged path forged by district courts across the country—each divining their own

60

procedures, with their own criteria, yielding their own sense of what should be required. *See, e.g.*, *D.B.U.*, 2025 WL 116350 (21-days); *G.F.F.*, 2025 WL 1301052, at *6 (indicating 10 days); *Gutierrez-Contreras v. Warden*, No. 5:25-CV-00965-SSS-KES, 2025 WL 1202547, at *3 (C.D. Cal. Apr. 25, 2025) (14 days)]. That lack of uniformity underscores that courts should be wary of engaging in judicial policymaking in an area laden with deference to the Executive Branch's judgments about how to combat hostile actions by foreign powers.

## C. Petitioners' Other Procedural Objections Fail

Petitioners are equally unlikely to succeed on their other procedural arguments.

1.    Petitioners (at 52-54) are wrong that a period of voluntary departure is *required* by the AEA. The AEA permits the President to "provide for the removal of those who . . . refuse or neglect to depart therefrom," 50 U.S.C. §21, but also dictates that they "*shall be* liable to be . . . removed as alien enemies." *Id.* (emphasis added). In this context, where the alien enemies are members of the hostile force itself, the President may immediately effectuate removal; the AEA does not provide hostile foreign actors a grace period.

Petitioners cite (at 52-53) a handful of 1940s Second Circuit cases, none of which bears on the fact-pattern presented here. All involved German nationals who were not members of that country's armed forces. *See, e.g.*, *United States ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 651-52 (2d Cir. 1947). By contrast, the aliens here have all engaged in "actual hostility." 50 U.S.C. 22; *see* 90 Fed. Reg. 13033. For such aliens, "the President acting under the AEA need not offer voluntary departure to alien enemies who the Executive Branch has concluded are engaged in chargeable actual hostility." *See J.A.V.*, 2025 WL 1257450, at *12; *see also A.S.R.*, 2025 WL 1378784, at *21.

Finally, Petitioners assert (at 53-54) that the President must make an "individualized assessment" whether an alien is engaged in actual hostility and faults the Proclamation's categorical determination. But Congress assigned to the President the authority to determine the presence of actual hostilities. *See Ludecke*, 335 U.S. at 164-65. Federal courts are no better suited to second-guess the scope of that determination than its substance. *See Munaf v. Geren*, 553 U.S. 674, 702, 128 S. Ct. 2207 (2008). Petitioners offer no basis for this Court to undermine the President's determination that a class of aliens are

engaged in actual hostilities—nor insist that the head of a coequal branch exercise that authority in a particular manner.

2.    Petitioners' remaining arguments lack merit.

*First*, Petitioners say (at 47-49) that the INA has silently supplanted the AEA, and that any removal on any basis must follow the INA's terms.  But no Justice in either of the AEA cases relied on the INA, or even hinted the AEA was subject to the INA.  For good reason.  The AEA and INA are distinct mechanisms for effectuating removals.  The INA establishes the governing scheme for removals pursuant to Title 8. *See, e.g.*, 8 U.S.C. §1229a(a)(3).    But the INA does not regulate independent removal authority under Title 50.  This Court should not interpret the INA to implicitly repeal a Founding era law that was used just a few years prior without a peep from Congress.  *See TVA v. Hill*, 437 U.S. 153, 189–90, 98 S. Ct. 2279 (1978) (reiterating the "cardinal rule . . . that repeals by implication are not favored" (quoting *Morton v. Mancari*, 417 U.S. 535, 549, 94 S. Ct. 2474 (1974)) and collecting cases).

*Second*, Petitioners are mistaken (at 49-52) that the AEA procedures are defective in light of the withholding-of-removal statute and the Convention Against Torture (CAT).  For one, the exclusive

remedy under the AEA is habeas, *see J.G.G.*, 145 S. Ct. at 1005; but claims for withholding-of-removal and CAT protection—which govern *where* an alien may be removed, not *whether* he may be removed—do not sound in habeas at all, and cannot be raised here, *Hamama v. Adduci*, 912 F.3d 869, 876 (6th Cir. 2018).  And as has been true for decades, it continues to be "the policy of the United States not to transfer an individual in circumstances where torture is likely to result." *Munaf*, 553 U.S. at 702.  "The Judiciary is not suited to second-guess such determinations." *Id.*; *see also Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009) ("Under *Munaf*, however, the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee.").  And for asylum, it is a discretionary form of relief, and eligibility for such relief may be foreclosed on a categorical basis.  *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730-31 (D.C. Cir. 2022).  In any event, individuals subject to removal under Title 50 are barred from asylum and withholding of removal.

## IV.  PETITIONERS FAIL TO ESTABLISH THE REMAINING PRELIMINARY-INJUNCTION FACTORS

### A. Petitioners Have Not Established Irreparable Harm

Petitioners fail to establish that a preliminary injunction is

necessary to prevent irreparable harm.  "[T]he burden of removal alone cannot constitute the requisite irreparable injury."  *Nken*, <u>556 U.S. at 435</u>.    Petitioners instead contend that, if removed under the Proclamation, they may be sent to El Salvador, where they allege they may face "harsh and life-threatening" conditions and "may never get out."  <u>Br.54</u>.  Again, the Government does not remove aliens to countries where it believes they may be tortured.  *See Munaf*, 553 at 702.  Regardless, a preliminary injunction would not prevent that asserted harm, nor would enjoining the Proclamation.  Petitioners would still be removable under the INA as designated members of a foreign terrorist organization and could still be sent to El Salvador under the INA's procedures for third-country removal.  *See* <u>8 U.S.C. §§1227(a)(4)(B)</u>, <u>1231(b)(2)</u>.

## B. The Balance of Equities And Public Interest Favor The Government

The balance of harms and the equities strongly favor the government here, as an injunction irreparably harms the President's conduct of foreign affairs. The Supreme Court has already "recognize[d] the significance of the Government's national security interests" in this case.  *A.A.R.P.*, <u>145 S. Ct. at 1368</u>.  Rightly so.  The President has determined that TdA's "campaigns of violence and terror . . . present an

65

unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." 90 Fed. Reg. at 8439. And the Secretary of State has designated TdA as a foreign terrorist organization. *See*, *supra,* pp.9-10. The Government always has a strong interest in the "prompt" execution of removal, *Nken v. Holder*, 556 U.S. 418, 436 (2009); that interest is "heightened" when "the alien is particularly dangerous," *id.*; and it reaches its apex when aliens belong to a foreign terrorist organization.

The record here reinforces the point. As noted, the Government has had serious difficulties detaining TdA members. In one recent episode, members of the putative class "threatened to take hostages and injure facility contract staff and ICE officers," and refused to comply with orders for several hours. ROA.1219 at ¶ 9. Moreover, the Government has determined that prolonged detention of TdA members is particularly dangerous given TdA's track record of recruiting members from prison. *See, supra,* p.14. Petitioners' proposal would stymie the President's ability to respond to the threat imposed by TdA. Such an injunction "intrudes into the core concerns of the executive branch," *Adams v.*

*Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and undermines the public interest.

*     *     *

Because Petitioners fail to satisfy the preliminary-injunction prerequisites, neither the named petitioners nor the putative class members are entitled to relief.  Although the Government is enjoined from removing any putative class members until the Supreme Court has reviewed a timely petition for a writ of certiorari, *see A.A.R.P.*, 145 S. Ct. at 1370, the Government preserves its argument that on remand, class certification should ultimately be denied for the reasons in the district court's now-vacated decision.  Meanwhile, the government respectfully requests that this Court expeditiously deny Petitioners' request for injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should remand with instructions to deny the preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

67

DREW C. ENSIGN
Acting Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to Assistant Attorney General

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

JOHN W. BLAKELEY
Senior Counsel

*/s/ Nancy Safavi*
NANCY N. SAFAVI
Senior Trial Attorney
TX Bar No. 24042342
U.S. Dept of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 514-9875
Nancy.Safavi@usdoj.gov

Dated: June 10, 2025                 Counsel for Respondents-Appellees

## **BRIEF FORMAT CERTIFICATION**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and

Fifth Circuit Rule 32.3, I certify that Respondents-Appellees' Brief:

(1) was prepared using 14-point Times New Roman font;

(2) is proportionally spaced; and

(3) contains twelve thousand, eight hundred, sixty-seven (12,867)

words.

Dated: June 10, 2025           */s/ Nancy Safavi*
                              NANCY N. SAFAVI
                              Senior Trial Attorney
                              U.S. Dept of Justice, Civil Division
                              Office of Immigration Litigation
                              P.O. Box 878, Ben Franklin Station
                              Washington, DC 20044
                              (202) 514-9875

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that Petitioners-Appellants' counsel is a registered CM/ECF user and will be served through the CM/ECF system.

*/s/ Nancy Safavi*
NANCY N. SAFAVI
Senior Trial Attorney
U.S. Dept of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 514-9875