No. 25-10534

# In the United States Court of Appeals for the Fifth Circuit

W.M.M., ET. AL.,
*Petitioners-Appellants*,

v.

DONALD J., TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
UNITED STATES, ET. AL.,
*Respondents-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas
Case No. 1:25-cv-00059-H

## BRIEF OF SOUTH CAROLINA AND 24 OTHER STATES AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS-APPELLEES

ALAN WILSON
  *Attorney General of South Carolina*

THOMAS T. HYDRICK
  *Solicitor General*
  Counsel of Record
JOSEPH D. SPATE
  *Deputy Solicitor General*
BENJAMIN M. MCGREY
  *ASST. Deputy Solicitor General*

*Counsel for Amicus the State of South Carolina*

(ADDITIONAL COUNSEL LISTED AFTER SIGNATURE BLOCK)

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**.....................................................................iii

**INTRODUCTION AND INTEREST OF AMICI** .................................1

**SUMMARY OF ARGUMENT** ...............................................................2

**ARGUMENT** ...........................................................................................3

I.    An injunction would undermine the security of the States. ...........3

II.    Both constitutional and statutory authority authorize the President to deport alien enemies ...................................................9

III.    The political question doctrine forecloses—or at a minimum, cabins—judicial review of the President's Proclamation that TdA is perpetrating an invasion or predatory incursion against the United States ............................................................12

      A.    The authority to declare an invasion or incursion is textually committed to the President ...................................15

      B.    Courts lack judicially manageable standards to review a declaration of an invasion or incursion under the AEA................................................................................18

      C.    Three of *Baker*'s prudential factors warrant against judicial review of the Proclamation's substantive determinations. ...................................................................22

      D.    *J.G.G.* does not compel a contrary conclusion ......................28

      E.    Even if inapplicable, the logic of the doctrine should cabin this Court's review........................................................30

**CONCLUSION**.....................................................................................31

**CERTIFICATE OF COMPLIANCE**....................................................35

**CERTIFICATE OF SERVICE** ............................................................36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.A.R.P. v. Trump,*
  145 S. Ct. 1364 (2025) .................................................................... 1, 4

*A.S.R. v. Trump,*
  2025 WL 1378784 (W.D. Pa. May 13, 2025) ........................................ 25

*Adams v. Vance,*
  570 F.2d 950 (D.C. Cir. 1978) .............................................................. 22

*Aktepe v. United States,*
  105 F.3d 1400 (11th Cir. 1997) ............................................................ 21

*Al-Tamimi v. Adelson,*
  916 F.3d 1 (D.C. Cir. 2019) .................................................................. 19

*American Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) .............................................................................. 13

*Arizona v. United States,*
  567 U.S. 387 (2012) ................................................................................ 5

*Baker v. Carr,*
  369 U.S. 186 (1962) .......................................................... 12, 19, 22, 23

*Bancoult v. McNamara,*
  445 F.3d 427 (D.C. Cir. 2006) ............................................................. 18

*Biden v. Texas,*
  597 U.S. 785 (2022) .............................................................................. 27

*Boumediene v. Bush,*
  553 U.S. 723 (2008) .............................................................................. 16

*California v. United States,*
104 F.3d 1086 (9th Cir. 1997) ................................................................. 17

*Chicago & S. Air Lines v. Waterman S.S. Corp.,*
333 U.S. 103 (1948) ................................................. 9, 14, 16, 20

*Chiles v. United States,*
69 F.3d 1094 (11th Cir. 1995) ................................................................. 18

*Citizens Protective League v. Clark,*
155 F.2d 290 (D.C. Cir. 1946) ............................................................... 11

*El-Shifa Pharm. Indus. Co. v. United States,*
607 F.3d 836 (D.C. Cir. 2010) .......................................... 15, 16, 20, 22

*First Nat. City Bank v. Banco Nacional de Cuba,*
406 U.S. 759 (1972) ................................................................................. 14

*Freytag v. Commissioner,*
501 U.S. 868 (1991) ................................................................................. 22

*Haig v. Agee,*
453 U.S. 280 (1981) ...................................................................... 10, 18, 20

*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004) ........................................................ 8, 21, 22, 23

*Harbury v. Hayden,*
522 F.3d 413 (D.C. Cir. 2008) ............................................................... 13

*Holder v. Humanitarian L. Project,*
561 U.S. 1 (2010) ................................................................. 9, 20, 23, 26

*J.A.V. v. Trump,*
2025 WL 1257450 (S.D. Tex. May 1, 2025) .................................... 20, 25

*Japan Whaling Ass'n v. Am. Cetacean Soc.,*
478 U.S. 221 (1986) ........................................................................ 11, 18

*Johnson v. Eisentrager,*
   339 U.S. 763 (1950) ...............................................................20

*Lane v. Halliburton,*
   529 F.3d 548 (5th Cir. 2008) ........................................... 10, 11

*Ludecke v. Watkins,*
   335 U.S. 160 (1948) ................................... 11, 12, 17, 23, 28

*Mathews v. Diaz,*
   426 U.S. 67 (1976) ................................................................14

*Medtronic, Inc. v. Lohr,*
   518 U.S. 470 (1996) ...............................................................5

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) .............................................................21

*Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum
   Laden Aboard Tanker Dauntless Colocotronis,*
   577 F.2d 1196 (5th Cir. 1978) .............................................12

*Padavan v. United States,*
   82 F.3d 23 (2nd Cir. 1996) ..................................................17

*People's Mojehedin Org. of Iran v. U.S. Dep't of State (PMOI),*
   182 F.3d 17 (D.C. Cir. 1999) ....................................... 16, 21, 25

*Sale v. Haitian Centers Council, Inc.,*
   509 U.S. 155 (1993) .............................................................13

*Schneider v. Kissinger,*
   412 F.3d 190 (D.C. Cir. 2005) ......................................... 21, 27

*Spacil v. Crowe,*
   489 F.2d 614 (5th Cir. 1974) ................................................22

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
  632 F.3d 938 (5th Cir. 2011) ....................................... 12, 13, 22

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ................................................ 14, 19, 25

*Trump v. J.G.G.*,
  145 S. Ct. 1003 (2025) ................................................. 11, 24

*Trump v. United States*,
  603 U.S. 593 (2024) ................................................. 8, 13, 15

*United States v. Abbott*,
  110 F.4th 700 (5th Cir. 2024) .............................................. 17

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) .............................................. 9, 14, 23, 24

*United States*,
  585 U.S. 274 (2018) ........................................................ 21

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................... 10, 15

*Zemel v. Rusk*,
  381 U.S. 1 (1965) ........................................................... 9

## Statutes & Constitutional Provisions

8 U.S.C. § 1189(a)(1) ....................................................... 14

8 U.S.C. § 1357(g) ......................................................... 6, 7

50 U.S.C. § 21 ....................................................... 10, 11, 14

U.S. Const. art. II ........................................................... 13

**Rules**

Federal Rule of Appellate Procedure 27 ..................................................35

Federal Rule of Appellate Procedure 27(d)(2)(A) ...................................35

Federal Rule of Appellate Procedure 32(a)(5) .......................................35

Federal Rule of Appellate Procedure 32(a)(6) .......................................35

Federal Rule of Appellate Procedure 32(f )............................................35

## INTRODUCTION AND INTEREST OF AMICI

*Amici* curiae are the States of South Carolina, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Virginia, West Virginia, and Wyoming (collectively, the *Amici* States). Criminal activity perpetuated by violent foreign gangs, like Tren de Aragua (TdA), directly impacts these States and harms their citizens. Each State has an interest in protecting its citizens from such criminal activity. Moreover, TdA is "a designated foreign terrorist organization," *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1366 (2025), which makes its criminal activities even more dangerous. That is why the *Amici* States support robust actions against gangs like TdA that are wreaking havoc within our borders.

President Trump's recent Proclamation deploys constitutional and statutory authority to deport TdA members that are Venezuelan citizens, and are not American citizens or lawful permanent residents. Now that the Supreme Court has instructed this Court to proceed "expeditiously" with this appeal, *A.A.R.P.*, 145 S. Ct. at 1368, this Court should vindicate the lawful exercise of that power. Our Nation's interests are best served

1

when the Commander in Chief is able to rely upon intelligence and the judgment of national-security professionals in deciding how to exercise his constitutional and statutory authority in meeting modern threats, not when courts improperly intrude into the President's discretionary national-security decisions.

## SUMMARY OF ARGUMENT

This Court should deny Appellants an injunction for three reasons.

*First*, lawfully carrying out the President's Proclamation is in the public interest. TdA is a designated terrorist organization that has ravaged innocent citizens across the country. States have long fought against TdA, but they now have a welcome partner in the Presidency willing to join the fight for the safety and security of the American people. Preventing removal of TdA members *as a class* would undermine those efforts, allowing TdA to continue its destabilizing criminal activity in the *Amici* States. The public interest weighs in favor of the safety and security of American citizens.

*Second*, an injunction would fail to properly evaluate the sources of the President's authority invoked in his Proclamation. President Trump acted pursuant to both constitutional and statutory authority. At this

confluence of two significant fonts of authority, the judiciary should be reticent to hold that the President is unable to determine *when* the nation is subject to an invasion or predatory incursion.

*Finally*, the political question doctrine forecloses judicial review of the President's determination that TdA is engaged in an invasion or predatory incursion. The doctrine is particularly applicable in the context of foreign affairs and national security, and application of the *Baker* factors demonstrates exactly why the doctrine should apply.

## ARGUMENT

## I.   An injunction would undermine the security of the States.

The public interest weighs heavily against granting an injunction because doing so would perpetuate the threat TdA poses to the safety and security of *Amici* States' citizens. Here, the President's Proclamation describing TdA's brutality comports with the recent experiences of the States with TdA, and thus underscores the importance of the Proclamation to public safety efforts in the States.

Invoking his constitutional and statutory authority, the President published a Presidential Proclamation regarding TdA on March 15, finding and declaring that TdA "commits brutal crimes, including murders,

kidnappings, extortions, and human, drug, and weapons trafficking" and that TdA "has engaged in and continues to engage in mass illegal migration to the United States to further its objectives of harming United States citizens, undermining public safety, and supporting [Venezuela's] goal of destabilizing democratic nations in the Americas, including the United States." President Donald J. Trump, *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua* (Mar. 15, 2025), https://tinyurl.com/2s392utm (hereinafter, "March 15 Proclamation").

The experiences of the States support the President's findings on this point, as the States and their citizens have been subject to escalating acts of violence committed by TdA. In the past year alone, TdA members have murdered American citizens, seized property, and violently attacked police officers. *See* Joe Chatham, FEDERATION FOR AMERICAN IMMIGRATION REFORM, *DHS Memo Reveals Tren de Aragua Now Operates in 16 States* (Nov. 2024), https://tinyurl.com/5e7muxrr.

In particular, a TdA member's horrific murder of Laken Riley led to the Laken Riley Act, mandating federal detention of illegal aliens who are arrested for certain crimes. *See* Attorneys General Alan Wilson, Chris

4

Carr, and Ashley Moody, *Letter to Senate Leadership* (Mar. 13, 2024), https://tinyurl.com/2x5r6ce6. TdA also engaged in a hostile takeover of an apartment complex in Aurora, Colorado. Nicole C. Bramila, THE DENVER GAZETTE, *Venezuelan gang demanded 50% of all rent at Aurora complex, law firm says* (Oct. 23, 2024), https://tinyurl.com/2cmwavwu. TdA reportedly terrorized the apartment complex with violence and intimidation, and used it as a hub for egregious illegal activities, such as prostitution of minors. *Id.* And TdA has notably given a "green light" to its members to attack law enforcement officers. Adam Shaw, FOX NEWS, *Venezuelan gang Tren de Aragua gives 'green light' to members to attack cops: officials* (July 30, 2024), https://tinyurl.com/385skd68.

TdA has steadily expanded its reach across the several States. Just this month, Immigration and Customs Enforcement (ICE) arrested "high-level cartel members" with ties to both TdA and "Los Zetas" (a drug cartel) in a South Carolina nightclub that "was a hub for weapons, narcotics, and human trafficking." Héctor Ríos Morales, THE LATIN TIMES, *Dozens Arrested in South Carolina Nightclub Raid Tied to Alleged Los Zetas Cartel Member* (June 4, 2025), https://tinyurl.com/bdh7tyy3. And in February, ICE officials arrested multiple TdA members during a

5

routine daily operation in Charleston, South Carolina. U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *ICE operations between Feb. 1 and Feb. 6, Feb. 10, 2025*, https://tinyurl.com/2vtexbsa. TdA commits crimes in a host of other states as well. Dan Gooding, NEWSWEEK, *Map Shows Locations Where Venezuelan Gang Tren de Aragua are Active* (Nov. 20, 2024) https://tinyurl.com/mw528m74. Indeed, TdA is on the very doorstep of the nation's capital in northern Virginia. *See* Tom Roussey, WJLA, *Violent Venezuelan gang now appears to be in the DC area* (Nov. 21, 2024) https://tinyurl.com/mr3v35er. As long as TdA is allowed to continue operating and expanding throughout the United States, the gang will continue its deluge of criminal activity. In short, the States and their citizens are being actively harmed by TdA's infiltration.

In response to these harms, States have attempted to act and will continue to act to protect their citizens. After all, perhaps the core function of the States' police powers is "to protect the health and safety of their citizens." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). States can act to defend their citizens from safety risks posed by illegal immigrants. *See Arizona v. United States*, 567 U.S. 387, 418 (2012) (Scalia, J, concurring) (describing the States' constitutional role in certain

immigration settings). And States and localities can act as important partners in federal immigration efforts. *See* 8 U.S.C. § 1357(g). Many of the undersigned States have undertaken these measures (and will continue to do so), and some of the undersigned States have attempted to take the fight directly to TdA. OFFICE OF THE GEORGIA ATTORNEY GENERAL, *Carr Launches Operation "Hold the Line," Takes the Fight to Transnational Gangs* (Feb. 6, 2025), https://tinyurl.com/28zc5ujd.

But States are often constrained when countering threats posed by transnational criminal organizations like TdA. *See* UNITED STATES DEPARTMENT OF THE TREASURY, *Treasury Sanctions Tren de Aragua as a Transnational Criminal Organization* (Jul. 11, 2024), https://tinyurl.com/yhwd7hub (designating TdA as a significant transnational criminal organization). As the President declared, TdA has ties to the Venezuelan government as well as other criminal organizations linked to the Maduro regime, and it coordinates with them to destabilize the United States through mass illegal immigration, drug smuggling, and other crime. *See* March 15 Proclamation.

Foreign adversaries commonly use criminal organizations to infiltrate and undermine other nations. "Long gone are the days when

hostilities between states began with formal declarations of war," as the age of hybrid warfare brings conflict through "proxies, hackers, criminal gangs, drug traffickers, paramilitaries, terrorists and private contractors." Pol Bargués & Moussa Bourekba, *War by all means: the rise of hybrid warfare, Barcelona Centre for International Affairs* (Sep. 2022), https://tinyurl.com/ay247c5t. TdA is a tool of hybrid warfare. *See* March 15 Proclamation ("TdA is undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela"). And its destabilizing criminal activities done at the behest of Venezuela are not limited to the United States, as Chile's Attorney General has accused Venezuela of employing TdA to carry out a political assassination of a Venezuelan dissident. See REUTERS, *Chile meets ICC officials over Tren de Aragua-linked murder of Venezuelan dissident* (Mar. 28, 2025), https://tinyurl.com/2mtjtnxx.

Essentially, when "criminal networks . . . become proxies for hybrid threat actors," "[t]he risk of destabilization becomes exponential." EUROPOL, *2025 European Union Serious and Organized Crime Threat Assessment* 14 (2025), https://tinyurl.com/4wbpy3dy. Individual States may not

always be well-positioned to unilaterally navigate this "complex and evolving threat landscape." *Id*. For that reason, the States look to the President to use his "core powers as President and Commander-In-Chief to defend the American People from an urgent threat." THE WHITE HOUSE, *Statement from the Press Secretary* (Mar. 16, 2025), https://tinyurl.com/ycx9mtd3.

An injunction preventing the United States from swiftly dealing with members of criminal networks would trample the public interest by harming States and their citizens.

## II. Both constitutional and statutory authority authorize the President to deport alien enemies.

Both Article II of the Constitution and the Alien Enemies Act (AEA) empower the President to issue the Proclamation. Article II of the Constitution provides the President with substantial authority over foreign affairs, national security, and immigration. The Founders understood that the unpredictable nature of global threats required swift and dynamic action, as Congress could not foresee every crisis. Specifically, the "extent and variety of national exigencies" demanded centralized direction from the branch of government overseeing national defense. The Federalist No. 23 (A. Hamilton). The Founders accordingly vested "a

9

unitary Executive" with the primary responsibility and the "necessary power" to maintain national security, as that branch enjoys "structural advantages." *Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting) (quoting The Federalist No. 70, at 471–72 (J. Cooke ed. 1961) (A. Hamilton) ("Energy in the Executive is … essential to the protection of the community against foreign attacks.")). Thus, Article II provides the President with the requisite authority to manage foreign affairs and matters related to terrorism, immigration, and national security. *See Trump v. United States*, 603 U.S. 593, 607 (2024).

Indeed, the Supreme Court has long recognized the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). The separation of powers therefore recognizes that the President, "as Commander-in-Chief and as the Nation's organ for foreign affairs," is uniquely situated to take the type of decisive and timely action that the other branches are incapable of carrying out. *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). "The Executive is immediately privy to information

10

which cannot be swiftly presented to, evaluated by, and acted upon by the legislature." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). And these decisions are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility" to make. *Chicago & S. Air Lines*, 333 U.S. at 111. Threats like TdA are "evolving . . . in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34–35 (2010). How best to address hybrid threats like TdA is a decision that is "delicate, complex, and involve[s] large elements of prophecy." *Chicago & S. Air Lines*, 333 U.S. at 111. Therefore, the President is uniquely suited to address such evolving and uncertain circumstances.

The President can also draw his power to issue the Proclamation from the AEA. The AEA expressly authorizes the President to proclaim "any invasion or predatory incursion" that "is perpetrated, attempted, or threatened . . . by any foreign nation or government," upon which "all natives, citizens, denizens, or subjects of" that "nation or government" are "liable to be . . . removed as alien enemies"—so long as they are at least fourteen and not naturalized in the United States. 50 U.S.C. § 21. The statute entrusts the President with determining the status of aliens

not just during a declared war, but also "during the period of confusion and conflict . . . when the guns are silent but the peace of Peace has not come." *Ludecke v. Watkins*, 335 U.S. 160, 170 (1948). And "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

III.  **The political question doctrine forecloses—or at a minimum, cabins—judicial review of the President's Proclamation that TdA is perpetrating an invasion or predatory incursion against the United States.**

Although not all questions "touching foreign relations" are nonjusticiable, *Lane v. Halliburton*, 529 F.3d 548, 559 (5th Cir. 2008), matters implicating foreign and military affairs are generally beyond the authority or competency of the judiciary's adjudicative powers. *See Haig v. Agee*, 453 U.S. 280, 291 (1981). And here, judicial review of the President's determination that an "invasion or predatory incursion is perpetrated, attempted, or threatened," 50 U.S.C. § 21, violates the political question doctrine by "pass[ing] judgment upon the exercise of [the President's] discretion," *Ludecke*, 335 U.S. at 163–64; *see also Citizens Protective League*

12

*v. Clark*, 155 F.2d 290, 296 (D.C. Cir. 1946) (explaining that invoking the AEA is an exercise of "[u]nreviewable power" because the "conditions call for the exercise of judgment and discretion" quintessential to the President's role as Commander-in-Chief); *Cf. Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (noting individual judicial review is permitted on a case-by-case basis as to whether an alien subject to detention and removal is subject to the statute).

The political question doctrine prevents courts from making "policy choices and value determinations" that are constitutionally committed to the President and Congress. *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). One of its main purposes is to bar claims that have the potential to undermine the separation of powers between the respective branches of government. *See Lane*, 529 F.3d at 559. In *Baker v. Carr*, the Supreme Court identified six factors that guide the political question doctrine analysis:

> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an

13

unusual need for unquestioning adherence to a political de-
cision already made; and (6) the potentiality of embarrass-
ment from multifarious pronouncements by various de-
partments on one question.

369 U.S. 186, 217 (1962). The "inextricable presence of *one or more*" of
these factors will render the case nonjusticiable and "devoid the judiciary
of jurisdiction." *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo
of Petroleum Laden Aboard Tanker Dauntless Colocotronis*, 577 F.2d
1196, 1203 (5th Cir. 1978) (emphasis added).

This Court has applied *Baker* using a three-step analysis in cases
that present a controversy involving foreign affairs and national security.
*First*, it examines whether there is a "[t]extual [c]ommitment to the
[p]olitical [b]ranches"—the first *Baker* factor. *Spectrum Stores, Inc. v.
Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011). *Second*, it "con-
sider[s] whether there is a lack of judicially discoverable and manageable
standards for resolving the claims presented"—the second *Baker* factor.
*Id.* at 952 (cleaned up). *Third*, the Court analyzes "[t]he remaining four
*Baker* factors" as "[p]rudential [c]onsiderations." *Id.* at 953. All three cat-
egories militate in favor of applying the political question doctrine to re-
view the President's Proclamation.

14

A.    **The authority to declare an invasion or incursion is textually committed to the President.**

The first *Baker* factor—a textual commitment to another branch of government—is one of the two "most important" considerations in identifying a political question (along with the second factor). *Harbury v. Hayden*, 522 F.3d 413, 418 (D.C. Cir. 2008); *see also Spectrum Stores*, 632 F.3d at 950-52 (considering this factor individually). Here, the Constitution textually commits the power that the President exercised in issuing the Proclamation to the Executive Branch—a commitment that the AEA confirms.

To begin, the Constitution commits this issue to the President. The President commands the armed forces, makes treaties with foreign nations, oversees international diplomacy and intelligence gathering, and manages matters related to terrorism, trade, and immigration. U.S. Const. art. II, §§ 2, 3; *see also Trump v. United States*, 603 U.S. 593, 607 (2024). Article II vests these sweeping powers in a single person, in part, because "[d]ecision, activity, secrecy, and dispatch" are "essential" to the protection of national security. *See* The Federalist No. 70 (A. Hamilton). And a "vast share" of the Nation's foreign policy and national security

15

falls on the President's shoulders. *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003).

The President thus has a "unique responsibility" for the conduct of "foreign and military affairs." *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 188 (1993); *see also First Nat. City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972) (the President has "the lead role … in foreign policy"). The President "both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available to him the collective knowledge, experience, and resources of the government in the conduct of foreign relations." *Curtiss-Wright Export Corp.*, 299 U.S. at 320; *see also Chicago & Southern Air Lines*, 333 U.S. at 109 ("The President … possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs"). Determining whether an "invasion" or "predatory incursion" is occurring thus involves the combination of three areas that are constitutionally committed to the President: (1) foreign affairs, *see Chicago & Southern Air Lines*, 333 U.S. 103, at 109; (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976); and (3) national security, *see Trump v. Hawaii*, 585 U.S. 667, 704 (2018).

In addition, the other political branch—Congress—has unequivocally assigned authority in this space to the Executive Branch on two separate occasions. *First*, the AEA itself provides explicit textual authority for the President to deport alien enemies. *See* 50 U.S.C. § 21; *accord Ludecke*, 335 U.S. at 166. *Second,* Congress expressly empowered the Executive Branch to designate foreign terrorist organizations as national security threats. *See* 8 U.S.C. § 1189(a)(1). These two statutory grants, considered together and with the President's constitutional authority, establish that the President operates at the zenith of his authority when he uses the AEA to declare an invasion or incursion by a foreign terrorist organization. *See Youngstown Sheet & Tube*, 343 U.S. at 635-36 (Jackson, J., concurring). The exercise of that power must be "supported by the strongest presumptions and the widest latitude of judicial interpretation." *Id.* at 637.

No "comparable constitutional commitment to the judiciary" exists to enjoin the President's Proclamation. *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 849 (D.C. Cir. 2010); *see also*, *e.g.*, *Mississippi v. Johnson*, 71 U.S. (4 Wall). 475, 501 (1867) (courts have "no jurisdiction . . . to enjoin the President in the performance of his official

17

duties"); *Compare, Trump v. United States*, 603 U.S. 593, 607 (2024) (recognizing part of the President's official national security responsibilities include overseeing intelligence gathering, managing matters related to terrorism, and immigration). As a result, *Baker*'s first factor applies.

### B.    Courts lack judicially manageable standards to review a declaration of an invasion or incursion under the AEA.

The second *Baker* factor likewise renders the propriety of the President's Proclamation a political question. Courts lack judicially manageable standards to define the scope of an "invasion" or "predatory incursion" without impermissibly encroaching on the President's exclusive national security responsibilities. The President's national-security policies result from often-classified factual determinations, and they are "delicate, complex, and involve large elements of prophecy" to respond to real-time threats. *Chicago & S. Air Lines*, 333 U.S. at 111 (discussing the President's intelligence services' ability to obtain confidential information that must remain outside the purview of judicial review). Courts generally have "neither the aptitude," nor the "facilities [or] responsibility" to declare when an invasion or predatory incursion might exist. *Id.*

The judiciary "lack[s] the competence to assess strategic decision[s]" or to "create standards" on how to execute a mission which is important to national security. *El-Shifa*, 607 F.3d at 844 (cleaned up) (applying the political question doctrine in declining to review a claim that challenged the President's factual determination that certain militant groups were threats to national security). Unlike the President, judges do not "begin the day with briefings that may describe new and serious threats" to the Nation. *Boumediene v. Bush*, 553 U.S. 723, 797 (2008). Courts cannot "elucidate the standards" which "guide a President when he evaluates the veracity of military intelligence." *El-Shifa*, 607 F.3d at 846.

For example, in *People's Mojehedin Org. of Iran v. U.S. Dep't of State (PMOI)*, the D.C. Circuit expressly held that the question of whether an organization's alleged "terrorist activity" threatened the national security of the United States was "nonjusticiable" because courts have no way of judging the veracity of the information provided to the national security apparatus. 182 F.3d 17, 23-25 (D.C. Cir. 1999). Because courts do not have the appropriate intelligence capabilities, operational personnel, or capacity to engage in swift operations to respond to national

19

security threats—let alone a constitutional prerogative to do so—*Baker*'s second factor must apply here because there are no manageable standards for this Court to determine when hostile activity within the United States is considered an invasion or predatory incursion for the purposes of invoking the AEA.

Indeed, exactly *when* an "invasion" or "predatory incursion" exists is not a decision for judges to make, but rather it is a "political determination for [the] other branches of government." *United States v. Abbott*, 110 F.4th 700, 727-28 (5th Cir. 2024) (Ho., J., concurring in part). That is as true under the AEA as it is in other contexts. In particular, federal courts have consistently held that determining whether an "invasion" has occurred under Article IV, Section 4 of the Constitution (the Invasion Clause) is a nonjusticiable political question, as it involves foreign policy and national security matters best reserved for the political branches.

For example, in *California v. United States*, the Ninth Circuit emphasized that "the issue of protection of the States from invasion implicates foreign policy concerns which have been constitutionally committed to the political branches." 104 F.3d 1086, 1091 (9th Cir. 1997). Similarly, the Second Circuit held that an "Invasion Clause claim is nonjusticiable"

because "the protection of the states from 'invasion' involves matters of foreign policy and defense, which are issues that courts have been reluctant to consider." *Padavan v. United States*, 82 F.3d 23, 28 (2nd Cir. 1996). And likewise in *Chiles v. United States*, the Eleventh Circuit held that whether an influx of illegal immigration was an "invasion" of Florida "present[ed] a nonjusticiable political question." 69 F.3d 1094, 1097 (11th Cir. 1995) (cleaned up).

Judges recognize that matters implicating foreign and military affairs are generally beyond their authority or competency to address. *See Haig*, 453 U.S. at 291. That is because these matters are "quintessential sources of political questions." *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006). And courts are "particularly ill suited" to make decisions in these arenas because they are "fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *Japan Whaling*, 478 U.S. at 230 (cleaned up).

### C.    Three of *Baker*'s prudential factors warrant against judicial review of the Proclamation's substantive determinations.

The President's Proclamation also implicates at least three of *Baker*'s prudential factors. When analyzing the prudential *Baker* factors, "the official position of the Executive is highly relevant" because the President is "institutionally well-positioned to understand the foreign policy ramifications of the court's resolution of a potential political question." *Al-Tamimi v. Adelson*, 916 F.3d 1, 12-13 (D.C. Cir. 2019).

**1.** A declaration that there is an invasion or predatory incursion under the AEA implicates *Baker*'s third factor because it is impossible for this Court to adjudicate this invocation of the AEA "without an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. The decision to invoke the AEA in the Proclamation is based on the President's "evaluation of the underlying facts" pertaining to a foreign terrorist organization and should be "entitled to appropriate weight." *Trump v. Hawaii*, 585 U.S. 667, 708 (2018).

Courts should not "question a belief by the President" about invasions or predatory incursions because those are "political judgment[s] for which judges have neither [the] technical competence nor official

responsibility." *Ludecke*, 335 U.S. at 170. Indeed, in *Ludecke*, the Supreme Court avoided contradicting the President's determination that German nationals remained deportable under the AEA beyond Germany's "unconditional surrender" because the determination of *when* a "state of war" ended was a political judgment entrusted to the President and Congress. *See id.* at 168-70. And here, the determination of *when* an "invasion" or "predatory incursion" exists is a determination to be made by real-time information that is presented to the President, and not the judiciary. Thus, this is clearly a discretionary policy decision made by the President based on the information provided to him.[1]

Moreover, any decision made in foreign affairs, national security, and immigration is going to be "delicate, complex, and involve large elements of prophecy" that the President is uniquely situated to address. *Chicago & Southern Air Lines,* 333 U.S. at 111. These decisions are often swiftly made by the Executive Branch because they require immediate

---

[1] Although *Ludecke* and *Johnson v. Eisentrager*, 339 U.S. 763 (1950) could be read as suggesting that claims challenging the AEA are more broadly justiciable, "no court appears to have applied the *Baker* analysis to the AEA." *J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1257450, at *9 (S.D. Tex. May 1, 2025). As a result, those decisions should not be viewed as dispositive of any analysis under *Baker*.

action. *See Holder,* 561 U.S. at 31 (noting that actions taken in national security are often based on informed judgment rather than on "concrete evidence"). And since there is "no government interest more compelling than the security of the Nation[,]" *Haig*, 453 U.S. at 307, courts cannot "reconsider the wisdom" of discretionary actions taken in this political sphere without undermining the President's policy on national security. *El-Shifa*, 607 F.3d at 844.

Additionally, courts do not have the "prerogative to make [these kinds of] policy judgments" in the first place. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). Nor does the Constitution "provide [any] authority [to courts] for policymaking in the realm of foreign relations" or even prescribe to the judiciary a "provision of national security[.]" *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005). Just as courts cannot "render a policy determination" for the military given that they are neither equipped, nor constitutionally empowered, to speak for the military, courts are in no position to decide *when* there is an invasion or predatory incursion that presents a threat to national security. *See Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997).

And courts cannot adjudicate what types of hostile activities would present a threat to the security of the United States in the first place. *See PMOI*, 182 F.3d at 22-25. That is because "national security underpinnings are broad and malleable"—especially in the modern era. *Hamdi*, 542 U.S. at 520 (cleaned up). And in the age of modern and unconventional warfare, the AEA's application necessarily adjusts to meet that challenge. *See Wisc. Ctr. Ltd. v. United States*, 585 U.S. 274, 284 (2018) ("[E]very statute's meaning is fixed at the time of enactment, but new applications may arise in light of changes in the world.").

The case at bar presents the type of policy determination that clearly requires Presidential discretion because it involves the kinds of national security decisions that are specifically tailored to handle TdA's hostile activities. Because the Founders intended for the President (not courts) to "have [the] primary responsibility—along with the necessary power—to protect the national security" of the Nation, *Hamdi*, 542 U.S. at 580 (Thomas, J., dissenting), any kind of injunction granted here would "deeply intrude[] into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978).

**2.** *Baker*'s fourth factor also shows that it would be impossible for this Court to undertake an "independent resolution" of the matter without expressing a "lack of respect" for the President's determination on TdA's threat to national security. *Baker*, 369 U.S. at 217. "If the political question doctrine means anything in the arena of national security and foreign relations, it means courts cannot assess the merits of the President's decision" to invoke the AEA and prevent the entry (and facilitate the expulsion) of foreign terrorists on American soil. *El-Shifa*, 607 F.3d at 844. Separation of powers principles "impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy." *Spectrum Stores*, 632 F.3d at 953 (quoting *Spacil v. Crowe*, 489 F.2d 614, 619 (5th Cir. 1974)). And the judiciary must not "aggrandize its power" in national security and foreign affairs "at the expense" of the President's Proclamation. *Freytag v. Commissioner*, 501 U.S. 868, 878 (1991).

The President alone has the "structural advantage" and the "energy" necessary to protect the homeland from invasions or predatory incursions. Federalist No. 70 (A. Hamilton). That was by design. *See Hamdi*, 542 U.S. at 580 (Thomas, J., dissenting). So *Baker*'s fourth factor

26

counsels deference and respect to the President's determination that TdA presents an evolving threat to national security and that its members are worthy of being classified as not only foreign terrorists, but enemy aliens eligible for deportation. *See Holder*, 561 U.S. at 33-35 (recognizing courts are ill-equipped to confront evolving threats in national security and foreign policy).

**3.** The sixth *Baker* factor applies because there exists potential "embarrassment from multifarious pronouncements" by the President's national security department and the judiciary on the "one question" of whether the AEA may be invoked to help combat TdA. *Baker*, 369 U.S. at 217. The current *back-and-forth* of litigation scattered across the country on whether the President does or does not have the authority to invoke the AEA is the exact situation that *Baker* seeks to avoid, and it is why the political question doctrine is appropriate here.

The President must be afforded a "degree of discretion" to conduct foreign affairs and national security. *Curtiss-Wright*, 299 U.S. at 320. That is because these issues are "complicated, delicate, and [have] manifold problems" that "the President alone has the power" to handle for the

Nation. *Id*. at 319. To avoid "serious embarrassment" here, *Baker*'s sixth factor would advise for judicial restraint. *Curtiss-Wright*, 299 U.S. at 320.

### D. *J.G.G.* does not compel a contrary conclusion.

In *Trump v. J.G.G.*, 145 S. Ct. 1003 (2025), the Supreme Court acknowledged that judicial review under the AEA is "limited," but expressly concluded that an "individual subject to detention and removal under [the AEA] is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'" *Id.* at 1006 (quoting *Ludecke*, 335 U.S. at 163, 172 n. 17).

Importantly, the types of claims recognized as justiciable by the Court in *J.G.G.* and *Ludecke* fall within the core competencies of the judiciary. For example, a court is well equipped to determine whether an individual fits within the parameters of the proclamation (i.e. whether the individual is in fact a Venezuelan or is a member of TdA). *See Ludecke*, 335 U.S. at 172 n. 17 ("The additional question as to whether the person restrained is in fact an alien enemy fourteen years of age or older may also be reviewed by the courts.").

Courts are also obviously well-suited to adjudicate the constitution-ality of a statute or to issue an interpretation of a statute's terms. But, as one district court in this circuit acknowledged, "[o]nce a court defines the parameters of what conduct constitutes an 'invasion' or 'predatory incursion' for purposes of the AEA, the court leaves to the Executive Branch the determination of whether such conduct has been perpetrated, attempted, or threatened." *J.A.V.*, 2025 WL 1257450, at *10. Stated dif-ferently, once a court determines the "meaning of the[] terms" in the AEA, it leaves "to the Executive Branch to determine whether a foreign nation or government has threatened or perpetrated activity that in-cludes such an entry." *Id.*[2]

---

[2] That District Court ultimately concluded that the factual state-ments contained in the President's Proclamation were insufficient to in-voke the statute. *See J.A.V.*, 2025 WL 1257450, at *18. But the Supreme Court has outrightly rejected the attacks on the "sufficiency of the Presi-dent's findings" in matters involving foreign affairs and national security. *See Trump v. Hawaii*, 585 U.S. 667, 686-87 (2018). Indeed, at least one other District Court determined that the Proclamation complies with the statutory definitions found in the AEA. *See A.S.R. v. Trump*, No. 3:25-CV-00113, 2025 WL 1378784, at *17 (W.D. Pa. May 13, 2025) ("When this Court applies that definition to the Proclamation and its finding that TdA is committing a 'predatory incursion,' the Court holds that the Proclama-tion complies with the AEA.").

Such an approach to the doctrine is not unprecedented with courts previously recognizing that certain aspects of a statutory scheme may present a political question while others are still susceptible to judicial definition. *See PMOI*, 182 F.3d at 23-25.

### E. Even if inapplicable, the logic of the doctrine should cabin this Court's review.

Even if this Court ultimately concludes that the political question doctrine is inapplicable, the above considerations strongly counsel in favor of a limited and deferential review of the President's Proclamation. *See Holder*, 561 U.S. at 33–34 ("That evaluation of the facts by the Executive, like Congress's assessment, is entitled to deference. This litigation implicates sensitive and weighty interest of national security and foreign affairs.").

## CONCLUSION

The determination of whether "drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policy making." *Schneider v. Kissinger*, 412 F.3d 190, 197 (D.C. Cir. 2005); *see also Biden v. Texas*, 597 U.S. 785, 816 (2022) (Kavanaugh, J., concurring) ("Nothing in the relevant immigration statutes … suggests Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment" with respect to national security and foreign affairs).

Invoking the AEA to address TdA's hybrid warfare was an act committed to the President's discretion by the Constitution and the AEA itself. This Court should decline to review whether the President properly issued the Proclamation.

June 17, 2025                     Respectfully submitted,

ALAN WILSON
*Attorney General of South Carolina*

*/s/ Thomas T. Hydrick*
THOMAS T. HYDRICK
  *Solicitor General*
JOSEPH D. SPATE
  *Deputy Solicitor General*
BENJAMIN M. MCGREY
  *Assistant Deputy Solicitor General*
Office of the South Carolina Attorney
  General
1000 Assembly Street
Columbia, SC 29201
(803) 734-3970
thomashydrick@scag.gov

*Counsel for Amicus Curiae the State of
  South Carolina*

## ADDITIONAL SIGNATORIES

STEVE MARSHALL
ATTORNEY GENERAL OF
ALABAMA

RUSSELL COLEMAN
ATTORNEY GENERAL OF
KENTUCKY

TREG TAYLOR
ATTORNEY GENERAL OF
ALASKA

LIZ MURRILL
ATTORNEY GENERAL OF
LOUISIANA

TIM GRIFFIN
ATTORNEY GENERAL OF
ARKANSAS

LYNN FITCH
ATTORNEY GENERAL OF
MISSISSIPPI

JAMES UTHMEIER
ATTORNEY GENERAL OF
FLORIDA

ANDREW BAILEY
ATTORNEY GENERAL OF
MISSOURI

CHRIS CARR
ATTORNEY GENERAL OF
GEORGIA

AUSTIN KNUDSEN
ATTORNEY GENERAL OF
MONTANA

RAÚL LABRADOR
ATTORNEY GENERAL OF
IDAHO

MICHAEL T. HILGERS
ATTORNEY GENERAL OF
NEBRASKA

THEODORE E. ROKITA
ATTORNEY GENERAL OF
INDIANA

DREW H. WRIGLEY
ATTORNEY GENREAL OF
NORTH DAKOTA

BRENNA BIRD
ATTORNEY GENERAL OF
IOWA

DAVE YOST
ATTORNEY GENERAL OF
OHIO

KRIS KOBACH
ATTORNEY GENERAL OF
KANSAS

GENTNER DRUMMOND
ATTORNEY GENERAL OF
OKLAHOMA

MARTY JACKLEY
ATTORNEY GENERAL OF
SOUTH DAKOTA

JASON MIYARES
ATTORNEY GENERAL OF
VIRGINIA

JONATHAN SKRMETTI
ATTORNEY GENERAL OF
TENNESSEE

JOHN B. MCCUSKEY
ATTORNEY GENERAL OF
WEST VIRGINIA

KEN PAXTON
ATTORNEY GENERAL OF
TEXAS

RYAN SCHELHAAS
INTERIM ATTORNEY
GENERAL OF WYOMING

## CERTIFICATE OF COMPLIANCE

1.    This document complies with Federal Rule of Appellate Procedure 27(d)(2)(A), because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f ), it contains 5947 words.

2.    This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27, Federal Rule of Appellate Procedure 32(a)(5), and Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font using Microsoft Word.

*/s/ Thomas T. Hydrick*

## CERTIFICATE OF SERVICE

I certify that on June 17, 2025, I electronically filed initial brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/Thomas T. Hydrick*