# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Docket No. 25-10534

W.M.M., F.G.M., and A.R.P., *et al.*,

*Petitioners – Appellants*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents – Appellees*,

**On Appeal from**
United States District Court for the Northern District of Texas,
No. 1:25-cv-59-H

## REPLY BRIEF OF PETITIONERS-APPELLANTS

Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: samdur@aclu.org
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org

Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org
E: dgalindo@aclu.org
E: agorski@aclu.org
E: ptoomey@aclu.org

E: cwofsy@aclu.org

Brian Klosterboer
Tx Bar No.  24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
Adriana Piñon
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS,
INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org
apinon@aclutx.org

E: ojadwat@aclu.org
E: hshamsi@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(212) 549-2500
E: khuddleston@aclu.org

*For Petitioners-Appellants
W.M.M., F.G.M., A.R.P., et al.*

*\*Barred in Texas and Arizona only;
supervised by a member of the D.C.
Bar*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ....................................................................................... 1

ARGUMENT .............................................................................................. 2

   I.    THE PROCLAMATION IS REVIEWABLE. ................................... 2

   II.   THE PROCLAMATION VIOLATES THE AEA. ........................... 4

       A. An "Invasion" Or "Predatory Incursion" Requires Armed Conflict. ...... 4

       B. The Proclamation Does Not Meet the "Foreign Nation or Government" Requirement. ........................................................ 16

   III.   THE NEW NOTICE PROTOCOL IS DEFICIENT ....................... 21

   IV.  THE GOVERNMENT MUST FOLLOW OTHER APPLICABLE PROTECTIONS. ............................................................................ 25

       A. The Government Cannot Bypass the INA's Removal Procedures or Jettison Mandatory Humanitarian Protections. ........................... 25

       B. The Government Must Provide an Opportunity to Voluntarily Depart. ................................................................................... 26

   V.   THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PETITIONERS ......................................................................... 28

CONCLUSION ...................................................................................... 29

CERIFICATE OF SERVICE .................................................................. 31

CERIFICATE OF COMPLIANCE ........................................................ 32

# TABLE OF AUTHORITIES

## Cases

*A.A.R.P. v. Trump*,
145 S. Ct. 1364 (2025)................................................................28

*Abrego Garcia v. Noem*,
2025 WL 1135112 (4th Cir. Apr. 17, 2025).........................................25

*Al-Alwi v. Trump*,
901 F.3d 294 (D.C. Cir. 2018) ................................................4

*Bas v. Tingy*,
4 U.S. 37 (1800) ...............................................................15

*El-Shifa Pharm. Indus. Co. v. United States*,
607 F.3d 836 (D.C. Cir. 2010) ..............................................3

*Ex parte Bollman*,
8 U.S. 75 (1807) .............................................................10

*Fischer v. United States*,
603 U.S. 480 (2024) .........................................................11

*Grace v. Barr*,
965 F.3d 883 (D.C. Cir. 2020) .............................................23

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) ......................................................4, 24

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022)............................................26

*J.A.V. v. Trump*,
2025 WL 1257450 (S.D. Tex. May 1, 2025)............................... passim

*J.G.G. v. Trump*,
2025 WL 1577811 (D.D.C. June 4, 2025)................................23

*J.G.G. v. Trump*,
No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ......... passim

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) .....................................................................12

*Khan v. Obama,*
    741 F. Supp. 2d 1 (D.D.C. 2010).............................................23

*Ludecke v. Watkins,*
    335 U.S. 160 (1948) ........................................................... 2, 3, 4

*The Mary,*
    12 U.S. 388 (1814) ......................................................................19

*The Palmyra,*
    25 U.S. 1 (1827) ..........................................................................19

*The Rapid,*
    12 U.S. 155 (1814) .........................................................................8

*Trump v. J.G.G.,*
    145 S. Ct. 1003 (2025)........................................................ 2, 3, 26

*U.S. ex rel. D'Esquiva v. Uhl,*
    137 F.2d 903 (2d Cir. 1943)..........................................................4

*U.S. ex rel. Jaegeler v. Carusi,*
    342 U.S. 347 (1952) ......................................................................4

*U.S. ex rel. Ludwig v. Watkins,*
    164 F.2d 456 (2d Cir. 1947)........................................................26

*U.S. ex rel. Zdunic v. Uhl,*
    137 F.2d 858 (2d Cir. 1943)..........................................................4

*United States v. Hansen,*
    599 U.S. 762 (2023) .......................................................................6

*United States v. Smith,*
    18 U.S. 153 (1820) .........................................................................9

*United States v. Smith,*
    27 F. Cas. 1192 (C.C.D.N.Y. 1806) ...........................................8

*United States v. Trejo-Galvan*,
  304 F.3d 406 (5th Cir. 2002) ................................................................11

*Ware v. Hylton*,
  3 U.S. 199 (1796) ................................................................................10

*Worcester v. Georgia*,
  31 U.S. 515 (1832) ............................................................................9, 13

**Statutes**

1 Stat. 96 ..................................................................................................10

1 Stat. 264 ..................................................................................................6

1 Stat. 329 ................................................................................................11

1 Stat. 384 ................................................................................................10

1 Stat. 424 ..................................................................................................6

1 Stat. 558 ............................................................................................6, 15

1 Stat. 725 ..................................................................................................7

2 Stat. 759 ..........................................................................................19, 20

8 U.S.C. § 1182(a)(7) ..............................................................................23

8 U.S.C. § 1189 ..........................................................................................5

8 U.S.C. § 1225(b)(1)(A)(i) ....................................................................23

8 U.S.C. § 1229a(a)(3) ............................................................................25

10 U.S.C. subtitle A, pt. V ......................................................................20

50 U.S.C. § 21 ............................................................................13, 16, 26-27

**Regulations**

8 C.F.R. § 208.9(b) ..................................................................................24

8 C.F.R. § 208.30(b) ................................................................................24

8 C.F.R. § 208.30(d)(1) ...................................................................24

8 C.F.R. § 1208.30(g)(2) ...............................................................24

**Constitutional Provisions**

U.S. Const. art. I § 8 cl. 11 ...........................................................11

**Treatises**

1 William Blackstone & Edward Christian, Commentaries on the Laws of England (14th ed. 1803)................................................................20

1 Matthew Hale, The History of the Pleas of the Crown  (1736), *available at* https://bit.ly/4neo6pJ ......................................................... 13-14

2 Thomas Rutherforth, Institutes of Natural Law (3d ed. 1799) ............................10

Christian Wolff, Jus Gentium Methodo Scientifica Pertractatum (1764 ed., pub. 1934)................................................................................13

Cornelius Van Bynkershoek & Peter Stephen Du Ponceau, Treatise on the Law of War (1810) ...................................................... 8, 19, 21

D.A. Azuni, Maritime Law of Europe (1806)............................................ 19, 20, 21

Emer de Vattel, Law of Nations (1st ed. 1796)................................................. 19, 20

Emer de Vattel, Law of Nations (1863) ................................................. 12, 13, 14, 27

Hugo Grotius & Archibald Colin Campbell, Rights of War and Peace, Including the Law of Nature and of Nations (1814)...................................... 20, 21

Jean-Jacques Burlamaqui, Principles of Natural and Politic Law (4th ed. 1792) . 12, 13, 14

Richard Lee, Treatise of Captures in War (2d ed. 1803) ........................................20

**Other Authorities**

8 Annals of Cong. 1581 ...............................................................13

8 Annals of Cong. 1790-91 ...........................................................11

8 Annals of Cong. 1980 ...............................................................11

v

Articles of Confederation art. VI .......................................................................10

Br. for Pet'r, *Ludecke v. Watkins*, 1948 WL 47492 (Apr. 30, 1948) .......................22

Br. for Pet'r, *U.S. ex rel. Jaegeler v. Carusi*, 1951 WL 82066 (Dec. 12, 1951) ......22

Continental Congress, *Letter of Marque Issued to Northampton*, Oct. 24, 1776
(N.C. Digital Collections)......................................................................19

Dep't of Defense, Law of War Manual (July 2023),
https://perma.cc/34BB-GG95 ......................................................... 24-25

*Enemy*, Barlow's Complete English Dictionary (1772) ...........................................8

Federalist No. 8 ..................................................................................................7

Federalist No. 25 ..........................................................................................7, 13

Federalist No. 41 ..........................................................................................7, 10

George Washington to Thomas Jefferson (Feb. 6, 1781)..........................................9

Gov't Br., *W.M.M. v. Trump*,
No. 1:25-cv-59 (N.D. Tex. Apr. 16, 2025), ECF No. 19 ......................................16

Gov't Stay Appl., *D.V.D. v. DHS*,
No. 24A1153 (U.S. May 27, 2025) ..................................................................21

Hamilton, The Examination No. 1 (Dec. 17, 1801).................................................13

*Hostile*, Ash's New and Complete Dictionary of the English Language (1795).......7

*Hostilities*, Duane's Military Dictionary (1810)......................................................7

*Hostility*, Dyche's New General English Dictionary (1771) .....................................7

*Hostilities*, James's New and Enlarged Military Dictionary (1805)..................... 7-8

*Hostility,* Ash's New and Complete Dictionary of the English Language (1795).....7

*Hostility*, Johnson's Dictionary (1773) ...................................................................7

*Incursion*, Bailey's Universal Etymological English Dictionary (1770)..................8

*Incursion*, Webster's American Dictionary of the English Language (1828)............8

*Inroad*, Dyche's New General English Dictionary (1754) .......................................8

James Madison, Report of 1800.................................................................................7

James Morton Smith, Freedom's Fetters (1956)............................................... 12, 15

John Adams, Special Session Message (May 16, 1797)............................................9

John Wood, The Suppressed History of the Administration of John Adams (1846).9

Life and Speeches of Henry Clay (1854).................................................................9

Martti Koskenniemi, et al., International Law and Empire (2017) ........................21

ODNI, *Members of the Intelligence Community*,
   https://perma.cc/H7ZV-JDDH ...............................................................................17

**INTRODUCTION**

The Alien Enemies Act ("AEA") applies only to armed conflict (i.e. military conflict), as Judge Henderson and district courts have overwhelmingly held. Opening Brief ("OB") 10-11, 24.  The government understandably does not claim that such a conflict exists or that the Proclamation would satisfy this standard. Instead, the government seeks a limitless expansion of the statute beyond wartime, to cover any "coordinated entry" for "a common destructive purpose."  Answering Brief ("AB") 27.  But the overwhelming weight of contemporaneous usage and context makes clear that this was a wartime statute, not an unbounded, all-purpose statute to address any harmful activity.  Nor can the Proclamation's conclusory statement that Tren de Aragua ("TdA") acts partly at Maduro's "direction" in some nebulous fashion excuse that the Proclamation did not and could not have named Venezuela as the statutorily-required "foreign government or nation."  This is especially so given that 17 of 18 national security agencies concluded that it is "highly unlikely" that Venezuela cooperates with TdA.

Virtually every ethnic group in this country has historically been associated with a criminal organization that could in some way be alleged to have entanglements with their home country's government.  The implications of the government's proposed expansion of the AEA are staggering and should be rejected.

1

Regarding process, after the Supreme Court twice rejected its efforts to send people to the Salvadoran CECOT prison without review, the government now proposes a marginally revised process. But it still provides too little time to secure counsel for a complex habeas petition involving an eighteenth-century wartime statute and fails to supply critical information.

On the equities, the government claims that Petitioners offer only "generic concerns." AB.6. But the government does not genuinely attempt to dispute CECOT's abuses—torture and indefinite incommunicado detention without trial— or that the United States is paying to have AEA deportees held there. Nor does the government acknowledge that Congress has provided other tools specifically to detain and remove gang members, Foreign Terrorist Organization ("FTO") members, and those who commit crimes, including a special Alien Terrorist Removal Court. OB.4. Instead, the government seeks to convert a wartime authority—used only three times in 227 years, all during major wars—into a general-purpose tool for the President to target any group of immigrants.

## ARGUMENT

## I.    THE PROCLAMATION IS REVIEWABLE.

The government acknowledges, as it must, that "questions of interpretation and constitutionality of the Act" are reviewable. AB.24 (quoting *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025), and *Ludecke v. Watkins*, 335 U.S. 160, 163 n.17

(1948)).  The government contends, however, that the Supreme Court has "construed the AEA only to the extent necessary to reject the argument that the President ha[s] exceeded the scope of his authority under the AEA."  AB.25 (internal quotation omitted).  But that is precisely what Petitioners seek here—a determination of whether the Proclamation satisfies the AEA's requirements.

It is thus undisputed that the Court can interpret the statute's requirements to determine whether the Proclamation satisfies them, regardless of what limits may exist once the AEA's predicates are met.  OB.20-22.  Without that, the statute's textual limits would disappear.

The government briefly invokes the political question doctrine, AB.26, but *J.G.G.* and *Ludecke* foreclosed that as well.  *See also El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855-56 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("The Supreme Court has never applied the political question doctrine in cases involving statutory claims[.]").  Review of these statutory claims is thus unaffected by cases finding that the *Constitution*'s Guarantee Clause is not judicially enforceable.  AB.26; *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, *7 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) ("insofar as *California* has any bearing on this case, it is against the government"); *id*. at *7 n.4.

Because the Proclamation fails on its face, the Court need not address the validity of its findings; nonetheless, the government wrongly claims that the

Proclamation's *factual* assertions are all but unreviewable.  AB.26-27.  That would eviscerate the AEA's textual limits because a President could simply assert that the predicates were met.  Even during World War II, courts reviewed facts to determine whether the AEA's requirements were satisfied.  *Ludecke*, 335 U.S. at 166-70 (determining whether "declared war" existed as a factual matter); *U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952) (similar, concluding "declared war" no longer existed); *U.S. ex rel. D'Esquiva v. Uhl*, 137 F.2d 903, 905-07 (2d Cir. 1943) (reviewing facts and ordering factfinding on whether the U.S. had recognized Austria's annexation by Germany); *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860-61 (2d Cir. 1943) (similar).

These AEA cases are consistent with the factual review in other military contexts.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) (plurality op.) (asking "[i]f the record establishes that United States troops are still involved in active combat"); *Al-Alwi v. Trump*, 901 F.3d 294, 298-300 (D.C. Cir. 2018) (evaluating "[t]he record" to conclude "active hostilities" existed).

## II.    THE PROCLAMATION VIOLATES THE AEA.

### A.    An "Invasion" Or "Predatory Incursion" Requires Armed Conflict.

By its own terms, the Proclamation is premised principally on TdA "engag[ing] in mass illegal migration to the United States" and "us[ing] drug trafficking as a weapon."  AB.34 (relying on "weapons, drugs, and illegal migrants"

as the "incursion"). But none of those activities meet the AEA's requirement of an "organized armed attack." *J.A.V. v. Trump*, 2025 WL 1257450, *16, *18 (S.D. Tex. May 1, 2025) (invalidating Proclamation because AEA limited to "military" conflict); *J.G.G.*, 2025 WL 914682, *9 (Henderson, J., concurring) ("The theme that rings true is that an invasion is a military affair, not one of migration."); *id*. at *10 ("Like its statutory counterparts, predatory incursion referred to . . . a form of attack short of war."). And understandably, the government does not claim that the Proclamation alleges an armed conflict.[1]

Rather, the government argues that no armed conflict is required. *See*, *e.g.*, AB.30 ("predatory incursions extend beyond armed conflict"). But the government marshals little support for the limitless expansion it proposes, which would transform a military measure into an all-purpose law enforcement tool.

1. The first and virtually dispositive indication that the AEA is exclusively a wartime measure for armed conflict is its use of the legal term "alien enemies"—including its title. When Congress enacted the AEA, the term "alien enemies" had a well-established meaning, referring to the concept that, during a time of armed conflict, all citizens of one nation were mobilized against all citizens of the other

---

[1] Respondents note TdA is designated an FTO under a different statutory regime. AB.11. Not only is designation as an FTO a low standard, but the statutory predicates under that statute are wholly different than the AEA's. 8 U.S.C. § 1189; OB.35-36.

nation.  OB.24-26, 31; *United States v. Hansen*, 599 U.S. 762, 774 (2023) (courts presume statutes incorporate established terms of art).  In response, the government has not identified a *single* contemporaneous source recognizing the concept of "alien enemy" status outside of armed conflict or claiming that Congress meant to depart from that meaning in the AEA, nor found a single instance of the United States or any other country doing so, before or since 1798.  The use of "alien enemies" in the statute would have made no sense at the time unless it was referring to military conflict.[2]

2.  Without a response to the use of "alien enemies" as the AEA's overarching focus, the government tries to offer expansive constructions of "invasion" and "predatory incursion" that go beyond military conflict.  AB. 29-30, 40-42.  But contemporaneous usage overwhelmingly cuts the other way.

At the AEA's enactment, Congress consistently used "invasion" to describe acts involving a military conflict.  1 Stat. 264 (authorizing summoning militia "whenever the United States shall be invaded"); 1 Stat. 424 (same); 1 Stat. 558 (authorizing raising army "in the event of a declaration of war against the United

---

[2] Respondents cite a 1917 statute narrowly defining the term "enemy," arguing that where Congress wants to limit the term it knows how to do so.  AB.38.  But the 1917 statute was not enacted contemporaneously.  Also, it defines the broad term "enemy," not "alien enemy."  The legal term "alien enemies" was so well-understood at the founding that, absent qualification, it would have been understood to have its accepted meaning.

States, or of actual invasion of their territory, by a foreign power"); 1 Stat. 725 (similar).

The government does not dispute that the Constitution also repeatedly uses "invasion" to refer to acts involving the military—in the event of an invasion, states can engage in war and Congress can call forth the militia. OB.27-28. In all kinds of writings, the generation that enacted the AEA used "invasion" the same way. *See, e.g.*, James Madison, Report of 1800 ("Invasion is an operation of war."); Federalist No. 8 (using "invader" and "invasion" to describe "war"); Federalist No. 25 (discussing "foreign invaders" perpetrating undeclared war); Federalist No. 41 (standing navy to protect against "invaders," and contemplating "war"); OB.27-29.

The government relies heavily on dictionaries that defined "invasion" as a "hostile" entrance or encroachment. AB.29, 40. But contrary to the government's use of "hostile" in the colloquial sense of unfriendly or adverse, the term and its variants consistently referred to armed, organized action that involved the military, and arose in the context of conflict between nations. *See, e.g.*, *Hostile*, Ash's New and Complete Dictionary of the English Language (1795) ("Suitable to an enemy, warlike"); *id*., *Hostility* ("A state of war"); *Hostility*, Dyche's New General English Dictionary (1771) ("Open war"); *Hostility*, Johnson's Dictionary (1773) ("open war"); *Hostilities*, Duane's Military Dictionary (1810) ("act of hostility" tantamount to "declaration of war"); *Hostilities*, James's New and Enlarged Military Dictionary

7

(1805) (same); Cornelius Van Bynkershoek, Treatise on the Law of War 58 (1810) (equating "hostilities" with "war"); *The Rapid*, 12 U.S. 155, 162 (1814) (referring to wartime enemy as "hostile country"); *United States v. Smith*, 27 F. Cas. 1192, 1230 (C.C.D.N.Y. 1806) ("invasive hostilities" create "war").  By defining invasions as hostile acts, the government's own citations thus undermine its theory that the AEA goes beyond armed conflict. *J.G.G.*, 2025 WL 914682, *8 (Henderson, J., concurring) (limiting AEA to "military" context, noting "invasion" is "legal term of art" that required "hostilities").[3]

The same is true of "predatory incursion."  The government claims that no contemporaneous dictionaries defined "incursion" in "expressly military terms." AB.35.  But they did.  *See, e.g.*, *Incursion*, Webster's American Dictionary of the English Language (1828) ("detachments of an enemy's army, entering a territory for attack"); *Incursion*, Bailey's Universal Etymological English Dictionary (1770) ("An Inroad of Soldiers into an Enemy's Country.").  Even the two dictionaries the government cites refer to terms for armed conflict.  AB.29, 35 ("hostile" entrance, "invasion without conquest").[4]

---

[3] Respondents cite Barlow's definition of "invasion" as an "attack of an enemy." AB.40.  But an "enemy" was "one who is of an opposite side in war." *Enemy*, Barlow's Complete English Dictionary (1772).

[4] Similarly, Respondents' definitions of "incursion" include "inroad," which meant "the invasion or coming in of an army into the lands or territories of another to commit hostilities." *Inroad*, Dyche's New General English Dictionary (1754).

The use of "incursion" to refer to acts of war—not criminal acts requiring a law enforcement response—was ubiquitous at the time of the AEA. *See*, *e.g.*, John Adams, Special Session Message (May 16, 1797) (calling for standing army "to guard against sudden and predatory incursions"); Life and Speeches of Henry Clay 16 (1854) (reproducing 1811 speech calling for troops to guard against "invasions and predatory incursions"); George Washington to Thomas Jefferson (Feb. 6, 1781) ("incursions" by British troops during Revolutionary War);[5] *cf.* John Wood, The Suppressed History of the Administration of John Adams 290-91 (1846) (describing same incident as "predatory incursion"); *J.A.V.*, 2025 WL 1257450, *15 ("significant majority" of historical sources used "invasion" and "predatory incursion" to refer to "an attack by military forces").

The government cites a few mentions of "incursions" by pirates and Native Americans. AB.31-32. But those only underscore the AEA's requirement of armed conflict. *Worcester v. Georgia*, 31 U.S. 515, 545 (1832) (describing incursions that "authorize[] offensive as well as defensive war"). Armed pirate ships were repelled by nations using military force. *United States v. Smith*, 18 U.S. 153, 163 n.h (1820) ("pirate[s]" have "armed vessel[s]"); 2 Thomas Rutherforth, Institutes of Natural

---

[5] Respondents rely on an address by George Washington, AB.32, discussing individuals engaging in a predatory incursion, but that is an outlier, at best. *J.A.V.*, 2025 WL 1257450, *16 ("Although other uses exist for these terms, those rare uses do not represent the ordinary meaning of those terms.").

Law 481 (1799) ("nation" can "make[] war upon pirates"). Their raids on coastal communities looked like any military attack and engendered the same sort of response. Federalist No. 41 (both "foreign enemy" or "pirate" attacks against "maritime towns" necessitate a navy); Articles of Confederation art. VI (states "infested by pirates" can outfit "vessels of war" against them). Armed Native American attacks against U.S. territory were similarly military in nature. *Ware v. Hylton*, 3 U.S. 199, 202-03 (1796) (describing Native Americans "furnished with arms, ammunition and weapons of war . . . for the purpose of enabling them to prosecute war"). And, notably, Congress authorized the President to call in the militia in response to such "hostile incursions" by Native Americans. 1 Stat. 96.

The government is therefore wrong that the AEA's use of "invasion" and "predatory incursion" suggests an intent to allow the President to declare "alien enemies" in times other than military conflict. The AEA's requirement that an invasion or incursion be "against the territory of the United States" reinforces that Congress had military acts in mind—ones that undermined our territorial control— not criminal acts committed within U.S. territory. *J.G.G.*, 2025 WL 914682, *8 (Henderson, J., concurring) ("Undesired people do not arrive against the territory. But foreign armies can[.]"); *cf.* 1 Stat. 384 (criminalizing "any military expedition or enterprise . . . against the territory or dominions of any foreign prince or state" at peace with the U.S.); *Ex parte Bollman*, 8 U.S. 75, 131 (1807). In contrast, ordinary

10

*crimes* were committed "against the person or property" of a private individual. *United States v. Trejo-Galvan*, 304 F.3d 406, 408 (5th Cir. 2002); 1 Stat. 329 (criminalizing "murder" and "other crime against the person or property of any friendly Indian"); *J.A.V.*, 2025 WL 1257450, *16 (emphasizing invasion and incursion as military entry into territory).

Surrounding text and context reinforce that the AEA is about armed conflict. First, "invasion" and "predatory incursion" appear in a list beginning with "declared *war*" (emphasis added). *Fischer v. United States*, 603 U.S. 480, 487 (2024) ("word is given more precise content by the neighboring words") (cleaned up). Second, the statute requires an invasion or incursion by a "hostile" foreign nation and, as noted, "hostile" signals war. Third, the AEA was enacted pursuant to Congress's power "[t]o declare War." U.S. Const. art. I § 8 cl. 11; 8 Annals of Cong. 1980. Fourth, the AEA's undisputed historical context was the possibility of "war with France," and the drafters made clear that "in a time of tranquility" they would *not* "put a power like this into the hands of the Executive," but that "in a time of war, the citizens of France" should become alien enemies. 8 Annals of Cong. 1790-91; OB.26. The AEA was intended where a military response to another nation was called for. This mountain of evidence forecloses the government's attempt to narrow the focus to a handful of carefully selected dictionary definitions.

Moreover, the same Congress passed a *different* statute (the Alien Friends Act, "AFA") to govern removal of noncitizens who committed crimes or other harmful activities *outside* of war. OB.27. The government does not deny that the AFA addressed the same kinds of activity that it now claims the AEA covers—thus rendering the AFA superfluous. AB.39. It cites a source that describes the two Acts as "overlapping." James Morton Smith, Freedom's Fetters 49 (1956). But the overlap was that, while the AEA was only for "wartime," the AFA was "enforceable in peacetime as well as wartime." *Id.* Indeed, the AEA avoided controversy precisely because it was only for wartime. *Johnson v. Eisentrager*, 339 U.S. 763, 774 n.6 (1950) (drafters were "emphatic in distinguishing between the two bills"); *see also J.G.G.*, 2025 WL 914682, *1 (Henderson, J., concurring) (AEA was AFA's "wartime counterpart" ).

3. The government maintains that requiring armed conflict would fail to "give[] independent effect" to "invasion" and "incursion," separate from "declared war." AB.29-30. But Congress had to enumerate both sets of terms to match the law of nations' framework for "alien enemies," which recognized a distinction between "offensive" and "defensive" wars. Jean-Jacques Burlamaqui, Principles of Natural and Politic Law 348-49 (1792) (the aggressor "commences an offensive war and he who opposes him … begins a defensive war."). Offensive wars began with a written "declaration" of war. *Id.* at 362; Emer de Vattel, Law of Nations 315-16

12

(1863). Defensive wars did not require a declaration, because the hostile act—a military attack on another nation's territory—itself established a state of war. *See, e.g.*, Vattel, Nations 316-17 (1863) ("He who is attacked and only wages defensive war, needs not to make any hostile declaration" because "open hostilities" establish "the state of warfare"); Burlamaqui, Principles 362 (same); Christian Wolff, Jus Gentium 368 (1934) (same); Hamilton, The Examination No. 1 (Dec. 17, 1801) (same).

Congress tracked this distinction in the AEA by providing for alien enemy status during both an *offensive* "declared War" and a *defensive* response to an "invasion" or "predatory incursion." 50 U.S.C. § 21; *Worcester*, 31 U.S. at 545 (discussing "defensive war" "to repel invasion" and "to repel [] incursions").[6]

Indeed, defensive war was precisely what the AEA's drafters were concerned about, 8 Annals of Cong. 1581, particularly since Congress was not always in session to issue an immediate declaration of war in response.[7] The law of nations specifically recognized that alien enemy status was appropriate in defensive wars. 1

---

[6] Invasion differs from incursion because the former signals an intent to conquer land, whereas the latter is a more limited military attack against the territory to weaken the enemy "with a subsequent retreat." *J.A.V.*, 2025 WL 1257450, *16; *J.G.G.*, 2025 WL 914682, *10 (Henderson, J., concurring); OB.24 (incursion is "[i]nvasion without conquest").

[7] The need to address undeclared defensive wars would have been obvious to Congress because formal declarations of war had largely "fallen into disuse." Federalist No. 25.

Matthew Hale, Pleas of the Crown 163 (1736); Vattel, Nations 399 (1863). To match the AEA with the law of nations, Congress thus had to include "invasion" and "incursion," to cover defensive wars commenced with an organized, armed attack on U.S. soil.

The government also relies on the AEA's use of "threatened" and "attempted," AB.30, 37-38, but those terms do not signal any deviation from the law of nations, which recognized the use of defensive measures in response to *anticipated* military hostilities, without waiting for the attack to materialize. Vattel, Nations 302 (1863); Burlamaqui, Principles 363. The government points to the Cuban Missile Crisis as a threatened incursion, AB.38, but that only proves Petitioners' point: the AEA requires the threat of *armed conflict*, and the Proclamation alleges no threat by TdA akin to nuclear missiles in Cuba.

4. Contrary to the government's argument, AB.30-32, the historical context of the Quasi War supports Petitioners. The AEA was passed in response to heightened tensions with France, in case that conflict required an offensive declaration of war or led to an attack against U.S. territory. OB.26; *J.G.G.*, 2025 WL 914682, *1, 9 (Henderson, J., concurring). Congress's inclusion of defensive war—granting the President the power to respond to sudden military attack—makes particular sense given Congress's concern that France would engage in armed military conflict against U.S. territory while Congress was out of session. *See* 1 Stat.

558 (authorizing President to respond to military attacks during Congressional recess).

But France did not ultimately attack U.S. territory, and the AEA was therefore never invoked—which the government omits. Smith, Freedom's Fetters 93 (government's source noting the AEA "was never in effect during the Adams administration"). Thus, in the absence of a French attack, Congress authorized only a limited use of force as needed under a different statutory authority. *Bas v. Tingy*, 4 U.S. 37, 40-41 (1800) (Washington, J.) (during the Quasi War "all the members [we]re not authorized to commit hostilities"); *id.* at 43 (Chase, J.) ("the authority [wa]s not given, indiscriminately, to every citizen of *America*, against every citizen of *France*"). If the Quasi War was not enough to invoke the AEA, clearly the Proclamation is not either.

Nor is the government helped by the Proclamation's vague reference to "irregular warfare." The AEA cannot be satisfied simply by placing a label on activities that do not constitute an organized armed conflict. *J.A.V.*, 2025 WL 1257450, *18 n.11 ("irregular warfare" language "merely refers to" TdA conduct specifically described).

## B.    The Proclamation Does Not Meet the "Foreign Nation or Government" Requirement.

The government no longer claims that TdA itself is a "government" or "nation."[8]  Instead, it argues this requirement is satisfied because the Proclamation asserts TdA action "at the direction of Venezuela's Maduro regime."  AB.44.  But the Proclamation's assertions on their face do not satisfy the AEA; they are also factually baseless.

1.  The Proclamation does not assert what the statute requires:  It does not claim that *Venezuela* has invaded or made incursions into the United States.  And it does not say that the "natives, citizens, denizens, or subjects" of *Venezuela* are alien enemies.  Instead, it claims there is an invasion by a *private* group that receives "direction" from the regime, direction which the government describes only as *coordination* with a regime-sponsored cartel to sell drugs.  AB.44 (citing Proclamation).  But Congress required an attack by a "nation or government" itself, not a private group with a loose and vague connection to a government.  50 U.S.C. § 21.

The Proclamation also does not allege that the Venezuelan government actually controls TdA's activities.  It declares that TdA is undertaking actions "both

---

[8] *Contra, e.g.*, Gov't Br., *W.M.M. v. Trump*, No. 1:25-cv-59 (N.D. Tex. Apr. 16, 2025), ECF No. 19 at 21 ("TdA is a foreign nation or government for purposes of 50 U.S.C. § 21.").

directly and at the direction . . . of the Maduro regime." But despite vaguely claiming TdA to be a "hybrid criminal state," the Proclamation does not in fact specify what particular "actions," beyond possibly migration and drug *coordination*, are "at the direction" of Venezuela. *J.A.V.*, 2025 WL 1257450, *4, 18 n.11. Nor does the Proclamation claim that TdA is "an arm of" or "part of" the Venezuelan government. *Contra* AB.44, 45.

2. Even if they were facially sufficient, the Proclamation's assertions about state control are factually baseless. Courts have repeatedly reviewed factual questions like these to ensure the Executive stays within the bounds of the AEA. *Supra* Section I.

The overwhelming majority of U.S. intelligence agencies—17 of 18—have rejected the Proclamation's claim, concluding it is "highly unlikely" that the Maduro regime and TdA "cooperate in a strategic or consistent way." Supp.ROA.Tab.P.2 (noting that "the regime treats TdA as a threat").[9] The intelligence community "has not observed the regime directing TDA," even though coordination-related communications and financing are things the agencies "would collect" if they existed. Supp.ROA.Tab.P.3. The agencies also disagree with the Proclamation's description of TdA activities in the United States. As they explain, TdA's "focus on low skill criminal activities, and its decentralized structure make it highly unlikely

---

[9] ODNI, *Members of the Intelligence Community*, https://perma.cc/H7ZV-JDDH.

that TDA coordinates large volumes of human trafficking or migrant smuggling." Supp.ROA.Tab.P.1; *see also* ROA.826 (government's own declarant testifying that TdA is "a loosely affiliated collection of independent cells committing disorganized and opportunistic crimes").

The government has submitted none of these intelligence assessments, only the FBI's lone assessment (of "medium confidence") that "*some* Venezuelan Government officials likely facilitate the migration of [TdA] members from Venezuela to the United States." Resp.Supp.ROA.Tab.C.20, 23 (emphasis added). But it neglects to mention that even the FBI concluded it "more or less equally plausible" that TdA's activity "is not actively planned or centrally supported by the Venezuelan Government." Resp.Supp.ROA.Tab.C.24. Those doubts make sense. As other agencies explain, the evidence of regime control over TdA comes from just a few individuals in U.S. custody with no direct knowledge of any such control, and whose circumstances make them "motivated to fabricate information"—something the FBI does not deny. Supp.ROA.Tab.P.2-4 (concluding such evidence "not credible"); *see also* Resp.Supp.ROA.Tab.C.23.

Vague, conclusory assertions rejected by every other agency are too thin a basis for invoking the AEA's sweeping powers—particularly when the lone view to the contrary among many intelligence agencies was based on only "medium confidence." If that were enough, virtually any private group could be alleged to

18

have governmental ties and then targeted under the AEA. Whatever deference is due, the Proclamation's conclusory statements are not enough.

If the government's theory were correct, not only would TdA's alleged actions call for a military response, not a law enforcement one, but the United States could also declare war against Venezuela. That is inconceivable, and indeed, the administration has testified there is *no* assessment we are at war with or being invaded by Venezuela. OB.34.

3. The government claims that TdA members are like privateers who fought for France in the Quasi-War. AB.46-47. Privateers, however, were granted official sovereign authority, through written public charters, to wage war on behalf of a nation state. *See, e.g.*, Continental Congress, *Letter of Marque Issued to Northampton*, Oct. 24, 1776 (N.C. Digital Collections);[10] 2 Stat. 759 (privateering required written application and posting of bond); Bynkershoek, Treatise 161; D.A. Azuni, Maritime Law 354-55 (1806). Privateers often served as a national navy for nations that did not maintain standing navies. *See, e.g.*, Bynkershoek, Treatise 140. Critically, these commissions were *public* and subject to judicial review, to protect privateers from allegations of piracy and robbery. *Id.* at 139-40 (privateers under "the sanction of public authority" with "commission"); Vattel, Nations 400 (1796) (commission gave status of prisoners of war); *The Palmyra*, 25 U.S. 1, 8-18

---

[10] https://perma.cc/R55L-BHY8.

(1827). And because of their official status, they were treated as the sovereign's own armed forces under the laws of war. *See, e.g.*, *The Mary*, 12 U.S. 388, 397 (1814) (privateers were "part of the armed forces of the nation"). Thus, when captured, they were treated as prisoners of war, not criminals; they received state disability pensions; and, upon receipt of a commission, "ha[d] the same power and jurisdiction as the general of an army." Azuni, Maritime 353-54, 360; Vattel, Nations 466 (1796); 1 Blackstone, Commentaries 259 (1803); 2 Stat. 759, 763-64. Any acts they committed outside the bounds of their public written authority were accordingly not attributable to the sovereign. Richard Lee, Treatise of Captures in War 211 (1803).

TdA, by contrast, has no official or public authority to make war on behalf of Venezuela. *Compare* 10 U.S.C. subtitle A, pt. V (defense contractors). The Proclamation cites no formal or public agreement between the Maduro regime and TdA. And the United States does not hold TdA members as prisoners of war but prosecutes them under ordinary domestic criminal law. TdA bears none of the features that would have made its acts attributable to Venezuela at the time of the AEA.

The government similarly invokes pirates to show that the AEA's drafters were familiar with war against non-state actors. AB.46. But it was well established that pirates "form no national body" and were not "clothed with any public authority." Azuni, Maritime 361-62; Hugo Grotius, Rights of War and Peace 161-

62 (1814) ("nor can a band of pirates or robbers ever become a state"). Authorities were unanimous that pirate activity was private violence not attributable to any state actor. *See, e.g.*, Bynkershoek, Treatise 127; Grotius, Rights 160; Azuni, Maritime 361. That explains why alien enemy status has never been applied to pirates, or indeed, anything other than a nation.[11]

## III.    THE NEW NOTICE PROPOSAL IS DEFICIENT.

The requirement that Petitioners receive sufficient notice and opportunity to bring habeas actions stems from due process, as the Supreme Court has now twice held in *J.G.G.* and *A.A.R.P.*, as well as from basic habeas principles and the AEA itself. AB.49, 59-60; Gov't Stay Appl. 35 n.10, *D.V.D. v. DHS*, No. 24A1153 (U.S. May 27, 2025).[12]

1. Petitioners must receive 30 days, not the mere seven days now proposed by the government. To date, Petitioners are aware of *no* individual that has managed to file an AEA case *pro se*. Indeed, it is hard to imagine how an individual would know what to file given that even the new form does not explain what a habeas petition is,

---

[11] Respondents reference the Barbary Wars (AB.31, 46), but those involved armed forces of sovereign nations, not pirates. *See, e.g.*, Bynkershoek, Treatise 131 ("The Algerines, Tripolitans, Tunisians, and those of Salee, are not pirates."); Martti Koskenniemi, et al., International Law and Empire 205-06 (2017) (same).

[12] Respondents cite regular immigration entry cases for the proposition that due process may not require notice to AEA detainees, but that is simply an attempt to relitigate *J.G.G.* and *A.A.R.P.*

21

or, beyond providing a mailing address, what is required to file one. ROA.1125-26. The government nonetheless claims that seven days is sufficient because detainees can request a list of supposedly available counsel, AB.54, but ignores Petitioners' showing of the limited attorney pool for complex federal habeas litigation, especially *pro bono*. OB.44-45. The government also does not contest that finding counsel will only become more difficult as more individuals are designated—particularly if hundreds or thousands of individuals must seek habeas relief as to their own particular designation in courts throughout the country.

Tellingly, the government provided a 30-day period during World War II despite a global conflict, the invasion of Hawai'i, and German saboteurs in the United States. The internet solves little given that detained immigrants generally lack computer access. ROA.643. And the government provides no evidence to support their assertion that detained immigrants accused of being members of TdA have "greater access to legal services" than German or Japanese nationals had. AB.55. In fact, AEA designees during World War II received notice of their designation months or even years before removal, and then had the opportunity to appear before a civilian board followed by habeas review. *See, e.g.*, Br. for Pet'r, *Ludecke v. Watkins*, 1948 WL 47492, *3 (Apr. 30, 1948) (Ludecke interned as alien enemy over four years before receiving order of removal); Br. for Pet'r, *U.S. ex rel. Jaegeler v. Carusi*, 1951 WL 82066, *4 (Dec. 12, 1951) (similar). In contrast, the

government now proposes giving designees just seven days to locate a lawyer and file a habeas, with no notice of specific allegations against them.

2. The government analogizes the use of this wartime authority to expedited removal procedures in immigration law, AB.51, but the differences only underscore why a minimum of 30 days' notice is necessary. Expedited removal is an administrative proceeding where immigration officers generally make simple and frequently uncontested determinations—for example, whether a noncitizen is seeking admission without valid documents. 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(7). The government's suggestion that TdA membership likewise constitutes a simple question is belied by the record. "[S]ignificant evidence has come to light indicating that many of those currently entombed in CECOT have no connection to the gang and thus languish in a foreign prison on flimsy, even frivolous, accusations." *J.G.G. v. Trump*, 2025 WL 1577811, *2 (D.D.C. June 4, 2025).[13]

The government's analogy to the asylum "credible fear" process, AB.51, likewise fails. That process begins with a "nonadversarial" interview with an asylum officer, 8 C.F.R. § 208.9(b), subject to a statutorily mandated "low screening

---

[13] For membership in the Taliban and al-Qaeda, courts have recognized that "determination[s] must be made on a case-by-case basis by using a functional . . . approach . . . focusing on the actions of the individual in relation to the organization" and "consider[ing] the totality of the evidence." *Khan v. Obama*, 741 F. Supp. 2d 1, 5 (D.D.C. 2010) (cleaned up).

standard," *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). Asylum officers are required to "elicit all relevant and useful information," and then independently apply the low threshold standard, with no need for *legal* argument by the noncitizen. 8 C.F.R. §§ 208.30(b), (d)(1). And the final review of that non-adversarial determination occurs before immigration judges who do not require formal legal briefing, much less initiating a case in federal court as a detained immigrant. 8 C.F.R. § 1208.30(g)(2).

3. The form itself is also insufficient. Whether an individual will want to contest removal may depend significantly on whether they are designated for removal to Venezuela or to the foreign CECOT prison in El Salvador (or Libya or South Sudan, where the government has recently tried to send other detainees). Yet the form nowhere reveals that information.

The factual basis for the TdA allegations must also be provided, even at a broad level (*e.g.*, designation based on the presence of alleged gang tattoos). Notably, the Department of Defense requires, for detainees anywhere in the world, that "[d]etainees shall be informed promptly of the reasons for their detention" and that "[w]hen feasible, more specific information should be provided." Dep't of Defense, Law of War Manual, 535-36 (July 2023);[14] *Hamdi*, 542 U.S at 533 (plurality op.) (requiring "notice of the factual basis for . . . classification" as enemy

---

[14] https://perma.cc/34BB-GG95.

combatant *before* opportunity to be heard).  And counsel should also receive notice.  OB.17-18.

Because the government is sending AEA detainees to the notorious CECOT prison and claims that it cannot remedy mistaken removals, *Abrego Garcia v. Noem*, 2025 WL 1135112, *2 (4th Cir. Apr. 17, 2025), due process simply cannot tolerate the glaring weaknesses in the government's anemic new process.

## IV.    THE GOVERNMENT MUST FOLLOW OTHER APPLICABLE PROTECTIONS.

### A.    The Government Cannot Bypass the INA's Removal Procedures or Jettison Mandatory Humanitarian Protections.

The government claims the Immigration and Nationality Act's ("INA") procedures only apply to "removals pursuant to Title 8."  AB.63.  But the statute's text is categorical: It provides the "sole and exclusive procedure for determining whether an alien may be . . . removed from the United States"—full stop.  8 U.S.C. § 1229a(a)(3).  The government maintains that following this text as written would "implicitly repeal" the AEA.  AB.63.  But the AEA would still provide authority to detain and remove a category of people who otherwise could not be detained or removed: those here lawfully.   The two statutes are easily reconciled without ignoring the INA's clear text.

The government asserts, without any evidence, that CECOT does not torture so the Court should look the other way.  That is not the way the Convention Against

Torture ("CAT") works.  The government further suggests no court can review its refusal to provide AEA detainees with torture or persecution screenings, but that proposition was rejected in a conceptually identical case, *Huisha-Huisha v. Mayorkas*, which the government does not address and which held that fear screenings were required when the government pursues removal outside Title 8.  27 F.4th 718, 732 (D.C. Cir. 2022) (Title 42 expulsions under public health laws).

The government additionally asserts that this claim does not "sound in habeas," citing *Hamama v. Adduci*, because it does not challenge removal, AB.63-64, but the Supreme Court has already squarely held that challenges to removal under the AEA do fall within "core" habeas.  *J.G.G.*, 145 S. Ct. at 1005.  The government's other cases—where individuals were already in a foreign country and thus considered to be outside of CAT—are also inapposite.  AB.64 (citing *Munaf* and *Kiyemba*).

### B.  The Government Must Provide an Opportunity to Voluntarily Depart.

The government agrees that the AEA provides a right to voluntary departure but claims the President can eliminate it wholesale.  AB.61-62.  That ignores the Act's structure.  Section 21 provides an unconditional right of voluntary departure. 50 U.S.C. § 21 (removal only for people who "refuse or neglect to depart"); *U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947) ("statutory condition precedent" to removal).  Section 22 provides a different right: "Time allowed to

26

settle affairs," subject to the "actual hostility" exception.    Contrary to the government's argument, the Section 22 "actual hostility" exception has no impact on the Section 21 voluntary departure right.    That structure tracks the law of nations at the AEA's enactment, which provided that a nation was "bound to allow [alien enemies] a reasonable time for withdrawing" once war begins.    Vattel, Nations 318 (1863).    By contrast, providing the "full time for the settlement of their affairs" was considered optional and subject to bilateral agreements and exceptions.    *Id.* Congress enshrined this distinction in the AEA, by providing a categorical right of voluntary departure in Section 21 and a conditional right "to settle affairs" in Section 22.    OB.52-53.

Even if the hostility exception could negate the voluntary departure right, that exception cannot be invoked categorically and without evidence.    Whether "an alien," singular, has committed "actual hostility" is a fact-specific question.    And reliably identifying AEA detainees is nothing like identifying nationals of another country or members of a country's "armed forces."    AB.61-62.    Here, the criteria used by the government, as the emerging evidence shows, comes nowhere close to ensuring that the Proclamation is enforced solely against people who are even TdA members, much less engaged in "actual hostility."    OB.7-8.

## V. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PETITIONERS.

The government does not dispute that, if relief is denied here, it intends to send Petitioners to the notorious CECOT prison known for torture of all kinds, including waterboarding and electric shocks. ROA.768, 856-61. Nor do they dispute that detainees at CECOT are held indefinitely, without trial, and without any contact with the outside world. Not surprisingly, therefore, the Supreme Court concluded that Petitioners face "a high risk" of "severe, irreparable harm" if removed there. *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367 (2025).

The government suggests that noncitizens could be removed to El Salvador under the INA even without the AEA. AB.65. But many are not removable at all absent the Proclamation, because the government is enforcing it against people who have lawful status in the U.S. The INA, moreover, contains essential procedural and humanitarian safeguards the government is attempting to circumvent by using the AEA rather than the normal immigration process, including sending *Venezuelans* to a foreign prison in *El Salvador*. OB.3.

Generalized invocations of national security, AB.65-66, do not tip the balance in the government's favor, especially where the Executive is violating limits imposed by Congress. The Supreme Court recognized as much in the face of the same arguments, including the untested assertion that alleged TdA detainees have caused disturbances. *A.A.R.P.*, 145 S. Ct. at 1368. And that is especially true where the

28

government retains all the tools of prosecution, detention, and removal that Congress

has provided for addressing the unlawful migration and crime that the Proclamation

alleges.  OB.36.

## CONCLUSION

The Court should grant preliminary relief.


Dated: June 17, 2025                            Respectfully submitted,

                                                */s/Lee Gelernt*

Spencer Amdur                                   Lee Gelernt
Noelle Smith                                    Daniel Galindo
Oscar Sarabia Roman                             Ashley Gorski
My Khanh Ngo                                    Patrick Toomey
Cody Wofsy                                      Omar Jadwat
AMERICAN CIVIL LIBERTIES                        Hina Shamsi
UNION FOUNDATION                                AMERICAN CIVIL LIBERTIES
425 California Street, Suite 700                UNION FOUNDATION
San Francisco, CA 94104                         125 Broad Street, 18th Floor
T: (415) 343-0770                               New York, NY 10004
E: samdur@aclu.org                              T: (212) 549-2660
E: nsmith@aclu.org                              E: lgelernt@aclu.org
E: osarabia@aclu.org                            E: dgalindo@aclu.org
E: mngo@aclu.org                                E: agorski@aclu.org
E: cwofsy@aclu.org                              E: ptoomey@aclu.org
                                                E: ojadwat@aclu.org
                                                E: hshamsi@aclu.org
Brian Klosterboer
Tx Bar No.  24107833
Thomas Buser-Clancy                             Kathryn Huddleston*
TX Bar No. 24078344                             AMERICAN CIVIL LIBERTIES
Savannah Kumar                                  UNION FOUNDATION
TX Bar No. 24120098                             915 15th Street, NW, 7th Floor
Charelle Lett                                   Washington, DC 20005
TX Bar No. 24138899                             (212) 549-2500
Ashley Harris                                   E: khuddleston@aclu.org
TX Bar No. 24123238

Adriana Piñon                          *For Petitioners-Appellants*
TX Bar No. 24089768                    *W.M.M., F.G.M., A.R.P., et al.*
ACLU FOUNDATION OF TEXAS,
INC.
1018 Preston St.                       *\*Barred in Texas and Arizona only;*
Houston, TX 77002                      *supervised by a member of the D.C.*
(713) 942-8146                         *Bar*
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org
apinon@aclutx.org

## CERIFICATE OF SERVICE

I certify that, on June 17, 2025, a true and correct copy of this document
was transmitted to the Clerk of the United States Court of Appeals for the Fifth
Circuit via the Court's CM/ECF document filing system, and to all counsel of
record.


/s/ *Lee Gelernt*
Lee Gelernt

31

## CERIFICATE OF COMPLIANCE

This brief complies with (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 6,498 words, excluding the parts of the brief exempt by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Lee Gelernt*
Lee Gelernt