# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 2, 2025

Lyle W. Cayce
Clerk

No. 25-10534

---

W.M.M., *on their own behalf and on behalf of others similarly situated*;
F.G.M., *on their own behalf and on behalf of others similarly situated*;
A.R.P., *on their own behalf and on behalf of others similarly situated*,

> *Petitioners—Appellants*,

*versus*

Donald J. Trump, *in his official capacity as President of the United States*; Pamela Bondi, *Attorney General of the United States, in her official capacity*; Kristi Noem, *Secretary of the United States Department of Homeland Security, in her official capacity*; United States Department of Homeland Security; Todd Lyons, *Acting Director of the Director of United States Immigration and Customs Enforcement, in his official capacity*; United States Immigration and Customs Enforcement; Marco Rubio, *Secretary of State, in his official capacity*; United States State Department; Josh Johnson, *in his official capacity as acting Dallas Field Office Director for United States Immigration and Customs Enforcement*; Marcello Villegas, *in his official capacity as the Facility Administrator of* the Bluebonnet Detention Center; Phillip Valdez, *in his official capacity as Facility Administrator of* the Eden Detention Center; Jimmy Johnson, *in his/her official capacity as Facility Administrator of* the Prairieland Detention Center; Judith Bennett, *in her official capacity as Warden of the Rolling Plains Detention Center*,

> *Respondents—Appellees*.

---

Appeal from the United States District Court

for the Northern District of Texas
USDC No. 1:25-CV-59

---

Before SOUTHWICK, OLDHAM, and RAMIREZ, *Circuit Judges*.

LESLIE H. SOUTHWICK, *Circuit Judge*:

This case is on remand from the Supreme Court. The litigation began after two of the Petitioners, who are natives of Venezuela, were detained by immigration officials on the basis that they were members of a Venezuelan terrorist organization. The Petitioners filed for a writ of habeas corpus in federal court, alleging they were about to be removed to El Salvador under the terms of a March 2025 Presidential Proclamation. The Proclamation was issued under the authority of a 1798 statute applicable only in the event of a declared war, an invasion, or a predatory incursion by a foreign nation or government, and it allows the President to detain alien enemies. Petitioners sought an opportunity to dispute that they were members in the organization and also to show the Proclamation was unlawful.

The Petitioners' motion for a temporary restraining order to prevent their removal made an extraordinarily rapid rise to the Supreme Court, where the Court granted a temporary injunction. The Court then remanded the case for us to determine whether the factors for a preliminary injunction to block removal have been satisfied and also whether the Government's notice to these individuals of their removal satisfied due process.

There is scant Supreme Court authority on the 1798 statute. The first and only time that court has needed to analyze the statute prior to the 2025 Presidential Proclamation arose 150 years after the statute was enacted. The same question was posed in three cases over a four-year period — had the declared war (World War II) and the President's authority under the statute ended? The first two times the answer was "no," but the third time it was "yes." For now, we simply describe what each opinion held about the scope of a court's review.

No. 25-10534

The first "no" was in 1948, but, importantly, the Supreme Court held that judicial review for "interpretation" of the 1798 statute was appropriate. *Ludecke v. Watkins*, 335 U.S. 160, 163–64 (1948). There was no suggestion that "interpretation" was a pointless endeavor, that a court could make its interpretation for the interest of legal scholars but was prohibited from applying that interpretation to the facts before it. Further, the Court held that courts should review whether the detainee was (as required in the 1798 statute) "an alien enemy fourteen years of age or older." *Id.* at 171 n.17.[1] Then, the Supreme Court in 1950 held that courts were to "ascertain the existence of a state of war" when detention under the 1798 statute based on a declaration of war was challenged. *Johnson v. Eisentrager*, 339 U.S. 763, 775 (1950). Finally, in 1952, the Court held that Congress's terminating its declaration of war had ended the President's authority under the statute. *United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952).

Interpreting the meaning of a "declared war" and whether one existed was relatively simple; deciding whether there is an invasion or predatory incursion after we interpret those terms will be more difficult.

In a different context, the Court held that a governor's determination that "an exigency requiring military aid . . . has arisen" was "conclusive." *Sterling v. Constantin*, 287 U.S. 378, 399 (1932). But, though the governor's decision that the state militia was needed could not be challenged, the Court reviewed closely and rejected the governor's decision on how to use the troops because the evidence showed "there was no military necessity which,

---

[1] Earlier this year, the Supreme Court reaffirmed that courts must determine whether a person detained under this 1798 statute falls within the category identified in the Proclamation. *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025).

from any point of view, could be taken to justify the action of the Governor." *Id.* at 403–04.

We will discuss those and other authorities in more detail later. We state now that the caselaw we just cited and others we will review do not directly or unambiguously give us the answers to the Supreme Court's questions. Thus, judicial humility is particularly appropriate here. A decision must be made, of course, for acceptance or rejection by the Supreme Court in this or some other case. Our analysis leads us to GRANT a preliminary injunction to prevent removal because we find no invasion or predatory incursion, conclude on the current record that the updated notice satisfies due process, and REMAND for further proceedings. To be clear as to our ruling, two judges agree that the revised notice procedures satisfy due process at least based on the current record.

We declare, as did the Supreme Court, that our injunction solely applies to the use of the war-related federal statute and does not impede use of any other statutory authority for removing foreign terrorists.

## FACTUAL AND PROCEDURAL BACKGROUND

The Alien Enemies Act ("AEA"), adopted in 1798, authorizes removal of "natives, citizens, denizens, or subjects of the hostile nation" if there is a "declared war" with a foreign nation or government, or a nation or government is engaged in an "invasion or predatory incursion" of territory of the United States. 50 U.S.C. § 21. President Trump invoked the AEA to remove Venezuelan nationals who are members of Tren de Aragua ("TdA"), a designated foreign terrorist organization ("FTO").

The Proclamation explained that

TdA is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States. TdA is undertaking hostile actions and conducting

No. 25-10534

> irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela.

Proclamation No. 10903 (Proclamation), 90 Fed. Reg. 13033, 13034 (March 14, 2025).

There were two Petitioners when the complaint was filed. Both were held in the Bluebonnet Detention Center in Anson, Texas, roughly midway between Fort Worth and Lubbock, Texas. They filed suit in the United States District Court for the Northern District of Texas under the provisions of 28 U.S.C. § 2241. They sued on their own behalf and on behalf of all other noncitizens in custody in the Northern District who are or will be subject to the President's Proclamation. No class certification has occurred.[2] The district court denied their motion for a temporary restraining order against summary removal under the AEA. Petitioners filed an emergency appeal to this court. We dismissed the appeal for lack of jurisdiction and denied their motion for injunction pending appeal as premature. The Supreme Court construed the Petitioners' application as a petition for writ of certiorari from our decision dismissing the appeal. The Court vacated our decision and remanded for further proceedings. *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1370 (2025).

The Supreme Court remanded for this court to "address (1) all the normal preliminary injunction factors, including likelihood of success on the merits, as to the named [Petitioners'] underlying habeas claims that the AEA

---

[2] The district court denied class certification while this case was on appeal, but that order was "automatically vacated" by its own terms when the Supreme Court granted certiorari. *W.M.M. v. Trump*, No. 1:25-CV-059, 2025 WL 1358476, at *1 (N.D. Tex. May 9, 2025); *see also A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1369 n.1 (2025). For present purposes, we treat the issue of class certification as remaining open.

No. 25-10534

does not authorize their removal pursuant to the President's March 14, 2025, Proclamation, and (2) the issue of what notice is due, as to the putative class's due process claims against summary removal." *Id.* at 1370.

We preface our discussion with an acknowledgment that our opinions rely to some extent on our independent historical research in order to interpret statutory language. If the Supreme Court grants review, the briefing there will permit the parties and amici to examine our efforts to understand and recount relevant historical events.

## DISCUSSION

### I. *Preliminary Injunction*

Petitioners argue the AEA does not authorize President Trump's Proclamation and the Government's notice did not satisfy due process. The Supreme Court advanced this case procedurally to the stage of consideration of a preliminary injunction. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

We will analyze these requirements in that order.

### A. *Likelihood of Success on the Merits*

The foundation of Petitioners' claims is that the President's Proclamation cannot be supported by the authority granted him by the AEA. There is no argument before us that the Constitution would independently permit the detention or removal of individuals solely because they are citizens of a nation that is an enemy of this country or even because they are members of a terrorist organization. Therefore, our obligation is to interpret a statute. Undoubtedly, a President is entitled to broad discretion if the statute applies.

No. 25-10534

The point at which a court's authority ends and a President's unreviewable discretion begins is a key interpretive issue.

The President's Proclamation relies on the following authority:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

50 U.S.C. § 21.

The parties agree that, as preconditions to invoking the AEA, there must be a declared war, an invasion, or a predatory incursion by a foreign nation or government. There is no declared war, and the parties disagree on the scope of our review and the meaning of the other terms — "invasion or predatory incursion." We also must consider how the phrase "foreign nation or government" affects the use of the AEA in this case.

We start with the degree of review we can give to the Proclamation.

### 1. Scope of Review

The Government contends "the AEA grants the President a near 'unlimited' authority to identify and countermand foreign invasions or predatory incursions." In its view, it is not for the courts to question the President's assertion that the actions of TdA members constitute an invasion or predatory incursion by a foreign government.

No. 25-10534

Before reviewing the precedents on which the parties rely, we quote the Supreme Court's recent opinion discussing judicial review of this Proclamation:

> Although judicial review under the AEA is limited, we have held that an individual subject to detention and removal under that statute is entitled to "'judicial review'" as to "questions of interpretation and constitutionality" of the Act as well as whether he or she "is in fact an alien enemy fourteen years of age or older." *Ludecke* [*v. Watkins*], 335 U.S. [160,] 163, 172, n.17 [(1948)]. (Under the Proclamation, the term "alien enemy" is defined to include "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States." 90 Fed. Reg. 13034.)

*Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025).

Enumerating the Court's categories, these issues are subject to judicial review:

(1) proper interpretation of the AEA,
(2) constitutionality of the AEA, and
(3) whether Petitioners are "Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States." Proclamation, 90 Fed. Reg. at 13034.

The constitutionality of the AEA is not being challenged, and the case has not reached a point where a decision is to be made on whether the Proclamation applies to these Petitioners. That leaves the task of interpretation. Of course, the text is the place to start with statutory interpretation, and at times nothing further is needed. Here, the place to start is not the usual one. We must begin by deciding what the Supreme Court

No. 25-10534

meant by "interpretation" and address arguments that our interpretive role is extraordinarily limited.

Prior invocations of the AEA provide context as we seek to understand that role. Of significance for the historical understandings of the AEA is that its authority has been invoked only three times before 2025. Two occurred after and the other just days before Congress declared war on the nation(s) covered by an AEA invocation. Those invocations were after war was declared in 1812 against Great Britain, after war was declared against Germany in 1917, and just before war was declared against the Axis Powers in 1941. *See* Amicus Brief of Constitutional Accountability Center 15–18.

The earliest AEA decision from a Supreme Court justice was by Chief Justice Marshall, "riding circuit" in December 1813. Marshall and a district judge, in a habeas suit filed in Virginia circuit court by a person jailed under the AEA, released the detainee from confinement. *See* Gerald L. Neuman & Charles F. Hobson, *John Marshall and the Enemy Alien*, 9 Green Bag 2d 39, 41–42 (2005) (reproducing Marshall's decision in *United States v. Williams*). The release was ordered because the "alien enemy" was to be held until an opportunity to remove him arose, but there was no place designated for him to be taken. *Id.* Thus, the first time a Supreme Court justice considered the AEA, a careful review of the validity of an alien's detention was made. The identified flaw was technical, but judicial review led to release.

The most useful judicial precedents on those prior invocations of the AEA occurred after World War II. The Government's primary authority on the limits to the judiciary's interpretive role is the 1948 decision of *Ludecke v. Watkins*, 335 U.S. 160. In that declared-war case, petitioners argued the President's authority to employ the AEA during a time of war "did not survive cessation of actual hostilities" via Germany's and Japan's formal surrenders in 1945. *Id.* at 166. The Court refused (with four dissenters) to

No. 25-10534

review the President's determination that a state of war still existed. *Id.* at 170, 173. The Court's making its own determination "would be assuming the functions of the political agencies of the Government." *Id.* at 170.

> It is not for us to question a belief by the President that enemy aliens who were justifiably deemed fit subjects for internment during active hostilities do not lose their potency for mischief during the period of confusion and conflict which is characteristic of a state of war even when the guns are silent but the peace of Peace has not come. These are matters of political judgment for which judges have neither technical competence nor official responsibility.

*Id.* (footnote omitted).

In *Ludecke*, the Court explained that the AEA's "terms, purpose, and construction leave no doubt" that judicial review is precluded except for "questions of interpretation and constitutionality" of the Act. *Id.* at 163–64. Indeed, the Act "confers on the president very great discretionary powers" that are "as unlimited as the legislature could make [them]." *Id.* at 164 (first quoting *Brown v. United States*, 12 U.S. (8 Cranch) 11s0, 126 (1814) (Marshall, C.J.); and then quoting *Lockington v. Smith*, 15 F. Cas. 758, 760 (Washington, Circuit Justice, C.C.D. Pa. 1817) (No. 8,448)). "Such great war powers may be abused, . . . but that is a bad reason for having judges supervise their exercise, whatever the legal formulas within which such supervision would nominally be confined." *Id.* at 172. The "full responsibility for the just exercise of this great power may validly be left where the Congress has constitutionally placed it — on the President of the United States." *Id.* at 173.

We conclude that *Ludecke* resolves one issue about the scope of our review. If judicial review is precluded except for "questions of interpretation and constitutionality" of the Act, *id.* at 163, and we take that to refer to

No. 25-10534

interpretating the statute's text and also applying the interpretation, then the President's fact-findings are not within our review authority. For example, Petitioners here have challenged the President's finding that the Maduro regime in Venezuela is directing the actions of TdA in this country. We interpret the *Ludecke* Court to have made conclusive the President's "belief" that certain categories of aliens are enemies and engaged in hostile actions. *Id.* at 170. Thus, even though Petitioners insist there is no basis to find the Maduro regime is directing TdA's action in the United States, it is not for a court to review a President's findings about the facts when he is employing the AEA. We accept all *Presidential* fact-findings about what events have occurred — including who is directing them.

Nonetheless, for us to defer to findings of fact, there must be findings of fact. The AEA specifies that the "President [must] make[] public proclamation of the event" giving rise to his invocation of the AEA. 50 U.S.C. § 21. The statute does not identify what, at a minimum, must be included in the proclamation. We conclude that proclaiming, without more, that an "invasion" or "predatory incursion" has occurred will not suffice. We know this because the precedents require "interpretation," which implies the application of law to facts. Thus, the proclamation must inform of what is believed to be occurring. Our role is then to see if those facts meet the meaning of the statute.[3]

---

[3] To the extent that cases about the reviewability of agency action could provide analogies, they are not contrary to what we identify as the scope of our review. Although sometimes the best reading of the statute is to afford discretion, we are still to police the outer bounds of that discretion, not to abdicate the judicial role altogether. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). Statutes can sometimes be read to preclude judicial review entirely, but there is a presumption in favor of reviewability that "can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *See Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993)). The Supreme Court in *Ludecke* found some degree

No. 25-10534

An acknowledgement and caveat. The *Ludecke* opinion involved a declaration of war, a formal announcement by Congress that one of the prerequisites for a President's invoking the AEA has occurred. Even if a war undoubtedly exists, perhaps due to an invasion and an armed response by this country's military, but there has been no Congressional declaration of war, the President would need to declare that an invasion or predatory incursion is occurring in order to use the authority of the AEA. There is almost nothing for parties to dispute as to whether a *declaration* of war exists, but we will soon address one issue. Perhaps our understanding of the *Ludecke* Court's holding about findings of fact would not apply *in toto* when the AEA is being used to respond to what the President believes should be labeled an "invasion or predatory incursion." If such a distinction is to be made, we leave it for the Supreme Court to make it.

The unreviewability of the President's factual findings is a discrete issue separate from whether the statutory label the Proclamation places on a finding is consistent with a court's interpretation of a statute. The needed interpretation is the meaning of a declared war, an invasion, or a predatory incursion. More clarity about a court's role was added in a habeas corpus proceeding brought by a German national confined by the United States Army in Germany. The Court held that the detention was constitutional, but courts had authority "to ascertain the existence of a state of war and whether he is an alien enemy and so subject to the Alien Enemy Act." *Johnson v. Eisentrager*, 339 U.S. 763, 775 (1950) (citing *Ludecke*, 335 U.S. at 160). That is a revised description of review from what *Ludecke* stated in that the existence of a state of war was explicitly mentioned as a valid subject. We

---

of judicial review precluded despite this presumption, but in the next breath it preserved judicial review of "questions of interpretation." *See Ludecke*, 335 U.S. at 163–64. Our scope of review is consistent with that holding, as we have explained.

No. 25-10534

conclude that the *Johnson* opinion means that a court was to assure itself that there was a declaration of war and that it had not been terminated. That issue arose in the next case.

The final relevant precedent coming out of World War II was *United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347 (1952). The Court referred to the 1945 Presidential Proclamation under the AEA, seemingly still in effect, that had authorized the Attorney General to detain and remove alien enemies "deemed by the Attorney General to be dangerous to the public peace and safety." *Id.* at 347 n.1; Proclamation No. 2655, 10 Fed. Reg. 8947, 8947 (July 20, 1945). The Attorney General used that authority to order a German who was a prisoner in this country to be removed to Germany. *Jaegeler*, 342 U.S. at 347–48. While the prisoner's petition for writ of certiorari was pending, Congress by joint resolution declared the state of war between the United States and Germany at an end. *Id.* at 348 (citing Joint Resolution of Oct. 19, 1951, Pub. L. No. 82-181, 65 Stat. 451). The Court showed no interest in whether the President agreed that "the period of confusion and conflict which is characteristic of a state of war" was over. *Ludecke*, 333 U.S. at 170. Perhaps then-President Truman would have disagreed. At least as to this AEA prerequisite, Congress itself could end its applicability, regardless of the President's agreement.

The other possible foundational events for invoking the AEA, an invasion or a predatory incursion, are for the President to determine. Congress seemingly has no role. Because there are no Supreme Court precedents reviewing the invocation of the AEA on either of those grounds, we consider the following decisions in which the Supreme Court addressed the reviewability of executive determinations in other contexts.

One decision concerned the Militia Act of 1795. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827) (Story, J.). The controversy grew out of the War

No. 25-10534

of 1812 between the United States and Great Britain. Mott was court-martialed for not responding to the New York governor's calling out the militia, a call complying with the President's requisitioning troops from New York for the war. *Id.* at 28–29. The Militia Act, enacted three years before the AEA, provided that "whenever the United States shall be invaded, or be in imminent danger of invasion . . . it shall be lawful for the President . . . to call forth such number of the militia . . . as he may judge necessary to repel such invasion." *Id.* at 31 (quoting Militia Act of 1795, ch. 36, § 1, 1 Stat. 424). The Court recognized this power as limited "to cases of actual invasion, or of imminent danger of invasion." *Id.* at 29. In navigating that limitation, the Court answered questions that are relevant here:

> If it be a limited power, the question arises, by whom is the exigency to be judged of and decided? Is the President the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which every officer to whom the orders of the President are addressed, may decide for himself, and equally open to be contested by every militia-man who shall refuse to obey the orders of the President? We are all of opinion, that the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons.

*Id.* at 29–30.

Obviously, the decision was in a different context. The state militias were being activated at the President's direction in response to an invasion of the United States by Great Britain in 1812. The Court was writing long after the 1815 end of that war, but it was discussing a situation in which the country had been physically invaded by the British Army in what at times is called the Second War of Independence, the loss of which could have ended independence. *See generally* The War of 1812: Writings from

No. 25-10534

America's Second War of Independence (2013) (Donald R. Hickey ed.).

We conclude that the Supreme Court, in interpreting the Militia Act of 1795, held that it was for the President's unreviewable discretion to decide that circumstances exist that require the calling up of the militia, or in today's terminology, the National Guard. The present-day use of that authority is being litigated. *See Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025). Even if a Supreme Court precedent concludes that litigation with *Mott* unchanged, the need for troops as an immediate defense to an actual or threatened invasion is readily distinguishable for justiciability purposes from when residents of this country may be detained and removed.[4] This 1827 opinion concerning the Militia Act does not displace the on-point and century-plus later *Ludecke*, *Eisentrager*, and *Jaegeler* AEA opinions.

More helpful than *Mott* and much closer to *Ludecke* in time, the Court considered whether the Texas governor had exceeded his authority under state law when issuing a proclamation declaring martial law in certain counties that "were in a state of insurrection," and having a brigadier general of the Texas National Guard "take such steps as he might deem necessary" to enforce the law. *Sterling v. Constantin*, 287 U.S. 378, 387 (1932) (quotation marks omitted). The proclaimed insurrection was by a group of East Texas oil and gas producers, and the laws being violated were state regulators' limits on the amount of production. *Id.* at 387–88. The Supreme Court recognized that "[b]y virtue of his duty [under Texas law] to 'cause the laws to be faithfully executed,' the [governor was] appropriately vested with the

---

[4] Additionally, the Militia Act of 1795 was worded in a manner that more clearly gave unbounded discretion to the President. The Act used phrases such as "as he may judge" and "as he shall think proper" no fewer than three times in the section authorizing the President to call forth the militia. Militia Act of 1795, ch. 36 § 1, 1 Stat. at 424.

No. 25-10534

discretion to determine whether an exigency *requiring military aid* for that purpose ha[d] arisen." *Id.* at 399 (emphasis added). Indeed, "[h]is decision to that effect [was] conclusive." *Id.* The limitations of "conclusive" were then explained:

> It does not follow from the fact that the executive has this range of discretion, deemed to be a necessary incident of his power to suppress disorder, that every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat.

*Id.* at 400.

To be clear, the power being used was found in the Texas constitution and statutes. An analogy was made in the opinion to the Presidential power recognized in *Mott*. *Id.* at 399. The Court upheld an injunction against the governor: "There was no military necessity which, from any point of view, could be taken to justify the action of the Governor in attempting to limit complainants' oil production." *Id.* at 403–04. Therefore, what was conclusive was only the governor's belief that circumstances existed that required "military aid." *Id.* at 399–400. The Court did not enjoin the call-up of the militia. After leaving that decision solely in the executive's discretion, the Court did not hesitate to say the executive's categorization of the events as an insurrection did not prevent the judiciary's enjoining the use of troops to enforce production limits for oil and gas. *Id.* at 401–02.

Of importance, the label of "insurrection" did not enter into the Court's reasoning beyond what we just stated. For example, there was not discussion of any state statute providing that if the governor believes there is an "insurrection," certain actions can be taken. Indeed, almost everything discussed in the *Sterling* opinion after stating the governor's belief that an

No. 25-10534

exigency exists is conclusive, makes the use of the governor's military powers subject to judicial review. *Sterling* thus supports the proposition that when private rights are involved, as here, courts retain some role in judging the propriety of the use of war powers.[5] *See id.* at 400–01.

We sum up this way. The Supreme Court's recent *J.G.G.* opinion shows *Ludecke* is to be understood as requiring courts to interpret the AEA after the President has invoked it. *J.G.G.*, 145 S. Ct. at 1006. Interpretation cannot be just an academic exercise, *i.e.*, a court makes the effort to define a term like "invasion" but then cannot evaluate the facts before it for their fit with the interpretation. Thus, interpretation of the AEA allows a court to determine whether a declaration of war by Congress remains in effect, or whether an invasion or a predatory incursion has occurred. In other words, those questions are justiciable, and the executive's determination that certain facts constitute one or more of those events is not conclusive. The Supreme Court informs us that we are to interpret, and we do not create special rules for the AEA but simply use traditional statutory interpretive tools.

We now examine and interpret the key language.

---

[5] *The Prize Cases* are not to the contrary. *See The Brig Amy Warwick* (*The Prize Cases*), 67 U.S. (2 Black) 635 (1862). It is true that, even though private rights were involved, the Supreme Court referred to the President's "proclamation of blockade" as "official and conclusive evidence . . . that a state of war existed." *Id.* at 670. That was *dicta*, however: the only question before the court was not whether a state of war existed as a factual matter, but instead whether a state of war existed as a technical matter, *i.e.*, whether a war could exist between states of the same country and without a formal congressional declaration of war. *Id.* at 641, 646–47 (arguments of counsel). The Court resolved the latter question in the affirmative. *Id.* at 669 (majority opinion). As for the former question, there could be no legitimate doubt that the country was at war, a war that, as the Supreme Court emphasized, "all the world acknowledge[d] to be the greatest civil war known in the history of the human race." *Id.* That truth could not be evaded "by subtle definitions and ingenious sophisms." *Id.* at 670.

No. 25-10534

## 2. *Construction of the AEA*

The AEA was born in 1798 from the threat of war with France. Although France was an American ally during the Revolutionary War that formally ended with the Treaty of Paris in 1783, ten years later relations soured. France viewed the Jay Treaty of 1794 between the United States and Great Britain as a betrayal; French privateers began seizing American ships bound for British ports.[6] This spurred the undeclared naval conflict known as the Quasi-war. Gregory E. Fehlings, *America's First Limited War*, 53 NAVAL WAR COLL. R. 101, 111 (2000). Along with facing French aggression at sea, President John Adams and the Federalist-controlled Congress worried that French immigrants would act as agents to sabotage the American government. 11 JOHN SPENCER BASSETT, THE AMERICAN NATION: A HISTORY 252 (1906). So, "they proceeded to devise a means of dealing with the objectionable aliens already in the country." *Id.* at 258. Two resulting laws were the AEA and its peacetime counterpart, which became known as the Alien Friends Act. *Id.* Only the former is still in force today. What its words mean controls the President's use of its broad authority.

We interpret statutory "words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (alteration in original) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). "We often look to dictionary definitions for help in discerning a word's ordinary meaning." *Cascabel*

---

[6] "French officials encouraged that plunder by renting French warships to privateers, and they profited from it by taking payoffs from privateers whose captures they upheld in admiralty court." Gregory E. Fehlings, *America's First Limited War*, 53 NAVAL WAR COLL. R. 101, 120 (2000). "President Adams called it 'an unequivocal act of war on the commerce' of the United States." *Id.* at 121 (quoting President John Adams, Second Annual Message to Congress (Dec. 8, 1798)).

No. 25-10534

*Cattle Co. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020). "[I]t is helpful to consider the interpretation of other statutory provisions that employ the same or similar language." *St. Tammany Par. ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 320 (5th Cir. 2009) (quoting *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 233 n.4 (5th Cir. 2001)). "[T]he text of a law controls over purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). "[C]ourts, in construing a statute, may with propriety recur to the history of the times when it was passed . . . ." *Leo Sheep Co. v. United States*, 440 U.S. 668, 669 (1979) (quoting *United States v. Union Pac. R.R. Co.*, 91 U.S. 72, 79 (1875)).

We start with the meaning of "invasion," then "predatory incursion," and conclude with the effect of including "foreign nation or government" in the understanding of those terms.

### 3. Invasion

Petitioners read "invasion" to require military hostilities, relying on these dictionary definitions:

> *Invasion*, Johnson's Dictionary (1773): Hostile entrance upon the rights or possessions of another; hostile encroachment.

> *Invasion*, Webster's Dictionary (1828): A hostile entrance into the possessions of another; particularly, the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force. An attack on the rights of another; infringement or violation.

An initial argument by the Government is that the terms are distinguishable simply by the fact Congress used three terms and separated them with the disjunctive — "declared war . . . or any invasion or predatory incursion." 50 U.S.C. § 21. We accept that each term should be given a

No. 25-10534

distinct meaning. That each means something different does not answer whether each does or does not require some level of military action. The Government's argument continues that because "declared war" already "cover[s] armed conflicts perpetrated by foreign armies," Congress must have intended "invasion" and "predatory incursion" to require something less. Consistent with that view, it interprets "invasion" to mean "a hostile attack or encroachment" and "predatory incursion" to mean "a coordinated entry into the United States with a common, destructive purpose." We are holding for a closer look later what "nation or government" adds to the analysis, but we mention here that the Government seemingly accepts that those entries would have to be by a nation or government.

The Government relies on some of the definitions listed above and also the following:

> *Invader*, JOHNSON'S DICTIONARY (1773): One who enters with hostility into the possessions of another.

> *Invasion*, FREDERICK BARLOW, THE COMPLETE ENGLISH DICTIONARY (1773): The entrance or attack of an enemy on the dominions of another. The act of entering and attacking the possessions of another as an enemy. An [e]ncroachment.

> *Invasion*, NATHAN BAILEY, A UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (25th ed. 1783): An inroad or descent upon a country, an usurpation, or [e]ncroachment.

There of course can be far less warlike meanings to the word "invasion," used colloquially or just in non-military contexts. Our focus is on a statute passed by the United States Congress in anticipation of an armed conflict with another country. The formality of the occasion requires rejecting interpretations that wander far from that common understanding of an "invasion."

No. 25-10534

Equally formal use occurred not many years prior to passage of the AEA. The Constitutional Convention adopted a provision granting Congress the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel *Invasions*." U.S. CONST. art. I, § 8, cl. 15 (emphasis added). The Constitution also specifies that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or *Invasion* the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2 (emphasis added).[7] The variation "invaded" is also used:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless *actually invaded*, or in such imminent Danger as will not admit of delay.

U.S. CONST. art. I, § 10, cl. 3 (emphasis added).

Also of importance is James Madison's interpretation of the meaning of "invasion" in specific reference to its use in the AEA. We concede that the National Archives, which provide the text for many of our sources, explained that Madison, a partisan Jeffersonian, was stating his views during an intense political struggle with the Federalists who passed the AEA; his Founding Father credentials do not protect his comments from close scrutiny. *See Editorial Note*, James Madison, Report of 1800 (Jan. 7, 1800), *in* FOUNDERS ONLINE [https://perma.cc/2D3N-N64Z]. Nonetheless, in his discussion of the Alien and Sedition Acts, Madison reasonably explained:

---

[7] Article IV, Section 4 also uses the word "invasion": "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. CONST. art. IV, § 4.

No. 25-10534

Invasion is an operation of war. To protect against invasion is an exercise of the power of war. A power therefore not incident to war, cannot be incident to a particular modification of war. And as the removal of alien friends has appeared to be no incident to a general state of war, it cannot be incident to a partial state, or a particular modification of war.

*Id.*

In addition, Congress's use of the word in the AEA is consistent with the use in the Constitution, that "invasion" is a term about war in the traditional sense and requires military action by a foreign nation. Petitioners have the sense of the distinctions in saying that responding to another country's invasion is defensive; declaring war is an offensive, assertive action by Congress; and predatory incursion is for lesser conflicts. Of course, after this country has been attacked by an enemy with invading forces, Congress might then declare a war. That occurred in World War II after the attack on Pearl Harbor. Still, when the invasion precedes a declaration, the AEA applies when the invasion occurs or is attempted.

Therefore, we define an invasion for purposes of the AEA as an act of war involving the entry into this country by a military force of or at least directed by another country or nation, with a hostile intent. Some of the definitions we have quoted also suggest the intent needs to be to conquer, occupy, or otherwise exercise some long-term control. We see no reason for being that specific in this case. Petitioners are likely to succeed in demonstrating that the Proclamation cannot be supported either by the existence of a declared war or an invasion.

### 4. Predatory Incursion

We now examine the remaining precondition for applicability of the AEA, "predatory incursion." The parties' primary interpretive

No. 25-10534

disagreement about "predatory incursion" is whether its contemporary, 1798 meaning demanded some level of military action.

### i.   Definitions

First, some definitions.

*Predatory*, WEBSTER'S DICTIONARY (1828): Plundering; pillaging; characterized by plundering; practicing rapine; as a predatory war; a predatory excursion; a predatory party.

*Incursion*, JOHNSON'S DICTIONARY (1773): Attack; mischievous occurrence. Invasion without conquest; inroad; ravage.

*Incursion*, WEBSTER'S DICTIONARY (1828): Literally, a running into; hence, an entering into a territory with hostile intention; an inroad; applied to the expeditions of small parties or detachments of an enemy's army, entering a territory for attack, plunder or destruction of a post or magazine. Hence it differs from invasion, which is the hostile entrance of any army for conquest.

According to Petitioners, the neighboring text supports their theory that military hostilities are required. Not only does the Act include this term alongside "declared war" and "invasion," but the Act refers to "alien enemies," which they argue is a law-of-nations concept that "require[s] armed hostilities between warring sovereigns." The Government contends Petitioners' interpretation does not give independent meaning to each term in the disjunctive phrase "declared war . . . or any invasion or predatory incursion." 50 U.S.C. § 21. As mentioned before, we find little assistance in that argument because Congress could have been identifying different levels and categories of armed conflict that would justify use of the AEA. The Government also argues the language covering "attempted" or "threatened" predatory incursions reinforces the idea that "predatory incursion" extends beyond actual military hostilities. We conclude that the

additional terms simply extend the AEA to failed efforts to commit an invasion or incursion but do not assist in defining the terms.

When Congress used the disjunctive "declared war . . . or any invasion or predatory incursion," it "intended each term to have a particular, nonsuperfluous meaning." *Dubin v. United States*, 599 U.S. 110, 126 (2023) (quoting *Bailey v. United States*, 516 U.S. 137, 146 (1995)). A "declared war" denotes a more formal announcement of armed conflict. The ordinary meaning of "invasion" covers military hostilities that are unaccompanied by a formal announcement of war. What did Congress mean when it added "predatory incursion"?

Based on the dictionary definitions and neighboring statutory text, a "predatory incursion," as used in the AEA, definitely applies to an unauthorized entrance by units of another nation's military to commit acts that are destructive to the interests of the United States, such as victimizing its people or property, for the benefit of a foreign power or its agents without the necessary objective of a long-term occupation or control of American territory. We will examine other relevant sources before deciding whether the phrase means more, or better put for the Government's argument, might mean less as well.

### ii. *Contemporaneous Usage*

We now consider how the term was used during the period of the adoption of the AEA. Some examples are of predatory incursions by Indian tribes:

> [T]he President . . . approves the measures you have taken, for preventing those predatory incursions of the Wabash Indians, which, for a considerable period past, have been so calamitous.

Letter from Henry Knox to Governor St. Clair (Aug. 23, 1790).

No. 25-10534

> You will pay a strict observance to the order I have forwarded
> to Major Peters relative to the observance of tranquillity on the
> Indian Frontiers by guarding the Indian land from being
> illegally settled, and the industrious Frontier Inhabitant from
> Indian thieving and predatory incursions.

Letter from Charles Cotesworth Pinckney to Thomas Butler (Mar. 23, 1800).
Whether the tribes themselves were directing the incursions would affect the
applicability of the AEA, but we are gaining meaning from the examples.

An 1805 Supreme Court advocate used the phrase in the context of
"an Indian War." *See Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1,
11 (1805) (arguments of counsel).

Another case used the word "incursion" in a similar fashion, albeit in
the syllabus authored by the reporter — which shows another source for
contemporaneous meaning:

> The place, to which they removed under this last treaty, is said
> to be exposed to incursions of hostile Indians, and that they are
> engaged in constant scenes of killing and scalping, and have to
> wage a war of extermination with more powerful tribes, before
> whom they will ultimately fall.

*Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 10 (1831) (syllabus) (quotation
marks omitted).

The phrase "predatory incursion" was also used to refer to British
forces and others during the Revolutionary War:

> [F]or as to our being able totally to prevent the desultory &
> predatory incursions of the Enemy (if they should have a
> disposition to exert themselves in that way) I do not think our
> whole Army competent to the object. I conceive, however, that
> Cavalry are much preferable for such services than Infantry,
> and it is for this reason, I shall not object to your retaining the

No. 25-10534

two Corps before specified, so long as there may be occasion
for them.

Letter from George Washington to Nathanael Greene (Jan. 29, 1783).

Each of these uses of the phrase during the Revolutionary War dealt with the actions of armed forces in a war between the United States and another country. Years later, tensions arose between the United States and France. The phrase "predatory incursion" was used in that context, too:

> Instead of waiting [for] an actual invasion, I think the raising of the army ought *now* to be commenced. It would take many months to form & bring it into a state of discipline in which we could place any confidence. Small, predatory incursions of the French, tho' they might occasion great destruction of property, would not be *dangerous*, and the militia might be sufficient to repel them; but what we have to guard against is an invasion by a powerful army of veterans: and I do not know any body of *militia* adequate to stop their progress; and a fatal pannic might be the consequence.

Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798).

Other examples show the phrase used to refer to hostilities at sea or our seaports:

> The distance of the United States from Europe and the spirit & fortitude of the people happily diminish in a great degree, if they do not render [e]ntirely improbable, invasions in time of War. — Nevertheless, the unprotected situation of some of our principal Sea Ports, renders it proper to guard against the danger of sudden & predatory incursions.

John Adams, Address to Congress (May 16, 1797).

> If the war has exposed us to increased spoliations on the ocean, and to predatory incursions on the land, it has developed the national means of retaliating the former, and of providing

No. 25-10534

protection against the latter; demonstrating to all, that every blow aimed at our maritime independence, is an impulse accelerating the growth of our maritime power.

James Madison, Address to Congress (Dec. 7, 1813).

Three decades later, the President used the phrase "predatory incursion" to describe the Mexican army's entry into the Republic of Texas:

[T]he war which has so long existed between Mexico and Texas which since the battle of San Jacinto has consisted altogether of predatory incursions, attended by circumstances revolting to humanity. . . . This Government, from time to time, exerted its friendly offices to bring about a termination of hostilities upon terms honorable alike to both the belligerents. Its efforts in this behalf proved unavailing. Mexico seemed, almost without an object, to persevere in the war . . . .

Since your last session, Mexico has threatened to renew the war, and either made or proposes to make formidable preparations for invading Texas. She has issued decrees and proclamations, preparatory to the commencement of hostilities . . . .

President John Tyler, Address to Congress (Dec. 3, 1844).

One of the predatory incursions President Tyler likely was referencing occurred in 1843. Mexican General Rafael Vasquez led 1400 troops across the Rio Grande to San Antonio, while small detachments entered other towns; none did much damage, and all returned to Mexico after a few days. Stanley Siegel, A Political History of the Texas Republic 1836–1845, at 192–93 (1956). According to one historian, this raid "serve[d] notice that the reconquest of Texas might soon be attempted on a grand scale." *Id.* at 193.

These predatory incursions all involved a military force of some meaningful size, organized in a manner related to the kind of enemy involved,

No. 25-10534

whether an Indian tribe, a distant foreign government who used its own forces or privateers, or an adjacent country using its own troops. Before reaching a conclusion, we consider a few more sources for meaning.

### iii.     *AEA and Other Contemporaneous Enactments*

We add to the contemporaneous meaning of the statutory terms our understanding of how the AEA would have fit within an array of contemporaneous statutes. In less than a month, Congress passed four related acts. The first was a Naturalization Act and the last was a Sedition Act. Naturalization Act of 1798, ch. 54, 1 Stat. 566 (June 18, 1798); Sedition Act of 1798, ch. 74, 1 Stat. 596 (July 14, 1798). What became known as the Alien Friends Act passed a week after the Naturalization Act and less than two weeks before the AEA. An Act Concerning Aliens (Alien Friends Act), ch. 58, 1 Stat. 570 (June 25, 1798); An Act Respecting Alien Enemies (Alien Enemies Act), ch. 66, 1 Stat. 577 (July 6, 1798). The four are collectively labeled the Alien and Sedition Acts. The Sedition Act applied to aliens and to citizens, as supposed sedition by both were concerns to the Congressional majority. James Morton Smith, Freedom's Fetters: The Alien and Sedition Laws and American Civil Liberties 94 (1956). The Naturalization Act "established the longest residence requirement for citizenship in the history of the United States" at fourteen years, applicable to all immigrants who arrived after 1794. *Id.* at 33–34.

One historian, discussing all these 1798 enactments, concluded "there was an overlapping of the legislation affecting aliens," *id.* at 49, but it was also clear that each Act had a specific "problem" in mind. We consider whether any overlap in the acts for the country's Friends and its Enemies helps the Government's argument.

The Alien Friends Act did not require hostilities with a foreign nation or government. It simply granted the president power to "order all such

No. 25-10534

aliens as he shall judge dangerous to the peace and safety of the United States, or shall have reasonable grounds to suspect are concerned in any treasonable or secret machinations against the government thereof, to depart out of the territory of the United States." Alien Friends Act § 1, 1 Stat. at 571. The Act expired by its own terms in 1800. Alien Friends Act § 6, 1 Stat. at 572. Petitioners contend that "[b]y using a *different* statute from the AEA to govern the peacetime removal of noncitizens a President deemed dangerous, Congress made clear that the President could not undertake the identical action under the AEA."

In response, the Government argues the relevant actions in President Trump's Proclamation could have fallen under the Alien Friends Act in addition to being supported by the AEA. We will examine what Congress included within these two acts and keep the coverage separate if textually required.

We have already identified the coverage of the AEA — predicate events fitting specific categories of hostility with another nation or government, and a resulting liability of "natives, citizens, denizens, or subjects of the hostile nation or government ... to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21.

Using "Friends" to name, colloquially, the other Act is reasonable because no hostility with a foreign nation or government was required. Though the individual's home country was still ostensibly a "friend," this Act required that individual aliens be enemies, *i.e.*, that they themselves were "dangerous to the peace and safety of the United States" or there were "reasonable grounds to suspect [they were] concerned in any treasonable or secret machinations against the government" of the United States, before they could be ordered to leave this country. Alien Friends Act § 1, 1 Stat. at 571. In other words, even though this country and another need not have

No. 25-10534

been involved even in the lowest level of conflict required by the Alien Enemies Act, the President could detain and remove aliens who were considered dangerous. No one was ever removed under this Act, but one historian reported that those considered for expulsion were Frenchmen of some significance and notoriety, not common criminals. SMITH, FREEDOM'S FETTERS, *supra*, at 159–76.

There are several other details in each enactment, but the clear difference in *requirements* is that the Alien Friends Act allowed forced removal from the United States based solely on the perceived danger to this country by a specific alien. There was no statutory interest in the actions of the alien's home nation or government, though the existence of hostile acts would not block use of the Alien Friends Act against a specific, dangerous alien. Conversely, the Alien Enemies Act demands specific categories of hostility by another nation or government before acting against an individual alien, but the individual need not exhibit personal hostility to this country.

As to what Act would more directly apply here, we summarize the President's Proclamation as identifying a terrorist organization engaged in actions that are dangerous to the peace and safety of this country, and whose members could be said to be involved in "secret machinations against the government" of this country. The Alien Friends Act would have covered those actions had it not expired 225 years ago. The only possibility that the Alien Enemies Act applies on the record before us is if the Proclamation identifies a predatory incursion by forces of a foreign nation or government.

### iv. Conclusion: Predatory Incursions and the Proclamation

These different sources of contemporary meaning that we have identified from dictionaries, the writings of those from the time period of the enactment, and from the different requirements of the Alien Enemies Act and the Alien Friends Act, convince us that a "predatory incursion"

No. 25-10534

described armed forces of some size and cohesion, engaged in something less than an invasion, whose objectives could vary widely, and are directed by a foreign government or nation. The success of an incursion could transform it into an invasion. In fact, it would be hard to distinguish some attempted invasions from a predatory incursion. The only reason for us to distinguish under the AEA would be to check our understanding of each term. Our understanding is that to some extent at least, the distinction between a predatory incursion and an invasion turns on the enemy's objectives, something often unknowable but, also, largely irrelevant under the AEA.

We still need to apply these understandings to the actions described in the Proclamation. That requires a recognition that the manner in which declared wars, invasions, and predatory incursions are fought will often not be the same, even in broad strokes, as in 1798. Modern warfare involves different categories of weapons, and the ability of nations to harm other nations can involve actions altogether different from the past, such as using computers to disrupt or even cripple an enemy. That is not to say that, for the AEA to apply, any current method of conducting hostilities suffices without showing it is in some manner comparable to an invasion or predatory incursion as understood in 1798.

Some guidance on updating the conditions to which a dated enactment applies can be found in caselaw applying the Constitution's protection of rights to modern conditions: "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (citations omitted). Similar principles apply to statutes. Though "every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world." *Wisconsin Cent.*

No. 25-10534

*Ltd. v. United States*, 585 U.S. 274, 284 (2018). In *Wisconsin Central,* the statutory word was "money," which for that statute's purpose "must always mean a 'medium of exchange'"; still, "the facts of the day" will allow the statute to apply to a medium unknown when the statute was adopted. *Id.*

In applying the centuries-old AEA to modern conditions, we still need to decide what are "modern forms" of invasion and predatory incursion (a "declared war" remains unchanged as requiring Congress to act). We examine the Proclamation for its relevant findings, then for each, consider whether, even if they are applying 1798 statutory words to much different actions, they are identifying modern forms of those actions. The findings are all found in the President's Proclamation, 90 Fed. Reg. at 13033–34.

- TdA . . . unlawfully infiltrated the United States and [is] conducting irregular warfare and undertaking hostile actions against the United States.

This statement is a summary of the specific findings and has no independent force under our analysis.

- TdA has engaged in and continues to engage in mass illegal migration to the United States to further its objectives of harming United States citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States.

A country's encouraging its residents and citizens to enter this country illegally is not the modern-day equivalent of sending an armed, organized force to occupy, to disrupt, or to otherwise harm the United States. There is no finding that this mass immigration was an armed, organized force or forces. It is an action that would have been possible when the AEA was written, and the AEA would not have covered it. The AEA does not apply today either.

No. 25-10534

- The result is a hybrid criminal state that is perpetrating an invasion of and predatory incursion into the United States, and which poses a substantial danger to the United States.

This finding refers to the previously identified actions and declares them to be an invasion and predatory incursion. We just held these actions are not within the reach of the AEA, and this finding does not change that holding.

- TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens.

The additional findings here refer to irregular warfare and to the use of drug trafficking. There is no description of what is meant by irregular warfare. We have already held that factual assertions by the President are to be accepted, but freestanding labels to unstated actions are not relevant findings. We accept the finding that drug-trafficking is being used as a weapon, but we hold it is not within even an updated meaning of invasion or predatory incursion. The completely accurate implication of this finding is that drugs are a scourge and weaken our citizens and our country, but it is not beyond reason that in 1798 an enemy country could try to sicken and physically weaken those within the United States. That would not have been an invasion or predatory incursion then, and it is not one today.

- I find and declare that TdA is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States.

There are no new factual assertions here; instead, the Proclamation is summarizing the findings that had already been made.

- TdA is undertaking hostile actions and conducting irregular warfare against the territory of the United States both

No. 25-10534

directly and at the direction, clandestine or otherwise, of
the Maduro regime in Venezuela.

Here, too, the findings are restating more clearly what was more of an implication in earlier findings that the Maduro regime is directing the hostile actions. We will discuss that finding when we review the AEA's requirement that the actions be by a nation or government.

- I further find and declare that all such members of TdA are
  a danger to the public peace or safety of the United States.

This factual finding concerning the danger posed by all TdA members is unreviewable by this court, but it is not finding facts that constitute an invasion or predatory incursion.

A supplemental record was filed with this court. It includes affidavits explaining the types of heinous crimes committed by TdA members who "coalesce to conduct" the acts; how TdA infiltrates and expands its geographical territory, including in urban areas; and how housing TdA members creates specific safety and administrative problems within ICE detention facilities. The supplemental record also includes an FBI Intelligence assessment explaining how Venezuela has used TdA to silence its critics in other countries. The assessment predicts, with medium confidence, that within six to eighteen months, some Venezuelan officials will leverage TdA members to "threaten, abduct, and kill members of the US-based Venezuelan diaspora who are vocal Maduro critics."

First, this evidence is not entitled to the preclusive effect of the President's own findings in the Proclamation. Instead, these documents could be the basis for findings of fact if not overcome by contrary evidence. Second, facts found by a court on additional evidence would not even be relevant under the AEA if invocation of the Act depends on the President's beliefs about conditions. The court's findings, even if supportive of the

No. 25-10534

Proclamation, might not mirror the President's unstated findings. Third, any decision now about the relevance under the AEA of any judicial fact-finding would be premature because the district court would need to put all evidence to the test of the adversarial system.

We accept each of the factual findings in the Proclamation, but not the labels applied to those findings. Instead, applying our obligation to interpret the AEA, we conclude that the findings do not support that an invasion or a predatory incursion has occurred. We therefore conclude that petitioners are likely to prove that the AEA was improperly invoked.

### 5. Foreign Nation or Government

We have just held that there was no "invasion or predatory incursion," and therefore the AEA does not apply. Nonetheless, the Supreme Court remanded the case to this court to address all relevant issues. As a result, we continue our analysis by examining whether the Proclamation alleges that the actions of TdA are the actions of a "foreign nation or government" as the AEA requires for its invocation. 50 U.S.C. § 21.

Petitioners argue that TdA is not a nation or government with "natives, citizens, denizens, or subjects"; instead, it is a gang with members. In response, the Government insists the determination that TdA is "entwined with the Maduro regime" is "a sensitive national-security judgment that warrants particular deference." That may be, but if the court has authority to define these statutory terms, whether entwining legally suffices is for the court to determine.

According to the Government, when "an organization is so closely bound up with a foreign nation as to create a 'hybrid criminal state,' an incursion or invasion by the organization is an incursion or invasion by a 'foreign nation or government.'" It contends that such an "interpretation tracks conflicts that precipitated the enactment of the AEA," such as the

No. 25-10534

Barbary Wars, where nations used "pirates or privateers . . . to conduct hostile acts on other nations."[8]

As relevant to this AEA requirement, President Trump's Proclamation provided the following.

- TdA operates in conjunction with Cártel de los Soles, the Nicolas Maduro regime-sponsored, narco-terrorism enterprise based in Venezuela;

- TdA has engaged in and continues to engage in mass illegal migration to the United States to further its objectives of . . . supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States;

- Maduro leads the regime-sponsored enterprise Cártel de los Soles, which coordinates with and relies on TdA and other organizations to carry out its objective of using illegal narcotics as a weapon to "flood" the United States;

- The result is a hybrid criminal state that is perpetrating an invasion of and predatory incursion into the United States, and which poses a substantial danger to the United States;

- TdA is undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela.

Proclamation, 90 Fed. Reg. at 13033–34.

The Proclamation identifies the Maduro regime as the one controlling TdA's activities in the United States. *See, e.g.*, *id.* at 13034 ("TdA is

---

[8] "The Barbary States were a collection of North African states, many of which practiced state-supported piracy." OFFICE OF THE HISTORIAN, U.S. DEP'T OF STATE, *Barbary Wars, 1801–1805 and 1815–1816*, https://history.state.gov/milestones/1801-1829/barbary-wars.

No. 25-10534

undertaking hostile actions and conducting irregular warfare . . . at the direction . . . of the Maduro regime."). Because we accept the President's factual assertions, the question is whether this interconnectedness makes TdA's activities in the United States attributable to the Venezuelan government. We conclude that there is no principled difference between the President's finding that the Maduro regime is directing TdA in this country and what the AEA was written to address. The AEA was enacted at a time when France was using privateers to attack American shipping and two decades after Great Britain had used the Hessians, who were German mercenaries, as part of the army it sent to suppress the American Revolution. Famously, it was a large contingent of Hessians who were surprised in Trenton when General Washington and his forces crossed the Delaware River on Christmas night 1776. JAMES THOMAS FLEXNER, GEORGE WASHINGTON IN THE AMERICAN REVOLUTION (1775–1783) 173–79 (1967). An enemy using forces, whether from the directing government's own country or from another, that are not part of the country's regular military does not prevent the use of the AEA.

A different issue is whether a President under the AEA can identify a terrorist group and its members as the subjects of detention and removal as opposed to a foreign country and its natives, citizens and the like. We conclude that the President, having identified TdA and its members as Venezuelan and the Maduro government as directing its actions in the United States, in effect narrowed what he otherwise would be entitled to do. Instead of targeting all Venezuelans in this country, which the AEA permits, he is directing action only against actual enemies who are Venezuelans. It does appear that the AEA contemplates that a foreign country will be designated in a proclamation; we conclude the different wording of the Proclamation to designate the TdA does not by itself invalidate use of the AEA.

No. 25-10534

Had we determined TdA was engaged in either an invasion or a predatory incursion, the findings in the Proclamation that such actions were being directed at least in part by the foreign Maduro regime would satisfy the requirement that those actions be by a government or nation. We held instead that TdA was not the kind of organized force or engaged in the kind of actions necessary to constitute an invasion or predatory incursion.

Because of our conclusion that the Proclamation does not identify actions by the Maduro regime in control of Venezuela that constitute one of the predicate acts for invoking the AEA, Petitioners are likely to succeed on the merits of their claims.

Before moving to other issues, we repeat the Supreme Court's closing words in its opinion remanding this case: "The Government may remove the named plaintiffs or putative class members under other lawful authorities." *A.A.R.P.*, 145 S. Ct. at 1370. These other authorities are potent ones.

A quite useful overview of what else is available to the Executive Branch was set out in the amicus brief jointly provided by the Democracy Defenders Fund and several former government officials. The counsel for the former officials had once been head of the Department of Justice's Civil Division, whose responsibilities included immigration enforcement. We consider the description in the brief to identify the most significant relevant procedures under the Immigration and Nationality Act. We repeat next some of what is in that brief.

The Government has broad authority to remove aliens who are members of foreign terrorist organizations or who otherwise engage in terrorist activities in the United States. *See* 8 U.S.C. §§ 1227(a)(4)(B), 1182(a)(3)(B), (F). This authority extends to aliens who have "engaged in," "incited," or "endorse[d] or espouse[d] terrorist activity," or who have "persuade[d] others to endorse or espouse terrorist activity or support a

No. 25-10534

terrorist organization." § 1182(a)(3)(B). The Government's removal authority under these provisions also extends more generally to aliens who are members or representatives of a designated foreign terrorist organization, or who have otherwise "received military-type training . . . from or on behalf of any organization that, at the time the training was received, was a terrorist organization." § 1182(a)(3)(B).

Relevant here, TdA, the target of the President's Proclamation, has been designated as a foreign terrorist organization. Foreign Terrorist Organization Designations, 90 Fed. Reg. 10030 (Feb. 20, 2025). This means there are other provisions that would allow the Government to promptly remove precisely those individuals whom it seeks to remove under the President's Proclamation.

In addition, the Government may remove aliens who have committed espionage, sabotage, other offenses "endanger[ing] public safety or national security," or any other acts designed to oppose, control, or overthrow the Government "by force, violence, or other unlawful means." § 1227(a)(4)(A). The Government may also remove aliens who have committed crimes of violence punished by at least one year in prison. §§ 1227(a)(2)(A)(iii), 1101(a)(43)(F).

Using these provisions would not jeopardize national security. When a removal under these provisions is based on classified information, the Government can proceed through the Alien Terrorist Removal Court to avoid disclosure of that classified information. 8 U.S.C. §§ 1533(a)(1), 1534(e)(3)(A).

It may well be that these and other peacetime tools are not so quickly utilized as the Alien Enemies Act, but the Government has substantial authority to remove TdA members independent of that Act.

No. 25-10534

## B. *Likely to Suffer Irreparable Harm Absent Preliminary Relief*

Petitioners contend that they are likely to suffer irreparable injury absent preliminary relief because "the government has represented 'that it is unable to provide for the return of an individual deported in error to a prison in El Salvador.'" *See A.A.R.P.*, 145 S. Ct. at 1368. They also argue irreparable harm because the conditions they face at the facility where they are detained are "harsh and life threatening."

In response, the Government contends that it "does not remove aliens to countries where it believes they may be tortured," and "a preliminary injunction would not prevent that asserted harm" because "Petitioners would still be removable under the INA as designated members of a foreign terrorist organization and could still be sent to El Salvador under the INA's procedures for third-country removal."

Typically, "[t]he burden of removal alone cannot constitute the requisite irreparable injury" because "[a]liens who are removed may continue to pursue their petitions for review, and those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This case is atypical as the Supreme Court has already concluded: "[t]he Government has represented elsewhere that it is unable to provide for the return of an individual deported in error to a prison in El Salvador where it is alleged that detainees face indefinite detention." *A.A.R.P.*, 145 S. Ct. at 1368 (citations omitted). If Petitioners are removed based on the alleged improper invocation of AEA, there is little potential for effective relief. Even if the destination for AEA detainees has changed, and we do not know, the questions remain on whether their return could ever be effected. Thus, the *Nken* presumption that removal can be undone does not apply under these circumstances.

No. 25-10534

The Supreme Court found the prospect of irremediable error means Petitioners' "interests at stake are accordingly particularly weighty." *Id.* Petitioners have demonstrated that they are likely to suffer irreparable harm if they are *improperly* removed. That will not occur, the Government argues. The reason as set out in the Government's brief here is that after being given notice and "the alien" files a habeas petition, "he will not be removed under the AEA until that petition is adjudicated." The authority cited in the brief for that statement is the updated notice itself, but that document contains no such promise. The Government cites nothing else to this court to indicate a commitment not to remove if there are pending habeas proceedings.

The district court in finding no risk of removal relied on assurances made there by Government counsel as precluding a finding of irreparable harm. Surprisingly, the Government does not refer to those assurances here and no party briefed the effect of such representations on irreparable harm. If the Government is not going to urge that we rely on the representations made in district court, we should be extremely wary of considering doing so *sua sponte.* We add that the Government made a similar argument before the Supreme Court, and the Supreme Court nevertheless provided injunctive relief even to the named Petitioners, implying that the named Petitioners faced irreparable harm despite the Government's assurances. *See A.A.R.P.,* 145 S. Ct. at 1369–70.

In any event, the assurances in the district court record extended only to named Petitioners and not to any putative class members.[9]  As a result,

---

[9] To be clear, although the Supreme Court asked us to address the "*named plaintiffs'* underlying habeas claims that the AEA does not authorize their removal," *A.A.R.P.,* 145 S. Ct. at 1370 (emphasis added), class certification on the propriety of the President's invocation of the AEA was sought before this case was appealed from the district court. It is therefore appropriate for us to consider whether the putative class members ought to receive preliminary injunctive relief. *See A.A.R.P.,* 145 S. Ct. at 1369

No. 25-10534

even if these assurances could be found to preclude irreparable harm as to the named Petitioners, they would not do so as to the putative class members. The Supreme Court in this case explicitly "reject[ed] the proposition that a class-action defendant may defeat class treatment, if it is otherwise proper, by promising as a matter of grace to treat named plaintiffs differently." *Id.* The Court held that we "may issue temporary relief to a putative class" even before any decision is made about certification; thus, it is proper to "enjoin the Government from removing putative class members while the question of what notice is due is adjudicated," *id.* at 1369, and we conclude it is also proper to consider doing so while the foundational question of whether the AEA has properly been invoked is litigated.

Here, both the named Petitioners and the putative class members have shown irreparable harm.

## C. *The Balance of Equities and the Public Interest*

As for the third and fourth factors, those merge in cases against the Government. *Nken*, 556 U.S. at 435. "Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Id.* at 436. There is also "a public interest in prompt execution of removal orders." *Id.* "The interest in prompt removal may be heightened by the circumstances as well — if, for example, the alien is particularly dangerous, or has substantially prolonged

---

(granting temporary relief to a putative notice class even though the class had not yet been certified).

Relatedly, although the Government has promised on appeal not to remove aliens with pending habeas petitions, its assurances before the district court referred only to the named Petitioners. Consistent with those assurances, we interpret the Government's promise on appeal as only extending to the named Petitioners or others who file their own habeas petitions, even if the putative class members have in some sense filed habeas petitions by virtue of the named Petitioners' joint habeas petition.

his stay by abusing the processes provided to him." *Id.* (citation omitted). The Government has alleged such circumstances here. Its brief argues that "the Government has had serious difficulties detaining TdA members," "members of the putative class 'threatened to take hostages and injure facility contract staff and ICE officers,' and refused to comply with orders for several hours," and the "prolonged detention of TdA members is particularly dangerous given TdA's track record of recruiting members from prison."

The Government's argument, though, assumes the very things it must show in order to remove the named Petitioners and putative class members under the Proclamation, *i.e.*, that they are members of TdA. The named Petitioners and putative class members have not yet had that question answered in court, and we therefore cannot rely on the Government's assertion that they are members of TdA for purposes of our analysis.

## D. Scope of the Preliminary Injunction

Having determined that a preliminary injunction is appropriate, we explain its proper scope. As discussed above, our preliminary injunction will extend only to removal under the AEA, not to removal under other authorities.

We also consider whether it is appropriate to grant injunctive relief only to the named Petitioners, only to the putative class members, or to both. We conclude that it is proper to grant injunctive relief to both. Based on the discussion above, both the named Petitioners and the putative class members have shown that all four preliminary injunction factors favor relief. For the putative class members, it might be true that we would need to find a likelihood of success on class certification, but it appears that is not the case. In the opinion remanding the case to us, the Supreme Court granted injunctive relief to the putative class members without considering the

No. 25-10534

likelihood of class certification, deeming class certification issues irrelevant at this stage of the case. *A.A.R.P.*, 145 S. Ct. at 1369. The treatise the Supreme Court cited is in accord: as long as the preliminary injunction factors are met for the putative class members, preliminary injunctive relief is appropriate for them regardless of whether a class is likely to be certified. *See* 2 Newberg & Rubenstein on Class Actions § 4:30 (6th ed. 2025). Class certification issues are to be resolved at a later stage. *See id.*[10] Thus, we need not consider whether class certification is likely before granting injunctive relief to the putative class members.

## II.    *Adequacy of the Notice*

The Supreme Court also required that we determine the adequacy of the notice the Government will give to detainees who are subject to removal as a result of the President's Proclamation.

"[T]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." *A.A.R.P.*, 145 S. Ct. at 1367 (alteration in original) (quoting *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025)). "Due process requires notice that is 'reasonably calculated, under all the circumstances, to apprise interested parties' and that 'afford[s] a reasonable time . . . to make [an] appearance.'" *Id.* at 1367–68 (alterations in original) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). Relevant here, "'AEA detainees must receive notice . . . that they are subject to removal under the Act . . . within a reasonable time and in such a manner as will allow them to actually seek habeas relief' before removal." *Id.* at 1368

---

[10] Although the treatise has been updated since the Supreme Court's citation to it, the treatise's guidance on this point has remained largely consistent. If anything, the treatise's discussion of this issue has become more circumspect over time. Regardless, we rest our holding on our interpretation of the Supreme Court's guidance, albeit with the caveat that this is an unsettled area of law.

No. 25-10534

(quoting *J.G.G.*, 145 S. Ct. at 1006). "In order to 'actually seek habeas relief,' a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." *Id.*

In this case, the Supreme Court determined that "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *Id.* at 1368. The Court remanded for us to analyze the notice due as to the putative class's due process claims against summary removal.

Petitioners argue that the Government's notice must be "in a language the individual understands" and it must provide "(1) information about how to challenge a person's AEA designation and removal; (2) the factual basis for the government's accusation of TdA membership; and (3) a 30-day period to attempt to find counsel and to prepare and file a habeas petition in federal court."

After Petitioners submitted their opening brief, the Government filed an updated notice. The updated notice addresses many of Petitioners' challenges. It includes the following:

> [name of alien enemy] has been determined to be: (1) at least fourteen years of age; (2) not a citizen or lawful permanent resident of the United States; (3) a citizen of Venezuela; and (4) a member of Tren de Aragua.
>
> . . . .
>
> You may be removed from the United States seven days following receipt of this Notice . . . . If you desire to contest your removal under the Alien Enemies Act and Presidential Proclamation, you may do so by filing a petition for writ of habeas corpus in the United States District Court for the District in which you are detained. Here, that is:
>
> > United States District Court

No. 25-10534

> Northern District of Texas—Abilene Division
> 341 Pine Street, Room 2008
> Abilene, TX 79601

> You may retain counsel to assist you in the preparation and filing of such petition and seeking any related relief. You will be permitted to make telephone calls for that purpose. A list of attorneys who may be available will be provided to you upon request.

The updated notice requires certification that the detainee was provided a copy of the notice written in a language the detainee understands. It also requires certification that the notice was read to the detainee in a language he or she understands.

Under the updated notice, the Government now gives AEA detainees notice of their detention in a language they understand, information about how to challenge detention including how to contact counsel, and seven days in which to file a habeas petition before being removed.

Petitioners argue that the updated notice is deficient because it does not provide detainees with a 30-day timeframe, does not identify the removal designation, and does not provide the factual basis for the TdA designation. To justify a 30-day delay, Petitioners list several practical barriers such as the detainee's inability to contact counsel and lack of time to prepare a case. Those are valid concerns, especially considering what is likely a limited pool of available attorneys. Not particularly significant is that a 30-day timeframe was used during World War II. What was reasonable in the 1940s is not automatically what is reasonable today, considering the different conditions of communication, availability of counsel, number of aliens subject to the AEA, and other circumstances.

What must be satisfied is found in the Supreme Court ruling: "a detainee must have sufficient time and information to reasonably be able to

No. 25-10534

contact counsel, file a petition, and pursue appropriate relief." *See A.A.R.P.*, 145 S. Ct. at 1368. On this point, there is little in the record to base a decision. The trial court proceedings, brief as they were, occurred when the Government was giving only 24 hours' notice. The updated notice, as noted, was developed while the case was pending in this court.

In the absence of a more developed factual record, we searched for a current, similar procedure to consider the length of notice it provides. Notice for one relatively comparable proceeding is required under the Immigration and Nationality Act, and it provides that no hearing to remove an alien can be scheduled sooner than ten days after service of a notice to appear. 8 U.S.C. § 1229(b)(1). That section, as does the notice here, requires providing a list of counsel available for such representation. There are distinctions, too. For example, the proceedings after a Section 1229(b)(1) notice are largely defensive, whereas here a detainee must find counsel to prepare an affirmative petition for habeas corpus. On the current record, though, we view it as a fair comparison to the updated notice.

Of course, the existence of a comparable procedure cannot end our analysis, which must be sensitive to the particular facts on the ground. *See Mullane,* 339 U.S. at 314; *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). The needed time will depend on how many detainees are simultaneously trying to locate counsel, the capacity of the detention facility's forms of communication, the timely availability of counsel once contact is made, and perhaps other factors. Even so, we view the notice provided under Section 1229(b)(1) as a good starting point because it presumably comports with the requirements of procedural due process. Given its similarities to the Government's updated notice, along with the fact that the updated notice appears to comply with the Supreme Court's directive, we cannot say that the Petitioners have shown a likelihood of success on their procedural due process claim.

No. 25-10534

We stress that our holding here is based on the current record, which is undeveloped.  There has been no fact-finding in this case, though affidavits have been filed setting out different affiants' views that seven days is insufficient.  A more developed record may demonstrate an actual success on the merits.  The district court on remand should take evidence and make findings as to what is a sufficient timeframe.

At this early stage of the proceedings, we decline to require more than the Government's updated notice procedure.

\*    \*    \*

We GRANT a preliminary injunction blocking removal, leave in place the Government's updated notice, and REMAND for further proceedings consistent with this opinion.  The Government is not enjoined from removing the named Petitioners and putative class members under other lawful authorities.  Should the district court deny class certification, the preliminary injunction will automatically expire as to the putative class members unless an appeal of that order is timely sought and accepted by this court.

No. 25-10534

Irma Carrillo Ramirez, *Circuit Judge*, concurring in part and dissenting in part:

Petitioners have shown they are likely to succeed on the merits of their claims because Proclamation No. 10903 (Proclamation) does not identify an invasion or predatory incursion, threatened, or otherwise, and the other preliminary injunction factors likewise weigh in favor of preliminary relief. Accordingly, I concur.

The government has shown that its new notice provides adequate information. Because the limited factual record before us contains unrebutted evidence demonstrating that seven days is not "sufficient time . . . to reasonably be able to contact counsel, file a petition, and pursue appropriate relief," *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1368 (2025) (per curiam), however, I respectfully dissent.

The government argues that "[n]othing suggests that aliens facing removal under the AEA could not file habeas petitions within a week," noting that Petitioners here were able to seek relief within hours and "petitioners across the country have filed petitions in fewer than seven days, *with the help of counsel.*" But the record shows that even represented detainees at the Bluebonnet Detention Facility (Bluebonnet) had difficulty *meeting* with counsel *by video* within seven days.[1]

---

[1] The record also contains evidence of logistical challenges for in-person meetings. Bluebonnet is located in Anson, Texas, which is a three-hour drive "from the nearest large city, Dallas," so attorneys who are not from the area cannot get there quickly. Also, the attorney visitation area had only two meeting rooms available.

No. 25-10534

Attorney visits, including confidential legal video visits, must be scheduled days in advance at Bluebonnet.[2] One attorney waited *over a week* for a scheduled video call with a client detained there. But before that scheduled call could take place, the client was transferred to another facility where the client's phone access was "sporadic."[3]

Transfers have also affected attorneys' ability to meet with their clients after those clients received AEA notices. An attorney who was scheduled to have video calls with two clients on April 14, 2025, received emails less than two hours before the first call was scheduled to begin, informing him that both calls had been cancelled. Two days later, on the night of April 16, the attorney learned that both clients had been transferred to Bluebonnet, and he emailed requests to that facility for a video call with each client. As noted, legal video visits had to be scheduled in advance. He received a response regarding one client on April 17 and regarding the other on April 18, the same morning that the client received notice that he would be removed. Of the ten detainees interviewed by attorneys from the American Civil Liberties Union (ACLU) at Bluebonnet on April 18, 2025, at least three received AEA removal notices and were subsequently transferred to other facilities. Detainees interviewed by the ACLU on May 12, 2025, reported that several detainees who received AEA notices on April 18 had also been transferred to other detention facilities.

---

[2] Attorneys must "provide a list of names and A-numbers in advance in order to speak with individuals" at Bluebonnet; they [are] not permitted to speak with individuals whose names or A-numbers they [do] not have."

[3] Each detention center has its own rules and system for setting up confidential attorney calls.

No. 25-10534

The record contains evidence that transfers impeded detainees' ability to contact their attorneys.[4] One of the named petitioners in this case was transferred to Bluebonnet on April 14, 2025. Late in the afternoon on April 15, 2025, he relayed to his attorney that his telephone access (and that of other detainees) *had been cut off*, which he understood to be an indication that he would be imminently relocated.[5] As for those detainees who are unrepresented when they receive AEA notices, the government's revised notice states that "[a] list of attorneys who may be available will be provided [] upon request." According to the director of "one of the few legal service providers offering pro bono representation to detained immigrants in Texas," "there are not enough attorneys willing to work" in this "complicated" area of law, especially on a *pro bono* or low-cost basis, so most detainees are unrepresented. Her organization has a waiting list that ranges from one to four weeks. In addition to a limited pool of attorneys, "the [detainees'] ability to find, retain, and confer with counsel [can be] considerably constrained by their incarceration[,] . . . exacerbated by both

---

[4] Calls are usually initiated by attorneys from outside of the facility. According to one attorney, unrepresented detainees must have enough money in their accounts to pay for outgoing calls to seek representation.

[5] The impact of transfers on detainees' ability to contact counsel and file a habeas petition was specifically considered in *A.S.R. v. Trump*, No. 3:25-CV-113, 2025 WL 1378784 (W.D. Pa. May 13, 2025). The district court noted, based on its experience with immigration habeas petitions, that detainees "are frequently moved, counsel for such individuals may have a difficult time speaking with them, and such individuals cannot realistically file for habeas relief within a matter of hours." *A.S.R.*, 2025 WL 1378784, at *20. After also considering the risk of errant removals and the lack of undue burden on the government, the *A.S.R.* court found that 21 days' notice was a "sufficient period of time to 'actually allow [detainees] to seek habeas relief in the proper venue.'" *Id.* In *W.J.C.C. v. Trump*, No. 3:25-CV-153, 2025 WL 1703682, at *6–7 (W.D. Pa. June 18, 2025), the district court considered the effect of transfers on detainees' ability to comply with the same seven-day time frame proposed in this case. Citing *A.S.R.*, the court found that due process mandated 21 days' notice. 2025 WL 1703682, at *7.

No. 25-10534

being moved, pursuant to court ordered writs of habeas corpus ad testificandum, preparat[ion] [for] the hearing, a holiday weekend and poor prison mail service," as our circuit has acknowledged, albeit in the criminal context. *Alford v. United States*, 709 F.2d 418, 424 (5th Cir. 1983).[6]

Non-attorney resources are also limited. Funding cuts have resulted in no groups regularly visiting "many if not all" detention centers to provide legal information and orientation." Although each detention center is supposed to have a law library, not all do, and some of the law libraries have "limited resources, including old computers that struggle to maintain internet connection and load websites, and there are no interpretation or translation services available." Detainees at Bluebonnet have no access to computers.[7]

Finally, the revised notice states that detainees may contest their removal under the AEA by "filing" a habeas petition in the district court for the district of detention, and it provides a physical mailing address. Because detainees at Bluebonnet do not have computer access, unrepresented detainees who seek to file petitions must tender their petitions to officials at the facility for mailing to the district court. "Under the 'mailbox rule,' a

---

[6] Three of our sister circuits have likewise recognized that it is harder for immigration detainees to obtain counsel. *See Freza v. Att'y Gen. United States*, 49 F.4th 293, 300 (3d Cir. 2022) (referencing "the realities of obtaining legal counsel while detained"); *Usubakunov v. Garland*, 16 F.4th 1299, 1303–04 (9th Cir. 2021) (noting that detainees are far less likely than non-detained persons to secure representation); *Hernandez Lara v. Barr*, 962 F.3d 45, 55 (1st Cir. 2020) (stating that "data shows that detention significantly decreases the ability of respondents in immigration proceedings to obtain counsel" (citation omitted)). In *Usubakunov*, the Ninth Circuit also noted that according to empirical documentation, represented persons were three to five times more likely to obtain relief. 16 F.4th at 1304.

[7] Detainees at Bluebonnet stated that tablets were available for messaging families or making video calls only; they were not aware of any other applications on the tablets.

No. 25-10534

prisoner's federal habeas corpus petition is deemed filed when he delivers the petition to prison officials for mailing to the district court." *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999) (per curiam) (quoting *Spotville v. Cain*, 149 F.3d 374, 376–78 (5th Cir. 1998)), *abrogated on other grounds*.[8] Delays caused by mail service could result in the removal of detainees who timely "filed" habeas petitions.

"Due process requires notice that is 'reasonably calculated, *under all the circumstances*,'" to afford parties "a reasonable time to make an appearance.'" *A.A.R.P.*, 145 S. Ct. at 1367–68 (emphasis added) (citation modified) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). The Supreme Court has instructed that in the context of the AEA, this means "'detainees must receive notice that they are subject to removal under the Act within a reasonable time and in such a manner as will allow them to actually seek habeas relief' before removal." *Id.* at 1368 (quoting *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (per curiam)). "In order to 'actually seek habeas relief,' a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." *Id.* The government conceded at oral argument that it had not responded to Petitioners' evidence regarding the need for more than seven days' notice.[9] The undisputed evidence in this case is

―――――――――――――

[8] The mailbox rule also applies to pro se detainees in immigration proceedings. *Fosu v. Garland*, 36 F.4th 634, 637 (5th Cir. 2022).

[9] It instead argued that the expedited-removal process under 8 U.S.C. § 1225(b) permitted "immediate removal 'without further hearing or review,' . . . subject to only a limited window to establish a 'credible fear of persecution.'" In *W.J.C.C.*, the court rejected the argument that the expedited-removal process is an appropriate analog because it applies to different categories of detainees, and it allows a detainee to seek a hearing and review of an adverse decision "*within the branch of Government by which he is detained,*" unlike people detained under the Proclamation and the AEA who must seek review "*from*

No. 25-10534

sufficient to show that seven days' notice is not reasonably calculated, under all the circumstances, to afford detainees, especially those who are unrepresented, due process under the AEA. At least twenty-one days' notice is required.[10]

---

*the Judiciary.*" 2025 WL 1703682, at *5–7. Regardless, resort to an analog is unnecessary based on the Supreme Court's explicit instructions. *See* 145 S. Ct. at 1368.

[10] None of the few courts that have considered what amount of notice is required under the AEA have found less than ten days' notice to be sufficient. *See e.g.*, *W.J.C.C.*, 2025 WL 1703682, at *7 (finding that due process mandated the 21-day notice requirement articulated in *A.S.R.*); *M.A.P.S. v. Garite*, No. EP-25-CV-00171, 2025 WL 1622260, at *16 (W.D. Tex. June 9, 2025) (requiring 30 days' notice after looking to the 30-day notice provided during prior invocations of AEA during World War II); *Gutierrez-Contreras v. Warden*, No. 5:25-CV-00965, 2025 WL 1400402, at *5 (C.D. Cal. May 14, 2025) (finding that the petitioner had raised a "serious question" about possible due process violations if he was removed under the AEA without 14 days' notice); *A.S.R.*, 2025 WL 1378784, at *20 (holding that 21 days' notice was a "sufficient period of time to 'actually allow [detainees] to seek habeas relief in the proper venue'"); *G.F.F. v. Trump*, No. 25 CIV. 2886, 2025 WL 1301052, at *6 (S.D.N.Y. May 6, 2025) (stating that "a reasonable amount of time" was required and citing 8 U.S.C. § 1229(b)(1) with a parenthetical noting it requires "a hearing to be held no fewer than ten days after service of notice '[i]n order that an alien be permitted the opportunity to secure counsel'"); *D.B.U. v. Trump*, 779 F. Supp.3d 1264, 1282 (D. Colo. Apr. 22, 2025) (instructing the government, "absent further guidance from the Supreme Court—to provide a twenty-one (21) day notice to Petitioners and the provisionally certified class").

No. 25-10534

Andrew S. Oldham, *Circuit Judge*, dissenting:

For 227 years, every President of every political party has enjoyed the same broad powers to repel threats to our Nation under the Alien Enemies Act ("AEA"). And from the dawn of our Nation until President Trump took office a second time, courts have never second-guessed the President's invocation of that Act. Not once. The reason is simple: Determining whether the AEA's preconditions are satisfied—whether there is a declared war, or "any invasion or predatory incursion" being "perpetrated, attempted, or threatened," 50 U.S.C. § 21—depends upon "matters of political judgment for which judges have neither technical competence nor official responsibility." *Ludecke v. Watkins*, 335 U.S. 160, 170 (1948).

Time and time and time again, the Supreme Court has instructed that the President's declaration of an invasion, insurrection, or incursion is conclusive. *Final*. And completely beyond the second-guessing powers of unelected federal judges. That rule does not only apply to Presidents. It also applies to *Governors*. In one famous case from the 1930s, for example, the Governor of Texas declared an "insurrection" because some oil barons in East Texas were pumping too much crude. *Sterling v. Constantin*, 287 U.S. 378, 387 (1932). It seems patently absurd to call profit-maximizing business practices an "insurrection." But that's irrelevant. The Supreme Court unanimously held: "By virtue of his duty to 'cause the laws to be faithfully executed,' the executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen. ***His decision to that effect is conclusive***." *Id.* at 399 (emphasis added).

For President Trump, however, the rules are different. Today the majority holds that President Trump is just an ordinary civil litigant. *His* declaration of a predatory incursion is *not* conclusive. Far from it. Rather, President Trump must plead sufficient facts—as if he were some run-of-the-

No. 25-10534

mill plaintiff in a breach-of-contract case—to convince a federal judge that he is entitled to relief.

That contravenes over 200 years of legal precedent. And it transmogrifies the least-dangerous branch into robed crusaders who get to playact as multitudinous Commanders in Chief.

I respectfully but emphatically dissent.

## I

By way of background, I (A) begin with the historical foundation of the AEA. Then I (B) describe the procedural history of the AEA claims in this case.

## A

### 1

Congress enacted the AEA when our young Nation was in the midst of a major national security crisis. The statute's historical background gives important meaning to its text.

As George Washington's second term drew to a close, relations with France had soured. *See* Stanley Elkins & Eric McKitrick, The Age of Federalism 529, 537 (1993). The French revolutionary government thought itself betrayed by the 1794 Jay Treaty, which the United States signed with France's mortal enemy (Great Britain). *See* James Morton Smith, Freedom's Fetters: The Alien and Sedition Laws and American Civil Liberties 5 (1963); *see also* Alexander DeConde, The Quasi-War: The Politics and Diplomacy of the Undeclared War with France 1797–1801, at 10 (1966). So France took revenge.

No. 25-10534

But not official, declaration-of-war-style revenge. Rather, France gave free rein to privateers, "or private armed ships authorized by their government to attack enemy shipping." DeConde, *supra*, at 8. These privateers "made a lucrative business of raiding American commerce, especially in the Caribbean." *Ibid.* In 1795 alone, Secretary of State Timothy Pickering estimated, 316 American ships were captured. *Id.* at 9.

Much of the privateers' activity "bordered on unabashed piracy." Elkins & McKitrick, *supra*, at 648–49. In early March 1797, for example, "a French armed brig captured" an American vessel called *Cincinnatus*. DeConde, *supra*, at 9. "The captors tortured the American captain with thumbscrews," before "robb[ing]" him and "plunder[ing]" his ship. *Ibid.*

By the time President John Adams took office, "France and the United States were on the verge of war." *Id.* at 10. Two days prior to Adams's inauguration, the Directory—the latest form of French revolutionary government—had issued a decree that seemed to violate a 1778 treaty between the United States and France. DeConde, *supra*, at 17. That decree effectively authorized "limited maritime hostilities against Americans." *Ibid.* And so President Adams would soon write: France "is at war with us, but we are not at war with her." *Id.* at 23.

Nevertheless, the new President wanted to avoid full-scale war. *See id.* at 11. So shortly after his inauguration, he convened a special session of Congress. Smith, *supra*, at 5–6. Although President Adams acknowledged that France had treated the United States as an enemy and "urged Congress to take adequate defense measures," he insisted on attempting negotiations. *Id.* at 6.

But negotiations seemed destined for disaster. The Directory "had not only refused to receive" America's previous ambassador, Charles

No. 25-10534

Cotesworth Pinckney; it had "driven him out of Paris." DeConde, *supra*, at 16. But that did not weaken the President's resolve. He was determined to "send[] a fresh mission to France." Elkins & McKitrick, *supra*, at 552.

That fresh mission would arrive in France in October 1797. *Id.* at 570. It consisted of three men: John Marshall (the future Chief Justice), Elbridge Gerry (the future Vice President and namesake of "gerrymandering"), and Pinckney (the recently rejected ambassador). *See* Smith, *supra*, at 6. Although the envoys would fail in their negotiations with the corrupt French diplomat, Charles Maurice de Talleyrand,[1] the sordid story of their adventures would live on in American history as the "XYZ Affair." *Ibid.*

2

My abbreviated account of the XYZ Affair begins on October 18, 1797. On that day, the American envoys "received a visit from" a French agent named "Jean Conrad Hottinguer" (later known as "X"). Elkins & McKitrick, *supra*, at 571. Hottinguer's demands shocked the envoys. Hottinguer first demanded that the envoys "disavow[]" comments President Adams had made publicly about France. *Ibid.* Then Hottinguer demanded, among other things, that the United States "make a 'considerable

---

[1] Talleyrand was the rare political operative who somehow managed to serve not only in both Louis XVI's government and even the Directory but also in "every subsequent French government—Consulate, Empire, Restoration, July Monarchy—whatever upheavals and *coups d'etat* might come in between." Elkins & McKitrick, *supra*, at 562. Although Talleyrand had originally become a priest under demands from his father, Talleyrand refused to let the priesthood get in the way of his passions "for luxury, women, and intrigue." *Id.* at 561. Unsurprisingly, soon after he rose to become the Bishop of Autun, he betrayed the church, resulting in his defrocking and excommunication. *Id.* at 561–62. Talleyrand became Minister of Exterior Relations under the Directory. *Id.* at 562. Upon taking office, he exulted: "I have to make an immense fortune out of it, a really immense fortune." *Ibid.* And he would do just that, earning an estimated 13 or 14 million francs during his time as Minister. *Id.* at 568.

loan' to France." *Ibid.* Finally, Hottinguer proffered his most infamous demand: If the envoys wanted negotiations with France to go well, they had to pay a *douceur*—a bribe. *Ibid.*

The envoys were outraged, but they decided to delay rather than respond. So two days later, another French agent, Pierre Bellamy ("Y"), came calling. *Ibid.* Bellamy reiterated Hottinguer's demand for an explanation for Adams's comments about France. *Ibid.* Bellamy also clarified that the loan paid to the Directory should be 32 million Dutch florins. *Id.* at 572. Finally, Bellamy got to the point: If the Americans wanted Talleyrand to "use his influence with the Directors to persuade them to receive the commissioners," they would need to pay 50,000 pounds sterling (about $250,000 at the time, depending on how you count). *Ibid.*

After more delay from the envoys, Hottinguer and Bellamy returned. This time, they were accompanied by Lucien Hauteval, or "Z." *Id.* at 573. At that point, the French agents began to "threaten[] the envoys more or less openly." *Ibid.* "[A]ll nations," they menaced, "must aid France or be treated as enemies." *Ibid.* While the envoys explained that any war would be France's fault, Hottinguer interjected: "Gentlemen, you do not speak to the point. It is money—it is expected that you will offer money." *Ibid.* At this, Pinckney had had enough: "No! No! Not a sixpence!" *Ibid.*

About a week later, Bellamy returned, "maddened by the receding mirage of money." *Id.* at 574. Bellamy continued to levy threats against the envoys and their Nation. *Ibid.* But these threats were more concrete. Bellamy threatened that the French would invade. *Ibid.* "And if America had any thought of calling on England for assistance," Bellamy sneered, "it was a vain hope, because an army of 150,000 men under [Napoleon] Bonaparte was preparing to descend upon England and overturn her government." *Ibid.*

No. 25-10534

Once more, Bellamy returned to the point: all these hostilities might be avoided if only the envoys would pay the *douceur*. *Ibid.*

The envoys again blanched because "America was the only nation upon earth which felt & had exhibited real friendship for France." *Ibid.* Yet France had "treat[ed]" the envoys "as enemies," "abus[ing] & insult[ing] their government." *Ibid.* And to make matters worse, if the envoys refused to pay a *douceur*, they could "expect the vengeance of France & like Venice be erazed [*sic*] from the list of nations." *Ibid.*

The savvy Marshall had been recording these conversations with the French agents from the start. Marshall sent several dispatches, signed by all three envoys, back to President Adams. To obscure the contents of the messages and avoid French suspicions, Marshall had them written "in cipher." *Id.* at 582.[2]

3

On March 4, 1798, exactly one year after Adams's inauguration, the first bundle of coded dispatches reached Secretary of State Pickering. DECONDE, *supra*, at 66. As Pickering read what was not coded, his blood boiled. *Ibid.* "[H]e rushed to the President." *Ibid.* After spending several days decoding the entirety of the messages, Adams read them in full. ELKINS & MCKITRICK, *supra*, at 582. Shortly thereafter, he transmitted a brief

---

[2] Marshall's role in the XYZ Affair would turn him into a national hero. When he returned in June 1798, "[s]enators, representatives, and just plain citizens swarmed around" him "to praise him and to congratulate him on his safe return." DECONDE, *supra*, at 93. That evening, as Marshall was entertained with a banquet at Philadelphia's finest establishment, Oeller's Hotel, roughly 120 "distinguished guests, including members of the President's cabinet and [J]ustices of the [S]upreme [C]ourt, paid tribute to his 'patriotic firmness' in Paris." *Ibid.* One toast in Marshall's honor received the loudest applause: "Millions for defense, but not one cent for tribute!" *Ibid.* That would "quickly bec[o]me the slogan of Federalist patriots." *Ibid.*

No. 25-10534

message to Congress, noting "that a settlement with France seemed unlikely" and "call[ing] for hasty defense measures." Smith, *supra*, at 6–7.

Congress refused to listen. President Adams's Francophilic Vice President, Thomas Jefferson, inveighed against the President's message, calling it "insane." Elkins & McKitrick, *supra*, at 587. Jefferson's Republicans called Adams a warmonger and "speculated" that he was concealing information about the helpfulness of negotiations. *Ibid.* Then they "demanded that the [P]resident lay before Congress the envoys' dispatches." Smith, *supra*, at 7.

The President understood the obvious peril of disclosing national-security information. Adams feared disclosing the contents of the dispatches both because it "might be dangerous to the commissioners' personal safety," Elkins & McKitrick, *supra*, at 586, and because "it might arouse such emotion among the people as to drive the nation immediately into war," DeConde, *supra*, at 67. Thus, Adams initially resolved to keep the contents of the dispatches secret. Elkins & McKitrick, *supra*, at 586. But he soon backed down under fire from Congress and handed over the letters. Still, Adams "withheld the names of the French agents who served as Talleyrand's go-betweens, referring to them only as X, Y, Z." Smith, *supra*, at 7.[3] Moreover, Adams begged Congress to keep the letters "in confidence." Elkins & McKitrick, *supra*, at 588. Naturally, "[w]ithin a week . . . the papers were in print and were being read all over the country." *Ibid.*

---

[3] An additional individual of interest implicated in the XYZ Affair was Pierre Augustin Caron de Beaumarchais, the celebrated playwright who wrote *The Marriage of Figaro*. Beaumarchais was featured as "W" in the dispatches Adams transmitted to Congress. *See* DeConde, *supra*, at 72. But as evidenced by the fact that no one calls it the WXYZ Affair, the playwright's part has largely been forgotten. *See id.* at 55–56.

No. 25-10534

4

The news of the mistreatment of the American envoys lit the country on fire. *See* Smith, *supra*, at 7. "[T]hat the government of one sovereign nation should refuse to negotiate with the accredited representatives of another, or even to receive them, without bribes for its leading members and a loan for that nation's military incursions in Europe, seemed to touch the utmost limits of insult." Elkins & McKitrick, *supra*, at 550.

As the American people raged, the Nation prepared for war. Smith, *supra*, at 7. Here is a short overview of some of the measures taken:

- A Department of the Navy was established. *Id.* at 7–8.

- Twelve armed vessels and 10 galleys were added to protect American trade. *Ibid.*

- The President was authorized to use the new Navy to seize certain French ships. DeConde, *supra*, at 91, 106.

- The President was authorized to commission privateers. *Id.* at 106.

- "[A]rmed merchantmen" were allowed "to repel French" attacks. Smith, *supra*, at 8.

- A Marine Corps was established. *See* DeConde, *supra*, at 102.

- The regular army was augmented by an additional 12,000 men. *See* Elkins & McKitrick, *supra*, at 595 (citing An Act to Augment the Army of the United States, ch. 76, 1 Stat. 604 (1798)).

- A "Provisional Army" of 10,000 men could be activated by the President in the event of "a declaration of war against the United States, or of actual invasion, . . . or of imminent danger of such invasion." An Act Authorizing the President of the United States to Raise a Provisional Army, ch. 47, 1 Stat. 558 (1798).

No. 25-10534

- George Washington "was recalled from the shade of his fig tree at Mount Vernon to command the augmented army." Smith, *supra*, at 8.

- All treaties with France were abrogated. DeConde, *supra*, at 102.

These measures launched what would become known as the Quasi-War. *See id.* at 89–90. True, France and the United States were not engaged in a "perfect" war under the law of nations. *Bas v. Tingy*, 4 U.S. (4 Dall.) 37, 40 (1800) (opinion of Washington, J.). Rather, the Quasi-War was an "*imperfect war*," more "limited as to places, persons, and things." *Ibid.* But such a limited war was still a "*public war*" between sovereign nations. *Ibid.* In short, the two nations had become "*enemies.*" *Id.* at 39 (opinion of Moore, J.).

5

The Alien Enemies Act was one way that Congress fought back against France.[4]

The AEA traded on a familiar concept from the law of nations. When a "perfect" war existed between two nations, "*all* the members of" one "nation" became enemies of all the members of the other nation. *Bas*, 4 U.S. (4 Dall.) at 40 (opinion of Washington, J.); *see also* Emer de Vattel, The

---

[4] Like other laws passed during the Quasi-War, the Alien Enemies Act was designed to be a permanent measure that nevertheless responded to the "present situation with France." 8 Annals of Cong. 1580 (1798) (Rep. Samuel Whittlesey Dana); *see also id.* at 1581 (Rep. Otis); *Bas*, 4 U.S. (4 Dall.) at 41 (opinion of Washington, J.). And "the immediate problem was to provide against the residence of alien enemies already in the United States." Smith, *supra*, at 40; *see also* 8 Annals of Cong. at 1577 (Rep. Sitgreaves) (emphasizing that "the business of defence would be very imperfectly done" if the Nation could not immediately act to remove the threat posed by French aliens); *id.* at 1581 (Rep. Otis) (explaining that the key "evil" threatening the country was "the residence of alien enemies" already "existing in the bosom of the country").

Law of Nations bk. 3, ch. 5, § 70 (Béla Kapossy & Richard Whatmore eds., Thomas Nugent trans., Liberty Fund 2008) (1758) ("When the sovereign or ruler of the state declares war against another sovereign, . . . the whole nation declares war against another nation, . . . and all the subjects of the one are enemies to all the subjects of the other."). Thus, alien residents were deemed "alien enemies" when their home country and host country were at war. As alien enemies, they were liable to be detained, removed, or have effected against them any other "measure that [wa]s necessary in order to weaken" the enemy. Vattel, *supra*, bk. 3, ch.8, §§ 138, 148; *see also* Smith, *supra*, at 40 ("In war, alien subjects could be removed as enemy aliens under the law of nations.").

Crucially, however, Congress extended the AEA beyond "perfect" wars. After all, Congress had stopped short of authorizing "a perfect state of war" with France. *Bas*, 4 U.S. (4 Dall.) at 41 (opinion of Washington, J.). And the Federalists did not think the Government should have to "wait for a declaration of war before expelling French agents." DeConde, *supra*, at 98. Already, "a great number of aliens" from France were residing in the United States. 8 Annals of Cong. 1577 (1798) (Rep. Samuel Sitgreaves). Among those aliens, the Federalists feared, were innumerable French "agents and spies . . . spread all over the country." *Id.* at 1574 (Rep. Edward Rutledge); *see also id.* at 1577 (Rep. Sitgreaves); *id.* at 1791 (Rep. Harrison Gray Otis); John McNelis O'Keefe, Stranger Citizens: Migrant Influence and National Power in the Early American Republic 26 (2021) (noting that "[a] number of French migrants had worked to gather intelligence on North American affairs for the French Directory"). Those "spies" would instantly "join" the French in any "attack." 8 Annals of Cong. at 1791 (Rep. Otis). And if these persons were not removed at once, France, for its part, would "never declare war."

No. 25-10534

*Id.* at 1574 (Rep. Rutledge). So "nothing short of the" Alien Enemies Act could "be effectual" in responding to this threat. *Id.* at 1791 (Rep. Otis).

So the Alien Enemies Act, or originally "An Act respecting Alien Enemies," expanded the traditional concept of "alien enemies" under the law of nations in certain respects. 1 Stat. 577 (1798) (codified as amended at 50 U.S.C. §§ 21 *et seq.*); *see also Ludecke*, 335 U.S. at 162 & n.1 (explaining that any "minor changes in wording" since 1798 are generally "without significance"). True, "whenever there" should "be a *declared war* between the United States and any foreign nation or government, . . . all natives, citizens, denizens, or subjects of the hostile nation or government" were "liable to be apprehended, restrained, secured and removed." 1 Stat. at 577 (emphasis added). But so too could such individuals be treated "*as* alien enemies" if their "nation or government" should "perpetrate[], attempt[]," or even just "threaten[]" "any invasion or predatory incursion . . . against the territory of the United States." *Ibid.* (emphasis added); *see also* 8 ANNALS OF CONG. at 1791 (Rep. Otis) (noting that the AEA proposed a "modification" in part so that the President could act "in case of a predatory incursion, . . . as in case of actual war or invasion"); Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798) (noting that "predatory incursions of the French" might be rather "[s]mall" and would only "occasion . . . destruction of property"). *Cf.* Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Powers of States*, 13 BRITISH J. AM. LEG. STUDIES 1, 24–25 & n.142 (2024) (noting that at the Founding the term "invasion" was broad and could refer to, *inter alia*, even quite small attacks).[5]

---

[5] In certain respects, the category of people who might be labeled "as alien enemies" under the AEA was narrower than the category under the law of nations. Under the law of nations, *all* citizens of the warring nations were at war with each other. *See supra*,

No. 25-10534

The Act's focus on threatened invasions made sense. Given America's weak defenses, its "shores seemed open to invasion." DeConde, *supra*, at 90. And many believed France was threatening to "send[] an army" to do just that. Elkins & McKitrick, *supra*, at 596; *see also* 8 Annals of Cong. at 1576 (Rep. Otis) ("Some believe that this country is at present threatened with an invasion."); Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798) (positing that there was already "*imminent*" "danger" of "invasion" from France (emphasis added)). *Cf. supra*, at 599 (explaining that the French agents during the XYZ Affair literally threatened a French invasion). Even John Quincy Adams, the President's son and future sixth President, a sober-minded foreign minister at the time, "was convinced" the French were plotting "to send an invading army." Elkins & McKitrick, *supra*, at 595.

Southerners were especially gripped by fear. They believed the French would "invade the southern coast," probably from St. Domingue (modern day Haiti). *Id.* at 598. Representative Robert Goodloe Harper of South Carolina went so far as to declare before the House in April 1798 "that the infamous Victor Hugues," a French commander "renowned for his sweeping acts of brutality and sadism," had "5000 of his best troops" ready "to make a blow upon Southern country." *Id.* at 645.

Southerners were not alone, though, in fearing an invasion from the South. The former Secretary of War, Henry Knox, warned President Adams

---

at 63–64. That meant that even "women and children," as "subjects of the" enemy "state," were "ranked in the class of enemies." Vattel, *supra*, bk. 3, ch. 5, § 72; *see also id.* bk. 3, ch. 8, § 148 (noting that the Sovereign under the law of nations could "lawfully secure and make prisoners" of "even the women and children"). But the AEA was originally limited to "males of the age of fourteen years and upwards," 1 Stat. at 577, although it was amended in the early twentieth century to apply to all persons ages 14 and over, *see* 40 Stat. 531 (1918).

No. 25-10534

that French invaders would land at "the defenceless ports of the Carolinas and Virginia." DeConde, *supra*, at 84. And even George Washington warned Adams's Secretary of State that "[i]f the French should be so *mad* as openly, and formidably, to Invade these United States, . . . their operations will commence in the Southern quarter." Letter from George Washington to Timothy Pickering (July 11, 1798). But Washington admitted to President Adams himself that whether to "expect" an "*actual* Invasion . . . must be better known to the Government than to private Citizens." Letter from George Washington to John Adams (July 4, 1798).[6]

The Federalists who championed the Act recognized the sweeping discretionary authority granted to the President by allowing him to respond to threatened invasions or predatory incursions. One defender, Representative Harrison Gray Otis, emphasized that the language was by its nature "indefinite." 8 Annals of Cong. at 1576. As such, it conferred extensive power upon the Nation's Commander-in-Chief. *Ibid.*

Unsurprisingly, the Republicans were less thrilled. Representative Matthew Lyon, for example, moved to strike the word "threatened," because he thought it "too vague to authorize the exercise of so great a power." *Id.* at 1786. Representative Nathaniel Macon seconded Lyon's motion. *Ibid.* After the motion failed, Lyon renewed it, yet again emphasizing that the pre-condition for the President's exercise of authority was "too indefinite an expression upon which to rest so important a power as was given to the President." *Id.* at 1792.

---

[6] Although Washington would accept an appointment to re-enter government service as Lieutenant General of the Army, *see supra*, at 63, that was not until a few days after his letter to Adams, *see* 7 Annals of Cong. 621–22 (1798).

No. 25-10534

Representative Lyon's concerns were not shared widely. "[L]ess than one-fifth of the members present r[ose] in . . . favor" of Lyon's motion. *Ibid.*

Republican opponents also feared that, between both the vagueness of the language of Section 1 and the limited role for judges under Section 3, the President's "proclamation in all cases, was to be considered as law." *Id.* at 1786 (Rep. Macon). Representative Albert Gallatin, a leading Republican, bemoaned that the bill effectively provided "that the President . . . shall have the power to do by proclamation what ought only to be done by law." *Id.* at 1793. That was because, under the bill, "all Judges" were "bound . . . to carry into effect any proclamation, or other public act of the President." *Id.* at 1789 (Rep. Albert Gallatin). Thus, what mattered was not any judicial interpretation of what would later become Section 1 of the Alien Enemies Act, but "the will of the President." *Ibid.*

The Republicans' fears did not stop the bill. Although they were able to temporarily delay the bill's passage by sending it back to "a special committee" for a few weeks, SMITH, *supra*, at 47, they would soon regret that decision. Fears of war with France were growing by the second. As Representative Harper imaginatively put it, "the knife of the traitor" was "held to [the people's] throats." 8 ANNALS OF CONG. at 1990. So the Federalists "pushed through a temporary alien act," the Alien Friends Act, "to cope with the emergency" situation. SMITH, *supra*, at 47. But that Act gave the President *complete* discretion to remove *any* alien—even those from friendly Nations—that "he [might] deem dangerous." 8 ANNALS OF CONG. at 1896–97. In comparison, the more familiar concept of "alien enemies" began to seem rather banal.

Thus, the same day the House voted to return what would become the Alien Friends Act to the Senate, *see* 7 ANNALS OF CONG. 586 (1798), Representative Gallatin rose to speak about the alien enemies bill—but this

No. 25-10534

time in defense of it. As Gallatin emphasized, other countries, such as Holland and Switzerland, had been defeated not by an assortment of alien friends, but by "an invading enemy" from France. *Id.* at 2027. The Alien Enemies Act was designed to fix that problem. *Ibid.* And so to that legislation, Gallatin emphasized, he now "had no objection." *Ibid.*

A few days later, on the same day the Alien Friends Act was signed into law, the House reconvened to discuss the alien enemies bill. The result? The House promptly passed it without any relevant amendments. Smith, *supra*, at 47; *see also* 8 Annals of Cong. at 2049. The Senate did the same. Indeed, "the *Annals* record" virtually "no debate in either house." Smith, *supra*, at 47. So after President Adams signed the legislation, the Alien Enemies Act became law. The fears of the great discretionary power vested in the President by the Alien Enemies Act seemed trite in comparison to the *completely* discretionary power vested in the President by the Alien Friends Act. And the Nation accepted the fact that the President would have broad, discretionary, and unreviewable power to defend our borders.

\*

One historical coda: President Adams never invoked his authority under the AEA.[7] Adams himself never thought "there was the least likelihood of France's sending an army to invade the United States." Elkins & McKitrick, *supra*, at 596. And for all the Republicans' accusations that Adams was a warmonger, it was far from true. As Adams wrote a few years earlier, "[g]reat is the Guilt of an unnecessary War." Letter from John Adams to Abigail Adams (May 19, 1794). But by invoking his authority under the AEA, Adams might provoke one. *Cf.* 8 Annals of

---

[7] Nor for that matter was there ever a single deportation under the Alien Friends Act. *See* Smith, *supra*, at 175.

No. 25-10534

Cong. at 2022 (Rep. Samuel Smith) (noting that Great Britain's use of similar measures had steadily "involved" that nation "in war"). Better, thought Adams, to keep the hostilities a purely naval matter. Elkins & McKitrick, *supra*, at 597.[8]

Eventually, fears of invasion subsided. An invasion from the south was "impossible" during "late fall or winter." *Id.* at 646. And the fledgling American Navy, under the leadership of Benjamin Stoddert, would soon retake "control" of the American coast. *Ibid.* With the coast secured—and news having reached the Americans that Horatio Nelson had destroyed the French fleet at the Battle of the Nile, *id.* at 615—peace drew "closer and closer," *id.* at 636.

So before long, in February 1799, President Adams announced that he would appoint a new minister to France. *Id.* at 618. And with the signing of the Treaty of Mortefontaine about a year and a half later, "the first armed conflict" fought by our independent Nation came to a close. DeConde, *supra*, at vii.

## B

### 1

But new conflicts have since emerged. One such conflict is the focus of today's dispute: the conflict between the United States and Tren de Aragua ("TdA")—a violent Venezuelan gang intimately intertwined with

---

[8] Adams's decision was cemented once Alexander Hamilton, "the one man in all the world [Adams] most detested," Elkins & McKitrick, *supra*, at 641, was given a leading role in the military, *see* DeConde, *supra*, at 112. Adams suspected Hamilton might use his position in the army to "proclaim a Regal Government" with "Hamilton at the Head." *Id.* at 617. Or as Abigail Adams warned, if Hamilton were given the opportunity, he would "become a second Buonaparty [*sic*]." DeConde, *supra*, at 97. Adams was resolved never to give the man such a chance.

No. 25-10534

the nation of Venezuela that has infiltrated U.S. borders and wrought violence and destruction across our country.

Founded "in the mid-to-late 2000's as a prison gang" in Aragua, Venezuela, Selwyn Smith Decl. ¶ 7, TdA quickly rose to prominence as Venezuela's "most powerful criminal enterprise," Luis Ferre-Sadurni & Chelsia Rose Marcius, *Venezuelan Gang's Path to U.S. Stokes Fear, Crime and Border Politics*, N.Y. Times (Sept. 22, 2024), https://perma.cc/QM86-NGAG. Although TdA first began its expansion by spreading across South America, TdA is currently "proliferating into North America" and is focusing its expansion efforts on the United States. Selwyn Smith Decl. ¶¶ 7, 9; *see also id.* ¶ 9 (noting that TdA "has expanded throughout North America").

In infiltrating the United States, TdA has taken "advantage of the ongoing border crisis." Anna Giaritelli, *Venezuelan Gang Tren de Aragua Used Border Chaos to Infiltrate US*, Wash. Examiner (June 15, 2024), https://perma.cc/4CMC-6S79; *see also* Selwyn Smith Decl. ¶ 15 (explaining that TdA's expansion into the U.S. has come in large part from "exploiting the record mass migration" from Venezuela); *United States v. Texas*, 144 F.4th 632, 689–93 (5th Cir. 2025) (Oldham, J., dissenting) (discussing the border crisis). As I have recently noted, "millions upon millions" of illegal aliens have poured into our Nation since 2021. *Texas*, 144 F.4th at 689 (Oldham, J., dissenting).

Unsurprisingly, the number of illegal Venezuelan aliens in the United States has skyrocketed. *See* Country Brief: Venezuela, Fed'n for Am. Immigr. Reform 1–2 (2024), https://perma.cc/4P2P-N9UW. For comparison, in Fiscal Year 2020, border patrol had 4,520 encounters with illegal Venezuelans. *Ibid.* The next year, that number saw "an eleven-fold increase," reaching to 50,499. *Id.* at 2. In Fiscal Year 2023, the number of

No. 25-10534

encounters eclipsed 300,000. *Ibid.* All in all, Venezuelan nationals are now the second most frequently encountered group of illegal aliens (behind Mexicans). *Ibid.* And these numbers do not include the innumerable "gotaways" who "evaded law enforcement and now live throughout the country without having ever been screened by immigration officials." *Texas*, 144 F.4th at 690 (Oldham, J., dissenting).

When TdA members enter our country, they conceal themselves by "mixing with" ordinary aliens "traveling along migratory routes." Selwyn Smith Decl. ¶ 12. "TdA members can keep a low profile," before passing into a "new region[]." *Ibid.* Once TdA members arrive in these new regions, they set out to "establish themselves." *Id.* at ¶ 13. For instance, some TdA members enter "migrant shelters" to recruit new members. Ferre-Sadurni & Marcius, *supra*; *see also* Jennifer Bisram, *Venezuelan Migrant Accused of Shooting 2 NYPD Officers Arraigned, Reveals How Guns are Smuggled into Shelters*, CBS News N.Y. (June 27, 2024), https://perma.cc/4DTY-2XYB (noting that a Venezuelan TdA member who shot two police officers in New York "lived in a migrant shelter"). Before law enforcement can respond to the threat, "small intrusions . . . become infestations" and TdA spreads. Press Release, *Governor Abbott Designates Tren de Aragua as Terrorist Organization*, Off. of the Tex. Governor (Sept. 16, 2024), https://perma.cc/E9P6-4BX2. So police in New York City, for example, have bemoaned that as TdA's membership has proliferated, its "members have blended into the city's fabric." Ferre-Sadurni & Marcius, *supra*; *see also ibid.* (noting the concerns of NYPD's chief of detectives that there are "[o]bviously" many TdA members in New York City).

The danger TdA poses to our Nation is hard to overstate. TdA is renowned not only "for its size," but also for its "wanton use of violence." Antonio Maria Delgado, *This Bloodthirsty Venezuelan Gang Has Caused Havoc in Latin America. Now It's in Miami*, Miami Herald (Jan. 20,

No. 25-10534

2024), https://perma.cc/U988-VJU3. TdA "use[s] excessive violence to demonstrate [its] power, . . . murder[ing]" anyone who "betrays or does not obey orders." *Ibid.* TdA members have been linked to homicides, kidnappings, hostage takings, rapes, burglaries, assaults, and other acts of violence and intimidation across our Nation. *See* Selwyn Smith Decl. ¶ 6; Marcos Charles Decl. ¶ 8.

Consider one notable incident by way of example. Shortly before President Trump took office, Venezuelan TdA members took over an apartment complex in Aurora, Colorado. They kidnapped and tortured two innocent people. *See* Jonathan Limehouse, *Colorado Apartment to Close After Multiple Arrests, Claims of Venezuelan Gang Takeover*, USA Today (Jan. 14, 2025), https://perma.cc/6HRQ-HCGR; *see also* Selwyn Smith Decl. ¶ 19. The innocent civilians were "bound, pistol-whipped and tortured for hours." Nicole C. Brambila, *Venezuelan TdA Gang Uses Similar Aurora Tactics to Take Over Building in San Antonio, Texas*, Denver Gazette (Dec. 21, 2024), https://perma.cc/VL8D-7BG2. "The male victim . . . was stabbed in the leg multiple times, while gang members ripped the female victim's fingernails out using pliers." *Ibid.* In response, a Colorado state court granted the City of Aurora "an emergency order to temporarily close" the apartment complex due "to an imminent threat to public safety and welfare." Selwyn Smith Decl. ¶ 19 (quotation omitted). Nineteen individuals were eventually detained, and police obtained arrest warrants for three more suspects. Limehouse, *supra*. This was no ordinary, run-of-the-mill criminal incident.

That is not all. This apartment complex was "one of three troubled apartment complexes" in Aurora "that the owners have claimed were taken over by TdA." Brambila, *supra*. The City's efforts to shut down these complexes appear to have been unsuccessful. All that has happened is that the City has "pushed" TdA "further into other properties." *Ibid.* And "Aurora residents who live near the apartment complexes overtaken by the

No. 25-10534

Venezuelan gang have been desperate" for someone "to respond and address the growing crisis." *Ibid.*

Such violent attacks have not been limited to Colorado or apartment complexes. They have occurred all across the Nation. In San Antonio, Texas, for instance, TdA repeated similar tactics in taking over an apartment complex. *Ibid.* In Miami, Florida, a former Venezuelan police officer was abducted and murdered by a TdA member. *See* Delgado, *supra.* In Raleigh, North Carolina, another suspected TdA member and illegal Venezuelan alien was arrested for a mass shooting in Chicago, Illinois. *See* Alan Wooten, *Chicago Mass Shooting Suspect, Believed TdA Member Arrested in Raleigh*, THE CTR. SQUARE (Feb. 13, 2025), https://perma.cc/6TB9-6S5P. In Cobb County, Georgia, another TdA member was arrested after he kidnapped and shot three women in the head in an alley in Chicago. *See* Press Release, *U.S. Marshals Arrest Fugitive Tren de Aragua Member for Violent Crimes*, U.S. DEP'T OF JUST. (Mar. 21, 2025), https://perma.cc/U4MR-F2FD. And perhaps most infamously of all, in Athens, Georgia, a TdA member beat and strangled to death a nursing student named Laken Riley, who was out for a jog near the University of Georgia campus. *See* Priscilla DeGregory, *Tren de Aragua Gangster Jose Ibarra Asks for New Trial after Laken Riley Murder Conviction*, N.Y. POST (Dec. 3, 2024), https://perma.cc/2NHJ-MWBP.

As if all that violence and destruction were not bad enough, TdA's hostilities have extended beyond purely civilian targets. As "an internal safety bulletin sent across Border Patrol" recently "warn[ed]," TdA members have been "given the 'green light' by the organization's leaders to fire on authorities." Ali Bradley, *Over 1,000 Venezuelan Crime Organization Members in US*, NEWS NATION (July 30, 2024), https://perma.cc/6FWR-AMY8. One 19-year-old Venezuelan migrant and apparent TdA member, Bernardo Raul Castro Mata, was recently "accused of shooting two New York City police officers who confronted him." Ferre-Sadurni & Marcius,

*supra*. Another illegal Venezuelan alien and TdA member was recently charged for attempting to strangle a federal agent to death. *See* Press Release, *Venezuelan National and Suspected Tren de Aragua Member Charged with Attempted Murder of Federal Officer*, U.S. Dep't of Just. (June 20, 2025), https://perma.cc/8X3M-PEG9. As a result, local authorities have lamented that TdA "is a transnational gang unlike we have ever seen before. . . . [T]hey are more dangerous, more violent and more organized than MS–13." Brambila, *supra*; *see also Texas*, 144 F.4th at 691 (Oldham, J., dissenting) (describing the dangers MS–13 poses).

TdA is not just some gang: It is deeply intertwined with the sovereign nation of Venezuela. TdA has "infiltrated" Venezuela's "military and law enforcement." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, Proclamation No. 10903, 90 Fed. Reg. 13033, 13033 (Mar. 14, 2025). And it has taken "ever-greater control" over the "territories" of "Venezuelan national and local authorities." *Ibid.* "The result is" that Venezuela, as intertwined with TdA, has become "a hybrid criminal state." *Ibid.*

Initially, the Biden Administration sought to deal with the threats TdA poses through the ordinary framework of criminal law. *See* Press Release, *Treasury Sanctions Tren de Aragua as a Transnational Criminal Organization*, U.S. Dep't of the Treasury (July 11, 2024), https://perma.cc/TP22-8GE6 (President Biden designating TdA a "transnational criminal organization"). But the Trump Administration soon recognized these measures were insufficient. As a result, the Trump Administration first exercised its statutory authority to designate TdA a foreign terrorist organization. 90 Fed. Reg. at 13033. And it sanctioned several high-ranking leaders of TdA, including a lieutenant who "provides Tren de Aragua with military-grade weapons used to . . . fight against Colombian guerrillas" and another top operative that has allegedly

No. 25-10534

committed "homicide, extortion, bombings, [and] terrorism." Press Release, *Treasury Sanctions Top Leaders of Tren de Aragua*, U.S. Dep't of the Treasury (July 17, 2025), https://perma.cc/N93E-PBWM.

Still, given the unique threat posed by a deadly gang committing acts of violence and destruction within our borders at the behest of a foreign sovereign, President Trump considered even these aggressive measures insufficient. So he decided to use his traditional authority to combat hostile threats from foreign sovereigns by invoking the AEA. In a Proclamation of March 2025, the President explained that the "hybrid criminal state" of Venezuela "is perpetrating an invasion of and predatory incursion into the United States." 90 Fed. Reg. at 13033. The President thus "proclaim[ed] that all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id.* at 13034. The President also found that "all such members of TdA are, by virtue of their membership in that organization, chargeable with actual hostility against the United States and are therefore ineligible for the benefits of 50 U.S.C. 22." *Ibid.* Finally, the Proclamation declared "that all such members of TdA are a danger to the public peace or safety of the United States." *Ibid.*

2

In accordance with President Trump's Proclamation, executive officials began arranging for the removal of the subset of Venezuelans who are members of TdA. Challenges to the Proclamation ensued. In the first round of challenges, the Supreme Court clarified that "[c]hallenges to removal under the AEA, . . . must be brought in habeas." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1005 (2025) (per curiam).

No. 25-10534

So the three named plaintiffs in this case filed a habeas petition. But they did not sue only on their own behalf. They also sued on behalf of a putative class of AEA designees. They contested both the merits of their removals under the AEA and the constitutional adequacy of the notice provided by the Government concerning their pending removal. They also sought a temporary restraining order ("TRO") blocking their removal under the AEA.

Here, the procedural history gets a little complicated. So I just highlight some of the basics.

The plaintiffs first purported to file for an *ex parte* TRO by leaving a voicemail with the district court. The district court then assured the plaintiffs that it would act expeditiously on their requested relief—after, of course, hearing from the Government. The district court also assured the plaintiffs that none of them would be removed pending the court's decision. *A.A.R.P. v. Trump*, 778 F. Supp. 3d 882, 884 (N.D. Tex. Apr. 17, 2025). That should have assured an orderly resolution of this case.

Alas, it did not. At 12:48:55 p.m. on Good Friday, April 18, 2025, petitioners filed another emergency motion and demanded an emergency status conference and emergency relief that very day. What happened next is wild:

> Approximately 133 minutes after the plaintiffs filed their motion for an emergency status conference (Dkt. No. 34) and approximately 90 minutes after the party-imposed deadline, the petitioners filed a notice of appeal, informing the Court that they appealed the Court's order denying the first motion for a temporary restraining order (Dkt. No. 2), as well as the "constructive" denials of the petitioners' motions for class certification (Dkt. Nos. 3; 39) and second emergency motion for a temporary restraining order (Dkt. No. 30)

No. 25-10534

*A.A.R.P. v. Trump*, No. 1:25-CV-059-H, 2025 WL 1177194, at *1 (N.D. Tex. Apr. 18, 2025). Our court denied relief, holding there was no appellate jurisdiction. *See A.A.R.P. v. Trump*, No. 25-10534, 2025 WL 1148141, at *1 (5th Cir. Apr. 18, 2025) (per curiam).

The Supreme Court, for its part, granted the entire putative class "temporary injunctive relief" grounded in the Court's view of the constitutional inadequacy of the original notice the Government had offered the AEA designees concerning their removal. *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1369 & n.* (2025) (per curiam). The Supreme Court also granted a writ of certiorari, held the Fifth Circuit had had appellate jurisdiction, vacated our court's judgment, and remanded to our court. *Id.* at 1367, 1370. On remand from the Supreme Court, we have been instructed to "address" the following two questions: "(1) [A]ll the normal preliminary injunction factors, including likelihood of success on the merits, as to the named plaintiffs' underlying habeas claims that the AEA does not authorize their removal pursuant to the President's March 14, 2025, Proclamation, and (2) the issue of what notice is due, as to the putative class's due process claims against summary removal." *Id.* at 1370.

## II

The named petitioners are not entitled to a preliminary injunction blocking their removal under the AEA. The named petitioners first raise two challenges to the President's invocation of the AEA: They argue (A) no invasion or predatory incursion has been perpetrated, attempted, or threatened; and (B) TdA is not itself a nation or government. As I explain, both fail. On neither front can we countermand the President's assessment. As far as the named plaintiffs' challenge that (C) they are not members of TdA, that also fails. So the named plaintiffs are not likely to succeed on the merits. That alone would be reason enough to affirm the district court's

No. 25-10534

denial of the preliminary injunction. But there is another reason: (D) The named plaintiffs have failed to make a clear showing that the other preliminary-injunction factors are satisfied.

## A

For over 200 years, courts have recognized that the AEA vests sweeping discretionary powers in the Executive. And at least until President Trump took office a second time, courts had never countermanded the President's determination that an invasion, or other similar hostile activity, was threatened or ongoing.

I (1) start with the canonical AEA case, *Ludecke v. Watkins*. That case holds that the political branches—not the courts—decide whether the AEA's preconditions are satisfied. Then, I (2) explain that my reading of *Ludecke*—and only my reading—fits with over 200 years of Supreme Court precedent spanning various areas of law. Finally, I (3) respond to several arguments made by the majority and *amici*.

## 1

*Ludecke* arose from World War II. Specifically, in the wake of the attack on Pearl Harbor, President Franklin Delano Roosevelt issued a series of proclamations declaring that Germany, Italy, and Japan were "threaten[ing]" "an invasion or predatory incursion upon the territory of the United States." Alien Enemies, German, Proclamation No. 2526; Alien, Enemies, Italian, Proclamation No. 2527; Alien Enemies, Japanese, Proclamation No. 2525. Under these Proclamations, the President determined that "[a]lien enemies deemed dangerous" should be "subject to summary apprehension." Proclamation No. 2525 (Japan); *see also* Proclamation No. 2526 (Germany) (incorporating "[t]he regulations contained in Proclamation No. 2525").

No. 25-10534

On December 8, 1941—the same day as FDR's Germany proclamation—a German citizen named Kurt Ludecke was arrested. *See Ludecke*, 335 U.S. at 162–63. Critically, Congress had not yet declared war on Germany when Ludecke was arrested. Congress did that later. *See* Joint Resolution Declaring War with Germany, S.J. Res. 119, 77th Cong. (Dec. 11, 1941). Nearly four years later, on May 7, 1945, Germany unconditionally surrendered. Two months after that, on July 14, 1945, President Harry S. Truman issued his own proclamation providing that all "dangerous" "alien enemies" were "subject . . . to removal from the United States." Removal of Alien Enemies, Proclamation No. 2655 (July 14, 1945). To block his removal, Ludecke filed a habeas petition. Ludecke argued, *inter alia*, that the President's authority under the AEA expired upon "cessation of actual hostilities." *Ludecke*, 335 U.S. at 166.

On June 21, 1948, over three years after Germany's unconditional surrender, the Supreme Court held that Ludecke was not entitled to habeas relief. That's because courts may *never* second-guess whether a "state of war" existed. *Id.* at 168. It is for the political branches—specifically, the President—to determine whether the powers conferred under the AEA were still needed. And in 1948, "[t]he political branch of the Government ha[d] not brought the war with Germany to an[] end." *Id.* at 170. "On the contrary," the President "ha[d] proclaimed that 'a state of war still exist[ed].'" *Ibid.* (quoting Cessation of Hostilities of World War II, Proclamation No. 2714 (Dec. 31, 1946)). That the war was in fact over, and that Germany had in fact surrendered, was irrelevant. "The Court would be assuming the functions of the political agencies of the Government" to second-guess the President's determination. *Ibid.* Simply put, it was "not for [the Court] to question a belief by the President that enemy aliens" remained dangerous simply because "the guns [we]re silent." *Ibid.*

No. 25-10534

*Ludecke*'s holding cannot be limited to only congressional declarations of war. The President invoked the AEA and arrested Ludecke *before* Congress declared war on Germany. And in upholding the President's actions, the Court's rationale swept far more broadly than declared wars. The Court focused on the fact that the *President* had proclaimed that a state of war continued to exist even after the shooting stopped. *Ibid.* The Court could not "question" the President's "belief" about the dangers "enemy aliens" posed. *Ibid.* Moreover, regardless of whether Congress or the President had made the judgment call required to trigger the AEA, *courts* had no business getting involved. On the contrary, determining whether the AEA's preconditions are satisfied is a "matter[] of political judgment for which judges have neither technical competence *nor official responsibility*." *Ibid.* (emphasis added).

*Ludecke* controls this case. The President has determined that an invasion or predatory incursion is threatened. Countermanding that determination would mean "assum[ing] the functions" of the political branches. *Ibid.* That lies beyond our "official responsibility." *Ibid.*

It also exceeds our "technical competence." *Ibid.* As Joseph Story wrote for the Court nearly 200 years ago—in a case to which I will return soon, *see infra*, Part II.A.2.—the "evidence upon which the President might decide that there is imminent danger of invasion, might be of a nature not constituting strict technical proof." *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 31 (1827). In other words, the decision is inherently uncertain, depending on "large elements of prophecy." *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). We judges could spend a thousand years studying constitutional theory, and we would still have zero ability to predict how France's Revolutionary government would respond to the XYZ Affair; how the public would react to publication of Marshall's diplomatic dispatches; or how Venezuela would threaten or perpetuate an invasion or predatory

No. 25-10534

incursion. The "nature" of the decision "is political, not judicial." *Ibid.*; *cf. Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1512 (2025) (explaining that fact-intensive applications of law to fact even in the ordinary administrative-law context often turn on political discretion more than legal analysis). And it is only by hearkening back to "Old Testament days, when judges . . . led the[]" people of Israel "into battle," that the majority can assert the authority to make a decision belonging to the Commander-in-Chief. *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1550–51 (D.C. Cir. 1984) (en banc) (Scalia, J., dissenting), *cert. granted, judgment vacated*, 471 U.S. 1113 (1985).

But suppose for a second there *were* some concrete evidence constituting "strict technical proof." *Mott*, 25 U.S. (12 Wheat.) at 31. Why should the President need to disclose it? I see no reason. "[T]he disclosure of the evidence might reveal important secrets of state." *Ibid.* And one of the very purposes of having a unitary Executive is to preserve "secrecy." THE FEDERALIST No. 70, at 424 (Clinton Rossiter ed., 1961) (Alexander Hamilton) (hereinafter THE FEDERALIST). So the more people who get to know the relevant information, the more this crucial presidential "qualit[y] will be diminished." *Ibid.* John Adams himself learned that lesson when he set off a nationwide panic about an invasion from France simply by handing over to Congress the secret dispatches about the XYZ Affair. *See supra*, at 61–62.

We should take that lesson to heart. As the XYZ Affair illustrated, some national-security secrets are better kept, well, *secret*—even from the other branches. *See also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) ("Secrecy in respect of information gathered by [the President's confidential sources] may be highly necessary, and the premature disclosure of it productive of harmful results."). As the Supreme Court

No. 25-10534

explained shortly after World War II with respect to disclosure of national-security secrets by the President to the courts:

> The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit in camera in order to be taken into executive confidences.

*Chicago & S. Air Lines*, 333 U.S. at 111. Because we cannot know the "secret" "information" upon which the President may be relying, it is "intolerable" for the majority to "nullify" the President's "action[]." *Ibid.*

Finally, a word on a potential (but in my view chimerical) distinction. Some of our colleagues on other courts have asserted that *Ludecke* only bars us from determining whether the AEA's statutory pre-conditions *continue* to be satisfied (say at "*T2*"). *See, e.g., J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *6 (D.C. Cir. Mar. 26, 2025) (per curiam) (Henderson, J., concurring in denial of stay). In this world, courts nonetheless remain entirely free to decide whether the AEA's statutory pre-conditions were satisfied *in the first instance* (say at "*T1*"). *Ibid.* Respectfully, I do not understand that at all. Do judges really lack "technical competence" and "official responsibility" to decipher whether threats of invasion exist at *T2* but somehow possess "technical competence" and "official responsibility" to decipher them at *T1*? *Ludecke*, 335 U.S. at 170. Do we really possess the wisdom and capacity to make sensitive national-security determinations when hostilities begin, but somehow lose them over time? At both *T1* and *T2*, the question is the same: whether threats of invasion exist. And the answer to the question is also the same: The threats exist at *T1*, *T2*, and *T∞* if the President so declares. There is no principled distinction between the *T1* and

No. 25-10534

*T2* inquiries. And as far as I know, no federal judge has received a single intelligence briefing about TdA and the AEA—at *T1*, *T2*, or *T∞*. So even if the Constitution gave us the power to countermand the political branches' determinations in this area, we could not possibly do the job with anything more than judicial whim or gut-level instincts based on ill-informed, unbriefed judicial guesswork.

\*

As *Ludecke* explained long ago, "some statutes preclude judicial review." *Id.* at 163 (quotation omitted). The AEA "is such a statute." *Id.* at 164.

*Ludecke*'s reasoning turned on basic principles in our law. As courts have long understood, the field of foreign relations implicates the sorts of factual and policy considerations that are "entirely incompetent to the examination and decision of a court of justice." *Coleman v. Miller*, 307 U.S. 433, 454–55 (1939) (quotation omitted). What is true of foreign relations generally is true of immigration law specifically, *Biden v. Texas*, 597 U.S. 785, 805 (2022), which is itself "vitally and intricately interwoven with . . . the conduct of foreign relations" and "the war power." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Thus, courts have long "declined to run interference" in immigration law "without the *affirmative intention* of the Congress *clearly expressed*." *Biden*, 597 U.S. at 805 (emphasis added) (quotation omitted). Nothing in the AEA extends a *clear* and *affirmative* invitation to the courts to begin sticking their noses into sensitive foreign policy decisions implicating the war power. On the contrary, the AEA's "terms, purpose, and construction leave no doubt." *Ludecke*, 335 U.S. at 164. It leaves "full responsibility for the just exercise of this great power . . . where the Congress has constitutionally placed it—on the President of the United States." *Id.* at 173.

No. 25-10534

2

My reading of *Ludecke* is the only reading that accords with 200 years of Supreme Court precedent. Since the Founding, the Executive has had conclusive power to find that an invasion, or similar hostility, is being perpetrated or threatened. That has been true when dealing with Executive claims of authority under (a) related statutes, such as the 1795 Militia Act or (b) inherent Article II powers. It has even been true (c) when *state* Executives have made the judgment call.

a

First, consider the Supreme Court's early interpretation of a related statute passed shortly before the AEA, the Militia Act of 1795. The language of the Militia Act of 1795 should sound familiar; it largely mirrors the AEA's. The Militia Act provided that the President could call forth the militia "whenever the United States shall be *invaded*, or be *in imminent danger of invasion* from any foreign nation or Indian tribe." An Act to Provide for Calling Forth the Militia, ch. 36, 1 Stat. 424 (1795) (emphasis added).

In *Martin v. Mott*, the Supreme Court addressed the authority of the President to invoke the Militia Act of 1795. During the War of 1812, President James Madison had called forth the militia under the Act. *See Mott*, 25 U.S. (12 Wheat.) at 28. A New York farmer, Jacob E. Mott, refused to show up for service, claiming the call was invalid. *See ibid.* The Supreme Court rejected Mott's claim.

Justice Story, writing for the Court, could not have been clearer: "We are all of [the] opinion, that the authority to decide whether the exigency has arisen" that would justify the President's exercise of authority under the Act "belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Id.* at 30. In other words, the Supreme Court read the 1795 Militia Act to make the President "the sole and exclusive judge of

No. 25-10534

the existence" of an invasion. *Id.* at 32; *see also* Jack Goldsmith, Martin v. Mott *Enters the Stage*, Executive Functions (June 16, 2025), https://perma.cc/YR54-MEU5 (explaining that "*Mott* interpreted" the 1795 Milita Act "to confer unreviewable discretion on the [P]resident").

*Mott* makes clear that even deferential review is too searching. As I explained earlier, "the evidence upon which the President might decide that there is imminent danger of invasion, might be of a nature not constituting strict technical proof." *Mott*, 25 U.S. (12 Wheat.) at 31; *see also supra*, at 81. In other words, when Presidents decide that our Nation is under attack, they have *zero* obligation to base such decisions on facts provable in court. They have *zero* obligation to paper such decisions like litigation associates at law firms in New York paper commercial agreements. And they have *zero* obligation to come into court and convince a federal judge of the most delicate and dangerous affairs of state. *Supra*, at 822. Moreover, courts could not review any evidence the President might have because "the disclosure of th[at] evidence might reveal important secrets of state, which the public interest, and even safety, might imperiously demand to be kept in concealment." *Mott*, 25 U.S. (12 Wheat.) at 31. So courts have to keep their noses out of the matter.

*Mott* was reaffirmed, and even expanded, not long after in *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849). Unlike *Mott*, *Luther* dealt with an alleged insurrection—the Dorr Rebellion in Rhode Island. But like *Mott*, *Luther* held that the President's finding of an insurrection was conclusive. *See* 48 U.S. (7 How.) at 43. So great was the deference accorded the President that the Court had to defer even though the President had not actually called forth the militia. *Id.* at 44. He had only taken preparatory steps. *Ibid.* Yet those were "equally authoritative" as evidence of an insurrection. *Ibid.*

No. 25-10534

The *Luther* Court relied heavily on *Mott*. As *Luther* explained, under *Mott*, the statute at issue gave the President "a discretionary power . . . to be exercised by him" if certain facts—namely, the existence of an insurrection or invasion—pertained. *Luther*, 48 U.S. (7 How.) at 45 (quoting *Mott*, 25 U.S. (12 Wheat.) at 31). And under the proper "rule of construction" that meant "the statute constitute[d] him the sole and exclusive judge of the existence of those facts." *Ibid.* (quoting *Mott*, 25 U.S. (12 Wheat.) at 31–32).

What if the President were to err? Well, the Court explained, "it would be in the power of Congress to apply the proper remedy." *Ibid.* "But the courts" had to "administer the law as they f[ound] it." *Ibid.* And the law forbid them from countermanding the President's determination. Full stop.

b

These are not the only cases that award conclusive effect to the President's determination of an invasion, insurrection, or any other real or threatened hostility. The Supreme Court has also deferred to the President's determination in these contexts because of his inherent authority as Commander-in-Chief.

In the *Prize Cases*, for example, President Lincoln announced a blockade of southern ports after the southern rebels seized Fort Sumter. Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2071 (2005). But the power to announce a blockade depended on the existence of "a state of war." *Prize Cases*, 67 U.S. (2 Black) 635, 666 (1862). So did a state of war exist? Per the Court, yes. But not because the Court got to review the evidence, determine whether the United States could go to war with itself, or find facts as if it were adjudicating a bench trial on the nature of the armed conflict in South Carolina. The *only* thing that mattered was President Lincoln's

No. 25-10534

announcement of the blockade, which was "itself official and conclusive evidence to the Court that a state of war existed." *Id.* at 670.

True, the Court acknowledged, the President had no power to "initiate or declare a war" unilaterally. *Id.* at 668. The power to declare war obviously lies with Congress. *See* U.S. Const. art. I, § 8, cl. 11. But that did not matter. As the Court explained, courts could not countermand the President's determination that a "state of war" *already* existed. Any contrary position would be intolerable: It would allow courts to "cripple the arm of the Government and paralyze its power by" the sort of "subtle definitions and ingenious sophisms" that are the hallmarks of lawyers. *See Prize Cases*, 67 U.S. (2 Black) at 669–70; *cf.* Bradley & Goldsmith, *supra*, at 2054 (expressing concern over limiting presidential authority based on some "metaphysical test for war"). Instead, in our constitutional system, the "question" of "[w]hether the President . . . ha[d] met with such armed hostile resistance" so as to make the hostilities a war was "to be decided *by him.*" *Prize Cases*, 67 U.S. (2 Black) at 670.

c

State executives also have the first and last word on the existence of insurrections, invasions, and other forms of real or threatened hostilities.

Take *Sterling v. Constantin*, for example. There, the Governor of Texas proclaimed that an insurrection was unfolding in East Texas because some oil barons were pumping too much oil. 287 U.S. at 386–89. "The troops were ordered in and the [oil] wells were closed." Charles Fairman, *Martial Rule, in the Light of* Sterling v. Constantin, 19 Cornell L.Q. 20, 21 (1933). Several owners of interests in oil and gas leaseholds sued. *Sterling*, 287 U.S. at 387. The district court granted judgment in the owners' favor. *See id.* at 392.

No. 25-10534

In explaining that judgment, the district court found there had never been "any actual riot, tumult, or insurrection, which would create a state of war existing in the field." *Id.* at 391 (quotation omitted). And not only that. The Governor had listed a host of fears concerning what might happen in East Texas. Even "if all of the conditions had come to pass" as the Governor feared, "they would have resulted merely in breaches of the peace" not "even remotely resembling . . . a state of war." *Ibid.* (quotation omitted). So "unless the Governor [could by] proclamation create an irrebuttable presumption that a state of war exist[ed]," the court could only conclude there was no state of war. *Id.* at 392. (quotation omitted)

What did the Supreme Court say about all that? Did they presage today's majority opinion by saying the Executive's finding was so implausible it should be overridden by a handful of generals-in-robes? No. The Court held that the Governor's determination that there was an insurrection was "conclusive." *Id.* at 399; *see also Moyer v. Peabody*, 212 U.S. 78, 83 (1909) (holding that the Governor of Colorado's "declaration that a state of insurrection existed [wa]s conclusive of that fact"). So no court could countermand it.

\*

What is the upshot of this series of cases? All of them recognize one fundamental principle: The President's judgment call as to the existence of a state of war, invasion, or insurrection is conclusive.

3

Now time for some responses to the arguments on the other side. The majority (a) offers several cases as if they support its position. None of them do. Next, the majority (b) tries to undermine two of the (many) cases that support my position. That fails. Then, the majority (c) pretends it has afforded the President some great deference. It has not. Finally, *amici* (d) try

to reconceptualize this case as being about the political question doctrine. They think that means we can countermand the President's determination as "manifestly" unreasonable. That is wrong coming and going.

a

In response, the majority has only identified two partial sentences arguably saying that this court can countermand the President's determination that an invasion is perpetrated or threatened. But neither sentence comes close to bearing the weight the majority places on it. As far as the other two cases the majority discusses, they do not even possibly support its position.

i

Start with the first sentence (or really clause) the majority found. That clause comes from *Ludecke*, which was then quoted in *J.G.G.*, for the proposition that AEA designees are "entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act." *J.G.G.*, 145 S. Ct. at 1006 (quoting *Ludecke*, 335 U.S. at 163, 172 n.17). The majority reads this statement for all it could be worth—despite the fact that Justice Frankfurter's paean to judicial restraint in *Ludecke* does not contain any other clauses that comport with the majority's judicial-supremacist reading of that case.

The majority says that the very concept of "interpretation" requires searching judicial review—as if that singular word is a skeleton key that opens to every alien enemy every legal door in every federal courthouse. That is wrong. I have also "interpret[ed]" the Act. I did so *just as Ludecke did* by saying that President Trump's invocation of it is conclusive. And it is hard to see how that reading conflicts with *J.G.G.* because that case rested on, you guessed it, *Ludecke*. Is the power vested in the President by the AEA an awesome one? You bet it is. But that has never precluded a federal court from

No. 25-10534

recognizing that the Constitution and the statute give the President conclusive power in this decision:

> *[W]e hold that full responsibility for the just exercise of this great power may validly be left where the Congress has constitutionally placed it—on the President of the United States.* The Founders in their wisdom made him not only the Commander-in-Chief but also the guiding organ in the conduct of our foreign affairs. He who was entrusted with such vast powers in relation to the outside world was also entrusted by Congress, almost throughout the whole life of the nation, with the disposition of alien enemies during a state of war. Such a page of history is worth more than a volume of rhetoric.

*Ludecke*, 335 U.S. at 173 (emphasis added).

This is not an anomalous reading of a statute. The "best reading of a statute" sometimes is "that it delegates discretionary authority to" the Executive. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). In such cases, the judicial duty "to independently interpret the statute" is "fulfill[ed] . . . by recognizing" the "delegation[]." *Ibid.*; *see also Dalton v. Specter*, 511 U.S. 462, 477 (1994) ("Where a statute . . . commits decisionmaking to the discretion of the President," the best reading of the statute is that "judicial review of the President's decision is not available."). So by treating the President's determination as conclusive, I am simply fulfilling the judicial obligation to render the best interpretation of the AEA—in precisely the way *Ludecke* did. *See also Ludecke*, 335 U.S. at 163–64 (holding the AEA generally prohibits all judicial review).

Nor is it anomalous to read *Ludecke* as asking *and answering* such questions of "interpretation." After all, the relevant clause in Justice Frankfurter's opinion for the Court says we can consider "'questions of interpretation *and constitutionality*' of the Act." *J.G.G.*, 145 S. Ct. at 1006 (quoting *Ludecke*, 335 U.S. at 163, 172 n.17) (emphasis added). Does that

No. 25-10534

mean courts are now empowered to hold that the 227-year-old statute, which has been invoked numerous times over the centuries in numerous circumstances, is unconstitutional? Of course not. In the same breath that the *Ludecke* Court said courts can consider constitutional questions, it supplied in the answer: The statute "is valid as we have construed it." *Ludecke*, 335 U.S. at 170–71. So yes, courts can consider the constitutionality of the AEA, so long as they hold it constitutional. Just as they can interpret the statute, so long as they do not countermand the President's conclusive invocation of it.

That is how courts have long understood this presidential determination. As one esteemed commentator has explained, *Mott* and *Luther* held "[t]he President had unfettered discretion to invoke his authority" precisely "*because* Congress had specifically intended and delegated such" authority. Stephen I. Vladeck, Note, *Emergency Power and the Militia Acts*, 114 Yale L.J. 149, 174 (2004) (emphasis added). So too here.

That does not mean the President's *interpretation* of the AEA is conclusive. I am not arguing that the President has conclusive interpretative power to proclaim that AEA invasions include denying that baseball is our national pastime or double parking at the grocery store. I am arguing only that—consistent with 200 years of precedent—we must treat the President's extraordinarily fact-intensive application of law-to-fact as conclusive.

Why does the majority disagree? It thinks that *Ludecke*'s reference to "questions of interpretation" necessarily includes both interpreting "the statute's text" and then "applying the interpretation" to the facts—and that to conclude otherwise would be "abdicat[ing] the judicial role altogether." *Ante*, at 10–11 & n.3. That is wrong. Not only does that drag *Ludecke* into conflict with the numerous cases I have discussed that make the President's determination conclusive, *see supra*, Part II.A.2, it also confuses the differing

natures of the two inquiries. As the Supreme Court explained just a couple months ago when writing in the ordinary administrative-law context, although "the meaning of" a discrete term "is a question of law" that fits well within the Court's wheelhouse, a fact-intensive *application* of that same term may often be grounded more in judgments of policy than legal analysis. *Eagle County*, 145 S. Ct. at 1512. If that is true when dealing with domestic administrative law, it is *a fortiori* true when dealing with foreign affairs and national security. *See Al-Bihani v. Obama*, 619 F.3d 1, 40 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of rehearing en banc) (emphasizing that "[a]pplying" certain legal rules "to particular factual situations" in the foreign affairs and national security contexts involves a great deal "of subjective judgment"). And if such policy judgments should not be "excessively second-guessed by a court" in the domestic administrative-law context, *Eagle County*, 145 S. Ct. at 1512, they most certainly should not be when the security of the Nation hangs in the balance, *Al-Bihani*, 619 F.3d at 40 (Kavanaugh, J., concurring in the denial of rehearing en banc) ("The President's execution of foreign affairs statutes often requires judgments of policy and principle, and the foreign policy expertise of the executive places it—not courts—in the best position to make those judgments." (quotation omitted)). So *Ludecke*'s reference to "questions of interpretation" by no means requires us to countermand the President's fact-intensive determination concerning what constitutes an invasion—let alone a *threatened* invasion.

The more the majority argues the statute requires armed conflict, the more obvious it is that we must defer to the President's *finding* of an armed conflict. That is what the Supreme Court specifically told us to do in *Martin v. Mott*, *Luther v. Borden*, and the *Prize Cases*. And in *Ludecke* itself—where the AEA applied with conclusive force long after the shooting stopped. It is

No. 25-10534

precisely in the military context that the President, as Commander-in-Chief, gets the most sway.[9]

ii

Okay now for the majority's second sentence. That sentence comes from *dicta* in *Johnson v. Eisentrager*, 339 U.S. 763 (1950). That *dictum* does nothing to support the majority's scrutinizing judicial review.

All *Eisentrager* said is that under the AEA, the court may "ascertain the existence of a state of war." *Id.* at 775 (citing *Ludecke*, 335 U.S. at 160). But *whether* a state of war exists and *how* one should go about figuring that out are two very different questions. Fortunately, *Ludecke*—the very case *Eisentrager* relied on—tells us how to answer the "how" question: We must determine whether "a state of war" exists by looking to the determination of the political branches. *See Ludecke*, 335 U.S. at 168–69. So *Eisentrager*'s *dictum*—even if given full force—cannot support the majority's decision to countermand the President's determination here.

---

[9] The majority also points to the fact that some federal judges think TdA's armed conflict across the United States is not the sort of armed conflict that previous Presidents identified in invoking the AEA. *See ante*, at 9 ("Prior invocations of the AEA provide context as we seek to understand [our] role."). As an initial matter, I am not so sure. Woodrow Wilson invoked the AEA against German nationals during World War I. But as far as I know, during the Great War, German nationals did not violently overrun apartment complexes in the United States, murder law enforcement officers in the United States, or savagely beat to death innocent nursing students in the United States. So even if TdA's armed conflict is different from previous examples, I am not sure it is different in a way that matters. And even if it is different in a way that matters, I do not see how it could matter for determining the scope of our review. Maybe historical examples suggest President Wilson did not need to invoke the AEA? I have no idea. But that says nothing about the question of *who decides* whether the President needed to invoke the AEA. And under the AEA, the answer is simple: the President.

No. 25-10534

iii

The majority cites two more cases. But I do not understand either citation.

The first is *United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347 (1952) (per curiam). But that case is wholly irrelevant. The President didn't even argue that a state of war existed when Jaegeler was ordered removed. Congress had enacted—and President Truman had approved—a joint resolution formally terminating the war between the U.S. and Germany before the Attorney General ordered Jaegeler's removal. *Id.* at 348; *see also* Brief for Respondents, *Jaegeler*, 342 U.S. 347 (No. 275), 1952 WL 82533, at *3 n.2 (noting that "the Joint Resolution ending the war with Germany . . . was approved by the President"). The Executive Branch lawyers, in their briefing before the Supreme Court, *explicitly acknowledged* that the war was over. *See* Brief for Respondents, *Jaegeler*, 342 U.S. 347 (No. 275), 1952 WL 82533, at *25–26. The Court deferred completely to the judgment of the political branches as to the existence of an armed conflict (or lack thereof). So the Court acted consistently with *Ludecke* by taking the Executive Branch at its word. The only fight was whether Jaegeler's removal order—which had been validly issued during the war—became retroactively unenforceable once the war ended. *Id.* at *25–35. So *Jaegeler* does nothing to vest *judges* with power to second-guess the President's invocation of the AEA.

The final case is *United States v. Williams*—an unpublished circuit court opinion that was reported for the first time in the *Green Bag*.[10] *Williams*

---

[10] *See* Gerald L. Neuman & Charles F. Hobson, *John Marshall and the Enemy Alien*, 9 Green Bag 2d 39, 41–42 (2005). To be clear, I do not mean to denigrate this publication. To the contrary, the *Green Bag* has published numerous works of historical and legal significance—including one of my favorite books. *See* David B. Sentelle,

No. 25-10534

did nothing to review a President's invocation of the AEA. Instead, *Williams* appears to have held only that "the regulations made by the President" did "not authorize the confinement of the petitioner." Gerald L. Neuman & Charles F. Hobson, *John Marshall and the Enemy Alien*, 9 Green Bag 2d 39, 42 (2005) (quoting U.S. Circuit Court, Va., Order Book No. 9 (1811–16), at 264). Or as a news report published contemporaneously with *Williams* explained—and one can only hope that early American newspapers were more reliable reporters of cases than their modern counterparts—the problem was that "the marshal had not designated a place to which Williams should remove, as [his] instructions required." *Id.* at 43 & n.15 (quotation omitted). Thus, the case held only that "the writ protected the individual's liberty against a *subordinate official's* action in excess of *delegated* authority, not a constitutional or statutory violation." *Id.* at 43 (emphasis added). The majority admits that Justice Marshall released the petitioner because of this "technical" flaw, which has nothing to do with the President's power to conclusively determine whether a state of war or threatened invasion exists. *Ante*, at 9. Yet the majority somehow reads *Williams* to support its holding that we can countermand the President's invocation of the AEA.

---

Judge Dave and the Rainbow People (Green Bag Press 2002). A serialized version of that book was published in volume 3 of the Green Bag 2d. *See* David B. Sentelle, *Judge Dave and the Rainbow People*, 3 Green Bag 2d 61 (1999); David B. Sentelle, *Judge Dave and the Rainbow People, Part II*, 3 Green Bag 2d 179 (2000); David B. Sentelle, *Judge Dave and the Rainbow People, Part III*, 3 Green Bag 2d 285 (2000); David B. Sentelle, *Judge Dave and the Rainbow People, Part IV*, 3 Green Bag 2d 405 (2000). Nor do I mean to criticize the excellent work of historical scholarship that unearthed this 200-year-old circuit court opinion. But I do mean to suggest just how desperate the majority is to find precedents that support its position that are not just district court opinions from the last few months.

No. 25-10534

b

The majority next tries to undermine two of the precedents I have relied on: (i) *Martin v. Mott* and (ii) *Sterling v. Constantin*.[11] Both efforts fail.

i

Start with *Mott*. The majority does not even try to argue I have overread *Mott*. Instead, it admits *Mott* is a bad case for federal judges who desire to countermand the President. It agrees that *Mott* reads the Militia Act to confer "unreviewable discretion to decide that circumstances exist that require the calling up of the militia." *Ante*, at 15. How does the majority deal with that? It says, without explanation, that the AEA issue here presents a "different context": "the need for troops as an immediate defense to an actual or threatened invasion is readily distinguishable for justiciability purposes from when residents of this country may be detained and removed." *Id* at 14–15. Therefore, *Mott* "does not displace" *Ludecke*, *Eisentrager*, and *Jaegeler*. *Id.* at 15. After that, we hear no more mention of *Mott*.[12]

It is unclear why the majority thinks *Mott* is distinguishable from *Ludecke*, *Eisentrager*, and *Jaegeler*. As I have explained, *Ludecke* says nary one word to contradict *Mott*, or anything else in my analysis. On the contrary, *Ludecke* emphasized that whether armed hostilities were ongoing was a

---

[11] The majority also attempts to distinguish *The Prize Cases*. But its way of doing so is confusing. The majority says "the only question before the court was not whether a state of war existed as a factual matter, but instead whether a state of war existed as a technical matter." *Ante*, at 17 n.5 (citing *The Prize Cases*, 67 U.S. (2 Black) at 641, 646–47). It isn't clear why that distinction matters for deciding whether we can second-guess the President's determination.

[12] The majority does not mention *Moyer* or *Luther*. But one can only imagine that we should disregard all those cases as inconsistent with later precedents, too.

No. 25-10534

"matter[] of political judgment for which judges have neither technical competence nor official responsibility." 335 U.S. at 170. And relying on the words of Justice Iredell a few decades before *Mott*, *Ludecke* emphasized that concerns that the President's powers under the AEA could "be abused" were irrelevant. *Id.* at 172 (citing *Case of Fries*, 9 F. Cas. 826, 914 (No. 5,126) (C.C.D. Pa. 1799) (jury charge given by Iredell, J.)). That sounds a whole lot like what Justice Story said in *Mott*. *See* 25 U.S. (12 Wheat.) at 31 (noting that determining whether there is an invasion is not subject to "technical proof" and emphasizing that judges have no role in second-guessing the President in this regard); *id.* at 32 ("It is no answer that such a power may be abused."). Moreover, as a general matter, *Ludecke* pointed to the past to support its holding, emphasizing that "a page of history is worth more than a volume of rhetoric." 335 U.S. at 173. So I do not see why anyone should read Justice Frankfurter's opinion in *Ludecke* as breaking new ground, blessing searching review of presidential determinations related to armed conflicts, and thereby undermining older authorities such as *Mott*.

But let's suppose I am wrong in my reading of *Ludecke*. At most, the majority could contend that *Ludecke* is ambiguous or unclear—in that it has a singular half-sentence-long clause that could be read to support some minimal role for judges, sandwiched between page after page after page of insistence that the President's determinations are conclusive and beyond judicial review. Nothing in *Ludecke* comes anywhere close to cabining *Mott*. *Cf. supra*, Part II.A.3.a.i (explaining that *Ludecke*'s singular statement that "questions of interpretation" are for the courts tells us nothing about whether the President's invocation of the AEA is conclusive). And we do not ordinarily read Supreme Court precedent to overrule "earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). So at worst, *Mott* should escape these later cases unscathed—exactly as the many Supreme Court justices who continue to cite *Mott* seem to think. *See,*

*e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 206 n.1 (2012) (Sotomayor, J., concurring in part and concurring in the judgment) (explaining that in *Mott*, the Court "declin[ed] to review the President's determination that an exigency had arisen" (quotation omitted)).

If anything, the majority's approach is backwards. It takes a maximalist read of a couple words in Supreme Court opinions like *Ludecke* and *Eisentrager*. It then holds that these maximalist readings of ambiguous cases conflict with centuries of unambiguous precedent in *Mott*, *Moyer*, *Luther*, the *Prize Cases*, &c.

That is a strange way to interpret precedent. If a bunch of old cases all unambiguously say *X*, and a new case has at most a stray sentence that could be read to suggest perhaps-not-*X*, why would any faithful reader of precedent take the old, unambiguous cases to have all been implicitly overruled by the new, stray clauses? The more sensible approach would be to read the new, obscure cases in light of the old, unambiguous cases.

The majority's effort to get rid of *Mott* bears emphasis. The majority says Mott is distinguishable because, in that case, the President was acting "in response to an invasion," and that is somehow different from deciding "when residents of this country may be detained and removed." *Ante*, at 14–15. But isn't that the precise question presented here too? Isn't the AEA, which allows the President to remove alien enemies *that live in this country*, also triggered by an "actual" or "threatened" invasion? And I thought *Mott* told us that we should give the President's answer to that question conclusive effect. Rather than follow the Supreme Court's emphatic command in *Mott*, the majority decides the President's determination is irrelevant because there is no invasion, and it decides there is no invasion because the President's determination is irrelevant.

No. 25-10534

ii

Next, the majority argues I have overread *Sterling*. *See ante*, at 15–17. That is wrong.

The majority misunderstands *Sterling* and its import in this case. In *Sterling*, the Court held that even though it could not countermand the Executive's determination that there was an insurrection, the Court could still question whether the Executive's actions during that insurrection had exceeded the scope of his authority. *See Sterling*, 287 U.S. at 397–402.

In other words, in *Sterling*, there were two questions:

- **Question 1:** Was there an insurrection?

- **Question 2:** Therefore, what? What could the Executive do in response?

As to Question 1—whether there was an insurrection—*Sterling* said exactly what I said it said. *Sterling* said courts *cannot* second-guess the Governor's declaration of an insurrection. *See* 287 U.S. at 399 (holding that the Executive's "decision" as to whether there was an insurrection was "conclusive"). But as to Question 2, *Sterling* said that just because there is an insurrection does not mean the Executive can do whatever he wants in response. *See id.* at 400 ("It does not follow from the fact that the Executive has this range of discretion, . . . that every sort of action the Governor may take, . . . is conclusively supported by mere executive fiat."). So the Governor could not shut down the printing presses because that would violate the First Amendment. Nor could he infringe the property rights of U.S. citizens. And the Court could say so.

That is the only sense in which the Governor's use of the "military powers" was left "subject to judicial review." *Ante*, at 16. The Court held "the measures of martial rule taken by the governor" in response to the

insurrection were invalid because they "amounted to a taking of property without due process of law." Fairman, *supra*, at 20. The Court never suggested it could countermand the Governor's determination as to Question 1. Thus, the upshot of *Sterling*, as one contemporary commentator put it, is this: "[T]he courts must give conclusive value" to "the proclamation of a state of insurrection," but "not [to] the orders issued" in response. *Id.* at 33. Or to take an even more famous separation of powers case: Of course the President can wage war in Korea as the Commander in Chief **(Question 1)**, but that does not mean he can take private property from the owners of steel mills **(Question 2)**. *See The Steel Seizure Case*, 343 U.S. 579, 587–89 (1952).

So too here. We must give conclusive effect to the Executive's proclamation that an invasion is being perpetrated or threatened. But that does not mean we need to give conclusive effect to whatever the President might do in response. No one suggests, for instance, that if the President began detaining and removing toddlers under the AEA that that would be immune from judicial intervention. *See* 50 U.S.C. § 21 (providing that only those who are "fourteen years and upward" are "liable to be apprehended, restrained, secured, and removed as alien enemies"). And of course, we can make sure that the President stays within the bounds of other constitutional provisions that might apply during an invasion, like the Due Process Clause. *See infra*, Part III.

But this shows that nothing in *Sterling* undermines my point. Detaining and removing toddlers under the AEA is unlawful *even if* an invasion is being perpetrated or threatened. And so too would it be unlawful to violate detained aliens' notice rights. In other words, just as in *Sterling*, we must treat as conclusive the Executive's determination that an insurrection, invasion, &c, is being perpetrated or threatened. But we need not let the President do literally whatever he wants in response.

No. 25-10534

True, *Sterling* cited *Mitchell v. Harmony*, 54 U.S. (13 How.) 115 (1851), and its doctrine of necessity. But that doctrine has no bearing on this case.

Start with *Mitchell*'s doctrine of necessity. As we all know, the Government cannot take private property without just compensation. *See* U.S. Const. amend. V. But as is true in the case of many other constitutional rights, the courts have developed doctrines allowing the plain text of the Takings Clause to give way in certain circumstances. Specifically, under *Mitchell*, "the taking of private property by a military commander" can be justified in the case "of an immediate and impending danger, . . . or an urgent necessity for the public service." 54 U.S. (13 How.) at 134. So the Government cannot take private property without just compensation—unless it has a really good excuse.

In many ways, that doctrine resembles strict scrutiny. *Cf.* Michael Stokes Paulsen, *The Constitution of Necessity*, 79 Notre Dame L. Rev. 1257, 1259–60 (2004). Certain governmental action may seem to infringe the plain text of a constitutional right. But if that specific action is absolutely necessary, the plain text will give way.

It was *that* doctrine that *Sterling* applied when it held the Governor's action unlawful. *See Sterling*, 287 U.S. at 401, 403–04 (applying *Mitchell*). But the question of whether a particular measure that otherwise infringes constitutional rights (like taking private property) satisfies strict scrutiny (or is absolutely necessary) bears no resemblance to the question of whether an invasion is being perpetrated or threatened. That is why the *Sterling* Court found it utterly uninteresting that it held both that (1) courts cannot second-guess the Executive's determination that an insurrection is ongoing, and (2) courts can second-guess whether the Executive's decision to take private property in response is so utterly necessary so as to override the plain text of the Constitution.

No. 25-10534

To see this more clearly, think precisely about how the doctrine of necessity operates within the analytic framework of *Sterling*:

- **Question 1:** Is there an insurrection? The Governor says there is. "His decision to that effect is conclusive." *Sterling*, 287 U.S. at 399.

- **Question 2:** Therefore, what? What can the Governor do in response to an insurrection? A lot. But can he infringe private property rights? Almost certainly not. *See* U.S. Const. amends. V, XIV; *see also Sterling*, 287 U.S. at 400–01; *The Steel Seizure Case*, 343 U.S. at 587–89.

- **Question 3:** But wait. Is taking the specific property so absolutely, positively necessary that the Governor can do so notwithstanding the constitutional text? *Sterling*, 287 U.S. at 401 (citing *Mitchell*, 54 U.S. (13 How.) at 134).

The doctrine of necessity is irrelevant here. We are nowhere close to reaching that third question. No one is asking whether it is necessary for the President to take a particular measure that might otherwise infringe the baseline constitutional rule. Instead, we are asking the more general, first question of whether an invasion, or other armed hostility, is being perpetrated or threatened. Under *Sterling*, the Executive's resolution of *that* issue is "conclusive." *Id.* at 399. As to the second question, the President is simply seeking to rely on the powers expressly granted to him by the AEA. We know those powers comport with the Constitution. *Ludecke*, 335 U.S. at 171 ("The Act is almost as old as the Constitution, and it would savor of doctrinaire audacity now to find the statute offensive to some emanation of the Bill of Rights."). And to the extent the President's invocation of the AEA infringes notice rights, we can say so. *But cf. infra*, Part III (explaining that the revised procedures do not violate notice rights). But no one has suggested we have any need to pass to the *third* question and ask about the necessity of

No. 25-10534

any particular infringement.[13] So *Sterling*'s discussion of necessity has no bearing here. Instead, the only thing *Sterling* says of interest is this: The Executive's determination that an insurrection, invasion, or other armed hostility is ongoing is "conclusive." *Sterling*, 287 U.S. at 399.

Nor can the majority dodge Sterling by invoking the (irrelevant) public rights doctrine. First, some doctrinal context. "Public rights" are those rights "belonging to the people at large," while "private rights" are the "private unalienable rights of each individual." *Lansing v. Smith*, 4 Wend. 9, 21 (N.Y. 1829). Public rights can be adjudicated in the legislative or executive branches, while the Government must use Article III courts "to act authoritatively upon core private rights that had vested in a particular individual." Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 569 (2007). Here, the majority says that *Sterling* involved private rights, so "courts retain some role in judging the propriety of the use of war powers." *Ante*, at 17.

Respectfully, that makes no sense. While I suppose that *Sterling* did involve private rights—oil and gas contracts—that is irrelevant. We are not debating whether this suit can be heard in an Article III court, which is the question that the public rights doctrine concerns. As this case's journey to the Supreme Court and back suggests, everyone agrees it can. Instead, we are debating whether a statute commits a particular factual determination to the

---

[13] That would raise its own questions. Some measures, for instance, might be unjustifiable even in the face of necessity, so there would be no third question. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 591–92 (2006). *But cf.* Paulsen, *supra*, at 1257–60 (arguing the Constitution's text countenances presidential power to do whatever is necessary to preserve the constitutional order). And if the third question were raised, the President may be entitled to exceptionally high levels of deference, at least in the context of national security interests. *Cf. Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–35 (2010). But that question is not raised here.

No. 25-10534

President or to every federal judge in America. And that determination has nothing at all to do with the private rights doctrine. Suppose an agency with unreviewable prosecutorial discretion decided to go after one man but not the other for insurance fraud. For the majority, the fact that the case concerned a "private right" (a contract) is a *deus ex machina* that means it could second-guess the prosecutorial decision. But that argument defeats itself.

c

Next, the majority urges that the scope of its review is narrow. It pretends to have accorded the President deference because it takes the facts alleged in the President's proclamation—and no other facts the President might have considered—as true. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also ante*, at 11. But then the majority says for it to "defer to findings of fact, there must be findings of fact." *Ante*, at 11. The majority declares outright that it can ignore the President's "mere conclusory statements." *Iqbal*, 556 U.S. at 678; *ibid.* ("A pleading that offers 'labels and conclusions . . . will not do.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also ante*, at 33 ("We have already held that factual assertions by the President are to be accepted, but freestanding labels to unstated actions are not relevant findings."); *id.* at 32–35. Then it compares the President's well-pleaded facts to the majority's curated definition of a "predatory incursion" or "invasion" before concluding—presto!—the President failed to state a claim under the AEA. *Iqbal*, 556 U.S. at 678–80; *see also ante*, at 35.

i

With all due respect, that is wrong. The President has *zero* obligation to produce "findings of fact" to us to defend his conclusion that an actual or threatened war or invasion exists. Treating the President as an ordinary civil plaintiff at the motion-to-dismiss stage is the polar opposite of what the AEA

and 200 years of history under that statute demand. Even ordinary immigration policy "is vitally and intricately interwoven with . . . the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades*, 342 U.S. at 588–89. That is especially so with the AEA. So subjecting the President to ordinary 12(b)(6) scrutiny hardly respects the fact that these "matters are . . . largely immune from judicial inquiry or interference." *Id.* at 589.

Anyway, what does the majority think the President must do? Must he wait months before declaring an invasion is threatened, so that his lawyers can produce a 600-page proclamation defending his position in anticipation of judicial scrutiny? Does he need to create an appendix with the various intelligence assessments he relied on? Does he need to disclose an OLC memo that we can grade to determine if it comports with our understanding of predatory incursions? Should he proffer witnesses that violent TdA members can depose on the meaning of "invasion" and "incursion"? Does he need to wait for a federal court to conduct a bench trial on the extent of armed conflict that Venezuela is perpetuating inside the United States? How many bench trials would be enough before the President can act? Shouldn't he wait for several federal judges to enter final judgments? And presumably the appellate courts too? What about certiorari petitions? What if the Supreme Court waits years to intervene? Does that mean the United States could be beset by a predatory incursion for the entirety of the Trump Administration and that the President would remain powerless to act until given the green light by one or more federal judges?

These are absurd restrictions to impose on an emergency power. The power to act in response to invasions or predatory incursions is one "to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union." *Mott*, 25 U.S. (12 Wheat.) at 30. "[E]very delay, and every obstacle to an efficient and

No. 25-10534

immediate compliance, necessarily tend to jeopard[ize] the public interests." *Ibid.* Our intervention would mean that "the hostile enterprise" of an invasion or predatory incursion "may be accomplished without the means of resistance." *Ibid.*

What's more, the majority's rule contravenes at least two Supreme Court precedents. In the *Prize Cases*, for example, President Lincoln never had to explain *why* he thought the activity of the southern rebels constituted a state of war. He announced a blockade, and that blockade depended upon a "state of war" existing. 67 U.S. (2 Black) at 665–66. That "proclamation of blockade," and that proclamation alone, was "itself official and conclusive evidence to the Court that a state of war existed." *Id.* at 670. And in *Martin v. Mott*, the Court rejected Mott's claim that the President had to aver any facts whatsoever as to an invasion to validate the "exercise of" his power. 25 U.S. (12 Wheat.) at 32. What mattered was solely his "own judgment of the facts"—not any jury or court's assessment. *Id.* at 33. So the "judgment of the President [was] conclusive as to the existence of the exigency." *Ibid.*

The majority concedes that the AEA's language "does not identify what, at a minimum, must be included in the [President's] proclamation" for the President to invoke his AEA authority. *Ante*, at 11. But rather than take the AEA's text as further evidence that the President's decision is beyond our review, the majority decides for itself that the President's "proclaiming, without more," that an invasion exists "will not suffice." *Ibid.* We don't get to demand the President's homework.

ii

It is worth pausing to reflect on what is really doing the work in the majority's opinion. The majority half-heartedly defines the critical terms "invasion" or "predatory incursion." *See, e.g., ante*, at 30–32 (offering an open-ended and indeterminate definition of "predatory incursion" while

No. 25-10534

leaving room for "updating").[14] It half-heartedly applies that definition to the facts. *See id.* at 32–35 (taking each individual fact offered by the President one-by-one and holding each individually does not amount to an invasion, so somehow all those facts put together cannot constitute an invasion either). And it half-heartedly takes the President's factual claims as true. *See id.* at 35. On that thin basis, our unelected court has overridden an action of "the most democratic and politically accountable official in" all the land—an action in defense of our national security that the sovereign people elected him to take. *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020).

At bottom, the majority seems to think that whatever an invasion or predatory incursion is, it cannot be *this*. So it thinks it can—indeed, it *must*—stop the President from taking what it sees as flagrantly unlawful and dangerous action. I have already explained why that is legally wrong. But let's zoom out to focus on the underlying vision of the relationship between the courts and the President that has led the majority down this path.

The majority appears to think this is just another administrative law dispute. Under ordinary ad-law circumstances, federal courts get the last say. So too, the majority appears to think, with determining whether an invasion

---

[14] There is much, much more that could be said about all of this. For instance, the majority ignores many of the definitions it purports to rely on. *See, e.g., ante*, at 19, 22 (offering two definitions of invasion, only one of which refers to "military force," before concluding that "invasion" "requires military action"). It disregards much of the historical evidence it cites. *See, e.g., ante*, at 18 n.6, 21–22 (relying on Madison's claim that "[i]nvasion is an operation of war" to hold that invasion "requires military action," while ignoring its own earlier statement that the Quasi War was "an unequivocal act of war *on the commerce of the United States*" (emphasis added) (quotation omitted)); *ante*, at 22–28 (offering a definition of "predatory incursion" before turning to multiple other, contemporary sources of evidence). And it does not even recognize that the AEA applies to *threatened* invasions or predatory incursions. *See, e.g., ante*, at 7 ("[A]s preconditions to invoking the AEA, there *must be* a declared war, an invasion, or a predatory incursion." (emphasis added)); *see also ante*, at 22.

No. 25-10534

is threatened against the territory of our sovereign Nation. Why? There is no legal support for that position. So best I can tell, it is because of some implicit notion that unless the President is subservient to courts, he cannot be subject to law.

That is deeply mistaken. Regardless of what courts say or do, the President must follow the law. *See* U.S. Const. art. II, § 3. That obligation on the part of the President in no way implies any "authority" on the part of courts "to enforce" that obligation. *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2561 (2025). On the contrary, "the law" often "prohibits courts from doing so." *Ibid.*

Take one famous example—*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). Folks love to remember Chief Justice Marshall's "invo[cation]" of "the venerable maxim *ubi jus ibi remedium*." *Villarreal v. City of Laredo*, 134 F.4th 273, 277–78 (5th Cir. 2025) (Oldham, J., concurring). But we tend to forget the holding of the case: Even though the Executive Branch "had violated the law," the *Court* could not do anything about it. *CASA*, 145 S. Ct. at 2561. And "perhaps no court could" have. *Villarreal*, 134 F.4th at 278 (Oldham, J., concurring) (citing William Baude et al., Hart & Wechsler's The Federal Courts and the Federal System 89 n.6 (8th ed. 2025)). So however aspirational *Marbury*'s *dictum* about remedies might be, *Marbury*'s *holding* is what really merits reflection. Just because the Executive might violate the law does not mean the courts can do anything about it.

That is not to say that the President is a law unto himself. The White House Counsel, the Attorney General, or the Assistant Attorney General for the Office of Legal Counsel might disagree with this or that invocation of the AEA. And all these officials take oaths to uphold and defend the Constitution, laws, and treaties of the United States. These days the

President takes his oath on national television—to much pomp and circumstance. And in discharging his solemn oath, the President presumably takes seriously the legal views of his advisors who take the same or similar oaths. So make no mistake: Executive Branch officials, including the President, are subject to law. But that does not mean unelected, unaccountable federal judges have the power to do anything about it in any particular case. *See Marbury*, 5 U.S. (1 Cranch) at 179–80.

The contrary vision of the majority sees courts as standing over and above our constitutional order. How can we be sure, the majority asks, that the President is respecting the law if there is no judge there to say "aye" or "nay"? I worry that this view of judges as guardians is increasingly ubiquitous these days. But it overlooks the ancient question: "[*Q*]*uis custodiet ipsos custodes?*" (Who is to guard the guards themselves?) Juvenal, Satire VI 347–48 (Lindsay Watson & Patricia Watson eds., Cambridge Univ. Press 2014). That is, this judicial supremacist view requires us to assume that judges are infallible and cannot overstep their own constitutional limits.

Unlike the majority, the Founders were aware of this issue and designed a system to protect against it. When the Founders considered how to allocate sovereign power in our federal system, they did not decide to fork it all over to judges and pray they would play nice. The Founders instead decided to make *all three branches*—yes, even the judicial—subject to checks and balances from the other two. That way, "[a]mbition" would "counteract ambition," and the fallen men—including the fallen judges—who would hold power in our Republic would stay in line. The Federalist No. 51, at 322  (James Madison); *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 502 (5th Cir. 2020) (en banc) (Oldham, J., concurring) (discussing the "deep fears" expressed by "the Anti-Federalists" that "federal 'judges'" would "'extend the power of the courts'" (quoting Brutus XI, ¶ 2.9.140, *in* 2 The Complete Anti-Federalist 420

No. 25-10534

(Herbert Storing ed., 1981)). And one of the most important checks on the Judicial Branch is that some questions—including whether our Nation is under invasion—are wholly, totally, completely, and unreviewably allocated to someone who does not have "Judge" in his honorific.

But on the majority's telling, it is only Congress and the President who must submit to checks and balances. Meanwhile, the courts have a roving commission to police both, free from any oversight from the other two. So much for "the judiciary" being "beyond comparison the weakest of the three." THE FEDERALIST NO. 78, at 465 (Alexander Hamilton).

d

Finally, an argument from *amici*. *Amici* attempt to provide a doctrinal justification for the majority's decision. *Amici* do this by reconceptualizing this case around the political question doctrine. Under the political question doctrine, *amici* argue, courts can override the President's determination if it is "manifestly" unreasonable. *See* Br. of *Amici Curiae* The Brennan Center for Justice et al. at 19–22. And, they say, this determination by this President is manifestly unreasonable. *Id.* at 3–18. That is wrong at every step.

i

The political question doctrine is not the proper framework for thinking about this case.

"The Supreme Court has never applied the political question doctrine in cases involving statutory claims of this kind." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the judgment). Of course, I hesitate to make any strong claims about the political question doctrine because it is "notoriously 'murky and unsettled.'" *Ibid.* (quoting *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 n.8 (D.C. Cir. 1984) (Bork, J., concurring)). So I do not claim the

No. 25-10534

doctrine could *never* apply to a statutory claim.[15] But at least as a general matter, in statutory cases, other doctrines—such as reviewability, deference, and delegation—do the work the political question doctrine does in constitutional cases. Thus, in *Mott*, for example, the Court gave conclusive deference to the President's determination because the statute at issue delegated authority to the President to make that determination. *See supra*, at 85–87. And in *Ludecke*, the Court seemed to invoke reviewability doctrine—and certainly not the political question doctrine—when it explained that the AEA itself largely "preclude[s] judicial review." 335 U.S. at 163 (quoting Act of June 11, 1946 (Administrative Procedure Act) § 10, 60 Stat. 237, 243).

Here, just as in *Mott* and *Ludecke*, this case is not best analyzed under the political question doctrine. Instead, the statutory doctrines I have discussed provide the better framework for analyzing a case like this where the statutory text is best interpreted as making the Executive's determination conclusive upon the courts.[16] And because the political question doctrine is not implicated, any purported exceptions to that doctrine are irrelevant.

---

[15] For instance, if a statute were best interpreted to require us to determine whether an invasion was being perpetrated or threatened, it might very well implicate the political question doctrine. But that hypothetical statute is not before us. The statute that is before us, the AEA, leaves this determination to the President. So *Baker*'s considerations are simply not implicated, as nothing in the AEA requires us to resolve a question that there are no "judicially discoverable and manageable standards for resolving." *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

[16] Perhaps the framework of deference and delegation, just as in *Mott*, is the proper framework for thinking through this case. *See supra*, at 85–87; *cf. Baker*, 369 U.S. at 281–82 (Frankfurter, J., dissenting) (suggesting *Ludecke* may have been about "defer[ence]"). After all, in myriad contexts, courts have afforded the President extensive deference in making fact-intensive determinations involving sensitive issues of national security. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686–87 (2018). That makes sense. As I have noted, the Supreme Court recently underscored that fact-intensive applications of law to fact, even in the ordinary administrative-law context, often turn more on judgments of policy than legal analysis. *See supra*, at 93; *see also Eagle County*, 145 S. Ct. at 1512. That is especially so in

No. 25-10534

True, *dicta* in *Baker v. Carr* drew on *Mott* in suggesting that certain questions related to the presence of armed hostilities were "political questions." 369 U.S. 186, 213 (1962) (citing *Mott*, 25 U.S. (12 Wheat.) at 30). But *Baker* did not try to reconceptualize *Mott* or any of the other cases it discussed—let alone cases it did not even mention like *Ludecke*. On the contrary, *Baker*'s discussion was focused purely on the question before it— whether redistricting cases were justiciable. *Id.* at 210–11. It used cases like *Mott* to "infer" the "threads that make up the political question doctrine." *Id.* at 211. But it refused to "explore" the "implications" of these cases "in

---

the context of foreign affairs and national security—and so it is especially inappropriate for the courts to second-guess a fact-intensive presidential determination like this one. *See supra*, at 93; *see also Al-Bihani*, 619 F.3d at 40 (Kavanaugh, J., concurring in the denial of rehearing en banc). So, just as in *Mott*, those concerns support the conclusion that the statute itself delegates authority to the President to make this determination. *See supra*, at 90–92; *cf. FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2516 (2025) (Kavanaugh, J., concurring) ("[T]he usual understanding is that Congress intends to give the President substantial authority and flexibility to protect America and the American people."); Curtis Bradley & Jack Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Pa. L. Rev. 1743, 1799 (2024) (arguing that "exclusion" of aliens, which "clearly concerns foreign affairs," is "an area where it is appropriate to conclude that Congress sees comparative competence in the executive branch and can be expected to authorize exclusion with broad authorizations").

But similar concerns have grounded determinations of unreviewability. *See, e.g., Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (holding a determination unreviewable because it raised "concerns of national security" and involved "a sensitive and inherently discretionary judgment call"); *see also* Ronald M. Levin, *Understanding Unreviewability in Administrative Law*, 74 Minn. L. Rev. 689, 744–45 (1990) (noting that "[a]ctions related to foreign policy, military, and national security affairs are among the strongest candidates" for unreviewability). And *Ludecke* itself seemed to invoke that doctrine, when it suggested that only "questions of interpretation and constitutionality" were subject to judicial review. *See* 335 U.S. at 163–64. So reviewability doctrine may provide the better framework for thinking through why we cannot second-guess the President's fact-intensive determination here.

Nevertheless, it is not necessary to decide which framework is more apt in this case. Either way, the President's determination is conclusive.

No. 25-10534

other contexts." *Id.* at 210. So I do not see why we should read *Baker* to reimagine *Mott* and other cases as political question doctrine cases, nor as requiring us to treat *this* case that way.

It would be error to read *Baker* any other way. Obviously, *Mott* was not about the political question doctrine. The political question doctrine did not even exist for at least 100 years after *Mott* was decided. *See* Tara Leigh Grove, *The Lost History of the Political Question Doctrine*, 90 N.Y.U. L. Rev. 1908, 1911 (2015) (explaining that the political question doctrine did not exist until the middle of the twentieth century). Instead, as I have explained, *Mott* was about deference to a presidential determination, because the statute at issue delegated authority to the President to make that determination. *See also supra*, at 85–87. And the *Baker* majority never even mentioned *Ludecke*. So even if it was sensible for *Baker* to draw on *Mott* and other cases to inform certain aspects of the political question doctrine, that does not mean it is sensible for us to read *Baker* as having transmogrified *Mott*, *Ludecke*, and every other case dealing with armed hostilities as political question cases.

ii

Even if the political question doctrine *were* the proper framework for thinking about this issue, I do not see how we could set aside the President's determination as "manifestly" unreasonable.

The Supreme Court has held over and over again that the Executive's determination is "conclusive." *See Mott*, 25 U.S. (12 Wheat.) at 30 (holding that the President's determination that there was an invasion was "*conclusive*" (emphasis added)); *Prize Cases*, 67 U.S. (2 Black) at 670 (holding that President Lincoln's determination that "a state of war existed" with the South was "*conclusive*" (emphasis added)); *Sterling*, 287 U.S. at 399 (holding that the Governor's determination that there was an insurrection was "*conclusive*" (emphasis added)); *Moyer*, 212 U.S. at 83 (holding that a

"Governor's declaration that a state of insurrection existed is *conclusive*" (emphasis added)); *see also Luther*, 48 U.S. (7 How.) at 45 (holding that the President is "the sole and exclusive judge of the existence of" an invasion or insurrection). Conclusive means conclusive. The Supreme Court has made that clear even when lower courts have protested that the Executive's determination was utterly absurd. *See supra*, at 88–89 (discussing *Sterling*). So even if we could somehow conclude—despite not knowing the President's evidence—that the odds of invasion are 0.0000000%, we would contravene clear Supreme Court precedent if we were to countermand his determination.

How do *amici* escape 200 years of precedent saying the President's determination is conclusive? One way is by ignoring it. One can search *amici*'s brief in vain for any reference to *Martin v. Mott*, *Moyer v. Peabody*, or *Luther v. Borden*. The other way is by seizing on *dicta* in *Baker* to contend that courts can second-guess the political branches' resolution of a political question if it is "an obvious mistake," 369 U.S. at 214, or "manifestly" wrong, *id.* at 217.

That *dicta* cannot be taken to have overruled centuries of Supreme Court precedent holding the President's determination is conclusive. After all, *amici* have pointed to precisely zero cases in the 63 years since *Baker* where the Supreme Court has actually found *Baker*'s *dicta* satisfied. Instead, the Supreme Court routinely applies Baker without reference to its *dicta*. Recently, in *Rucho v. Common Cause*, 588 U.S. 684 (2019), for example, after the Supreme Court held that partisan gerrymandering involved a political question, the Court did not go on to analyze whether the partisan gerrymandering at issue constituted such a "manifestly unauthorized exercise of power" that the Court could wade into the dispute, *Baker*, 369 U.S. at 217. Nor did the Court suggest the North Carolina or Maryland legislatures had somehow made an "obvious mistake" in drawing their

No. 25-10534

districting maps. *Id.* at 214 (quotation omitted). On the contrary, the Court rejected the dissent's suggestions that at some point a partisan gerrymander was simply "too much," *Rucho*, 588 U.S. at 716, and that the Court could intervene because it simply had to in order to counteract what the dissent saw as extraordinarily problematic political behavior, *id.* at 718. Instead, the Court held that because the political question doctrine was implicated, it had to stay out—no matter how bad the political actors' exercise of political judgment might have been.

That makes sense. After all, how could the Court conclude that an issue was absolutely, positively committed to the political branches because it involved a matter utterly unfit for judicial resolution—and then go on to hold that judges can nonetheless step in and resolve the political question if the political branches made a *really bad* political decision? If there is *no* judicially discoverable or manageable standard for resolving a particular dispute—such that the political question doctrine applies in the first place—how could it also be true that courts can decide whether a particular political judgment is reasonable? And if there is a demonstrable textual commitment to another branch, how could it be consistent with the separation of powers to answer a political question simply because the courts believe the political branches got it wrong? I do not know. And *amici* provide no answers.

So what does *Baker*'s dicta mean if not what *amici* say? *Baker* is reminiscent of the *dicta* in *Teague v. Lane*, 489 U.S. 288 (1989). *Teague* famously held that "a new rule of criminal procedure ordinarily does not apply retroactively on federal collateral review." *Edwards v. Vannoy*, 593 U.S. 255, 258 (2021). Then the *Teague* Court created a hypothetical exception: A new procedural rule might apply retroactively if it "constitutes a 'watershed' rule of criminal procedure." *Id.* at 264 (quoting *Teague*, 489 U.S. at 311 (plurality opinion)).

No. 25-10534

For years courts, lawyers, and scholars debated what sort of watershed rule might satisfy the *Teague* exception. Then, more than three decades after *Teague*, the Court told us that the exception is empty and that *Teague*'s dicta covered nothing. As the Court explained *Edwards v. Vannoy*, "in the 32 years since *Teague*, . . . the Court ha[d] *never* found that any new procedural rule actually satisfie[d] th[e] purported exception." *Ibid.*; *see also id.* at 267–68. So the Court decided to "make explicit what ha[d] become increasingly apparent": The purported "exception" was "moribund." *Id.* at 272.

So perhaps *amici* are right that the Supreme Court has left "a door ajar" in *Baker*, "hold[ing] out the possibility that someone, someday might walk through it—though no one ever has." *Edwards*, 593 U.S. at 282–83 (Gorsuch, J., concurring). But for over 60 years, the Court has refused to find that any decision committed to the political branches and unfit for judicial resolution was so wrong that the judiciary could step in and countermand the political decision.

iii

In any event, we cannot conclude the President's determination is "manifestly" unreasonable in this case for at least four additional reasons.

First, we do not know the President's evidence. The President need not—and often should not—disclose the national-security secrets upon which he is relying. *See supra*, at 82–84. That is as true today as it was during the Adams Administration; and the President's reluctance to disclose every bit of national-security evidence underlying his decisions does not mean he has no evidence. *See supra*, at 61. The President may simply be withholding the evidence because he thinks it may endanger government employees, or because he thinks it may escalate international tensions, or because of literally anything else that prudence and wise administration might require. *See supra*, at 82–84. Or perhaps disclosure of that intelligence would undermine other

executive priorities, like tracking and arresting TdA's leaders. *See supra*, at 75–76. Our constitutional order entrusts these considerations *to him. See Chicago & S. Air Lines*, 333 U.S. at 111. But if we do not know the President's evidence (and we have no authority to require him to show it to us), how in the world can we hold the President's conclusion from that evidence is manifestly wrong?

Second, federal judges have no competence to hold the President's determinations manifestly wrong. The AEA does not give the President authority only when an invasion or predatory incursion actually occurs. It gives the President authority whenever an invasion or predatory incursion is "attempted" or even "*threatened*." 50 U.S.C. § 21 (emphasis added). So even if whatever TdA is doing is not an "invasion" or "predatory incursion," it does not matter. What matters is whether Venezuela is *threatening* an invasion. Answering that question "involve[s] large elements of prophecy." *Chicago & S. Air Lines*, 333 U.S. at 111. And we do not live in the days of Samuel, when the roles of prophet and judge were united. *See 1 Samuel* 7:15–17 (ESV). Under our constitutional order, judges must leave "*full* responsibility for" making this predictive judgment involving sensitive issues of national security "where the Congress has constitutionally placed it—on the President of the United States." *Ludecke*, 335 U.S. at 173 (emphasis added); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (questioning the courts' ability to override a "[p]redictive judgment" of the Executive Branch in matters implicating national security).

Third, *amici* seem to think there is a clear, judicially determinable line between ordinary criminal activity and war-like hostilities. *See* Br. for Brennan Center at 4. But that line is a figment of *amici*'s imagination.

Take perhaps the most obvious example: terrorism. "Prior to the 1990s, terrorism was addressed primarily through the lens of criminal law."

Robert Chesney & Jack Goldsmith, *Terrorism and the Convergence of Criminal and Military Detention Models*, 60 STAN. L. REV. 1079, 1094 (2008). Thus, "[t]errorist acts were criminal acts." *Ibid.* But over time, the failures of "[t]he traditional criminal approach" to deter terrorism became "obvious." *Id.* at 1096. Given the sheer "scale" of terrorist attacks, government officials began to deem an "armed-conflict model" more appropriate. *Id.* at 1095.

Another example is much older: civil war. As the Supreme Court explained in the *Prize Cases*, subversive activity rises from the level of individual criminal treason to the level of a full-scale civil war "by its accidents—the number, power, and organization of the persons who originate and carry it on." 67 U.S. (2 Black) at 666.

These two examples reveal that drawing lines between mere crime (the concern of the criminal law) and dangerous hostilities (the concern of national security) requires military expertise, not legal analysis. *Cf. Luther*, 48 U.S. (7 How.) at 45 (leaving to the State the power to determine whether "an armed insurrection" within the State was "too strong to be controlled by the civil authority" but instead required "military" response); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Court[s] would hardly be competent to undertake assessments of varying degrees of friendliness or its absence."). And that makes sense because crime, terrorism, and war are not the furniture of the universe. *See* Bradley & Goldsmith, *supra*, at 2054 (There is no "metaphysical test for war."); *cf.* THE FURNITURE OF THE WORLD: ESSAYS IN ONTOLOGY AND METAPHYSICS (Guillermo Hurtado & Oscar Nudler eds. 2012). Federal judges do our Nation a disservice when we employ "subtle definitions and ingenious sophisms" to determine whether "a war" "exist[s]" in a "technical" sense, "and thus cripple the arm of the Government and paralyze its power." *Prize Cases*, 67 U.S. (2 Black) at 669–70.

No. 25-10534

Fourth, suppose everything I have said is wrong. Is it so clear that what Venezuela is doing is *not* an invasion or predatory incursion?

As I explained earlier, Venezuelan aliens who are TdA members have taken over apartment complexes and killed civilians. *See supra*, at 72–75. Venezuela has given TdA the "green light" to slaughter law enforcement, and Venezuelan agents have done so. *Ibid.* All in all, TdA's organization, violence, and sophistication have made it a unique threat to the public safety—unlike any mere "gang" known to the Federal Government. *Ibid.*

True, the attacks I described above have not taken place upon military targets; they have taken place primarily upon civilian and commercial targets. But so too with many terrorist attacks—and no one doubts that those call for military responses. *See supra*, at 118–19. And at the time the AEA was passed, the law was clear that attacks upon civilian and commercial targets could still constitute armed hostilities. As I discussed earlier, the French privateers attacked and seized merchant ships. *See* DeConde, *supra*, at 8–9, 127; *see also* Grotius, On the Rights of War and Peace: An Abridged Translation 405 (William Whewell trans. 1853) (1625) (lamenting the fact that privateering often did "not hurt the general body of the enemy, . . . but the innocent"). Those attacks primarily affected American *commerce*. *See* Elkins & McKitrick, *supra*, at 645 (explaining the massive effects the French privateers had on American commerce); *see also ante*, at 18 n.6 (noting that President Adams called the actions of the privateers "an unequivocal act of war on the commerce of the United States" (quotation omitted)). Moreover, the attacks resembled pure, unadulterated crime more than anything else. *See supra*, at 57. Nevertheless, they were deemed acts of war. *See supra*, at 57–63.

The AEA's plain text contemplates such attacks upon civilian targets. As Secretary of State Timothy Pickering wrote, "*predatory incursions* of the

No. 25-10534

French" might only "occasion great destruction of property." Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798) (emphasis added). And the Founders understood that "foreign *invaders*" might sometimes "seize the naked and defenseless" rather than military targets. THE FEDERALIST NO. 25, at 166 (Alexander Hamilton). So it is unclear why it matters that TdA has attacked civilians. And it should be especially hard to disregard TdA's violent attacks when they have not even been limited to "the naked and defenseless." *Ibid.*; *see also supra*, at 74 (noting that TdA members have been given the "green light" from leadership to kill U.S. law enforcement).

Consider also the role "mass illegal migration" plays here. 90 Fed. Reg. at 13033 (discussing "mass illegal migration to the United States"). The history of the AEA shows that mass immigration is at bare minimum a relevant consideration in identifying whether an invasion is threatened and in planning the appropriate response. As I explained earlier, the AEA was partially grounded in worries about "the great number of" French "aliens" residing in the United States. 8 ANNALS OF CONG. at 1577 (Rep. Sitgreaves). Federalists feared that among those aliens were innumerable "agents and spies spread all over the country." *Id.* at 1574 (Rep. Rutledge); *see also supra*, at 64–65. Those agents and spies increased the risks associated with an invasion. *See supra*, at 64–65. So for national-security purposes, detentions and removals had to happen at once. *See id.* at 1577 (Rep. Sitgreaves).

So too here. The President might sensibly deem that mass immigration from a country like Venezuela raises concerns about threatened incursions or invasions. Today, as in the 1790s, the President of the United States is entitled to determine that enemy aliens in our country will "join" in a sudden "attack" by other forces. 8 ANNALS OF CONG. at 1791 (Rep.

No. 25-10534

Otis). That is his decision and his alone. *See Chicago & S. Air Lines*, 333 U.S. at 111.

*

At bottom, today's decision boils down to this: The majority, plaintiffs, and *amici* all urge that we cannot trust the President. On their telling, the President may abuse his authority, so the court must usurp it.

That is a grave mistake. "[N]o doubt" the "powers" granted by the AEA to the President "may be abused." *Ludecke*, 335 U.S. at 172. "[B]ut that is a bad reason for having judges supervise their exercise." *Ibid.* "[T]here is no power which is not susceptible of abuse." *Mott*, 25 U.S. (12 Wheat.) at 32. That includes the power the majority arrogates for itself today.

## B

Next, take the plaintiffs' claim that TdA is not itself a government or nation under the AEA. That is true but irrelevant. All that matters is that (1) President Trump identified a foreign nation or government—Venezuela—and that satisfies the AEA. It does *not* matter that (2) the plaintiffs, or anyone else not sitting in the Oval Office, want to debate *how* Venezuela does or does not threaten or effectuate its predatory incursions into the United States.

### 1

Let's start with what matters. In relevant part, the AEA requires the President to make a two-part proclamation. He must (a) identify "any foreign nation or government." 50 U.S.C. § 21. And he must (b) identify any actual or threatened "invasion or predatory incursion" by that foreign nation or government. *Ibid.*

President Trump's Proclamation does both. First, the President identifies Venezuela as the foreign nation or government. He mentions

No. 25-10534

Venezuela eight times. And he mentions Venezuela's Nicolas Maduro, and Maduro's regime, seven times. Thus, he identified "any foreign nation or government." *Ibid.*[17]

---

[17] Neither the plaintiffs nor the majority dispute that the Maduro regime qualifies as a "government" for purposes of the AEA, even in the absence of a formal recognition by President Trump of Maduro's legitimacy. So I take it that issue is now settled. And for good reason. As an initial matter, the AEA's text says nothing about formal recognition. The text of the AEA is broad: It includes "*any* foreign nation or government" within its scope. 50 U.S.C. § 21 (emphasis added). Nothing in the text clearly limits itself to only formally recognized governments or nations.

That makes sense given the historical background. The AEA, as I have explained, responded to the situation with revolutionary France. But the Founders realized what all the world knew about revolutionary France: The "government" of France was in constant flux. *See* DeConde, *supra*, at 30 (quoting President Adams saying that the French could no more maintain their form of government "than a snowball c[ould] exist a whole week in the streets of Philadelphia under a burning sun"). True, President Washington had recognized the then-current Revolutionary Government when he received their minister, Citizen Genet, in 1793. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 24 (2015). But the predominant Girondin faction to which Genet belonged would soon lose control of France. With Robespierre's rise to power and the onset of the Terror, "[m]ost of the leading Girondins would go to the guillotine by the end of the year." Elkins & McKitrick, *supra*, at 354. By mid-1794, though, Robespierre himself had been executed. *Id.* at 506.

Shortly thereafter, the Directory took control. But the Directory hardly proved a model of stability. In September of 1797, in a *coup d'etat*, the Directory used military force to "nullif[y]" the elections of earlier in the year, eliminating nearly 200 new legislative deputies and purging two members of the Directory. Elkins & McKitrick, *supra*, at 569; *see id.* at 669. And in 1798, another *coup d'etat* resulted in the purging of 100 opposition candidates. *Id.* at 669. At the same time, a talented young general, Napoleon Bonaparte, was already off "making his own foreign policy." *Id.* at 570. Indeed, "[i]t was Bonaparte and not his government that made" a treaty with Austria in October 1797, which involved the "bartering of territory." *Ibid.* But forming a treaty was a sovereign act, and generally only the sovereign representative of the nation could enter a treaty "in the name of the state he represent[ed]." Vattel, *supra*, bk. 2, ch. 12, § 154; *see also* Elkins & McKitrick, *supra*, at 340 ("Treaties were made with nations.").

In the midst of all this turmoil, in 1798, President Adams "refused to accept" the diplomatic "credentials" of the recently appointed "Consul General for the French Republic," Victor Marie DuPont. DeConde, *supra*, at 87. And the United States would

No. 25-10534

Second, President Trump identified numerous aspects of the invasion or predatory incursion perpetuated and/or threatened by Venezuela. The President proclaimed that Venezuela is a "hybrid criminal state." 90 Fed. Reg. at 13033. What does that mean? President Trump tells you: It means that Venezuela uses its official, taxpayer-funded military and law enforcement apparatuses *combined with* "transnational criminal organizations, including TdA," to wage war beyond its borders. *Ibid.*; *see also* Red Br. at 48 ("TdA is part of Venezuela's hybrid criminal state."). So it is true that TdA is *an arm* of Venezuela's hybrid criminal state—just like the French privateers were arms of France's Revolutionary government. It is true that Venezuela uses TdA—just as France used the privateers—to threaten an invasion or predatory incursion against the United States. And it is true that TdA has perpetuated grave acts of violence at the behest of the

---

soon begin to question new diplomatic efforts out of fear that the present government in France might soon fall. *See* ELKINS & MCKITRICK, *supra*, at 637. Those fears were well grounded. By the time the new batch of envoys arrived in France, Napoleon had a new French Consulate with himself as the first consul and "master of France." *Id.* at 678–79; *see also id.* at 670.

Finally, we should take care before employing formalisms to restrict the President's authority to respond to national security threats. *Cf. Prize Cases*, 67 U.S. (2 Black) at 669–70. The President must "exercise[e] the executive authority in a world that presents each day some new challenge with which he must deal." *Dames & Moore v. Regan*, 453 U.S. 654, 662 (1981); *see also Haig v. Agee*, 453 U.S. 280, 291 (1981) ("underscor[ing]" "the volatile nature of problems confronting the Executive in foreign policy and national defense"); THE FEDERALIST NO. 23, at 153 (Alexander Hamilton) (similar). And he may have extraordinarily good reasons to meet the threat posed by an invading but unrecognized foreign regime claiming to *represent* a state—or an invading but unrecognized foreign entity claiming to *be* a state—without according all the benefits that come with recognition. *See Kerry*, 576 U.S. at 11. "[I]t would be anomalous if the Executive's decision to withhold recognition from a foreign political entity . . . invested that entity" and its so-called citizens with "greater" protections from removal under the AEA than a recognized sovereign and its citizens enjoy. *Cf. Fuld v. Palestinian Liberation Org.*, 145 S. Ct. 2090, 2113 (2025) (Thomas, J., concurring in the judgment).

No. 25-10534

government in Caracas—just as the privateers perpetuated violence at the behest of the Directory in Paris's Luxembourg Palace.

The plaintiffs' claim that TdA is not itself a foreign nation or government thus conflates two distinct requirements in the AEA. TdA need not be a foreign nation or government because Venezuela is. Rather, TdA is relevant because Venezuela uses that foreign terrorist organization as *an arm* of the hybrid criminal state to perpetuate actual and threatened invasions and predatory incursions into the United States. Thus, Venezuela meets the AEA's first statutory prerequisite; TdA is relevant only for the second one.

2

To avoid this simple conclusion, the plaintiffs offer three contentions. First, they say that TdA is made up of private actors. Second, they say that French privateers had letters of marque. Third, they dispute any connection between TdA and Venezuela. All are red herrings.

First, it does not matter that TdA is made up of otherwise private actors. The AEA contemplates that. At the time the AEA was passed, the use of privateers, privately owned and operated ships, was a familiar and important feature of military activity. And France's use of privateers to conduct hostilities against the United States was one of the very problems leading to the enactment of the AEA. *See supra*, at 57–66. Because the conduct of the privateers was authorized by France, the Supreme Court had no problem recognizing that America *and France* were "enemies" "at war" with each other. *Bas*, 4 U.S. (4 Dall.) at 41–42 (opinion of Washington, J.). So we should recognize what Americans recognized at the time the AEA was passed: "[H]ostile nation[s] or government[s]" may use a variety of actors to engage in hostilities against the United States. 50 U.S.C. § 21.

Second, it does not matter that the French privateers had letters of marque. Just because privateers had one *specific* kind of relationship with the

No. 25-10534

sovereign—which depended on issuance of a letter of marque—does not mean that without a letter of marque, no private actor could ever be deemed to act on behalf of the sovereign. After all, privateers were not the only kind of otherwise private actors that sovereigns used for military purposes in the eighteenth century. *See, e.g.*, *ante*, at 36 n.8 (discussing the use of pirates by the Barbary States); Alex J. Whitman, *From the Shores of Tripoli to the Deserts of Iraq: Congress and the President in Offensive and Defensive Wars*, 13 U. Pa. J. Const. L. 1363, 1374–75 (2011) (same). The use of mercenaries, who agreed "to serve the state for money, or a stipulated pay," was also commonplace. *See* Vattel, *supra*, bk. 3, ch. 2, § 13; *see also ante*, at 37 (discussing the use of German mercenaries by Great Britain during the American Revolution). They obviously did not possess a letter of marque or any other formal, public documentation. They just entered into an ordinary contract, just like any other private citizen might. *See* Vattel, *supra*, bk. 3, ch. 2, § 13; *see also* Cornelius Van Bynkershoek, A Treatise on the Law of War 177-78 (Peter Stephen Du Ponceau trans., 1810) (explaining that it was "equally" "lawful" "to contract for the hiring of soldiers . . . , as to make any other contract, and carry on any kind of trade"). So what mattered was not some formal, public documentation. What mattered was whether the "hostilities" were authorized or "unauthorized" by the sovereign. 1 William Blackstone Commentaries *249. If the former, the sovereign was deemed "partner" in "[w]hatever hostilities" may have been "committed by" the otherwise "private citizens." *Ibid.* If the latter, the actors were "treated like pirates and robbers." *Ibid.*

Any contrary understanding would raise severe national security risks. Even today, sovereigns use otherwise private actors to achieve military objectives. *See* Nicholas Parrillo, *The De-Privatization of American Warfare: How the U.S. Government Used, Regulated, and Ultimately Abandoned Privateering in the Nineteenth Century*, 19 Yale J.L. & Humanities 1, 2–

No. 25-10534

3 (2007) (discussing the U.S.'s use of "private contractors" for military operations in Iraq). During our involvement in Iraq, for example, the United States made use of a private military contractor, Blackwater Security Consulting. *Id.* at 2. Blackwater "commandos . . . wield[ed] machine guns and [were] supported by their company's own helicopters" while "repell[ing] an attack on U.S. headquarters in Najaf by hundreds of Iraqi militiamen." *Ibid.*

So suppose Iran unleashed a bunch of Hezbollah operatives into Texas. Or suppose Syria sent ISIS terrorists to New York. Would anyone seriously contest that such activity was *private* and not properly ascribed to a sovereign nation—such that the President would have no authority under the AEA—simply because the actors might lack a letter of marque or other formal, public documentation? Obviously not.

These hypotheticals illustrate a critical point. There are innumerable relationships a sovereign may form with some actor that may compromise our national security. No one—least of all federal judges—can possibly anticipate all the dangers that may arise. *Boumediene v. Bush*, 553 U.S. 723, 797 (2008) ("Unlike the President[,] . . . most federal judges" do not "begin the day with briefings that may describe new and serious threats to our Nation and its people."); *see also* THE FEDERALIST NO. 23, at 153 (Alexander Hamilton) ("[I]t is impossible to foresee or to define the extent and variety of national exigencies . . . The circumstances that endanger the safety of nations are infinite."). So we should be cautious before applying legal formalisms that sound nice in the safety and comfort of our judicial chambers to "cripple" the President's ability to protect our country from danger. *Prize Cases*, 67 U.S. (2 Black) at 669–70.

Third, it does not matter that plaintiffs dispute the connection between Venezuela and TdA. For example, the ACLU objects that "17 of 18

No. 25-10534

national security agencies concluded that it is 'highly unlikely' that Venezuela cooperates with TdA." Gray Br. at 1. But that turns Article II on its head. The President—and the President alone—is the Commander in Chief. He uses innumerable auxiliaries to take care that the laws be faithfully executed. But at no point are those auxiliaries somehow superior to the President himself. *See* 50 U.S.C. § 21; *cf. Myers v. United States*, 272 U.S. 52, 133 (1926); *Trump v. United States*, 603 U.S. 593, 639–40 (2024). So why in the world would we think the President's minions—who exercise authority only "on his behalf," *Seila Law*, 591 U.S. at 204—get to contradict the national security determinations of the President himself? It is the height of nonsense to say that the servant controls the master, just as it is to say that President's advisors somehow get to countermand the President. And it is particularly ironic to point to 17 intelligence agencies to undermine the President's judgments, given recent controversies over the politicization of the intelligence community. *See, e.g., Crawford on the Release of the HPSCI Majority Staff Report Providing the Unprecedented & Overdue Truth on the Russia Collusion Hoax*, H. Permanent Select Comm. on Intel. (July 23, 2025), https://perma.cc/CX6Y-TS3P.

All that matters is that the President publicly proclaimed that a "hostile government or nation"—the "hybrid criminal state" of Venezuela, 90 Fed. Reg. at 13033—is "perpetrat[ing]" or "threaten[ing]" an "invasion or predatory incursion," 50 U.S.C. § 21. It does not matter that the majority disagrees with the *reasons* the President has publicly offered, which turn in part on the relationship between TdA and Venezuela. *See ante*, at 32–37. The statute empowers President Trump to decide whether Venezuela is perpetrating or threatening an invasion. We cannot say that the President's beliefs are unfounded—whether because Venezuela is not sufficiently connected to TdA, or for any other reason.

No. 25-10534

So there is no basis for overriding the President's determination that Venezuela is conducting or threatening an invasion of the United States simply because he has told us Venezuela is relying on TdA to do it.

C

Finally, we reach the last merits issue. The named plaintiffs contest whether they are members of TdA at all. Even if the President's invocation of the Act is lawful as a general matter, the named plaintiffs say they cannot be removed under the AEA. The problem? Under *Ludecke*, the plaintiffs cannot challenge their status as TdA members.

I already discussed *Ludecke* in some depth, so I won't repeat those details here. *See supra*, Part II.A.1; *see also* Part II.A.3.a.i. Under the Proclamation in *Ludecke*, the President declared that only enemy aliens whom the Attorney General deemed to be "dangerous" were subject to removal. 335 U.S. at 163. So Ludecke sought to block his removal on the ground that he was not dangerous. The Supreme Court rejected that argument.

The reason was this: Under the AEA, *all* "citizens . . . of the hostile nation or government" are "liable to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21.[18] So if Ludecke was a citizen of Germany, as all acknowledged, *see Ludecke*, 335 U.S. at 162 & n.3, the AEA made him "liable to be . . . removed as" an "alien enem[y]," 50 U.S.C. § 21. And the AEA gave the President discretion to determine what should happen to "the aliens," like Ludecke, "who become so liable." *Ibid.* But "[t]he very nature of the President's power to order the removal of *all* enemy aliens reject[ed] the notion that courts may pass judgment upon the exercise

---

[18] Of course, there are some limited exceptions not relevant here. *See supra*, at 101.

No. 25-10534

of his discretion." *Ludecke*, 335 U.S. at 164; *cf. Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946) ("Unreviewable power in the President . . . to provide for the removal of[] alien enemies . . . is the essence of the" AEA.). So courts could not pass judgment upon the President's discretionary decision to remove only a subset of alien enemies (those who were dangerous). On the contrary, the President's discretionary power under the AEA did not somehow become "judicially reviewable" simply "because the President cho[se] to have that power exercised within narrower limits than Congress authorized." *Ludecke*, 335 U.S. at 166.[19] Thus, Ludecke could not challenge whether he was *dangerous*, since that challenge would just be a product of the President's discretionary choice to exercise his power "within narrower limits than Congress authorized." *Ibid.* Ludecke could challenge only whether he was German, since that made him liable to be removed as an alien enemy under the Act.

*Ludecke* controls this issue. Under that decision, the named plaintiffs can challenge only whether they are Venezuelan. As explained, the President's proclamation declares that Venezuela is perpetrating or threatening an invasion. *See supra*, Part II.B. So all Venezuelan citizens are liable to be removed as alien enemies under the Act. *But cf. supra*, at 11 n.5. The fact that President Trump exercised his discretion to remove only a subset of Venezuelans (Venezuelans who are dangerous TdA members) does "not transmute[]" the President's action "into a judicially reviewable" one. *Ludecke*, 335 U.S. at 166. And how could it be otherwise given *Ludecke*? Recall that President Truman exercised his discretion to remove only a subset of

---

[19] Of course, the *Ludecke* Court also explained that the Presidential Proclamation made "removal contingent not upon a finding that in fact an alien was 'dangerous,'" but instead on whether the alien was "deemed by the Attorney General to be dangerous." *Id.* at 165. Still, that was an *independent* reason why Ludecke's dangerousness was not judicially reviewable.

Germans (Germans who were dangerous)—and the Court held that decision was wholly committed to the President's discretion. *Ibid. Ludecke* provides no basis for allowing the named plaintiffs to contest their membership in TdA.

True, *J.G.G.* did say that the President's Proclamation "define[s]" "the term 'alien enemy' . . . to include 'all Venezuelan citizens 14 years of age or older who are members of TdA.'" 145 S. Ct. at 1006 (quoting 90 Fed. Reg. at 13034). But I see no reason to read this statement to conflict with *Ludecke.* That would be quite the uncharitable read of the Supreme Court's opinion. And it would contravene Supreme Court precedent because we would be reading *J.G.G.* as overruling a key holding of *Ludecke sub silentio*. *See Shalala*, 529 U.S. at 18 (explaining that the Court does not "overturn, or so dramatically limit, earlier authority *sub silentio*").

That reading of *J.G.G.* would be especially strange here. Just before this sentence, the Supreme Court quoted *Ludecke* for the proposition that an alien may contest only whether he "is *in fact* an alien enemy." *J.G.G.*, 145 S. Ct. at 1006 (quoting *Ludecke*, 335 U.S. at 172 n.17) (emphasis added). So not only did the Supreme Court rely on *Ludecke*; it reaffirmed that aliens may contest only their status *as alien enemies*.

But whether one is an alien enemy is determined by the Act. As I have explained, under the Alien Enemies Act, as *Ludecke* recognized, "*all* natives, citizens, denizens, or subjects of the hostile nation or government" are "alien enemies." 50 U.S.C. § 21 (emphasis added); *see also Ludecke*, 335 U.S. at 164. And here, the "hostile nation or government" is Venezuela. 50 U.S.C. § 21. That is true even if the President's Proclamation is read as attempting to set out a narrower definition of "alien enemy." The AEA's plain meaning controls. *See Loper Bright*, 603 U.S. at 394; *see also J.G.G.*, 145 S. Ct. at 1006

No. 25-10534

(explaining that courts may resolve "questions of interpretation" concerning the AEA (quotation omitted)). So this challenge is foreclosed.[20]

## D

I now turn to the remaining preliminary-injunction factors. To obtain a preliminary injunction, the named plaintiffs need to make clear showings that (1) they are likely to suffer an irreparable injury and that (2) the balance of equities and the public interest tip in their favor. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).[21] They fail at both steps.

### 1

Start with irreparable injury.

#### a

The irreparable injury requirement is "an essential feature" of the preliminary injunction. Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 825 (2025). That is because the purpose of the preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Or in other words, the point "is to ensure that, at the end of the case, the court can still grant an adequate remedy." *Del. State*

---

[20] Admittedly, the unpublished circuit court precedent discussed *supra*, at 95–96, *United States v. Williams*, might suggest courts can review whether one is subject to the presidential proclamation as well. But as even the authors of the essay that unearthed *Williams* recognize, *Williams* runs straight into *Ludecke* on this front. *See* Neuman & Hobson, *supra*, at 43–44. What's more, a single unpublished circuit court opinion cannot override Supreme Court precedent.

[21] "Generally, 'when the Government is the opposing party,' the balance of equities and the public interest 'merge.' So I analyze them together." *Texas*, 144 F.4th at 736 n.23 (Oldham, J., dissenting) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *see also Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 254 (5th Cir. 2024) (explaining these two factors "merge when the government opposes an injunction").

No. 25-10534

*Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (2025); *see also Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975) ("[T]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.").

That is why the "key word . . . is *irreparable.*" *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (emphasis added) (quotation omitted). The animating rationale is not how "substantial" the plaintiffs' injuries are. *Ibid.* As has been true for centuries, the court's inquiry must instead focus on whether the plaintiff will suffer irreversible damage before the court can hear his claims on the merits and issue final relief. *See Georgia v. Brailsford*, 2 U.S. (2 Dall.) 402, 407 (1792) (opinion of Blair, J.) ("[So] that an injury may not be done, which it may be out of our power to repair, the injunction ought, I think, to issue, till we are enabled, by a full enquiry, to decide upon the whole merits of the case."). Therefore, the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation," weighs heavily against a claim of irreparable harm. *Sampson*, 415 U.S. at 90 (quotation omitted).

b

"The Supreme Court has rejected the idea that removal automatically constitutes irreparable injury *even to the removed alien.*" *Texas*, 144 F.4th at 736 (Oldham, J., dissenting) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). So the named plaintiffs claim that their AEA removals to El Salvador cannot be undone. *See* Blue Br. at 54. But they have failed to show irreparable injury for two reasons.

First, the Government has represented in briefs, affidavits, and at oral argument in this case that it will not conduct AEA removals of any alien who

No. 25-10534

files a habeas petition until his judicial proceedings are complete. *See, e.g.*, Red Br. at 17 ("Aliens who petition for habeas will not be removed until that petition is resolved."); *id.* at 50 ("Thereafter, the alien then has at least seven days to choose to file a habeas petition. If the alien does so, he will not be removed under the AEA until that petition is adjudicated." (quotations omitted)); Carlos Cisneros Decl. ¶ 11 ("[I]n a general case, ICE will not remove under the AEA an alien who has filed a habeas petition while that petition is pending."); Oral Arg. at 38:42–46 ("And once you file [a habeas petition], the Government is committed not to removing you pending the adjudication of that.").

The Government's pending-petition policy means that the named plaintiffs face no irreparable harm at all. Simply put, no preliminary injunction is needed to hear this claim on the merits and grant effectual relief later. The named plaintiffs have filed habeas petitions. ROA.342. So under the policy, the Government will not remove them until their petitions are adjudicated in an Article III court. *See* Yousuf Khan Decl. ¶ 13 ("ICE does not intend to remove A.A.R.P., W.M.M., or F.G.M. under the AEA while their habeas petitions are pending."). Thus, an injunction "to preserve the relative positions of the parties until a trial on the merits can be held," *Starbucks*, 602 U.S. at 346 (quotation omitted), is redundant: It does nothing to further preserve the court's ability to provide habeas relief at the end of the case.

Second, the named plaintiffs fail to show irreparable injury even without the pending-petition policy. That is because an injunction against AEA removal would not stop the Government from removing the named plaintiffs to El Salvador "under other lawful authorities" such as the INA. *A.A.R.P.*, 145 S. Ct. at 1370. For example, the Secretary of State has designated TdA as a foreign terrorist organization pursuant to 8 U.S.C. § 1189(a). *See* 90 Fed. Reg. at 13033. That designation makes TdA members

No. 25-10534

inadmissible, *see* 8 U.S.C. § 1182(a)(3)(B), and removable, *see id.* § 1227(a)(4)(B). And it likely authorizes the Government to remove TdA members to El Salvador even though they are Venezuelan nationals. *See id.* § 1231(b)(2)(C)(iv), (b)(2)(E)(vii), (b)(3)(B)(iv).

The named plaintiffs reply that many noncitizens "are not removable at all absent the [AEA] Proclamation, because the government is enforcing it against people who have lawful status in the U.S." Gray Br. at 28. That is irrelevant. The named plaintiffs have not made a clear showing that *they* have lawful status and are not removable under other authorities. So they have not established an irreparable injury necessitating the protection of a preliminary injunction against enforcement of the AEA. And we are not tasked with deciding the merits of removal under the AEA as to any other parties. *See infra*, Part II.E.

c

The majority's response is unavailing. It argues the Supreme Court has already explained that "[i]f Petitioners are removed based on the alleged improper invocation of AEA, there is little potential for effective relief." *Ante*, at 40 (citing *A.A.R.P.*, 145 S. Ct. at 1368).

i

That is a big *if*. As I have already explained, under the pending-petition policy, the petitioners will not be removed without an opportunity to vindicate their habeas petitions. So it is irrelevant that if some other alien was removed before that policy. And it is irrelevant what harms hypothetical aliens could suffer in a hypothetical universe. *These* plaintiffs under *this* policy cannot possibly suffer any injury, much less irreparable injury.

The majority nonetheless ignores the Government's representations about the pending-petition policy. The majority argues that the "authority

No. 25-10534

cited" in the Government's brief "contains no such promise," that the Government "cites nothing else to this court to indicate a commitment not to remove if there are pending habeas proceedings," and that the Government does not "urge" us to "rely on the representations [it] made in district court." *Ante*, at 41.

That's puzzling. There is ample support in the record for the existence of the pending-petition policy. *See supra*, at 133–34. Regardless, the Government need not cite an "authority" nor rely on "assurances" to the district court. *Ante*, at 41. The Government has repeatedly represented *to this court*—twice in its briefing and once at oral argument—that it is "committed" to the pending-petition policy. Oral Arg. at 38:42–46. Do we think its lawyers are lying? If they are, I suppose they should be sanctioned. But it is astounding to say that lawyers from the United States Department of Justice are lying. And more to the point, in-court representations from DOJ lawyers have been more than enough for the Supreme Court.[22] *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 529–31 (2003) (relying on Solicitor General's representation of Government statistics to uphold no-bail detention provision of the INA); *Munaf v. Geren*, 553 U.S. 674, 702 (2008) ("[T]he Solicitor General states that it is the policy of the United States *not* to transfer an individual in circumstances where torture is likely to result."); *Nken*, 556

---

[22] The majority also argues that the Supreme Court's decision to issue an injunction to the named petitioners in *A.A.R.P.* "impl[ies] that the named Petitioners faced irreparable harm despite the Government's assurances." *Ante*, at 41 (citing *A.A.R.P.*, 145 S. Ct. at 1369–70). I am not so sure we can infer that conclusion. The Court only issued the injunction "to preserve [its] jurisdiction" over the case. *A.A.R.P.*, 145 S. Ct. at 1369. And then it asked us to decide if the named plaintiffs will suffer irreparable injury on remand. *Id.* at 1370. Inferring that the Supreme Court agrees that the named plaintiffs face irreparable harm "despite the Government's assurances" requires *also* inferring that the Court asked us to answer a question the Court already answered for us. *Ante*, at 41. We should not assume that the Court's remands are so meaningless.

No. 25-10534

U.S. at 435 (relying on Solicitor General's representation in its brief that "[a]liens who are removed may continue to pursue their petitions for review, and those who prevail can be afforded effective relief by facilitation of their return"); *CASA*, 145 S. Ct. at 2561 n. 18 (crediting the Solicitor General's statement at oral argument "that the Government will respect both the judgments and the opinions of this Court"). It is odd that today's majority apparently has a higher standard of proof than the Supreme Court does—and yet somehow does not want to sanction or disbar the DOJ lawyers it disbelieves.[23]

The majority's disbelief of DOJ also conflicts with the presumption of regularity. Not only do we credit the representations lawyers make in court. *See DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974) ("[It has] been the settled practice of the Court . . . fully to accept representations such as these as parameters for decision."). But we also employ a heavy presumption that Government officers, including Government lawyers, act in good faith "in the absence of clear evidence to the contrary." *United States v. Chem. Found.*, 272 U.S. 1, 15–16 (1926).

The presumption of regularity is long-standing and pervades multiple areas of law. *See Ross v. Reed*, 14 U.S. 482, 486 (1816) ("It is a general principle to presume that public officers act correctly until the contrary be shown."). It applies in administrative law. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (requiring "a strong showing of bad faith or improper behavior" before "inquir[ing] into the mental processes of administrative" officials); *see also United States v. Morgan*, 313 U.S. 409, 422

---

[23] It is also irrelevant that "no party briefed [what] the effect of" the pending-petition policy representations would be on irreparable harm. *Ante*, at 41. Regardless of how the Government briefs its case, the burden to make a clear showing of irreparable injury lies with the plaintiffs. *See Starbucks*, 602 U.S. at 346.

No. 25-10534

(1941) ("Cabinet officers . . . are assumed to be men of conscience and intellectual discipline."). It applies in criminal prosecution. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (explaining that the "presumption of regularity" attaches to the prosecutorial discretion of federal prosecutors because they "discharge" the President's "constitutional responsibility to 'take Care that the Laws be faithfully executed'" (quoting U.S. Const. art. II, § 3)). It applies in habeas proceedings. *See Nguyen v. Noem*, No. 6:25-CV-057-H, slip op. at 10 (N.D. Tex. Aug. 10, 2025) ("The petitioner in a habeas proceeding bears the burden of displacing the presumption [of regularity]." (*citing Bute v. Illinois*, 333 U.S. 640, 671 (1948)). It applies in high-stakes cases as well as low-stakes cases. *See, e.g.*, *Jordan v. Miss. State Executioner*, No. 25-70013, 2025 WL 1752391, at *2 n.2 (5th Cir. June 24, 2025) (per curiam) (crediting representation that executioner would double check the prisoner's unconsciousness during lethal-injection protocol). And the Supreme Court has already applied it in this very case. *A.A.R.P.*, 145 S. Ct. at 1368 (crediting Government's previous "represent-[ation] elsewhere that it [was] unable to provide for the return of an individual deported in error to a prison in El Salvador").

It is troubling that, here again, the rules for this Administration are different. The majority has offered no reason—let alone clear evidence—to discredit the Government's multiple and consistent representations in this case about the pending-petition policy. So if anything, the majority seems to give this President a presumption of *irregularity*.

In a last-ditch effort, the majority argues it is irrelevant if the named plaintiffs cannot show irreparable injury in their own right. Instead, they can freeride off the putative class members. Per the majority, "the assurances in the district court record extended only to named Petitioners and not to any putative class members." *Ante*, at 41; *see also id.* at 41 n.9. And thus, the majority holds it can issue preliminary relief to *the entire putative class*, named

plaintiffs included. How so? Well, the majority says, *A.A.R.P.* already "reject[ed] the proposition that a class-action defendant may defeat class treatment, if it is otherwise proper, by promising as a matter of grace to treat named plaintiffs differently." *Id.* at 42 (quoting *A.A.R.P.*, 145 S. Ct. at 1369–70.)

That is wrong for at least three reasons.

First, the majority yet again ignores the Government's representations *in this court*. In this court, the Government's representations about the pending-petition policy have not been limited to the named plaintiffs. They have been categorical. *See supra*, at 133–34.

Second, there is no basis for thinking it is appropriate in this appeal to issue preliminary relief to the entire putative class on the AEA claims. The Supreme Court only told us to consider and address the "*named plaintiffs'* underlying habeas claims." *Ante*, at 41 n.9 (emphasis added) (quoting *A.A.R.P.*, 145 S. Ct. at 1370). I will return to this issue in Part II.E, *infra*.

Third, as if that weren't enough, I am not so sure the Supreme Court said in *A.A.R.P.* what the majority thinks it said. All the Supreme Court said was that promises not to remove the named plaintiffs could not "defeat *class treatment*, if it is otherwise proper." 145 S. Ct. at 1369–70 (emphasis added). So presumably, if class counsel could satisfy the other requirements of Rule 23, the fact that the promises were made to plaintiffs alone would not necessarily defeat class certification. The Court said nothing about applying some transitive property of irreparable injury in which the irreparable injuries of putative class members somehow count as irreparable injuries for the named plaintiffs. Nor did the Court say anything about whether putative class members' irreparable injuries can cover for named plaintiffs' failure to establish their own irreparable injuries. At most, the Court issued preliminary relief to protect the named plaintiffs as well as the putative class members

No. 25-10534

without explanation as to how the named plaintiffs themselves might satisfy irreparable injury. But the Court has since explained that "[l]ike a drive-by jurisdictional ruling," its "implicit acquiescence to a broad remedy has no precedential effect." *CASA*, 145 S. Ct. at 2553 n.7 (quotation omitted). So even after *A.A.R.P.*, there is no reason to think an individual can get a preliminary injunction protecting himself without showing that he himself is likely to suffer irreparable injury.

The majority bootstraps the named plaintiffs out of their failure to show irreparable harm by attaching their claims to the putative class's injuries, even though the Supreme Court instructed us to address only the "named plaintiffs' underlying habeas claims." *Ante*, at 41 n.9 (quoting *A.A.R.P.*, 145 S. Ct. at 1370). Then, it creates irreparable harm for the putative class by ignoring the Government's promises in this court that its assurances against removal extend to the putative class members. *Ibid.* In short, this doubly flawed logic generates irreparable harm for both plaintiff groups out of thin air.

ii

In any event, the named plaintiffs have not made a clear showing that the Government would be unable to provide for their return from El Salvador even if they are improperly removed there. The majority points only to the fact that months ago the "Government ha[d] represented elsewhere," *i.e.*, in the *Abrego Garcia* case, "that it [was] unable to provide for the return of an individual deported in error to a prison in El Salvador." *Ante*, at 40 (quoting *A.A.R.P.*, 145 S. Ct. at 1368).

But the circumstances are different today: The Government has provided for Abrego Garcia's return to the United States. *See Abrego Garcia v. Noem*, No. 25-CV-00951, 2025 WL 1862255, at *1 (D. Md. July 7, 2025). And the Government recently helped negotiate for the return of 200 AEA

No. 25-10534

deportees from El Salvador to Venezuela in exchange for Americans imprisoned in Venezuela. Julie Turkewitz & Hamed Aleaziz, *Prisoner Swap Frees Americans in Venezuela for Migrants in El Salvador*, N.Y. Times (July 18, 2025), https://perma.cc/GR5B-D495.

Because the Government has not told us anything in this case about whether the named plaintiffs could be returned if removed, we have zero basis for saying any removal would be irremediable. Even the majority agrees that "we do not know" for sure whether "their return could ever be effected." *Ante*, at 40. But that means the named plaintiffs have not made a clear showing that their removal to El Salvador cannot be undone.

2

Last but not least, the balance of the equities and the public interest weigh against a preliminary injunction here. I (a) explain the weighty interests on the Government's side of the ledger, which implicate national security, foreign affairs, and sovereign prerogatives. Then, I (b) weigh those interests against the interests on the other side. Although those are not negligible, they cannot overcome the Government's weighty interests. Finally, I (c) respond to the majority's argument that these factors are somehow irrelevant.

a

The Government has weighty interests in enforcing the AEA against TdA members.

Let me start with the obvious: The Government always has an important interest in enforcing the law. When a federal court improperly enjoins the Executive from carrying out its agenda, the court "intrudes on a coordinate branch of the Government and prevents the Government from enforcing its policies." *CASA*, 145 S. Ct. at 2561 (quotation omitted). That is a form of irreparable injury to the Government. *See id.* at 2562 ("Any time

a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up))); *see also Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State.").

Thus, the Supreme Court has recognized that "[t]here is always a public interest in *prompt* execution of removal[s]." *Nken*, 556 U.S. at 436 (emphasis added). The Government's speedy enforcement of the AEA against the named petitioners furthers that public interest because "the consequence of delay" in removing AEA detainees "is to permit and prolong a continuing violation of United States law." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999). Accordingly, "deportation is necessary" to end these "*ongoing violation*[s]." *Id.* at 491.

Moreover, in this case, that "interest in prompt removal" is "heightened by the circumstances" because these "alien[s] [are] particularly dangerous." *Nken*, 556 U.S. at 436. Members of TdA "commit[] brutal crimes, including murders, kidnappings, extortions, and human, drug, and weapons trafficking." 90 Fed. Reg. at 13033. TdA has taken over multiple apartment complexes in Colorado and Texas, terrorizing and torturing residents; and it has murdered law enforcement officers and innocent citizens. *See supra*, at 72–75. So the interest in prompt removal is especially weighty.

Nor are the threats to public safety posed by TdA members somehow mitigated by their detention. On the contrary, the record shows that TdA members are especially dangerous in prison. A sworn declaration from DHS's Acting Field Office Director for Dallas describes how TdA members "have proven difficult to manage in immigration detention facilities." Decl.

of Joshua D. Johnson ¶ 9. "[O]rganized and coordinated," detained TdA members recently "barricaded both the front and rear entrance doors of their housing units using bed cots," "covered the surveillance cameras and blocked the housing unit windows," and "attempted to flood the housing unit by clogging toilets." *Id.* ¶¶ 9–12. In the process, the TdA members "threatened to take hostages and injure facility contract staff and ICE officers." *Id.* ¶ 9. As a result, the Government transferred the TdA detainees from Bluebonnet to the Prairieland Detention Center in Alvarado. *Ibid.* Preventing the Government from removing the TdA members out of the Nation would allow them to "recruit new TdA members," and would "pose[] a grave risk to ICE personnel; other, nonviolent detainees; and the United States as a whole." *Id.* ¶ 12; *see also supra*, at 71 (discussing TdA's origins as a prison gang).

True, I recognize some might dislike the President's decision to enforce the Nation's immigration laws and secure our borders. But that does not make his interest in doing so any less serious. Rather, it is well settled that the Nation has a "paramount interest in protecting . . . its territorial integrity." *Texas*, 144 F.4th at 736 (Oldham, J., dissenting) (quoting *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004)). Any injunction blocking the President from using his authority under the AEA undermines that interest. *See also Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 582 (2017) (per curiam) ("To prevent the Government from pursuing that objective by enforcing [the statute] against foreign nationals unconnected to the United States would appreciably injure its interests.").

Nor is the interest in protecting our borders abstract. On the contrary, it implicates the most concrete and fundamental governmental interest of all: national security. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." (quotation omitted)); *see also Int'l Refugee Assistance*

No. 25-10534

*Project*, 582 U.S. at 581 ("The interest in preserving national security is an urgent objective of the highest order." (quotation omitted)); *supra*, at 143–44 (explaining that immigration is bound up with national security).

Consider the national security interests at stake here. The Executive has determined that thousands of TdA members—all officially designated foreign terrorists—have "unlawfully infiltrated" the Nation and "are conducting irregular warfare and undertaking hostile actions against the United States" on behalf of the Venezuelan government. 90 Fed. Reg. at 13033. The President has also found that TdA's "campaigns of violence and terror in the United States and internationally are extraordinarily violent, vicious, and similarly threaten the stability of the international order in the Western Hemisphere." Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, Exec. Order No. 14157, 90 Fed. Reg. 8439, 8439 (Jan. 20, 2025). TdA accordingly "present[s] an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Ibid.* For these reasons and more, the Supreme Court has "recognize[d] the significance of the Government's national security interests" in this case. *A.A.R.P.*, 145 S. Ct. at 1368. So should we.

b

The named petitioners offer one real interest on their side of the ledger. They allege they will face "harsh" conditions—even torture—in El Salvador. Blue Br. at 54 (quotation omitted).

I do not deny "there is a public interest in preventing aliens from being wrongfully removed . . . to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. But "it is the policy of the United States *not* to transfer an individual in circumstances where torture is likely to result." *Munaf*, 553 U.S. at 702; *see also* Red Br. at 65 ("[T]he Government does not

remove aliens to countries where it believes they may be tortured."). As Article III judges, we are "not suited to second-guess such determinations" about "sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally." *Munaf*, 553 U.S. at 702.

Thus, although the named petitioners have alleged an interest that is not insubstantial, they come nowhere close to clearly showing that their interests overcome the weighty interests favoring enforcement. *See Starbucks*, 602 U.S. at 346.

c

The majority says that it "cannot rely on the Government's assertion[s]" that the public interest and equities weigh in its favor because the Government's arguments "assume[]" that plaintiffs have been correctly identified as "members of TdA," and "that question" has not yet been "answered in court." *Ante*, at 43. That is a mistake.

The majority's argument reverses the burden of proof. We cannot take as true the plaintiffs' allegations of harm unless and until the Government disproves them. Rather, the *plaintiffs* must "must make a clear showing" that they are entitled to preliminary relief—not only on the first two factors, but also "that the balance of equities tips in [their] favor, *and* that an injunction is in the public interest." *Starbucks*, 602 U.S. at 346 (emphasis added) (quotation omitted). Accordingly, the Supreme Court has repeatedly held that courts cannot issue a preliminary injunction when these factors "tilt[] against" that relief. *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam); *see also Winter v. NRDC*, 555 U.S. 7, 23 (2008). The majority doesn't even pretend to balance the equities and public interests raised by both parties. Instead, it chooses to *disbelieve* the Government's equity and

No. 25-10534

public-interest arguments because it is unsure whether the Government will show that the petitioners are TdA members on the merits.[24]

But preliminary injunctions are just that—*preliminary*. The whole point of preliminary relief is that the court must decide whether to issue an injunction *before* the parties' factual assertions have been conclusively "answered in court." *Ante*, at 43; *see Univ. of Tex.*, 451 U.S. at 395 ("[A] preliminary injunction is customarily granted on the basis of . . . evidence that is less complete than in a trial on the merits."). The Government is "*not required* to prove [its] case in full at a preliminary-injunction hearing"— especially because it is the nonmoving party and doesn't carry the burden of proof. *Ibid.* (emphasis added). All told, it makes little sense for the majority to fault the government for failing to meet some burden. The named plaintiffs' failure to show that the balance of the equities tips in their favor and that a preliminary injunction is in the public interest is an independent reason to deny one today. That is especially true when, as here, the Government's interests in protecting national security and vindicating the sovereign borders of the United States are so powerful.

\*

To win a preliminary injunction against their removal under the AEA, the named petitioners needed to run the table on the preliminary-injunction factors. *See Starbucks*, 602 U.S. at 346. But they cannot clearly establish even a single factor. So by blessing the issuance of a preliminary injunction today, the majority turns the "extraordinary and drastic remedy" of a preliminary

---

[24] Recall again that the Government doesn't have to prove that the petitioners are TdA members to invoke the AEA. As the majority concedes, *see ante*, at 37, the Government could lawfully remove all Venezuelans, *see also supra*, at 129–32, but has chosen to exercise discretion.

No. 25-10534

injunction into an ordinary and trifling one. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quotation omitted).

## E

I would leave the preliminary-injunction analysis there, since I've discussed everything the Supreme Court asked us to address. But the majority goes a step further. Not only does it incorrectly issue a preliminary injunction on the named plaintiffs' AEA claims—it issues a preliminary injunction on the AEA claims for the *entire putative class*. That flatly contradicts the Supreme Court's remand order.

The Supreme Court told us to address the AEA claims only "as to the named plaintiffs." *A.A.R.P.*, 145 S. Ct. at 1370. I do not mean to make the classic mistake of reading the Supreme Court's opinion like a statute. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023). But we are supposed to read Supreme Court opinions "with a careful eye." *Id.* at 374. And even a careless eye would notice that the Supreme Court appeared to deliberately limit our analysis of the AEA claims to the named plaintiffs only. How do we know that? The Supreme Court explicitly noted that we should address the other issue "of what notice is due, as to the putative class." *A.A.R.P.*, 145 S. Ct. at 1370 (emphasis added). So one question asks us to address the entire class; but the other asks us to address only the named plaintiffs.

What else could we make of that line drawing? How can we address the propriety of issuing a preliminary injunction as to the entire putative class's "habeas claims that the AEA does not authorize their removal" when the Supreme Court seems to have deliberately instructed us only to do so "as to the named plaintiffs[]?" *Ibid.*

But that is not all. A careful study of the rest of the Court's opinion reinforces my read of the remand order. True, as the majority notes, the

No. 25-10534

Supreme Court blessed the issuance of a preliminary injunction to a putative class. But it did *not* bless the issuance of a preliminary injunction to a putative class *without reflection*. On the contrary, the Supreme Court suggested that class certification was likely merited on the notice issue—the only claim considered in its temporary injunction decision. *See id.* at 1369 n.\*. In responding to the Government's argument that it would not remove the named plaintiffs, the Court emphasized that "class treatment" should not be "defeat[ed]," "if it is otherwise proper," simply because the Government promises to treat named plaintiffs differently. *Id.* at 1370. But if the Court thought it could issue preliminary injunctive relief to the entire putative class without the propriety of class treatment being remotely relevant, what would be the point of that response? Then, the Court went ahead and suggested class treatment was in fact probably "proper" on the notice claims. *Ibid.* As the Court put it in the very next sentence, it was "skeptical of the self-defeating notion that the right to the *notice* necessary to actually seek habeas relief" had to "*itself* be vindicated through individual habeas petitions." *Ibid.* (quotation omitted). That sounds a whole lot like consideration of the propriety of class treatment. *See also id.* at 1374 (Alito, J., dissenting) ("[I]n order to obtain what the application sought (and what the Court now provides)—*i.e.*, relief for the members of the class that applicants asked to have certified—applicants had to show that they were likely to establish that class relief is available.").

　　Thus, the Supreme Court's opinion strikes me as fully consistent with what seems to be the more sensible read of the law generally: Courts can issue a preliminary injunction to a putative class *only if* the plaintiffs have shown a likelihood of success on class certification. That makes better sense for at least two reasons. First, if the plaintiffs are unlikely to succeed in certifying a class, the putative class members would not be likely to succeed on the merits, and a fundamental requirement of the preliminary-injunction test

No. 25-10534

would not be satisfied. *See id.* at 1374 n.3 (Alito, J., dissenting) ("[T]o consider whether a request for classwide relief is likely to succeed on the merits, a court must at least consider whether class certification is likely.").[25] Second, allowing a preliminary injunction to be issued to a putative class without such analysis would allow a massive "workaround[] to the longstanding principle of equity," recently "vindicated by the Supreme Court—that federal courts may not issue universal injunctions." *Texas*, 144 F.4th at 715 (Oldham, J., dissenting) (discussing *CASA*, 145 S. Ct. at 2553–54). I see no reason to read *A.A.R.P.* to permit courts to issue such extraordinarily broad relief while "circumvent[ing] Rule 23's procedural protections," when that was the very thing the Court decried mere weeks after *A.A.R.P. See CASA*, 145 S. Ct. at 2556.

There is little reason, though, to think the Supreme Court concluded class certification was likely for AEA habeas petitioners. As a general matter, the Supreme Court "has never addressed whether habeas relief can be pursued in a class action." *Jennings v. Rodriguez*, 583 U.S. 281, 324 n.7 (2018) (Thomas, J., concurring in part and concurring in the judgment). And there are substantial reasons to "doubt[] that class relief may be obtained in a habeas proceeding." *A.A.R.P.*, 145 S. Ct. at 1375 (Alito, J., dissenting); *cf. J.G.G.*, 2025 WL 914682, at *35 (Walker, J., dissenting). Those include the fact that the Supreme Court has considered habeas class actions only once after *Jennings*—and it *rejected* them. *See Garland v. Aleman Gonzalez*, 596

---

[25] The dissenting opinion in *A.A.R.P.* may be read to suggest in certain places that the majority implicitly rejected these requirements. But even if that is the proper way to understand what the dissent said, dissenting opinions do not provide authoritative constructions of majority opinions. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023). And the majority opinion indicates that class certification was likely proper *as to the notice issue*.

No. 25-10534

U.S. 543, 546 (2022).[26] So I am skeptical the Supreme Court *sub silentio* blessed class treatment for habeas claims in its emergency *A.A.R.P.* opinion.[27]

Moreover, the district court itself provided several independent reasons why class certification was not warranted in this very case. *See* Dist. Ct. ECF 67 at 23. And the Supreme Court deliberately refrained from addressing any arguments related to class certification as to the specific AEA claims here. *See A.A.R.P.*, 145 S. Ct. at 1369 n.*. So all indications are that the Supreme Court did not conclude that class certification for the AEA claims was likely and thus deliberately limited its remand instructions to us. Thus, we should address the AEA claims *only* as to the named plaintiffs. The majority erred when it took the additional and unnecessary step of considering unnamed parties.

---

[26] Even the most ardent professorial proponents of habeas class actions recognize they were imagined by lower courts during the heady habeas days of the 1970s—an *ancien régime* that has little relevance to modern habeas doctrine more generally. *See* Lee Kovarsky & D. Theodore Rave, *Habeas Class Actions*, 139 Harv. L. Rev. ___ (forthcoming 2026), https://perma.cc/3EAC-YZGD, at 12–13. And even if *all* of the lower courts adopted the strongest form of habeas class actions favored in the faculty lounge, that still would not help the plaintiffs here. That's because the Supreme Court has said that any rule incorporated into habeas must conform to "the history of habeas corpus procedure." *Harris v. Nelson*, 394 U.S. 286, 293 (1969). And there is no way to say that a collective-litigation device created in lower courts in the 1970s meets that standard.

[27] Although the relationship between the nature of the two primary claims here is not entirely clear, the Court treated *only* the AEA claims as the "underlying habeas claims." *A.A.R.P.*, 145 S. Ct. at 1370. The Court never referred to the notice claims as habeas claims. Instead, it treated the notice claims as separate claims that allow detainees to "actually seek habeas relief," not claims that are themselves vindicated by habeas relief. *Ibid.* (quotation omitted).

No. 25-10534

III

The Supreme Court's second instruction on remand asks us to determine the putative class members' notice rights. *See id.* at 1370.[28] The nature of this request is tricky. The Supreme Court did not tell us to address any of the other ordinary preliminary-injunction factors in addressing this issue on appeal. That may be because the Court effectively addressed them as to the notice issue in granting its own "temporary injunctive relief." *Id.* at 1368. But I am not sure. Best I can tell, the Supreme Court directed us to review the district court's constructive denial of a TRO grounded in the notice rights of the putative class. And the only thing we need to address in doing so is the precise scope of their notice rights. But it's hard to address that question in this posture.

First I (A) discuss the complexities of adjudicating the notice rights for the putative class members. Then I (B) explain why the Government's revised notice procedures for putative class members comply with the Due Process Clause and the Supreme Court's instructions in *J.G.G.* and *A.A.R.P.*

A

First, the problems. The Supreme Court itself noted that it was "not optimal" for it "to determine in the first instance the *precise* process necessary" for the Government to satisfy the Due Process Clause's requirements. *Ibid.* Why? Because the Supreme Court is "far removed from the circumstances on the ground." *Ibid.* And "the circumstances on the ground" are absolutely critical. *Ibid.* The process due in any given case "is

---

[28] The putative class is presumably that which is set out in the habeas petition: "[a]ll noncitizens in custody in the Northern District of Texas who were, are, or will be subject to the March 2025 Presidential Proclamation . . . and/or its implementation." ROA.356.

flexible and calls for such procedural protections as the *particular situation* demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (emphasis added); *accord* Jason Parkin, *Dialogic Due Process*, 167 U. Pa. L. Rev. 1115, 1119 (2019) ("[T]he procedural due process analysis is sensitive to the facts and circumstances of a particular procedural regime."). So the inquiry is inherently case specific.

That is equally true when dealing with notice rights. As explained in *Mullane v. Central Hanover Bank & Trust Co.*, notice must be "reasonably calculated, *under all the circumstances*, to apprise interested parties" of their rights. 339 U.S. 306, 314 (1950) (emphasis added); *see also A.A.R.P.*, 145 S. Ct. at 1367–68 (citing *Mullane*, 339 U.S. at 314). So the single most important tenet of constitutional notice is "due regard for the practicalities and peculiarities of the case." *Mullane*, 339 U.S. at 314.

But like the Supreme Court, we sit "far removed from the circumstances on the ground." *A.A.R.P.*, 145 S. Ct. at 1368. And we are dealing with a threadbare record, given the speed at which this litigation has moved. So how can we divine the *particular* circumstances in order to determine the precise contours of the putative class members' notice rights?

And there is an even more fundamental challenge we must face: If due process rights depend so greatly on individual and particular circumstances, what are we to do with potentially relevant differences between different members of the putative class? True, the Supreme Court said that "the notice to which" the putative class members "are entitled is the same." *Id.* at 1369. But it did not tell us what exactly it meant by the notice rights being the "same." For example, "[e]ach detention center has its own rules and systems in place" to facilitate attorney representation through visits, telephone calls, and Internet access. ROA.1058. And there are at least four ICE detention centers in the Northern District alone. Suppose one detention

center allows daily telephone calls and another allows weekly telephone calls. That would naturally affect the number of days a detainee needs to "actually seek habeas relief." *A.A.R.P.*, 145 S. Ct. at 1368. Should we not consider those differences if they would suggest different notice periods for different detention centers? Should we use the least common denominator approach and key the notice period to the facility with the fewest allowed calls?

In addition, due process rights may vary depending on a putative class member's status under the INA. The political branches maintain "plenary authority . . . to set the procedures to be followed in determining whether an alien should be admitted," which limits the due process rights available to those deemed applicants for admission and subject to summary removal. *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2022); *see also infra*, n. 29. The Government represents that at least 121 putative class members are "amenable to expedited removal pursuant to section 235(b) of the [INA]." ROA.1219. Aliens subject to expedited removal are "applicants for admission." 8 U.S.C. § 1225(a)(1); *see also Thuraissigiam*, 591 U.S. at 109 (describing scheme). So, given the century-long distinction between resident aliens and those seeking admission, *see The Japanese Immigrant Case*, 189 U.S. 86, 100–01 (1903); *see also infra*, Part IV.A, one might think these individuals could be treated differently in at least some respects for notice purposes, too.

Nonetheless, my best understanding of the Supreme Court's instructions is that we should address the notice rights of the entire putative class as specifically and precisely as we can. So I will do my best.

B

I now turn to the issue of what notice is due to the putative class members. I agree with the majority's conclusion that the Government's revised notice procedures are constitutional. But I disagree with the majority's rationale. In this subsection, I (1) analyze the Government's

No. 25-10534

revised notice procedures under the relevant constitutional standards. I then (2) explain why petitioners' counterarguments are unavailing. Next, I (3) explain why the INA is irrelevant. Finally, I (4) address the due process dissent, which would erroneously impose a 21-day notice requirement.

1

The Fifth Amendment entitles aliens to due process of law before their removal.[29] *See The Japanese Immigrant Case*, 189 U.S. at 100–01. "Many

---

[29] This case demonstrates the difficulty of applying traditional due process standards in an era of unprecedented illegal immigration. Over a century ago, the Supreme Court held that, for an alien seeking entry into the United States, "the decisions of executive or administrative officers, acting within powers expressly conferred by congress, are due process of law." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892); *see also ibid.* ("It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government."). The Court has reiterated that aliens seeking entry into the United States are only entitled to whatever the Executive and Legislative Branches choose to give them. *See, e.g.*, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("But an alien on the threshold of initial entry stands on a different footing: Whatever the procedure authorized by Congress, it is due process as far as an alien denied entry is concerned." (quotation omitted)); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.").

Aliens who have already entered the United States, however, enjoy different due process rights. The seminal *Japanese Immigrant Case*, 189 U.S. 86 (1903), held an alien who enters the United States and has "become subject in all respects to its jurisdiction, and a part of its population," may not be "arbitrarily" removed under the "the principles involved in due process of law," *id.* at 101; *see also Landon*, 459 U.S. at 32 (an alien who enters the United States "begins to develop the ties that go with permanent residence [and] his constitutional status changes accordingly"). So "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Mezei*, 345 U.S. at 212. And the Court has described the "well established" principle that "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons'

No. 25-10534

controversies have raged about the cryptic and abstract words of the Due Process Clause," *Mullane*, 339 U.S. at 313, but the Supreme Court has provided one consistent guiding principle: The Constitution guarantees process "appropriate to the nature of the case." *Ibid.*; *see also Morrissey*, 408 U.S. at 481 ("It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands.").

I (a) explain that the Government's revised procedures comport with *Mullane*, the standard identified by the Supreme Court in *J.G.G.* and *A.A.R.P.* Then, I (b) show why the same is true under any other applicable due process standard.

a

The Government's revised notice protocol satisfies *Mullane*'s constitutional standard. In *J.G.G.* and *A.A.R.P*, the Court pointed to *Mullane* as the touchstone for our due process inquiry. *See* 145 S. Ct. at 1006; 145 S. Ct. at 1367–68. This reflects the Court's "well-settled practice" to "turn[] to [*Mullane*] when confronted with questions regarding the adequacy of the

---

within the United States, including aliens" whose presence is "unlawful." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

It bears emphasis that this adverse-possession theory of due process "create[s] a perverse incentive": Aliens who enter unlawfully accrue greater due process rights than those who present at a lawful port of entry and risk refusal. *Thuraissigiam*, 591 U.S. at 140 The upshot? The millions of "gotaways" who entered the United States unlawfully since 2021, *see Texas*, 144 F.4th at 690 (Oldham, J., dissenting); *see also supra*, Part I.B, can invoke an entire menu of constitutional rights available to them *because* of, not in spite of, their unlawful entries. At a minimum, that puts strain on the due process considerations in this case because many of the putative class members presumably acquired their due process rights through adverse possession.

No. 25-10534

method used to give notice." *Dusenberry v. United States*, 534 U.S. 161, 168 (2002). So I begin there.

Because of the inherent flexibility in the due process inquiry, *Mullane* instructs courts to look to "general principles" rather than "any formula" prescribing the appropriate notice "in a particular proceeding." *Mullane*, 339 U.S. at 314. But it sets a constitutional floor: In all cases, the Due Process Clause requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Ibid.* Reasonableness must account for the "practicalities and peculiarities" of the case at hand. *Ibid.*

Previous AEA litigation teaches that notice in this context is all about facilitating habeas review. In *J.G.G.*, the Court instructed that AEA detainees "are entitled to notice and an opportunity to challenge their removal," 145 S. Ct. at 1006, as "appropriate to the nature of the case," *ibid.* (quoting *Mullane*, 339 U.S. at 313). That notice must inform detainees "that they are subject to removal under the Act" and "be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Ibid.* Later, in *A.A.R.P.*, the Court clarified that a detainee can "actually seek habeas relief" when he has "sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." 145 S. Ct. at 1368. The Court held that the Government's original procedure, consisting of "notice roughly 24 hours before removal" and with insufficient "information about how to . . . contest that removal, surely d[id] not pass" the Supreme Court's "muster." *Ibid.*

The Government's revised notice protocols for AEA detainees fully comply with the Court's instructions. To start, the Government pledges it "will ensure" notice and relevant "information is conveyed to the alien in a

No. 25-10534

language he understands." Red Br. at 4, 50. *Cf. DeFunis*, 416 U.S. at 317 (affording presumption of regularity to Government representations). Its revised notice describes the factual basis for an alien's detention and removal. *See* ROA.1125 (informing recipient he has "been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua"); *see also infra*, Part III.B.2.b. The notice next states the alien "may be removed from the United States seven days following receipt of this Notice." *Ibid.* It informs the alien that he can "contest [his] removal under the Alien Enemies Act . . . by filing a petition for writ of habeas corpus" and identifies the appropriate district in which to do so. *Ibid.* Critically, once a petition is filed, the Government will not remove detainees until the petition is resolved. *See supra*, at 133–34. Finally, the Government promises that aliens "will be permitted to make telephone calls" to retain counsel and that it will provide a list of available attorneys "upon request." ROA.1126.

I am unable to find a difference between that process and the Court's prescriptions in *A.A.R.P.* and *J.G.G. See A.A.R.P.*, 145 S. Ct. at 1368 ("[W]e decide today only that the detainees are entitled to more notice than was given on April 18."). The Government's revised notice (1) informs detainees that "they are subject to removal under the Act," *J.G.G.*, 145 S. Ct. at 1006; (2) is "afforded within a reasonable time" (seven days before removal), *ibid.*; (3) provides "sufficient time and information to reasonably be able to contact counsel" (seven days and a list of available attorneys upon request), *A.A.R.P.*, 145 S. Ct. at 1368; (4) provides "sufficient time and information to reasonably be able to . . . file a petition" (seven days and information on what to file and where), *ibid.*; and (5) provides "sufficient time and information to reasonably be able to . . . pursue appropriate relief" (unlimited time once petition is filed), *ibid.*

No. 25-10534

These elements also satisfy *Mullane*'s requirement of notice reasonably calculated to apprise affected parties so they may object to any threatened government deprivation. Because the notice the detainees get is in an accessible language, it is "reasonably certain to inform those affected." *Mullane*, 339 U.S. at 315. The factual basis for detention under the AEA and the information about what to file and where provides everything needed for detainees to "present their objections." *Id.* at 314. And its provision of attorney contact information and phone access ensure the notice is not "a mere gesture." *Id.* at 315.

Of course, the ACLU turns to a parade of horribles—missed calls, "unclear" voicemails, and the like—based on the "random luck" of telephone access. Blue Br. at 46. But there is absolutely no reason to doubt the Government's guarantee that detainees "will be permitted to make telephone calls" to file habeas petitions. ROA.1126. Given the simplicity of a habeas petition that would air all available legal and factual grounds to oppose detention, *see infra*, Part III.B.2.b, seven days provides "sufficient time" to object. *A.A.R.P.*, 145 S. Ct. at 1368.

b

Any due process balancing is not necessary and, in any event, dictates the same result. The Supreme Court conspicuously declined to mention the procedural due process test announced in *Mathews v. Eldridge*, 424 U.S. 319 (1976), in both *A.A.R.P.* and *J.G.G.* While the Court has "invoked *Mathews* to evaluate due process claims in other contexts," its test is not "all-embracing." *Dusenberry*, 534 U.S. at 167–68.[30] That explains the Court's use

---

[30] The Supreme Court has applied *Mathews* to the question of adequate notice in removal proceedings of noncitizens. *See Landon*, 459 U.S. at 34–36. But that makes its failure to cite *Mathews* in *A.A.R.P.* and *J.G.G.* all the more conspicuous. And in any event,

No. 25-10534

of *Mullane* as the constitutional standard for notice. *Cf. id.* at 168. In any event, to the extent *Mathews* is informative, it only reinforces my analysis.[31]

"Procedural due process rules are meant to protect against the mistaken or unjustified deprivation of life, liberty, or property." *A.A.R.P.*, 145 S. Ct. at 1367 (quoting *Carey v. Piphus*, 435 U.S. 247, 259 (1978)). As such, "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases." *Mathews*, 424 U.S. at 344. The balancing test prescribed in *Mathews* considers three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

First, I acknowledge the weighty individual liberty interests at stake here. *Cf. Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

Second, on this record, it is by no means clear that petitioners' additional procedural requests would reduce the risk of error. To stop an AEA removal, a putative plaintiff need only *file* a petition—*any* petition. *See*

---

even when *Mathews* applies, the Court is "not . . . in a position to answer" that due process question without more information about "all of the circumstances." *Id.* at 37.

[31] In many ways, *Mullane*'s reasoning reflects a proto-*Mathews* balancing standard. *See* 339 U.S. at 314–15 (describing "balanc[ing]" state and individual interests and considering whether "the form chosen is not substantially" as effective as "other of the feasible and customary substitutes"); *accord Jones v. Flowers*, 547 U.S. 220, 229 (2006) ("[A]ssessing the adequacy of a particular form of notice requires balancing the 'interest of the State' against 'the individual interest sought to be protected by the [Due Process Clause].'" (citing *Mullane*, 339 U.S. at 314–15)).

*supra*, at 133–34. And in fact, filing a habeas petition unlocks a menu of procedural rights to contest removal before an Article III court. *See infra*, 165–66. So adding more time and complicating notice at Step Zero does little to improve the "truthfinding process," *Mathews*, 424 U.S. at 344, available in habeas.

Third, on the other side, the Government interests are substantial. In fact, "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig*, 453 U.S. at 307 (quotation omitted). Where the Court *has* applied *Mathews* balancing to removal proceedings, *see supra*, at 158 n.30, it has urged that we must "weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Landon*, 459 U.S. at 34. That sovereign prerogative counsels a "weighty" government "interest in efficient administration of the immigration laws." *Ibid.*

Moreover, the Supreme Court has provided one concrete touchpoint in this malleable balancing test: deference to the Executive. *Mathews* says as much: "In assessing what process is due in this case, substantial weight must be given to the good-faith judgments of the individuals charged by Congress" with the duty to execute our Nation's immigration laws. 424 U.S. at 349. Under the AEA, that duty belongs to the President. *See supra*, Part II.A.2. So "substantial weight must be given" to *his* assessment. *Mathews*, 424 U.S. at 349.

It is particularly appropriate for courts to defer to the political branches in immigration cases. It is hornbook law that the Constitution assigns power over both immigration and national security to the political branches. *See Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893) ("The power to exclude or to expel aliens, being a power affecting international

relations, is vested in the political departments of the government."). And in this case, Congress has constitutionally allocated *all* discretion concerning how to conduct removals under the AEA to the President. *See* 50 U.S.C. § 21; *see also Lockington v. Smith*, 15 F. Cas. 758, 760 (C.C.D. Pa. 1817) (Washington, J.) ("[T]he power of the [P]resident under [§ 21] to establish . . . rules and regulations for . . . removing alien enemies, . . . appears to me to be as unlimited as the legislature could make it."). So the nature of the "function involved" in this case further tips the scales toward the Executive. *Mathews*, 424 U.S. at 335.

The government interest also includes any "societal costs" imposed by the cost and delay of added process. *Id.* at 347. "[P]rocedural requirements entail the expenditure of limited resources." Henry J. Friendly, *"Some Kind of Hearing,"* 123 U. PA. L. REV. 1267, 1276 (1975). "[A]t some point the benefit to individuals from an additional safeguard is substantially outweighed by the cost of providing such protection." *Ibid.* Here, such costs are substantial. There are hard costs, like those the Government incurs when it feeds and houses TdA members each day. And there are also soft costs, like those the Government incurs when it polices communities and prisons beset by TdA terrorists. *See supra*, at 72–75.

### 2

All of petitioners' counterarguments fail. I (a) explain why appellants' 30-day rule is not constitutionally required. Next, I (b) explain why the current notice suffices to describe the factual basis for putative class members' detention. Finally, I (c) address the ACLU's arguments about the availability of counsel.

### a

First, the ACLU requests a 30-day window between notice and removal because the Government granted that much time to German AEA

No. 25-10534

detainees during World War II. *See* Blue Br. at 42 (citing *Citizens Protective League*, 155 F.2d at 295). The upshot is that, because the 1940s-era Government gave detainees a particular window of time to contest removal, the Trump Administration must match it.

But that argument fails. For one, a 1940s-era policy choice is not a constitutional requirement. Thus, there is no reason for courts to force a modern administration to follow an eighty-year-old self-imposed timetable today. And while it is of course true that history can inform how we interpret constitutional texts, this single example provides no guidance on what "due process" requires. How could it? A 1940s-era practice says nothing about the original meaning of "due process," a term that was enshrined in our Constitution in 1788 and in the Fourteenth Amendment in 1868. The 155 years separating the Constitution's ratification and *Citizens Protective League* make that connection illusory.

More to the point, this kind of historical analysis is (sadly) a poor match for the Court's due process doctrine. The Court teaches that procedural requirements—including notice—depend on "the nature of the case." *Mullane*, 339 U.S. at 313; *see also, e.g., id.* at 314 ("practicalities and peculiarities of the case"); *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961) ("The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 162 (1951) (Frankfurter, J., concurring) ("[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances . . . . [It] cannot be imprisoned within the treacherous limits of any formula."). So the ACLU's reliance on a 30-day limit from one historical episode in the 1940s does not make sense. If the circumstances are different here (which they most certainly are), then

modern due process doctrine tells us that we must decide what process is due based on the different facts that exist today.

And detention today looks nothing like detention in World War II. In the 1940s, attorneys submitted typewritten, hard-copy filings and researched cases from printed reporters. Today, electronic case reports, search engines, cell phones, iPads, and laptops allow lawyers to do a week's worth of old-fashioned research in minutes. And e-filing now enables attorneys to file petitions from any location in an instant—as evidenced by this very case. *See supra*, at 77–78 (noting the ACLU was able to skip the district court, leapfrog our court, and win emergency relief in the Supreme Court in *mere minutes*). The idea that the ACLU can win relief in the Supreme Court in *133 minutes* but that it needs *30 days* merely to file a barebones habeas petition for a TdA terrorist is "sheer applesauce." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 113 (2007) (Scalia, J., dissenting). The ACLU's prodigious resources, access to modern technology, boundless aggression in seeking *ex parte* TROs by voicemail, *see supra*, at 77, and its proven track record of success in this case among others all far exceed what Kurt Ludecke and his attorneys had in 1946.

And today's AEA detainees have far greater access to counsel than did other detainees in the past. The ACLU protests that incarceration makes it difficult for detainees to contact and confer with counsel and limits their access to relevant documents. Blue Br. at 42–43. This contravenes our presumption of regularity, as the Government pledges to provide telephone calls for this very purpose. *See supra*, at 156–57. It further speculates that attorney shortages could result from a seven-day timeline due to the "limited pool" of counselors able to file habeas petitions. Blue Br. at 44–46. Even if these concerns are well-founded, despite the utter lack of record support, *see infra*, at 168–69, the legal profession numbered 221,000 in 1950. *Growth of the Legal Profession: ABA Profile of the Legal Profession 2024*, Am. Bar Ass'n,

No. 25-10534

https://perma.cc/P5M9-MJ8F. As of 2024, that number exceeded 1.3 *million*. *Ibid.* That almost-500-percent increase may raise other concerns, *cf.* WILLIAM SHAKESPEARE, HENRY VI, PART II act IV, sc. 2, l. 75 ("The first thing we do, let's kill all the lawyers."), but due process is not one of them.

Adopting a different rule would introduce unreasonable discrepancies between aliens designated as enemies who endanger national security and non-enemy aliens in the ordinary course of affairs. For aliens subject to expedited removal,[32] *see* 8 U.S.C. § 1225(b)(1)(A)(iii), including those without valid entry documents and those with fewer than two years of continuous presence, *ibid.*, proceedings must both start *and* conclude "*in no case later than 7 days after*" they are determined removable, *id.* § 1225 (b)(1)(B)(iii)(III) (emphasis added). The Supreme Court has held this poses no due process problem. *Thuraissigiam*, 591 U.S. at 138–40. So to adopt a contrary constitutional rule would extend more due process rights to those designated as alien enemies by the President, pursuant to his broad statutory authority, *see Lockington*, 15 F. Cas. at 760, than that due to other aliens facing expedited removal. I see no constitutional basis to create such an unusual rule.

Finally, the ACLU's objections run smack into the fact that petitioners across the country, including the named petitioners in this case, have filed and continue to file petitions within seven days. Under the previous notice policy, petitioners A.A.R.P. and W.M.M. filed habeas petitions within two days of their transfers to the Northern District of Texas. *See* Petition at 5–6; *see also*, *e.g.*, *J.A.V. v. Trump*, 781 F. Supp. 3d 535, 545

---

[32] Despite our threadbare record, the ICE Acting Field Office Director for Dallas avers that approximately 121 of the putative class members "are amenable to expedited removal." ROA.1219–20.

No. 25-10534

(S.D. Tex. 2025) (two days); *D.B.U. v. Trump*, 779 F. Supp. 3d 1264, 1272 (D. Colo. 2025) (one day for plaintiff R.M.M.); *J.G.G. v. Trump*, No. 1:25-CV-00766, 2025 WL 825116 (D.D.C. Mar. 15, 2025) (one day to file APA lawsuit). Courts are open 24 hours a day and are expected to adjudicate habeas petitions in mere hours, even on holidays. 28 U.S.C. § 452; *supra*, at 77. So seven days far exceeds what the Constitution requires.

b

Second, the ACLU requests notice informing detainees of "[t]he factual basis for the TdA allegations . . . even at a broad level." Gray Br. at 24. Even if the allegations related to TdA were relevant,[33] notice need only "afford" the detainees "an opportunity to present their objections" to removal. *Mullane*, 339 U.S. at 314. The revised notice protocol does more than enough to afford the detainees the opportunity to present their objections in a federal habeas proceeding. A federal habeas petition need only "allege the facts concerning the applicant's commitment or detention . . . and by virtue of what claim or authority." 28 U.S.C. § 2242. And the new notice tells the detainees everything they need to know to file such a petition. *See* ECF 137-4, Exhibit F (informing recipient he has "been determined to be at least fourteen years of age; not a citizen or lawful permanent resident of the United States; a citizen of Venezuela; and a member of Tren de Aragua") (citation modified). So due process requires nothing more.

---

[33] It is not. That is because TdA members have no statutory right to contest their TdA membership. *See supra*, Part II.C (explaining why the President's determination that Venezuela is perpetrating an invasion, permitting him to remove any and all Venezuelan citizens under the AEA, is not transmuted into a judicially reviewable action because the President chooses to have that power exercised within narrower limits than Congress authorized).

No. 25-10534

The proper time for the Government to present more detailed evidence is *in* habeas proceedings. To start, the Government's proposed seven-day notice period provides the time in which a detainee must *initiate* habeas proceedings by filing a petition, not conclude them. By contesting his age, alienage status, and nationality, a detainee can achieve "the essence of habeas corpus[:] an attack by a person in custody upon the legality of that custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). And district courts may subsequently litigate the merits of those petitions with the procedural protections provided by federal law. *See, e.g.*, 28 U.S.C. §§ 2243 (providing a hearing), 2246 (permitting oral or deposition evidence), 2247 (permitting documentary evidence).

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), is not to the contrary. First, the fractured plurality's constitutional holding applied narrowly to circumstances "when a *United States citizen* is detained in the United States as an enemy combatant." *Id.* at 532 (emphasis added). Moreover, its requirement that such a "*citizen*-detainee . . . must receive notice of the factual basis for his classification" did *not* specify that factual bases must be provided as soon as the detainee receives a notice of removal. *Id.* at 533 (emphasis added). Rather, the case focused on Hamdi's ability, once a proceeding started, "to prove military error" by contesting the Government's factual contentions *in that proceeding. Id.* at 534.[34]

---

[34] In a similar vein, the ACLU invokes the purportedly "immutable" proposition that "the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." Blue Br. at 41 (citing *Greene v. McElroy*, 360 U.S. 474, 496 (1959)). *Greene* is inapposite. That case insisted upon "the requirements of confrontation and cross-examination," 360 U.S. at 496, in security clearance hearings that relied on undisclosed, anonymous, and unexamined "testimony of absent witnesses," *id.* at 497–99. The Court's statement therefore described the adequacy of the opportunity to contest factual assertions during a proceeding—it said *nothing* about whether, when, and which facts must be disclosed in an initial notice.

No. 25-10534

I would not extend *Hamdi* to require notice of the Government's evidence in initial removal notices issued to designated alien enemies. Requiring notice of additional facts before habeas proceedings begin could risk disclosure of sensitive national security information. The ACLU's proposal would also burden the Government as it attempts to move expeditiously in the interest of national security. The longer TdA members are detained in this country, the more danger they present—already "prov[ing] difficult to manage" even in ICE detention. ROA.1219. *See supra*, Part I.B (describing prison riot by putative class members). TdA poses "a heightened challenge" in prisons due to its "formation and history in penal institutions." ROA.1188. TdA regularly recruits members from and in prisons, often via extortion of other inmates. ROA.1197. Given these concerns, the Government's interest in removing TdA members as quickly as possible explains its policy of deferring factual disputes to actual habeas proceedings for those who choose to file.

c

The ACLU requests process the Government has already agreed to provide: notice "written in plain language" in the detainee's language, that informs the detainee he can contest his removal in federal court, that he can attain an attorney, how to contact attorneys, and when he will otherwise be removed. Blue Br. at 39. Check, check, check, and check. *See* ROA.1125–26.

Insofar as it now revises its requests to include a lesson on "How to File Habeas 101" and a magic solution for the "limited attorney pool for complex federal habeas litigation," Gray Br. at 21–22, these requests far exceed the constitutional minimum.

First, take the ACLU's demand for a Habeas Primer. The ACLU objects that the Government's revised notice "does not explain what a habeas petition is . . . or what is required to file one." Gray Br. at 21–22. But

No. 25-10534

it points to no source of law requiring the Government to provide that information. *Cf. Lewis v. Casey*, 518 U.S. 343, 350–51 (1996) (holding that prisoners' "right of *access to the courts*" does not imply a concomitant "freestanding right to a law library or legal assistance in prison"). Detainees have no constitutional guarantee of "the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Id.* at 355. Given the simple fact refutations needed to challenge removal under the AEA, the Government need not provide more fulsome instructions.

Second, the attorney pool. Far from a "showing of the limited attorney pool for complex federal habeas litigation," Gray Br. at 22, petitioners' evidence consists of bare allegations and one declaration about the legal services offered by a single nonprofit, ROA.1057–59. But that nonprofit operates in the Western District of Texas, not the Northern District. So even if its representations should be credited,[35] its description of conditions and access to counsel in the Western District are irrelevant to the conditions impacting due process for our putative class of Northern District detainees. The Western District contains five ICE detention facilities,

---

[35] In recent litigation in this court, that same nonprofit sought to enjoin the State of Texas from enforcing democratically enacted immigration restrictions because state immigration work would distract from its mission of federal immigration assistance. *See Texas*, 144 F.4th at 645 ("Las Americas . . . has always been designed to provide the assistance and representation people need to seek protection through the federal immigration system.").

In this case, however, Las Americas contends it cannot overcome the "challenges juggling briefing and hearing rules and timelines in two different federal circuits" because it often lacks "an attorney that can assist [it] with a pro hac vice appearance in federal court." ROA.1059. Fortunately, it has "recently invested in applying for admission for *one* staff attorney to the Western District of Texas." *Ibid.* (emphasis added). But it is a puzzling assertion given Las Americas' earlier insistence that its core purpose is serving "immigrants navigating the federal system." *Texas*, 144 F.4th at 644.

No. 25-10534

ROA.1057, and covers the vast majority of Texas's border counties. Naturally, that affects its detention population. *See also ibid.* (describing Western District detention center as one of the twelve most crowded in the Nation). And it says *nothing* about the conditions of our putative class. I would decline the ACLU's request to craft a new rule of constitutional law on shaky facts and conclusory allegations.

At bottom, these objections about counsel and legal instruction merely restate and underscore the request for a longer notice period. They surely do not amount to a record showing that due process violations are likely to recur under the Government's revised notice regime.

3

The majority correctly concludes the Government's revised notice is constitutionally sufficient. But I cannot agree with its assertion that a cherrypicked provision from the INA is at all relevant to that inquiry.[36]

To start, the analogy is inapt. As I have discussed at great length, *see supra*, Part III.B.1, notice rights are entirely dependent on the "practicalities and peculiarities" of a given case. *Mullane*, 339 U.S. at 314. So I am wary of looking at unlike contexts to inform this one.[37] And there are significant

―――――――――――

[36] It is perhaps telling that the majority's selected provision, 8 U.S.C. § 1229(b)(1), is cited precisely zero times in either of the petitioners' briefs, the Government's brief, or a single one of the six *amicus curiae* briefs submitted to this court. And it has been mentioned in only *one* of the dozens of district court opinions that have discussed the adequacy of notice under the AEA. *See G.F.F. v. Trump*, 781 F. Supp. 3d 195, 207–08 (S.D.N.Y. 2025).

[37] Of course, both the AEA and INA concern removals. But it is perhaps more analogous to consider removals of terrorists under the INA, *see generally* 8 U.S.C. § 1226a, which must occur within only seven days of the Attorney General's identification and detention, *see id.* §§ 1226a(1), (5), of an alien "who is a member of a terrorist organization," *Id.* § 1182(a)(3)(B). *See also id.* § 1182(a)(3)(B)(vi)(II) (defining terrorist organization as one designated by the Secretary of State); Foreign Terrorist Organization Designations, 90 Fed. Reg. 10030 (Feb. 20, 2025) (so designating Tren de Aragua). Or perhaps we should

No. 25-10534

differences between removals under the AEA in this case and removals under the INA in the mine-run of cases. Our putative class members are all detained in the Northern District of Texas and subject to removal under the AEA—not to mention other applicable immigration authorities. Suffice to say they have *actual* notice that they are entangled in our immigration system before they receive anything that mentions the AEA. But an illegal alien who receives a notice to appear under § 1229(b)(1) may live undetected for years in Anytown, USA, without any inkling that the Government will detect his presence and initiate INA removal proceedings. So in many ways, the majority's analogy proves strained.

More broadly, though, I question the majority's method of looking to *any* statute to determine the content of the Due Process Clause.

In cases like this one, we typically treat the Constitution as providing a floor for individual rights. *See, e.g.*, *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 72 (2019) (Kavanaugh, J., concurring) ("[T]he Constitution sets a floor for the protection of individual rights. The constitutional floor is sturdy and often high, but it is a floor."). And due process is no exception—we identify baseline procedural protections that the state and federal Governments[38] *must* provide but *may* exceed. *See, e.g.*, *Bracy v. Gramley*, 520

---

consider another congressional scheme to remove "alien terrorist[s]" on application from the Attorney General, 8 U.S.C. § 1533, which provides that "a removal hearing shall be conducted under this section *as expeditiously as practicable*," *id.* § 1534(a)(1) (emphasis added). Notice before such a hearing need not occur on a given time frame but must only "set an expeditious date" for it.

[38] This case challenges the federal Government's authority and thereby implicates the Fifth Amendment's Due Process Clause. Despite their identical text, the Due Process Clauses of the Fifth and Fourteenth Amendments "were ingrafted upon the Constitution at different times and in widely different circumstances," so "questions may arise in which different constructions and applications of their provisions may be proper." *French v. Barber Asphalt Paving Co.*, 181 U.S. 324, 328 (1901).

No. 25-10534

U.S. 899, 904 (1997) ("[T]he Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard."); *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 889 (2009) (describing the "constitutional floor" of due process as opposed to the "ceiling set by common law [or] statute" (quotation omitted)). Even more to the point, *Mullane*'s notice standard has long been called "a constitutional minimum" "prescribe[d]" by the Due Process Clause. *Greene v. Lindsey*, 456 U.S. 444, 449 (1982).

Looking at statutes—no matter how similar their subject matter—to locate that constitutional floor gets the analysis exactly backwards. Difficult as it may be to decode "the cryptic and abstract words of the Due Process Clause," *Mullane*, 339 U.S. at 313, we must identify the constitutional minimum *first*. Only then can we determine whether a statute or government action (here, the revised notice protocol) meets it. *Cf.*, *e.g.*, *Greene*, 456 U.S. at 449 ("It is against [the *Mullane*] standard that we evaluate the procedures employed in this case."); *Dusenbery*, 534 U.S. at 167–69 (identifying *Mullane* standard, then applying it to "the notice in this case"); *Bracy*, 520 U.S. at 904–05 (identifying due process requirements, then applying them to facts). I conclude that the Government's revised notice protocol rises above the constitutional floor only because I first identify that floor, *see supra*, at 154–56, and then measure the notice against it, *see supra*, at 156–58. At no point do any statutory analogs enter the equation.

————————————

In the realm of procedural due process, however, the two often overlap. For instance, *Dusenbery* applied *Mullane*, a Fourteenth Amendment case, even though it arose under the Fifth Amendment. 534 U.S. at 167. And *Mathews*, itself a Fifth Amendment case, *see* 424 U.S. at 323, has been frequently applied in Fourteenth Amendment cases, *see*, *e.g.*, *Nelson v. Colorado*, 581 U.S. 128, 134 (2017); *Turner v. Rogers*, 564 U.S. 431, 444 (2011); *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005).

No. 25-10534

The opposite approach would turn legislation into a one-way ratchet for due process rights. Assume the INA's ten-day notice provision is analogous and relevant because it "presumably comports with the requirements of due process." *Ante*, at 47. What if Congress had given 90 days? Or 30? Or just one? Can a single Congress tie everyone's hands with a contingent policy choice? Of course not. But if we choose to give those policy choices constitutional effect, we permit Congress to legislate only in one direction. If Congress gives 90 days, it cannot take a single one away without violating the Due Process Clause. *Cf.* Sherif Girgis, *Living Traditionalism*, 98 N.Y.U. L. Rev. 1477, 1520 (2023) (describing a court as applying a "ratchet if it lets practice move the case law in one direction (for a legal conclusion) but not as easily the other way (against that conclusion)"). There is no basis to conclude that Congress wanted to tie its hands to a due process minimum, especially one that would apply *outside the INA context*, simply by legislating about one kind of notice.

The majority's approach would also elevate Congress over the Constitution. Congress could not alter the meaning of the Due Process Clause in our system of constitutional supremacy, even if it wanted to. "If Congress could define its own powers by altering [constitutional] meaning, no longer would the Constitution be 'superior paramount law, unchangeable by ordinary means.'" *City of Boerne v. Flores*, 521 U.S. 507, 529 (1997). And "[s]hifting legislative majorities could change the Constitution," *ibid.*, a problem that becomes ever more pernicious if it only operates in one direction, *accord Katzenbach v. Morgan*, 384 U.S. 641, 668 (1966) (Harlan, J., dissenting) (rejecting the idea that Congress can only legislate in the direction of more due process). Even in areas of law explicitly determined with reference to society's "evolving standards of decency," *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion), the Court has firmly rejected the contention that statutes can only give, not take away, *see Harmelin v.*

CaSe: 25-10534     Document: 195-1     Page: 173     Date Filed: 09/02/2025

No. 25-10534

*Michigan*, 501 U.S. 957, 990 (1991) ("The Eighth Amendment is not a ratchet."); *Kennedy v. Louisiana*, 554 U.S. 407, 469 (2008) (Alito, J., dissenting) ("[T]his Court has previously rejected the proposition that the Eighth Amendment is a one-way ratchet.").[39]

Consider an analogous context. While the Suspension Clause references the writ of habeas corpus, it does not affirmatively establish a constitutional floor of habeas rights. *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807) (Marshall, C.J.) (describing the Judiciary Act of 1789 as "providing efficient means by which this great constitutional privilege should receive life and activity; for if the means be not in existence, the privilege itself would be lost, although no law for its suspension should be enacted"). So we cannot look to congressional enactments to give the Clause content. In fact, the Supreme Court has repeatedly declined to extend its protections further to constitutionalize later congressional expansions of the writ. *See INS v. St. Cyr*, 533 U.S. 289, 300–01 (2001); *accord Boumediene*, 553 U.S. at 773–74. As Justice Scalia wisely observed, it is "too absurd to be contemplated" to view the Suspension Clause as a "one-way ratchet that enshrines in the Constitution every grant of habeas jurisdiction." *St. Cyr*, 533 U.S. at 342 (Scalia, J., dissenting).

So in sum, the majority reaches the right destination on due process but arrives there by accident.

---

[39] Admittedly, the Court has sometimes treated it as such in practice. *See, e.g.*, Jeffrey Omar Usman, *State Legislatures and Solving the Eighth Amendment Ratchet Puzzle*, 20 U. Pa. J. Const. L. 677, 679 (2018) ("The United States Supreme Court's Eighth Amendment jurisprudential framework has been largely understood to create a one-way ratchet," which "irreversibly imposes rules based on a potentially fleeting consensus.").

No. 25-10534

4

Finally, a few points about the due process dissent. *See ante*, at 49–54. It says the Due Process Clause floor—applicable to all aliens in all circumstances—is twenty-one days' notice. *See id.* at 54. Why? Some plaintiffs have said they faced various issues in meeting with their lawyers. Some have allegedly had trouble filing habeas petitions from the Bluebonnet Detention Facility. *See id.* at 49–52. Various attorneys also argue that, in early April, they struggled to have video calls with detainees. *Cf. ibid.*; ROA.273; 286. So the due process dissent says the detainees need twenty-one days to file a petition.

The problem is that the record belies all of this. The Government hands out a notice in a language that detainees understand. *Cf.* ROA.1125–27. And it gives them a list of attorneys they can contact. *Ibid.* It also affords them seven days to contact lawyers. *Ibid.* Here, there's no evidence that the detainees are "'cut off' from contact with lawyers or adults and 'made accessible only to the police.'" *Gallegos v. Colorado*, 370 U.S. 49, 61 (1962) (Clark, J., dissenting). In fact, there's evidence that there are sufficient procedural protections. In the very instances that the due process dissent cites as evidence that detainees need more than seven days' notice, the clients in question reestablished contact with lawyers only *three* and *four* days after being moved. *Cf.* ROA.273, 286. And the petitioners in this very case could seek relief only hours after they learned they would be removed. ROA.12–14. So there's nothing in the record suggesting that alien detainees need more than a week to file their petitions. Indeed, the due process dissent cannot identify even one plaintiff who was unable to contact counsel, file a petition, and pursue appropriate relief (which is achieved by filing the petition itself) in fewer than twenty-one days.

No. 25-10534

At bottom, the twenty-one-day rule is not grounded in the facts or law at issue in this case. Instead, it appears to account for what an unidentified, hypothetical detainee who suffered from *all* possible hardships might need. Thus, it is pure fiction. And, as the Court has long held, "fiction always is a poor ground for changing substantial rights." *Haddock v. Haddock*, 201 U.S. 562, 630 (1906).

IV

At this point, I have responded to the two questions that the Supreme Court instructed us to answer.

Ironically, though, answering those queries yields more questions. Why? On the one hand, the Court asked us to answer only two questions. But on the other hand, it asked us to "resolv[e] the detainees' appeal." *A.A.R.P.*, 145 S. Ct. at 1370. And if we did that, we'd have to address and reach a judgment on each issue before us. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). That's a problem for two reasons. First, doing so may exceed the remand order's scope, which directs us to answer only the two questions. Second, it may also be inconsistent with our own jurisdiction.

To see why, it's helpful to separate the remaining claims into two categories: (A) class certification and (B) other statutory claims. I discuss the problems with each.

A

Start with class certification. The named plaintiffs filed in the district court a notice of appeal of that court's alleged "constructive denial[] of" their "[m]otions for [c]lass [c]ertification." ROA.339. Ordinarily, that is all that is necessary to put the ball in our court.

But can we address class certification consistent with the Court's remand instructions? It seems unlikely given that the Supreme Court's

No. 25-10534

opinion seemed to suppose the class certification issue was pending before the district court. *See A.A.R.P.*, 145 S. Ct. at 1369 n.\*. But the district court recently expressed that it could not decide class certification because that issue was pending before *us*. *See* Dist. Ct. ECF. 75.

Regardless, there is no appellate jurisdiction over the class certification issue. Whatever "constructive denial" as to a class certification motion might mean, it is unclear that the district court did anything of the sort here. Perhaps waiting several hours to adjudicate a motion for a TRO might constitute "constructive denial" of that motion. But why think the same is true for class certification here when every party before us was still able to get effectual preliminary relief? I have no idea.

Anyway, even if the district court did constructively deny the motion for class certification, which it did not, the grant or denial of class certification is not "immediately reviewable under 28 U.S.C. § 1291." *Microsoft Corp. v. Baker*, 582 U.S. 23, 26 (2017).

Instead, plaintiffs must look to one of three jurisdictional hooks. But none are met here. The first and most obvious is Rule 23(f). But under Rule 23(f), we "may permit an appeal" *only if* the appellant "file[s] a petition for permission to appeal with the circuit clerk." Fed. R. Civ. P. 23(f); *see also* Fed. R. App. P. 5 (rules governing petitions for permission to appeal). But the plaintiffs never filed a petition for permission to appeal. The second option is related—a certified order under § 1292(b). *See Microsoft*, 582 U.S. at 30, 34 (noting § 1292(b) is another avenue for appealing). That fails for the same reason. Third and finally, pendent appellate jurisdiction. That fares about as well as the first two options. Pendent appellate jurisdiction is extraordinarily narrow, and its stringent test is nowhere close to met here. *See Heidi Grp., Inc. v. Tex. Health & Hum. Servs. Comm'n*, 138 F.4th 920, 929–30 & n.6 (5th Cir. 2025).

No. 25-10534

That leaves only one remaining mechanism for us to review the denial of class certification: the plaintiffs' request for mandamus. *Microsoft*, 582 U.S. at 30 (noting mandamus can be an alternative in extreme circumstances). It is also unclear whether that is even before us. On April 18, the petitioners appealed and also sought an administrative stay, an injunction pending appeal, and mandamus. ECF-4, at 34. The motions panel explicitly denied the motion for a temporary administrative stay and an injunction pending appeal, and it dismissed the appeal. ECF-14, at 2. The judgment dismissing the appeal was vacated by the Supreme Court. *A.A.R.P.*, 145 S. Ct. at 1370. And the Supreme Court granted its own "temporary injunctive relief." *Id.* at 1368. But neither this court nor the Supreme Court ever acted upon the request for mandamus. So it seems that the mandamus petition is still before us.

If that is true, mandamus should not be granted. As I have just explained, the plaintiffs have plenty of alternative avenues for seeking review of any denial of class certification. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (explaining that mandamus is proper only if the petitioner shows he has "no other adequate means to attain the relief he desires" (quotation omitted)); *see supra*, at 176 (noting three alternatives). And anyway, the petitioners have not shown that it is "clear and indisputable" that the class should be certified. *Cheney*, 542 U.S. at 381. On the contrary, it is extraordinarily doubtful. *See supra*, at 149–50 & n.26. So the plaintiffs' request for an extraordinary writ of mandamus ordering the district court to certify a class—to the extent it is before us—should be denied.

No. 25-10534

B

The plaintiffs also raise four additional statutory claims.[40] *See* Blue Br. at 47–54. They argue (1) the Proclamation is subject to the INA's removal procedures, so no removals may occur under the AEA unless the Government goes through those procedures; (2) they may not be removed under the Proclamation because of the Convention Against Torture ("CAT"); (3) they may not be removed under the Proclamation because of their withholding of removal claims; and (4) the Proclamation violates the procedures in the AEA itself, and thus preliminary relief preventing AEA removals unless the Government complies with those procedures is necessary.

Here, too, it is quite unclear whether the petitioners' four additional statutory claims are properly before us given the Supreme Court's instructions. After all, if the plaintiffs were to succeed on any of these claims, it would end-run our ability to consider the constitutional due process question that the Supreme Court said we should answer. The plaintiffs argue that "[e]ven if [1] the Proclamation was authorized by the AEA, and [2] individuals were given due process," the "Proclamation cannot be enforced without following" these additional "statutory commands." Blue Br. at 47. As the plaintiffs themselves frame it, these statutory procedural claims go beyond the two claims we were explicitly required to resolve on remand. So it is far from clear whether we can even consider these claims at this juncture.

Even if these statutory claims are all properly before us, it is not obvious whether we should address these claims as to the named plaintiffs,

---

[40] In their habeas petition, petitioners brought eight separate claims. *See* ROA.359–63. Petitioners mention another one of those claims—their asylum claim—in a single footnote in their appellate brief. *See* Blue Br. at 49 n.16. So at least for purposes of preliminary relief, they appear to have abandoned that claim.

No. 25-10534

the putative class members, or both. The plaintiffs do not even begin to explain what they are even asking of us.

But because the plaintiffs raised these claims in their habeas petition, before the district court, and in their briefing before us, I want to briefly comment on why the plaintiffs have fallen far short of the requisite "clear showing" that they are likely to succeed on any of these issues. *Starbucks*, 602 U.S. at 346.

1

Start with the plaintiffs' claim that "*all* removals" are subject to the INA's removal procedures. Blue Br. at 47–48.

Of the four additional statutory claims, this one raises the most questions about how it can be consistent with the mandate. If the plaintiffs are right, habeas would be the wrong vehicle for AEA cases. Instead, the Government would be required to bring a separate removal proceeding under the INA, as the plaintiffs acknowledge. *See id.* at 49 n.15. But how would that fit with the Supreme Court's supposition that habeas is the proper vehicle to adjudicate cases like this? *See J.G.G.*, 145 S. Ct. at 1005–06. And if the plaintiffs are right that the INA applies in full, would it even make sense to reach the notice the putative class is entitled to under the Due Process Clause? They would already be entitled to the full suite of procedural rights that the INA affords. And the notice at issue here is concerned only with allowing the class to "actually seek habeas relief," *A.A.R.P.*, 145 S. Ct. at 1370 (quotation omitted), which might no longer be the relevant type of proceeding. But how could a third issue that the Supreme Court did not specifically instruct us to answer obviate an issue it required us to answer?

But because the plaintiffs have repeatedly argued that they are entitled to preliminary relief on this claim, I want to make clear that they are not. That is because their argument has no basis in the INA. The statute states in

No. 25-10534

relevant part: "[A] proceeding under this section shall be the sole and exclusive procedure" for removing an alien only "if the alien has been . . . admitted." 8 U.S.C. § 1229a(a)(3) (emphasis added). The term "admitted" is defined as "the *lawful* entry of the alien into the United States after inspection and authorization by an immigration officer." *Id.* § 1101(a)(13)(A) (emphasis added); *see also Thuraissigiam*, 591 U.S. at 138–41 (2020) (distinguishing admitted aliens from those who illegally enter the country). But the plaintiffs have not made "a clear showing"—let alone alleged—that they or the putative class members have lawfully entered the country. *Starbucks*, 602 U.S. at 346. That is all that is needed at this preliminary stage to reject their claim of entitlement to the "extraordinary and drastic remedy" of a preliminary injunction. *Mazurek*, 520 U.S. at 972 (quotation omitted).

But that is not all. One implication of the plaintiffs' argument is that the AEA has been impliedly repealed by the INA. *See, e.g.*, ROA.360 (claiming the procedures the Government is using to enforce the AEA "violate[] the INA"). But why in the world should anyone think the "strong presumption" against implied repeals has been overcome? *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quotation omitted). Plaintiffs face an uphill battle to prove that. Courts should not lightly assume one statute impliedly repeals another—let alone one dealing with important matters of national security. So I cannot conclude that the plaintiffs are likely to succeed on their claim that the INA has impliedly repealed, and thus replaced, the AEA's own express procedures. *See* 50 U.S.C. §§ 21–23.

2

Next, the plaintiffs point to CAT. *See* Blue Br. at 49–52. But their CAT claims are confounding. Are they saying the plaintiffs themselves have meritorious CAT claims? Are they saying the plaintiffs need certain procedures to raise their CAT claims? Something else?

No. 25-10534

Start with the merits. There are at least two problems with these potential CAT claims. First, habeas is a poor vehicle for any CAT claims. *See* 8 U.S.C. § 1231, note (d); *Munaf*, 553 U.S. at 703 n.6 (indicating that a CAT claim is not cognizable in habeas because such claims "may be limited to certain immigration proceedings"); *accord Nasrallah v. Barr*, 590 U.S. 573, 580 (2020). Second, we should not assume the United States will remove people to places where they will be tortured. *Cf. Munaf*, 553 U.S. at 702; *see also Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009) (explaining that "court[s] may not question the Government's determination that a potential recipient country is not likely to torture a detainee"). And the plaintiffs provide little-to-no evidence the U.S. would remove someone to such a land. So the plaintiffs have not made a "clear showing" they are likely to succeed on their "claim[] raised under" CAT. *Starbucks*, 602 U.S. at 346.

Next, procedure. Suppose the plaintiffs are arguing they are entitled to certain procedures to raise their CAT claims, whether meritorious or not. Even if that's true, their claims would still fail. Why? The CAT affords no procedural rights. That's not unusual, since many rights and duties afford no corresponding procedural rights to vindicate them.

What's more, even if the Executive were required to grant the plaintiffs certain procedural rights to vindicate potential CAT claims, the rights–remedies problem would persist. Why would an Article III court be the proper place to vindicate those procedural rights? The plaintiffs provide zero answers.

3

Next, the plaintiffs argue we should grant the preliminary injunction because the Government withheld removal protections. *See* Blue Br. at 49–52.

No. 25-10534

It is also hard to make sense of this claim. Is this a request for unspecified procedures to pursue a withholding claim? Or is it a claim that the putative class members are all entitled to withholding of removal here? Because courts of appeals ordinarily hear such claims only when reviewing final orders of removal, *see Nasrallah*, 590 U.S. at 579, is a withholding of removal claim even cognizable in habeas? Moreover, the protections of withholding of removal do not apply at all "if the Attorney General decides that . . . there are reasonable grounds to believe that the alien is a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B)(iv). Is it not sufficient that the President himself, for whom even the Attorney General is an *alter ego*, says the plaintiffs "are a danger to the public peace or safety of the United States?" 90 Fed. Reg. at 13034; *see also, e.g.*, *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2517 (Kavanaugh, J., concurring) ("When Cong-ress delegates authority to . . . an executive agency, the exercise of that delegated authority is controlled by the President who was elected by and is accountable to the people."). And what about the Attorney General's statement in the March 14 guidance memorandum that declares that "all Alien Enemies subject to the Proclamation are chargeable with actual hostility or other crime against the public safety?" ROA.883. Is that not enough?

The plaintiffs yet again provide no answers. So they yet again fail to make the requisite "clear showing." *Starbucks*, 602 U.S. at 346.

4

Finally, the plaintiffs argue that the Government cannot remove them because it did not comply with the AEA's procedures. Those procedures, plaintiffs say, render removable only those enemy aliens who refused to depart voluntarily. Out of the plaintiffs' additional statutory claims, this is the one most plausibly before us. As a reminder, the named plaintiffs contend the AEA itself permits the President "to provide for the removal" only "of

No. 25-10534

those who . . . refuse or neglect to depart." 50 U.S.C. § 21. And the named plaintiffs allege they are not refusing or neglecting to depart.

But what else are the named plaintiffs doing if not refusing to depart? Maybe I am missing something, but isn't the entire point of this habeas petition that the named plaintiffs "refuse" to depart? *Ibid.*; *cf. United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) (per curiam) ("So long as there is *any foreign country* to which he could have gone, his failure to go there is a 'neglect' or 'refusal' to depart voluntarily." (emphasis added)). They very much want to stay in the United States. And their lawyers from the ACLU very much want the same thing. So, by my reading, the named plaintiffs are refusing to depart from the United States.

So maybe the named plaintiffs mean something else. Maybe they mean they should be allowed time to settle their affairs before departing? Well, there is a problem: There is a different section of the AEA, 50 U.S.C. § 22, that deals with that. It is called "Time allowed to settle affairs and depart." *Id.* § 22. If any provision of the AEA provides a cognizable and enforceable right to time to depart, it would seem to be § 22.

But that section also provides no help to the plaintiffs. Under § 22, the "time" allotted to depart is whatever is either (a) "stipulated by any treaty" currently "in force between the United States and the hostile nation"; or (b) if there is no treaty, whatever the President decides. *Ibid.* But the plaintiffs provide no evidence that such a treaty exists between the United States and Venezuela. So that only leaves whatever time the President declares is appropriate. But he has determined that the appropriate amount of time is zero. *See* 90 Fed. Reg. at 13033.

To make matters worse for the plaintiffs, § 22 applies only to aliens who are "not chargeable with actual hostility." But the President's declaration has charged *all* TdA members with actual hostility. *See* 90 Fed.

No. 25-10534

Reg. at 13033. So how can anyone say they are not even "*chargeable* with actual hostility?" The petitioners' only response is that there needs to be an individualized determination. But they have cited no authority for that proposition. And there is no apparent historical or textual basis for it either. And the plaintiffs' conclusory statement does not count as "a clear showing" that they are likely to succeed on this issue. *Starbucks*, 602 U.S. at 346.

In short, even if we could address plaintiffs' several statutory claims, the plaintiffs have not shown they are likely to succeed on any of them. Thus, they are not entitled to a preliminary injunction on these grounds.

\*　　\*　　\*

Two short years ago, the Supreme Court of the United States held the President has unreviewable enforcement discretion to arrest and not to arrest alien terrorists and aliens with violent criminal convictions. *See United States v. Texas*, 599 U.S. 670, 681 (2023); *cf.* 8 U.S.C. §§ 1226(a), 1231(a) (directing that such aliens "shall" be detained). That is so, the Court held, because the President "must constantly react and adjust to the ever-shifting public-safety and public-welfare needs of the American people." *Texas*, 599 U.S. at 680. And the federal courts lack "meaningful standards for assessing those policies." *Ibid.* Therefore, the Court "abide[d] by and reinforce[d] the proper role of the Federal Judiciary under Article III" by rejecting "expansive judicial direction of the [President's immigration] arrest policies." *Id.* at 681.

Today, however, the rule is different.

- Two years ago, the President had unreviewable discretion to "constantly react and adjust to the ever-shifting public-safety and public-welfare needs of the American people." *Id.* at 680. But today, the President's assessment of the public-safety and public-welfare threats posed by a foreign terrorist organization acting on behalf of a

No. 25-10534

foreign country is subject to judicial veto for the first time in our Nation's history.

- Two years ago, the President had "sweeping Executive power." *Id.* at 735 (Alito, J., dissenting). But today the President is just another civil litigant.

- Two years ago, the President had unviewable powers to arrest and not arrest violent terrorists. *Id.* at 710 (Alito, J., dissenting) ("[N]o party may challenge the Executive's arrest and prosecution policies." (quotation omitted)). But today, federal courts can award habeas relief to violent terrorists *who are not even parties before us*.

- And two years ago, the federal courts lacked "meaningful standards for assessing" what the word "shall" means when Congress directs that the President "shall" detain violent terrorists and violent convicted criminals. *Id.* at 680 (majority opinion). But today, the majority uncovers meaningful standards for countermanding the President's determination that a foreign power is threatening a "predatory incursion" within our borders.

The majority's approach to this case is not only unprecedented—it is contrary to more than 200 years of precedent. It reflects a view of the Judicial power that is not only muscular—it is herculean. And it reflects a view of the Executive power that is not only diminutive—it is made subservient to the foreign-policy and public-safety hunches of every federal district judge in the country.

I respectfully but emphatically dissent.