**No. 25-10534** (Detained)

───────────────────────────────

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

───────────────────────────────

W.M.M., F.G.M., A.R.P., et al.,
Petitioners-Appellants,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,
Respondents-Appellees.

───────────────────────────────

ON APPEAL FROM UNITED STATES DISTRICT COURT OF THE
NORTHERN DISTRICT OF TEXAS
Case No. 1:25-cv-00059-H

───────────────────────────────

**PETITION FOR REHEARING EN BANC**
───────────────────────────────

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS T. DAVIS
Counsel to Assistant Attorney
General

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

JOHN W. BLAKELEY
Senior Counsel

DREW C. ENSIGN
Deputy Assistant Attorney General
U.S. Department of Justice
Civil Division
950 Pennsylvania Ave., N.W.
Washington D.C. 20530
(202) 514-2331
Drew.C.Ensign@usdoj.gov

Attorneys for Respondents-
Appellees

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel certifies that the following listed non-government persons may have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- W.M.M,
- A.R.P.,
- F.G.M,
  Petitioners on their own behalf and on behalf of others similarly situated

- Lee Gelernt
- Daniel Galindo
- Ashley Gorski
- Patrick Toomey
- Sidra Mahfooz
- Omar Jadwat
- Hina Shamsi
- AMERICAN CIVIL LIBERTIES UNION FOUNDATION
- 125 Broad Street, 18th Floor
- New York, NY 10004
  Counsel for Petitioners

- Spencer Amdur
- Noelle Smith
- Oscar Sarabia Roman
- My Khanh Ngo
- Cody Wofsy
- AMERICAN CIVIL LIBERTIES UNION FOUNDATION
- 425 California Street, Suite 700
- San Francisco, CA 94104

- T: (415) 343-0770
  Counsel for Petitioners

- Brian Klosterboer
- Thomas Buser-Clancy
- Savannah Kumar
- Charelle Lett
- Ashley Harris
- Adriana Piñon
- ACLU FOUNDATION OF TEXAS, INC.
- 1018 Preston St.
- Houston, TX 77002
- (713) 942-8146
  Counsel for Petitioners
-
- Kathryn Huddleston*
- AMERICAN CIVIL LIBERTIES UNION FOUNDATION
- 915 15th Street, NW, 7th Floor
- Washington, DC 20005
- T: (212) 549-2500
  Counsel for Petitioners

- Respondents-Appellees are government officials and entities.

s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney Gen.
U.S. Department of Justice
Civil Division
950 Pennsylvania Ave., N.W.
Washington D.C. 20530
(202) 514-2331
Drew.C.Ensign@usdoj.gov

# STATEMENT PURSUANT TO FED. R. APP. P. 40(b)(2)

This petition presents issues of "exceptional importance" to our national security. Fed. R. App. P. 40(b)(2)(D). The Alien Enemies Act (AEA) authorizes the President to detain and remove enemy aliens whenever an "invasion or predatory incursion is perpetrated, attempted, or threatened" against the United States by a "foreign nation or government." 50 U.S.C. §21. President Trump found that the foreign terrorist organization Tren de Aragua (TdA) is conducting such irregular warfare against the United States at the behest of Venezuela's Maduro regime and invoked the AEA to detain and remove TdA members. On remand from the Supreme Court, the panel wrongly invalidated that action, relying on reasoning that conflicts with Supreme Court precedent in *Ludecke v. Watkins*, 335 U.S. 160, 170 (1948), and misinterprets the AEA's text and history. This Court should grant rehearing en banc to remedy serious errors in an extraordinarily serious case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................... i

STATEMENT PURSUANT TO FED. R. APP. P. 40(b)(2) .................. iii

INTRODUCTION ....................................................................... 1

STATEMENT OF THE ISSUES ................................................... 2

STATEMENT OF THE CASE .................................................... 2

ARGUMENT .......................................................................... 7

I.    THE PANEL WRONGLY HELD THAT THE
PROCLAMATION LIKELY VIOLATES THE AEA ....................... 8

    A.    The Panel Failed To Apply the Required Deference ............. 8

    B.    The Panel Misinterpreted and Misapplied the AEA ........... 10

II.    THE PANEL ERRONEOUSLY CONCLUDED THAT THE
REMAINING EQUITABLE FACTORS FAVOR A
PRELIMINARY INJUNCTION ................................................... 19

III.    THE PANEL CORRECTLY CONCLUDED THAT THE
REVISED NOTICE PROCEDURE LIKELY SATISFIES DUE
PROCESS ............................................................................... 20

CONCLUSION ....................................................................... 21

CERTIFICATE OF SERVICE

BRIEF FORMAT CERTIFICATION

# TABLE OF AUTHORITIES

## CASES

*A.A.R.P. v. Trump,*
  605 U.S. 91 (2025) ................................................................5,6, 19, 20

*Arevalo v. Trump,*
  2025 WL 1554183 (C.D. Cal. June 2, 2025) ................................... 9, 10

*Citizens Protective League v. Clark,*
  155 F.2d 290 (D.C. Cir. 1946) ....................................................... 8, 9, 18

*Ludecke v. Watkins,*
  335 U.S. 160 (1948) ....................................................................... iii, 8, 9

*Luther v. Borden,*
  48 U.S. (7 How.) 1 (1849) ............................................................. 9

*Martin v. Mott,*
  25 U.S. (12 Wheat.) 19 (1827) ...................................................... 9

*Nken v. Holder,*
  556 U.S. 418 (2009) ....................................................................... 19

*Trump v. J.G.G.,*
  145 S. Ct. 1003 (2025) ................................................................... 8, 9

*Worcester v. Georgia,*
  31 U.S. 515 (1832) ......................................................................... 13

## STATUTES

**Immigration and Nationality Act of 1952, as amended.**

Section 219(a)(1),
  8 U.S.C. 1189(a)(1) ........................................................................ 3

**Others:**

50 U.S.C. §21 .........................................................iii, 2, passim

U.S. Const. Art. IV.................................................................. 4, 5

8 Annals of Cong. at 1577 ...................................................... 15

*Calvin's Case*, 7 Co. Rep. 1, 29 (1773)...................................... 16

 8 Annals of Cong. 1574-1576, 1581 (1798) ............................ 16

Alexander DeConde, *The Quasi-War: The Politics and Diplomacy of the Undeclared War with France 1797-1801*, at 8-9, 124 (1966) ................................................................. 2

Press Release, U.S. Dept. of Treasury, *Treasury Sanctions Venezuelan Cartel Headed by Maduro* (July 25, 2025).......................... 4

Letter from Gov. Abbott to President Biden, at 1-3 (Nov. 16, 2022), gov.texas.gov/uploads/files/press/BidenJoseph_11.16.22.pdf (Abbott Letter) ................................................................................... 4

*A Dictionary of the English Language* (4th ed. 1773) ........................... 11

*An American Dictionary of the English Language* (1828) .................... 12

President George Washington, Eighth Annual Address to Congress (Dec. 7, 1796)......................................................................... 13

*The New and Complete Dictionary of the English Language* (1775).... 13

*A Complete Dictionary of the English Language* (2d ed. 1789) ........... 13

Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Power of States*, 13 Brit. J. Am. Legal Stud. 21, 23-24 (2024)........................... 14

## REGULATIONS

90 Fed. Reg. 10,030, 10,030-10,031 (Feb. 20, 2025);.................................3

90 Fed. Reg. 13033, 13034 (March 14, 2025). ...........................1, 3, 5, 18

## INTRODUCTION

Respondents-appellees respectfully seek rehearing en banc to resolve a question of exceptional importance: whether and under what circumstances the President can invoke his broad powers under the Alien Enemies Act (AEA) to combat the threat posed by the foreign terrorist organization Tren de Aragua (TdA). Acting at the behest of Venezuela's Maduro regime, TdA has infiltrated the United States and wielded violence to sow chaos and undermine our democratic institutions. The President thus invoked the AEA in his Proclamation to detain and remove TdA members as alien enemies. Proclamation No. 10903 ("Proclamation"), 90 Fed. Reg. 13033, 13034 (March 14, 2025).

The panel, however, invalidated the President's Proclamation by misinterpreting the AEA. As Judge Oldham's dissent explains, the panel failed to defer to the Executive as Supreme Court precedent requires, then misinterpreted the AEA's text and history to unduly cabin its reach. The full Court should rehear this case to make clear that the AEA supports the President's Proclamation, and reaffirm that the government's policy for notifying enemy aliens of their removal under the AEA comports with due process.

## STATEMENT OF THE ISSUES

1.    Whether the panel erred in holding that the President likely exceeded his broad powers under the AEA.

2.    Whether the panel erred in holding that the remaining equitable factors favor a preliminary injunction.

3.    Whether the panel correctly held that the government's revised notice procedure likely comports with due process.

## STATEMENT OF THE CASE

The AEA grants the President broad power to designate, detain, and remove enemy aliens "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government." 50 U.S.C. §21.

The statute was enacted in 1798, at the start of the Quasi-War between the United States and France—an undeclared conflict in which the two nations raided each other's vessels, primarily through privateers. *See* Alexander DeConde, *The Quasi-War: The Politics and Diplomacy of the Undeclared War with France 1797-1801*, at 8-9, 124 (1966).

Since the AEA's enactment, Presidents have invoked the statute to combat threats posed by enemy aliens. Recently, President Trump invoked the AEA against members of TdA, a transnational criminal organization supported and directed by members of the Maduro regime. ROA.1201-04. TdA has "conducted kidnappings, extorted businesses, bribed public officials, authorized its members to attack and kill U.S. law enforcement, and assassinated a Venezuelan opposition figure." ROA.1192-93 ¶6, ROA.1194-95 at ¶12, ROA.11. The FBI has assessed it is "likely" that the Maduro regime will "leverage TdA members in the United States as proxy actors to threaten, abduct, and kill members of the US-based Venezuelan diaspora who are vocal Maduro critics." *Id.*

TdA was able to infiltrate the United States due to the border crisis which transnational criminal organizations and foreign terrorist organizations leveraged to further their own illegal activities, including smuggling fentanyl, weapons, and people. Some of those groups, including TdA, have "the capability and intent" to engage in terrorist activity and thereby "threaten[] the security" of the Nation, and have been designated as foreign terrorist organizations. 8 U.S.C. 1189(a)(1) and (d)(4); see 90 Fed. Reg. 10,030, 10,030-10,031 (Feb. 20, 2025); *see also*

Press Release, U.S. Dept. of Treasury, *Treasury Sanctions Venezuelan Cartel Headed by Maduro* (July 25, 2025), home.treasury.gov/news/press-releases/sb0207 (sanctioning Cártel de los Soles for materially assisting TdA and Cártel de Sinaloa).  The border crisis grew so dire that Texas invoked the constitutional promise that the federal government "shall protect each of the[ States] against Invasion," U.S. Const. Art. IV, §4.[1] The Governor explained that "[r]anches are being ripped apart"; "homes are vulnerable to intrusion"; "border communities are regularly disrupted by human traffickers and bailouts"; and "[d]eadly fentanyl is crossing the porous border to such a degree that it is now the leading cause of death for citizens between the ages of 18 and 45."  Abbott Letter 1.

The President's Proclamation thus invoked the AEA against TdA members to address the grave threat they posed. The President found that TdA effectively functioned as a "hybrid criminal state," "closely

---

[1]     Letter from Gov. Abbott to President Biden, at 1-3 (Nov. 16, 2022), gov.texas.gov/uploads/files/press/BidenJoseph_11.16.22.pdf (Abbott Letter).

aligned with" Venezuela's Maduro regime. *Id.* Through TdA, the Maduro regime is "conducting irregular warfare" and "perpetrating an invasion of and predatory incursion into" the U.S., posing "a substantial danger" to the Nation. *Id.* Based on those determinations, the President proclaimed that "all Venezuelan citizens 14 years of age or older who are members of TdA … and are not actually naturalized or lawful permanent residents … [are] liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id.* at 13,034.

Petitioners are being detained in an immigration-detention facility in Texas. They jointly petitioned for a writ of habeas corpus on behalf of a putative class, alleging that the Proclamation violates the AEA's statutory requirements and constitutional due process. ROA.1-22.

After various emergency filings, the Supreme Court issued emergency relief enjoining the Government from removing putative class members under the AEA "pending this Court's decision and any timely petition for a writ of certiorari." *A.A.R.P. v. Trump*, 605 U.S. 91, 99 (2025). The Supreme Court held that aliens subject to removal under the AEA "must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief" before

removal but did not specify what process is due, *id.* at 95, instead remanding the case to this Court to "address (1) all the normal preliminary injunction factors, including likelihood of success on the merits, as to the named plaintiffs' underlying habeas claims that the AEA does not authorize their removal," and "(2) the issue of what notice is due." *Id.* at 98-99.

The government then revised its notice policy for aliens designated for removal under the AEA. The new form tells aliens, in a language they can understand, that they can contest their removal under the AEA by filing a habeas petition in the district where they are detained and that they may retain counsel. *Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act*, ROA.1124-27. Aliens have seven days from receipt of that notice to file habeas petitions, during which time the aliens will not be removed under the AEA. *Id.*

On remand, a panel of this Court issued a splintered precedential decision granting petitioners a preliminary injunction and remanding for further factfinding. A majority upheld the government's updated notice procedures as consistent with due process. Op.48-48. Judge Ramirez dissented, stating that at least a 21-day notice period. Op.49-54.

6

A separate majority held that the court could review the proper interpretation and application of the AEA, Op.6-17, and reasoned that petitioners showed a likelihood of success on the merits because the Proclamation does not identify a "predatory incursion" or "invasion" within the meaning of the AEA. That majority further held that the other injunctive factors favored petitioners. Op.18-43, 49. Judge Oldham dissented, explaining that the court lacked authority to assess if the AEA's preconditions have been satisfied and that the equities favored the government. Op.78-150.

## ARGUMENT

The Supreme Court directed this Court on remand to evaluate (1) petitioners' entitlement to a preliminary injunction on their claim that the AEA does not authorize the President's Proclamation, including (a) the likelihood of success on the merits, and (b) the remaining injunction factors; and (2) what notice is due before removal. The panel majority got only one of those questions right—that the government's notice satisfies due process. But the panel misinterpreted the AEA in ways that threaten the Executive's ability to address extraordinary threats from TdA that the Maduro regime is leveraging to harm our

national security. That error manifestly warrants rehearing. In doing so, the en banc court should clarify the correct answers to each of the Supreme Court's questions.

## I. The Panel Wrongly Held that the Proclamation Likely Violates the AEA

### A. The Panel Failed To Apply the Required Deference

The panel erred at the threshold of its AEA analysis by failing to give proper deference to any of the President's determinations—then faulting the President's determination that TdA is committing a "predatory incursion" and "invasion" against the United States. *See* Op.78-132 (Oldham, J., dissenting).

1. The Supreme Court has long recognized that judicial review under the AEA must be extremely limited. *See Ludecke*, 335 U.S. at 170. The AEA grants the President discretion to proclaim when an "invasion" or "predatory incursion" by a hostile nation has occurred. 50 U.S.C. §21. Courts have "neither technical competence nor official responsibility" for second-guessing those determinations. *Ludecke*, 335 U.S. at 170. The AEA thus "largely preclude[s] judicial review." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (quoting *Ludecke*, 335 U.S. at 163); *see Citizens*

*Protective League v. Clark*, 155 F.2d 290, 296 (D.C. Cir. 1946) ("Unreviewable power in the President ... is the essence of the" AEA.). That approach tracks the Supreme Court's refusal to second-guess other presidential national-security determinations. *See, e.g.*, *Luther v. Borden*, 48 U.S. (7 How.) 1, 31-32 (1849); *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 31 (1827); Op.85-89 (Oldham, J., dissenting).

The Supreme Court has clarified that courts may engage in "limited" judicial review to decide "'questions of interpretation and constitutionality' of the Act.'" *J.G.G.*, 145 S. Ct. at 1006 (quoting *Ludecke*, 335 U.S. at 163 n.17). But courts must conduct those limited interpretive tasks deferentially given the AEA's deliberate breadth, the variety of national-security situations that may arise, and the President's Article II authority. Thus, *Ludecke* "construed the AEA only to the extent necessary to reject the argument that the President had exceeded the scope of his authority under the AEA." *Arevalo v. Trump*, 2025 WL 1554183, at *8 (C.D. Cal. June 2, 2025)

2.  Rather than deferring, the panel held that Supreme Court precedent permits it "to interpret the AEA after the President has invoked it," Op.17, reasoned that such "[i]nterpretation cannot be just an

academic exercise," and refused to credit "the executive's determination that certain facts constitute" a predatory incursion or invasion, calling those determinations "not conclusive." *Id.* After (erroneously) interpreting the AEA's terms, *see* Op. 19-30, *infra*, the panel parsed the findings in the President's Proclamation and faulted them. Op.32-36.

That approach was erroneous. "[A] court cannot decide whether an invasion or a predatory incursion exists without supplanting, to some degree, the President's discretion." *Arevalo*, 2025 WL 1554183, at *9; *see* Op.78-122 (Oldham, J., dissenting). And a court's "interpretation" of the AEA cannot involve second-guessing the President's conclusions whether hostilities rise to the level of a threatened incursion or invasion. *See* Op.107-08 (Oldham, J., dissenting). Nor can courts then second-guess the President's factfinding. *See* Op. 11, 55*, 89 infra*. That review contravenes Supreme Court precedent and supplants the President's national-security determinations in an area of core Article II powers.

## B. The Panel Misinterpreted and Misapplied the AEA

Having employed the wrong level of scrutiny, the panel then misinterpreted the AEA itself—committing errors under any standard. The AEA broadly empowers the President to act "[w]henever there is a

declared war ... or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by a foreign nation or government." 50 U.S.C. §21. The panel correctly accepted the President's determination that through TdA, a "foreign nation or government" is taking hostile actions against the United States. *See* Op.34-39. Yet the panel concluded that TdA's hostilities were not the kind of "armed, organized force" supposedly required to constitute a "predatory incursion"—even an "attempted" or "threatened" predatory incursion—under the AEA. Op.32-34. That determination is doubly wrong. The AEA is not limited to hostilities by an "armed, organized force"; even if it were, irregular warfare conducted on behalf of the Maduro regime by violent proxies surely qualifies.

1.     The statutory text, structure, and history demonstrate that the terms "predatory incursion" and "invasion" cover a wide range of hostile entries, not just organized military hostilities. Start with "predatory incursion." Contemporaneous dictionaries defined "incursion" broadly, without reference to formal military warfare. Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773) (an "[a]ttack; mischievous occurrence," or an "[i]nvasion without conquest; inroad;

ravage); Noah Webster, *An American Dictionary of the English Language* (1828). Similarly, those dictionaries define "predatory" to mean "plundering," "pillaging," and "rapine." Johnson, *supra*; Webster, *supra*. Thus, the contemporaneous meaning of "predatory incursion" was any entry or attack for a hostile and destructive purpose—not just military hostilities.

Neighboring text confirms this point. The AEA applies in times of "declared war … *or* … invasion or predatory incursion." 50 U.S.C. §21 (emphasis added). Congress's use of different terms—and the disjunctive—signals that "predatory incursion" means something different from "declared war" and covers less formal hostilities. Moreover, the AEA authorizes removal of alien enemies when a predatory incursion (or invasion) is "perpetrated, *attempted, or threatened*." 50 U.S.C. §21 (emphasis added). That the AEA covers nationals of hostile powers that have merely "attempted" or "threatened" incursions shows that actual hostilities by "armed forces" were not required. *Contra* Op.30.

Historical context and usage reinforce the statutory text. *See* Op.56-63 (Oldham, J., dissenting). As noted, the AEA's impetus was the Quasi-War, an undeclared conflict between the United States and France

largely perpetrated by privateers. Op.18, 56-63. Consistent with that history, the contemporaneous use of "incursion" was not limited to aggressions by organized military forces. In 1796, President Washington addressed measures to protect American settlements "from the predatory incursions of those unruly individuals who can not be restrained by their tribes." President George Washington, Eighth Annual Address to Congress (Dec. 7, 1796). The "predatory incursion" was not conducted by a tribe's army, but by "unruly individuals" not necessarily aligned with their tribe. Likewise, *Worcester v. Georgia*, 31 U.S. 515 (1832), discussed state charters that referred to "incursions" by Indians and by "other enemies, pirates, and robbers." *Id.* at 545. "Incursions" need not be perpetrated by a military or similarly cohesive organization.

Similarly, in 1798, an "invasion" broadly referred to a "hostile entrance," *e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or "hostile encroachment" on another's territory, *see* Thomas Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789). Some contemporaneous dictionaries "included formal military operations," but also included "many other kinds of encroachments or intrusions," including hostile acts of mass migration.

Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Power of States*, 13 Brit. J. Am. Legal Stud. 21, 23-24 (2024).

2. The panel erroneously concluded that when the AEA was enacted, "predatory incursion" meant "armed forces of some size and cohesion, engaged in something less than an invasion." Op.31. And the panel held that an "invasion" meant "an act of war involving the entry into this country by a military force of or at least directed by another country or nation, with a hostile intent." Op.22.

The panel's own sources undercut those interpretations. Its cited dictionaries included definitions that did not refer to organized military hostilities. *See* Op.20, 23. To define "predatory incursion," the panel relied on "contemporaneous usage" to narrow the dictionary definitions, identifying instances where a "predatory incursion" was used to describe hostilities by "a military force of some meaningful size." Op.24, 27. But the government has never disputed that the term "predatory incursion" was sometimes used to describe hostilities by an organized military force; the problem with the panel's interpretation is that the phrase *also*

referred to less formal or militaristic intrusions. Op.23, (describing examples of historical usage).

The panel also improperly downplayed the statutory terms "attempted" and "threatened." As Judge Oldham's dissent observes, the AEA reflected concerns regarding "the great number of" French 'aliens' residing in the United States," including "innumerable French 'agents and spies'" who might have been ready to join an attack on the United States. Op.59, 63; *see also* 8 Annals of Cong. at 1577. Underpinning the AEA was the idea that expelling French enemies would *prevent* France from attacking by depriving France of the assistance of agents in the United States. *Id.* at 1574. Thus, Congress drafted the AEA to give the President leeway to address potential threats to United States territory. The panel instead wrongly concluded that the terms "threatened" and "attempted" merely "extend the AEA to failed efforts to commit an invasion or incursion but do not assist in defining the terms." Op 24.

The panel also credited petitioners' argument that the AEA requires military hostilities because the term "alien enemies" supposedly "is a law-of-nations concept that 'require[s] armed hostilities between warring sovereigns.'" Op.23. That view of "alien enemies" is incorrect.

Edward Coke addressed the notion of a "perpetual" "alien enemy," such as an "infidel[]," who maintained that status "though there be no wars by fire and sword between them." *Calvin's Case*, 7 Co. Rep. 1, 29 (1773). And during the Quasi-War, Members of Congress referred to French citizens as "alien enemies" even though no war had been declared. *See* 8 Annals of Cong. 1574-1576, 1581 (1798).

The panel also erred in drawing inferences from the Alien Friends Act. Op.28-30. That statute allowed the President to remove dangerous aliens without hostilities between nations, whereas the AEA "demands specific categories of hostility by another nation or government." Op.30. But that comparison comports with the government's interpretation, which requires hostilities at the direction of a foreign government but does not limit those hostilities to declared war or organized military operations.

3.     Even under the panel's erroneous interpretation of the AEA, the President's Proclamation is lawful. The panel confirmed that "being directed at least in part by the foreign Maduro regime" suffices to meet the AEA's requirement for action "by any foreign nation or government." Op.34-39. The panel acknowledged that the AEA can cover "[m]odern

warfare," Op.31, which is often conducted using proxies. Moreover, TdA is a designated "foreign terrorist organization," *i.e.*, a cohesive "organization," which has entered the United States with the hostile purpose of destabilizing the country. Indeed, the FBI believes the Maduro regime may direct TdA to carry out targeted attacks on Venezuelan dissidents on American soil. *See* FBI Assessment, ROA.1202. Even were "organized" force required, as the panel wrongly concluded, TdA's actions surely constitute at least a *"threatened"* "predatory incursion" against U.S. territory. 50 U.S.C. § 21 (emphasis added).

The panel held otherwise only by committing another significant error: failing to defer to the President's factual determinations underpinning the Proclamation. In determining whether TdA's hostilities constituted a "predatory incursion" or "invasion" under the panel's interpretation of those terms, the panel examined only the findings of fact in the Proclamation itself. *See* Op.34-35. The panel ignored all statements in the Proclamation that it deemed conclusory or unsupported. *See* Op.33. And it refused to credit later-produced evidence further substantiating the Proclamation's findings, such as the FBI's assessment of TdA's threat. Op.34.

That approach effectively demotes the President as Commander in Chief marshaling sensitive intelligence sources in a Proclamation to an ordinary plaintiff trying to satisfy Rule 12(b)(6) in a civil complaint. Op.105 (Oldham, J., dissenting). Such treatment "is the polar opposite of what the AEA" and its history "demand." *Id.* at 105-106. Forcing the President to divulge every basis for his AEA determinations in a public proclamation puts the President to the improper choice of having to divulge classified or otherwise sensitive information or face judicial invalidation. As the D.C. Circuit has put it, "it is inconceivable that before an alien enemy could be removed," the "President should be compelled to spread upon the public record in a judicial proceeding" such sensitive information. *Citizens Protective League*, 155 F.2d at 294.

The panel thus failed to defer to the President's determinations that TdA is perpetrating "irregular warfare within the country," "using drug trafficking as a weapon" to "further" the Maduro regime's "objectives of harming United States citizens." Op.32. *But see* 90 Fed. Reg. 13,033; ROA.1192-93 ¶6, ROA.1194-95 at ¶12, ROA.11. And it improperly dismissed the FBI's findings. Had the panel properly deferred, it should

have upheld the President's determination that TdA is at the least threatening or attempting a predatory incursion against U.S. territory

## II. The Panel Erroneously Concluded that the Remaining Equitable Factors Favor a Preliminary Injunction

The panel also erred in holding that the remaining equitable factors favor a preliminary injunction on petitioners' AEA claim. *See* Op.40-43. The Supreme Court has already "recognize[d] the significance of the Government's national security interests." *A.A.R.P.*, 145 S. Ct. at 1368; *see* Op.141 (Oldham, J., dissenting). Moreover, the government has a strong interest in the "prompt" execution of removal, *Nken v. Holder*, 556 U.S. 418, 436 (2009), and an especially "heightened" interest where, as here, "the alien is particularly dangerous." *Id.* Petitioners "come nowhere close to clearly showing that their interests overcome the weighty interests favoring enforcement." Op.145 (Oldham, J., dissenting).

The panel contended that the government "assume[s]" that the petitioners have been correctly identified as TdA members. Op.43. But that reasoning flips the burden of proof. Petitioners, not the government, "must make a clear showing" that they are entitled to preliminary relief. Op.145 (Oldham, J., dissenting) (citation omitted). The panel erroneously discredited the government's national-security interests at this stage.

## III. The Panel Correctly Concluded that the Revised Notice Procedure Likely Satisfies Due Process

Given the Supreme Court's remand order, the en banc Court should also address petitioners' due-process claim and affirm the panel's holding on that issue. *See* Op.44-47.

As a matter of due process, AEA detainees must be given "sufficient time and information to reasonably be able to contact counsel, file a petition and pursue appropriate relief." *A.A.R.P.*, 605 U.S. at 98. The government's new procedures readily satisfy that standard. Aliens are given notice of their designation, that they can pursue habeas relief and retain counsel, and that they have seven days to file. *Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act*, ROA.1124-27. That is sufficient time to pursue relief, as the panel correctly held. *See* Op.47.

Judge Ramirez would have held that "[a]t least twenty-one days' notice is required." Op.54. That rule has no basis in due-process caselaw or relevant facts. To the extent unusual circumstances make it difficult for an individual detainee to contact counsel and file a petition in seven days, that merely highlights why class certification should ultimately be denied, not any facial due-process problem.

## <u>CONCLUSION</u>

The Court should grant rehearing en banc.


September 22, 2025                    Respectfully submitted,

                                     BRETT A. SHUMATE
                                     Assistant Attorney General
                                     Civil Division

                                     TIBERIUS T. DAVIS
                                     Counsel to Assistant Attorney General

                                     ANTHONY NICASTRO
                                     Acting Director
                                     Office of Immigration Litigation

                                     JOHN W. BLAKELEY
                                     Senior Counsel

                                     s/ Drew C. Ensign
                                     DREW C. ENSIGN
                                     Deputy Assistant Attorney Gen.
                                     U.S. Department of Justice
                                     Civil Division
                                     950 Pennsylvania Ave., N.W.
                                     Washington D.C. 20530
                                     (202) 514-2331
                                     Drew.C.Ensign@usdoj.gov

                                     Attorneys for Respondents-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that Petitioners-Appellants' counsel are registered CM/ECF users and will be served through the CM/ECF system.

s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney Gen.
U.S. Department of Justice
Civil Division
950 Pennsylvania Ave., N.W.
Washington D.C. 20530
(202) 514-2331
Drew.C.Ensign@usdoj.gov

## BRIEF FORMAT CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 32(f), I certify this brief was prepared using 14-point proportionally spaced typeface in Microsoft Word 365. It complies with the 3900-word limit as it contains 3884 words, excluding the parts exempted by Fed. R. App. P. 32(f).


Dated: September 22, 2025       s/ Drew C. Ensign
                                              DREW C. ENSIGN
                                              Deputy Assistant Attorney Gen.
                                                U.S. Department of Justice
                                              Civil Division
                                              950 Pennsylvania Ave., N.W.
                                              Washington D.C. 20530
                                              (202) 514-2331
                                              Drew.C.Ensign@usdoj.gov