# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Docket No. 25-10534

W.M.M., F.G.M., and A.R.P., *et al.*,

*Petitioners – Appellants*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents – Appellees*.

## On Appeal from
United States District Court for the Northern District of Texas
No. 1:25-cv-59-H

## PETITIONERS-APPELLANTS' BRIEF IN RESPONSE TO RESPONDENTS-APPELLEES' PETITION FOR REHEARING EN BANC

Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: samdur@aclu.org
E: nsmith@aclu.org
E: osarabia@aclu.org

Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org
E: dgalindo@aclu.org

E: mngo@aclu.org
E: cwofsy@aclu.org

Brian Klosterboer
TX Bar No. 24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
Adriana Piñon
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS,
INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org
apinon@aclutx.org

E: agorski@aclu.org
E: ptoomey@aclu.org
E: ojadwat@aclu.org
E: hshamsi@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(212) 549-2500
E: khuddleston@aclu.org

*For Petitioners-Appellants
W.M.M., F.G.M., A.R.P., et al.*

*\*Barred in Texas and Arizona only;
supervised by a member of the D.C.
Bar*

## CERTIFICATE OF INTERESTED PERSONS

Appellants certify that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioners-Appellants**
A.R.P., on their own behalf and on behalf of others similarly situated
F.G.M., on their own behalf and on behalf of others similarly situated
W.M.M., on their own behalf and on behalf of others similarly situated

**Counsel for Petitioners-Appellants**

| | | |
|---|---|---|
| Lee Gelernt | Spencer Amdur | Brian Klosterboer |
| Daniel Galindo | Noelle Smith | Thomas Buser-Clancy |
| Ashley Gorski | Oscar Sarabia Roman | Savannah Kumar |
| Patrick Toomey | My Khanh Ngo | Charelle Lett |
| Omar Jadwat | Cody Wofsy | Ashley Harris |
| Hina Shamsi | Kathryn Huddleston | Adriana Piñon |

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
TEXAS

**Respondents-Appellees** are government officials and entities.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF AUTHORITIES .................................................................................. iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

   A.  The Proclamation And Its Implementation..................................................... 3

   B.  This Litigation .................................................................................................. 4

ARGUMENT ........................................................................................................... 6

   I.    THE PANEL CORRECTLY HELD THAT THE PROCLAMATION
   LIKELY EXCEEDS THE AEA'S BOUNDS. ....................................................... 7

     A.  The Court Has Authority To Interpret And Apply The AEA's
     Requirements. ................................................................................................... 7

     B.  The Panel's Decision Was Correct On The Merits. .................................... 9

   II.  THE PANEL CORRECTLY CONCLUDED THAT THE REMAINING
   EQUITABLE FACTORS FAVOR A PRELIMINARY INJUNCTION............. 16

CONCLUSION ...................................................................................................... 16

CERTIFICATE OF SERVICE .............................................................................. 18

CERTIFICATE OF COMPLIANCE ..................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*A.A.R.P. v. Trump*,
   605 U.S. 91 (2025)......................................................................1, 4, 5, 7

*A.S.R. v. Trump*,
   No. 25-02311 (3d Cir.) ...........................................................................6

*Arevalo Milan v. Trump*,
   No. 25-04866 (9th Cir.) ..........................................................................6

*Calvin's Case*,
   7 Co. Rep. 1 (1773) ..............................................................................13

*D.B.U. v. Trump*,
   No. 25-01265 (10th Cir.) ........................................................................6

*G.F.F. v. Trump*,
   No. 25-01671 (2d Cir.) ...........................................................................6

*J.A.V. v. Trump*,
   781 F. Supp. 3d 535 (S.D. Tex. 2025)...............................................1, 10

*J.A.V. v. Trump*,
   No. 25-40400 (5th Cir.) ..........................................................................6

*J.G.G. v. Trump*,
   No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025)...............*passim*

*U.S. ex rel. Jaegeler v. Carusi*,
   342 U.S. 347 (1952)................................................................................8

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950)...................................................................2, 11, 12

*Ludecke v. Watkins*,
   335 U.S. 160 (1948)............................................................................7, 8

*M.A.P.S. v. Garite*,
   No. 25-50580 (5th Cir.) ..........................................................................6

*Sparenburgh v. Bannatyne*,
  126 Eng. Rep. 838 (1797)...................................................................13

*Techt v. Hughes*,
  229 N.Y. 222 (1920)........................................................................12

*The Benito Estenger*,
  176 U.S. 568 (1900) ........................................................................12

*The Rapid*,
  12 U.S. 155 (1814) ..........................................................................12

*Trump v. J.G.G.*,
  604 U.S. 670 (2025).........................................................................7

*Ware v. Hylton*,
  3 U.S. 199 (1796).............................................................................12

*White v. Burnley*,
  61 U.S. 235 (1857) ..........................................................................12

*Worcester v. Georgia*,
  31 U.S. 515 (1832)......................................................................11, 14

**Statutes**

1 Stat. 96 (1789)...................................................................................10

1 Stat. 264 (1792).................................................................................10

1 Stat. 424 (1795).................................................................................10

1 Stat. 558 (1798).................................................................................10

1 Stat. 725 (1799).................................................................................10

8 U.S.C. § 1182(a)(3)(B) .....................................................................15

8 U.S.C. § 1189(a)(1)(A) .....................................................................15

8 U.S.C. § 1189(a)(1)(B) .....................................................................15

An Act Concerning Aliens § 1, 1 Stat. 571 (1798)...............................11

## Other Authorities

8 Annals of Cong. 1574 (1798)...................................................................13

8 Annals of Cong. 1575 (1798)............................................................12, 13

8 Annals of Cong. 1576 (1798)...................................................................13

8 Annals of Cong. 1577 (1798) ..................................................................14

8 Annals of Cong. 1581 (1798)...................................................................13

8 Annals of Cong. 1791 (1798) ..................................................................12

8 Annals of Cong. 1980 (1798) ..................................................................11

Dep't of State, Foreign Terrorist Organizations (2025),
    https://perma.cc/TM2J-ALVK.............................................................15

Emer de Vattel, The Law of Nations: Principles of the Law of Nature
    Applied to the Conduct and Affairs of Nations and Sovereigns
    (Philadelphia, T. & J. W. Johnson & Co.1863)............................13, 14

James Madison, Report of 1800
    (Jan. 7, 1800) .......................................................................................13

J.J. Burlamaqui, 1 The Principles of Natural and Politic Law (Boston,
    Thomas Nugent trans., Boyle, Benjamin & Larkin 4th ed. 1792) ....................14

Joseph Chitty, A Practical Treatise on the Law of Nations
    (Boston, Bradford and Read 1812).....................................................13

Matthew Hale, 1 Historia Placitorum Coronae: The History of the
    Pleas of the Crown (F. Gyles 1736) ...................................................14

U.S. Const. art. I, § 8, cl. 11.......................................................................11

U.S. Const. art. I, § 8, cl. 15.......................................................................10

U.S. Const. art. I, § 10, cl. 3.......................................................................10

# INTRODUCTION

Consistent with decisions from courts across the country, the panel correctly held that the Proclamation is not authorized by the Alien Enemies Act ("AEA"). Panel Opinion ("Op.") 6-35 (Southwick, Ramirez, JJ.), Dkt. No. 195-1; *see, e.g.*, *J.G.G. v. Trump*, 2025 WL 914682, *1-13 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *J.A.V. v. Trump*, 781 F. Supp. 3d 535 (S.D. Tex. 2025) (Rodriguez, J.). The Supreme Court has stayed further AEA removals pending its own review and directed lower courts to "address AEA cases expeditiously." *A.A.R.P. v. Trump*, 605 U.S. 91, 96 (2025) (per curiam); *id*. at 100 (Kavanaugh, J., concurring) ("The circumstances call for a prompt and final resolution, which likely can be provided only by this Court.").[1] En banc review is not warranted and would only delay the Supreme Court's consideration of any petition for certiorari. That delay is particularly unwarranted given that the government has made *W.M.M.* the test case for its use of the AEA by moving to pause all other AEA appeals pending resolution of this case by the Supreme Court. *See* Br. Amicus Curiae Dem. Defs. Fund, Dkt. No. 211 (experienced former government and national security officials urging denial of en banc rehearing so Supreme Court can expeditiously decide this issue, noting that other circuits have placed AEA appeals in abeyance at the government's suggestion).

---

[1] The *A.A.R.P.* case was later re-styled in its current form as *W.M.M.*

1

For two centuries prior to the Proclamation, every branch of government has understood the AEA as an emergency statute intended for wartime only. Congress enacted it to establish "the effect of war upon the status of nationals of belligerents." *Johnson v. Eisentrager*, 339 U.S. 763, 771-75 (1950). And Presidents have previously used it solely during wartime, and even then, only in three major wars. Op. 9. Now, the government is trying to use the AEA during peacetime, as an all-purpose tool to detain and remove immigrants based on law enforcement and immigration issues. The panel correctly rejected the government's sweeping claims.

Citing Judge Oldham's dissent, the government maintains that courts have no meaningful role in determining whether the Proclamation satisfies the AEA's requirements. But as the panel properly noted, the Supreme Court held precisely the opposite just months ago in *J.G.G.*, reaffirming its World War II-era AEA cases. The government's disagreement with the Supreme Court is not a basis for en banc review.

On the merits, the government maintains that the AEA does not require military invasions or incursions but is satisfied as long as the President proclaims that a group has a "hostile and destructive purpose," using "hostile" in the colloquial sense of unfriendly or adverse. *See* Pet. for Reh'g En Banc ("Pet.") 12. The panel properly rejected that virtually limitless interpretation. Like other courts, the panel canvassed the historical record and properly concluded that every aspect of the

2

statute's text and context point to the need for an ongoing or threatened military conflict on U.S. territory: a declared war, or "the entry into this country by a military force," or "armed forces of some size and cohesion, engaged in something less than an invasion." Op. 22, 31; *see also, e.g.*, *J.G.G.*, 2025 WL 914682, *9-10 (Henderson, J.) (concluding that the Proclamation does not satisfy the AEA because an "invasion is a military affair" and an "incursion is a lesser form of invasion").

Against all of that, the government offers little more than a few cherry-picked quotes purporting to show that individual words in isolation—like "incursion"—can have non-military meanings. The Court should deny the petition.

## BACKGROUND

### A.     The Proclamation And Its Implementation

On March 14, the President signed a Proclamation under the AEA declaring that Tren de Aragua ("TdA"), a Venezuelan criminal gang, is "perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." Op. 4-5. The Proclamation does not lay out any process for accused TdA members to challenge their designation. The Department of Justice's implementing memorandum likewise authorizes "immediate removal" and states that detainees are not entitled "to judicial review of the removal order in any court of the United States." ROA.880-86, §§ 5(a), 8(a).

On March 15, Venezuelan detainees alleged to be TdA members were loaded onto planes without prior warning and removed to the Centro de Confinamiento del Terrorismo, a notoriously brutal prison in El Salvador. Since then, evidence has emerged that a disturbing number of those individuals appear to have no connection to TdA at all, and were designated for removal based on innocuous clothing, tattoos, and hand signs. ROA.899-1050.

## B.    This Litigation

Petitioners filed this habeas action in the Northern District of Texas on behalf of themselves and a proposed class after learning that the government was moving Venezuelan noncitizens from around the country to the Bluebonnet Detention Facility. Mot. for Class Cert., *W.M.M. v. Trump*, No. 1:25-cv-59, at 1-2 (N.D. Tex. Apr. 16, 2025), Dkt. No. 3-1. The district court denied Petitioners' request for a TRO, believing that removals were not imminent and that immediate relief was therefore unnecessary. ROA.250, 253-59. But only "hours later, putative class members were served notices of AEA removal and told that they would be removed 'tonight or tomorrow.'" *A.A.R.P.*, 605 U.S. at 92.

Upon learning of their imminent removal, the putative class moved for an emergency TRO. Without a response from the district court, and as the government transported putative class members from the detention facility to a nearby airport, Petitioners appealed the constructive denial of the emergency TRO, first to this

4

Court and then to the Supreme Court. *Id.* at 92-93. The Supreme Court issued an emergency administrative stay barring removal. *Id.* at 93-94 (noting district court had not acted for over "14 hours").

After further briefing, the Supreme Court granted an injunction pending appeal and remanded for this Court to address "(1) all the normal preliminary injunction factors, including likelihood of success on the merits, as to the named plaintiffs' underlying habeas claims that the AEA does not authorize their removal pursuant to the President's March 14, 2025, Proclamation, and (2) the issue of what notice is due, as to the putative class's due process claims against summary removal." *Id.* at 98-99. The Court further directed that "lower courts should address AEA cases expeditiously." *Id.* at 96. This Court accordingly expedited the appeal.

On remand, Judge Southwick, writing for the majority, held that the Court could review whether the AEA authorized the Proclamation, Op. 7-17, and on the merits held that the AEA did not authorize the Proclamation because there has been no ongoing or threatened military invasion or predatory incursion of the United States, Op. 18-35.[2] Judge Oldham dissented. Op. 55-185. A separate majority, from

---

[2] Petitioners disagree with the panel's conclusion that the Proclamation satisfies the AEA's requirement that the invasion or incursion be by a "foreign nation or government." Op. 35-39; *see* OB.30-35; RB.16-21; *infra* (noting conclusion of national security agencies that TdA is not directed by the Maduro government). But in light of the panel's conclusion that the Proclamation was invalid on other grounds, Petitioners do not take issue with that finding here.

which Judge Ramirez dissented, declined to invalidate the government's notice procedures, but acknowledged further fact-finding regarding the sufficiency of those procedures would be required by the district court. Op. 44-48.[3]

Numerous AEA cases are now on appeal but, at the government's request, have been placed in abeyance pending a decision in this case and any subsequent Supreme Court review. *G.F.F. v. Trump*, No. 25-01671 (2d Cir.), Dkt. No. 29 (holding appeal in abeyance "pending the Supreme Court's resolution of any petition for certiorari from the Fifth Circuit's forthcoming decision in *W.M.M. v. Trump*, No. 25-10534 (5th Cir.), or, if such petition is granted, pending the Supreme Court's decision"); *D.B.U. v. Trump*, No. 25-01265 (10th Cir.), Dkt. Nos. 22, 34 (same); *J.A.V. v. Trump*, No. 25-40400 (5th Cir.), Dkt. No. 52 (same); *A.S.R. v. Trump*, No. 25-02311 (3d Cir.), Dkt. No. 21 (same); *M.A.P.S. v. Garite*, No. 25-50580 (5th Cir.), Dkt. No. 51 (same); *Arevalo Milan v. Trump*, No. 25-04866 (9th Cir.), Dkt. No. 6 (same); *see also* Br. Amicus Curiae Dem. Defs. Fund 2-3, Dkt. No. 211.

## ARGUMENT

The Supreme Court specifically instructed lower courts to "address AEA cases expeditiously," *A.A.R.P.*, 605 U.S. at 96, which this Court has now done. And appellate courts across the country have held their AEA cases in abeyance at the government's request, pending the outcome of any petition for certiorari in this case.

---

[3] Neither party seeks en banc review as to the panel's due process decision. Pet. 20.

*See supra*. Taking this case en banc would impede "a prompt and final resolution" of this case and numerous other AEA cases across the country. *A.A.R.P.*, 605 U.S. at 100 (Kavanaugh, J., concurring). Moreover, there is no reason for the en banc court to revisit the panel's well-reasoned opinion.

## I.   THE PANEL CORRECTLY HELD THAT THE PROCLAMATION LIKELY EXCEEDS THE AEA'S BOUNDS.

### A.   The Court Has Authority To Interpret And Apply The AEA's Requirements.

The panel majority correctly held that courts may "interpret" the AEA—a familiar judicial task that necessarily involves "application of law to facts." Op. 17. The Supreme Court recently made this clear once again as to the AEA, reaffirming that courts can decide "'questions of interpretation and constitutionality' of the Act." *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)). As the panel properly recognized, such interpretation would be meaningless if a court could not then apply its interpretation to the government's use of the statute. Indeed, in *Ludecke* itself, the Supreme Court interpreted and applied the AEA to decide whether the term "declared war" in the statute should be understood to apply only while the "shooting" continued. 335 U.S.

7

at 166-70 & n.11; *see also U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952) (reversing AEA removal order).[4]

The government nonetheless argues for what effectively amounts to zero judicial review. It maintains that courts cannot review whether the Proclamation satisfies the requirements of the AEA. Pet. 8-10; *see* Op. 79-111 (Oldham, J., dissenting). The government phrases this as a matter of "deference." Pet. 8. But because the government (and Judge Oldham) contend that the courts must defer to the President's bare assertion that the AEA's predicates have been met, there would, in effect, be no review at all of whether the President stayed within the bounds set by *Congress*. *See* Op. 101, 115 (Oldham, J., dissenting) ("we must treat as conclusive the Executive's determination that an insurrection, invasion, &c, is being perpetrated or threatened," even if that "determination was utterly absurd"). That would wipe out the judicial review that the Supreme Court reaffirmed just a few months ago. And by making the President's actions unreviewable, it would effectively eliminate the specific requirements that Congress wrote into the statute. The panel correctly rejected that claim and explained that "[i]nterpretation cannot be just an academic exercise." Op. 17.

---

[4] Consistent with *J.G.G.* and *Ludecke*, courts during World War II reviewed the government's compliance with a range of statutory requirements in the AEA. *See* OB.22 (collecting cases).

The government also claims that the panel "second-guess[ed] the President's factfinding." Pet. 10. But the majority did exactly the opposite: It "accept[ed] each of the factual findings in the Proclamation" without probing those assertions' veracity at all. Op. 11, 35.[5]

## B.     The Panel's Decision Was Correct On The Merits.

In its petition, the government's primary contention is that the AEA is triggered by "any entry" that is for any "hostile and destructive purpose—not just military hostilities." Pet. 12. The panel rightly held, however, that the Proclamation's allegations of mass migration, drug smuggling, and various crimes "do not support that an invasion or a predatory incursion has occurred." Op. 32-35.

The panel reached its conclusion after exhaustively reviewing contemporaneous uses of the words "invasion," Op. 19-22, and "predatory incursion," Op. 23-27, including by Congress and the Framers. As the panel explained, a large body of statutes, letters, dictionaries, and other sources establish that an invasion is "an act of war involving the entry into this country by a military

---

[5] Indeed, although the government relied heavily on an FBI report, the panel chose not to grant Petitioners' request to supplement the appellate record with an assessment by 17 U.S. national security agencies that casts significant doubt on the FBI report and concludes that the Maduro regime is not directing the TdA gang. Mot. to Suppl. R., Dkt. No. 143, Tab.P at 2 ("highly unlikely" that the Maduro regime and TdA "cooperate in a strategic or consistent way"). Thus, the panel clearly did not question the validity of the Proclamation's factual findings. In any event, there is clear precedent for reviewing factual findings, RB.3-4, but that is not an issue for present purposes given the manner in which the panel resolved the case.

force," Op. 22; *see also J.G.G.*, 2025 WL 914682, *9 (Henderson, J., concurring) (same), and that a predatory incursion is a smaller-scale attack by "a military force," Op. 24, 27; *see also J.G.G.*, 2025 WL 914682, *10 (Henderson, J., concurring) (same); *J.A.V.*, 781 F. Supp. 3d at 559-60 (rejecting government's broad interpretation of the AEA after examining 133 records from the Framing era referring to "invasion," "predatory incursion," or "incursion"); ROA.847-49.

Indeed, every single time *Congress* used these terms in the late 18th century, it referred to military attacks. *See, e.g.*, 1 Stat. 96 (1789) (authorizing militia response to "hostile incursions"); 1 Stat. 264 (1792) (authorizing militia response "whenever the United States shall be invaded"); 1 Stat. 424 (1795) (same); 1 Stat. 558 (1798) (army response to "invasion"); 1 Stat. 725 (1799) (similar); U.S. Const. art. I, § 10, cl. 3 (States can "engage in War" if "invaded"); *id.* § 8, cl. 15 (use of "Militia" to "repel Invasions"); *see also* RB.7-8, OB.24 (dictionary definitions of "incursion" and "invasion").

In response to this overwhelming body of contemporaneous evidence that "invasion" and "predatory incursion" in the AEA referred to military attacks, the government cites a tiny number of supposed counter-examples, but even many of its own sources talk in terms of war or other *military* invasions or incursions; and not one of the government's sources is from Congress. *See, e.g.*, *Worcester v. Georgia*, 31 U.S. 515, 545 (1832) (discussing "defensive war" "to repel invasion" and "to

repel [] incursions" by Native American tribes); Pet. 13 (defining "invasion" as "hostile entrance"); *compare* RB.7-8 ("hostile" referred to a "state of war"), *with* Pet. 11 (dictionary defining "incursion" as "invasion without conquest").

Moreover, as the panel recognized, in isolation, words like "invasion" and "incursion" could of course mean other things. Op. 20; *see J.G.G.*, 2025 WL 914682, *8 n.5 (Henderson, J.); Pet. 11 ("mischievous occurrence"). But in addition to the pattern of usage discussed above, the AEA's surrounding text and context eliminate any doubt that Congress meant *military* invasions and incursions, rather than *any* activity that could colloquially be called an invasion or incursion. As the panel explained, the AEA was enacted "in anticipation of an armed conflict with another country," Op. 20, and pursuant to Congress's power "[t]o declare War," U.S. Const. art. I, § 8, cl. 11; 8 Annals of Cong. 1980; *Eisentrager*, 339 U.S. at 774 n.6.

And, as the panel explained, the AEA was enacted alongside a *different* statute—the Alien Friends Act—which, just like the Proclamation at issue here, provided for the peacetime removal of people who were deemed "dangerous to the peace and safety of the United States." An Act Concerning Aliens § 1, 1 Stat. 571 (1798); Op. 30. The Alien Friends Act generated controversy precisely because, unlike the AEA, it allowed detention and removal outside the context of a military invasion or incursion. *Eisentrager*, 339 U.S. at 774 n.6. Congress would have been

11

shocked to learn that the AEA also applied outside of wartime. Op. 30 (citing "the clear difference in *requirements*" between the AFA and the AEA).[6]

Congress reinforced the requirement that the invasion or incursion be military in nature by using the term "alien enemies" in the AEA's title and operative text. At the time, "alien enemies" was a well-established term of art in the law of nations, which referred to "the subject[s] of a foreign state at war with the United States." *Eisentrager*, 339 U.S. at 769 n.2 (quoting *Techt v. Hughes*, 229 N.Y. 222, 229 (1920) (Cardozo, J.), and collecting sources). Alien enemy status was based on the understanding that "in war 'every individual of the one nation must acknowledge every individual of the other nation as his own enemy.'" *Id.* at 772 (quoting *The Rapid*, 12 U.S. 155, 161 (1814)). The concept had no application outside the context of a military conflict between sovereigns. *See, e.g.*, *id.* at 775 (AEA requires "the existence of a state of war"); *Ware v. Hylton*, 3 U.S. 199, 228 (1796) (no such thing as "alien enemies" during peacetime).[7] It would have made no sense at the time for

---

[6] Indeed, the drafters were explicit that the AEA would not confer authority "in a time of tranquility," *i.e.*, outside "a time of war." 8 Annals of Cong. 1791; *id.* at 1575 (outside of war, AEA "was not pointed at" "foreigners guilty of crimes against the United States").

[7] Evidence for the term-of-art meaning is overwhelming. OB.24-27; *see also supra* (*Eisentrager*, *The Rapid*, *Ware*); *White v. Burnley*, 61 U.S. 235, 249 (1857) ("alien enemy" status requires that "one nation is at war with another nation"); *The Benito Estenger*, 176 U.S. 568, 571 (1900) (same); *Techt*, 229 N.Y. at 232 (term "'alien enemy' ha[s] come down through the centuries" and requires "war"); *Sparenburgh v. Bannatyne*, 126 Eng. Rep. 838, 840 (1797) (the "character of an alien enemy . . .

Congress to use this term outside the context of military hostilities, and there is no evidence that Congress meant such a radical departure from the established meaning.[8]

The panel amply answered the government's remaining objections. The government claims that requiring a military attack does not give independent effect to the AEA's three predicates: declared war, invasion, and predatory incursion. Pet. 12. But, as the panel explained, those terms were well understood as "different levels and categories of armed conflict": Declared war "denotes a more formal announcement of armed conflict"; invasion referred to "military hostilities that are unaccompanied by a formal announcement of war"; and incursions required "armed

---

arises from the party being under the allegiance of the state at war with us"); James Madison, Report of 1800 (Jan. 7, 1800) ("the removal of alien enemies is an incident to the power of war"); Vattel, Law of Nations 320-21 (1863 ed.) (alien enemies exist when "a nation is at open war" against "another nation"); Chitty, Law of Nations 30 (1812 ed.) (same).

[8] The government cites a single case, Pet. 15-16, in which an English court discussed a theory of "perpetual hostility"—and thus "perpetual enem[y]" status—between "[a]ll infidels" and "the Christian," among whom the court stated there "can be no peace." *Calvin's Case*, 7 Co. Rep. 1, 29 (1773). This concept has no application here, and it does nothing to dislodge the overwhelming evidence of the term's law-of-nations meaning. Indeed, outside its "infidel" discussion, the case affirmed the general rule that alien enemy status results only from "open war." *Calvin's Case*, 7 Co. Rep. at 29. The government also cites the statements of a single legislator, stating that the country was "at present threatened with an invasion," and arguing against limiting the statute to "declared war." Pet. 16 (citing 8 Annals of Cong. 1574-1576, 1581 (1798)). There is no indication that legislator, or any other, believed the AEA could be used outside imminent or ongoing military invasion or incursion.

forces of some size and cohesion, engaged in something less than an invasion." Op. 22, 23, 24, 31; *see J.G.G.*, 2025 WL 914682, *10 (Henderson, J., concurring) (incursion was "invasion without conquest" (cleaned up)). These distinctions were repeated by a plethora of contemporaneous authorities, which recognized "defensive war"—without a declaration of war—as a response "to repel invasion" and "repel [] incursions." *Worcester*, 31 U.S. at 545; *see* Burlamaqui, Principles of Natural and Politic Law 348-49, 362 (1792 ed.) (same); Vattel, Law of Nations 316-17 (same). As these sources explain, alien enemy status applied in both *offensive* military conflicts (declared wars) and *defensive* military conflicts (caused by invasions and incursions). *See* Hale, 1 Pleas of the Crown 163 (1736 ed.); Vattel, Law of Nations 399. These were distinct categories, but all required *military* invasions or incursions.

The government next argues that the statute's application to "attempted" and "threatened" invasions and incursions mean that "invasion" and "incursion" must include non-military acts. Pet. 12, 15. The panel rejected this non-sequitur. Op. 23-24. Congress and the law of nations were clear that *impending* military invasions or incursions could trigger alien enemy status—a nation did not need to wait for the foreign army to commence its attack. Vattel, Law of Nations 302; Burlamaqui, Principles 363; 8 Annals of Cong. 1577 (1798). But that did nothing to erase the need for a military attack against U.S. territory, whether threatened or ongoing.

14

Finally, the government suggests the Proclamation is valid even under the panel's interpretation of the AEA. Pet. 16-17. But as the panel recognized, the Proclamation clearly does not allege any kind of military attack against U.S. territory. Op. 31 (requiring military attack "in some manner comparable to an invasion or predatory incursion as understood in 1798"). The government again urges deference to the Proclamation's labels, emphasizing that it portrays drug trafficking as a form of "irregular warfare." Pet. 18. But as explained, *supra* Part I.A, if a mere label were enough, judicial review and Congress's limits would both disappear. The panel rightly made clear that "freestanding labels to unstated actions are not relevant findings." Op. 33; *id*. at 11.

The government points to TdA's designation as an FTO, Pet. 1, 3, 17, but such designation does not require any kind of military attack. A "foreign organization" can be designated an FTO if it commits or intends any one of a list of crimes. 8 U.S.C. § 1189(a)(1)(A)-(B) (referencing 8 U.S.C. § 1182(a)(3)(B)); *see also* OB.35-36. Multiple *criminal* gangs have thus recently been designated. Dep't of State, Foreign Terrorist Organizations (2025).[9]

---

[9] https://perma.cc/TM2J-ALVK.

## II.    THE PANEL CORRECTLY CONCLUDED THAT THE REMAINING EQUITABLE FACTORS FAVOR A PRELIMINARY INJUNCTION.

The panel held that Petitioners are likely to suffer irreparable harm absent an injunction. Following the Supreme Court's lead, the panel concluded that the "prospect of irremediable error means Petitioners' 'interests at stake are accordingly particularly weighty.'" Op. 41 (quoting *A.A.R.P.*, 605 U.S. at 95). The government's petition does not contest that holding.

Instead, the government contends that the panel "erroneously discredited the government's national-security interests." Pet. 19. But the panel specifically considered those interests. Op. 38-39. It held that "there are other provisions that would allow the Government to promptly remove precisely those individuals whom it seeks to remove under the President's Proclamation," and that "[u]sing these provisions would not jeopardize national security." *Id.* (citing "useful overview" of available authorities in amicus brief by former government officials).

### CONCLUSION

The Court should deny the petition for rehearing en banc.

Dated: September 29, 2025                 Respectfully submitted,

                                          */s/Lee Gelernt*
                                          Lee Gelernt
Spencer Amdur                             Daniel Galindo
Noelle Smith                              Ashley Gorski
Oscar Sarabia Roman                       Patrick Toomey
My Khanh Ngo                              Omar Jadwat
Cody Wofsy                                Hina Shamsi

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: samdur@aclu.org
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org
E: cwofsy@aclu.org

Brian Klosterboer
TX Bar No. 24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
Adriana Piñon
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS,
INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org
apinon@aclutx.org

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org
E: dgalindo@aclu.org
E: agorski@aclu.org
E: ptoomey@aclu.org
E: ojadwat@aclu.org
E: hshamsi@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(212) 549-2500
E: khuddleston@aclu.org

*For Petitioners-Appellants
W.M.M., F.G.M., A.R.P., et al.*


*Barred in Texas and Arizona only;
supervised by a member of the D.C.
Bar*

## CERTIFICATE OF SERVICE

I certify that on September 29, 2025, a true and correct copy of this document was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit via the Court's CM/ECF document filing system, and therefore served electronically on all counsel of record.

*/s/ Lee Gelernt*
Lee Gelernt

**CERTIFICATE OF COMPLIANCE**

This brief complies with (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 3,871 words, excluding the parts of the brief exempt by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Lee Gelernt*
Lee Gelernt