# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Docket No. 25-10534

W.M.M., F.G.M., and A.R.P., *et al.*,

*Petitioners – Appellants*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents – Appellees*,

## On Appeal from
United States District Court for the Northern District of Texas,
No. 1:25-cv-59-H

## EN BANC BRIEF FOR PETITIONERS

Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: samdur@aclu.org
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org

Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sean M. Lau
Omar Jadwat
Hina Shamsi
Sidra Mahfooz
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org
E: dgalindo@aclu.org

E: cwofsy@aclu.org

Brian Klosterboer
Tx Bar No. 24107833
Thomas Buser-Clancy
TX BAR No. 24078344
Savannah Kumar
TX BAR No. 24120098
Charelle Lett
TX BAR No. 24138899
Ashley Harris
TX BAR No. 24123238
Adriana Piñon
TX BAR No. 24089768
ACLU FOUNDATION OF TEXAS,
INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org
apinon@aclutx.org

E: agorski@aclu.org
E: ptoomey@aclu.org
E: slau@aclu.org
E: ojadwat@aclu.org
E: hshamsi@aclu.org
E: smahfooz@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(212) 549-2500
E: khuddleston@aclu.org

*For Petitioners-Appellants
W.M.M., F.G.M., A.R.P., et al.*

*Barred in Texas and Arizona only;
supervised by a member of the D.C.
Bar*

# CERTIFICATE OF INTERESTED PERSONS

Appellants certify that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioners-Appellants**
A.R.P., on their own behalf and on behalf of others similarly situated
F.G.M., on their own behalf and on behalf of others similarly situated
W.M.M., on their own behalf and on behalf of others similarly situated

**Counsel for Petitioners-Appellants**

| | | |
|---|---|---|
| Lee Gelernt | Spencer Amdur | Brian Klosterboer |
| Daniel Galindo | Noelle Smith | Thomas Buser-Clancy |
| Ashley Gorski | Oscar Sarabia Roman | Savannah Kumar |
| Patrick Toomey | My Khanh Ngo | Charelle Lett |
| Sean M. Lau | Cody Wofsy | Ashley Harris |
| Omar Jadwat | Kathryn Huddleston | Adriana Piñon |
| Hina Shamsi | | |
| Sidra Mahfooz | | |

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS

**Respondents-Appellees** are government officials and entities.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ iii

TABLE OF AUTHORITIES .................................................................................. vi

JURISDICTIONAL STATEMENT ...........................................................................1

STATEMENT OF THE ISSUES.................................................................................1

INTRODUCTION ....................................................................................................1

STATEMENT OF THE CASE...................................................................................3

   A. STATUTORY FRAMEWORK AND PROCLAMATION.............................3

   B. THIS LITIGATION.......................................................................................6

   C. NEW EXECUTIVE BRANCH STATEMENTS .............................................8

SUMMARY OF ARGUMENT .................................................................................9

STANDARD .............................................................................................................11

ARGUMENT ...........................................................................................................11

   I. THE PROCLAMATION IS REVIEWABLE ...............................................11

   II. THE PROCLAMATION IS NOT AUTHORIZED BY THE AEA. ...........19

      A. The AEA's Statutory Predicates of "Invasion" and "Predatory Incursion"
      Require Military Attacks. ............................................................................19

      B. The Proclamation Fails to Establish an Attack by a "Foreign Nation or
      Government."...............................................................................................31

   III. DUE PROCESS REQUIRES RELEVANT INFORMATION AND AT
   LEAST 30 DAYS TO FIND A LAWYER AND SEEK RELIEF. ..................41

   IV. THE PROCLAMATION VIOLATES MULTIPLE PROCEDURAL
   PROTECTIONS........................................................................................49

A. The Government Cannot Bypass the INA's Removal Procedures or Jettison Mandatory Humanitarian Protections. .............................................49

B. The Proclamation Violates the AEA's Right to Voluntary Departure. .....52

V. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PETITIONERS. ........................................................................................53

CONCLUSION ...................................................................................................56

CERTIFICATE OF SERVICE .............................................................................59

CERTIFICATE OF COMPLIANCE ....................................................................60

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Pages**

*A.A.R.P. v. Trump*,
   605 U.S. 91 (2025) ....................................................................................*passim*

*A.S.R. v. Trump*,
   782 F. Supp. 3d 224 (W.D. Pa. 2025) .............................................................13

*Al-Alwi v. Trump*,
   901 F.3d 294 (D.C. Cir. 2018) ......................................................................18

*Alford v. United States*,
   709 F.2d 418 (5th Cir. 1983) .......................................................................45

*Allen v. Cooper*,
   589 U.S. 248 (2020) .....................................................................................30

*Baker v. Carr*,
   369 U.S. 186 (1962) .....................................................................................17

*Bas v. Tingy*,
   4 U.S. 37 (1800) ...........................................................................................23

*Boumediene v. Bush*,
   553 U.S. 723 (2008) .....................................................................................42

*California v. United States*,
   104 F.3d 1086 (9th Cir. 1997) ......................................................................28

*Citizens Protective League v. Clark*,
   155 F.2d 290 (D.C. Cir. 1946) ......................................................................47

*Cruz Rendon v. Holder*,
   603 F.3d 1104 (9th Cir. 2010) ......................................................................45

*D.B.U. v. Trump*,
   2025 WL 1233583 (10th Cir. Apr. 29, 2025) ................................................56

*D.B.U. v. Trump*,
   781 F. Supp. 3d 1158 (D. Colo. 2025) ....................................................13, 20

vi

*Doe v. Duncanville Indep. Sch. Dist.*,
   994 F.2d 160 (5th Cir. 1993) ...............................................................55

*El-Shifa Pharm. Indus. Co. v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) ............................................................12

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018)..............................................................................49

*Fischer v. United States*,
   603 U.S. 480 (2024)..............................................................................25

*Freza v. Att'y Gen.*,
   49 F.4th 293 (3d Cir. 2022) .................................................................45

*G.F.F. v. Trump*,
   781 F. Supp. 3d 195 (S.D.N.Y. 2025) ...................................13, 19, 28

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006)..............................................................................29

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004)........................................................................18, 48

*Hernandez Lara v. Barr*,
   962 F.3d 45 (1st Cir. 2020) .................................................................45

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022)..............................................................50

*In re Terrorist Attacks*,
   538 F.3d 71 (2d Cir. 2008) ..................................................................38

*J.A.V. v. Trump*,
   781 F. Supp. 3d 535 (S.D. Tex. 2025)...................................13, 19, 22

*J.G.G. v. Trump*,
   2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ...............................*passim*

*J.G.G. v. Trump*,
   786 F. Supp. 3d 37 (D.D.C. 2025).......................................................43

*Johnson v. Eisentrager*,
339 U.S. 763 (1950)................................................................22, 24, 33

*Kaplan v. Cent. Bank of the Islamic Republic of Iran*,
896 F.3d 501 (D.C. Cir. 2018)..........................................................18

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
213 F.3d 841 (5th Cir. 2000) ............................................................38

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)..............................................................56

*L.G.M.L. v. Noem*,
2025 WL 2671690 (D.D.C. Sept. 18, 2025)......................................54

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) ...........................................................55

*Ludecke v. Watkins*,
335 U.S. 160 (1948)..............................................................12, 13, 14, 20

*Ludwig v. Watkins*,
164 F.2d 456 (2d Cir. 1947) .............................................................52

*Luther v. Borden*,
48 U.S. 1 (1849)..........................................................................16, 17

*M.A.P.S. v. Garite*,
786 F. Supp. 3d 1026 (W.D. Tex. 2025) .....................................13, 20

*Martin v. Mott*,
25 U.S. 19 (1827) .......................................................................16, 17

*Mathews v. Eldridge*,
424 U.S. 319 (1976)..........................................................................43

*Matter of C-B-*,
25 I. & N. Dec. 889 (BIA 2012) .......................................................46

*Memphis Light, Gas & Water Div. v. Craft*,
436 U.S. 1 (1978)..............................................................................42

*Moyer v. Peabody*,
212 U.S. 78 (1909)......................................................................16, 17

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950)............................................................................47

*Munaf v. Geren*,
553 U.S. 674 (2008)............................................................................54

*Nasrallah v. Barr*,
590 U.S. 573 (2020)............................................................................51

*New Jersey v. United States*,
91 F.3d 463 (3d Cir. 1996) ................................................................28

*Nken v. Holder*,
556 U.S. 418 (2009)............................................................................55

*Padavan v. United States*,
82 F.3d 23 (2d Cir. 1996) ..................................................................28

*Paulson Geophysical Serv., Inc. v. Sigmar*,
529 F.3d 303 (5th Cir. 2008) .............................................................11

*Quintero v. Garland*,
998 F.3d 612 (4th Cir. 2021) .............................................................44

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)............................................................................51

*SEC v. Stanford Int'l Bank, Ltd.*,
112 F.4th 284 (5th Cir. 2024) ..............................................................9

*Sessions v. Dimaya*,
584 U.S. 148 (2018)............................................................................25

*Sterling v. Constantin*,
287 U.S. 378 (1932)................................................................15, 16, 17

*The Mary*,
12 U.S. 388 (1814).............................................................................39

*The Prize Cases*,
   67 U.S. 635, 666, 670 (1862)...........................................................................17

*The Rapid*,
   12 U.S. 155 (1814)..........................................................................................33

*The Resolution*,
   2 U.S. 1 (1781)...............................................................................................39

*The Resolution*,
   2 U.S. 19 (1781).............................................................................................31

*TikTok v. Garland*,
   145 S. Ct. 57 (2025).......................................................................................18

*Trump v. J.G.G.*,
   604 U.S. 670 (2025)...........................................................................12, 42, 47, 51

*United States v. Rafiekian*,
   991 F.3d 529 (4th Cir. 2021) ........................................................................37

*United States v. Smith*,
   18 U.S. 153 (1820)....................................................................................30, 39

*Usubakunov v. Garland*,
   16 F.4th 1299 (9th Cir. 2021) .......................................................................45

*Valentine v. Collier*,
   960 F.3d 707 (5th Cir. 2020) ..........................................................................8

*Von Heymann v. Watkins*,
   159 F.2d 650 (2d Cir. 1947) .........................................................................52

*W.J.C.C. v. Trump*,
   2025 WL 1703682 (W.D. Pa. June 18, 2025) ..............................................44

*Webster v. Doe*,
   486 U.S. 592 (1988)..................................................................................12, 18

*Worcester v. Georgia*,
   31 U.S. 515 (1832).........................................................................................25

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................................ 16, 27

*Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) ...................................................................................... 12

**Statutes**

1 Stat. 96 (1789) ............................................................................................ 21

1 Stat. 384 (1794) .......................................................................................... 24

1 Stat. 558 (1798) .......................................................................................... 26

1 Stat. 571 (1798) .......................................................................................... 24

8 U.S.C. § 1182(a)(7) .................................................................................... 46

8 U.S.C. § 1225(b) ........................................................................................ 49

8 U.S.C. § 1225(b)(1)(A)(i) .......................................................................... 46

8 U.S.C. § 1226a ........................................................................................... 49

8 U.S.C. § 1228 ............................................................................................. 49

8 U.S.C. § 1229 ............................................................................................. 45

8 U.S.C. § 1229(b)(1) .................................................................................... 45

8 U.S.C. § 1229(b)(2) ............................................................................... 46, 48

8 U.S.C. § 1229a(a)(3) ................................................................................... 49

8 U.S.C. § 1231 ............................................................................................. 50

8 U.S.C. § 1231(b)(3)(A) .............................................................................. 50

8 U.S.C. § 1231(b)(3)(B) .............................................................................. 50

8 U.S.C. § 1531 ............................................................................................. 49

18 U.S.C. § 951 ........................................................................................ 37, 38

18 U.S.C. § 2441 ...................................................................................... 29, 35

28 U.S.C. § 1292(a)(1).................................................................1

28 U.S.C. § 1331 ........................................................................1

28 U.S.C. § 1603(b)(2)..............................................................38

28 U.S.C. § 2241 ........................................................................1

50 U.S.C. § 21 ....................................................................*passim*

50 U.S.C. § 22 ....................................................................52, 53

**Rules and Regulations**

8 C.F.R. § 208.30(b) .................................................................47

8 C.F.R. § 208.30(d) .................................................................47

8 C.F.R. § 1208.30(g)(2)...........................................................47

8 C.F.R. § 1240.10(f) ................................................................51

8 C.F.R. § 1240.11(c)(1)...........................................................51

90 Fed. Reg. 13033 ...............................................24, 28, 32, 37

90 Fed. Reg. 13034 ...............................................24, 32, 34, 36

Fed. R. App. Pro. 10(e)(2) .........................................................9

Fed. R. Evid. 201(b)(2) .............................................................8

**Treatises**

Charles Molloy, De Jure Maritimo et Naval: Treatise of Affairs
    Maritime (9th ed. 1769) ("Molloy, Maritime")....................39

Cornelius Van Bynkershoek, Treatise on the Law of War (Peter
    Stephen du Ponceau trans., Farrand & Nicholas 1810) (1737)
    ("Bynkershoek, Treatise") ..................................23, 30, 39

Emer de Vattel, The Law of Nations (Charles G. Fenwick trans.,
    Carnegie Inst. 1916) (1758) ("Vattel, Nations (1916)").............40, 41

Emer de Vattel, The Law of Nations (Joseph Chitty ed., T. & J.W. Johnson & Co. 1863) (1758) ("Vattel, Nations (1863)") ..........................*passim*

G.F. Martens, Summary of the Law of Nations (William Cobbett, trans., Thomas Bradford 1795) ("Martens, Summary")....................................27

Hugo Grotius, De Jure Belli Ac Pacis [On the Law of War and Peace] (Francis W. Kelsey trans., Clarendon Press 1925) (1625) ("Grotius, De Jure Belli") .........................................................................................34

James Kent, Commentaries on American Law (3d ed. 1836) ("Kent, Commentaries") ...................................................................................30

Jean Jacques Burlamaqui, Principles of Natural and Politic Law (Thomas Nugent trans., 4th ed. 1792) ("Burlamaqui, Principles") .............30, 34

Samuel Pufendorf, De Jure Naturae Et Gentium: Libri Octo [The Law of Nature and Nations] (C.H. Oldfather & W.A. Oldfather trans., Clarendon Press 1934) (1688) ("Pufendorf, De Jure Naturae")............21, 27, 40

William Rawle, A View of the Constitution of the United States of America (2nd ed. 1829) ("Rawle, View") ........................................34

**Other Authorities**

3 Parliamentary Register: History of the Proceedings and Debates of the House of Commons (1802).............................................................40

8 Annals of Cong. 1573 (1798).................................................................26

8 Annals of Cong. 1790 (1798)...........................................................23, 26

1543 Notice to Congress (undated, made public Oct. 2, 2025)................8

Articles of Confederation art. VI .............................................................30

DHS, Louisiana Lockup: A New Partnership with DHS and the State of Louisiana to Expand Detention Space (Sept. 3, 2025)....................................54

*Direction*, Black's Law Dictionary (2024)..............................................37

DoD Law of War Manual (2023).....................................29, 33, 34, 35, 48

Donald J. Trump, Truth Social (Sept. 2, 2025) .........................................8

Federalist No. 41 (1788) ......................................................30

Geneva Conventions Common Art. 3 ......................................29

Homeland Security (@DHSgov), X (Sept. 4, 2025) ................54

*Hostile*, Ash's New and Complete Dictionary of the English Language
    (1795) ..........................................................................23

Immigration Court Practice Manual § 4.15 ...........................46

*Invasion*, Bouvier's Law Dictionary (1839) .........................21

*Invasion*, Dyche's New General English Dictionary (1771) ...................21

James Madison, Report of 1800 ............................................21

NBC, *Venezuelans Describe Being Beaten, Sexually Assaulted and
    Told to Commit Suicide During El Salvador Detention* (July 28,
    2025) ..............................................................................5

President's Instructions to Private Armed Vessels, *in* Henry Weaton,
    A Digest of the Law of Maritime Captures and Prizes (1815)..........................30

ProPublica, *Now That They're Free* (July 30, 2025)................5

Rodney Atwood, The Hessians (1980) ...................................40

S. Rep. No. 82-1137 (1952) ..................................................49

Thomas Jefferson, Notes on the State of Virginia (1794) .......23

U.N. Art. on Responsibility of States 8 .................................33

U.S. Mission to the U.N., *Remarks at a UN Security Council Briefing
    on Venezuela* (Oct. 10, 2025)..................................................8

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 2241, 1331. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether Petitioners-Appellants satisfy the preliminary injunction factors for their claim that the Alien Enemies Act does not authorize their removal.

2.  What notice and procedural protections are required before an AEA detainee is removed under the Proclamation.

## INTRODUCTION

The Alien Enemies Act ("AEA") is a wartime authority that requires a declared war or military attack by a foreign nation. Presidents have adhered to those statutory limits for over two hundred years. But now, for the first time, the government claims it can use this war power against individuals it claims are members of a private criminal organization, due to alleged crimes and migration, even though Congress has enacted extensive laws to regulate those same acts.

The panel was correct to enjoin the Proclamation. After carefully reviewing the historical record, it found that the statute's text and context clearly indicated that its extraordinary powers are only available when there is a military attack on U.S. soil—something the Proclamation does not assert. Courts around the country have held the same. As Judge Henderson noted: "invasion is a military affair" and an

"incursion is a lesser form of invasion." *J.G.G. v. Trump*, 2025 WL 914682, *9-10 (D.C. Cir. 2025).

In response, the dissent's core contention was that the Proclamation is effectively unreviewable, because courts must defer to the President's bare assertion that the AEA is satisfied, with a possible exception if the President invoked the Act to address "double parking" or someone claiming "baseball is not the country's pastime." The Supreme Court specifically held otherwise just this year, as the panel majority correctly noted. And the focus on eliminating review underscores the weakness of the government's case on the merits.

The Proclamation also fails the AEA's requirement of an attack by a "foreign nation or government." Since the panel decision, the President has made a formal determination that Tren de Aragua ("TdA"), the criminal organization that is the subject of the Proclamation, is a *non*-state actor whose alleged drug trafficking triggers a *non*-international armed conflict—meaning it is not attributable to Venezuela. That directly contradicts the Proclamation's attempts to tie TdA to the Venezuelan government, as a way to satisfy the AEA's requirement of an attack by a "nation or government." Thus, while the panel majority was willing to defer to the Proclamation's assertion that Venezuelan President Maduro "directed" some of TdA's activities, that deference is no longer justified. That is especially true given

that 17 of 18 U.S. national security agencies have concluded that Maduro probably does *not* direct TdA.

Finally, the government's removal procedures violate due process and the INA. Strong protections are critical here, especially because there are extensive and disturbing indications that, using the Proclamation, the government has already removed countless people who have no connection to TdA, and sent them all to a notorious Salvadoran prison where they suffered horrific abuse. Given the barriers to filing new habeas litigation from detention—especially if hundreds need to do so all at once—detainees must be given at least 30 days' notice to ensure that the government cannot again remove people without judicial review. At a minimum, if the Court concludes that the government's 7-day policy is sufficient on this record, it should reaffirm the panel's holding that the district court can reevaluate that conclusion based on a complete record.

## STATEMENT OF THE CASE

### A.    STATUTORY FRAMEWORK AND PROCLAMATION

Passed in 1798, the Alien Enemies Act provides:

Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government…shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

3

50 U.S.C. § 21. And the Act allows "for the removal of" noncitizens only if they "refuse or neglect to depart" after being designated alien enemies. *Id.*

On March 14, the President signed a Proclamation under the AEA declaring that TdA, a Venezuelan criminal gang, is "perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." Panel Opinion ("Op.") 4-5. The Proclamation does not lay out any process for those accused of TdA membership to challenge that designation.

The administration issued a worksheet to identify TdA members, called an "Alien Enemy Validation Guide." The Guide assigns points based on alleged indicators of gang affiliation, such as tattoos, hand gestures, and social media activity. ROA.872-76. Evidence in the record shows that these criteria have little connection to TdA. The group does not use consistent symbols or tattoos, and the ones the government relied on are common in Venezuelan culture and do not reliably indicate gang affiliation. Opening Brief ("OB") 6 (collecting evidence). The Guide also assigns points for a TdA membership certificate, but even the government's own experts agree that TdA is a fragmented and decentralized group with no clear leadership structure and certainly no membership certificates. OB.7 (addressing the evidence).

A disturbing number of designees appear to have no connection to TdA at all. Reporting indicates that approximately 75% of individuals sent to El Salvador had

no criminal record in the United States or abroad, and that a substantial number entered the United States legally, including several who entered as highly vetted refugees. ROA.914-20, 961-92, 1040-44 (CBS investigation); ROA.1046-50 (CATO report); *Agelviz-Sanguino v. Noem*, No. 4:25-cv-2116, Dkt. 1 ¶ 1 (S.D. Tex. 2025). And scores of people appear to have been designated based on innocuous tattoos. ROA.899-1038 (collecting stories). For one detainee, the only evidence the government ever adduced to establish his membership in TdA was two crown tattoos, which accompany the words "Mom" and "Dad" and celebrate his participation in his hometown's Epiphany festival. ROA.775-77. Another man had a tattoo of the autism awareness ribbon, along with the name of his brother, who has autism. ROA.964-72. These individuals nonetheless ended up in what is essentially a Salvadoran gulag, never having had an opportunity to contest their designation as TdA. *See, e.g.*, ProPublica, *Now That They're Free* (July 30, 2025)[1] (routine severe beatings and acts of humiliation); OB.8-9 (conditions typical for CECOT); NBC, *Venezuelans Describe Being Beaten, Sexually Assaulted and Told to Commit Suicide During El Salvador Detention* (July 28, 2025)[2] (sexual abuse, beatings, denial of food).

---

[1] https://perma.cc/Q5JD-7S5X.
[2] https://perma.cc/EB5Y-N8LX.

**B.     THIS LITIGATION**

Petitioners filed this habeas class action in the Northern District of Texas on behalf of themselves and a proposed class after learning that the government was moving Venezuelan noncitizens from around the country to the Bluebonnet Detention Facility. ROA.89-90.

On April 17, 2025, the district court denied Appellants' request for a TRO based on a lack of imminent harm. Mere "hours later, putative class members were served notices of AEA removal and told that they would be removed 'tonight or tomorrow.'" *A.A.R.P. v. Trump*, 605 U.S. 91, 92 (2025). The putative class then moved for an emergency TRO just after midnight.[3] *Id.* Fourteen hours later, on April 18, Appellants appealed the constructive denial of the emergency TRO to this Court and subsequently filed an application for an emergency injunction with the Supreme Court. *Id.* at 92-93. Late that afternoon, the government began transporting putative class members from the detention facility to an airport. *Id.* at 93. The Supreme Court issued an administrative stay just prior to midnight ordering the government "not to remove any member of the putative class of detainees." *Id.* at 93, 96. Shortly after, this Court denied Appellants' motion. Dkt. 14-1.

After briefing, the Supreme Court construed the application as a petition for a writ of certiorari from this Court's decision, granted the petition and the application

---

[3] All times are Central Time.

for an injunction pending further proceedings, vacated this Court's judgment, and remanded for further proceedings. *A.A.R.P.*, 605 U.S. at 94. On remand, the Supreme Court instructed this Court to address "(1) all the normal preliminary injunction factors, including likelihood of success on the merits, as to the named plaintiffs' underlying habeas claims that the AEA does not authorize their removal pursuant to the President's March 14, 2025, Proclamation, and (2) the issue of what notice is due, as to the putative class's due process claims against summary removal." *Id.* at 98-99.

The panel granted a preliminary injunction and remanded for further proceedings. Judge Southwick, writing for the majority, held that the Court could review whether the AEA authorized the Proclamation, Op.7-17, and that, on the merits, the Proclamation did not satisfy the AEA. The panel accepted the Proclamation's findings but held that those "findings do not support that an invasion or predatory incursion has occurred." Op.18-35. The panel held that the Proclamation did satisfy the statute's requirement of action by a "foreign nation or government." Op.35-37. Judge Oldham dissented on the ground that courts could not review the President's assertion that an "invasion" or "predatory incursion" has occurred. Op.55-185.

A separate majority, from which Judge Ramirez dissented, Op.49-54, declined to invalidate the government's notice procedures on the current record, but

acknowledged the need for further fact-finding by the district court regarding the sufficiency of those procedures. Op.44-48.

## C.    NEW EXECUTIVE BRANCH STATEMENTS

On September 2, the government began military strikes against boats in the Caribbean on the allegation that they were "transporting illegal narcotics" for cartels, including TdA. Donald J. Trump, Truth Social (Sept. 2, 2025) (initial strike, against alleged TdA members).[4] In a notification to Congress that became public in early October, the executive branch stated that "the President determined these cartels are non-state armed groups" and "that the United States is in a non-international armed conflict [NIAC] with these designated terrorist organizations." 1543 Notice to Congress (undated, made public Oct. 2, 2025).[5] The government took the same position before the United Nations Security Council on October 10, stating that "President Trump has determined" TdA and Cártel de Los Soles "are non-state armed groups" with whom "the United States is in a non-international armed conflict." U.S. Mission to the U.N., *Remarks at a UN Security Council Briefing on Venezuela* (Oct. 10, 2025).[6] The Court can take judicial notes of these statements.[7]

---

[4] https://perma.cc/GQS7-QG88.

[5] https://perma.cc/5M4F-SLMY.

[6] https://perma.cc/2JYP-KDNT.

[7] "[C]ourts reviewing preliminary injunctions can take judicial notice of subsequent factual developments bearing on the case." *Valentine v. Collier*, 960 F.3d 707, 708 n.1 (5th Cir. 2020) (Davis, J., concurring) (collecting cases); *see also* Fed. R. Evid. 201(b)(2). Alternatively, Petitioners move to supplement the record with the

## SUMMARY OF ARGUMENT

I. Petitioners' claims are justiciable. The Supreme Court and lower courts have always reviewed AEA challenges to ensure that the executive stays within the authority provided by Congress. The government argues for total deference to the President's bare statement that the AEA authorizes his actions. That is impossible to square with *J.G.G.*, *Ludecke*, and the specific textual requirements Congress wrote into the AEA. No case law supports the government's blank-check view of the statute.

II. The AEA does not authorize the Proclamation, which fails to demonstrate a military attack by a foreign government.

A. At the time of enactment, "invasion" and "predatory incursion" were widely used to refer to military attacks. The status of "alien enemies" also required military conflict. Yet the Proclamation does not assert a military attack, only civilian law enforcement issues like drug trafficking and illegal migration.

B. The Proclamation also fails the AEA's requirement that the attack be by a "foreign nation or government," because it names TdA, not Venezuela. And even assuming the panel was correct in concluding that the Proclamation's barebones assertion that Maduro is directing TdA was legally and factually sufficient to satisfy

---

congressional notification and U.N. statement under F.R.A.P. 10(e)(2). *See SEC v. Stanford Int'l Bank, Ltd.*, 112 F.4th 284, 291 (5th Cir. 2024) (noting "'ample authority' to supplement the record").

this prong of the Act, the administration itself has now undermined any basis for deference to its assertions. In seeking to justify the recent boat strikes in the Caribbean, the President has now acknowledged that TdA is a "non-state armed group[]" engaged in a "non-international armed conflict." That forecloses any claim that TdA's actions are attributable to Venezuela and undermines any case for deference.

III. The government's notice procedures and forms violate due process. Detainees face immense practical barriers to quickly bringing new habeas lawsuits. And the form continues to omit critical information. Its 7-day notice period would result in many removals without judicial review. At a minimum, the panel correctly concluded that the district court may reevaluate the notice procedures based on a complete record.

IV. The Proclamation also violates a number of procedural protections. The INA provides the exclusive procedures to adjudicate removal. It provides mandatory protections against deportation to torture and persecution. And the AEA provides a right to voluntary departure.

V. The equitable factors favor relief. Class members face illegal removal, and every AEA removal has been to CECOT, where detainees are subject to shocking brutality. The government is not harmed by having to follow the law and use the law-enforcement tools Congress provided.

## STANDARD

The Supreme Court instructed this Court to address "all the normal preliminary injunction factors." *A.A.R.P.*, 605 U.S. at 98. "A court should issue a preliminary injunction if the movant shows (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Paulson Geophysical Serv., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008) (cleaned up).

## ARGUMENT

## I.    THE PROCLAMATION IS REVIEWABLE.

The panel majority correctly held that courts may review the Proclamation's validity. Petitioners advance two sets of claims: (1) the Proclamation does not satisfy the AEA's statutory requirements, and (2) the Proclamation violates a series of procedural protections. The Court can review both sets of claims, including the claim that the Proclamation does not satisfy the AEA's requirement of an "invasion or predatory incursion" perpetrated by a "foreign nation or government." Op.7-17. Even taking the Proclamation's factual assertions as true, as the majority did, the

11

Court can determine whether the statutory requirements Congress imposed in the AEA have been met.[8]

Interpreting statutes and applying those interpretations to facts is the essence of what courts do. *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012); Op.11. When Congress authorizes executive action, judicial review is essential to ensure that the executive stays within Congress's limits. That is why, for example, the Supreme Court has *never* applied the political-question doctrine to statutory questions. *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855-56 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring); *see J.G.G.*, 2025 WL 914682, *6-8 (Henderson, J., concurring). And it is why courts only find statutory authority to be unreviewable in the most "rare" circumstances where Congress provides no limits at all. *Webster v. Doe*, 486 U.S. 592, 599-601 (1988) (no specific parameters cabined CIA Director's termination discretion).

Consistent with this approach, the Supreme Court recently reaffirmed that courts can decide "'questions of interpretation and constitutionality' of the [Alien Enemies] Act." *Trump v. J.G.G.*, 604 U.S. 670, 672-73 (2025) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)). This Court can accordingly interpret

---

[8] As explained *infra*, courts may also assess the factual record to determine whether the statute's requirements have been satisfied—especially where, as here, the government has now taken conflicting positions on whether TdA's activities are those of a non-state actor or a foreign government.

the meaning of the AEA's terms. And, as the panel recognized, interpreting the AEA necessarily involves "application of law to facts." Op.11. Interpretation would be meaningless if a court could not then apply its interpretation to determine "whether an invasion or predatory invasion has occurred." Op.17.

Courts around the country have thus correctly held that the Proclamation's validity is reviewable. *J.A.V. v. Trump*, 781 F. Supp. 3d 535, 549-53 (S.D. Tex. 2025); *D.B.U. v. Trump*, 781 F. Supp. 3d 1158, 1165 (D. Colo. 2025); *G.F.F. v. Trump*, 781 F. Supp. 3d 195, 205 (S.D.N.Y. 2025); *A.S.R. v. Trump*, 782 F. Supp. 3d 224, 238 (W.D. Pa. 2025); *M.A.P.S. v. Garite*, 786 F. Supp. 3d 1026, 1046-48 (W.D. Tex. 2025). As Judge Henderson observed, nothing in *Ludecke* or the other available precedents "precludes judicial review of whether the Executive has properly invoked a wartime authority…Indeed, we have previously considered the precise sort of question that the government contends we cannot." *J.G.G.*, 2025 WL 914682, *8-10 (citation omitted); *id.* at *16 (Millett, J., concurring).

In *Ludecke* itself, the Supreme Court reviewed whether the AEA's predicates were satisfied. It interpreted the meaning of "declared war" in the statute and held, on the merits, that a "declared war" under the Act still existed even when "actual hostilities" had ceased, and only ended once the political branches rescinded the declaration. 335 U.S. at 161, 166-70; Op.3, 9-12. *Ludecke* did not evaluate the "political judgment" of Congress and the President about when to rescind it. *Id.* at

13

169-70. But it did interpret the meaning of the statute to determine whether its requirements were satisfied. *Ludecke* also described certain presidential "discretion" in regulating alien enemies, but only once the AEA has been triggered "during a state of war." *Id.* at 164, 173. Lower courts during World War II reviewed a range of other issues concerning the meaning and application of the AEA's statutory terms. OB.21-22 (collecting cases).

Against all of that, the government and dissent claim there is effectively *no* judicial review of whether the AEA's predicates are satisfied. Pet. for Reh'g En Banc ("Pet.") 8-10; Op.79-111. Both describe this as a matter of "deference." Pet.8. But their point is that "we must treat as *conclusive* the Executive's determination that an insurrection, invasion, &c, is being perpetrated or threatened," even if that "determination was utterly absurd." Op.101, 115 (emphasis added). In other words, the claim is that courts must afford total deference to the President's bare assertion that the AEA's statutory requirements have been satisfied. That is the same as denying review altogether. The dissent posits some fanciful scenarios in which the President would not have "conclusive *interpretive* power" to say what constitutes an AEA "invasion"—*e.g.*, "double parking at the grocery store." Op.92 (emphasis added). But in practice, its position boils down to a simple rule of no review. *See generally* Op.55-185 (using "conclusive" 49 times).

That position defies the Supreme Cout's rulings in *Ludecke* and *J.G.G.* Why would the Supreme Court instruct courts to engage in an empty interpretive exercise if, ultimately, they had to uphold every proclamation? Eliminating review would eviscerate the textual limits that Congress wrote into the AEA. Despite Congress's careful efforts to cabin this extraordinary war power to specific narrow circumstances, the President could use it any time he wanted for any reason at all.

There is no support for this blank-check view of the AEA. The government and dissent mainly rely on a series of cases that do not address the AEA at all, and were not even mentioned in *Ludecke* or *J.G.G.*

*Sterling v. Constantin*, for example, actually *supports* review here, because it did the *opposite* of what the dissent and government advocate: It reviewed the facts and invalidated an executive use of military authority. 287 U.S. 378 (1932); Op.15-17. The Texas governor had imposed production quotas on "a group of oil and gas producers" who he claimed were "in a state of insurrection" by producing too much oil and gas. 287 U.S. at 389. The Supreme Court rejected the governor's invocation of a military emergency, holding that the existence of an "insurrection" was reviewable and not supported by the facts there. *Id.* at 400-04; *see id.* at 390-91, 404 (crediting district court's "findings of fact" that the "proclaimed state of war" was "wholly without support in the evidence"). *Sterling* thus firmly *rejected* the idea that the executive could cite military authorities and thereby "conclusively" expand its

authority "by mere executive fiat." *Id.* at 400; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952) (reviewing President's steel mill seizure despite his declaration of military emergency and his "broad powers" in the "theater of war"); Op.17.

The dissent nonetheless claimed that *Sterling* held courts cannot review any assertion of military emergency. Op.100. But *Sterling* extensively reviewed whether the claimed insurrection was in fact occurring. 287 U.S. at 400-04. And while the Court mentioned "conclusive" "discretion to determine whether an exigency requir[es] *military aid*," it was merely distinguishing cases involving "the power constitutionally conferred by the Congress upon the President to call the militia into service." 287 U.S. at 399 (emphasis added) (cabining *Martin*, *Luther*, and *Moyer*); Op.16. That power was not at issue in *Sterling*, nor is it at issue here. And even in the military context, *Sterling* importantly made clear that "the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions." *Id.* at 401; Op.17. The Court noted that where "[i]t is the emergency that gives the right" of governmental action, "the emergency must be shown to exist before" the action can be justified. *Id.* (quotation marks omitted).

Cases involving the use of the militia are even further afield. *Martin v. Mott* addressed the Militia Act of 1795 and merely held that militiamen could not challenge their deployment. 25 U.S. 19, 28-31 (1827). Its language about executive

power focused on the President's need to maintain "command" and "obedience" among soldiers. *Id*. at 29-30. Thus, when the Court said that the President's decision to call up the militia in an exigency is "conclusive upon all other persons," it was referring to "every [subordinate] officer to whom the orders of the President are addressed." *Id.* By addressing a different issue under a different statute with different language, *Mott* does not support the blank-check view of the AEA.

*Luther* similarly involved the use of the militia, and did not even decide a statutory question—only the constitutional question of who determines the legitimacy of state governments. *Luther v. Borden*, 48 U.S. 1, 38-43 (1849). The Supreme Court has explained that *Luther* presaged today's political-question doctrine—a doctrine the dissent agrees does not apply. *Baker v. Carr*, 369 U.S. 186, 211, 218 (1962); Op.111. And in *Moyer v. Peabody*, the Supreme Court simply nodded to what it had said in *Luther*. 212 U.S. 78, 83 (1909). Critically, *Sterling* later cabined all these cases by emphasizing the narrow issue they addressed. 287 U.S. at 399-400.[9]

In addition to finding no support in case law, the government's blank-check theory has no basis in first principles. First, the text of the AEA imposes a number

---

[9] As the panel majority explained, *The Prize Cases* do not bar review because the *fact* of war there was not in question, only whether a legal "state of war" could exist in a civil war between states absent a congressional declaration. Op.17 n.5 (citing 67 U.S. 635, 666, 670 (1862)).

of specific requirements, with no indication of unreviewable discretion. *Compare Webster*, 486 U.S. at 559 (no substantive limits at all). The government's view would mean that Congress extensively debated the statute's language and limits for no reason, because whatever the text, it would impose no constraint at all. *Infra* Section II.A (discussing congressional debates).

Second, it is manifestly not true that courts can never review the President's actions under wartime statutes. Courts do that all the time. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) (plurality op.) (detention of Taliban combatants authorized by AUMF only "*[i]f the record establishes* that United States troops are still involved in active combat in Afghanistan" (emphasis added)); *Al-Alwi v. Trump*, 901 F.3d 294, 298-300 (D.C. Cir. 2018) (evaluating whether "active hostilities" continued under AUMF; concluding that "[t]he record so manifests here"); *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514 (D.C. Cir. 2018) ("determin[ing] whether the circumstances involve an act of war within the meaning of the statutory exception" is an "interpretive exercise" for the court). These cases and many others also refute the dissent's argument, Op.83, that judicial review is eliminated anytime it is possible a policy relies on "secret" information. *See, e.g.*, *Hamdi*, 542 U.S. at 532 (plurality op.); *TikTok v. Garland*, 145 S. Ct. 57, 69 n.3 (2025) (per curiam); *id.* at 74 (Gorsuch, J., concurring).

Third, the government's view of the merits contradicts any basis for eliminating judicial review. The main premise of the dissent's position is that courts cannot review the executive's *military* judgment. But the government's main merits argument is that the AEA is *not* just a war power but can be applied to a wide range of activities like migration and drug trafficking—"not just military hostilities." Pet.12; *infra* Part II.A. The government's attempt to transform the AEA from a wartime law into a general-purpose law thus undermines the whole premise of any case against review.

## II.   THE PROCLAMATION IS NOT AUTHORIZED BY THE AEA.

### A.   The AEA's Statutory Predicates of "Invasion" and "Predatory Incursion" Require Military Attacks.

1. For over two centuries, the AEA has been understood as a wartime statute that requires either declared war or a military attack. The panel thus properly concluded that the statutory terms "invasion" and "predatory incursion" refer to military attacks—"sending an armed, organized force to occupy, to disrupt, or to otherwise harm the United States." Op.22, 24, 27, 32 (invasion is "an act of war involving the entry into this country by a military force" and predatory incursion is a smaller-scale attack by "a military force"). As Judge Henderson likewise stressed in construing the AEA: "invasion is a military affair" and an "incursion is a lesser form of invasion." *J.G.G.*, 2025 WL 914682, *8-10. Other judges across the country have agreed. *See, e.g.*, *J.A.V.*, 781 F. Supp. 3d at 561; *G.F.F.*, 781 F. Supp. 3d at

19

210; *D.B.U.*, 781 F. Supp. 3d at 1175; *M.A.P.S.*, 786 F. Supp. 3d at 1049; *see also Ludecke*, 335 U.S. at 166, 171 (AEA is a "war power"); Op.94 (Oldham, J.) (AEA applies in "military context"); *id.* at 125 (AEA "contemplates…military activity"); *id.* at 84 (AEA "implicat[es] the war power").

But the Proclamation does not assert any declared war or military attack, only domestic law enforcement issues like irregular migration, drug trafficking, and other crimes. As a result, the government's main argument is that the AEA extends to "any entry" that is "for a hostile or destructive purpose—not just military hostilities." Pet.12; Answering Brief ("AB") 30 (arguing the statute "extend[s] beyond armed conflict"). The government uses "hostile" in the colloquial sense of unfriendly or unwelcome. AB.27. If the statute swept that broadly, one would expect it to have been used more than three times in our nation's history, during the War of 1812, World War I, and World War II. As Judge Southwick observed, the government's proposed definition "would probably cover an awful lot of difficulties we have in this country today with organized criminal activities that may have some connection to a foreign country." Oral.Arg.Tr.43:52.

The government's position is impossible to square with the statute. The text and context make clear that the AEA requires a declared war or military attack, not the "crimes" or "mass migration" asserted by the Proclamation.

20

Start with the text. The Act requires one of three events—a "declared war," "invasion," or "predatory incursion," 50 U.S.C. § 21—all of which refer to military conflict. A "declared war" is plainly military. An "invasion" is too: Every time Congress used that word in the late eighteenth century, it referred to military conflict. Reply Brief ("RB") 6-7 (collecting statutes). The same is true in the Constitution, written and ratified just a decade prior to the AEA. Op.22; OB.28-29 (collecting constitutional provisions); *J.G.G.*, 2025 WL 914682, *9 (Henderson, J., concurring). Contemporaneous dictionaries and other sources confirm the term's military meaning. Op.19-22 (reviewing contemporaneous uses of "invasion").[10]

Like the two preceding terms, "predatory incursion" also referred to military attacks. Congress's only contemporaneous mention of "incursion" came in a statute that authorized the President to summon the militia in response to attacks by Native American tribes. 1 Stat. 96 (1789) (addressing "hostile incursion"); *infra* at 23-24 ("hostile" referred to military action). A litany of other sources reviewed by the majority reflected a similar understanding. Op.23-27 (reviewing contemporaneous uses of "predatory incursion" and concluding that examples "all involved a military force of some meaningful size, organized in a manner related to the kind of enemy

---

[10] *See also Invasion*, Dyche's New General English Dictionary (1771) ("entering of an army into another's country"); *Invasion*, Bouvier's Law Dictionary (1839) ("the entry of a country by a public enemy, making war"); James Madison, Report of 1800 ("Invasion is an operation of war."); Pufendorf, De Jure Naturae 1126 ("forts, arms, and troops" are "required to repel invasion").

involved"); *J.A.V.*, 781 F. Supp. 3d at 560 (similar); RB.8-9 (collecting dictionary definitions and contemporaneous usage).

"There of course can be far less warlike meanings" when the terms "invasion" or "predatory incursion" are "used colloquially." Op.20; *J.G.G.*, 2025 WL 914682, *8 n.5; *J.A.V.*, 781 F. Supp. 3d at 561. Ants may invade a kitchen; a person may invade someone's privacy; a business may complain of incursions from a competitor. But in the AEA, the majority correctly concluded that all surrounding text and context confirms that Congress used these terms in the military sense. *See* Antonin Scalia & Bryan Garner, Reading Law 70 (2012) (when words have multiple meanings, "context disambiguates").

Critically, the Act's title and operative text refer to "alien enemies," a well-established term of art in the law of nations that required military conflict. *See* Op.64 (Oldham, J.) (alien enemies was "familiar concept" that referred to subjects of a foreign nation "when their home country and host country were at war"). The evidence for this military term-of-art meaning is overwhelming. *Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (collecting sources for the proposition that "an alien enemy is the subject of a foreign state at war with the United States"); *id.* at 772 (alien enemy status "imposed temporarily as an incident of war"); Vattel,[11]

---

[11] Full citations to the historical treatises in this section are included in the Table of Authorities.

Nations 321 (1863) (same); Bynkershoek, Treatise 195 n.* (same); Thomas Jefferson, Notes on the State of Virginia 226 (1794) (same); OB.24-27 (collecting sources); RB.13-14 (same).[12]

Applying alien enemy status outside of actual or imminent war would have been unheard of. There is no hint that Congress intended such a radical departure from the term's established meaning. As Judge Henderson observed, all the statutory predicates "trigger a formal change in relations between the United States and the hostile power under the law of nations, and, in turn, the relationship of America to that nation's people." *J.G.G.*, 2025 WL 914682, *8. And the debates show a universal understanding that "[i]n the event of a *war with France*, all her citizens here will become alien enemies…" 8 Annals of Cong. 1790 (1798) (emphasis added).

Other statutory text provides further support. The Act requires an attack by a "hostile" foreign nation, and "hostile" signified war during the founding era. *See Hostile*, Ash's New and Complete Dictionary of the English Language (1795) ("hostile" means "warlike"); *Bas v. Tingy*, 4 U.S. 37, 45 (1800) ("hostile operations" permitted when Congress authorized "war"); RB.7-8 (collecting sources). The AEA also requires an attack "against the territory" of the United States—a phrase

---

[12] The government's rehearing petition cited a single case and a single legislative history statement, Pet.15-16, but both were consistent with the term-of-art meaning, and neither comes close to dislodging the overwhelming evidence of the term's military meaning. Pet.Opp.13 n.8.

Congress used in contemporaneous statutes to refer to a "military expedition or enterprise" that undermined a nation's territorial control. 1 Stat. 384 (1794); RB.10-11.

Historical context confirms the Act's military focus. It was enacted in response to Congress's concern about potential war with France. Op.18; Op.62 (Oldham, J.). And it was enacted pursuant to Congress's power "to declare war." *Eisentrager*, 339 U.S. at 774 n.6. Indeed, the Act faced little opposition on constitutional grounds because, "[w]ith respect to alien enemies, no doubt has been intimated as to the federal authority over them; the Constitution having expressly delegated to Congress the power to declare war." *Id.*

That stands in stark contrast with the contemporaneously enacted Alien Friends Act ("AFA"), which permitted the removal of individuals "dangerous to the peace and safety of the United States" and individuals engaged in "secret machinations against the government"—with *or without* military conflict. 1 Stat. 571 (1798). Those terms align much more closely with the Proclamation, which asserts that "members of TdA are a danger to the public peace and safety of the United States," and that they are engaged in "clandestine" efforts to "undermine" and "destabiliz[e]" the United States. 90 Fed. Reg. 13033-34. In other words, the AFA applied to the same activity the government claims the AEA covers: "any entry" that is "for a hostile and destructive purpose." Pet. 12; AB.29; Op.30 (AFA "would more

directly apply here"). Unlike the AEA, the AFA was "widely condemned as unconstitutional" precisely because it operated outside of wartime. *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring). Congress would have been shocked to hear the government's position that the AEA *also* applies outside wartime and encompasses the same things as the AFA.

2. The government has no way around these clear indications that the AEA requires a military attack. It has cited a few dictionary definitions and speeches which use "invasion" and "incursion" in other contexts. But these isolated examples cannot overcome the terms' clearly predominant military meaning, *Congress*'s consistent military usage, the historical context of impending war, or the terms' combination with numerous other military terms in the AEA, including the term "alien enemies" itself. *See Fischer v. United States*, 603 U.S. 480, 487 (2024) ("word is given more precise content by the neighboring words").

The government suggests that Congress did not intend to adopt the term-of-art meaning of "alien enemies" because the AEA refers not just to "declared war," but also to "invasion" and "incursion." AB.37. But those terms match the term of art perfectly. When the AEA was enacted, "invasion" and "incursion" were familiar ways of referring to military attacks that began a "defensive war," which was waged "to repel invasion" or "to repel [] incursions" without the need for a declaration of war. *Worcester v. Georgia*, 31 U.S. 515, 545 (1832) (discussing warfare against

Native American tribes); Vattel, Nations 316-17 (1863) ("He who is attacked and only wages defensive war, needs not to make any hostile declaration" because "open hostilities" establish "the state of warfare[.]"); RB.12-13. Congress thus included those terms to ensure that the AEA applied to both declared wars and defensive wars.

Indeed, Congress was specifically concerned about this sort of sudden military attack when it was out of session, which was frequent at that time. *See, e.g.*, 1 Stat. 558 (1798) (authorizing President to respond to military attacks during congressional recess); 8 Annals of Cong. 1573 (1798) (rejecting limitation of AEA to times when Congress was in session and could declare war). And alien enemy status arose in both kinds of war—offensive wars that started with a declaration, and defensive wars that started with an invasion or predatory incursion. RB.13-14. The statute's enumeration of these different kinds of military conflict does nothing to depart from the established meaning of "alien enemies." To the contrary, the drafters consciously imported this meaning. 8 Annals of Cong. 1790 (1798).

The government also suggests that the statute's application to "threatened" and "attempted" invasions or incursions means that "invasion" and "incursion" cannot refer to military attacks. AB.30, 37-38. But those terms simply extend the AEA to impending or failed military attacks; they "do not assist in defining the terms" invasion or incursion. Op.23-24. At the time, it was well understood that nations could wage defensive war when an enemy "is already bent upon attacking" but "is

26

still engaged in his preparations." Pufendorf, De Jure Naturae 1294; Vattel, Nations 302 (1863) ("[a nation] has a right to prevent the intended injury, when she sees herself threatened with it"); Martens, Summary 272-73 (same); RB.14. By aligning the AEA with the law of nations and providing for its use in response to threatened or attempted military attacks, Congress did nothing to depart from the military meanings of "invasion" and "incursion."

3. The AEA's statutory terms thus require a military attack by a foreign nation or government against U.S. territory. But as the panel majority recognized, the Proclamation does not assert any sort of military activity, much less an attack on U.S. territory via a "method of conducting hostilities…in some manner comparable to an invasion or predatory incursion as understood in 1798." Op.31. Instead, it alleges migration and criminal activity, particularly drug trafficking. Those are law enforcement issues, extensively regulated by domestic law, including Title 8, Title 18, and the laws of every state. That is why the government so strenuously resists the statutory requirement of a military attack.[13]

---

[13] The government's recent boat strikes, *infra* Part II.B, do not change this analysis, because they do not change the nature of the activities asserted in the Proclamation. There is still no "declared war," and drugs and migration still do not constitute an "invasion" or "predatory incursion" against U.S. territory as those terms were understood in 1798. Nor can the President use his military powers abroad to expand his domestic authority at home. *Youngstown*, 343 U.S. at 587-89.

The panel was correct to reject the government's reliance on "freestanding labels." Op.33. The Proclamation *calls* drug sales a form of "irregular warfare." 90 Fed. Reg. 13033. It *says* that migration constitutes an "invasion" and "predatory incursion." *Id*. at 13033-34. But mere labels cannot be enough to satisfy the AEA—otherwise, the careful limits that Congress wrote into the statute would disappear.

Beyond bare labels, the Proclamation's factual assertions are strikingly thin and do not match the AEA's requirements. The Proclamation contains one mention of crimes like "murders, kidnappings, [and] extortions," but it does not even claim that TdA is undertaking those activities in the United States. *Id.* at 13033. The only activities it claims within U.S. territory are "mass illegal migration" and "drug trafficking." *Id.* Even taking those assertions as true, those activities are "not within even an updated meaning of invasion or predatory incursion." Op.32-33; *G.F.F.*, 781 F. Supp. 3d at 212 ("narcotics trafficking…is a criminal matter, not an invasion or predatory incursion"); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) (migration is not an "invasion" for constitutional purposes); *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (same); *New Jersey v. United States*, 91 F.3d 463, 468 (3d Cir. 1996) (same).[14]

---

[14] The dissent alleges other activities by TdA within the United States, citing extra-record evidence. *E.g.*, Op.71-75, 120. But even those media articles do not suggest that TdA engages in military rather than criminal activity. *See also* Op.35 ("the district court would need to put all evidence to the test of the adversarial system").

It makes sense that the government resists the requirement of a military attack, because treating domestic drug crimes and immigration violations as military actions could have major implications. Military attacks on U.S. soil would trigger key elements of the Geneva Conventions, including the requirement that U.S. officials ensure alleged TdA members are "treated humanely" and are not subjected to "cruel treatment" or "outrages upon personal dignity." Geneva Conventions Common Art. 3; *Hamdan v. Rumsfeld*, 548 U.S. 557, 628, 630-31 (2006). There could be domestic criminal liability for war crimes if U.S. officials violated the Conventions. 18 U.S.C. § 2441. And such an attack could trigger law-of-war rules permitting the lethal targeting of combatants, including U.S. personnel. DoD Law of War Manual ("DoD Manual") 106-07 (2023).[15] The gravity of these consequences is one reason why Congress has never treated domestic drug sales and migration as military attacks. They are handled through a variety of other legal authorities, Op.38-39, not those pertaining to warfare.[16]

Most importantly, no one would have considered these activities to be military attacks at the time of the AEA's enactment. Neither drug trafficking nor migration

---

[15] https://perma.cc/UZ5U-FGZF.

[16] The dissent criticized the "clear, judicially determinable line between ordinary criminal activity and war-like hostilities" as "a figment of *amici*'s imagination." Op.118. But the dissent's two examples of supposed crossover activities—the Civil War and large-scale international terrorism, Op.118-19—illustrate just how far this case is from any potential gray area. Civil wars and events like the 9/11 attacks are nothing like border crossings and drug trafficking.

look anything like the historical examples invoked by the government. Predatory incursions or invasions by pirates and Native Americans were fundamentally military in nature, with armed combatants using military weapons and battling militias and navies. RB.9-10 (collecting sources); Burlamaqui, Principles 383-84 (discussing "wars" against "pirates"); *United States v. Smith*, 18 U.S. 153, 163 n.h (1820) (describing the "armed vessel[s]" of "pirate[s]"); *Allen v. Cooper*, 589 U.S. 248, 251 (2020) (pirate ship "carr[ied] some 40 cannons and 300 men"); Federalist No. 41 (describing need for navy to repel pirate incursions); Articles of Confederation art. VI (authorizing "vessels of war" to repel pirate incursions).

Attacks by privateers were similarly full-scale military affairs, as nations often relied on privateers in lieu of a large standing navy. *See* President's Instructions to Private Armed Vessels, *in* Henry Wheaton, A Digest of the Law of Maritime Captures and Prizes 341 (1815) (privateers "exercis[e] the rights of war"); 1 Kent, Commentaries 95 (it is "the practice for maritime states" that privateers serve "as auxiliary to the public force"); *infra at* Bynkershoek, Treatise 140 (describing privateers acting as national navy).

Indeed, at the time of the AEA, privateers were widely recognized under the law of nations as conducting lawful military activity on behalf of sovereign nations, and were treated as prisoners of war when captured. Bynkershoek, Treatise 139-40 (the subject of privateers "belongs to the law of nations" and their work "is done

under the sanction of public authority"); *The Resolution*, 2 U.S. 19, 22 (1781) (similar); Vattel, Nations 400 (1863) (POWs). The government has of course not treated alleged TdA members as POWs.

Nor does the administration's labeling of TdA as a "foreign terrorist organization" mean TdA is engaged in military attacks. The statutory predicates for FTO designation include numerous crimes, such as using a weapon to endanger a person's safety or cause property damage. *See* OB.35-36. Designation as an FTO thus involves distinct statutory predicates from the AEA.

Moreover, Congress has squarely addressed detention and removal of FTO members within the normal immigration system. *See* Op.38-39; OB.36-37. As the panel majority noted (citing a bipartisan amicus from former government officials), there are numerous authorities, with carefully chosen limits, for detaining and removing FTO members. Op.38.

In sum, as the panel majority properly concluded, the AEA can only be used in response to a declared war or military attack on U.S. territory. The Proclamation fails that requirement.

## B. The Proclamation Fails to Establish an Attack by a "Foreign Nation or Government."

The Proclamation is not authorized by the AEA for a second, independent reason. The statute requires not just a military attack against U.S. territory, but one carried out by a "foreign nation or government." 50 U.S.C. § 21. The Proclamation

fails this requirement in multiple ways. The Proclamation on its face fails to establish an attack by Venezuela, studiously avoiding that assertion and instead naming TdA. And while the panel opinion deferred to the Proclamation's assertion that Maduro was directing TdA, the government has since taken the contradictory position that TdA's actions are *not* attributable to Venezuela. That position, which nearly the entire intelligence community agrees with, fatally undermines the conclusory assertions in the Proclamation.

1. The Proclamation tries to satisfy the AEA's foreign-nation requirement by asserting that TdA is part of "a hybrid criminal state" or is acting "at the direction…of the Maduro regime." 90 Fed. Reg. 13033-34. The panel held that the Proclamation satisfied this requirement. Op.38. But since the panel ruled, the government has directly contradicted these statements in other fora. In October, to justify its boat strikes, the government informed Congress and the U.N. Security Council that the President has now determined TdA is a "*non*-state" actor, and that through its drug trafficking, TdA is engaged in a "*non*-international armed conflict" against the United States. *Supra* 8 (emphasis added).

Those recent presidential determinations can only be true if the Proclamation's assertions are false. If TdA's actions create a "non-international armed" conflict, then it cannot be acting "at the direction" of the Maduro government. Such direction would transform the conflict into an "*international* armed conflict."

DoD Manual 74 (IAC is "between states"); U.N. Art. on Responsibility of States 8 (group's conduct is attributable to a government where the group is acting "under the direction or control" of the government). It is impossible for TdA's drug trafficking to be attributable to the Maduro government and simultaneously to form the basis of a non-international armed conflict in which TdA is engaged as a non-state actor. DoD Manual 1040 ("Non-international armed conflicts are those armed conflicts that are *not* between States." (emphasis added)). Therefore, the President's own formal determinations make clear that TdA's actions are not those of a "nation or government." 50 U.S.C. § 21.

The government's shifting determinations concerning TdA mirror its shifting positions in this case. It has now abandoned its former argument that TdA itself "is a foreign nation or government." Dist. Ct. Dkt. 19. And the new determinations contradict numerous statements in the government's briefing to this Court. *See, e.g.*, AB.44 (while Petitioners argued "TdA is a 'non-state actor,'" "the President found otherwise").

The recent determinations also contradict the AEA's fundamental purpose. As explained, the concept of "alien enemies" only applies when "a foreign *state* [is] at war with the United States." *Eisentrager*, 339 U.S. at 769 n.2 (emphasis added); *supra* Part II.A. Such status is premised on the unique legal relationship between sovereigns and their subjects. *Eisentrager*, 339 U.S. at 772 (citing *The Rapid*, 12

33

U.S. 155, 161 (1814)). But that requires war between two sovereigns. The drafters of the AEA would never have recognized the notion of alien enemies in a conflict between a nation and a "non-state" actor. *See* Rawle, View 100 (describing "public war" between sovereigns, where alien enemy status applied); Grotius, De Jure Belli 91 (distinguishing public war from "mixed" war between nation and non-state group); Burlamaqui, Principles 349-50 (similar).

In addition to contradicting the Proclamation and precluding the application of alien enemy status, the President's new determinations also underscore a problem on the Proclamation's face: It never claims an invasion by Venezuela itself, only TdA. While it asserts various connections between the two, the Proclamation repeatedly states that "TdA"—not Venezuela—"is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." 90 Fed. Reg. 13034.

That does not satisfy the AEA, which requires an attack by a "nation or government," not a non-state group. And it is no mere technicality. Declaring an invasion by the nation of Venezuela would mean that we are in an *international* armed conflict, which would trigger a host of serious consequences: Both Venezuela and the United States could lethally target each other's combatants under the laws of war. DOD Manual 106-07. The entirety of the Geneva Conventions would apply. TdA members would have to be treated as prisoners of war and could not be

prosecuted for drug trafficking (as the alleged action constituting a military attack). *Id.* at 105, 539-40. And, again, U.S. officials could be subject to criminal liability for war crimes. 18 U.S.C. § 2441.

That should end the matter: According to the administration itself, TdA's actions are not attributable to the Venezuelan government, and the AEA cannot be invoked against a non-state actor.

2. The government's contradictory statements undermine the basis for deferring to the Proclamation's factual assertions. When the government itself contradicts its previous assertion, courts no longer have a consistent set of claims to defer to. Meaningful review of the facts is necessary so that the President cannot baselessly assert that the AEA's predicates are met. Indeed, courts have repeatedly reviewed the government's factual assertions in AEA cases. *Supra* 13-14; OB.21-22; RB.4 (collecting cases).

Here, the President's recent boat-strike determinations match the view of nearly the entire intelligence community, which concluded that TdA's actions are not attributable to Venezuela. Seventeen out of eighteen national security agencies that make up the National Intelligence Council ("NIC") concluded it is "highly unlikely" that the Maduro regime is "directing TDA movement to and operations in the United States." Supp.ROA.2; RB.17-18.[17] The NIC explained that TdA focuses

---

[17] Supp.ROA refers to the supplemental record excerpts submitted at Dkt. 143-2.

on "low-skill criminal activities" and that its "decentralized structure make[s] it highly unlikely that TDA coordinates large volumes of human trafficking or migrant smuggling." Supp.ROA.1.[18]

A report from the sole dissenting agency, the FBI, does little to support the Proclamation. The FBI did not find that the Maduro regime is directing *any* drug trafficking in the United States. Just the opposite: The FBI Report found that increased drug trafficking here would mean that "TdA's expansion into the United States…likely is *not* actively planned or centrally supported by the Venezuelan Government." ROA.1206 (emphasis added). While it stated that Venezuelan officials "likely facilitate" and "encourage[]" TdA members' migration, ROA.1202, that falls far short of directing TdA's actions. And even as to these limited conclusions, the rest of the NIC noted that the FBI's sources were "motivated to fabricate information." Supp.ROA.2-3.

3. Even without looking beyond the face of the Proclamation, it does not satisfy the AEA's requirement of an attack by a "nation or government." The Proclamation states that TdA acts "both directly and at the direction, clandestine or otherwise, of the Maduro regime." 90 Fed. Reg. 13034. But like its assertion of "irregular warfare," its bare assertion of "direction" by Maduro is simply a label—a

---

[18] Appellants renew their motion to supplement the record with the NIC Report. Dkt. 143. The government relies on similar material outside the Proclamation. AB.34, 43-45 (relying on FBI Assessment).

legal conclusion that cannot satisfy the AEA all by itself. Op.33 (rejecting the sufficiency of "freestanding labels"). The Proclamation provides no information about the alleged direction: Nothing about its extent, such as whether it involves mere encouragement, or general instructions, or direct operational control. The Proclamation does not even say *what* Maduro allegedly directed TdA to do, where, or against whom. If it were enough to simply write the word "direction" in a proclamation, the AEA's "nation or government" requirement would disappear.

Nor do the Proclamation's more specific factual assertions support this label. It states that TdA "operates in conjunction" and "coordinates" with Cártel de los Soles, and that it "support[s] the Maduro regime's goal[s]." 90 Fed. Reg. 13033. But those do not describe *direction*. Direction requires "[a]n order," "an instruction on how to proceed," or "an act of guidance." Black's Law Dictionary (2024). The Proclamation describes no such order or instruction. *Cf. United States v. Rafiekian*, 991 F.3d 529, 538 (4th Cir. 2021) (for "direction" or "control" under 18 U.S.C. § 951, agent "must do more than act in parallel with a foreign government's interests or pursue a mutual goal"). Moreover, the President has now determined that, like TdA, Cártel de los Soles is also a "non-state" group, strikes against whom constitute a "non-international armed conflict." *Supra* 8. So "coordination" with that group is even further afield from state direction.

The same problems apply to the Proclamation's assertion that TdA is part of a "hybrid criminal state." Again, the President has now taken the position that TdA is a "non-state" actor. *Id.* But regardless, "hybrid criminal state" is an unexplained label just like irregular warfare. And it finds no support in the Proclamation's more specific factual statements. The Proclamation makes contradictory assertions that TdA is "closely aligned" with the regime yet has "infiltrated" the regime. And it says authorities have "ceded" an unspecified amount and kind of "control over their territories." None of that comes close to establishing that TdA is "an arm of Venezuela's 'hybrid criminal state.'" AB.44. In other contexts, to determine whether an entity is "an organ of a foreign state," 28 U.S.C. § 1603(b)(2) (Foreign Sovereign Immunities Act), courts must consider "whether the foreign state created the entity," whether it "actively supervises the entity," and "whether the foreign state requires the hiring of public employees and pays their salaries." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846-47 (5th Cir. 2000). The Proclamation does not assert that TdA meets *any* of those factors. *Compare id.* at 848-49 (entity created, owned, and managed by government was state organ); *In re Terrorist Attacks*, 538 F.3d 71, 86 (2d Cir. 2008) (similar).

4. In 1798, none of the Proclamation's assertions would have transformed TdA's actions into those of a "foreign nation or government." The most prominent contemporaneous analog is privateers. But privateer activity was only treated as state

action when privateers acted *openly* on behalf of the sovereign pursuant to a formal public commission. RB.19-20; Vattel, Nations 450-51 (1863) (actions by "private individuals who commit acts of hostility without being able to produce a commission from their sovereign" cannot "be imputed to the sovereign"); Op.126 (Oldham, J.) (privateers' relationship with sovereign "depended on issuance of a letter of marque").[19]

Indeed, privateers were so formally and openly tied to their authorizing government that they formed "part of the armed forces of the nation." *The Mary*, 12 U.S. 388, 397 (1814); Bynkershoek, Treatise 140 (describing privateers acting as national navy). In contrast, sailors acting without any formal commission delegating sovereign authority were treated as private criminals—just like TdA. *See* RB.19; Bynkershoek, Treatise 127-28 (those "who sail out for the purpose of making depredations on the enemy, without a commission" "are punished as pirates"); *Smith*, 18 U.S. at 162-63 (same). The Proclamation's conclusory assertions of "coordination," "clandestine or otherwise," would never have sufficed to turn private armed activities into the acts of a sovereign nation. *See The Resolution*, 2 U.S. 1, 3

---

[19] The dissent also points to the Barbary pirates, but those were effectively privateers acting as the armed forces of North African nation states. RB.21 n.11; 1 Molloy, Maritime 79 (Barbary pirates "having acquired the reputation of a Government…cannot properly be esteemed Pirates but Enemies").

(1781) ("The act of the subject can never be the act of the sovereign; unless the subject has been commissioned by the sovereign to do it.").

The same was true of mercenaries. Mercenaries were private individuals who enlisted directly in foreign armies pursuant to formal contracts. Vattel, Nations 239 (1916) (mercenaries "enter into the service of the State"); *id.* at 319 (mercenaries "are in fact part of…the army in which they are fighting"). Mercenaries had the same duties as any other enlisted soldier. *Id.* at 241 ("All soldiers" had "same…obligation" "whether because of their character as subjects or because of their contract as mercenaries."); Pufendorf, De Jure Naturae 1013 (state can use citizen soldiers or "hire in their place as many mercenaries, as seem required for the common defence").

The same is true of the Hessians, Op.37, 126, who were "auxiliary troops"— entire battalions of trained, professional soldiers sent to augment the British army pursuant to treaties between Britain and German principalities. Rodney Atwood, The Hessians 1 (1980); 3 Parliamentary Register 46 § 1 (1802) (February 5, 1776 treaty) (Hessian auxiliary troops "shall be at the entire disposition of the King of Great Britain"); *id.* at 34 § 1, 275 § 1 (same). Like mercenaries, foreign auxiliaries served the same essential functions as their national peers. *See* Vattel, Nations 261 (1916). TdA members are plainly not hired soldiers fighting as regular troops in the Venezuelan military.

And when captured, both privateers and mercenaries were treated as prisoners of war, not criminals—reflecting their formal status as functional members of the national military. *Id.* at 318 (privateer's commission ensured that "if taken, they will be treated as prisoners captured in regular warfare"); *id.* at 319 (mercenaries are "when captured, treated by the enemy as if they formed part of the army in which they are fighting"). That makes sense for hired members of a foreign military with the status of lawful combatants. But the government points to nothing similar for TdA. Lacking that and lacking any formal, public authorization to fight under sovereign authority, TdA's actions would not have been attributable to Venezuela in 1798.

The Proclamation thus fails the AEA's "nation or government" requirement. And, at bottom, the President's recent determinations have fatally undermined the government's previous arguments.

## III.    DUE PROCESS REQUIRES RELEVANT INFORMATION AND AT LEAST 30 DAYS TO FIND A LAWYER AND SEEK RELIEF.

The panel held that "based on the current record, which is undeveloped" with "no fact-finding," Petitioners were not likely to succeed in their challenge to the government's current notice practice, which provides 7 days before removal. Op.47-48 (Ramirez, J.). The panel remanded for fact-finding and emphasized that a "more developed record may demonstrate an actual success on the merits." *Id.* The record shows that 7 days is insufficient, and that detainees should instead be provided with

30 days, in addition to other basic procedural safeguards. But, at a minimum, Petitioners agree with the panel that further factfinding is warranted.

The Supreme Court has been clear that "AEA detainees must receive notice…that they are subject to removal under the Act…afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *J.G.G.*, 604 U.S. at 673. "In order to 'actually seek habeas relief,' a detainee must have sufficient time and information to *reasonably* be able to contact counsel, file a petition, and pursue appropriate relief." *A.A.R.P.*, 605 U.S. at 95 (emphasis added).[20]

Notice must be tailored to the recipient's circumstances. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13-15 (1978). Here, sufficient notice requires (1) 30 days to find counsel and then prepare and file a habeas petition in federal court, with removal stayed during habeas proceedings; (2) information describing how to challenge AEA designation and removal; and (3) the factual basis for the government's accusation of TdA membership. The government's updated notice process remains deficient.

---

[20] The requirement for sufficient notice and opportunity to bring habeas actions stems not only from due process, as the Supreme Court recognized in *J.G.G.* and *A.A.R.P.*, but also from habeas principles and the AEA itself. *Boumediene v. Bush*, 553 U.S. 723, 779 (2008); Gov't Stay Appl. 35 n.10, *D.V.D. v. DHS*, No. 24A1153 (U.S. May 27, 2025).

Such notice is essential due to the high "risk of an erroneous deprivation," and the enormous consequences of such error. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). There is "significant evidence" the government has targeted individuals who "have no connection to" TdA based "on flimsy, even frivolous, accusations." *J.G.G. v. Trump*, 786 F. Supp. 3d 37, 46 (D.D.C. 2025); *supra* 4-5. The government has sent all AEA detainees removed so far to severely abusive conditions at CECOT. *Supra* 5. And once there, it has claimed that it is powerless to remedy erroneous removals. *A.A.R.P.*, 605 U.S. at 95. With such "particularly weighty" interests at stake, "sufficient time and information" to "actually seek habeas relief" is critical. *Id.*

1. The current 7-day notice period is insufficient for AEA detainees "to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." *Id.* At the outset, as the Supreme Court recognized, finding counsel is essential to challenge one's AEA designation. Petitioners are unaware of *any* AEA detainee who has been able to file a habeas petition pro se. That is no surprise given the barriers outlined below.

To file a habeas petition, AEA detainees must find and retain counsel if unrepresented; they must meet with counsel, likely multiple times; and counsel must investigate, prepare pleadings, and file. There are immense barriers to rapidly accomplishing this.

43

First, it is extremely difficult, if not impossible, for detainees to rapidly meet with counsel. Attorney access barriers at Bluebonnet, where Petitioners are detained, are illustrative. Remote access is lacking: Unrebutted evidence shows detainees have struggled to even *once* "meet[] with counsel by video within seven days." Op.49; ROA.639. So is in-person access: Meetings must be scheduled days in advance, and there are only two attorney-client meeting spaces. ROA.643. Further, attorneys cannot speak with detainees unless they already know their name and A-number. ROA.643. And detainees are frequently transferred between facilities, Op.51-52, which can disrupt attorney-client communication for days at a time. ROA.639; *see W.J.C.C. v. Trump*, 2025 WL 1703682, *6 (W.D. Pa. June 18, 2025).

Second, detention creates additional hurdles to filing a habeas petition. Bluebonnet, like many immigration facilities, lacks computers. ROA.643. Timely filed habeas petitions may not reach the courthouse before a detainee is removed. Op.52-53. Detainees "may have limited access to relevant documents," requiring attorneys to spend additional days seeking documents from family or the government. *Quintero v. Garland*, 998 F.3d 612, 629 (4th Cir. 2021). And lack of literacy and English fluency pose obvious barriers to learning about the legal process and contacting attorneys. ROA.270 (Brown Decl.) ¶ 4; ROA.273-74 (Collins Decl.) ¶ 10.

Finally, the pool of pro bono attorneys with time and expertise to litigate federal habeas petitions is limited. ROA.1059 (Babaie Supp. Decl.) ¶¶ 10-11. And if the Proclamation is upheld, numerous detainees will need to prepare and file lawsuits from the same detention center within the same short window. ROA.948, 1012 (over 100 removals to CECOT under AEA on March 15). Dozens of detainees will not realistically be able to find their own lawyer, and prepare and file a new lawsuit, from the same facility in a single week—particularly with attorney-access limitations such as Bluebonnet's.

Even 30 days is rapid under these circumstances. Based on similar barriers, courts have found longer timeframes necessary for detained immigrants to press their claims. *Freza v. Att'y Gen.*, 49 F.4th 293, 300-02 (3d Cir. 2022) (because courts cannot "ignore the realities of obtaining legal counsel while detained," denial of additional 30-day continuance violated due process); *Hernandez Lara v. Barr*, 962 F.3d 45, 55-56 (1st Cir. 2020) (five weeks insufficient); *Cruz Rendon v. Holder*, 603 F.3d 1104, 1110 (9th Cir. 2010) (two months insufficient); *Usubakunov v. Garland*, 16 F.4th 1299, 1306-07 (9th Cir. 2021) (seven weeks insufficient); *see also Alford v. United States*, 709 F.2d 418, 424 (5th Cir. 1983) (five weeks insufficient).

The panel analogized an AEA habeas to ordinary immigration proceedings under 8 U.S.C. § 1229. Op.47. But for those proceedings, the 10-day period to locate counsel is "before the *first* hearing date," which is just a scheduling conference. 8

U.S.C. § 1229(b)(1) (emphasis added); Immigration Court Practice Manual ("Practice Manual") § 4.15(e).[21] If no counsel is located, the immigration judge provides the pro se respondent with a list of legal service providers and allows for a continuance to seek representation. 8 U.S.C. § 1229(b)(2); Practice Manual § 4.15(g). Noncitizens can then request additional continuances, so that they have "a fair opportunity" to "seek, speak with, and retain counsel." *Matter of C-B-*, 25 I. & N. Dec. 889 (BIA 2012); Practice Manual § 4.15(g).[22] Further, as the panel recognized, these immigration proceedings are "largely defensive," meaning they do not require noncitizens to initiate a new lawsuit in federal court. Op.47.

The government's analogy to expedited removal procedures, AB.51, is even more inapposite. Expedited removal is an administrative proceeding where immigration officers make far different types of determinations—like whether a noncitizen is seeking admission without valid documents—than what will be at stake in an AEA case. 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(7). AEA cases will necessarily require detailed factual inquiries about TdA membership, as is demonstrated by the significant evidence that individuals sent to CECOT were not TdA members. *Supra* 4-5; RB.23 n.13 (group membership is case-by-case and can require multi-factor functional analysis).

---

[21] https://perma.cc/24XY-PY4U.

[22] Similarly, here, the notice procedure must provide for continuances where necessary to obtain counsel.

The asylum credible-fear process is also not analogous. Critically, there asylum officers must "elicit all relevant and useful information" and apply a low threshold standard, with no requisite legal pleadings or argument. 8 C.F.R. § 208.30(b), (d). Final review before an immigration judge likewise does not require legal briefing. *Id.* § 1208.30(g)(2).

The government gave alleged alien enemies 30 days' notice during World War II, even for those the government deemed "dangerous to the public peace and safety of the United States." *Citizens Protective League v. Clark*, 155 F.2d 290, 295 (D.C. Cir. 1946). At least 30 days' notice is also necessary here so that AEA detainees can "reasonably be able to contact counsel" and "actually seek habeas relief," in light of the significant barriers to doing so quickly and grave consequences of error. *A.A.R.P.*, 605 U.S. at 95.

2. Adequate notice must also provide basic information about the process. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) (notice must be "desirous of actually informing" a person of their rights). Here, notice must be written plainly in a language the individual understands and read to the individual in that language. It must inform them of their AEA designation, the country of removal, and the earliest possible date of removal. *J.G.G.*, 604 U.S. at 673 (notice must inform detainees "they are subject to removal under the Act"). It must state clearly that the person can challenge their removal by filing a lawsuit in federal court, and that they

can contact lawyers to help do so. *A.A.R.P.*, 605 U.S. at 95 (notice must explain "how to exercise due process rights").

To facilitate representation, the government must additionally provide this notice to immigration counsel, if any, and class counsel in this case. The government must provide the list of free legal service providers it is already required to share, including providers who may take on AEA habeas petitions. 8 U.S.C. § 1229(b)(2). And the government must provide regular telephone access.

The current notice procedures remain deficient. Among other shortcomings, the notice is not in plain language, does not provide notice of the country of removal, is not provided to immigration and class counsel, and does not provide adequate information about how to challenge removal.

3. Finally, the government must provide the factual basis for its TdA allegations. OB.41-42, RB.24-25. The government's burden is slight, since it has already completed the "Validation Guide." ROA.873-74. Initial disclosure is necessary to ensure that detainees can file informed habeas petitions, begin gathering evidence, and deter any more frivolous designations based on Chicago Bulls hats or the like. Indeed, even during a "period of ongoing combat," a detainee "must receive notice of the factual basis for his classification." *Hamdi*, 542 U.S. at 532-33 (plurality op.); DoD Manual 535-36 (similar).

## IV.  THE PROCLAMATION VIOLATES MULTIPLE PROCEDURAL PROTECTIONS.

Even if the Proclamation complied with the AEA, and individuals were given due process, it would still have to conform to the procedures Congress has mandated in the INA, humanitarian statutes, and the AEA itself.

### A.  The Government Cannot Bypass the INA's Removal Procedures or Jettison Mandatory Humanitarian Protections.

Congress enacted the INA's comprehensive framework in 1952 as the "sole and exclusive procedure" to govern *all* removals, "[u]nless otherwise specified." 8 U.S.C. § 1229a(a)(3); S. Rep. No. 82-1137, 30 (1952) (INA "supersede[s] all previous laws with regard to deportability"). Congress has explicitly exempted other removal procedures from the INA's "sole and exclusive" framework. 8 U.S.C. §§ 1225(b), 1228, 1229a(a)(3) (expedited removal); *id.* § 1531 *et seq.* (special removal procedures for FTO members and other terror suspects); *id.* § 1226a (same). But it did not exempt the AEA, even though the AEA was used in World War II just a few years prior to the INA's enactment. And the statutes are easily reconcilable. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (where "two Acts of Congress allegedly touch[] on the same topic," court must "strive to give effect to both"). The AEA continues to provide authority to remove (and detain) noncitizens who are otherwise legally present—the same core functions it had prior to the INA. But it does not exempt those removals from the INA's procedures.

Even if AEA removals need not comply with the INA's removal procedures, they would still be subject to statutes barring removal to a country where a person faces torture or persecution. OB.49-51 (describing statutes and regulations). These protections apply here by their plain terms. Both rules apply to removals generally, with no limitation that would exclude the AEA. 8 U.S.C. § 1231(b)(3)(A) (applying withholding to any effort to "remove" a person); *id.* § 1231 note (applying CAT to any effort to "expel, extradite, or otherwise effect the involuntary return of any person"). The AEA, which itself speaks of "removal," falls squarely within both statutes' terms. 50 U.S.C. § 21. While Congress included specific exceptions to both withholding and CAT, 8 U.S.C. § 1231(b)(3)(B); *id.* § 1231 note, it made no exception for AEA removals.

This tracks Judge Walker's reasoning in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022). There, the D.C. Circuit addressed whether the government could expel noncitizens under a public health statute that, like the AEA, lies outside the INA and authorizes removal. The Court explained that because the public health law "says nothing about where the Executive may expel," it does not displace Congress's specific commands regarding humanitarian protections. *Id.* at 731-32. The same is true here. Congress's "specific prohibition[s]" against removal to persecution and torture are an "exception" to the AEA's "general permission" for

removal. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

The government therefore may not remove anyone under the Proclamation without screening them for persecution and torture in the country of removal. The government argues that those claims do not "sound in habeas" and thus cannot be raised here. AB.63-64. But the Supreme Court already squarely held that challenges to removal under the AEA fall within "core" habeas. *J.G.G.*, 604 U.S. at 672. And, in any event, Petitioners do not ask this Court to conduct the screening itself. They merely request that the Court order the government to implement a process for conducting such screening before effectuating an AEA removal.[23]

So far, the government has ignored these congressional mandates, with devastating consequences. Unwilling to even acknowledge what it has done to AEA detainees, the government argues that it has a policy of not transferring people to torture, and accordingly, torture does not occur at CECOT. AB.64. But that is plainly not true. *See supra* 5 (describing torture at CECOT). Congress enacted withholding and CAT precisely to bar removals to places like CECOT.

[23] The process requires, at minimum, that the government notify individuals of the country of removal, provide a meaningful opportunity to express fear, and if fear is expressed, afford a fair and serious adjudication of the claim. *See Nasrallah v. Barr*, 590 U.S. 573, 575 (2020); 8 C.F.R. §§ 1240.10(f), 1240.11(c)(1).

**B.     The Proclamation Violates the AEA's Right to Voluntary Departure.**

The AEA states that the President may "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom." 50 U.S.C. § 21. The AEA's right of voluntary departure is a "statutory condition precedent" to removal. *Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947); *Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (removal without opportunity to voluntarily depart is unlawful); Br. for Respondents, *Jaegeler*, 342 U.S. 347, 1952 WL 82533, *11 (same). In fact, the government concedes that the AEA provides a right to voluntary departure. AB.61-62. But it argues that it can disregard that statutory requirement just by asserting that everyone subject to the Proclamation has engaged in "actual hostility." 50 U.S.C. § 22. That fails for two reasons.

First, it misreads the statutory structure. Section 21 provides an unconditional right of voluntary departure, whereas Section 22 provides an additional right: time to "settle affairs," subject to the "actual hostility" exception. This additional time to settle affairs would have been meaningful in 1798—departing from the United States meant that noncitizens would need to sell or transport all of their possessions at a time when doing so was not straightforward. The Act's structure also tracks the law of nations, which provided that a nation was "bound to allow [alien enemies] a reasonable time for withdrawing" once war begins. Vattel, Nations 318 (1863). By

contrast, providing the "full time for the settlement of their affairs" was considered optional and subject to bilateral agreements and exceptions. *Id.* Accordingly, irrespective of whether Petitioners are owed time to settle their affairs, they are plainly entitled to voluntary departure.

The dissent contends Petitioners forfeited this right because they are refusing to depart by engaging in this litigation. Op.183 (Oldham, J.). But the right to voluntary departure is not contingent on giving up the right to judicial review. A person does not "refuse or neglect" an order just by exercising their right to test its legality. 50 U.S.C. § 21. And at any rate, the government is denying this right to *all* detainees, regardless of litigation.

Second, even if Section 22's exception applied to Section 21, the government cannot invoke the exception categorically and without evidence. Whether "an alien," singular, has committed "actual hostility" is a fact-specific question. 50 U.S.C. § 22. And as discussed, the government's criteria for applying the Proclamation fails to reliably determine even TdA membership, much less that a person has engaged in "actual hostility." *Supra* 4-5.

## V.    THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PETITIONERS.

1. The Supreme Court has already held that Petitioners are at "high risk" of "severe, irreparable harm." *A.A.R.P.*, 605 U.S. at 94.

First, Petitioners face unlawful removal under the AEA. Their interest in avoiding removal is "particularly weighty" given the government's past refusals "to provide for the return of an individual deported in error to a prison in El Salvador." *Id.* at 95; Op.40-41.

Second, Petitioners face torture. As is routine at CECOT, the AEA detainees removed there were subject to unspeakable brutality. *Supra* 5. And the government has continued to threaten removals there. DHS, Louisiana Lockup (Sept. 3, 2025)[24] ("If you are in America illegally, you could find yourself in CECOT[.]"); Homeland Security (@DHSgov), X (Sept. 4, 2025)[25] (same). If sent to CECOT like everyone previously removed under the AEA, Petitioners too will likely be tortured. OB.54 (cases holding torture is irreparable harm). The government's purported "decades"-old policy barring transfer of individuals to countries where they face torture, AB.64, does nothing to rebut Petitioners' evidence about CECOT, *cf. Munaf v. Geren*, 553 U.S. 674, 702 (2008) (relying on evidence about specific foreign facilities before crediting government determination about torture). If anything, the government's continuing refusal to take responsibility for what it did to previous AEA detainees underscores the risk class members continue to face.[26] *Cf. L.G.M.L. v. Noem*, 2025

---

[24] https://perma.cc/6T73-3CEG.

[25] https://perma.cc/TS55-JDGZ.

[26] The dissent points out the government's assurance that it would not remove the *named* petitioners during this litigation. Op.134. But that obviously does nothing for the other class members whose removal the Supreme Court barred. Op.41-42.

WL 2671690, *17 (D.D.C. Sept. 18, 2025) (describing government's efforts to deport children to places where they faced "death threats," "neglect," "abandonment," and violence of multiple kinds).

The government makes the bizarre contention that detainees are not harmed by unlawful AEA removals, because some may be removed under the INA anyway. AB.65; Op.134-35 (Oldham, J.). The injunction does not bar valid INA removals, Op.38-39, which means the only people whose removal it bars are those who *cannot* be removed under the INA. Indeed, some AEA detainees have lawful status, and so are not subject to removal at all. Others are pursuing humanitarian protections that Congress provided. And the rest have the right to defend themselves in removal proceedings that are not yet resolved. It makes no sense for the government to argue that class members are unharmed by illegal AEA removals that take away all these rights.

2. The balance of equities and public interest favor Petitioners. Op.42-43. The public has a critical interest in "preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009). There is no "public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022)

---

Regardless, even as to the named petitioners, voluntary forbearance "does not preclude a finding of irreparable injury." *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993).

(citation omitted). And there is a "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

The government can make no comparable claim to harm. *A.A.R.P.*, 605 U.S. at 95-96 (granting injunction despite government's claims of harm); *D.B.U. v. Trump*, 2025 WL 1233583, *1 (10th Cir. 2025) (no irreparable harm from order restraining AEA removals); *J.G.G.*, 2025 WL 914682, *11-12 (Henderson, J., concurring) (same). Congress has already provided ample and specific authorities to address the precise problems the government claims here. Even beyond the ordinary criminal and immigration laws, Congress has provided a range of authorities specifically for the detention and removal of FTO members. Op.38-39. The government is not harmed by having to use the tools Congress provided.

## CONCLUSION

The Court should grant a preliminary injunction.

Dated: November 6, 2025

Respectfully submitted,

*/s/Lee Gelernt*

Spencer Amdur
Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: samdur@aclu.org
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org
E: cwofsy@aclu.org

Brian Klosterboer
Tx Bar No. 24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
Adriana Piñon
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS,
INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org

Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sean M. Lau
Omar Jadwat
Hina Shamsi
Sidra Mahfooz
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org
E: dgalindo@aclu.org
E: agorski@aclu.org
E: ptoomey@aclu.org
E: slau@aclu.org
E: ojadwat@aclu.org
E: hshamsi@aclu.org
E: smahfooz@aclu.org

Kathryn Huddleston*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW, 7th Floor
Washington, DC 20005
(212) 549-2500
E: khuddleston@aclu.org

*For Petitioners-Appellants*
*W.M.M., F.G.M., A.R.P., et al.*

aharris@aclutx.org
apinon@aclutx.org

*Barred in Texas and Arizona only; supervised by a member of the D.C. Bar*

## CERTIFICATE OF SERVICE

I certify that on November 6, 2025, a true and correct copy of this document was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit via the Court's CM/ECF document filing system, and therefore served electronically on all counsel of record.


*/s/ Lee Gelernt*
Lee Gelernt

## CERTIFICATE OF COMPLIANCE

This brief complies with (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 13,000 words, excluding the parts of the brief exempt by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Lee Gelernt*
Lee Gelernt