No. 25-10534

---

In the United States Court of Appeals for the Fifth Circuit

---

W.M.M., F.G.M., and A.R.P., *et al.*,

*Petitioners-Appellants*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents-Appellees.*

---

*On Appeal from the United States District Court
for the Northern District of Texas*

---

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS
*AMICUS CURIAE* IN SUPPORT OF PETITIONERS-APPELLANTS**

---

Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
Ana M. Builes
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation.  In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: November 13, 2025                    */s/ Brianne J. Gorod*
                                            Brianne J. Gorod

                                            *Counsel for Amicus Curiae*

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS.................. i

CORPORATE DISCLOSURE STATEMENT .................................... ii

TABLE OF CONTENTS.......................................................... iii

TABLE OF AUTHORITIES ..................................................... iv

INTEREST OF *AMICUS CURIAE* .............................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

ARGUMENT .................................................................. 5

I.  As Used in the AEA, a "Nation or Government" Is a Sovereign Entity that Claims to Exercise Control over the People in a Defined Territory and Is Recognized by Other Sovereigns as Having that Authority............................................................. 5

II.  The AEA Has Only Been Invoked in Conflicts with Entities that Constituted "Nation[s] or Government[s]" Within the Meaning of the Law of Nations at the Time the AEA Was Passed........................ 16

    A.  War of 1812.......................................................... 16

    B.  World War I .......................................................... 17

    C.  World War II ......................................................... 18

III.  Appellees' Invocation of the AEA Is Unlawful ............................ 20

CONCLUSION................................................................. 28

CERTIFICATE OF SERVICE ..................................................... 1A

CERTIFICATE OF COMPLIANCE.................................................. 2A

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Johnson v. Eisentrager,*
339 U.S. 763 (1950) ............................................................ 15

*Korematsu v. United States,*
323 U.S. 214 (1944) ............................................................ 19

*Lamar v. Browne,*
92 U.S. 187 (1875) ............................................................. 27

*Little v. Barreme,*
2 Cranch 170 (1804) .......................................................... 25

*Ludecke v. Watkins,*
335 U.S. 160 (1948) ........................................... 14, 27, 28

*Murray v. The Schooner Charming Betsy,*
2 Cranch 64 (1804) ........................................................... 12

*Sessions v. Dimaya,*
584 U.S. 148 (2018) ........................................................... 13

*Trump v. Hawaii,*
585 U.S. 667 (2018) ........................................................... 19

*United States v. Klintock,*
18 U.S. 144 (1820) ............................................................. 24

*United States v. Palmer,*
16 U.S. 610 (1818) ............................................................. 24

*Ware v. Hylton,*
3 Dall. 199 (1796) ............................................................... 6

CONSTITUTIONAL PROVISIONS, STATUTES, & LEGISLATIVE
MATERIALS

Act of June 25, 1798, ch. 58, 1 Stat. 570 ................................. 13

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Act of June 25, 1798, ch. 60, 1 Stat. 572 ................................................. 24

Act of July 6, 1798, ch. 66, 1 Stat. 577 ................................................. 13

Act of June 18, 1812, ch. 102, 2 Stat. 755 ............................................. 16

7 Annals of Cong. (1797) .......................................................................... 12, 13

8 Annals of Cong. (1798) .......................................................................... 6

24 Annals of Cong. (1812) ........................................................................ 16

The Declaration of Independence (U.S. 1776) ....................................... 9

Joint Resolution Declaring War Against Imperial Government of Japan, Pub. L. No. 77-328, 55 Stat. 795 (1941) ............................................. 19

Joint Resolution Declaring War Against Germany, Pub. L. No. 77-331, 55 Stat. 796 (1941) ...................................................................................... 19

Joint Resolution Declaring War Against Italy, Pub. L. No. 77-332, 55 Stat. 797 (1941) ...................................................................................... 19

Pub. Res. No. 1, 40 Stat. 1 (1917) ........................................................... 17

Pub. Res. No. 17, 40 Stat. 429 (1917) ..................................................... 17

50 U.S.C. § 21 ............................................................................ 1, 13, 26, 27

50 U.S.C. § 22 ............................................................................ 13, 26

50 U.S.C. § 23 ............................................................................ 13, 26

50 U.S.C. § 24 ............................................................................ 13

50 U.S.C. § 1543 ........................................................................ 20, 21

U.S. Const. art. I, § 8, cl. 11 ................................................... 3, 14, 23

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

OTHER AUTHORITIES

Gregory Ablavsky, *Species of Sovereignty: Native Nationhood, the United States, and International Law, 1783-1795*, 106 J. Am. Hist. 591 (2019) ................................................................... 7, 8

William Blackstone, *Commentaries on the Laws of England* (1791) ..................................................................... 6, 22

Continental Congress, *Letter of Marque Issued to Northampton*, Oct. 24, 1776 (North Carolina Digital Collections), https://digital.ncdcr.gov/Documents/Detail/letter-of-marque-issued-to-northampton/412416 ................................................ 23

Brian Finucane, *Legal Issues Raised by a Lethal U.S. Military Attack in the Caribbean*, Just Security (Sept. 3, 2025) https://www.justsecurity.org/119982/legal-issues-military-attack-carribean/ ........................................................ 21

Julius Goebel Jr., *The Recognition Policy of the United States* (1915) ..................................................................... 9, 10

David M. Golove & Daniel J. Hulsebosch, *The Law of Nations and the Constitution: An Early Modern Perspective*, 106 Geo. L.J. 1593 (2018) ..................................................................... 6, 7

Wilhelm G. Grewe, *The Epochs of International Law* (Michael Byers ed., 2000) ................................................ 7, 8, 10

Daniel J. Hulsebosch, *The Revolutionary Portfolio: Constitution-Making and the Wider World in the American Revolution*, 47 Suffolk U. L. Rev. 759 (2014) .......................................................... 9

Charles Cheney Hyde, *International Law Chiefly as Interpreted and Applied by the United States* (1922) ............................ 10, 11

Letter from John Quincy Adams to Don Joaquin de Anduaga (Apr. 6, 1822) ..................................................................... 11

Letter from Thomas Jefferson to Gouverneur Morris (Mar. 12, 1793), https://founders.archives.gov/documents/Jefferson/01-25-02-0330.... 11

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Letter from Robert Lansing to Attorney General (Oct. 5, 1918), *in Papers Relating to the Foreign Relations of the United States*, https://history.state.gov/historicaldocuments/frus1918Supp02/d206 .. 18

Letter from James Monroe to the Secretary of the Mississippi Territory (July 11, 1812), *in* Mississippi Department of Archives & History, https://da.mdah.ms.gov/series/territorial/s499/detail/10761#dtop ....... 16, 26

James Madison, *Report on Virginia Resolutions* (Jan. 7, 1800), https://founders.archives.gov/documents/Madison/01-17-02-0202 ........................................................................................... 3, 6, 14, 15

C. Kevin Marshall, *Putting Privateers in Their Place: The Applicability of the Marque and Reprisal to Undeclared Wars*, 64 U. Chi. L. Rev. 953 (1997) ............................................................................. 23, 24

*Notice to Congress under 50 U.S.C. § 1543*, Sept. 15, 2025, https://www.justsecurity.org/wp-content/uploads/2025/10/50-usc-1543-notice-to-congress-drug-cartels.pdf ..................................................... 20, 21

Proclamation No. 1364, 40 Stat. 1659 (Apr. 6, 1917) ............................ 17

Proclamation No. 1417, 40 Stat. 1716 (Dec. 11, 1917) .......................... 17

Proclamation No. 2525, 55 Stat. 1700 (Dec. 7, 1941) ............................ 18

Proclamation No. 2526, 55 Stat. 1705 (Dec. 8, 1941) ............................ 18

Proclamation No. 2527, 55 Stat. Pt. 2 1707 (Dec. 8, 1941) .................... 18

Proclamation No. 10903, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13033 (Mar. 14, 2025) ..................................................... 2, 4, 19

J. Gregory Sidak, *The Quasi-War Cases—And Their Relevance to Whether 'Letters of Marque and Reprisal' Constrain Presidential Power*, 28 Harv. J. L. & Pub. Pol'y 465 (2005) ................................................ 24

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ................................................................................................. 13

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

United Nations Office for Disaster Risk Reduction, *Non-International Armed Conflict (NIAC)*, https://www.undrr.org/understanding-disaster-risk/terminology/hips/so0102.............................................................. 21

United Nations Office for Disaster Risk Reduction, *International Armed Conflict (IAC)*, https://www.undrr.org/understanding-disaster-risk/terminology/hips/so0101.............................................................. 21

Emer de Vattel, *The Law of Nations* (Liberty Fund 2008)........................................................... 6-8, 10, 14, 15, 22, 23, 26

Woodrow Wilson, *Address to a Joint Session of Congress Requesting a Declaration of War Against Germany* (1917), https://www.archives.gov/milestone-documents/address-to-congress-declaration-of-war-against-germany ..................................................... 17

*Works of Jefferson* (Paul Leicester Ford ed., 1904)................................. 10

*The Writings of Thomas Jefferson* (H.A. Washington ed., 1854)................................................................................................ 10

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC seeks to uphold constitutional protections for noncitizens as well as for citizens and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 1798, Congress passed the Alien Enemies Act (AEA), which provides that during a state of "declared war," or when "any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government," the President can restrain and remove "all natives, citizens, denizens, or subjects of the hostile nation or government" as "alien enemies." 50 U.S.C. § 21. As the text of the AEA makes explicit, the President can only invoke the AEA's sweeping authorities under certain circumstances and against certain people.

On March 14, 2025, President Trump issued a proclamation invoking the AEA in response to "hostile actions" perpetrated against the United States by Tren de Aragua (TdA), a "Foreign Terrorist Organization" with alleged ties to the

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. Appellants consent to the filing of this brief, and Appellees do not oppose it.

Venezuelan President. *See* Proclamation No. 10903, Invocation of the Alien

Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90

Fed. Reg. 13033 (Mar. 14, 2025). The Proclamation states that "all Venezuelan

citizens . . . who are members of [TdA], are within the United States, and are not

actually naturalized or lawful permanent residents of the United States are liable to

be apprehended, restrained, secured, and removed as Alien Enemies." *Id.* § 1, 90

Fed. Reg. at 13033.

The President's invocation of the AEA is unlawful on multiple grounds,

including that the AEA can only be invoked against "foreign nation[s] or

government[s]," and TdA is not one. The lawmakers who passed the AEA in 1798

understood the terms "nation" and "government" with reference to the law of

nations. And under the law of nations, there were at least two essential attributes

of any "nation" or "government." First, a "nation" or "government" had to hold

itself out as controlling a defined territory and acting on behalf of the people who

lived in that territory. Second, other sovereigns had to recognize the "nation" or

"government" as acting on behalf of the people in that territory such that it could

engage in foreign affairs with other sovereigns.

The history of the AEA's passage explains why the Act's drafters used

language that limited its applicability to "natives, citizens, denizens, or subjects of"

the sorts of formal sovereigns that qualified as "nation[s] or government[s]" under

the law of nations.  When the AEA was passed in response to the United States's

ongoing hostilities with the French Republic, it was understood to be an exercise of

Congress's power "[t]o declare [w]ar," U.S. Const. art. I, § 8, cl. 11.  As the AEA's

drafters understood it, during a state of war or when the nation was under attack,

Congress had the power "under the law of nations" to hold noncitizens accountable

for the "offences committed by the nations of which they make part."  James

Madison, *Report on Virginia Resolutions* (Jan. 7, 1800),

https://founders.archives.gov/documents/Madison/01-17-02-0202 [hereinafter

*Report on Virginia Resolutions*].  Significantly, though, only the "natives, citizens,

denizens, or subjects" of formal "nation[s] or government[s]"—those sovereign

entities that held themselves out as acting on behalf of the people within a defined

territory and that had been recognized by other sovereigns as having the authority

to do so—could be held accountable under the law of nations for the actions of

their nations of origin.

This is why the AEA's drafters made a belligerent act against the United

States by a "foreign nation or government" a prerequisite to invoking the AEA's

sweeping powers and only permitted the President to invoke those powers against

the "natives, citizens, denizens, or subjects" of those "foreign nation[s] or

government[s]."  Indeed, during the over two hundred years that the AEA has been

federal law, it has been invoked only three times—each time against the subjects or

citizens of "foreign nation[s] or government[s]" as those terms were understood at the time of the AEA's drafting.

TdA is not a "foreign nation or government" within the meaning of the AEA. Seemingly acknowledging as much, the government has instead argued that "TdA is entwined with Venezuela so as to effectively function as a 'hybrid criminal state.'" Appellees Panel Br. 12 (citing Proclamation No. 10903, 90 Fed. Reg. 13033). This is irreconcilable with the President's recent determination—made explicit in a notice to Congress—that TdA is actually a non-state armed actor that he claims is engaged in a non-state armed conflict. Appellants Br. 9-10 ("the administration itself has now undermined any basis for deference to its assertions. . . . the President has now acknowledged that TdA is a 'non-state armed group[]' engaged in a 'non-international armed conflict'"); *see infra* at 20-21.

But even putting this aside, the government's arguments in this litigation fail on their own terms. The government has argued, and the panel determined, that TdA acts like a privateer for Venezuela. Appellees Panel Br. 46; Panel Op. 37. But TdA does not have the sort of formal authorization to act on behalf of Venezuela that privateers did when the AEA was enacted. And even if it did, that would be a reason to invoke the AEA against Venezuela, not TdA. *See infra* at 25.

According to the panel, it does not matter that the Proclamation is directed only at TdA. While observing that "[i]t does appear that the AEA contemplates

that a foreign country will be designated in a proclamation," the panel nonetheless concluded that "the different wording of the Proclamation to designate the TdA does not by itself invalidate use of the AEA." Panel Op. 37. According to the panel, the President "can identify a terrorist group and its members as the subjects of detention and removal as opposed to a foreign country and its natives, citizens and the like" because in so doing the President is simply "narrow[ing] what he otherwise would be entitled to do." *Id.* But the AEA does not just "contemplate[]" the designation of a foreign country; it requires it, as its text and history make clear. *See infra* at 25-26.

In sum, President Trump's Proclamation attempts to utilize sweeping authorities that can only be invoked under the specific circumstances set out in the text of the statute. Routine judicial interpretation of that text can elucidate the contours of the AEA's requirements, and it makes clear that those requirements have not been satisfied here.

## ARGUMENT

### I.    As Used in the AEA, a "Nation or Government" Is a Sovereign Entity that Claims to Exercise Control over the People in a Defined Territory and Is Recognized by Other Sovereigns as Having that Authority.

**A.** The AEA does not define the terms "nation or government" because at the time of the AEA's passage, both terms were understood to be defined by the law of nations, the international norms that governed the "mutual intercourse"

5

between nations in the eighteenth century and profoundly influenced the Founding

generation.  1 William Blackstone, *Commentaries on the Laws of England*, bk. 1,

§ 2, at *43 (1791); *see also* David M. Golove & Daniel J. Hulsebosch, *The Law of*

*Nations and the Constitution: An Early Modern Perspective*, 106 Geo. L.J. 1593,

1597 (2018) (noting the "broad consensus in the Founding period" that the law of

nations informed and bound the federal government); *cf. Ware v. Hylton*, 3 Dall.

199, 281 (1796) (Wilson, J.) ("When the United States declared their

independence, they were bound to receive the law of nations, in its modern state of

purity and refinement.").  Indeed, the phrase "alien enemy" stems from the law of

nations, *see, e.g.*, *id*. at 227 (Chase, J.), and the debates concerning the AEA were

littered with references to that body of law, 8 Annals of Cong. 1577 (1798) (Rep.

Sitgreaves) ("All understand the rights to which aliens are entitled by the laws of

nations."); 8 *id*. at 1790 (Rep. Sewall); 8 *id*. at 1979-80 (Rep. Gallatin); *cf. Report*

*on Virginia Resolutions.*

While the terms "nation" and "government" had slightly different meanings

under the law of nations, *see* Emer de Vattel, *The Law of Nations*, bk. 1, ch. I, § 1

(Liberty Fund 2008); *id*. bk. 1, ch. III, §§ 26-31 (a "nation" was a "societ[y] of men

united together," while a "government" was the "public authority" that could

establish laws "to be observed" by the nation), the AEA's drafters understood the

law of nations to establish two interrelated qualifications for any entity seeking to

become either a nation or government: self-definition and foreign recognition. *Cf.* Golove & Hulsebosch, *supra*, at 1630 n.164 (noting that the recognition of governments and nations was "governed by similar principles, at least according to the American interpretation of the law of nations in the Founding era").

First, both nations and governments were sovereigns that held themselves out as ruling a defined territory and exercising control over the people in that territory. For example, one leading source defined a "nation" as a "body politic," with the "peculiar and exclusive right" to act on behalf of its territory, Vattel, *supra*, bk. I, ch. 1, § 1, & ch. 18, § 203, and a "government" as an entity with the "right to command" the nation, *id.* bk. 1, ch. 1, § 3; *cf.* Gregory Ablavsky, *Species of Sovereignty: Native Nationhood, the United States, and International Law, 1783-1795*, 106 J. Am. Hist. 591, 596 (2019) (describing the influence of Vattel's "canonical" treatise in the early United States). Under these definitions, both "nations" and "governments" held themselves out as exercising control over a defined territory: "The whole space over which a nation extends its government, becomes the seat of its jurisdiction, and is called its *territory*." Vattel, *supra*, bk. I, ch. 18, § 205; *see generally* Wilhelm G. Grewe, *The Epochs of International Law* 343 (Michael Byers ed., 2000) (during the late 1700s, recognition of new states

"was satisfied with the actual existence of a sufficiently organised political body with effective authority and an approximately definable territory").

Second, nations and governments were entities recognized by other sovereigns as having the authority to act on behalf of the people in their territory, such that they could speak for those people on the international stage. Nations and governments could engage in foreign affairs by, for example, "contract[ing] in the name of the state" through the negotiation of "[p]ublic treaties" which were "binding on the whole nation," participating in diplomacy through "public ministers," and declaring war "in the name of the society at large." *See Vattel*, *supra*, bk. II, ch. 12, § 154; *id.* bk. III, ch. 1, §§ 2-4; *id*. bk. IV, ch. 5, §§ 55-57; *see also* Ablavsky, *supra*, at 607 ("The definitive measure of sovereignty was external, turning on recognition by other sovereigns. Nationhood, in short, was a performative act directed toward an audience of other nations."); *see generally* Grewe, *supra*, at 361 (describing the eighteenth-century understanding of treaties as commitments on behalf of the state instead of "personal obligations of the sovereign").

**B.** These international norms described the attributes of European nations whose legitimacy was long established, and they also informed the Founding

generation's understanding of what would be required for the American Revolution to turn thirteen colonies into a new nation.

Start with self-definition. In the Declaration of Independence, the colonies declared that they "ought to be Free and Independent States," and they claimed the "full Power to levy War, conclude Peace, contract Alliances, [and] establish Commerce." The Declaration of Independence para. 34 (U.S. 1776). In other words, they claimed the power to do all "which Independent States may of right do." *Id.* The Declaration of Independence thus "announced" to other nations that the new United States had determined it had a "claim to international recognition" under the law of nations. Daniel J. Hulsebosch, *The Revolutionary Portfolio: Constitution-Making and the Wider World in the American Revolution*, 47 Suffolk U. L. Rev. 759, 764 (2014).

While the Declaration of Independence announced that the colonies understood themselves to be an independent sovereign, the Framers appreciated that it was critical for other countries to also recognize the United States as a new nation. That is why the Continental Congress sent Benjamin Franklin as its first Minister to France to secure "a recognition of our independency and sovereignty." Julius Goebel Jr., *The Recognition Policy of the United States* 82 (1915). Indeed, it was only after the United States announced its independence, and France accepted its foreign minister, that it could negotiate its first treaty with the French monarchy

in 1778. *Id.*; Grewe, *supra*, at 348 (describing France's assessment "that the colonies which, through their population and the extension of their territory, had formed a respectable nation, [and] had established their independence not only through a solemn declaration, but also factually").

After independence, the United States had to develop its own policy for when to recognize new nations and governments, and that policy again underscored that self-definition and formal recognition were key attributes of any such entity. For example, when deciding whether to recognize new governments or nations, eighteenth-century diplomats reiterated the law of nations requirement that a nation or government must hold itself out as a sovereign that controlled and represented the people in its territory. Vattel, *supra*, bk. I, ch. 18, § 203; *id.* bk. 1, ch. 1, § 3. Consistent with that approach, during the French Revolution, Thomas Jefferson urged his compatriots to recognize France's new republican government because that government had been "established as the lawful representatives of the Nation and authorized to act for them." Goebel, *supra*, at 105 (quoting 4 *Works of Jefferson* 149 (Paul Leicester Ford ed., 1904)); Charles Cheney Hyde, *International Law Chiefly as Interpreted and Applied by the United States* 67-68 (1922) (noting that, for Jefferson, the American policy of recognition was to "acknowledge any government to be rightful which is formed by the will of the nation, substantially declared" (quoting 3 *The Writings of Thomas Jefferson* 488-89

10

(H.A. Washington ed., 1854))); *see* Letter from Thomas Jefferson to Gouverneur Morris (Mar. 12, 1793), https://founders.archives.gov/documents/Jefferson/01-25-02-0330 ("every [nation] may govern itself according to whatever form it pleases, and change these forms at it's own will: and that it may transact it's business with foreign nations through whatever organ it thinks proper").

In this inquiry, an entity's self-definition was essential. Diplomats considered whether new foreign nations or governments "deliberately assert[ed] their right to that character, [and] had maintained and established it," Hyde, *supra*, at 60 n.3 (quoting Letter from John Quincy Adams to Don Joaquin de Anduaga (Apr. 6, 1822)), and whether a newly declared nation or government was "in a position to fulfill all the international obligations and responsibilities incumbent upon a sovereign state," *id.* at 70 n.2 (quoting Acting Secretary of State Hill's September 8, 1900, description of a recognition policy that had been "practiced upon occasion for more than a century"). In that way, self-definition and recognition went hand in hand—the "former exclusively depending upon the determination of the Nation itself" and the "latter resulting from the successful execution of that determination." *Id.* at 60 n.3 (quoting Letter from John Quincy Adams (1822)).

**C.** The history of the AEA's passage underscores that the Act extends only to entities that qualified as foreign nations or governments under the law of

nations—that is, sovereign entities that held themselves out as acting on behalf of people in a defined territory and were recognized by other nations as having that authority.

The AEA was the federal government's response to ongoing hostilities with one "foreign nation or government" in particular—the French Republic. *See* 7 Annals of Cong. 56 (1797) (President Adams referring to France as "nation" and "Government"). In 1798, the United States was embroiled in hostilities with its erstwhile ally. Known as the Quasi-War, the conflict started when the French Directory, outraged that the United States had ratified a treaty with Great Britain, retaliated by publicly commissioning privateers to attack U.S. merchants in the Caribbean. *See Murray v. The Schooner Charming Betsy*, 2 Cranch 64, 79 (1804) (noting that the France granted "commissions" "to private armed vessels" which then became the "vessels of war of France" (emphasis omitted)). Hundreds of U.S. ships were seized. President Adams, in a 1797 address, urged Congress to take action to "enable our seafaring citizens to defend themselves against violations of the law of nations." 7 Annals of Cong. 57 (Speech to Joint Session of Congress). Although Adams never asked Congress to declare war, he "nevertheless" urged Congress to increase funds for the "general defence" in order to "guard against"

possible "predatory incursions" "at home" by "foreign nations" like the French Republic. *Id.* at 58.

That same year, still hoping to normalize relations, Adams sent envoys to meet with the French foreign minister. The foreign minister, through three intermediaries, responded by demanding a bribe. Public outrage over the incident led Congress to pass two interrelated acts: the Alien Friends Act and the AEA. *See* Act of June 25, 1798, ch. 58, 1 Stat. 570 (expired); Act of July 6, 1798, ch. 66, 1 Stat. 577 (codified at 50 U.S.C. §§ 21-24). The Alien Friends Act granted the President sweeping power to detain and expel any noncitizen deemed "dangerous to the peace and safety of the United States." *See* 1 Stat. at 571, § 1. That Act was "vigorously and contemporaneously attacked as unconstitutional." *Ludecke v. Watkins*, 335 U.S. 160, 171 n.18 (1948); *cf. Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) (describing the Alien Friends Act as "one of the most notorious laws in our country's history" that was "widely condemned as unconstitutional by Madison and many others"); 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1288 (1833) (the Alien Friends Act "left no permanent traces in the constitutional jurisprudence of the country"). By contrast, the AEA, passed just eleven days later,

was met with consensus about its fundamental constitutionality by members of both political parties. *Ludecke*, 335 U.S. at 171 n.18.

The reason for this disparity was simple: the AEA was understood to be an extension of Congress's power "[t]o declare [w]ar," U.S. Const. art. I, § 8, cl. 11, while the Alien Friends Act was not. During a state of war, as James Madison explained, Congress had the power "under the law of nations" to hold foreign citizens and subjects accountable for the "offences committed by the nation of which they make part." *Report on Virginia Resolutions*; *accord* Vattel, *supra*, bk. III, ch. 5, § 70 ("[w]hen the sovereign or ruler of the state declares war against another sovereign, it is understood that the whole nation declares war against another nation: for the sovereign represents the nation, and acts in the name of the whole society" and thus "all the subjects of one are enemies to all the subjects of the other"). Put differently, even though a noncitizen might not have himself committed a belligerent act, his "removal" was "conformable to the law of nations" and "justified by the constitution" if he was the subject of a nation waging war, purportedly on his behalf. *Report on Virgina Resolutions*.

This is why the AEA's drafters required a "declared war" between a "foreign nation or government" and the United States, or an "invasion or predatory incursion" against the United States by a "foreign nation or government," before the AEA's sweeping powers could be invoked. Only a nation or government could

14

demand the sort of allegiance from its people that would justify holding them personally accountable for their sovereign's actions during war. To put it in law of nations terms, only a sovereign entity that claimed the authority to act on its peoples' behalf and was recognized as having that authority was capable of waging the type of war the AEA requires—a "public" one, "in the name of the public power[] and by its order." Vattel, *supra*, bk. III, ch. 1, § 2.

"Alien friends," by contrast, could be held accountable only for their own actions. As Madison explained, while an "alien friend[]" resided in the United States, he owed it "temporary allegiance," by which he was bound to its "municipal law" and in turn "entitled" to its "protection and advantage." *Report on Virgina Resolutions.* Because of this, alien friends could only be "tried and punished" according to municipal law, and the law of nations did not authorize their "expulsion." *Id.*; *accord Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950) ("But disabilities this country lays upon the alien who becomes also an enemy are imposed as an incident of war and not as an incident of alienage."). That was why, to Madison, the Alien Friends Act was "unjustifiable." *Report on Virginia Resolutions*; *see also id.* (although "admission of an alien" friend might be a "favor," that "favor" could only be "revoked" by judicial process, not executive fiat).

Thus, the AEA's history underscores what its text makes clear: the AEA can

only be invoked against a "nation or government" that both holds itself out as acting on behalf of the people in its territory and is recognized by other nations as having the authority to do so.

## II.    The AEA Has Only Been Invoked in Conflict with Entities that Constituted "Nation[s] or Government[s]" Within the Meaning of the Law of Nations at the Time the AEA Was Passed.

The AEA has been invoked just three times.  Each time, the United States was in a state of war against an entity that held itself out as a sovereign nation able to act on behalf of the people in its territory and that was formally recognized as such by other sovereigns.

**A. War of 1812.**  On June 18, 1812, Congress declared war—against the United Kingdom of Great Britain—for the first time in the United States's history. Act of June 18, 1812, ch. 102, 2 Stat. 755.  Claiming that its subjects owed it perpetual allegiance, Great Britain had indiscriminately stopped American merchant vessels and pressed both their British and American sailors into service in the British Navy.  *See* 24 Annals of Cong. 1623-24 (1812) (Pres. Madison).  A month after Congress declared war to respond to this attack on American commerce, Secretary of State James Monroe noted that "all the subjects of his Britannic Majesty, residing within the United States, have become alien enemies," and directed them to "report themselves" to the U.S. Marshals for further procedures under the AEA.  Letter from James Monroe to the Secretary of the

Mississippi Territory (July 11, 1812), *in* Mississippi Department of Archives &
History, https://da.mdah.ms.gov/series/territorial/s499/detail/10761#dtop.

**B. World War I.**   On April 2, 1917, President Woodrow Wilson posed to
Congress an extraordinary dilemma "which it was neither right nor constitutionally
permissible that I should assume the responsibility of making."  Woodrow Wilson,
*Address to a Joint Session of Congress Requesting a Declaration of War Against
Germany* (1917), https://www.archives.gov/milestone-documents/address-to-
congress-declaration-of-war-against-germany.  Shortly after the Imperial German
Government torpedoed the *Lusitania*, killing all 128 Americans on board, and
urged Mexico, in the Zimmerman telegram, to invade the United States, Congress
declared war against the Imperial German Government and its ally the Imperial
and Royal Austro-Hungarian Government.  *See* Pub. Res. No. 1, 40 Stat. 1 (1917);
Pub. Res. No. 17, 40 Stat. 429 (1917).  Wilson then issued proclamations that
termed all subjects of both governments "alien enemies."  *See* Proclamation No.
1364, 40 Stat. 1659 (Apr. 6, 1917); Proclamation No. 1417, 40 Stat. 1716 (Dec. 11,
1917).

The government implemented these proclamations in a manner designed to
guard against the possibility of exercising the AEA's authorities against natives,
citizens, denizens, or subjects of nations or governments with which the United
States was not at war.  Wilson's proclamations applied to all subjects of the

German and Austrian governments, including members of the Czecho-Slovak

National Council, even though they actively opposed their governments' war

efforts.  Later in the war, after the Czecho-Slovaks proclaimed their intent to form

an independent state with a separate government, the United States "formally

recognize[d] the Czecho-Slovak National Council as a '*de facto* belligerent

government clothed with proper authority to direct the military and political affairs

of the Czecho-Slovaks.'"  Letter from Robert Lansing to Attorney General (Oct. 5,

1918), *in Papers Relating to the Foreign Relations of the United States*,

https://history.state.gov/historicaldocuments/frus1918Supp02/d206.  And after the

United States formally recognized the Czecho-Slovak Republic as a sovereign

state, the government stopped considering its people to be "alien enemies" subject

to the AEA.  *Id.*

    **C. World War II.**  Hours after the bombing of Pearl Harbor, President

Franklin D. Roosevelt proclaimed that "an invasion has been perpetrated upon the

territory of the United States by the Empire of Japan."  Proclamation No. 2525, 55

Stat. 1700, 1701 (Dec. 7, 1941); *see also* Proclamation No. 2526, 55 Stat. Pt. 2

1707 (Dec. 8, 1941) (proclaiming "that an invasion or predatory incursion is

threatened upon the territory of the United States by Germany"); Proclamation No.

2527, 55 Stat. Pt. 2 1707 (Dec. 8, 1941) (same against Italy).  Because of this, in

those same Proclamations, Roosevelt labeled the citizens of the Axis Powers—

Japan, Germany, and Italy—"alien enemies." Days later, Congress declared war against those three governments. *See* Joint Resolution Declaring War Against Imperial Government of Japan, Pub. L. No. 77-328, 55 Stat. 795 (1941); Joint Resolution Declaring War Against Germany, Pub. L. No. 77-331, 55 Stat. 796 (1941); Joint Resolution Declaring War Against Italy, Pub. L. No. 77-332, 55 Stat. 797 (1941).[2]

* * *

In the last 227 years, Presidents have used the AEA only when provoked by the belligerency of "foreign nation[s] or government[s]." Breaking with this time-tested understanding, President Trump proclaimed the "Invasion of The United States by Tren de Aragua." Proclamation No. 10903, 90 Fed. Reg. 13033. No President has ever attempted to invoke the AEA as Appellees do here—to restrain and remove alleged members of a "criminal organization[]," *id.*, who are citizens of a foreign nation with which the United States is not at war.

---

[2] Later, by Executive Order, Roosevelt interned thousands of Japanese American citizens, a decision notoriously upheld by the Supreme Court at the time. *See Korematsu v. United States*, 323 U.S. 214, 223-24 (1944). *But cf. Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (internal citation and quotation marks omitted) (observing that "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—has no place in law under the Constitution").

**III.    Appellees' Invocation of the AEA Is Unlawful.**

Seemingly conceding that TdA is not itself a "foreign nation or government," Appellees argued before the panel that, because the TdA "is so closely bound up with a foreign nation as to create a 'hybrid criminal state,' an incursion or invasion by [such an] organization *is* an incursion or invasion by a 'foreign nation or government.'" Appellees Panel Br. 46. This claim is flatly inconsistent with the government's position in other contexts and regardless fails on its own terms.

**A.** Appellees' claim that TdA is "so closely bound up" with Venezuela as to be a "hybrid-criminal state" is at odds with the government's determinations regarding TdA's status elsewhere. Since September 2, 2025, the government has been carrying out a campaign of lethal strikes against alleged drug smugglers in the Caribbean. In notifying Congress of these attacks, the government explained that "the President determined th[at] cartels," including TdA, "are *non-state armed groups*." *Notice to Congress under 50 U.S.C. § 1543*, Sept. 15, 2025, https://www.justsecurity.org/wp-content/uploads/2025/10/50-usc-1543-notice-to-congress-drug-cartels.pdf [hereinafter *Notice to Congress*] (emphasis added); *see* 50 U.S.C. § 1543a(a), (b)(1) (requiring the President to make a report to Congress "[n]ot later than 48 hours after any incident in which the United States Armed Forces are involved in an attack or hostilities, whether in an offensive or defensive

capacity" to provide, among other things, "the authority or authorities under which the United States Armed Forces were operating when the incident occurred"); Brian Finucane, *Legal Issues Raised by a Lethal U.S. Military Attack in the Caribbean*, Just Security (Sept. 3, 2025) https://www.justsecurity.org/119982/legal-issues-military-attack-carribean/ (President Trump announcing that the first strike was "against positively identified Tren de Aragua Narcoterrorists").

In that same notice, the government also explained that the President further "determined that the United States is in a non-international armed conflict with" those groups, *Notice to Congress*, *supra*, underscoring that the President does not consider TdA to be a state actor. Under international law, a "non-international armed conflict" is a conflict between a state and a non-state actor, whereas a conflict between a state and a non-state actor acting at the direction of another state would be an "international armed conflict." United Nations Office for Disaster Risk Reduction, *Non-International Armed Conflict (NIAC)*, https://www.undrr.org/understanding-disaster-risk/terminology/hips/so0102; *see also* United Nations Office for Disaster Risk Reduction, *International Armed Conflict (IAC)*, https://www.undrr.org/understanding-disaster-risk/terminology/hips/so0101. The government cannot have it both ways.

**B.** Putting aside the government's conflicting claims about TdA's status and its relationship with Venezuela, the government's arguments in this litigation fail

on their own terms. The government has argued, and the panel seemed to accept, that TdA acts on Venezuela's behalf like the "privateers" who acted on behalf of foreign nations around the time of the AEA's enactment. Panel Op. 37. But at that time, privateers could only act on behalf of a foreign nation or government if they had a public grant to do so, and who had such a grant was routinely subject to judicial review.

At the time the AEA was drafted, "privateers" acted pursuant to official commissions, known as letters of marque or reprisal, "by grant from the sovereign." Vattel, *supra*, bk. 3, ch. XV, § 229 (Liberty Fund 2008). "These letters [were] grantable by the law of nations" and were understood to be "plainly derived from" a sovereign's power to "mak[e] war." Blackstone, *supra*, bk. 1, ch. 7, § 4, at *259 ("the lord chancellor shall make him out letters of marque under the great seal"). Only "by virtue" of this commission could an individual privateer commit an act of war on behalf of a sovereign "without hazard of being condemned as a robber or pirate." *Id*.; *see also* Vattel, *supra*, bk. 3, ch. 4, § 52 (the hostile acts of "private person[s]" "without a commission" cannot "be imputed to the sovereign"). Reflecting their formal status as agents of a sovereign, privateers who were captured were treated like prisoners of war, not criminals. Vattel, *supra*, bk. 3, ch. 15, § 226 (privateer's commission ensured that "in case they are captured" they will receive "such treatment as is given to prisoners taken in regular warfare").

The Founding generation followed this law of nations requirement.  During the Revolutionary War, the Continental Congress issued public commissions to American privateers battling the British, *see, e.g.*, Continental Congress, *Letter of Marque Issued to Northampton*, Oct. 24, 1776 (North Carolina Digital Collections), https://digital.ncdcr.gov/Documents/Detail/letter-of-marque-issued-to-northampton/412416 (granting "license and authority to . . . attack" by "Order of the Congress"), without which privateers could not claim recompense, C. Kevin Marshall, *Putting Privateers in Their Place: The Applicability of the Marque and Reprisal to Undeclared Wars*, 64 U. Chi. L. Rev. 953, 976-77 (1997) (without "a copy of a privateer's commission," a prize could not be collected).  After independence, the Founding Fathers included the power to "grant Letters of Marque and Reprisal" in the same clause in which the Constitution authorizes Congress to "declare war."  U.S. Const. art. I, § 8, cl. 11.  And up until the War of 1812, Congress frequently passed laws governing these letters, including detailed requirements on registration, posting bond, when American privateers could attack British ships, and how the spoils of such an attack had to be split between the government and the privateer.  *See* Act of June 25, 1798, ch. 60, 1 Stat. 572 (during the Quasi-War, establishing a system of "due process and trial" for seizing French vessels claiming to "act under authority of the French Republic"); J. Gregory Sidak, *The Quasi War Cases—And Their Relevance to Whether 'Letters of Marque*

*and Reprisal' Constrain Presidential War Powers*, 28 Harv. J.L. & Pub. Pol'y 465, 480 (2005) (explaining, for example, the various acts passed by Congress during the Quasi War to govern the laws of prize); Marshall, *supra*, at 971 (explaining that, during the Revolutionary War, Congress set up laws to "hold the privateers within their proper bounds").

Because of the significant consequences that could follow if the actions of private parties were attributed to sovereign states, courts were regularly asked to determine whether private actors were, in fact, acting on behalf of a nation or government. *See* Marshall, *supra*, at 974-77. As part of these judicial proceedings, privateers were required to furnish actual proof in court that they were acting on behalf of a government. *United States v. Palmer*, 16 U.S. 610, 635 (1818) (privateers who claimed to be acting on behalf of their government had to be able to "prove the fact of their being actually employed in such service"); *see also United States v. Klintock*, 18 U.S. 144, 149 (1820) (upholding a charge of piracy against an American citizen who claimed to be acting on commission because the commission was granted by an officer of an unrecognized nation who had "no power . . . to issue commissions to authorize private or public vessels to make captures at sea"). And when a privateer went further than the foreign state's commission authorized, he could be held liable for damages, even if he was acting pursuant to orders from that nation's highest official. *See Little v. Barreme*, 2

Cranch 170, 177-78 (1804) (holding that an American privateer could not rely on the President's order to seize an alien ship when that order contravened the Congressional Act authorizing such seizures in the first place).

In short, at the time of the AEA's passage, a private party could not act on behalf of a foreign nation or government—and a foreign nation or government could not be held accountable for the actions of private parties—absent formal authorization. This requirement—and the judicial checks that ensured compliance with it—reflected the idea that a nation or government had to claim the actions of a private actor as its own. Venezuela has in no way claimed TdA's actions as its own, making TdA more akin to a pirate than a privateer.

**C.** Moreover, even if TdA were privateers acting at the behest of the Venezuelan President, that would still only justify invoking the AEA against Venezuela, not TdA. *See supra* at 22 (explaining that when privateers acted pursuant to commission from a sovereign state, the state would be held accountable for their actions). The President chose to name TdA and its members, not Venezuela and its citizens. Panel Op. 37. According to the panel, this is irrelevant: the President "can identify a terrorist group and its members as the subjects of detention and removal as opposed to a foreign country and its natives, citizens and the like" because in so doing the President is simply "narrow[ing] what he otherwise would be entitled to do." *Id.*

But the panel conflated the AEA's requirement of a "public proclamation" against a "foreign nation or government" with the powers that the Act grants to a president who has validly made such a proclamation. The AEA itself makes clear that the President must properly invoke the Act *before* deciding which "alien enemies" can be restrained or removed. To invoke the Act, the President must first "make[] public proclamation" of an attack by a "foreign nation or government," after which "*all* natives, citizens, denizens, or subjects . . . shall be liable . . . as alien enemies." 50 U.S.C. § 21 (emphasis added). After making the Proclamation, the President can issue regulations that distinguish between subsets of "alien enemies." Indeed, the Act itself creates categories of "alien enemies," providing different rules for those charged with "actual hostility" or "other crime against the public safety," *id.* §§ 21, 23, and those who are not, *id.* § 22.

This is not a throwaway requirement. The AEA specifies a "foreign nation or government" because, under the law of nations, it was only the hostile actions of a sovereign state that could justify holding every one of its citizens liable as alien enemies. Vattel, *supra*, bk. 3, ch. 5, § 70; Monroe, *supra* ("[A]ll British subjects, by becoming alien enemies, have essentially changed their relation to the United States."); *see Lamar v. Browne*, 92 U.S. 187, 194 (1875) ("In war, all residents of enemy country are enemies."). That is why, in its almost 250-year history, the AEA has only ever been invoked against "*all* natives, citizens, denizens, or

subjects of the hostile nation or government."  50 U.S.C. § 21.  It was invoked not
against British privateers, but against all British citizens during the War of 1812;
not against German submariners, but against all German citizens during World War
I; and not against the Japanese Navy or the Nazi Party, but against all Japanese and
German citizens during World War II.

Citing *Ludecke*, the government argued before the panel that the President
could make a proclamation against TdA because he ultimately has the power to
decide that only TdA members, rather than all Venezuelans, shall be restrained and
removed under the AEA.  Appellees Panel Br. 47.  But even when President
Truman ultimately chose to exercise the removal authority granted by the AEA
against "dangerous" "alien enemies" during World War II, he did so only after
President Roosevelt had invoked the AEA to proclaim that *all* citizens of the
"foreign nation of government[s]" with which the United States was at war were
"alien enemies."  *See Ludecke*, 335 U.S. at 163 (explaining that "[u]nder authority
of the Act of 1798, the President, on July 14, 1945, directed the removal from the
United States of all alien enemies who shall be deemed by the Attorney General to
be dangerous to the public [peace] and safety of the United States").  Because the
AEA had been properly invoked against an actual "foreign nation or government,"
rendering all of its citizens liable as "alien enemies," President Truman could
restrain and remove only those German citizens the Attorney General deemed

"dangerous." *Ludecke*, 335 U.S. at 165-6. Here, by contrast, President Trump does not have that discretion because he has not properly invoked the AEA against a "foreign nation or government."

## CONCLUSION

For the foregoing reasons, this Court should hold that the President's invocation of the AEA is unlawful.

Respectfully submitted,

Dated: November 13, 2025

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
Ana M. Builes
CONSTITUTIONAL
    ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on November 13, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 13th day of November, 2025.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,464 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Executed this 13th day of November, 2025.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*