No. 25-10534

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

W.M.M., F.G.M. AND A.R.P., *et al.*,

*Petitioners - Appellants*, v.

DONALD J. TRUMP,

in his official capacity as President of the United States, *et al.*,

*Respondents - Appellees.*

**On Appeal from**

United States District Court for the Northern District of Texas

No. 1:25-cv-59-H

---

**BRIEF OF AMICI CURIAE DEMOCRACY DEFENDERS FUND AND
FORMER GOVERNMENT OFFICIALS IN SUPPORT OF EN BANC
BRIEF FOR PETITIONERS**

November 13, 2025

Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@democracydefenders.org
Steve@democracydefenders.org
Joshua@democracydefenders.org

Stuart M. Gerson
1227 25th Street NW, Suite 700
Washington, DC 20037
Tel: (202) 861-4180
SGerson@ix.netcom.com

*Counsel for* Amici Curiae

# CERTIFICATE OF INTERESTED PERSONS

No. 25-10534

W.M.M., F.G.M. AND A.R.P., *et al.*,
*Petitioners - Appellants*,

v.

DONALD J. TRUMP,
in his official capacity as President of the United States, *et al.*,
*Respondents - Appellees*.

The undersigned counsel for *amici curiae* certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of the case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Amici Curiae:**

Alan Charles Raul, Associate Counsel to the President in the Reagan Administration from 1986 to 1988.

Barbara Comstock, Representative of the 10th Congressional District of Virginia from 2015 to 2019 (R).

Christine Todd Whitman, Governor of New Jersey from 1994 to 2001 (R); Administrator of the Environmental Protection Agency in the George W. Bush Administration from 2001 to 2003.

Christopher Shays, Representative for the 4th Congressional District of Connecticut from 1987 to 2009 (R).

Donald B. Ayer, Deputy Attorney General in the George H.W. Bush Administration from 1989 to 1990; Principal Deputy Solicitor General in the Reagan Administration from 1986 to 1988; United States Attorney for the Eastern District of California from 1981 to 1986 in the Reagan Administration.

Mickey Edwards, Representative of the 5th Congressional District of Oklahoma from 1977 to 1993 (R).

Fern M. Smith, Judge of the U.S. District Court for the Northern District of California appointed by President Reagan from 1988 to 2005.

John J. Farmer Jr., New Jersey Attorney General from 1999 to 2002 (R); Assistant U.S. Attorney for the District of New Jersey from 1990 to 1994.

John McKay, U.S. Attorney for the Western District of Washington appointed by George W. Bush from 2001 to 2007.

Paul Rosenzweig, Deputy Assistant Secretary for Policy, Department of Homeland Security in the George W. Bush Administration from 2005 to 2009.

Peter Keisler, Acting Attorney General in the George W. Bush Administration in 2007; Assistant Attorney General for the Civil Division in the Bush Administration from 2003 to 2007; Principal Deputy Associate Attorney General and Acting Associate Attorney General in the Bush Administration from 2002 to 2003; Assistant and Associate Counsel to the President in the Reagan Administration from 1986 to 1988.

Philip Lacovara, Counsel to the Special Prosecutor, Watergate Special Prosecutor's Office in the Nixon Administration from 1973 to 1974.

Robert Shanks, Deputy Assistant Attorney General, Office of Legal Counsel in the Reagan Administration from 1981 to 1984.

Stanley A. Twardy, Jr., United States Attorney for the District of Connecticut from 1985 to 1991 and Chief of Staff to Connecticut Governor Lowell P. Weicker, Jr from 1991 to 1993.

Susan Molinari, Representative of the 14th Congressional District of New York from 1990 to 1993 and the 13th Congressional District of New York from 1993 to 1997 (R).

Tom Coleman, Assistant Attorney General of Missouri from 1969 to 1972; Missouri State Representative from 1973 to 1976; Representative of the 6th Congressional District of Missouri from 1976 to 1993 (R).

Trevor Potter, Chairman of the Federal Election Commission and Commissioner of the Federal Election Commission from 1991 to 1995; General Counsel to John McCain's Presidential Campaign from 2000 to 2008.

Ty Cobb, Special Counsel to the President in the Trump Administration from 2017 to 2018 and Assistant U.S. Attorney for the District of Maryland from 1980 to 1986.

William F. Weld, Governor of Massachusetts from 1991 to 1997 (R) and United States Assistant Attorney General for the Criminal Division from 1986 to 1988.

William Joseph Walsh, Representative of the 8th Congressional District of Illinois from 2011 to 2013 (R).


## STATEMENT REGARDING PARTIES' CONSENT

Pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure, on or before November 13, 2025, counsel for *Amici* conferred with counsel for Appellants and counsel for Appellees, and all parties consented to the filing of this brief.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ I

STATEMENT REGARDING PARTIES' CONSENT .......................................... III

TABLE OF CONTENTS.......................................................................................... IV

TABLE OF AUTHORITIES ................................................................................... V

STATEMENT OF INTEREST AND INTRODUCTION........................................ 1

ARGUMENT ............................................................................................................. 4

   I.   THE AEA IS NOT APPLICABLE TO THE PRESENT CONTEXT. ................................. 4

  II.  IMMIGRATION AND CRIMINAL LAW PROVIDE THE STATUTORY AUTHORITY NEEDED TO PROTECT PUBLIC SAFETY AND NATIONAL SECURITY ............................ 6

      A.  Immigration Law ........................................................................... 6

      B.  Criminal Law.............................................................................. 11

CONCLUSION........................................................................................................ 15

CERTIFICATE OF SERVICE ............................................................................. 17

CERTIFICATE OF COMPLIANCE.................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*A.A.R.P. v. Trump*, 605 U.S. 91 (2025) .......................................................... 1

*Bonilla v. Decker*, No. 22-CV-4501 (ER),  2024 WL 182315 (S.D.N.Y. Jan. 17, 2024) ............................................................................................................ 8

*D.B.U. v. Trump*, 1:25-cv-01163 (D. Colo. May 6, 2025) ................................ 6

*G.F.F. v. Trump,* 1:25-cv-02886 (S.D.N.Y. May 6, 2025)................................ 6

*J.A.V. v. Trump*, 1:25-cv-00072 (S.D. Tex. May 1, 2025), .............................. 6

*J.G.G. v. Trump,* 25-5068 (D.C. Cir. Mar. 26, 2025)........................... 2, 3, 5

*Lockington v. Smith*, 15 F. Cas. 758 (C.C.D. Pa. 1817) ................................ 5

*W.M.M. v. Trump*, 154 F.4th 207 (5th Cir.), *reh'g en banc granted, opinion vacated*, 154 F.4th 319 (5th Cir. 2025)........................................... 2, 3, 5

## Statutes

8 U.S.C. § 1182.............................................................................................. 7, 8

8 U.S.C. § 1225.................................................................................................. 8

8 U.S.C. § 1226.................................................................................................. 8

8 U.S.C. § 1227......................................................................................... 6, 7, 8

8 U.S.C. § 1229................................................................................................ 11

8 U.S.C. § 1531................................................................................................ 10

8 U.S.C. § 1533................................................................................................ 11

18 U.S.C. § 1381.............................................................................................. 14

18 U.S.C. § 1389.............................................................................................. 14

18 U.S.C. § 1959.............................................................................................. 13

18 U.S.C. § 1962.............................................................................................. 13

18 U.S.C. § 2339A........................................................................................... 12

18 U.S.C. § 2339B........................................................................................... 12

18 U.S.C. § 951................................................................................................ 14

21 U.S.C. § 846................................................................................................ 13

50 U.S.C. § 21.............................................................................................. 1, 3

Act Establishing the Navy Department, ch. 52, 1 Stat. 553 (1798)......................... 5

Act of May 28, 1798, ch. 46, § 1, 1 Stat. 551 (1798) .................................... 5

Alien Friends Act, ch. 58., 1 Stat. 570 (1798) ............................................... 5

Proclamation, 40 Stat. 1651 (1917) ................................................................ 5

Proclamation: Alien Enemies—Japanese, 6 Fed. Reg. 6,321 (Dec. 10, 1941) ........ 5

Naturalization Act, 1 Stat. 566 (1798) ...................................................... 5

Sedition Act,  ch. 74, 1 Stat. 596 (1798) .................................................... 5

## Other Authorities

Eldridge, et al., Staff Report of the National Commission on Terrorist Attacks
    Upon the United States (2004) ............................................................. 11

Goodman, Ryan, Schmitt, Michael and Jimenez, Anna, *Irreconcilable Presidential
    Determinations: On Tren de Aragua and the Venezuelan Government*, Just
    Security (Oct. 29, 2025) ...................................................................... 3

*Invocation of the Alien Enemies Act Regarding the Invasion of The United States*,
    The White House (Mar. 15, 2025), ....................................................... 3

Johnson, Tae D., Acting Director of U.S. Immigration and Customs Enforcement
    on *Guidelines for the Enforcement of Civil Immigration Law*, Sept. 30, 2021 ..... 9

Memo. from John Morton, Director, Immigration & Customs Enforcement, to All
    Field Office Dirs., All Special Agents in Charge, and All Chief Counsel
    Regarding Civil Immigration Enforcement: Guidance on the Use of Detainers in
    the Federal, State, Local, and Tribal Criminal Justice Systems, (Dec. 21, 2012). 8

Press Release, U.S Dep't of Justice, MS-13 Member Sentenced to Over 12 Years
    for Kidnapping, Witness Retaliation, and a Firearms Offense (Apr. 18, 2025),. 10

Press Release, U.S. Dep't of Homeland Security,
    ICE Deports Heinous Criminal Illegal Aliens Including a Gang Member,
    Pedophiles, and Drug Traffickers (Aug. 13, 2025) ........................................... 10

Press Release, U.S. Dep't of Homeland Security,
    DHS Deports Tren de Aragua Gang Members, Sexual Predators, and Violent
    Criminals from the United States to Venezuela (Oct. 24, 2025) ........................... 9

Press Release, U.S. Dep't of Homeland Security,
    ICE Houston Arrests more than 350 Gang Members in First 6 Months of Trump
    Administration  (Aug. 12, 2025) ......................................................... 10

Press Release, U.S. Dep't of Justice, 27 Members or Associates of Tren de Aragua
    Charged with Racketeering, Narcotics, Sex Trafficking, Robbery and Firearms
    offenses (Apr. 21, 2025), ................................................................. 12

Press Release, U.S. Dep't of Justice, Suspected Tren de Aragua Member Pleads
    Guilty to Illegal Firearms Possession (Oct. 8, 2025) ........................................... 13

Press Release, U.S. Dep't of Justice,

Tren de Aragua Members Charged with May 2024 Double Murder in the Bronx and Other Racketeering Offenses (Sep. 16, 2025) .............................................. 13

Press Release, U.S. Dep't of Justice, Venezuelan National and Suspected Tren de Aragua Member Charged with Attempted Murder of Federal Officer (Jun. 20, 2025) ...................................................................................................................... 13

Terrorism Prosecution Database CENTER ON NATIONAL SECURITY AT FORDHAM LAW (last visited Nov. 12, 2025) ................................................................... 12, 14

United States Department of State, *Designation of International Cartels*, (Feb. 20, 2025) .......................................................................................................................... 7

**STATEMENT OF INTEREST AND INTRODUCTION**

*Amicus Curiae* Democracy Defenders Fund ("DDF") is a bipartisan, nonprofit organization committed to upholding the rule of law and defending the Constitution. The other *amici curiae* on this brief (collectively with DDF, "*Amici*") are conservative or independent former government and national security officials, including those who were elected as Republicans or served in Republican administrations.[1] These *amici* have collectively spent decades in public service in the federal government and state governments. They share a commitment to limited government, the rule of law, and protecting American public safety and national security, consistent with the Constitution and the nation's laws.[2]

*Amici* write to express their deep concern over the use of the Alien Enemies Act ("AEA," or "Act"), 50 U.S.C. § 21, which grants the Executive Branch extraordinary powers during wartime, at a moment when the United States is not at war. As the panel correctly ruled, the Trump Administration improperly invoked the AEA to enforce its immigration and public safety policy objectives. Altogether apart

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* affirm that no counsel for a party authored this brief in whole or in part, no party or counsel for a party contributed money that was intended to fund preparing or submitting this brief, and no person other than *Amici* or their counsel contributed money that was intended to fund the preparation or submission of this brief.

[2] In its order remanding this case to the 5th Circuit, the Supreme Court "recognize[d] the significance of the Government's national security interests as well as the necessity that such interests be pursued in a manner consistent with the Constitution." *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025).

1

from one's views concerning those objectives, the Administration's use of the AEA is unlawful and unnecessary. The Executive Branch has at its disposal a panoply of immigration and criminal statutes to remove dangerous noncitizen gang members and other public safety and national security threats from the country. The AEA is not one of them.

The Administration's own actions prove that it does not need the AEA to enforce its immigration and public safety policies. The government has repeatedly, including during en banc review, taken advantage of applicable immigration and criminal laws to detain and remove relevant individuals, including alleged members of Tren de Aragua ("TdA"). As this court has already held, "the Government has substantial authority to remove TdA members independent of" the AEA. *W.M.M. v. Trump*, 154 F.4th 207, 232 (5th Cir.), *reh'g en banc granted, opinion vacated*, 154 F.4th 319 (5th Cir. 2025).

Enacted in 1798 when the United States faced potential war with France, the AEA grants the President "near-blanket authority" to immediately detain and remove so-called "alien enemies." *J.G.G. v. Trump,* 25-5068, (D.C. Cir. Mar. 26, 2025), ECF No. 1208724047, at 3 (Henderson, J., concurring).[3] The AEA conditions those powers on the existence of wartime conflicts with foreign nations. *Id.* at 2. If

---

[3] On March 26, 2025, the D.C. Circuit of Appeals denied an emergency motion by the United States to stay two temporary restraining orders preventing the deportation of noncitizens under the AEA.

the United States is not facing a "declared war" with, or "invasion or predatory incursion" "perpetrated, attempted, or threatened against, the territory of the United States" by, a "foreign nation or government," 50 U.S.C. § 21, the President cannot invoke the AEA.

The United States is not presently at war. Nor is it under threat of foreign invasion or incursion. Nevertheless, President Trump issued a proclamation invoking the AEA and declaring that TdA, a Venezuelan gang, is a "hybrid criminal state" "threatening an invasion or predatory incursion" against the United States. Tren De Aragua, *Invocation of the Alien Enemies Act Regarding the Invasion of The United States*, The White House (Mar. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/. But that proclamation failed to meet the AEA's required statutory criteria. *See W.M.M.*, 154 F.4th at 229-231; *J.G.G.,* 25-5068, at 23 (Henderson, J., concurring).[4]

As set forth below, even without the AEA, the United States maintains an array of tools to protect public safety against gang, terrorist, and other criminal

---

[4] While the proclamation attempts to skirt the issue by suggesting links between TdA and the Venezuelan government, alleged links between a gang and a foreign nation are not sufficient to satisfy the AEA. The AEA requires an invasion or incursion by a "foreign nation or government." 50 U.S.C. § 21. Moreover, even the Administration itself has taken inconsistent positions on whether TdA is operating as a foreign nation or government. Ryan Goodman, Michael Schmitt and Anna Jimenez, *Irreconcilable Presidential Determinations: On Tren de Aragua and the Venezuelan Government*, Just Security (Oct. 29, 2025), https://www.justsecurity.org/123360/presidential-determinationa-alien-enemies-act-venezuela/.

activity. An order stopping the improper use of the AEA would not limit the government's ability to ensure our safety in any way, including through removals. For years after 9/11, terrorist organizations and their members or affiliates in the United States posed a primary threat to this nation. The AEA was never invoked throughout this period. Yet the United States successfully protected the homeland, removing members of terrorist organizations or those otherwise engaged in terrorist activities, and prosecuting hundreds of these individuals. Similarly, since invoking the AEA, the Trump Administration has repeatedly used these other lawful authorities to detain and remove the very individuals it claims it needs the AEA to address.

The Administration's invocation of the AEA is patently unlawful. It is also the wrong tool to accomplish the aims that the Administration has advanced. The United States has many legal and effective ways to apprehend or remove individuals who threaten the nation's security.

## ARGUMENT

### I.    The AEA is not applicable to the present context.

The United States enacted the AEA a decade after adopting the Constitution, at a time when the young nation had no standing army or navy, and virtually no criminal, immigration, or national security law. The AEA was one in a series of statutes intended to prepare for a war with a hostile foreign nation, France. See,

collectively, the Alien and Enemies Acts of 1798 (Naturalization Act of June 18, 1798, ch. 54, 1 Stat. 566; Alien Friends Act of June 25, 1978, ch. 58, 1 Stat. 570; Sedition Act of July 14, 1798, ch. 74, 1 Stat. 596; and the AEA).[5] This effort went beyond these four Acts—and included, for example, laws creating the Department of the Navy, (Act Establishing the Navy Department, April 30, 1798, ch. 52, 1 Stat. 553-554), and authorizing the President to raise a standing army of 10,000 men to combat a French invasion or declaration of war (Act of May 28, 1798, ch. 46, § 1, 1 Stat. 551).

The AEA has previously been invoked only three times: the War of 1812, World War I, and World War II. *See Lockington v. Smith*, 15 F. Cas. 758, 758-759 (C.C.D. Pa. 1817) (discussing the War of 1812 proclamation); Proclamation, 40 Stat. 1651 (1917) (World War I); Proclamation: Alien Enemies—Japanese, 6 Fed. Reg. 6,321 (Dec. 10, 1941) (World War II). The alleged presence of TdA gang members in the United States bears no resemblance to those wars—and does not meet the AEA's statutory requirements. The text, surrounding statutory context, and history described above, all show that the AEA is limited to times when the U.S. faces "invasion" or "predatory incursion," during "hostilities," from a "foreign nation or government." *W.M.M.*, 154 F.4th at 229-230; *J.G.G.*, 25-5068, at 16-17 (Henderson,

---

[5] The other three acts are no longer operative; the Naturalization Act of 1798 was repealed in 1802, and the Alien Friends Act and Sedition Act both expired in 1801.

J., concurring); *see also J.A.V. v. Trump*, 1:25-cv-00072 (S.D. Tex. May 1, 2025), ECF No. 58; *G.F.F. v. Trump,* 1:25-cv-02886 (S.D.N.Y. May 6, 2025), ECF No. 84; *D.B.U. v. Trump*, 1:25-cv-01163 (D. Colo. May 6, 2025), ECF No. 52. The United States currently faces no wartime threat from a foreign nation justifying removals under the AEA.

## II.      Immigration and criminal law provide the statutory authority needed to protect public safety and national security

An order forbidding the improper invocation of the AEA will not hamper the government's ability to protect public safety and national security. Congress has provided the Executive with many tools, through both immigration and criminal law, to ensure public safety and national security. There is no need for the Executive to twist the meaning of the AEA beyond recognition to accomplish these aims. In fact, both immigration and criminal law are often better suited to the task of addressing risks to national security and public safety because their application is not limited by a noncitizen's place of birth or nationality—as opposed to the overbroad yet underinclusive AEA.

### A. Immigration Law

Immigration law provides the Executive Branch power to remove foreign terrorists and other national security threats. Under 8 U.S.C. § 1227(a)(4)(B), the government is empowered to remove noncitizen members of foreign terrorist organizations and other noncitizens who may engage in terrorist activities in the

United States. The United States may also remove any noncitizen who would otherwise be inadmissible to receive visas or enter the United States because of their terrorist activities or association with a terrorist organization, under 8 U.S.C. § 1182(a)(3)(B) and (F).

The Executive has the statutory authority to remove a noncitizen who has "engaged" or "incited terrorist activity," is a representative or a member of a terrorist organization, has "endorse[d] or espouse[d] terrorist activity" or persuaded others to do so, or "has received military-type training…from or on behalf of any organization that, at the time the training was received, was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B), (F). Since the United States has deemed TdA to be a terrorist organization, United States Department of State, *Designation of International Cartels*, (Feb. 20, 2025), https://www.state.gov/designation-of-international-cartels/, the government can pursue removing TdA members from the country under this authority.

The Administration's removal authorities are not limited to terrorism. Immigration law also grants the Executive the capacity to detain and remove noncitizens who threaten national security or public safety in other ways. Under 8 U.S.C. § 1227(a)(4)(A), the government may deport noncitizens who commit espionage, sabotage, national security offenses, or other activities to overthrow the

government of the United States through force or unlawful means, as well as "any other criminal activity which endangers public safety or national security."

The Executive Branch is permitted by the Immigration and Nationality Act ("INA") to detain certain noncitizens at their discretion. Moreover, noncitizens who are statutorily inadmissible or deportable under terrorism-related grounds are subject to mandatory detention. That category has historically included known gang members. See, e.g., Memorandum from John Morton, Director, Immigration & Customs Enforcement, to All Field Office Dirs., All Special Agents in Charge, and All Chief Counsel Regarding Civil Immigration Enforcement: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems, (Dec. 21, 2012), https://www.ice.gov/doclib/detention-reform/pdf/detainer-policy.pdf (listing "known gang member" as an example of a removable noncitizen who "poses a significant risk to national security, border security, or public safety"). The United States moved to detain and remove members of the MS-13 gang under this authority. *See Bonilla v. Decker*, No. 22-CV-4501 (ER), 2024 WL 182315 (S.D.N.Y. Jan. 17, 2024). Under existing immigration authorities, there are a number of statutes that specifically authorize the detention of such individuals, including 8 U.S.C. § 1225(b)(1)(B)(ii), 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), 8 U.S.C. § 1225(b)(2)(A), and 8 U.S.C. § 1226(c)(1)(D) (providing for mandatory detention of noncitizens covered by § 1182(a)(3)(B) ("Terrorist activities") or § 1227(a)(4)(B) (covering "Terrorist

activities" and "Association with terrorist organizations")). Similarly, the INA explicitly provides that noncitizens who commit criminal offenses are deportable, and this has previously been reflected in Department of Homeland Security guidance. 8 U.S.C. § 1227(a)(2) ("Any alien who…is convicted of a crime for which a sentence of one year or longer may be imposed, is deportable."); *see also* memorandum from Tae D. Johnson, Acting Director of U.S. Immigration and Customs Enforcement on *Guidelines for the Enforcement of Civil Immigration Law*, September 30, 2021, https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf ("A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal."). DHS deported three TdA members to their home country of Venezuela. Press Release, U.S. Dep't of Homeland Security, DHS Deports Tren de Aragua Gang Members, Sexual Predators, and Violent Criminals from the United States to Venezuela (Oct. 24, 2025), https://www.dhs.gov/news/2025/10/24/dhs-deports-tren-de-aragua-gang-members-sexual-predators-and-violent-criminals. These actions are not limited to TdA; the government has taken similar steps under the INA to target other alleged gang members. For example, ICE has arrested and deported at least four gang members in the Houston area in 2025. Press Release, U.S. Dep't of Homeland Security, ICE Houston Arrests more than 350 Gang Members in First 6 Months of Trump Administration (Aug. 12, 2025),

https://www.dhs.gov/news/2025/08/12/ice-houston-arrests-more-350-gang-members-first-6-months-trump-administration. In August, DHS deported a member of the Laotion gang "Masters of Destruction." Press Release, U.S. Dep't of Homeland Security, *ICE Deports Heinous Criminal Illegal Aliens Including a Gang Member, Pedophiles, and Drug Traffickers* (Aug. 13, 2025), https://www.dhs.gov/news/2025/08/13/ice-deports-heinous-criminal-illegal-aliens-including-gang-member-pedophiles-and. And in April, the Department of Justice stated its plan to deport an alleged MS-13 member who was convicted of federal criminal offenses after the completion of his sentence. Press Release, U.S Dep't of Justice, *MS-13 Member Sentenced to Over 12 Years for Kidnapping, Witness Retaliation, and a Firearms Offense* (Apr. 18, 2025), https://www.justice.gov/opa/pr/ms-13-member-sentenced-over-12-years-kidnapping-witness-retaliation-and-firearms-offense. The government's own pronounced actions undercut its rationale for abusing the extraordinary powers granted under the AEA.

To the extent the Executive Branch wishes to deport noncitizens outside the bounds of standard immigration procedures, Congress has enacted exceptional measures for deporting "alien terrorists." Title 8 U.S.C. § 1531 *et seq.* establishes the Alien Terrorist Removal Court ("ATRC") and related procedures. The Attorney General may proceed through this channel when she has "classified information that

an alien is an alien terrorist." 8 U.S.C. § 1533(a)(1). This statute, unlike the AEA, could provide the government recourse for instances in which it is concerned that the typical legal processes imperil national security. Notably, the government has never utilized the ATRC because regular removal proceedings have never been insufficient to adequately handle terrorist or national security issues. Later amendments to the INA allowed for ex parte review of "national security information" in traditional immigration courts, § 1229a(b)(4)(B), likely obviating the need for the ATRC thus far.[6] The fact that the federal government has yet to require use of the ATRC further undercuts the government's efforts to improperly use the AEA.

### B. Criminal Law

The criminal law is also an important and effective tool for the United States to address terrorist and other security threats. Unlike the AEA, criminal law can be used against any individual, whether they are a citizen or not, thereby allowing the government to apprehend and prosecute anyone who threatens public safety.

---

[6] "A major reason for the lack of use of the ATRC was that new immigration laws permitted the use of classified evidence in traditional deportation hearings, making recourse to a special court unnecessary. … By 1998, a handful of the aliens affiliated with terrorist activity that were known to the INS and the Justice Department were successfully removed by the INS using both traditional immigration law and classified evidence." Eldridge, et al., Staff Report of the National Commission on Terrorist Attacks Upon the United States (2004), at 98, https://www.govinfo.gov/content/pkg/GOVPUB-Y3-PURL-LPS53197/pdf/GOVPUB-Y3-PURL-LPS53197.pdf

Terrorism is not limited to noncitizens, nor are the broad array of violent threats that imperil our security.

Across administrations, there have been hundreds of terrorism prosecutions and convictions that have successfully protected the homeland against potential threats. See Terrorism Prosecution Database, CENTER ON NATIONAL SECURITY AT FORDHAM LAW, https://piano-wolverine-fyzy.squarespace.com/terrorism-database. These laws—including, for example, broad material-support statutes 18 U.S.C. § 2339A and 18 U.S.C. § 2339B—enable the government to prosecute those who provide resources or other assistance in support of the commission of terrorist crimes. They also allow the government to prosecute those who provide resources or other material support to designated foreign terrorist organizations—a category that now includes TdA.

Yet again, the Trump Administration has repeatedly utilized these authorities this year to target and prosecute alleged TdA gang members. For example, DOJ indicted 27 suspected TdA members for racketeering conspiracy, sex trafficking conspiracy, drug trafficking conspiracy, robbery, and firearms offenses. Press Release, U.S. Dep't of Justice, 27 Members or Associates of Tren de Aragua Charged with Racketeering, Narcotics, Sex Trafficking, Robbery and Firearms offenses (Apr. 21, 2025), https://www.justice.gov/opa/pr/27-members-or-associates-tren-de-aragua-charged-racketeering-narcotics-sex-trafficking.        In

September, DOJ charged another 10 alleged members of TdA with dozens of federal crimes, including racketeering conspiracy under 18 U.S.C. § 1962(d), drug trafficking conspiracy under 21 U.S.C. § 846, and murder and assault with a dangerous weapon in aid of racketeering under 18 U.S.C. §§ 1959(a)(1), (a)(3), and 2. Press Release, U.S. Dep't of Justice, Tren de Aragua Members Charged with May 2024 Double Murder in the Bronx and Other Racketeering Offenses (Sep. 16, 2025), https://www.justice.gov/opa/pr/tren-de-aragua-members-charged-may-2024-double-murder-bronx-and-other-racketeering-offenses. DOJ secured a conviction against a suspected TdA member last month for illegal possession of firearms and conspiracy to destroy evidence. Press Release, U.S. Dep't of Justice, Suspected Tren de Aragua Member Pleads Guilty to Illegal Firearms Possession (Oct. 8, 2025), https://www.justice.gov/usao-nm/pr/suspected-tren-de-aragua-member-pleads-guilty-illegal-firearms-possession. And DOJ is also prosecuting a separate suspected TdA member for one count of attempted murder of a federal officer and one count of assault of a federal officer with infliction of bodily injury. Press Release, U.S. Dep't of Justice, Venezuelan National and Suspected Tren de Aragua Member Charged with Attempted Murder of Federal Officer (Jun. 20, 2025), https://www.justice.gov/opa/pr/venezuelan-national-and-suspected-tren-de-aragua-member-charged-attempted-murder-federal. This record not only demonstrates the robust authorities the government enjoys to handle TdA (and other gang-related)

crimes, but also that the Trump Administration has already amply availed itself of these powers.

Even in wartime, criminal law provides alternatives preferable to the AEA. Chapters 37 and 105 of the criminal code cover all manner of espionage and sabotage. Other parts of the criminal code authorize the imprisonment of unregistered agents of a foreign government, trespassers on military property, and conspirators who plot attacks on United States service members. *See* 18 U.S.C. § 951, 18 U.S.C. § 1381, and 18 U.S.C. § 1389. The United States has fought a number of wars since World War II and repelled numerous threats from hostile foreign governments. Not once has the nation been compelled to invoke the AEA.

Unlike the AEA, criminal law applies against both noncitizens and citizens. That flexibility is useful in combating modern threats, and the United States has availed itself of criminal laws to do so many times. Through 2019, the United States brought hundreds of terrorism prosecutions against alleged ISIS-affiliated defendants. The majority of the ISIS prosecutions—at the time, pursuing the most significant terrorist threat the United States faced—were against United States citizens. See Terrorism Prosecution Database CENTER ON NATIONAL SECURITY AT FORDHAM LAW (last visited November 12, 2025), https://piano-wolverine-fyzy.squarespace.com/terrorism-database.  President Trump has repeatedly touted his success at "defeating ISIS" during his first term in office; his administration's

use of the criminal law—and not the AEA—was a critical component of that victory securing the home-front.

Employing the AEA to tackle modern threats against the U.S. is neither efficient nor effective. The AEA is a blunt instrument with a narrow aperture—contributing to the government sweeping up nonviolent Venezuelans in its dragnet, while missing all criminal activity by anyone who is not a Venezuelan noncitizen. Crime and terrorism are perpetrated by people of all backgrounds. But the United States' invocation of the AEA only targets immigrants from a specific country, Venezuela, leaving a vast swath of potential perpetrators untouched. The threats represented by those dangerous noncitizens identified in the President's Proclamation can be contained by the wide range of immigration and criminal laws at the United States' disposal.

## CONCLUSION

Not only would it be unlawful and set a dangerous precedent, there is simply no need to apply the AEA to circumstances beyond its clear language and intent. The Executive Branch is imbued with sufficient powers, both derived from the Constitution and granted statutorily by Congress, to accomplish the Administration's public safety and national security objectives. It is the Executive's duty to exercise those powers responsibly and lawfully and not to circumvent them through invocation of an act designed for wartime.

Respectfully submitted,

*/s/ Norman L. Eisen*

Norman L. Eisen
Stephen A. Jonas
Joshua G. Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@democracydefenders.org
Steve@democracydefenders.org
Joshua@democracydefenders.org

Stuart M. Gerson
1227 25th Street NW, Suite 700
Washington, DC 20037
Tel: (202) 861-4180
SGerson@ix.netcom.com

*Counsel for* Amici Curiae

November 13, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2025 an electronic copy of the foregoing brief of *amici curiae* was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF filing system and that service upon counsel for the parties will be accomplished using the CM/ECF system.

*/s/ Norman L. Eisen*
Norman L. Eisen

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it has 3,368 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Norman L. Eisen*
Norman L. Eisen