No. 25-10534

In the United States Court of Appeals
for the Fifth Circuit

W.M.M., ET AL.,
*Petitioners - Appellants*,

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
UNITED STATES, ET AL.,
*Respondents - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
NO. 1:25-CV-00059

## BRIEF FOR *AMICUS CURIAE* PROFESSOR ANDREW KENT IN SUPPORT OF PETITIONERS-APPELLANTS AND SUPPORTING AFFIRMANCE

Deborah Malamud
Covington & Burling LLP
30 Hudson Yards
New York, NY 10001-2170
(212) 841-1000
dmalamud@cov.com

Brandon R. Gould
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
bgould@cov.com

*Attorneys for* Amicus Curiae *Professor Andrew Kent*

November 13, 2025

## CERTIFICATE OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2 and Rule 28.2.1, *amicus curiae* make the following supplemental statement of interested parties to fully disclose all those with an interest in this brief.

Amicus Curiae
Andrew Kent

Counsel for Amicus Curiae
Brandon R. Gould
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
bgould@cov.com

Deborah Malamud
Covington & Burling LLP
30 Hudson Yards
New York, NY 10001-2170
(212) 841-1000
dmalamud@cov.com

## INTEREST OF AMICUS CURIAE[1]

*Amicus* is a professor of constitutional law, foreign relations and the law, and legal history, who has written extensively about executive power and national security. *Amicus* has a strong interest in the outcome of this litigation, as demonstrated by his recent research about the Alien Enemies Act, which is described in his proposed *amicus* brief.[2] *Amicus* believes the proposed *amicus* brief, which reflects his expertise in executive power, national security law, and legal history, will help the Court assess the parties' arguments concerning the meaning of the Alien Enemies Act of 1798.

**Professor Andrew Kent** is the Joseph M. McLaughlin Chair and Professor of Law at Fordham University. He earned his J.D. at Yale Law School and his A.B. degree from Harvard University. Professor Kent's research on constitutional law and legal history has been published in leading academic journals, including the *Harvard Law Review*, the *Columbia Law Review*, *Georgetown Law Journal*, and the *Journal of American Constitutional History*.

---

[1] No party's counsel authored this brief in whole or in part, nor did any party, counsel for any party, or any person other than amici curiae or their counsel contribute funding for the preparation or submission of this brief.

[2] Andrew Kent, *The Alien Enemies Act of 1789* (Nov. 13, 2025), Fordham Law Legal Studies Research Paper No. 5383662, *available at* https://perma.cc/7GVG-KB5G

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ............................................................... 1

BACKGROUND .............................................................................. 3

ARGUMENT .................................................................................. 5

I.    Before 1798, Alien Enemy Status Arose During Wars Between
      Sovereigns and Implicated the Authority of All Three Branches of
      Government. ........................................................................... 5

      A.    Before the AEA, Alien Enemy Status Arose During Wartime
            Under Principles of Common Law and International Law. ................ 7

      B.    U.S. Courts Applied Well-Recognized Principles of Alien
            Enemy Law to Noncitizens During Times of War. ........................ 10

      C.    Because Alien Enemy Status Was Incidental to War, Congress
            Controlled When It Applied. ................................................. 12

II.   Legislative Debates About the AEA Show That Congress Understood
      the AEA to Codify Existing Law, not Reshape it. ......................... 15

      A.    Legislative Debates Show that the AEA Constrains Executive
            Authority Within Conventional Limits During Wartime. ............... 16

      B.    The AEA's Broad Bipartisan Support, In Sharp Contrast to the
            Contemporaneous Partisan Opposition to the Alien Friends Act,
            is Evidence of Its Continuity with Existing Law .......................... 22

III.  Post-Enactment History Confirms That the AEA Represented
      Continuity with Preexisting Law, Not a Radical Break From It. .......... 24

CONCLUSION ............................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*The Adventure*, 12 U.S. (8 Cranch) 221 (1814) ........................................................ 12

*Brown v. United States*,
12 U.S. (8 Cranch) 110 (1814) ..................................................................... 14, 15

*Fairfax's Devisee v. Hunter's Lessee*,
11 U.S. (7 Cranch) 603 (1812) ............................................................................ 12

*Hamilton v. Eaton*,
11 F. Cas. 336 (C.C.D. N.C. 1796) ..................................................................... 10

*The Julia*, 14 F. Cas. 27 (C.C.D. Mass. 1813).................................................. 9, 12-13

*Ludecke v. Watkins*,
335 U.S. 160 (1948)............................................................................................ 1

*The Rapid*, 12 U.S. (8 Cranch) 155, 161 (1814) ........................................................ 9

*Talbot v. Seeman*,
5 U.S. (1 Cranch) 1 (1801) ............................................................................... 14

*Trump v. J.G.G.*,
604 U.S. 670 (2025)............................................................................................ 1

*The Venus*, 12 U.S. (8 Cranch) 253, 290-91 (1814) ................................................. 9

*W.M.M. v. Trump*,
154 F.4th 207 (5th Cir. 2025) ..................................................................... 22, 23

*Ware v. Hylton*,
3 U.S. (3 Dall.) 199 (1796) ................................................................. 11, 12, 15

*Wisconsin Cent. Ltd. v. United States*,
585 U.S. 274 (2019)............................................................................................ 1

**Statutes**

Act of July 7, 1798, ch. 67, 1 Stat. 578......................................................... 5

Act of July 9, 1798, ch. 68, § 8, 1 Stat. 578 ................................................ 27

Act of May 28, 1798, ch. 47, 1 Stat. 558 ................................................ 22

An Act Concerning Aliens, ch. 58, 1 Stat. 570 (June 25, 1798) ...................... *passim*

An Act Respecting Alien Enemies, 1 Stat. 577, ch. 64, § 1 (July 6, 1798) ................................................................................. *passim*

Naturalization Act of 1798, ch. 54, § 1, 1 Stat. 566 ................................. 10

Sedition Act, ch. 74, 1 Stat. 596 (July 14, 1798) ......................................... 5

Treaty of Amity and Commerce, art. 20, U.S.-Fr., 8 Stat. 12 .................................. 10

Treaty of Amity and Commerce, art. 22, U.S.-Swed., 8 Stat. 60 ............................ 10

Treaty of Amity and Commerce, art. 23, U.S.-Pruss., 8 Stat. 84 ............................ 10

Treaty of Friendship, Limits, and Navigation, art. 13, U.S.-Spain, 8 Stat. 138 ...................................................................................... 10

**Other Authorities**

U.S. Const., art. I, § 8, cl. 11 ................................................................... 14

8 Annals of Cong. (1798) ........................................... 18, 21, 22, 23, 25

1 Op. Att'y Gen. 84 (1798) ...................................................... 26, 27

Alexander deConde, *The Quasi-War: The Politics and Diplomacy of the Undeclared War with France, 1797-1801* (1966) ........................................... 3

*Americanus No. 1* (Jan. 31, 1794) (Alexander Hamilton), *reprinted in* 15 *The Papers of Alexander Hamilton* 669, 669 (Harold C. Syrett & Jacob E. Cooke eds., 1969) .......................................................... 14

Andrew Kent, *The Alien Enemies Act of 1789* (Nov. 13, 2025), Fordham Law Legal Studies Research Paper No. 5383662 ........................ *passim*

Anthony J. Bellia Jr. & Bradford R. Clark, *The Political Branches and the Law of Nations,* 85 Notre Dame L. Rev. 1795 (2010) ..................................... 7

Emer de Vattel, *The Law of Nations*, ch. V, § 69 (London, 2d ed., 1763) (Petter Korkman reprint ed., 2006) .......................................................... 8, 9

Gordon S. Wood, *Empire of Liberty: A History of the Early Republic, 1789-1815* (2009) ................................................................ 4

James Madison, *The Report of 1800, [7 January] 1800*, Founders Online, National Archives ........................................................... 9

James Morton Smith, *Freedom's Fetters: The Alien and Sedition Laws and American Civil Liberties* (1956). ..................................... 23

*John Jay's Circuit Court Opinion, June 7, 1793*, in 7 *Documentary History of the Supreme Court of the United States, 1789-1800* (Maeva Marcus ed., 2003) ..................................... 11, 12, 15

Lance Banning, *The Jeffersonian Persuasion: Evolution of a Party Ideology* (1978) ................................................................. 4

Michael D. Ramsey, *Textualism and War Powers*, 69 U. CHI. L. REV. 1543 (2002) .............................................................. 13

Saikrishna Prakash, *Unleashing the Dogs of War: What the Constitution Means by "Declare War"*, 93 Cornell L. Rev. 45, (2007) ........................................................................ 13

Terri Diane Halperin, *The Alien and Sedition Acts of 1798: Testing the Constitution* (2016) ........................................................ 4

1 William Blackstone, *Commentaries on the Laws of England: The Oxford Edition of Blackstone* (Wilfrid Prest ed., 2016) (1765) ....................... 7, 8

## SUMMARY OF ARGUMENT

This brief addresses a question that the Supreme Court held is subject to "judicial review," namely the correct "interpretation" of the Alien Enemies Act of 1798 ("AEA"). *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163 (1948)). As with any statute, the meaning of the AEA is determined by construing its terms "as of the time Congress enacted" it. *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2019).

The most important term in the AEA is "alien enemies." In 1798, that term had a well-understood meaning at common law and in the law of nations. An "alien enemy" was a foreigner who was a citizen or subject of a nation at war with the sovereign. Under preexisting law, "alien enemies" faced a host of legal disabilities, which courts adjudicated in particular cases and controversies, and they could be excluded, detained, and removed from the territory of the sovereign during wartime.

In the AEA, Congress codified these background legal principles within the nascent constitutional structure of the United States Government. At the time, it was generally understood that Congress had the exclusive power to declare war and authorize actions that would lead the nation to the brink of armed conflict. Accordingly, the AEA tethered the invocation of alien enemy status to situations in which Congress had exercised—or imminently would exercise—its warmaking power. In doing so, the Congress rejected multiple proposals that would have more-

1

broadly delegated authority to the President outside of wartime contexts. A close reading of the statute's text likewise confirms its narrow scope.

Congress debated the AEA during a period of intense diplomatic, military, and political tension between the United States and France on the high seas, and between the emerging Federalist and Republican parties in Congress. Despite these challenges, the AEA passed with bipartisan support. This was, in part, because the statute was understood to represent continuity with preexisting law on alien enemies during wartime, rather than a radical departure from it. In this way, Congress's enactment of the AEA stands in sharp contrast with the bitter partisan debates over the more controversial "Alien Friends Act," of 1798, which broadly delegated discretionary power to the President beyond traditional wartime contexts.

The AEA's post-enactment history confirms this narrative of continuity, not change. Ultimately, the Adams administration did not invoke the AEA during the undeclared "Quasi-War" with France, which transpired at sea and never resulted in an invasion or incursion of French forces into U.S. territory. Indeed, until this year, Presidents have invoked the AEA only three times, all during or immediately before wars declared against foreign nations. The historical record before, during, and after the passage of the AEA thus strongly suggests that executive authority to invoke alien enemy status is limited to narrow, traditional situations in which Congress had declared or soon would exercise its warmaking powers.

2

**BACKGROUND**

In 1798, the fifth U.S. Congress passed the Alien Enemies Act ("AEA"), which allowed the President, upon "public proclamation" to "apprehend[], restrain[], secure[], and remove[]" noncitizens "age fourteen years and upward" who were determined to be "alien enemies" during a "declared war between the United States and any foreign nation or government," or "any invasion or predatory incursion" that was "perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government." An Act Respecting Alien Enemies, 1 Stat. 577, ch. 64, § 1 (July 6, 1798) (hereinafter, "AEA").

At that time, the United States was engaged in what many historians call the "Quasi-War" with France, a "long crisis of half war" which "dominated" the administration of President John Adams. Alexander deConde, *The Quasi-War: The Politics and Diplomacy of the Undeclared War with France, 1797-1801* vii, 4 (1966). Although France had helped the United States achieve independence less than two decades earlier, U.S. public opinion on France fractured following the French Revolution and its subsequent European wars. Further inflaming tensions, French privateers and warships began seizing U.S. commercial vessels and their cargoes to fund these European wars, asserting that American merchants were trading with France's enemies. *See* Andrew Kent, *The Alien Enemies Act of 1789* (Nov. 13, 2025), Fordham Law Legal Studies Research Paper No. 5383662, at 14,

17-18, 20, 22, *available at* https://perma.cc/7GVG-KB5G.   Though raiding commerce at sea was an accepted practice during hostilities, many of these seizures violated either U.S.-French treaty provisions or the law of nations. *See id*. at 17.

Domestic politics polarized over France's revolution and its hostile maritime actions against U.S. shippers. *See id*. at 13-16, 24.  Politicians identified with the emerging Federalist Party—including George Washington, Alexander Hamilton, and John Adams—viewed the actions of France with increasing concern. *See, e.g.,* Terri Diane Halperin, *The Alien and Sedition Acts of 1798: Testing the Constitution* 14-23, 26 (2016); Gordon S. Wood, *Empire of Liberty: A History of the Early Republic, 1789-1815* 176-77 (2009).  By contrast, politicians in the nascent Republican Party (often called Democratic-Republicans by historians), including Thomas Jefferson, James Madison, James Monroe, and Albert Gallatin, wanted U.S. policy to favor its former ally France. *See* Wood, at 176-77 (2009); Lance Banning, *The Jeffersonian Persuasion: Evolution of a Party Ideology* 208-45 (1978).

Despite these partisan divides and diplomatic tensions, the AEA passed the Congress with support from both Federalists and Republicans. *See* Kent, at 35-37. This bipartisan support for the AEA contrasts sharply with other bills advanced by the Federalists in 1798 that also addressed the conflict with France, such as the Aliens Act (labeled derisively by Republicans as the "Alien Friends Act") and the Sedition Act. *See* An Act Concerning Aliens, ch. 58, 1 Stat. 570 (June 25, 1798);

Sedition Act, ch. 74, 1 Stat. 596 (July 14, 1798). Unlike the AEA, Republicans opposed both bills, claiming they were unconstitutional exercises of congressional power and dangerous delegations to the executive. *See* Kent, at 19, 35-37, 66-72. But despite Republicans' opposition, both bills ultimately passed the Congress in which Federalists held majorities in both chambers. *Id.*

The day after the AEA became law, Congress declared that several treaties between the United States and France were no longer in force due to France's armed aggression against U.S. merchants on the high seas. *See* Act of July 7, 1798, ch. 67, 1 Stat. 578. But despite these diplomatic tensions and the ongoing maritime conflict, Congress did not declare war against France, and the Adams administration did not invoke the AEA to designate French nationals within the U.S. as "alien enemies." *See* Halperin, at 6. Indeed, until this year, Presidents have only invoked the AEA three times—during the War of 1812, World War I, and World War II—each time after or immediately before a formal declaration of war.

## ARGUMENT

I.   **Before 1798, Alien Enemy Status Arose During Wars Between Sovereigns and Implicated the Authority of All Three Branches of Government.**

The original meaning of the AEA must be analyzed in the legal, political, and constitutional context in which it was drafted. The Congress that passed the AEA and the Adams administration responsible for deciding whether to execute it were keenly aware of principles of international and common law that defined who was

an "alien enemy" and when that status attached. Under those background legal principles, all citizens or subjects of a nation at war with the United States were considered alien enemies, regardless of whether any particular noncitizen posed a danger to the nation.

At the time, alien enemy status also entailed a well-understood set of legal disabilities, including limitations on property rights, and the sovereign's power to exclude, detain, or remove noncitizens determined to be alien enemies. Both before and after the passage of the AEA, judges routinely resolved cases and controversies about whether these (and other) disabilities applied to foreign nationals alleged to be alien enemies.

The United States' experience crafting a new Constitution just a decade earlier also informs the original meaning of the AEA. In 1798, legislators and executive officials believed that the Constitution vested the Government's war powers principally in Congress, which had the sole authority to declare war and enact policies that would bring the U.S. closer to war. Those decisions, in turn, would trigger alien enemy status for citizens of hostile nations under international law. Congress's warmaking power also allowed it to craft statutes defining the President's authority to detain and remove alien enemies during conflicts. Those powers, however, had to be exercised carefully because the fledgling United States was far weaker than the European powers. If the Congress's delegations strayed too

6

far from well-recognized principles of international law, unbridled executive action risked giving a *casus belli* (legal grounds for war) to hostile foreign nations, provoking conflicts that Congress sought to avoid. *See* Anthony J. Bellia Jr. & Bradford R. Clark, *The Political Branches and the Law of Nations,* 85 NOTRE DAME L. REV. 1795, 1799–1800, 1804 (2010).

A.   **Before the AEA, Alien Enemy Status Arose During Wartime Under Principles of Common Law and International Law.**

In English common law, as set forth by Blackstone, "[t]he first and most obvious division of the people is into aliens and natural-born subjects." 1 William Blackstone, *Commentaries on the Laws of England: The Oxford Edition of Blackstone* 235 (*354) (Wilfrid Prest ed., 2016) (1765). An "alien" was a "foreigner," a person "from another country," sometimes called a "stranger." *See* Kent, at 37. American courts, legislatures, and executive officials post-independence followed English law in distinguishing between two categories of aliens. *Alien enemies* were foreigners who were citizens or subjects of a government at war with the sovereign. *See* Blackstone, at 271 (*401) (discussing a "foreigner" who becomes an "alien enemy" "after[ ] a war breaks out between his country and ours"); Kent, at 38-39. All other citizens or subjects of a country at peace with the sovereign were *alien friends*, sometimes called aliens in amity or aliens in league. *See* 1 BLACKSTONE, at 239 (*360) (contrasting alien enemies with "alien-friends," that is, foreigners whose countries are "in peace with ours"); Kent, at 38. These

7

distinctions were also part of the law of nations. *See, e.g.,* Emer de Vattel, *The Law of Nations*, ch. V, § 69, at 509 (London, 2d ed., 1763) (Petter Korkman reprint ed., 2006).

In 1798, it was also well understood that several legal disabilities accompanied a noncitizen's status as an "alien enemy." Those included bans on trading, contracting, and partnerships between U.S. citizens and alien enemies. *See* Kent, at 39-42, 44-45. The government could also confiscate the property of alien enemies, and, in some circumstances under the law of that time, alien enemies could not access the courts to seek protection of the laws. *Id.* at 40, 44. In addition, the government had the right to detain, exclude, or remove alien enemies from the country. *Id.* It was understood that nations possessed these authorities over citizens or subjects of an enemy nation during wartime as a matter of national sovereignty and self-defense. *See id.* at 40–42, 44–45. To give one example, in a concurring opinion in a case arising out of the War of 1812 with Britain, Chief Justice Marshall summarized the longstanding, black-letter law on the government's power to remove alien enemies as follows:

> "The right of the citizens or subjects of one country to remain in another, depends on the will of the sovereign of that other … *When war breaks out*, the subjects of one belligerent in the country of the other are considered as *enemies*, and have no right to remain there."

*The Venus*, 12 U.S. (8 Cranch) 253, 290-91 (1814) (emphasis added).

8

At its core, alien enemy status and the legal disabilities associated with it depended upon whether war existed between nations.  If a state of war existed, all citizens of the hostile nation were categorically considered alien enemies, regardless of whether any particular noncitizen actually threatened the country.  *See The Rapid*, 12 U.S. (8 Cranch) 155, 161 (1814) (stating that in a state of public war, "[e]very individual of the one nation must acknowledge every individual of the other nation as his own enemy because the enemy of his country"); *The Julia*, 14 F. Cas. 27, 30 (C.C.D. Mass. 1813) (Story, J.) ("By the war, every subject is placed in hostility to the adverse party.").  By contrast, without war between nations, noncitizens were considered "alien friends" under common law and international law.  *See, e.g.*, *The Report of 1800, [7 January] 1800*, Founders Online, National Archives (drafted by James Madison).  It was thus clearly established that alien enemy status and its attendant disabilities "exist[ed] only in wartime."  *See Hamilton v. Eaton*, 11 F. Cas. 336, 338 (C.C.D. N.C. 1796) (Sitgreaves, J.).

Legislation and treaties that predate the AEA provide further evidence of the well-understood linkage between war and alien enemy status.  For example, shortly before the AEA passed in 1798, Congress revised the naturalization statute to prohibit naturalization of any "alien, who shall be a native, citizen, denizen or subject of any nation or state with whom the United States *shall be at war*, at the time of his application."  Naturalization Act of 1798, ch. 54, § 1, 1 Stat. 566, 567 (emphasis

9

added).  Early treaties also referred to alien enemy status arising when "war" broke out, and they granted citizens of hostile nations time to wrap up their affairs and voluntarily depart the U.S. before facing consequences from their new alien enemy status.[3]  Indeed, the AEA expressly referenced and incorporated these treaties, showing Congress's desire to codify, not change, preexisting law respecting alien enemies.  *See* AEA § 1.

### B.     U.S. Courts Applied Well-Recognized Principles of Alien Enemy Law to Noncitizens During Times of War.

After the adoption of the Constitution, U.S. federal courts applied the legal disabilities associated with alien enemy status consistent with longstanding principles of international law.  In the 1780s and 1790s, courts often adjudicated suits by British creditors seeking to recover debts from Americans undertaken prior to the American Revolutionary War.  For example, in a case decided in the U.S. circuit court in Virginia in 1793, Justice James Iredell made clear that a British creditor could only be considered an "alien enemy" (and thus barred from suing the debtor) if the United States was presently "in a state of War" with Britain.  *Ware v.*

---

[3] *See, e.g.,* Treaty of Amity and Commerce, art. 20, U.S.-Fr., Feb. 6, 1778, 8 Stat. 12, 24 ("[I]f a war shall break out between the said two nations …."); Treaty of Amity and Commerce, art. 22, U.S.-Swed., Apr. 3, 1783, 8 Stat. 60, 72 ("[I]n case a war should break out between the said two nations …."); Treaty of Amity and Commerce, art. 23, U.S.-Pruss., Sep. 10, 1785, 8 Stat. 84, 94 ("If war should arise between the two contracting parties …."); Treaty of Friendship, Limits, and Navigation, art. 13, U.S.-Spain, Oct. 27, 1795, 8 Stat. 138, 144 ("[I]f a war shall break out between the said two Nations ….").

*Hylton*, 3 U.S. (3 Dall.) 199, 262 (1796).  In doing so, Justice Iredell rejected an argument from the debtors' lawyers—which included John Marshall—that the creditor "is an Alien Enemy" because "a War in fact tho' not in name subsists" due to Britain's alleged breaches of the 1783 peace treaty that ended the Revolutionary War.  *See id.*

In the same case on circuit, Chief Justice John Jay agreed that British subjects were not alien enemies as to the United States in 1793.  According to Jay, alien enemy status turned on being "actually at war" and he further explained that:

> "[t]here is a wide distinction between a power who is unfriendly and inimical to, and a power actually at war with the United States, and they with him.  There is, also, a wide distinction between the existence of causes which would justify a war, and the existence of actual war in consequence of them."

7 *Documentary History of the Supreme Court of the United States, 1789-1800,* at 292, 293 (Maeva Marcus ed., 2003).

In late 18th and early 19th centuries, many federal and state court decisions similarly recognized that alien enemy status (1) arose during wartime, (2) could be adjudicated by courts, and (3) imposed a variety of legal disabilities on the subjects or citizens of the enemy foreign nation, consistent with longstanding common law and the law of nations.  *See, e.g.*, *The Adventure*, 12 U.S. (8 Cranch) 221, 228 (1814) (indicating that British subjects cannot make a claim in a U.S. court sitting in prize during the war between the United States and Great Britain); *Fairfax's Devisee v.*

11

*Hunter's Lessee*, 11 U.S. (7 Cranch) 603, 620 (1812) ("During the war, the property of alien enemies is subject to confiscation *jure belli*, and their civil capacity to sue is suspended."); *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 248, 254 (1796) (seriatim opinion of Paterson, J.) (stating that a British creditor was an "alien enemy" during the Revolutionary War and that by "the law of nations" "the confiscation of debts, which were contracted by individuals of the enemy in time of war" is allowed, although the actual practice of commercial nations has been milder); *The Julia*, 14 F. Cas. at 29-30 (Story, J., stating that "[I]n war all intercourse between the subjects and citizens of the belligerent countries is illegal, unless sanctioned by the authority of the government, or in the exercise of the rights of humanity," and "trading with the enemy is prohibited"), *aff'd*, 12 U.S. (8 Cranch) 181 (1814).

## C. Because Alien Enemy Status Was Incidental to War, Congress Controlled When It Applied.

The recently enacted Constitution and its allocation of warmaking powers also provides a backdrop for Congress's debates over the AEA in 1798. In the Founding era, political and legal elites near-unanimously agreed that the Constitution granted Congress the sole power to decide whether to initiate war with a foreign adversary. *See* Michael D. Ramsey, *Textualism and War Powers*, 69 U. Chi. L. Rev. 1543, 1545-46 (2002); Saikrishna Prakash, *Unleashing the Dogs of War: What the*

*Constitution Means by "Declare War"*, 93 CORNELL L. REV. 45, 67-94 (2007).[4]  The founding generation understood that Congress's constitutional power to "declare war" included both formal written declarations of war and less-formal authorizations for the President to declare war by deeds, *i.e.*, by initiating a military attack on a foreign enemy.  *See, e.g.*, Ramsey, at 1543.  Congress's authority also included the power to determine whether to authorize full-scale war or more limited hostilities. *See, e.g.*, *Talbot v. Seeman*, 5 U.S. (1 Cranch) 1, 28 (1801) (holding, in a case about the legality of a privateer's prize seizure during the limited maritime war with France, that "[t]he whole powers of war being by the constitution of the United States, vested in congress, the acts of that body can alone be restored [*sic*] to as our guides in this enquiry").

Attendant to its warmaking powers, Congress also had authority to control what measures would be taken against enemy citizens and their property during war. In a decision dating from the War of 1812, for example, the Supreme Court ruled that the existence of a state of war triggers the U.S. government's "full right to take the persons and property of the enemy wherever found." *Brown v. United States*, 12

---

[4] *See also Americanus No. 1* (Jan. 31, 1794) (Alexander Hamilton), *reprinted in* 15 *The Papers of Alexander Hamilton* 669, 669 (Harold C. Syrett & Jacob E. Cooke eds., 1969) ("[T]o become volunteers in the war is a question, under our constitution, not of Executive, but of Legislative cognizance.  It belongs to Congress to say – whether the Nation shall of choice dismiss the olive branch and unfurl the banners of War").

U.S. (8 Cranch) 110, 122-23, 126 (1814). But under the Constitution, the Court explained, there must be "some existing law" of Congress to authorize such actions because only Congress had the power to "declare war" and to "grant letters of marque and reprisal [and] make rules concerning captures on land and water." *Id.* (quoting U.S. Const., art. I, § 8, cl. 11). Indeed, in that decision, Chief Justice Marshall noted that the AEA reflected the constitutional principle that express authorization from Congress was required before the President could take action against alien enemies, and that mere assertions that a state of war existed were not enough. *See id.* at 126.

Judicial authority prior to 1798 confirms the view that Congress controlled when alien enemy status was triggered. As mentioned above, in *Ware v. Hylton*, both Chief Justice Jay and Justice Iredell rejected the suggestion that alleged British violations of a 1783 peace treaty revived alien enemy status for British subjects in 1793. According to Justice Iredell, there had been no "Declaration that we are in a state of War from that part of the Sovereignty of the Union to which that important subject is committed," namely "Congress." DHSC at 266, 268; *see also id.* at 294-95 (Jay. C.J.) (holding that courts must decide whether British subjects were again alien enemies by reference to the actions of "the power vested with the right to war," *i.e.*, Congress). These decisions by Justices Jay, Iredell, and Marshall in *Ware* and *Brown* not only recognize that Congress alone controlled the triggering of alien

enemy status through use of its war powers, but also demonstrate that courts played a vital role in determining when legal consequences attendant to that status applied in adjudicating individual cases and controversies.

## II. Legislative Debates About the AEA Show That Congress Understood the AEA to Codify Existing Law, not Reshape it.

The legislative history of the AEA reflects continuity with—not change from—these preexisting understandings of international law and constitutional structure. Debates in the House of Representatives[5] suggest that the AEA was designed to codify established legal principles that governed the treatment of alien enemies during wartime, not to expand presidential authority beyond them. Far from broadly delegating power, Congress rejected several attempts to allow the President to invoke the AEA outside of formal military conflicts, except in situations where war with another sovereign was imminent. In doing so, Congress preserved the historical link between alien enemy status and its own warmaking powers.

This conservative legislative approach ultimately allowed the AEA to attract support from both Federalists and Republicans, even though the parties had vastly different views on policy toward the French during the Quasi-War. Moreover, Congress's bipartisan support for the AEA stands in sharp contrast to the bitter debates between Federalists and Republicans over the Aliens Friends Act ("AFA"),

---

[5] Unlike House proceedings, Senate debates were not recorded.

15

which broadly delegated power and discretion to the President to detain and remove noncitizens outside of wartime based upon individualized determinations of dangerousness. Differences in the legislative history of these two contemporaneous statutes likewise show that the Congress viewed the AEA as a more narrow and limited delegation of power to the executive that, unlike the AFA, applied only during periods of declared or imminent war between sovereigns.

**A.  Legislative Debates Show that the AEA Constrains Executive Authority Within Conventional Limits During Wartime.**

House debates about the AEA proceeded against the backdrop of both longstanding principles of international law and the separation of powers set forth in the newly enacted Constitution. *Supra* § I. Those debates show that Congress carefully drafted to the AEA protect its own constitutional power to declare war, rather than broadly delegating that authority to the President.

As an initial matter, the express language of the AEA makes clear that it can be invoked only during a "declared war" or when offensive military actions by a foreign nation have either created a state of war or would do so imminently. These narrow strictures show that Congress did not intend to allow the President to thrust the country toward a state of war by designating a foreign country's nationals as enemy aliens as a purely discretionary matter of policy. *See* AEA § 1 (discussing a "declared war between the United States and *any foreign nation or government*" or an "invasion or predatory incursion" that is "perpetrated, attempted, or threatened

16

against the territory of the United States by *any foreign nation or government*");
Kent, at 66-74 (discussing Congress's deliberations); *id*. at 54-66, 72-74 (discussing
the meaning of the key statutory terms).

Additionally, during the drafting process, Congress rejected multiple attempts
to broaden the AEA's language beyond this traditional wartime context. Three
Federalist members of Congress proposed amendments would have allowed the
President to detain and remove noncitizens in the event that (1) the United States
and a foreign government "shall be at war"; (2) a foreign government "shall
authorize hostilities against the United States;" or (3) a foreign government "shall
declare hostility against the United States." 8 Annals of Cong. 1573, 1581 (1798)
(motions of Nathaniel Smith, Connecticut; Harrison Gray Otis, Massachusetts; and
Samuel Sitgreaves, Pennsylvania).

Republican members of Congress objected to these proposals, particularly the
latter two. One member argued that "hostility" was too vague a term and allow the
president to invoke alien-enemies powers outside of wartime. *See id.* at 1581-82
(statement of Albert Gallatin). The terms "hostility" and "hostilities" were very
commonly used at the time to refer both to full war and, somewhat more frequently,
partial or limited war. *See* Kent, at 20-21, 23, 31-33, 45-46, 48-49, 60-63. Another
Republican member argued that "it might be said [by the President that] hostilities
were authorized when no war was declared, and these people [noncitizens now

17

deemed alien enemies] might be treated as if the nation from which they came was at war with us, when no war existed." *Id*. at 1573 (statement of Joseph McDowell, North Carolina). And yet another Republican warned that the proposed amendments could lead to "[m]any cases [being] deemed hostility by the President," a momentous step he believed the government "ought not to [take]" as two nations teetered on the brink of war. *Id*. at 1574 (statement of Abraham Venable).

Republican criticism of the amendments was bolstered by an unexpected source: Samuel Sewall, the Federalist from Massachusetts who led the drafting of the AEA. In House debates, Sewall echoed Republicans' concerns that the proposed amendments' vagueness risked undue executive discretion. According to Sewall, the amendments ran afoul of the constitutional principle that "it is an act of Congress to declare war, [and] we could not be considered as at war until Congress declared us to be in such a state, except war was declared against us." *Id*. at 1574. Speaking to the country's brewing conflict with France, Sewall acknowledged that "[t]oo many circumstances of insult and aggression … had been experienced by this country from a foreign Power, which might have been understood" as sufficient to trigger a presidential invocation of the AEA under the proposed amendments. *Id*. at 1574-75. Sewall cautioned that the amendments' "indefinite provisions" were "particularly dangerous" because, if invoked by the executive, the designation of all French immigrants as "alien enemies" might trigger retaliation against Americans

living in France, edging the nations closer to *de facto* war without the deliberation of Congress. *Id.* Accordingly, Sewall urged his colleagues to adopt a version of the AEA that was "as well guarded and definite as possible." *Id.* at 1574. Ultimately, despite their fierce disagreements on other matters, moderate Federalists joined Republicans in rejecting these three broadening amendments.

Legislative debates also show that the terms "predatory incursion" and "threatened" in the AEA were not inconsistent with Congress's intent to link alien enemy status to its own constitutional war powers. At a later stage of the House debates, a Federalist member of Congress, Robert Harper, raised the concern that the term "predatory incursion" was too broad and should be stricken. According to Harper, the law gave the President "very extensive" power, which he did not think "ought to be given except in case of serious attack." *Id.* at 1786. Though the *Annals of Congress* contain limited detail on the subsequent exchange, Sewall apparently spoke "a few words in opposition" to Harper's motion, and Harper withdrew it, admitting "he had not rightly understood the section." *Id.* Sewall likely assured Harper that a "predatory incursion" indeed amounted to a "serious attack" by an enemy nation, persuading him that the AEA kept the President's authority within its traditional bounds. *See* Kent, at 5, 18, 29-34, 61-66, 73-74 (discussing contemporaneous uses of "predatory incursion" that support this interpretation).

The term "threatened" similarly was not understood to broadly delegate power to the executive outside of the wartime context.  At the time, news from abroad—for instance a French fleet leaving port for a potential U.S. invasion—traveled very slowly across the ocean.  Moreover, Congress was often out of session, and it could not assemble rapidly given the means of transportation available at the time.  Accordingly, members of Congress recognized that the President might need to protect the United States some time before any enemy nation's invading military actually "landed in our country."  8 Annals of Cong. 1575 (1798) (statement of Harrison Gray Otis, Massachusetts-Federalist); *see also* Act of May 28, 1798, ch. 47, 1 Stat. 558 (creating a detailed framework for President Adams to raise a "provisional army" to defend against a possible French invasion during the upcoming Congressional recess).  The AEA's limited delegation of preemptive power on the eve of a "threatened" war was thus consistent with both Congress's war-making authority and principles of alien enemy status under preexisting law, not a radical departure from them.[6]

Nor do other statements of House members referenced by the dissent suggest that Congress intended the AEA to depart from the preexisting law on alien enemy

---

[6] The Senate's proposed amendments to the House bill did not concern any of the language disputed today about "invasion" or "predatory incursion."  National Archives Microfilm Publication M1704, Unbound Records of the U.S. Senate, Fifth Congress, 1797-1799, Roll 1: Records of Legislative Proceedings, Target 4, House of Representatives' Bills Considered in the Senate, SEN 5A-C1.

status during times of war.  *See W.M.M. v. Trump*, 154 F.4th 207, 245-46 (5th Cir. 2025) (Oldham, J. dissenting).  Most of the discussions cited by the dissent occurred early in the drafting process.  In early May, Sewall's drafting committee introduced the first framework for what became the AEA.  The committee's draft proposed to trigger alien enemy status if a foreign country "shall declare war against the United States, or shall threaten, attempt, or perpetrate an any invasion or predatory incursion."  8 ANNALS OF CONG. 1566-67 (May 1, 1798).

Some hardline Federalists thought this language did not go far enough.  But they did not say that Sewall's proposal needed to "expand[ ]" the definition of alien enemies "beyond 'perfect' wars," as the dissent summarizes their views.  *W.M.M.*, 154 F.4th at 245 (Oldham, J., dissenting).  Instead, they proposed two main changes.  First, they wanted to trigger the AEA either when a foreign government "shall be at war" or "shall authorize hostilities" against the United States.  8 ANNALS OF CONG. 1573 (motions of Otis and Smith); *id*. at 1577 (Sitgreaves in support). As discussed above, the Congress rejected these proposals. *Supra* 18-19.  Second, they proposed what would represent an entirely different bill, one authorizing executive action against suspicious or dangerous aliens of any nationality regardless of whether a state of war existed with the alien's home country.  8 ANNALS OF CONG. 1578 (statement of Allen).  The House also rejected that demand, but a bill proposing similar policies later was introduced in the Senate and ultimately became the AFA.

21

In short, although certain Federalists pushed to expand the committee's early draft, their specific proposals did not influence the AEA in the way the dissent suggests. Moreover, those Federalists' concerns about the need for executive authority over foreign "agents and spies" outside of wartime were ultimately addressed by the AFA, when that separate bill was later introduced in the Senate.

Ultimately, the AEA passed the fifth Congress with support from both Federalists and Republicans. Despite their vast political and policy disagreements with Federalists during the Quasi-War, Republicans "had no objection to a well-drawn bill governing the control of enemy aliens" during wartime. James Morton Smith, *Freedom's Fetters: The Alien and Sedition Laws and American Civil Liberties* 35 (1956). As discussed below, this bipartisan support for the AEA contrasts sharply with fierce partisan debates over the AFA, which allowed the President to detain and remove any noncitizen determined to be dangerous, regardless of whether a state of war existed with between nations.

### B. The AEA's Broad Bipartisan Support, In Sharp Contrast to the Contemporaneous Partisan Opposition to the Alien Friends Act, is Evidence of Its Continuity with Existing Law

While the AEA codified principles of existing law respecting alien enemies during times of war, Federalist members of Congress advanced a different bill to address perceived threats from dangerous noncitizens during times of peace, the Alien Friends Act ("AFA"). The AFA's scope far exceeded that of the AEA. It

22

allowed the President to order any alien to leave the country without regard to the alien's country of origin during either war or peacetime. An Act Concerning Aliens, ch. 58, 1 Stat. 570 (June 25, 1798). To do so, the President merely needed to determine that the alien was "dangerous to the peace and safety of the United States," or that he had "reasonable grounds to suspect" that the alien was "concerned in any treasonable or secret machinations against the government." *Id.*

The same Republicans who supported the AEA opposed the AFA's more expansive delegation of power to the executive. Republicans also criticized the AFA because it could be invoked during peacetime and against citizens of friendly or neutral nations, which they believed was inconsistent with the law of nations and beyond Congress's war-making powers under the Constitution. *See , e.g.,* 8 Annals of Cong. 1955 (1798) (statement of Albert Gallatin). Regardless of whether these objections were correct, they show that Republicans had grave concerns about broadly delegating power to the President under the AFA, even as many of them supported a narrower, wartime delegation of power to the executive in the AEA.

This makes sense, given the vastly different structures of the two laws. The AEA was categorical: During wartime, all noncitizens over fourteen from a hostile nation are subject to removal under the AEA without any individualized determination of their dangerousness. By contrast, the AFA allowed the President to make highly discretionary determinations about whether particular noncitizens

23

were "dangerous to the peace and safety of the United States," regardless of whether a state of war existed between sovereign nations. Whereas Republicans viewed the former as a narrowly prescribed executive enforcement of Congress's own decision to go to war, they deemed the latter an unconstitutional delegation of authority without meaningful checks on the executive's discretion.

These politically-salient distinctions between the AEA and the AFA would have vanished if the AEA were understood in 1798 have the meaning the administration now assigns to it. Indeed, by designating only specific Venezuelan nationals as "alien enemies" (*i.e.*, only alleged members of Tren de Aragua) based upon their individualized dangerousness, the administration now wields the AEA as though it actually were the AFA, even though the latter statute expired in 1800.[7]

## III. Post-Enactment History Confirms That the AEA Represented Continuity with Preexisting Law, Not a Radical Break From It.

After the AEA passed, the Adams administration did not invoke it during the Quasi-War with France. The administration's refusal to classify French nationals as alien enemies in response to France's maritime hostilities provides yet more evidence that the AEA applied only in declared wars or where U.S. territory was invaded and such a declaration was imminent, consistent with preexisting law.

---

[7] Put in contemporary terms, the administration now wields the AEA as if it were the many other provisions of the Immigration and Nationality Act that allow the exclusion and deportation of dangerous noncitizens.

Indeed, no President would invoke the AEA until the War of 1812 was declared and British troops invaded the United States.

The Adams administration's decision not to invoke the AEA during the Quasi-War suggests that the ongoing naval hostilities with France had not yet satisfied the wartime conditions required by the statute.  For example, the Government's most senior lawyer—Attorney General Charles Lee—wrote a legal opinion to Secretary of State Timothy Pickering about how to respond to the French threat "having taken into consideration … the laws of Congress passed last session[.]"  1 Op. Att'y Gen. 84 (1798).  Notably, despite the Attorney General's conclusion that there was "a maritime war authorized by both nations," he wrote that only those French citizens actually acting for the French government should be "treated as an enemy, and confined as a prisoner of war."  *Id.*  In a conspicuous omission, Lee did not suggest that *all* French citizens could be considered "alien enemies" under the AEA. Congress apparently agreed with that judgment.  Just after the AEA passed, Congress authorized the treatment of French persons "found acting on board any French armed vessel" as prisoners of war.  Act of July 9, 1798, ch. 68, § 8, 1 Stat. 578.  But neither the Congress—by declaring war—nor the President—by a proclamation under the AEA—took the further step of designating that *all* French nationals within the United States were alien enemies during the Quasi-War.

25

The sporadic use of the AEA over the next two centuries reinforces this close link between a declared (or imminent) war and alien enemy status. Before 2025, the AEA had only been used three times: the War of 1812 against Great Britain, World War I, and World War II, each time after or days before Congress formally declared war. The AEA was not invoked during the 20th and 21st Century foreign conflicts in Korea, Vietnam, Iraq, and Afghanistan, perhaps because its triggering conditions, *i.e.*, a declared war, attempted or threatened invasion, predatory incursion into U.S. territory were not satisfied. If adopted, the current administration's novel interpretation of the AEA would mark the first time in more than two centuries that President's authority under the AEA was invoked when its triggers have not unambiguously been met.

## CONCLUSION

For the reasons stated above, *amicus* believes this Court should affirm the panel decision.

Respectfully submitted,

Brandon R. Gould
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC  20001-4956
(202) 662-6000

*Attorney for Amici*

Dated: November 13, 2025

**CERTIFICATE OF SERVICE**

I, Brandon Gould, certify that on November 13, 2025, I electronically filed this brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Brandon R. Gould*
Brandon R. Gould

**CERTIFICATE OF ELECTRONIC COMPLIANCE**

I, Brandon Gould, hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,344 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point, Times New Roman font.

Dated: November 13, 2025

*/s/ Brandon R. Gould*
Brandon R. Gould