No. 25-10534

# United States Court of Appeals for the Fifth Circuit

W.M.M., F.G.M., and A.R.P. et al.,

*Petitioners-Appellants,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States,* et al.,

*Respondents-Appellees*

On Appeal from the United States District Court
for the Northern District of Texas
No. 1:25-CV-59

**BRIEF OF THE BRENNAN CENTER FOR JUSTICE, THE CATO INSTITUTE, AND PROFESSORS OF LAW ILYA SOMIN, JOHN DEHN, AND GEOFFREY CORN AS AMICI CURIAE IN SUPPORT OF PETITIONERS-APPELLANTS**

Gregory L. Diskant
Aron Fischer
Emma Ellman-Golan
Isaac Weingram
Anna Blum
PATTERSON BELKNAP WEBB & TYLER
1133 Avenue of the Americas
New York, New York 10036
Phone: (212) 336-2000
gldiskant@pbwt.com

Leah J. Tulin
Katherine Yon Ebright
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
Phone: (202) 650-6397
tulinl@brennan.law.nyu.edu

Ilya Somin
Professor of Law
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
Phone: (703) 993-8069
isomin@gmu.edu

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for amici curiae certifies that, in addition to those listed in Appellants' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Amici:*

(1)  The Brennan Center for Justice at NYU School of Law;

(2)  The Cato Institute;

(3)  Ilya Somin;

(4)  John Dehn; and

(5)  Geoffrey Corn.

None of amici have any parent corporations and no publicly held company owns 10% or greater ownership in any of amici.

**Counsel for Amici**: Leah J. Tulin and Katherine Yon Ebright of the Brennan Center for Justice; Professor Ilya Somin of the Antonin Scalia Law School; and Gregory L. Diskant, Aron Fischer, Emma Ellman-Golan, Isaac Weingram, and Anna Blum of Patterson Belknap Webb & Tyler LLP.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ......................................................................ii

INTEREST OF AMICI CURIAE ............................................................. 1

SUMMARY OF ARGUMENT.................................................................. 2

ARGUMENT .......................................................................................... 3

I.   The Proclamation Is Manifestly Unlawful. ................................... 3

    A.   The AEA's text, context, and history establish that it is a wartime authority only............................................................ 3

    B.   The Proclamation improperly applies the AEA in peacetime.................................................................................. 12

II.  AEA Proclamations Are Subject to Judicial Review. .................... 18

    A.   Courts may review the Proclamation as a "manifestly unauthorized exercise of power" even if AEA invocations typically involve political questions. ................ 21

    B.   The judiciary's power is at its height because individual liberties are threatened. ..................................... 23

    C.   Judicially manageable standards allow courts to identify manifestly unauthorized exercises of wartime powers.................................................................................. 26

III. The Government's Interpretation of the AEA Could Have Dire Consequences. ....................................................................... 30

    A.   The government's arguments could allow the AEA to be used against any group of immigrants. ............................... 30

    B.   The government's interpretation of "invasion" could subvert the federal-state balance of war powers and threaten habeas corpus protections.................................... 31

CONCLUSION...................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Al-Warafi v. Obama,*
No. 09-2368, 2015 WL 4600420 (D.D.C. July 30, 2015),
*vacated and appeal dismissed as moot,* No. 15-5266 (D.C.
Cir. Mar. 4, 2016) ........................................................................ 28–29

*Baker v. Carr,*
369 U.S. 186 (1962) ....................................................................... *passim*

*Bas v. Tingy,*
4 U.S. 37 (1800) ......................................................................... 10, 12

*Bostock v. Clayton Cnty.,*
590 U.S. 644 (2020) ............................................................................. 4

*Boumediene v. Bush,*
553 U.S. 723 (2008) .................................................................... 24, 32

*California v. United States,*
104 F.3d 1086 (9th Cir. 1997) ......................................................... 29

*Chastleton Corp. v. Sinclair,*
264 U.S. 543 (1924) .......................................................................... 23

*Clarke v. Morey,*
10 Johns. 69 (N.Y. 1813) ................................................................... 9

*Dalton v. Specter,*
511 U.S. 462 (1994) .......................................................................... 19

*Duncan v. Kahanamoku,*
327 U.S. 304 (1946) .......................................................................... 17

*Ebel v. Drum,*
52 F. Supp. 189 (D. Mass. 1943) ...................................................... 22

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006) .................................................................... 17, 22

ii

*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004) ................................................................ 21, 24

*J.A.V. v. Trump,*
    781 F. Supp. 3d 535 (S.D. Tex. 2025) .............................................. 5, 7

*J.G.G. v. Trump,*
    No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025),
    *vacated on other grounds,* 604 U.S. 670 (2025) .......................... 5, 7, 29

*J.O.P. v. U.S. Dep't of Homeland Sec.,*
    No. 25-1519, 2025 WL 1431263 (4th Cir. May 19, 2025) ................ 5, 7

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ................................................................ 12, 18

*Koohi v. United States,*
    976 F.2d 1328 (9th Cir. 1992) ......................................................... 27

*Little v. Barreme,*
    6 U.S. 170 (1804) ............................................................................. 22

*Lockington's Case,*
    1 Brightly 269 (Pa. 1813) ................................................................. 9

*Ludecke v. Watkins,*
    335 U.S. 160 (1948) .......................................................................... 18

*Martin v. Mott,*
    25 U.S. 19 (1827) .............................................................................. 19

*McAllister v. Att'y Gen.,*
    444 F.3d 178 (3d Cir. 2006) ............................................................. 16

*Ex parte Milligan,*
    71 U.S. 2 (1866) ................................................................................ 22

*Mitchell v. Laird,*
    488 F.2d 611 (D.C. Cir. 1973) ......................................................... 28

*Mochizuki v. United States,*
    43 Fed. Cl. 97 (1999) ........................................................................ 25

iii

*Padavan v. United States,*
  82 F.3d 23 (2d Cir. 1996) ................................................................ 29

*Pan Am. World Airways v. Aetna Cas. & Sur. Co.,*
  505 F.2d 989 (2d Cir. 1974) .................................................... 27–28

*Prize Cases,*
  67 U.S. 635 (1862) ............................................................... 19, 28

*Rucho v. Common Cause,*
  588 U.S. 684 (2019) .................................................................. 23

*In re September 11 Litig.,*
  751 F.3d 86 (2d Cir. 2014) ..................................................... 17, 27

*Sterling v. Constantin,*
  287 U.S. 378 (1932) ............................................................. 20, 21

*United States v. Abbott,*
  110 F.4th 700 (5th Cir. 2024) .................................................. 5, 21

*United States v. Sandoval,*
  231 U.S. 28 (1913) .................................................................. 21

*United States v. Shell Oil Co.,*
  294 F.3d 1045 (9th Cir. 2002) .................................................... 28

*United States v. Zubaydah,*
  595 U.S. 195 (2022) ........................................................ 22, 25–26

*Ware v. Hylton,*
  3 U.S. 199 (1796) ..................................................................... 9

*Yates v. United States,*
  574 U.S. 528 (2015) ................................................................... 8

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl. 2 ...................................................... 32

U.S. Const. art. I, § 10 ........................................................ 4, 31

**Statutes**

8 U.S.C. § 1227(a)(4)(B).................................................................16

8 U.S.C. § 1231(b)(3)(A).................................................................25

8 U.S.C. §§ 1531–37.....................................................................16

50 U.S.C. § 21.....................................................................3–4, 8, 19, 30

50 U.S.C. § 22..............................................................................8

50 U.S.C. §§ 1541 *et seq.*............................................................15

Act of Feb. 20, 1800, ch. 9, 2 Stat. 7..........................................4

Act of Jan. 2, 1812, ch. 11, 2 Stat. 670.......................................4

Act of Sept. 29, 1789 § 5, ch. 25, 1 Stat. 95................................7

Alien Friends Act, 1 Stat. 570 (1798)........................................8–9

Anti-Terrorism Act, 18 U.S.C. § 2336(a)....................................26

Civil Liberties Act of 1988, Pub. L. No. 100-383, 102 Stat. 903 (1988).....................................................................25

Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607(b)(2) ............................26

Federal Torts Claims Act, 28 U.S.C. § 2680(j).............................26

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681-761 ..........................................25

Wartime Violation of Italian American Civil Liberties Act, Pub. L. No. 106-451, 114 Stat. 1947 (2000)...........................25

**Legislative Materials**

8 Annals of Cong. 1573–82 (1798)................................................6

8 Annals of Cong. 1576 (1798) ...................................................10

8 Annals of Cong. 1786 (1798) ................................................................ 6

8 Annals of Cong. 1790 (1798) ........................................................ 7, 10

8 Annals of Cong. 1980 (1798) ................................................................ 9

American Sovereignty Protection Act, H.R. 6941, 96th Cong.
   (1980) ............................................................................................ 15

*Annual Worldwide Threats Assessment: Hearing Before H.
   Permanent Select Comm. on Intel.*, 119th Cong. (2025) .................... 17

H.R. Rep. No. 93-287 (1973) .................................................................. 15

J. Res. 8, 13th Cong. (1815) .................................................................... 4

*Reclaiming Congress's Article I Powers: Counterterrorism
   AUMF Reform: Hearing Before H. Comm. on Foreign
   Affs.*, 118th Cong. 30 (2023) (statement of Rich Visek,
   Acting Legal Adviser, U.S. Dep't of State) .................................. 13–14

**Other Authorities**

*Invocation of the Alien Enemies Act Regarding the Invasion
   of the United States by Tren de Aragua*, 90 Fed. Reg.
   13033 (Mar. 14, 2025) ............................................................... *passim*

Presidential Proclamation 1364, 40 Stat. 1650 (Apr. 6, 1917) .............. 11

Presidential Proclamation 2525, 6 Fed. Reg. 6321, 55 Stat.
   1700 (Dec. 7, 1941) .................................................................... 11, 30

Presidential Proclamation 2526, 6 Fed. Reg. 6323, 55 Stat.
   1705 (Dec. 8, 1941) .................................................................... 11, 30

Presidential Proclamation 2527, 6 Fed. Reg. 6324, 55 Stat.
   1707 (Dec. 8, 1941) .................................................................... 11, 30

Treaty of Paris, Sept. 3, 1783, 8 Stat. 80 ................................................ 8

Treaty with the Apaches, July 1, 1852, 10 Stat. 979 .............................. 7

**Secondary Sources**

Amanda L. Tyler, *Habeas Corpus and the American Revolution*, 103 Calif. L. Rev. 645 (2015) ........................... 32

Amanda L. Tyler, *Suspension as an Emergency Power*, 118 Yale L.J. 600 (2009) .......................................................... 32

Circular from James Monroe to the Secretary of the Mississippi Territory (July 11, 1812), *in* Mississippi Dep't of Archives & History, *available at* https://perma.cc/RY6D-BETN ........................................... 11

David J. Bier, *U.S. Citizens Were 89% of Convicted Fentanyl Traffickers in 2022*, Cato at Liberty (Aug. 23, 2023), https://perma.cc/H8MF-NCDE ........................................... 32

Ellen Nakashima & Noah Robertson, *Trump Administration Tells Congress War Law Doesn't Apply to Cartel Strikes*, Wash. Post (Nov. 1, 2025), https://perma.cc/9T2A-VBMT ................ 14

Emmerich de Vattel, The Law of Nations (1758) .................................... 9

Exec. Comm., Int'l Law Ass'n, *Final Report on the Meaning of Armed Conflict in International Law* (2010), https://perma.cc/4G5G-6837 .............................................. 14

Harvey Strum, *Jewish Internees in the American South, 1942-1945*, 42 Am. Jewish Archives 27 (1990).................................. 30

Ilya Somin, *Immigration is Not Invasion* (Geo. Mason Public Law Res. Paper No. 25-19, Nov. 7, 2025), https://perma.cc/A25D-E9LE ....................................... 4, 5, 8

James Kent, 1 Commentaries on American Law (1826) ....................... 12

James Madison, *The Report of 1800,* Founders Online (Jan. 7, 1800), https://perma.cc/E73C-5TN8 ........................................ 5, 9

James Morton Smith, *The Enforcement of the Alien Friends Act of 1798*, 41 Miss. Valley Hist. Rev. 85 (1954) .............................. 11

John Adams, Address Before United States Congress (May 16, 1797), *in* Founders Online, https://perma.cc/GJJ8-2RB7 ................................................................................... 6

John Yoo, *What's Wrong with a Military Campaign Against the Drug Trade,* Wash. Post (Sept. 23, 2025), https://perma.cc/U67C-6VVE ............................................. 15

John Yoo, *Why Texas Cannot Treat Illegal Immigration as an 'Invasion',* Nat'l Rev. (Nov. 18, 2022), https://archive.is/BzABV ...................................................... 31

Joshua Braver & John Dehn, *Deference Due? Trump, the National Guard, and the Misuse of Martin v. Mott,* Volokh Conspiracy (Oct. 14, 2025), https://perma.cc/DXC6-8U9R .......... 19–20

Joshua Treviño, Tex. Pub. Pol'y Found., *The Meaning of Invasion Under the Compact Clause of the U.S. Constitution* (2022), https://perma.cc/F4XC-AVRP ............................. 8

Kathryn L. Einspanier, *Burlamaqui, the Constitution, and the Imperfect War on Terror,* 96 Geo. L.J. 985, 1007, 1012 (2008) ........................................................................ 10

Letter from Alan Parker, Assistant Att'y Gen., to Sen. Edward Kennedy (Aug. 2, 1980) (on file with authors) .................... 15

Letter from Gen. Henry Knox to Gov. Arthur St. Clair (Aug. 23, 1790), *in* 2 The St. Clair Papers 162 (1882) .................................. 7

Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798), *in* Founders Online, https://perma.cc/9ZLS-MGZP ................................................................... 5–6

Michael Schmitt, *Striking Drug Cartels Under the Jus ad Bellum and Law of Armed Conflict,* Just Sec. (Sept. 10, 2025), https://perma.cc/3K4L-SPCG ................................... 15

Nat'l Intel. Council, Venezuela: Examining Regime Ties to Tren de Aragua (Apr. 7, 2025), https://perma.cc/KGL6-QNC8 ............................................................................ 18

Off. of the Att'y Gen., *Guidance for Implementing the Alien Enemies Act* (Mar. 14, 2025), https://perma.cc/28MW-9MCB ............................................................................... 24

Rebecca Ingber, *Judicial Deference and Presidential Power Under the Alien Enemies Act*, Just Sec. (May 20, 2025), https://perma.cc/V9ZC-329R.................................................... 15–16, 22

Scott Dodson, *Article III and the Political Question Doctrine*, 116 Nw. U. L. Rev. 681 (2021) ........................................................... 20

U.S. Dep't of State, Bureau of Counterterrorism, *Foreign Terrorist Organizations*, https://perma.cc/WK4D-WNNV ................. 16

William H. Taft, IV, *Self-Defense and the Oil Platforms Decision*, 29 Yale J. Int'l L. 295 (2004)................................................ 13

## INTEREST OF AMICI CURIAE[1]

The Brennan Center is a nonpartisan public interest law institute that seeks to improve systems of democracy and justice. The Center has conducted extensive research on presidential emergency powers, including the Alien Enemies Act.

The Cato Institute is a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. The Institute has long focused on immigration policy and issues related to civil liberties.

Ilya Somin, John Dehn, and Geoffrey Corn are law professors with expertise in constitutional law, the law of war, and immigration law and policy. Additional information about amici Law Professors is included as an appendix to this brief.

---

[1] No counsel for a party authored this brief in whole or in part, and no party or its counsel made a monetary contribution intended to fund its preparation or submission. No person, other than amici curiae, their members, or their counsel, contributed money intended to fund preparing or submitting the brief. This brief does not purport to convey the position of New York University School of Law. All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The Alien Enemies Act of 1798 (AEA) is a wartime authority. Congress enacted the AEA under its constitutional war powers as an implementation of the law of war, which in 1798 allowed the detention or expulsion of "alien enemies." The AEA may be invoked only in a declared war or after an act of war undertaken by a foreign nation or government against U.S. territory. It has no peacetime applicability. Prior to 2025, the AEA's only invocation absent a declared war was after Japan's attack on Pearl Harbor, just days before Congress declared war.

The AEA's current invocation, *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13033 (Mar. 14, 2025) ("Proclamation"), falls well outside the law's scope. The Proclamation addresses unlawful migration, narcotics trafficking, and (in a passing mention) gang violence, none of which constitutes an "invasion" or "predatory incursion." Under no interpretation of the law of war could these civil and criminal matters trigger the AEA's exceptional powers. The designation of Tren de Aragua (TdA) as a foreign terrorist organization (FTO) does not transform its activities into acts of war.

The Proclamation is judicially reviewable. Nothing in the AEA precludes review, and courts may always check manifestly unauthorized exercises of power, even in cases involving political questions. The power of judicial review is at its apex when civil liberties are threatened. Courts have the power to correct the president's peacetime abuse of the AEA and can rely on the judicially manageable standards historically used to identify acts of war.

Should courts adopt the government's unfounded interpretation of the AEA or hold that the matter is judicially unreviewable, there could be dire consequences. The president could leverage the law's power against any group of immigrants. Congress could suspend the writ of habeas corpus and states could assert the power to "engage in War" at will.

## ARGUMENT

### I.    The Proclamation Is Manifestly Unlawful.

#### A.    The AEA's text, context, and history establish that it is a wartime authority only.

Congress authorized the AEA's use only in limited circumstances: times of declared war or an ongoing or threatened "invasion or predatory incursion" by a foreign nation or government against U.S. territory. 50

U.S.C. § 21. Although neither "invasion" nor "predatory incursion" is defined, these terms were readily understood in 1798 to refer to military attacks. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020) (using ordinary public meaning of terms to interpret statute). Indeed, the law's text, context, and history clarify that these terms refer to military activity under the law of nations, not civil or criminal activity.

Contemporaneous sources — the Constitution, acts of Congress, and Founding-era writings — consistently use "invasion" to refer to large-scale military attacks. Ilya Somin, *Immigration is Not Invasion* 14–29, 33–37 (Geo. Mason Public Law Res. Paper No. 25-19, Nov. 7, 2025), *available at* https://perma.cc/A25D-E9LE (reviewing use of "invasion" at Constitutional Convention, state ratifying conventions, debates over AEA, and *Federalist Papers*); *see, e.g.*, U.S. Const. art. I, § 10 (permitting states to "engage in War" when invaded); J. Res. 8, 13th Cong. (1815) (adopted) (lauding Louisiana for implementing State War Clause to repel British "invading army"); Act of Feb. 20, 1800, ch. 9, 2 Stat. 7 (authorizing enlistments if "war shall break out" or "imminent danger of invasion of their territory" is "discovered to exist"); Act of Jan. 2, 1812, ch. 11, 2 Stat. 670 (authorizing enlistments upon "actual or threatened invasion" and

subjecting enlistees to "rules and articles of war"); James Madison, *The Report of 1800,* Founders Online (Jan. 7, 1800), https://perma.cc/E73C-5TN8 (explaining, in report addressing Invasion Clause of Article IV, AEA, and Alien Friends Act, that "[i]nvasion is an operation of war").

Recognizing this original understanding, the panel majority joined other courts in concluding that "invasion" refers to a sizeable military attack. *See* Panel Opinion ("Op.") at 22; *see also J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8–10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring), *vacated on other grounds,* 604 U.S. 670 (2025); *J.O.P. v. U.S. Dep't of Homeland Sec.*, No. 25-1519, 2025 WL 1431263, at *9–10 (4th Cir. May 19, 2025) (Gregory, J., concurring); *J.A.V. v. Trump*, 781 F. Supp. 3d 535, 561 (S.D. Tex. 2025).[2]

The Founding generation used "predatory incursion" to refer to smaller-scale acts of war — particularly military raids that could be repelled by militias. *See, e.g.*, Letter from Timothy Pickering to Alexander

---

[2] A member of this Court has suggested that unlawful migration and private violence might constitute a constitutional "invasion." *United States v. Abbott*, 110 F.4th 700, 735–38 (5th Cir. 2024) (en banc) (Ho, J., concurring in the judgment in part, dissenting in part). But this opinion cites no textual or original-meaning evidence and misinterprets its cited 1870s sources. *See* Somin, *supra*, at 59–61.

Hamilton (June 9, 1798), *in* Founders Online, https://perma.cc/9ZLS-MGZP ("Small, predatory incursions of the French . . . might occasion great destruction of property [but] the militia might be sufficient to repel them . . . ."). On the eve of the Quasi-War with France, President Adams requested war preparations, cautioning Congress that while the Atlantic insulated the nation against "invasions," its "principal Sea Ports" could be subject to "predatory incursions" by French forces. John Adams, Address Before United States Congress (May 16, 1797), *in* Founders Online, https://perma.cc/GJJ8-2RB7. In ensuing debates over the AEA, a legislator proposed an amendment to make the law available the moment an adversary authorized hostilities, believing "it would not be proper to wait until predatory incursions were made . . . or until what shall be considered as threatening or actual invasion appeared." 8 Annals of Cong. 1573–82 (1798). The amendment failed, with other lawmakers criticizing the lower "authorized hostilities" threshold because "it would be improper to give the President this power" before an actual war. *Id.* at 1575. The debates show that Congress understood "predatory incursions" to be "serious attack[s]," *see* 8 Annals of Cong. 1786 (1798), creating a

6

state of war, *see* 8 Annals of Cong. 1790 (1798) (explaining that "[i]n the event of a war," foreign citizens "will become alien enemies").

Similarly, "predatory incursion" and related phrases were used to describe military attacks in Native American wars. *See, e.g.*, Letter from Gen. Henry Knox to Gov. Arthur St. Clair (Aug. 23, 1790), *in* 2 The St. Clair Papers 162 (1882) (discussing "predatory incursions of the Wabash Indians" during Northwest Indian War); Treaty with the Apaches arts. 2, 5, July 1, 1852, 10 Stat. 979 (agreeing that "hostilities between the . . . parties shall forever cease" and binding Apaches "to desist and refrain from making any incursions . . . of a hostile or predatory character" (quotation marks omitted)); *see also* Act of Sept. 29, 1789 § 5, ch. 25, 1 Stat. 95 (authorizing president to call forth militia to repel "hostile incursions of the Indians"). As with "invasion," the term "predatory incursion" referred specifically to acts of war. *See J.G.G.*, 2025 WL 914682, at *10 (Henderson, J., concurring) (listing additional uses of "predatory incursion" to mean military "attack" amounting to "a lesser form of invasion"); *J.O.P.*, 2025 WL 1431263, at *9–10 (Gregory, J. concurring); *J.A.V.*, 781 F. Supp. 3d at 561. Contrary to the government's argument, it did not encompass a "wide range of hostile entries [beyond]

organized military hostilities." Pet. for Reh'g En Banc at 11. The Founding generation used "trespass" to describe unlawful non-military entries, *see* Joshua Treviño, Tex. Pub. Pol'y Found., *The Meaning of Invasion Under the Compact Clause of the U.S. Constitution* 7 (2022), https://perma.cc/F4XC-AVRP, and luminaries like Madison and Jefferson would have opposed the AEA had it applied in peacetime, as did the controversial Alien Friends Act, *see* Somin, *supra*, at 34–37.

This understanding of "invasion" and "predatory incursion" is reinforced by the rule of *noscitur a sociis* — a "word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citation and quotation marks omitted). The terms "invasion" and "predatory incursion" should be understood by reference to the adjacent term "declared war" and nearby mentions of "hostile nation" and "actual hostility." 50 U.S.C. §§ 21–22. This is the language of armed conflict between nations, not illicit activity by gang members. *See, e.g.*, Treaty of Paris art. 7, Sept. 3, 1783, 8 Stat. 80 ("There shall be a firm and perpetual peace . . . wherefore all hostilities . . . shall from henceforth cease . . . .").

The context of the AEA's enactment confirms that these terms refer to acts of war. The law was enacted alongside the Alien Friends Act, ch.

58, 1 Stat. 570 (1798), a complementary — and controversial — peacetime deportation authority. Congress and critics of the Alien Friends Act justified the more potent powers of the AEA as implementing the rules of war under the law of nations. *See, e.g.*, 8 Annals of Cong. 1980 (1798) (noting that "alien enemies" can be "treated as prisoners of war" under law of nations); Madison, *supra*. Indeed, the entire concept of "alien enemies" is drawn from the law of war (as of 1798) and has no apparent peacetime significance. *See* Emmerich de Vattel, The Law of Nations, bk. III, ch. IV, § 63 (1758); *Ware v. Hylton*, 3 U.S. 199, 228 (1796) (opinion of Chase, J.) (explaining that "alien enemies" do not exist in peacetime). Contrary to the panel dissent's assertion that the AEA "expanded the traditional concept of 'alien enemies' under the law of nations," Op. at 65, jurists of the era described the AEA as "a true exposition and declaration of the modern law of nations." *Clarke v. Morey*, 10 Johns. 69, 74 (N.Y. 1813); *Lockington's Case*, 1 Brightly 269, 296 (Pa. 1813) (opinion of Brackenridge, J.) ("Alien enemies remaining in our country after a declaration of war, are to be treated according to the law of nations . . . .").

Consistent with its enactment as an implementation of the law of war, the AEA was designed for what the Founding generation understood

as "perfect" or "general" war between nations, including military attacks launching such wars, not periods of "restrained, or limited, hostility" — let alone migration or gang violence. *See Bas v. Tingy*, 4 U.S. 37, 43–44 (1800) (opinion of Chase, J.) (explaining that perfect wars are regulated by law of nations, whereas imperfect wars are governed by municipal law); Kathryn L. Einspanier, *Burlamaqui, the Constitution, and the Imperfect War on Terror*, 96 Geo. L.J. 985, 1007, 1012 (2008) (identifying "alien enemy" status as one distinction between perfect war and imperfect war). Congress declined a proposal to make the AEA applicable in times of "authorize[d] hostilities," with lawmakers concerned about the prudence and legality of imposing "alien enemy" status on immigrants in lower-intensity engagements. *See supra* at 6. Lawmakers did not believe the French could be treated as "alien enemies" unless the *Quasi*-War, which involved naval hostilities with France, escalated through a war declaration or ground assault. *See* 8 Annals of Cong. 1576 (1798) (describing AEA as "fitted for a state of war" warranting congressional declaration, not limited hostilities); 8 Annals of Cong. 1790 (1798) ("In the event of a war with France, all her citizens here will become alien enemies . . . ."). President Adams thus relied on the Alien Friends Act

throughout the Quasi-War. *See generally* James Morton Smith, *The Enforcement of the Alien Friends Act of 1798*, 41 Miss. Valley Hist. Rev. 85 (1954).

The AEA has previously been invoked three times, always in a major war. In the War of 1812 and World War I, Presidents Madison and Wilson invoked the law after Congress declared war. Circular from James Monroe to the Secretary of the Mississippi Territory (July 11, 1812), *in* Mississippi Dep't of Archives & History, Doc. No. 5, *available at* https://perma.cc/RY6D-BETN; Presidential Proclamation 1364, 40 Stat. 1650 (Apr. 6, 1917). In World War II, President Roosevelt invoked the law upon Japan's attack on Pearl Harbor, an obvious "invasion." Presidential Proclamation 2525, 6 Fed. Reg. 6321, 55 Stat. 1700 (Dec. 7, 1941). The next day, Roosevelt proclaimed that Germany and Italy, Japan's allies, threatened an "invasion or predatory incursion." Presidential Proclamation 2526, 6 Fed. Reg. 6323, 55 Stat. 1705 (Dec. 8, 1941); Presidential Proclamation 2527, 6 Fed. Reg. 6324, 55 Stat. 1707 (Dec. 8, 1941). Roosevelt immediately sought and received war declarations against all three countries.

**B.    The Proclamation improperly applies the AEA in peacetime.**

The Proclamation is an improper invocation of the AEA. While it asserts that TdA is "conducting irregular warfare and undertaking hostile actions" against the United States, the activities it describes are fundamentally different from an armed attack by a foreign sovereign. Unlawful migration, narcotics trafficking, and gang violence are not acts of war that unlock the AEA.

The United States has not suffered a military attack constituting an "invasion" or "predatory incursion" as those terms were used in 1798. Furthermore, there is no analogy between the Proclamation's civil and criminal activities, perpetrated by a gang, and "perfect war," which Justice Washington described as a conflict in which "one whole nation is at war with another whole nation" and "all members of the nation . . . are authorised to commit hostilities against all the members of the other." *Bas*, 4 U.S. at 40 (opinion of Washington, J.); *accord Johnson v. Eisentrager*, 339 U.S. 763, 772–73 (1950) (grounding AEA in perfect-war principles); *see also* James Kent, 1 Commentaries on American Law 53–54 (1826) ("When war is duly declared, it is . . . between all the individuals of the one, and all the individuals of which the other nation is

composed. . . . [A] state has a right to deal as an enemy with persons and property so found within its power . . . .").

No plausible interpretation of the modern law of war — which evolved in tandem with modern war-fighting — would conclude that unlawful migration, narcotics trafficking, or gang violence constitute an act of war. Today, the law of war has two components: *jus ad bellum*, which primarily governs whether an armed attack triggering a nation's right of self-defense has occurred, and *jus in bello*, which governs the means and methods of war, including the treatment of civilians during armed conflict. Neither of these law-of-war frameworks applies to the civil and criminal activity described in the Proclamation. Under *jus ad bellum*, an armed attack, particularly one by irregular forces, must involve a use of force of a certain "gravity," with substantial "scale and effects," to trigger a state's right to self-defense. William H. Taft, IV, *Self-Defense and the Oil Platforms Decision*, 29 Yale J. Int'l L. 295, 300–01 (2004); *see infra* at 27–29 (identifying similar threshold for "acts of war" in U.S. statutory and contract cases); *see also Reclaiming Congress's Article I Powers: Counterterrorism AUMF Reform: Hearing Before H. Comm. on Foreign Affs.*, 118th Cong. 30 (2023) (statement of Rich Visek,

Acting Legal Adviser, U.S. Dep't of State) (testifying that he is "not aware of any statement by anyone" that narcotics trafficking constitutes an armed attack).

Likewise, an armed conflict under *jus in bello* requires "fighting of some intensity." Exec. Comm., Int'l Law Ass'n, *Final Report on the Meaning of Armed Conflict in International Law*, 2 (2010), https://perma.cc/4G5G-6837. It is not enough to show "lower level or chaotic violence" of the type that gangs perpetrate. *Id.* at 2–3, 28. The Proclamation's cited activities are typical of gangs; indeed, the Proclamation refers to these activities as "crimes." This conduct does not remotely entail an armed attack or armed conflict under the law of war.

The administration's airstrikes in the Caribbean do not change matters. The AEA requires a declared war or armed attack against U.S. territory, not congressionally unauthorized U.S. attacks on the high seas. Furthermore, the administration has told Congress that its strikes do not constitute "war under the Constitution" or even "hostilities" under the War Powers Resolution, *see* Ellen Nakashima & Noah Robertson, *Trump Administration Tells Congress War Law Doesn't Apply to Cartel Strikes*, Wash. Post (Nov. 1, 2025), https://perma.cc/9T2A-VBMT, a law that

covers conduct below the threshold of armed conflict, *see* 50 U.S.C. § 1541 *et seq.*; H.R. Rep. No. 93-287, at 7 (1973). Leading national security law experts agree that there has been no armed attack or armed conflict justifying the strikes — and that the administration is conflating crime and war. *See, e.g.,* Michael Schmitt, *Striking Drug Cartels Under the Jus ad Bellum and Law of Armed Conflict,* Just Sec. (Sept. 10, 2025), https://perma.cc/3K4L-SPCG; John Yoo, *What's Wrong with a Military Campaign Against the Drug Trade,* Wash. Post (Sept. 23, 2025), https://perma.cc/U67C-6VVE.

Neither does the rise of international terrorism and TdA's FTO designation warrant AEA invocation. All efforts to amend the AEA to apply to terrorism have failed.[3] FTO designation is "inapposite to the question of whether we are at war." Rebecca Ingber, *Judicial Deference*

---

[3] Notably, during the Iran hostage crisis, Congress debated defining "predatory incursion" to include "seizing and holding the premises of a diplomatic mission." American Sovereignty Protection Act, H.R. 6941, 96th Cong. (1980). Asked to assess the amendment, the Department of Justice advised that "predatory incursion" was "clearly intended to apply to situations where war is imminent but has not yet been declared" and expressed doubts about the legality of applying the AEA "when no war was anticipated." Letter from Alan Parker, Assistant Att'y Gen., to Sen. Edward Kennedy (Aug. 2, 1980) (on file with authors). The amendment failed.

*and Presidential Power Under the Alien Enemies Act*, Just Sec. (May 20, 2025), https://perma.cc/V9ZC-329R. Immigration law — not the law of war — explicitly governs the deportation of FTO members. *See* 8 U.S.C. § 1227(a)(4)(B). When using regular immigration procedures would threaten national security, immigration law establishes special procedures for terrorist deportations. *See* 8 U.S.C. §§ 1531–37. Interpreting FTO designation to trigger the AEA would effectively nullify this carefully legislated regime.

Treating FTO designation as grounds for invoking the AEA would also have absurd consequences: roughly 100 organizations scattered across the globe are designated FTOs. U.S. Dep't of State, Bureau of Counterterrorism, *Foreign Terrorist Organizations*, https://perma.cc/WK4D-WNNV; *see also McAllister v. Att'y Gen.*, 444 F.3d 178, 187 (3d Cir. 2006) (noting that standard for FTO designation "encompasses more conduct than our society, and perhaps even Congress, has come to associate with traditional acts of terrorism"). Although a large-scale attack by an FTO can constitute an act of war,[4] it cannot be

---

[4] Under the AEA, an act of war must also be perpetrated by a "foreign nation or government" – not a nonstate FTO.

the case that any assault, theft, or murder committed by FTO members creates a state of war. *See In re September 11 Litig.*, 751 F.3d 86, 92 (2d Cir. 2014) (holding that although terrorist attacks are not generally "acts of war," the September 11 attacks "were different in means, scale, and loss from any other terrorist attack"); *Hamdan v. Rumsfeld*, 548 U.S. 557, 599 n.31 (2006) (holding that U.S. war with al-Qaeda started on September 11, well after al-Qaeda's FTO designation). To hold otherwise, as the government urges, would untenably expand the reach of constitutional war powers beyond *but also within* U.S. borders. *Cf. Duncan v. Kahanamoku*, 327 U.S. 304, 322 (1946) ("[T]he founders of this country are not likely to have contemplated complete military dominance within the limits of a Territory made part of this country . . . .").

Government officials, moreover, disclaimed any war with Venezuela when the Proclamation was issued and called into question TdA's capacity to conduct substantial operations in U.S. territory. On March 26, 2025, CIA Director John Ratcliffe testified before Congress that no intelligence assessment suggested the nation was being invaded by Venezuela. *Annual Worldwide Threats Assessment: Hearing Before H. Permanent Select Comm. on Intel.*, 119th Cong. (2025). A declassified

intelligence assessment from April concluded that TdA does not operate at Venezuela's behest and has a "small," "decentralized" U.S. presence that "focus[es] on low-skill criminal activities." Nat'l Intel. Council, Venezuela: Examining Regime Ties to Tren de Aragua 1 (Apr. 7, 2025), https://perma.cc/KGL6-QNC8. Far from having the capacity to wage war, TdA, per the intelligence assessment, likely lacks the capacity to "coordinate[] large volumes of human trafficking or migrant smuggling." *Id*. These conclusions underscore that the Proclamation wrongly identified an "invasion" or "predatory incursion" by a foreign government.

## II.    AEA Proclamations Are Subject to Judicial Review.

The government argues that AEA invocations are not subject to judicial review. The panel dissent goes so far as to say that courts cannot intervene even if "the odds of invasion are 0.0000000%." Op. at 115. But the Supreme Court has never endorsed such judicial abdication. Instead, it has said that "resort to the courts may be had . . . to challenge the construction and validity of the [AEA],'" *Ludecke v. Watkins*, 335 U.S. 160, 171 (1948), or "to ascertain the existence of a state of war," *Eisentrager*, 339 U.S. at 775; *see also Baker v. Carr*, 369 U.S. 186, 211

(1962) (noting that a case does not "lie beyond judicial cognizance" simply because it "touches foreign relations").

The Supreme Court's pronouncements about judicial review comport with the AEA's text. The text requires the factual existence of a declared war or threatened or ongoing "invasion" or "predatory incursion" by a foreign power. 50 U.S.C. § 21; *see also Prize Cases*, 67 U.S. 635, 667 (1862) ("[A] civil war is never publicly proclaimed . . . , its actual existence is a fact in our domestic history which the Court is bound to notice and to know."). It separately requires the president to issue a proclamation recognizing the conflict. 50 U.S.C. § 21. Nowhere does the AEA suggest that the president is the sole judge of whether a declared war or invasion exists. Nor does the text allow the president to invoke the AEA "for whatever reason he sees fit," distinguishing the AEA from statutes that fully "commit[] decisionmaking to the discretion of the President." *See Dalton v. Specter*, 511 U.S. 462, 476–77 (1994). *Martin v. Mott*, 25 U.S. 19 (1827), cited by the panel dissent, Op. at 85–86, addressed a materially different context and cannot rewrite the AEA's text. Joshua Braver & John Dehn, *Deference Due? Trump, the National Guard, and the Misuse of Martin v. Mott*, Volokh Conspiracy (Oct. 14, 2025),

https://perma.cc/DXC6-8U9R ("[*Mott*] concerns the allocation of authority between the President and the military chain of command—not the courts."). Had the AEA granted the president unreviewable discretion to invoke the law, the detractors of the Alien Friends Act surely would have raised constitutional objections against the AEA; instead, they supported it. *See supra* at 7–8.

The courts' power to review the Proclamation is not diminished by the political question doctrine. Determining whether that doctrine precludes review demands "discriminating inquiry into the precise facts and posture of the particular case." *Baker*, 369 U.S. at 217. When this inquiry reveals an "obvious mistake" or "manifestly unauthorized exercise of power," the doctrine does not bar judicial intervention. *Id.* at 214, 217; *Sterling v. Constantin*, 287 U.S. 378, 399 (1932) ("[T]here is a permitted range of honest judgment as to the measures to be taken in meeting force with force, in suppressing violence and restoring order."); *see also* Scott Dodson, *Article III and the Political Question Doctrine*, 116 Nw. U. L. Rev. 681, 703–04 (2021) (documenting Supreme Court's willingness to resolve political questions "in extreme cases"). Additionally, courts "most assuredly" may review executive action when

individual liberties are threatened, even during war. *Hamdi v. Rumsfeld*, 542 U.S. 507, 535–36 (2004).

> **A.    Courts may review the Proclamation as a "manifestly unauthorized exercise of power" even if AEA invocations typically involve political questions.**

The political branches have broad discretion in matters of war. But the president cannot transform civil and criminal matters into acts of war by "arbitrarily calling" them an invasion or predatory incursion by a foreign government. *See Baker*, 369 U.S. at 216 (rejecting political branches' ability to unlock powers through baseless designations (quoting *United States v. Sandoval*, 231 U.S. 28, 46 (1913))); *Abbott*, 110 F.4th at 736 (Ho, J., concurring in the judgment in part, dissenting in part) (acknowledging that an "invasion . . . does not exist just because [the executive] has uttered a certain magic word"); *cf. Sterling*, 287 U.S. at 399, 401 (explaining that although governor had discretion as state commander in chief, it did not follow that "every sort of action the Governor may take, no matter how unjustified by the exigency . . . is conclusively supported by mere executive fiat"). Words have meaning. And it is within the power of the courts to correct "obvious mistake[s]," even when those words arise in a wartime statute. *Baker*, 369 U.S. at 214

(citation omitted); *see also United States v. Zubaydah*, 595 U.S. 195, 237–
38 (2022) (Gorsuch, J., dissenting) ("There comes a point where we should
not be ignorant as judges of what we know to be true as citizens."); Ingber,
*supra* (noting that "[t]he president's attempt to invoke the language of
war does not change" the "basic judicial task[s]" of "interpret[ing] a
statute, weigh[ing] the facts, and apply[ing] them to the law").

Across conflicts, courts have intervened when the political branches
exceeded their authorities. Since the Quasi-War, courts have assessed
whether the political branches' wartime measures exceed what the law
"obviously contemplates." *Little v. Barreme*, 6 U.S. 170, 177 (1804). They
have rejected exercises of presidential discretion when patently unsound,
*see Ex parte Milligan*, 71 U.S. 2, 121 (1866) (disallowing Civil War-era
use of military commissions based on "judicial knowledge that in Indiana
the Federal authority was always unopposed, and its courts always
open"); *Ebel v. Drum*, 52 F. Supp. 189, 196 (D. Mass. 1943) (rejecting
World War II-era exclusion order against ethnically German U.S. citizen
over absence of "realistic" military necessity); *Hamdan*, 548 U.S. at 603–
13 (plurality opinion) (rejecting use of military commission during War
in Afghanistan because government "failed even to offer a 'merely

colorable' case" that it was prosecuting law-of-war violations), and they have challenged baseless congressional determinations regarding war-related exigencies, *see Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924) (scrutinizing Congress's assessment that World War I-related emergencies existed after 1922).

In formalizing the political question doctrine, the Supreme Court acknowledged that the judiciary is "not at liberty to shut its eyes to an obvious mistake," even in matters relating to the "duration of hostilities." *Baker*, 369 U.S. at 214 (citation omitted). As discussed, no plausible interpretation of TdA's conduct qualifies as an "invasion" or "predatory incursion" under the AEA — *i.e.*, as an act of war. The Proclamation is precisely the kind of "obvious mistake" and "manifestly unauthorized exercise of power" that courts have reviewed notwithstanding the president's latitude in matters of war. *See id.* at 214, 217.

## B.    The judiciary's power is at its height because individual liberties are threatened.

Throughout its political question caselaw, the Supreme Court has emphasized that the judiciary's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Rucho v. Common Cause*, 588 U.S. 684, 709 (2019) (quotation marks and citation

omitted); *Baker*, <u>369 U.S. at 261</u>, <u>262</u> (Clark, J., concurring) ("[A] chief function of the Court is to secure the national rights . . . ."). This role does not vanish when the political branches assert national security interests. Instead, as the Court explained in *Hamdi v. Rumsfeld*, "[w]hatever power the United States Constitution envisions for the Executive . . . in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." <u>542 U.S. at 536</u>; *see also Boumediene v. Bush*, <u>553 U.S. 723, 765</u> (2008) ("To hold the political branches have the power to switch the Constitution on or off at will . . . would permit a striking anomaly in our tripartite system of government . . . .").

AEA invocations unlock sweeping regulatory, detention, and deportation powers over immigrants. *See infra* at 31 (discussing past AEA regulations). The administration has apparently concluded that the Proclamation authorizes warrantless searches and arrests, notwithstanding the Fourth Amendment. *See* Off. of the Att'y Gen., *Guidance for Implementing the Alien Enemies Act* (Ma<u>r. 14</u>, <u>2025)</u>, https://perma.cc/28MW-9MCB. It has also determined that the Proclamation allows it to bypass "any relief or protection from removal," *id.*, including laws safeguarding immigrants' right not to be deported to

24

countries where they will face torture or persecution, *see* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681-761; 8 U.S.C. § 1231(b)(3)(A). The Proclamation attempts to enable the government to run roughshod over established rights.

These rights deprivations are no surprise, given the AEA's shameful history. The law was last used to intern 31,000 noncitizens of Japanese, German, and Italian descent without due process and based principally on their ancestry — actions that the federal government subsequently recognized as a "fundamental injustice." *See, e.g.*, Civil Liberties Act of 1988, Pub. L. No. 100-383, 102 Stat. 903 (providing reparations to lawful residents of Japanese descent interned under AEA and U.S. citizens of Japanese descent incarcerated under Executive Order 9066); Wartime Violation of Italian American Civil Liberties Act, Pub. L. No. 106-451, 114 Stat. 1947 (2000) (apologizing to Italian AEA internees); *Mochizuki v. United States*, 43 Fed. Cl. 97, 97–98 (1999) (approving settlement providing reparations to additional Japanese AEA internees).

When the president revives a law with this record, the courts' power to safeguard civil liberties is at its height. *See Zubaydah*, 595 U.S. at 250,

252 (Gorsuch, J., dissenting) ("[H]istory reveals that executive officials can sometimes be tempted to misuse claims of national security to shroud major abuses . . . . This Court hardly needs to add fuel to that fire by abdicating any pretense of an independent judicial inquiry . . . .").

**C. Judicially manageable standards allow courts to identify manifestly unauthorized exercises of wartime powers.**

The government suggests that courts cannot review the Proclamation because no judicially manageable standards exist for determining what constitutes an "invasion" or "predatory incursion." That concern rings hollow when extensive caselaw — including cases addressing the Proclamation — demonstrates that courts are capable of adjudicating what constitutes an act of war.

The Anti-Terrorism Act, 18 U.S.C. § 2336(a), Federal Torts Claims Act (FTCA), 28 U.S.C. § 2680(j), and Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607(b)(2), explicitly exclude harms arising from acts of war. Similarly, insurance contracts commonly exclude wartime harms from their coverage. When confronted with disputes over "war exclusion" provisions, judges regularly decide what constitutes an act of war.

Across this jurisprudence, courts evaluate: the (1) scale of an attack; (2) means used for an attack; (3) objectives targeted; (4) nature and motives of the adversary; and (5) responses of the U.S. and foreign governments. *Koohi v. United States*, for instance, identified the congressionally unauthorized Tanker War of the 1980s as a "time of war" by reference to actual hostilities between U.S. and Iranian armed forces. 976 F.2d 1328, 1334–35 (9th Cir. 1992) (exempting Navy's downing of Iranian aircraft from FTCA). *Koohi* described war as a state of "overwhelming and pervasive violence" in which U.S. forces might make "life or death decisions in the midst of combat" and civilians might be harmed. *Id.* at 1335. Similarly, *In re September 11 Litigation* deemed the September 11 attacks an act of war based on their "purpose" and devastating "scale, means, and effect," which mirrored that of a military attack. 751 F.3d at 89 (exempting World Trade Center dust remediation from CERCLA). By contrast, *Pan Am. World Airways v. Aetna Casualty & Surety* reasoned that a plane hijacking was not an act of war because it had "criminal rather than military overtones," did not target military objectives, and was perpetrated by a "relatively minute entity . . . rather than a sovereign government." 505 F.2d 989, 1014–15, 1017 (2d Cir.

27

1974). In these cases and others, courts used the law of war as a guidepost. *See, e.g.*, *id.* at 1012, n.12 (describing law of war as "starting place" for analysis); *United States v. Shell Oil Co.*, 294 F.3d 1045, 1061 (9th Cir. 2002).

Courts have used the same standards to review challenges to clear presidential exercises of war powers. Before upholding President Lincoln's unilateral imposition of a blockade in the Civil War, the *Prize Cases* independently reviewed relevant facts to establish the presence of a war under the law of war. 67 U.S. at 667–69 (discussing attack on Fort Sumter and ensuing military conflict, attempted secession of Confederate States as separate sovereign, and foreign nations' responses). A century later, *Mitchell v. Laird* assessed the duration, magnitude, and casualties of the Vietnam War to determine that a state of war existed and the president "was without power to continue the war without Congressional approval." 488 F.2d 611, 614 (D.C. Cir. 1973). More recently, *Al-Warafi v. Obama* reviewed the scope of U.S. combat operations to determine that the War in Afghanistan persisted and supported continuing law-of-war detentions, notwithstanding President Obama's announcement of the war's conclusion. No. 09-2368, 2015 WL 4600420, at *5–7 (D.D.C. July

30, 2015), *vacated and appeal dismissed as moot*, No. 15-5266 (D.C. Cir. Mar. 4, 2016) (dismissing case based on petitioner's transfer from Guantanamo Bay).

The Invasion Clause cases are not to the contrary. Those 1990s cases invoked the political question doctrine to dismiss claims that the government was permitting a migrant "invasion" in violation of Article IV of the Constitution. *See, e.g.*, *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). They are materially different: The plaintiffs were not challenging presidential action but instead presidential *inaction*. The courts had no cause to consider whether there had been a "manifestly unauthorized exercise of power." *Baker*, 369 U.S. at 217. Still, those courts clarified that the term "invasion" requires armed hostilities by foreign powers. *Padavan*, 82 F.3d at 28 ("[F]or a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity . . . ."); *California*, 104 F.3d at 1091 (same); *see also J.G.G.*, 2025 WL 914682, at *6 (Henderson, J., concurring) (noting *California* would weigh against the government's argument). Courts can use well-developed bodies of law to enjoin the Proclamation's obvious

29

misappropriation of a wartime authority for peacetime immigration enforcement.

## III. The Government's Interpretation of the AEA Could Have Dire Consequences.

### A. The government's arguments could allow the AEA to be used against any group of immigrants.

Without a judicial check on AEA invocations, the president could target any immigrant group at any time. By its text, the AEA applies to "all natives, citizens, denizens, or subjects" of a foreign belligerent. 50 U.S.C. § 21. It does not exclude long-term residents, asylum-seekers, or other lawfully present noncitizens. In World War II, even German Jews were interned under the AEA. *See generally* Harvey Strum, *Jewish Internees in the American South, 1942–1945*, 42 Am. Jewish Archives 27 (1990).

The law's power extends beyond interning and expelling "alien enemies." Presidents have used it to issue draconian regulations. During World War II, Roosevelt prohibited *all* Japanese, German, and Italian noncitizens — over one million individuals — from owning flashlights, radios, and cameras; joining disfavored associations; and traveling by plane. *See* Proclamation 2525; Proclamation 2526; Proclamation 2527.

These powers cannot be available to respond to civil and criminal activity. Nor can their invocation be immune to judicial review. Otherwise, the AEA would empower the president to bypass Congress and establish *de facto* criminal and immigration law.

### B. The government's interpretation of "invasion" could subvert the federal-state balance of war powers and threaten habeas corpus protections.

If unlawful migration, narcotics trafficking, and gang violence constituted an "invasion" under the AEA, states could assert a capacious right to "engage in War" under the Constitution, even though the State War Clause generally forbids state war-making. U.S. Const. art. I, § 10. Because these civil and criminal acts occur routinely, border states might invoke the State War Clause's "invasion" exception at will, attacking neighboring countries and dragging the nation into war. This would be a drastic usurpation of federal authority over war and peace and would defeat the "very purpose" of the State War Clause's general prohibition. John Yoo, *Why Texas Cannot Treat Illegal Immigration as an 'Invasion'*, Nat'l Rev. (Nov. 18, 2022), https://archive.is/BzABV.

The government's overbroad definition of "invasion" could lead to the abuse of other extraordinary powers, including the Suspension

Clause, which guarantees the right of habeas corpus "unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. British suspensions of habeas corpus were major grievances before and during the American Revolution. *See generally* Amanda L. Tyler, *Habeas Corpus and the American Revolution*, 103 Calif. L. Rev. 645 (2015). The Founders wisely took care to prevent such abuses. *See Boumediene*, 553 U.S. at 739–44. Labeling peacetime activity as an "invasion" under the AEA would jeopardize their efforts, paving the way for dangerous interpretations of the suspension power.

The suspension power is not limited to immigrants or border states. Suspension has been applied to citizens and noncitizens alike. *See* Amanda L. Tyler, *Suspension as an Emergency Power*, 118 Yale L.J. 600, 639–62 (2009). Today, U.S. citizens regularly facilitate unlawful migration, traffic narcotics, and commit gang violence. *See, e.g.*, David J. Bier, *U.S. Citizens Were 89% of Convicted Fentanyl Traffickers in 2022*, Cato at Liberty (Aug. 23, 2023), https://perma.cc/H8MF-NCDE. Undocumented migrants, narcotics traffickers, and gang members live in both border and interior states.

Courts should refuse the government's invitation to degrade constitutional safeguards — whether by redefining "invasion" or holding that proclaimed "invasions" are judicially unreviewable. Our system of checks and balances exists to prevent this kind of abuse.

## CONCLUSION

This Court should conclude that the president lacked the authority to invoke the AEA.

Respectfully submitted,

Gregory L. Diskant
Aron Fischer
Emma Ellman-Golan
Isaac Weingram
Anna Blum
PATTERSON BELKNAP WEBB &
TYLER
1133 Avenue of the Americas
New York, New York 10036
Phone: (212) 336-2000
gldiskant@pbwt.com

*/s/ Leah J. Tulin*
Leah J. Tulin
Katherine Yon Ebright
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
Phone: (202) 650-6397
tulinl@brennan.law.nyu.edu

Ilya Somin
Professor of Law
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
Phone: (703) 993-8069
isomin@gmu.edu

*Counsel for Amici Curiae*

November 13, 2025

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 6,489 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

*/s/ Leah J. Tulin*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

*/s/ Leah J. Tulin*

## APPENDIX

Ilya Somin is Professor of Law at the Antonin Scalia Law School, George Mason University and B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute. He writes extensively on constitutional law and immigration law and policy. His writings and briefs have been cited by the U.S. Supreme Court, lower federal courts, state supreme courts, and the Supreme Court of Israel. He is the author of multiple books on constitutional law and migration rights, including *Free to Move: Foot Voting, Migration, and Political Freedom* (rev. ed. 2022), *Democracy and Political Ignorance: Why Smaller Government is Smarter* (2d ed. 2016), and *The Grasping Hand:* Kelo v. City of New London *and the Limits of Eminent Domain* (2015).

John Dehn is Associate Professor of Law and Faculty Director of the National Security and Civil Rights Program at Loyola University Chicago School of Law. A retired U.S. Army judge advocate, he writes in his personal capacity on constitutional and international law in areas related to foreign affairs, armed conflict, U.S. military law, and national self-defense. His work has been cited by the Office of Legal Counsel, by the Second Circuit, and in briefs related to military commissions.

Geoffrey S. Corn is the Killam Chair of Criminal Law and Director of the Center for Military Law and Policy at Texas Tech University School of Law. A retired U.S. Army Lieutenant Colonel, Geoffrey Corn has been teaching law for 22 years. His military career included service as both a tactical intelligence officer and a military lawyer, culminating as the Army's senior law of war advisor. He has published more than 60 scholarly articles and co-authored *The Law of Armed Conflict: An Operational Perspective*; *The Laws of War and the War on Terror*; *National Security Law and Policy: Principles and Policy*; *U.S. Military Operations: Law, Policy, and Practice*; *National Security Law and the Constitution*, and *Law in War: A Concise Overview*.