**No. 25-10534** (Detained)

———————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————————

W.M.M., F.G.M., A.R.P., et al.,
Petitioners-Appellants,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,
Respondents-Appellees.

———————————————————

ON APPEAL FROM UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
Case No. 1:25-cv-00059-H
Agency Case Numbers: A244-147-155; A249-153-992; A240-730-011

———————————————————

**SUPPLEMENTAL BRIEF FOR RESPONDENTS-APPELLEES**

———————————————————

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS T. DAVIS
Counsel to Assistant Att'y Gen.

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

JOHN W. BLAKELEY
Senior Counsel

NANCY N. SAFAVI
Senior Trial Attorney

DREW C. ENSIGN
Deputy Assistant Attorney General
U.S. Dep't of Justice, Civil Division
950 Pennsylvania Ave., N.W.
Washington D.C. 20530
(202) 514-2331
Drew.C.Ensign@usdoj.gov

Attorneys for Respondents-
Appellees

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel certifies that the following listed non-government persons may have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- W.M.M,
- A.R.P.,
- F.G.M,
  Petitioners on their own behalf and on behalf of others similarly situated

- Lee Gelernt
- Daniel Galindo
- Ashley Gorski
- Patrick Toomey
- Sean M. Lau
- Sidra Mahfooz
- Omar Jadwat
- Hina Shamsi
- AMERICAN CIVIL LIBERTIES UNION FOUNDATION
- 125 Broad Street, 18th Floor
- New York, NY 10004
  Counsel for Petitioners

- Spencer Amdur
- Noelle Smith
- Oscar Sarabia Roman
- My Khanh Ngo
- Cody Wofsy
- AMERICAN CIVIL LIBERTIES UNION FOUNDATION
- 425 California Street, Suite 700

- San Francisco, CA 94104
- T: (415) 343-0770
  Counsel for Petitioners

- Brian Klosterboer
- Thomas Buser-Clancy
- Savannah Kumar
- Charelle Lett
- Ashley Harris
- Adriana Piñon
- ACLU FOUNDATION OF TEXAS, INC.
- 1018 Preston St.
- Houston, TX 77002
- (713) 942-8146
  Counsel for Petitioners
-
- Kathryn Huddleston
- AMERICAN CIVIL LIBERTIES UNION FOUNDATION
- 915 15th Street, NW, 7th Floor
- Washington, DC 20005
- T: (212) 549-2500
  Counsel for Petitioners

- Respondents-Appellees are government officials and entities.


s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney Gen.
U.S. Department of Justice
Civil Division
950 Pennsylvania Ave., N.W.
Washington D.C. 20530
(202) 514-2331
Drew.C.Ensign@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

This Court scheduled en banc oral argument for Thursday, January 22, 2026, at 9:00 a.m., in the En Banc Courtroom of the Wisdom Courthouse in New Orleans. Respondents-Appellees' counsel will attend and present Respondents-Appellees' position.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF JURISDICTION ............................................................ 1

STATEMENT OF THE ISSUES ............................................................... 1

INTRODUCTION .................................................................................. 1

STATEMENT OF THE CASE ................................................................. 6

    I.    The Alien Enemies Act .................................................... 6

    II.    The President's Proclamation ........................................ 8

    III.    The Present Controversy ............................................. 12

        A.    Petitioners' Suit ..................................................... 12

        B.    The Government's Revised Notice Procedure ............ 13

        C.    The Panel Decision ................................................ 14

    IV.    Recent Events ............................................................ 16

SUMMARY OF ARGUMENT ................................................................ 17

STANDARD OF REVIEW .................................................................... 20

ARGUMENT ...................................................................................... 20

    I.    THE PROCLAMATION IS A LAWFUL EXERCISE OF THE PRESIDENT'S BROAD POWERS UNDER THE AEA ........................................................................... 20

        A.    Judicial Review Under the AEA is Extremely Limited and Deferential ............................................ 21

        B.    The Proclamation Properly Identifies a "Foreign Nation or Government" Under the AEA ..................... 27

i

C.  The Proclamation Properly Identifies an Attempted, Threatened, or Actual "Predatory Incursion" and "Invasion" Under the AEA ................. 36

    1.  "Attempted" and "threatened" invasions and incursions include hostilities that have not yet occurred ......................................................... 37

    2.  "Predatory incursions" are not limited to military attacks .................................................... 40

    3.  The term "invasion" is not limited to military attacks .................................................... 47

    4.  TdA has perpetrated, attempted, or threatened a predatory incursion or invasion by any metric ....................................... 49

II.  THE GOVERNMENT'S AEA NOTICE PROCEDURES SATISFY DUE PROCESS ..................................................... 54

A.  The Revised Procedures Provide Sufficient Opportunity to Seek Habeas Relief ............................. 54

B.  Requiring 30 Days' Notice and Detailed Factual Disclosures is Unwarranted ....................................... 57

C.  Petitioners' Other Procedural Objections Fail ............ 64

III.  PETITIONERS FAIL TO SATISFY THE REMAINING PRELIMINARY-INJUNCTION FACTORS ........................ 67

CONCLUSION ................................................................................. 69

CERTIFICATE OF SERVICE

BRIEF FORMAT CERTIFICATION

# TABLE OF AUTHORITIES

## CASES

*A.A.R.P. v. Trump,*
  605 U.S. 91 (2025) .................................................................. 1, *passim*

*Adams v. Vance,*
  570 F.2d 950 (D.C. Cir. 1978) ............................................... 69

*Al-Bihani v. Obama,*
  619 F.3d 1 (D.C. Cir. 2010) .................................................. 26

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) .............................................................. 24

*A.S.R. v. Trump,*
  782 F. Supp. 3d 224 (W.D. Pa. 2025) ................................... 65

*A.S.R. v. Trump,*
  No. 25-cv-133 (W.D. Pa. Apr. 15, 2025) ............................... 59

*Arevalo v. Trump,*
  785 F. Supp. 3d 644 (C.D. Cal. 2025) ............................... 21, 22, 23, 25

*California v. United States,*
  104 F.3d 1086 (9th Cir. 1997) ............................................... 23

*Citizens Protective League v. Clark,*
  155 F.2d 290 (D.C. Cir. 1946) ......................................... 21, 53, 60

*D.B.U. v. Trump,*
  No. 25-cv-1163 (D. Colo. Apr. 12, 2025) ............................. 58

*DHS v. Thuraissigiam,*
  591 U.S. 103 (2020) .......................................................... 56, 63, 64

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ................................................................ 66

*Ex parte Gilroy*,
    257 F. 110 (S.D.N.Y. 1919) .................................................. 61

*Ex parte Risse*,
    257 F. 102 (S.D.N.Y. 1919) .................................................. 61

*G.F.F. & J.G.O. v. Trump*,
    No. 25-cv-2886 (S.D.N.Y. Apr. 8, 2025) .............................. 58

*Hamama v. Adduci*,
    912 F.3d 869 (6th Cir. 2018) ................................................ 66

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) .............................................................. 62

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................ 24, 34, 35

*Huidekoper's Lessee v. Douglass*,
    7 U.S. (3 Cranch.) 1 (1805) ................................................ 43

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) .............................................. 67

*J.A.V. v. Trump*,
    781 F. Supp. 3d 535 (S.D. Tex. 2025) ................................ 65

*J.A.V. v. Trump*,
    No. 25-cv-72 (S.D. Tex. Apr. 8, 2025) ................................ 58

*Jones v. Flowers*,
    547 U.S. 220 (2006) .............................................................. 55

iv

*Little v. Llano County,*
   138 F.4th 834 (5th Cir. 2025) .............................................................. 20

*Lockington v. Smith,*
   15 F. Cas. 758 (C.C.D. Pa. 1878). ....................................................... 21

*Ludecke v. Watkins,*
   335 U.S. 160 (1948) ......................................................... 2, *passim*

*Martin v. Mott,*
   25 U.S. (12 Wheat.) 19 (1827) ............................................................ 23

*Mullane v. Central Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950) ............................................................................. 54

*Munaf v. Geren,*
   553 U.S. 674 (2008) ....................................................................... 66, 67

*New Jersey v. United States,*
   91 F.3d 463 (3d Cir. 1996) .................................................................. 24

*Nishimura Ekiu v. United States,*
   142 U.S. 651 (1892) ............................................................................. 63

*Nken v. Holder,*
   556 U.S. 418 (2009) ....................................................................... 67, 68

*Reno v. Flores,*
   507 U.S. 292 (1993) ............................................................................. 59

*Trump v. Hawaii,*
   585 U.S. 667 (2018) ....................................................................... 24, 34

*Trump v. J. G. G.,*
   604 U.S. 670 (2025) ............................................................... 21, 61, 66

*United States ex rel. Schlueter v. Watkins,*
   67 F. Supp. 556 (S.D.N.Y. 1946), *aff'd*, 158 F.2d 853 (2d Cir. 1946) ..62

*United States ex rel. Von Heymann v. Watkins,*
   159 F.2d 650 (2d Cir. 1947) ................................................................ 65

*Worcester v. Georgia,*
   31 U.S. 515 (1832) ................................................................ 42, 43

*Yamataya v. Fisher,*
   189 U.S. 86 (1903) ................................................................ 55

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 1 (2015) ................................................................ 24

## STATUTES

1 Stat. 577 (1798) ................................................................ 7

8 U.S.C. § 1101(a)(13)(A) ................................................................ 65

8 U.S.C. § 1182(b)(3)(B) ................................................................ 11

8 U.S.C. § 1189(a)(1) ................................................................ 10

8 U.S.C. § 1189(d)(4) ................................................................ 10

8 U.S.C. § 1225(b) ................................................................ 56

8 U.S.C. § 1225(b)(1)(A)(i) ................................................................ 56

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ................................................................ 56

8 U.S.C. § 1227(a)(4)(B) ................................................................ 11, 68

8 U.S.C. § 1229a(a)(3) ................................................................ 65

8 U.S.C. § 1229(b)(1) ................................................................ 57

8 U.S.C. § 1231(b)(2) ................................................................ 68

28 U.S.C. § 1292(a)(1) ................................................................ 1

28 U.S.C. § 2241 ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

50 U.S.C. § 21 ........................................................ 2, *passim*

50 U.S.C. § 22 ................................................................... 7

50 U.S.C. § 1543a ............................................................ 16

## REGULATIONS

90 Fed. Reg. 8439 ........................................................... 50

90 Fed. Reg. 10,030 .......................................................... 9

90 Fed. Reg. 13,033 .............................................. 3, *passim*

90 Fed. Reg. 53,045 ......................................................... 28

## OTHER AUTHORITIES

1 Annals of Congress 722 ................................................ 48

1 John Ash, *The New and Complete Dictionary of the English Language* (1775) ................................................................. 47

1 Matthew Bacon, A New Abridgment of the Law 138 n.b (5th ed. 1798) ................................................................. 45

1 William Blackstone, *Commentaries* *249 ........................ 36

2 Chitty's General Practice 176 (1834) ........................... 56

2 Noah Webster, *An American Dictionary of the English Language* (1828) ................................................................. 38

4 *The Documentary History of the Ratification of the Constitution* 116, 117 (John P. Kaminski et al. eds., 1976-2023) .................................. 48

8 Annals of Congress 1574 ......................................................... 7, *passim*

Alexander DeConde, *The Quasi-War:  The Politics and Diplomacy of the Undeclared War with France 1797-1801* (1966) ................... 7, 33

Antonio María Delgado, *Missiles and militias: Maduro fortifies Caracas' coastal access as US military looms*, Miami Herald, Nov. 20, 2025 ............................................................................. 17

*Calvin's Case*, 7 Co. Rep. 1, 29 (1773) ..................................................... 46

*Communications*, Pa. Weekly Telegraph (Oct. 3, 1798) ........................ 42

Department of Defense Law of War Manual §3.3.1 (July 2023 update) .................................................................... 32

Donald J. Trump, Truth Social (Sept. 2, 2025) ............................... 16, 31

*The Federalist* No. 41 (Madison) ........................................................... 48

Henry Knox, Department of War, *Plan for the Arrangement of the Militia*, *in* III Thomas Lloyd, *The Congressional Register* 132 (1790) ................................................................... 48

Israeli Ministry of Foreign Affairs, *Operation 'Rising Lion': Key Factual and Legal Aspects of the Iran-Israel Hostilities* 11 (Aug. 12, 2025, update) .......................................................................... 32

James Iredell, *Charge to the Grand Jury* (1799), *in* Francis Wharton, *State Trials of the United States* 468 (1849) ...................... 39

Jonathan Limehouse, *Colorado Apartment to Close After Multiple Arrests, Claims of Venezuelan Gang Takeover*, USA Today (Jan. 14, 2025) ................................................................................. 51

Letter from A. Arbuthnot to Charles Cameron (1818), in 1 *American State Papers: Military Affairs* 722-723 (1832) ................................. 44

Letter from Caleb Strong to William Eustis (Aug. 5, 1812), in 1 *American State Papers: Military Affairs* 323 (1832) ......................... 43

Nicole C. Brambila, *Venezuelan TdA Gang Uses Similar Aurora Tactics to Take Over Building in San Antonio, Texas*, Denver Gazette (Dec. 21, 2024) ................................................................................. 51

Office of the Spokesperson, Dep't of State, Designation of International Cartels (Feb. 20, 2025) ............................................................. 8

Oxford English Dictionary, June 2025 ................................................. 38

President George Washington, Eighth Annual Address to Congress (Dec. 7, 1796) ...................................................................... 42

Robert G. Natelson & Andrew T. Hyman*, The Constitution, Invasion, Immigration, and the War Power of States*, 13 Brit. J. Am. Legal Stud. 21 (2024) ............................................................. 47, 48

Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773) ................................................................... 41

*Sparenburgh v. Bannatyne,* 126 Eng. Rep. 837 (1797) ................................................... 45

Stephen I. Vladeck, *Enemy Aliens, Enemy Property, and Access to the Courts*, 11 Lewis & Clark L. Rev. 963 (2007) ....................... 42

Thomas Sheridan, A Complete Dictionary of the English Language (2d ed. 1789) .......................................................................... 47

*Tren de Aragua: From Prison Gang to Transnational Criminal Enterprise*, InSight Crime (Oct. 2023) ...................................... 52

U.N. International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts,* commentary to art. 8 (2001) ................................................................ 31

U.S. Dep't of War, Statement from Chief Pentagon Spokesman Sean Parnell on U.S. Force Posture Changes in the U.S. Southern Command Area of Responsibility (Oct. 24, 2025) ............................ 17

U.S. Mission to the U.N., Remarks at a UN Security Council Briefing on Venezuela (Oct. 10, 2025) ................................................. 16, 31, 33

*Vaughan's Trial*, 90 Eng. Rep. 1280, 1281 (1696) .................................. 45

William Bartram, *Travels* 65 (1792) ....................................................... 48

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§2241, 1331. This Court has jurisdiction under 28 U.S.C. §1292(a)(1). *See A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) (per curiam).

## STATEMENT OF THE ISSUES

I.    Whether Petitioners have failed to show that they are likely to succeed on the merits because, under the highly deferential and limited judicial review available under the Alien Enemies Act, the President acted within his authority in finding that (A) TdA has perpetrated, attempted, or threatened a "predatory incursion" or "invasion," (B) carried out by a "foreign nation or government."

II.    Whether the Government's revised notice procedures comport with the Due Process Clause and statutory procedural requirements.

III.    Whether the remaining preliminary injunction factors favor the Government.

## INTRODUCTION

In 1798, Congress enacted the Alien Enemies Act (AEA) so the President could act swiftly to designate, detain, and remove enemy aliens from the United States. That grant of authority to the President is about

1

"as unlimited as the legislature could make it." *Ludecke v. Watkins*, 335 U.S. 160, 169 (1948). Congress was not just concerned with ensuring that the President could detain and remove any agents of hostile foreign powers that successfully mounted military attacks. Congress also expressly empowered the President to invoke the AEA's broad powers against enemy aliens to address a "threatened" or "attempted" "invasion or predatory incursion." 50 U.S.C. §21.

That broad, preventive scope was no coincidence. The AEA was enacted during the Quasi-War with France, when Americans feared French infiltrators might launch surprise attacks before war was declared. Congress accordingly empowered the President to remove would-be attackers before they could launch any such attacks. And, by augmenting the President's Article II authorities with wide, discretionary powers, Congress created a regime with highly circumscribed and deferential judicial review. *Ludecke*, 335 U.S. at 170.

Petitioners' attempt to enjoin President Trump's invocation of the AEA thus faces extraordinarily steep odds. The President has determined that thousands of members of a foreign terrorist organization—Tren de Aragua (TdA)—have "infiltrated" this Nation at

the behest of the hostile Maduro regime in Venezuela. Proclamation No. 10,903, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. at 13,033 (Mar, 20, 2025). And he found that TdA members are working to "destabiliz[e] … the United States" by "undertaking hostile actions and conducting irregular warfare" at the regime's direction. *Id.*

Those determinations are subject to the utmost deference, as is the President's conclusion that TdA members may be summarily detained and removed to prevent them from accomplishing further hostile acts. And the Executive Branch's revised procedures for facilitating expeditious but responsible removal of enemy aliens—under which such aliens receive notice in a language they understand, information about how to challenge their removal, the option to request a list of available attorneys, and seven days to file a habeas petition—plainly comports with due process.

Petitioners' contrary view would transform the AEA from a Founding-era bulwark against foreign subversion into an inexplicably toothless tool. Under Petitioners' view, aliens aligned with hostile foreign governments or nations who are actively plotting assassinations on U.S.

soil—as the FBI has warned TdA may be doing in conjunction with the Maduro regime, ROA.1201-02—would fall outside the AEA entirely. The AEA would cover such aliens only after a formal "military attack" or "declared war" transpired—at which point the Executive could not detain or remove them without exhaustively detailing all reasons for designating them alien enemies; providing 30 days' notice before removal; and applying all of the procedures that the immigration laws prescribe for ordinary removals of non-enemy aliens. All the while, would-be assassins would remain in the United States to wreak additional havoc while obtaining information in the notice that a hostile foreign power could exploit.

That cramped, nonsensical interpretation of the AEA defies text, history, and precedent at every turn. Petitioners would limit the AEA to times of "active military hostilities" or "declared war"—ignoring the wide scope that courts must give to these terms under the AEA, the AEA's plain authorization to avert "threatened" incursions or invasions, and the broad contemporaneous meanings of "predatory incursion" and "invasion." Petitioners would replace deference to the President's national-security judgments with skepticism, demanding judicial second-

guessing and a *Chenery*-esque adequate-explanation requirement for Proclamations. *See* Br.32-34.

Furthermore, Petitioners would revamp the Due Process Clause into a discovery juggernaut, ignoring compelling national security interests in favor of a regime where the Government would have to provide enemy aliens with 30 days to file habeas petitions and a roadmap for litigating them. At bottom, Petitioners would perversely subject the President's invocation of the AEA to more scrutiny than any administrative agency would receive under the Administrative Procedure Act (APA)—a result that the Founding generation would have considered inconceivable and that this Court should not countenance. This Court should deny the preliminary injunction.[1]

---

[1] The Government continues to object to class certification. Indeed, Petitioners' own arguments underscore why a class should never be certified at this point. Although the Court may view class-certification issues as beyond the scope of the Supreme Court's remand order, class certification should ultimately be denied for the reasons in the district court's now-vacated decision and because habeas classes are improper. ROA.20, Dkt.-75; *see* Op.147 (Oldham, J., dissenting).

## STATEMENT OF THE CASE

### I.    The Alien Enemies Act

Enacted in 1798, the AEA grants the Executive broad power to designate, detain, and remove enemy aliens not only during a "declared war," but also in response to an "invasion or predatory incursion" that is "perpetrated, attempted, or threatened." 50 U.S.C. §21. The first sentence of Section 21—the Act's most significant source of authority—provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

50 U.S.C. §21. Section 21's second sentence elaborates on related powers granted to the President upon his proclamation. These include the powers "to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety." *Id.*

6

The Act's remaining provisions outline procedures for implementing the President's broad authority. Relevant here, section 22 provides that "an alien who becomes liable as an enemy" but who "is not chargeable with actual hostility, or other crime against the public safety," may be afforded some time to settle his affairs before departing. 50 U.S.C. §22.

The AEA was enacted at the start of the Quasi-War against France—an episode called the "Quasi-War" because no war was ever declared. Instead, for years, France and the United States raided each other's vessels in the Caribbean, primarily through privateers—private sailors commissioned by the government. *See* Alexander DeConde, *The Quasi-War: The Politics and Diplomacy of the Undeclared War with France 1797-1801*, at 8-9, 124 (1966).

Congress thus enacted the AEA against the backdrop of concerns about the dangers posed by Frenchmen in the United States. *See* 8 Annals of Congress 1574. Congress ultimately drafted the statute to empower the President to address not only instances of declared war, but also "attempted" and "threatened" "invasion or predatory incursion." 1

Stat. 577 (1798). Presidents relied on the AEA to detain and remove alien enemies during the War of 1812, World War I, and World War II.

## II.    The President's Proclamation

In March 2025, the President invoked the AEA to proclaim that members of Tren de Aragua (TdA) are alien enemies. TdA is a transnational criminal organization, supported and directed by members of the Maduro regime. ROA.1201-04*, FBI Intelligence Assessment: Venezuelan Government Officials Use Tren de Aragua to Undermine Public Safety*, 23 January 2025; ROA.1188 ¶7. The group originated in Venezuelan prisons and has since expanded—first to neighboring countries, and, by leveraging Venezuelan nationals' migration flow, into North America. ROA.1191-94, Smith Declaration ¶¶9, 12, 15-16. TdA has "conducted kidnappings, extorted businesses, bribed public officials, authorized its members to attack and kill U.S. law enforcement, and assassinated a Venezuelan opposition figure." Office of the Spokesperson, Dep't of State, Designation of International Cartels (Feb. 20, 2025).

Over the past three years, TdA has established a strong presence in "at least 40 states" and Canada. ROA.1191-94, Smith Declaration ¶16. Further, TdA's proliferation has fostered crime and endangered

8

communities, committing murder, robbery, human trafficking, hostage taking, narcotics trafficking, and firearms violations. ROA.1192-93 ¶6, ROA.1194-95 ¶12, ROA.1195-96 ¶16, ROA.1197-99 ¶¶23-25. TdA has even taken over several apartment complexes across the country, including one in Aurora, Colorado, where TdA members kidnapped and abused Venezuelan migrants. ROA.1192-96 ¶¶6, 19.

Behind TdA stands the regime of Nicolas Maduro, who falsely styles himself as Venezuela's President. The Maduro regime has used groups like TdA to intimidate, kidnap, and kill dissidents abroad. ROA.1204. The FBI has assessed it is "likely" that the regime will similarly "leverage TdA members in the United States as proxy actors to threaten, abduct, and kill members of the U.S.-based Venezuelan diaspora who are vocal Maduro critics," *id.*, as part of a long-term strategy to "destabilize" democratic countries by releasing TdA members from prison and directing and financing them to create "political, social, and security issues" for the United States. ROA.1201-03. The FBI has determined that Maduro himself oversees decisions to use TdA strategically. *Id.*

Shortly after President Trump took office, the Secretary of State designated TdA as a "foreign terrorist organization." 90 Fed. Reg. 10,030.

That designation reflects the Secretary's finding that TdA engages in "terrorist activity" or "terrorism" or "retains the capability and intent" to do so, and thereby "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. §1189(a)(1), (d)(4).

On March 14, 2025, the President signed a proclamation invoking his authorities under the AEA, 50 U.S.C. §21 *et seq.*, citing TdA's entwinement with the Maduro regime and its hostile designs on the United States. *See* 90 Fed. Reg. 13,033. That Proclamation outlines the President's findings that TdA members meet the AEA's statutory criteria for removal. The President found that TdA is entwined with the Maduro regime—in which Maduro "claims to act as Venezuela's President and asserts control over the security forces and other authorities in Venezuela." *Id.* That entwinement has effectively created a "hybrid criminal state," "closely aligned with" the Maduro regime in Venezuela, in which TdA has "infiltrated" the regime's "military and law enforcement apparatus." *Id.* Further, at the direction of the Maduro regime, TdA is "conducting irregular warfare and undertaking hostile actions against the United States," *id.*, and "is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory

of the United States," posing "a substantial danger" to the Nation. *Id.* at 13,033-13,034.

Based on these determinations and "a review of TdA's activities," the President proclaimed that, pursuant to the AEA, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id.* Further, "all such members of TdA are" "chargeable with actual hostility against the United States" and "are a danger to the public peace or safety of the United States." *Id.* The Proclamation also deemed all such TdA members "subject to immediate apprehension, detention, and removal." *Id.* The President directed the "issu[ance of] any guidance necessary to effectuate the prompt apprehension, detention, and removal of all Alien Enemies described" above. *Id.*

TdA members remain deportable under other authorities, including under Title 8 as members of a foreign terrorist organization or otherwise. 8 U.S.C. §§1182(b)(3)(B), 1227(a)(4)(B); *see A.A.R.P.*, 605 U.S. at 99. But

the Proclamation provides an essential tool to use the AEA's expeditious removal methods for particularly dangerous individuals.

## III. The Present Controversy

### A. Petitioners' Suit

On April 16, 2025, Petitioners A.R.P. and W.M.M. jointly petitioned for a writ of habeas corpus, challenging the legality of their prospective removal under the AEA. ROA.17-22. Simultaneously, they moved for a temporary restraining order (TRO), ROA.51-74, and certification of a class of aliens detained pursuant to the AEA, ROA.35-37. The case quickly reached the Supreme Court. *See* Gov't Panel Br.14-15 (further detailing the procedural history).

On May 16, 2025, the Supreme Court vacated this Court's judgment and enjoined the Government from removing class members under the AEA until this Court issues a further decision and the Supreme Court disposes "of the petition for a writ of certiorari." *A.A.R.P.*, 605 U.S. at 99. The Court held that aliens subject to removal under the AEA "must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief" before removal. *Id.* at 95. The Court did not specify what process is due, but deemed insufficient

"notice roughly 24 hours before removal" that did not contain information as to how to contest removal. *Id.*

The Supreme Court remanded the case to this Court to "address (1) all the normal preliminary injunction factors, including likelihood of success on the merits, as to the named plaintiffs' underlying habeas claims that the AEA does not authorize their removal … and (2) the issue of what notice is due, as to the putative class's due process claims against summary removal." *Id.* at 98-99. The Court clarified that the injunction bars removals only "under the AEA," not other authorities. *Id.* at 99.

## B.    The Government's Revised Notice Procedure

In light of *A.A.R.P.*, the Government revised its notice policy for aliens designated for removal under the AEA. *See* ROA.1124-27 (revised notice). The new notice form tells aliens, in a language they can understand, that they can contest their removal under the AEA by filing a habeas petition in the district where they are detained. *Id.* The notice further informs aliens that they may retain counsel, make calls for that purpose, and will be given a list of potential counsel upon request. *Id.*

Alien enemies will be given seven days from receipt of that notice to file habeas petitions, during which time the aliens will not be removed

under the AEA. *Id.* Aliens who petition for habeas will not be removed until that petition is resolved. *Id.* To date, over thirty aliens detained under the AEA have filed habeas petitions, and for many of them, it has now been over 100 days since notice was served.

## C.    The Panel Decision

On remand from the Supreme Court, a divided panel of this Court granted Petitioners a preliminary injunction and remanded for further fact-finding. Panel Decision, Dkt.195 ("Op.").

A majority held the Government's updated notice procedures comported with due process, Op.48, explaining that on the limited factual record available, "the updated notice appears to comply with the Supreme Court's directive" in *A.A.R.P.* Op.47. Judge Ramirez dissented; she would have required at least a 21-day notice period. Op.49-54.

A separate majority held that the court could review the proper interpretation and application of the AEA, Op.6-17, and deemed Petitioners likely to succeed on the merits. All three panel members agreed with the Government that the Proclamation properly identifies hostilities by a "foreign nation or government," given the President's finding that "the Maduro regime is directing TdA in this country." Op.37.

14

The majority held, however, that the Proclamation does not identify a "predatory incursion" or "invasion" within the meaning of the AEA. Op.35. The panel majority read those terms to require attacks by a "military force" or "armed forces." Op.22, 30-31. The panel majority determined that the Proclamation did not identify such an incursion or invasion, and held that Petitioners were likely to succeed on their statutory claim. Op.34. That majority further held that the other injunctive factors favored Petitioners. Op.18-43, 49.

Judge Oldham dissented. Op.78-150. He explained that the Court lacked authority to assess if the AEA's preconditions have been satisfied and would have held that the President's "power to find that an invasion, or similar hostility is being perpetrated or threatened" is "conclusive." Op.85. He also would have held that the equities favored the Government. Op.78-150.

The Government sought, and this Court ordered, rehearing en banc.

## IV.   Recent Events

Since the panel decision, tensions between the United States and the Maduro regime have escalated. In September, the President announced that the United States had conducted a targeted strike in the Caribbean against a narco-terrorist boat manned by TdA members that was "transporting illegal narcotics, heading to the United States." Donald J. Trump, Truth Social (Sept. 2, 2025), https://perma.cc/GQS7-QG88. Since then, the United States has conducted other strikes against narco-terrorist boats in the region. *See generally* U.S. Mission to the U.N., Remarks at a UN Security Council Briefing on Venezuela (Oct. 10, 2025); https://perma.cc/5C84-9AJ9. Consistent with 50 U.S.C. §1543a, the Executive Branch notified Congress of these actions and explained their compliance with the law of armed conflict. *See* Notice to Congress, https://perma.cc/5M4F-SLMY. As Petitioners own evidence shows, TdA and other groups are controlled by the Maduro regime, which the United States does not recognize as the legitimate government of Venezuela. *See* Truth Social (Sept. 2, 2025), ("TDA is a designated Foreign Terrorist Organization, operating under the control of Nicolas Maduro, responsible

for mass murder, drug trafficking, sex trafficking, and acts of violence and terror across the United States and Western Hemisphere.").

The Secretary of War also deployed an aircraft carrier group to the region. *See* U.S. Dep't of War, *Statement from Chief Pentagon Spokesman Sean Parnell on U.S. Force Posture Changes in the U.S. Southern Command Area of Responsibility* (Oct. 24, 2025), https://perma.cc/5R6N-X8ZW. Maduro, in turn, has mobilized the military and armed civilians. *See* Antonio María Delgado, *Missiles and militias: Maduro fortifies Caracas' coastal access as US military looms*, Miami Herald, Nov. 20, 2025, https://perma.cc/6EQJ-6VJ3.

## SUMMARY OF ARGUMENT

Petitioners are not entitled to a preliminary injunction, and the panel erred in concluding otherwise.

I.     Petitioners are unlikely to succeed on their argument that the Proclamation violates the AEA. Judicial review under the AEA is extremely limited and deferential. In resolving this challenge, the Court must defer conclusively to the President's factual determinations and ask (at most) whether the AEA's terms can bear the President's statutory interpretation. The panel majority instead closely scrutinized the

relevant terms, in contravention of basic statutory-interpretation and separation-of-powers principles.

A.    Under any standard of review, the Proclamation readily satisfies the AEA's statutory requirements. To begin, as every member of the panel recognized, the Proclamation properly identifies action by a "foreign nation or government." 50 U.S.C. §21. Petitioners contend that the President cannot remove TdA members under the AEA because TdA is a "non-State actor." But the President found that TdA is so entwined with the Maduro regime as to form a "hybrid criminal state." 90 Fed. Reg. at 13,033. Such use of "forces" "that are not part of the country's regular military" suffices under the AEA. Op.37.

B.    The Proclamation also properly identifies a "predatory incursion" or "invasion" that has been "perpetrated, attempted, or threatened" by the Maduro regime through TdA. 50 U.S.C. §21. Petitioners contend, and the panel majority agreed, that those terms apply only in cases of declared war or military attack by armed forces. That argument ignores the statutory terms "attempted" and "threatened," which grant the President authority to invoke the AEA before any hostilities are completed. In all events, Petitioners and the

panel majority are wrong about the meaning of "predatory incursion" and "invasion." Contemporaneous dictionaries and examples of historical usage amply demonstrate that those words can encompass hostile actions like TdA's. And even under the panel's overly cramped definition, the President plainly found at least a "threatened" "predatory incursion."

II.    Petitioners are unlikely to succeed on their due-process challenge to the Government's revised notice procedures. The Government now gives AEA detainees notice of their designation in a language they understand, information about how to challenge their designation, and seven days in which to file a habeas petition before being removed. ROA.1124-27. Those procedures readily afford aliens a "sufficient" opportunity to "actually seek habeas relief," particularly in light of the Government's countervailing interests in removing dangerous TdA members swiftly. *See A.A.R.P.*, 605 U.S. at 95. Petitioners' other procedural arguments similarly lack merit.

III.    Petitioners cannot satisfy the remaining preliminary-injunction factors. Petitioners do not explain why an injunction would prevent their asserted harms. On the other side of the ledger, the Supreme Court has already "recognize[d] the significance of the

Government's national security interests" in this case. *A.A.R.P.*, 605 U.S. at 96. Petitioners' request for a preliminary injunction should be denied.

## STANDARD OF REVIEW

The Supreme Court instructed this Court to address "all the normal preliminary injunction factors" on remand. *A.A.R.P.*, 605 U.S. at 98. To prevail, Petitioners thus must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Little v. Llano County*, 138 F.4th 834, 841 (5th Cir. 2025). Petitioners come nowhere close to carrying that burden.

## ARGUMENT

## I.   THE PROCLAMATION IS A LAWFUL EXERCISE OF THE PRESIDENT'S BROAD POWERS UNDER THE AEA

To start, Petitioners are unlikely to show that the Proclamation violates the AEA, which authorizes the President to direct the removal of alien enemies if (1) a "foreign nation or government" has (2) "perpetrated, attempted, or threatened" an "invasion" or a "predatory incursion" against U.S. territory. 50 U.S.C. §21. The Proclamation readily satisfies

both requirements, especially under the highly limited and exceedingly deferential standard of review that applies. The panel majority erred several times over in holding otherwise.

### A. Judicial Review Under the AEA is Extremely Limited and Deferential

1.    The AEA's grant of authority to the President is about "as unlimited as the legislature could make it." *Ludecke*, 335 U.S. at 169 (quoting *Lockington v. Smith*, 15 F. Cas. 758, 760 (C.C.D. Pa. 1878 (Washington Circuit Justice)). The AEA grants the President alone discretion to find that an "invasion" or "predatory incursion" by a hostile nation or government has been "perpetrated, attempted, or threatened." 50 U.S.C. §21; *Arevalo v. Trump*, 785 F. Supp. 3d 644, 664 (C.D. Cal. 2025). Courts have long recognized that "[u]nreviewable power in the President" is the "essence" of the AEA. *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946). As the Supreme Court recently reiterated, the AEA "largely 'preclude[s] judicial review.'" *Trump v. J. G. G.*, 604 U.S. 670, 672 (2025) (quoting *Ludecke*, 335 U.S. at 163).

Accordingly, courts may engage in only "limited" judicial review, to decide "questions of interpretation and constitutionality" of the AEA (or whether the petitioner is an alien enemy at least 14 years old)." *Id.*

21

(quoting *Ludecke*, 335 U.S. at 163, 172 n.17). Courts may define statutory terms, but must allow the President a wide berth. For instance, unduly narrow interpretations of terms like "predatory incursion" and "invasion" could preclude the President from responding to evolving forms of warfare and conflict. *See Ludecke*, 335 U.S. at 164 n.7. Further, courts must be particularly deferential to the President's factual determinations and the application of law to those facts. That deference reflects the AEA's breadth, the range of sensitive national-security situations that may arise, and the President's underlying constitutional authority over national security and foreign affairs. *See Arevalo*, 785 F. Supp. 3d at 665.

The Supreme Court's analysis in *Ludecke* underscores how limited judicial review is under the AEA. There, the Court upheld the President's decision to direct the removal of German nationals under the AEA even long after Germany's unconditional World War II surrender. 335 U.S. at 170. The Court engaged in statutory interpretation when it agreed that the statutory term "declared war" does not mean only "actual hostilities." *Id.* at 170-71. But, critically, the Court "construed the AEA only to the extent necessary to reject the argument that the President had exceeded

the scope of his authority under the AEA." *Arevalo*, 785 F. Supp. 3d at 663; *see* Op.93 (Oldham, J., dissenting) (discussing *Ludecke*).

Underscoring the point, many determinations closely related to those which the AEA vests in the President are nonjusticiable in other contexts. Take the question whether the President validly determined that TdA is engaged in an actual or threatened "predatory incursion" or "invasion" under the AEA. Nearly 200 years ago, the Supreme Court considered a challenge to the President's exercise of authority under a similarly worded statute, which authorized the President to call up the militia "whenever the United States shall be invaded, or be in imminent danger of invasion." *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29 (1827). The Court refused to second-guess the President's assessment of the danger of such an invasion, explaining that his determination was "conclusive." *Id.* at 30; *see* Op.85-87 (Oldham, J.) (discussing *Mott*). Moreover, until recently, courts uniformly held that challenges under the Constitution's Invasions Clause provided "no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion." *California v. United States*, 104 F.3d 1086,

1091 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996) (same).

More broadly, the President bears the "vast share of responsibility for the conduct of our foreign relations." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (citation omitted). Thus, in matters involving "sensitive and weighty interests of national security and foreign affairs," courts must defer to the "evaluation of the facts by the Executive." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010). To that end, the President has the exclusive "power to recognize foreign states." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015). The President's determination that a particular group's attempted, threatened, or completed incursion or invasion is attributable to a foreign sovereign similarly involves sensitive foreign-policy considerations that courts are not well equipped to second-guess. Courts are particularly ill-suited to questioning the President's "predictive judgments," *Trump v. Hawaii*, 585 U.S. 667, 708 (2018), such as whether such invasion or incursion is "threatened," 50 U.S.C. §21.

Here, deferential review means deferring conclusively to the President's factual determinations and asking (at most) whether the

AEA's terms can bear the President's statutory interpretation. That is the type of deferential review the Supreme Court employed in *Ludecke*, and such deference is essential to stop courts from usurping the President's constitutional authority over national-security affairs.

2.    The panel majority instead interpreted the AEA's terms narrowly and only deferred to specific factual determinations on the face of the Proclamation, not to the President's ultimate conclusions. Op.17. That minimal, piecemeal deference is legally erroneous and practically impossible: There is "no way to strike such a balance" between "attempt[ing] to construe the terms contained in the AEA while purporting to defer to the President's judgment about the existence of either an invasion or predatory incursion." *Arevalo*, 785 F. Supp. 3d at 664.

The panel majority resisted deferential review based on concerns about "creat[ing] special rules for the AEA" outside of ordinary statutory-interpretation principles. Op.17. But the panel majority's approach is the anomaly. There is a "deeply rooted tradition of judicial restraint when the President is executing national security or foreign affairs statutes pursuant to a broad congressional authorization" that is completely

25

consistent with "basic tenets of statutory interpretation and the tripartite separation of powers." *Al-Bihani v. Obama*, 619 F.3d 1, 38-39 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of rehearing en banc). The "'best reading of a statute' sometimes is 'that it delegates discretionary authority to' the Executive." Op.91 (Oldham, J., dissenting)) (citation omitted). And such discretion is ubiquitous in the national-security sphere, where Congress recognizes the President's unique competence and delegates latitude accordingly. As the Supreme Court concluded in *Ludecke*, "Congress has constitutionally placed" the "full responsibility for the just exercise of this great power" on "the President of the United States." 335 U.S. at 173.

Of course, highly deferential review under the AEA does not mean "no review" at all. *Contra* Br.14, 18. Courts may interpret statutory terms; courts simply must give those terms wide berth. *See* pp. 21-25, *supra*. Some interpretations would obviously be beyond the pale even under that highly deferential standard. The President does not, for example, have "conclusive interpretative power to proclaim that AEA invasions include … double parking at the grocery store," Op.92 (Oldham, J., dissenting). Further, the President's ability to invoke the AEA

requires the President to publicly make findings that the statutory criteria are satisfied. But those limits do not grant courts *carte blanche* to narrowly construe the statute and second guess the President's determination.

## B. The Proclamation Properly Identifies a "Foreign Nation or Government" Under the AEA

The AEA requires the President to find that a qualifying hostile action—a "declared war," or a "perpetrated, attempted, or threatened" "invasion or predatory incursion"—has been committed by a "foreign nation or government." 50 U.S.C. §21. Even under its incorrect deference-depriving standard of review, *see* pp. 25-27, *supra*, the panel majority correctly held that the President's AEA Proclamation satisfies the requirement of identifying hostilities by a "foreign nation or government." *See* Op.37; *see id.* Op.122-27 (Oldham, J., dissenting) (agreeing on this score under deferential standard). The President found that TdA is so interconnected with the Maduro regime as to make its activities in the United States attributable to that regime. *Id.* That determination—which is consistent with the President's statements concerning the recent strikes against narcoterrorist boats, *contra* Br.33-

37—should be dispositive. Petitioners' new arguments against those findings lack merit.

1. No one in this case has "dispute[d] that the Maduro regime qualifies as a 'government' for purposes of the AEA." Op.123 n.17 (Oldham, J., dissenting). Although the United States does not recognize Maduro's regime as legitimate, the regime asserts control over civil and military authority in Venezuela. As to TdA's entwinement with that regime, the President found that TdA infiltrated the Maduro regime, "including its military and law enforcement apparatus." 90 Fed. Reg. at 13,033. The President explained that Maduro coordinates with TdA via the regime-sponsored narcoterrorism enterprise Cártel de los Soles.[2] *Id.* The Cártel de los Soles, in turn, "coordinates with and relies on TdA … to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id.* Thus, the President found that Maduro controls and ceded control over territory to TdA, and that Venezuela operates as a hybrid-criminal state with TdA and other criminal organizations. *Id.* FBI intelligence also reveals that Maduro regime officials "likely use TdA

---

[2] The Secretary of State has also recently designated Cártel de los Soles as a foreign terrorist organization. *See* 90 Fed. Reg. 53,045 (Nov. 24, 2025).

members as proxies," and "deliberately releas[ed] members of TdA" from Venezuelan prisons and encouraged their "travel to the United States." ROA.1202.

2.    When an organization is so closely bound up with a foreign regime as to create a "hybrid criminal state," hostilities by that organization *are* hostilities by a "foreign nation or government" within the meaning of the AEA. *See* Op.35-37; Op.125 (Oldham, J., dissenting). That interpretation tracks conflicts that precipitated the enactment of the AEA, like the Quasi-War. *See* pp. 7-8, *supra*. At that time, "France was using privateers to attack American shipping," and the British had recently hired Hessian mercenaries in its attempt "to suppress the American Revolution." Op.37. Against that backdrop, as the panel correctly recognized, an "enemy using forces … that are not part of the country's regular military does not prevent use of the AEA." *Id.*; *see* Op.124-25 (Oldham, J., dissenting).

To be sure, the President could have gone further and designated all Venezuelans living under Maduro's regime, rather than only TdA members. *See* 50 U.S.C. §21. Instead, the President chose to designate only TdA members, *see* 90 Fed. Reg. at 13,034, consistent with the

President's authority under the AEA to prescribe "in what cases" enemy aliens shall be restrained and removed, 50 U.S.C. §21. The President's decisions should not be second-guessed by courts simply because he exercised power "within narrower limits than Congress authorized" in the AEA. *Ludecke*, 335 U.S. at 166; *see* Op.37.

3.    Petitioners challenge both the factual determination that TdA is intertwined with the Maduro regime and the legal conclusion that such intertwinement satisfies the AEA's "foreign nation or government" requirement. Both lines of argument fail.

a.    On the facts, Petitioners urge this Court not to defer to the President's determination that TdA has formed a "hybrid criminal state" with the Maduro regime on the grounds that "the [G]overnment has directly contradicted these statements in other fora." Br.32. That is just another plea to disregard the particular deference owed to the President's application of the AEA to particular facts. In all events, it is incorrect.

Petitioners invoke recent letters from the Executive Branch to Congress and to the United Nations explaining that "the President has determined" that "cartels" including TdA "are non-State armed groups," and that "the United States is in a non-international armed conflict with

these designated terrorist organizations." Br.8 (citing Notice to Congress; Remarks to the UN Security Council). Those determinations are consistent with the President's AEA findings. Indeed, Petitioners own evidence shows that the President has consistently found that "TDA is a designated Foreign Terrorist Organization, operating *under the control of Nicolas Maduro.*" Truth Social (Sept. 2, 2025) (emphasis added); Remarks to the UN Security Council ("Nicolas Maduro is a fugitive from American justice and the head of the vicious narco-terrorist Cartel de Los Soles.").

Moreover, "Non-State armed group" and "non-international armed conflict" are international-law terms of art that do not correspond to whether TdA constitutes a "foreign nation or government" under the AEA. International law sets a demanding standard for when conduct by a group other than a State itself can be attributed to a State. As a leading commentary explains, "conduct will be attributed to [a] State only if it directed or controlled *the specific operation* and the conduct complained of was an integral part of that operation." U.N. International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts*, commentary to art. 8 (2001) (emphasis added). Even when

31

a State is "responsible for the 'planning, direction and support' given" to a group, international law does not treat "all the conduct" of the group as "attributable to the [State] by reason of its control over them." *Id.*

Even groups that are closely entwined with foreign States, such as Hezbollah, are deemed "non-State armed groups." *See, e.g.*, Israeli Ministry of Foreign Affairs, *Operation 'Rising Lion': Key Factual and Legal Aspects of the Iran-Israel Hostilities* 11 (Aug. 12, 2025, update) (describing Hezbollah, Hamas, and Houthis as such). And a conflict between the United States and such a non-State group would not necessarily qualify as an "international armed conflict," even if some aspects of the group's conduct are directed by a foreign State. *See* Department of Defense Law of War Manual §3.3.1 (July 2023 update).

By contrast, the phrase "foreign nation or government" in the AEA does not impose the modern-day international-law standard for attribution of conduct to a State. A group may qualify based on its close entwinement with a foreign power, even if that group takes some actions that are not directly attributable to that government. After all, "the AEA was enacted at a time when France was using privateers to attack American shipping." Op.37; *see* Op.124-25 (Oldham, J., dissenting).

32

Hostilities by those privateers surely could be attributed to a "foreign nation or government," even though France did not specifically direct each attack (indeed, the French government was unable "to control many of the greedy privateers which flew the flag of France," DeConde, *supra*, at 125). The AEA, in short, recognizes that armed groups affiliated with foreign states can trigger preventive emergency measures even when the foreign state does not specifically direct or coordinate each of the armed group's hostile acts or attempted acts.

Another key distinction between international-law concepts and the AEA turns on the fact that the United States does not recognize Maduro's regime as the government of Venezuela. *See U.S. Mission to the U.N. Statement*. A group associated with an entity that is not recognized as the government of a State is by definition a "non-State" group, and a conflict with such a group is inherently "non-international" in character. By contrast, neither Petitioners nor the panel majority "dispute that the Maduro regime qualifies as a 'government' for purposes of the AEA, even in the absence of a formal recognition by President Trump of Maduro's legitimacy." Op.123 n.17 (Oldham, J., dissenting). As Judge Oldham explains, it would be highly "anomalous" if a President's decision to

withhold recognition from a regime deprived him of the power to remove the regime's subjects as alien enemies. *Id.*[3]

Petitioners' remaining challenges to the President's factual determinations are equally meritless. Petitioners urge the Court to weigh the President's findings against other intelligence assessments. Br.35-36. As the panel correctly acknowledged, however, "it is not for a court to review a President's findings about the facts when he is employing the AEA." Op.11; *see* Op.84 (Oldham, J., dissenting). When "it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,' and respect for the Government's conclusions is appropriate." *Humanitarian Law Project*, 561 U.S. at 34 (citation omitted); *see Trump*, 585 U.S. at 708.

Petitioners also contend that the Proclamation lacks sufficient information about the relationship between Maduro and TdA to justify the President's findings. Br.35. Again, that substitues the deferential

---

[3] For the same reasons, there is no contradiction between the Government's recent statements and its briefing in this case. *Contra* Br.33. In refuting Petitioners' argument that "TdA is a 'non-State actor,'" the Government was explaining why the AEA's "foreign nation or government" requirement is satisfied; it was not using the term "non-State" in an international-law sense. *See* Gov't Panel Br.44.

review standard with APA-style substantial-evidence review (or worse). In all events, the AEA requires the President only to "make[] public proclamation of the event"—*i.e.*, the existence of a declared war, or an actual, attempted, or threatened predatory incursion or invasion by a "foreign nation or government"—not to explain in detail the bases for those findings. 50 U.S.C. §21. That statutory requirement protects against disclosure of sensitive intelligence sources in a public proclamation.

b.    On the law, Petitioners argue that a "hybrid criminal state" such as TdA cannot qualify as a "foreign nation or government" under the AEA. Br.33-34. Petitioners suggest that a President can name only a foreign sovereign in his Proclamation, not a terrorist group and its members. *Id.* All three panel members correctly rejected that argument. Op.37; *see* Op.125 (Oldham, J., dissenting). By identifying TdA rather than the Maduro regime itself, the President "in effect narrowed what he otherwise would be entitled to do"—an action that "does not by itself invalidate use of the AEA." *Id.* at 37.

Petitioners also contend that when the AEA was enacted, a private group's activities could not be attributed to a State without a "formal

35

public commission" such as a letter of marque. Br.39. Petitioners ignore that States also contracted with other types of proxies such as pirates and mercenaries, who did not "possess a letter of marque or any other formal, public documentation." Op.126 (Oldham, J., dissenting). What "mattered was not some formal, public documentation," but rather "whether the 'hostilities' were authorized or 'unauthorized' by the sovereign." *Id.* (quoting 1 William Blackstone, *Commentaries* *249).

Petitioners' contrary theory would prevent the President from addressing threats posed by States through clandestine proxies—an increasingly prevalent dynamic in modern warfare. That would "raise severe national security risks." *Id.* Under any metric—especially the deferential standard that the Supreme Court has prescribed—the President's findings abundantly satisfy the AEA's "foreign nation or government" requirement.

## C.   The Proclamation Properly Identifies an Attempted, Threatened, or Actual "Predatory Incursion" and "Invasion" Under the AEA

The AEA also requires the President's Proclamation to identify a "predatory incursion" or "invasion" that has been "perpetrated, attempted, or threatened" by a foreign power. Here, the President found

36

that TdA engages in "mass illegal migration to the United States" to advance the Maduro regime's goal of "destabilizing democratic nations in the Americas, including the United States," and that it uses "illegal narcotics as a weapon to 'flood' the United States." 90 Fed. Reg. 13,033. The panel majority deemed those hostile acts insufficient, interpreting a "predatory incursion" or "invasion" to require military attacks by armed forces or a declared war. *See* Op.22, 30-35; Br.19-30. That conclusion disregards the statutory terms "attempted" and "threatened," which make clear that the President can invoke the AEA *before* any predatory incursion or invasion occurs. Further, the terms "predatory incursion" and "invasion" cover a wide range of hostile entries, not just organized military hostilities. Regardless, even under the panel majority's unduly narrow definitions, the Proclamation properly identified an actual or threatened predatory incursion or invasion.

### 1. "Attempted" and "threatened" invasions and incursions include hostilities that have not yet occurred

a.    By its plain terms, the AEA extends to "attempted" or "threatened" predatory incursions and invasions, *i.e.*, not just incursions or invasions that have actually been "perpetrated." 50 U.S.C. §21. Those

37

words—particularly "threatened"—authorize the President to invoke the Act to protect against predicted incursions and invasions that have not yet materialized. *See Threatened, Adj., Sense 2."* Oxford English Dictionary, June 2025, https://doi.org/10.1093/OED/1034958671 ("Held out or presented as impending"); *see also* 2 Noah Webster, *An American Dictionary of the English Language* (1828) (defining "threaten" as "to present the appearance of *coming* evil") (emphasis added). The statutory text thus unambiguously refutes Petitioners' insistence that the AEA only applies to an actual "military attack" by armed forces; the prospect of such an attack would be a "threatened" invasion or incursion even under Petitioners' and the panel majority's unduly narrow interpretation of an "incursion" or "invasion." *See* Sections I.C.2-3.

Historical context confirms that the President can invoke the AEA as a preventive measure. As Judge Oldham notes, the AEA was partially grounded in concerns regarding innumerable alien "agents and spies" who might have been ready to join in an attack. 8 Annals of Cong. 1574 (Rep. Rutledge). The AEA was premised on the notion that expelling such aliens would *prevent* France from attacking by depriving them of agents acting from within the United States. As Representative Sitgreaves put

it, "there could be no doubt" that the United States should not "wait till the enemy landed, before any measures were taken to remove persons from the country, who would be ready to join them by thousands or take advantage of knowledge we have of their hostile intentions towards us." *Id.* at 1577.

Thus, the AEA was drafted with a reference to "attempted" or "threatened" invasions and predatory incursions to allow the President to address potential future threats to United States territory. Justice Iredell recognized the importance of this aspect of the statute, observing that "equal danger may be apprehended from the citizens of a hostile power, before war is actually declared as after, perhaps more, because less suspicion is entertained." James Iredell, *Charge to the Grand Jury* (1799), *in* Francis Wharton, *State Trials of the United States* 468 (1849).

b.   The panel majority improperly downplayed the statutory terms "attempted" and "threatened" as "simply extend[ing] the AEA to failed efforts to commit an invasion or incursion." *Id.* That interpretation would render the term "threatened" surplusage. "Threatened" refers to hostilities that may occur in the future, as distinct from "attempted" prior

acts that fell short of accomplishing an invasion or incursion. Regardless of what an "incursion" or "invasion" entails, the words "attempted" and "threaten" further broaden the President's powers under the AEA by confirming that the President can remove alien enemies before an attack actually takes place—to prevent such attacks from wreaking destruction.

Tellingly, Petitioners part ways with the panel majority and concede that the Act's reference to "threatened" invasions and incursions extends to "impending" hostilities. Br.26-27. They contend, however, that an incursion or invasion is "threatened" only during a defensive war when an enemy is already bent upon attacking but is still engaged in preparations. *Id.* That is pure *ipse dixit* unmoored from the statutory text or any definition of the word "threatened."

### 2. "Predatory incursions" are not limited to military attacks

a.    Statutory text, structure, and history demonstrate that the term "predatory incursion" covers a broad range of hostile entries into U.S. territory—not only military aggressions. *Contra* Op.32; Br.19.

Starting with the text, contemporaneous dictionaries define "incursion" broadly and without reference to formal military warfare. Eighteenth- and nineteenth-century dictionaries defined "incursion" as

40

an "[a]ttack; mischievous occurrence," or an "[i]nvasion without conquest; inroad; ravage." Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773); *see* Webster, *supra* ("Literally, a running into; hence entering into a territory with hostile intention; an inroad."). And those dictionaries defined "predatory" to mean "plundering," "pillaging," and "rapine." Johnson, *supra*; Webster, *supra*. Thus, the contemporaneous meaning of the phrase "predatory incursion" was an entry or attack for a hostile and destructive purpose, regardless of whether the act was perpetrated by an army.

Neighboring text confirms the point. The AEA applies in times of "declared war … *or* … invasion or predatory incursion." 50 U.S.C. §21 (emphasis added). Congress's use of different terms—and the disjunctive "or"—signals that "predatory incursion" means something different from "declared war" and "invasion," covering less-formal hostilities. And again, the AEA authorizes removal of alien enemies when a predatory incursion is "perpetrated, *attempted, or threatened*," demonstrating that the actual use of armed forces was not required. 50 U.S.C. §21 (emphasis added); *see* pp. 37-39, *supra*.

41

Historical context and usage reinforce the plain text. *See* Op.56-63 (Oldham, J., dissenting). As noted, the AEA's impetus "was meant to give the President broad authority over potential spies and saboteurs at home" during the Quasi-War, an undeclared conflict between the United States and France largely waged by privateers. Stephen I. Vladeck, *Enemy Aliens, Enemy Property, and Access to the Courts*, 11 Lewis & Clark L. Rev. 963, 968 (2007); *see* Op.18, 56-63 (Oldham, J., dissenting). Contemporary commentators thus understood that the "alien enemy bill" was enacted "against the French." *Communications*, Pa. Weekly Telegraph (Oct. 3, 1798), at 2.

Consistent with that history, the contemporaneous use of "predatory incursion" was not limited to aggressions by organized armed forces. In a 1796 address to Congress, President Washington addressed measures to protect American settlements "from the predatory incursions of those unruly individuals who cannot be restrained by their tribes." President George Washington, Eighth Annual Address to Congress (Dec. 7, 1796). The "predatory incursion" was not conducted by an army, but by "unruly individuals" not necessarily aligned with the tribe. Likewise, *Worcester v. Georgia*, 31 U.S. 515 (1832), discussed state

charters that referred to "incursions" by Indians and by "other enemies, pirates, and robbers." *Id.* at 545; *see also Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch.) 1, 7 (1805) ("watch and repel the predatory incursions of the Indians.").

Petitioners wave away examples involving pirates and Indians, insisting that predatory incursions by those groups "were fundamentally military in nature," because they involved "armed combatants using military weapons and battling militias and navies." Br.30. Of course, pirates also attacked private ships. More importantly, under Petitioners' logic, TdA is also "military in nature," as their members plainly use "weapons" and have provoked the engagement of our "navies." *See* pp. 8-10, *supra.*

Regardless, the phrase "predatory incursion" was used to describe attacks by other nonmilitary groups as well. Not long after the AEA's enactment, the Massachusetts Governor wrote to the Secretary of War that although citizens "had no apprehensions of invasion by an authorized British force, … there were many lawless people on the borders from whom they were in danger of predatory incursions." Letter from Caleb Strong to William Eustis (Aug. 5, 1812), *in* 1 *American State*

*Papers: Military Affairs* 323 (1832). In another instance, a Creek Nation representative asked the Governor of the Bahamas for protection from "the predatory incursions of the back Georgians"—that is, private Georgian citizens—who plundered Creek cattle herds. Letter from A. Arbuthnot to Charles Cameron (1818), *in* 1 *American State Papers: Military Affairs* 722-723 (1832). These uses exemplify the broad, flexible meaning of the term "predatory incursion"—a phrase not limited to encroachments by armies.

b.    Petitioners erroneously argue that the AEA applies only in times of "declared war or military attack." Br.19. The panel majority largely adopted that argument, holding that the phrase "predatory incursion" required action by "armed forces." Op.30. Neither Petitioners nor the panel majority, however, offer a dictionary definition that supports that narrow reading. On the contrary, the panel majority's cited dictionaries included definitions that did not refer to organized military hostilities. *See* Op.23. The panel majority relied on "contemporaneous usage" to narrow those dictionary definitions, identifying instances where a "predatory incursion" was used to describe hostilities by "a military force of some meaningful size." Op.24, 27. But the Government

44

has never disputed that "predatory incursion" was sometimes used to describe hostilities by an organized military force. The problem with the panel majority's interpretation is that the phrase *also* referred to less formal or militaristic intrusions, as discussed above.

Instead, Petitioners rely on statutory context to argue that the term "predatory incursion" should carry a narrower meaning in the AEA. *See* Br.22-23. Petitioners say that "alien enemies" was "a well-established term of art in the law of nations that required military conflict," and that it would have been "unheard of" to apply it "outside of actual or imminent war." Br.22; *see* Op.23. That view of "alien enemies" is incorrect. A leading treatise recognized that for a person to be "said an alien enemy," "open acts done by his prince are sufficient, and … it is not necessary that a war be proclaimed." 1 Matthew Bacon, *A New Abridgment of the Law* 138 n.b (5th ed. 1798). Contemporaneous English sources likewise recognized that a citizen of a neutral country could "bec[o]me an enemy in consequence of having participated in one single act of hostility" against the country, even if his country was formally neutral. *Sparenburgh v. Bannatyne*, 126 Eng. Rep. 837, 840 (1797); *see Vaughan's Trial*, 90 Eng. Rep. 1280, 1281 (1696). Edward Coke even addressed the

45

notion of a "perpetual" "alien enemy," such as an "infidel[]," who maintained that status "though there be no wars by fire and sword between them." *Calvin's Case*, 7 Co. Rep. 1, 29 (1773). And, during the Quasi-War, French citizens were described as "alien enemies" even though no war had been declared. *See* 8 Annals of Cong. 1581 (1798); *see id.* at 1574-1576.

Nor does the contemporaneous Alien Friends Act support Petitioners' interpretation. *Contra* Op.28-30; Br.27. That peacetime statute would have allowed the President to remove "all such aliens as he shall judge dangerous to the peace and safety of the United States," *without* requiring any finding of hostilities between nations, 1 Stat. 571 (1798), whereas the AEA "demands specific categories of hostility by another nation or government." Op.30. The panel majority strained to "keep the coverage separate" for the two statutes, Op.29, but that approach does not work. Even under Petitioners' theory, the two statutes overlapped, as Petitioners acknowledge that the Alien Friends Act would have applied during times of "military conflict," not only during times "without" such conflict. Br.24.

### 3. The term "invasion" is not limited to military attacks

a.    As discussed, the AEA can be invoked to guard against an "invasion *or* predatory incursion," 50 U.S.C. §21 (emphasis added), as well as a "declared war." While the incursion prong alone justifies the Proclamation, TdA's hostilities against the United States also constitute an "invasion" under the AEA.

In 1798, an "invasion" broadly referred to a "hostile entrance," *e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or "hostile encroachment" on another's territory, *see* Thomas Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789). While other definitions include "formal military operations," they also mention "other kinds of encroachments or intrusions," including hostile acts of mass migration. Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Power of States*, 13 Brit. J. Am. Legal Stud. 21, 23-24 (2024). In short, "[e]ighteenth-century dictionaries" indicate that "the scope" of the term "invasion" "was not limited to incursions by a foreign army." Natelson & Hyman, *supra*, 20.

Both the Federalist Papers and the early acts of Congress reinforce that broad understanding. *See* Natelson & Hyman, *supra*, 23. For

47

example, when debating the Constitution, the Founders referred to "hostile invasions of lawless and ambitious men" seeking to "introduce anarchy, confusion, and every disorder." *Id.* (quoting 4 *The Documentary History of the Ratification of the Constitution* 116, 117 (John P. Kaminski et al. eds., 1976-2023)). Madison warned of "the *predatory* spirit of licentious adventurers" and "daring and sudden *invaders*" along the Atlantic Coast. *The Federalist* No. 41 (Madison) (emphases added).

Much like "predatory incursion," numerous sources refer to pirates, Indians, and other non-military organizations engaging in invasions.[4] Indeed, the term "invasion" sometimes even described hostile acts of mass migration. For example, in 1783, the Pennsylvania legislature passed a resolution that unauthorized immigration from Connecticut had become an invasion, referring to "invaders of the State." Natelson & Hyman, *supra*, 23-24. In short, "invasion" was used far more broadly than just military aggressions.

---

[4] *See, e.g.,* 1 Annals of Cong. 722 (1789) (statement of Rep. Jackson) ("Georgia has been invaded [by Creek Indians]; the fact is absolute and notorious."); Henry Knox, Department of War, *Plan for the Arrangement of the Militia, in* III Thomas Lloyd, *The Congressional Register* 132, 154 (1790) (similar); William Bartram, *Travels* 65 (1792) (pirates);

b.　The panel majority defined "invasion" to mean "an act of war involving the entry into this country by a military force of or at least directed by another country or nation, with a hostile intent." Op.22. As the dissent explains, the panel majority's definition of "invasion" is unsupported. The opinion first offers two separate definitions of invasion to support its conclusion that the word "requires military action"; only one actually refers to "military force." Op.19, 22, *see id.* at 108 n.14 (Oldham, J., dissenting). Moreover, as with the term "predatory incursion," the panel majority cherrypicked examples of contemporaneous usage. *See* pp. 39-40, 44-46, *supra.* The term "invasion" in the AEA is not limited to acts of war, as the panel majority erroneously believed.

### 4.　TdA has perpetrated, attempted, or threatened a predatory incursion or invasion by any metric

Applying the proper definitions, the Proclamation plainly identifies a "predatory incursion" or "invasion" that has been "perpetrated, attempted, or threatened" by TdA. 50 U.S.C. §21. But even under the panel majority's overly narrow definitions, the President's findings of "irregular warfare" should satisfy the AEA's requirements. Only by

failing to properly defer to the President's factual determinations did the panel majority reach a contrary conclusion.

a. Under the proper definitions of the terms, the Proclamation plainly identifies a predatory incursion or invasion—at the very least, one that has been threatened.

In the Proclamation, the President found that TdA shares with the Maduro regime a common "goal of destabilizing democratic nations in the Americas, including the United States." 90 Fed. Reg. at 13,033-34. TdA has entered the United States with the hostile purpose of fulfilling that destructive goal. The President has found that TdA operates "both within and outside the United States." *See* Exec. Order No. 14,157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8439 (Jan. 29, 2025). TdA uses "illegal narcotics as a weapon to 'flood' the United States" and destabilize our security. 90 Fed. Reg. at 13,033. TdA engages in "mass illegal migration" and "used drug trafficking as a weapon against our citizens." *Id.* These actions plainly qualify as a hostile encroachment or "predatory incursion." *See* pp. 40-46, *supra*.

50

And by flooding weapons, drugs, and illegal migrants into the United States, TdA is plainly committing that incursion "against the territory of the United States." 50 U.S.C. §21; *see* ROA.1201-04 ¶¶5, 8 (describing TdA's infiltration of American cities and violent acts against Americans). Moreover, the FBI believes the Maduro regime may direct TdA to carry out targeted attacks on Venezuelan dissidents on American soil as it has elsewhere. *See* FBI Assessment, ROA.1203-04. At the very least, that amounts to a "*threatened*" "predatory incursion" against U.S. territory. 50 U.S.C. §21 (emphasis added).

The Proclamation also appropriately identifies an "invasion." There is substantial evidence that TdA is physically "encroaching" on U.S. territory. For example, several recent reports explain that TdA is present in over 40 states and has taken control over particular apartment complexes in U.S. cities.[5] Moreover, TdA has demonstrated a pattern of "setting down roots" in multiple South American countries—indicating

---

[5] *See* Jonathan Limehouse, *Colorado Apartment to Close After Multiple Arrests, Claims of Venezuelan Gang Takeover*, USA Today (Jan. 14, 2025), https://perma.cc/Y2UM-3K9L; Nicole C. Brambila, *Venezuelan TdA Gang Uses Similar Aurora Tactics to Take Over Building in San Antonio, Texas*, Denver Gazette (Dec. 21, 2024), https://perma.cc/S9NQ-PDWV; *see also* ROA.1193-96, Smith Decl ¶¶9, 12, 15-16.

that its *modus operandi* is encroaching on foreign territory with the hostile purpose of taking control.[6] That pattern of TdA "violat[ing] the territorial sovereignty of Venezuela's neighbors" was documented in U.S. intelligence reports preceding the Proclamation. *See* FBI Intelligence Assessment, ROA.1201-04. Those actions plainly satisfy the historical meaning of an "invasion" as a hostile attack or encroachment. At the very least, TdA has "attempted" or "threatened" an "invasion"—which would suffice to satisfy the AEA. 50 U.S.C. §21.

b.    TdA's hostilities also satisfy even the panel majority's unduly narrow definition of a "predatory incursion." The panel majority recognized that an "enemy using forces … that are not part of the country's regular military does not prevent the use of the AEA." Op.37. And it recognized that the Maduro regime was using TdA's forces in that way. *Id.* The panel also acknowledged that today's enemies may engage in "modern warfare" which "involves different categories of weapons" and "actions altogether different from the past." Op.31. Combining those points, TdA's use of modern weapons—drug trafficking and illegal

---

[6] *Tren de Aragua: From Prison Gang to Transnational Criminal Enterprise*, InSight Crime (Oct. 2023), https://perma.cc/GKB8-2KPD.

migration—should meet even the panel majority's definition of a "predatory incursion": namely, "armed forces of some size and cohesion, engaged in something less than an invasion, whose objectives could vary widely, and are directed by a foreign government or nation." Op.30-31.

The panel majority held otherwise only by committing another significant error: failing to defer to the President's factual determinations and myopically focusing only on the facts in the Proclamation itself. Op.34-35; *see* p. 25, *supra*. The panel majority ignored all statements in the Proclamation that it deemed conclusory or unsupported, and refused to credit information outside the four corners of the Proclamation. Op.33-34. That approach effectively requires the President to include every sensitive intelligence source in a Proclamation as if it were a rule issued under the APA. Op.105 (Oldham, J., dissenting). As the D.C. Circuit has put it, "it is inconceivable that before an alien enemy could be removed," the "President should be compelled to spread upon the public record in a judicial proceeding" such sensitive information. *Citizens Protective League*, 155 F.2d at 294.

## II. THE GOVERNMENT'S AEA NOTICE PROCEDURES SATISFY DUE PROCESS

Separate from the AEA statutory analysis, a different panel majority correctly rejected Petitioners' due-process and procedural objections to the Government's revised notice, which informs a detainee in a language that he understands of his designation and that he has seven days to challenge that notice in a habeas proceeding filed in his district of confinement. Op.44-47; Op.155 (Oldham, J., dissenting); *see* Notice, ROA.1124-27. Petitioners' contrary arguments and remaining procedural objections lack merit.

### A. The Revised Procedures Provide Sufficient Opportunity to Seek Habeas Relief

A governmental notice complies with due process when it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The Supreme Court has clarified how that standard applies in the context of AEA removal notices: "AEA detainees must receive notice that they are subject to removal under the Act within a reasonable time and in such a manner as will allow them to actually

54

seek habeas relief before removal." *A.A.R.P.*, 605 U.S. at 95 (citation and ellipses omitted). To "'actually seek habeas relief,' a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief.'" *Id.*; *see* Op.44-45.

The adequacy of a particular notice is a case-specific inquiry that depends on "all the circumstances," *A.A.R.P.*, 605 U.S. at 95, including the interests of the Government and the individual, *see Jones v. Flowers*, 547 U.S. 220, 229 (2006). Importantly, where the Government has a strong interest in "prompt, vigorous action"—especially in matters of national security—due process does not forbid the Government from requiring illegal aliens to move with "appropriate" expedition. *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903).

As the panel majority correctly recognized, the Government's revised notice procedures here readily pass muster. *See* Op.47; Op.155 (Oldham, J., dissenting). The notice provides a detainee with seven days to challenge their removal and informs him, in a language that he can understand: (1) that he has been designated an alien enemy; (2) that he can challenge his designation by filing a habeas petition in his district of confinement; and (3) that he can request a list of available attorneys. *See*

ROA.1125-26. That is more than "reasonable time" and "sufficient information" to "contact counsel" and "file a petition," *A.A.R.P.*, 605 U.S. at 95, especially since AEA detainees across the country, including members of this putative class, have pursued relief through counsel in far less time. *See* p. 58 n.7, *infra; see* p.14, *supra.*

Indeed, seven days to merely *file* a habeas petition is far greater process than what the federal immigration laws offer in analogous contexts. For one, the expedited-removal process under 8 U.S.C. §1225(b) subjects certain illegal aliens to immediate removal "without further hearing or review," 8 U.S.C. §1225(b)(1)(A)(i), subject only to a limited window to establish a "credible fear of persecution," *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020). Within that window, credible fear determinations are often made within a matter of hours, and any review must be completed within a week—and "to the maximum extent practicable within 24 hours." 8 U.S.C. §1225(b)(1)(B)(iii)(III). The Supreme Court has held that these procedures satisfy due process. *Thuraissigiam*, 591 U.S. at 140. Rightly so. "[I]n general," the English common law only required "several days" between the "time of summons and a hearing." 2 Chitty's General Practice 176 (1834); *see also* Op.47

(drawing analogy to ten-day period for scheduling removal hearing under 8 U.S.C. §1229(b)(1)). Given the President's national-security determination that the presence of TdA members in this country endangers the nation, *see* 90 Fed. Reg. at 13,033, due process permits even swifter removal. *See A.A.R.P.*, 605 U.S. at 96 (recognizing "the significance of the Government's national security interests").

That threat is not alleviated by the fact that some TdA members are currently detained. This April, for instance, detained TdA members barricaded themselves within their housing unit and "threatened to take hostages." Johnson Decl., ROA.1219 ¶9. More generally, TdA has long been able to "grow its numbers" from others in detention, creating the risk that current members will "recruit new TdA members." ROA.1220 ¶12. Continued detention of TdA members presents a "grave risk" to national security, *id.*, warranting an expedited process.

### B.    Requiring 30 Days' Notice and Detailed Factual Disclosures is Unwarranted

Petitioners counter that the Government must (1) give enemy aliens a month to file a habeas petition and (2) provide each alien with information about the removal process and a factual basis for his detention before habeas proceedings even commence. Br.42. Those

demands lack any constitutional basis and disregard the Government's compelling national-security interests in this context.

1.     Petitioners demand a 30-day notice period, claiming that a host of practical barriers necessitate a full month to simply file a habeas petition. Br.43-45. That argument myopically focuses on alleged barriers to habeas filings without crediting the Government's extraordinarily weighty countervailing national-security interests. And in all events, Petitioners have not established that detainees could not file habeas petitions within a week, least of all when the inquiry at issue—whether the alien is in fact a member of TdA—is straightforward, and could be accomplished via a simple habeas filing contesting TdA membership. *See* Op.158 (Oldham, J., dissenting). Any necessary factual development can occur through amendment or the hearing process itself.

The facts also belie Petitioners' practical concerns. Petitioners themselves sought relief here within hours of learning of their potential removal. ROA.12-14; *see* Op.174 (Oldham, J.). And AEA detainees across the country have also filed petitions in fewer than seven days.[7]

_____

[7] *See, e.g., G.F.F. & J.G.O.* v. *Trump*, No. 25-cv-2886 (S.D.N.Y. Apr. 8, 2025); *J.A.V. v. Trump*, No. 25-cv-72 (S.D. Tex. Apr. 8, 2025); *D.B.U. v.*
(*Footnote continues on next page…*)

Petitioners posit that some putative class members may have a harder time filing habeas petitions, depending on their "lack of literacy and English fluency," their "access to relevant documents," and their preexisting relationship with an attorney. Br.44. Those arguments about potential material variations among class members are classic reasons to reject class certification, not a basis for a facial due-process challenge. As the Supreme Court explained in *Reno v. Flores*, 507 U.S. 292, 300 (1993), a procedural due-process challenge to a policy that had never "yet been applied in a particular instance" is a "facial challenge" that requires a plaintiff class to "'establish that no set of circumstances exists'" in which the relevant procedures would be adequate. *Id.* at 301 (citation omitted). Petitioners plainly cannot make that showing when many of them sought relief in far less time than the Government's revised notice procedure affords. Nor have they shown that the notice procedure is *typically* insufficient for putative class members.

Petitioners nevertheless insist on 30 days' notice because that was what the Government afforded to World War II enemy aliens. Br.47. But

---

*Trump*, No. 25-cv-1163 (D. Colo. Apr. 12, 2025); *A.S.R.* v. *Trump*, No. 25-cv-133 (W.D. Pa. Apr. 15, 2025).

that was a policy choice, not a constitutional floor. *See Citizens Protective League*, 155 F.2d at 295. The Constitution permits a more expedited timeline—particularly where, as here, the President has determined that speedy removal is important for national-security reasons. Besides, as the panel majority correctly explained, "[w]hat was reasonable in the 1940s is not automatically what is reasonable today." Op.46; *see* Op.162 (Oldham, J.). Before modern communications, more time was needed to provide notice, reach counsel, file claims, and hold hearings. *Id.* Finally, Petitioners suggest that supposed past due-process violations justify procedural prophylaxis today—but allegations of process fouls under different notice regimes cannot justify inventing an unduly onerous regime going forward.

Judge Ramirez, while rejecting a 30-day requirement, would have instead held that "[a]t least twenty-one days' notice is required." Op.54. Nothing in the caselaw or record supports a 21-day standard; indeed, Petitioners have not identified "even one plaintiff who was unable to contact counsel, file a petition, and pursue appropriate relief" within twenty-one days. Op.174 (Oldham, J., dissenting). Seven days' notice is more than enough—as the facts here underscore.

2.    Petitioners would also impose a due-process requirement that the Government's notice supply the factual basis for designation as an alien enemy, as well as "basic information about the process" of removal. Br.47-48. That objection just underscores Petitioners' recurrent disregard for the highly sensitive information at issue in AEA designations.

When the President issues a proclamation under the AEA, he establishes a class of aliens subject to summary removal. And when the Executive Branch detains an alien pursuant to that proclamation, it necessarily determines that the alien is a member of that class. That designation provides everything that an alien needs to "actually seek habeas relief in the proper venue before such removal occurs"—*i.e.*, to assert he is not subject to the proclamation. *J.G.G.*, 604 U.S. at 673.

Given the exigencies and the presidential responsibilities involved in AEA designations, courts have held that it "must be presumed that the President has acted lawfully" in detaining an enemy alien. *Ex parte Risse*, 257 F. 102, 104 (S.D.N.Y. 1919). The "burden" is on the alien to show he is "not" part of that "hostile" invasion or incursion. *Id.* It is "not upon the United States to show that he is." *Ex parte Gilroy*, 257 F. 110, 114

(S.D.N.Y. 1919); *see also United States ex rel. Schlueter v. Watkins*, 67 F. Supp. 556, 565 (S.D.N.Y. 1946), *aff'd*, 158 F.2d 853 (2d Cir. 1946) (describing procedures during World War II).

Petitioners' proposal would improperly flip that burden by requiring the Government to disclose to an enemy alien the basis for its determination before that alien even decides whether to contest his removal. Petitioners assert (Br.48) that such burden-flipping is consistent with *Hamdi v. Rumsfeld*, 542 U.S. 507, 532-33 (2004) (plurality opinion), which stated that a U.S. citizen detained as an enemy combatant "must receive notice of the factual basis for his classification." *Id.* at 533. But *Hamdi* "did *not* specify that factual bases must be provided as soon as the detainee receives a notice of removal," and does not apply to noncitizen alien enemies. Op.166 (Oldham, J., dissenting).

Moreover, to the extent the Government must justify its classification before an alien's removal, the proper time is "*in* habeas proceedings," Op.166 (Oldham, J., dissenting), not before. Indeed, the evidence showing membership in an enemy class—particularly when that class is a foreign terrorist organization—is often highly sensitive and may need to be sealed or otherwise protected. *See id.* at 167.

Petitioners also contend that the removal notice must specify "basic information about the process" such as the earliest removal date and country of removal. Br.48. Again, that is pure policy invention, not a legal requirement; the same goes for Petitioners' remaining grab-bag of requests, such as their preferences that the notice be written in more "plain language," and specify "how to challenge removal." Br.48. The Government need not supply enemy aliens with a "Habeas Primer." Op.167 (Oldham, J., dissenting). The Government's policy is to provide notice in a language the alien can understand, that explains how to challenge the designation, and that says the detainee can request a list of attorneys. ROA.1124-27. Due process requires nothing more.

3.    Petitioners' demands for additional procedures are especially misguided because "the due process rights of an alien seeking initial entry" are no greater than "[w]hatever procedure[s] [are] authorized by Congress." *Thuraissigiam*, 591 U.S. at 138-39. For aliens who have never been lawfully admitted—a group which undoubtedly includes many of the putative class members here—"the decisions of executive or administrative officers, acting within powers expressly conferred by [C]ongress, *are* due process of law." *Nishimura Ekiu v. United States*, 142

U.S. 651, 660 (1892) (emphasis added); *accord Thuraissigiam*, 591 U.S. at 138-40.

To be sure, tailored review of AEA decisions is available in habeas. *See Ludecke*, 335 U.S. at 163-64, 171 n.17. But Congress chose that process; the Constitution does not impose it, let alone license federal courts to augment those procedures.

## C.    Petitioners' Other Procedural Objections Fail

Petitioners' remaining procedural arguments are outside the scope of the Supreme Court's remand order, and are baseless to boot.

1.    First, Petitioners are wrong that the AEA *requires* the Government to offer a period of voluntary departure. Br.52-53. The AEA permits the President to "provide for the removal of those who … refuse or neglect to depart therefrom," 50 U.S.C. §21, but also dictates that they "*shall be* liable to be … removed as alien enemies." *Id.* (emphasis added). Here, where the alien enemies are members of the hostile force itself, the President may immediately effectuate removal; the AEA does not provide hostile foreign actors a grace period for potential further mayhem.

Petitioners cite a handful of 1940s Second Circuit cases, but those cases did not involve detainees "chargeable with actual hostility" under

Section 22. *See, e.g.*, *United States ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 651-52 (2d Cir. 1947). By contrast, the President has made such a determination for all alien enemies who are members of TdA. 90 Fed. Reg. 13033. "[T]he President acting under the AEA need not offer voluntary departure to alien enemies who the Executive Branch has concluded are engaged in chargeable actual hostility." *J.A.V. v. Trump*, 781 F. Supp. 3d 535, 555 (S.D. Tex. 2025); *see also A.S.R. v. Trump*, 782 F. Supp. 3d 224, 250-51 (W.D. Pa. 2025). In all events, Petitioners have essentially forfeited this claim; during the months while this litigation has been pending, none has attempted to voluntarily depart. *See* Op.182-83 (Oldham, J., dissenting).

2.    Next, Petitioners remarkably contend that the INA supplants the AEA such that all AEA removals must follow the INA's terms. Br.49-51. That position is meritless. To begin, the INA states that Title 8 proceedings are the "exclusive" procedures for removal only for an alien who "has been… admitted," meaning "lawful entry." 8 U.S.C. §§1229a(a)(3), 1101(a)(13)(A). That is unlikely to apply to the vast majority of putative class members. Op.180 (Oldham, J., dissenting). Even as to putative class members who were lawfully admitted, however,

the INA did not impliedly repeal the distinct procedures that the AEA applies to alien enemies under Title 50. "[R]epeals by implication are 'disfavored,'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018), and that goes doubly for the notion that the INA—a statute governing removal of all sorts of aliens—would silently supplant the highly specific procedures that Congress since the Founding has prescribed for alien enemies. Petitioners now argue that the AEA still applies to lawful permanent residents, Br.49, but it would be strange if they could be removed under the AEA while illegals received the protections of the INA.

3.    Finally, Petitioners are mistaken that the AEA procedures are defective in light of the withholding-of-removal statute and the Convention Against Torture (CAT). *See* Br.50-51. The exclusive remedy under the AEA is habeas. *See J.G.G.*, 604 U.S. at 672. But claims for withholding-of-removal and CAT protection—which govern *where* an alien may be removed, not *whether* he may be removed—do not sound in habeas at all, and cannot be raised here, *Hamama v. Adduci*, 912 F.3d 869, 876 (6th Cir. 2018). Moreover, the United States' longstanding policy remains "not to transfer an individual in circumstances where torture is likely to result." *Munaf v. Geren*, 553 U.S. 674, 702 (2008). And in any

event, individuals subject to removal under Title 50 can be barred from asylum and withholding of removal. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730-31 (D.C. Cir. 2022).

## III.   PETITIONERS FAIL TO SATISFY THE REMAINING PRELIMINARY-INJUNCTION FACTORS

All else aside, Petitioners are not entitled to an injunction because the remaining equitable factors strongly favor the Government. *Contra* Op.40-43.

To begin, Petitioners have not shown irreparable harm. "[T]he burden of removal alone cannot constitute the requisite irreparable injury." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Petitioners contend that if removed under the Proclamation, they may be sent to a "prison in El Salvador" where they assert that "they face torture." Br.54. Again, the Government does not remove aliens to countries where it believes they will be tortured. *See Munaf*, 553 at 702. Moreover, the TdA members removed by the United States are no longer in CECOT, and Petitioners' assertions that they will be sent there are speculative. Regardless, a preliminary injunction barring AEA removals would (as Petitioners have conceded) not preclude Petitioners' removal under the INA (including as designated members of a foreign terrorist organization), and the INA's

third-country removal procedures would allow for the possibility of removal to El Salvador. *See* 8 U.S.C. §§1227(a)(4)(B), 1231(b)(2).

On the other side of the balance, the Supreme Court has already "recognize[d] the significance of the Government's national security interests." *A.A.R.P.*, 605 U.S. at 96. The Government has a strong interest in the "prompt" execution of removal, *Nken*, 556 U.S. at 436, and an especially "heightened" interest where, as here, "the alien is particularly dangerous." *Id.* Petitioners "come nowhere close to clearly showing that their interests overcome the weighty interests favoring enforcement." Op.145 (Oldham, J., dissenting).

The panel majority reasoned that because Petitioners' membership in TdA has not yet been adjudicated, "we therefore cannot rely on the Government's assertion that they are members of TdA for purposes of our analysis." Op.143 That reasoning inverts the burden of proof. Petitioners—not the Government—"must make a clear showing" that they are entitled to preliminary relief. Op.145 (Oldham, J., dissenting).

Finally, a preliminary injunction in this case would stymie the President's ability to respond to the significant national-security threat imposed by TdA. An injunction in this case would thus deprive the

68

President of his chosen tool to respond to the threat posed by TdA. *See* pp. 10-12, *supra*. Such an injunction thus would "intrude[] into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and undermine the public interest.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should remand with instructions to deny the preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to Assistant Attorney General

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

JOHN W. BLAKELEY
Senior Counsel

NANCY N. SAFAVI
Senior Trial Attorney

s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney Gen.
U.S. Department of Justice
Civil Division
950 Pennsylvania Ave., N.W.
Washington D.C. 20530
(202) 514-2331
Drew.C.Ensign@usdoj.gov

Dated: December 8, 2025          Counsel for Respondents-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that Petitioners-Appellants' counsel is a registered CM/ECF user and will be served through the CM/ECF system.

s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney Gen.
U.S. Department of Justice
Civil Division
950 Pennsylvania Ave., N.W.
Washington D.C. 20530
(202) 514-2331
Drew.C.Ensign@usdoj.gov

## **BRIEF FORMAT CERTIFICATION**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that the foregoing:

(1) was prepared using 14-point Century Schoolbook font;

(2) is proportionally spaced; and

(3) contains twelve thousand, nine-hundred and ninety-nine (12,999) words.

Dated: December 8, 2025            s/ Drew C. Ensign
                                   DREW C. ENSIGN
                                   Deputy Assistant Attorney Gen.
                                   U.S. Department of Justice
                                   Civil Division
                                   950 Pennsylvania Ave., N.W.
                                   Washington D.C. 20530
                                   (202) 514-2331
                                   Drew.C.Ensign@usdoj.gov