**No. 25-10534**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

W.M.M., *on their own behalf and on behalf of others similarly situated*; F.G.M., *on their own behalf and on behalf of others similarly situated*; A.R.P., *on their own behalf and on behalf of others similarly situated*,

Petitioners-Appellants,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PAMELA BONDI, *Attorney General of the United States, in her official capacity*; KRISTI NOEM, *Secretary of the United States Department of Homeland Security, in her official capacity*; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, *Acting Director of the Director of United States Immigration and Customs Enforcement, in his official capacity*; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCO RUBIO, *Secretary of State, in his official capacity*; UNITED STATES STATE DEPARTMENT; JOSH JOHNSON, *in his official capacity as acting Dallas Field Office Director for United States Immigration and Customs Enforcement*; MARCELLO VILLEGAS, *in his official capacity as the Facility Administrator of* THE BLUEBONNET DETENTION CENTER; PHILLIP VALDEZ, *in his official capacity as Facility Administrator of* THE EDEN DETENTION CENTER; JIMMY JOHNSON, *in his/her official capacity as Facility Administrator of* THE PRAIRIELAND DETENTION CENTER; JUDITH BENNETT, *in her official capacity as Warden of the Rolling Plains Detention Center*,

Respondents-Appellees.

---

On Appeal from the United States District Court
for the Northern District of Texas

---

**SUPPLEMENTAL BRIEF *AMICUS CURIAE* OF AMERICA'S FUTURE IN SUPPORT OF RESPONDENTS-APPELLEES**

---

Rick Boyer
INTEGRITY LAW FIRM
P.O. Box 10953
Lynchburg, VA 24506

Attorneys for *Amicus Curiae*
December 15, 2025

William J. Olson*
Jeremiah L. Morgan
WILLIAM J. OLSON, P.C.
370 Maple Ave. West, Ste. 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com
*Counsel of Record

Case No. 25-10534

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

W.M.M., *et al.*,

Petitioners-Appellants,

v.

DONALD J. TRUMP, *et al.*,

Respondents-Appellees.

---

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

W.M.M, *et al.*, Petitioners-Appellants.

Donald J. Trump, President of the United States, *et al.*, Respondents-Appellees.

America's Future, *Amicus Curiae*.

William J. Olson, Jeremiah L. Morgan, and Rick Boyer are counsel for *Amicus Curiae*.

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and Fifth Circuit Rule 28.2.1, it is hereby certified that *Amicus Curiae* America's Future is a non-stock, nonprofit corporation, has no parent companies, and no person or entity owns it or any part of it.

*/s/ William J. Olson*
William J. Olson
Attorney of Record for *Amicus Curiae*

# TABLE OF CONTENTS

Page


Certificate of Interested Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Interest of the *Amicus Curiae* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. AEA Was Enacted as an Exercise of the Inherent Power of Every Nation under the Law of Nations . . . . . . . . . . . . . . . . . . 5

II. The "Law of Nations" Jurists Cited by the Framers Found Several Types of Activities to Constitute Violations of Territorial Integrity . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. Tren de Aragua's Activities Constitute an Invasion and Incursion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV. Numerous Courts Have Recognized Their Lack of Jurisdiction to Review Presidential Proclamations under the AEA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CONSTITUTION**

Article I, Section 8, Clause 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**STATUTES**

Alien Enemies Act of 1798, 50 U.S.C. § 21 . . . . . . . . . . . . . . . . . . . 1, *passim*

**CASES**

*Citizens Protective League v. Clark*, 155 F.2d 290 (1946) . . . . . . . . . . 20, 21
*Ex parte Fronklin*, 253 F. 984 (N.D. Miss. 1918) . . . . . . . . . . . . . . . . . . . 20
*Ex parte Quirin*, 317 U.S. 1 (1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
*Lockington v. Smith*, 15 F. Cas. 758 (C.C.D. Pa. 1817) . . . . . . . . . . . 21, 22
*Ludecke v. Watkins*, 335 U.S. 160 (1948). . . . . . . . . . . . . . . . . . . . . 4, 18, 20
*Miller v. United States*, 78 U.S. 268 (1871) . . . . . . . . . . . . . . . . . . . . . . . 19
*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) . . . . . . . . . . . . . . . 6
*Vaughan's Case* (1696) 91 Eng. Rep. 535; 2 Salk. 634 (K.B.) . . . . . . . . . . 10

**MISCELLANEOUS**

Annals of Congress, 5th Cong., 2nd Sess. (June 19, 1798). . . . . . . . . . . 7, 20
J. Ash, The New and Complete Dictionary of the English Language (1775) . . 12
N. Bailey, A Universal Etymological English Dictionary (25th ed. 1783). . . . 12
Emer de Vattel, The Law of Nations (J. Newbery *et al.* eds., 1760)
(1758) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 14
Hugo Grotius, The Rights of War and Peace (Richard Tuck ed., 2005)
(John Morrice trans., 1738) (1625) . . . . . . . . . . . . . . . . . . . . . 10, 11, 13
T. Halperin, "Immigrants and the Alien and Sedition Acts of 1798,"
Gilderman Lehrman Institute of American History (Fall 2018) . . . . . . 6
A. Lenner, "Separate Spheres: Republican Constitutionalism in the
Federalist Era," 41 AM. J. OF LEGAL HIST. 250 (Apr. 1997) . . . . . . 7, 8
A. McLaughlin, A Constitutional History of the United States (D. Appleton
Century Company: 1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
R. Natelson and A. Hyman, "The Constitution, Invasion, Immigration,
and the War Powers of States," 13 BRIT. J. AM. LEGAL STUD. 1
(2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-13
T. Sheridan, A Complete Dictionary of the English Language (2d ed. 1789). . 13

J.G. Sidak, "War, Liberty, and Enemy Aliens," 67 N.Y.U. L. REV. 1402 (1992) . . . . . . . . . . 17

"Supplemental Brief of the United States in support of the plenary power of congress over alien enemies, and the constitutionality of the Alien Enemy Act," (1918) . . . . . . . . . . 7, 8, 9, 22-25

## INTEREST OF THE *AMICUS CURIAE*[1]

*Amicus curiae* America's Future is a nonprofit organization, exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code. It participates actively in the public policy process, and has filed numerous *amicus curiae* briefs in federal and state courts, defending U.S. citizens' rights against government overreach. America's Future has filed many *amicus* briefs on the President's power with respect to borders and immigration.

## STATEMENT OF THE CASE

On March 14, 2025, President Trump issued a Proclamation pursuant to the Alien Enemies Act of 1798 ("AEA"), stating: "all Venezuelan citizens 14 years of age or older who are members of TdA [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be … removed as Alien Enemies."

The current case involves two consolidated cases from the Northern District of Texas, *A.A.R.P. v. Trump* and *W.M.M. v. Trump*. Both cases involve Venezuelan citizens detained by the government and potentially subject to

[1] It is hereby certified that all parties consented to the filing of this *amicus curiae* brief; that no counsel for a party authored this brief in whole or in part; and that no person other than this *amicus curiae*, its members, or its counsel made a monetary contribution to its preparation or submission.

deportation under the Proclamation, seeking determinations that their removal pursuant to the AEA would be unlawful. *A.A.R.P. v. Trump*, 778 F. Supp. 3d 882, 883-84 (N.D. Tex. 2025) ("*A.A.R.P. I*")

On April 17, 2025, the district court denied Petitioners' motions for a temporary restraining order in both cases. The district court believed that after *Trump v. J.G.G.*, 604 U.S. 670 (Apr. 7, 2025), the government was required to provide the Petitioners notice of any proposed deportation and allow for judicial review before doing so. Accordingly, the Petitioners could not show immediate irreparable harm. *A.A.R.P. I* at 886.

Petitioners then sought a "temporary administrative stay and an injunction pending appeal" in the district court, advising that if the district court did not respond within 42 minutes, they would consider the inaction a denial of their motion. When the district court did not act within 42 minutes, Petitioners appealed to this Court. The following day, April 18, 2025, this Court denied the appeal as "premature" for lack of jurisdiction, because Petitioners "should have litigated these concerns before the district court…." *A.A.R.P. v. Trump,* 2025 U.S. App. LEXIS 9432 (5th Cir. Apr. 18, 2025) ("*A.A.R.P. II*").

Shortly after midnight on April 19, 2025, the Supreme Court enjoined the government from removing "any member of the putative class of detainees from

the United States until further order of this Court." *A.A.R.P. v. Trump*, 145 S. Ct. 1034 (Apr. 19, 2025) ("*A.A.R.P. III*").

On May 16, 2025, the Supreme Court considered Petitioners' petition for temporary injunction and ruled that the Fifth Circuit was in error in dismissing for lack of jurisdiction, stating that "[a]ppellate courts have jurisdiction to review interlocutory orders that have the practical effect of refusing an injunction." *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) ("*A.A.R.P. IV*") (internal quotation omitted). The Supreme Court ruled that alien detainees have the right to due process to contest their removal, and that 24 hours is not sufficient notice. *Id.* at 95. The Court again granted classwide relief to all members of the putative class. *Id.* at 99.

On remand, a panel of this Court concluded that "the [President's] findings do not support that an invasion or a predatory incursion has occurred. We therefore conclude that petitioners are likely to prove that the AEA was improperly invoked." *W.M.M. v. Trump*, 154 F.4th 207, 229 (5th Cir., Sept. 2, 2025) ("*W.M.M. I*"). This Court then found that the risk of improper removal constituted irreparable harm, and applied the finding to Petitioners and the putative class. *Id.* at 233.

Finally, on September 30, 2025, this Court granted the government's motion to rehear the case *en banc*. *W.M.M. v. Trump*, 154 F.4th 319 (5th Cir. 2025) ("*W.M.M. II*").

## ARGUMENT

The points made by the government and Judge Oldham in his dissent are strengthened when the historical roots of the AEA are examined, as presented here. The panel focused on the fact that the AEA has previously been utilized during wartime, thus asserting that AEA should not apply now. Limiting the scope of the law to its prior applications ignores the original purpose of the law and why Congress granted the President discretion "as unlimited as the legislature could make it." *Ludecke v. Watkins*, 335 U.S. 160, 164 (1948). Congress enacted AEA pursuant to the inherent power of any nation, sourced in the Law of Nations, to defend the nation by expelling enemy aliens found within U.S. borders in several circumstances not limited to wartime.

This power is not unmoored from constitutionally enumerated powers. Article I, Section 8, Clause 10 provides that "[t]he Congress shall have Power … [t]o define and punish … Offences against the Law of Nations." The Law of Nations allows every nation to defend its sovereign territory against any act of defiance of its territorial integrity through the deportation of enemy aliens native

to the country from which the hostile action originated, not limited to declared wars. When the AEA is properly invoked, there is no role for the judiciary to play. This *amicus* examines the writings by scholars of the Law of Nations that informed the views of the framers of both the Constitution and the AEA.

## I. AEA WAS ENACTED AS AN EXERCISE OF THE INHERENT POWER OF EVERY NATION UNDER THE LAW OF NATIONS.

The government ably points out that AEA, as set out in 50 U.S.C. § 21, contains a series of disjunctive grants of power to the President. *See* Government Supplemental Brief at 41. In summary, the President is authorized to remove alien enemies:

> in cases of
> (a) declared war, **or**
> (b) perpetrated invasion, **or**
> (c) attempted invasion, **or**
> (d) threatened invasion, **or**
> (e) perpetrated predatory incursion, **or**
> (f) attempted predatory incursion, **or**
> (g) threatened predatory incursion.

Regardless of which of those disjunctive triggers applies, the President's power is the same.

The panel began its historical review from the date AEA was enacted, largely ignoring the historical circumstances which the AEA was designed to address. The AEA was one of four bills, collectively known as the Alien and

Sedition Acts: the AEA, the Naturalization Act, the Alien Friends Act ("AFA"), and the Sedition Act.[2] The Sedition Act and the AFA raised a storm of protest.[3] "Although the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history." *New York Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964).

The AFA permitted the President to "order all such aliens as he shall judge dangerous to the peace and safety of the United States, or shall have reasonable grounds to suspect are concerned in any treasonable or secret machinations against the government thereof, to depart out of the territory of the United States." *W.M.M. I* at 226 (quoting AFA § 1, 1 STAT. at 571). The AFA applied to any alien, during war or peace, and regardless of whether his citizenship lay in a country friendly to the United States, or hostile. Thomas Jefferson and James Madison penned the Kentucky and Virginia Resolutions in response. A wave of popular fury swept President John Adams' Federalist Party out of power two years later, propelling Jefferson and his Democratic-Republican Party to power, which allowed the AFA and the Sedition Act to expire. *Id.*

---

[2] *See W.M.M. I* at 226.

[3] T. Halperin, "Immigrants and the Alien and Sedition Acts of 1798," Gilderman Lehrman Institute of American History (Fall 2018).

The AEA was not controversial at the time and remains in effect to this day, largely unaltered since 1798. During debate in the House, Representative Albert Gallatin, himself an immigrant and "the unofficial spokesman of Republicans in the U.S. House of Representatives," argued **against the AFA**,[4] while at the same time arguing **in favor of the AEA**. "The authority to pass the Alien Enemies Bill, he confidently declared, was derived from '**a principle which existed prior to the Constitution**'" — the Law of Nations. *Id.* (emphasis added).

> Although Congress has not the power to remove alien friends, it can not be inferred that it had not the power to remove alien enemies — this last authority resulted from the power to make all laws necessary to carry into effect one of the specific powers given by the Constitution.... By virtue of that power, and in order to carry it into effect, **Congress could dispose of the persons and property of alien enemies as it thinks fit, provided it be according to the laws of nations and to treaties.** [Annals of Congress, 5th Cong., 2nd Sess., at 1980 (June 19, 1798) (emphasis added).[5]]

Madison made the same key distinction. In his "Report of 1800," Madison "argued that the distinction between alien enemies and alien friends is a

---

[4] A. Lenner, "Separate Spheres: Republican Constitutionalism in the Federalist Era," 41 AM. J. OF LEGAL HIST. 250 (Apr. 1997) (hereinafter "Lenner").

[5] Quoted in "Supplemental Brief of the United States in support of the plenary power of congress over alien enemies, and the constitutionality of the Alien Enemy Act," at 40 (1918) (hereinafter "Gregory Brief").

clear and conclusive one. '**Alien enemies**,' he wrote, 'are **under the law of nations**, and are liable to be punished for offenses against it. **Alien friends** … are **under the municipal law**, and must be tried according to that law only.'" Lenner at 267 (emphasis added). In short, the court below erroneously evaluated the President's Proclamation under municipal law rather than under the law of nations.

John Taylor, serving in the Virginia House of Delegates in 1789, soon to be appointed to the U.S. Senate in 1792, "echoed these sentiments. The alien enemy laws of both the United States and Virginia, he argued, 'were found to be usage of all nations.'" *Id.*

In a 1918 brief, Attorney General Thomas Gregory detailed numerous statements from Framers outlining the broad powers of Congress and the President to remove enemy aliens. Gregory noted that "[t]hroughout the debate [over the AEA] it was stated to be the purpose of the resolution to vest in the President the power to remove and restrain alien enemies."[6] Gregory noted that Representative Harrison Otis of Massachusetts argued that "an army of soldiers would not be so dangerous to the country as an army of spies and incendiaries

[6] Gregory Brief at 10.

scattered through the continent." *Id.* at 8. Otis added, "When an enemy authorized hostilities, that was the time to take up that crowd of spies and inflammatory agents which overspread the country like the locusts of Egypt, and who were continually attacking our liberties." *Id.* at 10.

As with Venezuela, war was never declared against France, nor did the French military ever invade. But the AEA was designed to address enemy aliens on U.S. soil before any war or invasion occurred. Otis argued that "[i]t would be best to vest a discretionary power in the Executive to secure and take care that these men should do no injury. And this could not be looked upon as a dangerous or exorbitant power, since the President would have the power, the moment war was declared, to apprehend the whole of these people as enemies, and make them prisoners of war." *Id.* at 15-16.

## II. THE "LAW OF NATIONS" JURISTS CITED BY THE FRAMERS FOUND SEVERAL TYPES OF ACTIVITIES TO CONSTITUTE VIOLATIONS OF TERRITORIAL INTEGRITY.

Professor Robert Natelson and Andrew Hyman have meticulously detailed the Law of Nations scholars to whom the Framers looked for authority on international law. These scholars were clear that "incursions" and "invasions" allowed alien enemies to be expelled without declared war. The acts by Tren de

Aragua described in President Trump's proclamation plainly count as both incursions and invasions, and indeed, likely as war.

The term "war" had a broad meaning in 1791 and 1798:

> Hugo Grotius defined **war** as "the State or Situation of those . . . who Dispute by Force of Arms."[7] Emer de Vattel described it as "that state in which a nation prosecutes its right by force."[8] For a state of **war** to exist, actual fighting was not necessary.[9] [R. Natelson and A. Hyman, "The Constitution, Invasion, Immigration, and the War Powers of States," 13 BRIT. J. AM. LEGAL STUD. 1 (2024) (hereinafter "Natelson") (emphasis added).]

At that time, "[w]ars were classified as private, public, or mixed." *Id.* at 5. Grotius held that "[m]ixed war is that which is made on one Side by publick Authority, and on the other by mere private Persons."[10] German natural law philosopher Samuel Pufendorf "used the term 'less solemn war' to denote either an undeclared war or one against private persons, as in defending against the '**Incursion** or Depredation **of Robbers**.'"[11] "Mixed war was a clash between a

---

[7] Quoting I Hugo Grotius, The Rights of War and Peace at 134 (Richard Tuck ed., 2005) (John Morrice trans., 1738) (1625) (hereinafter "Grotius").

[8] Quoting II Emer de Vattel, The Law of Nations at 1 (J. Newbery *et al.* eds., 1760) (1758) (hereinafter "Vattel").

[9] I Grotius at 134; *Vaughan's Case* (1696) 91 Eng. Rep. 535, 536; 2 Salk. 634, 635 (K.B.) (asserting that a state of war does not require actual fighting).

[10] I Grotius at 240.

[11] Natelson at 6, n.19 (quoting Samuel Pufendorf, Of the Law of Nature and Nations at 839-40 (Basil Kennett trans., 1739) (1672)) (emphasis added).

sovereign and private persons[12] such as international criminals of the kind denominated 'enemies of the human race.'" Natelson at 5-6. These "included pirates (defined in eighteenth century dictionaries as 'sea robbers' and other thieves; … assassins, and incendiaries;[13] those who participated in combat merely for depredation;[14] and foreigners who were 'unauthorized voluntiers [sic] in violence.'"[15] Natelson at 9.

As Natelson argues, "[m]odern analogues include international freelance terrorists and international criminal organizations, such as the Mexican drug and human trafficking cartels." *Id.* at 9-10. Here, according to the President's Proclamation, they include the brutal international gangs of Tren de Aragua as well.

The panel accepted two dictionary definitions of "invasion" proffered by Plaintiffs. *W.M.M. I* at 221. But only one of those two even mentions an army

---

[12] Quoting I Grotius at 250 ("But a publick War not Solemn, may be made both without any Formality, and against mere private Persons, and by the Authority of any Magistrate whatever").

[13] Quoting I Vattel at 99.

[14] Quoting III Vattel at 26 ("A nation attacked by such sort of enemies is not under any obligation to observe towards them the rules of wars in form. It may treat them as robbers.").

[15] Quoting I William Blackstone, Commentaries on the Laws of England at *249 ("[U]nauthorized voluntiers [sic] in violence are not ranked among open enemies, but are treated like pirates and robbers….")

or military forces; the other reads, "[h]ostile entrance upon the rights or possessions of another; hostile encroachment." *Id.* This definition requires neither a breach of national borders nor the necessity of invasion by a formal military force or a declared war. Natelson and Hyman studied 13 dictionaries from the Founding era. "Among the thirteen Founding-era English dictionaries we examined, only one seemed to limit 'invasion' and its variants to formal military operations." Natelson at 20. One dictionary defined "invade" as "To enter with hostile intentions, to attack a country, to assault, to assail, **to encroach on another's right or property**...."[16] Another defined "invade" as "to attack or set upon … Invasion: a descent upon a country, an usurpation, or encroachment."[17] Another defined "invasion" as "Hostile entrance upon the rights or possessions of another, hostile encroachment.... Encroachment: An unlawful gathering in upon another man; advance into the territories or rights of another.... Invade: To attack a country, to make a hostile entrance; to assail, to

[16] J. Ash, The New and Complete Dictionary of the English Language (1775) (emphasis added).

[17] N. Bailey, A Universal Etymological English Dictionary (25th ed. 1783).

assault."[18] The others mention military invasions, but include non-military uses of the term as well.

Likewise, in Federalist 41, Madison references the need for a U.S. Navy to provide protection along the seacoast from "daring and sudden invaders" as well as "predatory … licentious adventurers" and "rapacious … pirates and barbarians." Grotius also referred to pirates as "invaders."[19]

As Natelson notes, the Constitution never "limit[ed] invasions to large-scale incursions." Natelson at 24. Indeed, during ratification debates, some criticized the Constitution for giving too broad a power to the federal government specifically without requiring that it could only be used against militarily significant invasions.

Neither did an "invasion" require large numbers. In 1942, the Supreme Court referred to eight Nazi saboteurs captured in New York as "enemy invaders." *Ex parte Quirin*, 317 U.S. 1, 47 (1942).

Vattel, indeed, held that even entry into a sovereign nation under arms in pursuit of an escaped criminal, without permission, could be treated as an invasion of territory and an act of war:

---

[18] T. Sheridan, A Complete Dictionary of the English Language (2d ed. 1789).

[19] II Grotius at 735 ("Pirates, or any other Invaders").

> We cannot, then, without doing an injury to a state, enter its territories with force and arms and in pursuit of a criminal, and take him from thence. This would at once be a violation of the safety of the state, and a trespass on the rights … vested in the sovereign. This is what is called a violation of territory; and among nations, there is nothing more generally acknowledged as an injury that ought to be vigorously repelled.[20]

He added, "If a sovereign, who might keep his subjects within the rules of justice and peace, suffers them to injure a foreign nation either in its body or its members, he does no less injury to that nation, than if he injured it himself."[21] "Finally, there is another case where the nation in general is guilty of the crimes of its members. That is when by its manners and by the maxims of its government it accustoms and authorizes its citizens … to make inroads into neighboring countries."[22]

These are all violations of the Law of Nations, Vattel holds, with or without a military invasion.

---

[20] E. Vattel, The Law of Nations at 257, J. Chitty, trans. (Lawbook Exchange: 2005).

[21] *Id.* at 246.

[22] *Id.* at 248.

## III. TREN DE ARAGUA'S ACTIVITIES CONSTITUTE AN INVASION AND INCURSION.

Tren de Aragua's atrocities are described in detail in Judge Oldham's dissent. By any Law of Nations measure, the malignant penetration by TdA now metastasizing across America qualifies as invasion and incursion. *See W.M.M. I* at 250-251 (Oldham, J., dissenting) ("Consider one notable incident by way of example. Shortly before President Trump took office, Venezuelan TdA members took over an apartment complex in Aurora, Colorado. They kidnapped and tortured two innocent people…. This apartment complex was 'one of three troubled apartment complexes' in Aurora 'that the owners have claimed were taken over by TdA.' … The City's efforts to shut down these complexes appear to have been unsuccessful. All that has happened is that the City has 'pushed' TdA 'further into other properties.' … And 'Aurora residents who live near the apartment complexes overtaken by the Venezuelan gang have been desperate' for someone 'to respond and address the growing crisis.'" (Internal citations omitted)). The dissent points out that similar violent attacks have occurred across the Nation:

- San Antonio, Texas;
- Miami, Florida:

- Raleigh, North Carolina;
- Cobb County, Georgia;
- Athens, Georgia.

TdA's hostilities have extended beyond purely civilian targets.

"As a result, local authorities have lamented that TdA 'is a transnational gang unlike we have ever seen before.... [T]hey are more dangerous, more violent and more organized than MS-13.' Brambila, *supra; see also Texas*, 144 F.4th at 691 (Oldham, J., dissenting) (describing the dangers MS-13 poses)." *W.M.M. I* at 251.

The dissent explained:

> TdA is not just some gang: It is deeply intertwined with the sovereign nation of Venezuela. TdA has "infiltrated" Venezuela's "military and law enforcement."... And it has taken "ever-greater control" over the "territories" of "Venezuelan national and local authorities." *Ibid*. "The result is" that Venezuela, as intertwined with TdA, has become "a hybrid criminal state." *Ibid*. [*Id*.]

## IV. NUMEROUS COURTS HAVE RECOGNIZED THEIR LACK OF JURISDICTION TO REVIEW PRESIDENTIAL PROCLAMATIONS UNDER THE AEA.

The government's position is that the judicial role is narrow, limited to providing "highly deferential and limited judicial review." Supp. Br. of Resp. at 1. However, based on the historical record, the better view is that once the Act

is correctly invoked, no court has any authority whatsoever to limit, supervise, or otherwise constrain the powers granted to the President in removing alien enemies. Also, alien enemies being removed have no entitlement to any type of hearing, notice, or any other type of due process, giving the court no protective role to play.

Professor Sidak correctly described the AEA as "[o]ne of the most sweeping delegations of power to the President to be found anywhere in [federal law]."[23] He notes that "[t]he Alien Enemy Act is a harsh statute aimed at a difficult problem, a statute whose execution by the President has the potential seriously to infringe upon individual liberty in the United States during wartime." *Id.* at 1424. However, he concedes, "[t]he mechanism for controlling that risk to liberty is neither judicial review nor congressional oversight once the delegation of emergency powers to the President has occurred." *Id.*

In his work A Constitutional History of the United States, written in 1935, Andrew McLaughlin did not find the President's broad power under the AEA problematic:

---

[23] J.G. Sidak, "War, Liberty, and Enemy Aliens," 67 N.Y.U. L. REV. 1402, 1407 (1992).

> The Alien Enemies Act likewise does not demand much attention. There can be no doubt of the right of Congress to authorize the president to take such steps as seem necessary to protect the country against the machinations of enemies.... It is true, he might act tyrannically and might abuse his power. Possibly we might criticize the act because no provision was made for the proper protection of those persons who were alleged to be enemy aliens but asserted they were citizens; but on the face of the act itself one cannot find the assignment of unconstitutional authority.[24]

As Justice Frankfurter wrote for the Court: "[t]he Act is almost as old as the Constitution, and it would savor of doctrinaire audacity now to find the statute offensive to some emanation of the Bill of Rights." *Ludecke v. Watkins* at 171.

> The very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of his discretion. This view was expressed by Mr. Justice Iredell shortly after the Act was passed … and **every judge** before whom the question has since come **has held that the statute barred judicial review**. [*Id.* at 164-65 (emphasis added).]

This Court noted, "Such great war powers may be abused, no doubt, but **that is a bad reason for having judges supervise their exercise**, **whatever the legal formulas** within which such supervision would nominally be confined." *Id.* at 172 (emphasis added). Notably, in 1948, the Court was still looking to "war

[24] A. McLaughlin, A Constitutional History of the United States at 267 (D. Appleton Century Company: 1935).

powers," which are derived not from the Constitution, but from the Law of Nations.

In 1871, Justice Field explained that war powers were subject only to the limitations of the law of nations applicable to the conduct of war, and not subject to the limitations in the Constitution:

> [I]t is evident that legislation founded upon the **war powers** of the government, and directed against the public enemies of the United States, is subject to **different considerations and limitations** from those applicable to legislation founded upon the **municipal power** of the government and directed against criminals. Legislation in the former case is **subject to no limitations, except such as are imposed by the law of nations in the conduct of war**. Legislation in the latter case is subject to all the **limitations prescribed by the Constitution for the protection of the citizen** against hasty and indiscriminate accusation, and which insure to him, when accused, a speedy and public trial by a jury of his peers. [*Miller v. United States*, 78 U.S. 268, 315 (1871) (Field, J., dissenting) (emphasis added).]

He continued:

> **The war powers of the government have no express limitation in the Constitution**, and the only limitation to which their exercise is subject is the law of nations.... [I]t is in the light of that law [of nations] that the war powers of the government must be considered.... The plain reason of this is, that the rules and limitations prescribed by that law were in the contemplation of the parties who framed and the people who adopted the Constitution. [*Id*. at 315-16 (Field, J., dissenting) (emphasis added).]

Likewise, the Law of Nations was "in the contemplation" of the Congress that adopted the AEA. Indeed, the language Justice Field's dissent is strikingly similar to that of Congressman Gallatin in his speech supporting passage of the AEA, that "Congress could dispose of the persons and property of alien enemies as it thinks fit, **provided it be according to the laws of nations** and to treaties." Annals of Congress, 5th Cong., 2nd Sess., at 1980 (June 19, 1798) (emphasis added).

Not just the *Ludecke* Court, but numerous other courts as well, have recognized the same lack of jurisdiction. In 1918, a federal district court stated that the courts had no role in second guessing the President in such matters.

> [T]he discretion is vested in the President to determine the manner and degree of restraint to which alien enemies shall be subjected.... [T]he only question … is whether he is a citizen of the United States or is a German alien enemy.... I am convinced that the petitioner was born in Hamburg, Germany, and is a **German alien enemy**.... I do **not** think this action of the President, exercised in the manner provided by law, is **subject to review by the courts**. [*Ex parte Fronklin*, 253 F. 984, 984-85 (N.D. Miss. 1918) (emphasis added).]

In 1946, the D.C. Circuit ruled, "[t]he Alien Enemy Act is constitutional, both as an exercise of power conferred upon the Federal Government and as a grant of power by the Congress to the President." *Citizens Protective League v. Clark*, 155 F.2d 290, 293 (1946).

> [T]he members of Congress who vigorously fought the Alien [Friends] Act saw no objection to the Alien Enemy Act….
>
> The courts, in an unbroken line of cases … have asserted or assumed the validity of the Act…. The judicial view has been without dissent. **At common law "alien enemies have no rights**, no privileges, unless by the king's special favour, during the time of war."… **Unreviewable power in the President** to restrain, and to provide for the **removal** of, alien enemies in time of war **is the essence of the Act**….
>
> [I]t is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs. [*Id.* at 293-94 (internal quotations omitted) (emphasis added).]

While the court in 1946 was focused on World War II, the AEA does not have different levels of deference the courts owe the President based on whether the proclamation deals with a "war," or merely a "predatory incursion," or "invasion."

Judge Oldham's dissent noted that the distinguished jurist Justice Bushrod Washington also wrote of the unreviewable nature of presidential proclamations under the AEA:

> [The President] alone is authorised to direct the conduct to be observed on the part of the United States towards such alien enemies, … and to provide for the removal of those whom he should not permit to remain in the United States … and, **to avoid all doubt as to the extent of his power, he is authorised in general and unqualified terms, to establish any regulations which he should think necessary** in the premises, and for the public safety.

> [*Lockington v. Smith*, 15 F. Cas. 758, 760 (C.C.D. Pa. 1817) (Washington, J.) (emphasis added).]

In his 1918 brief in support of the constitutionality of the AEA, Attorney General Thomas Gregory argued:

> One of the measures of protection found by every nation to be most necessary in time of war is the guarding against internal enemies whose operations are more insidious, and therefore, more dangerous to the common weal, in many cases, than are the active maneuvers of military forces. The very presence of enemy subjects in the land may constitute a potentiality of danger which must be guarded against, even before such persons become an active danger…. An army of spies, incendiaries, and propagandists may be more dangerous than an army of soldiers.[25]

Gregory's brief touted the plenary power of Congress over enemy aliens, rather than the delegation to and exercise of that plenary power by the President under the AEA, but the arguments are parallel. Gregory argued:

> The power of Congress over the persons and property of alien enemies resident in the United States in time of war is plenary and uncontrolled; it is derived from the power of Congress under the Constitution to declare war … as well **as from the power residing in the sovereign Nation** under the common law and **under the law of nations**. [*Id.* at 5 (emphasis added).]

He added, "[t]he exercise by Congress of its war powers with reference to resident alien enemies is not so restricted by the due process clause of the fifth

[25] Gregory brief at 40.

amendment as to entitle an alien enemy to recourse to the courts in time of war…. Due process of law, under the common law, gave to a resident alien enemy no rights which he could maintain in the courts. He had no rights or privileges except such as arose from a license or other form of protection which the sovereign chose to grant….” *Id.* at 5-6.

Gregory argued that “[i]t would entirely neutralize the effect of the statute to impose upon the exercise of a power so necessary to the effective administration of the statute any restrictions such as right to a hearing before the courts or other official.” *Id*. at 42.

Gregory spends a good deal of time reviewing the *Lockington* case in the Supreme Court of Pennsylvania, before it was transferred to Justice Washington’s review in federal court. In the state court’s *Lockington* case, Pennsylvania Chief Justice Tilghman wrote:

> The President, being best acquainted with the danger to be apprehended, is best able to judge of the emergency which might render such measures necessary…. It is certain, that these powers create a most extensive influence, which is subject to great abuse: but **that was a matter for the consideration of those who made the law, and must have no weight with the judge who expounds it.** [Gregory brief at 31 (emphasis added).]
>
> Judge Brackenridge concurred:

> By this act, entitled "An act respecting alien enemies," the President would seem to be constituted, as to this description of persons, with the power of a Roman dictator or consul, in extraordinary cases, when the Republic was in danger, that it sustain no damage.… Alien enemies remaining in our country after a declaration of war are to be treated according to the law of nations, and it has been so argued in this case. Shall then the judicial power constitute itself a judge between the Executive of the General Government and the nation with whom we are at war, and say whether the proceeding in the case of their subjects remaining in our country has been according to the law of nations? [*Id.* at 34.]

"Further," Gregory notes, "Mr. Justice Story cited the statute in *Brown* v. *United States* (1814), 8 Cranch, 110, evidently without any doubt as to its constitutionality. So did Kent, C. J., in *Clarke* v. *Morey* (1813) … 69, 71. We thus have four justices of the United States Supreme Court (Marshall, Washington, Iredell, and Story) and James Kent giving expressions of opinion on the statute without any intimation of doubt as to its constitutionality." Gregory Brief at 38-39.

Gregory cites a number of commentaries in defense of the constitutionality of the AEA:

> Rawle's View of the Constitution (1825), which was the earliest American book on constitutional law, says, page 87: "Thus if war should break out between the United States and the country of which the alien resident among us is a citizen or subject, he becomes on general principles an alien enemy, and is liable to be sent out of the country at the pleasure of the General Government … and in these respects no State can interfere to protect him." See also Kent's

> Commentaries (1829), Volume I, pages 56-59; Story's Commentaries on the Constitution (1885), section 1177 (see also note in Cooley's Edition); Dana's Wheaton's International Law (1866), section 304 and note; Halleck's International Law, page 815; Woolsey's International Law (1867), section 118. [*Id*. at 51.]

Gregory argues by analogy that the other war powers given to Congress in the Constitution are not textually subjected to judicial review. "The Constitution confers upon Congress expressly power to declare war, grant letters of marque, and reprisal, and make rules respecting captures on land and water. Upon the exercise of these powers no restrictions are imposed." *Id.* at 53. Likewise with the AEA.

The AEA makes no distinction between the plenary powers of the President in wartime, and the plenary powers of the President to address "invasions" and "predatory incursions" not involving organized national military forces. There is no constitutional warrant for any court to create that distinction.

## CONCLUSION

For the foregoing reasons, the Court should remand with instructions to deny the preliminary injunction.

Respectfully submitted,

Rick Boyer
INTEGRITY LAW FIRM
P.O. Box 10953
Lynchburg, VA 24506

William J. Olson*
Jeremiah L. Morgan
WILLIAM J. OLSON, P.C.
370 Maple Avenue West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
Fax (703) 356-5085
wjo@mindspring.com
*Counsel of Record

December 15, 2025

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Supplemental Brief *Amicus Curiae* of America's Future in Support of Respondents-Appellees, was made, this 15th day of December, 2025, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

*/s/ William J. Olson*
William J. Olson
Attorney for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1. That the foregoing Supplemental Brief *Amicus Curiae* of America's Future in Support of Respondents-Appellees complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,761 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as well as Circuit Rule 32.1, because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point CG Times.

*/s/ William J. Olson*
William J. Olson
Attorney for *Amicus Curiae*
Dated: December 15, 2025